UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
JOHN D. CERQUEIRA, )
 )
    Plaintiff, )
 )
    v. )
 )   CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC., )
 )
    Defendant. )
_____)

### AMERICAN AIRLINES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

American Airlines, Inc. ("AA") requests that this Court enter summary judgment in its favor on all counts of the plaintiff's Amended Complaint because the plaintiff has no evidence that would allow a reasonable factfinder to conclude that AA and its employees discriminated intentionally against the plaintiff as required under the state and federal statutes through which he brings his causes of action. Moreover, the plaintiff cannot demonstrate that the actions of the Captain, or of any other AA employee, were arbitrary and capricious as required under federal law and consistent with his obligations under the statutes pursuant to which he brings his claims. Finally, the Airline Deregulation Act precludes plaintiff's claims, as Congress did not intend to bestow passengers with rights to sue airlines for decisions arising out of the airlines' legitimate business interests, like the safety of their passengers.

I.    THE UNDISPUTED FACTS

On December 28, 2003, plaintiff John D. Cerqueira was scheduled to fly from Boston to Fort Lauderdale, Florida on American Airlines Flight 2237. (*See* American Airlines, Inc.'s Statement of Undisputed Facts in Support of its Motion for Summary Judgment, hereinafter "SOF" at ¶1).

According to the plaintiff, he arrived at the airport early on the morning of his flight. He proceeded through security and arrived at the gate at approximately 5 a.m. (SOF at ¶2). He hoped to have his seat reassigned to an exit row at the gate. (SOF at ¶3). When a person who appeared to him to be an AA employee arrived at the gate ticket counter, he approached her. (SOF at ¶4).

The person whom he approached at the gate ticket counter was Sally Walling, an AA flight attendant with 37 years of experience on the job. (SOF at ¶5). In spite of the fact that the plaintiff flies on a regular basis, he was not aware that he was approaching a flight attendant, who could not assist him with a seat assignment, rather than a gate agent. (SOF at ¶6). When he approached Ms. Walling, Ms. Walling informed the plaintiff that she was not the gate agent, that she could not assist him, and that he should wait in the seats near the gate ticket counter for someone who could. (SOF at ¶7). In spite of her request, he lingered near the ticket counter for an extended period of time. (SOF at ¶8). Ms. Walling characterized his demeanor and tone as "hostile and insistent." (SOF at ¶9).

After this encounter, Ms. Walling boarded the plane to perform her pre-flight assignments. (SOF at ¶10). During pre-flight, before any other coach passenger had boarded (and indeed before many first class passengers had boarded), Ms. Walling observed the plaintiff board; she saw him proceed almost immediately to the lavatory in the rear of the aircraft. The plaintiff remained in the aircraft lavatory for several minutes before returning to his seat. (SOF at ¶11).

Shortly thereafter, Ms. Walling went to the galley area of the plane to prepare it for service. She was approached by two passengers, who told her that they felt "uneasy and uncomfortable" with the gentlemen seated in the exit row. The two passengers stated that these gentlemen were "saying uneasy things to them." (SOF at ¶12). Ms. Walling then went to observe the gentlemen

of whom the passengers complained, and found that all three men seated in the exit row, seats 20D, E and F, appeared to be asleep. Ms. Walling found their behavior "unusual" under the circumstances. (SOF at ¶13).

Before the pilot of the flight, Captain John Ehlers (who had at that time approximately 20 years of commercial aviation experience) boarded the flight, he was approached in the gate area by two gentlemen, one of whom wore a ponytail and asked him if he was the captain for the flight to Fort Lauderdale. (SOF at ¶14). Upon hearing that Captain Ehlers was the captain for that flight, the man with the ponytail responded, "That's good. I'm going with you. We're going to have a good trip today." (SOF at ¶15). According to Captain Ehlers, that was the first time in almost twenty years of commercial flying that a passenger had made such a comment to him. (SOF at ¶16).

