UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| JOHN D. CERQUEIRA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) CIVIL ACTION NO.: 05-11652 WGY |
| AMERICAN AIRLINES, INC., | ) |
|  | ) |
| Defendant. | ) |

_____)

## AMERICAN AIRLINES, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendant American Airlines, Inc. (hereinafter, "AA") submits its statement of material facts not in dispute for purposes of its summary judgment motion.

### Statement of Facts

1. On December 28, 2003, plaintiff John D. Cerqueira ("plaintiff" or "Mr. Cerqueira") was scheduled to fly from Boston to Fort Lauderdale, Florida on American Airlines Flight 2237. *See* Amended Complaint, hereinafter "Complaint," attached hereto as Exhibit "A," at ¶13.

2. According to the plaintiff, he arrived at the airport early on the morning of his flight. He proceeded through security and arrived at the gate at approximately 5 a.m. *See* Complaint at ¶13, Deposition of John D. Cerqueira, hereinafter "Cerqueira Deposition," attached hereto as Exhibit "B," at 27:19, 29:24-30:1, Plaintiff John D. Cerqueira's Responses to Defendant American Airlines, Inc.'s Interrogatories to Plaintiff, attached hereto as Exhibit "C," hereinafter "Cerqueira Ints.," at ¶2.

3. Mr. Cerqueira hoped to have his seat reassigned to an exit row at the gate. Cerqueira Deposition at 30:18-31:1.

4. When a person who appeared to him to be an AA employee arrived at the gate ticket counter, Mr. Cerqueira approached her. Cerqueira Deposition at 30:18-31:9.

5. The person whom he approached at the gate ticket counter was Sally Walling, an AA flight attendant with 37 years of experience on the job. *See* Deposition of Sally Walling, attached hereto as Exhibit "D," hereinafter "Walling Deposition," at 7-8.

6. Although plaintiff flies on a frequent basis, he was not aware that he was approaching a flight attendant, who could not assist him with a seat assignment, rather than a gate agent. Cerqueira Deposition at 18:6, Cerqueira Ints. at ¶3.

7. When Mr. Cerqueira approached Ms. Walling, Ms. Walling informed the plaintiff that she was not the gate agent, that she could not assist him, and that he should wait in the seats near the gate ticket counter for someone who could. Walling Deposition at 8:13, 18:4, 18:14.

8. In spite of her request to wait in the seats, Mr. Cerqueira lingered near the ticket counter for an extended period of time. Walling Deposition at 17:17. *See also* AMR Event Call Center Report, completed by Sally Walling, hereinafter "Walling Event Report," attached hereto as Exhibit "E," at page 2.

9. Ms. Walling characterized Mr. Cerqueira's demeanor and tone as "hostile and insistent." Walling Deposition at 8:19, 17:17.

10. After this encounter, Ms. Walling boarded the plane to perform her pre-flight assignments. Walling Deposition at 12:3-7.

11. During pre-flight, Ms. Walling was working in the rear of the airplane. Before any other coach passenger had boarded (and indeed before many first class passengers had boarded), Ms. Walling observed the plaintiff board; she saw him proceed almost immediately to the lavatory in the rear of the aircraft. The plaintiff remained in the aircraft lavatory for several minutes before returning to his seat. Walling Deposition at 12:10-23, 17:8, 19:18. Cerqueira Deposition at 41:2, Walling Event Report.

12. Shortly thereafter, Ms. Walling went to the galley area of the plane to prepare it for service. She was approached by two passengers, who told her that they felt "uneasy and uncomfortable" with the gentlemen seated in the exit row. The two passengers stated that these gentlemen were "saying uneasy things to them." Walling Deposition at 19:9 – 20:1, 20:21 – 21:14.

13. Ms. Walling then went to observe the gentlemen of whom the passengers complained, and found that all three men seated in the exit row, seats 20D, E and F, appeared to be asleep. Ms. Walling found their behavior "unusual" under the circumstances. Walling Deposition at 21:12, 22:15-22.

14. Before the pilot of the flight, Captain John Ehlers, who had at that time approximately 20 years of commercial aviation experience, boarded the flight, he was approached in the gate area by two gentlemen, one of whom wore a ponytail and asked him if he was the captain for the flight to Fort Lauderdale. *See* Deposition of John M. Ehlers, hereinafter "Ehlers Deposition," attached hereto as Exhibit "F," at 5:16 – 8:16; 11:6-13:5, 16:11, 19:6.

15. Upon hearing that Captain Ehlers was the captain for that flight, the man with the ponytail responded, "That's good.  I'm going with you.  We're going to have a good trip today."  Ehlers Deposition at 16:8-15.

16. According to Captain Ehlers, that was the first time in almost twenty years of commercial flying that a passenger had made such a comment to him. Ehlers Deposition at 16:22.

17. Flight attendant Lois Sargent began the safety briefing for those seated in Row 20, the exit row.  Deposition of Lois Sargent, hereinafter "Sargent Deposition," attached hereto as Exhibit "G," at 7:2.

18. The plaintiff was seated in seat F of Row 20, the exit row.  Cerqueira Ints. at ¶2, Walling Deposition at 20:3.

19. Ms. Sargent observed the two gentlemen seated next to the plaintiff (in seats D and E) making strange comments and laughing inappropriately during the safety briefing. She further observed the plaintiff laughing at the comments made by the two gentlemen seated next to him.  Sargent Deposition at 7:16-22.

20. According to Ms. Sargent, the behavior of the gentlemen seated in seats D and E of the exit row did not comport with that of typical customers during a routine safety briefing.  Sargent Deposition at 7:16-22.

21. After Ms. Sargent had concluded the briefing, Ms. Walling commented to Ms. Sargent and to Captain Ehlers that the gentlemen in seats 20D and E had been heard making odd remarks, such as repeatedly wishing complete strangers "Happy New Year." Walling Event Report, Walling Deposition at 20:21 – 21:14, Sargent Deposition at 17:3-6.

22. Around that time, Ms. Walling and Captain Ehlers spoke, sharing their observations about the unusual behavior exhibited by several passengers. Walling Deposition at 23:18-20; Ehlers Deposition at 22:21-23:8.

23. Based on the comments made to him in the gate area and during the boarding process, Captain Ehlers asked Ms. Walling to check on a passenger with a ponytail; Ms. Walling did and found that the passenger to whom Captain Ehlers was referring was seated next to the plaintiff. She reported back to Captain Ehlers and informed him that the passenger who had boarded early and spent time in the lavatory was seated next to the gentleman with the ponytail. Walling Deposition at 23:18-23.

24. Based on the totality of unusual circumstances with which the crew had been presented before and during the boarding process, Captain Ehlers decided to consult with System Operations Control ("SOC"). Ehlers Deposition at 30:11-31:12, Sargent Deposition at 17:3-7.

25. Prior to contacting SOC, Captain Ehlers had no interaction with the plaintiff at any time. Ehlers Deposition at 16:2, 19:18-20.

26. At the time that Captain Ehlers made the decision to request assistance from SOC with regard to the passengers in seats 20D, E and F of Flight 2337, he did not have any knowledge of Mr. Cerqueira's appearance, or his actual or perceived race, ethnicity or religion. *See* Affidavit of John M. Ehlers In Support of American Airlines, Inc.'s Motion for Summary Judgment, attached hereto as Exhibit "H."

27. Based on the information available, AA made the decision to remove those passengers from the flight for questioning. This decision was made by SOC in

consultation with Captain Ehlers and the Massachusetts State Police in Boston. Ehlers Deposition at 25:8-12, 14:14, 29:18.

28. The Corporate Complaint Resolution Officer ("CCRO") and the System Operations Control Manager on Duty ("SOC MOD"), the two ground control officers in charge of determining if passengers should be removed for questioning, had no knowledge of the plaintiff's appearance or actual or perceived race, ethnicity or religion on December 28, 2003. *See* Affidavit of Craig Marquis and Affidavit of Rhonda Cobbs In Support of American Airlines, Inc.'s Motion for Summary Judgment, attached hereto as Exhibits "I" and "J," respectively.

29. Subsequent to the removal of the passengers in seats 20D, E and F, a passenger informed the flight crew that one of those passengers had a prohibited object removed from him during the security screening process. Ehlers Deposition at 42:19-22, 43:6-9, 43:13-15.

30. In light of that assertion and the lengthy period of time spent by the plaintiff in the lavatory, the State Police removed the remaining passengers and luggage from the aircraft for security re-screening and had dogs search the airplane. Ehlers Deposition at 44:19 – 45:5.

31. The State Police then informed Captain Ehlers that the three removed passengers would not be traveling with him that day. Ehlers Deposition at 48:19-49:2.

32. Given the circumstances and information available as well as the communication from the State Police, Systems Operations made the determination that AA would not rebook the three passengers removed from the flight, including the plaintiff, for further travel that day. *See generally*, Ehlers Deposition.

33. As a result of these events, the plaintiff filed suit against AA, claiming that its decision to remove him from the flight in question and to preclude him from further travel on that day violates 42 U.S.C. §1981, 42 U.S.C. § 2000d, and M.G.L. c. 272 § 98.  *See generally*, Complaint.

34. Specifically, he contends that because, in his opinion, he looked like the gentlemen seated in seats 20D and 20E, whom he subjectively believes looked to be Middle Eastern, he was assumed to be traveling with them and, when they came under suspicion, so did he.[1]  *See generally*, Complaint.

**AMERICAN AIRLINES, INC.**
By its Attorneys,


__UU*/s/ Amy Cashore Mariani*_____
Michael A. Fitzhugh, (BBO 169700)
Amy Cashore Mariani, (BBO #630160)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 22, 2006.

__*/s/ Amy Cashore Mariani*___
Amy Cashore Mariani

---

[1] The plaintiff's assertions not only lack any support in the evidence, but ignore entirely his own unusual behavior.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,

                Plaintiff,

v.

AMERICAN AIRLINES, INC.,

                Defendant.

Civil Action No. 05-11652-WGY

## AMENDED COMPLAINT
### Jury Trial Demanded

Plaintiff John D. Cerqueira, by his attorneys, alleges as follows:

### Introduction

1.      On December 28, 2003, defendant American Airlines removed plaintiff John D. Cerqueira from an American Airlines flight and refused to provide him any further transportation services because defendant mistakenly believed that Mr. Cerqueira was of Arab, Middle Eastern, or South Asian descent.  American Airlines had no legitimate non-discriminatory reason to justify its treatment of Mr. Cerqueira; rather, it based its actions on Mr. Cerqueira's perceived race, color, national origin, ethnicity, or ancestry.  Because of American Airlines' discriminatory acts, Mr. Cerqueira was denied the right to make and enforce a contract, subjected to unlawful discrimination by a recipient of federal financial assistance, and denied equal treatment in a place of public accommodation.  Mr. Cerqueira brings this action under 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and M.G.L. c. 272, § 98.  Mr. Cerqueira seeks declaratory relief, compensatory and punitive damages, and injunctive relief to prevent future unlawful discrimination by American Airlines.

**Jurisdiction and Venue**

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.  Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 1343.

3.     The events giving rise to the claims alleged in this Complaint occurred at Boston Logan Airport.  Venue therefore lies in this Court pursuant to 28 U.S.C. § 1391(b)(2).

**Parties**

4.     Plaintiff John D. Cerqueira is a citizen of the United States and a resident of the State of Florida.  He is of Portuguese national origin and his color and physical appearance is similar to that commonly associated with individuals of Arab, Middle Eastern, or South Asian descent.

5.     Defendant American Airlines, Inc., is an air carrier engaged in the business of transporting passengers.  American Airlines is a Delaware corporation with headquarters at 4333 Amon Carter Blvd., Fort Worth, Texas  76155.  American Airlines maintains a business presence at Logan Airport in Boston, Massachusetts.  American Airlines is a recipient of federal financial assistance.

**Facts**

6.     Mr. Cerqueira is a frequent flier and has accumulated over 370,000 miles in American Airlines' frequent flyer program.  Mr. Cerqueira's work requires frequent air travel and many of the routes he flies are served by American Airlines.

7.     On or about June 12, 2003, Mr. Cerqueira purchased on-line a round-trip ticket on American Airlines for travel in late December 2003, between Fort Lauderdale, Florida, and

Boston, Massachusetts. Mr. Cerqueira was going to Massachusetts to visit his family for the holidays.

8.    On December 24, 2003, Mr. Cerqueira flew from Fort Lauderdale, Florida to Boston, Massachusetts on American Airlines flight 2224 without incident.

9.    On December 28, 2003, Mr. Cerqueira arrived early at Logan Airport for his return trip to Florida on American Airlines flight 2237. He checked one bag curbside, received his boarding pass, and proceeded to the gate.

10.    At the gate, Mr. Cerqueira requested a seat in an exit row or bulkhead so that he would have more leg room. Mr. Cerqueira did not request any particular seat. American Airlines personnel at the gate honored Mr. Cerqueira's request and assigned Mr. Cerqueira seat number 20F, which was a window seat in an exit row.

11.    American Airlines boarded the passengers for flight 2237 by group number. Mr. Cerqueira was assigned to "Group 1" for boarding purposes. Mr. Cerqueira boarded the aircraft when his assigned group was called. He was among the first coach passengers to board.

12.    Once seated on the airplane, Mr. Cerqueira took out his laptop computer and worked for a short time. Approximately 10 minutes after Mr. Cerqueira boarded the airplane, two men boarded the plane and sat next to him in seat numbers 20D and 20E.

13.    Mr. Cerqueira did not know the men seated in 20D and 20E, and he did not speak to them.

14.    The men in seat numbers 20D and 20E were speaking to each other, partly in English and partly in a foreign language. The two men had a color and physical appearance similar to that of Mr. Cerqueira.

-3-

15.     When the announcement was made to turn off all electronic devices, Mr. Cerqueira stowed his laptop computer and fell asleep.

16.     An American Airlines flight attendant woke Mr. Cerqueira and asked for his boarding pass. The flight attendant also asked the men seated in 20D and 20E for their boarding passes. Mr. Cerqueira was unable to immediately locate his boarding pass, but handed the flight attendant the American Airlines receipt for his itinerary, which the flight attendant indicated was sufficient.

17.     Soon after the flight attendant left with Mr. Cerqueira's receipt and the boarding passes of the men seated in 20D and 20E, three or four troopers from the Massachusetts State Police boarded the plane and demanded that Mr. Cerqueira and the two men seated next to him immediately deplane with their carry-on luggage. Neither the police nor any representative of American Airlines told Mr. Cerqueira why he was being removed from the plane. Mr. Cerqueira had not made any comments or engaged in any behavior that was unusual, suspicious, or out of the ordinary.

18.     Mr. Cerqueira and the other two passengers were questioned by the troopers on the ramp immediately outside of the airplane. Mr. Cerqueira surrendered his driver's license and the other two men surrendered their passports.

19.     Mr. Cerqueira informed the troopers that he did not know, and was not traveling with, the other two men.

20.     After initial questioning on the ramp, Mr. Cerqueira and the men who had been seated in 20D and 20E were escorted through the airport to a small room near the security screening area. They were held in the small room for approximately one hour, then Mr. Cerqueira was removed and further questioned by the police in the main hallway of the terminal.

-4-

21.     When Mr. Cerqueira was questioned, the trooper repeatedly demanded to know Mr. Cerqueira's "nationality." Believing that the trooper was inquiring as to his citizenship, Mr. Cerqueira told the trooper repeatedly that he is a United States citizen. As the trooper became increasingly hostile, Mr. Cerqueira realized that the trooper wanted to know Mr. Cerqueira's national origin or ancestry. Mr. Cerqueira informed the trooper that he is of Portuguese descent.

22.     Eventually, Mr. Cerqueira convinced the trooper that he was a stranger to the other men seated in his row and that he had been seated next to them by American Airlines.

23.     Mr. Cerqueira and the other two men were released by the police and escorted to the American Airlines ticket counter. The trooper who accompanied them to the ticket counter told the ticket agent that they had been removed from a flight for questioning, but were now free to go. Mr. Cerqueira had still not been informed of the reason he had been removed from the plane, detained, and questioned.

24.     A ticket agent at the American Airlines counter told Mr. Cerqueira that there was a seat available for him on an American Airlines flight from Boston to Fort Lauderdale departing in the early afternoon, but that she needed to ask a supervisor about the situation. On information and belief, the ticket agent was Dalila MacLeod.

25.     The ticket counter supervisor arrived and spoke first to the men who had been seated in 20D and 20E. On information and belief, the ticket counter supervisor was Nicole Traer. Ms. Traer told these two men that American Airlines was denying them service and that she was refunding the cost of the Boston to Florida portion of their tickets. When they asked how they were to get back to Florida, Ms. Traer told them that they were on their own. When they asked why American Airlines would not serve them, Ms. Traer replied that it was based on something they had said while on the plane.

26.     When Mr. Cerqueira was called to the ticket counter, Ms. Traer told Mr. Cerqueira that he was being denied service and that she was refunding the cost of the return portion of his ticket.  When Mr. Cerqueira asked why he was being denied service, Ms. Traer told him that it was because of what Mr. Cerqueira had said on the plane, as documented in the file.  She refused to provide Mr. Cerqueira with any further information and told him that he could contact customer service for more information.  American Airlines refused to assist Mr. Cerqueira in making travel arrangements and American Airlines provided no indication as to how long the denial of service would last.

27.     Unable to receive any further information or assistance from American Airlines personnel at Logan Airport, Mr. Cerqueira sent the following electronic message to American Airlines:

> Today I was scheduled to fly on flight 2237 from Boston to Fort Lauderdale.  I was denied service after being escorted off the plane by several police officers.  At a loss of much valuable time and money and after considerable embarrassment, I have had to make other arrangements to fly home to Florida.  The supervisor in Boston, Nicole, said I was denied service because of something I said on the plane and, when I asked her what I was being accused of saying, she said for me to contact customer service online for more information.  Please provide me further information and as much information as you are able to regarding the file for this incident.  Also please comment on what the short, medium, and long-term implications are for me to travel on American Airlines or any other airline.

28.     Mr. Cerqueira received an "auto-response" indicating that someone would respond to his message at a later time.

29.     Mr. Cerqueira was unable to find a reasonably priced ticket on any other airline for travel from Boston to Fort Lauderdale on December 28, 2003.  Mr. Cerqueira was able to purchase a ticket for a December 29, 2003, flight on U.S. Airways connecting through Philadelphia.  Mr. Cerqueira arrived at his home in Florida about 30 hours later than he would

-6-

have arrived had American Airlines not refused to serve him, at increased cost, and with considerable inconvenience and emotional trauma.

30.     On January 6, 2004, American Airlines sent Mr. Cerqueira the following response to his inquiry of December 28, 2003:

> One of the most difficult decisions our personnel must make is to refuse passage to one of our customers.  Nevertheless, we do have that obligation and that authority when there are manifestations of behavior, which could become troublesome during flight.  We have fully reviewed the decision not to let you board your flight to Fort Lauderdale.  Our investigation has revealed that our personnel perceived certain aspects of your behavior, which could have made other customers uncomfortable on board the aircraft.  It was for this reason that you were not permitted to travel.  It was also noted in the record that our personnel authorized a refund of the Boston -- Fort Lauderdale segment of your ticket.  There is no indication that you will be denied boarding in the future.  We welcome all customer feedback.  Should you wish to contact us again, please do so via http://www.aa.com/customerrelations/, and we'll be back with you as soon as possible.

31.     No government or law enforcement agency or personnel requested that Mr. Cerqueira be removed from flight 2237, nor did any government or law enforcement agency or personnel suggest that Mr. Cerqueira posed a threat to safety or security.

32.     On information and belief, John Ehlers was the captain of American Airlines flight 2237 on December 28, 2003.  Capt. Ehlers made the decision to have Mr. Cerqueira removed from the flight.

33.     On information and belief, Capt. Ehlers based his decision to have Mr. Cerqueira removed from flight 2237 at least in part on information and/or opinions communicated to him by a flight attendant who was a member of the crew for American Airlines flight 2237 on December 28, 2003.  On information and belief, the flight attendant was Sally Walling.

34.     At the time Capt. Ehlers made the decision to have Mr. Cerqueira removed from the flight, Capt. Ehlers was an agent and employee of American Airlines and was acting within the scope of his employment.

35.     At the time Ms. Walling provided Capt. Ehlers information and/or opinions about Mr. Cerqueira, Ms. Walling was an agent and employee of American Airlines and was acting within the scope of her employment.

36.     No government or law enforcement agency or personnel requested that Mr. Cerqueira be denied transportation services after he was released from questioning following his removal from flight 2237, nor did any government or law enforcement agency or personnel suggest that Mr. Cerqueira posed a threat to safety or security.

37.     Nicole Traer, an American Airlines ticket counter supervisor, made the decision to deny service to Mr. Cerqueira after he was released from questioning following his removal from flight 2237.

38.     On information and belief, Ms. Traer based her decision to deny service to Mr. Cerqueira at least in part on information and/or opinions communicated to her by Dalila MacLeod.

39.     At the time Ms. Traer made the decision to deny service to Mr. Cerqueira, Ms. Traer was an agent and employee of American Airlines and was acting within the scope of her employment.

40.     At the time Ms. MacLeod provided Ms. Traer information and/or opinions about Mr. Cerqueira, Ms. MacLeod was an agent and employee of American Airlines and was acting within the scope of her employment.

41.     Mr. Cerqueira did not engage in any behavior or make any comments that could justify American Airlines' decision to have Mr. Cerqueira removed from flight 2237.   Mr. Cerqueira did not engage in any behavior or make any comments that could justify American Airlines' decision to deny Mr. Cerqueira any further transportation services after he had been questioned by the Massachusetts State Police and the police had informed American Airlines that Mr. Cerqueira posed no threat.   American Airlines had no legitimate non-discriminatory reason to believe that Mr. Cerqueira posed a security risk.

42.     American Airlines caused Mr. Cerqueira to be removed from flight 2237 and questioned by the Massachusetts State Police because it mistakenly believed that Mr. Cerqueira was of Arab, Middle Eastern, or South Asian descent.

43.     American Airlines caused Mr. Cerqueira to be denied air transportation services after he was cleared by the police because it mistakenly believed that Mr. Cerqueira was of Arab, Middle Eastern, or South Asian descent.

44.     Defendant's discriminatory acts were intentional and proximately caused Mr. Cerqueira to suffer emotional distress and financial loss.   As a result of the incidents of December 23, 2003, Mr. Cerqueira has endured fear, humiliation, embarrassment, mental pain, suffering, inconvenience, and financial injury, including lost business profits.

45.     Defendant's actions were intentional, malicious, willful, wanton, and callous, and showed reckless disregard for Mr. Cerqueira's civil rights.

46.     On October 14, 2004, Mr. Cerqueira filed a complaint of discrimination with the Massachusetts Commission Against Discrimination (MCAD) charging American Airlines with discrimination in a place of public accommodation on the basis of race, color, national origin, or ancestry.   MCAD investigated Mr. Cerqueira's

-9-

complaint and, on May 3, 2005, issued a decision concluding that Mr. Cerqueira had established a prima facie case of discrimination and finding probable cause to credit the allegations in Mr. Cerqueira's complaint.

### Count I:  42 U.S.C. § 1981

47.     Mr. Cerqueira repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint, as if fully set forth herein.

48.     Defendant engaged in intentional discrimination based on Mr. Cerqueira's perceived race, color, ethnicity, or ancestry, and caused Mr. Cerqueira to suffer deprivation of his right to make and enforce contracts.

49.     Defendant's actions violated 42 U.S.C. § 1981.

### Count II:  Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)

50.     Mr. Cerqueira repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint, as if fully set forth herein.

51.     Defendant American Airlines is a recipient of federal financial assistance. Defendant engaged in intentional discrimination based on Mr. Cerqueira's perceived race, color, or national origin.

52.     Defendant's actions violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

### Count III: M.G.L. c. 272, § 98

53.     Mr. Cerqueira repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint, as if fully set forth herein.

54.     American Airlines flight 2237, from which Mr. Cerqueira was removed, and other American Airlines' flights to which Mr. Cerqueira was denied admission, are places of public accommodation as defined in M.G.L. c. 272, § 92A.

55.     On December 28, 2003, defendant denied Mr. Cerqueira access to American Airlines flight 2237 and any other American Airlines flight.

56.     Defendant's actions were based on Mr. Cerqueira's perceived race, color, national origin, or ancestry.

57.     Defendant's actions violated M.G.L. c. 272, § 98.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Cerqueira respectfully requests that this Court:

(a)     Declare that defendant's actions described above constitute discrimination on the basis of race, color, national origin, ethnicity, or ancestry, and violate 42 U.S.C. § 1981, 42 U.S.C. § 2000d, and M.G.L. c. 272, § 98;

(b)     Enter a permanent injunction directing defendant American Airlines to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(c)     Award plaintiff damages in an amount to be determined at trial to compensate him for being deprived of his right to travel as a passenger in air transportation regardless of his perceived race, color, national origin, ethnicity, or ancestry, including damages for fear, humiliation, embarrassment, mental pain, suffering, inconvenience, and financial injury, including lost business profits;

(d)     Award plaintiff punitive damages in an amount to be determined at trial that would punish defendant for its malicious, willful, wanton, callous, and reckless conduct and effectively deter defendant from engaging in similar conduct in the future;

(e)     Award plaintiff prejudgment interest;

(f)     Award plaintiff reasonable attorneys' fees and the costs incurred in this action; and

(g)     Award plaintiff such other relief as the Court deems just and proper.

### Jury Trial Demand

Plaintiff demands a trial by jury for all issues triable by jury.

Respectfully submitted,

**JOHN D. CERQUEIRA**
By his attorneys,

David S. Godkin, BBO #196530
Erica Abate Recht, BBO #641452
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100

Michael T. Kirkpatrick
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
(202) 588-1000

Dated: September 14, 2005

# In The Matter Of:

*John D. Cerqueira   v.*
*American Airlines, Inc.*

---

*Sally Walling*
*Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA   02110*

*(617) 426-2432*

*Original File WALLING.V1, 63 Pages*
*Min-U-Script® File ID: 0526695123*

**Word Index included with this Min-U-Script®**



Page 1

Volume I
Pages 1 to 63
Exhibits 1 to 4
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
JOHN D. CERQUEIRA,
                        Plaintiff,       :
    vs.                                  : Civil Action
                                         : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,                 :
                        Defendant.       :
        DEPOSITION OF SALLY WALLING, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
    2006, commencing at 10:15 a.m.
            PRESENT:
        Birnbaum & Godkin, LLP
            (By Erica Abate Recht, Esq.)
    280 Summer Street, Boston, MA 02210,
            for the Plaintiff.
        Fitzhugh, Parker & Alvaro LLP
            (By Amy Cashore Mariani, Esq.)
    155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.

Page 2

                INDEX
WITNESS   DIRECT  CROSS  REDIRECT  RECROSS
SALLY WALLING
  BY MS. ABATE RECHT   3           60
  BY MS. MARIANI               58
            EXHIBITS
NO.      DESCRIPTION          PAGE
  1   Document entitled "AMR Event Call   9
      Center Report" Bates stamped AA 0018
      to 0020
  2   Document entitled "American         14
      Airlines, Inc.'s Answers to
      Plaintiff's First Set of
      Interrogatories"
  3  Document Bates stamped CRQ 0029 to   41
      0035
  4   One-page document stamped           52
      "CONFIDENTIAL," beginning with
      "operating at slightly under 75% of
      the total schedule"

Page 3

[1]              PROCEEDINGS
[2]              SALLY WALLING
[3] a witness called for examination by counsel for the
[4] Plaintiff, having been satisfactorily identified by
[5] the production of her driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:
[8]              DIRECT EXAMINATION
[9]          BY MS. ABATE RECHT:
[10]   Q: Good morning, Ms. Walling.
[11]   A: Good morning.
[12]   Q: My name is Erica Abate Recht, and I
[13] represent Mr. Cerqueira in this matter. Before we
[14] get started, I just want to note for the record that
[15] we were just given a few minutes before the
[16] deposition some documents. I have attempted to look
[17] through them briefly before we got started, and it
[18] doesn't appear as if they are in particular to the
[19] witnesses we'll be deposing today, but I just wanted
[20] to make it clear on the record that we did just
[21] receive documents just before the deposition
[22] started.
[23]      Ms. Walling, could you please state your
[24] full name for the record.

Page 4

[1]    A: Sally Walling.
[2]    Q: Can you spell that, please.
[3]    A: W-A-L-L-I-N-G.
[4]    Q: What is your address?
[5]    A: 23 Cusack, C-U-S-A-C-K, Road, No. 9 in
[6] Hampton, New Hampshire.
[7]    Q: Did you do anything to prepare for this
[8] deposition today?
[9]    A: No.
[10]   Q: Did you review any documents to prepare for
[11] the deposition?
[12]   A: Yes.
[13]   Q: What documents did you review?
[14]   A: My notes that I took at American, my OP-4.
[15]   Q: Is that your statement?
[16]   A: Yes.
[17]   Q: Were there any other notes that you took
[18] besides that statement?
[19]   A: There was a brief that was sent to me.
[20]   MS. MARIANI: I'm going to instruct the
[21] witness not to answer with respect to communications
[22] with counsel. She's free to answer with respect to
[23] any documents that she reviewed that were not
[24] generated by counsel.

Page 5

[1] **Q:** So you reviewed documents that were
[2] generated by counsel?
[3] **A:** Yes.
[4] **Q:** Any other documents?
[5] **A:** No.
[6] **Q:** So just to be clear, the document that you
[7] reviewed other than documents generated by counsel
[8] were the statement that you had filled out for
[9] American?
[10] **A:** Yes.
[11] **Q:** Did you speak to anyone in preparation for
[12] your deposition?
[13] **A:** Yes.
[14] **Q:** Who did you speak to? You can answer who
[15] you spoke to. I won't ask you what the substance of
[16] your communications were with counsel.
[17] **MS. MARIANI:** You may answer.
[18] **Q:** So you're indicating your counsel, Ms.
[19] Mariani?
[20] **A:** Yes.
[21] **Q:** Did you speak with anyone else?
[22] **A:** No.
[23] **Q:** Are you currently employed by American
[24] Airlines?

