UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA,<br><br>                Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>                Defendant. | Civil Action No. 05-11652-WGY |

**PLAINTIFF JOHN D. CERQUEIRA'S MEMORANDUM
IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Introduction**

On December 28, 2003, plaintiff John D. Cerqueira fell victim to racial profiling by employees of defendant American Airlines, Inc. (AA). Because AA's personnel mistakenly believed that Mr. Cerqueira was from the Middle East, AA twice discriminated against Mr. Cerqueira. First, AA caused Mr. Cerqueira to be removed from AA flight 2237, detained, and interrogated by the Massachusetts State Police. Second, AA refused to provide service to Mr. Cerqueira after he was released from questioning and cleared for further travel. AA had no legitimate nondiscriminatory reason to justify its treatment of Mr. Cerqueira; rather, it based its actions on Mr. Cerqueira's perceived race, color, national origin, ethnicity, or ancestry. To vindicate his right to be free of unlawful discrimination, Mr. Cerqueira brought this action under 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and M.G.L. c. 272 § 98.

The primary issue under each of the three statutes is the same—whether AA's treatment of Mr. Cerqueira was motivated by discrimination. Because direct evidence of discrimination is often elusive, intentional discrimination may be proved with indirect or circumstantial evidence using the

legal framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1972). Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Once the plaintiff establishes a *prima facie* case, a presumption of illegal discrimination is created, and the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged acts. If the defendant fails to carry its burden, plaintiff is entitled to judgment as a matter of law. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1015 (1st Cir. 1979).

Mr. Cerqueira has established a *prima facie* case of discrimination, and AA has failed to meet its burden of production in two independent respects. First, AA claims that it removed Mr. Cerqueira from flight 2237 because he requested a change in seat assignment, was among the first coach passengers to board, used the airplane lavatory, and fell asleep. According to AA, these four aspects of Mr. Cerqueira's behavior presented a "security concern." AA's claim is insufficient to justify its decision to remove Mr. Cerqueira from flight 2237, because it is undisputed that Mr. Cerqueira's behavior is common among airline passengers and does not ordinarily result in a denial of service. Second, AA has failed to articulate *any* reason for its refusal to rebook Mr. Cerqueira following his release from questioning. Although AA has identified the employee who made the decision, the employee cannot recall why he decided to deny service to Mr. Cerqueira. Because AA has failed to articulate legitimate nondiscriminatory reasons that could justify its actions, Mr. Cerqueira is entitled to summary judgment on the issue of liability.

## Facts[1]

Mr. Cerqueira purchased a ticket to fly from Boston to Ft. Lauderdale on AA flight 2237. Fact 6. Mr. Cerqueira is of Portuguese national origin, but his color and physical appearance is similar to that of individuals who are Arab, Middle Eastern, or South Asian. Fact 4. On the day of his flight, December 28, 2003, Mr. Cerqueira went Logan airport, checked a bag, received his boarding pass, and proceeded to his gate. Facts 8, 9.

Sally Walling, an AA flight attendant, was the first AA employee to arrive at the gate. Fact 12. Ms. Walling was standing behind the gate counter and Mr. Cerqueira, not realizing that Ms. Walling was not a gate agent, approached the counter and requested that his seat be changed to an exit row or bulkhead so that he would have more leg room. *Id.* Ms. Walling told Mr. Cerqueira that she could not help him and asked him to sit down and wait. Fact 13. Mr. Cerqueira complied with Ms. Walling's instructions. *Id.* Once a gate agent arrived, Mr. Cerqueira was assigned to seat number 20F, which was a window seat in an exit row. *Id.*

Mr. Cerqueira boarded when his group was called. Fact 15. He found his seat, stowed his carry-on items, used the lavatory, then returned to his seat and began working on his laptop computer. Fact 16. About ten minutes after Mr. Cerqueira took his seat, two men, Oren Ashmil and Vittorio Daniel Rokah, boarded and sat next to Mr. Cerqueira in seat numbers 20D and 20E. Fact 17. Mr. Cerqueira did not know either man, and he did not speak to them. *Id.* Mr. Ashmil and Mr. Rokah had a color and physical appearance similar to that of Mr. Cerqueira, and they were speaking