Once some passengers had boarded, flight attendant Lois Sargent began the safety briefing for those seated in Row 20, the exit row. (SOF at ¶17). The plaintiff was seated in seat F of that row. (SOF at ¶18). Ms. Sargent observed the two gentlemen seated next to the plaintiff (in seats D and E) making strange comments and laughing inappropriately during the safety briefing. She further observed the plaintiff laughing at the comments made by the two gentlemen seated next to him. (SOF at ¶19). According to Ms. Sargent, the behavior of the gentlemen seated in seats D and E of the exit row did not comport with that of typical customers during a routine safety briefing. (SOF at ¶20). After Ms. Sargent had concluded the briefing, Ms. Walling commented to Ms. Sargent and to Captain Elhers that the gentlemen in seats 20D and E had been heard making odd remarks, such as repeatedly wishing complete strangers "Happy New Year." (SOF at ¶21).

Around that time, Ms. Walling and Captain Ehlers spoke, sharing their observations about the unusual behavior exhibited by several passengers. (SOF at ¶22). Based on the comments made to him in the gate area and during the boarding process, Captain Ehlers asked Ms. Walling to check on a passenger with a ponytail; Ms. Walling did, and found that the passenger to whom Captain Ehlers was referring was seated next to the plaintiff. She reported back to Captain Ehlers and informed him that the passenger who had boarded early and spent time in the lavatory was seated next to the gentleman with the ponytail. (SOF at ¶23).

Based on the totality of unusual circumstances with which the crew had been presented before and during the boarding process, Captain Ehlers decided to consult with Systems Operations. (SOF at ¶24). Prior to contacting Systems Operations, Captain Ehlers had no interaction with the plaintiff at any time. (SOF at ¶25). At the time that he made the decision to request assistance from Systems Operations with regard to the passengers in seats 20D, E and F of Flight 2337, Captain Ehlers did not have any knowledge of Mr. Cerqueira's appearance, or his actual or perceived race, ethnicity or religion. (SOF at ¶26).

Based on the information available, AA made the decision to remove those passengers from the flight for questioning. This decision was made by Systems Operations in consultation with Captain Ehlers and the Massachusetts State Police in Boston. (SOF at ¶27). The Corporate Complaint Resolution Officer ("CCRO") and the System Operations Control Manager on Duty ("SOC MOD"), the two ground control officers in charge of determining if passengers should be removed for questioning, had no knowledge of the plaintiff's appearance or actual or perceived race, ethnicity or religion on December 28, 2003. (SOF at ¶28).

Subsequent to the removal of the passengers in seats 20D, E and F, a passenger informed the flight crew that one of those passengers had a prohibited object removed from him during the

4

security screening process. (SOF at ¶29). In light of that assertion and the lengthy period of time spent by the plaintiff in the lavatory, the State Police removed the remaining passengers and luggage from the aircraft for security re-screening and had dogs search the airplane. (SOF at ¶30). The State Police then informed Captain Ehlers that the three removed passengers would not be traveling with him that day. (SOF at ¶31). Given the circumstances and information available as well as the communication from the State Police, Systems Operations made the determination that AA would not rebook the three passengers removed from the flight, including the plaintiff, for further travel that day. (SOF at ¶32).

As a result of these events, the plaintiff filed suit against AA, claiming that its decision to remove him from the flight in question and to preclude him from further travel on that day violates 42 U.S.C. §1981, 42 U.S.C. § 2000d, and M.G.L. c. 272 § 98. (SOF at ¶33). Specifically, he contends that because, in his opinion, he looked like the gentlemen seated in seats 20D and 20E, whom he subjectively believes looked to be Middle Eastern, he was assumed to be traveling with them and, when they came under suspicion, so did he.[1] (SOF at ¶34). Other than his own subjective beliefs, the plaintiff has no evidence that would support his claim that the gentlemen seated next to him appeared to be Middle Eastern or that he looked like the gentlemen seated next to him.

II.    ARGUMENT

    A. <u>Based On The Existing Evidence, A Reasonable Factfinder Could Not Conclude That AA Or Its Employees Engaged In Intentional Discrimination Against The Plaintiff.</u>

Each of the statutes under which the plaintiff asserts causes of action requires the plaintiff to prove that AA intended to discriminate against him on December 28, 2003. The plaintiff has no such evidence, and therefore his case should be dismissed.