Page 6

[1] **A:** Yes.
[2] **Q:** For how long have you been employed by
[3] American —
[4] **A:** 37 years.
[5] **Q:** Just because the court reporter is trying
[6] to get everything we say down, it's important that
[7] you just let me finish my question, and then you
[8] answer. And that way she can get a clear
[9] transcript.
[10] **MS. MARIANI:** Ms. Abate Recht, before you
[11] proceed into anything substantive, why don't we make
[12] sure we have the stipulations with respect to
[13] objections on the record, so that the record is
[14] clear in that regard.
[15] **MS. ABATE RECHT:** So all objections, except
[16] as to form —
[17] **MS. MARIANI:** Right, and reserve motions to
[18] strike until time of trial. And there may be some
[19] instances where I will be objecting on the basis of
[20] sensitive security information, which is a federal
[21] statute that prohibits American Airlines and its
[22] employees from disclosing certain information
[23] without prior authorization by the Transportation
[24] Security Administration.

Page 7

[1] **MS. ABATE RECHT:** Where were we.
[2] **MS. MARIANI:** My apologies for
[3] interrupting.
[4] **BY MS. ABATE RECHT:**
[5] **Q:** What is your current position at American?
[6] **A:** I'm a flight attendant.
[7] **Q:** And have you been a flight attendant for 37
[8] years?
[9] **A:** Yes.
[10] **Q:** Did you have any previous positions at
[11] American?
[12] **A:** No.
[13] **Q:** What is your educational background?
[14] **A:** I'm a four-year college graduate.
[15] **Q:** Were you a member of the flight crew for
[16] American Airlines Flight 2237 on December 28, 2003?
[17] **A:** Yes.
[18] **Q:** Do you recall a passenger by the name of
[19] Mr. John Cerqueira, who was a passenger on that
[20] flight?
[21] **A:** Yes.
[22] **Q:** Do you recall having a conversation with
[23] Mr. Cerqueira on that day?
[24] **A:** Yes.

Page 8

[1] **Q:** What was the substance of that
[2] conversation?
[3] **A:** He approached the counter at work that I
[4] was at at the gate, the gate counter, and asked if
[5] he could have his seat changed.
[6] **Q:** And is there anything unusual about
[7] passengers asking to have seat changes at the gate?
[8] **A:** No.
[9] **Q:** Did you have any concerns after that
[10] conversation?
[11] **A:** Yes.
[12] **Q:** What were your concerns?
[13] **A:** He was very insistent. He repeatedly asked
[14] to have his seat changed after I told him that I
[15] couldn't do it; that I was not a ticket agent.
[16] **Q:** And is it uncommon for passengers to be
[17] insistent about things when they speak with you or
[18] with —
[19] **A:** To be hostile and insistent at 5:30 in the
[20] morning, yes.
[21] **Q:** Are passengers typically denied service for
[22] asking for seat changes?
[23] **MS. MARIANI:** Objection. You may answer.
[24] **A:** I'm sorry, can you repeat that.

Page 9

[1]  **Q:** I said, are passengers typically denied
[2]  service for asking for seat changes?
[3]  **MS. MARIANI:** Objection. You may answer.
[4]  **A:** No.
[5]  **Q:** And did you discuss this incident with
[6]  anyone at the time?
[7]  **A:** No.
[8]  **MS. ABATE RECHT:** I'm going to mark as
[9]  Exhibit 1 a document that's been Bates numbered as
[10]  AA0018 through 20.
[11]     (Document marked as Walling
[12]  Exhibit 1 for identification)
[13]  **Q:** Ms. Walling, if you could take a moment to
[14]  look at this document, please.
[15]  **A:** (Witness reviews document)
[16]  **Q:** Do you recognize this document?
[17]  **A:** Yes.
[18]  **Q:** Can you identify it for the record, please.
[19]  **A:** It's the OP-4 or the AMR.
[20]  **Q:** What does OP-4 stand for?
[21]  **A:** It's just paperwork that American — we
[22]  have to fill out an OP-4 whenever we have an event.
[23]  And I guess the technical term is "AMR Event Call
[24]  Center Report."

Page 10

[1]  **Q:** So OP-4 is just —
[2]  **A:** It's the same.
[3]  **Q:** It's the same thing. And you don't know
[4]  what the "O" or the "P" stands for?
[5]  **A:** No.
[6]  **Q:** When did you fill this out?
[7]  **A:** When I went downstairs, before I went home
[8]  and after the incident.
[9]  **Q:** So on the same day?
[10]  **A:** Yes.
[11]  **Q:** On the 28th of December?
[12]  **A:** Yes.
[13]  **Q:** Is this the document that you were
[14]  referring to before that you've reviewed in
[15]  preparation for the deposition?
[16]  **A:** Yes.
[17]  **Q:** If you look at the second page that's AA
[18]  0019, it states, "I told the other FAs" flight
[19]  attendants "going down the jet bridge there was a
[20]  passenger I felt very uncomfortable with."
[21]     Does this refresh your recollection as to
[22]  whether you discussed this incident with anyone at
[23]  the time?
[24]  **A:** I did not discuss this incident. I merely

Page 11

[1]  stated how I felt about the passenger that was
[2]  sitting there.
[3]  **Q:** Who did you say that to?
[4]  **A:** The other two flight attendants.
[5]  **Q:** What are their names?
[6]  **A:** They were reserve flight attendants.
[7]  Lois — I don't even know the first flight
[8]  attendant. I haven't flown with them since.
[9]  **Q:** Would you recognize their names? Was it
[10]  Lois Sargent, Amy —
[11]  **A:** Lois Sargent, I do. Amy, I recognize the
[12]  name. I wouldn't recognize the face.
[13]  **Q:** But you recognize the name Amy Milenkovic?
[14]  **A:** Yes.
[15]  **Q:** What did you tell the flight attendants?
[16]  **A:** In regard to?
[17]  **Q:** It says here, "I told the other flight
[18]  attendants going down the jet bridge there was a
[19]  passenger I felt very uncomfortable with." Is that
[20]  the extent of what you told them or was there more?
[21]  **A:** That was it.
[22]  **Q:** Did you tell the captain anything at that
[23]  time?
[24]  **A:** No.

Page 12

[1]  **Q:** What happened next with respect to Mr.
[2]  Cerqueira?
[3]  **A:** Are you talking about before I went down to
[4]  get on the airplane?
[5]  **Q:** You boarded the airplane ahead of the
[6]  passengers; is that correct?
[7]  **A:** Yes.
[8]  **Q:** And then Mr. Cerqueira boarded the airplane
[9]  as well; is that correct?
[10]  **A:** Yes.
[11]  **Q:** You stated here, "Upon boarding, he was the
[12]  first passenger in coach and went into the" — and
[13]  if you could just read your handwriting there. I
[14]  don't know what it says.
[15]  **A:** "Aft right lav."
[16]  **Q:** What does "aft" stand for?
[17]  **A:** The back of the airplane.
[18]  **Q:** Okay. Did that raise any suspicion for
[19]  you?
[20]  **A:** Yes.
[21]  **Q:** Why?
[22]  **A:** Because he was not supposed to be on that
[23]  airplane at that time.
[24]  **Q:** Why —

**Sally Walling**
**Vol. 1, March 28, 2006**

Case 1:05-cv-11652-WGY    Document 17-6    Filed 08/22/2006

**John D. Cerqueira    v.**
**American Airlines, Inc.**

Page 5 of 17

Page 13

[1] **A:** He was a coach passenger. First class had
[2] just barely begun to board. Generally speaking, no
[3] coach passengers come on, in my recollection, before
[4] first class.
[5] **Q:** Did you hear the gate agent calling the
[6] passengers to board?
[7] **A:** No.
[8] **Q:** So you have no idea whether his group was
[9] called to board and whether he boarded correctly?
[10] **MS. MARIANI:** Objection. You may answer.
[11] **A:** I've never known a coach passenger boarding
[12] first.
[13] **Q:** But you were on the plane, right?
[14] **A:** Correct.
[15] **Q:** So you didn't hear whether the people at
[16] the gate had called his group to board; is that
[17] right?
[18] **A:** No, I didn't hear it.
[19] **Q:** Are passengers typically denied service for
[20] boarding ahead of their scheduled group, if that's
[21] what —
[22] **Q:** — Mr. Cerqueira did.
[23] And are passengers typically denied service

Page 14

[1] for using the restroom upon boarding the plane?
[2] **MS. MARIANI:** Objection. You may answer.
[3] **A:** No.
[4] **Q:** It's not uncommon, actually, for passengers
[5] to use the restroom in the airplane, is it?
[6] **MS. MARIANI:** Objection. You may answer.
[7] **A:** No.
[8] **Q:** Did you speak with Mr. Cerqueira at all
[9] after he had boarded the flight?
[10] **A:** No.
[11] **MS. ABATE RECHT:** I'm going to mark as
[12] Exhibit 2 American Airlines Answers to Plaintiff's
[13] First Set of Interrogatories.
[14]    (Document marked as Walling
[15] Exhibit 2 for identification)
[16] **Q:** Ms. Walling, these are American Airlines'
[17] Answers to the Plaintiff's First Set of
[18] Interrogatories. Are you familiar with
[19] interrogatories at all?
[20] **A:** No.
[21] **Q:** Interrogatories are questions that, in this
[22] case, the plaintiff has posed to the defendant,
[23] American Airlines, and American has answered those
[24] questions. And I'm just going to ask you about some

Page 15

[1] of American's responses to plaintiff's questions.
[2]    Did you review these at all prior to seeing
[3] them today?
[4] **A:** I don't remember.
[5] **Q:** If you would turn, please, to Page 3. Do
[6] you see where it says "Interrogatory No. 4"?
[7] **A:** Yes.
[8] **Q:** And it says, "Identify all American
[9] Airlines personnel who communicated with Mr.
[10] Cerqueira on or after December 28, 2003, and state
[11] the substance of the communications." Do you see
[12] where it says that?
[13] **A:** Yes.
[14] **Q:** And four rows down in the response it
[15] states, "Ms. Walling also subsequently spoke to Mr.
[16] Cerqueira after he had boarded the flight. And the
[17] substance of the conversation was to advise Mr.
[18] Cerqueira to raise his seat back and follow other
[19] general safety instructions that are given prior to
[20] all departures." Do you see where it says that?
[21] **A:** Yeah.
[22] **Q:** Does that refresh your recollection at all
[23] as to whether you had a conversation with Mr.
[24] Cerqueira after he boarded the flight?

Page 16

[1] **A:** I did not.
[2] **Q:** You didn't?
[3] **A:** No.
[4] **Q:** So is this untrue?
[5] **MS. MARIANI:** Objection. You may answer.
[6] **A:** Yes.
[7] **Q:** Did you talk with anyone — did anyone
[8] speak to you about American's preparation of these
[9] answers to interrogatories?
[10] **MS. MARIANI:** I'm going to object, and I'm
[11] going to instruct the witness not to answer insofar
[12] as she has spoken with anyone at my office or anyone
[13] at American Airlines' legal department with regard
[14] to any matter surrounding this case.
[15] **MS. ABATE RECHT:** I'm not asking her what
[16] the substance of the communication was. I'm merely
[17] asking her whether she communicated with anyone
[18] regarding answers to interrogatories.
[19] **MS. MARIANI:** She may answer as to whether
[20] or not she did or did not, to the best of her
[21] recollection.
[22] **A:** I don't remember.
[23] **Q:** But you don't remember, sitting here today,
[24] speaking with Mr. Cerqueira and asking him to raise

[1] his seat back and follow other general safety
[2] instructions?
[3]    **A:** I did not.
[4]    **Q:** If you would turn back to your statement
[5] that we were looking at a moment ago, which was
[6] marked as Exhibit 1. Do you recall approximately
[7] how long Mr. Cerqueira was in the restroom?
[8]    **A:** Approximately four to five minutes.
[9]    **Q:** Did that raise any suspicion for you, that
[10] length of time?
[11]    **MS. MARIANI:** Objection. You may answer.
[12]    **A:** Under the circumstances, yes.
[13]    **Q:** And can you explain what you mean by that.
[14]    **MS. MARIANI:** You may answer.
[15]    **A:** He was not supposed to be in the coach at
[16] that time. He had raised my suspicions at the gate
[17] because he was hostile and insistent with me. He
[18] stood very close to me and watched me for 20 minutes
[19] while I was doing my computer work. When I turned
[20] around to retrieve my computer work, he was sitting
[21] next to me, staring at me.
[22]    **Q:** Were you doing your computer work behind
[23] the counter —
[24]    **A:** Yes.

[1]    **Q:** — or were you sitting in a seat?
[2]    **A:** No, behind the counter.
[3]    **Q:** Did he at any time go behind the counter?
[4]    **A:** No. I had asked him to sit over to the
[5] side, because he continued to ask and continued to
[6] stand in front of me after I told him, "I am not a
[7] gate agent. I cannot help you."
[8]    **Q:** So you were standing behind the counter,
[9] and he was standing at the counter on the other
[10] side?
[11]    **A:** Yes.
[12]    **Q:** And then you asked him to go sit down in
[13] one of the —
[14]    **A:** Seats.
[15]    **Q:** — seats. And he did that?
[16]    **A:** Yes.
[17]    **Q:** So he followed your instructions when you
[18] told him to go sit down?
[19]    **A:** Eventually.
[20]    *Q. You say in your statement, if you look at
[21] the last line of your statement on the second page,
[22] "Then everything started to happen, with the captain
[23] feeling uneasy with one of them." Can you explain
[24] that further, please.

[1]    **A:** He took his seat at the window exit — I
[2] need to ask you something. Can I do that?
[3]    **MS. MARIANI:** You have to answer the
[4] question.
[5]    **THE WITNESS:** What is it?
[6]    **MS. ABATE RECHT:** Can you read repeat the
[7] question, Jane.
[8]    *(Question read)
[9]    **A:** Before I talked with the captain, before he
[10] called me, two passengers came back and said
[11] something to me about — a statement to me, about
[12] the passengers in the window exit row saying uneasy
[13] things to them.
[14]    **Q:** Do you recall what they were saying?
[15]    **A:** No. No.
[16]    **Q:** So this was during the boarding process
[17] to —
[18]    **A:** In the back of the airplane, yes.
[19]    **Q:** Okay. You don't recall what they said,
[20] though?
[21]    **A:** They said they felt very uneasy and
[22] uncomfortable.
[23]    **Q:** Were they referring to Mr. Cerqueira?
[24]    **A:** What they said was, "The men in the window

[1] exit row."
[2]    **Q:** What does the "window exit row" mean?
[3]    **A:** The window exit row is where he sat. It's
[4] the row in front — where the window exits are,
[5] there are two rows of window exits.
[6]    **Q:** Okay.
[7]    **A:** And he was in the window exit row.
[8]    **Q:** So there's two rows of emergency exits —
[9]    **A:** Correct.
[10]    **Q:** And one row doesn't have a window, and one
[11] row —
[12]    **A:** No, they both have windows.
[13]    **Q:** They both have windows.
[14]    **A:** Yeah.
[15]    **Q:** So Mr. Cerqueira was seated at the window
[16] seat?
[17]    **A:** Yes.
[18]    **Q:** And you're calling that the window exit
[19] row?
[20]    **A:** Yes.
[21]    **Q:** So before the captain called you, you
[22] testified that two passengers approached you and
[23] said that they felt uneasy?
[24]    **A:** Correct.

---

Page 21

[1] Q: Did you know whether they were referring to
[2] Mr. Cerqueira or were they referring to the other
[3] two men who were seated with him?
[4] MS. MARIANI: Objection. You may answer.
[5] A: The men in the window exit row.
[6] Q: So they referred to the three collectively?
[7] A: Yeah.
[8] MS. MARIANI: Objection. You may answer,
[9] if you know.
[10] A: Yeah.
[11] Q: Then what happened?
[12] A: I went up to see who they were referring
[13] to, because I was in the back of the airplane
[14] getting the galley ready for the service. They
[15] expect me to do that.
[16] Q: Okay.
[17] A: So I went up and looked at them. This was
[18] probably — there might have been maybe 10 or 12
[19] people at that time in coach, maybe 15. It was at
[20] the initial part of boarding.
[21] Q: How many people — what kind of airplane
[22] was it?
[23] A: Super 80.
[24] Q: So how many coach passengers does that —

---

Page 22

[1] A: 125.
[2] Q: 125. So at that time there were only about
[3] 10 to 15 passengers?
[4] A: Maybe 20. It was a small amount. It was
[5] just the initial part of boarding. So when I went
[6] up, it was Mr. Cerqueira and two other men, and they
[7] had their eyes closed, and they were sitting back
[8] like this during this whole boarding (indicating).
[9] I repeatedly went back to check, and they all —
[10] they had their eyes closed.
[11] MS. MARIANI: Please remember that the
[12] court reporter cannot take down physical gestures.
[13] So if you could describe for the record any physical
[14] movements that you make, that would be appreciated.
[15] A: They had their seat back, and they had
[16] their eyes closed, which was unusual for the
[17] boarding process, with 100 people boarding around
[18] you, to be in that way.
[19] Q: So you felt it was unusual that they were
[20] resting with their eyes closed?
[21] MS. MARIANI: Objection. You may answer.
[22] A: Under the circumstances, yes.
[23] Q: And those circumstances were just that the
[24] passengers were boarding or are there any other

---

Page 23

[1] circumstances?
[2] A: The passengers were boarding, there was a
[3] lot of activity, and they weren't involved in any
[4] way. I mean — I don't know how to explain it, but
[5] it's not generally done. People do not pretend
[6] they're sleeping.
[7] Q: So in your opinion, they were pretending to
[8] sleep. They weren't just actually sleeping?
[9] MS. MARIANI: Objection. You may answer.
[10] A: I don't know. I don't know that.
[11] Q: You don't know that?
[12] A: (Witness shakes head)
[13] Q: Did you think they were pretending?
[14] A: Yes.
[15] Q: You did say, "Then everything started to
[16] happen, with the captain feeling uneasy with one of
[17] them." Can you explain that?
[18] A: The captain called back — John called back
[19] on the phone and asked me if I — something was said
[20] to him on boarding that made him feel uncomfortable.
[21] There was a gentleman in coach with a ponytail.
[22] Would I go and check and just see what I felt, what
[23] I thought about it.
[24] Q: So after you — I'm just trying to get the

---

Page 24

[1] sequence of events down. So the passenger said
[2] something to you. You went up, saw that the three
[3] men were sleeping, and then you went to the back of
[4] the plane again and then received the call from the
[5] captain?
[6] A: Yes.
[7] Q: Did the captain mention anything about Mr.
[8] Cerqueira?
[9] MS. MARIANI: Objection. You may answer.
[10] A: Not specifically. He said to look for the
[11] gentleman with the ponytail.
[12] Q: And did you notice whether Mr. Cerqueira
[13] had a ponytail?
[14] A: I don't believe he did.
[15] Q: In your statement, you then say, "The
[16] passengers saying how the passenger with the
[17] ponytail was wishing everyone around him 'Happy New
[18] Year.' He also said strange comments to the
[19] captain."
[20] Is this what you were referring to a moment
[21] ago when you said the passengers approached you?
[22] A: Yes.
[23] Q: So they were referring to just the
[24] passenger with the ponytail?

---

**Page 25**

[1]  **A:** No.

[2]  **Q:** Well, you say here, "The passengers saying

[3]  how the passenger with the ponytail was wishing

[4]  everyone around him 'happy new year.'" Did they say

[5]  something else that you didn't include here?

[6]  **A:** I'm confused.

[7]  **Q:** Well, you testified earlier, I believe,

[8]  that the passengers said something to you, but they

[9]  didn't specify which passengers in the window exit

[10]  row they were referring to?

[11]  **A:** Correct.

[12]  **Q:** And then in your statement, you said, "The

[13]  passengers saying how the passenger with the

[14]  ponytail was wishing everyone around him 'Happy New

[15]  Year.'" So did they say something else to you in

[16]  addition to this?

[17]  **A:** I don't recall.

[18]  **Q:** And then you say, "He also said strange

[19]  comments to the captain." And that's referring back

[20]  to the man with the ponytail; is that correct?

[21]  **A:** Yes.

[22]  **Q:** So as you sit here today, you don't recall

[23]  whether any of the passengers mentioned anything

[24]  specifically with respect to Mr. Cerqueira?

**Page 26**

[1]  **A:** I don't recall.

[2]  **A:** Do you recall which passenger said anything

[3]  to you?

[4]  **A:** No.

[5]  **Q:** Do you recall where they were sitting?

[6]  **A:** Approximately the same area as — I'm

[7]  trying to remember. I don't remember the seat, but

[8]  the lady with the two children were more towards the

[9]  back of the airplane. The older lady was actually

[10]  sitting around the window exit.

[11]  **Q:** So it was an older woman and a woman who

[12]  was traveling with two children?

[13]  **A:** Yeah.

[14]  **Q:** You mentioned a moment ago that you thought

[15]  it was unusual for the three passengers in the

[16]  window exit row to be sleeping during boarding; is

[17]  that correct?

[18]  **A:** Yeah.

[19]  **Q:** Passengers aren't typically denied service

[20]  for falling asleep during the boarding process, are

[21]  they?

[22]  **MS. MARIANI:** Objection. You may answer.

[23]  **A:** No.

[24]  **Q:** After you spoke with the captain initially

**Page 27**

[1]  and you went up to look at the three passengers, did

[2]  you report back to the captain?

[3]  **A:** Yes.

[4]  **Q:** What did you say to him?

[5]  **A:** That I needed to come to the cockpit and

[6]  talk to him.

[7]  **Q:** And did you go to the cockpit and talk to

[8]  him?

[9]  **A:** Yes.

[10]  **Q:** What did you discuss?

[11]  **A:** At that time I relayed to him, the captain,

[12]  what had happened at the gate in regards to one of

[13]  the gentleman at the window exit.

[14]  **Q:** Did you say anything else to him?

[15]  **A:** No.

[16]  **Q:** And did he say anything back to you?

[17]  **A:** I don't recall what his actual response

[18]  was.

[19]  **Q:** Do you recall generally what his response

[20]  was?

[21]  **A:** I think he asked me to go back and recheck

[22]  the lavatory and to check around the overhead bins

[23]  and in front of the — underneath the seats, just to

[24]  make sure that everything looked okay.

**Page 28**

[1]  **Q:** And did you do that?

[2]  **A:** Yeah.

[3]  **Q:** And did you find anything that made you

[4]  uncomfortable?

[5]  **MS. MARIANI:** Objection. You may answer.

[6]  **A:** No.

[7]  **Q:** How long did that process take you?

[8]  **A:** Just a few minutes.

[9]  **Q:** Was anyone else involved with that

[10]  conversation between you and Captain Ehlers?

[11]  **A:** The co-pilot.

[12]  **Q:** Was he participating in the conversation or

[13]  just listening?

[14]  **A:** Listening.

[15]  **Q:** Did he say anything?

[16]  **A:** No. Actually, the captain sent him back to

[17]  double-check the lavatory.

[18]  **Q:** And did he do that?

[19]  **A:** Yes.

[20]  **Q:** And do you know whether he found anything?

[21]  **A:** I don't know.

[22]  **Q:** Did he tell you that he found anything?

[23]  **Q:** Did you speak with any of the other flight

Page 29

[1] attendants during this time?
[2] **A:** No.
[3] **Q:** Did you speak with any other American
[4] Airlines personnel during this time?
[5] **A:** No.
[6] **Q:** Did you perceive the three passengers
[7] seated in the exit window row that Mr. Cerqueira was
[8] sitting in to be traveling together?
[9] **MS. MARIANI:** Objection. You may answer.
[10] **A:** I wasn't sure.
[11] **Q:** Are you familiar with how exit row seating
[12] is assigned by American Airlines?
[13] **MS. MARIANI:** Objection. You may answer.
[14] **A:** Vaguely.
[15] **Q:** What is your understanding of that process?
[16] **MS. MARIANI:** Objection. You may answer.
[17] **A:** That they board with the rest of the coach
[18] people.
[19] **Q:** That's not my question. My question is how
[20] the exit row seats are assigned.
[21] **MS. MARIANI:** Objection.
[22] **A:** Assigned?
[23] **A:** Yes.
[24] **A:** No.

Page 31

[1] **A:** Yes.
[2] **Q:** Did you witness Mr. Cerqueira talking with
[3] them or interacting with them in any way?
[4] **A:** No.
[5] **Q:** Did you think the three passengers were
[6] Middle Eastern?
[7] **MS. MARIANI:** Objection. You may answer.
[8] **A:** I had no idea.
[9] **Q:** Did you think they were foreign?
[10] **MS. MARIANI:** Objection. You may answer.
[11] **A:** "Foreign" being what?
[12] **Q:** Not born in the United States.
[13] **A:** No. I didn't know that.
[14] **Q:** Do you think that they looked similar?
[15] **MS. MARIANI:** Objection. You may answer.
[16] **A:** Yes.
[17] **Q:** Can you describe that; why you thought they
[18] looked similar.
[19] **A:** They were dark. They could have been any
[20] nationality.
[21] **Q:** And by "dark," you mean their skin was
[22] dark?
[23] **A:** Well, their hair was dark. They had dark
[24] hair. But that really wasn't it, their looks.

Page 30

[1] **Q:** You're not familiar with how exit row seats
[2] are assigned?
[3] **A:** No.
[4] **Q:** Do you know whether — but you are aware —
[5] strike that.
[6] Exit row seats are assigned by the gate
[7] agent; is that correct?
[8] **MS. MARIANI:** Objection. You may answer.
[9] **A:** I don't know. I have nothing to do with
[10] the assignment of seats.
[11] **Q:** Have you ever flown on an airplane as a
[12] passenger?
[13] **A:** Yes.
[14] **Q:** Have you ever requested an exit seat?
[15] **A:** No.
[16] **Q:** So as an employee of American Airlines for
[17] 37 years, you have no idea how exit row seats are
[18] assigned?
[19] **MS. MARIANI:** Objection. You may answer.
[20] **A:** No.
[21] **Q:** Okay. I think you just said a moment ago
[22] that you weren't sure whether Mr. Cerqueira was
[23] traveling with the other two gentlemen in his row;
[24] is that right?

Page 32

[1] **Q:** Did you check to see if they had purchased
[2] their tickets together?
[3] **A:** No.
[4] **Q:** Are you aware of whether any other American
[5] employee had checked to see whether they purchased
[6] their tickets together?
[7] **A:** No.
[8] **Q:** Do you know whether they requested to sit
[9] together?
[10] **A:** No.
[11] **Q:** Do you recall whether Mr. Cerqueira was
[12] with the other two gentlemen in the gate area before
[13] boarding?
[14] **A:** There was just basically him and I before I
[15] got on that airplane. There were not a lot of other
[16] people in that area. There were probably two or
[17] three people in that whole gate area. And when I
[18] boarded the airplane, I don't know who he was with.
[19] **Q:** But the time that — I think you testified
[20] you were there for about 20 minutes doing your
[21] computer work.
[22] **A:** Uh-hum.
[23] **Q:** During that 20 minutes, you didn't see him
[24] with the other two passengers, did you?

Page 33

[1]   **A:** No.
[2]   **Q:** What made you think they could have been
[3] traveling together?
[4]   **MS. MARIANI:** Objection. You can answer.
[5]   **A:** It was basically because I felt that they
[6] were feigning sleep during a very busy boarding
[7] process, and they seemed to be hostile.
[8]   **Q:** All three seemed to be hostile?
[9]   **A:** Yes.
[10]   **Q:** How did the other two appear to be hostile?
[11]   **A:** They wouldn't look at you.
[12]   **Q:** Because they were sleeping?
[13]   **MS. MARIANI:** Objection.
[14]   **A:** No, before they slept. You know, they
[15] didn't look at anybody. They just were sleeping or
[16] pretending to sleep. But their body language —
[17] they just seemed hostile.
[18]   **Q:** How did their body language seem hostile?
[19]   **A:** It's hard to explain. I could show you,
[20] but I don't know how to explain it.
[21]   **Q:** Well, try.
[22]   **A:** If you cross your arms and you sit back,
[23] you lay back —
[24]   **MS. ABATE RECHT:** Just let the record

Page 34

[1] reflect that the witness has just crossed her arms
[2] in front of her chest.
[3]   **A:** Lean back and close your eyes — it's just
[4] a hostile way of being. It's not an open type of
[5] situation on the airplane. It's hard to explain.
[6]   **Q:** It's not uncommon for passengers to cross
[7] their arms and sit back and close their eyes, is it?
[8]   **MS. MARIANI:** Objection. You may answer.
[9]   **A:** No.
[10]   **Q:** And typically passengers aren't refused
[11] service for crossing their arms, sitting back and
[12] closing their eyes, are they?
[13]   **MS. MARIANI:** Objection. You may answer.
[14]   **A:** No.
[15]   **Q:** Did you notice any other behavior on the
[16] part of Mr. Cerqueira that you thought was
[17] suspicious that we haven't discussed yet?
[18]   **A:** No.
[19]   **Q:** And other than — strike that.
[20] Did you notice any other behavior on the
[21] part of the other two gentlemen seated with Mr.
[22] Cerqueira that you thought was suspicious that we
[23] haven't discussed yet?
[24]   **A:** No.