---

[1] Pursuant to Local Rule 56.1 and Rule 56 of the Federal Rules of Civil Procedure, Mr. Cerqueira's statement of undisputed material facts accompanies this memorandum and includes citations to competent summary judgment evidence attached as exhibits thereto. Mr. Cerqueira will only summarize the facts here, and will cite the undisputed material facts and supporting evidence using "Fact" and the number listed next to each.

loudly to each other, partly in English and partly in a foreign language. Facts 18, 19. When the announcement was made to turn off electronic devices, Mr. Cerqueira stowed his laptop computer and fell asleep. Fact 21.

John Ehlers was the captain of AA flight 2237. Fact 22. In the terminal before the flight, either Mr. Ashmil or Mr. Rokah asked Capt. Ehlers if he was the Captain going to Fort Lauderdale. When Capt. Ehlers confirmed that he was, Mr. Ashmil or Mr. Rokah said: "That's good. I'm going with you. We're going to have a good trip today." Fact 22. After the crew and passengers had boarded, Capt. Ehlers asked Ms. Walling to check on the passenger he had talked to before the flight, whom Capt. Ehlers described as a man with a ponytail. Fact 23.

Ms. Walling told Capt. Ehlers that two passengers were uneasy about some things that were said by Mr. Ashmil or Mr. Rokah. Fact 24. According to Ms. Walling, the passengers were uncomfortable because either Mr. Ashmil or Mr. Rokah—but not Mr. Cerqueira—was heard wishing other passengers a "happy new year." *Id.* Ms. Walling also told Capt. Ehlers that she had concerns about Mr. Cerqueira. Facts 25, 30. Ms. Walling and the other flight attendants, Lois Sargent and Amy Milenkovic, thought Mr. Cerqueira was traveling with Mr. Ashmil and Mr. Rokah because the three men looked similar. Facts 26-28. Ms. Walling thought they looked similar because they were "dark" and had dark hair. Fact 26. Ms. Milenkovic noticed that the three men all had dark hair. She thought that the man with the ponytail, either Mr. Ashmil or Mr. Rokah, was Middle Eastern, and she noticed that he had a heavy accent. Fact 27. Ms. Sargent thought the three men were foreigners because of their appearance. Fact 28. She also believed that a review of the passenger list had revealed that Mr. Ashmil and Mr. Rokah had Arabic names. *Id.*

Ms. Walling told Capt. Ehlers that she had four concerns about Mr. Cerqueira.  Fact 30. First, Ms. Walling told Capt. Ehlers that Mr. Cerqueira had been insistent about wanting to change his seat.  Fact 31.  It is not unusual for passengers to ask for a seat change at the gate counter, and passengers are not ordinarily denied service for asking for a seat change.  *Id.*  Second, Ms. Walling told Capt. Ehlers that Mr. Cerqueira had boarded the airplane when first class started to board and that Mr. Cerqueira was the first passenger into coach.  Fact 32.  AA admits that Mr. Cerqueira boarded when his group was called.  *Id.*  Passengers are not ordinarily denied service even if they board ahead of their group.  *Id.*  Third, Ms. Walling told Capt. Ehlers that she was concerned that Mr. Cerqueira had used the lavatory.  Fact 33.  It is not unusual for a passenger to use the lavatory upon boarding a flight, and passengers are not ordinarily denied service if they do.  *Id.*  Fourth, Ms. Walling told Capt. Ehlers that she was concerned that Mr. Cerqueira appeared to be sleeping while other passengers continued to board.  Fact 34.  It is not uncommon for passengers to sit back and close their eyes, and passengers are not ordinarily denied service for falling asleep in their seats during the boarding process.  *Id.*  Based on Ms. Walling's concerns, Capt. Ehlers made the decision to have Mr. Cerqueira removed from flight 2237.  Fact 35.

Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were escorted from the plane by four troopers from the Massachusetts State Police.  Fact 37.  Neither the police nor any representative of AA told Mr. Cerqueira why he was being removed from the plane.  *Id.*  The three men were questioned by the troopers on the jet bridge.  Fact 39.  Mr. Cerqueira surrendered his Florida driver's license, and Mr. Ashmil and Mr. Rokah surrendered their passports.  *Id.*  Mr. Ashmil and Mr. Rokah are Israeli. *Id.*  Mr. Cerqueira informed the troopers that he did not know, and was not traveling with, Mr. Ashmil and Mr. Rokah.  *Id.*  Mr. Ashmil and Mr. Rokah confirmed that they were not with, and did

not know, Mr. Cerqueira. *Id.* After initial questioning on the ramp, the troopers escorted the three men to a small room where they were held and interrogated for about two hours. Fact 40. Mr. Cerqueira repeatedly told the troopers that he was traveling home, by himself, after a family visit for the holidays, and that he did not know Mr. Ashmil or Mr. Rokah. Fact 41. The troopers completed their investigation and released Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah. *Id.* The investigation revealed no reason to suspect that Mr. Cerqueira posed a security threat. *Id.* The last trooper to interrogate Mr. Cerqueira concluded that Mr. Cerqueira had been removed from the flight and questioned solely because he happened to be sitting next to Mr. Ashmil and Mr. Rokah. *Id.*

The troopers escorted Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah to the AA ticket counter and expected that the three would be rebooked on another flight. Fact 42. Although Mr. Cerqueira was cleared for further travel, AA refused to rebook him. Fact 43. Craig Marquis was the AA official who made the decision to deny service to Mr. Cerqueira after he was released from questioning. Fact 44. Mr. Marquis has no recollection of why he decided that Mr. Cerqueira should be denied service on AA. Fact 45. An entry in Mr. Cerqueira's computerized Passenger Name Record states that Mr. Cerqueira was denied boarding on Flight 2237 due to unspecified "security issues" and that Mr. Cerqueira should not be rebooked on AA. Fact 47.

## Argument

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**I.       Mr. Cerqueira Has Established a *Prima Facie* Case under Each Cause of Action.**

Mr. Cerqueira brought this action pursuant to 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and M.G.L. c. 272 § 98. To establish AA's liability under § 1981, Mr. Cerqueira must show that: 1) he was perceived to be a member of a minority group; 2) AA intentionally discriminated against him on account of his perceived membership in a minority group; and 3) the discrimination concerned the right to make and enforce contracts. *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002). Under Title VI, the first two elements are the same as under § 1981, and for the third element, Mr. Cerqueira must show that AA receives federal financial assistance. 42 U.S.C. § 2000d; *Goodman v. President and Trs. of Bowdoin Coll.*, 135 F. Supp. 2d 40, 48 (D. Me. 2001). Similarly, the first two elements of a claim under M.G.L. c. 272 § 98 are the same as

those under § 1981, and for the third element, Mr. Cerqueira must show that AA operates a place of public accommodation within the meaning of M.G.L. c. 272 § 92A.[2]

Mr. Cerqueira's initial burden to establish a *prima facie* case under the *McDonnell Douglas* framework "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Although *McDonnell Douglas* lists the elements of a *prima facie* case in the context of discrimination in hiring, "the elements of the *prima facie* case may vary depending upon the context." *T & S Serv. Assocs. v. Crenson*, 666 F.2d 722, 725 n.3 (1st Cir. 1981). To establish a *prima facie* case, a plaintiff must merely offer "proof of facts that, absent other explanation by the employer, make it 'more likely than not' that a discriminatory motive was at work." *Loeb*, 600 F.2d at 1017 n.18 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

It is undisputed that Mr. Cerqueira was perceived to be a member of a minority group. Mr. Cerqueira's color and physical appearance is similar to that of individuals who are Arab, Middle Eastern, or South Asian. Fact 4. Based on the similar physical appearance of the three men in the exit row, the flight attendants concluded that Mr. Cerqueira was traveling with Mr. Ashmil and Mr. Rokah, both of whom were from the Middle East and were heard speaking a foreign language and heavily accented English. Facts 18-19, 26-28.