---

[1] The plaintiff's assertions not only lack any support in the evidence, but ignore entirely his own unusual behavior.

Specifically, the evidence in this case proves that none of the people making decisions about the plaintiff's travel status on December 28, 2003 had any information about the plaintiff's appearance, his actual or perceived ethnicity, his actual or perceived race, or his actual or perceived religion. Captain Ehlers had no such information, the CCRO had no such information, and the SOC MOD had no such information. In consequence, there cannot have been any intent to discriminate.[2]

    1.    <u>Analysis under 42 U.S.C. § 1981</u>.

In order to prevail on his Section 1981 claim, the plaintiff must prove by a preponderance of the evidence that AA's employees intended to discriminate against him when they decided to prohibit him from traveling on December 28, 2003. *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Springer v. Seaman*, 821 F.2d 871, 880 (1st Cir.1987) (proof of racial animus necessary element of any Section 1981 claim). *See also Jones v. City of Boston*, 738 F.Supp. 604, 605-06 (D.Mass. 1990). Specifically, the plaintiff must prove that he is a member of a racial minority, that he was discriminated against on the basis of his race, and that the discrimination implicated statutorily protected activities. *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir.2002). For purposes of summary judgment, AA assumes that the plaintiff meets his burden of proof on the first and third elements of his claim; namely, AA assumes that he can prove he is a member of a racial minority and that any alleged discrimination would involve activities covered under 42 U.S.C. 1981.

However, the plaintiff has not, and cannot, meet his burden of proof on the second element of a §1981 claim. He has no evidence that any discrimination against him was on the basis of his race, ethnicity or religion, whether actual or perceived. In fact, all evidence points to

---

[2] At best, Captain Ehlers recalls that the passenger who made strange remarks to him had a ponytail. Captain Ehlers has no further recollections of the passengers seated in seats 20D, E and F.

the contrary.  Captain Ehlers, the CCRO and the SOC MOD had no knowledge of his actual or perceived race, ethnicity or religion.

All that remains, then, is the plaintiff's belief that he was assumed to be Middle Eastern because he looked like the people next to whom he was sitting.  However, the plaintiff's own beliefs do not constitute evidence of racial animus.  *Scott v. Macy's East, Inc.*, 2002 WL 3149745, at 5, (plaintiff's own subjective belief that he was victim of racial profiling, sole admissible "evidence" offered in support of his allegations, insufficient to prove intent to discriminate), *citing Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989) ("[M]erely juxtaposing the fact of one's race with an instance of discrimination is insufficient to state a claim"). Without any evidence beyond his own subjective belief to substantiate his case, his claims under 42 U.S.C. §1981 fail, entitling AA to summary judgment.

2. Analysis under 42 U.S.C. § 2000d.

As an initial matter, Title VI does not apply to AA because AA does not receive federal financial assistance as 42 U.S.C. §2000d-1 defines that term.  *See, e.g., Shotz v. American Airlines, Inc.*, 420 F.3d 1332 (11th Cir.2005) (compensation under the Stabilization Act does not qualify as "federal financial assistance" for purposes of the Rehabilitation Act); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir.1984) (legislative history for Rehabilitation Act shows term "federal financial assistance" should be construed in keeping with the meaning afforded that term under §2000d-1).  Plaintiff's claims under 42 U.S.C. ß2000d should be dismissed on that basis.

Moreover, in 2001, the United States Supreme Court held that a plaintiff alleging discrimination under 42 U.S.C. §2000d must prove intent to discriminate to prevail on his claim.  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).  In decision after decision, the Supreme Court

has affirmed the principal that Title VI applies only to intentional discrimination. *Id.*, *citing Alexander v. Choate*, 469 U.S. 287, 293 (1985); *Guardians Association v. Civil Service Commission of New York City*, 463 U.S. 582, 610-11 (1983); *Regents of University of California v. Bakke*, 438 U.S. 265 (1978).