Page 35

[1]   **Q:** What happened next, after you spoke with
[2] the captain and after you checked the lavatory and
[3] the overhead bins?
[4]   **A:** I went back to stand in the back of the
[5] airplane and continued the boarding process in back
[6] and the galley, my stuff in the galley. And that
[7] was it.
[8]     You know, he took over, the captain and
[9] everybody — I know nothing about that. Once I left
[10] the cockpit and went back to my position in the back
[11] of the airplane, I had nothing to do with anything
[12] else.
[13]   **Q:** What are you referring to, "with anything
[14] else"?
[15]   **A:** With what transpired.
[16]   **Q:** Did the captain tell you what he was
[17] planning to do?
[18]   **A:** No.
[19]   **Q:** Were you aware that the captain had
[20] contacted law enforcement?
[21]   **A:** No.
[22]   **Q:** At some point after your conversation with
[23] the captain, Mr. Cerqueira and the other two
[24] passengers seated next to him were removed from the

Page 36

[1] plane; is that correct?
[2]   **A:** Yes.
[3]   **Q:** Who were they removed from the plane by?
[4]   **A:** I don't recall exactly their titles.
[5]   **Q:** Do you recall whether it was officers from
[6] the State Police?
[7]   **A:** No, it wasn't that.
[8]   **Q:** It wasn't the State Police who removed him?
[9]   **A:** No. The agent came back — or somebody
[10] from ground came back and asked for them to come
[11] forward to the airplane, the front of the airplane.
[12]   **Q:** Do you know who that person was?
[13]   **A:** No, I don't.
[14]   **Q:** Was it Mr. Flores?
[15]   **A:** It may have been. I really don't recall
[16] exactly who came back.
[17]   **Q:** Do you recall whether any law enforcement
[18] officers ever entered the plane?
[19]   **A:** I don't remember seeing any officers get on
[20] the airplane. I was in the back of the airplane.
[21]   **Q:** Who was the flight attendant who would have
[22] been in that area, taking care of that area?
[23]   **MS. MARIANI:** Objection. You may answer.
[24]   **A:** The No. 1, the No. 1 — what was her name.

Sally Walling
Vol. 1, March 28, 2006

Case 1:05-cv-11652-WGY    Document 17-6    Filed 08/22/2006

John D. Cerqueira    v.
American Airlines, Inc.
Page 11 of 17

---

Page 37

[1] Not Lois. The other one.

[2] **Q:** Amy Milenkovic?

[3] **A:** Uh-hum.

[4] **Q:** So are you the No. 4 flight attendant?

[5] **A:** I'm the No. 2, the galley person in the
[6] back.

[7] **Q:** Is the No. 2 person?

[8] **A:** Yes.

[9] **Q:** And the No. 1 person is the person —

[10] **A:** First class flight attendant.

[11] **Q:** And there were three flight attendants
[12] onboard that day?

[13] **A:** And Lois is the No. 4.

[14] **Q:** So is there any No. 3?

[15] **A:** No.

[16] **Q:** What does the No. 4 do?

[17] **A:** Boards. Boards up front, hangs coats in
[18] first class.

[19] **Q:** Okay. What did they do during the flight?

[20] **A:** They work with me in back. I set up the
[21] carts. No. 2 sets up the carts and gets — and
[22] takes care of all the — pretty much whatever is
[23] going on in the back of the airplane.

[24] **Q:** So at some point you noticed that Mr.

---

Page 38

[1] Cerqueira and the three passengers were removed from
[2] the airplane; is that correct?

[3] **A:** Uh-hum.

[4] **Q:** That was done before the decision was made
[5] to deplane and rescreen all of the passengers on the
[6] plane; is that correct?

[7] **A:** Yes.

[8] **Q:** Do you know why Mr. Cerqueira and the other
[9] two passengers were being removed?

[10] **A:** No.

[11] **Q:** Did you ask anyone?

[12] **MS. MARIANI:** Objection. You may answer.

[13] **A:** I don't think so, because I was in the back
[14] of the airplane with all the passengers, so I wasn't
[15] privy to anything that was transpiring up front; who
[16] they called, why they called or what was happening.
[17] So no, I did not have a conversation.

[18] *Q. Did you have a conversation with anyone
[19] after the incident about why these passengers were
[20] removed from the plane?

[21] **MS. MARIANI:** Objection. I'm going to
[22] allow the witness to answer as to conversations with
[23] anyone other than members of the American legal
[24] department or my office.

---

Page 39

[1] **Q:** You can answer whether you had
[2] conversations with anyone from the legal department.
[3] You just don't need to tell us what the substance of
[4] those communications were.

[5] **A:** So the question is? I'm sorry.

[6] **MS. ABATE RECHT:** Jane, can you repeat the
[7] question.

[8] *(Question read)

[9] **A:** Yes.

[10] **Q:** Who did you speak with?

[11] **A:** The supervisor on duty downstairs.

[12] **Q:** Who was that?

[13] **A:** I don't recall.

[14] **Q:** Was it a man or a woman?

[15] **A:** You know, three years ago, their MODs, I
[16] don't recall.

[17] **Q:** What's —

[18] **A:** They're supervisors on duties downstairs to
[19] assist flight attendants with any problems or — you
[20] know, to gather the paperwork for the wide bodies
[21] and things like that. I mean, I don't normally talk
[22] to them.

[23] **Q:** Do you remember what you spoke with them
[24] about that day?

---

Page 40

[1] **A:** That I had to write up an OP-4 and that I
[2] would submit it. And I went into the conference
[3] room.

[4] **Q:** And by "OP-4," you're referring to the
[5] statement that's marked as Exhibit 1?

[6] **A:** Yes.

[7] **Q:** And other than this document, did you write
[8] anything else regarding this incident?

[9] **A:** No.

[10] **Q:** Did anyone from American contact you to
[11] discuss this further after that day?

[12] **A:** No.

[13] **Q:** Did you communicate with any law
[14] enforcement officers?

[15] **A:** No.

[16] **Q:** Did you notice whether Mr. Cerqueira and
[17] the other two passengers seated in his row were
[18] either giggling or joking during the security
[19] briefing, the safety briefing?

[20] **A:** I remember something about that, but I'm
[21] not sure what.

[22] **MS. ABATE RECHT:** I'll mark as Exhibit 3
[23] the document that's been Bates numbered CRQ 0029-35.

[24]

---

Page 41

[1]    (Document marked as Walling
[2] Exhibit 3 for identification)
[3]    Q: Ms. Walling, this is a document that was
[4] submitted to the Massachusetts Commission Against
[5] Discrimination by American Airlines back in December
[6] 2004.
[7]    If you would turn to the third page, CRQ
[8] 0031, the last sentence of the second paragraph
[9] states, "A flight attendant also observed the
[10] passengers in seats 20D-F to be giggling or joking
[11] during the safety briefing."
[12]    Does this refresh your recollection at all
[13] as to whether you were —
[14]    A: Not me.
[15]    Q: You were not that flight attendant?
[16]    A: (No response)
[17]    Q: Is that right?
[18]    A: Correct.
[19]    Q: Did you continue on to Fort Lauderdale with
[20] this flight?
[21]    A: No.
[22]    Q: Why not?
[23]    A: Because they got a new crew.
[24]    Q: Why did they get a new crew?

Page 42

[1]    A: Because I didn't want to.
[2]    Q: Why didn't you want to?
[3]    A: I just didn't want to.
[4]    Q: Was there a reason why?
[5]    A: No.
[6]    Q: Were you required to give them any reason
[7] for asking to be replaced on a flight?
[8]    A: Am I required —
[9]    Q: Are you required to give American any
[10] reason —
[11]    A: Yes.
[12]    Q: What reason did you give them?
[13]    A: Because of the incident that happened and
[14] the passengers were taken off, so much was going on,
[15] it was undetermined when and if the airplane would
[16] go, because they were bringing dogs and all of that
[17] onboard.
[18]    The other two flight attendants were very
[19] junior — by that, I mean Lois is not young, but
[20] she's very junior. And the No. 1 was very junior.
[21] And they were very upset with all the commotion,
[22] because it was upsetting. I didn't think we should
[23] go on the flight. I wanted to go home.
[24]    Q: Did you have any safety concerns about the

Page 43

[1] flight or was it just that you were staffed with
[2] junior flight attendants?
[3]    MS. MARIANI: Objection. You may answer.
[4]    A: Yes.
[5]    Q: Which one?
[6]    MS. MARIANI: Objection. You may answer.
[7]    A: I wasn't comfortable with the incident in
[8] the lavatory.
[9]    (Interruption)
[10]    MS. ABATE RECHT: We'll go off the record
[11] for a minute.
[12]    (Recess taken from 11:06 to 11:15 a.m.)
[13]    BY MS. ABATE RECHT:
[14]    Q: Ms. Walling, before the break we were
[15] talking about your decision to not continue on the
[16] flight to Fort Lauderdale. And I'll just ask again,
[17] why did you decide that?
[18]    MS. MARIANI: Objection. You may answer.
[19]    A: Because I felt unsafe. And that was my
[20] prerogative to do that.
[21]    Q: Why did you feel unsafe?
[22]    A: There were just too many instances that had
[23] happened that made me feel that way.
[24]    Q: Were you aware that the three gentlemen who

Page 44

[1] had been seated in the exit row would not be on that
[2] flight?
[3]    A: Yes.
[4]    Q: So even without them on the flight, you
[5] still felt fearful?
[6]    MS. MARIANI: Objection. You may answer.
[7]    A: Basically, it was the lavatory situation.
[8] I did not want to go on that airplane.
[9]    Q: And when you say "the lavatory situation,"
[10] what are you referring to?
[11]    A: When Mr. Cerqueira went in the back
[12] lavatory for four to five minutes, I felt
[13] uncomfortable with that.
[14]    Q: I'm just going to ask you about the
[15] involvement of a number of other American Airlines
[16] personnel in this incident. And if you could just
[17] tell me what their involvement was for each person,
[18] I would appreciate that.
[19]    What was the involvement of Captain Ehlers?
[20]    A: I'm unclear.
[21]    Q: What was his role in the events that
[22] occurred on the morning of December 28th, 2003?
[23]    A: He was the captain of the flight. And we
[24] had that conversation in the cockpit.

---

Page 45

[1] **Q:** Do you know whether he was involved in any
[2] other way?
[3] **A:** No.
[4] **Q:** Do you know who made the decision to have
[5] the three passengers removed from the plane?
[6] **A:** No.
[7] **Q:** What was the involvement of Nicole Traer in
[8] the incident?
[9] **A:** I don't know her. I have no idea.
[10] **Q:** What was the involvement of Lois Sargent in
[11] the incident?
[12] **A:** I have no idea. I was in the back of the
[13] airplane. I don't know what happened with her.
[14] **Q:** Ms. Sargent was a flight attendant, right?
[15] **A:** Correct.
[16] **Q:** And what number was she again?
[17] **A:** She was No. 2.
[18] **Q:** So she was tasked with the —
[19] **A:** Boarding and hanging coats and assisting
[20] first class.
[21] **Q:** What was the involvement of Amy Milenkovic
[22] in the incident?
[23] **A:** She was probably just doing her job,
[24] predeparture, you know. She really — I don't

---

Page 46

[1] really know what involvement they had.
[2] **Q:** What was the involvement of D.M. Ball in
[3] the incident?
[4] **A:** Is that the co-pilot?
[5] **Q:** I believe he was the first officer. Is
[6] that the co-pilot? Same thing?
[7] **A:** Other than checking the lavatory after he
[8] was asked to, I don't know.
[9] **Q:** What was the involvement of Ynes Flores in
[10] the incident?
[11] **A:** I don't know.
[12] **Q:** What was the involvement of Doug Wood in
[13] the incident?
[14] **A:** Again, he's the check airman —
[15] **Q:** What does that mean?
[16] **A:** He's the head of the pilots.
[17] **Q:** He's the head of the pilots?
[18] **A:** Head of the pilots in Boston.
[19] **Q:** Was he on the flight?
[20] **A:** No. I'm sure he must have been called at
[21] some point during — you have to follow the chain of
[22] command. You can't arbitrarily decide for yourself
[23] something.
[24] **Q:** Okay. So what —

---

Page 47

[1] **A:** I'm sure Captain Ehlers called his chief
[2] pilot.
[3] **Q:** And Captain Wood would have been based in
[4] Boston?
[5] **A:** Yes.
[6] **Q:** What was the involvement of Rhonda Cobbs in
[7] the incident?
[8] **A:** I don't know her.
[9] **Q:** Do you know Craig Marquis?
[10] **A:** No.
[11] **Q:** Do you know whether American has a
[12] procedure for removing passengers from planes based
[13] on suspicions of safety concerns?
[14] **MS. MARIANI:** Objection. You may answer.
[15] **A:** No, I don't know their specific procedures.
[16] **Q:** Do you know whether American has a
[17] procedure or a protocol to follow?
[18] **A:** I don't know.
[19] **MS. MARIANI:** Objection. You may answer.
[20] **Q:** Do you know whether American has a policy
[21] regarding the removal of passengers?
[22] **MS. MARIANI:** Objection. You may answer.
[23] **A:** I don't know what their policy is.
[24] **Q:** Have you received any training on

---

Page 48

[1] identifying suspicious behavior?
[2] **MS. MARIANI:** Objection. You may answer.
[3] **A:** Only in training. And I wouldn't limit it
[4] to suspicious behavior.
[5] **Q:** What training are you referring to?
[6] **A:** EPT training in Dallas that you have to go
[7] for two days.
[8] **Q:** What is that?
[9] **A:** It's emergency training specifically for
[10] American Airlines. Each company has their own
[11] training and conducts it in their own ways. And
[12] then a part of it is the FAA training. You have to
[13] have so many hours, and you have to do the drills
[14] and, you know, things like that every year.
[15] **Q:** What other issues are discussed besides
[16] emergency preparedness at this training?
[17] **A:** Incidences, security incidences and safety
[18] instances.
[19] **Q:** Can you elaborate on the security
[20] incidences that are discussed?
[21] **A:** No.
[22] **Q:** Why not?
[23] **A:** I can't remember specifically what it
[24] entails. Every year it's different.

Page 49

[1] **Q:** Do you remember what it entailed this year?

[2] **A:** I haven't gone this year.

[3] **Q:** Do you remember what it entailed last year?

[4] **A:** Security — I can't specifically.

[5] **Q:** Do you recall generally?

[6] **A:** Generally?

[7] **Q:** Yes.

[8] **A:** It usually involves — how can I say this?

[9] It usually involves instances that happen on the

[10] airplane.

[11] **Q:** What kind of instances?

[12] **A:** Safety instances.

[13] **Q:** Are you thinking of anything in particular?

[14] **A:** No.

[15] **Q:** How long does the training on safety last?

[16] **A:** It's a part of the two-day training.

[17] **Q:** What portion of the two days is that?

[18] **A:** Several hours.

[19] **Q:** And you don't remember anything about it?

[20] **MS. MARIANI:** Objection. You may answer.

[21] **A:** Not specifically.

[22] **Q:** Generally.

[23] **A:** No.

[24] **Q:** Do you have to take any kind of test or

Page 50

[1] quiz at the end of the training?

[2] **A:** Yes.

[3] **Q:** Are you graded on that test or quiz?

[4] **A:** You have to pass. It's a pass/fail thing.

[5] **Q:** Did you pass?

[6] **A:** Yes.

[7] **Q:** When was the last time you attended that

[8] training?

[9] **A:** Last April.

[10] **Q:** And I'll just ask again; you don't remember

[11] anything from the safety training or security

[12] incidences that they discussed?

[13] **MS. MARIANI:** Objection. You may answer.

[14] **A:** No.

[15] **Q:** Does American have protocols for what you

[16] should do if you think a passenger is suspicious?

[17] **MS. MARIANI:** Objection. You may answer,

[18] without giving specific details of the protocol,

[19] based on SSI concerns.

[20] **A:** You report to the captain.

[21] **Q:** Did you have to sign a confidentiality or

[22] nondisclosure agreement before being given access to

[23] any of American's policies or training materials?

[24] **MS. MARIANI:** Objection. You may answer.

Page 51

[1] **A:** Can you repeat that.

[2] **Q:** Sure. Did you have to sign a

[3] confidentiality agreement or a nondisclosure

[4] agreement before being given access to any of

[5] American's policies or training materials?

[6] **A:** No.

[7] **MS. MARIANI:** Objection.

[8] **A:** No.

[9] **Q:** Have you ever discussed American Airlines'

[10] protocols regarding what to do if you think a

[11] passenger is suspicious with anyone who is not an

[12] American Airlines employee?

[13] **A:** No.

[14] **Q:** Has American ever instructed you on whether

[15] it's okay to consider a passenger's ethnicity in

[16] determining whether a passenger may pose some sort

[17] of threat?

[18] **MS. MARIANI:** Objection. You may answer.

[19] **A:** No.

[20] **MS. ABATE RECHT:** I'm going to ask the

[21] court reporter to mark as Exhibit 4 a document that

[22] I just received today. It is not Bates numbered,

[23] but it has a "CONFIDENTIAL" stamp at the top of the

[24] page, and the first line says, "operating at

Page 52

[1] slightly under 75% of the total schedule."

[2] (Document marked as Walling

[3] Exhibit 4 for identification)

[4] **Q:** And Ms. Walling, I'll give you this

[5] document in a moment. I don't have another copy

[6] right now.

[7] **MS. MARIANI:** I actually have a copy which

[8] we can — I can give to you, so that you have a copy

[9] while asking her questions.

[10] **MS. ABATE RECHT:** All right, great.

[11] **MS. MARIANI:** I will need that back.

[12] **Q:** If you look at the second full paragraph —

[13] I'm sorry, the first full paragraph, it states, "I

[14] believe that you have the right to question any

[15] passenger acting suspicious, but I ask that if you

[16] have a problem, call it in for our 'experts' to

[17] check it out."

[18] Do you know what experts they're referring

[19] to?

[20] **A:** No.

[21] **Q:** Have you ever seen this document before?

[22] **A:** No.

[23] **Q:** Do you have any idea what it is?

[24] **A:** No.

Page 53

[1]   **Q:** Do you have any idea where it might come
[2]   from?
[3]   **A:** Probably the GO in Dallas, general office.
[4]      **MS. MARIANI:** Off the record for just a
[5]   second.
[6]      (Discussion off the record)
[7]         **BY MS. ABATE RECHT:**
[8]   **Q:** Does the "GO in Dallas" refer to — what
[9]   does "GO" refer to?
[10]  **A:** It's just where our base of operations —
[11]  everything comes out of Dallas. You know, the
[12]  general offices are there. But I'm not saying that
[13]  this document came from there, because I'm not
[14]  familiar with this document at all, but I have
[15]  really no idea about this.
[16]  **Q:** Do you get documents from the general
[17]  office in Dallas?
[18]  **A:** We get emails from — not the general
[19]  office, but emails — company emails that Jane
[20]  Allen, the head of flight, would generate or
[21]  supervisors would generate or something like that.
[22]  **Q:** And do these emails deal with the removal
[23]  of suspicious passengers from flights?
[24]     **MS. MARIANI:** Objection. You may answer.

Page 54

[1]   **A:** Not generally. I don't recall any.
[2]   **Q:** Have you ever been involved in any other
[3]   incident in which a passenger was removed from a
[4]   flight, denied boarding or refused service?
[5]   **A:** No.
[6]   **Q:** Have you ever been the subject of a
[7]   discrimination complaint by an American customer?
[8]   **A:** No.
[9]   **Q:** By that, I'm not limiting that to formal
[10]  litigation, but just any kind of complaint.
[11]  **A:** No.
[12]  **Q:** And can you just say your answer.
[13]  **A:** No.
[14]  **Q:** Because the court reporter can't pick up a
[15]  head nod.
[16]     Has American provided you with any training
[17]  or instruction or written materials concerning the
[18]  circumstances under which a passenger may be removed
[19]  from a flight, denied boarding or refused service.
[20]     **MS. MARIANI:** Objection. The witness may
[21]  answer as to whether she's been provided with such
[22]  materials. She cannot answer as to the specific
[23]  nature of materials, due to SSI considerations.
[24]  **A:** For the removal of passengers?

Page 55

[1]   **Q:** Right.
[2]   **A:** No.
[3]   **Q:** Has American provided you with any training
[4]   instruction or written materials concerning whether
[5]   a passenger's race, color, national origin,
[6]   ethnicity or ancestry may be considered in
[7]   determining whether a passenger should be removed
[8]   from a flight, denied boarding or refused service?
[9]   **A:** No, that would not happen.
[10]  **Q:** You said, "That would not happen." That
[11]  wasn't my question.
[12]     My question was, has American provided you
[13]  with any training or written materials on that
[14]  subject?
[15]  **A:** No.
[16]  **Q:** Has American ever taken any disciplinary
[17]  action against you for considering a passenger's
[18]  race, color, national origin, ethnicity or ancestry
[19]  in determining whether a passenger should be removed
[20]  from a flight, denied boarding or refused service?
[21]  **A:** No.
[22]  **Q:** Do you know any other American Airline
[23]  employee who has ever been disciplined for
[24]  considering such factors in determining whether a

Page 56

[1]   passenger should be removed from a flight, denied
[2]   boarding or refused service?
[3]      **MS. MARIANI:** Objection. You may answer.
[4]   **A:** No.
[5]   **Q:** Have you received any training regarding
[6]   the circumstances under which a passenger may be
[7]   removed from a flight, denied boarding or refused
[8]   service after the incident on December 28, 2003?
[9]      **MS. MARIANI:** Objection. You may answer.
[10]  **A:** No.
[11]  **Q:** Just to confirm, the training that you go
[12]  to once a year doesn't touch on any of those issues?
[13]     **MS. MARIANI:** Objection. You may answer.
[14]  **A:** Any of the last things that you just asked?
[15]  **Q:** Yes. The circumstances under which a
[16]  passenger may be —
[17]  **A:** No.
[18]     **MS. ABATE RECHT:** We can go off the record
[19]  for five minutes. I just want to look over my
[20]  notes.
[21]     **MS. MARIANI:** Sure.
[22]     (Off the record)
[23]         **BY MS. ABATE RECHT:**
[24]  **Q:** Did you have any discussions with the

Page 57

[1] captain after — strike that.
[2]     Did you have any discussions with Captain
[3] Ehlers about the incident after it occurred?
[4]   **A:** No discussion.
[5]   **Q:** Did you talk about it at any time with him?
[6]   **A:** There wasn't talk, no.
[7]   **Q:** When you say, "There wasn't talk," was
[8] there something other — was there anything else?
[9]   **A:** It was some time ago. I flew with him
[10] again, and he said — I can't remember exactly how
[11] he said it to me. Something like — I really can't
[12] remember exactly. It was something like, "We'll
[13] probably be hearing from the lawyers about our
[14] incident a year or two ago," or whatever it was.
[15] And I said, "Oh, really," and that was it. I mean,
[16] it was something vague like that. It wasn't — we
[17] never discussed it. We never discussed talked about
[18] it. We never —
[19]   **Q:** Do you know why he said that to you?
[20]   **A:** I don't know.
[21]   **Q:** Had you been contacted by any lawyers at
[22] that point?
[23]   **A:** No.
[24]   **Q:** And did you talk with anyone else after the

Page 58

[1] incident?
[2]   **A:** No.
[3]   **Q:** None of the other flight attendants?
[4]   **A:** No. I never saw them again. I think I've
[5] flown maybe once with Lois at some point, but I
[6] never saw them again. I never talked to them again.
[7]   **MS. ABATE RECHT:** Okay. I have no further
[8] questions.
[9]   **MS. MARIANI:** I just have a couple of
[10] things to clarify some of your earlier responses.
[11]       **CROSS EXAMINATION**
[12]       **BY MS. MARIANI:**
[13]   **Q:** You testified that you don't recall
[14] receiving specific training with regard to removal
[15] of passengers from flights based on their ethnicity;
[16] is that correct?
[17]   **A:** Yes.
[18]   **Q:** Do you recall any training at American
[19] Airlines about not discriminating against
[20] passengers?
[21]   **A:** Well, we're always told that. I mean, it's
[22] kind of a — it's just kind of a known thing.
[23]   **Q:** And when you say, "It's kind of a known
[24] thing," why is it a known thing?

Page 59

[1]   **A:** Because that's not enough to — you know,
[2] American would not — unless you had a combination
[3] of factors going on, American would not back you up
[4] in that way.
[5]     It is a clear policy at American that we
[6] are not to generalize on someone's appearances or,
[7] you know, make any type of a — I mean, it would not
[8] be — it would not hold up. You couldn't go to
[9] American and say that.
[10]   **Q:** You also testified that you receive emails
[11] from Jane Allen. How frequently do you receive
[12] those emails?
[13]   **A:** Well, it's not specifically Jane Allen.
[14] Jane Allen is the head of flight. So she will
[15] generate messages of concern that a flight attendant
[16] might be concerned with, and it comes out of her
[17] office.
[18]   **Q:** How often do you receive emails from her
[19] office?
[20]   **A:** Once or twice a year maybe.
[21]   **Q:** You testified that you don't recall any of
[22] those messages having to do with denial of boarding
[23] or refusal to provide service to passengers based on
[24] their ethnicity; is that correct?

Page 60

[1]   **A:** Yes.
[2]   **Q:** Is it fair to say that as you sit here
[3] today, you don't recall each and every one of those
[4] communications you've received from her office?
[5]   **A:** Yes.
[6]   **MS. MARIANI:** I have nothing further.
[7]   **MS. ABATE RECHT:** I just want to follow up
[8] on something.
[9]       **REDIRECT EXAMINATION**
[10]       **BY MS. ABATE RECHT:**
[11]   **Q:** You just testified in response to your
[12] counsel's question that ethnicity wouldn't be
[13] considered; that you have to have a combination of
[14] factors to deny someone boarding. Could ethnicity
[15] be one of those factors?
[16]   **MS. MARIANI:** Objection. You may answer.
[17]   **A:** No.
[18]   **Q:** What are the combination of factors you
[19] were referring to?
[20]   **A:** Suspicious behavior, a security or an
[21] instance — for instance, the lavatory thing that I
[22] felt was unwarranted. It would have to be something
[23] like that. It would not be because of their looks.
[24] It would have to generate other things.

Page 61

[1]    **MS. ABATE RECHT:** I have nothing further.

[2]    **MS. MARIANI:** I have no further questions.

[3]    (Whereupon, the deposition was

[4] concluded at 11:41 a.m.)

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 62

[1]          CERTIFICATE

[2]    I, SALLY WALLING, do hereby certify that I have

[3] read the foregoing transcript of my testimony, and

[4] further certify that said transcript (with/without)

[5] suggested corrections is a true and accurate record

[6] of said testimony.

[7]    Dated at __, this ____ day of _____,

[8] 2006.

[9]

[10]

[11]

[12]

[13]

[14]

[15]    On this ____ day of _____, 2006, before

[16] me, the undersigned Notary Public, personally

[17] appeared _____ and proved to

[18] me through satisfactory evidence of identification,

[19] which was _____, to be the person

[20] whose name is signed above.

[21]

[22]

[23] Notary Public

[24] My commission expires: _____

Page 63

[1] COMMONWEALTH OF MASSACHUSETTS)

[2] SUFFOLK, SS.                    )

[3]  I, Jane M. Williamson, Registered Merit Reporter

[4] and Notary Public in and for the Commonwealth of

[5] Massachusetts, do hereby certify that there came

[6] before me on the 28th day of March 2006, at 10:15

[7] a.m., the person hereinbefore named, who was by me

[8] duly sworn to testify to the truth and nothing but

[9] the truth of her knowledge touching and concerning

[10] the matters in controversy in this cause; that she

[11] was thereupon examined upon her oath, and her

[12] examination reduced to typewriting under my

[13] direction; and that the deposition is a true record

[14] of the testimony given by the witness.

[15]  I further certify that I am neither attorney or

[16] counsel for, nor related to or employed by, any

[17] attorney or counsel employed by the parties hereto

[18] or financially interested in the action.

[19]  In witness whereof, I have hereunto set my hand

[20] and affixed my notarial seal this  day of April

[21] 2006.