It is also undisputed that AA removed Mr. Cerqueira from flight 2237 and refused to rebook him on another AA flight even though Mr. Cerqueira had purchased a ticket. Because an airline

---

[2]M.G.L. c. 272 § 98 imposes liability for "discrimination . . . on account of race, color, religious creed, national origin, . . . or ancestry relative to the admission of any person to, or his treatment in, any place of public accommodation" as defined in M.G.L. c. 272 § 92A. Section 92A defines a "place of public accommodation" as "any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public" including "a carrier, conveyance or elevator for the transportation of persons, whether operated on land, water or in the air."

ticket is a contract for carriage, AA is a recipient of federal financial assistance, and AA's flights are places of public accommodation, Mr. Cerqueira has satisfied the third element of each of his three causes of action. *See* Facts 5, 6, 35, 43.

Thus, the only real dispute in this case is whether AA's treatment of Mr. Cerqueira was motivated, at least in part, by discrimination. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n.10 (1976) (noting that discrimination need not be the sole cause of the adverse action, but rather a "but for" cause); *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (holding that under § 1981 and § 2000d, plaintiff must demonstrate that "discrimination was a substantial or motivating factor for the defendant's actions")). Mr. Cerqueira has established the elements necessary to make out a *prima facie* case on each of his claims because only the three passengers perceived to be Middle Eastern were removed from flight 2237, detained, questioned, and denied service. These facts create an inference of discrimination. *Furnco*, 438 U.S. at 577 (explaining that satisfaction of the *prima facie* elements "raises an inference of discrimination . . . because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors"). Thus, under the *McDonnell Douglas* framework, the burden shifts to AA to rebut this inference.

II. **AA Has Failed to Articulate Legitimate Nondiscriminatory Reasons Sufficient to Justify its Actions.**

AA has "the burden of 'producing evidence' that the adverse . . . actions were taken 'for a legitimate, nondiscriminatory reason.'" *Hicks*, 509 U.S. at 506-07 (quoting *Burdine*, 450 U.S. at 254). If AA is silent in the face of Mr. Cerqueira's *prima facie* case, "the court must enter judgment for the plaintiff because no issue of fact remains." *Burdine*, 450 U.S. at 254. If AA is not silent, to

meet its burden, AA must "clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse action]." *Id.* at 255. Conclusory, vague, or general statements are not sufficient—AA must articulate its reasons "with some specificity." *Loeb*, 600 F.2d at 1012 n.5; *see also Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 251 (1st Cir. 2000) ("A mere scintilla of evidence will not rise to a triable issue of fact.") (citation ommitted). AA's proffered explanation must "be legally sufficient to justify a judgment for [it]." *Burdine*, 450 U.S. at 255. Thus, AA cannot satisfy its burden unless it produces reasons "which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the [adverse] action." *Hicks*, 509 U.S. at 507 (emphasis in original). If AA fails to meet this burden of production, Mr. Cerqueira is entitled to judgment as a matter of law. *Hicks*, 509 U.S. at 509; *Loeb*, 600 F.2d at 1015.

      **A.    AA's Asserted Reasons for Removing Mr. Cerqueira from Flight 2237 Are Insufficient to Rebut the Inference of Discrimination.**

AA claims that it removed Mr. Cerqueira from flight 2237 because flight attendant Walling made four observations about Mr. Cerqueira that allegedly raised "security concerns." Specifically, AA claims that Ms. Walling told Capt. Ehlers that Mr. Cerqueira 1) requested a seat change in an insistent manner;[3] 2) was the first coach passenger to board; 3) used the lavatory soon after boarding; and 4) was sleeping while other passengers continued to board. Facts 30-34. AA's explanation for its decision to remove Mr. Cerqueira from his flight is not "legally sufficient to justify a judgment for the defendant," *Burdine*, 450 U.S. at 248, because it is not plausible that Mr. Cerqueira's behavior, standing alone, caused his removal from flight 2237 as a security risk. *See Simmons v.*

---

[3]Mr. Cerqueira disputes that his request for a seat change was made in an insistent, confrontational, or hostile manner, but he recognizes that, for purposes of summary judgment motions, the nonmoving party's evidence will be treated as true.