In order to prove his claims under 42 U.S.C. §2000d, the plaintiff must demonstrate that AA discriminated against him based on his protected class status, that the discrimination was intentional and was a substantial or motivating factor in its decisions. *Goodman v. Bowdoin College*, 380 F.3d 33, 43 (1st Cir.2004), citing *Tolbert v. Queens College*, 242 F.3d 58, 69 (2nd Cir.2001). *See also Ali v. University of Massachusetts Medical Center*, 76 Fed. Appx. 342, *1 (1st Cir.2003). As discussed supra, the plaintiff has no evidence, other than his own subjective assessment, of discrimination. Therefore, his claims under 42 U.S.C. §2000d fail.

        3.        <u>Analysis under M.G.L. c. 272 §98</u>.

Similarly, the plaintiff cannot prevail on his claims under M.G.L. c. 272 §98 because he has no evidence that AA's employees intended to discriminate against him when they denied him service on December 28, 2003. *See, e.g., Jones*, 738 F.Supp. at 605-606; *Scott*, 2002 WL 31439745 at 8. *See also Gutierrez v. Massachusetts Bay Transportation Authority*, 437 Mass. 396, 411 (2002) (refusal to instruct jury on violation of civil rights in place of public accommodation appropriate where plaintiff introduced no evidence that defendant sought to exclude plaintiff on basis of race).

Moreover, even if any of AA's employees did intend to discriminate against the plaintiff by denying him service on December 28, 2003, AA cannot be held responsible for such actions pursuant to M.G.L. c. 272 §98. *Jones*, 738 F.Supp. at 606. Respondeat superior does not apply to the actions of employees who violate criminal statutes enforcing civil rights laws like M.G.L.

c. 272 §98. *Id.* In consequence, summary judgment must be granted for AA on the plaintiff's claims under M.G.L. c. 272 §98.

> B. The Plaintiff Fails To Prove That the Actions of Any AA Employee Were Arbitrary And Capricious.

AA has established that it had a legitimate, non-discriminatory reason: safety concerns, for refusing service to the plaintiff on December 28, 2003. It has further established that the plaintiff has no evidence of any intention to discriminate against him for the simple reason that none of the persons making the decision to deny him service had any information regarding his actual or perceived race, ethnicity or religion, either now or at the time the decision was made. These facts mandate summary judgment not only under the discrimination statutes discussed *supra*, but also in accordance with 49 U.S.C. § 44902(b).

Pursuant to 49 U.S.C. § 44902(b), Congress granted airlines the right to refuse to transport passengers whom the airlines deem may be "inimical to safety." Courts throughout the nation have afforded airlines broad discretion in deciding which passengers may be inimical to safety. *Smith v. Comair, Inc.*, 134 F.2d 254, 259 (4th Cir.1998); *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2nd Cir.1975); *Adamson v. American Airlines, Inc.*, 444 N.E.2d 21, 24 (N.Y. 1982). Specifically, airlines are required to act rationally and reasonably in exercising their discretion regarding denial of service decisions. *Williams*, 509 F.2d at 948. As long as their actions are not arbitrary or capricious, their actions should not serve as a basis for liability. *Id. See also Adamson*, 444 N.E.2d at 25.

By definition, decisions resting on intentional discrimination are arbitrary and capricious. *See Williams*, 509 F.2d at 948. *See also Alshrafi v. American Airlines, Inc.,* 321 F.Supp.2d 150, 162 (D.Mass. 2004); *Bayaa v. United Air Lines, Inc.*, 249 F. Supp.2d 1198, 1205 (C.D.Cal. 2002)*; Dasrath v. Continental Airlines, Inc.*, 228 F.Supp.2d 521, 538-39, n. 12 (D.N.J. 2002);