[22]

[23]          Notary Public

[24]       My commission expires:  1/19/07

  [1]

12/29/2003  19:19    617-634-5359    BOS FLT SVC    PAGE 07

## AMR EVENT CALL CENTER REPORT

1. Complete a HISEND Form 28 - AMR Event Call Center Report. (Flight Attendants ONLY)
or 2. Complete this form and FAX to ICS 817-967-8282 within 24 HOURS
or 3. CALL 1-800-662-6000 / ICS 817-963-7322. The operator will prompt you for the information below.
F/A's ONLY: All turbulence and passenger misconduct events must be reported via HISEND Form 28 or FAX

Once the event has been reported, this form may be retained for your records only

### 1. General Information          PLEASE PRINT ALL INFORMATION

Station of Event **BOS**  Flight # **2237**  Dept. City **BOS**  Arrv City **FLL**  Aircraft Type **80**  Aircraft Tail # _____

Date & Time of Report **12-28-03**  AM/PM

Employee Reporting  **638724 Walling**

Employee # **63872**  ☐ F/AA ☐ AE ☐ AMRS

Home Base **BOS**  Position **F/A**

Employee Contact Phone ( )

Employee's Manager **Nancy Wyatt**

Date & Time of Event **7:30**  AM/PM

**Passenger Information:**
Name _____

Address: _____

Home Ph: (    )_____  Bus. Phone: (    )_____
Age:_____    ☐ Male    ☐ Female
Guardian (if a minor) _____
Guardian Phone Contact: (    )_____
Seat Number on Aircraft: _____

### 2. Injury/Illness Event    ☐ Passenger ☐ Non-Passenger ☐ Other

What Happened _____

Illness    ☐ Unconscious    ☐ Seizure    ☐ Heart Attack    ☐ Hyperventilating    ☐ Contagious Disease

☐ Other (Describe symptoms) _____

Injury (Specific Description of Injury & Body Part) _____

**Where Did It Happen:**

| Aircraft | Airport | | Incident Due to: | | |
|---|---|---|---|---|---|
| ☐ Aisle | ☐ Escalator | ☐ Ramp | ☐ Slip/Fall | ☐ Turbulence | |
| ☐ Seat | ☐ Elevator | ☐ Parking Lot | ☐ Serving Cart | ☐ --Pax Injury | |
| ☐ Lavatory | ☐ Stairs | ☐ Curbside | ☐ --Pax Injury | ☐ --No Injuries | |
| ☐ Galley | ☐ Bathroom | ☐ Shuttlebus | ☐ Hot Spill | ☐ --Seat Belt Sign | |
| ☐ O/H Bin | ☐ Customs | ☐ Bag Claim | ☐ Object in Food | ☐ On ☐ Off | |
| ☐ Cockpit | ☐ Security | ☐ Restaurant | Object_____ | ☐ Unsched. Landing | |
| ☐ Cargo | ☐ Gate No. **19** | ☐ Vehicle | ☐ Decompression | ☐ --Mechanical | |
| ☐ Stairs | ☐ Jetbridge | ☐ Passenger Service Cart | ☐ Ear Discomfort | ☐ --Medical Diversion | |
| | ☐ Concourse | ☒ Ticket Counter | ☐ Slide Deployment | ☐ --Weather | |
| | ☐ Other_____ | | ☐ Struck by Object from O/H Bin | ☐ Evacuation | |
| | | | --O/H Bin Opened by: | ☐ --Planned | |
| | | | ☐ -- F/A | ☐ --Unplanned | |
| | | | ☐ -- Pax | | |
| | | | ☐ ~ Takeoff/Landing | | |

Cabin Altitude (if known) _____   ☐ Other_____

Medical Treatment Offered?   ☐ Yes ☐ No   ☐ Medical Treatment Refused
Medical Provided By:   ☐ Airport Medical ☐ MD ☐ RN ☐ EMT/Para ☐ DO ☐ LPN/LVN ☐ No Med. Assistance on A/C

Name of Person Providing Treatment: _____  Phone:(    )_____

Specific Treatment Given _____

Other Illness of Passenger _____  Current Medication _____

Oxygen Given?   ☐ Yes ☐ No
Reason for Oxygen?   ☐ Irrational    ☐ Note from Doctor    ☐ Unconscious ☐ Severe Chest Pain
   ☐ Difficulty Breathing   ☐ Provided by Station
Medical Kit Opened?   ☐ Yes   ☐ No   Items Used _____

Grab and Go Kit Used?   ☐ Yes   ☐ No   Items Used _____

Defibrillator Used?   ☐ Yes   ☐ No   Results _____

First Aid Kit Opened?   ☐ Yes   ☐ No   Items Used _____

Medical Procedures?   ☐ CPR Administered   ☐ Laerdal Mask   ☐ Latex Gloves   ☐ Heimlich Maneuver
   ☐ Ice Pack   ☐ Wheelchair Assistance   ☐ Other_____
Body Fluids Involved?   ☐ Blood   ☐ Urine   ☐ Vomit   ☐ Other_____

Hospitalized?  Hospital Name _____  Doctor _____  Phone (    )_____

FECO 1 CFN 10/C000 REV 906

AA 0018

12/29/2003   19:19    617-634-5359    BOS FLT SVC    PAGE  08

## AMR EVENT CALL CENTER REPORT

### 3. Security/Theft/Misconduct Event

What Happened _Suspicious psgrs on board_

Where Did It Happen _Super 80    # 2237_

- ☐ Articles Missing / Stolen
- ☐ Unauthorized Person in Security Restricted Area
- ☒ Suspicious Behavior
- ☐ Estimate of Value of Articles Missing/Stolen $ _____
- ☐ Suspicious Article
- ☐ ~Article Left on A/C - No Pax
- ☐ ~Items Which Bypass Security

**Bomb Threat**
- ☐ Verbal Threat
- ☐ Parked at Ramp
- ☐ Written Threat
- ☐ Emerg. Landing
- ☐ Pax Removed
- ☐ Evacuation
- ☒ Aircraft Searched
- ☐ False Threat

**Hijacking**
- ☐ Verbal Threat
- ☐ Written Threat

**Smoking / Non-Smoking Event**
- ☐ Pax Smoked in Aisle
- ☐ Pax Smoked in Cabin
- ☐ Pax Smoked in Lavatory
- ☐ Pax Would Not Put Out Cigarette
- ☐ Pax Smoked in Terminal
- ☐ Hazardous Disposal

**Pax Appeared Intoxicated / Drugs**
- ☐ Boarding Denied
- ☐ Belligerent
- ☐ Pax Removed On Landing
- ☐ Removed Before Departure
- ☐ Unconscious
- ☐ Pax Denied Alcohol
- ☐ Using Own Bottle

**Threatened / Interfered with Employee**
- ☐ Physical Actions Toward Employee
- ☐ Verbal Actions Toward Employee

Police / Security Meet Flight?  ☒ FAA    ☒ FBI    ☒ Local Police    ☐ Pax Service Staff
Passenger Taken Into Custody?  ☒ Yes    ☐ No
Police/Security Requested / Did Not Meet Flight  ☐

Police/Security Notified? Name _____    Phone (____) _____

Parties Involved: Name _____    Company Phone (____) _____
Address _____

Name _____    Company Phone (____) _____
Address _____

### 4. Witnesses

1.) Name Address _Capt. John Ebbers_        2.) Name Address _F/O Don Ball_

Home Phone (____) _____        Home Phone (____) _____
Business Phone (____) _____        Business Phone (____) _____

### 5. Comments / Additional Information

_When I was at the computer (at gate) psg approached me and wanted to change his seat - I told him the agent would be here shortly - he waited and watched me. I told the other FA's going down the jetbridge - their was a psg. I felt very uncomfortable with. Upon boarding, he was the 1st psg. in coach - and went into the aft Rh. lav. I waited for him to come out. Then, everything started to happen with the (over)_

AA 0019

**Event ID: 03122856**        **Description:WALLING P3**        **Filename:122856.TIF**
  12/29/2003  19:23      617-634-5359        BOS FLT SVC
                                                                    PAGE  01

Capt. feeling uneasy with one of them. The passengers saying how the psg. with the ponytail was wishing everyone around him "Happy New Year" — he also said strange comments to the Captain. All three psgrs (including the psg. that asked to change his seat to the window exit and they all were seated together now).

They (all three) pretended to be sleeping throughout the initial delay — everyone else was curious and watchful — not those three.

AA 0020

# In The Matter Of:

*John D. Cerqueira    v.*
*American Airlines, Inc.*

---

*John M. Ehlers*
*Vol. 1, April 26, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA   02110*

*(617) 426-2432*

*Original File EHLERS.V1, 93 Pages*
*Min-U-Script® File ID: 0234695554*

# Word Index included with this Min-U-Script®

**Page 1**

Volume I
Pages 1 to 93
Exhibits 15 to 17
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,          :
      Plaintiff,            :
vs.                         : Civil Action
                            : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,    :
      Defendant.            :

DEPOSITION OF JOHN M. EHLERS, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
26, 2006, commencing at 10:00 a.m.

PRESENT:
    Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
    280 Summer Street, Boston, MA  02210,
        for the Plaintiff.

    Fitzhugh, Parker & Alvaro LLP
        (By Michael A. Fitzhugh, Esq.)
    155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.

**Page 2**

INDEX
WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
JOHN M. EHLERS
BY MS. ABATE RECHT    3           84
BY MR. FITZHUGH            83

EXHIBITS
NO.      DESCRIPTION                 PAGE
15   Letter dated 6/14/04 to Samuel   21
     Podberesky from Alec Bramlett
16   Document entitled "Detail Note"   23
     Bates stamped AA 0035
17   Document entitled "KUDWA HOTLINE  54
     MESSAGE," dated 8/12/02

**Page 3**

PROCEEDINGS

[1]
[2]     Stipulation
[3] It is stipulated by and between counsel for the
[4] respective parties that the deposition is to be read
[5] and signed under the pains and penalties of perjury;
[6] and that all objections, except as to form, and
[7] motions to strike are reserved to the time of trial.
[8]
[9]            JOHN M. EHLERS
[10] a witness called for examination by counsel for the
[11] Plaintiff, having been satisfactorily identified by
[12] the production of his driver's license and being
[13] first duly sworn by the Notary Public, was examined
[14] and testified as follows:
[15]            DIRECT EXAMINATION
[16]          BY MS. ABATE RECHT:
[17]   Q: Captain Ehlers, good morning.
[18]   A: Hi.
[19]   Q: Would you please state your full name for
[20] the record.
[21]   A: John Mitchell Ehlers.
[22]   Q: What is your address?
[23]   A: 81 Farmers Cliff Road in Concord.
[24]   Q: Massachusetts?

**Page 4**

[1]   A: Yes.
[2]   Q: Did you do anything to prepare for today's
[3] deposition?
[4]   A: Yes, I did. I spoke with Michael, the
[5] attorney. Other than that, I haven't done anything
[6] to prepare.
[7]   Q: Did you speak with anyone else besides your
[8] attorney?
[9]   A: No.
[10]   Q: Did you speak with any other American
[11] Airlines personnel?
[12]   A: No.
[13]   Q: Did you review any documents?
[14]   A: Yes.
[15]   Q: Do you recall which documents those were?
[16]   A: The documents in the complaint that the
[17] client had made and going through that page by page.
[18]   Q: Are you referring to the First Amended
[19] Complaint that was filed in this action or a
[20] different complaint?
[21]   A: It must have been the first that I saw.
[22]   Q: Do you recall reviewing any other
[23] documents?
[24]   A: No.

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    John M. Ehlers    v.
American Airlines, Inc.

Page 5

[1] **Q:** Did you review any deposition transcripts?
[2] **A:** Yeah, I've reviewed Sally Walling's
[3] transcripts.
[4] **Q:** Completely?
[5] **A:** No.
[6] **Q:** Do you recall which portions you reviewed?
[7] **A:** Portions related to her experience with
[8] this passenger prior to boarding and then the few
[9] minutes after boarding the aircraft.
[10] **Q:** Did you review anyone else's deposition
[11] transcript?
[12] **A:** No.
[13] **Q:** Are you currently employed by American
[14] Airlines?
[15] **A:** Yes.
[16] **Q:** What is your position?
[17] **A:** I'm a captain.
[18] **Q:** Have you held that position for the
[19] entirety of your tenure at American?
[20] **A:** No.
[21] **Q:** How long have you held the position of
[22] captain?
[23] **A:** Ten years.
[24] **Q:** How long have you been employed by

Page 6

[1] American?
[2] **A:** 20 years.
[3] **Q:** What position did you have before you were
[4] a captain?
[5] **A:** I was hired as a flight engineer, and then
[6] I was an instructor for American and an FAA
[7] designee, it's called, for three years and a first
[8] officer at the same time, and then was promoted to
[9] captain in 1996.
[10] **Q:** Do you recall which years you served as a
[11] flight engineer?
[12] **A:** Yeah. It would have been 1986 through
[13] 1989.
[14] **Q:** What did your responsibilities include as a
[15] flight engineer?
[16] **A:** All the duties that a flight engineer would
[17] perform on the 727.
[18] **Q:** What are those duties?
[19] **A:** Basically they're in charge of the aircraft
[20] air conditioning and heating, hydraulics, fuel and
[21] electrics.
[22] **Q:** And you said after that, you were an FAA
[23] instructor?
[24] **A:** Yes.

Page 7

[1] **Q:** And at the same time a first officer; is
[2] that correct?
[3] **A:** Right.
[4] **Q:** What did your responsibilities include as
[5] an FAA instructor?
[6] **A:** I would take new flight engineers out on
[7] their first trips, so their first actual trips with
[8] passengers, they would go with me as an instructor
[9] evaluating them. And then at the end of usually a
[10] three-day trip, I would either pass them and okay
[11] them to go on their own without an instructor or
[12] fail them, and they would go for retraining.
[13] **Q:** So a flight engineer is part of the flight
[14] crew?
[15] **A:** Yes. The 727 was a three-pilot airplane
[16] that we don't fly anymore.
[17] **Q:** And what years did you work on the 727?
[18] **A:** That would have been 1986 through 1992.
[19] **Q:** So you were a flight — FAA instructor and
[20] first officer from 1989 to 1992?
[21] **A:** I stopped instructing in 1990 and primarily
[22] was just a first officer.
[23] **Q:** Until 1992?
[24] **A:** Until 1996, when I was promoted to captain.

Page 8

[1] **Q:** What did your responsibilities include as a
[2] first officer?
[3] **A:** Just all the duties of a copilot flying.
[4] And usually what we do at American is we'll swap
[5] legs, it's called. One pilot will fly to one
[6] destination, and then the other pilot will fly the
[7] second leg.
[8] **Q:** Can you be more specific as to what you do
[9] when — in addition to flying a plane, do you have
[10] any other responsibilities?
[11] **A:** Yeah. Basically the copilot shows up, and
[12] his primary duty is to pre-flight the airplane, get
[13] it ready and know whether there are any mechanical
[14] problems and then report to the captain. And then
[15] the flying duties and in-flight duties are very
[16] similar to the captain's.
[17] **MR. FITZHUGH:** Can I have a second?
[18] **MS. ABATE RECHT:** Sure.
[19] **MR. FITZHUGH:** Let me see you for a minute.
[20] **THE WITNESS:** Sure.
[21] (Witness and Mr. Fitzhugh
[22] leave the room and return)
[23] **MR. FITZHUGH:** Thank you.
[24] Captain Ehlers would like to supplement a

**Page 9**

[1] previous answer.

[2] **MS. ABATE RECHT:** Sure.

[3] **THE WITNESS:** I have looked through Mr.

[4] Cerqueira's deposition and also Mr. Flores'

[5] deposition. He's a supervisor at the airport also.

[6] **Q:** When did you review those deposition

[7] transcripts?

[8] **A:** Most of that I looked at again yesterday.

[9] **Q:** Most of that or did you review some of

[10] those documents before yesterday?

[11] **A:** Yeah, it was probably a week ago now.

[12] **Q:** Which documents did you review yesterday?

[13] **A:** I looked at Flores' deposition again and

[14] part of Cerqueira's deposition.

[15] **Q:** That was yesterday?

[16] **A:** Yeah.

[17] **Q:** And then did you review Ms. Walling's

[18] deposition a week ago?

[19] **A:** I also looked at that yesterday.

[20] **Q:** Do you recall which portions of Mr. Flores'

[21] deposition you looked at yesterday?

[22] **A:** I scanned through all of it.

[23] **Q:** How long did it take you to read it?

[24] **A:** I didn't read all of it, but I probably

**Page 10**

[1] spent about 20 minutes with it.

[2] **Q:** What portions of Mr. Cerqueira's deposition

[3] did you look through yesterday?

[4] **A:** Again, I just scanned it quickly and looked

[5] at it and looked at the parts where he talked about

[6] what was going on prior to boarding the aircraft.

[7] **Q:** Do you recall how long it took you to

[8] review that transcript?

[9] **A:** Probably about 15 or 20 minutes again.

[10] **Q:** Do you recall how long it took you to

[11] review Ms. Walling's transcript?

[12] **A:** Again, maybe 10 or 15 minutes.

[13] **Q:** Are there any other documents you now

[14] recall reviewing before today's deposition?

[15] **A:** Not that I can remember.

[16] **Q:** What are your in-flight duties in addition

[17] to actually flying the plane?

[18] **A:** I'm in charge of the cabin crew, the flight

[19] attendants. I'm in charge of any security issues

[20] that might arise and obviously any mechanical

[21] problems or weather issues that might arise that

[22] would affect the flight.

[23] **Q:** Did you meet with your attorneys yesterday?

[24] **A:** By phone.

**Page 11**

[1] **Q:** How long did that conversation last?

[2] **A:** It was about an hour.

[3] **Q:** Before today, had you met with your

[4] attorneys in person?

[5] **A:** No.

[6] **Q:** Were you employed before working at

[7] American?

[8] **A:** Yes.

[9] **Q:** Where?

[10] **A:** A corporation, a corporate flight

[11] department in Ohio.

[12] **Q:** What was the name of that corporation?

[13] **A:** It was called Will Air, W-I-L-L Air.

[14] **Q:** How long were you employed by Will Air?

[15] **A:** I was there about two years.

[16] **Q:** So would that be from 1984 to 1986?

[17] **A:** Yes.

[18] **Q:** What did you do before being employed by

[19] Will?

[20] **A:** I was a flight instructor and corporate

[21] pilot in Vermont.

[22] **Q:** Did you work for anyone there?

[23] **A:** Where is that?

[24] **Q:** In Vermont.

**Page 12**

[1] **A:** Yes. It was a called company Montair.

[2] **Q:** How long did you work for Montair?

[3] **A:** I started there in 1984 or 1983, somewhere

[4] in there.

[5] **Q:** And what did you do before Montair?

[6] **A:** I was a student at UVM.

[7] **Q:** Did you earn a degree at UVM?

[8] **A:** Yes.

[9] **Q:** What was that degree?

[10] **A:** Bachelor of Arts and Economics.

[11] **Q:** When did you earn your pilot's license?

[12] **A:** The first one would have been in 1984.

[13] **Q:** And when you say "first one," what was —

[14] **A:** Prior to that would have been private

[15] pilot.

[16] **Q:** What other pilot licenses do you hold?

[17] **A:** Commercial pilot, flight instructor, ground

[18] instructor, airline transport. That's it.

[19] **Q:** When did you earn your commercial pilot's

[20] license?

[21] **A:** Somewhere around 1984, 1985.

[22] **Q:** When did you earn your flight instructor

[23] license?

[24] **A:** Same time.

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    John D. Cerqueira   v.
American Airlines, Inc.

**Page 13**

[1]  Q: How about the ground instructor license?
[2]  A: That would have been '86.
[3]  Q: And when did you earn your airline
[4] transport license?
[5]  A: Same time frame, '86.
[6]  Q: Were you a member of the flight crew for —
[7] before we get to that, actually, you said that you
[8] were previously on the 727?
[9]  A: Yes.
[10]  Q: And then American stopped flying them?
[11]  A: Right.
[12]  Q: When did American stopped flying the 727?
[13]  A: I think we stopped flying the last one
[14] somewhere around 1988.
[15]  Q: And then what were you flying?
[16]  A: The MD80.
[17]  Q: Do you continue to fly the MD80 now?
[18]  A: Yes.
[19]  Q: Do you fly any other type of aircraft?
[20]  A: No. At American Airlines we only check out
[21] in one aircraft.
[22]  Q: Were you a member of the flight crew for
[23] American Airlines Flight 2237 on December 28, 2003?
[24]  A: Yes.

**Page 14**

[1]  Q: As the captain of the aircraft, did you
[2] have the ultimate responsibility for determining
[3] whether a passenger should be removed from a flight
[4] or denied boarding?
[5]  A: Yes, I do.
[6]  Q: On December 28, 2003 did you make the
[7] decision to have three passengers removed from the
[8] flight?
[9]  A: No, I did not.
[10]  Q: Do you recall that on that date three
[11] passengers were removed from the flight?
[12]  A: Yes.
[13]  Q: Who made that decision?
[14]  A: The ground personnel in Boston, along with
[15] the state police.
[16]  Q: Who was the ground personnel in Boston who
[17] made that decision?
[18]  A: I can't remember who made the decision to
[19] have the passengers get off the airplane.
[20]  Q: Do you recall any American Airlines
[21] personnel you spoke with before the passengers were
[22] removed from the airplane?
[23]  A: I know I spoke with whoever the gate agent
[24] was working the flight. I don't remember — I don't

**Page 15**

[1] know who that was. I know I spoke with Mr. Flores
[2] at some point.
[3]  Q: Do you recall what position Mr. Flores was
[4] in?
[5]  A: No, I don't, no, back then.
[6]  Q: Do you recall speaking with anyone else in
[7] addition to Mr. Flores?
[8]  A: Oh, yes. At some point I spoke with Nicole
[9] Traer.
[10]  Q: Do you recall when you spoke with Ms.
[11] Traer?
[12]  A: Speaking with Nicole happened later on.
[13] Probably the first time I saw her was — oh, I would
[14] estimate maybe 20 minutes after these passengers had
[15] begun their interview with the State Police.
[16]  Q: Do you recall what American Airlines
[17] personnel you spoke with before the passengers were
[18] removed from the plane?
[19]  A: No.
[20]  Q: Did you ever have any direct conversations
[21] or interactions with Mr. Cerqueira on December 28,
[22] 2003?
[23]  A: Never did.
[24]  Q: Prior to boarding the plane, did you have

**Page 16**

[1] an opportunity to observe Mr. Cerqueira?
[2]  A: No.
[3]  Q: Did you ever have any direct conversations
[4] or interactions with either of the two other men who
[5] were removed from the flight that day?
[6]  A: Yes, I did.
[7]  Q: Do you recall what they were?
[8]  A: One conversation I remember from one of the
[9] other passengers, I was walking towards the gate
[10] prior to the flight, and he stopped me in the
[11] terminal and asked if I was the Captain going to
[12] Fort Lauderdale. And I said I was. And he looked
[13] at me and said, "That's good. I'm going with you.
[14] We're going to have a good trip today." And then he
[15] walked away.
[16]  Q: And is it your testimony that he initiated
[17] that conversation?
[18]  A: Oh, yes, he did, yes.
[19]  Q: Did you find that suspicious?
[20]  A: I found it extremely odd.
[21]  Q: Why?
[22]  A: Because for the first time in my 20-year
[23] career, that's the first time a passenger has
[24] stopped me when I'm walking in uniform in a

[1] passenger terminal, especially with a conversation
[2] like that.
[3]   **Q:** Did you have any other conversations with
[4] this passenger when you boarded the flight?
[5]   **A:** No, I did not.
[6]   **Q:** Did you review any of the flight
[7] attendants' statements before the deposition today?
[8]   **A:** Yes, I did.
[9]   **Q:** Did you review Ms. Milenkovic's?
[10]   **MR. FITZHUGH:** Milenkovic?
[11]   **MS. ABATE RECHT:** Milenkovic.
[12]   **A:** I reviewed all of the flight attendant, we
[13] call them, OF25 or P reports, which basically
[14] summarized what happened, quite a few weeks ago, and
[15] I went through Sally Walling's report again
[16] yesterday.
[17]   **Q:** I'm going to show you a document that's
[18] previously been marked as Exhibit 9. And this is
[19] Ms. Milenkovic's statement.
[20]   **MS. ABATE RECHT:** Do you need another copy?
[21]   **MR. FITZHUGH:** No, that's okay.
[22]   **A:** (Witness reviews document) Okay.
[23]   **Q:** Do you see on the page that's numbered
[24] AA0016 —

[1]   **A:** Uh-hum.
[2]   **Q:** — three lines up from the bottom it says,
[3] "We began to board and toward the end of boarding a
[4] passenger with a ponytail and heavy accent made a
[5] comment to the captain asking him if he was their
[6] captain."
[7]   **A:** Uh-hum.
[8]   **Q:** Is that an accurate statement?
[9]   **A:** Yes, it seems fairly accurate.
[10]   **Q:** So you did have a conversation with a
[11] passenger during the boarding time?
[12]   **A:** No. That happened prior to boarding. That
[13] was the instance prior to boarding, where he
[14] approached me.
[15]   **Q:** So then that statement is not accurate?
[16]   **A:** No. I think maybe what she was trying to
[17] say was that she might have heard of that happening
[18] at that point in boarding, possibly. I don't know.
[19]   **Q:** But that as it is written here, "Toward the
[20] end of boarding, a passenger with a ponytail and
[21] heavy accent made a comment to the captain" is
[22] actually incorrect, is it not?
[23]   **A:** No, it's not entirely correct, because that
[24] happened prior to boarding.

[1]   **Q:** Okay. When this passenger made that
[2] statement to you, did you notice whether he had an
[3] accent?
[4]   **A:** I did not.
[5]   **Q:** Did you notice whether he had a ponytail?
[6]   **A:** I think I do remember him having a
[7] ponytail.
[8]   **Q:** Do you remember his physical appearance in
[9] any other way?
[10]   **A:** No.
[11]   **Q:** So you had one exchange with that passenger
[12] prior to boarding, and that was it; is that correct?
[13]   **A:** Correct.
[14]   **Q:** Okay. Once the passengers had boarded the
[15] plane, did you have an opportunity to observe Mr.
[16] Cerqueira or the other two passengers seated next to
[17] him?
[18]   **A:** No.
[19]   **Q:** You didn't observe them at all?
[20]   **A:** No.
[21]   **Q:** So is it fair to assume you didn't
[22] personally observe any unusual or suspicious
[23] behavior on the part of Mr. Cerqueira once he
[24] boarded the plane?

[1]   **A:** That's correct.
[2]   **Q:** And you didn't observe any unusual or
[3] suspicious behavior on the part of Mr. Cerqueira
[4] prior to his boarding the plane either; is that
[5] right?
[6]   **A:** Correct.
[7]   **Q:** Did you perceive the three passengers
[8] seated in Mr. Cerqueira's row to be traveling
[9] together?
[10]   **MR. FITZHUGH:** Objection. Form. You can
[11] still answer.
[12]   **A:** I didn't see any of the passengers once we
[13] had boarded. The only situation that I've talked
[14] about is this one passenger who came to me in the
[15] terminal. So except for that, I don't know — I
[16] don't even know what these passengers looked like.
[17] The next time that I saw them is as they were being
[18] interviewed by the State Police in the terminal
[19] off the airplane.
[20]   **MS. ABATE RECHT:** I'm going to ask the
[21] court reporter to mark as Exhibit 15 — because
[22] we'll continue with sequential marking of the
[23] exhibits from the previous depositions — a document
[24] Bates numbered AA0009 through 11.

Page 21

[1]   (Document marked as Ehlers
[2] Exhibit 15 for identification)
[3]   **A:** Would you like me to review all of this
[4]   or —
[5]   **Q:** I'm only going to ask you about a paragraph
[6] on the second page of that letter. But if you'd
[7] feel more comfortable reviewing it, feel free.
[8]   **MR. FITZHUGH:** I'd like the witness to
[9] review the entire document. So why don't you do
[10] that and let us know when you're finished.
[11]   **A:** (Witness reviews document) Okay.
[12]   **Q:** If you would look at the second page, the
[13] page marked AA0010.
[14]   **A:** Uh-hum.
[15]   **Q:** The second to the last paragraph on the
[16] bottom it says, "Captain Ehlers and Ms. Walling
[17] perceived Mr. Cerqueira to be traveling with Mr.
[18] Rokah and Mr. Ashmil." Is that an incorrect
[19] statement?
[20]   **A:** I would say so. I would say that Ms.
[21] Walling perceived that, and I had to go on what
[22] information I was being given.
[23]   **Q:** But you didn't independently perceive that;
[24] is that correct?

Page 23

[1] into coach.
[2]   She was also concerned about his use of the
[3] lavatory and the time in the lavatory.
[4]   She also I remember was concerned about
[5] some things that were said that were never relayed
[6] to me, but that there were passengers in the cabin
[7] once the plane had fully boarded that passengers
[8] became concerned about.
[9]   **Q:** Do you know what those passengers became
[10] concerned about?
[11]   **A:** No.
[12]   **Q:** And do you know whether they became
[13] concerned about Mr. Cerqueira or one of the other
[14] two men seated next to him?
[15]   **A:** I believe it involved all three gentlemen.
[16]   **MS. ABATE RECHT:** I'm going to ask the
[17] court reporter to mark as Exhibit 16 a document
[18] Bates numbered AA 0035.
[19]   (Document marked as Ehlers
[20] Exhibit 16 for identification)
[21]   **Q:** Do you recognize this document?
[22]   **A:** Yes.
[23]   **Q:** Did you review this document in preparation
[24] for today's deposition?

Page 22

[1]   **A:** No. I couldn't. All I could do is go on
[2] what employees are telling me.
[3]   **Q:** Okay. Did you know whether these three
[4] passengers had purchased their tickets together?
[5]   **A:** I had no idea.
[6]   **Q:** Did you know whether these three passengers
[7] had requested to sit together?
[8]   **A:** No idea.
[9]   **Q:** Did you know whether they were together in
[10] the gate area?
[11]   **A:** No.
[12]   **Q:** Did you know whether they had boarded the
[13] flight at the same time?
[14]   **A:** No.
[15]   **Q:** Did you have any discussions with any of
[16] the flight attendants regarding Mr. Cerqueira or the
[17] other two men seated next to him?
[18]   **A:** Other than Ms. Walling's concerns about Mr.
[19] Cerqueira, no other discussions prior to the flight.
[20]   **Q:** Can you tell me what Ms. Walling told you.
[21]   **A:** She had a number of concerns. One of her
[22] concerns I remember was when Mr. Cerqueira boarded
[23] the flight, I was told that he boarded when first
[24] class started to board, and he was the first one

Page 24

[1]   **A:** A couple of weeks ago I did.
[2]   **Q:** Approximately how many weeks ago?
[3]   **A:** I would say three.
[4]   **Q:** Do you recall writing this document?
[5]   **A:** Yes.
[6]   **Q:** If you look at the top, it says, "Created
[7] 6/1/2004"?
[8]   **A:** That's incorrect.
[9]   **Q:** Do you know why it says that?
[10]   **A:** I have no idea.
[11]   **Q:** When did you write this document?
[12]   **A:** Probably it was the end of December, right
[13] after the incident happened.
[14]   **Q:** Do you recall how long after the incident?
[15]   **A:** It wouldn't have been more than 48 hours.
[16]   **Q:** And what makes you think that?
[17]   **A:** Because when I have a situation that
[18] requires a debrief, such as this, I do it within 24
[19] hours every time.
[20]   **Q:** Is that American policy or is that your
[21] personal practice?
[22]   **A:** Part of that is American's policy, within
[23] 48 hours for a security event like this, and my
[24] personal practice is within 24.