*American Airlines*, 34 Fed. Appx. 573, 575-76 (9th Cir. 2002) ("The burden-shifting structure devised by the Supreme Court in [*Burdine*] does not give American carte blanche to proffer any explanation, regardless of its plausibility, for its actions to shift the burden back to [plaintiff].")

AA has made no attempt to explain *how* Mr. Cerqueira's behavior is indicative of a security threat. Moreover, AA admits that there is nothing uncommon about Mr. Cerqueira's behavior and that such behavior does not ordinarily result in a denial of service. Facts 31-34. Thus, Ms. Walling's observations that Mr. Cerqueira engaged in common passenger activities cannot justify AA's decision to have Mr. Cerqueira removed flight 2237 and questioned by the police. Indeed, Ms. Walling was not so concerned about Mr. Cerqueira's behavior that she felt any need to bring it to Capt. Ehler's attention. Ms. Walling reported her concerns about Mr. Cerqueira only *after* Capt. Ehlers asked her to check on the passenger with the ponytail, and she did so only because she thought—based solely on Mr. Cerqueira's physical appearance— that Mr. Cerqueira was traveling with the men seated next to him. Facts 25-26. Had Capt. Ehlers not made his inquiry about the man with the ponytail, Ms. Walling would not have taken any action in response to her observations of Mr. Cerqueira. After Ms. Walling reported her observations to the Captain, Ms. Walling returned to work and was not even aware that her concerns were the basis of Capt. Ehler's decision to have Mr. Cerqueira removed from the flight. Fact 38.

The evidence shows that Mr. Cerqueira fell under suspicion because the flight attendants thought Mr. Cerqueira was traveling with Mr. Ashmil and Mr. Rokah. The flight attendants jumped to the conclusion that the three men were together because they shared a similar Middle Eastern appearance. Facts 26-28. It is undisputed that Mr. Cerqueira did not speak to Mr. Ashmil or Mr. Rokah or interact with them in any way. Facts 17, 26. Mr. Cerqueira did not board at the same time

as the other two men, and he was not seen with them in the gate area before the flight. Facts 17, 26-27. None of the AA personnel involved in the decision to remove Mr. Cerqueira from flight 2237 ever checked to see if Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah had purchased their tickets together or had requested to sit together. Facts 25-27.

Indeed, to the extent that AA imputed to Mr. Cerqueira any suspicious behavior by Mr. Ashmil or Mr. Rokah, it provides *direct* evidence of discrimination because the only reason that AA personnel associated Mr. Cerqueira with the men seated next to him was Mr. Cerqueira's perceived race or national origin. Moreover, the flight attendants' written reports from the day of the incidents demonstrate that the flight attendants were concerned about the behavior of the men in the exit row *because* the men were perceived to be Middle Eastern. The flight attendants specifically noted that Mr. Ashmil or Mr. Rokah spoke with a "heavy accent," had foreign passports, and "Arabic names." Facts 27-28. Had discrimination played no role in the decision to remove the three men from the airplane, these irrelevant facts would never have been mentioned. *See Williams v. Lindenwood Univ.*, 288 F.3d 349, 356 (8th Cir. 2002) (holding that "injecting racial language at all into the decision-making process creates the inference that race had something to do with the decision-making process"); *Local Fin. Co. of Rockland v. Mass. Comm'n Against Discrimination*, 342 N.E.2d 536, 539-40 (Mass. 1968) (holding that distinguishing loan applicants by color was evidence of discrimination even though loan company claimed that it recorded color only for identification purposes).