9

*Newman v. American Airlines, Inc.*, 176 F.3d 1128, 1132 (9th Cir.1999); *Cordero v. Cia Mexicana de Aviacion, S.A.*, 681 F.2d 669, 670-73 (9th Cir.1982); *Schaeffer v. Cavallero*, 54 F.Supp.2d 350, 351-52 (S.D.N.Y. 1999). Conversely, however, decisions that do not arise from intentional discrimination and that are grounded in legitimate safety concerns must be presumed rational and reasonable. *Dasrath*, 228 F.Supp.2d. at 538-39. Where a plaintiff cannot establish by a preponderance of the evidence that an airline intended to discriminate against the plaintiff when it denied the plaintiff service, a finding that must be made in light of the circumstances in question (including, but not limited to, the risk of terrorist activity on airplanes, the consequences flowing therefrom, and the short time frame in which decisions regarding denial of service must be made), the plaintiff's claims should be dismissed at summary judgment. *Id.* at 538. Moreover, airlines have no duty to investigate a passenger's status before making decisions regarding whether they will or will not transport them on a particular flight. *Id.* at n. 9. *See also Sedigh v. Delta Airlines, Inc.*, 850 F.Supp. 197, 201-02 (E.D.N.Y. 1994); *Zervigon v. Piedmont Aviation, Inc.*, 558 F.Supp. 1305, 1306 (S.D.N.Y. 1983); *Norman v. Trans World Airlines, Inc.*, No. 98 Civ. 7419(BSJ), 2000 WL 1480367, at 3-4 (S.D.N.Y. Oct. 6. 2000); *Huggar v. Northwest Airlines, Inc.*, No. 98 C 594, 1999 WL 59841, at 5-6 (N.D. Ill. Jan. 27, 1999); *Rubin v. United Air Lines, Inc.*, 117 Cal. Rptr. 2d 109, 119 (Ct. App. 2002); *O'Carroll v. American Airlines, Inc.*, 863 F.2d 11, 12 (5th Cir.1989).

In this case, the plaintiff contends that Captain Ehlers' failure to independently verify information reported to him by Ms. Walling demonstrate an intent to discriminate. In the *Norman* case cited *supra*, the judge deciding summary judgment rejected similar assertions by a plaintiff. *Norman*, 2000 WL 1480367 at 3-4. Specifically, the judge concluded that the sincerity of the flight attendant's conclusions did not matter in deciding whether the decision to remove

the plaintiff in that case was arbitrary and capricious. *Id*. In granting summary judgment to America West Airlines, Inc., the court deciding the case of *Al-Qudhai'een v. America West Airlines, Inc.* similarly held that airlines bear no burden to conduct complete and formal investigations into safety concerns before acting upon them, or to hold flights while they review safety concerns. *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F.Supp.2d 841, 847 (S.D.Oh. 2003)[3]. *See also Christel v. AMR*, 222 F.Supp.2d 335, 340 (E.D.N.Y. 2000).

One of the principal reasons cited by courts for applying the arbitrary and capricious standard in denial of services cases is the time constraints associated with making critical security decisions. *Ruta v. Delta Airlines, Inc.*, 322 F.Supp.2d 391, 397 (S.D.N.Y. 2004). In the case of *Ruta v. Delta Airlines, Inc.*, the court granted summary judgment to Delta Airlines where a passenger was removed from a flight before it departed on the basis of her appearance and behavior. *Id*. In its decision, the court found that airlines' decisions should be given deference, and thus held only to the arbitrary and capricious standard, because decisions regarding denial of service are made "on the spur of the moment, shortly before the plane takes off, and therefore without the benefit of complete and accurate information." *Id*. The court further found that the captain of an aircraft should be entitled to rely upon, without further inquiry, information provided to him by the flight attendants. *Id*.