Page 25

[1] **Q:** Do you see the top line it states, "Flight
[2] attendants became concerned about behavior of two to
[3] three of our passengers sitting in exit row"?
[4] **A:** Uh-hum.
[5] **Q:** Were you unsure whether there were two or
[6] three passengers who were of concern to the flight
[7] crew?
[8] **A:** No. I knew there were concerns about
[9] people in the exit row, and I was getting
[10] information about each one of them. And American
[11] personnel decided to have three gentlemen removed
[12] from the airplane for questioning.
[13] **Q:** So you were getting concerns about three of
[14] the passengers?
[15] **A:** Yeah. One of the concerns that I remember
[16] Sally had was that all three passengers seemed to be
[17] feigning sleep, which in my career, when we're
[18] boarding an aircraft, it seemed very rare that we
[19] had anyone attempting to sleep at all.
[20] **Q:** If it was three passengers, why did you
[21] write "two to three"?
[22] **A:** I can't remember, it's been so long.
[23] **Q:** In your experience, is it unusual for a
[24] passenger to use the lavatory upon boarding the

Page 26

[1] flight?
[2] **A:** Not at all.
[3] **Q:** And is it unusual for a passenger to board
[4] the plane first — is it unusual to be the first
[5] coach passenger in the coach section?
[6] **A:** The information that I received from one of
[7] the flight attendants who worked for me at that
[8] point is that this passenger boarded when they
[9] should not have boarded, and that is rare.
[10] **Q:** Do you know what she was basing her
[11] information on?
[12] **A:** Because first class is called first to
[13] board. And this passenger was sitting in coach and
[14] boarded with first class, which is not what's
[15] supposed to happen.
[16] **Q:** How do you know that coach passengers
[17] hadn't been called to board when he boarded the
[18] aircraft?
[19] **A:** Because that's what the flight attendants
[20] informed me. And that is standard practice.
[21] **Q:** And the flight attendants were on the plane
[22] at this time? They weren't in the gate area
[23] listening to the boarding calls, right?
[24] **A:** No. Regulations stipulate that we have to

Page 27

[1] have three flight attendants on the plane if we're
[2] boarding.
[3] **Q:** Did Ms. Walling tell you how long Mr.
[4] Cerqueira spent in the lavatory?
[5] **A:** I think she said somewhere between four and
[6] six minutes, something like that.
[7] **Q:** And is that — you described that as an
[8] inordinate amount of time?
[9] **A:** I would say on average, that's longer.
[10] **Q:** Four minutes is longer than the average
[11] passenger spends in the lavatory?
[12] **A:** If someone's in the lav for five minutes, I
[13] would say that's longer than average.
[14] **Q:** Would you characterize that as suspicious?
[15] **A:** That in and of itself is one of the factors
[16] we look at in determining whether we're going to ask
[17] a passenger some more questions or have other
[18] concerns about the safety of the flight.
[19] **Q:** In addition to Ms. Walling, did you speak
[20] with any of the other flight attendants regarding
[21] any of these three gentlemen?
[22] **A:** I spoke with our No. 1 flight attendant,
[23] who would be the flight attendant up at first class,
[24] and I can't remember whether she was relaying

Page 28

[1] information to me or had any concerns of her own.
[2] But it's standard practice for the captain to
[3] discuss issues with the flight attendant up in the
[4] front of the airplane, especially in flight.
[5] However, because our situation was farther in the
[6] back of the airplane, that's why I was talking to a
[7] flight attendant back there.
[8] **Q:** Do you recall who the No. 1 flight
[9] attendant was?
[10] **A:** I do not.
[11] **Q:** Do you recall what, if anything, she told
[12] you?
[13] **A:** No.
[14] **Q:** I want to go back to something we were
[15] speaking about earlier. I had asked you whether as
[16] the captain, you had the ultimate authority to
[17] remove passengers from the flight or deny them
[18] boarding. And you had responded, "Yes, I do." And
[19] then I asked you who made the decision to remove Mr.
[20] Cerqueira and the other two passengers from the
[21] flight that day, and you did not know the answer to
[22] that; that you had testified that it wasn't you. Is
[23] that unusual?
[24] **MR. FITZHUGH:** I object to the form and

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    John B. Cerqueira    v.
American Airlines, Inc.

Page 29

[1] foundation of the question.
[2]    MS. ABATE RECHT: Well, we can read it
[3] exactly and go back if you'd like.
[4]    MR. FITZHUGH: You used the word "removed"
[5] in two different contexts. If you're talking about
[6] having him taken off the flight for questioning, as
[7] opposed to removed in the sense that he's denied
[8] boarding, that's the confusion. I just want it
[9] clarified. That's all.
[10]    BY MS. ABATE RECHT:
[11]    Q: So did you make the decision to have these
[12] three passengers removed from the plane for
[13] questioning?
[14]    A: I would say the answer to that is "no." I
[15] conferred with the gate agent and what would be
[16] called our ground security advisor, and we discussed
[17] our — some of the concerns that the flight
[18] attendants had with these passengers. Gate
[19] personnel decided that the best course of action
[20] would be to have them off the airplane and start the
[21] questioning.
[22]    Q: Was that based on your recommendation?
[23]    A: No, I don't remember recommending anything.
[24] All I was doing was passing along the flight

Page 30

[1] attendant concerns.
[2]    Q: If you look at your statement, which we
[3] have just marked as Exhibit 16, about a quarter of
[4] the way down it states, "It became clear that flight
[5] attendants were uncomfortable with our departing,
[6] and that is when I called for an agent and the GSC,
[7] even though we were about to push and agent had
[8] left." Is that the agent you were just referring
[9] to?
[10]    A: I'm sorry, say that again.
[11]    Q: Do you see that statement in your — do you
[12] see where you wrote, "It became clear that flight
[13] attendants were uncomfortable with our departing,
[14] and that is when I called for an agent and the
[15] GSC..."?
[16]    A: Yes.
[17]    Q: Is that the agent you were just referring
[18] to?
[19]    A: Yes.
[20]    Q: And you don't recall who that agent was?
[21]    A: No.
[22]    Q: What is the GSC?
[23]    A: The ground security coordinator.
[24]    Q: Why did you call them?

Page 31

[1]    A: It's required per regulations, and it's
[2] standard practice if we have any kind of a security
[3] concern.
[4]    Q: What did you discuss with them?
[5]    A: I relayed the flight attendant concerns
[6] with these passengers, and then I remembered making
[7] a phone call to Dallas to what's called our SOC
[8] operations.
[9]    Q: Is that different than the GSC?
[10]    A: Yes.
[11]    Q: What did you discuss with the GSC?
[12]    A: There was no further discussion, other than
[13] relaying the flight attendant concerns.
[14]    Q: And "the flight attendant's concerns," are
[15] you referring to Ms. Walling's concerns?
[16]    A: All of the flight attendants.
[17]    Q: Do you recall what the other flight
[18] attendants' concerns were?
[19]    A: No, other than what we've already talked
[20] about.
[21]    Q: Did Ms. Milenkovic relay any concerns she
[22] had to you?
[23]    A: I can't remember.
[24]    Q: Did Ms. Sargent relay any concerns she had

Page 32

[1] to you?
[2]    A: I can't remember that either.
[3]    Q: So the only concerns you can recall at this
[4] time are Ms. Walling's concerns; is that right?
[5]    A: Yes.
[6]    Q: Do you recall specifically what you related
[7] to the agent and the GSC?
[8]    A: Other than relaying the flight attendant
[9] concerns —
[10]    Q: And can you be more specific?
[11]    A: I relayed information about how I had been
[12] approached in the terminal. I relayed information
[13] that we had a passenger that boarded improperly in
[14] terms of timing. I relayed information that we had
[15] a passenger that spent a lot of time in the rear
[16] lavatory. I relayed information that we had
[17] passengers concerned about these three passengers,
[18] some things had been said that were making people
[19] nervous. I relayed information to them again that
[20] these passengers seemed to be feigning sleep.
[21] Again, all of this information had been passed
[22] to me, because I never saw these people, except for
[23] the situation prior to boarding with this other
[24] passenger.

Page 33

[1] **Q:** You said that other passengers were
[2] concerned. Do you know what the basis for their
[3] concern was?
[4] **A:** No.
[5] **Q:** Did you relay that the three men were
[6] seated next to each other?
[7] **A:** Yes.
[8] **Q:** Did you relay that you thought these three
[9] men were traveling together?
[10] **A:** No.
[11] **Q:** You testified that you also spoke with SOC
[12] in Dallas?
[13] **A:** Uh-hum.
[14] **Q:** What does "SOC" stand for?
[15] **A:** It stands for Systems Operation Control.
[16] **Q:** Do you know with whom you spoke at the SOC?
[17] **A:** No.
[18] **Q:** What did you relay to SOC?
[19] **A:** I relayed the security concerns that we
[20] had, which is required, and they start a process
[21] where they check the passengers. They do things
[22] like checking to make sure how they paid for their
[23] tickets, when they paid for their tickets, et
[24] cetera.

Page 34

[1] **Q:** This is prior to the passengers being
[2] removed from the plane; is that correct?
[3] **A:** At that point it might have been just as
[4] they were being removed for questioning. I'm not
[5] sure of the exact timing. But it might have been
[6] just prior. It's hard to remember.
[7] **Q:** So had the decision to remove the
[8] passengers for questioning already been made by the
[9] time you were calling the SOC?
[10] **A:** I can't remember.
[11] **Q:** Had the decision been made to remove the
[12] passengers by the time you were speaking to the
[13] ground security coordinator and the agent?
[14] **A:** No.
[15] **Q:** And you don't recall who made the decision
[16] to remove the passengers for questioning?
[17] **A:** No.
[18] **Q:** Did you have any other conversations with
[19] any other American Airlines personnel?
[20] **A:** Yes. I remember talking with Nicole Traer.
[21] **Q:** Actually, if we can back up for a minute.
[22] You said that the SOC has certain — what was the
[23] word you used — procedures that they follow?
[24] **A:** Uh-hum.

Page 35

[1] **Q:** Can you elaborate on what those procedures
[2] are?
[3] **A:** I don't think it's proper to at all.
[4] **MR. FITZHUGH:** I'm going to object to the
[5] questioning and instruct the witness not to answer
[6] any more fully because of SSI. If you can rephrase
[7] and ask something that's more specific, I'll work
[8] with you, but the question as phrased would call for
[9] the disclosure of SSI.
[10] **Q:** You testified that they check passenger
[11] information; is that correct?
[12] **A:** Yes.
[13] **Q:** Do you know what information they check?
[14] **A:** No.
[15] **Q:** You testified that they check to see how
[16] the passengers had purchased their tickets.
[17] **A:** That's one of the things that I know that
[18] they check, but we're quickly delving into an area
[19] that's secure information, and we're not supposed to
[20] talk about it.
[21] **Q:** Did they tell you what they found when they
[22] did these checks?
[23] **MR. FITZHUGH:** Just "yes" or "no."
[24] **A:** No.

Page 36

[1] **Q:** Did you speak with any other American
[2] Airlines personnel?
[3] **A:** Not that I can remember.
[4] **Q:** You testified that you spoke with Ms.
[5] Traer?
[6] **A:** Yes.
[7] **Q:** What did you speak with her about?
[8] **A:** Again, just relaying all the concerns that
[9] the flight attendants had. She at that point, when
[10] she showed up, it was a little bit later on in the
[11] process, so she had been fully briefed by whoever
[12] the ground security coordinator is.
[13] **Q:** Do you know who that is?
[14] **A:** I can't remember who that was that day.
[15] **Q:** So she already knew what was going on by
[16] the time she showed up?
[17] **A:** Yes.
[18] **Q:** What discussions did you have with her
[19] specifically?
[20] **A:** Again, just making sure she fully
[21] understood some of the concerns that we had. Other
[22] than that, I don't remember any conversation with
[23] her.
[24] **Q:** Did you have discussions with any other

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    Page 1 of 26    John D. Cerqueira    v.
American Airlines, Inc.

[1] American Airlines personnel?
[2]    **A:** No other AA personnel that I can remember.
[3]    **Q:** Did you have discussions with a Doug Wood?
[4]    **A:** Yeah, I probably did. He would have been
[5] the assistant chief pilot that day.
[6]    **Q:** What are his responsibilities as assistant
[7] chief pilot?
[8]    **A:** Basically he's my supervisor.
[9]    **Q:** What did you speak with him about?
[10]    **A:** I informed him of the security problem that
[11] we had, that the flight was delayed, and that we had
[12] a ground security coordinator working on the issue,
[13] and we were also talking to our people in Dallas at
[14] the SOC and that it was being handled. I believe
[15] when I talked to him, he offered to come in if we
[16] needed any extra manpower or help, and I didn't
[17] think that was necessary.
[18]    **Q:** Did he say anything else to you?
[19]    **A:** I can't remember if he did.
[20]    **Q:** Do you recall how the removal process
[21] proceeded?
[22]    **MR. FITZHUGH:** Objection. Form.
[23]    **Q:** When the passengers were removed from the
[24] plane for questioning, do you recall how that

[1] procedure proceeded?
[2]    **A:** I believe — I wasn't there; I was up at
[3] the gate at this point, but I believe at least one
[4] American supervisor and state police officer went
[5] down to the airplane to have these people come out
[6] of the terminal to start their questioning.
[7]    **Q:** So why were you at the gate at this time?
[8]    **A:** Mostly to talk to SOC and make sure that
[9] they were fully informed about what was happening.
[10]    **Q:** So you left the aircraft and were speaking
[11] with the SOC from the gate?
[12]    **A:** The gate area, yes.
[13]    **Q:** When you spoke with GSC and the agent,
[14] where were you?
[15]    **A:** Up at the gate.
[16]    **Q:** At what point did you leave the aircraft?
[17]    **A:** Probably when I decided to let the agent
[18] know we had some security concerns. I probably
[19] walked up to the gate, because that's faster than
[20] making a phone call or getting on the radio.
[21]    **Q:** So did you see the gate agent and the State
[22] Police go down the jet bridge to the aircraft?
[23]    **A:** I don't remember seeing them, no.
[24]    **Q:** So is it your testimony that you don't know

[1] how the removal process proceeded, because you
[2] weren't on the airplane at that time?
[3]    **A:** Correct.
[4]    **Q:** Did you have any discussions with the
[5] police officers?
[6]    **A:** Yes.
[7]    **Q:** What were your discussions with them?
[8]    **A:** Again, making sure they were fully informed
[9] of all of the concerns that the flight attendants
[10] had.
[11]    **Q:** What specifically did you tell them?
[12]    **A:** I told the State Police that we had a
[13] passenger that had spent some time — an inordinate
[14] amount of time in the lavatory; that we had
[15] passengers concerned about things they might have
[16] said. I didn't know what they were. I told them
[17] about my experience in the terminal prior to
[18] boarding with one of these passengers. And then
[19] basically the response was they would talk with all
[20] of these passengers and delve further into what was
[21] going on.
[22]    **Q:** Do you recall how many state police officer
[23] you spoke with?
[24]    **A:** I probably spoke with two or three of them

[1] at one point.
[2]    **Q:** Do you know who they were?
[3]    **A:** No.
[4]    **Q:** Did you speak with any of the law
[5] enforcement officers?
[6]    **A:** Yes.
[7]    **Q:** Who did you speak with?
[8]    **A:** There were federal air marshalls there
[9] also.
[10]    *Q. At what point did the federal air marshalls
[11] come?
[12]    **A:** I really don't want to say what time they
[13] came, because that's really secure information.
[14]    **MR. FITZHUGH:** Just give me a second.
[15]    **MS. ABATE RECHT:** Okay.
[16]    (Witness and Mr. Fitzhugh leave the
[17] room and return)
[18]    **MR. FITZHUGH:** I'm going to allow Captain
[19] Ehlers to answer the question in the context of a
[20] sequence of events, but that will be all. Why don't
[21] you have the question read back, please.
[22]    *(Question read)
[23]    **MR. FITZHUGH:** I'm going to allow the
[24] witness to answer the question with respect to when

Page 41

[1] the air marshalls were part of the conversation.
[2]     **MS. ABATE RECHT:** How is that different
[3] than my original question?
[4]     **MR. FITZHUGH:** Asking when they arrived
[5] could lead to other issues that can't be discussed.
[6] Where they came from, that will not be discussed. I
[7] will let Captain Ehlers respond to when they joined
[8] the conversation and what was said, to the extent he
[9] can.
[10]    **A:** After the State Police became involved,
[11] marshalls became involved.
[12]    **Q:** How long after?
[13]    **A:** I would guess probably 10 to 15 minutes
[14] after the State Police arrived, we had marshalls in
[15] on the discussion.
[16]    **Q:** Discussions with the three passengers,
[17] questioning of the three passengers or just
[18] discussions with American Airlines personnel?
[19]    **A:** I can't remember whether marshalls
[20] interviewed the passengers or not.
[21]    **Q:** What information was relayed to the
[22] marshalls?
[23]    **A:** I don't know. They were talking with the
[24] police.

Page 42

[1]     **Q:** Did you overhear any of those discussions?
[2]     **A:** No.
[3]     **Q:** Where were they speaking with the police?
[4]     **A:** Initially, they were in the terminal near
[5] the gate.
[6]     **Q:** Do you know whether the police initially
[7] interviewed the passengers on the jet bridge?
[8]     **A:** I don't.
[9]     **Q:** Were there any other law enforcement
[10] officers involved?
[11]    **A:** Yes. Eventually the head of all of TSA at
[12] Logan Airport showed up.
[13]    **Q:** And "TSA" stands for Transportation
[14] Security Administration; is that correct?
[15]    **A:** Right.
[16]    **Q:** Do you know who that person is?
[17]    **A:** No.
[18]    **Q:** What was his or her involvement?
[19]    **A:** Their involvement had to do with one of our
[20] passengers who thought they saw one of these
[21] passengers have box cutters taken from them at
[22] security.
[23]    **Q:** Do you recall who that passenger was?
[24]    **A:** No.

Page 43

[1]     **Q:** Did you have any discussions with that
[2] passenger?
[3]     **A:** Yes.
[4]     **Q:** What were your discussions with that
[5] passenger?
[6]     **A:** My discussion with the passenger was to be
[7] very clear and make sure she was sure of what she
[8] saw. And she told me she was positive of what she
[9] saw.
[10]    **Q:** You later found out that that was not true;
[11] is that correct?
[12]    **A:** That's correct.
[13]    **Q:** That discussion happened after the decision
[14] had already been made to remove Mr. Cerqueira and
[15] the two other gentlemen seated next to him, correct?
[16]    **A:** Correct.
[17]    **Q:** How long after?
[18]    **A:** Not long after. I would say maybe five
[19] minutes.
[20]    **Q:** Were there any other law enforcement
[21] officials involved?
[22]    **A:** I don't think so.
[23]    **Q:** Backing up a bit, when you were told by Ms.
[24] Walling that she had some concerns about one of the

Page 44

[1] passengers, did you ask her or the first officer to
[2] do anything?
[3]     **A:** I believe I remember asking the first
[4] officer to check the lavatory, because the
[5] lavatories are a very insecure area on the airplane
[6] and are a big concern of the flight crew.
[7]     **Q:** Do you recall whether the first officer
[8] carried out your instruction?
[9]     **A:** If I asked him to do it, he did it.
[10]    **Q:** Do you recall whether he found anything?
[11]    **A:** He did not.
[12]    **Q:** And he reported to you that he did not; is
[13] that right?
[14]    **A:** Correct.
[15]    **Q:** He reported to you that he did not find
[16] anything before the decision was made to remove the
[17] passengers for questioning; is that right?
[18]    **A:** I can't remember the timing there.
[19]    **Q:** Mr. Cerqueira and the other two passengers
[20] were removed the plane before the decision was
[21] made to deplane everyone and rescreen all of the
[22] luggage; is that correct?
[23]    **A:** Correct.
[24]    **Q:** Was that decision made, in part, because of

Page 45

[1] the passenger saying that she had seen a box cutter
[2] taken away from one of these men?
[3]    A: That decision was primarily made by the
[4] State Police, and I'm sure it was a factor in that
[5] decision.
[6]    Q: You said that decision was primarily made
[7] by the State Police. Did you have any input?
[8]    A: I had some input because I have a
[9] concern — my first concern is whether the flight
[10] departs on time with all passengers. My second
[11] concern is if we depart without some of the
[12] passengers, will we depart on time or not.
[13]    This situation started growing to the point
[14] where I was delaying all of the passengers, and now
[15] I was trying to decide with law enforcement whether
[16] the flight would depart at all.
[17]    Q: What were those discussions?
[18]    A: My discussion with the State Police was
[19] that if we had a passenger who had box cutters taken
[20] from them at security, that we probably would not
[21] depart with that airplane that day at all.
[22]    Q: You eventually did depart with that
[23] airplane, correct?
[24]    A: Yes.

Page 46

[1]    Q: So by the time you departed with the
[2] airplane, you had discovered that box cutters
[3] weren't taken from any of the three passengers on
[4] the flight, correct?
[5]    A: Correct.
[6]    Q: If you look at your statement which we
[7] marked as Exhibit 16, kind of halfway through it
[8] states, "State Police became concerned with at least
[9] one individual's passport and questioning continued
[10] at secure TSA location away from the gate." Do you
[11] see that? It's kind of right in the middle of the
[12] page.
[13]    A: Yes, got it.
[14]    Q: Do you recall which passenger they became
[15] concerned with?
[16]    A: I believe it was the passenger who had
[17] approached me in the terminal; but again, I don't
[18] know whether that was all three passports or two
[19] passports or just one passport at that point.
[20]    Q: Do you know what the cause for concern was?
[21]    A: No.
[22]    Q: Did they tell you at the time what they
[23] were concerned about?
[24]    A: No. All they said was that the passports

Page 47

[1] were one of the issues that they were becoming
[2] concerned about.
[3]    Q: Were the passports of the passengers who
[4] had been removed?
[5]    A: Yes. We were just talking about passports.
[6] And I don't know if they were looking at all three
[7] passengers' passports, because all three might not
[8] have had them, or they were talking about two or
[9] one, but it was at least one.
[10]    Q: What else can you recall about this
[11] incident that we haven't talked about yet?
[12]    MR. FITZHUGH: Objection. Form. Calls for
[13] a narrative. You can still answer.
[14]    A: Nothing of substance. I will say we were
[15] real careful before we did depart. One of the State
[16] Police initiatives was to search the airplane with
[17] dogs. And we did check all the checked luggage also
[18] before we did depart, and we did have the flight
[19] attendants replaced.
[20]    Q: Was that at their urging or was that a
[21] decision made by you or someone else at American?
[22]    A: That was a flight attendant request.
[23]    Q: Do you know why they made that request?
[24]    A: They made that request because they were

Page 48

[1] uncomfortable with the situation, and the security
[2] concerns had them nervous about operating the flight
[3] and what might be going on behind the scenes.
[4]    Q: You continued on with the flight; is that
[5] correct?
[6]    A: Yes.
[7]    Q: Did you not share their concerns?
[8]    A: I'm sorry?
[9]    Q: Did you not share those concerns?
[10]    A: I shared those concerns. But after the
[11] flight attendants left and we had the State Police
[12] and law enforcement search the airplane, search the
[13] lavs and go through all of the luggage — and I
[14] believe the departure delay ended up being almost
[15] three hours — I became convinced that the airplane
[16] was safe, and we did not depart with the three
[17] passengers who were the start of some of these
[18] concerns, so I felt we could operate safely.
[19]    Q: Did the State Police ever tell you that
[20] they were making the decision to take this out of
[21] your hands?
[22]    A: Yes.
[23]    Q: At what point did they tell you that?
[24]    A: I would guess maybe half an hour after they

[1] became involved, I was told that they wouldn't be
[2] traveling with me.
[3]     Q: "They" being the three passengers who had
[4] been removed?
[5]     A: Correct.
[6]     Q: So were you in constant contact with the
[7] State Police throughout the time of the three-hour
[8] delay?
[9]     A: To a degree. There were so many — let me
[10] say this. That there were so many officers there, I
[11] would even say that every officer assigned to our
[12] terminal was at my gate; that shuttling back and
[13] forth to the plane and the gate, I was talking with
[14] many different officers. In terms of the interview
[15] process of the passengers, I never heard anything
[16] that was going on there at all.
[17]     Q: What were your discussions with the State
[18] Police during that time?
[19]     A: I was asking them — my main concern was
[20] the safety of the aircraft, whether we would depart
[21] or not and how they felt about the safety of the
[22] airplane. And they're the ones that suggested
[23] bringing dogs and searching the airplane to make
[24] sure it was safe.

[1]     Q: And were they reporting to you at all on
[2] the status of the questioning of the three
[3] passengers who had been removed?
[4]     A: No. They didn't keep me in that loop at
[5] all.
[6]     Q: I'm going to go back to something that we
[7] talked about earlier, because I'm trying to
[8] understand who made the decision to have these three
[9] passengers removed from the flight.
[10]     A: Uh-hum.
[11]     Q: And I had asked you, do you have the
[12] ultimate authority to remove passengers from a
[13] flight or deny them boarding. And you said, "Yes, I
[14] do."
[15]     A: Uh-hum, absolutely.
[16]     Q: But in this case, you didn't make that
[17] decision.
[18]     A: Correct. Let me make a distinction.
[19]     Q: If you could clarify that, yes.
[20]     A: There are times where we might have a
[21] concern with a passenger. I can tell them that
[22] they're not going to go with us, because that's my
[23] authority. That's what I'm supposed to do.
[24]     If the State Police in this instance had

[1] said to me, "Okay, we've talked to these three
[2] gentlemen, we're comfortable with what's going on.
[3] We don't see any concerns at all, it's your call,"
[4] then I would have had to make a decision and confer
[5] with the flight attendants, the first officer, the
[6] ground security coordinator, people in SOC and
[7] Dallas and make a decision as to whether they were
[8] going to go with us or not. It never got to that
[9] point, and I was never offered that decision.
[10]     Q: Right now I'm talking about the initial
[11] decision to remove them for questioning.
[12]     A: I never had anyone removed from the
[13] airplane. It was decided by AA personnel at the
[14] gate that the best way to ask these people some
[15] questions and get a clear understanding of what was
[16] going on and some of the concerns that our flight
[17] attendants and other passengers had was to take them
[18] off the airplane and ask them these questions. The
[19] biggest reason we do that is because if we have
[20] seven state police officers asking these type of
[21] security questions onboard the airplane, it's going
[22] to make other passengers extremely nervous. And it
[23] just doesn't make any sense to do that, in my
[24] opinion.

[1]     Q: But again, I'm just trying to get at whose
[2] decision it was initially.
[3]     A: You know, I don't know who made the
[4] decision. I can only guess, you know, give you an
[5] educated guess, but it's not something —
[6]     Q: What's your educated guess — not your
[7] guess. I don't want you to guess. But being as
[8] familiar — you know, being a 20-year employee of
[9] American Airlines, who usually makes these kind of
[10] decisions?
[11]     MR. FITZHUGH: Objection. Foundation. You
[12] can still answer if it's possible without
[13] speculating.
[14]     A: I'm not speculating. I would imagine that
[15] AA supervisors, including the ground security
[16] coordinator, made the decision to have these
[17] questioned off the airplane.
[18]     Q: Do you know how we could find out who the
[19] ground security coordinator was that day?
[20]     A: I do not.
[21]     Q: Did you overhear any other discussions
[22] regarding Mr. Cerqueira or the other two gentlemen
[23] that we haven't talked about yet?
[24]     A: No.

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    John D. Cerqueira  v.
American Airlines, Inc.