Because Mr. Cerqueira's actions, standing alone, constituted normal, everyday passenger behavior, AA's proffered explanation for Mr. Cerqueira's removal does not "permit the conclusion that there was a non-discriminatory reason for the adverse action." *Hicks*, 509 U.S. at 509. Thus,

AA has failed to carry its burden of production, and Mr. Cerqueira is entitled to summary judgment on his claim that AA's decision to remove him from flight 2237 was motivated by discrimination. *Id.; see also Simmons*, 34 Fed. Appx. at 576 (holding that "American did not satisfy its burden of articulating a legitimate, non-discriminatory reason for removing [plaintiff]" from a flight, because American's evidence was insufficient to justify its claim that it removed plaintiff for safety reasons); *Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, No. 96-CV-6234, 2001 WL 1776163, at *8 (E.D.N.Y. Dec. 21, 2001) (granting summary judgment for plaintiffs under § 1981 because plaintiffs established a *prima facie* case of discrimination and "[n]one of defendants' proffered explanations [were] sufficient to shift the burden of proof back on plaintiffs"); *Wieczorek v. Red Roof Inns, Inc.*, 3 F. Supp. 2d 210, 214-15 (N.D.N.Y. 1998) (finding defendant's proffered explanation insufficient to "permit the conclusion that there was a non-discriminatory reason for the incident").

      **B.**    **AA Has Failed to Articulate Any Reason for its Refusal to Serve Mr. Cerqueira after He Was Released from Questioning and Cleared for Travel.**

With respect to AA's decision not to rebook Mr. Cerqueira after he was released from questioning and cleared for travel, AA has failed to carry its burden of production because it has articulated *no reason* for its decision to deny service to Mr. Cerqueira. The decision to bar Mr. Cerqueira from travel on AA was made by Craig Marquis. Fact 44. Mr. Marquis has no recollection of the reasons for his decision. Fact 45. Such silence in the face of Mr. Cerqueira's *prima facie* case requires the Court to "enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine*, 450 U.S. at 254; *see also IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (holding that where plaintiff established a *prima facie* case, conclusory statement that defendant selected the best qualified applicant was insufficient to satisfy defendant's rebuttal burden).

To the extent AA claims that it refused to allow Mr. Cerqueira to travel on any AA flight for the same reasons AA removed him from flight 2237, AA has failed to establish a legitimate nondiscriminatory reason sufficient to justify its treatment of Mr. Cerqueira. First, as discussed above, Ms. Walling's observations that Mr. Cerqueira engaged in common passenger activities cannot justify even the initial removal decision, much less AA's decision to deny any further service. Second, by the time Mr. Cerqueira sought to be rebooked, AA was aware that following his removal from flight 2237, Mr. Cerqueira had been detained, questioned, and released by law enforcement officers. Fact 48. Those officers had found no reason to suspect that Mr. Cerqueira posed a security threat, and they concluded that Mr. Cerqueira had been removed from flight 2237 solely because he happened to be sitting next to Mr. Ashmil and Mr. Rokah. Fact 41. Third, AA can only speculate that Mr. Marquis barred Mr. Cerqueira from further travel on AA for the same reasons Mr. Cerqueira was removed from flight 2237, and speculation is not sufficient. "[U]nder *Burdine*, there must be evidence that asserted reasons for [the adverse action] were actually relied on or the reasons are not sufficient to meet defendant's rebuttal burden." *IMPACT*, 893 F.2d at 1194 (quotations omitted). Even if "the record is replete with nondiscriminatory reasons for [the adverse action]" the defendant must articulate "that these *were in fact* the reasons for the particular challenged action." *Id.* (quotation omitted) (emphasis in original). Because Mr. Cerqueira has established a *prima facie* case and AA cannot articulate a reason for its refusal to serve him, Mr. Cerqueira is entitled to summary judgment on his claim that AA's refusal to rebook him after his release from questioning constituted unlawful discrimination. *See Hicks*, 509 U.S. at 506-07.

### C. Whether AA's Decisionmakers Knew That Mr. Cerqueira Was a Member of a Protected Group Is Irrelevant.

In its memorandum is support of its motion for summary judgment, AA argues that if neither Capt. Ehlers nor Mr. Marquis had information about Mr. Cerqueira's appearance, their decisions could not have been motivated by discrimination. *See* Doc. No.16 at 6. Even if the evidence suggested that AA's decisionmakers were not informed that the flight attendants thought that Mr. Cerqueira was Middle Eastern and traveling with Mr. Ashmil and Mr. Rokah, that would be irrelevant on the question of AA's liability.[4] It is well-settled that a decisionmaker need not be biased if someone else was biased and orchestrated the decision. *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 83 (1st Cir. 2004) (finding "merit under First Circuit precedent and persuasive case law from other circuits" for the proposition that "liability can attach if neutral decisionmakers . . . rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus"); *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484-88 (10th Cir. 2006) (explaining that a defendant may be liable even though the decisionmaker lacked discriminatory intent, if the decisionmaker acted on information supplied by a biased subordinate) (citing numerous cases endorsing the theory); *Zades v. Lowe's Home Cts, Inc.*, No. 03-30269-MAP, 2006 WL 2563456, *10 (D. Mass. Sept. 6, 2006) (holding that discriminatory motive may be shown