Moreover, the legislative history of 42 U.S.C. §44902(b) supports the aforementioned court findings requiring that decisions on denial of service be reviewed under the arbitrary and capricious standard. The hearings conducted before Congress in 1961 in connection with 42 U.S.C. §44902(b) demonstrate that Congress intended denial of service decisions to be reviewed under the standard of subjective good faith. *Crimes Aboard Aircraft in Air Commerce: Hearing*

---

[3] The Al-Qudhai'een case bears some resemblances to this case. 267 F.Supp. at 842. In that matter, one of the plaintiffs requested a change in seat assignment to sit next to a companion with whom he was traveling. *Id*. In this case, Flight Attendant Walling was aware that the plaintiff sought to have his seat changed, though she did not know where to until seeing him seated next to the gentlemen in seats 20D and 20E. Deposition of Sally Walling, Exhibit D to SOF, at pg. 30. Logically, she could have concluded that he requested a seat change to sit next to them.

11

*on S. 2268, S. 2370, S. 2373 and S. 2374 Before the Senate Committee on Commerce*, 87th Cong. 48, 62-64 (1961).

In short, both 42 U.S.C. §44902(b) and the cases decided thereunder require that the plaintiff prove AA intended to discriminate against it, thereby acting in an arbitrary and capricious manner, to avoid summary judgment. Because the plaintiff has failed to prove that any of the AA employees involved in the decision to deny him service on December 28, 2003 intended to discriminate against him, 42 U.S.C. §44902(b) shields AA from liability. This court should order summary judgment in AA's favor pursuant to 42 U.S.C. §44902(b).

    C. <u>Consistent With Anti-Discrimination Laws, The Airline Deregulation Act Preempts The Plaintiff's Claims</u>.

The record as developed at summary judgment lacks any evidence from which a reasonable factfinder could conclude that AA's actions on December 28, 2003 were motivated by anything other than safety. It lacks any evidence of an intention to discriminate, and indeed contains ample evidence that not only AA's employees were concerned about the safety of Flight 2237, but that the State Police were as well, as was evidenced by the State Police requesting that all passengers be re-screened, all luggage be searched, and that dogs search the aircraft before it departed.

In light of the foregoing evidence, the Airline Deregulation Act ("ADA"), 42 U.S.C. §41713(b) preempts the plaintiff's state law claims under M.G.L. c. 272 § 98. Where the decision to deny services to a passenger rests soundly in security concerns, preemption exists. *Alshrafi*, 321 F.Supp.2d at 163. *Huggar*, 1999 WL 59841, at 9. The ADA, and the decisions rendered by the United States Supreme Court thereon, define the term services broadly to ensure that airlines can run their legitimate business operations without interference or regulation by the states. *Cf. American Airlines, Inc. v. Wolens*, 513 U.S. 219, 219-20 (1995). In *American*

*Airlines, Inc. v. Wolens*, the United States Supreme Court held that the ADA preempts claims not only that are essential to air travel, but that it also may preempt those services that are related to it. *Id*. Security undoubtedly constitutes a service essential to air travel. *See, e.g., Huggar*, 1999 WL 59841 at 6, 9-10. In fact, an airline's paramount legitimate business concern is safety.

The *Huggar* case, discussed extensively by this Court in its ruling in *Alshrafi*, demonstrates clearly that where an airline has legitimate security concerns deriving from a passenger's unusual behavior, and where there is no evidence of intent to discriminate, that passenger's claims of discrimination are related to services as that term is defined in 42 U.S.C. § 41713(b). *Alshrafi*, 321 F.Supp.2d at 163; *Huggar*, 1999 WL 59841 at 6, 9-10. Because the plaintiff's claims under M.G.L. c. 272 § 98 relate to services as that term is defined under 42 U.S.C. §41713(b), the ADA preempts those claims, making summary judgment for AA appropriate on Count III of his Amended Complaint.

### III.   CONCLUSION

For the reasons set forth herein, AA requests that this Court grant summary judgment in its favor on all counts of the plaintiff's Amended Complaint.

### IV.   REQUEST FOR ORAL ARGUMENT

AA requests oral argument on its Motion for Summary Judgment.

Respectfully submitted,

**AMERICAN AIRLINES, INC.**
By its Attorneys,

__/s/ Amy Cashore Mariani_____

Michael A. Fitzhugh, (BBO 169700)
Amy Cashore Mariani, (BBO #630160)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 22, 2006.

__/s/ Amy Cashore Mariani___
Amy Cashore Mariani