[1]    **Q:** And I think you already testified that you
[2] didn't have any conversations with passengers
[3] directly; is that right?
[4]    **A:** Aside from the conversation with this lady
[5] who later in the process thought she had seen these
[6] box cutters taken from a passenger, no. I will say
[7] that later in the process, after an hour or two goes
[8] by, I'm talking with a number of different
[9] passengers, trying to make sure that we don't have
[10] too many nervous people, because I was worried that
[11] people would get so nervous about what was going on,
[12] that they wouldn't want to travel with us. So you
[13] know, those conversations were very general in
[14] nature.
[15]    **Q:** Did you notice any other behavior that you
[16] thought was suspicious that we have not discussed?
[17]    **A:** No.
[18]    **Q:** Other than speaking with Ms. Walling about
[19] her concerns, did you do any other investigation
[20] prior to contacting the gate agent and GSC regarding
[21] these three passengers?
[22]    **A:** No. That's not my job.
[23]    **MS. ABATE RECHT:** I'm going to ask the
[24] court reporter to mark as Exhibit 17 a document that

[1] has been produced by American Airlines, but not
[2] Bates numbered. It is a Kudwa Hotline Message dated
[3] August 12, 2002.
[4]    (Document marked as Ehlers
[5] Exhibit 17 for identification)
[6]    **A:** (Witness reviews document) Okay.
[7]    **Q:** Do you recognize this document?
[8]    **A:** Yes.
[9]    **Q:** Can you describe it for me.
[10]    **A:** It's basically a hotline message back in
[11] the summer of '02 from the chief pilot and vice
[12] president of flight that talks about discriminating
[13] and making decisions about passengers and denying
[14] service.
[15]    **Q:** Are these hotline messages, are they
[16] telephone recordings or do you get them in written
[17] form?
[18]    **A:** We also get them in written form.
[19]    **Q:** So they're telephone messages as well?
[20]    **A:** They're telephone messages, and they're
[21] also put on our secure website so we can read them.
[22]    **Q:** What's the practice with respect to getting
[23] these hotline messages?
[24]    **A:** You can get them on the phone. Normally

[1] what I'll do is I'll just go on the website and look
[2] at what the latest message is.
[3]    **Q:** How often do you check the website?
[4]    **A:** Before every trip.
[5]    **Q:** Do you see in the third paragraph in the
[6] middle it says, "Mere 'discomfort' of another
[7] passenger, or even another employee for that matter,
[8] is not sufficient reason to deny boarding or have
[9] them removed"?
[10]    **A:** Yes.
[11]    **Q:** And then towards the bottom of the page it
[12] says, "As in-flight security coordinators, we as
[13] pilots need to get directly involved with these
[14] situations and independently evaluate whether a
[15] valid potential security risk exists. Relying on
[16] unverified or unanalyzed concerns or making the
[17] determination solely on an assumption, feeling, or
[18] subjective opinion is not appropriate." Do you see
[19] that?
[20]    **A:** Uh-hum.
[21]    **Q:** It then goes on to say, "You certainly need
[22] to, and must, listen to the concerns of flight
[23] attendants and passengers. Flight attendants in
[24] particular, are your eyes and ears in the cabin and

[1] have demonstrated an ability to assess potential
[2] problems. However, you must accept that input as a
[3] signal to investigate, analyze, further scrutinize
[4] or question, and not as the sole basis for making
[5] the decision to remove someone from a flight. Doing
[6] so, without validity, in the absence of reasonable
[7] or justifiable facts is in short, wrong." Do you
[8] see that?
[9]    **A:** Uh-hum.
[10]    **Q:** Is it still your testimony that it's not
[11] your responsibility to make an independent
[12] evaluation?
[13]    **MR. FITZHUGH:** Objection.
[14]    **A:** That's not what I said. I will also say
[15] that I've known Captain Kudwa for a long time. And
[16] in this situation, I involved the State Police, who
[17] are experts at analyzing situations like this. So
[18] it didn't require me to go back and ask some of
[19] these questions, some of which I wouldn't know what
[20] to ask of these passengers.
[21]    **Q:** I asked you specifically, "Other than
[22] speaking with Ms. Walling about her concerns, did
[23] you do any other investigation prior to contacting
[24] the gate agent and GSC regarding these three

Page 57

[1] passengers." And you responded, "No, that's not my
[2] job."
[3]    **A:** That's the State Police job.
[4]    **Q:** So your job is not to speak to passengers
[5] directly?
[6]    **A:** Sometimes it might be. Sometimes it might
[7] not be.
[8]    **Q:** And in this situation, you didn't feel that
[9] was part of your job?
[10]    **A:** No.
[11]    **Q:** Did you also not feel it was part of your
[12] job to make any further investigation about whether
[13] these three passengers were actually traveling
[14] together or merely seated next to each other by
[15] American Airlines?
[16]    **A:** That's SOC's job.
[17]    **Q:** Did you not think it was part of your job
[18] to confirm what the flight attendants told you or
[19] just accept it at face value?
[20]    **A:** I fly with different people on every trip.
[21] Flight attendants are obviously different people. I
[22] have to listen to what they say, and I have to
[23] analyze that and decide what course of action to
[24] take. To disregard security concerns would

Page 58

[1] jeopardize the flight and all the other passengers.
[2] So by taking their concerns and passing them to SOC,
[3] to whoever the ground security is and the State
[4] Police, they can better determine whether they're
[5] valid or not.
[6]    Now, I'm the final say as to whether they
[7] would go or not. So if the State Police and all
[8] those other entities came to me and said, "We really
[9] don't see that there's a problem," now I have a
[10] decision to make. That decision for me was never
[11] made that day.
[12]    **Q:** But you thought that you made an adequate
[13] investigation prior to calling the G — is it GSC or
[14] GOC?
[15]    **A:** GSC.
[16]    **Q:** — GSC and the gate agent to ask that these
[17] passengers be removed for questioning?
[18]    **A:** Yes.
[19]    **Q:** Did you have any discussions with anyone
[20] else regarding the decision to have the passengers
[21] removed for questioning?
[22]    **A:** I'm sure I spoke with the first officer
[23] about it.
[24]    **Q:** Do you recall your discussions with him?

Page 59

[1]    **A:** No.
[2]    **Q:** Have you had any conversations with him
[3] since about this incident?
[4]    **A:** I have not.
[5]    **Q:** Did you speak with him — let's back up for
[6] a second. It's First Officer Ball, correct?
[7]    **A:** Yes.
[8]    **Q:** Did he accompany you on the flight to Fort
[9] Lauderdale eventually that day?
[10]    **A:** Yes.
[11]    **Q:** Did you have any discussions with him that
[12] day about this incident?
[13]    **A:** I'm sure we did.
[14]    **Q:** Do you recall what they were?
[15]    **A:** No.
[16]    **Q:** Is it just you and the first officer in the
[17] cockpit?
[18]    **A:** Yes, two pilots, yeah.
[19]    **Q:** This document has already been marked as
[20] Exhibit 10. It's a document produced by American
[21] Airlines dated 15th of October '01. Do you
[22] recognize this document?
[23]    **A:** Yes.
[24]    **Q:** Can you describe it for me.

Page 60

[1]    **A:** The first internal email talks about
[2] security increasing, and the second one talks about
[3] the new airport check in procedures.
[4]    **Q:** My question more specifically is, is this
[5] another one of those Bob Kudwa messages to pilots?
[6]    **A:** No. These look to be like internal emails
[7] that would go directly to my email box.
[8]    **Q:** From Captain Kudwa?
[9]    **A:** Yes.
[10]    **Q:** Do you see the third message dated the 23rd
[11] of September '01?
[12]    **A:** Uh-hum.
[13]    **Q:** And the subject is "Removal of Passengers."
[14] And about halfway through it says, "If you have any
[15] questions regarding a particular passenger's
[16] acceptance, please contact the CCRO at ICS
[17] 967-7299."
[18]    **A:** Uh-hum.
[19]    **Q:** What is the CCRO?
[20]    **A:** That's the Complaint Resolution Office.
[21] And that is the correct phone number to call if you
[22] have any kind of a question.
[23]    **Q:** What function does that office serve?
[24]    **A:** They would probably do some passenger

Page 61

[1] background checks.
[2]    Q: Would they do anything else?
[3]    A: Yes. I'm not up on everything they might
[4] do to give you information about a specific
passenger.
[6]    Q: Did you call the CCRO?
[7]    A: No.
[8]    Q: Why not?
[9]    A: Because we had State Police involved, and
[10] we also had Dallas SOC involved.
[11]    Q: So does the CCRO work with the SOC?
[12]    A: Yes.
[13]    Q: Is it part of the SOC?
[14]    A: Yes, it is. And they were probably
[15] involved in this situation.
[16]    Q: Is it an office within the SOC?
[17]    A: Yeah, it's — as a matter of fact, it's in
[18] the same room in the same building. So these two
[19] people might have been talking. I don't know.
[20]    Q: So the CCRO was not contacted?
[21]    A: Not by me.
[22]    Q: Do you know whether they were contacted by
[23] anyone else?
[24]    A: No. I would give you a very educated guess

Page 62

[1] and say "yes," but I don't...
[2]    Q: Who might they have been contacted by?
[3]    A: The SOC personnel or one of our other
[4] supervisors.
[5]    Q: When you say, "one of the other
[6] supervisors," who are you referring to?
[7]    A: Whoever was working ground security for
[8] Boston on that day.
[9]    Q: And I'm going to show you a document that
[10] has previously been marked as Exhibit 4. What I've
[11] handed you is two pages. It's actually the second
[12] page that's been marked as Exhibit 4. But it is a
[13] September 20, 2001 Kudwa Hotline Message that has
[14] been produced by American Airlines, though it has no
[15] Bates number.
[16]    A: Uh-hum.
[17]    Q: If you look at the second page, at the end
[18] of the first full paragraph of that page it says,
[19] "...call it in for our 'experts' to check it out."
[20]    A: Uh-hum.
[21]    Q: Do you know who those experts are?
[22]    A: That primarily refers to SOC and making
[23] sure that people in Dallas are in on your situation
[24] and not just local personnel, wherever you might be

Page 63

[1] in the world.
[2]    Q: Were you ever informed what happened to the
[3] three passengers after they were removed for
[4] questioning?
[5]    A: The only passenger that I had further
[6] information about was the passenger that approached
[7] me in the terminal.
[8]    Q: When did you get information about him?
[9]    A: I would guess maybe two weeks after this
[10] incident.
[11]    Q: Who gave you that information?
[12]    A: A state police officer.
[13]    Q: Did you ask the state police officer?
[14]    A: No. He recognized me from that day and
[15] shared with me some information.
[16]    Q: So that was just an informal conversation?
[17]    A: Yes.
[18]    Q: What did he share with you?
[19]    A: That at least one of the dogs that was used
[20] to search the aircraft went positive for drugs on
[21] this passenger, and they found $10,000 in cash on
[22] his person that he could not explain.
[23]    Q: Did they tell you anything else?
[24]    A: No.

Page 64

[1]    Q: Do you know whether these three passengers
[2] were denied further service on American?
[3]    A: I don't. Because by the time that might
[4] have occurred, whatever discussions occurred, I was
[5] probably in the air by then.
[6]    Q: Were you later told?
[7]    A: No.
[8]    Q: It says, if we go back to the document that
[9] was marked as Exhibit 16, which is your statement,
[10] it says about three-quarters of the way down, "I had
[11] lengthy debriefs with local AA management, State
[12] Police, TSA management and Air Marshalls who were
[13] called to our gate to investigate." Do you see
[14] that?
[15]    A: Yes.
[16]    Q: When did those debriefings happen?
[17]    A: This is all talking about as the situation
[18] unfolded.
[19]    Q: So is that talking about conversations —
[20] or testimony that you've already given?
[21]    A: Yes.
[22]    Q: Do you know who makes the decision
[23] regarding whether a passenger is denied further
[24] service on an American Airline flight?

Page 65

[1]    **A:** I do not.
[2]    **Q:** Do you know whether the decision to remove
[3] a passenger for questioning can impact whether that
[4] passenger is denied service on later American
[5] Airlines flights?
[6]    **A:** I don't know.
[7]    **Q:** You write at the bottom of your statement,
[8] "I would like to get the status of the passengers
[9] who we did not transport. Whether they took a later
[10] flight, no flight, etc. I would like to know
[11] whether the authorities found anything that pertains
[12] to our security concerns. And, will passengers be
[13] allowed to fly AA again if no 'problems' were
[14] found." Do you see that?
[15]    **A:** Yes.
[16]    **Q:** Did anyone ever respond to your request for
[17] further information?
[18]    **A:** The response I got — I remember someone —
[19] and I can't remember who the supervisor was, but I
[20] believe the passenger who I've talked about who
[21] approached me and who the State Police found the
[22] money on has been denied service permanently.
[23]    **Q:** Indefinitely?
[24]    **A:** Yes.

Page 66

[1]    **Q:** Is that the only passenger that you got
[2] further information on?
[3]    **A:** Yes.
[4]    **Q:** And you said, "I can't remember who their
[5] supervisor was." Who are you referring to?
[6]    **A:** The supervisor that told me that this
[7] gentleman had been denied service indefinitely.
[8]    **Q:** Was that Ms. Traer?
[9]    **A:** It might have been, but I can't remember.
[10]    **Q:** Did you get information regarding any of
[11] the other two passengers?
[12]    **A:** No.
[13]    **Q:** Did you get any information regarding the
[14] security concerns that you had?
[15]    **A:** No, I did not.
[16]    **Q:** Did anyone from American ever contact you
[17] to discuss this incident further?
[18]    **A:** No.
[19]    **MR. FITZHUGH:** You mean before the lawsuit?
[20] Can we just have a point in time?
[21]    **MS. ABATE RECHT:** Not connected to this
[22] lawsuit regarding the incidents.
[23]    **A:** Right. No.
[24]    **Q:** You say a couple of lines before that

Page 67

[1] towards the bottom, "Everyone involved with the
[2] situation did a very professional job. First
[3] officer, flight attendants, agents, ramp personnel,
[4] flight service and agent supervisors, TSA, State
[5] Police and the air marshalls, et cetera." Do you
[6] see that?
[7]    **A:** Uh-hum.
[8]    **Q:** Can you just tell me who you were referring
[9] to with each of these titles.
[10]    **A:** First officer would be Don Ball. All three
[11] of the flight attendants —
[12]    **Q:** And just for the record, that's Ms.
[13] Sargent, Ms. Milenkovic and Ms. Walling?
[14]    **A:** Correct.
[15]    **Q:** Agents?
[16]    **A:** The agents working the flight, including
[17] ground security agent Nicole Traer.
[18]    Ramp personnel are everybody that was
[19] helping us with the bags, because we ended up having
[20] to pull all checked baggage, which is, as you might
[21] imagine, a big deal. So they helped the police
[22] rescreen everything. And rescreening the passengers
[23] in the terminal was quite a project also. Again,
[24] the head of the TSA.

Page 68

[1]    **Q:** Who were the flight service and agent
[2] supervisors?
[3]    **A:** One of those would be Nicole Traer. Mr.
[4] Flores would be one of them. And then I know one of
[5] the flight service supervisors who is a supervisor
[6] for flight attendants came up at one point. And I
[7] can't remember who that was.
[8]    **Q:** What was she doing — or he?
[9]    **A:** They started to coordinate if the flight
[10] departed at some point during that day, who the
[11] flight attendants would be that would operate the
[12] flight.
[13]    **Q:** Since the incident occurred, have you had
[14] any conversations with anyone else about it?
[15]    **A:** I haven't seen the first officer at all. I
[16] haven't flown with the other two flight attendants.
[17] I've flown with Sally a couple of times.
[18]    **Q:** Did you discuss it with her?
[19]    **A:** Yes.
[20]    **Q:** What did you discuss?
[21]    **A:** She just basically reiterated some of the
[22] things that she saw and heard that day and told me
[23] that at one point her deposition had been scheduled.
[24]    **Q:** How long ago was that?

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    Page 19 of 26    John D. Cerqueira v.
American Airlines, Inc.

Page 69

[1] **A:** The last time I talked with her, I would
[2] guess maybe three weeks ago. She also owed me for
[3] Girl Scout cookies that I sold to her.
[4] **Q:** So other than collecting money for Girl
[5] Scout cookies, what did she reiterate to you three
[6] weeks ago?
[7] **A:** Again, that she had some of these concerns;
[8] the use of the bathroom, everything that was in her
[9] report talking about other passengers having
[10] concerns with these gentlemen and everything we've
[11] already talked about. I think nothing new.
[12] **Q:** Did you talk about the lawsuit?
[13] **A:** No. Just the fact that it looked like any
[14] crew members or people involved with this incident
[15] would be sitting here.
[16] **Q:** And "here" being giving your deposition?
[17] **A:** Right.
[18] **Q:** Did you speak with anyone outside of
[19] American about the lawsuit?
[20] **A:** No.
[21] **Q:** Any friends?
[22] **A:** No. In my opinion, this situation, while
[23] not SSI, is close enough to SSI that it really
[24] shouldn't be discussed.

Page 70

[1] **Q:** Did you at any time that day speak with
[2] Rhonda Cobbs?
[3] **A:** Is she an AA employee?
[4] **Q:** Yes.
[5] **A:** I don't know.
[6] **Q:** Do you recall speaking with Craig Marquis?
[7] **A:** No.
[8] **Q:** Do you know who Ms. Cobbs and Mr. Marquis
[9] are?
[10] **A:** No.
[11] **MS. ABATE RECHT:** Do you want to take a
[12] quick break?
[13] **MR. FITZHUGH:** Yes.
[14]   (Recess taken from 11:26 to 11:45)
[15] **MS. ABATE RECHT:** As an initial matter, I
[16] would just ask Mr. Fitzhugh that the plaintiff
[17] update its initial disclosures and interrogatories
[18] to identify the ground security coordinator and
[19] agent who Mr. — who, I'm sorry, Captain Ehlers has
[20] been referring to today.
[21]   **BY MS. ABATE RECHT:**
[22] **Q:** Captain, you testified that you did not
[23] make the decision to initially remove the
[24] passengers —

Page 71

[1] **A:** Right.
[2] **Q:** — for questioning. I'm going to ask you
[3] to look at the document that we had initially marked
[4] as Exhibit 15, which was the June 3, 2004 letter.
[5] **A:** Uh-hum.
[6] **Q:** If you look at Page AA 10, the second to
[7] the last paragraph on that page, the last sentence
[8] states, "Ultimately, Captain Ehlers made the
[9] decision to remove these three passengers from the
[10] flight so that they could be questioned by
[11] authorities." Do you see that?
[12] **A:** Right, yes.
[13] **Q:** Is that an incorrect statement?
[14] **A:** It's partially correct.
[15] **Q:** Can you explain that.
[16] **A:** The passengers were removed from the
[17] airplane for questioning, but I am not the one that
[18] asked that they be removed from the airplane for
[19] questioning.
[20] **Q:** So that statement is incorrect?
[21] **A:** I would say it is incorrect.
[22] **Q:** And I'm also going to ask you to look at a
[23] document that has previously been marked as Exhibit
[24] 2, which are Plaintiff's response to Defendant's

Page 72

[1] interrogatories. Are you familiar with what
[2] interrogatories are?
[3] **A:** You could remind me.
[4] **Q:** Interrogatories are questions posed by one
[5] party in a lawsuit to the other party.
[6] **A:** Okay.
[7] **Q:** And then the party answers those questions.
[8] And in this case, these are questions posed by the
[9] plaintiff in this case to American Airlines, which
[10] American has answered.
[11] **A:** Okay.
[12] **Q:** And I'm going to ask you to look at Page 2.
[13] Interrogatory No. 1 asks, "Identify the person(s)
[14] who made the decision to have John D. Cerqueira
[15] removed from American Airlines Flight 2237 on
[16] December 28, 2003, state the basis for the decision,
[17] and identify any other person(s) who participated in
[18] making the decision and describe their
[19] participation." Do you see that?
[20] **A:** Uh-hum.
[21] **Q:** And then about three-quarters of the way
[22] down American's response is, "Thus, the plaintiff
[23] was initially 'removed' from the flight along with
[24] all of the other passengers as a result of Captain

[1] Ehlers' decision..." Do you see that?

[2] **A:** Uh-hum.

[3] **Q:** Is that an incorrect statement?

[4] **A:** I would say that's incorrect.

[5] **Q:** Okay. Does American have a policy

[6] regarding the removal of passengers from flights?

[7] **A:** Most definitely.

[8] **Q:** What is that policy?

[9] **A:** Essentially it's security and behavior

[10] based in terms of a threat level. So no matter what

[11] someone looks like, what their religion is, sexual

[12] orientation, et cetera, et cetera, we don't remove

[13] anyone unless we have a valid security threat with

[14] them.

[15] **Q:** Do you receive training regarding

[16] identifying suspicious behavior?

[17] **A:** Yes, we do. And that training has

[18] obviously increased post-9/11.

[19] **Q:** What kind of training do you receive?

[20] **A:** I don't think we should talk about the

[21] training about identifying threats.

[22] **Q:** Are you objecting because you think that it

[23] might be sensitive security information?

[24] **A:** Yes.

[1] **Q:** How often do you receive the training?

[2] **A:** We go to recurrent training as captains

[3] every nine months.

[4] **Q:** At that training do you receive written

[5] materials?

[6] **A:** At the training it's mostly audio-visual

[7] and Web-based training. And then any written

[8] materials are destroyed.

[9] **Q:** When you say "audio-visual," are you

[10] referring to, for example, PowerPoint presentations?

[11] **A:** Yes, in-classroom type presentations.

[12] **Q:** Do you have anything written regarding

[13] identifying suspicious behavior?

[14] **A:** I do.

[15] **Q:** What is that?

[16] **A:** It's something that's SSI's — it's an area

[17] in our manual that we can't talk about.

[18] **Q:** Can you just identify where that

[19] information is located.

[20] **A:** Some of that information would be located

[21] in what's called "Part 1" of my manual.

[22] **Q:** And by "my manual," what is the name of the

[23] document you're referring to?

[24] **A:** It's just called "Part 1," and it's one of

[1] the sections in this manual talking about security

[2] threats.

[3] **Q:** What is the manual called? What is the

[4] full title of the manual?

[5] **A:** Part 1.

[6] **Q:** Part 1 manual, okay.

[7] Does American have protocols for what you

[8] should do if you think a passenger is engaging in

[9] suspicious behavior?

[10] **A:** Absolutely.

[11] **Q:** What are those protocols?

[12] **A:** I can't talk about it.

[13] **MR. FITZHUGH:** That's SSI.

[14] **Q:** I might ask these questions, and I

[15] understand that you'll be objecting on the basis of

[16] SSI, but I'm going to continue to ask them anyway

[17] for the record.

[18] **A:** Okay.

[19] **Q:** Has American ever instructed you on whether

[20] it's permissible to consider a passenger's ethnicity

[21] or national origin in determining whether that

[22] passenger may pose some sort of security threat?

[23] **A:** Absolutely.

[24] **Q:** What is that training or instruction?

[1] **A:** The training and instruction is emphatic

[2] that it's not to be used.

[3] **Q:** Have you ever been involved in any other

[4] incident in which a passenger has been removed from

[5] a flight?

[6] **A:** Yes.

[7] **Q:** Can you describe that incident for me.

[8] **A:** Another incident that comes to mind was

[9] October of '02, similar in that I had a call from

[10] one of the flight attendants in the back of the

[11] airplane that they were concerned about a

[12] passenger's behavior. The first officer and I

[13] started discussing what we might do about it. And

[14] we received another call from the flight attendant

[15] saying that this passenger, male passenger, had

[16] taken their belt off and had coiled it up in one of

[17] their hands, and that it looked like this passenger

[18] was watching the flight attendant duties very

[19] carefully, abnormally so.

[20] I finally made the decision to involve the

[21] ground security coordinator. We got SOC and we got

[22] the State Police out there. The passenger was taken

[23] off the airplane, and questioning started in the jet

[24] bridge. We had a concern among the crew initially

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    John D. Cerqueira v.
American Airlines, Inc.

Page 21 of 22

Page 77

[1] that he might be high on some sort of drug. While
[2] the questioning ensued in the jet bridge, the first
[3] officer and I discussed, based on what we had been
[4] told by the flight attendants, whether if the State
[5] Police cleared this individual and felt comfortable
[6] with him traveling, whether we would be comfortable
[7] with it also.
[8]     As we were having that discussion, the
[9] passenger decked one of the officers, ran out into
[10] the terminal; and as best as I can describe, a State
[11] Police pig pile ensued on this passenger. He was
[12] arrested, and he got a few free meals, I'm sure.
[13]     **Q:** You mentioned that while the questioning
[14] was going on, you and the first officer discussed
[15] what you would do if that individual was secured by
[16] the State Police?
[17]     **A:** Correct.
[18]     **Q:** Did you have some more discussions with
[19] First Officer Ball regarding the three passengers,
[20] Mr. Cerqueira and the other two passengers?
[21]     **A:** I'm sure I did.
[22]     **Q:** Do you recall what those conversations
[23] were?
[24]     **A:** I don't remember.

Page 78

[1]     **Q:** Assuming Mr. Cerqueira and the three other
[2] passengers —
[3]     **A:** Let me just add something quickly.
[4]     **Q:** Okay.
[5]     **A:** The first officer's function here, by
[6] regulations and by the way I operate my trips, is to
[7] give me counsel and advice. And unless he feels the
[8] aircraft is threatened immediately, I can disregard
[9] that advice, but it's my decision. I am
[10] responsible.
[11]     **Q:** Assuming Mr. Cerqueira and the other three
[12] passengers had been cleared by the State Police and
[13] you were informed of that, would you have permitted
[14] them to continue on the flight to Fort Lauderdale?
[15]     **MR. FITZHUGH:** Objection. You can still
[16] answer.
[17]     **A:** Depending on what SOC and the ground
[18] security coordinator came back with and what
[19] information there was, that might have been the
[20] case. I don't think we would have departed with the
[21] original three flight attendants. Obviously we
[22] didn't depart with them even without them.
[23]     **Q:** What information would you have been
[24] looking for from SOC and the ground security

Page 79

[1] coordinator to make that decision?
[2]     **A:** A number of items. And a lot of those
[3] items are really SSI in terms of what they're
[4] researching about all of these individuals.
[5]     **Q:** Are there any items that are not SSI that
[6] you can testify about?
[7]     **A:** Yes. I would say one item, if the State
[8] Police had felt comfortable with all of these
[9] individuals, if I had been told they were not
[10] traveling together and I was convinced of that, that
[11] would have been one of the factors.
[12]     **Q:** So the fact that these passengers were
[13] perceived as being traveling together —
[14]     **A:** One of many factors.
[15]     **Q:** — would have weighed heavily in your
[16] decision.
[17]     **A:** No, it would not have weighed heavily. It
[18] would have been one of many factors.
[19]     **Q:** Are there any other items that you would
[20] have considered?
[21]     **A:** Yes. My concern here is if I had been
[22] given an opportunity by the State Police to decide
[23] whether these passengers went with us or not,
[24] according to Ms. Walling, Mr. Cerqueira's behavior

Page 80

[1] prior to boarding the aircraft was unacceptable.
[2] And I have denied boarding to passengers who have
[3] been drunk in the past and who have been abusive and
[4] interfered with flight attendant duties.
[5]     So his behavior before he even got on the
[6] airplane was a problem. And that issue was not
[7] going to go away.
[8]     **Q:** Did Ms. Walling tell you that Mr. Cerqueira
[9] had interfered with her duties as a flight
[10] attendant?
[11]     **A:** No. She had described their interactions
[12] prior to boarding the airplane; with him being
[13] adamant about wanting to switch a seat and not
[14] listening to her in terms of whether she was a
[15] flight attendant or a gate agent, and then
[16] eyeballing her and making her feel extremely
[17] uncomfortable prior to boarding the airplane.
[18]     **Q:** Was there any concern that he was on any
[19] kind of substance, either alcohol or drugs?
[20]     **A:** I'd be speaking for one of the flight
[21] attendants, because I never met the gentleman.
[22]     **Q:** Did she tell you that she had that concern?
[23]     **A:** No.
[24]     **Q:** Have you ever been the subject of a

Page 81

[1] discrimination complaint by an American Airlines
[2] customer?
[3]   A: No.
[4]   Q: Has American provided you with any
[5] training, instruction or written materials regarding
[6] the circumstances under which a passenger may be
[7] removed from a flight, denied boarding or refused
[8] service?
[9]   A: Yes.
[10]   Q: Is that part of your recurrent training?
[11]   A: Yes.
[12]   Q: Is that part of Part 1 of your manual?
[13]   A: Yes.
[14]   Q: Is there anything that is not sensitive
[15] security information that you can testify about with
[16] respect to my question?
[17]   A: Yes. Certainly we're not to discriminate
[18] based on how an individual looks, what their
[19] religion is, many obvious factors like that. There
[20] are many other secure pieces of information that
[21] we're not to share.
[22]   Q: Are there any other factors that you can
[23] share?
[24]   A: I can't think of anything offhand, no.

Page 82

[1]   Q: Has American ever taken any disciplinary
[2] action against you for considering a passenger's
[3] race, national origin, ancestry, religion in
[4] determining whether that passenger could be removed
[5] from a flight, denied boarding or refused service?
[6]   A: No.
[7]   Q: Do you know whether any other American
[8] Airline employee has been subject to disciplinary
[9] action for that reason?
[10]   A: You mean many employees that were involved
[11] with this flight?
[12]   Q: Any other American Airline employee that
[13] you're aware of.
[14]   A: None that I'm aware of.
[15]   Q: Has the training you've received
[16] regarding — under the circumstances under which a
[17] passenger may be removed from a flight, has that
[18] training changed in any way since December 2003?
[19]   A: No. I would say — and I'd like to speak
[20] to this. I would say the answer to that is "no."
[21] It's just been emphasized even more post-9/11.
[22]   Q: What's been emphasized?
[23]   A: All of the training based on
[24] nondiscriminating.

Page 83

[1]   Q: Has American provided you with any
[2] training, instruction or written materials regarding
[3] whether a passenger's race can be used in
[4] determining whether the passenger is refused service
[5] or denied boarding?
[6]   A: Yes.
[7]   Q: Is that training part of your recurrent
[8] training?
[9]   A: Yes.
[10]   Q: Do you have any other training in addition
[11] to the recurrent training that you have every nine
[12] months?
[13]   A: If you stay on the same aircraft that you
[14] fly and you stay in the same position — i.e.
[15] captain, first officer, international officer — and
[16] you also stay in the same division, which would be
[17] international, for example, versus domestic flying,
[18] all the training that you're getting is recurrent
[19] training. There is no other training.
[20]   MS. ABATE RECHT: I have no further
[21] questions.
[22]           CROSS EXAMINATION
[23]           BY MR. FITZHUGH:
[24]   Q: With regard to the decision to remove the

Page 84

[1] three passengers for questioning, did you disagree
[2] with it?
[3]   A: No.
[4]   Q: Were you part of the discussion that led to
[5] that decision?
[6]   A: Yes.
[7]   Q: So would it be fair to say that it was a
[8] decision that you adopted as one you would have made
[9] yourself?
[10]   A: Yes. I felt very comfortable with it.
[11]   Q: Are you aware that when Mr. Flores was
[12] questioned at his deposition, he gave testimony in
[13] substance to the effect that you on the aircraft
[14] pointed out to him the three people in Row 20 that
[15] were to be removed from the flight for questioning?
[16]   A: Yes.
[17]   Q: And do you have a recollection of doing
[18] that?
[19]   A: No.
[20]   MR. FITZHUGH: That's all I have.
[21]         REDIRECT EXAMINATION
[22]         BY MS. ABATE RECHT:
[23]   Q: At what point did you leave the aircraft to
[24] make phone calls to the gate security coordinator

John M. Ehlers
Vol. 1, April 26, 2006

Case 1:05-cv-11652-WGY    Document 17-8    Filed 08/22/2006    John D. Cerqueira v.
American Airlines, Inc.

Page 85

[1] and gate agent?

[2] A: Soon after deciding that we were going to
[3] involve some other people and have some questions as
[4] to these gentlemen.

[5] Q: And Mr. Flores came on the — boarded the
[6] plane after that decision — after that call was
[7] made; is that right?

[8] A: Most likely, yes.

[9] Q: So did you then come back on the plane at
[10] some point?