---

[4] Although it may be taken as true for purposes of this motion, AA's claim that neither Capt. Ehlers nor Mr. Marquis had knowledge of Mr. Cerqueira's protected characteristics is disputed. AA Customer Service Manager Ynes Flores testified that Capt. Ehlers pointed out the passengers seated in the exit row and instructed Mr. Flores to ask them for their boarding passes. Fact 35. Similarly, Ms. Sargent testified that Capt. Ehlers came out and looked at the passengers in the exit row. Moreover, Capt. Ehlers knew that Ms. Walling perceived Mr. Cerqueira to be traveling with Mr. Ashmil and Mr. Rokah, and Capt. Ehlers conveyed Ms. Walling's concerns to Mr. Marquis. Fact 26, 35. Mr. Marquis testified that he cannot remember what he knew about Mr. Cerqueira on December 28, 2003. Fact 45.

where a neutral decisionmaker "acts on biased information without conducting his own independent investigation"); *Harlow v. Potter*, 353 F. Supp. 2d 109, 116-18 (D. Me. 2005) (explaining that a defendant is liable for discrimination if the decisionmaker who took the adverse action relied on information tainted by another's discriminatory animus "even if the decisionmaker lacked discriminatory intent") (citing numerous cases).

It is undisputed that Ms. Walling observed Mr. Cerqueira and believed—based solely on Mr. Cerqueira's physical appearance—that Mr. Cerqueira was traveling with Mr. Ashmil and Mr. Rokah. Fact 26. It is also undisputed that Ms. Walling's concerns caused Capt. Ehlers to have Mr. Cerqueira removed from flight 2237. Fact 35. Thus, if Ms. Walling was concerned about Mr. Cerqueira, at least in part, because she perceived him to be from the Middle East, AA is liable regardless of whether the decisionmaker who relied on Ms. Walling's concerns had discriminatory intent.

Moreover, Mr. Cerqueira need not prove that Ms. Walling acted out of "conscious racial animus," because the prohibition on discrimination extends to "decisions that are based on stereotyped thinking or other forms of less conscious bias." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir. 1999). If Ms. Walling would not have expressed concern about Mr. Cerqueira's common behavior but for her perception that he was Middle Eastern, Mr. Cerqueira was subjected to unlawful discrimination. "[T]he disparate treatment doctrine focuses on causality rather than conscious motivations, since unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination." *Id.* at 60 (internal quotations and citation omitted); *see also Sweeney v. Bd. of Trs. of Keene State Coll.*, 604 F.2d 106, 114 (1st Cir. 1979) (noting that discrimination may be "conscious or unconscious").

**Conclusion**

Because Mr. Cerqueira has established a *prima facie* case of discrimination and AA has failed to articulate legitimate nondiscriminatory reasons that could justify its actions, Mr. Cerqueira is entitled to summary judgment on the issue of liability.

        **JOHN D. CERQUEIRA**

        By his attorneys,

        */s/ Michael T. Kirkpatrick*
        _____
        Michael T. Kirkpatrick
        Public Citizen Litigation Group
        1600 20th Street NW
        Washington, DC  20009
        (202) 588-1000
        mkirkpatrick@citizen.org

        David S. Godkin (BBO #196530)
        Erica Abate Recht (BBO #641452)
        Birnbaum & Godkin, LLP
        280 Summer Street
        Boston, MA  02210
        617-307-6100

Dated: September 22, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 22, 2006.

        */s/ Michael T. Kirkpatrick*
        _____
        Michael T. Kirkpatrick