[11] A: You know, I shuttled back and forth between
[12] the airplane and the actual gate desk so many times,
[13] I can't remember how many times. Because I had two
[14] responsibilities. I had a perceived security
[15] threat, and I also am still responsible for the
[16] airplane, in making sure Don is doing what he needs
[17] to do, staying in command of the airplane and
[18] keeping the rest of the passengers comfortable.

[19] We had a lot of passengers who were getting
[20] nervous because of what was going on. So we were
[21] working to reassure people. We also have to do a
[22] number of things. We have to keep our flight plan
[23] active or the trip gets cancelled and it won't
[24] operate. So there are a number of things that keep

Page 86

[1] going on, even though the plane is not moving.

[2] Q: So you were shuttling back and forth up and
[3] down the jet bridge?

[4] A: Yeah.

[5] Q: Were you there when Mr. Cerqueira and the
[6] other two gentlemen were being questioned on the jet
[7] bridge by the State Police?

[8] A: I can't remember. I might have passed by
[9] them. But at no point, whether it was the jet
[10] bridge or the terminal, was I standing right there
[11] and listening to what they were being asked. What I
[12] was basically waiting for — so we're clear, I was
[13] waiting for the State Police to finish what their
[14] job is and to report to me and tell me what their
[15] final baseline outcome was, how they felt about it.

[16] Now, that never happened, because as I
[17] understand it, they took these passengers to another
[18] location. And my concentration began trying to
[19] operate the flight.

[20] Q: Do you recall speaking with Mr. Flores
[21] before he came on the flight?

[22] A: I don't. I can't remember whether he was
[23] one of the people operating the flight, because
[24] supervisors sometimes will also operate a normal

Page 87

[1] flight, or whether he became involved after the
[2] fact. I don't remember.

[3] Q: What do you mean by "operate the flight"?

[4] A: There's usually two people, two employees
[5] that will help board people and deal with any issues
[6] that arise prior to the plane departing. Sometimes
[7] a supervisor might be one of those people operating
[8] the flight prior to it leaving.

[9] MS. ABATE RECHT: I have nothing further.

[10] MR. FITZHUGH: Let's just take a second,
[11] because maybe I can clear up this issue. You asked
[12] about the ground security coordinator.

[13] MS. ABATE RECHT: Yes.

[14] MR. FITZHUGH: Well, I believe that we've
[15] all agreed that that was at the time Mr. Flores was
[16] called. I think that was his testimony. It was
[17] Flores and/or Traer.

[18] MS. ABATE RECHT: Well, Traer testified
[19] that she was not involved until after they had
[20] already been removed from the flight.

[21] MR. FITZHUGH: I think she may have been
[22] the GSC who may have been called. Are you looking
[23] for the person that he spoke to?

[24] MS. ABATE RECHT: I'm looking for the GSC

Page 88

[1] and the agent with whom Captain Ehlers spoke who
[2] were involved in the decision to remove the three
[3] passengers for questioning.

[4] MR. FITZHUGH: So when he first went up the
[5] jet bridge to the gate, you want to know who he
[6] spoke with?

[7] MS. ABATE RECHT: Yes.

[8] MR. FITZHUGH: Just give us a second.

[9] (Discussion off the record)

[10] MR. FITZHUGH: To follow up on your inquiry
[11] about the ground security coordinator and the gate
[12] agent that Captain Ehlers spoke to, I will make an
[13] effort to contact Mr. Flores and see if he recalls
[14] any other personnel in the area, because that would
[15] be the most likely source of the information. And
[16] I'll supplement the record by supplementing our
[17] interrogatory responses, if I can determine the
[18] information.

[19] THE WITNESS: I'm trying to be helpful off
[20] the record —

[21] MS. ABATE RECHT: Let's just keep on the
[22] record for a second.

[23] MR. FITZHUGH: I just want to make sure
[24] that that's the inquiry that you want me to respond

John D. Cerquetti, etc. v.   Case 1:05-cv-11652-WGY   Document 17-8   Filed 08/22/2006   Page 24 of 25
American Airlines, Inc.

John M. Ehlers
Vol. 1, April 26, 2006



Page 89

[1] to.
[2]     MS. ABATE RECHT: That's the inquiry that
[3] we're asking you to respond to; but to the extent
[4] that Mr. Flores has no recollection, I'm asking that
[5] other American Airlines records be searched to
[6] determine this information, too, as it is really at
[7] the crux of what Mr. Captain Ehlers has been
[8] testifying about today.
[9]     MR. FITZHUGH: And you want the names of
[10] these people in the event they might have more
[11] knowledge about their discussions with him, with
[12] Captain Ehlers?
[13]     MS. ABATE RECHT: In the event that they
[14] have knowledge regarding the removal of these three
[15] passengers from the flight.
[16]     MR. FITZHUGH: I understand that. But
[17] there are a lot of people who have knowledge. But I
[18] guess the question becomes what kind of knowledge
[19] they're going to have and the time and expense of
[20] ferrying out knowledge that is likely to be pretty
[21] marginal. Now, I'm going to work with you. And
[22] I'll respond to any legitimate discovery requests,
[23] but I just want to make sure that the reason —
[24]     MS. ABATE RECHT: These two individuals,

Page 91

[1] want to get into a physical confrontation with
[2] someone.
[3]     MR. FITZHUGH: Do you have anything else?
[4]     MS. ABATE RECHT: I don't.
[5]     MR. FITZHUGH: Okay. We're done.
[6]     (Whereupon, the deposition was
[7] concluded at 12:10 p.m.)
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 90

[1] Captain Ehlers has testified, are the people who
[2] made the decision to have these three passengers
[3] removed from the flight. I think that is extremely
[4] material information.
[5]     THE WITNESS: I guess on the record —
[6]     MR. FITZHUGH: Let's stop. I want to go
[7] back on the record, because Captain Ehlers wants to
[8] supplement one of his previous responses with regard
[9] to the identity of the ground security coordinator
[10] and the gate agent he talked about removal of these
[11] passengers with.
[12]     Go ahead, Captain.
[13]     THE WITNESS: The first point I will make
[14] is that I'm aware that a ground security coordinator
[15] is a title that requires extra training. Whether
[16] Ynes Flores is certified as a ground security
[17] coordinator, I don't know. I'm not sure. So that
[18] would be germane as to whether he was that person
[19] that day or not.
[20]     The other point I'd like to make is that
[21] the reason that a pilot is not going in the back of
[22] the airplane and pointing out people and saying,
[23] Come with me; we're getting off the airplane for
[24] whatever reason, is for several reasons. We do not

Page 92

[1]                 CERTIFICATE
[2] I, JOHN M. EHLERS, do hereby certify that I have
[3] read the foregoing transcript of my testimony, and
[4] further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]     Dated at __, this day of ,
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 93

[1]     **COMMONWEALTH OF MASSACHUSETTS)**
[2] SUFFOLK, SS. )
[3]     I, Jane M. Williamson, Registered Merit Reporter
[4] and Notary Public in and for the Commonwealth of
[5] Massachusetts, do hereby certify that there came
[6] before me on the 26th day of April, 2006, at 10:00
[7] a.m., the person hereinbefore named, who was by me
[8] duly sworn to testify to the truth and nothing but
[9] the truth of his knowledge touching and concerning
[10] the matters in controversy in this cause; that he
[11] was thereupon examined upon his oath, and his
[12] examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]     I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]     In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this day of May,
[21] 2006.
[22]
[23]     Notary Public
[24] My commission expires: 1/19/07

# In The Matter Of:

*John D. Cerqueira    v.*
*American Airlines, Inc.*

---

*Lois Sargent*
*Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File SARGENT.V1, 49 Pages*
*Min-U-Script® File ID: 2618236922*

# Word Index included with this Min-U-Script®



**Page 1**

Volume I

Pages 1 to 49

Exhibits 5 to 7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,          :

    Plaintiff,              :

vs.                         : Civil Action

                            : No. 05-11652-WGY

AMERICAN AIRLINES, INC.,    :

    Defendant.             :

DEPOSITION OF LOIS SARGENT, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Jane M. Williamson, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Birnbaum & Godkin, 280 Summer Street, Boston, Massachusetts, on Tuesday, March 28, 2006, commencing at 1:00 p.m.

PRESENT:

    Birnbaum & Godkin, LLP

        (By Erica Abate Recht, Esq.)

    280 Summer Street, Boston, MA  02210,

        for the Plaintiff.

    Fitzhugh, Parker & Alvaro LLP

        (By Amy Cashore Mariani, Esq.)

    155 Federal Street, Suite 1700, Boston, MA

    02110-1727, for the Defendant.

**Page 2**

INDEX

WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

LOIS SARGENT

BY MS. ABATE RECHT    3

EXHIBITS

NO.        DESCRIPTION            PAGE

5    Document entitled "AMR Event Call    9
     Center Report" Bates stamped AA 0012
     to 0014

6    Three-page document with heading in    17
     the middle "Describe
     Event/Situation" prepared by Lois
     Sargent

7    Document entitled "Snapshot of ON    29
     list"

**Page 3**

**PROCEEDINGS**
**LOIS SARGENT**

[3] a witness called for examination by counsel for the
[4] Plaintiff, having been satisfactorily identified by
[5] the production of her driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:

**DIRECT EXAMINATION**
**BY MS. ABATE RECHT:**

[10]    **Q:** Good afternoon, Ms. Sargent. Can you
[11] please state your full name for the record.
[12]    **A:** Lois Sargent.
[13]    **Q:** Could you spell your last name, please.
[14]    **A:** S-A-R-G-E-N-T.
[15]    **Q:** What is your address?
[16]    **A:** Here in Massachusetts, it's 100 Washington
[17] Street, No. 64, Salem, MA 01970.
[18]    **Q:** Do you have another residence?
[19]    **A:** My home of record is in Miami.
[20]    **Q:** What is the address there?
[21]    **A:** 15240 Southwest 86th Avenue, Palmetto,
[22] Florida, 33157.
[23]    **Q:** Did you do anything to prepare for today's
[24] deposition?

**Page 4**

[1]    **A:** Just reviewed the report that I had
[2] submitted.
[3]    **Q:** Did you speak with anyone?
[4]    **A:** Could you clarify?
[5]    **Q:** Did you speak with anyone to prepare?
[6]    **A:** Well, I did speak to Attorney Mariani.
[7]    **Q:** Anyone else?
[8]    **A:** Not specifically about the case, other than
[9] to say I'd have to, you know, do a deposition.
[10]    **Q:** Are you currently employed by American
[11] Airlines?
[12]    **A:** Yes, I am.
[13]    **Q:** How long have you been employed there?
[14]    **A:** A little over six years.
[15]    **Q:** What is your position?
[16]    **A:** I'm a flight attendant.
[17]    **Q:** Have you held that position for the
[18] entirety of your employment at American?
[19]    **A:** Yes.
[20]    **Q:** Were you employed previously as a flight
[21] attendant on another airline?
[22]    **A:** Yes.
[23]    **Q:** What airline?
[24]    **A:** Laker.

Page 5

[1]    **Q:** How many years were you employed at Laker?
[2]    **A:** Two.
[3]    **Q:** And before Laker, were you employed as a
[4] flight attendant?
[5]    **A:** No.
[6]    **Q:** What is your educational background?
[7]    **A:** I have an undergraduate degree in
[8] psychology and a master's in community counseling.
[9]    **Q:** Were you a member of the flight crew for
[10] American Airlines Flight 2237 on December 28, 2003?
[11]    **A:** Yes, I was.
[12]    **MS. MARIANI:** Before we continue, I'm
[13] assuming we're continuing under the same
[14] stipulations as this morning?
[15]    **MS. ABATE RECHT:** That's right.
[16]    **MS. MARIANI:** I just wanted to make sure.
[17]    **BY MS. ABATE RECHT:**
[18]    **Q:** Ms. Sargent, do you recall a passenger by
[19] the name of John Cerqueira?
[20]    **A:** I didn't recall him by name. I recall the
[21] incident that he was involved in.
[22]    **Q:** Do you recall communicating with Mr.
[23] Cerqueira on the morning of December 28, 2003?
[24]    **A:** I don't believe I spoke directly to him.

Page 6

[1]    **Q:** I'm going to give you what has previously
[2] been marked as Exhibit 2, which are American
[3] Airlines' Responses to Plaintiff's First Set of
[4] Interrogatories. Are you familiar with what an
[5] interrogatory is?
[6]    **A:** Not really.
[7]    **Q:** An interrogatory is an opportunity for, in
[8] this case, the plaintiff to ask questions of the
[9] defendant, of American Airlines, and for American
[10] Airlines to answer those questions in written form.
[11]    **A:** Uh-hum.
[12]    **Q:** I'm going to direct your attention to Page
[13] 3. You'll see Interrogatory No. 4. It states,
[14] "Identify all American Airlines personnel who
[15] communicated with Mr. Cerqueira on or after December
[16] 28, 2003, and state the substance of the
[17] communications." Do you see that?
[18]    **A:** Uh-hum.
[19]    **Q:** And then about halfway down, it says,
[20] "Flight Attendant Lois Sargent discussed with him
[21] and the others seated alongside him in the exit row
[22] the responsibilities for being seated there,
[23] including being able to physically manage opening
[24] the door in case of an emergency."

Page 7

[1]    **A:** That's correct, but I did not speak
[2] directly to him. I do a briefing for all six people
[3] that are sitting in the exit row. And what I ask
[4] for is their attention. And as I speak, I just get
[5] eye contact to make sure that they're listening to
[6] me, but I did not address myself to him
[7] specifically.
[8]    **Q:** Okay. But you addressed yourself to the
[9] six passengers?
[10]    **A:** To the six passengers — or I'm not sure if
[11] there were three on the other side or not.
[12]    **Q:** Okay. Of which he was one of them?
[13]    **A:** Yes.
[14]    **Q:** Did you notice anything unusual during the
[15] course of this conversation?
[16]    **A:** The two passengers in seats D and E were
[17] acting very bizarre, were laughing and asking
[18] questions and just not conducting themselves in the
[19] way that most people do when I'm doing a briefing.
[20] And Mr. Cerqueira was kind of just laughing at the
[21] whole thing. You know, he was observing the whole
[22] thing and laughing.
[23]    **Q:** So he was laughing at the other two
[24] gentlemen who were acting strangely?

Page 8

[1]    **A:** At what was going on, yeah.
[2]    **Q:** But he wasn't one of the gentlemen who was
[3] making the comments to you, was he?
[4]    **A:** He was not making comments, no.
[5]    **Q:** Did you notice any other inappropriate or
[6] suspicious behavior on the part of Mr. Cerqueira?
[7]    **A:** Just later, after security was called on
[8] the airplane, all the other passengers were craning
[9] their necks and all, you know, what's going on and
[10] all, and the three of them all of a sudden slumped
[11] down in their chairs, and all three of them looked
[12] like they were sleeping. We felt that they were
[13] feigning sleeping. We didn't really think that they
[14] were asleep.
[15]    **Q:** Did they slump down in their chairs after
[16] they saw security or were they already asleep when
[17] security came on?
[18]    **MS. MARIANI:** Objection. You can answer
[19] the question.
[20]    **A:** I did not — I was not there when they
[21] actually did this. It was just reported that they
[22] were —
[23]    **Q:** So you didn't see them sleeping at all —
[24]    **A:** Well, I saw the backs of their heads. I

Page 9

[1] was in the back at the time.
[2] **Q:** So you just saw the backs of their heads.
[3] You don't know whether their eyes were open or
[4] closed or what they were doing?
[5] **A:** No, I don't. No.
[6] **Q:** Do you recall preparing an AMR Event Call
[7] Center Report?
[8] **A:** Yes, I did.
[9] **Q:** Under what circumstances do American
[10] employees prepare these reports?
[11] **A:** When we have some kind of a specific event,
[12] when we have an illness onboard, we have disruptive
[13] behavior, any of that — anything of that nature.
[14] **Q:** Is it standard protocol?
[15] **A:** Yes. We're required to.
[16] **MS. ABATE RECHT:** Off the record.
[17]   (Discussion off the record)
[18] **MS. ABATE RECHT:** I'm going to mark as
[19] Exhibit 5 a document Bates numbered AA 0012 through
[20] 14.
[21]   (Document marked as Sargent
[22] Exhibit 5 for identification)
[23]   **BY MS. ABATE RECHT:**
[24] **Q:** Ms. Sargent, do you recognize this

Page 10

[1] document?
[2] **A:** Uh-hum.
[3] **Q:** This is the document that you prepared?
[4] **A:** Uh-hum, uh-hum.
[5] **MS. MARIANI:** You have to answer with
[6] either a "yes" or "no."
[7] **A:** I'm sorry. Yes.
[8] **Q:** Do you recall when you wrote this document?
[9] **A:** We deplaned and went down to base
[10] operations and wrote out a report at that time.
[11] **Q:** So it was the same day?
[12] **A:** Yes.
[13] **Q:** If you see on the bottom — I'm sorry, at
[14] the second page, it states, "Three passengers
[15] sitting in Row 20 DEF observed by flight attendants
[16] and cockpit crew as making inappropriate, suspicious
[17] comments in boarding area and onboard aircraft."
[18] Did you personally witness any
[19] inappropriate, suspicious comments?
[20] **A:** Just the comments about what they should do
[21] with the aircraft door. Then they called me back,
[22] "Is this the way we should do it?" I don't
[23] remember. It's two and a half years ago. I don't
[24] remember the specifics of what they asked me. But

Page 11

[1] it was just — I do this all the time. Nobody ever
[2] acts like that, you know. And they were all
[3] laughing about it. So it wasn't as though it was
[4] serious, you know. It was just — they seemed to be
[5] calling attention to themselves. And it was just
[6] one thing after another with these — this group of
[7] people.
[8] **Q:** And when you say "they," you're referring
[9] to the two gentlemen seated in the middle in the
[10] aisle row —
[11] **MS. MARIANI:** Objection.
[12] **Q:** — aisle seat?
[13] **MS. MARIANI:** You may answer.
[14] **A:** They were the ones that were most
[15] inappropriate, but the other gentleman seemed to be
[16] with them. I had no way of knowing if he was or if
[17] he wasn't. But since he was kind of laughing, too,
[18] I just assumed they were all sitting together. And
[19] he had requested, you know, an exit row seat, so we
[20] just assumed they were friends and wanted to be
[21] together.
[22] **Q:** You mentioned in your statement that they
[23] seemed to be foreign nationals. Why did you
[24] perceive them to be foreign nationals?

Page 12

[1] **A:** I don't really know. I guess they just
[2] appeared that way. I don't really know if they had
[3] accents or not. But they just seemed to be.
[4] **Q:** What about them led you to believe that
[5] they were foreign nationals?
[6] **MS. MARIANI:** Objection. You may answer.
[7] **A:** I just told you. I just —
[8] **Q:** You said that you don't recall whether they
[9] had an accent —
[10] **A:** No. They just —
[11] **Q:** Was it their skin color?
[12] **A:** Well, they weren't particularly — no.
[13] Their skin color was normal.
[14] **Q:** So if it wasn't their skin color and they
[15] didn't have an accent, why did you think that they
[16] seemed to be foreign nationals?
[17] **MS. MARIANI:** Objection. You may answer.
[18] **A:** I don't know. I guess their appearances.
[19] **MS. MARIANI:** Can we go off the record for
[20] just a second. I believe it's Ms. Milenkovic.
[21]   (Off the record).
[22]   **BY MS. ABATE RECHT:**
[23] **Q:** Can you be any more specific as to what
[24] about their appearance made you believe that they

Lois Sargent
Vol. 1, March 28, 2006

Case 1:05-cv-11652-WGY    Document 17-9    Filed 08/22/2006

John D. Cerqueira    v.
American Airlines, Inc.

Page 5 of 14

Page 13

[1] were foreign nationals?

[2] **A:** I would just say that for myself, I've had
[3] to learn to say "No capiche Italiano." I've had to
[4] learn to say, "No comprender," because people
[5] mistake me for even Spanish or Italian. So I mean,
[6] what is it about me that would identify me as
[7] Spanish or Italian? Well, I have vitiligo now, so
[8] that I usually have olive skin. And I'm dark. I
[9] have dark eyes. So I don't know why, but I'm always
[10] mistaken for Italian or Spanish. So I guess
[11] something about them just gave me that opinion.

[12] **Q:** Did you perceive them to be Middle Eastern?

[13] **MS. MARIANI:** Objection. You may answer.

[14] **A:** I really can't say that I remember that I
[15] did. I guess our report was kind of shaded by the
[16] fact that we had looked up their passports, and we
[17] know when we wrote this report what they were. So
[18] that kind of colored our thinking.

[19] **Q:** When did you look up their passports?

[20] **A:** While security was onboard, they brought
[21] what they call the manifest about the passengers.
[22] They had done a security check.

[23] **Q:** So that was after the decision was made to
[24] remove these passengers; is that right?

Page 14

[1] **A:** I don't know specifically. I think
[2] security was onboard. I don't know if they had left
[3] the airplane by that time or if we were — we were
[4] up in the front galley. And whether security was in
[5] the back talking to them while we were looking this
[6] up, I really can't tell you specifically. But after
[7] security came onboard, they came onboard and had
[8] this information with them.

[9] **Q:** And Sally Walling, do you know who Sally
[10] Walling is?

[11] **A:** Yes, I do.

[12] **Q:** Did she mention anything to you prior to
[13] boarding the aircraft about any of these three
[14] gentlemen?

[15] **A:** Yes.

[16] **Q:** What did she mention to you?

[17] **A:** That this gentleman was pacing about, and
[18] he kept asking her to change his seat, and she said
[19] that he was just annoying her or whatever. And she
[20] said, "Let's get onboard." She didn't want to have
[21] any more dealings with him.

[22] **Q:** In your experience, is it uncommon for a
[23] passenger to ask for a seat change?

[24] **MS. MARIANI:** Objection. You may answer.

Page 15

[1] **A:** No, except if we tell them that we're not
[2] gate agents and they'll have to wait, they usually
[3] wait. They don't keep coming up and — I wasn't
[4] there when — you know, we got there, and she just
[5] said, "Let's get onboard. He's" —

[6] **Q:** Annoying?

[7] **A:** Yeah, annoying. So I really can't say the
[8] extent to which this was going on.

[9] **Q:** You write in your report, "Overheard
[10] wishing other passengers 'Happy New Year.'" Did you
[11] actually overhear that?

[12] **A:** No, that was reported.

[13] **Q:** Did you personally witness any suspicious
[14] behavior?

[15] **MS. MARIANI:** Objection. You may answer.

[16] **A:** I believe I have answered that I went up to
[17] the front galley to talk to the captain and to the
[18] No. 1, because when I was doing my exit row
[19] briefing, their behavior was so erratic and unusual.
[20] And then when I finished my briefing and I went to
[21] the back, their overhead light went on, and I went
[22] up to them, and they started again.

[23] **Q:** Was there anything besides that exchange
[24] that you thought was suspicious?

Page 16

[1] **MS. MARIANI:** Objection. You may answer.

[2] **A:** No. No, it was mainly their — as far as
[3] my involvement, it was their behavior during the
[4] exit row briefing. And then when we put together
[5] everybody else's experiences — when I got up there
[6] to tell the captain, the captain immediately said to
[7] me, "Is that the same guy that made a comment to
[8] me?" And I said, "I don't know. I was not in the
[9] front of the airplane when they boarded." So he
[10] came out and he looked, and he said, "That's the
[11] same guy."

[12] **Q:** Which guy was he referring to?

[13] **A:** I don't know.

[14] **Q:** Was he referring to a man with a ponytail?

[15] **A:** I don't know.

[16] **Q:** What exactly was your conversation with the
[17] captain?

[18] **A:** I just went up to report my concern that
[19] I — what I'm telling you; that I was doing the exit
[20] row briefing, and these gentlemen were just acting
[21] very bizarre. And I said it was just unnerving, you
[22] know.

[23] **Q:** Did you speak with anyone else besides the
[24] captain about this?

Page 17

[1]  A: Well, the No. 1 was up there.
[2]  Q: Is that Ms. Milenkovic?
[3]  A: Yes. And then while we were talking, if I
[4] remember correctly, while we were talking, that was
[5] when Sally came up and said, "Now they're wishing
[6] everybody 'Happy New Year.'" And that was when the
[7] captain decided to call in security.
[8]  Q: But you didn't witness any of that; them
[9] wishing anyone a "Happy New Year"?
[10]  A: No.
[11]  MS. ABATE RECHT: I'm going to ask the
[12] court reporter to mark as Exhibit 6 a statement that
[13] is not Bates numbered. It appears to be an
[14] event/situation form authored by Ms. Sargent in
[15] response to a NASA Aviation Safety Reporting System.
[16]  THE WITNESS: Yes.
[17]  (Document marked as Sargent
[18] Exhibit 6 for identification)
[19]  Q: Ms. Sargent, do you recognize this
[20] document?
[21]  A: Yes, I do.
[22]  Q: Is this one of the documents you reviewed
[23] in preparation for this deposition?
[24]  A: That I what?

Page 18

[1]  Q: Is this one of the documents you reviewed
[2] in preparation for this deposition?
[3]  A: Yes, I did look this over.
[4]  Q: This and the previous document that we were
[5] just looking at?
[6]  A: Yes.
[7]  Q: Did you look at any other documents besides
[8] those two?
[9]  A: Just what I had, yes, what I received from
[10] the attorney.
[11]  Q: Okay. Can you identify anything you
[12] received from the attorney?
[13]  MS. MARIANI: I'm going to instruct the
[14] witness not to answer with respect to communications
[15] that were directed to her. She may respond with
[16] respect to other documents.
[17]  Q: Were there any other documents that you
[18] reviewed?
[19]  A: These are mainly my documents, yes.
[20]  Q: Did you review any other documents sent to
[21] you by your attorney? And I'll exclude asking for
[22] the substance of any attorney/client communications.
[23]  A: Yes.
[24]  Q: What other documents did you review?

Page 19

[1]  A: The documents that my attorney asked me to.
[2]  Q: Can you recall what any of them were?
[3]  A: Well, I think — one of them was I think
[4] this document here.
[5]  Q: And by "this," you're referring to Exhibit
[6] 2, which are American's responses to
[7] interrogatories?
[8]  A: Yeah.
[9]  Q: Were there any other documents that you
[10] reviewed that you can recall?
[11]  A: Just about the case, yes.
[12]  Q: Can you recall any documents in particular?
[13]  A: Well, she sent me copies of these that she
[14] had.
[15]  Q: In addition to these?
[16]  A: Not specifically.
[17]  Q: Did any of those documents refresh your
[18] recollection as to the events of December 28, 2003?
[19]  A: Just my own report, yeah.
[20]  Q: Did you write anything else besides these
[21] two reports?
[22]  A: No.
[23]  Q: And what did you write this report in
[24] response to? And by "this report," I'm referring to

Page 20

[1] the document we just marked as Exhibit 6.
[2]  A: We had a request from the safety — the
[3] Transportation Safety Authority sent me a form to
[4] fill out, and I did.
[5]  Q: Was that a general request or was it
[6] specific to the incident?
[7]  A: It was specific to this incident.
[8]  Q: Do you know whether any of the other flight
[9] attendants received that report?
[10]  A: No, I don't.
[11]  Q: Do you know whether any of the other crew
[12] members received that — the same form?
[13]  A: No, I don't.
[14]  Q: If you look on the first page, it says,
[15] "There was already concern, as (1) some passengers
[16] had made 'strange' comments to the captain during
[17] boarding..." Do you see that?
[18]  A: Uh-hum.
[19]  Q: Is that what you were just referring to?
[20]  A: Yes.
[21]  Q: What exactly were those comments?
[22]  A: I don't know. It was, as I reported, when
[23] I came up to tell the captain of my observations, he
[24] just asked me if they were the same passengers that

Page 21

[1] made the strange comments to him. I don't know what
[2] the comments were.
[3]   Q: And you say "and (2) Flight Attendant No. 2
[4] had reported to the" — "had reported" —
[5]   A: "That the passenger."
[6]   Q: — "that the passenger about whom she had
[7] concerns had gone immediately after boarding to the
[8] lavatory."
[9]   A: Uh-hum.
[10]   Q: Did Flight Attendant No. 2 — is that Ms.
[11] Walling?
[12]   A: Yes.
[13]   Q: Did she tell that to you at that time or
[14] had she told you that previously?
[15]   A: I really can't recall.
[16]   Q: Were you onboard the flight as the
[17] passengers were boarding?
[18]   A: Yes. We're required to have crew onboard.
[19]   Q: Did you notice any suspicious behavior with
[20] respect to a passenger visiting the lavatory?
[21]   MS. MARIANI: Objection. You may answer.
[22]   A: No. I was not in the rear of the airplane
[23] at that time, so I would not have seen that.
[24]   Q: Was it uncommon for passengers to visit the

Page 22

[1] lavatory upon boarding the plane?
[2]   MS. MARIANI: Objection. You may answer.
[3]   A: It's not uncommon. It's not common.
[4]   Q: Typically, passengers are not denied
[5] service because they choose to use the restroom upon
[6] boarding?
[7]   A: No.
[8]   MS. MARIANI: Objection. You may answer.
[9]   A: No.
[10]   Q: You then state, "The F/O" — is that first
[11] officer?
[12]   A: Where are you looking?
[13]   Q: At the top of the second page.
[14]   A: Yes, "F/O" is first officer.
[15]   Q: "The F/O went back to check the lav and
[16] said the passengers we were reporting were all
[17] sitting together in the exit row."
[18]   A: Yes.
[19]   Q: What do you know about the first officer
[20] checking the lavatory? Do you know what he was
[21] checking for?
[22]   A: To make sure there was nothing placed in
[23] the lavatory.
[24]   Q: Do you know whether he found anything?

Page 23

[1]   A: Apparently not, or he would have said
[2] something.
[3]   Q: Are you familiar with how passengers are
[4] assigned seating in exit rows?
[5]   MS. MARIANI: Objection. You may answer.
[6]   A: I'm not aware of how they're assigned
[7] seating. I know that there are restrictions on exit
[8] row seating, so that certain passengers are not
[9] allowed to sit in the exit row. And that's one of
[10] my duties when I go to do my briefing, is to look
[11] over the passengers that are sitting there and
[12] making sure that they're appropriate to be in the
[13] exit row.
[14]   Q: Exit row seats are assigned by the gate
[15] agent; is that right?
[16]   A: Correct.
[17]   Q: So a passenger can't book — passengers
[18] flying together can't request to be seated in an
[19] exit row; is that right? They have to be assigned
[20] the exit row at the gate by an agent; is that right?
[21]   MS. MARIANI: Objection. You may answer.
[22]   A: I really don't know. I know they have this
[23] electronic — you know, you can get your boarding
[24] pass. So I don't know whether that would allow them

Page 24

[1] to get an exit row seat or not. I don't know how
[2] that works.
[3]   Q: Did you perceive the three passengers
[4] sitting in Mr. Cerqueira's row to be traveling
[5] together?
[6]   MS. MARIANI: Objection. You may answer.
[7]   A: That was our assumption.
[8]   Q: Okay. Why did you assume that?
[9]   A: Because he requested that exit row seat,
[10] was one of the reasons. And the other reason was
[11] that, as I said, as the other two were making all of
[12] these comments and all, he was sitting there kind of
[13] watching it all and laughing. So I just thought he
[14] was part of the group.
[15]   Q: Other than Mr. Cerqueira observing the
[16] other two passengers as they were making comments to
[17] you, did you witness him interacting or talking with
[18] the other two passengers in any other way?
[19]   MS. MARIANI: Objection. You may answer.
[20]   A: No.
[21]   Q: Did you notice whether Mr. Cerqueira and
[22] the other two gentlemen looked similar to each
[23] other?
[24]   MS. MARIANI: Objection. You may answer.

Page 25

[1] **A:** He was much taller and seemed to be, I
[2] would say, dressed in a more business-like manner
[3] than the other two.
[4] **Q:** And by "he," you mean Mr. Cerqueira?
[5] **A:** Mr. Cerqueira, yes.
[6] **Q:** Did you notice whether they had a similar
[7] skin color?
[8] **MS. MARIANI:** Objection. You may answer.
[9] **A:** No, I don't perceive that.
[10] **Q:** Did you check to see whether they had
[11] purchased their tickets together?
[12] **A:** No.
[13] **Q:** Do you know whether any of the other crew
[14] did that?
[15] **A:** No.
[16] **Q:** You don't know or they didn't do it?
[17] **A:** I don't know.
[18] **Q:** Do you know whether these three gentlemen
[19] requested to sit together?
[20] **A:** I only know that Mr. Cerqueira requested an
[21] exit row seat.
[22] **Q:** Is it uncommon for passengers to request an
[23] exit row seat?
[24] **MS. MARIANI:** Objection. You may answer.

Page 26

[1] **A:** I really don't know. I'm not a gate agent.
[2] But I think that for some of the gentlemen who are
[3] tall, they like that, because they have a little bit
[4] more room. Other passengers don't, because they
[5] can't recline the seats.
[6] **Q:** Did you observe any of the three gentlemen
[7] in the gate area?
[8] **A:** Not really. When we got there, we did see
[9] Mr. Cerqueira; but really, we got onboard
[10] immediately, so we didn't really spend much time
[11] observing him.
[12] **Q:** Did you notice whether he was with the
[13] other two children in the gate area?
[14] **A:** No, I didn't.
[15] **Q:** You didn't notice or you didn't see that he
[16] was with them?
[17] **A:** I didn't notice. As I said, we went
[18] immediately onboard the airplane, so...
[19] **Q:** Did you notice whether the three gentlemen
[20] boarded the flight at the same time?
[21] **A:** No, I did not notice that.
[22] **Q:** So the only indication — the only reason
[23] you thought they were traveling together was because
[24] Mr. Cerqueira was observing and smiling at what the

Page 27

[1] other two were saying during the safety briefing?
[2] **MS. MARIANI:** Objection. You may answer.
[3] **A:** Well, our other concern was, as I said,
[4] when we brought security onboard, that of all the
[5] passengers on the airplane, only these three were —
[6] **Q:** But you testified that you actually didn't
[7] see them sleeping —
[8] **A:** I didn't see it, but it was reported, so
[9] that got everybody upset. You know, why were these
[10] three supposedly asleep when everybody else was
[11] alert to the fact that security was coming onboard.
[12] **Q:** How many passengers were on the plane at
[13] that time?
[14] **A:** Really, I fly so many flights, I don't know
[15] what the headcount was on that flight. You'd have
[16] to check with American Airlines.
[17] **Q:** How large is an S80 plane?
[18] **A:** I think there's 122 seats in the back and
[19] 16 in the front.
[20] **Q:** And do you recall —
[21] **A:** 120 and 16.
[22] **Q:** Do you recall whether it was a full flight
[23] that day?
[24] **A:** I really don't. I think it was fairly

Page 28

[1] full.
[2] **Q:** And so can you be sure that none of the
[3] other 136, approximately, passengers onboard were
[4] sleeping?
[5] **MS. MARIANI:** Objection. You may answer.
[6] **A:** No, I can't be, except it was — you know,
[7] everybody was up in their seats and looking, so...
[8] We did not observe anybody else that was that way.
[9] **Q:** But you didn't observe them sleeping,
[10] either?
[11] **A:** No. Just that I heard it reported.
[12] **Q:** It's not uncommon for passengers to be
[13] sleeping while they're on a plane, is it?
[14] **MS. MARIANI:** Objection. You may answer.
[15] **A:** No. But when there's, quote, an emergency
[16] in progress, they don't usually sleep.
[17] **Q:** Was there an announcement that there was an
[18] emergency in progress?
[19] **A:** No, but here, you know, these several
[20] uniformed security guards come onboard, marching
[21] down the aisle and all.
[22] **Q:** Did they make any particular noise or
[23] announcement as they were coming onto the plane?
[24] **A:** I don't really recall.

Page 29

[1]   **Q:** So it's possible that if you were already
[2] sleeping, you wouldn't notice security coming onto
[3] the plane?
[4]   **MS. MARIANI:** Objection. You may answer.
[5]   **A:** Except it would seem to me that one
[6] wouldn't be in such a deep sleep in such a short
[7] period of time.
[8]   **Q:** Did you have any discussions with the
[9] captain about his decision to call security?
[10]   **A:** I don't believe I had specifically had any
[11] conversation with him. It was his decision.
[12]   **Q:** When was the passenger manifest reviewed?
[13]   **A:** When security came onboard, they brought
[14] it. I can't be specific about the exact time.
[15]   **MS. ABATE RECHT:** I'm going to ask the
[16] court reporter to mark as Exhibit 7 a document that
[17] is not Bates numbered. It's entitled "Snapshot of
[18] ON List."
[19]   (Document marked as Sargent
[20] Exhibit 7 for identification)
[21]   **Q:** Do you recognize this document?
[22]   **A:** I would think it's the list of passengers,
[23] a passenger list.
[24]   **Q:** Is this the passenger manifest that you're

Page 30

[1] referring to in your report?
[2]   **A:** I would assume, yes. I mean, it usually
[3] isn't printed out like this on nice white paper.
[4]   **Q:** The first column that's AA and then it's
[5] numbered, are those row numbers?
[6]   **A:** I would assume so, yes.
[7]   **Q:** And it doesn't appear that —
[8]   **A:** I'm not sure.
[9]   **Q:** You're not sure?
[10]   **A:** (Witness reviews document) No, it would be
[11] printed out. What I'm used to seeing is something
[12] that has, like, "27A," "27B." I don't know. I
[13] guess this is just a listing of the passengers that
[14] came onboard, because this is not what I'm used to
[15] seeing.
[16]   **Q:** It does not appear to me that Mr.
[17] Cerqueira's name is on this list. Do you see it
[18] anywhere? It's not a trick question. I just really
[19] don't see Mr. Cerqueira's name on this list.
[20]   **MS. MARIANI:** Off the record.
[21]   (Discussion off the record)
[22]   **A:** This was not a list — this was not the
[23] manifest that we looked at.
[24]   **Q:** Okay. So does this appear to you to look

Page 31

[1] like a list of the passengers who actually continued
[2] on the flight?
[3]   **A:** I would assume so. I have to admit, I
[4] really have never seen a listing like this. Our
[5] listings are by seat and row.
[6]   **Q:** Okay. You state in your report, "A review
[7] of the passenger manifest revealed these three
[8] passengers had Israeli passports but Arabic names."
[9]   **A:** No, two of them did.
[10]   **Q:** Do you see in your report how it says
[11] "these three passengers"?
[12]   **A:** Well, that should be corrected, then,
[13] because it was two. Which report are you looking
[14] at?
[15]   **Q:** I'm looking at the report that was marked
[16] as Exhibit —
[17]   **A:** 5?
[18]   **Q:** The NASA report that you're holding. So
[19] it's Exhibit 6.
[20]   **A:** Okay.
[21]   **Q:** On the second page.
[22]   **A:** Okay. That, then, should be corrected,
[23] because it was two passengers did.
[24]   **Q:** Okay. And those two passengers didn't

Page 32

[1] include Mr. Cerqueira, correct?
[2]   **A:** I would assume not.
[3]   **Q:** And you're just assuming that based on —
[4]   **A:** Yeah, I don't remember, you know, at this
[5] point exactly what the names — except for the fact
[6] that we got this case going, I would not recall the
[7] names of the three passengers. So I wouldn't
[8] remember the names of the other two either.
[9]   **Q:** Did you notice any other behavior that you
[10] thought was suspicious that we have not discussed?
[11]   **MS. MARIANI:** Objection. You may answer.
[12]   **A:** I think we've pretty much covered it.
[13]   **Q:** Mr. Cerqueira and the other two passengers
[14] were removed by the State Police; is that correct?
[15]   **A:** I'm not sure if they were State Police or
[16] airport security. They were uniformed airport
[17] personnel, and I don't know specifically. I would
[18] not want to say specifically if they were State
[19] Police or airport security, transportation security.
[20]   **Q:** Okay. So Mr. Cerqueira and the other two
[21] gentlemen were removed from the plane by some sort
[22] of security personnel?
[23]   **A:** Security.
[24]   **Q:** This was done before the decision was made

---

Page 33

[1] to deplane and de-screen all the other passengers,
[2] correct?
[3]   **A:** That, I believe, is correct, yes.
[4]   **Q:** And to your knowledge, why were Mr.
[5] Cerqueira and these other two men being removed from
[6] the plane?
[7]   **A:** Because of our concerns, which we had
[8] communicated to the captain. And he felt it was
[9] important enough to have security check into it.
[10]   **Q:** You also say in your statement, "After
[11] security removed the passengers in 20 DEF, the
[12] passenger in 29D reported to me that she was in the
[13] security check line with passenger 20F and security
[14] had removed a box cutter from him." Do you see that
[15] statement?
[16]   **A:** Yes.
[17]   **Q:** So she did not relate this to you before
[18] the decision was made to remove them from the plane,
[19] correct?
[20]   **A:** No.
[21]   **Q:** Do you remember who that passenger was?
[22]   **A:** No, I don't. It was a woman.
[23]   **Q:** Do you remember where she was seated?
[24]   **A:** I think I said she was seated in 29D.

---

Page 34

[1]   **Q:** I see that.
[2]   **A:** And so I went up immediately and reported
[3] that. And they removed her from the plane.
[4]   **Q:** Do you know who removed her?
[5]   **A:** I really can't say. I would assume it was
[6] security.
[7]   **Q:** Was it the same security people who had
[8] removed the three gentlemen?
[9]   **A:** I really couldn't answer that honestly.
[10]   **Q:** You then say, "Security came back and asked
[11] me to check the overhead bins and make sure the
[12] passengers in 20 DEF had taken all their belongings.
[13] Since I don't know what coach passengers puts in the
[14] overhead, I went to Flight Attendant No. 1 and said
[15] I wanted the dogs brought on this plane. The other
[16] flight attendant concurred"?
[17]   Were you the first one to mention bringing
[18] dogs on the plane?
[19]   **A:** Yes.
[20]   **Q:** Did you communicate that to the pilot?
[21]   **A:** I believe it was to the No. 1 flight
[22] attendant.
[23]   **Q:** And is that Ms. Milenkovic?
[24]   **A:** Yes. I can't really remember at this time

---

Page 35

[1] whether the captain was standing right there in the
[2] front galley or not.
[3]   **Q:** You also say, "As a result of all the
[4] recurring incidents related to this flight, all
[5] three flight attendants opted to be relieved of
[6] duty." Does that mean you chose not to continue on
[7] to Fort Lauderdale with this flight?
[8]   **A:** Yes.
[9]   **Q:** Given that the three individuals had
[10] already been removed from the plane and weren't
[11] continuing on the flight, what additional concerns
[12] did you have?
[13]   **A:** We were just — by this time, we were kind
[14] of frazzled.
[15]   **Q:** Is there anything identifiable that you —
[16]   **A:** We just were rather anxious. Don't forget,
[17] we're the airport that lost our people on 9/11. So
[18] we take all of this very seriously. And we were
[19] just unnerved by the whole thing.
[20]   **Q:** Did anyone from American Airlines contact
[21] you to discuss this incident further?
[22]   **A:** No. The only one that called me was the
[23] Transportation Safety Board.
[24]   **Q:** Do you know who you spoke with at the

---

Page 36

[1] Transportation Safety Board?
[2]   **A:** I might have it in my notes at home. I
[3] can't at this time give you that information.
[4]   **MS. ABATE RECHT:** We would ask that any
[5] notes that Ms. Sargent has related to this incident
[6] be produced in response to our document requests.
[7]   **MS. MARIANI:** To the extent that they do
[8] not contain information that is either work product
[9] or constitutes attorney/client privileged
[10] communications, we will produce that information.
[11]   **A:** The reason they contacted me was not about
[12] the incident on this plane. It was about my addenda
[13] that they called.
[14]   **Q:** What addenda is that?
[15]   **A:** When I wrote about how vulnerable the
[16] flight attendants on certain jump seats —
[17]   **Q:** So you're referring to the last paragraph
[18] of your statement?
[19]   **A:** Yes, and that was the reason. They did not
[20] call me to review any of the information in the
[21] report about this incident. They called me because
[22] they told me that they were — they had read what I
[23] wrote, and they were very concerned about it, but
[24] they didn't know what they could do about it.

---

Lois Sargent
Vol. 1, March 28, 2006

Case 1:05-cv-11652-WGY   Document 17-9   Filed 08/22/2006

John D. Cerqueira   v.
American Airlines, Inc.

Page 11 of 14

---

Page 37

[1] **Q:** But they had originally contacted you about
[2] this incident?
[3] **A:** Well, that way by mail. They had sent me
[4] paperwork in the mail to fill out, and I did fill it
[5] out. And then as a result of my response, I
[6] received a telephone call from a member of the
[7] committee. And she wanted me to know that they had
[8] reviewed my report, and they had red flagged this
[9] and said that they were very concerned.
[10] **Q:** Did you communicate directly with law
[11] enforcement concerning the incident?
[12] **A:** No.
[13] **Q:** Did you have any other conversations with
[14] anyone else about this incident?
[15] **A:** No. The three of us talked about it down
[16] in ops as we were writing the reports.
[17] **Q:** You're referring to the three flight
[18] attendants?
[19] **A:** Yes — the two other flight attendants.
[20] **Q:** Do you remember what you all discussed?
[21] **A:** Just the incident. And what we discussed,
[22] we were, you know, rather upset about what was going
[23] on, and we were writing our report. And I guess I
[24] probably — the other person that I did talk to

---

Page 38

[1] about this was probably my flight manager.
[2] **Q:** Who is that?
[3] **A:** Ruby Hall. I told her.
[4] **Q:** Do you remember what you discussed with Ms.
[5] Hall?
[6] **A:** Just the incident as it occurred. I guess
[7] I went in to tell her that I had received this
[8] communication from the Transportation Safety. I had
[9] asked her — I remember now.
[10] I had asked her whether I should put this
[11] addenda on. Because I said to her, It really
[12] doesn't pertain to the specific incident; but as a
[13] result of the incident, I was concerned. And she
[14] said, "Well, if you want to put it on, you know, as
[15] an extra paragraph, go ahead." So then I went back
[16] to tell her that they had contacted me.
[17] **Q:** Okay. What was the involvement of Nicole
[18] Traer in this incident?
[19] **A:** I don't know any Nicole Traer. Is that the
[20] gate agent?
[21] **Q:** Could you tell me about her, then.
[22] **A:** I don't know. Because the gate agents and
[23] all, we know them; we see them all the time, but I
[24] don't know them by name.

---

Page 39

[1] **Q:** Other than checking the lavatory, did First
[2] Officer Ball do anything else with respect to this
[3] incident that you know of?
[4] **MS. MARIANI:** Objection. You may answer.
[5] **A:** I don't know.
[6] **Q:** Do you know who Ynes Flores is?
[7] **A:** No.
[8] **Q:** Do you know a Doug Wood?
[9] **A:** No.
[10] **Q:** Do you know a Rhonda Cobbs?
[11] **A:** No.
[12] **Q:** How about Craig Marquis?
[13] **A:** No.
[14] **Q:** Does American Airlines have a policy
[15] regarding the removal of passengers from airplanes?
[16] **MS. MARIANI:** Objection. You may answer.
[17] **A:** That would be the captain's decision.
[18] **Q:** Is that written anywhere?
[19] **MS. MARIANI:** Objection. You may answer.
[20] **A:** The captain is in charge of the airplane.
[21] It's written in that respect, yes.
[22] **Q:** Where is that written?
[23] **A:** In our manual.
[24] **Q:** Do you have a training manual that says all

---

Page 40

[1] of these things?
[2] **A:** Oh, yeah.
[3] **Q:** What is the manual called?
[4] **A:** It's our flight training manual.
[5] **Q:** Flight training manual?
[6] **A:** Uh-hum.
[7] **MS. MARIANI:** At this point I need to
[8] instruct the witness not to disclose the contents of
[9] that manual, because it is sensitive security
[10] information, which we have not yet been cleared by
[11] the Transportation Safety Administration to
[12] disclose.
[13] **Q:** Were you required to sign a confidentiality
[14] or nondisclosure agreement before being given the
[15] flight training manual that you're referring to?
[16] **MS. MARIANI:** Objection. You may answer.
[17] **A:** I don't believe so.
[18] **Q:** Have you ever discussed any of the contents
[19] of the flight training manual with anyone other than
[20] fellow American Airlines employees?
[21] **A:** No.
[22] **Q:** Have you been instructed not to?
[23] **A:** Yes.
[24] **Q:** Have you received any training from

---

Page 41

[1] American Airlines on identifying suspicious
[2] behavior?
[3]    MS. MARIANI: Objection. You may answer.
[4]    A: We have training in security procedures,
[5] yes.
[6]    Q: Does American Airlines have protocols for
[7] what you should do if you think a passenger is
[8] behaving in a suspicious manner?
[9]    MS. MARIANI: Objection. You may answer.
[10]    A: Yes.
[11]    Q: What are those protocols?
[12]    A: Well, that's part of our security manual.
[13]    Q: Can you tell me generally what the
[14] protocols are.
[15]    MS. MARIANI: You may answer in very broad
[16] terms.
[17]    A: Well, very broadly, we would convey our
[18] observations and our concerns to the captain. And
[19] that would be left to his discretion.
[20]    Q: Does the manual identify any specific
[21] behaviors that it considers suspicious?
[22]    A: To some extent. It can't identify every
[23] behavior.
[24]    Q: Can you elaborate on what some of the

Page 42

[1] behaviors are that it identifies?
[2]    A: No.
[3]    Q: And are you saying "no" because that would
[4] be sensitive security information?
[5]    A: Yes.
[6]    Q: Has American ever instructed you on whether
[7] it's permissible to consider a passenger's ethnicity
[8] in determining whether the passenger may pose some
[9] sort of flight risk?
[10]    MS. MARIANI: Objection. You may answer.
[11]    A: We are not allowed to discriminate. Our
[12] passengers are all different types, kinds.
[13]    Q: Have you ever been involved in any other
[14] incident in which a passenger was removed from a
[15] flight, denied boarding or refused service?
[16]    A: Not on American Airlines.
[17]    Q: Were you involved in such an incident on
[18] your previous airline?
[19]    A: Yes.
[20]    Q: Can you describe that incident for me.
[21]    A: It was not so much a security risk. This
[22] was before 9/11. And we were flying the DC10, which
[23] has three different cabins. And a family came
[24] onboard, and they had two children. And they were

Page 43

[1] all seated in different cabins, and they were not
[2] seated next to each other. And the mother got very
[3] hysterical, and she started screaming. And security
[4] was called. And they were removed from the flight.
[5]    Q: Have you ever been the subject of a
[6] discrimination complaint by an American Airlines
[7] customer?
[8]    A: No.
[9]    Q: Have you ever been the subject of a
[10] discrimination complaint by any customer of your
[11] previous employer?
[12]    A: No.
[13] *Q. Does the flight training manual cover
[14] instruction concerning circumstances under which a
[15] passenger may be removed from a flight, denied
[16] boarding or refused service?
[17]    MS. MARIANI: Objection. You may answer.
[18]    A: Would you repeat that.
[19]    MS. ABATE RECHT: Jane, can you repeat
[20] that.
[21]    *(Question read)
[22]    A: I think not specific.
[23]    Q: Is there any other document or training
[24] manual that covers that?

Page 44

[1]    A: No, not that I'm aware of. We have a
[2] policy of nondiscrimination.
[3]    Q: Is that a written policy?
[4]    A: I believe it is. But if I'm not mistaken,
[5] I believe that that pertains to our relationship
[6] with our fellow employees.
[7]    Q: Does that pertain to passengers?
[8]    A: I would have to — I would assume it would
[9] apply in all circumstances, but I really cannot say.
[10]    Q: Has American ever provided you with any
[11] training instruction or written materials concerning
[12] whether a passenger's race, ethnicity, color,
[13] national origin or ancestry may be considered in
[14] determining whether that passenger may be removed
[15] from the flight, denied boarding or refused service?
[16]    MS. MARIANI: Objection. You may answer.
[17]    A: No. On the contrary, we've had training to
[18] the effect that this should not color our decisions.
[19]    Q: How often do you have those trainings?
[20]    MS. MARIANI: Objection. You may answer.
[21]    A: We have recurrent training once a year.
[22] And during the recurrent training, we have a section
[23] on security. And we have lectures and also films of
[24] different possible incidents. And then in addition

Page 45

[1] to that, about two, two and a half, three years ago,
[2] American Airlines came up with this "Your World"
[3] training session, where we were required to go for
[4] two days and learn relationship skills. And I
[5] attended that — I think it was two summers ago in
[6] July. And not everybody did go, because they didn't
[7] continue the program. I don't remember the
[8] circumstances.
[9]     **Q:** When you say "relationship skills," did
[10] that touch on racial issues?
[11]     **MS. MARIANI:** Objection. You may answer.
[12]     **A:** No. It was more specifically on working
[13] with the other people in your group; you know,
[14] developing relationship skills and working as a
[15] team, being respectful of other people.
[16]     **Q:** So it was more for employee-to-employee
[17] relationships rather than passenger relationships?
[18]     **A:** Not specifically. I think it also referred
[19] to how you would interact with different people. It
[20] was a people training.
[21]     **Q:** Has American ever taken any disciplinary
[22] action against you for considering a passenger's
[23] race, color, national origin, ethnicity or ancestry
[24] in deciding whether a passenger should be removed

Page 46

[1] from a flight, denied boarding or refused service?
[2]     **MS. MARIANI:** Objection. You may answer.
[3]     **A:** No.
[4]     **Q:** Has a previous employer ever taken any such
[5] disciplinary action against you?
[6]     **MS. MARIANI:** Objection. You may answer.
[7]     **A:** No.
[8]     **Q:** Do you know any other American Airlines
[9] employee who has ever been disciplined for
[10] considering a passenger's race, color, national
[11] origin, ethnicity or ancestry in determining whether
[12] that passenger should be removed from a flight,
[13] denied boarding or refused service?
[14]     **A:** No.
[15]     **Q:** After the incident on December 28, 2003,
[16] did you receive any additional training regarding
[17] the circumstances under which a passenger may be
[18] removed from a flight, denied boarding or refused
[19] service?
[20]     **MS. MARIANI:** Objection. You may answer.
[21]     **A:** No.
[22]     **MS. ABATE RECHT:** If I could just take a
[23] quit break, I'm just going to look at my notes, and
[24] then we might be done.

Page 47

[1]     **MS. MARIANI:** Okay.
[2]     (Off the record)
[3]     **MS. ABATE RECHT:** I don't have anything
[4] further.
[5]     **MS. MARIANI:** I have no questions for this
[6] witness.
[7]     (Whereupon, the deposition was
[8] concluded at 1:59 p.m.)

Page 48

[1]         CERTIFICATE
[2]     I, LOIS SARGENT, do hereby certify that I have
[3] read the foregoing transcript of my testimony, and
[4] further certify that said transcript (with/without)
[5] suggested corrections is a true and accurate record
[6] of said testimony.
[7]     Dated at __, this ___ day of _____,
[8] 2006.
[9]
[10]
[11]
[12]
[13]
[14]
[15]     On this ____ day of _____, 2006, before
[16] me, the undersigned Notary Public, personally
[17] appeared _____ and proved to
[18] me through satisfactory evidence of identification,
[19] which was _____, to be the person
[20] whose name is signed above.
[21]
[22]
[23] Notary Public
[24] My commission expires: _____

Page 49

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                          )
[3]    I, Jane M. Williamson, Registered Merit Reporter
[4] and Notary Public in and for the Commonwealth of
[5] Massachusetts, do hereby certify that there came
[6] before me on the 28th day of March 2006, at 1:00
[7] p.m., the person hereinbefore named, who was by me
[8] duly sworn to testify to the truth and nothing but
[9] the truth of her knowledge touching and concerning
[10] the matters in controversy in this cause; that she
[11] was thereupon examined upon her oath, and her
[12] examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]    I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]    In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this   day of April
[21] 2006.
[22]
[23]            Notary Public
[24]    My commission expires:  1/19/07

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO.: 05-11652 WGY |
| AMERICAN AIRLINES, INC., | ) |
| | ) |
| Defendant. | ) |

**AFFIDAVIT OF JOHN M. EHLERS IN SUPPORT OF AMERICAN AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT**

I, John M. Ehlers, hereby state and depose the following under oath:

1. I am an employee of American Airlines, Inc. ("AA") in the position of Captain.

2. On December 28, 2003, I was the Captain of American Airlines Flight 2237 from Boston to Fort Lauderdale, Florida.

3. Upon information and belief, Plaintiff John D. Cerqueira was asked to disembark from Flight 2237 on December 28, 2003.

4. Upon information and belief, Mr. Cerqueira was seated in 20F of Flight 2337 on December 28, 2003.

5. Based upon information I received from the flight attendants of Flight 2237, as well as my own impressions and experiences on December 28, 2003, I contacted Systems Operations Control to investigate three male passengers on my flight. Said passengers were seated in 20D, E and F of Flight 2237, and included the

plaintiff.

6.  At the time that I made the decision to request assistance from Systems Operations

Control with regard to the passengers in seats 20D, E and F of Flight 2237, I did

not have any knowledge of the plaintiff, John D. Cerqueira's appearance, or his

actual or perceived race, ethnicity or religion.


Signed under the pains and penalties of perjury this _18th_ day of August, 2006.

John M. Ehlers

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,         )
                              )
      Plaintiff,           )
                              )
      v.                   )     CIVIL ACTION NO.: 05-11652 WGY
                              )
AMERICAN AIRLINES, INC.,   )
                              )
      Defendant.       )
                              )

**AFFIDAVIT OF CRAIG MARQUIS IN SUPPORT OF AMERICAN AIRLINES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

I, Craig Marquis, hereby state and depose the following under oath:

1.    I am an employee of American Airlines, Inc. ("AA") in the position of Operational Manager for the Systems Operations Control department.

2.    On December 28, 2003, I was employed with AA and working out of its office in Fort Worth, TX.

3.    Upon information and belief, on December 28, 2003, the plaintiff, John D. Cerqueira, was scheduled to depart from Boston, Massachusetts on AA Flight 2237.

4.    Because I was located in Texas on December 28, 2003, I had no opportunity to observe Mr. Cerqueira on that day.

5.    At the time that Mr. Cerqueira was asked to disembark from Flight 2237, I did not have any knowledge of, nor do I recall receiving any information regarding Mr. Cerqueira's appearance or his actual or perceived race, ethnicity or religion.

Signed under the pains and penalties of perjury this /9th day of August, 2006.

Craig Marquis

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN AIRLINES, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     CIVIL ACTION NO.: 05-11652 WGY <br> ) <br> ) <br> ) <br> ) |

**AFFIDAVIT OF RHONDA COBBS IN SUPPORT OF AMERICAN AIRLINES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

I, Rhonda Cobbs, hereby state and depose the following under oath:

1.     I am an employee of American Airlines, Inc. ("AA") in the position of Corporate

Complaint Resolution Official for the Systems Operations Control department.

2.     On December 28, 2003, I was employed with AA and working out of its office in Fort

Worth, TX.

3.     Upon information and belief, on December 28, 2003, the plaintiff, John D. Cerqueira,

was scheduled to depart from Boston, Massachusetts on AA Flight 2237.

4.     Because I was located in Texas on December 28, 2003, I had no opportunity to observe

Mr. Cerqueira on that day.

5.      At the time that Mr. Cerqueira was asked to disembark from Flight 2237, I did not have

any knowledge of, nor do I recall receiving any information regarding Mr. Cerqueira's

appearance or his actual or perceived race, ethnicity or religion.

Signed under the pains and penalties of perjury this _18th_ day of August, 2006.

_Rhonda Cobbs_

Rhonda Cobbs