# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,

                Plaintiff,

v.

AMERICAN AIRLINES, INC.,

                Defendant.

Civil Action No. 05-11652-WGY

## PLAINTIFF JOHN D. CERQUEIRA'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 and Rule 56 of the Federal Rules of Civil Procedure, plaintiff John D. Cerqueira submits this statement of undisputed facts in support of his motion for partial summary judgment. Each fact is supported by a citation to a pleading already on file with the court or the following attached exhibits:

### Table of Exhibits

| Exhibit No. | Description | Abbreviation |
|:---:|---|---|
| 1 | Excerpts of Deposition of John D. Cerqueira, with errata sheet | Cerqueira Dep. |
| 2 | Cerqueira Deposition Exhibit Nos. 1 & 21 | Cerqueira Dep. Ex. |
| 3 | Excerpts of Plaintiff John D. Cerqueira's Responses to Defendant American Airlines, Inc.'s Interrogatories to Plaintiff, with document CRQ 0037-40 (incorporated by reference) | Pl. Resp. to Interr. No. |
| 4 | Excerpts of American Airlines, Inc.'s Answers to Plaintiff's First Set of Interrogatories | Def. Resp. to Interr. No. |
| 5 | Excerpts of Deposition of Ynes F. Flores | Flores Dep. |

| 6 | Excerpts of Deposition of Lois Sargent with Deposition Exhibit Nos. 5 & 6 | Sargent Dep.; Dep. Ex. |
| 7 | Excerpts of Deposition of Sally Walling | Walling Dep. |
| 8 | Excerpts of Deposition of Amy Milenkovic with Deposition Exhibit No. 9 | Milenkovic Dep.; Dep. Ex. |
| 9 | Excerpts of Defendant's Supplemental Automatic Disclosures Pursuant to Fed. R. Civ. P. 26(a) and L.R. 26.2 | Def. Supp. Automatic Disclosure |
| 10 | Excerpts of Deposition of John M. Ehlers | Ehlers Dep. |
| 11 | Excerpts of Deposition of Craig Marquis | Marquis Dep. |
| 12 | Excerpts of Deposition of Nicole Traer with Deposition Exhibit No. 12 | Traer Dep.; Dep. Ex. |
| 13 | Excerpts of Deposition of Rhonda Cobbs with Deposition Exhibit Nos. 12 & 14 | Cobbs Dep.; Dep. Ex. |

## Statement of Facts

1.    Plaintiff John D. Cerqueira is a self-employed computer consultant and a resident of Florida. Mr. Cerqueira graduated from Stanford University with a degree in international relations and earned a Certificate in Computer Technology from the Massachusetts Institute of Technology (MIT).  Cerqueira Dep. 11:12-12:13; Cerqueira Dep. Ex. 1.

2.    Mr. Cerqueira's work involves customizing software for business applications.  Cerqueira Dep. 15:2-10, 16:14-21.  Mr. Cerqueira must travel frequently to consult with his clients, many of whom are foreign corporations in Latin America and Europe.  Cerqueira Dep. 19:11-17; Cerqueira Dep. Ex. 1.

3.      Mr. Cerqueira was born in Portugal.  He immigrated to the United States with his family when he was six years old.  Mr. Cerqueira is a United States citizen.  He was raised in Fall River, Massachusetts, where his extended family still resides.  Cerqueira Dep. 23:16-24.

4.      Although Mr. Cerqueira is of Portuguese national origin, his color and physical appearance is similar to that commonly associated with individuals of Arab, Middle Eastern, or South Asian descent.  Pl. Resp. to Interr. No. 2.

5.      Defendant American Airlines, Inc., is an air carrier engaged in the business of transporting passengers.  American Airlines is a recipient of federal financial assistance.  Defendant's Answer to Plaintiff's Amended Complaint (Doc. No. 5) ("Ans.") Ans. ¶ 5.  American Airlines receives federal financial assistance as a whole.  Def. Resp. to Interr. No. 18.

6.      On or about June 12, 2003, Mr. Cerqueira purchased a round-trip ticket on American Airlines' website, for travel in late December 2003, between Fort Lauderdale, Florida, and Boston, Massachusetts.  Ans. ¶ 7.  He was going to Massachusetts to visit his family for the Christmas holiday.  Pl. Resp. to Interr. No. 2.

7.      On December 24, 2003, Mr. Cerqueira flew on American Airlines from Fort Lauderdale, Florida to Boston, Massachusetts without incident.  Cerqueira Dep. 27:1-5.

8.      On December 28, 2003, Mr. Cerqueira was to return to Florida on American Airlines flight 2237, scheduled to depart at 6:45 am.  Mr. Cerqueira woke up at 3:00 am and his family drove him to Boston Logan airport for the flight.  Cerqueira Dep. 27:19-22; Pl. Resp. to Interr. No. 2.

9.      When Mr. Cerqueira arrived at Logan airport, he checked a bag, received his boarding pass, and proceeded to the gate.  Mr. Cerqueira passed all security without incident.  Ans. ¶ 9; Pl. Resp. to Interr. No. 2.

10.     Mr. Cerqueira is a frequent flier.  Before the incidents giving rise to this action, Mr. Cerqueira had accumulated over 370,000 miles in American Airlines' frequent flyer program.  Ans. ¶ 6.   When he flies, Mr. Cerqueira often requests a seat change to a bulkhead or exit row in order to have more leg room.  Exit row seating is usually assigned by the agents at the gate counter.  Cerqueira Dep. 30:18-23; Flores Dep. 6:7-19; Sargent Dep. 23:14-16.

11.     When Mr. Cerqueira arrived at the gate for flight 2237, the gate counter was not yet staffed by American Airlines personnel.  Mr. Cerqueira sat down in the gate area and waited.  Cerqueira Dep. 29:22-30:3.

12.     The first American Airlines employee to arrive at the gate was flight attendant Sally Walling.  Ms. Walling was standing behind the gate counter and Mr. Cerqueira, not realizing that Ms. Walling was not a gate agent, approached the counter and requested that his seat be changed to an exit row or bulkhead so that he would have more leg room.  Mr. Cerqueira did not request any particular seat.  Cerqueira Dep. 30:24-31:22.

13.     Ms. Walling told Mr. Cerqueira that she could not help him and asked him to sit down and wait.  Although Mr. Cerqueira did not understand why Ms. Walling could not help him, Mr. Cerqueira complied with Ms. Walling's instructions.  Walling Dep. 18:12-16; Cerqueira Dep. 32:3-15, 37:5-10.  Mr. Cerqueira did not make his request for a seat change in an insistent or hostile manner. Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0037).

After an American Airlines gate agent arrived, Mr. Cerqueira was assigned to seat number 20F, which was a window seat in an exit row.  Ans. ¶ 10; Cerqueira Dep. 34:23-35:6.

14.    In addition to Ms. Walling, two other flight attendants, Lois Sargent and Amy Milenkovic, were members of the crew of flight 2237.  Milenkovic Dep. 5:21-6:3.  As the three flight attendants boarded the aircraft, Ms. Walling mentioned to the other flight attendants that Mr. Cerqueira had asked to change his seat, and that she found him "annoying."  Sargent Dep. 14:16-21.  Ms. Walling did not indicate that she thought Mr. Cerqueira was a security threat. Walling Dep. 11:17-21.

15.    American Airlines boarded the passengers for flight 2237 by group number.  Mr. Cerqueira was assigned to "Group 1" for boarding purposes.  Mr. Cerqueira boarded the aircraft when his assigned group was called.  He was among the first coach passengers to board.  Ans. ¶ 11; Cerqueira Dep. 40:1-6.

16.    When Mr. Cerqueira boarded the airplane, he found his seat, stowed his carry-on items, and went to one of the lavatories in the rear of the airplane.  Cerqueira Dep. 39:6-8, 39:18-20. Mr. Cerqueira was in the lavatory for approximately four to five minutes, then he returned to his seat and began working on his laptop computer.  Cerqueira Dep. 40:12-41:2, 41:17-19; Walling Dep. 17:6-8.

17.    Approximately ten minutes after Mr. Cerqueira took his seat, two men boarded the plane and sat next to Mr. Cerqueira in seat numbers 20D and 20E.  Cerqueira Dep. 41:20-42:3.  The men seated next to Mr. Cerqueira were Oren Ashmil and Vittorio Daniel Rokah.  Def. Supp. Automatic Disclosure at 3-4.  Mr. Cerqueira did not know Mr. Ashmil or Mr. Rokah, and Mr. Cerqueira did not speak to them.  Cerqueira Dep. 44:22-24; Pl. Resp. to Interr. No. 2.

18.    Mr. Ashmil and Mr. Rokah had a color and physical appearance similar to that of Mr.
Cerqueira.  Walling Dep. 31:14-24; Milenkovic Dep. 18:16-20; Sargent Dep. 11:22-12:3;
Cerqueira Dep. 93:23-24, 128:12-13, 133:3-8; Pl. Resp. to Interr. No. 2.

19.    Mr. Ashmil and Mr. Rokah were speaking loudly to each other, partly in English and partly
in a foreign language.  Cerqueira Dep. 43:1-20; Pl. Resp. to Interr. No. 2.

20.    Mr. Cerqueira did not pay attention to any conversation that may have occurred between the
men seated next to him and the flight attendant giving the exit row briefing, and Mr.
Cerqueira did not laugh or otherwise react to any conversation that may have occurred
between the flight attendant and the men seated next to him.  Cerqueira Dep. 45:1-20; Pl.
Resp. to Interr. No. 2 (incorporating by reference CRQ 0038 n.1).

21.    Mr. Cerqueira continued working on his laptop computer until the announcement was made
to turn off all electronic devices.  He then stowed his laptop computer and quickly fell asleep.
Mr. Cerqueira was tired because he had slept only a few hours before leaving for the airport
from his family's home in southeastern Massachusetts.  Cerqueira Dep. 46:1-4, 46:24-47:8,
47:16-20; Pl. Resp. to Interr. No. 2.

22.    John Ehlers was the captain of American Airlines flight 2237 on December 28, 2003.  In the
terminal before he boarded the airplane, Capt. Ehlers had spoken to either Mr. Ashmil or Mr.
Rokah.  According to Capt. Ehlers, either Mr. Ashmil or Mr. Rokah had approached Capt.
Ehlers in the terminal and asked whether he was the Captain going to Fort Lauderdale.
When Capt. Ehlers confirmed that he was, the passenger said: "That's good.  I'm going with
you.  We're going to have a good trip today."  Ehlers Dep. 16:3-15.  Capt. Ehlers thought that
this conversation was odd.  Ehlers Dep. 16:20.

6

23.     After the crew and passengers had boarded, Capt. Ehlers asked Ms. Walling to check on the passenger he had talked to before the flight, whom Capt. Ehlers described as a man with a ponytail.  Walling Dep. 23:18-23.

24.     Ms. Walling told Capt. Ehlers that some passengers were concerned about some things that were said by Mr. Ashmil or Mr. Rokah, but what was allegedly said was never relayed to Capt. Ehlers, and Capt. Ehlers did not know the basis for the passengers' concern.  Ehlers Dep. 23:4-11, 33:1-4.  According to Ms. Walling, two passengers had told her that they felt uneasy with things that were said by the passengers in the exit row.  Walling Dep. 19:9-13, 20:21-24.  According to Ms. Walling, the passengers were uncomfortable because either Mr. Ashmil or Mr. Rokah, but not Mr. Cerqueira, was heard wishing other passengers a "happy new year."  Walling Dep. 24:15-22.

25.     Only after Capt. Ehlers inquired about the passenger with the ponytail did Ms. Walling tell Capt. Ehlers that she had concerns about Mr. Cerqueira.  Walling Dep. 23:18-23, 26:24-27:9; Ehlers Dep. 22:20-21.  Capt. Ehlers testified that he did not independently perceive Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah to be traveling together.  Ehlers Dep. 21:23-22:2.  Capt. Ehlers did not know, and did no investigation to determine, whether the three passengers had purchased their tickets together, requested to sit together, were together in the gate area, or boarded the flight at the same time.  Ehlers Dep. 22:3-14.

26.     According to Capt. Ehlers, Ms. Walling perceived Mr. Cerqueira to be traveling with Mr. Ashmil and Mr. Rokah.  Ehlers 21:15-22:2.  Ms. Walling did not witness Mr. Cerqueira talking with Mr. Ashmil or Mr. Rokah or interacting with them in any way.  Walling Dep. 31:2-4.  Ms. Walling thought that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah looked similar

because they were "dark" and had dark hair.  Walling Dep. 31:14-24.  Ms. Walling did not check to see if Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah had purchased their tickets together and she did not know if they had requested to sit together.  Walling Dep. 32:1-10. Ms. Walling did not see Mr. Cerqueira with Mr. Ashmil or Mr. Rokah in the gate area before boarding.  Walling Dep. 32:11-33:1.

27.  Ms. Milenkovic thought that the man with the ponytail, either Mr. Ashmil or Mr. Rokah, was Middle Eastern.  Milenkovic Dep. 18:3-9.  She also noticed that he had a heavy accent. Milenkovic Dep. 10:10-13, Dep. Ex. 9.  Ms. Milenkovic noticed that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah all had dark hair.  Milenkovic Dep. 18:16-20.  Since the events of September 11, 2001, Ms. Milenkovic pays close attention to whether a passenger has an accent.  Milenkovic Dep. 19:2-8.  Ms. Milenkovic did not observe any unusual or suspicious behavior on the part of Mr. Cerqueira.  Milenkovic Dep. 20:10-14.  Ms. Milenkovic did not check to see if Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah had purchased their tickets together and she did not know if they had requested to sit together.  Ms. Milenkovic did not see Mr. Cerqueira with Mr. Ashmil or Mr. Rokah in the gate area before boarding. Milenkovic Dep. 19:9-20.

28.  Flight attendant Sargent thought that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were foreign nationals because of their appearance.  Sargent Dep. 11:22-12:3, Dep. Ex. 5.  Ms. Sargent believed that a review of the passenger manifest had revealed that Mr. Ashmil and Mr. Rokah had Israeli passports but Arabic names.  Sargent Dep. 13:12-18, 31:6-32:2, Dep. Ex. 6.

29.     Capt. Ehlers never had any direct conversations or interactions with Mr. Cerqueira on December 28, 2003, and Capt. Ehlers did not observe Mr. Cerqueira prior to boarding the plane. Ehlers Dep. 15:20-16:2. Capt. Ehlers did not observe any unusual or suspicious behavior on the part of Mr. Cerqueira either before or after Mr. Cerqueira boarded the plane. Ehlers Dep. 19:21-20:6.

30.     Ms. Walling told Capt. Ehlers that she had four concerns about Mr. Cerqueira.

31.     First, Ms. Walling told Capt. Ehlers that, prior to boarding the airplane, Mr. Cerqueira had been insistent about wanting to change his seat. Ehlers Dep. 80:8-17. It is not unusual for passengers to ask for a seat change at the gate counter. Walling Dep. 8:6-8; Sargent Dep. 14:22-15:1. Passengers are not denied service for asking for a seat change. Walling Dep. 9:1-4.

32.     Second, Ms. Walling told Capt. Ehlers that Mr. Cerqueira had boarded the airplane when first class started to board and that Mr. Cerqueira was the first passenger into coach. Ehlers Dep. 22:21-23:1. Mr. Cerqueira did not board ahead of his scheduled group. Mr. Cerqueira boarded the aircraft when his assigned group was called. Ans. ¶ 11. Ms. Walling was on the aircraft before the passengers began to board and she could not hear the boarding announcements. Walling 12:5-7, 13:5-7, 13:13-18. Capt. Ehlers knows that flight attendants are required to be on board the airplane before passenger boarding begins. Ehlers Dep. 26:24-27:2. Passengers are not denied service even if they board ahead of their scheduled group. Walling Dep. 13:19-23.

33.     Third, Ms. Walling told Capt. Ehlers that she was concerned about Mr. Cerqueira's use of the lavatory. Ehlers Dep. 23:2-3. Ms. Walling told Capt. Ehlers that Mr. Cerqueira was in

9

the lavatory for between four and six minutes. Ehlers Dep. 27:3-6. Ms. Walling testified at deposition that Mr. Cerqueira was in the lavatory approximately four to five minutes. Walling Dep. 17:6-8. It is not unusual for a passenger to use the lavatory upon boarding a flight. Ehlers Dep. 25:23-26:2; Walling Dep. 14:4-7; Milenkovic Dep. 12:16-19; Sargent Dep. 21:24-22:3. Passengers are not denied service for using the lavatory upon boarding the plane. Milenkovic Dep. 13:1-3; Walling Dep. 13:24-14:3; Sargent Dep. 22:4-7. Capt. Ehlers asked First Officer Donald Ball to check the lavatory. The First Officer did so and reported that he did not find anything. Ehlers Dep. 44:3-14.

34.   Fourth, Ms. Walling told Capt. Ehlers that she was concerned that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah seemed to be sleeping while other passengers continued to board. Ehlers Dep. 25:15-19. Ms. Walling observed that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah had their eyes closed. Walling Dep. 22:5-10. Ms. Walling did not know if they were pretending to sleep or were actually sleeping. Walling Dep. 23:7-10. It is not uncommon for passengers to sit back and close their eyes, and passengers are not refused service if they do so. Walling Dep. 34:6-14. Passengers are not denied service for falling asleep during boarding. Walling Dep. 26:19-23.

35.   Based on Ms. Walling's concerns, Capt. Ehlers made the decision to have Mr. Cerqueira removed from flight 2237. Ans. ¶¶ 32-33. Capt. Ehlers contacted the gate agent, ground security coordinator, and System Operations Control, to relay Ms. Walling's concerns. Ehlers Dep. 22:15-19, 29:15-30:1, 31:5-32:24. AA personnel contacted the State Police and customer service manager Ynes Flores. While the State Police waited on the jet bridge, Mr. Flores went on the airplane. Capt. Ehlers pointed out Mr. Ashmil, Mr. Rokah, and Mr.

10

Cerqueira, and Mr. Flores went and asked the three men for their boarding passes. Flores Dep. 10:22-11:9, 12:18-19.

36.   Mr. Cerqueira was awoken by Mr. Flores. Mr. Flores asked Mr. Cerqueira for his boarding pass. Mr. Cerqueira was unable to immediately locate his boarding pass, but he handed Mr. Flores the American Airlines receipt for his itinerary, and Mr. Flores indicated that the receipt was sufficient. Mr. Flores also asked Mr. Ashmil and Mr. Rokah for their boarding passes. Flores Dep. 11:5-9; Cerqueira Dep. 47:23-48:4, 48:24-49:19. Mr. Flores left and gave the boarding passes and receipt to Capt. Ehlers. Flores Dep. 13:9-10.

37.   Soon after Mr. Flores left, a group of about four troopers from the Massachusetts State Police boarded the airplane and demanded that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah immediately deplane with their carry-on luggage. Ans. ¶ 17; Cerqueira Dep. 50:1-15. Neither the police nor any representative of American Airlines told Mr. Cerqueira why he was being removed from the plane. Cerqueira Dep. 50:16-19; Pl. Resp. to Interr. No. 2. Mr. Cerqueira had not conversed with anyone on the airplane until Mr. Flores asked Mr. Cerqueira for his boarding pass. Cerqueira Dep. 44:15-21.

38.   Ms. Walling returned to her position in the back of the airplane and continued the boarding process after communicating her concerns to Capt. Ehlers. Capt. Ehlers did not tell Ms. Walling what he was planning to do, and Ms. Walling was not aware that law enforcement officers had been contacted. Walling Dep. 35:4-21. Ms. Walling did not know why Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were being removed. Walling Dep. 38:8-10.

39.   Mr. Cerqueira was questioned by the troopers on the ramp immediately outside of the airplane. The troopers also questioned Mr. Ashmil and Mr. Rokah. Cerqueira Dep. 51:2-

52:23; Pl. Resp. to Interr. No. 2.  The troopers requested identification and Mr. Cerqueira surrendered his Florida driver's license.  Mr. Ashmil and Mr. Rokah surrendered their passports.  Mr. Ashmil and Mr. Rokah were from Israel.  Mr. Cerqueira informed the troopers that he did not know, and was not traveling with, Mr. Ashmil and Mr. Rokah.  Mr. Ashmil and Mr. Rokah confirmed that they were not with, and did not know, Mr. Cerqueira. Cerqueira Dep. 53:20-54:5, 55:12-16, 56:9-17, 57:2-9; Pl. Resp. to Interr. No. 2.

40.   After initial questioning on the ramp, the troopers escorted Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah through the airport to a narrow room near the security screening area.  Cerqueira Dep. 59:10-13.   Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were held there for about two hours. Cerqueira Dep. 61:13.  The troopers interrogated Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah.  64:16-23, 65:17-19.

41.   Mr. Cerqueira repeatedly told the troopers that he was traveling home, by himself, after a family visit for the holidays, and that he did not know Mr. Ashmil or Mr. Rokah.  Cerqueira Dep. 65:21-23.  The troopers completed their investigation and released Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah.  The investigation revealed no reason to suspect that Mr. Cerqueira posed a security threat.  The last trooper to interrogate Mr. Cerqueira concluded that Mr. Cerqueira had been removed from the flight and questioned solely because he happened to be sitting next to Mr. Ashmil and Mr. Rokah.  Cerqueira Dep. 73:7-13.

42.   The troopers escorted Mr. Cerqueira, Mr. Ashmil and Mr. Rokah to the American Airlines ticket counter.  The troopers expected that Mr. Cerqueira, Mr. Ashmil and Mr. Rokah would be rebooked on another flight.  Cerqueira Dep. 73:2-13, 76:24-77:1; Cerqueira Dep. Ex. 21.

43.    Mr. Cerqueira was escorted to the American Airlines ticket counter and was cleared for further travel, but American Airlines refused to provide service to Mr. Cerqueira after he was released from questioning following his removal from flight 2237.  Ans. ¶¶ 23 & 37.

44.    The decision whether to rebook a passenger following a removal for questioning is made by the System Operations Control (SOC) manager on duty.  Marquis Dep. 27:15-17.  Only the SOC manager on duty has the authority to decide that a passenger not be rebooked.  Marquis Dep. 27:18-20; Traer Dep. 35:2-4.  Craig Marquis was the SOC manager on duty on the morning of December 28, 2003.  Marquis Dep. 7:10-13, 9:13-14, 18:3-4.  Mr. Marquis made the decision to deny service to Mr. Cerqueira after he was released from questioning by the State Police.  Def. Resp. to Interr. No. 2.

45.    Mr. Marquis has no recollection of his actions on December 28, 2003, with respect to any of the incidents involving Mr. Cerqueira.  Marquis Dep. 10:1-25, 12:15-14:5.  Mr. Marquis does not recall making the decision that the three passengers removed from the airplane for questioning would not be rebooked on a later American Airlines flight, and he does not recall the basis for the decision not to rebook those passengers.  Marquis Dep. 13:11-17.  Mr. Marquis did not prepare any written report related to the incidents of December 28, 2003.  Marquis Dep. 24:16-18.

46.    Rhonda Cobbs was the Corporate Complaint Resolution Official (CCRO) on duty at American Airline's SOC on the morning of December 28, 2003.  Cobbs Dep. 7:25-8-2, 11:5-10.  When the SOC manager on duty decides that a passenger should not be rebooked, he tells the CCRO and the CCRO enters that information into the computer system.  Marquis

Dep. 27:21-28:5. In such situations, the CCRO's role is to compile and record the information provided by the manager on duty. Cobbs Dep. 53:5-21.

47. Ms. Cobbs made an entry to Mr. Cerqueira's computerized Passenger Name Record. Ms. Cobbs's entry indicated that Mr. Cerqueira was denied boarding on Flight 2237 per the SOC manager on duty due to "security issues" and that Mr. Cerqueira's ticket should be refunded and he should not be rebooked on American Airlines. Cobbs Dep. 22:1-9, 22:23-25, Dep. Ex. 12.

48. Ms. Cobbs does not recall what the "security issues" were that formed the basis of the decision not to rebook Mr. Cerqueira on American Airlines. Cobbs Dep. 23:1-8. Ms. Cobbs wrote a report called an "SS CCRO History" in which she summarized the events relating to Mr. Cerqueira's removal from flight 2237 and subsequent denial of service following his release from questioning by the State Police. That entry indicates that three male passengers and their bags were removed from the aircraft due to a "security concern." According to Ms. Cobbs's entry, the passengers reportedly exhibited suspicious behavior in the airport towards the Captain and suspicious behavior was observed on board by flight attendant Walling. Law enforcement officers removed the passengers, detained, questioned, and released them, and the SOC manager on duty decided that the three passengers should be denied boarding and their tickets refunded. Cobbs Dep. 41:14-42:25, Dep. Ex. 14. Ms. Cobbs does not recall the sources she used to compile this information. Cobbs Dep. 43:8-10. The SS CCRO History is the only report Ms. Cobbs wrote about the incident. Cobbs Dep. 46:21-25.

49. Nicole Traer was working as an American Airline's customer service manager at Logan Airport on December 28, 2003. Mr. Marquis advised Ms. Traer that Mr. Cerqueira was

14

denied travel on American Airlines and told her to refund the price of the ticket. Ms. Traer did not ask Mr. Marquis why Mr. Cerqueira was being denied service, and Mr. Marquis did not tell her. Traer Dep. 27:10-23. Ms. Traer did not know the basis for Mr. Marquis's decision that Mr. Cerqueira not be rebooked on an American Airlines flight. Traer Dep. 14:1-8, 17:14-23. Ms. Traer did not know the reason that Mr. Cerqueira had been removed from the plane. Traer Dep. 43:3-5. Ms. Traer did not know for how long Mr. Cerqueira was being denied travel on American Airlines. Traer Dep. 34:1-3.

50.    After Mr. Marquis told Ms. Traer that Mr. Cerqueira would be refused further service, Ms. Traer added an entry to Mr. Cerqueira's computerized Passenger Name Record. Ms. Traer's entry indicated that Mr. Cerqueira was being denied travel because of a "security issue" and that his ticket cost would be refunded due to the denial of service. Traer Dep. 14:23-15:19, 27:3-9, 34:14-24, Dep. Ex. 12; Marquis Dep. 17:6-17.

51.    When Mr. Cerqueira was escorted to the American Airlines ticket counter following his release from questioning, ticket agent Dalila MacLeod was at counter. Ms. MacLeod told Mr. Cerqueira that there was a seat available for him on an American Airlines flight from Boston to Fort Lauderdale departing in the early afternoon, but that she needed to ask a supervisor about the situation. Ans. ¶ 24; Cerqueira Dep. 79:1-5; Pl. Resp. to Interr. No. 2.

52.    Ms. Traer arrived at the ticket counter and spoke first to Mr. Ashmil and Mr. Rokah. Ans. ¶ 25. Ms. Traer told Mr. Ashmil and Mr. Rokah that American Airlines was denying them service and that she was refunding the cost of the Boston to Florida portion of their tickets. When they asked how they were to get back to Florida, Ms. Traer told them that they were on their own. When they asked why American Airlines would not serve them, Ms. Traer

replied that it was based on something they said on the plane. Cerqueira Dep. 82:5-21; Pl. Resp. to Interr. No. 2.

53. Mr. Cerqueira was called to the counter and Ms. Traer told him that American Airlines was denying him service and that she was refunding the cost of the return portion of his ticket. Mr. Cerqueira asked why he was being denied service and for how long, and Ms. Traer told him that she was not sure why he was being denied service, that it had to do with something he said on the plane, and that she had no further information. Ms. Traer told Mr. Cerqueira that if he wanted further information he would need to contact customer service, and she suggested that he do so through the American Airlines website. Ans. ¶ 26; Cerqueira Dep. 83:15-84:11, 102:6-15; Pl. Resp. to Interr. No. 2; Traer Dep. 11:16-12:3.

54. Mr. Cerqueira attempted to find another flight home to Florida on December 28, 2003, but he was unable to find a reasonably priced ticket that day. Cerqueira Dep. 103:12-16. Mr. Cerqueira called his family and they drove back to Logan airport to pick him up. On December 29, 2003, Mr. Cerqueira flew home on a U.S. Airways flight connecting through Philadelphia. Pl. Resp. to Interr. No. 2.

55. Mr. Cerqueira contacted American Airlines by e-mail in an attempt to determine why he had been removed from flight 2237, why he had been denied further service even after being questioned and cleared for further travel, and how long the denial of service would last. On December 28, 2003, Mr. Cerqueira sent the following electronic message to American Airlines:

> Today I was scheduled to fly on flight 2237 from Boston to Fort Lauderdale. I was denied service after being escorted off the plane by several police officers. At a loss of much valuable time and money

> and after considerable embarrassment, I have had to make other arrangements to fly home to Florida. The supervisor in Boston, Nicole, said I was denied service because of something I said on the plane and, when I asked her what I was being accused of saying, she said for me to contact customer service online for more information. Please provide me further information and as much information as you are able to regarding the file for this incident. Also please comment on what the short, medium, and long-term implications are for me to travel on American Airlines or any other airline.

Ans. ¶ 27.

56.    Mr. Cerqueira received an "auto-response" indicating that someone would respond to his message at a later time. Ans. ¶ 28. Nine days later, on January 6, 2004, American Airlines sent Mr. Cerqueira the following response to his inquiry of December 28, 2003:

> One of the most difficult decisions our personnel must make is to refuse passage to one of our customers. Nevertheless, we do have that obligation and that authority when there are manifestations of behavior, which could become troublesome during flight. We have fully reviewed the decision not to let you board your flight to Fort Lauderdale. Our investigation has revealed that our personnel perceived certain aspects of your behavior, which could have made other customers uncomfortable on board the aircraft. It was for this reason that you were not permitted to travel. It was also noted in the record that our personnel authorized a refund of the Boston – Fort Lauderdale segment of your ticket. There is no indication that you will be denied boarding in the future. We welcome all customer feedback. Should you wish to contact us again, please do so via http://www.aa.com/customerrelations/, and we'll be back with you as soon as possible.

Ans. ¶ 30.

57.    Mr. Cerqueira has not traveled as a passenger on any American Airlines flight since the incidents of December 28, 2003. Pl. Resp. to Interr. No. 25.

58.    On October 14, 2004, Mr. Cerqueira filed a complaint of discrimination with the Massachusetts Commission Against Discrimination (MCAD) charging American Airlines

17

with discrimination in a place of public accommodation on the basis of race, color, national origin, or ancestry. MCAD investigated Mr. Cerqueira's complaint and, on May 3, 2005, issued a decision concluding that Mr. Cerqueira had established a prima facie case of discrimination and finding probable cause to credit the allegations in Mr. Cerqueira's complaint. Ans. ¶ 46.

59. In response to an interrogatory from MCAD, American Airlines stated that even though law enforcement officials on the scene had determined that Mr. Cerqueira was not a threat to safety, "[u]nder all of the facts and circumstances and working with the information available at the time, American's personnel were unable to make . . . an independent assessment as to whether Mr. Cerqueira may or may not have posed a security risk." Pl. Resp. to Interr. No. 4 (quoting American Airlines Responses to MCAD's Interrogatories, p.2).

60. The U.S. Department of Transportation (DOT) has found that, following the attacks of September 11, 2001, American Airlines unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent, by causing such passengers to be removed from flights, denied boarding, or refused service. On April 25, 2003, the DOT brought an enforcement action against American Airlines. Docket OST-2003-15046. In its Complaint, DOT cited eleven separate instances in which American Airlines unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent by removing them from flights or denying boarding to them. The enforcement proceeding was concluded on February 27, 2004, pursuant to a Consent Order finding that American Airlines acted in a manner inconsistent with the requirements of Federal anti-discrimination law, and ordering American Airlines to cease and desist from future

violations and to spend at least $1.5 million to provide civil rights training to its flight and

cabin crewmembers and passenger service representatives.  Pl. Resp. to Interr. No. 4.


**JOHN D. CERQUEIRA**

By his attorneys,

*/s/ Michael T. Kirkpatrick*

_____

Michael T. Kirkpatrick
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
(202) 588-1000
mkirkpatrick@citizen.org

David S. Godkin (BBO #196530)
Erica Abate Recht (BBO #641452)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100

Dated: September 22, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will
be sent to those indicated as non-registered participants on September 22, 2006.


*/s/ Michael T. Kirkpatrick*

_____

Michael T. Kirkpatrick

# Exhibit 1

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of John D. Cerqueira,
with errata sheet

**[Page 1]**

Volume I
Pages 1 to 231
Exhibits 1 to 24

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

JOHN D. CERQUEIRA,                      :

    Plaintiff,                          :

vs.                                     : Civil Action

                                        : No.: 05-11652 WGY

AMERICAN AIRLINES, INC.,                :

    Defendant.                          :

- - - - - - - - - - - - - - - - x

DEPOSITION OF JOHN D. CERQUEIRA

Tuesday, April 4, 2006

9:53 a.m.

at

Fitzhugh, Parker & Alvaro LLP

155 Federal Street, Suite 1700

Boston, MA 02110

Reporter: Kathleen M. Madden

MADDEN REPORTING SERVICE
508-644-4035

**[Page 2]**

1  A P P E A R A N C E S:

2

3  PUBLIC CITIZEN LITIGATION GROUP

4  By Michael T. Kirkpatrick, Esq.

5  1600 20th Street, N.W.

6  Washington, D.C. 20009

7  202-588-7728

8  mkirkpatrick@citizen.org

9  On behalf of the Plaintiff

10

11  FITZHUGH, PARKER & ALVARO LLP

12  By Michael A. Fitzhugh, Esq.

13  155 Federal Street, Suite 1700

14  Boston, MA 02110-1727

15  617-695-2330

16  mfitzhugh@fitzhughlaw.com

17  On behalf of the Defendant

18

19  ALSO PRESENT:  Alec Bramlett

20

21

22

23

24

**[Page 3]**

1                  I N D E X

2

3  EXAMINATION OF:

4  JOHN D. CERQUEIRA

5

6                  DIRECT

7  By Mr. Fitzhugh      6

8

9              * * * * *

10

11          E X H I B I T S

12  NO.                           *PAGE

13  1 Software Contractor's Guild Internet Posting

14  2 Diagram of Logan Terminal B

15  3 Diagram of MD 80 Aircraft

16  4 Cerqueira 12/28/03 e-mail to AA

17  5 Womack 01/06/04 Response to

18    Cerqueira (AA 0038)

19  6 01/12/04 letter to US Department of

20    Transportation (AA 0004)

21  7 04/28/04 Podbersky letter to AA (AA 0001)

22  8 06/14/04 Bramlett letter to DOT

23  9 MCAD Complaint dated 10/06/04

24

**[Page 4]**

1              E X H I B I T S

2  NO.                           *PAGE

3  10 AA Position Statement in Response to

4     MCAD Complaint

5  11 Cerqueira 02/01/05 letter to

6     MCAD (CRQ 0036)

7  12 Amended Complaint

8  13 Cerqueira's Interrogatory Responses

9  14 AA Interrogatory Responses

10  15 Lois Sargent Statement (AA 0012)

11  16 Milenkovich Statement (AA 0016)

12  17 Sally Walling Statement (AA 0018)

13  18 Ehlers' "Debrief" (AA 0035)

14  19 PNR Detail Note (AA 0023)

15  20 Cobbs Detail Report (AA 0021)

16  21 State Police Report Summary

17  22 Medical Records (CRQ 0165-0174)

18  23 Federal Tax Return for 2003

19  24 Federal Tax Return for 2004

20

21      *(All exhibits marked at conclusion of the

22       deposition.  Exhibits retained in binder and

23       returned with original transcript.  Copy

24       binder provided to counsel.)

1    A. Yes.
2    Q. I'm not here to try to trick you or anything
3  like that. I'm merely seeking information. So if a
4  question, as I pose it, for any reason is unclear to
5  you, just ask me to repeat it or rephrase it, and
6  I'll be glad to do so. All right?
7    A. Yes.
8    Q. If at some point you want to confer with
9  your counsel, as a general proposition I would ask
10 that you first complete the question, unless your
11 counsel objects and instructs you not to answer.
12 Okay?
13   A. Yes.
14   Q. And if you want to confer with your counsel
15 in the midst of a question, we'll have to take that
16 up together, Mr. Kirkpatrick and I. And in
17 addition, if there's a particular line of questions
18 that I'm pursuing, I would ask that you allow me to
19 complete that, and then Mr. Kirkpatrick and I will
20 take up any request for you to confer with your
21 counsel. Okay?
22   A. Yes.
23   Q. Finally, you'll have the opportunity to read
24 and sign your deposition. Do you understand that?

1        MR. KIRKPATRICK: I don't mean to
2  interrupt, but I would just indicate that it looks
3  like we're into a line of questioning that the
4  transcript need not be marked confidential at this
5  point.
6        MR. FITZHUGH: Yes.
7        MR. KIRKPATRICK: Can we go off the
8  record for a minute.
9        (Discussion off the record)
10   Q. Can you give me a brief summary of your
11 educational background.
12   A. Well, I have public school education and a
13 bachelor's from Stanford.
14   Q. And with respect to your educational
15 background, do you have Exhibit 1 before you? Do
16 you recognize the document?
17   A. Yes.
18   Q. What is it?
19   A. It is a document that is posted at a Web
20 site with my resume and professional information.
21   Q. Is it an accurate summary of your
22 educational and professional background?
23   A. Yes.
24   Q. Can you just briefly summarize the courses

10

1    A. Yes.
2    Q. In summary, you have the right to make
3  clerical corrections as well as substantive
4  corrections to your transcript after the
5  stenographer sends it to you. Do you understand
6  that?
7    A. Yes.
8    Q. If you do not make any such changes, the
9  transcript will be deemed to be your actual
10 testimony given today. Do you understand that?
11   A. Yes.
12   Q. Now, you're the Plaintiff in this case;
13 isn't that right?
14   A. Yes.
15   Q. Have you ever been a party to a civil action
16 or criminal action before today?
17   A. No.
18   Q. Have you ever been a witness in any prior
19 litigation or administrative proceeding before
20 today?
21   A. No.
22   Q. Have you ever given testimony under oath for
23 any reason before today?
24   A. No.

12

1  that you pursued as an undergraduate at Stanford and
2  thereafter what additional educational endeavors you
3  undertook.
4    A. I have a bachelor's in international
5  relations from Stanford.
6    Q. You got that in what year?
7    A. My degree is officially either 1990 or 1991,
8  because I -- towards the end of my education, I took
9  an internship, so that is my degree. Then I did a
10 program at the Lowell Institute School at the
11 Massachusetts Institute of Technology from 1995 to
12 1996, and I've taken several certifications for my
13 professional development.
14   Q. What page of the exhibit are you looking at
15 now? Would it be Page 7 of 8?
16   A. Yes.
17   Q. Please describe the additional courses you
18 took.
19   A. Which --
20   Q. I believe you just testified that you took
21 some other courses to further your professional
22 development; is that correct?
23   A. Well, at the Lowell Institute School, they
24 were courses in computer technology programming.

15

1 And other professional development courses that I've
2 taken have been in programming and customizing of
3 business applications.
4    Q.  So your undergraduate degree was in
5 international relations?
6    A.  Yes.
7    Q.  And you thereafter transitioned into
8 computers or software?
9    A.  Yes.
10    Q.  What made you do that?
11    A.  It was a good option for me.
12    Q.  So when you began to pursue a career in
13 computer technology, what was your outlook with
14 respect to your career path at the time?
15        MR. KIRKPATRICK:  Objection.  You can
16 answer.
17    Q.  Do you want me to rephrase?
18    A.  I don't understand the question.
19    Q.  When you made a decision to engage in a
20 career that revolved around computer technology,
21 what were your general goals and aspirations?
22    A.  I felt it was a good career choice for me.
23    Q.  Can you elaborate on your answer as to why.
24    A.  I would say that I felt it was a strong

1 or endeavor after that?
2    A.  I started working as an SAP consultant.
3    Q.  Were you employed by SAP directly?
4    A.  No.
5    Q.  Were you an independent consultant?
6    A.  Yes.
7    Q.  Did you form your own company at that time?
8    A.  Yes.
9    Q.  So you worked as a freelance consultant?
10    A.  Yes.
11    Q.  What clients did you service, just by way of
12 example?
13    A.  The first client was Cultor Food Science as
14 an ABAP developer.  ABAP is programming language for
15 SAP software, and that was throughout 1997.
16    Q.  Can you give me a brief summary of your
17 professional endeavors from 1997 through the present
18 time.
19    A.  From November 1997 to August 1998, I was
20 working with Philips Lighting Company.  From
21 September 1998 to November 1998, Anchorage Telecom,
22 and that was through a consulting company called
23 Access Origin.
24    Q.  You're looking at Page 5 of Exhibit 1?

14

1 field to be in.
2    Q.  Did you seek to develop a particular
3 expertise or find a particular niche at some point?
4    A.  Yes.
5    Q.  Can you tell me when and elaborate on what
6 the expertise was that you sought.
7    A.  Well, in 1997, I started in an expertise,
8 which is business applications from a company called
9 SAP.
10    Q.  And that's the European software company?
11    A.  SAP is a German software company.  It's one
12 of the top four or five software companies in the
13 world.
14    Q.  So in 1997, what did you do with regard to
15 developing an expertise in SAP software?
16    A.  Well, actually, in 1996, I got certified in
17 the program language for SAP.
18    Q.  Are you looking at a particular page of
19 Exhibit 1?
20    A.  That's on Page 7.
21    Q.  And thereafter, after becoming certified,
22 what did you do?
23        MR. KIRKPATRICK:  Objection.
24    Q.  What was your next significant career choice

16

1    A.  Page 5 of Exhibit 1 is where the Anchorage
2 Telecom is mentioned, yes.
3    Q.  So I understand that Exhibit 1 is an
4 accurate reflection of your professional experience,
5 correct?
6    A.  Yes.
7    Q.  But in your own words, can you tell me for
8 the last five years, for example, what you have
9 pursued as a way to professionally develop your
10 skills and what you have accomplished as a freelance
11 consultant.
12        MR. KIRKPATRICK:  Objection.
13        MR. FITZHUGH:  Rephrase.
14    Q.  If somebody asked you, "What do you do," how
15 would you answer the question?
16    A.  I'm an SAP independent consultant.
17    Q.  And if someone asked you as a general
18 proposition, "What do you do on a regular basis,"
19 how would you answer the question?
20    A.  I work with customizing of SAP business
21 software.
22    Q.  Do you obtain your own clients, or does SAP
23 refer clients to you?  How does that work?
24    A.  Can you rephrase that question.

1    Q.  Do you have clients?

2    A.  Yes.

3    Q.  And how do you get your clients?

4    A.  Through different ways.

5    Q.  Can you elaborate on your answer and explain

6    it to me.

7    A.  Through -- my contacts will let me know

8    about opportunities that I will pursue.  Headhunters

9    will contact me quite frequently.

10   Q.  When there's a particular project?

11   A.  Yes.  I also get calls from customers that

12   I've worked for.

13   Q.  Those are the primary ways you get clients?

14   A.  I market myself.

15   Q.  How do you do that?

16   A.  Networking and contacting business contacts.

17   Q.  Do you have a location -- do you have a

18   primary business location, a physical location?

19   A.  Can I ask you if you're asking a certain

20   question?  Are you asking me if I rent a business

21   office?

22   Q.  That's a good start.

23   A.  I don't rent a business office.  I have a

24   home office, but I travel for work.

---

1    Q.  In 2003.

2    A.  Oh, in 2003?  No.  I'm sorry.  I apologize.

3    I was thinking about 2004.  In 2003, okay, that was

4    the year before the incident.  I apologize.  I

5    misunderstood the question.  I would say in 2003,

6    probably 50 trips.

7    Q.  Once a week?

8    A.  Pretty close.

9    Q.  And these would be to cities where you might

10   stay overnight?

11   A.  (Witness reviews document) In 2003, I

12   traveled frequently to Mississippi, Tennessee, and

13   Central America.

14   Q.  And you're looking at Page 4 of Exhibit 1.

15   A.  And Belgium and Texas.

16   Q.  So some of the travel was international?

17   A.  Yes, including Central America and Belgium.

18   Q.  And was there a particular airline that you

19   would use more frequently than others or that you

20   preferred to use?

21   A.  I'm supposed to pick the most economical

22   airline, because most of my travel is reimbursed

23   through my clients, so I'm supposed to pick the most

24   economical.  Of course, factoring in some

---

18

1    Q.  As a general matter, in the year 2003, how

2    many days do you estimate you traveled on business?

3    A.  I don't know.

4    Q.  Would you describe it as frequent or

5    infrequent?

6    A.  Infrequent.

7    Q.  Could you make an estimate of how many

8    business trips you made in 2003?

9    A.  I'm not exactly sure how many, but I do have

10   business records.

11   Q.  Just your best estimate of business trips

12   that required airplane travel.

13   A.  I'm concerned I don't have the right number,

14   and it's off.

15   Q.  We understand it's just your best estimate.

16   A.  I can give an estimate, but I would like to

17   reserve the right to go through my records and add

18   them up.

19   Q.  Certainly.

20   A.  Are you calling a trip just one day of a

21   trip, like if I have a round trip I should count it

22   as two?

23   Q.  No.  I would count a round trip as one trip.

24   A.  This is a guess, 15 to 20.

---

20

1    convenience, but I'm not supposed to have a

2    preferable preference of an airline.

3    Q.  So your choice of air carrier would be

4    economically driven?

5    A.  Yes.

6    Q.  So since 1997, you've pretty much worked for

7    yourself.  Is that a fair way to characterize your

8    employment background?

9    A.  Yes, and previously.

10

11

12   Confidential information

13   redacted pursuant to

14   Protective Order (Doc. No.

15   11) entered February 10,

16   2006.

17

18

19

20

21

22

23

24

1    Confidential information
2    redacted pursuant to
3    Protective Order (Doc. No.
4    11) entered February 10,
5    2006.

22    Q. When did you form Reliable?
23    A. I don't remember.
24    Q. Would it have been before 2001?

---

1    through January -- well, in February 1995, I worked
2    with Copley Pharmaceuticals in Canton,
3    Massachusetts, and I think that was underneath a
4    corporation of mine. If not, it was the job
5    immediately thereafter, so I went out on my own in
6    1995.
7    Q. And since then, you've been what we can call
8    a freelance consultant?
9    A. Yes. And I've had different corporations.
10    Like, originally, it was a Massachusetts-based
11    corporation, and right now I'm working with a
12    Florida-based corporation, but it's always been
13    consistent in that it's been working as a freelance,
14    yes.
15    Q. So you're from Massachusetts originally?
16    A. I was born in Lisbon, Portugal, and I moved
17    to the United States with my family when I was six
18    and attended the public school system in
19    Massachusetts.
20    Q. And then went to Stanford?
21    A. Yes.
22    Q. And thereafter, were did you live for what
23    periods of time of time?
24    A. I lived in the Fall River, Massachusetts,

---

22

1    A. I don't remember the exact dates, and it's
2    public knowledge. You can get it from the Florida
3    Department of Corporations Web site. So can we just
4    refer to that?
5    Q. All right.
6    A. It's public knowledge.
7    Q. I'm just asking for your best estimate of
8    when you formed the company.
9    A. I'm not very good at dates. I'm sorry. I'd
10    rather refer to the record. It's public knowledge.
11    Q. When was the last time you were employed by
12    another company as an employee?
13    A. Okay. Refer to Attachment 1, on Page 8 of 8
14    of my resume, you'll notice that I was a programmer
15    with a telecommunications company in Massachusetts.
16    That was a Quincy-based company, and it was from
17    February of 1994 to February of 1995.
18    Q. And what was the name of the company?
19    A. Network Plus.
20    Q. And it was thereafter you went out on your
21    own?
22    A. I started consulting immediately. I'm not
23    exactly sure whether the very next job was
24    independent or not. The next job was February 1995

---

24

1    Providence, Rhode Island, area, and then I moved to
2    Quincy.
3    Q. Can you give me a time frame?
4    A. I think it was in 1994.
5    Q. You moved to Quincy in 1994. Do you
6    remember the address?
7    A. 136 Clay Street.
8    Q. Clay?
9    A. I think that's the address.
10    Q. And how long did you live there?
11    A. I'm not good with dates.
12    Q. Okay.
13    A. My best guess, and I'm not sure if this is
14    exact or not, would be sometime in 1997.
15    Q. And what was your next physical move?
16    A. Well, I started working as an SAP
17    consultant, so I started working in different states
18    and different countries, but I was based out of
19    Massachusetts, or I was based out of Florida.
20    Q. When did you start working out of Florida as
21    well as Massachusetts?
22    A. I think I started to be based in Florida,
23    and this is my best guess and estimate, four years
24    ago.

**25**

```
 1    Q. 2002?
 2    A. My -- I would guess 2001 as opposed to 2002.
 3    Q. All right. Did you physically move to
 4  Florida, or better stated, did it become you primary
 5  residence?
 6    A. Yes, it became my primary residence.
 7    Q. Did you get a driver's license in Florida in
 8  2001?
 9    A. I'm pulling out my driver's license. Oh,
10  this is helpful. I'm not good with dates. My
11  driver's license is issued 05/04/00, so May 2000.
12    Q. Did you buy real estate in Florida at any
13  time?
14    A. Yes, I did.
15    Q. What was the first real estate you purchased
16  there?
17    A. My condo.
18    Q. The one you own now?
19    A. Yes.
20    Q. Do you own any other real property?
21    A. Land.
22    Q. Where?
23    A. Massachusetts.
24    Q. Where in Massachusetts?
```

**26**

```
 1    A. Westport, Massachusetts.
 2    Q. It's raw land without a physical structure?
 3    A. It's undeveloped.
 4    Q. It's in your name?
 5    A. Yes.
 6    Q. Anybody else's name?
 7    A. No.
 8    Q. No, at some point an incident occurred
 9  during a flight you were taking with American
10  Airlines on December 28th of 2003; is that right?
11    A. Yes, but I would describe it as incidents,
12  plural. Plural.
13    Q. All right. Before that, you had flown from
14  Massachusetts to Fort Lauderdale on American
15  Airlines, correct? I believe in your interrogatory
16  responses when you were asked to describe the trip,
17  you had mentioned that, in fact, you had bought a
18  round-trip ticket from Boston to Fort Lauderdale; is
19  that correct?
20    A. Yes. And I think I heard you say if I flew
21  from Massachusetts to Fort Lauderdale before. On
22  that round trip, I flew from Fort Lauderdale to
23  Massachusetts, and I was returning from
24  Massachusetts to Fort Lauderdale. So if you were
```

**27**

```
 1  referring to that round trip, yes, I did fly from
 2  Florida to Massachusetts.
 3    Q. You're right. I was mistaken. And that
 4  flight occurred without incident, I take it?
 5    A. Yes.
 6    Q. Tell us, in your own words, what happened on
 7  December 28, 2003.
 8         MR. KIRKPATRICK: Objection. Calls for
 9  a narrative. You can answer.
10    A. It's well-documented. Would you like me to
11  repeat the narrative, or do you want me to answer
12  specific questions about the narrative?
13    Q. I would just like you to tell me, in your
14  own words, what happened that day.
15    A. Well, I would refer to the narratives, which
16  are very complete, so anything I can say here would
17  start off as a summary. And I would request that if
18  you have specific questions, that you ask specific
19  questions. I got up at 3:00 in the morning. My
20  family drove me to the airport. I checked my bags
21  in curb side. I went through security with no
22  incidents. I went to my gate.
23    Q. Was the gate 29?
24    A. I don't remember.
```

**28**

```
 1    Q. If you turn to Exhibit 2, perhaps this will
 2  refresh your recollection. It's a diagram of
 3  Terminal B --
 4    A. Which?
 5    Q. 2. If you look at the first page, it's a
 6  diagram of Terminal B. Does this look familiar to
 7  you?
 8    A. Not particularly.
 9    Q. Okay. Well, if your boarding pass said you
10  left from Gate 29, would you agree that's the gate
11  that you were scheduled to depart from?
12    A. I don't remember which gate I was scheduled
13  to depart from. I went to the gate that I was
14  supposed to be at.
15    Q. Do you recall walking through security?
16    A. Yes.
17    Q. And how far past the security station was
18  the gate?
19    A. I don't remember.
20    Q. No recollection?
21    A. I don't remember. I went to the gate that I
22  was supposed to go to. I don't know how far it was.
23    Q. If you turn to the second page, perhaps this
24  will help refresh your recollection. This is an
```

29

1  enlargement of the gate area past security.

2      **A.**  Okay.

3      **Q.**  Does this help refresh your recollection as

4  to the area you found yourself?

5      **A.**  I'm in airports all the time, you know.

6      **Q.**  So the answer is no?

7      **A.**  The answer is I don't remember the specifics

8  of the distance between the security and the gate

9  and what the gate number was.  I don't remember the

10  specifics of how far it was and which gate it was.

11  I would assume whatever is on my boarding pass is

12  the gate we left from.

13      **Q.**  And if that was Gate 29, you would therefore

14  believe that was indeed the gate, correct?

15      **A.**  If my boarding pass says it was Gate 29, I

16  would assume that that's the gate I went to.

17      **Q.**  But this document wouldn't give you an

18  opportunity to refresh your recollection as to the

19  precise place?

20      **A.**  I'm in airports all the time.  This doesn't

21  do anything for me.

22      **Q.**  By this time, what time was it when you got

23  to the gate after going through security?

24      **A.**  I don't remember exactly when.  My best

31

1  gate to ask for an exit row or bulkhead seat.

2      **Q.**  And do you remember what he or she looked

3  like?

4      **A.**  No.

5      **Q.**  Was it a male or female?

6      **A.**  I think it was a female.

7      **Q.**  Please describe the interaction you had with

8  this person at that time.

9      **A.**  I asked for an exit row or a bulkhead seat.

10      **Q.**  Well, where was she standing.  And how did

11  you approach her.

12      **A.**  Well, usually, the airlines will have

13  somebody at the gate an hour before the flight,

14  usually.  I think I have a -- I think I remember

15  that for some reason there wasn't somebody there

16  until maybe, and my best guess, for 35 to 45 minutes

17  before the flight.  So what I'm saying is that I

18  remember that there wasn't somebody attending to the

19  flight with the normal window of time that I'm used

20  to seeing somebody there.  So when the person got

21  there, I went up to the counter, and I asked for an

22  exit row or a bulkhead seat.

23      **Q.**  And when you say "this person," this was the

24  female?

30

1  guess or estimate would be 5 a.m.

2      **Q.**  And what happened then?

3      **A.**  I sat down and worked on my computer.

4      **Q.**  Was anyone else there at 5 a.m. when you got

5  there?  In the gate area, that is.

6      **A.**  I don't remember, but I think there was.

7      **Q.**  Did they appear to be members of the flight

8  crew, or did they appear to be other passengers such

9  as yourself?

10      **A.**  I don't know, but my best guess would be

11  that they would be passengers.  My memory is I think

12  there was somebody there, and they were dressed as

13  regular people, you know, passengers.

14      **Q.**  At some point, did you interact with someone

15  who appeared to be an American Airlines personnel?

16      **A.**  At the gate?

17      **Q.**  Yes.

18      **A.**  Well, I travel all the time, and I pretty

19  much always -- sometimes I forget -- ask for exit

20  row or bulkhead seat.  And, usually, you have to ask

21  the person at the gate for that, because most of the

22  time that's how the airlines do it.  The person at

23  the gate hands out the exit or bulkhead seats.  So

24  when the person came to the gate, I approached the

32

1      **A.**  I think it was a female.

2      **Q.**  Okay.

3      **A.**  And I remember very little about that

4  conversation, but I think that she said that she

5  couldn't help me, and I didn't understand what she

6  meant by that.  Because, as I say, usually, there is

7  somebody who is attending to the flight at the gate

8  an hour before the flight, and there hadn't been

9  somebody there, and my best guess was that they only

10  showed up 35 to 45 minutes before the flight.  And

11  then I went to her, and she said she couldn't help

12  me, and I didn't understand what that meant, but she

13  did give me a change of seat.

14      **Q.**  She did?

15      **A.**  She did.

16      **Q.**  Would you turn to Exhibit 17, please, and

17  see if this refreshes your recollection.  This is a

18  statement of Sally Walling.  And let me just first

19  ask you, have you seen it before?

20      **A.**  No.

21      **Q.**  You need not accept my representation that

22  this is a record kept in the ordinary course of

23  American's business, but on that assumption, would

24  you please look at the narrative on Page 19, the

33

1  second page, AA0019, and I would ask if this would
2  refresh your recollection about the interaction you
3  had with the person at the gate?
4      A.  May I read what's on this page?
5      Q.  Take all the time you want, yes, of course.
6      A.  On the top it says, "Suspicious passengers
7  on board."  That is a plural, correct?
8          MR. KIRKPATRICK:  John, just read it to
9  yourself and then wait for the question and just
10  answer the question.
11      Q.  Mr. Cerqueira, your attorney will have an
12  opportunity to cross-examine you, and at that time
13  you will be able to answer any other questions.
14      A.  (Witness reviews document) Can I ask for
15  assistance?
16          MR. KIRKPATRICK:  John --
17      A.  I don't understand what that says.  It says,
18  "Upon boarding, he was the first passenger in coach
19  and went into the" -- what's the next three words?
20      Q.  "Aft row lav."
21      A.  Okay.  On page --
22          MR. KIRKPATRICK:  John --
23          MR. FITZHUGH:  Let me know when you're
24  finished.

34

1          MR. KIRKPATRICK:  Just read it and then
2  wait for the question.
3          THE WITNESS:  Okay.
4      A.  Okay.  I've read it.
5      Q.  Assuming that this is a record generated by
6  one of the flight attendants at the gate that day,
7  would this refresh your recollection about the
8  interaction you had with the American Airlines
9  personnel with respect to changing your seat
10  assignment?
11      A.  I don't understand the question.
12      Q.  Assuming that this is a record maintained by
13  American in the ordinary course of its business, and
14  that this record was generated by a flight attendant
15  named Ms. Sally Walling, and this is her
16  recollection of the interaction between you and she
17  at the ticket counter with respect to changing your
18  seat, does it refresh your recollection about what
19  occurred then?
20      A.  I'm not sure what you mean by refreshed, but
21  this doesn't add anything to my memory of what
22  happened, if that's what you're saying.
23      Q.  Thank you.  But it is your testimony that
24  someone changed your seat --

35

1      A.  Yes.
2      Q.  -- to Exit Row 20F?
3      A.  Is that the number that's on my boarding
4  pass?
5      Q.  Well, it's in your interrogatory responses.
6      A.  Yes, I think that was my seat.
7      Q.  If you look at Exhibit 13, your responses to
8  interrogatories, I think you'll find it, among other
9  places, that that was your seat assignment.  It's
10  Page 6 of Exhibit 13, if you would like to look.
11      A.  Okay.  Yes.
12      Q.  It says here, if you go back to Page 6 --
13  first of all, do you recall signing this document,
14  Exhibit 13?
15      A.  Yes.
16      Q.  And is it your understanding that these are
17  written questions to be answered under oath?
18      A.  Yes.
19      Q.  And you signed them on the 4th of February
20  of this year, according to Page 20.  Is that your
21  signature?
22      A.  Yes.
23      Q.  If we go back now to Page 5, the
24  interrogatory was requesting you identify all

36

1  communications between you and other person -- any
2  other person at the scene of the incident.  Do you
3  see that?
4      A.  Yes.
5      Q.  And the second full paragraph says, "After I
6  arrived at the gate, I communicated with American
7  Airlines personnel to request a seat near the exit
8  or a bulkhead."
9      A.  Which page?
10      Q.  The bottom of Page 5.
11      A.  Yes.
12      Q.  And if you turn to the next page, it says,
13  "As I understand it, according to American Airlines,
14  the first person I spoke to at the gate was flight
15  attendant Sally Walling."
16      A.  I've been told that since.
17      Q.  Between that and what I just directed you to
18  at Exhibit 16, does it refresh your recollection
19  with regard to the communication you had at the
20  gate?
21      A.  It doesn't refresh my memory, because my
22  memory was I just waited until the person --
23  normally, there's a person that comes to the gate to
24  tend to people on the flight.  My recollection was

37

1  that the person who came to the gate did not come at

2  the time that I thought they often come. Most of

3  the time they come a good 50 to 60 minutes before

4  the flight. My recollection was that the person

5  came late. My recollection was that I asked for an

6  exit row or bulkhead seat, and the only other

7  recollection I have of the conversation was that the

8  person said they couldn't help me, and I didn't

9  understand what that meant, but then they eventually

10  gave me a change of seat.

11      Q. Later on the aircraft when you were seated

12  in the exit row, do you recall getting a set of

13  instructions from a member of the crew about using

14  the exit row?

15      A. Yes.

16      Q. Was it the same person who you spoke with in

17  the terminal about changing your seat at first?

18      A. I don't remember.

19      Q. So you don't remember whether it was the

20  same person who ultimately changed your seat or not?

21      A. I don't remember.

22      Q. If you would turn to Exhibit 3, please.

23      A. (Witness complies)

24      Q. This is a diagram of an MD 80. Does this

38

1  look like a reasonably accurate depiction of the

2  airliner you were on that day?

3      A. I don't remember what the configuration of

4  the airplane was.

5      Q. Can you acknowledge that it was an MD 80?

6      A. I don't know. I do know that there were

7  three seats in my section of the plane.

8      Q. If you look at Row 20F, which is highlighted

9  in yellow on Exhibit 3, does that refresh your

10  recollection as to where you were seated?

11      A. I would disagree with the comment "refresh."

12  I remember I was seated in an exit row seat, and I

13  remember I was on the right-hand side of the plane,

14  and on the right-hand side of the plane there was a

15  configuration where there were three seats. This

16  diagram does not refresh my memory any more than

17  that.

18      Q. But if it was an accurate depiction of an MD

19  80 seating chart, and if that was the airliner used

20  that day in service, would you agree with me that

21  this is where you were seated on the day in

22  question?

23      A. Okay. If you are telling me this is a

24  picture of the airplane that I sat on and that's my

39

1  seat, then that's where I was.

2      Q. Please describe how you boarded the aircraft

3  and what happened between the time you were called

4  for boarding and when you got the exit row briefing

5  by the flight attendant.

6      A. Well, I boarded with my group, which was

7  Group 1. I stowed my belongings. I think I left my

8  computer on my seat. I went to the bathroom.

9      Q. Can you show us on the diagram which

10  bathroom you used. Again, assuming that this is an

11  accurate depiction of an MD 80 --

12      A. I don't. It was in the back.

13      Q. Well, if you look on the diagram, sir, at

14  the bottom you'll see the words "lav" and "lav." Do

15  you remember if it was in the right-hand lavatory or

16  the left-hand lavatory?

17      A. I don't remember.

18      Q. But it was a lavatory in the rear of the

19  plane?

20      A. Yes.

21      Q. Were there other people on the flight with

22  you at that time?

23      A. There were other passengers, yes.

24      Q. In first class or in coach?

40

1      A. I know there were people in first class. I

2  was in Group 1, and I boarded with my group. I may

3  have been the first passenger in coach.

4      Q. Did you go on the plane when the first-class

5  passengers were called, or did you wait?

6      A. No, I went with my group.

7      Q. So if anyone said they observed you boarding

8  before your group was called, that would be

9  inaccurate?

10      A. I went with my group. I did not board

11  early.

12      Q. And so you proceeded to your seat, 20F, left

13  your computer on the seat, and then went to the

14  lavatory?

15      A. And then I came back to my seat.

16      Q. How long were you in the lavatory?

17      A. I don't remember, but it was a short amount

18  of time.

19      Q. It was a short time?

20      A. Yes.

21      Q. Did you pass any flight attendants or other

22  personnel on your way to the lavatory?

23      A. I don't remember.

24      Q. When you say a short time, was it less than

41

1  five minutes?
2      A.  I would guess it was less than five minutes.
3      Q.  Why hadn't you used the facilities in the
4  terminal?
5      A.  I don't know why I didn't use the facilities
6  in the terminal.
7      Q.  On your way back to your seat from the
8  lavatory, do you recall walking past any other
9  seated passengers?
10     A.  I don't remember.
11     Q.  When you returned to your seat after using
12 the lavatory, was anyone else seated in the row at
13 that time?
14     A.  The people in the two seats next to me were
15 not there.
16     Q.  So tell me what you did then.
17     A.  I started to work on my computer a little
18 bit, and then I turned off my computer when they
19 told us to stow all electronic devices.
20     Q.  When did the other people arrive in your
21 row?
22     A.  The two guys sitting next to me, is that
23 this question?
24     Q.  Yes.

42

1      A.  I would assume that the two guys sitting
2  next to me arrived approximately ten minutes after I
3  had boarded.
4      Q.  And how long after they sat down with you
5  did the announcement come to stow electronic
6  devices?
7      A.  I don't remember.
8      Q.  Can you estimate for me the amount of time
9  you were working on the computer before you were
10 asked to stow electronic devices, the total time
11 increment?
12     A.  My best guess or estimate?
13     Q.  Best estimate.
14     A.  Would be about 10 to 15 minutes.
15     Q.  And at some point during that time
16 increment, the other two people seated in your row
17 sat down?
18     A.  Yes.
19     Q.  Do you recall any interaction with them?
20     A.  Me with them?
21     Q.  Yes.
22     A.  They were loud and --
23     Q.  When you say that, do you mean speaking
24 loudly?

43

1      A.  They were speaking loudly, and they were
2  speaking in a mixture of English and a foreign
3  language.  And I looked at them, and I think pretty
4  much a lot of people in that area looked at them,
5  because they were louder than your typical
6  passengers on a plane.
7      Q.  Just the decibel level of their voices?
8      A.  They were speaking a little bit -- yes, a
9  louder decibel level of their voices, sure.
10     Q.  What about their speech, if anything, struck
11 you as unusual?
12     A.  Well, they were speaking a mixture of
13 English and a foreign language.
14     Q.  Anything else about the conversation that
15 struck you as unusual?
16     A.  I didn't pay attention to what they were
17 saying.
18     Q.  Would you describe them as boisterous?
19     A.  I would describe them as a little louder
20 than your typical passengers.
21     Q.  How long were they seated there carrying on
22 loud conversation before the flight attendant
23 approached about the exit row briefing?
24     A.  I don't remember.

44

1      Q.  Do you recall the flight attendant
2  approaching you about the exit row briefing?
3      A.  I remember there was an exit row briefing,
4  but I don't recall when it was.
5      Q.  Briefing?
6      A.  Yes.
7      Q.  And you recall the flight attendant
8  approached and asked questions about being seated in
9  an exit row, correct?
10     A.  There was an exit row briefing, but I don't
11 remember the details on that.
12     Q.  Do you remember anything about conversations
13 occurring between any of you and the flight
14 attendant during the exit row briefing?
15     A.  I did not have any conversation on the plane
16 at all until the American Airlines person came to
17 ask me for my boarding pass.  I did not speak with
18 anyone.  I did not speak with any passenger.  I did
19 not speak with any American Airlines personal until
20 the American Airlines personnel came and asked me
21 for my boarding pass.
22     Q.  And you had no conversation with the two
23 gentlemen in the row with you?
24     A.  Not until we were taken off the plane.

45

1    Q. Do you recall a conversation that they had
2  with the flight attendant giving the exit row
3  briefing?
4    A. Once again, I was not paying attention to
5  their conversation. I said that I noticed them
6  because they were loud and they were speaking a
7  mixture of English and a foreign language, but I did
8  not pay attention to any conversation they were
9  having. And, quite frankly, part of that I couldn't
10  understand because it was a foreign language.
11    Q. But my question was about conversations or
12  any kind of remarks that they made to her or she
13  made to them.
14    A. I don't recall any.
15    Q. Nothing?
16    A. Nothing.
17    Q. So you don't recall having any reaction to
18  any conversation that may have occurred between the
19  flight attendant and them?
20    A. No.
21    Q. What happened after you got the exit row
22  briefing?
23    A. Okay. What happened on the plane was I got
24  on the plane. I went to the bathroom. I sat down.

46

1  I worked on my computer. At one point, they told us
2  to turn all electronic devices in preparation for
3  takeoff. I turned off my computer, and very, very
4  soon after I was asleep.
5    Q. Where was the exit row briefing in this
6  chain of events?
7    A. Exactly when, I don't remember.
8    Q. But it was before you were asked to stow
9  your electronic devices or after?
10    A. I honestly don't remember.
11    Q. So you turned off your computer --
12    A. I don't know when the exit row briefing was
13  in the chain of events. The next question, please.
14    Q. You turned off your computer?
15    A. Yes.
16    Q. Where did you put it?
17    A. I don't remember, but I think I put it like
18  under my seat, and that's my best guess, but I don't
19  remember.
20    Q. So you really have no recollection of
21  whether you put it under the seat in front of you or
22  not?
23    A. I don't remember.
24    Q. I think you testified then you fell asleep.

47

1    A. Oh, yes, deeply.
2    Q. How long did it take you to fall asleep
3  after you stowed your computer under the seat in
4  front of you?
5    A. Very briefly.
6    Q. A minute or less?
7    A. Obviously, I don't remember how long it
8  took, but I remember it was very, very briefly.
9    Q. Did you happen to notice whether the
10  gentlemen seated to your left were also asleep?
11    A. No, I did not.
12    Q. Did you ever observe them sleeping or
13  appearing to be asleep?
14    A. No. I'm not saying that they weren't
15  sleeping. I'm saying I didn't observe them asleep.
16    Q. You were able to fall asleep even though
17  they were carrying on a loud conversation?
18    A. By that time, they were not that loud; and,
19  yes, I was able to fall I sleep because I had three
20  hours of sleep that day, and I was very tired.
21    Q. And what's the next thing you recall
22  occurring of any significance thereafter?
23    A. The next thing, I was woken from my sleep by
24  an American Airlines personnel asking for my

48

1  boarding pass. And at the same time, they were
2  asking for the boarding pass of two guys next to me.
3    Q. What American Airlines personnel?
4    A. I think it was a man.
5    Q. It wasn't the same flight attendant who gave
6  you the exit row briefing?
7    A. I don't know.
8    Q. Well, if you look at your interrogatory
9  responses on Page 4, which is Exhibit 13.
10    A. Exhibit 13, Page 4. Okay.
11    Q. If you look at the fourth full paragraph, it
12  says, "An American Airlines flight attendant woke me
13  and asked for my boarding pass." Does that refresh
14  your recollection?
15    A. That is what I just told you.
16    Q. You said "American Airlines personnel."
17    A. Well, I assumed the person was a flight
18  attendant.
19    Q. So can we infer that it was a female who
20  asked you for your boarding pass?
21    A. I just mentioned to you that my memory is
22  that it was a man.
23    Q. And that's still your best recollection now?
24    A. Yes, that it was a man who asked me for my

49

1 boarding pass. Please remember that I was deeply
2 asleep when they asked me. I was quite disoriented
3 by being woken up because I had fallen into a deep
4 sleep. You know how it is when you wake from a deep
5 sleep, and you're a little bit disoriented and kind
6 of getting your bearings.
7     Q. That's a common human event. Is that what
8 happened with you?
9     A. Yes. I was disoriented. I couldn't find my
10 boarding pass initially. I knew it was around me.
11 I found the itinerary first, just because it was the
12 first document that I found. So I handed this
13 person the itinerary, and I asked if it was
14 sufficient for me if I could give them the itinerary
15 because I wasn't finding my boarding pass right
16 away, and they responded that it was okay.
17     Q. And do you recall the other two gentlemen in
18 your row producing boarding passes?
19     A. I think they did.
20     Q. Did you have any conversation with them at
21 that time about why you were being asked for your
22 boarding passes?
23     A. Once again, I did not have any conversation
24 with these people until we were taken off the plane.

50

1     Q. So what happened after your gave your
2 itinerary to the AA personnel?
3     A. Four minutes later the state troopers came
4 on the plane, approximately four minutes.
5     Q. How many?
6     A. I don't remember.
7     Q. Were they all in uniform?
8     A. Yes.
9     Q. Describe for me, in your own words, how they
10 approached you, what they said to you, and the
11 immediate events that occurred thereafter.
12     A. The troopers came and they asked for the
13 three of us to take all our possessions and that we
14 had to leave the plane, and they escorted us off the
15 plane.
16     Q. Did you say anything to them or ask any
17 questions as to why?
18     A. I think I asked them why, and they did not
19 give us -- they did not give me any response.
20     Q. Did the gentlemen in the row with you ask
21 similar questions?
22     A. I don't remember if, at the time that we
23 were initially approached by the state troopers, if
24 they asked similar questions.

51

1     Q. What happened thereafter?
2     A. They took us off the plane, and they
3 interviewed us directly outside the door that we had
4 entered. They interviewed us. There were several
5 American Airlines personnel observing the
6 interviewing.
7     Q. Let me just stop you. When you say that
8 they interviewed you outside the aircraft, were you
9 on the jetbridge or were you back up on the
10 terminal?
11     A. I was immediately outside the shell of the
12 plane right past where the door is that you walk
13 into the shell of the plane. That was the first
14 place we were interviewed.
15     Q. In that round or semicircle area that buts
16 up against the plane?
17     A. Yes.
18     Q. And when you were escorted off the plane, do
19 you recall any American Airlines personnel being
20 with the troopers as you were being taken off?
21     A. I don't remember.
22     Q. And so were you and your seatmates -- excuse
23 me. Were you and the other members of Row 20 all
24 interviewed in the same general place on the

52

1 jetbridge?
2     A. Yes.
3     Q. So you were all on the base of the
4 jetbridge?
5     A. I don't know the terminology for jetbridge.
6 We were immediately outside of the shell of the
7 plane, if that's what it's called.
8     Q. If your counsel will agree, we can stipulate
9 that the jetbridge is that walkway from the terminal
10 down to the aircraft all the way up to where it
11 abuts the aircraft.
12     A. Yes, we were abutting the aircraft.
13     Q. So we can agree that that's the jetbridge,
14 and when I say the "base of the jetbridge," I'm
15 talking about this area right outside the door.
16 Okay?
17     A. Okay.
18     Q. So all of you were there at the base of the
19 jetbridge?
20     A. I was there. The two passengers that were
21 in my row were there. The police troopers were
22 there, and I recall there were some American
23 Airlines personnel observing.
24     Q. And how do you know they were American

53

1 Airlines personnel observing?

2    A. Because the door to the plane was open.

3    Q. So these were members of the crew?

4    A. I assume they were members of the crew if

5 they were on the plane.

6    Q. Do you recall whether any American Airlines

7 personnel or people you thought were American

8 Airlines personnel had appeared at the base of the

9 jetbridge who were not members of the crew?

10    A. I don't know.

11    Q. So when you say that AA personnel were

12 observing, you're talking about members of the

13 flight crew inside the plane?

14    A. I recall that there were people immediately

15 on the other side of the door, and I was immediately

16 on the outside of the door.

17    Q. And describe for me the events that occurred

18 in the next five to ten minutes while you and the

19 other members of Row 20 were being questioned.

20    A. They kept asking me how I knew these other

21 two passengers, and they kept asking the other

22 passengers how they knew each other and how they

23 knew me, and they kept asking all of us what we were

24 doing.

54

1    Q. When you say "they," these are the uniformed

2 personnel?

3    A. Yes.

4    Q. State troopers?

5    A. I assume they were state troopers.

6    Q. Well, did you see any other people

7 participating in the process who were out of

8 uniform?

9    A. I don't remember.

10    Q. Any other person who could have been a

11 member of federal law enforcement?

12    A. I don't know.

13    Q. You just recall seeing uniformed state

14 police officers?

15    A. Yes.

16    Q. Did they interview you more or less as a

17 group, or did they separate you at all when you were

18 being questioned?

19    A. They did not separate us.

20    Q. What did they ask you, and what did they ask

  you to do?

22    A. Excuse me. Could you rephrase your question

23 as to whether they were asking me singular or "you"

24 as in the three of us.

55

1    Q. Well, I believe you just testified they

2 questioned you as a group, and they didn't separate

3 you.

4    A. Yes, they asked questions of the three of

5 us. Are you asking what questions were they asking

6 me or what questions were they asking me and the

7 other two gentlemen?

8    Q. Well, let's distinguish. What questions did

9 they ask you as a group, or what, if anything, did

10 they ask you to do, by way of example, with respect

11 to producing identification?

12    A. They asked for our passports and driver's

13 licenses. They asked me how I knew them and what I

14 was doing on the plane. They asked them how they

15 knew each other, how they knew me, and what they

16 were doing on the plane.

17    Q. And during this questioning, they didn't

18 really physically separate you to any significant

19 degree?

20    A. No.

21    Q. So, by way of example, they would ask you

22 questions as a group, and then one of them might

23 focus on a particular question completely directed

24 only at you. Is that a fair statement?

56

1    A. Well, they would ask the question to one

2 person at a time.

3    Q. So, by way of example, then, a police

4 officer might ask you about your passport and then

5 ask one of the other gentlemen about his driver's

6 license and then ask a third gentleman how he knew

7 the other two? Is that about how it went, by way of

8 illustration?

9    A. Yes. They kept asking the same thing. They

10 asked each one of us what we were doing on the

11 plane. They asked each one off of us how we knew

12 each other, and they asked each one of us for our

13 documents.

14    Q. And with respect to the questions asked of

15 you about, first of all, for your documents, did you

16 produce them?

17    A. I gave them my driver's license.

18    Q. Did you have a passport with you?

19    A. No.

20    Q. You said driver's licenses?

21    A. License.

22    Q. I'm sorry. I thought I heard plural. What

23 else did you provide by way of identification, if

24 anything, at that time?

57

1    A.  Nothing.

2    Q.  And you were asked questions individually

3 about whether you knew these two gentlemen or not?

4    A.  Yes.

5    Q.  And how did you respond in substance?

6    A.  I did not know them.

7    Q.  And how many times were you asked the

8 question?

9    A.  Over and over again.

10    Q.  Was there one particular officer who seemed

11 to be focused on you or not?

12    A.  When we were on the other side of the door?

13    Q.  We're still talking about everything that

14 occurred on the jetbridge.

15    A.  I don't recall that there was one officer

16 focused on me.

17    Q.  Did there seem to be one officer who was

18 more or less leading the group or in charge?

19    A.  I don't remember.

20    Q.  How long did this go on, the questioning and

21 asking you for identification?

22    A.  Right outside the door?

23    Q.  Yes.

24    A.  I don't remember; however, my best guess

58

1 would be about ten minutes.

2    Q.  How would you describe the demeanor of the

3 police officers?

4    A.  I would say they were doing their job.

5    Q.  Were they polite?

6    A.  I wouldn't necessarily use the word

7 "polite."

8    Q.  What word would you use?

9    A.  I think they were acting professional.

10    Q.  They were professional?

11    A.  Right.  I mean, I know we weren't getting

12 any kind of information whatsoever from them.  So in

13 common vernacular, does that mean it's polite or not

14 when you're not getting any answers?  I think they

15 were doing their job.  They weren't telling us

16 anything as far as what was happening.

17    Q.  So when you say they were acting

18 professionally, does that mean that you thought it

19 was appropriate -- let me withdraw.  You thought

20 they conducted themselves appropriately under all

21 the circumstances at that time?

22    A.  Are you talk about specifically during that

23 one time during, the ten minutes outside --

24    Q.  That's correct.

59

1    A.  Yes.  My memory is that it was appropriate

2 at that time.

3    Q.  And at that time, did you have any

4 conversation with the other two gentlemen?  And by

5 "the other two gentlemen," we're talking about the

6 other people seated in Row 20.

7    A.  No.

8    Q.  What happened thereafter when this

9 ten-minute time increment came to an end?

10    A.  They took us to a small room where the

11 employees, TSA employees, were hanging their coats

12 and leaving their lunch bags.  There was a microwave

13 in the room.

14    Q.  Let me take you back to Exhibit 2 just to

15 try again to see if this helps us with the location.

16 Again, this is the diagram of the terminal, Page 1.

17 On the assumption you were at Gate 29, which would

18 be on the right of the document you're looking at,

19 do you recall coming up the jetbridge and whether

20 you turned left or right?

21    A.  I don't remember.

22    Q.  Do you recall going up or down any flights

23 of stairs to get to this room?

24    A.  I don't remember.

60

1    Q.  So you came up the jetbridge escorted by the

2 four troopers with the other two gentlemen who had

3 been in Row 20, correct?

4    A.  Yes.

5    Q.  And you then ended up in a small room?

6    A.  Yes.

7    Q.  Did it have windows?

8    A.  I don't think so.

9    Q.  And you don't recall whether you went up a

10 flight of stairs or down a flight of stairs?

11    A.  Can I ask him something?

12    Q.  Let's just finish this line of questioning.

13    A.  I don't remember.

14    *Q.  Okay.  If you don't remember, that's fine.

15 Do you recall whether you had to go back through the

16 security checkpoint?  Which, if you look at the

17 diagram, you'll be able to make out the word

18 "security," here in handwriting.  Do you recall if

19 you had to go back through security to get to this

20 room?

21    *A.  I think we didn't go through security.

22    *Q.  You did not?

23    *A.  My memory is that we did not have to go

24 through security.

61

1    MR. KIRKPATRICK: Michael, is this a
2  good time?
3    MR. FITZHUGH: Sure.
4    (Brief recess taken)
5    *(Questions and answers read)
6  BY MR. FITZHUGH:
7    Q. Is that still your best recollection?
8    A. My best recollection is that we did not go
9  through security to get to the small room where the
10  coats were being hanged and had the microwave.
11    Q. And describe what happened when you got to
12  this room.
13    A. We were held there for about two hours.
14    Q. When you say "held there," what do you mean
15  by that?
16    A. We were brought to that room and told to sit
17  there.
18    Q. Was it your then mental impression that you
19  could not leave if you wanted to?
20    A. Yes.
21    Q. So you felt that you were being detained?
22    A. Oh, yes.
23    Q. By force of law?
24    A. We were being detained.

62

1    Q. Describe the room for me in terms of size,
2  lighting, seating, conditions.
3    A. It was very narrow. It had lots of coats on
4  one side of the room, and it had some shelves,
5  including a microwave, on the other side of the
6  room.
7    Q. I believe you testified that you don't
8  recall it having a window.
9    A. Correct.
10    Q. Can you estimate the size of the room?
11    A. My best estimate would be that it was
12  approximately 5 feet by 18 feet, that's just an
13  estimate.
14    Q. 5 feet --
15    A. It was very narrow. It was narrow.
16    Q. Was there a -- well, what about the seating?
17    A. There were some chairs in there, but I
18  recall that it was difficult to pass if somebody was
19  in a chair to get to the bottom of the room.
20    Q. The bottom of the room?
21    A. The far end of the room. Like the door was
22  on one end of the room, and then it was long and
23  narrow.
24    Q. There was only one door?

63

1    A. I think so.
2    Q. Was there a table or just chairs?
3    A. There were chairs, and I think there were
4  some like shelves, like the microwave was sitting on
5  a shelf.
6    Q. Did it look like a place where people would
7  sit and eat food?
8    A. It was very narrow.
9    Q. So it appeared to be a larger closet?
10    A. Yes.
11    Q. Were all three of you gentlemen who had been
12  in Row 20 been taken there?
13    A. Yes.
14    Q. How many police officers accompanied you
15  there, if any?
16    A. My best guess would be three or four, and
17  they were in and out. We were never left alone.
18    Q. Were some or all of these three or four
19  police officers the same ones that you had
20  interacted with at the base of the jetway?
21    A. I don't know.
22    Q. You were kept in this room for two hours?
23    A. Approximately.
24    Q. And were the other two gentlemen there with

64

1  you the entire time?
2    A. Yes. Excuse me. Clarification. You mean
3  the two people that were sitting in Row 20?
4    Q. Yes. I use that phrase, the other two
5  gentlemen, so we don't get --
6    A. I just want to make sure you weren't talking
7  about cops. I was confused.
8    Q. I appreciate that. So we'll have an
9  understanding that when I refer to the "other two
10  gentlemen," I'm talking about the people in Row 20
11  with you. Okay?
12    A. Okay.
13    Q. So were the other two gentlemen with you the
14  entire time in this room?
15    A. Yes.
16    Q. Were you all or any of you interrogated?
17    A. Yes.
18    Q. Were you interrogated individually, as a
19  group, or both?
20    A. We were together when we were interrogated,
21  so I would say we were interrogated as a group just
22  because we were all together. The questions were
23  asked individually.
24    Q. How did they seat you?

65

1    A.    They didn't seat us. They just told us to
2    go into the room.
3    Q.    Did you sit at all during the two hours you
4    were in the room?
5    A.    Yes.
6    Q.    That's what I'm asking. Where were you
7    seated in the room?
8    A.    I don't remember exactly where. The three
9    of us were just there.
10    Q.    Next to each other?
11    A.    Yes. It was a very narrow room. There was
12    no way but not to be next to each other.
13    Q.    Describe the questioning and how it
14    progressed.
15    A.    The questioning of the officers?
16    Q.    Correct.
17    A.    They asked me how I knew them. They asked
18    them how they knew me. They asked us what we were
19    doing on the flight.
20    Q.    And what was the substance of your response?
21    A.    My response was that I didn't know them, and
22    my response was that I was coming home from a
23    holiday visit to my family.
24    Q.    Were you ever questioned individually?

66

1    A.    While I was in that room?
2    Q.    Yes.
3    A.    No. I was always asked questions directly
4    to my person, but they were right there.
5    Q.    I see. Do you recall being interrogated by
6    one officer in particular?
7    A.    While I was in that room?
8    Q.    Yes.
9    A.    I do not recall being interrogated by one
10    officer in particular.
11    Q.    Do you recall the last police officer who
12    interviewed you?
13    A.    While I was in that room?
14    Q.    Yes.
15    A.    No, I don't.
16    Q.    Do you recall the kinds of questions you
17    were asked, other than whether you knew the other
18    two gentlemen?
19    A.    I don't remember if I was asked any other
20    questions other than whether I knew the other two
21    gentlemen and what I was doing on that trip.
22    Q.    What about questions concerning your ethnic
23    background or nationality or citizenship?
24    A.    There was one officer who started asking me

67

1    questions like that, but that was after I got out of
2    there.
3    Q.    After you left the room?
4    A.    (Witness nods)
5    Q.    So when you were in the room you were asked
6    no questions about your ethnic origin, ancestry,
7    citizenship, racial makeup or anything like that?
8    A.    I don't remember. I remember the
9    questioning about how I knew them and how they knew
10    me, and they kept asking us what we were doing. For
11    the approximate two hours we were in the room, those
12    are the questions that I remember.
13    Q.    About what time -- well, did you ultimately
14    get out of the room?
15    A.    Oh, yes, thankfully.
16    Q.    What time was that?
17    A.    About two hours after.
18    Q.    Can you give me an estimate of the time of
19    day?
20    A.    I would guess 9:00.
21    Q.    9:00?
22    A.    9:30.
23    Q.    What happened after that?
24    A.    We were brought into the area immediately

68

1    outside of that room, and I think it was very close
2    to security. At this point, we were interrogated,
3    but separately. The two of them separate from me.
4    Q.    Were you standing or seated while you were
5    being interrogated at this point?
6    A.    Standing.
7    Q.    And describe the interrogation for me.
8    A.    I remember there was one officer who asked
9    me what my nationality was, and I said I was a
10    United States citizen. My recollection is that he
11    asked me the exact same question three or four
12    times, and I would respond the same way. And he
13    said, threatened, saying that I wasn't cooperating
14    with him and that if I didn't start cooperating with
15    him that I would have to flap my wings to get home.
16    And he raised his voice at me, and he said, "You
17    know exactly what I'm asking. What's your
18    nationality? What's your race?"
19    Q.    This was a male police officer?
20    A.    Yes.
21    Q.    A state police officer?
22    A.    I assume so.
23    Q.    Did he have the same uniform as the others
24    who had come on the plane?

73

1  did he tell you that? Let me rephrase the question,
2  that was terrible. At some point, the officer
3  indicated to you that he was finished interrogating
4  you; is that right?
5      A. Yes.
6      Q. What did he say to you, in so many words?
7      A. I remember him saying, "So you're just the
8  unfortunate one to be sitting next to them. Is that
9  what you are telling me?" And I responded, "Yes,
10  sir." And then he just kind of walk away from me.
11  I think he said, "Wait right there." And shortly
12  thereafter, he escorted the three of us over to the
13  American Airlines ticket counter.
14      Q. Could you see the other two gentlemen being
15  questioned by other police officers during the time
16  you were being questioned?
17      A. Yes.
18      Q. Did you overhear it?
19      A. No. I don't recall their conversation at
20  that time.
21      Q. Where in the terminal were you when this was
22  occurring again, this part --
23      A. Once we got out of the extended closet area,
24  we were right outside of that area.

74

1      Q. Was there a passenger seating area?
2      A. It was like a corridor.
3      Q. So was it part of the public area of the
4  terminal?
5      A. I would describe it as part of the public
6  area of the terminal.
7      Q. While you were being interrogated, could you
8  see other passengers?
9      A. I think so.
10      Q. So this was in plain view of other
11  passengers and people in the terminal?
12      A. Yes, I think so.
13      Q. Do you know if anyone else overheard this
14  conversation?
15      A. I don't.
16      Q. Do you recall seeing any kind of partitions
17  or barriers that would have enabled the area to be
18  somewhat segregated from the other people in the
19  terminal?
20      A. I don't remember.
21      Q. And you don't recall whether it was in a
22  seating area or not?
23      A. I think it was in a corridor.
24      Q. And I believe you testified that he then

75

1  escorted you and the other two gentlemen to the
2  ticket counter?
3      A. The American Airlines ticket counter, yes.
4      Q. If we could go back to Exhibit 2, yet,
5  again, and orient the first page, please, to
6  yourself. Does this help refresh your recollection
7  as to where you may have been having this
8  conversation with the police officer? The ticket
9  counter, as you see in handwritten notation on the
10  left, can you give me a sense, if this helps you, as
11  to how long a walk you had to get to the ticket
12  counter and where you came from?
13      A. No.
14      Q. After you left the corridor to go to the
15  ticket counter, about how long did it take you to
16  get there?
17      A. My best guess would be two or three minutes.
18  It was short.
19      Q. Was this police officer accompanying all
20  three of you by himself, or were there other police
21  officers with him?
22      A. I don't remember.
23      Q. Was he tall or short?
24      A. I think he was a little bit taller than me.

76

1      Q. And you don't recall his hair color?
2      A. No.
3      Q. Did you have any conversation from the time
4  you were released, as you called it, until you got
5  to the ticket counter?
6      A. With the person who was at the ticket
7  counter.
8      Q. No. During the walk between from the
9  corridor where you were interrogated until you got
10  to the ticket counter, did you have any conversation
11  with anyone?
12      A. I don't think so.
13      Q. Not with him?
14      A. I don't think so.
15      Q. What about the other two gentlemen?
16      A. I don't think so.
17      Q. So in a couple minutes you got to the ticket
18  counter?
19      A. Yes.
20      Q. What happened then?
21      A. We talked to the person at the ticket
22  counter.
23      Q. You say "we" --
24      A. All three of us were brought to the ticket

77

1  counter at the same time.

2    Q.  Who spoke to whoever was at the ticket

3  counter first?

4    A.  I don't remember.

5    Q.  Do you recall whether this police officer

6  said anything to anyone behind the ticket counter?

7    A.  The police officer said anything to the

8  person at the counter, is that the question?

9    Q.  Yes.

10    A.  Yes.

11    Q.  You just said that no one said anything.

12    A.  We walked to the ticket counter, and I don't

13  remember saying anything, and I don't remember the

14  other two guys saying anything.  But the police

15  officer kind of brought us to the ticket counter

16  person and said something to her.

17    Q.  What did he say?

18    A.  I don't remember.

19    Q.  Could you hear what he said?

20    A.  Yes.

21    Q.  What's the gist of it?

22    A.  I don't remember what he said.

23    Q.  How long a conversation did he have?

24    A.  Brief, a minute or two.

78

1    Q.  So you could overhear it, but now you can't

2  recall it, or you couldn't hear it at all at the

3  time?  Which is it?

4    A.  I think I could hear it at that time, but I

5  don't remember what his words were.

6    Q.  And you don't remember the substance?

7    A.  I think it was something about relating to

8  the fact that -- I remember him saying she'll -- I

9  think I remember him saying something like, "They'll

10  take care of you from this point forward," that's

11  about all I remember.

12    Q.  And what happened after that?

13    A.  We talked to the woman who -- I think her

14  name was Delilah.

15    Q.  Delilah MacLeod, maybe?

16    A.  I did not know her last name then.

17    Q.  Did you approach her one after the other or

18  all three of you together at first?

19    A.  We were all taken to the ticket counter as a

20  group, and I don't remember which one of us three

21  talked to Delilah first, but we were all looking for

22  how we were going to get home.

23    Q.  With regard to you, what was the

24  conversation with Delilah?

79

1    A.  I found out there was an afternoon flight,

2  and she said it looked like there was seating

3  available.  She informed me that she wasn't going to

4  be able to resolve anything, that she had to wait

5  for her supervisor.

6    Q.  What happened after that?

7    A.  We waited for the supervisor.  I tried to

8  distance myself a little bit from them, because I

9  felt that all along we were being treated as if we

10  were a group of three, so I tried to not stand near

11  them, but I was in the general area with them.

12    Q.  Did you have any conversation with them up

13  to this point?

14    A.  Oh, in the room where we were for two hours,

15  yes.

16    Q.  You had conversations with them?

17    A.  You didn't ask me that earlier.  I did have

18  conversations with them when I was in the room with

19  them.

20    Q.  But the police officer was always present?

21    A.  Oh, yes.

22    Q.  So you were allowed to talk with them even

23  though the police officer was there?

24    A.  Yes.  It was mostly them trying to talk to

80

1  me about what was going on, and I kept telling them

2  I didn't understand what was going on.

3    Q.  What other conversations did you have with

4  them before you got to the ticket counter?

5    A.  What I remember is our first conversation

6  ever is when we were in the room together for the

7  two hours.

8    Q.  And other than talking about trying to

9  determine what was going on, did you have any other

10  discussions with them?

11    A.  No, I don't remember any other

12  conversations.

13    Q.  And at the ticket counter, did you have any

14  discussions with them?

15    A.  I don't think so.  I don't remember if we

16  did.  We were all trying to get home.  Well, I was

17  trying to get home.  I don't know what they -- they

18  were trying to get to Florida.  I don't know what

19  their plans were.

20    Q.  And so that's what you recall about getting

21  to the counter up to that point?

22    A.  I recall having been interrogated for about

23  ten minutes right outside the door.  I recall having

24  been led to the TSA closet kind of room, and then we

81

1  were there for about two hours. Then we were for
2  the first time interrogated kind of separately just
3  outside of the TSA room. Then we were brought to
4  this ticket counter, and I remember the police
5  officer saying, "They'll take care of you from now
6  on." Then we were all trying to figure out how we
7  were going to get home, and the ticket counter
8  informed -- answered both my questions and their
9  questions that we had to wait until the supervisor
10  came.
11      Q. And what happened after that?
12      A. Well, we waited until the supervisor came,
13  and she came approximately 20 minutes later.
14      Q. And you believe her name was Nicole?
15      A. Yes.
16      Q. Can you describe other physical
17  characteristics?
18      A. Yes. Her, I remember a little better. I
19  think she was dressed in like a two-piece suit, and
20  I think she was blond.
21      Q. Did you have some discussion with her?
22      A. Yes.
23      Q. What was the discussion?
24      A. Well, first she had a discussion with the

82

1  other two guys.
2      Q. Did you overhear it?
3      A. Yes.
4      Q. What was the gist of it?
5      A. She informed them that they were being
6  refunded their money, and she asked them -- no. She
7  informed them that they were being refunded their
8  money, and they asked Nicole how they were going to
9  get home, and I recall Nicole telling the two of
10  them that they had to make their own arrangements,
11  and they objected that it was not correct for
12  American Airlines to just not service them and not
13  help them to find other ways to get home. And I
14  remember one of them saying something like,
15  "Whatever happened to customer service," and I
16  remember Nicole, and I paraphrase, "Customer service
17  ended the minute you said what you said on the
18  plane." That was the conversation with the two
19  others. I was near them. I overheard the
20  conversation. It was a conversation between Nicole
21  and the two of them.
22      Q. Do you know what she was referring to?
23      A. No.
24      Q. Because you had been asleep on the plane?

83

1      A. I had no idea what she was referring to.
2      Q. How did they react?
3      A. They were upset.
4      Q. What happened after that? At some point,
5  did they leave the --
6      A. Well, at some point they left, and then she
7  asked me to approach the counter.
8      Q. You approached the counter to talk to her?
9      A. Yes.
10      Q. Was Delilah still there with her, or was she
11  working alone?
12      A. I think at this point Delilah was not there.
13      Q. So what happened with respect to you and Ms.
14  Traer?
15      A. She asked me for my credit card, and I asked
16  her why she needed my credit card, and she said
17  because she was refunding my trip, return trip, just
18  the return trip. And I asked, "Can you tell me why
19  you're refunding my return trip?" She said,
20  "Because American Airlines decided to decline me
21  service." And I asked why American Airlines decided
22  to decline me service, and she said it was based on
23  what I said as documented by the information in the
24  file from the captain, the flight attendant, the

84

1  neighboring passengers, the TSA, the police. I
2  objected. I said that I didn't do anything wrong,
3  you know, if she could give me more information.
4  She said that she had no further information, and if
5  I needed any further information I needed to contact
6  corporate American Airlines directly, and she said
7  that one of the ways that I might want to do so is
8  through the Web site. She said it might be faster
9  to contact them through the Web site, but she said
10  that she had no further information, and I had to
11  contact American Airlines directly.
12      Q. Did you have reason to believe that she was
13  making any of this up?
14      A. No.
15      Q. Is it your contention in this lawsuit that
16  Ms. Traer's actions were based upon unlawful
17  discrimination?
18          MR. KIRKPATRICK: I'll object to the
19  extent that it calls for a legal conclusion.
20      A. You're asking me to tell you what's legal
21  and not legal.
22      Q. No. I'm asking you if you believe her
23  actions were motivated by unlawful discrimination.
24          MR. KIRKPATRICK: Same objection.

1  Cerqueira, isn't it true that if we look at the
2  third line from the bottom on Page 1, it says,
3  starting with the fourth, "Specifically, Mr.
4  Cerqueira alleges that on December 28, 2003,
5  Respondents removed him from flight 2237 and refused
6  to provide transportation to him on account of his
7  actual or perceived race, color, religious creed,
8  national origin and/or ancestry." That's what it
9  says, isn't it?
10     A.  That's what it says.
11     Q.  And so you're saying that Nicole Doe is one
12  of those respondents who did this. Isn't that what
13  it says here?
14         MR. KIRKPATRICK:  Same objection.
15     A.  I feel like there is no rational reason why
16  I was taken off the plane. There is no rational
17  reason why I was denied service. There was no
18  rational reason why I was not put on the next
19  flight. There was no rational reason why I was
20  denied service indefinitely. Because at that time,
21  it was -- to my knowledge, it was an indefinite why
22  I was denied service. There was no rational reason.
23  And because I look like the guy sitting next to me,
24  somewhat, I have a similar complexion to them, I

94

1  believe that I was discriminated against.
2     Q.  So when you say "no rational reason," the
3  records we see in No. 19, your PNR on Page 2 and No.
4  20, don't provide Ms. Doe with a rational reason,
5  meaning Ms. Traer?
6         MR. KIRKPATRICK:  I'll object to that
7  question because it calls for a legal conclusion,
8  speculation. I'll object to the form. You can
9  answer if you can.
10     A.  Isn't that a question to Ms. Doe?
11     Q.  No, it's a question to you. You just said
12  that -- we can call her Ms. Traer, didn't provide a
13  rational reason. Isn't that your testimony, that
14  she had no rational reason?
15     A.  I feel that there was no rational reason for
16  me to have been removed from the flight or to have
17  been denied service once again at the counter or to
18  be denied service indefinitely because I wasn't told
19  when I was going to be able to fly again. There was
20  no rational reason.
21     Q.  And you testimony stands even in light of
22  what we see in Exhibits 19 and 20? Is that your
23  testimony?
24     A.  I feel there was no rational reason.

1     Q.  So if what's recited in Exhibit 20, for
2  example, is what Ms. Traer is looking at, that
3  doesn't give her a rational reason?
4         MR. KIRKPATRICK:  Objection.
5     Q.  If she's relying on what information is in
6  this document?
7         MR. KIRKPATRICK:  Same objection.
8     A.  I feel like I need legal counsel to answer
9  that question.
10     Q.  I'm asking if what's in Exhibit 20, the
11  detailed note, is what Ms. Traer relied upon, are
12  you saying she still had no rational reason to deny
13  you service?
14     A.  I think you're asking me a question that's
15  very legal, and I'm not a lawyer.
16     Q.  No. I'm asking you to clarify what you just
17  said. It was your testimony where you said she had
18  no rational reason. You said that, didn't you?
19     A.  I feel that there was no rational reason for
20  me to have been denied service, taken off the plane,
21  denied service indefinitely, not put on the next
22  plane.
23     Q.  And I'm testing that assertion by asking you
24  to look at Exhibit 20, which is the record that Ms.

96

1  Traer was looking at the time.
2     A.  On page --
3     Q.  Exhibit 20.
4     A.  I'm looking at AA 021.
5     Q.  "PAX reportedly exhibited suspicious
6  behavior in airport toward captain, and on aircraft
7  observed by No. 2 flight attendant based Sally
8  Walling."
9     A.  I am saying I did not engage in suspicious
10  behavior.
11     Q.  I understand that. But if this is what Ms.
12  Traer is relying upon, is it still your testimony
13  she had no rational reason for doing so?
14         MR. KIRKPATRICK:  Objection. I believe
15  the question has been asked and answered.
16     Q.  Is it your testimony that Ms. Traer should
17  not rely upon corporate records in implementing
18  these decisions?
19         MR. KIRKPATRICK:  Objection.
20     A.  I don't know who made the decision.
21     Q.  But why is it unreasonable for Ms. Traer to
22  rely upon this record in making the decision to deny
23  you further passage that day?
24         MR. KIRKPATRICK:  Objection.

101

1 the same objections.  The witness has indicated that
2 he has answered the question to the best of his
3 ability.  This is not productive use of our time,
4 and I think we're going to have to either move on or
5 take it to the judge.
6            MR. FITZHUGH:  I agree.
7     Q.  Are you going to answer the question?
8            MR. KIRKPATRICK:  He has already
9 answered.
10     Q.  Why did you name Nicole Traer as an
11 individual defendant?
12            MR. KIRKPATRICK:  Same objections.
13     A.  I've already answered.
14     Q.  What did she do to you at the counter that
15 day that was evidence of unlawful discrimination?
16            MR. KIRKPATRICK:  Same objection.
17            MR. FITZHUGH:  No, that's not the same
18 question or even close.
19            MR. KIRKPATRICK:  I know.  I'm objecting
20 to the question.
21     Q.  What did she do at the counter that day that
22 indicated to you that she was engaging in unlawful
23 discrimination?
24     A.  There was no rational reason for American

102

1 Airlines to have taken me off the plane.  There is
2 no rational reason for Nicole Traer to have denied
3 me service that day, and it was left indefinite.
4     Q.  Why do you say that, that it was left
5 indefinite?
6     A.  Because I specifically asked, "How long am I
7 being denied service?"  And Nicole Traer told me
8 that she had no further information, and if I needed
9 further information that I needed to contact
10 American Airlines.  She suggested that I use the Web
11 site to contact American Airlines.  She said, "You
12 can contact in any way you want, but if you use the
13 Web site, it might be faster."  So she did not
14 answer my question as to how long I was denied
15 service.
16     Q.  What made you think it was more than that
17 day?
18     A.  Because she did not tell me how long it was.
19 I asked the question, and she did not have an answer
20 for me.  She told me to contact American Airlines
21 corporate.
22     Q.  Did you have any other conversation with her
23 at that time?
24     A.  No.

103

1     Q.  What did you do?
2     A.  What did I do next?
3     Q.  Yes.
4     A.  I tried to figure out what I was going to do
5 next.
6     Q.  Did you --
7     A.  As in getting on another plane.
8     Q.  Did you contact American that day?
9     A.  The next thing I did was to try to find
10 another plane.
11     Q.  Did you do that?
12     A.  I contacted several airlines to try and find
13 another plane.  I wasn't successful in finding
14 another plane because people were asking for a lot
15 of money, $600, $700, $800, $900.  The airlines
16 wanted that much money to fly out
17     Q.  Did you contact American Airlines that day?
18     A.  I don't think so.
19     Q.  Would you turn to Exhibit 4.
20     A.  I know I e-mailed them at some point.  Oh, I
21 went to get my bags.  Is that what you're saying?
22     Q.  Does this document refresh your recollection
23 as to whether you contacted American Airlines that
24 day?

104

1     A.  I went to get my bags and I sent them an
2 e-mail.
3            MR. KIRKPATRICK:  John, just answer the
4 question that's asked.
5     A.  Is this dated 12/28?
6     Q.  If you look at the top right, it might help
7 you.
8     A.  This seems to refresh my memory that it was
9 that date that I sent the first e-mail out.
10     Q.  Where did you send it from?
11     A.  From my mother's house on my computer.
12     Q.  At 3:30 in the afternoon presumably.  It
13 says 14:31, so would that be about right?
14     A.  Yes.
15     Q.  So you got back to your mother's house and
16 sent an e-mail that afternoon to American?
17     A.  Yes.
18     Q.  And, again, you refer to Nicole as a
19 supervisor, said you were "denied service because of
20 something I said on the plane, and when I asked her
21 what I was being accused of saying, she said for me
22 to contact customer service online for more
23 information."  Correct?
24     A.  Okay.  Here it says that Nicole said I was

125

1  who asked you all about your nationality, is it?

2      A. Did the police ask me about my nationality?

3      Q. Yes.

4      A. Yes, the police asked me about my

5  nationality

6      Q. Looking at Pages 2 and 3, that's the

7  colloquy you had with the police officer who raised

8  his voice and makes inappropriate remarks, correct?

9      A. I had an incident with the police who raised

10 his voice at me, correct.

11     Q. Did any personnel at American ever inquire

12 about your nationality or your race?

13     A. Okay. Let's be clear about what my

14 interaction with the personnel from American --

15     Q. Just answer yes or no, please.

16     A. My interaction with American Airlines was

17 limited to me asking for an exit row or bulkhead

18 seat. Somebody asking for my boarding pass, and

19 Nicole telling me that I was denied service and not

20 offering any additional information. That doesn't

21 say that they did or they did not discriminate me,

22 because it was very, very limited conversation.

23     Q. My question was whether you were ever asked

24 by anyone at American anything about your race or

126

1  national origin or ethnic background. The answer is

2  no, isn't it?

3      A. During the day of the incident, no one

4  specifically asked me about my national origin or

5  race.

6      Q. We will wrap up in a second to go to lunch,

7  I promise. I just want to ask you about Exhibit 21,

8  which was produced by your counsel in discovery.

9      A. 21?

10     Q. Yes, State Police Administrative Log Note,

11 do you recognize it?

12     A. I've never seen this document. (Witness

13 reviews document) I'm not sure if I've seen this

14 document.

15     Q. Okay. So you don't recall obtaining it on

16 your own?

17     A. I didn't obtain this on my own.

18     Q. So it was likely obtained by your counsel?

19     A. I did not obtain this document on my own.

20     Q. Did you ever consider bringing an action

21 against the state police?

22         MR. KIRKPATRICK: I'll object to the

23 extent it calls for any of our communications. But

24 without reviewing that, you can respond.

127

1      Q. Mr. Cerqueira?

2      A. Did I ever take any action to?

3      Q. No. Did you ever consider bringing an

4  action against them? I'm not trying to intrude into

5  conversations with counsel. I'm just asking you in

6  your perception of what happened that day.

7      A. Anytime that I considered that, I felt that

8  ultimately it was American Airlines that was

9  responsible for the incidents on that day and not

10 the police.

11     Q. Because?

12     A. Because it was American Airlines that

13 assumed that I was traveling with those people and

14 that I was with those people. They considered us

15 the whole time, from my perspective -- from my point

16 of view, American Airlines considered the three of

17 us as traveling together, as being together

18 traveling, as being one of a group. They treated us

19 like a group, and that is the reason why the police

20 officers were treating us like a group. And the

21 other gentlemen were foreigners, and since I look

22 like them, that was the only reason why I got

23 considered to be part of that group. If I had been

24 blond with blue eyes and Scandinavian looking, they

128

1  wouldn't have made that assumption.

2      Q. And you're sure of that?

3      A. That is how I feel about what happened.

4      Q. And what was your evidentiary basis for

5  that?

6      A. There is no rational reason for me to have

7  been moved off the plane, for me to have been denied

8  service indefinitely, or me not having been put on

9  the next flight.

10     Q. So it's an absence of evidence that would

11 admit to some other conclusion --

12     A. And the fact that I look like these guys. I

13 look like them, somewhat.

14     Q. And the conduct of the state police, even

15 though at times it was hostile and unprofessional,

16 was not any part of the consequence you suffered

17 that day?

18     A. I believe American Airlines was responsible

19 for the fact that I was detained, and I hold

20 American Airlines responsible for what happened that

21 day.

22     Q. Including the unprofessional actions of the

23 state police?

24     A. Well, I think that one of them was

**133**

1    Q. But my question is, what did the captain do
2  wrong based upon your knowledge of the incident?
3    A. If I didn't look like the guys next to me, I
4  wouldn't have been removed from the flight. If I
5  didn't look like those guys, I wouldn't have been
6  denied the opportunity to get on the next flight.
7  If I didn't look like those guys, I wouldn't have
8  been denied service indefinitely.
9    Q. But --
10    A. As far as who has responsibility for what,
11  that's a legal issue.
12    Q. No, it's --
13    A. As far as whether it's the captain that is
14  responsible or American Airlines is responsible or
15  this American Airlines employee or who made the
16  decision or who doesn't make the decision, that's
17  for you guys to figure out.
18    Q. But my question is specific, and I don't
19  want to have to come back for a second day of your
20  deposition, so if you could stay with me --
21    A. I don't either.
22    Q. I understand. With respect to the actions
23  taken by the captain, and I understand you're
24  position that you didn't do anything wrong, but my

**134**

1  specific question is, what facts did the captain
2  undertake, to your knowledge, that caused you to
3  believe that he acted improperly?
4    A. To be honest with you?
5    Q. Yes.
6    A. I know nothing about what the captain's
7  decision-making process was. So I think you're
8  going to have to talk to him about that.
9    Q. Well, are you going to be here when he's
10  deposed?
11    A. I don't know. Am I?
12    Q. You have a right to be. Do you have plans
13  to hear his side of the story?
14    A. Well, if you're telling me I have a right to
15  be here, I can tell you that that's news to me, and
16  I haven't made a decision as to whether I would want
17  to be.
18    Q. Well, would you want to be present when he
19  gives testimony --
20    A. I haven't made a decision, and I don't feel
21  like I need to make a decision at this time.
22    Q. Do you have any interest in his side of the
23  events in question, in hearing it?
24    A. Sure.

**135**

1    Q. You do. What about the other people? Have
2  you ever spoken to any of the other people who were
3  involved in the incident?
4    A. You mean the American Airlines personnel?
5    Q. That's correct, including the people you
6  named as defendants.
7    A. I've never spoken to them.
8    Q. Did you have any interest in hearing their
9  side of the story or finding out why they undertook
10  the actions that they did that day before you filed
11  this lawsuit?
12    A. Yes.
13    Q. You did have an interest. What efforts did
14  you undertake to learn their side of the story?
15    A. I wrote a letter to American Airlines on the
16  Web site that afternoon, and a couple of days later,
17  I hadn't received a response yet, and I wrote
18  another letter to American Airlines on their Web
19  site.
20    MR. FITZHUGH: I don't think we have
21  that.
22    MR. KIRKPATRICK: I believe it was
23  produced. There were two e-mails but only one
24  response, so I think there are two e-mails.

**136**

1    MR. FITZHUGH: Well, I know that we have
2  one of them, which is Exhibit 4.
3    Q. No. 4, Mr. Cerqueira, if you go back --
4    MR. KIRKPATRICK: That might be it.
5    MR. BRAMLETT: This is it.
6    MR. FITZHUGH: This is the first e-mail
7  sent.
8    MR. BRAMLETT: No, that's the follow-up.
9    Q. Exhibit 4 was sent on the day in question,
10  correct, the first e-mail?
11    A. Exhibit 4, in my book, is the first one.
12    Q. And then you sent a subsequent e-mail and
13  didn't get an answer until you heard from Ms.
14  Womack; is that correct?
15    A. Can I have the date?
16    Q. I'm looking for it. Bear with me. It's
17  CRQ7.
18    A. 1/5/2004, and the response from American was
19  on 1/6/2004.
20    MR. BRAMLETT: I think that's might be
21  the print date.
22    Q. Do you think that's the print date or the
23  date you generated it, Mr. Cerqueira?
24    A. I think they're one in the same.

230

ERRATA SHEET

Case Name:  Cerqueira vs. American Airlines, Inc., et al.

Witness Name:  John D. Cerqueira

Deposition Date:  April 4, 2006

| Page No. | Line No. | Change |
|---|---|---|
| 18 | 6 | "Infrequent" to "Frequent." |
| 19 | 6 | Replace "50" with "45-50" |
| 32 | 15 | "She did." to "Someone did." |
| 50 | 18-19 | delete "and they did not give us" |
| 77 | 4 | "I don't remember." to "A police officer." |
| 77 | 22 | Add: "But the gist of it was that we were cleared for travel." |
| 98 | 21 | "specific" to "suspicious" |
| 109 | 20 | Add: "The police would not have taken us to the ticket counter and said that we were set to go if they thought we posed a threat." |
| 110 | 11 | Add: "The ticket counter personnel certainly knew that we were released by the police and cleared for travel." |
| 112 | 18 | change "assumption" to "statement" |
| 119 | 20 | Add: "I am saying that I was discriminated against because my color and physical appearance caused American Airlines to believe that I was Middle Eastern.  That may also have caused them to believe that I was Muslim." |
| 124 | 14 | change "seat" to "room" |
| 126 | 3 | Insert "from American Airlines" after "no one" |
| 132 | 24 | add "wrong" after "anything" |
| 157 | 1 | add "It was fine." |
| 167 | 20 | Change "yes" to "I started treatment seven months before I filed this lawsuit." |
| 203 | 24 | change "taxpayer" to "tax preparer" |
| 205 | 1 | change "work with him" to "work with me" |

John Cerqueira
5/24/2006

| 212 | 12 | add "and the psychological problems resulting from the incidents" |
| 215 | 15 | add "I have spent about $2,300.00 on medical care since the incident. This includes office visits to Dr. Blumenthal and Dr. Faulk, and the cost of prescription medications. With anticipated future treatment, I estimate my total out-of-pocket medical expenses associated with the incident to be about $10,000.00." |
| 228 | 4 | change "sat" to "stood" |

I do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections, if any, appear in the attached errata sheet signed under the pains and penalties of perjury by me.


John D. Cerqueira                    Date

*John D Cerqueira*
5/24/2006

# Exhibit 2

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Cerqueira Deposition Exhibit Nos. 1 & 21

# Cerqueira Deposition
# Exhibit 1



# Software Contractors' Guild

**Profile Page**

# John Cerqueira, SAP Consultant
# Reliable Technical Solutions, Inc.

 <u>View The Contractor's Resume</u>

---

## Availability Date: **Apr 03 2006**
<u>**Click here to Request Contact information**</u> (no fee).
Current Address:    Aventura   FL   USA

Additional Contract Information:
**Open to travel**

---

Geographical Areas where I will accept work:

> **<u>Canada</u>**
> **<u>Central America</u>**
> **<u>Mexico</u>**
> **<u>South America</u>**
> **<u>USA</u>**
> **<u>World Wide</u>**

(Travel worldwide)
☑ Willing to work over the internet
☐ Willing to Relocate
☐ Work Offsite ONLY
Citizenship: **USA and EEC**

---

Years of experience: **10**
List of Skill sets:

> **<u>Applications</u>**
> **Applications:<u>Accounting Software</u>**
> **Applications:Accounting Software:<u>QuickBooks</u>**
> **Applications:Business Applications:<u>MS Office</u>**
> **Applications:<u>Crystal Reports</u>**
> **Applications:<u>SAP</u>**
> **Applications:SAP:<u>BIW</u>**
> **Applications:SAP:<u>ERP</u>**
> **Applications:SAP:<u>FI/CO</u>**

**Applications:SAP:<u>Sales/Distribution</u>**
**Applications:<u>SBT</u>**
**Applications:SBT:<u>Accounts Payable</u>**
**Applications:SBT:<u>Inventory</u>**
**Applications:SBT:<u>Manufacturing</u>**
**Applications:SBT:<u>Sales Orders</u>**
**Consulting:<u>SAP</u>**
**Consulting:SAP:<u>Sales/Distribution</u>**
**Consulting:<u>Software Architect</u>**
**Consulting:<u>System Configuration</u>**
**Consulting:<u>System Upgrade/troubleshooting</u>**
**Consulting:<u>Training Development</u>**
**Data:<u>Database Design Training</u>**
**Industry:<u>Defense</u>**
**Industry:<u>Manufacturing</u>**
**Industry:<u>Pharmaceutical</u>**
**Industry:<u>Telecommunications</u>**
**Languages:<u>ABAP/4</u>**
**<u>Systems Integration</u>**
**<u>Training</u>**
**Training:<u>SAP</u>**

---

Acceptable Contract arrangements:
- ☑ I do use contract agents/recruiters.
- ☑ I am an Independent Corporation.
- ☐ I am a Limited Liability Company (LLC).
- ☐ I use an Umbrella company as employer of record.
- ☐ I am an Independent Sole Proprietor (1099).
- ☐ I can be an Employee of an Agent (W2).
- ☑ I can be convertible to Employee of Client.
- ☑ I am also looking for part-time work.
- ☐ I will also bid fixed price work.

---

Software Contractors' Guild (www.scguild.com)
**TO MODIFY:**



(Requires JavaScript to be enabled on your browser)

---



Member number:6619
Last Updated: Feb 13 2006
Member since: Jul 05 2001
Membership expires:Mar 08 2007
(Member in Good Standing)
Hit Statistics on **This Page** and the **Resume Page**.

| |
| --- |
| **To PAY DUES by Credit card or PayPal (Click "Modify This Page", login, go to bottom) If you don't know the password, contact us to have it reset.** |

The Legal Disclaimer.

Copyright(c) 1995 - 2005 Software Contractors' Guild, Post Office Box 257, Nottingham, NH USA 03290-0257



Reliable Technical Solutions, Inc.
20533 Biscayne Blvd #355
Aventura, FL 33180
saptech@lycos.com

JOHN D. CERQUEIRA

SUMMARY:    Thirteen years of IT experience, nine years of which as an SAP consultant working with SAP products

Certified by SAP– BW 3.5 (2004), SEM Strategic Enterprise Management (2001), SAP CRM
Customer Relationship Management (2000), BW 2.0B (1999), FI/CO (1998) and ABAP/4 (1996)

---

## SAP EXPERIENCE

SAP R/3 4.7, Florida
Oct 2005 – Present
- Supported client during realization and go-live phases of new project which added Production Planning (PP) and Product Costing (CO-PC) functionality to their existing SAP R/3 system.
- Developed SAPscript solutions for Purchase Order output, RFQ output, and Materials Management Goods Issue output.
- Supported finance users with Report Painter development.
- Supported production problems identified after a recent SAP 4.7 upgrade, including Vertex integration issues.
- Supported Logistics Invoice Verification and Accounts Payable, including Purchase Order Account Assignment, Invoice Processing, Automatic Payment Processing and AP reporting.
- Supported Asset Accounting production problems, including asset master maintenance, depreciation, AA module reporting.
- Copied a variety of standard SAP reports to custom report objects and added ALV (ABAP List Viewer) functionality, thus making the reports more user-friendly given the fact the client does not have SAP BW in-house.
- Consulted on various options for consolidated financial reporting, both via SAP solutions and non-SAP solutions.

SAP SEM,BW, and R/3 Instructor, Various locations
March 2004- October 2005
- Delivery of SAP training courses in SEM, BW, and R/3 at SAP training facilities in the Americas and Europe, as well as client-site training courses in the US and UK
- Courses taught include BW-Based Consolidations (SEM240), SAP/BW Analysis & Reporting (BW305), SAP/BW Staging (BW340), BW Modeling (BW330), SAP BW and SAP R/3 Integration (BW350), SAP SEM and SAP BW Integration (SEM200), SEM Overview (SEM010), SEM Corporate Performance Monitor (SEM220), Business Planning and Simulation (SEM240), General Ledger Configuration Workshop (ACNA02), and SAP FI Closing (AC205)

IBM Venezuela, Caracas, Venezuela
October 2004-November 2005
- Spot-consulting engagement to review BW-based SEM-BCS configuration for IBM's client in Caracas. Reviewed configuration of data basis and consolidation area, extraction of R/3 data for consolidations, and configuration relating to month-end close (data collection, currency translation, eliminations, consolidation of investments, etc.)

City Public Service, San Antonio, TX
SAP BW / Crystal Reports 9, December 2004
- Contacted by Crystal Decisions business partner to lead a class on report development with Crystal Reports with SAP BW data for public utility company, class done on-site at client location

SAP, Belgium
SEM200: Strategic Enterprise Management/BW Integration, December 2003
- Contracted by SAP Belgium to teach SEM200 (SEM version 3.2) to class of seven in Brussels.

Codessa, Consulting Company, Central America
SAP R/3 Release 4.7 and 4.6C, September 2003-November 2003
- Hired by former client, a growing consulting company in Central America, to provide production support for existing R/3 implementation at a textile manufacturer as well as consulting for new R/3 implementation at a food and beverage company.
- At the textile manufacturer, provided production supported as follows:
    - Helped the end-client solve production problems relating to R/3 software upgrade issues
    - Made recommendations regarding profile (authorizations) management
    - Taught the end-client SAP support team CATT and ABAP query
    - Implemented a user exit to add customer-specific controls regarding the creation of production orders
    - Taught end-client users to use Material Management (MM) stock overview report, Material Management transactions report, and other logistics reports to resolve problems with purchase order returns.
- The Central America based consulting company client, based on my successful project management experience with them in the past (see below – Bottler, Latin America, SAP FI/CO Functional Lead, November 1998-July 1999), requested me to implement SD for their food and beverage client,. I contracted with a US-based SD consultant for us to implement, together, SAP R/3's SD module for the end-client. We configured four different, complete sales order processes described below:
    - A standard sales order type featuring sales document processing and subsequent delivery and billing. Pricing procedure configuration featured custom enhancements, where user-exit development was required. The pricing procedure successfully automatically calculates, based on special customer requirements, packaging charges on the orders.
    - A consignment fill-up order type featuring the delivery trucks as sold-to,ship-to,and bill-to partners. The sales order and delivery on the consignment fill-up order required transferring inventory from both bin-managed storage locations and non-bin-managed storage locations. The delivery/posts goods issue process moved the inventory to customer consignment status.
    - A consignment pick-up sales order document and delivery "put-away" process requiring WM Warehouse Management transfer orders. This consignment pick-up process processed returns from the delivery trucks. These returns needed, per customer requirements, to return the inventory to a special storage location we configured to be managed by individual bins per delivery truck route.
    - A consignment sold sales order process. In this case the sold-to parties were the delivery truck routes but the ship-to,bill-to, and payer parties were the final customers.
We configured automatic account assignment for post goods issues and billing for the above sales order processes.
We configured outputs for SD and designed SAPscripts for sales documents.
We provided documentation on configuration, on SAPscripts, on pricing procedure enhancements, and on SD module application transactions.
We trained consultant of local consulting company to take over the project as we rolled off.

SAP, Miami, Florida
SEM010: SEM Overview, September 2003
- Hired by SAP to teach SEM010 at SAP's offices in Miami to management team of Bell South International. As Bell South International is implementing Business Planning and Simulation (BPS) and Business Consolidation (BCS) in its first phase, we focused on these modules and how to implement them.

Kimberly-Clark, Tennessee
SAP BW 3.0B and SAP R/3 Release 4.7 Consultant working with Accounting Team, Feb 2003-Sept 2003
- Configured document splitter in Special Purpose ledger with R/3 Release 4.7 in order to meet business requirement to split lines of accounting documents according to a new custom field. Business requirement was that if the new custom field was blank on a given line item, that line item was to be split proportionally in order to balance the accounting per the new custom field (total debits = total credits per the new custom field).
- Worked with team responsible to design SAP BW Reporting to combine legacy and R/3 transactions to meet legal, sector, and tax reporting requirements. Completed extensive business procedure analysis and documentation and designed data models to accomplish accounting to reporting process goals. Supported complex requirements of a phased roll-out throughout North America of SAP R/3 on a plant by plant basis
- Configured Accounts Receivable, Accounts Payable, Purchasing (Stock Transport Orders), Goods Issues, Goods Receipts, Billing, and Invoice Verification with the goal of netting of inter-company receivables with inter-company payables through the automatic payment program
- Configured Special Ledger prototype featuring R/3 reporting characteristics and custom characteristics. Designed user exits to derive custom characteristics for reporting on Financial and Controlling processes such as journal entries, accounts receivable transactions, accounts payable transactions, assessments, settlements of orders and projects, goods issues, goods receipts, goods movements due to confirmations, CO cost allocations, and other transactions

Ergon, Oil Company, Mississippi
SAP R/3 4.6C EC-CS Lead Consultant, BW 3.0B Upgrade Technical Consultant, Sept 2002 – January 2003
- Configured Master Data, Data Monitor, Consolidation Functions, Manual Adjustments for EC-CS module
- Configured FI/CO and EC-CS integration for realtime update for consolidation units
- Created Report Painter and Drilldown Reports for FI-GL, EC-PCA, EC-CS, and Cost Center Accounting
- Extended of EC-CS database with custom characteristics to meet cash flow reporting requirements
- Supported BW team on 3.0B Upgrade: configured RFC connection for source R/3 system, defined source system in BW administration workbench, tested custom marketing infocube and SD infocube in upgrade, troubleshooted master data integrity issues for infoobjects, identified need for patch level upgrades and implemented other OSS notes

SAP Andina y del Caribe, Caracas, Venezuela
BW220: R/3 – BW Integration, September-October 2002
- Taught BW220, SAP official course regarding R/3 and BW integration configuration to fifteen IT professionals from PdVSA, Venezuela's national oil company
- Configured extraction of SAP R/3 COPA, FI-SL, LIS, and Logistics data to BW
- Demonstrated Generic Data Extraction using ABAP Views and Infosets including using enhancements

Pharmacia, Pharmaceutical Company, New Jersey
SAP Release 3.1I, March 2002 – August 2002
- Customer consolidates in Hyperion and runs FI/CO in R/3. Designed, configured, developed, and converted complete Special Purpose Ledger solution feauturing characteristics from R/3 and Hyperion. Complex user exits used by field movements to map R/3 characteristics to Hyperion characteristics
- Trouble-shooting of concurrent CO-PA implementation including user-exit development to meet custom business needs

**SAP Andina y del Cariba, Venezuela**
SAP SEM Release 3.0B, March 10, 2002 – March 15, 2002
- Taught SEM 010 – SEM Overview and SEM 220 – SEM Corporate Performance Monitoring to 17 senior project members/executives of PdVSA (Venezuelan Oil Company), course delivered in Spanish
- Two day overview of SEM-BIC, SEM-BPS, SEM-BCS, SEM-CPM, and SEM-SRM and SEM/BW integration
- Three day Corporate Performance Monitoring overview including Measure Builder, Value Driver Trees, Balanced Scorecard configuration, and Management Cockpit configuration

**ESRI, Large Software Company, California**
SAP R/3 Release 4.5B, February 2002 – March 2002
- Configuration of EC-CS prototype for consolidation and management reporting requirements related to new corporate acquisitions in multiple countries
- Configuration of group, corporate, and country-specific chart of accounts to handle corporate, consolidation, and France statutory reporting requirements, data-mapping between the three charts of accounts
- Configuration of FI/CO/EC-CS for multi-currencies
- Development of EC-CS reports using Report Painter

**Embraer, World's Fourth Largest Commercial Aircraft Manufacturer, Fort Lauderdale, FL**
SAP R/3 Release 4.0B, April 2001 – November 2001
- Wrote specifications for enhancements to Service Notification/Service Order Processing to modify invoices (SM,SD,AR)
- Developed AR Open Items report, a new tool used daily by five AR representatives, which features drill-down and shows partial payments, credit memos and debit memos reflected against associated invoices
- Authored stock report featuring cycles and hours measurement documents, material numbers, serial numbers, equipment number, quantities, etc. to give visibility to inventory
- Developed new balance sheets and income statements using Report Painter, replacing manual processes featuring Excel manipulation of RFBILA00 outputs
- Replaced cash flow reporting functionality with new time-saving SAP report. New cash flow report replaced a cumbersome procedure that had involved various downloads, Excel macros, and manual processes
- Production support of check runs, invoice verification, line layouts and fast entry screens, cost center reporting, sales order processing, warranty processing
- Brazil-based company. Communicated in Portuguese and English

**Myonic, Swiss-Based Manufacturer, New Jersey**
SAP R/3, August 2001, November 2001
- SAPscript development for check printing
- Configuration of AP Automatic Payments
- Training on AP functions
- Communicated with Swiss-based employees French and US-based employees in English

**Global Crossing, Major Telecommunications Company, New Jersey**
Finance/Consolidations, SAP R/3 Release 4.6B, September 2000 – April 2001
- As member of the EC-CS consolidations team, rolled out closing processes, currency translation requirements, intercompany transactions, multiple data collection techniques, and inter-unit eliminations. Assisted in configuration of Data and Consolidation Monitors. Assisted in conversion efforts from FI-LC to EC-CS, conducted integration testing and assisted in defect resolution process.
- Investigated and corrected errors in open item revaluation and currency translation programs.
- Worked with affiliates on Hyperion, Oracle Financials, and JBA (AS400) to meet flat-file interface requirements for providing reported financial data to EC-CS (Consolidations) and BW (Business Warehouse) infocubes
- Configured master data, organizational structures, currency translation, and closing tasks in EC-CS to meet month-end closing requirements
- Trouble-shooting of EC-CS / FI integration issues and reporting requirements. Reconciliation of EC-CS, FI/CO and BW reports.
- Developed EC-CS training materials and hands-on exercises for training of company controllers in new module. Knowledge transfer and training to users.
- As Finance team member, configured SAP modules FI/AR/AP implementing statutory requirements for European companies for 4.6B implementation

**3Com, Networking Company, Santa Clara, California**

Analyst SAP R/3 Release 4.5, June 2000 – September 2000
- Co-ordinated, coded, and tested automatic conversion of vendor and fixed assets master data and purchase order transactional data for corporate spin-off

**Raytheon Aircraft, Major Defense and Commercial Aircraft Manufacturer, Kansas**
Developer SAP R/3 Release 4.5, November 1999 – April 2000
- Custom Reports for Warranty Department integrating data from R/3 modules of Service Management (SM), Sales & Distribution (SD), Purchasing, and Project Systems (PS)
- Custom-development of Soft Stores Government Billing Report to soft-peg made-to-stock parts for billing to government projects
- Development of interfaces for loading AR invoices using standard IDOCs
- Author of report analyzing Planned vs. Actual Hours on Production Orders by Work Center
- Gathering specifications, coding and form development of Quotation Document print program and SAPscript
- Taught class on ABAP Query. Ad hoc development of ABAP Query on Vertex/Tax Configuration, and other.
- Performance tuning of Oracle selects and enhancements of existing custom ABAP developments.

**Philips Lighting, Manufacturing Company (Repeat Customer). Project directed by ATOS/Origin, New Jersey**
Senior Developer, October 1999 – November 1999
Due to new R/3 implementations, client requested upgrades of custom developments from 1998 (see November 1997 to August 1998 detail below). Completed upgrades of four major custom developments satisfying the needs of several controllers and business managers.

**Gedas, International Consulting Company**
Instructor for SAP Academy in FI, August 1999 – September 1999
Sole instructor for SAP FI Academy offered to consultants from North America and Europe employed by international consulting company based out of Germany with offices in over 12 countries. Prepared course materials and exams. Knowledge-transfer to fellow consultants/participants. Over 200 hours of class time providing lectures, case studies, and practical examples and leading discussions on the following topics:
- ASAP implementation methodology/Project Management and Implementation Tools
- Organizational Structures: Definition and Assignment
- General Ledger/Accounts Receivable/Accounts Payable: Master Data, Configuration, and Processing
- Treasury Module-Cash Management: Manual Check Deposits and Manual Bank Statement Processing
- Fixed Assets: Master Data, Periodic and Daily Processing, Information System, Old Asset Data Transfer
- Special Ledger: Setting up the FI-SL Environment, Postings, Adjustments, Validations, Substitutions, Reporting
- Cost Element and Cost Center Accounting: Master Data, Event-Based and Periodic Processing, Planning, Reporting

**Cerveceria Hondurena, Bottler (now part of SAB / Miller, Latin America**
SAP FI/ CO Functional Lead, November 1998 – July 1999
- IMG configuration of SAP Financials, R/3 Release 4.0B, according to business plans of client, brewery/Coca-Cola products bottler. Modules configured include, in order of most experience: FI-GL, FI-SL, FI-AR, FI-AP, CO-CCA, EC-PCA, CO-IO, and TR-CM. Other modules implemented concurrently: Purchasing, Inventory Management, and Invoice Verification.
- Special Ledger implementation to offer financial statements reflecting accounted quantities in both transactional unit of measure and analytical (comparison) unit of measure. Data modeling / design of ledger to meet reporting requirements. Responsible for mapping of values from R/3 transactions into customer ledger. Training of users to develop their own reports based on new customer ledger using full Report Writer functionality for building libraries, sets, and reports with drill-down analysis.
- Validations and substitutions within FI, CO, and Special Ledger, including use of advanced user-exit functionality.
- Configuration of taxes on sales and purchases and withholding tax based on localized statutory requirements.
- Consulting on closing processes including foreign currency valuation, GR/IR clearing, and B/S readjustments.
- SAPscript modification and output device, device type, format, and page format configuration for A/P check printing.
- Spanish language project.

**Anchorage Telecom, Project directed by Origin Technology in Business (now ATOS/Origin)**
Senior Developer, September 1998 – November 1998
- FI - Special Ledger configuration, programming, and reporting for regulatory requirements of FCC. Created customer ledger integrating information from General Ledger, Accounts Payable, Accounts Receivable, Asset Accounting, Project Systems, and Materials Management. Data mapping of values from R/3 transactions to

Special Ledger. Custom development to meet FCC Part 32 and Part 64 requirements, including allocations on ADP payroll information and goods issue data

**Philips Lighting, Manufacturing Company (Repeat Customer). Project directed by ATOS/Origin, New Jersey**
**Team Lead FI/CO Development, November 1997 - August 1998**

- MM/FI system integration. Developed batch processes for month-end reclassification and settlement of Goods Receipts and Invoice Verification processes involving GR/IR clearing, Purchase Price Variance, and select expense accounts. Automated posting of accounting documents and controlling documents for internal goods movements involving stock transport orders, deliveries, and returns.
- SD/FI system integration. Configuration of revenue account determination. User exit providing additional fields into the communication table used for account allocation (SD module) to make "order reason" available as a key in account determination. Custom development for account determination of Goods Consumption and Returns for deliveries, returns, drop shipments, and shipment consolidations based on the Account Assignment Group of customer.
- Extensive Phase 1 development and implementation of complete set of financial reports using Report Writer/ Report Painter/ ABAP/4 with the GL, PCA, and CCA modules. External and internal reporting requirements met, including GL Entry Ledger, Balance Sheets, Income Statements, and P&Ls.
- Customized Profitability Analysis/Sales & Distribution Data Structures to transfer customer-defined partner functions. Created new information structure for Sales Information System (SIS) based on new partner functions fields.
- User exit development used to add customized security for Report Painter/Report Writer reports.

**Cultor Food Science, Food Ingredients Manufacturer, New York**
**ABAP Developer, January 1997- November 1997**

- Data conversion of legacy system data through batch input.
- Report Painter / Report Writer to produce and customize legal / divisional reports.
- Financial reporting using FI Modules General Ledger/ PCA/ Special Ledger.
- Batch input of financial documents such as accrual documents for unrealized foreign exchange gain/loss distribution across profit centers.
- Batch input to change materials management data.
- Customizing with IMG for Mexico installation.
- Request/task management with Workbench Organizer of ABAP and Customizing projects.
- Extensive programming and automating of month-end closing jobs.
- Interactive, on-line reporting of SD, FI, and MM custom requirements utilizing Menu Painter, Drill-Down, Call Transaction. Examples include a Month End Inventory Extract and a GR/IR account aging report.
- Querying of and application of SAP Notes database, for both Release 3.0D and upgrade effort to Release 3.0F.
- Time-saving initiatives such as researching of R3 system to locate standard reports and using SAP standard code as applicable for in-house requirements.
- Delivery of audit reports required by CPA firm.
- Team-work with functional consultants, technical consultants, and business unit managers and accountants.
- Some Basis including User/Authorization Maintenance, Transports through UNIX scripts, and Use of Oracle SQL.

---

## TRAINING / CERTIFICATIONS / EDUCATION

---

**mySAP Financials – SEM Academy & Certification, SAP Canada Training Center, Toronto, Ontario**
July 2001

**SAP CRM Customer Relationship Management Academy & Certification, SAP Canada, Toronto, Ontario**
November 2000

**Business Information Warehouse Academy & Certification, SAP Partner Academy, Waltham, Massachusetts**
June 1999
- Created custom InfoObjects first on OLTP side using InfoObject Assignment utility (report RSAO0003 in R/3) and then on BW side. Uploaded MetaData from R/3 into BW for new InfoObject. Created transfer routine at InfoObject level.
- Created an InfoSource for master data including maintenance of communication structure and transfer rules for OLTP Source System. Loaded master data for InfoSource by creating InfoPackages for R/3 master data and flat-file master data.
- Created InfoCube for transaction data based on custom InfoObject. Specified characteristics, time characteristics, and key figures. Assigned dimensions. Created update rules. Created InfoCube Aggregates. Extracted R/3 transaction data and flat-file transaction data into InfoCube.
- Created queries and queries with variables based on standard InfoCubes.

**FI/CO Academy & Certification, SAP Partner Academy, Waltham, Massachusetts**
August 1998 - September 1998
- An in-depth study of functionality in the Financial Accounting (FI) module and Overhead Management (CO). Use of module know-how to set up an integrated model company based on predefined business processes. Detailed preparation for the R/3 Application Consultant certification test in Financials and Controlling.

**ABAP/4 Release 3.0 Advanced Business Programming Track, SAP Partner Academy, Waltham, MA**
October 1996- November 1996
- Hands-on projects using Development Workbench, Menu Painter, Screen Painter, Interactive Reporting, Background Processing, On-line Programming, Database Table Updates, Transaction Maintenance, and other Development Tools. Successful completion of track leading to SAP America certification in ABAP/4 Release 3.0.

**Stanford University, Stanford, California**
September 1985- May 1990, B. A. International Relations

**Lowell Institute School, Massachusetts Institute of Technology, Cambridge, Massachusetts**
January 1995- April 1996
- MIT evening division's Certificate in Computer Technology program. Successful completion of course work in networking, hardware, and software, including C programming and Visual Basic.

## OTHER EXPERIENCE

**Consulting, Boston, Massachusetts**
February 1995- January 1997
- Industry experience with manufacturing, finance, health care/ pharmaceutical, and high technology/software companies.
- Support, maintenance, and enhancement of fixed income trading system at Putnam Investments of Boston, Massachusetts. Platforms worked with included FoxPro, Novell, UNIX, VAX, C, SQL Scripts, Oracle, FTP, and Portia.
- Fill-life cycle development of Access 2.0 database at Safety 1st of Chestnut Hill, Massachusetts for Sales Department's tracking and reporting of projected sales vs. actual sales. Met with user to conceptualize implementation of database to replace user's Excel spreadsheets. Developed code to extract monthly sales data from FoxPro accounting system for use in Access database's reports.
- Customization of SBT PRO 2.5 accounting system for Safety 1st of Chestnut Hill, Massachusetts. Complete full-life cycle implementation of new cash receipts entry module for credit department. This new MS Windows system provides business-critical ability to track four million dollars monthly of customer deductions. This system is used daily to data-enter up to 2.2 million in cash receipts. It combines multiple steps in one user-friendly process. Project included business needs and data structure analysis, preparation of specifications, user interface design, modular coding, report writing, technical and user documentation, and user training.
- Completed Visual FoxPro 3.0 project at Mentor Corporation of Boston, Massachusetts to convert data warehouse ASCII files output from Progress System to Excel spreadsheets for end-users. Successful delivery of multi-user application which was installed in WAN environment at field offices throughout the country.
- Application development and maintenance of computerized system for adverse event reporting of all company products of Copley Pharmaceuticals of Canton, Massachusetts. Participated in team effort for implementation of a client-server application using Microsoft NT, SQL Server, and Visual Basic for the administration of company contracts with governmental and HMO buying groups.
- Custom development and maintenance of on-line system for sales contact management used by Inside Sales and Marketing Departments of Seagate of Boston, Massachusetts.

**Programmer, Telecommunications Company, Massachusetts**
February 1994- February 1995
- Authored programs using "C" and FoxPro 2.5 to convert databases for new in-house billing software implementation.
- Developed and maintained the transmission of data files for processing of billing. Designed data entry screens for company employees. Coded for database relational integrity and validity.
- Initiated system of preparing bills on electronic media for customers. Provided tech support and administered user accounts for 50-100 Novell network customers.
- Technical liaison for company's largest customer, Vanguard Investments of Wayne, Pennsylvania.

## OTHER INFORMATION

- Dual US and EU citizen.
- Can communicate and interpret in Portuguese, Spanish, and French.
- References available upon request.

Member number:6619
Additional Contact information is available on the Information Page.
Software Contractors' Guild (www.scguild.com)

Copyright(c) 1995 - 2001 John Cerqueira and Software Contractors' Guild, Post Office Box 257,Nottingham, NH USA 03290-0257

**Cerqueira Deposition
Exhibit 21**



*The Commonwealth of Massachusetts*
*Department of State Police*

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**EDWARD A. FLYNN**
SECRETARY

**COLONEL THOMAS G. ROBBINS**
SUPERINTENDENT

*Headquarters, Troop "F"*
*Massachusetts State Police*
*Logan International Airport*
*East Boston, MA 02128*

*Telephone Number 617/561-1700*
*Sub-Station Fax: 617/561-1720*

## FAX TRANSMITTAL SHEET

**TO:** Dawn

**Company:**

**Fax:**

**FROM:**

**Company:** Massachusetts State Police

**Date:**

**Pages:** 2 (Including Cover Sheet)

**COMMENTS:**

### NOTICE OF CONFIDENTIALITY

The documents accompanying this facsimile transmission contain information from the Massachusetts State Police which may be confidential and/or privileged. The information is intended for use by the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that disclosure, copying of distribution or use of the contents of this transmission is prohibited. If you have received this facsimile in error, please notify us by telephone immediately.

*Excellence In Service Through Quality Policing*

CRQ 0009




**Massachusetts State Police**
**Daily Administrative Log**
State Police Logan Airport
Sunday, December 28, 2003

Roll Call held all inform. disseminated..

0714:  AA calls and advs that at gate # 29 possible suspicious parties  seaqts 20 E and F. Sec R and
Z-3 enrte. Lt. Toomey advs.

0718:  Tpr. Crowther advs that that the two subj.s made a statemnet in context of " Good Luck w/ flight"., TSA enrte and both passengers wil; be taken from flight #    (2237) to FLA. .

0742"  Capt of flight at gate # 29 de-planed all passangers and requests K-9 at scene.

0745:  DO contacts FBI agent McCall and left msg.

0749:  Major Robbins contacted.

0823:  Tpr. Bolke advs that all passangers have been de-planed and re- screened.

0842:  Tpr. D. Sullivan advs that passangers name:
1. John Cerqueira (11-15-67)
2. Danile Vittorio   (02-10-80)
3. Oren  Ashami   (1-23-80),
neg 14 and INS and  HLS watch list.
Subj. # 2. orginated conversation w/ flight attendent at AA counter and mentioned (to change seat.,Constantly stearing at her while at ticket counter. While subj # 2., boarded plane gave same evil steer at fig. attentent. Sub. #2 made the communication re: 07:18 entry. All (3) subjs. sat together on aircraft, thus the Capt. felt uncomfatable and asked for plane to be searched.

0900:  Z-3 advs all (#) subjs. denied boarding & will be re-booked.(no -charges)>

0933:  Sec R Tpr. Bolke advs flight # 2237 push back from gate 29.

BackUp: 2291 Trooper Yee, Frederick F UNKN @ F-H

BackUp: 0625 Trooper Bolke, Joseph J UNKN @ F-H

BackUp: 2024 Trooper Ventura, Donald J UNKN @ F-H

Primary: 1953 Trooper Sullivan, Daniel E UNKN @ F-H

BackUp: 2613 Trooper Crowther, David UNKN @ F-H

Logan : 1200/2200 Terminal Road  : B Terminal

— — — — — — — — — — — — — — — —

Airline Passenger: Ashmil, Oren
DOB: 01/23/1980       SSN:  ___-__-____
3801 Oceancrest E  Ocean Dr HOLLYWOOD, FL 33020

OSF1200303030:No Action
Injury:

— — — — — — — — — — — — — — — —

Airline Passenger: Vittorio, Daniel
DOF   ~/10/1980       SSN:  ___-__-____
30.    / Buren Sr HOLLYWOOD, FL 33020

OSF1200303038:No Action
Injury:

— — — — — — — — — — — — — — — —

Airline Passenger: Cerqueira, John D
DOB: 11/15/1967       SSN:  ___-__-____
1007 N Federal Hgwy FORT LAUDERDALE, FL 33304

OSF1200303058:No Action
Injury:

CRQ 0010

# Exhibit 3

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Plaintiff John D. Cerqueira's
Responses to Defendant American
Airlines, Inc.'s Interrogatories to Plaintiff,
with document CRQ 0037-40
(incorporated by reference)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,

                Plaintiff,

v.

AMERICAN AIRLINES, INC.,

                Defendant.

Civil Action No: 05-11652-WGY

---

### PLAINTIFF JOHN D. CERQUEIRA'S
### RESPONSES TO DEFENDANT AMERICAN
### AIRLINES, INC.'S INTERROGATORIES TO PLAINTIFF

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff John D. Cerqueira ("Cerqueira"), by his undersigned attorneys, submits the following responses and objections to Defendant American Airlines, Inc.'s Interrogatories to Plaintiff (the "Interrogatories"):

### GENERAL RESPONSES AND OBJECTIONS

1.      Plaintiff responds to the Interrogatories without waiver of or prejudice to his right, at any later time, to raise objections to: (a) any further demand for discovery involving or relating to the matters raised in the Interrogatories; or (b) the relevance, materiality, or admissibility of (i) the Interrogatories or any part thereof, or (ii) information or documents produced pursuant to this Response. Plaintiff may, in the future, obtain or locate additional information responsive to the Interrogatories. Plaintiff reserves the right, at any time, to revise, correct, add to, supplement, modify or clarify the specific responses set forth below.

2.      The specific responses set forth below are based upon information now available to Plaintiff.

## INTERROGATORY NO. 2:

Please describe the incident[s] in full and complete detail, including (without limitation) the date, time, what you did or were doing, where you were coming from and where you were going, what you saw and heard, and everything that happened in the order in which the events occurred.

## RESPONSE TO INTERROGATORY NO. 2:

The incidents on which the Amended Complaint is based have been described in the following documents, the substance of which is incorporated herein by reference:

1)    Correspondence of January 12, 2004, from John D. Cerqueira to Aviation Consumer Protection Division, U.S. Department of Transportation, Bates Nos. AA 0004-8;

2)    Complaint of Discrimination filed October 14, 2004, Massachusetts Commission Against Discrimination (MCAD) docket no. 04BPA02993;

3)    Correspondence of February 1, 2005, from counsel for John D. Cerqueira to Jessica Thrall, MCAD Investigator;

4)    Amended Complaint (Doc. No. 3) filed September 20, 2005.

In addition, plaintiff responds as follows:

On or about June 12, 2003, I purchased a round-trip ticket on the website of American Airlines for travel in late December 2003, between Fort Lauderdale, Florida, and Boston, Massachusetts. I was going to Massachusetts to visit my family for the Christmas holiday. On December 24, 2003, I flew on American Airlines from Fort Lauderdale, Florida to Boston, Massachusetts without incident.

On December 28, 2003, I was to return to Florida on American Airlines flight 2237, scheduled to depart at 6:45 am. I woke up at 3:00 am in order to have family members drive me to Boston Logan airport for my flight. I wanted to arrive early at the airport in case there were delays at the security check point.

When I arrived at Logan airport, I checked a bag curbside, received my boarding pass, and proceeded to the gate. At the gate, I requested a seat in an exit row or bulkhead so that I would have more leg room. I did not request any particular seat. American Airlines personnel at the gate assigned me seat number 20F, which was a window seat in an exit row.

The passengers for flight 2237 were boarded by group number. I was assigned to "Group 1" for boarding purposes. I boarded the aircraft when my group was called to board by an American Airlines representative, at about 6:15 am. I was among the first coach passengers to board.

3

After I boarded the airplane, I used the lavatory and then took my seat. I took out my laptop computer and started to do some work. Approximately 10 minutes later, two men boarded the plane and sat next to me in seat numbers 20D and 20E. I did not know the men seated in 20D and 20E, and I did not speak to them.

The men in seat numbers 20D and 20E were speaking to each other, partly in English and partly in a foreign language. The two men had a color and physical appearance similar to mine. I am of Portuguese national origin and my color and physical appearance is similar to that commonly associated with individuals of Arab, Middle Eastern, or South Asian descent.

I continued working on my computer until the announcement was made to turn off all electronic devices. At that time, I stowed my laptop computer and fell asleep. I was tired due to the early hour and because I had slept only a few hours before leaving for the airport from my family's home in southeastern Massachusetts.

An American Airlines flight attendant woke me and asked for my boarding pass. The flight attendant also asked the men seated in 20D and 20E for their boarding passes. I was unable to immediately locate my boarding pass, but I handed the flight attendant the American Airlines receipt for my itinerary, and the flight attendant indicated that the receipt was sufficient.

Soon after the flight attendant left, a group of about four troopers from the Massachusetts State Police boarded the plane and demanded that I and the men seated in 20D and 20E immediately deplane with our carry-on luggage. Neither the police nor any representative of American Airlines told me why I was removed from the plane. I had not made any comments or engaged in any behavior that was unusual, suspicious, or out of the ordinary.

I was questioned by the troopers on the ramp immediately outside of the airplane. The troopers also questioned the other two men who had been removed from the plane. I surrendered my driver's license and the other two men surrendered their passports. I informed the troopers that I did not know, and was not traveling with, the other two men.

After initial questioning on the ramp, the troopers escorted me and the men who had been seated in 20D and 20E through the airport to a small room near the security screening area. The room was long and narrow, and it appeared to be the area where TSA employees were storing their coats. I repeatedly told the troopers that I was traveling home, by myself, after a family visit for the holidays, and that I did not know the other two men.

At about approximately 8:45 am, I was removed from the room and further questioned by a trooper in the main hallway of the terminal. The substance of the trooper's questions and my responses is set forth in my letter of January 12, 2004, to the Aviation Consumer Protection Division, U.S. Department of Transportation, Bates Nos. AA 0004-8. In sum, the trooper repeatedly demanded to know my "nationality." Believing that the trooper was inquiring as to my citizenship, I told the trooper repeatedly that I am a United States citizen. As the trooper became increasingly hostile, I realized that the trooper wanted to know my national origin or ancestry. I informed the trooper that I am of Portuguese descent. Eventually, the trooper

4

realized that I was a stranger to the other men seated in row 20, and that I had been seated next to them by American Airlines.

At approximately 9:00 am, the last trooper I spoke to indicated that I was free to go, and the other two men and I were escorted to the American Airlines ticket counter. The trooper who accompanied us to the ticket counter told the ticket agent that we had been removed from a flight and questioned, but that we were cleared for travel.

An agent at the American Airlines ticket counter, whom American Airlines has identified as Dalila McLeod, told me that there was a seat available for me on an American Airlines flight from Boston to Fort Lauderdale departing in the early afternoon, but that she needed to ask a supervisor about the situation. About 20 minutes later, the ticket counter supervisor, whom American Airlines has identified as Nicole Traer, arrived and spoke first to the men who had been seated in 20D and 20E. Ms. Traer told these two men that American Airlines was denying them service and that she was refunding the cost of the Boston to Florida portion of their tickets. When they asked how they were to get back to Florida, Ms. Traer told them that they were on their own. When they asked why American Airlines would not serve them, Ms. Traer replied that it was based on something they had said while on the plane.

I was then called to the counter and Ms. Traer told me that American Airlines was denying me service and that she was refunding the cost of the return portion of my ticket. When I asked why I was being denied service, Ms. Traer told me that it was because of what I had said on the plane, as documented in the file. She refused to provide me with any further information and told me that I could contact customer service for more information.

About an hour later, I remembered that I needed to retrieve the bag that I had checked that morning, and I located it in the baggage claim area. I attempted to find another flight home to Florida that day, but I was unable to locate a reasonably priced ticket. I called my family and they drove back to Logan airport to pick me up. On December 29, 2003, I flew home on a U.S. Airways flight connecting through Philadelphia. I arrived home in Florida about 30 hours later than I would have arrived had American Airlines not refused to serve me, at increased cost, and having suffered considerable inconvenience and emotional trauma.

**INTERROGATORY NO. 3:**

Please identify in full and complete detail all communications between you and any other person at the scene of the incident[s].

**RESPONSE TO INTERROGATORY NO. 3:**

After I arrived at Logan airport the morning of December 28, 2003, I checked a bag curbside. During this process, I communicated as needed with the person who checked my bag. I do not know the name of the person who checked my bag.

After I arrived at the gate, I communicated with American Airlines personnel at the gate to request a seat in an exit row or bulkhead so that I would have more leg room. I did not request

**INTERROGATORY NO. 4:**

Please state all facts which form the basis for your claim that American engaged in unlawful discrimination against you, including in your answer the identity of all persons and communications that you contend substantiate your claims as set forth in your Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to this interrogatory to the extent that it requests information constituting a legal conclusion, or the strategies and mental impressions of his attorneys, or information protected by the attorney-client privilege. Subject to and without waiving that objection, plaintiff states as follows:

See response to Interrogatory Nos. 2 and 3, above, which plaintiff incorporates herein by reference. In addition, plaintiff states as follows:

On December 28, 2003, American Airlines removed me from flight 2237. American Airlines had no legitimate, non-discriminatory reason to do so. Rather, American Airlines removed me from flight 2237 because my color and physical appearance caused American Airlines to believe that I was of Arab, Middle Eastern, or South Asian descent. My color and physical appearance caused American Airlines to believe that I was associated with the men seated in seats 20D and 20E. Those men appeared to be of Arab, Middle Eastern, or South Asian descent, and they were also removed from flight 2237. Passengers who did not appear to be of Arab, Middle Eastern, or South Asian descent were allowed to travel on flight 2237. But for my perceived race, color, national origin, ethnicity, or ancestry, American Airlines would not have removed me from flight 2237. I had exhibited no suspicious behavior and American Airlines had no legitimate reason to believe that I posed a safety or security risk. Thus, to the extent American Airlines alleges that it had legitimate, non-discriminatory reasons to remove me from flight 2237, those reasons are a pretext for unlawful discrimination.

I understand that American Airlines has asserted that Captain John Ehlers, the pilot for flight 2237 on December 28, 2003, made the decision to have me removed from the flight. I further understand that American Airlines has alleged that Capt. Ehlers decided to have me removed from flight 2237 because:

1) the passengers that American Airlines seated next to me, whom I had never met and never spoken to before I was removed from the flight, were foreigners who made comments that Capt. Ehlers alleges were "odd," and it appeared to Capt. Ehlers and other crew members that I was traveling with these individuals;

2) flight attendant Sally Walling reported to Capt. Ehlers that I had engaged in suspicious behavior because:

a) I had arrived early at the gate and requested a seat change;

7

   b)  I was among the first coach passengers to board;

   c)  I used the airplane lavatory before taking my seat; and

   d)  I fell asleep after the announcement was made to turn off all electronic
       devices and I had stowed my laptop computer.

   To the extent that Capt. Ehlers had me removed from the flight because he or any other
crew member believed that I was somehow associated with the two men seated next to me, Capt.
Ehlers discriminated against me because there was no legitimate reason to believe that we were
together. American Airlines assigned me seat number 20F; I did not request any particular seat,
nor did I request that I be seated next to any other passenger(s). Further, I did not speak to the
two men seated next to me. Thus, Capt. Ehlers must have concluded that I was traveling with
the men seated in 20D and 20E because we appeared to be of the same race, color, national
origin, ethnicity, or ancestry. Moreover, Capt. Ehlers apparently concluded that the comments
and behavior of the other two men was "suspicious" because their appearance and accent when
speaking English led Capt. Ehlers to believe that they were Arab, Middle Eastern, or South
Asian. In her report of the incident, flight attendant Lois Sargent stated that the passengers
"seemed to be foreign nationals (later confirmed/Middle East Passports)" (AMR Event Call
Center Report of Lois Sargent, Bates No. AA 0013), and flight attendant Amy Milenkovic
reported that one of the passengers had a "heavy accent." AMR Event Call Center Report of
Amy Milenkovic, Bates No. AA 0016.

   To the extent that Capt. Ehlers had me removed from the flight because of the allegations
made by flight attendant Sally Walling, Capt. Ehlers discriminated against me because those
allegations do not provide a legitimate basis to conclude that I was a threat to the safety and
security of the flight. Arriving early at the gate, requesting a change in seat assignment,
boarding the aircraft when called, using the airplane lavatory, and falling asleep, are common
airline passenger behaviors.

   American Airlines also discriminated against me by denying me service after I was
released from questioning following my removal from American Airlines flight 2237 on
December 28, 2003. American Airlines had no legitimate, non-discriminatory reason for
refusing to serve me. But for my perceived race, color, national origin, ethnicity, or ancestry,
American Airlines would not have refused to transport me. I had exhibited no suspicious
behavior and American Airlines had no legitimate reason to believe that I posed a safety or
security risk. Indeed, when I was escorted to the American Airlines ticket counter, the
Massachusetts State Police had determined that I posed no threat to safety and a trooper
informed the American Airlines personnel at the counter that I was cleared for further travel.
Thus, to the extent American Airlines alleges that it had legitimate, non-discriminatory reasons
to deny me service, those reasons are a pretext for unlawful discrimination.

   I understand that American Airlines has asserted that the decision to deny me service was
made by American Airlines Systems Operations Control (SOC) personnel, and that the SOC
personnel who made the decision cannot recall the reason(s) for their decision. Correspondence
of June 3, 2004, from Alec Bramlett to Samuel Podberesky, Bates No. AA 0011. I further

understand that American Airlines has stated that even though law enforcement officials on the scene had determined that I was not a threat to safety, "[u]nder all of the facts and circumstances and working with the information available at the time, American's personnel were unable to make [] an independent assessment as to whether Mr. Cerqueira may or may not have posed a security risk." American Airlines Responses to the MCAD's Interrogatories, p.2. These statements are inadequate to support any assertion that American Airlines had a legitimate, non-discriminatory reason for denying me service.

My conclusion that American Airlines discriminated against me is also supported by the fact that the U.S. Department of Transportation (DOT) has reported that, following the attacks of September 11, 2001, airlines unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent, by causing such passengers to be removed from flights, denied boarding, or refused service. On April 25, 2003, the DOT brought an enforcement action against American Airlines. Docket OST-2003-15046. In its Complaint, DOT cited eleven separate instances in which American Airlines unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent by removing them from flights or denying boarding to them. The enforcement proceeding was concluded on February 27, 2004, pursuant to a Consent Order finding that American Airlines acted in a manner inconsistent with the requirements of Federal anti-discrimination law, and ordering American Airlines to cease and desist from future violations and to spend at least $1.5 million to provide civil rights training to its flight and cabin crewmembers and passenger service representatives. In addition, on October 14, 2004, I filed a complaint of discrimination with the Massachusetts Commission Against Discrimination (MCAD) charging American Airlines with discrimination in a place of public accommodation on the basis of race, color, national origin, or ancestry. MCAD investigated my complaint and, on May 3, 2005, issued a decision concluding that I had established a prima facie case of discrimination and finding probable cause to credit the allegations in my complaint.

## INTERROGATORY NO. 5:

Please state all facts which form the basis for your claim in Paragraph 42 that American removed you from Flight 2237 because American mistakenly believed that you were of Arab, Middle Eastern, or South Asian descent, including in your answer the identity of all persons and communications that you contend substantiate your claims as set forth in your Amended Complaint.

## RESPONSE TO INTERROGATORY NO. 5:

See response to interrogatory nos. 2, 3, and 4, which plaintiff incorporates herein by reference.

## INTERROGATORY NO. 6:

Please state all facts which form the basis for your claim in Paragraph 42 of your Amended Complaint that American caused you to be questioned by Massachusetts State Police because American mistakenly believed that you were of Arab, Middle Eastern, or

e)    the events or accident that caused your injury.

## RESPONSE TO INTERROGATORY NO. 23:

None.


## INTERROGATORY NO. 24:

Please identify any other lawsuits in which you have been a party (either plaintiff, defendant, third party plaintiff, third party plaintiff or intervenor), and include in your answer the state, county or federal district and docket number of the action (whether civil or criminal), as well as a general description of the nature of the action and the result that occurred.

## RESPONSE TO INTERROGATORY NO. 24:

None.

## INTERROGATORY NO. 25:

If you have traveled as a passenger on any flights operated by American Airlines after December 28, 2003, please identify the date, flight number, your point of origin, and your destination.

## RESPONSE TO INTERROGATORY NO. 25:

None.

As to the objections:

JOHN D. CERQUEIRA,

By his attorneys,

_David S. Godkin_ (BBO #196530)
Erica Abate Recht (BBO #641452)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100


Michael T. Kirkpatrick, Esq.
Public Citizen Litigation Group
1600 20th Street, NW

19

Washington, DC  20009
(202) 588-1000

ATTORNEYS FOR PLAINTIFF

### **VERIFICATION**

I have read and reviewed the foregoing Responses to Defendant American Airlines, Inc.'s

Interrogatories to Plaintiff and have been informed and believe that the responses set forth herein

are true and correct.

Declared under the penalties of perjury this __ day of February 2006

John D. Cerqueira

CERTIFICATE OF SERVICE

I, David S. Godkin, hereby certify that a true and
correct copy of the foregoing document was delivered to all
counsel of record on February __ 2006 by hand.

David S. Godkin

20

PUBLIC CITIZEN LITIGATION GROUP

1600 20TH STREET, N.W.

WASHINGTON, D.C. 20009-1001

—

(202) 588-1000

February 1, 2005

**By Overnight Delivery**

Ms. Jessica Thrall
Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, MA 02108

Re:  John D. Cerqueira v. American Airlines, Inc., et al., MCAD No. 04-BPA-
02993 (filed Oct. 14, 2004)

Dear Ms. Thrall:

Complainant John D. Cerqueira, through his counsel, hereby submits this rebuttal to the
position statement submitted by Respondents (hereinafter "American") on December 28, 2004.
This rebuttal was requested during the investigative conference of January 12, 2005. Mr.
Cerqueira appeared at the conference by telephone and provided a first-hand account of the
events underlying his complaint of discrimination. In contrast, American appeared at the
conference only through counsel and made no witnesses available. Indeed, American has so far
refused to identify the four "Doe" respondents or any other witnesses.

Facts

The parties agree that on December 28, 2003, American removed Mr. Cerqueira from
American Airlines flight 2237 before it departed Boston Logan Airport for Fort Lauderdale,
Florida. In its position statement, American asserts that "the following day, [Mr. Cerqueira] was
accommodated on another American Airlines flight to Fort Lauderdale, and arrived there the same
day." Position Statement at 2. This is false. As Mr. Cerqueira stated in his complaint and
explained during the conference, American refused to provide air transportation services to Mr.
Cerqueira on December 28, 2003, even after he had been cleared by law enforcement authorities.
See Complaint ¶¶ 21-27. Indeed, American refused to assist Mr. Cerqueira to make travel
arrangements, and American provided no indication as to how long the denial of service would
last until January 6, 2004, when it informed Mr. Cerqueira by e-mail that "[t]here is no indication
that you will be denied boarding in the future." See Complaint ¶ 28. Mr. Cerqueira thus had to
make his own arrangements to return to Florida, traveling on December 29, 2003, on a U.S.
Airways flight connecting through Philadelphia. Mr. Cerqueira arrived at his home in Florida
about 30 hours later than scheduled and at increased cost. Significantly, American has offered no

Printed on Recycled Paper

explanation, either in its position statement or at the conference, for its refusal to serve Mr. Cerqueira after his release from questioning on December 28, 2003.

American admits that it made the decision to remove Mr. Cerqueira from flight 2237 and caused him to be detained and interrogated by law enforcement authorities. In an attempt to justify this decision, American has asserted that the Captain and flight crew believed that Mr. Cerqueira may have posed a security risk for four reasons.

First, American asserts that Mr. Cerqueira arrived "very early at the gate," "approached a flight attendant who was at the counter," and "requested in a very insistent manner that his seat be changed to an exit row." Position Statement at 2. Mr. Cerqueira did arrive early at the gate because he had been told to arrive early because of anticipated delays at the security checkpoint, and Mr. Cerqueira did request a change in seat assignment to a bulkhead or exit row so that he would have more leg room. Mr. Cerqueira did not know that the American Airlines employee at the counter was not a gate agent, and he did not make his request in an insistent or confrontational manner, nor did he stare at the flight attendant as alleged by American. Mr. Cerqueira's request for a seat change was honored, and American assigned Mr. Cerqueira to seat number 20F, a window seat in an exit row.

Second, American asserts that "[d]espite the fact that Mr. Cerqueira was a coach passenger, he boarded immediately after the first announcement, disobeying the clear instructions from the gate agent that boarding at that time was limited to those seated in Business Class." Position Statement at 3. This is false. Mr. Cerqueira was assigned to "Group 1" for boarding purposes, as indicated on the attached photocopy of Mr. Cerqueira's boarding pass. Mr. Cerqueira did not pre-board with the first-class passengers, but was one of the first coach passengers to board. Mr. Cerqueira did not disobey any instructions from the gate agent. He boarded without incident after his assigned group was called.

Third, American asserts that, after boarding, Mr. Cerqueira used the airplane lavatory. This is true, but it is not "odd," as characterized by American. Rather, Mr. Cerqueira found it more convenient to use the lavatory upon boarding instead of having to get up from his seat after the airplane was full of passengers.

Fourth, American asserts that Mr. Cerqueira "appeared to be deeply sleeping" despite some unspecified "commotion" in the cabin. Position Statement at 3. As Mr. Cerqueira explained during the conference and stated in his complaint, when the announcement was made to turn off electronic devices, Mr. Cerqueira stowed his laptop computer and fell asleep. *See* Complaint ¶ 13. Mr. Cerqueira was tired because he had left his family's home very early in order to arrive at Logan Airport well in advance of his 6:45 am scheduled departure. Mr. Cerqueira is unaware of any "commotion" on board the aircraft. Mr. Cerqueira was asleep when the flight attendant woke him to request his boarding pass. *See* Complaint ¶ 14.

2

CRQ 0037

Although American relies on only the four assertions discussed above to attempt to justify its decision to remove Mr. Cerqueira from flight 2237, American sets forth in its position statement some allegations concerning the two men it seated next to Mr. Cerqueira. Specifically, American asserts that one of the men made "peculiar" remarks to the Captain before and during boarding, the other wished a "Happy New Year" to those around him, and both seemed to fall asleep at some time after taking their seats. Mr. Cerqueira is unable to comment on American's characterizations of the behavior of these two men before they took their seats, because Mr. Cerqueira had not seen them before and did not speak to them.[1] Mr. Cerqueira did notice that the two men had a physical appearance similar to his own, and that they appeared to be Middle Eastern. Mr. Cerqueira also noticed that the men seated next to him spoke to each other in a language other than English. Mr. Cerqueira later learned that they were from Israel.

## Discussion

There is more than sufficient evidence to support a finding of probable cause with respect to the allegations in Mr. Cerqueira's complaint. Mr. Cerqueira has made a *prima facie* showing that American discriminated against him in violation of M.G.L. 272, § 98, because only passengers who appeared to be Middle Eastern and/or Muslim were removed from the flight, detained, questioned, and ultimately denied any transportation services even after they were cleared by law enforcement. Although American claims that its treatment of Mr. Cerqueira "was based on legitimate safety concerns" (Position Statement at 2), and that it had "a legitimate, non-discriminatory reason for removing Mr. Cerqueira from its plane," (Position Statement at 4), American has failed to allege facts sufficient to support its defense.

With regard to its decision to remove Mr. Cerqueira from flight 2237 and cause him to be detained and interrogated, American claims that Mr. Cerqueira's behavior was "suspicious." Position Statement at 4. However, the behavior American attributes to Mr. Cerqueira—requesting a seat change, boarding the aircraft, using the lavatory, and falling asleep—are behaviors that air travelers engage in every day without incident. Thus, these behaviors cannot provide good cause for American's decision to treat Mr. Cerqueira differently from passengers who were not perceived to be Middle Eastern and/or Muslim.

With regard to American's decision to refuse service to Mr. Cerqueira at the ticket counter after he had been questioned and cleared by law enforcement, American has not even attempted to articulate *any* non-discriminatory reason for its actions. Thus, there is no question that American discriminated against Mr. Cerqueira by treating him differently from passengers who were not perceived to be Middle Eastern and/or Muslim.

---

[1] In its discussion of the behavior of the men seated in seats 20D and 20E, American also alleges that a flight attendant "observed the passengers in seats 20D-F to be giggling or joking during the safety briefing." Position Statement at 3. To the extent American is alleging that Mr. Cerqueira giggled or joked with the other men seated in his row, the allegation is false.

CRQ 0038

Finally, American asserts that Mr. Cerqueira's claims are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1), and barred by the Federal Aviation Act, 49 U.S.C. § 44902. The Commission has not requested briefing on these issues because American has sought only to preserve them, but has not moved to dismiss the complaint on these grounds. Nevertheless, Mr. Cerqueira notes that the same arguments were rejected in *Alshrafi v. American Airlines, Inc.*, 321 F. Supp. 2d 150, 163 (D. Mass. 2004).

## Conclusion

The Commission should find probable cause that American discriminated against Mr. Cerqueira in violation of M.G.L. 272, § 98.

Respectfully submitted,

**JOHN D. CERQUEIRA**
By his attorneys,

Michael T. Kirkpatrick
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC  20009
(202) 588-1000

David S. Godkin
Erica Abate-Recht
Birnbaum & Godkin, LLP
268 Summer Street
Boston, MA 02210-1108
(617) 542-3100

Attachment

cc:    Michael A. Fitzhugh
       Anne-Marie H. Gerber

4

CRQ 0039



CRQ 0040

# Exhibit 4

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of American Airlines, Inc.'s Answers
to Plaintiff's First Set of Interrogatories

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,          )
                            )
        Plaintiff,          )
                            )
v.                          )
                            )     CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,     )
                            )
        Defendant.          )
                            )

## AMERICAN AIRLINES, INC.'S ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed.R.Civ.P 33, defendant American Airlines, Inc. ("American" or "American Airlines") responds as follows to the interrogatories propounded by the plaintiff, John D. Cerqueira.

## GENERAL OBJECTIONS

I.      American objects to any interrogatory request insofar as it seeks materials or information covered by one or more of the following:

    (a)     attorney-client privilege;
    (b)     attorney's work product and mental impressions of the attorney;
    (c)     materials prepared in anticipation of or for litigation; and
    (d)     materials prepared for, at the request of, or by an expert.

II.     American objects to any interrogatory that is burdensome, oppressive, seeks information which is already known by the party, or which is not calculated to lead to the discovery of admissible evidence.

III.    American objects to any interrogatory which seeks the home address, telephone number or wages of any employee, representative, or agent of the defendant, and the defendant will not reveal such information for fear of violating the privacy of such persons who are not parties to this litigation.

IV.     American also objects to any interrogatory to the extent that it seeks, or a response would call for, the disclosure of Sensitive Security Information that it is prohibited by federal law from disclosing, per 49 CFR § 1520. Any and all subsequent responses are given subject to this objection, and with notice that no such disclosure will be made in any of the ensuing responses.

The foregoing General Objections shall apply to all requests, whether or not any reference is made to such objections in the defendant's response.

## RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1:

Identify the person(s) who made the decision to have John D. Cerqueira removed from American Airlines flight 2237 on December 28, 2003, state the basis for the decision, and identify any other person(s) who participated in making the decision and describe their participation.

**Response:**    Under the Federal Aviation Act, 49 U.S.C. § 44902, which affords an airline and its employees the discretion to refuse transport of a passenger who is or may be inimical to airline safety, Captain John Ehlers made an assessment that certain behavior exhibited by Mr. Cerqueira and other passengers who appeared to be traveling with him might pose a security risk. Captain Ehlers notified American Airlines' Ground Security Coordinator of these concerns, and thereafter all passengers were removed for re-screening, as was all baggage. Members of federal and state law enforcement agencies, including the Massachusetts State Police, then conducted interviews of some of the passengers, including Mr. Cerqueira. The State Police officers who were involved with the situation then notified Captain Ehlers that they were making the decision to "take this out of his hands," and detain Mr. Cerqueira for further questioning. Thus, the plaintiff was initially "removed" from the flight along with all of the other passengers as a result of Captain Ehlers' decision, but was subsequently not able to re-board the flight by virtue of the actions of the Massachusetts State Police. American Airlines also incorporates herein as a part of its response to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 2:

Identify the person(s) who made the decision to refuse service to John D. Cerqueira after he was released from questioning following his removal from American Airlines flight 2237 on December 28, 2003, state the basis for the decision, and identify any other person(s) who participated in making the decision and describe their participation.

**Response:**    On information and belief, Mr. Craig Marquis made this decision based upon information that he obtained from law enforcement officers involved with the incident, and other American Airlines personnel.

2

**INTERROGATORY NO. 16:**

Identify by name, date, and forum, every lawsuit, administrative complaint, charge, or enforcement action brought against American Airlines during the last five years which involved an allegation that a passenger's race, color, national origin, ethnicity, or ancestry was a motivating factor for a decision to have the passenger removed from a flight, denied boarding, or refused service.

**Objection:**    American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought seeks this information from a commercial airline with thousands of employees serving a worldwide market. American further objects to this interrogatory because much of this information is a matter of public record, and is therefore equally available to the plaintiff.

**INTERROGATORY NO. 17:**

State whether, during the last five years, you have taken disciplinary action against any employee for considering a passenger's race, color, national origin, ethnicity, or ancestry in determining whether a passenger should be removed from a flight, denied boarding, or refused service, and, if so, describe each incident and identify the persons involved.

**Objection:**    American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to the Boston station, and thus seeks this information from a commercial airline with thousands of employees serving a worldwide market.

**INTERROGATORY NO. 18:**

If you contend that American Airlines does not receive federal financial assistance as a whole, identify and describe the source and purpose of any federal financial assistance received by American Airlines during the five years preceding December 28, 2003.

**Objection:**  American objects to this interrogatory as being vague and seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**Response:**    Subject to and without waiver of the foregoing objection, American states that it has not advanced any such contention.

## INTERROGATORY NO. 19:

Identify each person whom American Airlines expects to call as an expert witness at trial.

**Response:**    American has not designated an expert witness to testify at this time. Discovery is continuing, and American will promptly supplement this answer in the event that it designates any expert.

## INTERROGATORY NO. 20:

With regard to each person identified in response to the previous interrogatory, state:

(a)    The subject matter on which the expert is expected to testify;
(b)    The substance of the facts and opinions to which the expert is expected to testify; and
(c)    The summary of the grounds for each opinion.

**Response:**    Please see American's response to Interrogatory No. 19.

    I hereby certify under the pains and penalties of perjury this 14th day of February, 2006, that based upon information I have obtained in response to reasonably thorough and diligent inquiries that I have made upon the agents and employees of American Airlines, Inc., the foregoing responses are true and correct to the best of my knowledge, information and belief.

Alec Bramlett, Senior Attorney
American Airlines, Inc.

Dated: February 14, 2006

Notary Public
My Commission Expires 5/ 9 /08

SANDRA SYMANOVICH
Notary Public, State of Texas
My Commission Expires 05-09-08

Objections Submitted by:

Michael A. Fitzhugh, (BBO 169700)
Anne-Marie H. Gerber, (BBO #649337)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330

9

# Exhibit 5

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of Ynes F. Flores

# In The Matter Of:

*John D. Cerqueira v.*
*American Airlines, Inc.*

---

*Ynes F. Flores*
*April 25, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: 617-426-2432*

Original File flores.v1, Pages 1-30

**Word Index included with this Min-U-Script®**



**Page 1**

Volume I
Pages 1 to 30
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
               :
JOHN D. CERQUEIRA,     :
     Plaintiff,     :
               :
  vs.        : Civil Action
           : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,  :
     Defendant.     :
               :
- - - - - - - - - - - - - - - -x

DEPOSITION OF YNES F. FLORES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
12, 2006, commencing at 1:02 p.m.

PRESENT:
    Birnbaum & Godkin, LLP
       (By Erica Abate Recht, Esq.)
       280 Summer Street, Boston, MA  02210,
       for the Plaintiff.
    Fitzhugh, Parker & Alvaro LLP
       (By Michael A. Fitzhugh, Esq.)
       155 Federal Street, Suite 1700, Boston, MA
       02110-1727, for the Defendant.
         * * * * *

**Page 2**

[1]           I N D E X
[2] WITNESS     DIRECT  CROSS   REDIRECT  RECROSS
[3]
    YNES F. FLORES
[4]
    BY MS. ABATE RECHT    3
[5]
    BY MR. FITZHUGH       26
[6]
[7]
[8]
            * * * *
[9]
[10]      E X H I B I T S
[11]
         None
[12]
[13]         * * *
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

**Page 3**

[1]        P R O C E E D I N G S
[2]          YNES F. FLORES
[3] a witness called for examination by counsel for the
[4] Plaintiff, having been satisfactorily identified by
[5] the production of his driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:
[8]        DIRECT EXAMINATION
[9]  BY MS. ABATE RECHT:
[10]    **Q.**  Good afternoon, Mr. Flores.  Could you
[11] please state your full name for the record.
[12]    **A.**  Yes.  Ynes Flores.
[13]    **Q.**  What is your address?
[14]    **A.**  It's 127 Ocean Street, Unit 6, Lynn,
[15] Massachusetts 01902.
[16]    **Q.**  Did you do anything to prepare for today's
[17] deposition?
[18]    **A.**  I conferred with counsel for American
[19] Airlines.
[20]    **Q.**  Did you speak with anyone else?
[21]    **A.**  No, I did not.
[22]    **Q.**  Did you review any documents?
[23]    **A.**  Yes, I did.
[24]    **Q.**  Do you recall what those documents were?

**Page 4**

[1]    **A.**  The documents relating to this case, the
[2] complaint.
[3]    **Q.**  Only the complaint?
[4]    **A.**  Uh-hum.
[5]    **Q.**  Did you review any deposition transcripts?
[6]    **A.**  No, I did not.
[7]    **Q.**  Are you currently employed by American
[8] Airlines?
[9]    **A.**  Yes, I am.
[10]    **Q.**  What is your position?
[11]    **A.**  Customer service manager.
[12]    **Q.**  How long have you been employed?
[13]    **A.**  Nine and a half years.
[14]    **Q.**  Have you been a customer service manager
[15] for that entire time?
[16]    **A.**  No, I have not.
[17]    **Q.**  What was your previous position at
[18] American?
[19]    **A.**  I was a passenger service agent.
[20]    **Q.**  When did you become a customer service
[21] manager?
[22]    **A.**  1998.
[23]    **Q.**  What did your responsibilities include as a
[24] passenger service agent?

Page 5

[1]   A.  Checking in passengers, checking bags,
issuing tickets.
[4]   Q.  Did you hold any other positions at
American before you were a passenger service agent?
[5]   A.  No, I did not.
[6]   Q.  What is your previous employment?
[7]   A.  I worked for a bank in Dallas, Texas.
[8]   Q.  Have you worked for any airline besides
[9]  American?
[10]  A.  No, I have not.
[11]  Q.  What is your educational background?
[12]  A.  Partial college.
[13]  Q.  How far did you get in college?
[14]  A.  Two years.
[15]  Q.  What do your responsibilities include as a
[16] customer service manager?
[17]  A.  Just run the day-to-day operation, handle
[18] any problems or situations with passengers or
[19] flights.
[20]  Q.  Can you be more specific than that?
[21]  A.  Passengers, you know, want to see a manager
[22] to complain about the service or if there's a flight
[23] cancellation, anything like that.
[24]  Q.  So do the passenger service agents report

Page 6

[1]  to you, as the customer service manager?
[2]   A.  Yes, they do.
[3]   Q.  Do you recall that you were the customer
[4]  service manager for Flight 2237 on December 28,
[5]  2003?
[6]   A.  Yes.
[7]   Q.  Are you familiar with the process of
[8]  assigning exit row seating?
[9]   A.  Yes, I am.
[10]  Q.  Can you describe how this process works.
[11]  A.  The passenger just has to be willing and
[12] able to assist in the event of an emergency.
[13]  Q.  Those seats are assigned by American,
[14] correct?
[15]  A.  Yes, they are.
[16]  Q.  So a passenger can't independently seat
[17] themselves there?  An agent has to assign them those
[18] seats; is that correct?
[19]  A.  Yes, that is correct.
[20]  Q.  Do you know who made Mr. Cerqueira's seat
[21] assignment?
[22]  A.  No, I do not.
[23]  Q.  Would you be able to tell from any
[24] particular document?

Page 7

[1]   A.  I might.
[2]   Q.  What document would that be?
[3]   A.  A boarding pass.
[4]   Q.  So a boarding pass would show who assigned
[5]  the seat?
[6]   A.  Yes, it would.
[7]   Q.  Did you have any contact with Mr. Cerqueira
[8]  or the other two passengers who were seated next to
[9]  him in the exit row before they boarded the plane?
[10]  A.  No, I did not.
[11]  Q.  Did you have an opportunity to observe them
[12] in any way?
[13]  A.  No, I did not.
[14]  Q.  Were you in the gate area at the time
[15] Flight 2237 was boarding?
[16]  A.  I was not.
[17]  Q.  Where were you?
[18]  A.  I do not remember.
[19]  Q.  After the passengers boarded the plane, do
[20] you recall being contacted regarding Mr. Cerqueira
[21] and the other two passengers seated next to him?
[22]  A.  Yes, I do.
[23]  Q.  By whom?
[24]  A.  That I do not remember.

Page 8

[1]   Q.  Do you recall what was discussed?
[2]   A.  No, I do not.
[3]   Q.  Do you recall at all why you were called?
[4]   A.  That a plane had returned to the gate.
[5]  There was an issue with a passenger.
[6]   Q.  With a passenger or more than one
[7]  passenger?
[8]   A.  A passenger, I believe.
[9]   Q.  Do you recall who that passenger was?
[10]  A.  No, I do not.
[11]  Q.  Do you recall who you were on the phone
[12] with?
[13]  A.  I do not.
[14]  Q.  Was it someone on the plane or was it
[15] someone on the ground?
[16]  A.  It was probably someone on the ground.
[17]  Q.  Do you know what that person's position
[18] was?
[19]  A.  Operations agent.
[20]  Q.  Do you know who that was?
[21]  A.  No, I do not.
[22]  Q.  What does an operations agent do?
[23]  A.  They dispatch the flights.  They're in
[24] contact with the crew member -- the captains on the

[1] flight and the control tower at Logan Airport.

[2] Q. So if a captain has a problem with a

[3] passenger on the flight, the captain would call the

[4] operations agent?

[5] A. Yes.

[6] Q. And then the operations agent would call

[7] the customer service manager?

[8] A. That is correct, yes.

[9] Q. Did you communicate with anyone else

[10] besides the operations agent?

[11] A. No, I did not.

[12] Q. When you were called, was the decision to

[13] remove these passengers already made?

[14] A. That I do not remember.

[15] Q. Do you recall if you were asked to do

[16] anything?

[17] A. No, I do not remember.

[18] Q. Do you recall boarding the flight?

[19] A. No, I do not.

[20] Q. Do you recall overhearing any discussions

[21] about these three passengers, Mr. Cerqueira and the

[22] other two men who were seated next to him?

[23] A. Can you be a little bit more specific?

[24] Q. Sure. Even if you weren't directly

[1] involved in any discussions about these three

[2] gentlemen, did you overhear any conversations about

[3] them?

[4] A. No, I did not.

[5] Q. So it's your testimony that you don't even

[6] remember boarding the flight?

[7] MR. FITZHUGH: Can I ask for some --

[8] generally, when you talk about "boarding the

[9] flight," that means getting the passengers on the

[10] plane. And I think you're asking about whether he

[11] remembers himself going on the airline.

[12] MS. ABATE RECHT: That's right.

[13] MR. FITZHUGH: So the term has a particular

[14] significance in the industry. And that's why I just

[15] wanted to interject.

[16] MS. ABATE RECHT: Well, I appreciate that

[17] clarification.

[18] Q. So do you recall yourself stepping onto the

[19] aircraft?

[20] A. Onto the airplane, yes, I do.

[21] Q. Do you recall why you did that?

[22] A. Because I received a call from operations

[23] regarding a passenger.

[24] Q. What did operations ask you to do?

[1] A. Just go to the gate and see what the

[2] problem was.

[3] Q. And when you arrived at the gate, what

[4] happened?

[5] A. I walked onboard. And the captain said

[6] there was a problem with a passenger seated in the

[7] exit row. They pointed out the passenger, and I

[8] went onboard and got their boarding pass to see who

[9] they were.

[10] Q. I think you just said that the captain told

[11] you there was a problem with a passenger and then

[12] pointed out that passenger, did the captain mention

[13] there was a problem with more than one passengers or

[14] just one passenger?

[15] A. That I do not remember specifically.

[16] Q. Do you recall what the passenger looked

[17] like who the captain pointed out?

[18] A. No, I do not.

[19] Q. Do you remember whether he had a ponytail?

[20] A. That I do not remember.

[21] Q. After you, yourself, boarded the plane,

[22] what happened?

[23] A. I went down to get the boarding pass from

[24] the passenger that the captain had pointed out.

[1] Q. What was the purpose of asking for their

[2] boarding passes?

[3] A. To find out what their names were.

[4] Q. Why did you want to find out that

[5] information?

[6] A. We needed to know who was onboard.

[7] Q. When you went onto the flight to get their

[8] boarding passes to ask -- to figure out what their

[9] names were, had the decision already been made to

[10] remove them from the flight?

[11] A. That I do not know.

[12] Q. Did you board the plane with the State

[13] Police?

[14] A. No, I did not.

[15] Q. So the State Police weren't with you when

[16] you went onto the plane?

[17] A. Not on the aircraft.

[18] Q. Were they on the jet bridge?

[19] A. Yes, they were.

[20] Q. Did you have any discussions with them?

[21] A. No, I did not.

[22] Q. Did you overhear them talking about

[23] anything?

[24] A. I did not.

Ynes F. Flores
April 25, 2006

Case 1:05-cv-11652-WGY    Document 22-6    Filed 09/22/2006

John D. Cerqueira v.
American Airlines, Inc.
Page 6 of 8

Page 13

[1] **Q.** What was your understanding of why the State Police were there?

[3] **A.** Generally when there is a call with a passenger with a problem, they are usually called. And they're there for support and backup.

[6] **Q.** So if I understand correctly, first you walked onto the plane, asked for the boarding passes. Then what happened?

[9] **A.** I came off board with the boarding pass, and I gave it to the captain.

[11] **Q.** Do you know what the captain did with the boarding pass?

[13] **A.** No, I do not.

[14] **Q.** What did you do next?

[15] **A.** I went up to the podium, to the gate area, and waited for my next instructions, because there were a lot of people on the bridge at the time.

[18] **Q.** Who else was on the bridge?

[19] **A.** TSA, representatives from TSA.

[20] **Q.** Do you remember who any of them were?

[21] **A.** No, I do not.

[22] **Q.** Do you remember who any of the State Police were?

[24] **A.** No, I do not.

Page 14

[1] **Q.** Did you have any discussions with any of the individuals on the bridge?

[3] **A.** On the bridge, no, I did not.

[4] **Q.** Who else was on the bridge besides TSA and the State Police?

[6] **A.** The captain.

[7] **Q.** Anyone else?

[8] **A.** No one else that I can remember.

[9] **Q.** So it's your testimony that you went onto the plane, asked for the boarding passes, immediately left and went back to the gate area?

[12] **A.** Yes.

[13] **Q.** I assume you had an opportunity, then, to communicate with Mr. Cerqueira and the other two gentlemen seated next to him onboard the plane?

[16] **A.** Can you be a little bit more specific?

[17] **Q.** Sure. You boarded the plane, and you asked them for their boarding pass, correct?

[19] **A.** Correct.

[20] **Q.** Was there any other conversation between you and the three gentlemen?

[22] **A.** No, there was not.

[23] **Q.** Did you have an opportunity to observe their demeanor?

Page 15

[1] **A.** No, I did not.

[2] **Q.** How did they react when you asked them for their boarding passes?

[4] **A.** I do not remember.

[5] **Q.** Is it fair to say that nothing stands out to you right now? You don't recall any suspicious behavior?

[8] **A.** I don't remember anything.

[9] **Q.** You weren't the one who asked Mr. Cerqueira and the other two gentlemen seated next to him to leave the plane, did you?

[12] **A.** No, I did not.

[13] **Q.** I'm going to show you a document that has been previously been marked as Exhibit 2. On this document are American Airlines' Answers to Plaintiff's First Set of Interrogatories. Have you reviewed this document before?

[18] **A.** This one, yes, I have.

[19] **Q.** Are you familiar with what answers to interrogatories are?

[21] **A.** No, I am not.

[22] **Q.** If I may explain, interrogatories are questions posed by, in this case, the plaintiff, Mr. Cerqueira, to the defendant, American Airlines. And

Page 16

[1] then American Airlines provides a response. So this document includes both questions and American Airlines' answers. Okay?

[4] **A.** Okay.

[5] **Q.** I'm going to ask you to turn to Page 3. Interrogatory No. 4 states, "Identify all American Airlines personnel who communicated with Mr. Cerqueira on or after December 28, 2003 and state the substance of the communications."

[10] And then about halfway down, the response states, "Mr. Ynes Flores, a customer service manager, subsequently asked Mr. Cerqueira and those seated alongside him to accompany him off of the plane in order to resolve some issues regarding their seat assignments." Do you see that?

[16] **A.** Yes, I do.

[17] **Q.** Is that a correct response? Were there actually any issues concerning seat assignments?

[19] **MR. FITZHUGH:** Objection. Form.

[20] **Q.** You can answer the question.

[21] **A.** Not that I remember.

[22] **Q.** Did anyone discuss American Airlines' responses to these interrogatories with you prior to you looking at them in preparation for your

# Exhibit 6

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT


Excerpts of Deposition of Lois Sargent
with Deposition Exhibit Nos. 5 & 6

# In The Matter Of:

*John D. Cerqueira   v.*
*American Airlines, Inc.*

---

*Lois Sargent*
*Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

Original File SARGENT.V1, 49 Pages
Min-U-Script® File ID: 2618236922

# Word Index included with this Min-U-Script®

Page 1

Volume I
Pages 1 to 49
Exhibits 5 to 7
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,                     :
          Plaintiff,                   :
vs.                                    : Civil Action
                                       : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,               :
          Defendant.                   :

DEPOSITION OF LOIS SARGENT, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 1:00 p.m.

PRESENT:

    Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
    280 Summer Street, Boston, MA  02210,
        for the Plaintiff.

    Fitzhugh, Parker & Alvaro LLP
        (By Amy Cashore Mariani, Esq.)
    155 Federal Street, Suite 1700, Boston, MA
    02110-1727, for the Defendant.

---

Page 2

INDEX
WITNESS   DIRECT  CROSS  REDIRECT  RECROSS
LOIS SARGENT
BY MS. ABATE RECHT   3
              EXHIBITS
NO.      DESCRIPTION             PAGE
 5   Document entitled "AMR Event Call   9
     Center Report" Bates stamped AA 0012
     to 0014
 6   Three-page document with heading in  17
     the middle "Describe
     Event/Situation" prepared by Lois
     Sargent
 7   Document entitled "Snapshot of ON   29
     list"

---

Page 3

**PROCEEDINGS**
**LOIS SARGENT**

[3] a witness called for examination by counsel for the
[4] Plaintiff, having been satisfactorily identified by
[5] the production of her driver's license and being
[6] first duly sworn by a Notary Public, was examined
[7] and testified as follows:

**DIRECT EXAMINATION**
**BY MS. ABATE RECHT:**

[10]   **Q:** Good afternoon, Ms. Sargent. Can you
[11] please state your full name for the record.
[12]   **A:** Lois Sargent.
[13]   **Q:** Could you spell your last name, please.
[14]   **A:** S-A-R-G-E-N-T.
[15]   **Q:** What is your address?
[16]   **A:** Here in Massachusetts, it's 100 Washington
[17] Street, No. 64, Salem, MA 01970.
[18]   **Q:** Do you have another residence?
[19]   **A:** My home of record is in Miami.
[20]   **Q:** What is the address there?
[21]   **A:** 15240 Southwest 86th Avenue, Palmetto,
[22] Florida, 33157.
[23]   **Q:** Did you do anything to prepare for today's
[24] deposition?

---

Page 4

[1]   **A:** Just reviewed the report that I had
[2] submitted.
[3]   **Q:** Did you speak with anyone?
[4]   **A:** Could you clarify?
[5]   **Q:** Did you speak with anyone to prepare?
[6]   **A:** Well, I did speak to Attorney Mariani.
[7]   **Q:** Anyone else?
[8]   **A:** Not specifically about the case, other than
[9] to say I'd have to, you know, do a deposition.
[10]   **Q:** Are you currently employed by American
[11] Airlines?
[12]   **A:** Yes, I am.
[13]   **Q:** How long have you been employed there?
[14]   **A:** A little over six years.
[15]   **Q:** What is your position?
[16]   **A:** I'm a flight attendant.
[17]   **Q:** Have you held that position for the
[18] entirety of your employment at American?
[19]   **A:** Yes.
[20]   **Q:** Were you employed previously as a flight
[21] attendant on another airline?
[22]   **A:** Yes.
[23]   **Q:** What airline?
[24]   **A:** Laker.

---

**Page 9**

[1] was in the back at the time.

[2] **Q:** So you just saw the backs of their heads.

[3] You don't know whether their eyes were open or

[4] closed or what they were doing?

[5] **A:** No, I don't. No.

[6] **Q:** Do you recall preparing an AMR Event Call

[7] Center Report?

[8] **A:** Yes, I did.

[9] **Q:** Under what circumstances do American

[10] employees prepare these reports?

[11] **A:** When we have some kind of a specific event,

[12] when we have an illness onboard, we have disruptive

[13] behavior, any of that — anything of that nature.

[14] **Q:** Is it standard protocol?

[15] **A:** Yes. We're required to.

[16] **MS. ABATE RECHT:** Off the record.

[17] (Discussion off the record)

[18] **MS. ABATE RECHT:** I'm going to mark as

[19] Exhibit 5 a document Bates numbered AA 0012 through

[20] 14.

[21] (Document marked as Sargent

[22] Exhibit 5 for identification)

[23] **BY MS. ABATE RECHT:**

[24] **Q:** Ms. Sargent, do you recognize this

**Page 10**

[1] document?

[2] **A:** Uh-hum.

[3] **Q:** This is the document that you prepared?

[4] **A:** Uh-hum, uh-hum.

[5] **MS. MARIANI:** You have to answer with

[6] either a "yes" or "no."

[7] **A:** I'm sorry. Yes.

[8] **Q:** Do you recall when you wrote this document?

[9] **A:** We deplaned and went down to base

[10] operations and wrote out a report at that time.

[11] **Q:** So it was the same day?

[12] **A:** Yes.

[13] **Q:** If you see on the bottom — I'm sorry, at

[14] the second page, it states, "Three passengers

[15] sitting in Row 20 DEF observed by flight attendants

[16] and cockpit crew as making inappropriate, suspicious

[17] comments in boarding area and onboard aircraft."

[18] Did you personally witness any

[19] inappropriate, suspicious comments?

[20] **A:** Just the comments about what they should do

[21] with the aircraft door. Then they called me back,

[22] "Is this the way we should do it?" I don't

[23] remember. It's two and a half years ago. I don't

[24] remember the specifics of what they asked me. But

**Page 11**

[1] it was just — I do this all the time. Nobody ever

[2] acts like that, you know. And they were all

[3] laughing about it. So it wasn't as though it was

[4] serious, you know. It was just — they seemed to be

[5] calling attention to themselves. And it was just

[6] one thing after another with these — this group of

[7] people.

[8] **Q:** And when you say "they," you're referring

[9] to the two gentlemen seated in the middle in the

[10] aisle row —

[11] **MS. MARIANI:** Objection.

[12] **Q:** — aisle seat?

[13] **MS. MARIANI:** You may answer.

[14] **A:** They were the ones that were most

[15] inappropriate, but the other gentleman seemed to be

[16] with them. I had no way of knowing if he was or if

[17] he wasn't. But since he was kind of laughing, too,

[18] I just assumed they were all sitting together. And

[19] he had requested, you know, an exit row seat, so we

[20] just assumed they were friends and wanted to be

[21] together.

[22] **Q:** You mentioned in your statement that they

[23] seemed to be foreign nationals. Why did you

[24] perceive them to be foreign nationals?

**Page 12**

[1] **A:** I don't really know. I guess they just

[2] appeared that way. I don't really know if they had

[3] accents or not. But they just seemed to be.

[4] **Q:** What about them led you to believe that

[5] they were foreign nationals?

[6] **MS. MARIANI:** Objection. You may answer.

[7] **A:** I just told you. I just —

[8] **Q:** You said that you don't recall whether they

[9] had an accent —

[10] **A:** No. They just —

[11] **Q:** Was it their skin color?

[12] **A:** Well, they weren't particularly — no.

[13] Their skin color was normal.

[14] **Q:** So if it wasn't their skin color and they

[15] didn't have an accent, why did you think that they

[16] seemed to be foreign nationals?

[17] **MS. MARIANI:** Objection. You may answer.

[18] **A:** I don't know. I guess their appearances.

[19] **MS. MARIANI:** Can we go off the record for

[20] just a second. I believe it's Ms. Milenkovic.

[21] (Off the record).

[22] **BY MS. ABATE RECHT:**

[23] **Q:** Can you be any more specific as to what

[24] about their appearance made you believe that they

Page 13

[1] were foreign nationals?

[2] A: I would just say that for myself, I've had

[3] to learn to say "No capiche Italiano." I've had to

learn to say, "No comprender," because people

[5] mistake me for even Spanish or Italian. So I mean,

[6] what is it about me that would identify me as

[7] Spanish or Italian? Well, I have vitiligo now, so

[8] that I usually have olive skin. And I'm dark. I

[9] have dark eyes. So I don't know why, but I'm always

[10] mistaken for Italian or Spanish. So I guess

[11] something about them just gave me that opinion.

[12] Q: Did you perceive them to be Middle Eastern?

[13] MS. MARIANI: Objection. You may answer.

[14] A: I really can't say that I remember that I

[15] did. I guess our report was kind of shaded by the

[16] fact that we had looked up their passports, and we

[17] knew when we wrote this report what they were. So

[18] that kind of colored our thinking.

[19] Q: When did you look up their passports?

[20] A: While security was onboard, they brought

[21] what they call the manifest about the passengers.

[22] They had done a security check.

[23] Q: So that was after the decision was made to

[24] remove these passengers; is that right?

Page 14

[1] A: I don't know specifically. I think

[2] security was onboard. I don't know if they had left

[3] the airplane by that time or if we were — we were

[4] up in the front galley. And whether security was in

[5] the back talking to them while we were looking this

[6] up, I really can't tell you specifically. But after

[7] security came onboard, they came onboard and had

[8] this information with them.

[9] Q: And Sally Walling, do you know who Sally

[10] Walling is?

[11] A: Yes, I do.

[12] Q: Did she mention anything to you prior to

[13] boarding the aircraft about any of these three

[14] gentlemen?

[15] A: Yes.

[16] Q: What did she mention to you?

[17] A: That this gentleman was pacing about, and

[18] he kept asking her to change his seat, and she said

[19] that he was just annoying her or whatever. And she

[20] said, "Let's get onboard." She didn't want to have

[21] any more dealings with him.

[22] Q: In your experience, is it uncommon for a

[23] passenger to ask for a seat change?

[24] MS. MARIANI: Objection. You may answer.

Page 15

[1] A: No, except if we tell them that we're not

[2] gate agents and they'll have to wait, they usually

[3] wait. They don't keep coming up and — I wasn't

[4] there when — you know, we got there, and she just

[5] said, "Let's get onboard. He's" —

[6] Q: Annoying?

[7] A: Yeah, annoying. So I really can't say the

[8] extent to which this was going on.

[9] Q: You write in your report, "Overheard

[10] wishing other passengers 'Happy New Year.'" Did you

[11] actually overhear that?

[12] A: No, that was reported.

[13] Q: Did you personally witness any suspicious

[14] behavior?

[15] MS. MARIANI: Objection. You may answer.

[16] A: I believe I have answered that I went up to

[17] the front galley to talk to the captain and to the

[18] No. 1, because when I was doing my exit row

[19] briefing, their behavior was so erratic and unusual.

[20] And then when I finished my briefing and I went to

[21] the back, their overhead light went on, and I went

[22] up to them, and they started again.

[23] Q: Was there anything besides that exchange

[24] that you thought was suspicious?

Page 16

[1] MS. MARIANI: Objection. You may answer.

[2] A: No. No, it was mainly their — as far as

[3] my involvement, it was their behavior during the

[4] exit row briefing. And then when we put together

[5] everybody else's experiences — when I got up there

[6] to tell the captain, the captain immediately said to

[7] me, "Is that the same guy that made a comment to

[8] me?" And I said, "I don't know. I was not in the

[9] front of the airplane when they boarded." So he

[10] came out and he looked, and he said, "That's the

[11] same guy."

[12] Q: Which guy was he referring to?

[13] A: I don't know.

[14] Q: Was he referring to a man with a ponytail?

[15] A: I don't know.

[16] Q: What exactly was your conversation with the

[17] captain?

[18] A: I just went up to report my concern that

[19] I — what I'm telling you; that I was doing the exit

[20] row briefing, and these gentlemen were just acting

[21] very bizarre. And I said it was just unnerving, you

[22] know.

[23] Q: Did you speak with anyone else besides the

[24] captain about this?

**Page 21**

[1] made the strange comments to him. I don't know what
[2] the comments were.
[3]   Q: And you say "and (2) Flight Attendant No. 2
[4]   .d reported to the" — "had reported" —
[5]   A: "That the passenger."
[6]   Q: — "that the passenger about whom she had
[7] concerns had gone immediately after boarding to the
[8] lavatory."
[9]   A: Uh-hum.
[10]   Q: Did Flight Attendant No. 2 — is that Ms.
[11] Walling?
[12]   A: Yes.
[13]   Q: Did she tell that to you at that time or
[14] had she told you that previously?
[15]   A: I really can't recall.
[16]   Q: Were you onboard the flight as the
[17] passengers were boarding?
[18]   A: Yes. We're required to have crew onboard.
[19]   Q: Did you notice any suspicious behavior with
[20] respect to a passenger visiting the lavatory?
[21]   MS. MARIANI: Objection. You may answer.
[22]   A: No. I was not in the rear of the airplane
[23] at that time, so I would not have seen that.
[24]   Q: Was it uncommon for passengers to visit the

**Page 22**

[1]  .vatory upon boarding the plane?
[2]   MS. MARIANI: Objection. You may answer.
[3]   A: It's not uncommon. It's not common.
[4]   Q: Typically, passengers are not denied
[5] service because they choose to use the restroom upon
[6] boarding?
[7]   A: No.
[8]   MS. MARIANI: Objection. You may answer.
[9]   A: No.
[10]   Q: You then state, "The F/O" — is that first
[11] officer?
[12]   A: Where are you looking?
[13]   Q: At the top of the second page.
[14]   A: Yes, "F/O" is first officer.
[15]   Q: "The F/O went back to check the lav and
[16] said the passengers we were reporting were all
[17] sitting together in the exit row."
[18]   A: Yes.
[19]   Q: What do you know about the first officer
[20] checking the lavatory? Do you know what he was
[21] checking for?
[22]   A: To make sure there was nothing placed in
[23] the lavatory.
[24]   Q: Do you know whether he found anything?

**Page 23**

[1]   A: Apparently not, or he would have said
[2] something.
[3]   Q: Are you familiar with how passengers are
[4] assigned seating in exit rows?
[5]   MS. MARIANI: Objection. You may answer.
[6]   A: I'm not aware of how they're assigned
[7] seating. I know that there are restrictions on exit
[8] row seating, so that certain passengers are not
[9] allowed to sit in the exit row. And that's one of
[10] my duties when I go to do my briefing, is to look
[11] over the passengers that are sitting there and
[12] making sure that they're appropriate to be in the
[13] exit row.
[14]   Q: Exit row seats are assigned by the gate
[15] agent; is that right?
[16]   A: Correct.
[17]   Q: So a passenger can't book — passengers
[18] flying together can't request to be seated in an
[19] exit row; is that right? They have to be assigned
[20] the exit row at the gate by an agent; is that right?
[21]   MS. MARIANI: Objection. You may answer.
[22]   A: I really don't know. I know they have this
[23] electronic — you know, you can get your boarding
[24] pass. So I don't know whether at the gate that would allow them

**Page 24**

[1] to get an exit row seat or not. I don't know how
[2] that works.
[3]   Q: Did you perceive the three passengers
[4] sitting in Mr. Cerqueira's row to be traveling
[5] together?
[6]   MS. MARIANI: Objection. You may answer.
[7]   A: That was our assumption.
[8]   Q: Okay. Why did you assume that?
[9]   A: Because he requested that exit row seat,
[10] was one of the reasons. And the other reason was
[11] that, as I said, as the other two were making all of
[12] these comments and all, he was sitting there kind of
[13] watching it all and laughing. So I just thought he
[14] was part of the group.
[15]   Q: Other than Mr. Cerqueira observing the
[16] other two passengers as they were making comments to
[17] you, did you witness him interacting or talking with
[18] the other two passengers in any other way?
[19]   MS. MARIANI: Objection. You may answer.
[20]   A: No.
[21]   Q: Did you notice whether Mr. Cerqueira and
[22] the other two gentlemen looked similar to each
[23] other?
[24]   MS. MARIANI: Objection. You may answer.

Page 29

[1]    **Q:** So it's possible that if you were already
[2] sleeping, you wouldn't notice security coming onto
[3] the plane?
[4]    **MS. MARIANI:** Objection. You may answer.
[5]    **A:** Except it would seem to me that one
[6] wouldn't be in such a deep sleep in such a short
[7] period of time.
[8]    **Q:** Did you have any discussions with the
[9] captain about his decision to call security?
[10]    **A:** I don't believe I had specifically had any
[11] conversation with him. It was his decision.
[12]    **Q:** When was the passenger manifest reviewed?
[13]    **A:** When security came onboard, they brought
[14] it. I can't be specific about the exact time.
[15]    **MS. ABATE RECHT:** I'm going to ask the
[16] court reporter to mark as Exhibit 7 a document that
[17] is not Bates numbered. It's entitled "Snapshot of
[18] ON List."
[19]    (Document marked as Sargent
[20] Exhibit 7 for identification)
[21]    **Q:** Do you recognize this document?
[22]    **A:** I would think it's the list of passengers,
[23] a passenger list.
[24]    **Q:** Is this the passenger manifest that you're

Page 30

[1] referring to in your report?
[2]    **A:** I would assume, yes. I mean, it usually
[3] isn't printed out like this on nice white paper.
[4]    **Q:** The first column that's AA and then it's
[5] numbered, are those row numbers?
[6]    **A:** I would assume so, yes.
[7]    **Q:** And it doesn't appear that —
[8]    **A:** I'm not sure.
[9]    **Q:** You're not sure?
[10]    **A:** (Witness reviews document) No, it would be
[11] printed out. What I'm used to seeing is something
[12] that has, like, "27A," "27B." I don't know. I
[13] guess this is just a listing of the passengers that
[14] came onboard, because this is not what I'm used to
[15] seeing.
[16]    **Q:** It does not appear to me that Mr.
[17] Cerqueira's name is on this list. Do you see it
[18] anywhere? It's not a trick question. I just really
[19] don't see Mr. Cerqueira's name on this list.
[20]    **MS. MARIANI:** Off the record.
[21]    (Discussion off the record)
[22]    **A:** This was not a list — this was not the
[23] manifest that we looked at.
[24]    **Q:** Okay. So does this appear to you to look

Page 31

[1] like a list of the passengers who actually continued
[2] on the flight?
[3]    **A:** I would assume so. I have to admit, I
[4] really have never seen a listing like this. Our
[5] listings are by seat and row.
[6]    **Q:** Okay. You state in your report, "A review
[7] of the passenger manifest revealed three
[8] passengers had Israeli passports but Arabic names."
[9]    **A:** No, two of them did.
[10]    **Q:** Do you see in your report how it says
[11] "these three passengers"?
[12]    **A:** Well, that should be corrected, then,
[13] because it was two. Which report are you looking
[14] at?
[15]    **Q:** I'm looking at the report that was marked
[16] as Exhibit —
[17]    **A:** 5?
[18]    **Q:** The NASA report that you're holding. So
[19] it's Exhibit 6.
[20]    **A:** Okay.
[21]    **Q:** On the second page.
[22]    **A:** Okay. That, then, should be corrected,
[23] because it was two passengers did.
[24]    **Q:** Okay. And those two passengers didn't

Page 32

[1] include Mr. Cerqueira, correct?
[2]    **A:** I would assume not.
[3]    **Q:** And you're just assuming that based on —
[4]    **A:** Yeah, I don't remember, you know, at this
[5] point exactly what the names — except for the fact
[6] that we got this case going, I would not recall the
[7] names of the three passengers. So I wouldn't
[8] remember the names of the other two, either.
[9]    **Q:** Did you notice any other behavior that you
[10] thought was suspicious that we have not discussed?
[11]    **MS. MARIANI:** Objection. You may answer.
[12]    **A:** I think we've pretty much covered it.
[13]    **Q:** Mr. Cerqueira and the other two passengers
[14] were removed by the State Police; is that correct?
[15]    **A:** I'm not sure if they were State Police or
[16] airport security. They were uniformed airport
[17] personnel, and I don't know specifically. I would
[18] not want to say specifically if they were State
[19] Police or airport security, transportation security.
[20]    **Q:** Okay. So Mr. Cerqueira and the other two
[21] gentlemen were removed from the plane by some sort
[22] of security personnel?
[23]    **A:** Security.
[24]    **Q:** This was done before the decision was made

**EXHIBIT  5**

12/28/2003  10:23    617-634-5359    BOS FLT SVC    PAGE  01

## AMR EVENT CALL CENTER REPORT

1. Complete this AmSEND Form 28 - AMR Event Call Center Report (Flight Attendants ONLY)
for all Consider this form and FAX to ICS 817-857-8382 within 24 HOURS.
Is a Call our ... Phone 817-860-0000 BOS 817-854-7932. The operator will prompt you for the information below.
FAX ONLY... All ambulance and passenger information can only be reported through AmSEND Form 28 or FAX

**Once the event has been reported, this form may be retained for your records only**

### Event Information — PLEASE PRINT ALL INFORMATION

Station of Event **BOS**   Flight # **2237**   Dept City **BOS**   Arrv City **FLL**   Aircraft Type **S 80**   Aircraft Tail # _____

Date & Time of Report  **7 30**   AM/PM

Employee Reporting **Lois Sargent**
Employee # **514534**   ☒ AA ☐ AE ☐ AMRB

Home Base **BOS**   Position **F/A # 4**
Employee Contact Phone _____

Employee's Manager **Ruby Hall**

Date & Time of Event **700**   AM/PM

**Passenger Information:**
Name _____
Address _____
Home Ph: ( )_____ Bus. Phone: ( )_____
Age:_____ ☐ Male ☐ Female
Guardian (if a minor) _____
Guardian Phone Contact: ( )_____
Seat Number on Aircraft _____

### Event  ☐ Passenger ☐ Non-Passenger ☐ Other

What Happened _____

Illness  ☐ Unconscious   ☒ Seizure   ☐ Heart Attack   ☐ Hyperventilating   ☐ Contagious Disease
         ☐ Other (Describe symptoms) _____

Injury (Specific Description of Injury & Body Part) _____

**Where Did It Happen:**

Aircraft
☐ Aisle
☐ Seat
☐ Lavatory
☐ Galley
☐ O/H Bin
☐ Cockpit
☐ Cargo
☐ Stairs

Airport
☐ Escalator
☐ Elevator
☐ Stairs
☐ Bathroom
☐ Customs
☐ Security
☐ Gate No. _____
☐ Jetbridge
☐ Concourse
☐ Other

☐ Ramp
☐ Parking Lot
☐ Curbside
☐ Shuttlebus
☐ Bag Claim
☐ Restaurant
☐ Vehicle
☐ Passenger Service Cart
☐ Ticket Counter

**Incident Due to:**
☐ Slip/Fall
☐ Serving Cart
   ☐ –Pax Injury
☐ Hot Spill
☐ Object in Food
   Object _____
☐ Decompression
☐ Ear Discomfort
☐ Slide Deployment
☐ Struck by Object from O/H Bin
   –O/H Bin Opened by:
      ☐ – F/A
      ☐ – Pax
      ☐ – Takeoff/Landing
☐ Other _____

☐ Turbulence
   ☐ –Pax Injury
   ☐ –No Injuries
   ☐ –Seat Belt Sign
      ☐ On  ☐ Off
☐ Unsched. Landing
   ☐ –Mechanical
   ☐ –Medical Diversion
   ☐ –Weather
☐ Evacuation
   ☐ –Planned
   ☐ –Unplanned

Cabin Altitude (if known) _____

Medical Treatment Offered?  ☐ Yes ☐ No    ☐ Medical Treatment Refused
Medical Provided By:   ☐ Airport Medical ☐ MD   ☐ RN   ☐ EMT/Para ☐ DO   ☐ LPN/LVN ☐ No Med. Assistance on A/C

Name of Person Providing Treatment: _____   Phone:( )_____

Specific Treatment Given _____

Other Illness of Passenger _____   Current Medication _____

Oxygen Given?   ☐ Yes   ☐ No
Reason for Oxygen?  ☐ Irrational   ☐ Note from Doctor   ☒ Unconscious ☐ Severe Chest Pain
                    ☐ Difficulty Breathing   ☐ Provided by Station
Medical Kit Opened?  ☐ Yes   ☐ No   Items Used _____
Grab and Go Kit Used?  ☐ Yes   ☐ No   Items Used _____
Defibrillator Used?  ☐ Yes   ☐ No   Results _____
First Aid Kit Opened?  ☐ Yes   ☐ No   Items Used _____
Medical Procedures?  ☐ CPR Administered   ☐ Laerdal Mask   ☐ Latex Gloves   ☐ Heimlich Maneuver
                     ☐ Ice Pack   ☐ Wheelchair Assistance   ☐ Other _____
Body Fluids Involved?  ☐ Blood   ☐ Urine   ☐ Vomit   ☐ Other _____

Hospitalized?  Hospital Name _____   Doctor _____   Phone ( )_____

AA 0012

Event ID: 03122856    Description:SARGENT P2    Filename:122856002.TIF

12/28/2003   10:23    617-634-5359          BOS FLT SVC          PAGE  02

## AMR EVENT CALL CENTER REPORT

**SECURITY INFORMATION ABOUT EVENT**

What Happened __PAX making suspicious inappropriate comments__

Where Did It Happen __Aboard Flt 2237   12/28__

- ☐ Articles Missing / Stolen
- ☐ Unauthorized Person in Security Restricted Area
- ☒ Suspicious Behavior
- ☐ Estimate of Value of Articles Missing/Stolen $ _____

- ☒ Suspicious Article
- ☐ —Article Left on A/C - No Pax
- ☐ —Items Which Bypass Security

**Bomb Threat**
- ☐ Verbal Threat
- ☐ Parked at Ramp
- ☐ Written Threat
- ☐ Emerg. Landing
- ☐ Pax Removed
- ☐ Evacuation
- ☐ Aircraft Searched
- ☐ False Threat

**Hijacking**
- ☐ Verbal Threat
- ☐ Written Threat

**Smoking / Non-Smoking Issues**
- ☐ Pax Smoked in Aisle
- ☐ Pax Smoked in Cabin
- ☐ Pax Smoked in Lavatory
- ☐ Pax Would Not Put Out Cigarette
- ☐ Pax Smoked in Terminal
- ☐ Hazardous Disposal

**Pax Appeared Intoxicated / Drugs**
- ☐ Boarding Denied
- ☐ Belligerent
- ☐ Pax Removed On Landing
- ☐ Removed Before Departure
- ☐ Unconscious
- ☐ Pax Denied Alcohol
- ☐ Using Own Bottle

**Threatened / Interfered with Employee**
- ☐ Physical Actions Toward Employee
- ☐ Verbal Actions Toward Employee

Police / Security Meet Flight?    ☒ FAA    ☒ FBI    ☒ Local Police    ☒ Pax Service Staff
Passenger Taken Into Custody?    ☒ Yes    ☐ No
Police/Security Requested / Did Not Meet Flight    ☐

Police/Security Notified? Name _____    Phone (___) ___

Parties Involved:  Name _____    Company _____
                   Address _____    Phone (___) ___

                   Name _____    Company _____
                   Address _____    Phone (___) ___

**Witnesses**

1.) Name __John Ehlers__        2.) Name __Don Ball__
    Address __AA Capt__            Address __AA F/O__

    Home Phone (___) ___           Home Phone (___) ___
    Business Phone (___) ___        Business Phone (___) ___

**Comments / Additional Information**

3 PAX sitting in row 20 DEF observed by F/As +
cockpit crew as making inappropriate suspicious comments
in boarding area + on board aircraft. Seemed to be
foreign nationals (later confirmed/Middle East passports)
Overheard wishing other PAX "Happy New Year" During
period other PAX were anxious when security
came aboard these 3 were "sleeping". After
Security removed these 3 PAX, PAX in 29D informed

AA 0013

ime she had observed PAX with Pony tail going thru Airport Security & that he had a box cutter which was removed by Security.

AA 0014

**EXHIBIT 6**

IDENTITIES AND CRIMINAL ACTIVITIES ARE NOT INCLUDED IN THE ASRS PROGRAM AND SHOULD NOT BE SUBMITTED TO NASA. ALL IDENTITIES CONTAINED IN THIS REPORT WILL BE REMOVED TO ASSURE COMPLETE REPORTER ANONYMITY.

**PLEASE FILL IN APPROPRIATE SPACES AND CHECK ALL ITEMS WHICH APPLY TO THIS EVENT OR SITUATION**

## REPORTER

| | | EXPERIENCE | |
|---|---|---|---|
| 2nd Attendant (FA) | ○ Trainee | Total years as Flight Attendant | 6 1/2 |
| ○ FA in charge | ○ Off-Duty FA | Total years as FA with your current airline | 4 1/2 |
| ○ Extra FA | | Number of aircraft types currently qualified to work on | 4 |
| ○ Other | | Percent of duty time in past year on aircraft type involved | 60 % |

## FLIGHT INFORMATION

Type of aircraft: Make Model **S 80**

number of seats ____ number of pax on board **2** number of cabin crew **4**

number of exits per level **2** window ____ flat lime ____

Flight segment: origin port **BOS** destination port **FLL** departure time **7 05**

time since takeoff ____ reporting nearest city, state & airport **BOS MA**

**Cabin activity (check all that apply)**
- ✗ boarding
- ○ deplaning
- ○ safety related duties, specify ____
- ○ beverage service
- ○ meal service
- ○ cart service
- ○ tray service
- ○ movie
- ○ other ____

FIRST FOLD

| OPERATOR | FLIGHT PHASE | WEATHER | LIGHTING |
|---|---|---|---|
| ✗ air carrier | ✗ predeparture ○ descent | ✗ clear ○ cloudy | CABIN   OUTSIDE |
| ○ commuter | ○ taxi ○ approach | ○ rain ○ fog | ✗ bright ○ day/gnd |
| ○ corporate | ○ takeoff ○ landing | ○ turbulence ○ snow | ○ medium ○ night |
| ○ charter | ○ climb ○ gate arrival | ○ thunderstorms ○ ice | ○ dark |
| ○ other ____ | ○ cruise ○ other | ○ unknown | |

## EVENT CHARACTERISTICS

Reporter's location in aircraft at time of event **Main Cabin**

Reporter's activity at time of event ____

| Was a passenger directly involved in the event? | ✗ Yes  ○ No | Was fire/smoke involved in the event? | ○ Yes  ✗ No |
|---|---|---|---|
| Did this event result in an injury? | ○ Yes  ✗ No | | |
| to passenger? | ○ Yes  ✗ No | Was there an evacuation during or as a result of this event? | ○ Yes  ✗ No |
| to crew? | ○ Yes  ✗ No | | |

## DESCRIBE EVENT/SITUATION

Keeping in mind the topics shown below, discuss those which you feel are relevant and anything else you think is important. Include what you believe really caused the problem, and what can be done to prevent a recurrence, or correct the situation. (CONTINUE ON THE OTHER SIDE AND USE ADDITIONAL PAPER IF NEEDED)

I was F/A # 4 on F/t 2237 Dec. 28, 2003 from BOS to FLL. Prior to boarding F/A #2 c/o feeling uneasy abt a PAX.

When I did the Exit Row Briefing I became concerned abt the responses I was receiving - laughing, comments abt taking care of the door. PAX in 20D called me back & jokingly showed me how he would follow the instructions on the Briefing Card. I reported this to F/A #1.

There was already concern as (1) Some PAXs had made "strange" comments to the Capt. during boarding + (2) F/A #2 had reported the the PAX abt whom she had concerns

| CHAIN OF EVENTS | HUMAN PERFORMANCE CONSIDERATIONS |
|---|---|
| · How the problem arose      · How it was discovered | · Perceptions, judgments, decisions    · Actions or inactions |
| · Contributing factors      · Corrective actions | · Factors affecting the quality of human performance |

SA ARC 277C (June 1995)          **CABIN CREW**          Rev Date: 06/29/95

**AVIATION SAFETY REPORTING SYSTEM**

NASA has established an Aviation Safety Reporting System (ASRS) to identify issues in the aviation system which need to be addressed. The program of which this system is a part is described in detail in FAA Advisory Circular 00-46D. Your assistance in informing us about such issues is essential to the success of the program. Please fill out this postage free form as completely as possible, fold it and send it directly to us.

The information you provide on the identity strip will be used only if NASA determines that it is necessary to contact you for further information. THIS IDENTITY STRIP WILL BE RETURNED DIRECTLY TO YOU. The return of the identity strip assures your anonymity.

Section 91.25 of the Federal Aviation Regulations (14 CFR 91.25) prohibits reports filed with NASA from being used for FAA enforcement purposes. This report will not be made available to the FAA for civil penalty or certificate actions for violations of the Federal Air Regulations. Your identity strip, stamped by NASA, is proof that you have submitted a report to the Aviation Safety Reporting System. We can only return the strip to you, however, if you have provided a mailing address. Equally important, we can often obtain additional useful information if our safety analysts can talk with you directly by telephone. For this reason, we have requested telephone numbers where we may reach you.

Thank you for your contribution to aviation safety.

NOTE: AIRCRAFT ACCIDENTS SHOULD NOT BE REPORTED ON THIS FORM. SUCH EVENTS SHOULD BE FILED WITH THE NATIONAL TRANSPORTATION SAFETY BOARD AS REQUIRED BY NTSB Regulation 830.5 (49CFR830.5).

---

**DESCRIBE EVENT SITUATION (continued):**

had gone immediately after boarding to the LAV.
The F/O went back to check the LAV & said the PAXs we were reporting were all sitting together in the Exit Row.
F/A # 2 came to the F/c galley & reported that the 3 PAXs in the Exit Row were wishing the PAXs around them a "Happy New Year."
The Capt called Security. When Security came on board the PAXs were alert & curious, the 3 PAXs in the Exit Row curled up in their seats & appeared to be asleep.
Review of the PAX Manifest revealed these 3 PAXs had Israeli passports but Arabic names.
After Security removed the PAXs in 20 DEF, the PAX in 29D reported to me that she was in the Security Check line with PAX 20F & Security had removed a box cutter from him. She was taken off the plane for Questioning. (I was later told that there was no box cutter confiscated by Security that morning)
Security came back & asked me to check the Overhead bins & make sure the PAX in 20 DEF had taken all their belongings. Since I don't know what each PAX

SECOND FOLD

SECOND FOLD





National Aeronautics and
Space Administration

**Ames Research Center**
P.O. Box 189
Moffett Field, CA 94035-0189

· Official Business
  Penalty for Private Use $300

**BUSINESS REPLY MAIL**
FIRST CLASS MAIL PERMIT NO. 12028 WASHINGTON, D.C.

POSTAGE WILL BE PAID BY NASA

NASA AVIATION SAFETY REPORTING SYSTEM
PO BOX 189
MOFFETT FIELD CA 94035-0189

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

AVIATION SAFETY REPORTING SYSTEM
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

# Exhibit 7

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of Sally Walling

# In The Matter Of:

## *John D. Cerqueira   v.*
## *American Airlines, Inc.*

---

## *Sally Walling*
### *Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA   02110*

*(617) 426-2432*

*Original File WALLING.V1, 63 Pages*
*Min-U-Script® File ID: 0526695123*

**Word Index included with this Min-U-Script®**

Page 1

Volume I

Pages 1 to 63

Exhibits 1 to 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,                    :

    Plaintiff,                         :

    vs.                                : Civil Action

                                       : No. 05-11652-WGY

AMERICAN AIRLINES, INC.,               :

    Defendant.                         :

DEPOSITION OF SALLY WALLING, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 10:15 a.m.

PRESENT:

Birnbaum & Godkin, LLP

(By Erica Abate Recht, Esq.)

280 Summer Street, Boston, MA  02210,

for the Plaintiff.

Fitzhugh, Parker & Alvaro LLP

(By Amy Cashore Mariani, Esq.)

155 Federal Street, Suite 1700, Boston, MA

02110-1727, for the Defendant.

---

Page 2

INDEX

WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

SALLY WALLING

BY MS. ABATE RECHT    3        60

BY MS. MARIANI           58

EXHIBITS

NO.    DESCRIPTION                        PAGE

1    Document entitled "AMR Event Call     9
    Center Report" Bates stamped AA 0018
    to 0020

2    Document entitled "American            14
    Airlines, Inc.'s Answers to
    Plaintiff's First Set of
    Interrogatories"

3    Document Bates stamped CRQ 0029 to     41
    0035

4    One-page document stamped             52
    "CONFIDENTIAL," beginning with
    "operating at slightly under 75% of
    the total schedule"

---

Page 3

[1]                    PROCEEDINGS

[2]                    SALLY WALLING

[3] a witness called for examination by counsel for the

[4] Plaintiff, having been satisfactorily identified by

[5] the production of her driver's license and being

[6] first duly sworn by the Notary Public, was examined

[7] and testified as follows:

[8]                    DIRECT EXAMINATION

[9]                    BY MS. ABATE RECHT:

[10]    Q: Good morning, Ms. Walling.

[11]    A: Good morning.

[12]    Q: My name is Erica Abate Recht, and I

[13] represent Mr. Cerqueira in this matter. Before we

[14] get started, I just want to note for the record that

[15] we were just given a few minutes before the

[16] deposition some documents. I have attempted to look

[17] through them briefly before we got started, and it

[18] doesn't appear as if they are in particular to the

[19] witnesses we'll be deposing today, but I just wanted

[20] to make it clear on the record that we did just

[21] receive documents just before the deposition

[22] started.

[23]    Ms. Walling, could you please state your

[24] full name for the record.

---

Page 4

[1]    A: Sally Walling.

[2]    Q: Can you spell that, please.

[3]    A: W-A-L-L-I-N-G.

[4]    Q: What is your address?

[5]    A: 23 Cusack, C-U-S-A-C-K, Road, No. 9 in

[6] Hampton, New Hampshire.

[7]    Q: Did you do anything to prepare for this

[8] deposition today?

[9]    A: No.

[10]    Q: Did you review any documents to prepare for

[11] the deposition?

[12]    A: Yes.

[13]    Q: What documents did you review?

[14]    A: My notes that I took at American, my OP-4.

[15]    Q: Is that your statement?

[16]    A: Yes.

[17]    Q: Were there any other notes that you took

[18] besides that statement?

[19]    A: There was a brief that was sent to me.

[20]    MS. MARIANI: I'm going to instruct the

[21] witness not to answer with respect to communications

[22] with counsel. She's free to answer with respect to

[23] any documents that she reviewed that were not

[24] generated by counsel.

Page 5

[1]    Q: So you reviewed documents that were
[2] generated by counsel?
[3]    A: Yes.
[i]    2: Any other documents?
[5]    A: No.
[6]    Q: So just to be clear, the document that you
[7] reviewed other than documents generated by counsel
[8] were the statement that you had filled out for
[9] American?
[10]    A: Yes.
[11]    Q: Did you speak to anyone in preparation for
[12] your deposition?
[13]    A: Yes.
[14]    Q: Who did you speak to? You can answer who
[15] you spoke to. I won't ask you what the substance of
[16] your communications were with counsel.
[17]    MS. MARIANI: You may answer.
[18]    Q: So you're indicating your counsel, Ms.
[19] Mariani?
[20]    A: Yes.
[21]    Q: Did you speak with anyone else?
[22]    A: No.
[23]    Q: Are you currently employed by American
[24] Airlines?

Page 6

[1]    A: Yes.
[2]    Q: For how long have you been employed by
[3] American —
[4]    A: 37 years.
[5]    Q: Just because the court reporter is trying
[6] to get everything we say down, it's important that
[7] you just let me finish my question, and then you
[8] answer. And that way she can get a clear
[9] transcript.
[10]    MS. MARIANI: Ms. Abate Recht, before you
[11] proceed into anything substantive, why don't we make
[12] sure we have the stipulations with respect to
[13] objections on the record, so that the record is
[14] clear in that regard.
[15]    MS. ABATE RECHT: So all objections, except
[16] as to form —
[17]    MS. MARIANI: Right, and reserve motions to
[18] strike until time of trial. And there may be some
[19] instances where I will be objecting on the basis of
[20] sensitive security information, which is a federal
[21] statute that prohibits American Airlines and its
[22] employees from disclosing certain information
[23] without prior authorization by the Transportation
[24] Security Administration.

Page 7

[1]    MS. ABATE RECHT: Where were we.
[2]    MS. MARIANI: My apologies for
[3] interrupting.
[4]    BY MS. ABATE RECHT:
[5]    Q: What is your current position at American?
[6]    A: I'm a flight attendant.
[7]    Q: And have you been a flight attendant for 37
[8] years?
[9]    A: Yes.
[10]    Q: Did you have any previous positions at
[11] American?
[12]    A: No.
[13]    Q: What is your educational background?
[14]    A: I'm a four-year college graduate.
[15]    Q: Were you a member of the flight crew for
[16] American Airlines Flight 2237 on December 28, 2003?
[17]    A: Yes.
[18]    Q: Do you recall a passenger by the name of
[19] Mr. John Cerqueira, who was a passenger on that
[20] flight?
[21]    A: Yes.
[22]    Q: Do you recall having a conversation with
[23] Mr. Cerqueira on that day?
[24]    A: Yes.

Page 8

[1]    Q: What was the substance of that
[2] conversation?
[3]    A: He approached the counter at work that I
[4] was at at the gate, the gate counter, and asked if
[5] he could have his seat changed.
[6]    Q: And is there anything unusual about
[7] passengers asking to have seat changes at the gate?
[8]    A: No.
[9]    Q: Did you have any concerns after that
[10] conversation?
[11]    A: Yes.
[12]    Q: What were your concerns?
[13]    A: He was very insistent. He repeatedly asked
[14] to have his seat changed after I told him that I
[15] couldn't do it; that I was not a ticket agent.
[16]    Q: And is it uncommon for passengers to be
[17] insistent about things when they speak with you or
[18] with —
[19]    A: To be hostile and insistent at 5:30 in the
[20] morning, yes.
[21]    Q: Are passengers typically denied service for
[22] asking for seat changes?
[23]    MS. MARIANI: Objection. You may answer.
[24]    A: I'm sorry, can you repeat that.

Page 9

[1] Q: I said, are passengers typically denied
[2] service for asking for seat changes?
[3] MS. MARIANI: Objection. You may answer.
[4] A: No.
[5] Q: And did you discuss this incident with
[6] anyone at the time?
[7] A: No.
[8] MS. ABATE RECHT: I'm going to mark as
[9] Exhibit 1 a document that's been Bates numbered as
[10] AA0018 through 20.
[11]     (Document marked as Walling
[12] Exhibit 1 for identification)
[13] Q: Ms. Walling, if you could take a moment to
[14] look at this document, please.
[15] A: (Witness reviews document)
[16] Q: Do you recognize this document?
[17] A: Yes.
[18] Q: Can you identify it for the record, please.
[19] A: It's the OP-4 or the AMR.
[20] Q: What does OP-4 stand for?
[21] A: It's just paperwork that American — we
[22] have to fill out an OP-4 whenever we have an event.
[23] And I guess the technical term is "AMR Event Call
[24] Center Report."

Page 10

[1] Q: So OP-4 is just —
[2] A: It's the same.
[3] Q: It's the same thing. And you don't know
[4] what the "O" or the "P" stands for?
[5] A: No.
[6] Q: When did you fill this out?
[7] A: When I went downstairs, before I went home
[8] and after the incident.
[9] Q: So on the same day?
[10] A: Yes.
[11] Q: On the 28th of December?
[12] A: Yes.
[13] Q: Is this the document that you were
[14] referring to before that you've reviewed in
[15] preparation for the deposition?
[16] A: Yes.
[17] Q: If you look at the second page that's AA
[18] 0019, it states, "I told the other FAs" flight
[19] attendants "going down the jet bridge there was a
[20] passenger I felt very uncomfortable with."
[21]     Does this refresh your recollection as to
[22] whether you discussed this incident with anyone at
[23] the time?
[24] A: I did not discuss this incident. I merely

Page 11

[1] stated how I felt about the passenger that was
[2] sitting there.
[3] Q: Who did you say that to?
[4] A: The other two flight attendants.
[5] Q: What are their names?
[6] A: They were reserve flight attendants.
[7] Lois — I don't even know the first flight
[8] attendant. I haven't flown with them since.
[9] Q: Would you recognize their names? Was it
[10] Lois Sargent, Amy —
[11] A: Lois Sargent, I do. Amy, I recognize the
[12] name. I wouldn't recognize the face.
[13] Q: But you recognize the name Amy Milenkovic?
[14] A: Yes.
[15] Q: What did you tell the flight attendants?
[16] A: In regard to?
[17] Q: It says here, "I told the other flight
[18] attendants going down the jet bridge there was a
[19] passenger I felt very uncomfortable with." Is that
[20] the extent of what you told them or was there more?
[21] A: That was it.
[22] Q: Did you tell the captain anything at that
[23] time?
[24] A: No.

Page 12

[1] Q: What happened next with respect to Mr.
[2] Cerqueira?
[3] A: Are you talking about before I went down to
[4] get on the airplane?
[5] Q: You boarded the airplane ahead of the
[6] passengers; is that correct?
[7] A: Yes.
[8] Q: And then Mr. Cerqueira boarded the airplane
[9] as well; is that correct?
[10] A: Yes.
[11] Q: You stated here, "Upon boarding, he was the
[12] first passenger in coach and went into the" — and
[13] if you could just read your handwriting there. I
[14] don't know what it says.
[15] A: "Aft right lav."
[16] Q: What does "aft" stand for?
[17] A: The back of the airplane.
[18] Q: Okay. Did that raise any suspicion for
[19] you?
[20] A: Yes.
[21] Q: Why?
[22] A: Because he was not supposed to be on that
[23] airplane at that time.
[24] Q: Why —

Page 13

[1] **A:** He was a coach passenger. First class had
[2] just barely begun to board. Generally speaking, no
[3] coach passengers come on, in my recollection, before
[4] st class.
[5] **Q:** Did you hear the gate agent calling the
[6] passengers to board?
[7] **A:** No.
[8] **Q:** So you have no idea whether his group was
[9] called to board and whether he boarded correctly?
[10] **MS. MARIANI:** Objection. You may answer.
[11] **A:** I've never known a coach passenger boarding
[12] first.
[13] **Q:** But you were on the plane, right?
[14] **A:** Correct.
[15] **Q:** So you didn't hear whether the people at
[16] the gate had called his group to board; is that
[17] right?
[18] **A:** No, I didn't hear it.
[19] **Q:** Are passengers typically denied service for
[20] boarding ahead of their scheduled group, if that's
[21] what —
[22] **A:** No.
[23] **Q:** — Mr. Cerqueira did.
[24] And are passengers typically denied service

Page 14

[1] using the restroom upon boarding the plane?
[2] **MS. MARIANI:** Objection. You may answer.
[3] **A:** No.
[4] **Q:** It's not uncommon, actually, for passengers
[5] to use the restroom in the airplane, is it?
[6] **MS. MARIANI:** Objection. You may answer.
[7] **A:** No.
[8] **Q:** Did you speak with Mr. Cerqueira at all
[9] after he had boarded the flight?
[10] **A:** No.
[11] **MS. ABATE RECHT:** I'm going to mark as
[12] Exhibit 2 American Airlines Answers to Plaintiff's
[13] First Set of Interrogatories.
[14] (Document marked as Walling
[15] Exhibit 2 for identification)
[16] **MS. ABATE RECHT:** Ms. Walling, these are American Airlines'
[17] Answers to the Plaintiff's First Set of
[18] Interrogatories. Are you familiar with
[19] interrogatories at all?
[20] **A:** No.
[21] **Q:** Interrogatories are questions that, in this
[22] case, the plaintiff has posed to the defendant,
[23] American Airlines, and American has answered those
[24] questions. And I'm just going to ask you about some

Page 15

[1] of American's responses to plaintiff's questions.
[2] Did you review these at all prior to seeing
[3] them today?
[4] **A:** I don't remember.
[5] **Q:** If you would turn, please, to Page 3. Do
[6] you see where it says "Interrogatory No. 4"?
[7] **A:** Yes.
[8] **Q:** And it says, "Identify all American
[9] Airlines personnel who communicated with Mr.
[10] Cerqueira on or after December 28, 2003, and state
[11] the substance of the communications." Do you see
[12] where it says that?
[13] **A:** Yes.
[14] **Q:** And four rows down in the response it
[15] states, "Ms. Walling also subsequently spoke to Mr.
[16] Cerqueira after he had boarded the flight. And the
[17] substance of the conversation was to advise Mr.
[18] Cerqueira to raise his seat back and follow other
[19] general safety instructions that are given prior to
[20] all departures." Do you see where it says that?
[21] **A:** Yeah.
[22] **Q:** Does that refresh your recollection at all
[23] as to whether you had a conversation with Mr.
[24] Cerqueira after he boarded the flight?

Page 16

[1] **A:** I did not.
[2] **Q:** You didn't?
[3] **A:** No.
[4] **Q:** So is this untrue?
[5] **MS. MARIANI:** Objection. You may answer.
[6] **A:** Yes.
[7] **Q:** Did you talk with anyone — did anyone
[8] speak to you about American's preparation of these
[9] answers to interrogatories?
[10] **MS. MARIANI:** I'm going to object, and I'm
[11] going to instruct the witness not to answer insofar
[12] as she has spoken with anyone at my office or anyone
[13] at American Airlines' legal department with regard
[14] to any matter surrounding this case.
[15] **MS. ABATE RECHT:** I'm not asking her what
[16] the substance of the communication was. I'm merely
[17] asking her whether she communicated with anyone
[18] regarding answers to interrogatories.
[19] **MS. MARIANI:** She may answer as to whether
[20] or not she did or did not, to the best of her
[21] recollection.
[22] **A:** I don't remember.
[23] **Q:** But you don't remember, sitting here today,
[24] speaking with Mr. Cerqueira and asking him to raise

**Page 17**

[1] his seat back and follow other general safety
[2] instructions?
[3]   A: I did not.
[4]   Q: If you would turn back to your statement
[5] that we were looking at a moment ago, which was
[6] marked as Exhibit 1. Do you recall approximately
[7] how long Mr. Cerqueira was in the restroom?
[8]   A: Approximately four to five minutes.
[9]   Q: Did that raise any suspicion for you, that
[10] length of time?
[11]   MS. MARIANI: Objection. You may answer.
[12]   A: Under the circumstances, yes.
[13]   Q: And can you explain what you mean by that.
[14]   MS. MARIANI: You may answer.
[15]   A: He was not supposed to be in the coach at
[16] that time. He had raised my suspicions at the gate
[17] because he was hostile and insistent with me. He
[18] stood very close to me and watched me for 20 minutes
[19] while I was doing my computer work. When I turned
[20] around to retrieve my computer work, he was sitting
[21] next to me, staring at me.
[22]   Q: Were you doing your computer work behind
[23] the counter —
[24]   A: Yes.

**Page 18**

[1]   Q: — or were you sitting in a seat?
[2]   A: No, behind the counter.
[3]   Q: Did he at any time go behind the counter?
[4]   A: No. I had asked him to sit over to the
[5] side, because he continued to ask and continued to
[6] stand in front of me after I told him, "I am not a
[7] gate agent. I cannot help you."
[8]   Q: So you were standing behind the counter,
[9] and he was standing at the counter on the other
[10] side?
[11]   A: Yes.
[12]   Q: And then you asked him to go sit down in
[13] one of the —
[14]   A: Seats.
[15]   Q: — seats. And he did that?
[16]   A: Yes.
[17]   Q: So he followed your instructions when you
[18] told him to go sit down?
[19]   A: Eventually.
[20]   *Q. You say in your statement, if you look at
[21] the last line of your statement on the second page,
[22] "Then everything started to happen, with the captain
[23] feeling uneasy with one of them." Can you explain
[24] that further, please.

**Page 19**

[1]   A: He took his seat at the window exit — I
[2] need to ask you something. Can I do that?
[3]   MS. MARIANI: You have to answer the
[4] question.
[5]   THE WITNESS: What is it?
[6]   MS. ABATE RECHT: Can you read repeat the
[7] question, Jane.
[8]   *(Question read)
[9]   A: Before I talked with the captain, before he
[10] called me, two passengers came back and said
[11] something to me about — a statement to me, about
[12] the passengers in the window exit row saying uneasy
[13] things to them.
[14]   Q: Do you recall what they were saying?
[15]   A: No. No.
[16]   Q: So this was during the boarding process
[17] to —
[18]   A: In the back of the airplane, yes.
[19]   Q: Okay. You don't recall what they said,
[20] though?
[21]   A: They said they felt very uneasy and
[22] uncomfortable.
[23]   Q: Were they referring to Mr. Cerqueira?
[24]   A: What they said was, "The men in the window

**Page 20**

[1] exit row."
[2]   Q: What does the "window exit row" mean?
[3]   A: The window exit row is where he sat. It's
[4] the row in front — where the window exits are,
[5] there are two rows of window exits.
[6]   Q: Okay.
[7]   A: And he was in the window exit row.
[8]   Q: So there's two rows of emergency exits —
[9]   A: Correct.
[10]   Q: And one row doesn't have a window, and one
[11] row —
[12]   A: No, they both have windows.
[13]   Q: They both have windows.
[14]   A: Yeah.
[15]   Q: So Mr. Cerqueira was seated at the window
[16] seat?
[17]   A: Yes.
[18]   Q: And you're calling that the window exit
[19] row?
[20]   A: Yes.
[21]   Q: So before the captain called you, you
[22] testified that two passengers approached you and
[23] said that they felt uneasy?
[24]   A: Correct.

Page 21

[1] **Q:** Did you know whether they were referring to
[2] Mr. Cerqueira or were they referring to the other
[3] two men who were seated with him?
[4]   **MS. MARIANI:** Objection. You may answer.
[5]   **A:** The men in the window exit row.
[6]   **Q:** So they referred to the three collectively?
[7]   **A:** Yeah.
[8]   **MS. MARIANI:** Objection. You may answer,
[9] if you know.
[10]   **A:** Yeah.
[11]   **Q:** Then what happened?
[12]   **A:** I went up to see how they were referring
[13] to, because I was in the back of the airplane
[14] getting the galley ready for the service. They
[15] expect me to do that.
[16]   **Q:** Okay.
[17]   **A:** So I went up and looked at them. This was
[18] probably — there might have been maybe 10 or 12
[19] people at that time in coach, maybe 15. It was at
[20] the initial part of boarding.
[21]   **Q:** How many people — what kind of airplane
[22] was it?
[23]   **A:** Super 80.
[24]   **Q:** So how many coach passengers does that —

Page 22

[1]   **A:** 125.
[2]   **Q:** 125. So at that time there were only about
[3] 10 to 15 passengers?
[4]   **A:** Maybe 20. It was a small amount. It was
[5] just the initial part of boarding. So when I went
[6] up, it was Mr. Cerqueira and two other men, and they
[7] had their eyes closed, and they were sitting back
[8] like this during this whole boarding (indicating).
[9] I repeatedly went back to check, and they all —
[10] they had their eyes closed.
[11]   **MS. MARIANI:** Please remember that the
[12] court reporter cannot take down physical gestures.
[13] So if you could describe for the record any physical
[14] movements that you make, that would be appreciated.
[15]   **A:** They had their seat back, and they had
[16] their eyes closed, which was unusual for the
[17] boarding process, with 100 people boarding around
[18] you, to be in that way.
[19]   **Q:** So you felt it was unusual that they were
[20] resting with their eyes closed?
[21]   **MS. MARIANI:** Objection. You may answer.
[22]   **A:** Under the circumstances, yes.
[23]   **Q:** And those circumstances were just that the
[24] passengers were boarding or are there any other

Page 23

[1] circumstances?
[2]   **A:** The passengers were boarding, there was a
[3] lot of activity, and they weren't involved in any
[4] way. I mean — I don't know how to explain it, but
[5] it's not generally done. People do not pretend
[6] they're sleeping.
[7]   **Q:** So in your opinion, they were pretending to
[8] sleep. They weren't just actually sleeping?
[9]   **MS. MARIANI:** Objection. You may answer.
[10]   **A:** I don't know. I don't know that.
[11]   **Q:** You don't know that?
[12]   **A:** (Witness shakes head)
[13]   **Q:** Did you think they were pretending?
[14]   **A:** Yes.
[15]   **Q:** You did say, "Then everything started to
[16] happen, with the captain feeling uneasy with one of
[17] them." Can you explain that?
[18]   **A:** The captain called back — John called back
[19] on the phone and asked me if I — something was said
[20] to him on boarding that made him feel uncomfortable.
[21] There was a gentleman in coach with a ponytail.
[22] Would I go and check and just see what I felt, what
[23] I thought about it.
[24]   **Q:** So after you — I'm just trying to get the

Page 24

[1] sequence of events down. So the passenger said
[2] something to you. You went up, saw that the three
[3] men were sleeping, and then you went to the back of
[4] the plane again and then received the call from the
[5] captain?
[6]   **A:** Yes.
[7]   **Q:** Did the captain mention anything about Mr.
[8] Cerqueira?
[9]   **MS. MARIANI:** Objection. You may answer.
[10]   **A:** Not specifically. He said to look for the
[11] gentleman with the ponytail.
[12]   **Q:** And did you notice whether Mr. Cerqueira
[13] had a ponytail?
[14]   **A:** I don't believe he did.
[15]   **Q:** In your statement, you then say, "The
[16] passengers saying how the passenger with the
[17] ponytail was wishing everyone around him 'Happy New
[18] Year.' He also said strange comments to the
[19] captain."
[20]     Is this what you were referring to a moment
[21] ago when you said the passengers approached you?
[22]   **A:** Yes.
[23]   **Q:** So they were referring to just the
[24] passenger with the ponytail?

Page 25

[1] **A:** No.

[2] **Q:** Well, you say here, "The passengers saying

[3] how the passenger with the ponytail was wishing

[4] everyone around him 'happy new year.'" Did they say

[5] something else that you didn't include here?

[6] **A:** I'm confused.

[7] **Q:** Well, you testified earlier, I believe,

[8] that the passengers said something to you, but they

[9] didn't specify which passengers in the window exit

[10] row they were referring to?

[11] **A:** Correct.

[12] **Q:** And then in your statement, you said, "The

[13] passengers saying how the passenger with the

[14] ponytail was wishing everyone around him 'Happy New

[15] Year.'" So did they say something else to you in

[16] addition to this?

[17] **A:** I don't recall.

[18] **Q:** And then you say, "He also said strange

[19] comments to the captain." And that's referring back

[20] to the man with the ponytail; is that correct?

[21] **A:** Yes.

[22] **Q:** So as you sit here today, you don't recall

[23] whether any of the passengers mentioned anything

[24] specifically with respect to Mr. Cerqueira?

Page 26

[1] **A:** I don't recall.

[2] **Q:** Do you recall which passenger said anything

[3] to you?

[4] **A:** No.

[5] **Q:** Do you recall where they were sitting?

[6] **A:** Approximately the same area as — I'm

[7] trying to remember. I don't remember the seat, but

[8] the lady with the two children were more towards the

[9] back of the airplane. The older lady was actually

[10] sitting around the window exit.

[11] **Q:** So it was an older woman and a woman who

[12] was traveling with two children?

[13] **A:** Yeah.

[14] **Q:** You mentioned a moment ago that you thought

[15] it was unusual for the three passengers in the

[16] window exit row to be sleeping during boarding; is

[17] that correct?

[18] **A:** Yeah.

[19] **Q:** Passengers aren't typically denied service

[20] for falling asleep during the boarding process, are

[21] they?

[22] **MS. MARIANI:** Objection. You may answer.

[23] **A:** No.

[24] **Q:** After you spoke with the captain initially

Page 27

[1] and you went up to look at the three passengers, did

[2] you report back to the captain?

[3] **A:** Yes.

[4] **Q:** What did you say to him?

[5] **A:** That I needed to come to the cockpit and

[6] talk to him.

[7] **Q:** And did you go to the cockpit and talk to

[8] him?

[9] **A:** Yes.

[10] **Q:** What did you discuss?

[11] **A:** At that time I relayed to him, the captain,

[12] what had happened at the gate in regards to one of

[13] the gentleman at the window exit.

[14] **Q:** Did you say anything else to him?

[15] **A:** No.

[16] **Q:** And did he say anything back to you?

[17] **A:** I don't recall what his actual response

[18] was.

[19] **Q:** Do you recall generally what his response

[20] was?

[21] **A:** I think he asked me to go back and recheck

[22] the lavatory and to check around the overhead bins

[23] and in front of the — underneath the seats, just to

[24] make sure that everything looked okay.

Page 28

[1] **Q:** And did you do that?

[2] **A:** Yeah.

[3] **Q:** And did you find anything that made you

[4] uncomfortable?

[5] **MS. MARIANI:** Objection. You may answer.

[6] **A:** No.

[7] **Q:** How long did that process take you?

[8] **A:** Just a few minutes.

[9] **Q:** Was anyone else involved with that

[10] conversation between you and Captain Ehlers?

[11] **A:** The co-pilot.

[12] **Q:** Was he participating in the conversation or

[13] just listening?

[14] **A:** Listening.

[15] **Q:** Did he say anything?

[16] **A:** No. Actually, the captain sent him back to

[17] double-check the lavatory.

[18] **Q:** And did he do that?

[19] **A:** Yes.

[20] **Q:** And do you know whether he found anything?

[21] **A:** I don't know.

[22] **Q:** Did he tell you that he found anything?

[23] **A:** No.

[24] **Q:** Did you speak with any of the other flight

Page 29

[1] attendants during this time?

[2] **A:** No.

[3] **Q:** Did you speak with any other American
lines personnel during this time?

[5] **A:** No.

[6] **Q:** Did you perceive the three passengers

[7] seated in the exit window row that Mr. Cerqueira was

[8] sitting in to be traveling together?

[9] **MS. MARIANI:** Objection. You may answer.

[10] **A:** I wasn't sure.

[11] **Q:** Are you familiar with how exit row seating

[12] is assigned by American Airlines?

[13] **MS. MARIANI:** Objection. You may answer.

[14] **A:** Vaguely.

[15] **Q:** What is your understanding of that process?

[16] **MS. MARIANI:** Objection. You may answer.

[17] **A:** That they board with the rest of the coach

[18] people.

[19] **Q:** That's not my question. My question is how

[20] the exit row seats are assigned.

[21] **MS. MARIANI:** Objection.

[22] **A:** Assigned?

[23] **Q:** Yes.

[24] **A:** No.

Page 30

[1] **Q:** You're not familiar with how exit row seats

[2] are assigned?

[3] **A:** No.

[4] **Q:** Do you know whether — but you are aware —

[5] strike that.

[6] Exit row seats are assigned by the gate

[7] agent; is that correct?

[8] **MS. MARIANI:** Objection. You may answer.

[9] **A:** I don't know. I have nothing to do with

[10] the assignment of seats.

[11] **Q:** Have you ever flown on an airplane as a

[12] passenger?

[13] **A:** Yes.

[14] **Q:** Have you ever requested an exit seat?

[15] **A:** No.

[16] **Q:** So as an employee of American Airlines for

[17] 37 years, you have no idea how exit row seats are

[18] assigned?

[19] **MS. MARIANI:** Objection. You may answer.

[20] **A:** No.

[21] **Q:** Okay. I think you just said a moment ago

[22] that you weren't sure whether Mr. Cerqueira was

[23] traveling with the other two gentlemen in his row;

[24] is that right?

Page 31

[1] **A:** Yes.

[2] **Q:** Did you witness Mr. Cerqueira talking with

[3] them or interacting with them in any way?

[4] **A:** No.

[5] **Q:** Did you think the three passengers were

[6] Middle Eastern?

[7] **MS. MARIANI:** Objection. You may answer.

[8] **A:** I had no idea.

[9] **Q:** Did you think they were foreign?

[10] **MS. MARIANI:** Objection. You may answer.

[11] **A:** "Foreign" being what?

[12] **Q:** Not born in the United States.

[13] **A:** No. I didn't know that.

[14] **Q:** Do you think that they looked similar?

[15] **MS. MARIANI:** Objection. You may answer.

[16] **A:** Yes.

[17] **Q:** Can you describe that; why you thought they

[18] looked similar.

[19] **A:** They were dark. They could have been any

[20] nationality.

[21] **Q:** And by "dark," you mean their skin was

[22] dark?

[23] **A:** Well, their hair was dark. They had dark

[24] hair. But that really wasn't it, their looks.

Page 32

[1] **Q:** Did you check to see if they had purchased

[2] their tickets together?

[3] **A:** No.

[4] **Q:** Are you aware of whether any other American

[5] employee had checked to see whether they purchased

[6] their tickets together?

[7] **A:** No.

[8] **Q:** Do you know whether they requested to sit

[9] together?

[10] **A:** No.

[11] **Q:** Do you recall whether Mr. Cerqueira was

[12] with the other two gentlemen in the gate area before

[13] boarding?

[14] **A:** There was just basically him and I before I

[15] got on that airplane. There were not a lot of other

[16] people in that area. There were probably two or

[17] three people in that whole gate area. And when I

[18] boarded the airplane, I don't know who he was with.

[19] **Q:** But the time that — I think you testified

[20] you were there for about 20 minutes doing your

[21] computer work.

[22] **A:** Uh-hum.

[23] **Q:** During that 20 minutes, you didn't see him

[24] with the other two passengers, did you?

**Page 33**

[1] **A:** No.

[2] **Q:** What made you think they could have been

[3] traveling together?

[4] **MS. MARIANI:** Objection. You can answer.

[5] **A:** It was basically because I felt that they

[6] were feigning sleep during a very busy boarding

[7] process, and they seemed to be hostile.

[8] **Q:** All three seemed to be hostile?

[9] **A:** Yes.

[10] **Q:** How did the other two appear to be hostile?

[11] **A:** They wouldn't look at you.

[12] **Q:** Because they were sleeping?

[13] **MS. MARIANI:** Objection.

[14] **A:** No, before they slept. You know, they

[15] didn't look at anybody. They just were sleeping or

[16] pretending to sleep. But their body language —

[17] they just seemed hostile.

[18] **Q:** How did their body language seem hostile?

[19] **A:** It's hard to explain. I could show you,

[20] but I don't know how to explain it.

[21] **Q:** Well, try.

[22] **A:** If you cross your arms and you sit back,

[23] you lay back —

[24] **MS. ABATE RECHT:** Just let the record

**Page 34**

[1] reflect that the witness has just crossed her arms

[2] in front of her chest.

[3] **A:** Lean back and close your eyes — it's just

[4] a hostile way of being. It's not an open type of

[5] situation on the airplane. It's hard to explain.

[6] **Q:** It's not uncommon for passengers to cross

[7] their arms and sit back and close their eyes, is it?

[8] **MS. MARIANI:** Objection. You may answer.

[9] **A:** No.

[10] **Q:** And typically passengers aren't refused

[11] service for crossing their arms, sitting back and

[12] closing their eyes, are they?

[13] **MS. MARIANI:** Objection. You may answer.

[14] **A:** No.

[15] **Q:** Did you notice any other behavior on the

[16] part of Mr. Cerqueira that you thought was

[17] suspicious that we haven't discussed yet?

[18] **A:** No.

[19] **Q:** And other than — strike that.

[20] Did you notice any other behavior on the

[21] part of the other two gentlemen seated with Mr.

[22] Cerqueira that you thought was suspicious that we

[23] haven't discussed yet?

[24] **A:** No.

**Page 35**

[1] **Q:** What happened next, after you spoke with

[2] the captain and after you checked the lavatory and

[3] the overhead bins?

[4] **A:** I went back to stand in the back of the

[5] airplane and continued the boarding process in back

[6] and the galley, my stuff in the galley. And that

[7] was it.

[8] You know, he took over, the captain and

[9] everybody — I know nothing about that. Once I left

[10] the cockpit and went back to my position in the back

[11] of the airplane, I had nothing to do with anything

[12] else.

[13] **Q:** What are you referring to, "with anything

[14] else"?

[15] **A:** With what transpired.

[16] **Q:** Did the captain tell you what he was

[17] planning to do?

[18] **A:** No.

[19] **Q:** Were you aware that the captain had

[20] contacted law enforcement?

[21] **A:** No.

[22] **Q:** At some point after your conversation with

[23] the captain, Mr. Cerqueira and the other two

[24] passengers seated next to him were removed from the

**Page 36**

[1] plane; is that correct?

[2] **A:** Yes.

[3] **Q:** Who were they removed from the plane by?

[4] **A:** I don't recall exactly their titles.

[5] **Q:** Do you recall whether it was officers from

[6] the State Police?

[7] **A:** No, it wasn't that.

[8] **Q:** It wasn't the State Police who removed him?

[9] **A:** No. The agent came back — or somebody

[10] from ground came back and asked for them to come

[11] forward to the airplane, the front of the airplane.

[12] **Q:** Do you know who that person was?

[13] **A:** No, I don't.

[14] **Q:** Was it Mr. Flores?

[15] **A:** It may have been. I really don't recall

[16] exactly who came back.

[17] **Q:** Do you recall whether any law enforcement

[18] officers ever entered the plane?

[19] **A:** I don't remember seeing any officers get on

[20] the airplane. I was in the back of the airplane.

[21] **Q:** Who was the flight attendant who would have

[22] been in that area, taking care of that area?

[23] **MS. MARIANI:** Objection. You may answer.

[24] **A:** The No. 1, the No. 1 — what was her name.

Page 37

[1] Not Lois. The other one.
[2]   Q: Amy Milenkovic?
[3]   A: Uh-hum.
       Q: So are you the No. 4 flight attendant?
[5]   A: I'm the No. 2, the galley person in the
[6] back.
[7]   Q: Is the No. 2 person?
[8]   A: Yes.
[9]   Q: And the No. 1 person is the person —
[10]  A: First class flight attendant.
[11]  Q: And there were three flight attendants
[12] onboard that day?
[13]  A: And Lois is the No. 4.
[14]  Q: So is there any No. 3?
[15]  A: No.
[16]  Q: What does the No. 4 do?
[17]  A: Boards. Boards up front, hangs coats in
[18] first class.
[19]  Q: Okay. What did they do during the flight?
[20]  A: They work with me in back. I set up the
[21] carts. No. 2 sets up the carts and gets — and
[22] takes care of all the — pretty much whatever is
[23] going on in the back of the airplane.
[24]  Q: So at some point you noticed that Mr.

Page 38

[1] ...erqueira and the three passengers were removed from
[2] the airplane; is that correct?
[3]   A: Uh-hum.
[4]   Q: That was done before the decision was made
[5] to deplane and rescreen all of the passengers on the
[6] plane; is that correct?
[7]   A: Yes.
[8]   Q: Do you know why Mr. Cerqueira and the other
[9] two passengers were being removed?
[10]  A: No.
[11]  Q: Did you ask anyone?
[12]  MS. MARIANI: Objection. You may answer.
[13]  A: I don't think so, because I was in the back
[14] of the airplane with all the passengers, so I wasn't
[15] privy to anything that was transpiring up front; who
[16] they called, why they called or what was happening.
[17] So no, I did not have a conversation.
[18]  *Q. Did you have a conversation with anyone
[19] after the incident about why these passengers were
[20] removed from the plane?
[21]  MS. MARIANI: Objection. I'm going to
[22] allow the witness to answer as to conversations with
[23] anyone other than members of the American legal
[24] department or my office.

Page 39

[1]   Q: You can answer whether you had
[2] conversations with anyone from the legal department.
[3] You just don't need to tell us what the substance of
[4] those communications were.
[5]   A: So the question is? I'm sorry.
[6]   MS. ABATE RECHT: Jane, can you repeat the
[7] question.
[8]   *(Question read)
[9]   A: Yes.
[10]  Q: Who did you speak with?
[11]  A: The supervisor on duty downstairs.
[12]  Q: Who was that?
[13]  A: I don't recall.
[14]  Q: Was it a man or a woman?
[15]  A: You know, three years ago, their MODs, I
[16] don't recall.
[17]  Q: What's —
[18]  A: They're supervisors on duties downstairs to
[19] assist flight attendants with any problems or — you
[20] know, to gather the paperwork for the wide bodies
[21] and things like that. I mean, I don't normally talk
[22] to them.
[23]  Q: Do you remember what you spoke with them
[24] about that day?

Page 40

[1]   A: That I had to write up an OP-4 and that I
[2] would submit it. And I went into the conference
[3] room.
[4]   Q: And by "OP-4," you're referring to the
[5] statement that's marked as Exhibit 1?
[6]   A: Yes.
[7]   Q: And other than this document, did you write
[8] anything else regarding this incident?
[9]   A: No.
[10]  Q: Did anyone from American contact you to
[11] discuss this further after that day?
[12]  A: No.
[13]  Q: Did you communicate with any law
[14] enforcement officers?
[15]  A: No.
[16]  Q: Did you notice whether Mr. Cerqueira and
[17] the other two passengers seated in his row were
[18] either giggling or joking during the security
[19] briefing, the safety briefing?
[20]  A: I remember something about that, but I'm
[21] not sure what.
[22]  MS. ABATE RECHT: I'll mark as Exhibit 3
[23] the document that's been Bates numbered CRQ 0029-35.
[24]

# Exhibit 8

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of Amy Milenkovic
with Deposition Exhibit No. 9

# In The Matter Of:

*John D. Cerqueira   v.*
*American Airlines, Inc.*

---

*Amy Milenkovic*
*Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

Original File MILENKOV.V1, 34 Pages
Min-U-Script® File ID: 3932626046

# Word Index included with this Min-U-Script®

**Page 1**

Volume I

Pages 1 to 34

Exhibits 8 and 9

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,                    :

    Plaintiff,                    :

vs.                    : Civil Action

    : No. 05-11652-WGY

AMERICAN AIRLINES, INC.,                    :

    Defendant.                    :

DEPOSITION OF AMY MILENKOVIC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 4:59 p.m.

    PRESENT:

    Birnbaum & Godkin, LLP

    (By Erica Abate Recht, Esq.)

280 Summer Street, Boston, MA  02210,

    for the Plaintiff.

    Fitzhugh, Parker & Alvaro LLP

    (By Amy Cashore Mariani, Esq.)

155 Federal Street, Suite 1700, Boston, MA

    02110-1727, for the Defendant.

**Page 2**

INDEX

WITNESS                    DIRECT    CROSS

AMY MILENKOVIC

BY MS. ABATE RECHT                    3

EXHIBITS

NO.    DESCRIPTION                    PAGE

8    Document entitled "Detail Note"    6

    Bates stamped AA 0031

9    Document entitled "AMR Event Call    7

    Center Report" Bates stamped AA 0015

    to 0017

**Page 3**

**PROCEEDINGS**

[2]    **MS. MARIANI:** And the same stipulations, I

[3] imagine?

[4]    **MS. ABATE RECHT:** Yes.

[5]    **AMY MILENKOVIC**

[6] a witness called for examination by counsel for the

[7] Plaintiff, having been satisfactorily identified by

[8] the production of her driver's license and being

[9] first duly sworn by the Notary Public, was examined

[10] and testified as follows:

[11]    **DIRECT EXAMINATION**

[12]    **BY MS. ABATE RECHT:**

[13]    **Q:** Can you please state your full name for the

[14] record.

[15]    **A:** Amy Marie Milenkovic.

[16]    **Q:** Can you spell your last name, please.

[17]    **A:** It's M-I-L-E-N-K-O-V-I-C.

[18]    **Q:** What is your address?

[19]    **A:** 867 Cleveland Avenue, and it's Apartment

[20] 0-10, and it's in St. Paul, Minnesota 55116.

[21]    **Q:** Did you do anything to prepare for today's

[22] deposition?

[23]    **A:** No, other than just talking to Amy and Alec

[24] Bramlett, as far as, like, making me aware of the

**Page 4**

[1] deposition and possibly when it would take place and

[2] all of that.

[3]    **MS. MARIANI:** I'm going to ask you not to

[4] disclose the substance of communications with myself

[5] or Mr. Bramlett, who is a member of the AA legal

[6] department.

[7]    **Q:** Did you review any documents in preparation

[8] for the deposition?

[9]    **A:** No, just I received a report that I had

[10] written at the time, a copy of it, and I looked over

[11] that.

[12]    **Q:** Are you referring to your AMR Event Call

[13] Center Report?

[14]    **A:** Yes.

[15]    **Q:** Did you speak to anyone else about the

[16] deposition?

[17]    **A:** My husband is aware that I had to come

[18] here, and then people at American Airlines, as far

[19] as my supervisor and people in the office, to make

[20] arrangements for me to come here.

[21]    **Q:** Were there conversations solely about

[22] scheduling or did you talk about the substance?

[23]    **A:** No, solely about scheduling, and that I had

[24] a deposition.

Mary Milenkovic                                    John D. Cerqueira  v.
Vol. 1, March 28, 2006                        American Airlines, Inc.

Case 1:05-cv-11652-WGY — Document 22-9 — Filed 09/22/2006 — Page 4 of 11

Page 5

[1]   Q: Are you currently employed by American
[2] Airlines?
[3]   A: Yes.
      Q: How long have you been employed by
[5] American?
[6]   A: Since October of '92.
[7]   Q: What is your position?
[8]   A: I'm a flight attendant.
[9]   Q: And have you held that position since
[10] October of '92?
[11]  A: Yes.
[12]  Q: Were you previously employed?
[13]  A: I was a student, and I had odd jobs, as far
[14] as restaurants and clerk type of jobs before that.
[15]  Q: So this was your first flight attendant
[16] job?
[17]  A: First, yes.
[18]  Q: What is your educational background?
[19]  A: I have a Bachelor of Arts in journalism and
[20] history.
[21]  Q: Were you a member of the flight crew for
[22] American Airlines Flight 2237 on December 28, 2003?
[23]  A: Can you tell me the destination? I don't
[24] remember flight numbers.

Page 6

[1]   Q: Okay. It was a flight from Boston to Fort
[2] Lauderdale.
[3]   A: Yes.
[4]   MS. ABATE RECHT: And I'll just mark as
[5] Exhibit 8 a document with Bates Nos. AA 0031.
[6]      (Document marked as Milenkovic
[7] Exhibit 8 for identification)
[8]   Q: And does this document refresh your
[9] recollection that you were a member of the flight
[10] crew of Flight 2237 on December 28, 2003?
[11]  A: Yes.
[12]  Q: Do you remember a passenger by the name of
[13] Mr. Cerqueira?
[14]  A: No. As far as I only since being referred
[15] to the deposition, hearing the name now. I don't
[16] remember the name at the time of the flight.
[17]  Q: Do you remember that on that flight, three
[18] passengers were removed from the plane?
[19]  A: Yes.
[20]  Q: And do you remember those three passengers?
[21]  A: No. As far as how they look or as far as
[22] how — I remember certain behavioral actions from
[23] some of them. But as far as to see someone on the
[24] street and recognize them, no.

Page 7

[1]   Q: Did you have any conversations with a
[2] flight attendant by the name of Sally Walling
[3] regarding Mr. Cerqueira or the other two gentlemen
[4] who you recall were the ones who were removed from
[5] the flight?
[6]   A: Yes. She — yes. She called me on our
[7] intercom phone as far as making me aware that there
[8] were some issues going on in the main cabin.
[9]   MS. ABATE RECHT: I'm going to mark as
[10] Exhibit 9 a document with Bates Nos. AA 0015 through
[11] 17.
[12]      (Document marked as Milenkovic
[13] Exhibit 9 for identification)
[14]  Q: Do you recognize this document?
[15]  A: Yes. This is the report I wrote up
[16] afterwards.
[17]  Q: And this is the report that you referred to
[18] earlier that you had reviewed?
[19]  A: Yes.
[20]  Q: Do you see you wrote, "The No. 4 mentioned
[21] to me as we were getting onboard the AC" — which I
[22] assume stands for "aircraft"?
[23]  A: Aircraft, yes.
[24]  Q: — "that a passenger at the gate kept

Page 8

[1] asking her if he could change his seat and kept
[2] staring at her when she told him she was the flight
[3] attendant." Do you see that there?
[4]   A: Yes.
[5]   Q: Does that refresh your recollection at all
[6] as to any discussions you had with Ms. Walling
[7] before you were in the main cabin?
[8]   A: Just as I said in my report, she mentioned
[9] it to me getting on the airplane, but she did not
[10] refer to — she just said "passenger." She didn't
[11] refer to as far as the way anyone looked or — it
[12] was just the behavior of what I mentioned in the
[13] report.
[14]  Q: Did she say anything else to you that's not
[15] written in the report?
[16]  A: I don't remember.
[17]  Q: Ms. Walling is the No. 4 who's referred to
[18] here; is that right?
[19]  A: Yes, that's correct.
[20]  Q: You also wrote, "She told me she had a very
[21] bad feeling from him." Do you recall what she told
[22] you about that?
[23]  A: No, I don't.
[24]  Q: Do you recall anything else about that

---

**Page 9**

[1] conversation with Ms. Walling?

[2] A: Not — I'm sorry, no.

[3] Q: You next write, "A passenger with a
[4] ponytail and heavy accent made a comment to the
[5] captain, asking him if he was their captain." Did
[6] you hear the passenger make that comment?

[7] A: How do I word this. I wasn't directly
[8] staring at him and heard him say it. I was doing
[9] other things in my galley, which is right where
[10] everyone boards. And so I did kind of hear him —
[11] someone make a comment to the captain, and I then
[12] turned to look.

[13] Q: And then you saw that it was the passenger
[14] with the ponytail?

[15] A: Yes, correct.

[16] Q: Do you recall whether Mr. Cerqueira had a
[17] ponytail?

[18] A: No.

[19] Q: Do you recall whether Mr. Cerqueira had an
[20] accent?

[21] A: No.

[22] Q: You also wrote after that, "I thought that
[23] seemed a little strange." Why did you think that
[24] seemed strange?

---

**Page 10**

[1] A: You mean, why he asked if the captain
[2] standing in the front of the airplane was our
[3] captain? Because it's obvious he is our captain,
[4] because he's standing right there in the door to the
[5] cockpit. And this is after September 11th, so no
[6] one else — any other crew members — I'll rephrase
[7] that. No other pilots from other airlines or anyone
[8] else would be standing there. So I thought that was
[9] a strange comment.

[10] Q: Why did you comment that this man had a
[11] heavy accent?

[12] A: I don't know. It was just something to
[13] differentiate who that person was in the ponytail.

[14] Q: What happened next?

[15] A: I would have to refer to the report.

[16] Q: You can refer to the report if that will
[17] refresh your recollection.

[18] A: Obviously, the captain told me that he had
[19] been approached by the same person in the terminal.
[20] So that made us a little bit suspicious, why the
[21] same person would have approached that same — our
[22] captain, both at the terminal and then make that
[23] comment that he made on the airplane. And I believe
[24] that's, you know, what the captain had said also.

---

**Page 11**

[1] Q: What did the captain tell you about his
[2] encounter with the passenger at the terminal?

[3] A: Just as far as I remember, was that he
[4] just — the passenger had come up to ask him about
[5] the flight or about if he was — if he was flying
[6] the airplane to Fort Lauderdale. And then the
[7] reason I remember it being strange is because the
[8] captain said it was the same person that just asked
[9] him when he got on the plane for the second time if
[10] it was the same captain.

[11] Q: Did the captain say anything else to you
[12] about that incident?

[13] A: Not that I remember.

[14] Q: You then wrote, "After all the passengers
[15] were boarded and the door closed, the No. 4 called
[16] the captain and said the passenger at 20F that had
[17] disturbed her in the terminal had been the first one
[18] on and had immediately gone to the right-hand lav in
[19] the rear." Do you see that?

[20] A: Yes.

[21] Q: Is the "4" again referring to Ms. Walling?

[22] A: Yes.

[23] Q: Did you hear Ms. Walling's conversation
[24] with the captain?

---

**Page 12**

[1] A: No. If I did, I don't remember it.

[2] Q: Was she in the back of the plane at this
[3] time?

[4] A: She was — I do remember she was in the
[5] back. And then also as things developed, she would
[6] come up and speak to the captain, who was in the
[7] cockpit at the time. So it was both in the back
[8] over the phone and coming up in person.

[9] Q: If she was in the back on the phone, would
[10] you have heard what she was saying?

[11] A: No, I would not.

[12] Q: Other than what you've written here, did
[13] you overhear Ms. Walling tell anything else to the
[14] captain?

[15] A: Not that I remember.

[16] Q: In your experience, is it unusual for
[17] passengers to use the lavatory in the bathroom upon
[18] boarding the plane?

[19] A: Not unusual; but in Boston there are
[20] bathrooms outside by the gates, so — we have some
[21] gates in our system where there are no bathrooms, so
[22] it is very common that a lot of people go to the
[23] bathroom right away, before, you know, they sit
[24] down. But, no, it's not unusual.

Page 13

[1]  **Q:** So certainly passengers aren't denied
[2] service because they used the bathroom on boarding?
[3]   **A:** No.
     MS. MARIANI: Objection. You may answer.
[5]  **Q:** You then wrote, "Passengers started to tell
[6] us the passenger in 20D had started yelling everyone
[7] around him 'Happy New Year.'" Is that right?
[8]   **A:** Yes.
[9]  **Q:** Did you talk to those passengers
[10] personally?
[11]  **A:** I don't remember if I spoke to them or if
[12] Lois or Sally spoke to them.
[13]  **Q:** Do you remember where these passengers were
[14] seated?
[15]  **A:** If I wrote, "Passengers started to tell us
[16] about the passenger in 20D, those passengers must
[17] have been in the main cabin."
[18]  **Q:** Do you remember specifically or are you
[19] guessing?
[20]  **A:** I don't remember. I'm reading what I
[21] wrote, but I don't remember where these passengers
[22] sat.
[23]  **Q:** Did anyone say anything about Mr. Cerqueira
[24] in particular?

Page 14

[1]  **A:** I don't remember. I don't know.
[2]  **Q:** Would it refresh your recollection as to
[3] who Mr. Cerqueira was if I told you that he was
[4] seated in the window seat of the exit row in Row 20?
[5]  **A:** I don't remember him, so that doesn't help
[6] me as far as remembering anything specific about
[7] him.
[8]  **Q:** Did these passengers mention this to you or
[9] the other flight — strike that.
     Did these passengers mention this to you
[11] before the three gentlemen in Row 20 were removed
[12] from the plane?
[13]  **A:** I don't remember.
[14]  **Q:** You then say, "The State Police were called
[15] and Passenger Service." When did that happen?
[16]  **A:** I don't know the time frame or the
[17] timeline, but it was obviously after there was
[18] calling back and forth to the captain about the
[19] three passengers. So I don't know exactly when this
[20] all took place. It was after the airplane was
[21] boarded. I do know that. I mean, everyone was on
[22] the airplane.
[23]  **Q:** Did you have any conversations with Captain
[24] Ehlers about his decision to remove these three

Page 15

[1] passengers from the plane?
[2]  **A:** Yes, because all three flight attendants —
[3] we were all working the flight, so he had to discuss
[4] this with all three of us. I don't remember my
[5] conversation with him, so I cannot say exactly what
[6] we discussed.
[7]  **Q:** Do you remember generally what was
[8] discussed?
[9]  **A:** It would have been what Sally and Lois saw
[10] in the main cabin. It would have been, you know —
[11]  **Q:** Do you remember what Lois saw?
[12]  **A:** No, I don't.
[13]  **Q:** Did she ever tell you anything that she
[14] saw?
[15]  **A:** No. I mean, not that I remember.
[16]  **Q:** I'm sorry, you can finish your answer.
[17]  **A:** So we just would have discussed how we felt
[18] about — that we would have had to discuss the
[19] reason we wanted the State Police and Passenger
[20] Service to come out. And so then the captain made
[21] that decision.
[22]  **Q:** And what were your reasons for wanting the
[23] State Police and Passenger Service to come out?
[24]  **A:** Well, I do know that there had been time

Page 16

[1] that had gone by. What I remember, it had been
[2] probably an hour that had gone by, and so —
[3]  **Q:** An hour from what?
[4]  **A:** From the time the flight attendants had
[5] gotten on the airplane. And I don't believe it was
[6] an hour after boarding, but it would have been after
[7] departure time. And my feelings were if the crew
[8] members don't feel comfortable, if we all don't feel
[9] comfortable with something, it's a security issue,
[10] and we have to address that.
[11]  **Q:** What did you feel uncomfortable with?
[12]  **A:** I felt uncomfortable that the passengers
[13] were making strange comments to both the captain and
[14] to just people they didn't know as they were getting
[15] on the airplane.
[16]  **Q:** Do you recall whether Mr. Cerqueira, who
[17] was the passenger who was seated in the window seat,
[18] was making any of those comments?
[19]  **A:** No, I don't remember.
[20]  **Q:** What other behavior did you feel was
[21] suspicious?
[22]     MS. MARIANI: Objection. You may answer.
[23]  **A:** I did not see a lot of things. I was in
[24] the front part of the aircraft, so I did not see,

[1] actually, any of the — a lot of the things that
[2] were going on. But I — as the time continued on, I
[3] did not feel comfortable that the rest of the crew
[4] did not — had seen these things, and it was a
[5] unanimous decision that we would have to, you know,
[6] talk to the captain and have the State Police. And
[7] these are things that we're trained for, as far as
[8] you have to listen to your fellow crew members, even
[9] if you haven't seen anything. So I was basically
[10] doing my job.
[11]     Q: Did you perceive the three passengers
[12] seated in Row 20 in the emergency exit row, Mr.
[13] Cerqueira's row, to be traveling together?
[14]     A: I don't know. I do know I had walked back
[15] there, and so I would have glanced at the row, but I
[16] didn't perceive that they — I don't know.
[17]     Q: So is it fair to say that you didn't really
[18] take any particular notice of them?
[19]     MS. MARIANI: Objection. You may answer.
[20]     A: Well, I did notice, because the gentleman
[21] with the ponytail was sitting in that row. And he's
[22] the one that I — to be honest, he's the one that I
[23] remember the most, just because he made comments to
[24] the captain, and I had more interaction with him.

[1] And so he was sitting in that row. So of course, I
[2] would have looked at the whole row, not just him.
[3]     Q: Did you recall whether you thought the
[4] three passengers were Middle Eastern?
[5]     MS. MARIANI: Objection. You may answer.
[6]     A: I don't remember, because I don't remember
[7] other than the gentleman with the ponytail.
[8]     Q: Did you think he was Middle Eastern?
[9]     A: I may have, yes.
[10]     Q: Did you witness Mr. Cerqueira talking or
[11] interacting with the gentleman with the ponytail in
[12] any way?
[13]     A: No.
[14]     Q: Do you recall whether you remember —
[15] strike that. It's a long day.
[16]     Did you think that the three passengers
[17] looked similar to each other?
[18]     MS. MARIANI: Objection. You may answer.
[19]     A: I don't remember, but I remember that they
[20] all had dark hair; you know, just very vague things.
[21]     Q: Do you recall whether they had a similar
[22] skin color?
[23]     MS. MARIANI: Objection. You may answer.
[24]     A: No. Like I said, I mainly remember the

[1] gentleman with the ponytail.
[2]     Q: And did it make you feel uncomfortable that
[3] he had an accent?
[4]     MS. MARIANI: Objection. You may answer.
[5]     A: No. Those things don't make me feel
[6] uncomfortable. My husband has an accent. But it's
[7] just something that you pay close attention to, you
[8] know, specifically since September 11th.
[9]     Q: Did you check to see whether those
[10] passengers had purchased their tickets together?
[11]     A: I don't remember if I — no, I don't know
[12] how to purchasing — to look at what they
[13] purchased. But I don't remember if I looked at
[14] their boarding passes or not.
[15]     Q: Do you know whether these three passengers
[16] requested seats together?
[17]     A: No, I don't.
[18]     Q: Did you witness any of these three
[19] passengers in the gate area before boarding?
[20]     A: No.
[21]     Q: Do you recall whether they boarded the
[22] flight at the same time?
[23]     A: No, I don't. I just remember the gentleman
[24] with the ponytail was with another gentleman. But I

[1] don't remember how he looks.
[2]     Q: So you recall that he was with one
[3] gentleman, not two gentlemen?
[4]     A: Correct.
[5]     Q: Did you personally observe any other
[6] unusual or suspicious behavior that we haven't
[7] talked about yet?
[8]     MS. MARIANI: Objection. You may answer.
[9]     A: No, I don't remember.
[10]     Q: Did you personally observe any unusual or
[11] suspicious behavior on the part of anyone other than
[12] the man with the ponytail?
[13]     MS. MARIANI: Objection. You may answer.
[14]     A: No.
[15]     Q: You mentioned earlier that when you
[16] witnessed the behavior that you thought was
[17] suspicious and made you uncomfortable, it was based
[18] on training you had had. Can you elaborate on that,
[19] what kind of training you've had to identify
[20] suspicious behavior?
[21]     MS. MARIANI: I'm going to object. And I'm
[22] going to instruct the witness to answer only in
[23] general terms and not to provide any specifics that
[24] may implicate Sensitive Security Information. She

**EXHIBIT 9**

12/29/2003  19:19    617-634-5359    BOS FLT SVC

**AMR EVENT CALL CENTER REPORT (Flight Attendants ONLY)**

Once the event has been reported, this form may be retained for your records only

**PLEASE PRINT ALL INFORMATION**

## General Information

Station of Event **BOS**    Flight # **2237**    Dept City **BOS**    Arv City **FL**    Aircraft Type **S80**    Aircraft Tail # _____

Date & Time of Report **12/28 8:30**  ☐ AM ☐ PM

Employee Reporting **Alan Milenkov**
Employee #  _____  ☐ EA ☐ AE ☐ AMR

Home Base **BOS**    Position **#1**
Employee Contact Phone _____

Employee's Manager **J. Davis**

Date & Time of Event **12/28 7:00**  ☐ AM ☐ PM

**Passenger Information:**
Name: _____
Address: _____
Home Ph: ( )  ☐ Male    Bus. Phone: ( )  ☐ Female
Age: _____
Guardian (if a minor) _____
Guardian Phone Contact: ( )
Seat Number on Aircraft: _____

## Medical/Illness Event

What Happened _____

Illness  ☐ Unconscious  ☐ Seizure  ☐ Heart Attack  ☐ Hyperventilating  ☐ Contagious Disease

☐ Other (Describe symptoms) _____

Injury (Specific Description of Injury & Body Part) _____

**Incident Due to:**
☐ Slip/Fall
☐ Serving Cart
  ☐ —Pax Injury
☐ Hot Spill
☐ Object in Food
  Object _____
☐ Decompression
☐ Ear Discomfort
☐ Slide Deployment
☐ Struck by Object from O/H Bin
  —O/H Bin Opened by:
  ☐ —F/A
  ☐ —Pax
  ☐ —Takeoff/Landing
☐ Other _____

☐ Turbulence
  ☐ —Pax Injury
  ☐ —No Injuries
  ☐ —Seat Belt Sign
  ☐ On  ☐ Off
☐ Unsched. Landing
  ☐ —Mechanical
  ☐ —Medical Diversion
  ☐ —Weather
☐ Evacuation
  ☐ —Planned
  ☐ —Unplanned

**Where Did It Happen:**

Aircraft:
☐ Aisle
☐ Seat
☐ Lavatory
☐ Galley
☐ O/H Bin
☐ CockpR
☐ Cargo
☐ Stairs

Airport:
☐ Escalator
☐ Elevator
☐ Stairs
☐ Bathroom
☐ Customs
☐ Security
☐ Gate No. _____
☐ Jetbridge
☐ Concourse
☐ Other _____

☐ Ramp
☐ Parking Lot
☐ Curbside
☐ Shuttlebus
☐ Bag Claim
☐ Restaurant
☐ Vehicle
☐ Passenger Service Cart
☐ Ticket Counter

Cabin Altitude (if known) _____

Medical Treatment Offered?  ☐ Yes ☐ No    ☐ Medical Treatment Refused
  ☐ Airport Medical ☐ MD  ☐ RN  ☐ EMT/Para  ☐ DO  ☐ LPN/LVN  ☐ No Med. Assistance on A/C

Medical Provided By: _____    Phone: ( )

Name of Person Providing Treatment: _____

Specific Treatment Given _____    Current Medication _____

Other Illness of Passenger _____    ☐ Unconscious  ☐ Severe Chest Pain

Oxygen Given?  ☐ Yes  ☐ No
Reason for Oxygen?  ☐ Irrational  ☐ Difficulty Breathing    ☐ Note from Doctor  ☐ Provided by Station
  Items Used _____

Medical Kit Opened?  ☐ Yes  ☐ No    Items Used _____

Grab and Go Kit Used?  ☐ Yes  ☐ No    Results _____

Defibrillator Used?  ☐ Yes  ☐ No    Items Used _____

First Aid Kit Opened?  ☐ Yes  ☐ No    ☐ Laerdal Mask  ☐ Latex Gloves  ☐ Heimlich Maneuver

Medical Procedures?  ☐ CPR Administered  ☐ Ice Pack    ☐ Wheelchair Assistance  ☐ Other _____
  ☐ Urine  ☐ Vomit    ☐ Other _____

Body Fluids Involved?  ☐ Blood    Doctor _____    Phone ( )

Hospitalized?  Hospital Name _____

FCC 1 OPR 1... REV0910

AA 0015

12/29/2003  19:19    617-634-5359    BOS FLT SVC    PAGE  05

## AMR EVENT CALL CENTER REPORT

**What Happened** _Suspicious passengers on board_

**Where Did It Happen** _Onboard S-80 flight 2237_

- ☐ Articles Missing / Stolen
- ☐ Unauthorized Person in Security Restricted Area
- ☒ Suspicious Behavior
- ☐ Estimate of Value of Articles Missing/Stolen $ _____

- ☐ Suspicious Article
  - ☐ —Article Left on A/C - No Pax
  - ☐ —Items Which Bypass Security

**Bomb Threat**
- ☐ Verbal Threat
- ☐ Parked at Ramp
- ☐ Written Threat
- ☐ Emerg. Landing
- ☐ Pax Removed
- ☐ Evacuation
- ☐ Aircraft Searched
- ☐ False Threat

**Hijacking**
- ☐ Verbal Threat
- ☐ Written Threat

**Smoking / Non-Smoking Issues**
- ☐ Pax Smoked in Aisle
- ☐ Pax Smoked in Cabin
- ☐ Pax Smoked in Lavatory
- ☐ Pax Would Not Put Out Cigarette
- ☐ Pax Smoked in Terminal
- ☐ Hazardous Disposal

**Pax Appeared Intoxicated / Drugs**
- ☐ Boarding Denied
- ☐ Belligerent
- ☐ Pax Removed On Landing
- ☐ Removed Before Departure
- ☐ Unconscious
- ☐ Pax Denied Alcohol
- ☐ Using Own Bottle

**Threatened / Interfered with Employee**
- ☐ Physical Actions Toward Employee
- ☐ Verbal Actions Toward Employee

**Police / Security Meet Flight?**    ☐ FAA    ☐ FBI    ☒ Local Police
**Passenger Taken Into Custody?**    ☒ Yes    ☐ No    ☒ Pax Service Staff
**Police/Security Requested / Did _Not_ Meet Flight**    ☐

ice/Security Notified? Name _____    Phone ( ___ ) _____

Parties Involved:  Name _____    Company _____
Address _____    Phone ( ___ ) _____

Name _____    Company _____
Address _____    Phone ( ___ ) _____

## 4. Witnesses

1.) Name _CAPTAIN John Ehlers_    2.) Name _FO Don Ball_
Address _AA Capt._    Address _AA FO_
Home Phone ( ___ )    Home Phone ( ___ )
Business Phone ( ___ )    Business Phone ( ___ )

## 5. Comments / Additional Information

The #4 mentioned to me as we were getting onboard the A/C that a pax at the gate kept asking her if he could change his seat & kept staring at her when she told him she was the FA. She told me she had a very bad feeling from him. We began to board & toward the end of boarding a pax w/ a pony tail & heavy accent ⊗ made a comment to the capt' asking him if he was their capt. I thought

AA 0016

that seemed a little strange. The capt. then told me he had approached him in the terminal asking him if he was the captain.

After all the pax were boarded & the door closed the #4 called the captain & said the pax at 20F that had disturbed her in the terminal had been the first one on and had immediately gone to the right-hand lav in the rear. Passengers started to tell us the pax in 20D had started telling everyone around him "Happy New Year." The state police were called & pax service.

# Exhibit 9

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT


Excerpts of Defendant's Supplemental
Automatic Disclosures Pursuant to
Fed. R. Civ. P. 26(a) and L.R. 26.2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA,<br><br>     Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO.: 05-11652 WGY |

## DEFENDANT'S SUPPLEMENTAL AUTOMATIC DISCLOSURES PURSUANT TO FED.R.CIV.P. 26(a) AND L.R. 26.2

Pursuant to Rule 26(a)(1)(A), (B), (C) and (D) of the Federal Rules of Civil Procedure, and Local Rule 26.2, defendant American Airlines, Inc. ("American") supplements its initial disclosures as set forth below. These disclosures are based on information reasonably available to American as of the date of this submission. American reserves the right to supplement these disclosures based on information developed in the course of discovery or further factual investigation.

American generally understands that the plaintiff is alleging economic losses, humiliation, embarrassment, emotional distress, and a deprivation of his right to enter and enforce a contract to travel as a passenger in air transportation regardless of his race, color, ethnicity, alienage, ancestry and national origin. American disputes these allegations, and bases its disclosures herein on this understanding of the nature of the plaintiff's claims.

American Airlines, Inc.

Lynn, MA

8.      Doug Wood
        Assistant Chief Pilot
        American Airlines, Inc.

9.      Rhonda Cobbs
        Systems Operations Control Analyst
        American Airlines, Inc.
        Arlington, TX

10.     Craig Marquis
        Systems Operations Control Manager
        American Airlines, Inc.
        Arlington, TX

11.     Vittorio Rokah
        Address and telephone number unknown

12.     Oren Ashmil
        Address and telephone number unknown

13.     Jason McGill
        Brooklyn, NY

14.     Members of the Cerqueira family (first names unknown)
        Address and telephone number unknown

Captain Ehlers, Ms. Walling, Ms. Sargent, Ms. Milenkovic, and First Officer Ball

likely have knowledge of the actions of the plaintiff and of the two passengers seated

next to him, Messrs. Rokah and Ashmil, on Flight 2237 on December 28, 2003 which

gave rise to Captain Ehlers' refusal to permit the plaintiff on the flight, including, but not

limited to, Ms. Walling's observations of the plaintiff before and immediately after he

boarded the flight, Ms. Sargent's observations of the plaintiff, Mr. Rokah and Mr. Ashmil

during the pre-flight boarding processes, and Captain Ehlers' observations of Mr. Rokah and Mr. Ashmil in the gate area.

Captain Wood likely has knowledge of the process utilized by Captain Ehlers to determine that the plaintiff and the other two passengers should be removed from the flight.

Ms. Flores and Ms. Traer likely have knowledge of what transpired, respectively, during the process of removing the plaintiff from Flight 2237 and during the process of refunding him his airfare for the subject flight.

Ms. Cobbs and Mr. Marquis likely have knowledge of what occurred to result in a continued denial of service to the plaintiff on December 28, 2003.

Mr. McGill and Mr. Cerqueira's family members may have knowledge of contemporaneous statements made by the plaintiff regarding the events of December 28, 2003. Mr. McGill and Mr. Cerqueira's family members also may have knowledge regarding Mr. Cerqueira's claimed damages.

The defendant hereby adopts and incorporates herein by reference the list of witnesses that the plaintiff has identified in his *Automatic Disclosure* or in subsequent pleadings and/or discovery responses. The defendant reserves the right to supplement its list of witnesses from time to time as discovery proceeds.

**B.    Disclosure Pursuant to Fed.R.Civ.P. 26(a)(1)(B)**

The following is a description by category of all non-privileged documents, data compilations, and tangible things that are in the possession, custody or control of American and that American may use to support its claims or defenses in this action:

1.    Correspondence from the U.S. Department of Transportation to American dated April 28, 2004;

# Exhibit 10

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of John M. Ehlers

# In The Matter Of:

*John D. Cerqueira    v.*
*American Airlines, Inc.*

---

*John M. Ehlers*
*Vol. 1, April 26, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File EHLERS.V1, 93 Pages*
*Min-U-Script® File ID: 0234695554*

# Word Index included with this Min-U-Script®

**Page 1**

Volume I
Pages 1 to 93
Exhibits 15 to 17
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,              :
        Plaintiff,              :
vs.                            : Civil Action
                               : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,       :
        Defendant.             :

DEPOSITION OF JOHN M. EHLERS, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
26, 2006, commencing at 10:00 a.m.

PRESENT:
        Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
        280 Summer Street, Boston, MA  02210,
        for the Plaintiff.

        Fitzhugh, Parker & Alvaro LLP
        (By Michael A. Fitzhugh, Esq.)
        155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.

**Page 2**

INDEX

WITNESS    DIRECT CROSS  REDIRECT RECROSS
JOHN M. EHLERS
   BY MS. ABATE RECHT     3        84
   BY MR. FITZHUGH                 83

EXHIBITS
NO.    DESCRIPTION            PAGE
15   Letter dated 6/14/04 to Samuel   21
     Podberesky from Alec Bramlett
16   Document entitled "Detail Note"  23
     Bates stamped AA 0035
17   Document entitled "KUDWA HOTLINE  54
     MESSAGE," dated 8/12/02

**Page 3**

[1]         **PROCEEDINGS**
[2]      Stipulation
[3]   It is stipulated by and between counsel for the
[4] respective parties that the deposition is to be read
[5] and signed under the pains and penalties of perjury;
[6] and that all objections, except as to form, and
[7] motions to strike are reserved to the time of trial.
[8]
[9]            **JOHN M. EHLERS**
[10] a witness called for examination by counsel for the
[11] Plaintiff, having been satisfactorily identified by
[12] the production of his driver's license and being
[13] first duly sworn by the Notary Public, was examined
[14] and testified as follows:
[15]          **DIRECT EXAMINATION**
[16]          **BY MS. ABATE RECHT:**
[17]   **Q:** Captain Ehlers, good morning.
[18]   **A:** Hi.
[19]   **Q:** Would you please state your full name for
[20] the record.
[21]   **A:** John Mitchell Ehlers.
[22]   **Q:** What is your address?
[23]   **A:** 81 Farmers Cliff Road in Concord.
[24]   **Q:** Massachusetts?

**Page 4**

[1]   **A:** Yes.
[2]   **Q:** Did you do anything to prepare for today's
[3] deposition?
[4]   **A:** Yes, I did. I spoke with Michael, the
[5] attorney. Other than that, I haven't done anything
[6] to prepare.
[7]   **Q:** Did you speak with anyone else besides your
[8] attorney?
[9]   **A:** No.
[10]   **Q:** Did you speak with any other American
[11] Airlines personnel?
[12]   **A:** No.
[13]   **Q:** Did you review any documents?
[14]   **A:** Yes.
[15]   **Q:** Do you recall which documents those were?
[16]   **A:** The documents in the complaint that the
[17] client had made and going through that page by page.
[18]   **Q:** Are you referring to the First Amended
[19] Complaint that was filed in this action or a
[20] different complaint?
[21]   **A:** It must have been the first that I saw.
[22]   **Q:** Do you recall reviewing any other
[23] documents?
[24]   **A:** No.

Page 13

[1]  Q: How about the ground instructor license?

[2]  A: That would have been '86.

[3]  Q: And when did you earn your airline

[4] transport license?

[5]  A: Same time frame, '86.

[6]  Q: Were you a member of the flight crew for —

[7] before we get to that, actually, you said that you

[8] were previously on the 727?

[9]  A: Yes.

[10]  Q: And then American stopped flying them?

[11]  A: Right.

[12]  Q: When did American stopped flying the 727?

[13]  A: I think we stopped flying the last one

[14] somewhere around 1988.

[15]  Q: And then what were you flying?

[16]  A: The MD80.

[17]  Q: Do you continue to fly the MD80 now?

[18]  A: Yes.

[19]  Q: Do you fly any other type of aircraft?

[20]  A: No. At American Airlines we only check out

[21] in one aircraft.

[22]  Q: Were you a member of the flight crew for

[23] American Airlines Flight 2237 on December 28, 2003?

[24]  A: Yes.

Page 14

[1]  Q: As the captain of the aircraft, did you

[2] have the ultimate responsibility for determining

[3] whether a passenger should be removed from a flight

[4] or denied boarding?

[5]  A: Yes, I do.

[6]  Q: On December 28, 2003 did you make the

[7] decision to have three passengers removed from the

[8] flight?

[9]  A: No, I did not.

[10]  Q: Do you recall that on that date three

[11] passengers were removed from the flight?

[12]  A: Yes.

[13]  Q: Who made that decision?

[14]  A: The ground personnel in Boston, along with

[15] the state police.

[16]  Q: Who was the ground personnel in Boston who

[17] made that decision?

[18]  A: I can't remember who made the decision to

[19] have the passengers get off the airplane.

[20]  Q: Do you recall any American Airlines

[21] personnel you spoke with before the passengers were

[22] removed from the airplane?

[23]  A: I know I spoke with whoever the gate agent

[24] was working the flight. I don't remember — I don't

Page 15

[1] know who that was. I know I spoke with Mr. Flores

[2] at some point.

[3]  Q: Do you recall what position Mr. Flores was

[4] in?

[5]  A: No, I don't, no, back then.

[6]  Q: Do you recall speaking with anyone else in

[7] addition to Mr. Flores?

[8]  A: Oh, yes. At some point I spoke with Nicole

[9] Traer.

[10]  Q: Do you recall when you spoke with Ms.

[11] Traer?

[12]  A: Speaking with Nicole happened later on.

[13] Probably the first time I saw her was — oh, I would

[14] estimate maybe 20 minutes after these passengers had

[15] begun their interview with the State Police.

[16]  Q: Do you recall what American Airlines

[17] personnel you spoke with before the passengers were

[18] removed from the plane?

[19]  A: No.

[20]  Q: Did you ever have any direct conversations

[21] or interactions with Mr. Cerqueira on December 28,

[22] 2003?

[23]  A: Never did.

[24]  Q: Prior to boarding the plane, did you have

Page 16

[1] an opportunity to observe Mr. Cerqueira?

[2]  A: No.

[3]  Q: Did you ever have any direct conversations

[4] or interactions with either of the two other men who

[5] were removed from the flight that day?

[6]  A: Yes, I did.

[7]  Q: Do you recall what they were?

[8]  A: One conversation I remember from one of the

[9] other passengers, I was walking towards the gate

[10] prior to the flight, and he stopped me in the

[11] terminal and asked if I was the Captain going to

[12] Fort Lauderdale. And I said I was. And he looked

[13] at me and said, "That's good. I'm going with you.

[14] We're going to have a good trip today." And then he

[15] walked away.

[16]  Q: And is it your testimony that he initiated

[17] that conversation?

[18]  A: Oh, yes, he did, yes.

[19]  Q: Did you find that suspicious?

[20]  A: I found it extremely odd.

[21]  Q: Why?

[22]  A: Because for the first time in my 20-year

[23] career, that's the first time a passenger has

[24] stopped me when I'm walking in uniform in a

Page 17

[1] passenger terminal, especially with a conversation
[2] like that.
[3]    Q: Did you have any other conversations with
[4] this passenger when you boarded the flight?
[5]    A: No, I did not.
[6]    Q: Did you review any of the flight
[7] attendants' statements before the deposition today?
[8]    A: Yes, I did.
[9]    Q: Did you review Ms. Milenkovic's?
[10]    MR. FITZHUGH: Milenkovic?
[11]    MS. ABATE RECHT: Milenkovic.
[12]    A: I reviewed all of the flight attendant, we
[13] call them, OF25 or P reports, which basically
[14] summarized what happened, quite a few weeks ago, and
[15] I went through Sally Walling's report again
[16] yesterday.
[17]    Q: I'm going to show you a document that's
[18] previously been marked as Exhibit 9. And this is
[19] Ms. Milenkovic's statement.
[20]    MS. ABATE RECHT: Do you need another copy?
[21]    MR. FITZHUGH: No, that's okay.
[22]    A: (Witness reviews document) Okay.
[23]    Q: Do you see on the page that's numbered
[24] AA0016 —

Page 18

[1]    A: Uh-hum.
[2]    Q: — three lines up from the bottom it says,
[3] "We began to board and toward the end of boarding a
[4] passenger with a ponytail and heavy accent made a
[5] comment to the captain asking him if he was their
[6] captain."
[7]    A: Uh-hum.
[8]    Q: Is that an accurate statement?
[9]    A: Yes, it seems fairly accurate.
[10]    Q: So you did have a conversation with a
[11] passenger during the boarding time?
[12]    A: No. That happened prior to boarding. That
[13] was the instance prior to boarding, where he
[14] approached me.
[15]    Q: So then that statement is not accurate?
[16]    A: No. I think maybe what she was trying to
[17] say was that she might have heard of that happening
[18] at that point in boarding, possibly. I don't know.
[19]    Q: But that as it is written here, "Toward the
[20] end of boarding, a passenger with a ponytail and
[21] heavy accent made a comment to the captain" is
[22] actually incorrect, is it not?
[23]    A: No, it's not entirely correct, because that
[24] happened prior to boarding.

Page 19

[1]    Q: Okay. When this passenger made that
[2] statement to you, did you notice whether he had an
[3] accent?
[4]    A: I did not.
[5]    Q: Did you notice whether he had a ponytail?
[6]    A: I think I do remember him having a
[7] ponytail.
[8]    Q: Do you remember his physical appearance in
[9] any other way?
[10]    A: No.
[11]    Q: So you had one exchange with that passenger
[12] prior to boarding, and that was it; is that correct?
[13]    A: Correct.
[14]    Q: Okay. Once the passengers had boarded the
[15] plane, did you have an opportunity to observe Mr.
[16] Cerqueira or the other two passengers seated next to
[17] him?
[18]    A: No.
[19]    Q: You didn't observe them at all?
[20]    A: No.
[21]    Q: So is it fair to assume you didn't
[22] personally observe any unusual or suspicious
[23] behavior on the part of Mr. Cerqueira once he
[24] boarded the plane?

Page 20

[1]    A: That's correct.
[2]    Q: And you didn't observe any unusual or
[3] suspicious behavior on the part of Mr. Cerqueira
[4] prior to his boarding the plane either; is that
[5] right?
[6]    A: Correct.
[7]    Q: Did you perceive the three passengers
[8] seated in Mr. Cerqueira's row to be traveling
[9] together?
[10]    MR. FITZHUGH: Objection. Form. You can
[11] still answer.
[12]    A: I didn't see any of the passengers once we
[13] had boarded. The only situation that I've talked
[14] about is this one passenger who came to me in the
[15] terminal. So except for that, I don't know — I
[16] don't even know what these passengers looked like.
[17] The next time that I saw them is as they were being
[18] interviewed with the State Police in the terminal
[19] off the airplane.
[20]    MS. ABATE RECHT: I'm going to ask the
[21] court reporter to mark as Exhibit 15 — because
[22] we'll continue with sequential marking of the
[23] exhibits from the previous depositions — a document
[24] Bates numbered AA0009 through 11.

---

**Page 21**

[1] (Document marked as Ehlers
[2] Exhibit 15 for identification)
[3] **A:** Would you like me to review all of this
[4] or —
[5] **Q:** I'm only going to ask you about a paragraph
[6] on the second page of that letter. But if you'd
[7] feel more comfortable reviewing it, feel free.
[8] **MR. FITZHUGH:** I'd like the witness to
[9] review the entire document. So why don't you do
[10] that and let us know when you're finished.
[11] **A:** (Witness reviews document) Okay.
[12] **Q:** If you would look at the second page, the
[13] page marked AA0010.
[14] **A:** Uh-hum.
[15] **Q:** The second to the last paragraph on the
[16] bottom it says, "Captain Ehlers and Ms. Walling
[17] perceived Mr. Cerqueira to be traveling with Mr.
[18] Rokah and Mr. Ashmil." Is that an incorrect
[19] statement?
[20] **A:** I would say so. I would say that Ms.
[21] Walling perceived that, and I had to go on what
[22] information I was being given.
[23] **Q:** But you didn't independently perceive that;
[24] is that correct?

---

**Page 22**

[1] **A:** No. I couldn't. All I could do is go on
[2] what employees are telling me.
[3] **Q:** Okay. Did you know whether these three
[4] passengers had purchased their tickets together?
[5] **A:** I had no idea.
[6] **Q:** Did you know whether these three passengers
[7] had requested to sit together?
[8] **A:** No idea.
[9] **Q:** Did you know whether they were together in
[10] the gate area?
[11] **A:** No.
[12] **Q:** Did you know whether they had boarded the
[13] flight at the same time?
[14] **A:** No.
[15] **Q:** Did you have any discussions with any of
[16] the flight attendants regarding Mr. Cerqueira or the
[17] other two men seated next to him?
[18] **A:** Other than Ms. Walling's concerns about Mr.
[19] Cerqueira, no other discussions prior to the flight.
[20] **Q:** Can you tell me what Ms. Walling told you.
[21] **A:** She had a number of concerns. One of her
[22] concerns I remember was when Mr. Cerqueira boarded
[23] the flight, I was told that he boarded when first
[24] class started to board, and he was the first one

---

**Page 23**

[1] into coach.
[2] She was also concerned about his use of the
[3] lavatory and the time in the lavatory.
[4] She also I remember was concerned about
[5] some things that were said that were never relayed
[6] to me, but that there were passengers in the cabin
[7] once the plane had fully boarded that passengers
[8] became concerned about.
[9] **Q:** Do you know what those passengers became
[10] concerned about?
[11] **A:** No.
[12] **Q:** And do you know whether they became
[13] concerned about Mr. Cerqueira or one of the other
[14] two men seated next to him?
[15] **A:** I believe it involved all three gentlemen.
[16] **MS. ABATE RECHT:** I'm going to ask the
[17] court reporter to mark as Exhibit 16 a document
[18] Bates numbered AA 0035.
[19] (Document marked as Ehlers
[20] Exhibit 16 for identification)
[21] **Q:** Do you recognize this document?
[22] **A:** Yes.
[23] **Q:** Did you review this document in preparation
[24] for today's deposition?

---

**Page 24**

[1] **A:** A couple of weeks ago I did.
[2] **Q:** Approximately how many weeks ago?
[3] **A:** I would say three.
[4] **Q:** Do you recall writing this document?
[5] **A:** Yes.
[6] **Q:** If you look at the top, it says, "Created
[7] 6/1/2004"?
[8] **A:** That's incorrect.
[9] **Q:** Do you know why it says that?
[10] **A:** I have no idea.
[11] **Q:** When did you write this document?
[12] **A:** Probably it was the end of December, right
[13] after the incident happened.
[14] **Q:** Do you recall how long after the incident?
[15] **A:** It wouldn't have been more than 48 hours.
[16] **Q:** And what makes you think that?
[17] **A:** Because when I have a situation that
[18] requires a debrief, such as this, I do it within 24
[19] hours every time.
[20] **Q:** Is that American policy or is that your
[21] personal practice?
[22] **A:** Part of that is American's policy, within
[23] 48 hours for a security event like this, and my
[24] personal practice is within 24.

---

Page 25

[1]   Q: Do you see the top line it states, "Flight
[2] attendants became concerned about behavior of two to
[3] three of our passengers sitting in exit row"?
[4]   A: Uh-hum.
[5]   Q: Were you unsure whether there were two or
[6] three passengers who were of concern to the flight
[7] crew?
[8]   A: No. I knew there were concerns about
[9] people in the exit row, and I was getting
[10] information about each one of them. And American
[11] personnel decided to have three gentlemen removed
[12] from the airplane for questioning.
[13]   Q: So you were getting concerns about three of
[14] the passengers?
[15]   A: Yeah. One of the concerns that I remember
[16] Sally had was that all three passengers seemed to be
[17] feigning sleep, which in my career, when we're
[18] boarding an aircraft, it seemed very rare that we
[19] had anyone attempting to sleep at all.
[20]   Q: If it was three passengers, why did you
[21] write "two to three"?
[22]   A: I can't remember, it's been so long.
[23]   Q: In your experience, is it unusual for a
[24] passenger to use the lavatory upon boarding the

Page 26

[1] flight?
[2]   A: Not at all.
[3]   Q: And is it unusual for a passenger to board
[4] the plane first — is it unusual to be the first
[5] coach passenger in the coach section?
[6]   A: The information that I received from one of
[7] the flight attendants who worked for me at that
[8] point is that this passenger boarded when they
[9] should not have boarded, and that is rare.
[10]   Q: Do you know what she was basing her
[11] information on?
[12]   A: Because first class is called first to
[13] board. And this passenger was sitting in coach and
[14] boarded with first class, which is not what's
[15] supposed to happen.
[16]   Q: How do you know that coach passengers
[17] hadn't been called to board when he boarded the
[18] aircraft?
[19]   A: Because that's what the flight attendants
[20] informed me. And that is standard practice.
[21]   Q: And the flight attendants were on the plane
[22] at this time? They weren't in the gate area
[23] listening to the boarding calls, right?
[24]   A: No. Regulations stipulate that we have to

Page 27

[1] have three flight attendants on the plane if we're
[2] boarding.
[3]   Q: Did Ms. Walling tell you how long Mr.
[4] Cerqueira spent in the lavatory?
[5]   A: I think she said somewhere between four and
[6] six minutes, something like that.
[7]   Q: And is that — you described that as an
[8] inordinate amount of time?
[9]   A: I would say on average, that's longer.
[10]   Q: Four minutes is longer than the average
[11] passenger spends in the lavatory?
[12]   A: If someone's in the lav for five minutes, I
[13] would say that's longer than average.
[14]   Q: Would you characterize that as suspicious?
[15]   A: That in and of itself is one of the factors
[16] we look at in determining whether we're going to ask
[17] a passenger some more questions or have other
[18] concerns about the safety of the flight.
[19]   Q: In addition to Ms. Walling, did you speak
[20] with any of the other flight attendants regarding
[21] any of these three gentlemen?
[22]   A: I spoke with our No. 1 flight attendant,
[23] who would be the flight attendant up at first class,
[24] and I can't remember whether she was relaying

Page 28

[1] information to me or had any concerns of her own.
[2] But it's standard practice for the captain to
[3] discuss issues with the flight attendant up in the
[4] front of the airplane, especially in flight.
[5] However, because our situation was farther in the
[6] back of the airplane, that's why I was talking to a
[7] flight attendant back there.
[8]   Q: Do you recall who the No. 1 flight
[9] attendant was?
[10]   A: I do not.
[11]   Q: Do you recall what, if anything, she told
[12] you?
[13]   A: No.
[14]   Q: I want to go back to something we were
[15] speaking about earlier. I had asked you whether as
[16] the captain, you had the ultimate authority to
[17] remove passengers from the flight or deny them
[18] boarding. And you had responded, "Yes, I do." And
[19] then I asked you who made the decision to remove Mr.
[20] Cerqueira and the other two passengers from the
[21] flight that day, and you did not know the answer to
[22] that; that you had testified that it wasn't you. Is
[23] that unusual?
[24]   MR. FITZHUGH: I object to the form and

Page 29

[1] foundation of the question.

[2] **MS. ABATE RECHT:** Well, we can read it
[3] exactly and go back if you'd like.

[4] **MR. FITZHUGH:** You used the word "removed"
[5] in two different contexts. If you're talking about
[6] having him taken off the flight for questioning, as
[7] opposed to removed in the sense that he's denied
[8] boarding, that's the confusion. I just want it
[9] clarified. That's all.

[10] **BY MS. ABATE RECHT:**

[11] **Q:** So did you make the decision to have these
[12] three passengers removed from the plane for
[13] questioning?

[14] **A:** I would say the answer to that is "no." I
[15] conferred with the gate agent and what would be
[16] called our ground security advisor, and we discussed
[17] our — some of the concerns that the flight
[18] attendants had with these passengers. Gate
[19] personnel decided that the best course of action
[20] would be to have them off the airplane and start the
[21] questioning.

[22] **Q:** Was that based on your recommendation?

[23] **A:** No, I don't remember recommending anything.
[24] All I was doing was passing along the flight

Page 30

[1] attendant concerns.

[2] **Q:** If you look at your statement, which we
[3] have just marked as Exhibit 16, about a quarter of
[4] the way down it states, "It became clear that flight
[5] attendants were uncomfortable with our departing,
[6] and that is when I called for an agent and the GSC,
[7] even though we were about to push and agent had
[8] left." Is that the agent you were just referring
[9] to?

[10] **A:** I'm sorry, say that again.

[11] **Q:** Do you see that statement in your — do you
[12] see where you wrote, "It became clear that flight
[13] attendants were uncomfortable with our departing,
[14] and that is when I called for an agent and the
[15] GSC..."?

[16] **A:** Yes.

[17] **Q:** Is that the agent you were just referring
[18] to?

[19] **A:** Yes.

[20] **Q:** And you don't recall who that agent was?

[21] **A:** No.

[22] **Q:** What is the GSC?

[23] **A:** The ground security coordinator.

[24] **Q:** Why did you call them?

Page 31

[1] **A:** It's required per regulations, and it's
[2] standard practice if we have any kind of a security
[3] concern.

[4] **Q:** What did you discuss with them?

[5] **A:** I relayed the flight attendant concerns
[6] with these passengers, and then I remembered making
[7] a phone call to Dallas to what's called our SOC
[8] operations.

[9] **Q:** Is that different than the GSC?

[10] **A:** Yes.

[11] **Q:** What did you discuss with the GSC?

[12] **A:** There was no further discussion, other than
[13] relaying the flight attendant concerns.

[14] **Q:** And "the flight attendant's concerns," are
[15] you referring to Ms. Walling's concerns?

[16] **A:** All of the flight attendants.

[17] **Q:** Do you recall what the other flight
[18] attendants' concerns were?

[19] **A:** No, other than what we've already talked
[20] about.

[21] **Q:** Did Ms. Milenkovic relay any concerns she
[22] had to you?

[23] **A:** I can't remember.

[24] **Q:** Did Ms. Sargent relay any concerns she had

Page 32

[1] to you?

[2] **A:** I can't remember that either.

[3] **Q:** So the only concerns you can recall at this
[4] time are Ms. Walling's concerns; is that right?

[5] **A:** Yes.

[6] **Q:** Do you recall specifically what you related
[7] to the agent and the GSC?

[8] **A:** Other than relaying the flight attendant
[9] concerns —

[10] **Q:** And can you be more specific?

[11] **A:** I relayed information about how I had been
[12] approached in the terminal. I relayed information
[13] that we had a passenger that boarded improperly in
[14] terms of timing. I relayed information that we had
[15] a passenger that spent a lot of time in the rear
[16] lavatory. I relayed information that we had
[17] passengers concerned about these three passengers,
[18] some things had been said that were making people
[19] nervous. I relayed information to them again that
[20] these passengers seemed to be feigning sleep.
[21] Again, all of this information that had been passed
[22] to me, because I never saw these people, except for
[23] the situation prior to boarding with this other
[24] passenger.

---

Page 33

[1] **Q:** You said that other passengers were
[2] concerned. Do you know what the basis for their
[3] concern was?
[4]    **A:** No.
[5] **Q:** Did you relay that the three men were
[6] seated next to each other?
[7]    **A:** Yes.
[8] **Q:** Did you relay that you thought these three
[9] men were traveling together?
[10]    **A:** No.
[11] **Q:** You testified that you also spoke with SOC
[12] in Dallas?
[13]    **A:** Uh-hum.
[14] **Q:** What does "SOC" stand for?
[15]    **A:** It stands for Systems Operation Control.
[16] **Q:** Do you know with whom you spoke at the SOC?
[17]    **A:** No.
[18] **Q:** What did you relay to SOC?
[19]    **A:** I relayed the security concerns that we
[20] had, which is required, and they start a process
[21] where they check the passengers. They do things
[22] like checking to make sure how they paid for their
[23] tickets, when they paid for their tickets, et
[24] cetera.

---

Page 34

[1] **Q:** This is prior to the passengers being
[2] removed from the plane; is that correct?
[3]    **A:** At that point it might have been just as
[4] they were being removed for questioning. I'm not
[5] sure of the exact timing. But it might have been
[6] just prior. It's hard to remember.
[7] **Q:** So had the decision to remove the
[8] passengers for questioning already been made by the
[9] time you were calling the SOC?
[10]    **A:** I can't remember.
[11] **Q:** Had the decision been made to remove the
[12] passengers by the time you were speaking to the
[13] ground security coordinator and the agent?
[14]    **A:** No.
[15] **Q:** And you don't recall who made the decision
[16] to remove the passengers for questioning?
[17]    **A:** No.
[18] **Q:** Did you have any other conversations with
[19] any other American Airlines personnel?
[20]    **A:** Yes. I remember talking with Nicole Traer.
[21] **Q:** Actually, if we can back up for a minute.
[22] You said that the SOC has certain — what was the
[23] word you used — procedures that they follow?
[24]    **A:** Uh-hum.

---

Page 35

[1] **Q:** Can you elaborate on what those procedures
[2] are?
[3]    **A:** I don't think it's proper to at all.
[4]    **MR. FITZHUGH:** I'm going to object to the
[5] questioning and instruct the witness not to answer
[6] any more fully because of SSI. If you can rephrase
[7] and ask something that's more specific, I'll work
[8] with you, but the question as phrased would call for
[9] the disclosure of SSI.
[10] **Q:** You testified that they check passenger
[11] information; is that correct?
[12]    **A:** Yes.
[13] **Q:** Do you know what information they check?
[14]    **A:** No.
[15] **Q:** You testified that they check to see how
[16] the passengers had purchased their tickets.
[17]    **A:** That's one of the things that I know that
[18] they check, but we're quickly delving into an area
[19] that's secure information, and we're not supposed to
[20] talk about it.
[21] **Q:** Did they tell you what they found when they
[22] did these checks?
[23]    **MR. FITZHUGH:** Just "yes" or "no."
[24]    **A:** No.

---

Page 36

[1] **Q:** Did you speak with any other American
[2] Airlines personnel?
[3]    **A:** Not that I can remember.
[4] **Q:** You testified that you spoke with Ms.
[5] Traer?
[6]    **A:** Yes.
[7] **Q:** What did you speak with her about?
[8]    **A:** Again, just relaying all the concerns that
[9] the flight attendants had. She at that point, when
[10] she showed up, it was a little bit later on in the
[11] process, so she had been fully briefed by whoever
[12] the ground security coordinator is.
[13] **Q:** Do you know who that is?
[14]    **A:** I can't remember who that was that day.
[15] **Q:** So she already knew what was going on by
[16] the time she showed up?
[17]    **A:** Yes.
[18] **Q:** What discussions did you have with her
[19] specifically?
[20]    **A:** Again, just making sure she fully
[21] understood some of the concerns that we had. Other
[22] than that, I don't remember any conversation with
[23] her.
[24] **Q:** Did you have discussions with any other

---

**Page 41**

[1] the air marshalls were part of the conversation.

[2]   MS. ABATE RECHT: How is that different
[3] than my original question?

[4]   MR. FITZHUGH: Asking when they arrived
[5] could lead to other issues that can't be discussed.
[6] Where they came from, that will not be discussed. I
[7] will let Captain Ehlers respond to when they joined
[8] the conversation and what was said, to the extent he
[9] can.

[10]   A: After the State Police became involved,
[11] marshalls became involved.

[12]   Q: How long after?

[13]   A: I would guess probably 10 to 15 minutes
[14] after the State Police arrived, we had marshalls in
[15] on the discussion.

[16]   Q: Discussions with the three passengers,
[17] questioning of the three passengers or just
[18] discussions with American Airlines personnel?

[19]   A: I can't remember whether marshalls
[20] interviewed the passengers or not.

[21]   Q: What information was relayed to the
[22] marshalls?

[23]   A: I don't know. They were talking with the
[24] police.

**Page 42**

[1]   Q: Did you overhear any of those discussions?

[2]   A: No.

[3]   Q: Where were they speaking with the police?

[4]   A: Initially, they were in the terminal near
[5] the gate.

[6]   Q: Do you know whether the police initially
[7] interviewed the passengers on the jet bridge?

[8]   A: I don't.

[9]   Q: Were there any other law enforcement
[10] officers involved?

[11]   A: Yes. Eventually the head of all of TSA at
[12] Logan Airport showed up.

[13]   Q: And "TSA" stands for Transportation
[14] Security Administration; is that correct?

[15]   A: Right.

[16]   Q: Do you know who that person is?

[17]   A: No.

[18]   Q: What was his or her involvement?

[19]   A: Their involvement had to do with one of our
[20] passengers who thought they saw one of these
[21] passengers have box cutters taken from them at
[22] security.

[23]   Q: Do you recall who that passenger was?

[24]   A: No.

**Page 43**

[1]   Q: Did you have any discussions with that
[2] passenger?

[3]   A: Yes.

[4]   Q: What were your discussions with that
[5] passenger?

[6]   A: My discussion with the passenger was to be
[7] very clear and make sure she was sure of what she
[8] saw. And she told me she was positive of what she
[9] saw.

[10]   Q: You later found out that that was not true;
[11] is that correct?

[12]   A: That's correct.

[13]   Q: That discussion happened after the decision
[14] had already been made to remove Mr. Cerqueira and
[15] the two other gentlemen seated next to him, correct?

[16]   A: Correct.

[17]   Q: How long after?

[18]   A: Not long after. I would say maybe five
[19] minutes.

[20]   Q: Were there any other law enforcement
[21] officials involved?

[22]   A: I don't think so.

[23]   Q: Backing up a bit, when you were told by Ms.
[24] Walling that she had some concerns about one of the

**Page 44**

[1] passengers, did you ask her or the first officer to
[2] do anything?

[3]   A: I believe I remember asking the first
[4] officer to check the lavatory, because the
[5] lavatories are a very insecure area on the airplane
[6] and are a big concern of the flight crew.

[7]   Q: Do you recall whether the first officer
[8] carried out your instruction?

[9]   A: If I asked him to do it, he did it.

[10]   Q: Do you recall whether he found anything?

[11]   A: He did not.

[12]   Q: And he reported to you that he did not; is
[13] that right?

[14]   A: Correct.

[15]   Q: He reported to you that he did not find
[16] anything before the decision was made to remove the
[17] passengers for questioning; is that right?

[18]   A: I can't remember the timing there.

[19]   Q: Mr. Cerqueira and the other two passengers
[20] were removed from the plane before the decision was
[21] made to deplane everyone and rescreen all of the
[22] luggage; is that correct?

[23]   A: Correct.

[24]   Q: Was that decision made, in part, because of

Page 77

[1] that he might be high on some sort of drug. While
[2] the questioning ensued in the jet bridge, the first
[3] officer and I discussed, based on what we had been
[4] told by the flight attendants, whether if the State
[5] Police cleared this individual and felt comfortable
[6] with him traveling, whether we would be comfortable
[7] with it also.
[8]     As we were having that discussion, the
[9] passenger decked one of the officers, ran out into
[10] the terminal; and as best as I can describe, a State
[11] Police pig pile ensued on this passenger. He was
[12] arrested, and he got a few free meals, I'm sure.
[13]     Q: You mentioned that while the questioning
[14] was going on, you and the first officer discussed
[15] what you would do if that individual was secured by
[16] the State Police?
[17]     A: Correct.
[18]     Q: Did you have some more discussions with
[19] First Officer Ball regarding the three passengers,
[20] Mr. Cerqueira and the other two passengers?
[21]     A: I'm sure I did.
[22]     Q: Do you recall what those conversations
[23] were?
[24]     A: I don't remember.

Page 78

[1]     Q: Assuming Mr. Cerqueira and the three other
[2] passengers —
[3]     A: Let me just add something quickly.
[4]     Q: Okay.
[5]     A: The first officer's function here, by
[6] regulations and by the way I operate my trips, is to
[7] give me counsel and advice. And unless he feels the
[8] aircraft is threatened immediately, I can disregard
[9] that advice, but it's my decision. I am
[10] responsible.
[11]     Q: Assuming Mr. Cerqueira and the other three
[12] passengers had been cleared by the State Police and
[13] you were informed of that, would you have permitted
[14] them to continue on the flight to Fort Lauderdale?
[15]     MR. FITZHUGH: Objection. You can still
[16] answer.
[17]     A: Depending on what SOC and the ground
[18] security coordinator came back with and what
[19] information there was, that might have been the
[20] case. I don't think we would have departed with the
[21] original three flight attendants. Obviously we
[22] didn't depart with them even without them.
[23]     Q: What information would you have been
[24] looking for from SOC and the ground security

Page 79

[1] coordinator to make that decision?
[2]     A: A number of items. And a lot of those
[3] items are really SSI in terms of what they're
[4] researching about all of these individuals.
[5]     Q: Are there any items that are not SSI that
[6] you can testify about?
[7]     A: Yes. I would say one item, if the State
[8] Police had felt comfortable with all of these
[9] individuals, if I had been told they were not
[10] traveling together and I was convinced of that, that
[11] would have been one of the factors.
[12]     Q: So the fact that these passengers were
[13] perceived as being traveling together —
[14]     A: One of many factors.
[15]     Q: — would have weighed heavily in your
[16] decision.
[17]     A: No, it would not have weighed heavily. It
[18] would have been one of many factors.
[19]     Q: Are there any other items that you would
[20] have considered?
[21]     A: Yes. My concern here is if I had been
[22] given an opportunity by the State Police to decide
[23] whether these passengers went with us or not,
[24] according to Ms. Walling, Mr. Cerqueira's behavior

Page 80

[1] prior to boarding the aircraft was unacceptable.
[2] And I have denied boarding to passengers who have
[3] been drunk in the past and who have been abusive and
[4] interfered with flight attendant duties.
[5]     So his behavior before he even got on the
[6] airplane was a problem. And that issue was not
[7] going to go away.
[8]     Q: Did Ms. Walling tell you that Mr. Cerqueira
[9] had interfered with her duties as a flight
[10] attendant?
[11]     A: No. She had described their interactions
[12] prior to boarding the airplane; with him being
[13] adamant about wanting to switch a seat and not
[14] listening to her in terms of whether she was a
[15] flight attendant or a gate agent, and then
[16] eyeballing her and making her feel extremely
[17] uncomfortable prior to boarding the airplane.
[18]     Q: Was there any concern that he was on any
[19] kind of substance, either alcohol or drugs?
[20]     A: I'd be speaking for one of the flight
[21] attendants, because I never met the gentleman.
[22]     Q: Did she tell you that she had that concern?
[23]     A: No.
[24]     Q: Have you ever been the subject of a

# Exhibit 11

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of Craig Marquis

# 05-11652-WGY

## John D. Cerqueira

### vs.

## American Airlines

## Deposition of Craig Marquis

### June 15, 2006



Tracey D. Smith, CSR, RMR
Collins Realtime Reporting
Dallas, Texas 75201
214-220-2449
www.collinsrealtime.net

[1]

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2
 3   JOHN D. CERQUEIRA,      )
 4      Plaintiff           )
 5   V.               )  CIVIL ACTION NO.
                      )    05-11652-WGY
 6   AMERICAN AIRLINES, INC.,  )
 7      Defendant           )
 8
 9
10
11      *********************************
12         ORAL DEPOSITION OF
              CRAIG MARQUIS
13             JUNE 15, 2006
14      *********************************
15
16
17
18      ORAL DEPOSITION OF CRAIG MARQUIS, produced as a
19   witness at the instance of the Plaintiff, and duly sworn,
20   was taken in the above-styled and numbered cause on the
21   15th of June, 2006, from 2:30 p.m. to 3:37 p.m., before
22   Thu Bui, CSR in and for the State of Texas, reported by
23   machine shorthand, at the offices of American Airlines,
24   4333 Amon Carter Boulevard, Fort Worth, Texas, pursuant
25   to the Fed.R.Civ.P.30.
```

[3]

```
 1                 INDEX
 2                         PAGE
 3   Appearances...............................    2
 4   Stipulations.............................    4
 5   CRAIG MARQUIS
 6      Examination by Mr. Kirkpatrick........    4
 7      Examination by Mr. Fitzhugh...........   41
 8   Signature and Changes.....................   44
 9   Reporter's Certificate....................   46
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

[2]

```
 1            A P P E A R A N C E S
 2   Mr. Michael T. Kirkpatrick
     PUBLIC CITIZENS LITIGATION GROUP
 3   1600 200th Street, N.W.
     Washington, D.C. 20009
 4   Phone: 202-588-7728  Fax: 202-588-7795
     Email: mkirkpatrick@citizen.org
 5
 6      APPEARING FOR THE PLAINTIFF
 7
 8   Mr. Michael A. Fitzhugh
     FITZHUGH, PARKER & ALVARO LLP
 9   155 Federal Street, Suite 1700
     Boston, Massachusetts 02110-1727
10   Phone: 617-695-2330  Fax: 617-695-2335
     Email: mfitzhugh@fitzhughlaw.com
11
12      APPEARING FOR THE DEFENDANT
13
14
15
16
17
18
19
20
21
22
23
24
25
```

[4]

```
 1              CRAIG MARQUIS,
 2   having been first duly sworn, testified as follows:
 3              EXAMINATION
 4   BY MR. KIRKPATRICK:
 5      Q  Good afternoon, Mr. Marquis.
 6      A  Hello.
 7      Q  We met earlier, but just for the record, my name
 8   is Michael Kirkpatrick and I represent John Cerqueira,
 9   who has brought this case against American Airlines.
10         MR. KIRKPATRICK:  Mr. Fitzhugh, same
11   stipulations as the last one?
12         MR. FITZHUGH:  Yes.
13         You'll have an opportunity to read and sign
14   your deposition transcript, but there won't be a need for
15   a notarization, but I'll get it transmitted to you.
16         THE WITNESS:  Okay.
17      Q  Mr. Marquis, would you just state your name and
18   address for the record, please?
19      A  Craig Marquis, M-a-r-q-u-i-s, address, 4403
20   Spring Creek Road, Arlington, Texas, 76017-1268.
21      Q  Mr. Marquis, have you had your deposition taken
22   before?
23      A  For this case?
24      Q  No, in any case.
25      A  Yes, I have.
```

[5]

1    Q   About how many times?
2    A   I believe I've been deposed two other times.
3    Q   What were those cases about?
4    A   One was for 9-11 and one was for a job that I
5    had prior to the airline business.
6    Q   I just want to quickly go over the ground rules
7    for today.  I am here to ask you some questions, to
8    gather some information, and your job is simply to give
9    me your best and -- and most honest answer.  You are
10   under oath as though we were in a court of law even
11   though we're in this informal atmosphere.
12       It's important because the court reporter
13   is taking down my questions and your answers that we not
14   speak at the same time, so I would just ask that you wait
15   until I finish my question before you start to give your
16   answers so that we get a clean transcript.  Also if you
17   don't understand one of my questions, please let me know
18   and I'll try to repeat it or rephrase it so that you do
19   understand it.
20       And if Mr. Fitzhugh objects to some of my
21   questions, those are objections for the record that we'll
22   deal with later if we need to.  But unless he instructs
23   you not to answer, you should still try to answer my
24   question even though he's made an objection for the
25   record.

[6]

1        And I don't think it'll take us too long
2    this afternoon, but if you need a break let me know and
3    I'm happy to stop and take a break.  But I would ask that
4    we finish the -- the question that's pending and maybe
5    the line of questioning and find a convenient place to
6    take a break if we need to do that.
7        Do you understand these instructions?
8    A   Yes, I do.
9    Q   Do you know of any reason that would prevent you
10   today from giving me your best full and honest answers?
11   A   None.
12   Q   Did you do anything to prepare for the
13   deposition today?
14   A   Yes, I did.
15   Q   What did you do?
16   A   I read the information that Michael had sent me,
17   just the due diligence, so that I could prepare and give
18   an accurate and helpful testimony.
19   Q   What were those documents, do you recall?
20   A   They were letters back and forth from different
21   attorneys, the letter from the client, the letter back
22   from American Airlines in response.
23   Q   Is it your understanding that those are
24   documents that the parties have exchanged in the course
25   of this lawsuit?

[7]

1    A   Yes.
2    Q   Other than your discussions with -- with the
3    lawyers for American Airlines, did you talk to anybody
4    else about today's deposition?
5    A   No.
6    Q   How long have you been employed by American
7    Airlines?
8    A   19 years.
9    Q   What is your current position?
10   A   I'm the operational manager in SOC, which is
11   system operations control.
12   Q   How long have you had that job?
13   A   Approximately six years.
14   Q   Could you describe for me your duties in that
15   position?
16   A   I represent higher management on this side of
17   the highway to operate the published schedule efficiently
18   and safely.
19   Q   And on a daily basis, what are the kinds of
20   tasks that you're required to carry out in order to keep
21   the operation operating on schedule and safely?
22   A   I take into consideration equipment that may be
23   out of service, manpower issues, air traffic control
24   issues, weather issues, safety issues, security issues,
25   environmental issues.

[8]

1    Q   How many people do you have working for you on a
2    particular shift?
3    A   I'm the operational manager for the whole
4    airline, so the whole airline works for me.
5    Q   Okay.  What about within SOC, within your sort
6    of work place, how many people do you typically have
7    helping you carry out your duties?
8    A   In SOC at one time?
9    Q   Yeah.
10   A   Probably 3' or 400.  SOC encompasses a lot of
11   different departments.
12   Q   And you're in charge of all of SOC; is that
13   right?
14   A   That's correct.
15   Q   Can you explain to me the position of CCRO and
16   how that position interacts with the SOC manager?
17   A   The CCRO is a federally mandated position; it's
18   corporate complaint resolution officer.  Those people
19   were trained in the laws of disabilities, and they know
20   the rules and regulations, either the law or American
21   Airlines guidelines and rules, and they sit two seats
22   down from my position, very close relationship, a lot of
23   interaction.
24   Q   And have you been trained in the same things
25   that the CCRO's have been trained in?

Craig Marquis

June 15, 2006

[9]

1    A  I have not.

2    Q  Do you supervise the CCRO?

3    A  I do.

4    Q  Prior to becoming operations manager, what other

5  positions did you have at American Airlines?  If you

6  could just sort of work back in time, tell me the other

7  jobs you've had.

8    A  I started as an assistant dispatcher, then

9  became a dispatcher, then became an equipment coordinator

10  and became a sector manager and then a center manager.

11    Q  Is there only one CCRO on duty at a time?

12    A  There is only one CCRO position.

13    Q  Were you working on December 28, 2003?

14    A  Yes, I was.

15    Q  What time did your shift start that day?

16    A  I believe 6:00 a.m., central.

17    Q  And on that day, did you become aware that there

18  was an incident or concern with respect to Flight 2237,

19  which was a scheduled flight from Boston Logan Airport to

20  Ft. Lauderdale?

21    A  I do not recall.

22    Q  Is it your understanding, from the documents you

23  reviewed, that an incident occurred that day that

24  involved the removal of some passengers from that flight?

25    A  Yes.

[10]

1    Q  Other than what you've learned by preparing for

2  this deposition, do you have any specific recollection of

3  what you did on December 28, 2003 with respect to that

4  flight out of Boston Logan?

5    A  No.

6    Q  Do you have any specific recollection of anybody

7  you talked to that day, any conversations you had

8  regarding the incident with Flight 2237?

9    A  No.

10    Q  Do you know how long you were involved in

11  matters relating to that Flight 2237?

12    A  I don't recall.

13    Q  Do you recall how you were first made aware, I'm

14  assuming that you were, that there was an incident with

15  that flight?

16    A  Again, I don't recall.

17    Q  Do you have any recollection of any tasks that

18  you carried out on December 28, 2003 with regard to the

19  removal of passengers or denial of re-booking related to

20  that flight?

21    A  I do not recall.

22    Q  Did you have any role in the decision to remove

23  three passengers from Flight 2237 for questioning by law

24  enforcement?

25    A  No, I do not recall.

[11]

1    Q  Do you recall whether anyone at SOC was

2  involved, any person other than yourself, do you recall

3  anybody else was -- was working on incidents related to

4  this Flight 2237?

5    MR. FITZHUGH:  Objection, form.

6    You can still answer if you --

7    Q  If you understand my question.

8    MR. KIRKPATRICK:  It wasn't a good

9  question, but I think he understands what I'm saying.

10    Q  Was there anybody else that you can recall right

11  now, this is the guy who handled that incident, do you

12  recall anybody else who was directly involved in this

13  incident?

14    A  I do not recall.

15    Q  Do you know who made the decision to have three

16  passengers removed from Flight 2237?

17    A  Other than the information from the paperwork?

18    Q  Okay.  Yeah.  Setting aside anything that you've

19  learned --

20    A  No.

21    Q  -- from the paperwork you looked at in

22  preparation for today's deposition?

23    A  No, I do not recall.

24    Q  Okay.  And I take it that you then do not recall

25  what the specific reasons were for that decision to

[12]

1  remove those passengers for questioning, am I right?

2    A  That's correct.

3    Q  On December 28, 2003, did you do anything to

4  determine whether any of the passengers on that flight

5  posed a security threat?

6    A  I do not recall.

7    MR. FITZHUGH:  If it'll help, we can

8  stipulate that's the day.  You can just say on the day in

9  question.

10    MR. KIRKPATRICK:  Thank you.

11    Q  And when I say "the incident", we all know what

12  I'm referring to.

13    A  Okay.

14    MR. FITZHUGH:  We'll so stipulate.

15    Q  Did you draw any conclusions on that day about

16  whether John Cerqueira was a security risk?

17    A  I do not recall.

18    Q  Did you do any type of investigation about

19  Mr. Cerqueira or the other two passengers removed from

20  that flight?

21    A  I do not recall.

22    Q  On that date, did you learn the results of any

23  law enforcement questioning of these passengers in

24  Boston?

25    A  I do not recall.

[13]

1    Q  Did you communicate with the pilot to that
2  flight -- it was Captain John Ehlers -- did you
3  communicate with him on that day?
4    A  I do not recall.
5    Q  Who made the decision to deplane all the
6  passengers and re-screen them?
7    A  I do not recall.
8    Q  Who made the decision to have dogs brought onto
9  the plane?
10    A  I do not recall.
11    Q  Were you involved in making the decision that
12  the three passengers removed for questioning would not be
13  rebooked on the later American Airlines flight that day?
14    A  I do not recall.
15    Q  Do you know the basis for the decision not to
16  rebook those passengers on a later flight?
17    A  I do not recall.
18    Q  Do you recall anybody that you received
19  information from on that date about this incident?
20    A  I do not recall.
21    Q  Do you recall anybody that you provided
22  information to on that date about this incident?
23    A  No.
24    Q  Do you know when the decision was made to deny
25  further service to these three passengers?

[14]

1    A  No.
2    Q  Do you know how the decision not to rebook these
3  passengers was communicated to American Airlines'
4  personnel in Boston?
5    A  I do not recall.
6    Q  Do you know whether the three individuals
7  removed from the flight are barred from further travel on
8  American Airlines?
9    A  Other than from the deposition or other from the
10  paperwork?  It was stated in the paperwork that they as
11  of January 6th, is that correct, 2004, they allowed that
12  person to travel; is that correct?
13    Q  Okay.  There are documents, yes, that --
14    A  I remember reading that in the document, --
15    Q  In preparation --
16    A  -- that's all the information I know.
17    Q  Okay.  Other than any review of documents you
18  did in preparation for this deposition, do you have any
19  knowledge about whether these individuals -- how long the
20  denial of service lasted?
21        MR. FITZHUGH:  Objection, form.  Why don't
22  you ask for each particular person?
23        MR. KIRKPATRICK:  Okay.
24    Q  With regard to Mr. Cerqueira, do you know how
25  long he was barred from travel on American Airlines?

[15]

1    A  Other from that documentation, I do not.
2    Q  With regard to the other passengers removed from
3  that flight, and the first one who is apparently in the
4  aisle seat, Oren Ashmil, do you know how long he was
5  barred from travel on American Airlines?
6    A  No.
7    Q  What about for Vittorio Daniel Rokah, who was in
8  the middle seat?
9    A  No.
10    Q  Before preparing for today's deposition, did
11  anybody from American Airlines contact you after
12  December 28, 2003 to discuss this incident?
13    A  Alec did.
14    Q  That would be Alec Bramlett?
15    A  That's correct.
16    Q  Do you recall when that was?
17    A  I do not.  I was on shift; he called, asked me
18  if I recalled; I did not.
19    Q  Do you have any -- do you have any --
20    A  Can I look at this?
21        MR. FITZHUGH:  No.  That's for the
22  stenographer, just for some names.
23    Q  Did you prepare any documents or reports the day
24  of the incident regarding the incident?
25    A  I do not recall.

[16]

1    Q  In preparation for this deposition, did you see
2  any documents that you had a hand in preparing?
3    A  Other than the ones that were in the file, no.
4    Q  Okay.  Let's take a look at some documents,
5  because I'm not privy to what was in the file that you
6  looked at.  But I'd like to just take a look at a series
7  of documents and, first, if you can tell me whether it's
8  one of the documents you reviewed in preparation for the
9  deposition, that would be helpful.
10        First, I'm going to show you what was
11  previously marked as Exhibit 12, and this is a passenger
12  name record for John Cerqueira.  And it's five pages, so
13  if you want to take a moment to familiarize yourself with
14  it.
15    A  I have seen this PNR.
16    Q  When did you see it first?
17    A  I saw this PNR a couple of weeks ago when I was
18  giving information on a case for Michael.
19    Q  To prepare for the deposition?
20    A  That's correct.
21    Q  On December 28, 2003, did you add any
22  information to the detail notes for the event with this
23  ID number?
24    A  No, I don't do that.
25    Q  Did you instruct Rhonda Cobbs to add any

[17]

1  information to this passenger name record?
2      A  I do not recall.
3      Q  Did you instruct Nicole Traer to add any
4  information to this passenger name record?
5      A  I do not recall.
6      Q  Mr. Marquis, if you would please turn to the
7  second page, which is AA0024, and the -- the first entry
8  under the -- the time stamp, correct me if I'm wrong, but
9  I believe this means passenger denied travel on Flight
10 2237 per SOC Craig, due to security issue.  CCRO will add
11 event number shortly.  Please refund tickets due to deny.
12 Boston customer service manager, N. Traer; is that
13 correct?
14     A  I see that.
15     Q  Does the notation, per SOC Craig due to security
16 issue, do you believe that that's referring to you?
17     A  Yes.
18     Q  Does this refresh your recollection at all
19 about -- about whether you made a decision to deny
20 boarding and refund the tickets to this passenger?
21     A  It does not.
22     Q  Looking down then, just a couple of lines below
23 that, there's an entry with the event ID number.  And it
24 states that above passenger denied boarding Flight 2237
25 Boston-Ft. Lauderdale per SOCMOD, due security issues

[18]

1  refund ticket.  Do not rebook on AA.  And that,
2  apparently, was input by Rhonda Cobbs.  Are you the --
3  were you the SOC, I guess, manager on duty that day?
4      A  Yes, I was.
5      Q  Do you recall telling Rhonda Cobbs that this
6  passenger should not be rebooked on American Airlines?
7      A  I do not recall.
8      Q  I think I can -- we're done with that exhibit.
9  Mr. Marquis, I'm showing you what's been previously
10 marked as Deposition Exhibit 18.  If you wouldn't mind
11 taking a look at these -- these pages that have been
12 collected together and labeled Exhibit 18.  Let me know
13 when you got a chance to take a look at it.
14     A  Okay.
15     Q  Do the documents we've labeled as Exhibit 18,
16 are these among the documents you reviewed in preparation
17 for the deposition?
18     A  I'm not sure these all were here, but I
19 remember -- I remember seeing the aircraft -- the
20 aircraft routing, some of the crew information.  I don't
21 recall that all of these were in that paperwork.
22     Q  Do any of these exhibit pages in Exhibit 18, do
23 any of them refresh your recollection about the incident?
24     A  They do not.  Mr. Kirkpatrick, it doesn't seem
25 to be anything spectacular or outstanding about all the

[19]

1  paperwork that I've looked at that would stay in my mind.
2      Q  So, in other words, none of that has refreshed
3  your recollection?
4      A  That's correct.
5      Q  Okay.  Thank you, for -- for cutting to the
6  chase there.  I am though, just for the record, going to
7  put you through a few more paces here.
8      A  That's fine.
9      Q  If you wouldn't mind taking a quick look at
10 Exhibit 14, and is this a document that you reviewed in
11 preparation for today's deposition?
12     A  I don't recall.  I mean, there was a lot of --
13 this is just general reporting for an event.  There's no
14 reason that this piece should stand out.
15     Q  Okay.
16     A  It's just reporting.
17     Q  All right.  I'd like to ask you a couple of
18 questions following up on -- on this Exhibit 14.  Where
19 it says, passengers reportedly exhibited suspicious
20 behavior in airport towards captain, do you know
21 specifically what behavior that was?
22     A  I do not recall.
23     Q  It -- it continues that there was some sort of
24 suspicious behavior on the aircraft observed by Number 2
25 flight attendant, Boston based S. Walling; do you know

[20]

1  specifically what she observed?
2      A  I do not recall.
3      Q  It also indicates that law enforcement officers
4  removed passengers, detained, questioned, and released
5  them.  Do you recall anything about what law enforcement
6  did with respect to these passengers?
7      A  No, I do not.
8      Q  It says, per SOCMOD passengers denied boarding
9  and tickets refunded; do you recall any specific reasons
10 why that decision was made?
11     A  I do not.
12     Q  It also says that security search of aircraft
13 was performed by dogs; do you recall specifically why
14 that was done?
15     A  I do not.
16     Q  And it says that the flight attendants were
17 replaced due to trauma; do you recall what it was that
18 caused that trauma?
19     A  I do not.
20     Q  Thank you.  I'm handing you what's been marked
21 as Exhibit 13.  Is this one of the documents you reviewed
22 in preparation for today's deposition?
23     A  It may have been.
24     Q  Thank you.  I'm handing you what's been marked
25 as Exhibit 11.  What is Exhibit 11?

[21]

1    A  It looks like a request to -- from a flight
2  service manager or person asking the flight attendants to
3  submit a report.
4    Q  Do you know whether reports were solicited at
5  your instruction?
6    A  I do not recall.
7    Q  What would be the purpose of asking the flight
8  service people to file a report?
9    A  Just for information gathering.
10    Q  Who do those reports go to, in other words, any
11  reports generated, you know, by flight attendants or
12  the -- the captain relating to this incident, would those
13  ordinarily be something that would go back to SOC manager
14  on duty or --
15    A  If I requested them specifically, they come to
16  me.  If I didn't, then there's a reporting system called
17  the Event Call Center and they're submitted to the Event
18  Call Center, and flight service then handles them.
19    Q  If they're submitted to that Event Call Center,
20  in your position, would you ever have reason to go back
21  and review them?
22    A  Hypothetically?
23    Q  Yeah.
24    A  If I had a question, I'd go and look at them.
25    Q  Do you know whether you did, with respect to

[22]

1  this incident, whether you went to look at any reports
2  that were filed?
3    A  I do not recall.  There's nothing outstanding on
4  this report, you know, it isn't a 9-11, it isn't Richard
5  Reid, it isn't, you know, a passenger being shot by FAMS.
6  There's nothing here that stands out.
7    Q  All right.  Okay.  Thank you.
8    A  You're welcome.
9    MR. FITZHUGH:  FAMS means Federal Air
10  Marshals?
11    THE WITNESS:  That's correct.
12    Q  In preparation for today's deposition, did you
13  review call center reports filed by the flight
14  attendants?
15    A  The only thing I reviewed was the paperwork that
16  I received from Michael.
17    Q  Okay.  I'm going to show you a series of
18  exhibits, there's about five of them.  And my question is
19  going to be the same for each, and it's whether you have
20  seen it before.
21    A  Seen them, okay.
22    Q  And if so, whether you saw it in preparation for
23  today's deposition or somewhere else.
24    MR. FITZHUGH:  Could we go off the record?
25  It may help.

[23]

1    (Off the record from 3:01 to 3:01 p.m.)
2    Q  Mr. Marquis, I'm handing you Exhibit 1, which
3  has previously been identified as a call center report of
4  Flight Attendant Walling.  Have you seen this before?
5    A  Yes.
6    Q  In preparation for today's deposition?
7    A  That's correct.
8    Q  Anywhere else?
9    A  No, sir.
10    Q  I'm handing you what's been marked as Exhibit 5.
11  This has been previously identified as the call center
12  report of Flight Attendant Sargent.  Have you seen this
13  document before?
14    A  Yes.
15    Q  In preparation for today's deposition?
16    A  That's correct.
17    Q  Anywhere else?
18    A  No, sir.
19    Q  I'm handing you what's been previously marked as
20  Exhibit 9, which has been identified as a call center
21  report of Flight Attendant Milencovic.  Have you seen
22  this before?
23    A  Yes, I have.
24    Q  In preparation for today?
25    A  That's correct.

[24]

1    Q  Anywhere else?
2    A  No, sir.
3    Q  I'm handing you what's been marked as Deposition
4  Exhibit 16.  This has been previously identified as the
5  statement of Captain Ehlers.  Have you seen this before?
6    A  Yes.
7    Q  In preparation for today?
8    A  That's correct.
9    Q  Anywhere else?
10    A  No, sir.
11    Q  Are there any other documents or reports that
12  were prepared contemporaneously to this incident by
13  American Airlines' personnel that you reviewed, and that
14  we haven't looked at today?
15    A  No, not that I know of.
16    Q  Okay.  Did you prepare any written report
17  related to this incident?
18    A  I did not.
19    Q  Do you know whether the CCRO that day prepared
20  any written report other than the detail notes that we've
21  looked at?
22    A  No.
23    Q  You don't know or she did not?  It wasn't a very
24  good question.
25    A  The information you have there with Rhonda's

Craig Marquis                                                June 15, 2006

[25]

1   name on it is the correct way that we report, --
2      Q   And --
3      A   -- that is the only report that she would do.
4      Q   Okay.  And as far as you know, that represents
5   the totality of what she recorded that day?
6      A   That's correct.
7      Q   Thank you.  You mentioned earlier that
8   Mr. Bramlett contacted you to discuss this incident at
9   some time after December 20th, 2003.  Other than that
10  contact and your contacts in preparation for today's
11  deposition, has anyone else from American Airlines
12  contacted you to discuss this incident?
13     A   No.
14     Q   Has anyone from outside American Airlines, such
15  as a government agency or a law enforcement agency,
16  contacted you to discuss this incident?
17     A   No.
18     Q   When a passenger is removed from a flight or
19  denied boarding because of a perceived security concern,
20  ordinarily, how long will the denial of service last
21  before that person can fly again?
22     A   To the extent you can -- can tell me that.
23         MR. FITZHUGH:  I'm going to instruct the
24  witness not to answer the question to the extent it would
25  call for the disclosure of sensitive security information

[26]

1   within the purview of 49 CFR 1520.5.
2          If you can answer the question without
3   disclosing such information, you may try to.
4      A   It varies.
5      Q   Where is it recorded to let, you know, for
6   example, ticket counter personnel know that somebody
7   should not be allowed to travel on American Airlines?
8          MR. FITZHUGH:  Is it for security issues
9   or --
10         MR. KIRKPATRICK:  Yes, yes.
11         MR. FITZHUGH:  Okay.  I'm going to instruct
12  the witness not to answer the question for the same
13  reasons as stated in my earlier instruction.
14     Q   If a passenger is removed or denied boarding, so
15  that further investigation can be done to determine if
16  there is security risk and nothing threatening or unusual
17  is found, are they ordinarily rebooked on a later
18  American Airlines flight?
19     A   Hypothetically?
20     Q   Yes.
21     A   Removed by who?
22     Q   For example, if the flight crew thought somebody
23  was behaving suspiciously, they have that person removed
24  and some type of law enforcement agent investigated that
25  person and found that there was an innocent explanation

[27]

1   for whatever was perceived as -- as suspicious, and said
2   this person does not pose a risk for the security of the
3   flight, would that passenger ordinarily be rebooked on a
4   later flight?
5      A   Each event is decided on its own merit and
6   conditions and conduct.  You're being very general.
7      Q   I'm just wondering if there's a general rule.
8      A   There is no general rule or guideline.  You take
9   the combination of all the information for that specific
10  situation, you take your training, you take your
11  experience, and you make the decision.
12         Very generally, we're in the passenger
13  service business that carries passengers, we don't make
14  money if we leave everyone standing at the gate.
15     Q   Is the decision whether a passenger should be
16  rebooked made by the SOC manager on duty?
17     A   Yes.
18     Q   Is there anybody else who has the authority to
19  make the decision that somebody should not be rebooked?
20     A   No.
21     Q   When you make a decision that a passenger should
22  not be rebooked, do you record the reason anywhere?
23     A   We have a recording -- do you see the recordings
24  in that -- the CCRO enters, that's the recording data
25  that we use.

[28]

1      Q   So, generally, the manager on duty in SOC would
2   verbally tell the CCRO the decision as to whether to
3   rebook or not, the CCRO would then input that information
4   into the computer system; is that right?
5      A   That's correct.
6      Q   When there is a security incident, such as the
7   one that happened in this case, do you, as the SOC
8   manager on duty, communicate directly with the crew
9   members, for example, the pilot ordinarily?  I know you
10  don't know remember the specifics of this incident, but,
11  ordinarily, would you get on the phone with the pilot?
12     A   In general, there are procedures in place where
13  the pilot contacts SOC, yes.
14     Q   And is it the manager on duty the point of
15  contact for the pilot?
16     A   Yes.
17     Q   Other than communicating with the pilot, are
18  there other individuals that the manager on duty and SOC
19  would ordinarily be in communication with?
20         MR. FITZHUGH:  Under what circumstances?
21     Q   Under these circumstances, where a passenger has
22  been identified as potentially suspicious and there's
23  been a decision to remove the passenger, and the next
24  thing that happened is somebody contacts SOC manager on
25  duty.  Under those circumstances, do you ordinarily have

[29]

1   people that you communicate with?
2       A   Well, there is no ordinary circumstance.
3       Q   Okay.
4       A   Every circumstance is different.  It would be
5   very easy to check boxes and make every circumstance
6   ordinary.  No event is ordinary.  I can tell you that I
7   communicate with people at the station that are passenger
8   service people, ground security people, law enforcement
9   people, crew members, yes.
10      Q   Okay.  Just so we're clear, with respect to this
11  incident, you don't recall the specifics of anybody you
12  may have communicated with?
13      A   That is correct.
14      Q   Has American Airlines provided you with training
15  on carrying out your duties in a nondiscriminatory
16  manner?
17      A   Yes.  We have a very clear and strong
18  anti-discrimination policy, and I think it's a law.
19      Q   Has the -- the substance of that training
20  changed since December 28, 2003?
21      A   No.
22      Q   Does American Airlines have set procedures and
23  protocols for how to respond if a member of a flight crew
24  thinks a passenger is suspicious?  And I'm not asking you
25  for the details, but does American Airlines have such a

[30]

1   procedure or protocol in place?
2       A   No.
3       Q   Everything is handled on case-by-case basis?
4       A   That's correct.
5       Q   So the procedure is to contact SOC manager on
6   duty, and then from there decisions are made about where
7   it goes from there; is that right?
8       A   Not always.  I mean, there's other people that
9   make security decisions; it depends on the severity.  I
10  mean, as an example, they can find a bullet on board an
11  aircraft on the ground.  They're going to take the bullet
12  off on their own, then they'll contact me.  I haven't
13  made that decision, but they have -- they're also
14  trained.  They, you know, everyone follows the exact same
15  protocol, I mean, our training's the same, okay?
16      Q   And so the individuals involved in making those
17  decisions could be the captain, could be ground security
18  coordinator, could be any number of people?
19      A   As far as what decision?
20      Q   A decision whether a passenger should be removed
21  and further screened because of some sort of --
22      A   No.  You were talking in general before.  A
23  Captain or a GSE cannot remove a passenger.  They cannot
24  do that --
25      Q   Okay.

[31]

1       A   -- not without first contacting SOC.
2       Q   I see.  And is the decision made by SOC manager
3   on duty?
4       A   That's correct.
5       Q   Have you ever been contacted after that decision
6   has already been made and a passenger has been removed?
7       A   Contacted by?
8       Q   Like the first time SOC hears about it, is after
9   the decision has already been made and the passenger's
10  been removed from the aircraft?
11      A   It may have happened once.
12      Q   Okay.  But it would be an unusual circumstance?
13      A   Very unusual.
14      Q   The ground security coordinator does not have
15  the authority to decide that a passenger should be
16  removed for further questioning?
17      A   That's correct.
18      Q   And the same with respect to the captain?
19      A   That's correct.
20      Q   Does the captain have the authority to say that
21  they don't want a particular passenger to fly on their
22  airplane without consulting SOC?
23      A   No.  The captain is the security coordinator
24  onboard that aircraft.  He is the security agent onboard
25  that aircraft.  As I'm the operational security manager,

[32]

1   he's the in-flight coordinat -- you know, he's the
2   in-flight guy, and then you have the ground guy.
3   Everyone has the same training; everyone follows the same
4   rules, as far as contacting goes.
5       Q   Okay.  But it would be SOC -- if procedures were
6   followed correctly, it would be the decision of the SOC
7   manager on duty to remove a passenger for further
8   questioning?
9       A   That's correct.  And then that would be
10  irregular if those procedures are not followed.
11      Q   Okay.  And once that passenger was removed,
12  let's say for further questioning by law enforcement
13  officers on the ground, it would be the SOC manager on
14  duty who would decide whether those passengers, once
15  released by law enforcement, were either denied rebooking
16  or were put on the next available flight?
17      A   In general, I wouldn't know the reason that the
18  law enforcement officer would take a passenger off an
19  aircraft.
20      Q   Okay.  Let me clarify a little bit.  If the
21  decision was made, passenger should be removed --
22      A   By?
23      Q   Let's say the SOC manager on duty --
24      A   Okay.
25      Q   -- decides, you know, crew members have reported

# Exhibit 12

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT


Excerpts of Deposition of Nicole Traer
with Deposition Exhibit No. 12

# In The Matter Of:

*John D. Cerqueira v.*
*American Airlines, Inc.*

---

*Nicole Traer*
*April 25, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: 617-426-2432*

Original File traer.v1, Pages 1-48

**Word Index included with this Min-U-Script®**

**Page 1**

Volume I
Pages 1 to 48
Exhibits 12 to 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
JOHN D. CERQUEIRA,                :
        Plaintiff,               :
                                  :
   vs.                     : Civil Action
                           : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,          :
        Defendant.               :
                                  :
- - - - - - - - - - - - - - - - -x

     DEPOSITION OF NICOLE TRAER, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
12, 2006, commencing at 1:37 p.m.
PRESENT:
     Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
        280 Summer Street, Boston, MA  02210,
        for the Plaintiff.
     Fitzhugh, Parker & Alvaro LLP
        (By Michael A. Fitzhugh, Esq.)
        155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.
                    * * * * *

**Page 2**

[1]
[2]                    I N D E X
[3]
WITNESS                        DIRECT    CROSS
[4]
NICOLE TRAER
[5]   BY MS. ABATE RECHT                 3
[6]
[7]
                     * * * *
[8]
                 E X H I B I T S
[9]
NO.          DESCRIPTION            PAGE
[10]
     12   Document entitled "Detail Note"    14
[11]        Bates stamped AA 0023 to AA 0027
[12]   13   Document entitled "Detail Note"    18
           Bates stamped AA 0028
[13]
     14   Document entitled "Detail note"    18
[14]        Bates stamped AA 0021
[15]
[16]                 * * * *
[17]
[18]
[19]
[20]
[21]
 21
 3]
[24]

**Page 3**

[1]            P R O C E E D I N G S
[2]                NICOLE TRAER
[3]   a witness called for examination by counsel for the
[4]   Plaintiff, having been satisfactorily identified by
[5]   the production of her driver's license and being
[6]   first duly sworn by the Notary Public, was examined
[7]   and testified as follows:
[8]            DIRECT EXAMINATION
[9]   BY MS. ABATE RECHT:
[10]   Q.  Good afternoon, Ms. Traer.
[11]   A.  Hi.
[12]   Q.  Can you please state your full name for the
[13]   record.
[14]   A.  Nicole Traer.
[15]   Q.  What is your address?
[16]   A.  101 Old Stone Way, Unit 103, Weymouth, MA
[17]   02189.
[18]   Q.  Did you do anything to prepare for today's
[19]   deposition?
[20]   A.  I spoke with the lawyers for American in
[21]   Attorney Fitzhugh's office.
[22]   Q.  Did you speak with anyone else?
[23]   A.  No.
[24]   Q.  Did you review any documents?

**Page 4**

[1]   A.  I looked over just the passenger name
[2]   record that was sent to me, and that was it.
[3]   Q.  Are you currently employed by American
[4]   Airlines?
[5]   A.  Yes.
[6]   Q.  What is your position?
[7]   A.  Manager of operations.
[8]   Q.  How long have you been a manager of
[9]   operations?
[10]   A.  A year and a few months.
[11]   Q.  Did you have a position at American before
[12]   that?
[13]   A.  Yes.
[14]   Q.  What was your position?
[15]   A.  Customer service manager.
[16]   Q.  Did you have any positions before being a
[17]   customer service manager?
[18]   A.  Yes.
[19]   Q.  And what was that?
[20]   A.  International departure coordinator and
[21]   customer service agent.
[22]   Q.  When did you serve as a customer service
[23]   manager?
[24]   A.  I believe from 1999 until 2005.

Page 5

[1] **Q.** How long have you been employed by American?

[3] **A.** Nine and a half years.

[4] **Q.** Were you employed prior to being employed by American Airlines?

[6] **A.** Yes.

[7] **Q.** Where?

[8] **A.** The Jupiter Island Club in Florida.

[9] **Q.** And before Jupiter Island Club in Florida, did you have employment before that?

[11] **A.** Yes.

[12] **Q.** Where?

[13] **A.** Legal Sea Food.

[14] **Q.** Was American Airlines your first airline job?

[16] **A.** Yes.

[17] **Q.** What is your educational background?

[18] **A.** High school graduate and some college.

[19] **Q.** How much college?

[20] **A.** A couple of courses over the years.

[21] **Q.** What do your responsibilities include as manager of operations?

[23] **A.** I run the operations department. I oversee the employees. I oversee the ramp operations and

Page 6

[1] any other functions that arise.

[2] **Q.** What does the operations department do?

[3] **A.** We handle the arrivals and departures, push-backs off of the gate, on-time performance.

[5] **Q.** What did your responsibilities include as a customer service manager?

[7] **A.** Handling passengers primarily at the ticket counter and the gates.

[9] **Q.** Were you involved in any way in the incident that led Mr. Cerqueira to be removed from Flight 2237 on December 28, 2003?

[12] **MR. FITZHUGH:** Objection. Form.

[13] **A.** Can you ask that again, please?

[14] **Q.** Sure. Were you involved in any way in the incident that led to Mr. Cerqueira being removed from Flight 2237?

[17] **MR. FITZHUGH:** Same objection.

[18] **A.** Can you be more specific in the involvement?

[20] **Q.** Sure. Well, why don't you tell me. When did you first become involved in the incident? Let me rephrase that.

[23] When did you first become aware that Mr. Cerqueira and two other passengers had been removed

Page 7

[1] from Flight 2237 on December 28, 2003?

[2] **A.** Are you looking for a time or in the sequence of events? I'm not exactly sure of the time frame.

[5] **Q.** Do you recall the sequence of events, then?

[6] **A.** I know my involvement began when I was notified over the radio of a return to gate.

[8] **Q.** Who notified you of that?

[9] **A.** Operations.

[10] **Q.** Do you recall what you were told?

[11] **A.** I don't recall the specifics. Just there was a return to gate.

[13] **Q.** Were you told the reason why?

[14] **A.** No.

[15] **Q.** What happened next?

[16] **A.** In regards to the flight or my --

[17] **Q.** Do you know what happened next with regard to the flight?

[19] **A.** I don't know what happened to the flight. I know I went to the gate to assist the passengers who were deplaning.

[22] **Q.** So when you say, "the passengers who were deplaning," do you mean Mr. Cerqueira and the other two passengers or do you mean --

Page 8

[1] **A.** I'm not sure where they were. They were off the aircraft already, I believe with the State Police, but I'm not sure.

[4] **Q.** So you were asked to go to the gate to help with the deplaning of the entirety of the passengers?

[7] **A.** Uh-hum, yes.

[8] **Q.** And at that point it's your understanding that Mr. Cerqueira and the two other gentlemen had already been removed from the plane and were being questioned by the State Police?

[12] **A.** I believe so, yes.

[13] **Q.** After you went to the gate to help with the deplaning of the passengers, what happened next?

[15] **A.** In regards to the other passengers?

[16] **Q.** Yes.

[17] **A.** There was some rescreening involving the flight with the Transportation Security Administration, and the State Police -- several units, bomb detection units and canine units came down.

[22] **Q.** What do you mean by "restraining involving the flight"?

[24] **A.** We had to rescreen all passengers who were

Page 9

[1] on board the aircraft.

[2] **Q.** "Rescreen" or "restrain"?

[3] **A.** Rescreen.

[4] **Q.** Okay, rescreen. I'm sorry, if you could
[5] just speak up. We're trying to get everything.

[6] **MR. FITZHUGH:** Keep your voice up a little
[7] bit.

[8] **A.** Okay.

[9] **Q.** Do you know why the passengers were being
[10] rescreened?

[11] **A.** It was at the instruction of the TSA.

[12] **Q.** Do you know who at the TSA made that
[13] decision?

[14] **A.** No.

[15] **Q.** Did you have any discussions with anyone
[16] from the TSA?

[17] **A.** I had discussions in regards to how and
[18] where this would be performed, but not why.

[19] **Q.** Did you have discussions with any other law
[20] enforcement officers?

[21] **A.** Regarding the situation with the other
[22] passengers or --

[23] **Q.** Or Mr. Cerqueira, either one.

[24] **A.** My involvement with the State Police was

Page 10

[1] the canine unit going on the aircraft.

[2] **Q.** What was your understanding of why the
[3] canine unit was going on the aircraft?

[4] **A.** I don't know. It was a procedure that they
[5] were performing. They didn't give me a reason.

[6] **Q.** Did you ask?

[7] **A.** No. They have access to the aircraft.

[8] **Q.** Did you have any discussions with any of
[9] the flight crew?

[10] **A.** No. The flight attendants were not
[11] available when I got there.

[12] **Q.** Did you have any discussions with the
[13] captain or the first officer?

[14] **A.** I spoke with the captain when I gave him
[15] the phone to speak with systems operations control.

[16] **Q.** What was your conversation with the
[17] captain?

[18] **A.** I can't remember specifics, but I remember
[19] I gave him the phone to talk to the manager at
[20] systems operations.

[21] **Q.** What was your understanding of why the
[22] captain needed to speak with systems operation
[23] control?

[4] **A.** It was at the request of the systems

Page 11

[1] operations control manager.

[2] **Q.** And do you know why?

[3] **A.** No.

[4] **Q.** Did you have any understanding of what had
[5] happened with respect to Mr. Cerqueira and the two
[6] other gentlemen who were seated next to him?

[7] **A.** No.

[8] **Q.** So is it fair to say that your involvement
[9] occurred only after the plane had returned to the
[10] gate and all the passengers were being removed from
[11] rescreening?

[12] **A.** Yes.

[13] **Q.** Is there anything else you can recall about
[14] that process that we haven't discussed?

[15] **A.** No.

[16] **Q.** Did you communicate with Mr. Cerqueira on
[17] December 28, 2003?

[18] **A.** At the departure gate or at any time?

[19] **Q.** At any time.

[20] **A.** I believe I did. I can't remember the
[21] exact conversation, but I believe he asked why he
[22] was being denied boarding.

[23] **Q.** Okay. Do you recall what you told him?

[24] **A.** Not in exact words, but I believe it was

Page 12

[1] something along the lines that I was not sure why.
[2] He would have to contact customer relations at
[3] American.

[4] **Q.** If you could take a look at a document that
[5] has previously been marked as Exhibit 2. And if you
[6] look at the first page, this document is entitled
[7] "American Airlines, Inc.'s Answers to Plaintiff's
[8] First Set of Interrogatories." Did you review this
[9] document in preparation for your deposition?

[10] **A.** I don't think it was this document, but I'm
[11] not 100 percent sure.

[12] **Q.** If you could turn to Page 5. First, let me
[13] just ask, do you know what interrogatories are?

[14] **A.** Yes.

[15] **Q.** So I'll read Interrogatory No. 10, which
[16] was the plaintiff's question to American Airlines,
[17] and then the response below is American Airlines'
[18] response to this question. Do you understand that?

[19] **A.** Yes.

[20] **Q.** Okay. Interrogatory No. 10 asks, "If you
[21] contend that any person(s) communicated to Mr.
[22] Cerqueira the reason(s) why he was removed from
[23] Flight 2237, or the reason(s) why he was refused
[24] service after his release from questioning, identify

Page 13

[1] the person(s) and state the substance of each
[2] communication."
[3]    And then the second sentence of the
[4] response states, "American is informed and believes
[5] that Ms. Nicole Traer later explained to Mr.
[6] Cerqueira that he was being refused service because
[7] his behavior and that of persons with whom he
[8] appeared to be traveling caused concerns among the
[9] passengers and crew of Flight 2237." Do you see
[10] that?
[11]    **A.** Yes.
[12]    **Q.** Does that refresh your recollection at all
[13] as to whether you had any further discussions with
[14] Mr. Cerqueira regarding why he was being refused
[15] service?
[16]    **A.** No.
[17]    **Q.** Did anyone speak with you about American's
[18] response to this interrogatory?
[19]    **A.** I spoke with the American lawyers and the
[20] attorneys in Mr. Fitzhugh' office, but --
[21]    **Q.** Do you recall when you spoke with them
[22] regarding this answer to interrogatory?
[23]    **A.** I didn't speak to them about an answer to
[24] any question. Just about the case itself.

Page 14

[1]    **Q.** Do you know who made the decision to not
[2] allow Mr. Cerqueira to board another American
[3] Airlines flight that day?
[4]    **A.** Not specifically, but the outcome and the
[5] answer came from our systems operations control.
[6]    **Q.** Do you know what that decision was based
[7] on?
[8]    **A.** I do not.
[9]    **Q.** Do you know when the decision was made?
[10]    **A.** I do not.
[11]    **MS. ABATE RECHT:** I'm going to ask the
[12] court reporter to mark as Exhibit 12 a document
[13] Bates numbered AA 0023 through 0027.
[14]    (Document marked as Traer
[15]    Exhibit 12 for identification)
[16]    **MR. FITZHUGH:** This is also Cerqueira 19.
[17]    **MS. ABATE RECHT:** Okay.
[18]    **Q.** Do you recognize this document?
[19]    **A.** Yes.
[20]    **Q.** Is this one of the documents you reviewed
[21] in preparation for your deposition?
[22]    **A.** Yes.
[23]    **Q.** Does this document help to refresh your
[24] recollection as to when the decision was made to

Page 15

[1] refuse service -- further service to Mr. Cerqueira?
[2]    **A.** I don't know when the decision was made.
[3] Just when I was notified.
[4]    **Q.** Do you recall when you were notified?
[5]    **A.** When I documented the record.
[6]    **Q.** What are you pointing to?
[7]    **A.** Second page.
[8]    **MR. FITZHUGH:** Recite the number.
[9]    **Q.** AA 0024?
[10]    **A.** Yes. It doesn't give a line down, but it's
[11] towards the bottom, where there's asterisks going
[12] across, "PASSENGER DENIED TRAVEL ON FLIGHT 2237 PER
[13] SOC CRAIG DUE TO SECURITY ISSUE. CCRO WILL ADD
[14] EVENT NUMBER SHORTLY. PLEASE REFUND TICKETS DUE TO
[15] DENY. BOSCSM N Traer."
[16]    **Q.** Does that mean that you put that --
[17]    **A.** Yes.
[18]    **Q.** Does that mean that you made that entry?
[19]    **A.** Yes.
[20]    **Q.** And right above it, it says "821." Do you
[21] see that?
[22]    **A.** Yes.
[23]    **Q.** "28December" -- "DEC03." Does that mean
[24] that you made that entry at 8:21?

Page 16

[1]    **A.** I believe -- and I'm not 100 percent
[2] sure -- it's the entry below it, where it shows
[3] "801."
[4]    **Q.** Okay. So is it your understanding, then,
[5] that you made the entry at 8:01?
[6]    **A.** Yes.
[7]    **Q.** Would that be eastern time?
[8]    **A.** I am not sure. It's either central or
[9] eastern.
[10]    **Q.** Is there something that would help you
[11] determine whether it's central or eastern time?
[12]    **A.** I would have to check it on SABRE with
[13] American Airlines, a computer that we use, to see
[14] what the time is that's on the PNR, passenger name
[15] record.
[16]    **Q.** So you're not able to tell from a printout,
[17] but you'd be able to tell from a computer screen?
[18] By actually accessing it on an American Airlines
[19] system?
[20]    **A.** Yes. I could enter something into a PNR
[21] and check the time to see if it was matching up to
[22] eastern or central.
[23]    **Q.** So just so I understand, it's your
[24] testimony that you believe the decision -- that you

Page 17

[1] were told to deny service to Mr. Cerqueira at some
[2] time before 8:01 a.m., whether that be eastern time
[3] or central time?
[4]    **A.** Could you repeat that first part?
[5]    **Q.** Sure. I just want to understand, is it
[6] your testimony that you were informed sometime
[7] before 8:01 on December 28, 2003 that you were to
[8] deny service to Mr. Cerqueira and the other two
[9] passengers? Strike that. Strike that.
[10]   Is it your testimony that at some time
[11] before 8:01 you were told to deny service to Mr.
[12] Cerqueira based on this time entry?
[13]   **A.** Yes.
[14]   **Q.** Do you know whether this decision was based
[15] on anything communicated to American Airlines from
[16] law enforcement?
[17]   **A.** I do not know.
[18]   **Q.** Do you know whether American Airlines
[19] considered the fact that Mr. Cerqueira had been
[20] cleared by law enforcement in making their decision
[21] to deny him further service?
[22]    **MR. FITZHUGH:** Objection. No foundation.
[23]   **A.** I don't know.
[24]    **MS. ABATE RECHT:** I'm going to ask the

Page 18

[1] court reporter to mark as Exhibit 13 a document
[2] Bates numbered AA 0028.
[3]    (Document marked as Traer
[4]    Exhibit 13 for identification)
[5]    **MS. ABATE RECHT:** I'm going to ask you to
[6] mark also as No. 14 the document that's Bates
[7] stamped AA 0021. You can look at these two
[8] documents together.
[9]    (Document marked as Traer
[10]    Exhibit 14 for identification)
[11]   **Q.** If would you first look at what was marked
[12] as Exhibit 13, AA 0028. Do you know who wrote this?
[13]   **A.** No.
[14]   **Q.** Do you see on the top it says, "Created
[15] 12/28/2003 Rhonda Cobbs"?
[16]   **A.** Yes.
[17]   **Q.** Would that mean that Ms. Cobbs was the one
[18] who wrote this?
[19]   **A.** I don't know. This is not a document that
[20] we usually use. It's used in our CCRO office.
[21]   **Q.** Can you look at Exhibit 14, AA 0021. Do
[22] you recognize this document?
[23]   **A.** This is not a document that we use either.
[4]    **Q.** Okay. Is this also a CCRO document?

Page 19

[1]    **A.** Yes.
[2]    **Q.** So is it safe to assume that you don't have
[3] information concerning how this information was
[4] compiled?
[5]    **A.** I do not know that.
[6]    **Q.** If you look on Exhibit 14, sort of halfway
[7] down the paragraph it says, "PER SOC MOD, PASSENGER
[8] DENIED BOARDING AND TICKETS REFUNDED." Do you know
[9] what "SOC MOD" is?
[10]   **A.** Systems operations control manager on duty.
[11]   **Q.** And do you know how we would find out who
[12] the manager on duty is or was?
[13]   **A.** American corporate offices.
[14]   **Q.** If we could go back to what was marked as
[15] Exhibit 12, AA 0023. I would just like to go
[16] through it in detail, if we could, so that we can
[17] understand what all of these different entries mean.
[18]   And if you could just go through
[19] line-by-line and interpret this.
[20]   **A.** I'm not sure what a lot of this is.
[21]   **Q.** Well, you'll see at the top it says,
[22] "Created: 12/282003 Rhonda Cobbs." Does that mean
[23] that Rhonda Cobbs was the one who was inputting this
[24] information?

Page 20

[1]    **A.** I don't know. Where "1.1" is, that is the
[2] start of the passenger name record.
[3]    **Q.** Okay.
[4]    **A.** I don't know what the top section is.
[5]    **Q.** Okay. What does "ARNK" stand for on Line
[6] 3?
[7]    **A.** I don't know what the actual letters mean,
[8] but it separates different flights in a reservation.
[9] It's used as a space.
[10]   **Q.** Do you know what Line 4 means?
[11]   **A.** Line 4 is a flight that normally is
[12] inputted by the CCRO.
[13]   **Q.** Do you know why it was inputted?
[14]   **A.** That saves a record for a set amount of
[15] time, so it doesn't get lost in the system.
[16]   **Q.** So do all passengers who fly American have
[17] a passenger name record in which the flights that
[18] they have flown for a particular time are all
[19] recorded on a document like this?
[20]   **A.** Each passenger that travels has a PNR. The
[21] information in it is all different.
[22]   **Q.** Does this indicate that -- so this would be
[23] Mr. Cerqueira's PNR; is that right?
[24]   **A.** Yes.

Page 25

[1]　**A.** With just making an assumption, because I
[2] didn't write it, "Fort Lauderdale Boston."
[3]　**Q.** So that means a passenger was allowed to
[4] change his flight because he missed a flight from
[5] Fort Lauderdale to Boston?
[6]　**A.** I can make an assumption on that, but I
[7] didn't write it, so I don't know for sure.
[8]　**Q.** What does Line 6 mean?
[9]　**A.** Bag-tag 890684 was security scanned.
[10]　**Q.** And that's December 20, 2003?
[11]　**A.** Yes.
[12]　**Q.** And if there was a problem with the bag,
[13] would that be noted on this printout?
[14]　**A.** No.
[15]　**Q.** No?
[16]　**A.** No.
[17]　**Q.** This just indicates that the bag was
[18] scanned?
[19]　**A.** Yes.
[20]　**Q.** If there was a problem with the bag, where
[21] would it be -- would it be noted anywhere?
[22]　**A.** It would depend on the situation.
[23]　**Q.** If there was a security concern about the
[24] bag, would that be noted anywhere?

Page 26

[1]　**A.** It would depend on what the security
[2] concern was or who found the security concern.
[3]　**Q.** What are the different scenarios that
[4] you're thinking of?
[5]　**A.** Hazardous material inside of a checked bag,
[6] a syringe in a bag, an item that could look
[7] suspicious, but is not or an item that is suspicious
[8] that somebody found.
[9]　**Q.** And where would that be recorded?
[10]　**A.** It would depend on who was finding the
[11] actual item.
[12]　**Q.** What are the different options?
[13]　**A.** I don't know what every department uses.
[14] American Airlines would document into the passenger
[15] name record. Other agencies, I don't know what they
[16] do.
[17]　**Q.** So if the bag was scanned and something
[18] suspicious was found by American Airlines, it would
[19] be on this report?
[20]　**A.** Yes.
[21]　**Q.** Do you see anything suspicious being found
[22] on the report?
[23]　**A.** There is no suspicious documentation about
[24] something in the bag in a passenger name record.

Page 27

[1]　**Q.** What does Line 7 mean?
[2]　**A.** I don't know.
[3]　**Q.** Can you turn the page on Line 39. It says,
[4] "PASSENGER DENIED TRAVEL ON FLIGHT 2237 PER SOC
[5] CRAIG Due TO SECURITY ISSUE. CCRO WILL ADD EVENT
[6] NUMBER SHORTLY. PLEASE REFUND TICKETS DUE TO DENY
[7] BOSCSM N TRAER." Is that what you testified that
[8] you inputted?
[9]　**A.** Yes.
[10]　**Q.** Did you have any discussions with SOC Craig
[11] about the decision to deny Mr. Cerqueira travel on a
[12] further American Airlines flight that day?
[13]　**A.** I was advised he was denied travel on
[14] American and to refund the ticket.
[15]　**Q.** Who did you talk to?
[16]　**A.** SOC Craig.
[17]　**Q.** What did he tell you exactly?
[18]　**A.** I don't know the specifics, but that travel
[19] was denied and the ticket was to be refunded.
[20]　**Q.** Did you ask him why?
[21]　**A.** No.
[22]　**Q.** Is that all he told you?
[23]　**A.** Yes.
[24]　**Q.** Did you have any discussions with Delilah

Page 28

[1] MacLeod?
[2]　**A.** Yes.
[3]　**Q.** What were your discussions with her?
[4]　**A.** To refund the ticket. She was a ticket
[5] agent.
[6]　**Q.** So you just told her to refund the ticket?
[7]　**A.** Yes.
[8]　**Q.** When you arrived at the ticket counter, was
[9] Mr. Cerqueira already standing there?
[10]　**A.** I followed them up to the ticket counter.
[11]　**Q.** Who is "them"?
[12]　**A.** Mr. Cerqueira was with the State Police.
[13]　**Q.** Okay. Do you recall whether the State
[14] Police told you anything?
[15]　**A.** No.
[16]　**Q.** You don't recall or they didn't tell you
[17] anything?
[18]　**A.** I did not discuss his incident with the
[19] State Police.
[20]　**Q.** Was it your understanding that he had been
[21] cleared for travel by the State Police?
[22]　**A.** I don't know.
[23]　**Q.** Did you have any discussions with Ms.
[24] MacLeod as to whether it was her understanding that

Page 33

[1]  in that situation.
[2]      Q.  Were all three passengers treated the same?
[3]      MR. FITZHUGH:  Objection.  Form,
[4]  foundation.
[5]      A.  I don't know.
[6]      Q.  Did you tell all three of them the same
[7]  thing?
[8]      MR. FITZHUGH:  You mean in substance?  I'm
[9]  going to object to the question.
[10]      A.  In regards to denying them travel?
[11]      Q.  Denying them further service, yes.
[12]      A.  I said the same thing to the three.
[13]      Q.  Okay.  Can we go back to the document we
[14]  were just looking at.  If you look at Line 47, where
[15]  we were just talking about, it says, "DO NOT REBOOK
[16]  ON AA."  And then if we look up at what you wrote on
[17]  Lines 39 to 41, "PLEASE REFUND TICKETS DUE TO DENY."
[18]  Does that mean the same thing?
[19]      A.  I can tell you what I meant.  What the
[20]  other documentation is that I didn't write, I don't
[21]  know what they meant to say.
[22]      Q.  Okay.
[23]      A.  My reference was to refund the tickets,
[24]  because the passengers were denied travel.

Page 34

[1]      Q.  And you didn't know whether that was for
[2]  one day or forever on American?
[3]      A.  I don't know.
[4]      Q.  Is there any way to tell from this document
[5]  when it was that SOC Craig made the decision to deny
[6]  travel on the flight?
[7]      A.  No.
[8]      MR. FITZHUGH:  Objection.  Move to strike.
[9]      Q.  Did you first have a discussion with Mr.
[10]  Craig regarding American's decision to deny travel
[11]  and then put this entry in?
[12]      MR. FITZHUGH:  Objection.
[13]      A.  I'm not sure what you mean.
[14]      Q.  You testified that you had a discussion
[15]  with SOC Craig, correct?
[16]      A.  Yes.
[17]      Q.  And he informed you that these passengers
[18]  were denied further travel, correct?
[19]      A.  They were denied travel, yes.
[20]      Q.  After that conversation — strike that.
[21]      Did you write this entry, Lines 39 to 41 on
[22]  Page AA 0024, after that conversation with Mr.
[23]  Craig?
[24]      A.  Yes.

Page 35

[1]      Q.  Who has the — strike that.
[2]      Does the sole authority to deny further
[3]  service rest with the SOC?
[4]      A.  Yes.
[5]      Q.  Do you know what constitutes a legitimate
[6]  reason to deny service?
[7]      A.  I don't know.
[8]      Q.  Did you write anything regarding this
[9]  incident?
[10]      A.  I typed the documentation in the record.
[11]      Q.  Besides this document, Exhibit 12 that
[12]  we've been looking at, did you write anything
[13]  regarding this incident?
[14]      A.  I don't believe so.
[15]      Q.  Were you asked to write anything regarding
[16]  this incident?
[17]      A.  Not that I can remember.
[18]      Q.  I'm going to ask you to look at a document
[19]  that was previously marked as Exhibit 11.  Do you
[20]  recall ever receiving this document?
[21]      A.  No.
[22]      Q.  If you had received it, would you have
[23]  filled out an incident report?
[24]      A.  The report was phoned in and is documented

Page 36

[1]  on Exhibit 12, on AA 0024, where it states,
[2]  "PASSENGER DENIED TRAVEL ON 2237," Lines 39 to 41.
[3]      Q.  But you didn't write anything in addition
[4]  to that?
[5]      A.  I don't believe so.
[6]      Q.  Did anyone from American Airlines contact
[7]  you to discuss this incident further?
[8]      A.  I don't believe so.
[9]      Q.  Did you communicate directly with law
[10]  enforcement at any time concerning this incident?
[11]      A.  In respect to the other passengers boarding
[12]  the flight?
[13]      Q.  With respect to the denial of further
[14]  service to Mr. Cerqueira.
[15]      A.  No.
[16]      Q.  What were your communications with law
[17]  enforcement regarding the rest of the passengers?
[18]      A.  We were following the instructions of the
[19]  Transportation Security Administration, and we just
[20]  coordinated the rescreening of the passengers.
[21]      Q.  Okay.  Did you have conversations with any
[22]  other American Airlines personnel regarding this
[23]  incident?
[24]      A.  No.

**Page 41**

[1]   **A.** No.

[2]   **Q.** Is there anywhere that denials of service

[3] for security reasons are documented?

[4]   **A.** I don't know. I can tell you not on a

[5] local level.

[6]   **Q.** Is it possible that the SOC keeps a record

[7] of that information?

[8]   **A.** I don't know.

[9]   **Q.** You testified that you do recall incidents

[10] in which a passenger was denied service due to their

[11] actions. Do you recall what their actions were?

[12]   **A.** Disorderly, intoxicated, fighting with

[13] other passengers, employees.

[14]   **Q.** Disorderly. What kind of conduct are you

[15] referring to when you say "disorderly"?

[16]   **A.** I don't know. The one that comes to mind,

[17] I was called in afterwards, and I was just the

[18] second person on the scene.

[19]   **Q.** What do you recall about it?

[20]   **A.** Just that I was called down. There was an

[21] incident at a gate, and the passenger was denied

[22] travel. I wasn't the person involved, per se.

[23]   **Q.** Do you recall what the incident was?

[24]   **A.** Not entirely. Just that there was a

**Page 42**

[1] passenger, a disorderly passenger in a terminal.

[2] Someone else was handling it. I went to see if

[3] there was assistance needed.

[4]   *Q. You recall whether you've been involved in

[5] incidents in which a passenger was denied service

[6] based on security concerns? And by that, I don't

[7] mean intoxication or disorderly conduct, but I'm

[8] referring more to a possible threat of terrorist

[9] activity.

[10]   **A.** Can you repeat that.

[11]   **MS. ABATE RECHT:** Sure. Can you repeat the

[12] question.

[13]   *(Question read)

[14]   **A.** I'm not sure what you mean by "terrorist

[15] activity." There are times when we've denied

[16] passengers. I don't know the reason why. It may or

[17] may not have been because of any type of activity,

[18] but I don't know.

[19]   **Q.** So, then, is your answer, you don't recall

[20] any such incidents?

[21]   **MR. FITZHUGH:** Objection. Her answer is

[22] her answer, as was previously stated.

[23]   **MS. ABATE RECHT:** I'm just trying to

[4] understand it.

**Page 43**

[1]   **MR. FITZHUGH:** Ask another question.

[2]   **A.** I don't know what you mean.

[3]   **Q.** Do you know why Mr. Cerqueira and the other

[4] two passengers were removed from the plane?

[5]   **A.** I don't know why.

[6]   **Q.** What other type of suspicious behavior are

[7] you aware of that would cause a passenger to be

[8] removed from a plane?

[9]   **A.** I don't know, based upon suspicious

[10] behavior the way -- I don't know what the question

[11] is.

[12]   **Q.** Are you trained at all in identifying

[13] suspicious behavior?

[14]   **A.** No, not behavior.

[15]   **Q.** Suspicious actions?

[16]   **A.** Actions? No. We go through a ground

[17] security training.

[18]   **Q.** What does that training consist of?

[19]   **A.** I can't give out that information.

[20]   **Q.** Can you say generally? I'm not asking for

[21] specifics.

[22]   **A.** Ground security would cover airport

[23] security, perimeter security, passenger baggage

[24] security, TSA regulations.

**Page 44**

[1]   **Q.** Have you ever been the subject of a

[2] discrimination complaint by an American Airlines

[3] customer?

[4]   **A.** No.

[5]   *Q. Has American ever provided you with any

[6] training regarding the circumstances under which a

[7] passenger may be denied service?

[8]   **A.** Training as to who to contact?

[9]   **MS. ABATE RECHT:** Can you just repeat the

[10] question, please.

[11]   *(Question read)

[12]   **A.** Yes. We contact the CCRO.

[13]   **Q.** I'm not specifically asking for what the

[14] procedure is. I'm asking, under what circumstances

[15] a passenger can be denied service.

[16]   **A.** Again, it could be anything. Intoxication,

[17] security, health reasons.

[18]   **Q.** When you say "security," what do you mean

[19] by that?

[20]   **A.** It could be anything. Leaving a bag

[21] unattended, a fraudulent ticket, fraudulent

[22] documents.

[23]   **Q.** Do you have written materials concerning

[24] that?

**EXHIBIT 12**

Event ID: 03122856

Pas nger Name Record (*PNR)

Created: 12/28/2003    Rhonda Cobbs          Updated: 12/28/2003    Rhonda Cobbs
08:29                                      08:29

.1CERQUEIRA/JOHN
   ARNK
  AA9124Y 01MAR M AVSFSG MM1    700A 1100A
KT/TIME LIMIT
.T-12JUN-XTM7EAD
.TE 0012147100338 CERQU/J XTM7W1K 1026/09MAY 1B*254202
.TE 0012147973213 CERQU/J XTM7EAD 1125/12JUN 1B*254206
.TK 0010494109138 CERQU/J BOS584H 0918/28DEC
CR COUPON DATA EXISTS  *VI TO DISPLAY
HONES
.WWW1510-579-3488-B
.WWWSAPTECH?ALYCOS.COM-E
.QHF510-579-3488-C/B
DDRESS
/JOHN CERQUEIRA
/3675 N COUNTRY CLUB DR 120
/AVENTURA, FL
/33180-1731
RICE QUOTE RECORD EXISTS - *PQS
REQUENT TRAVELER
.AA KDV1522              HK AA  1.1 CERQUEIRA/JOHN
.AA KDV1522              HK AX  1.1 CERQUEIRA/JOHN
EMARKS
.-TBMXX-ADD
.H-TBMEDIT/49AATDS EDITOR SESSION 3
.H-TBMEDIT/45AATDS EDITOR SESSION 4
.H-TBMEDIT/45AATDS EDITOR SESSION 4
.H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
.H- TMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
.H    MEDIT/45AATDS EDITOR SESSION 1
.H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
0.H-TBMEDIT/45AATDS EDITOR SESSION 1
1.H-TBMEDIT/36AATDS EDITOR SESSION 5
2.H-/T?TTE11/13.00/100.00/N1.1
3.H-/T?TTE12/VCR0012147100338/C1-2
4.H-/T?DOC?VCR
5.H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
6.H-/T?QHF ECK
7.H-/T?TBM*DS601001850655533?03/05
8.H-/T?JOHN CERQUEIRA
9.H-BOOKING MADE VIA AMERICAN AIRLINES WEBSITE
0.H-PTICERQUEIRA/JOHN-ADT
1.XXTACXTM09MAY/
2.H-TKTED PQ DELETED AND PLACED INTO HISTORY
3..
4.H-M4/PAD - NORMALIZED
5.XXAUTH/012352 *Z
6.XXTTEXTM12JUN/
7.H?EXCHANGE PROCESSED BY ETDS AUTOMATED EDITOR
8.H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
9.H-TBMEDIT/1426/24NOV/SCN SENT
0.?NAME?JOHN CERQUEIRA
  ?PNR?EJZSQY
2.?TYPE?SCN
3.?DLV?EMAIL?SAPTECH?ALYCOS.COM
4.H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
5.H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
.BAG-TAG FLL890684 SCANNED 28DEC2003 0521L/BOS/SG1
.F ▼LORIDA DL C626 464 67 415 0



AA 0023

## Event ID: 03122856

### Passenger Name Record (*PNR)

Created: 12/28/2003   Rhonda Cobbs     Updated: 12/28/2003   Rhonda Cobbs
08:29                         08:29

```
8.H-***************************************************
9.H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
0.H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
1.H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
2.H-***************************************************
3.H-C-..................................
4.H-C-EVENT 03122856.
5.H-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
6.H-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
7.H-C-TICKET...DO NOT REBOOK ON AA.
8.H-C~CCRO/R.COBBS/28DEC03/0808C.
9.H-C-..................................
AGGGAGE INFORMATION
ASSENGER REROUTED
OUTING-AA    804 LGA  /AA  5021 BOS
ERQUEIRA/JOHN
OS  AA 905071 - BY FLL546L 1048/24DEC03
OS  AA 905072 - BY FLL546L 1048/24DEC03
OUTING-AA  2237 FLL
ERQUEIRA/JOHN
LL  AA 890684 - BY BOS4DO1 0514/28DEC03
ECEIVED FROM - WWW?KDV1522
WW.HDQ2EAU 0919/09MAY03 FJZSQY H
NO PSGR DATA?
 AA 804H 24DEC*FLLLGA HK1  1145A  230P/E
 AA5021H 24DEC LGABOS*HK1   500P  615P HRS/E
021H 24DEC LGABOS HK  4B NA      1.1 CERQUEIRA/JOHN
5H  H-C-..................................
5H  H-C-EVENT 03122856.
5H  -C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
5H  -C-PER SOC MOD DUE SECURITY ISSUES. REFUND
5H  H-C-TICKET...DO NOT REBOOK ON AA.
5H  H-C-CCRO/R.COBBS/28DEC03/0808C.
5H  H-C-..................................
S   AA9124Y 01MAR AVSFSG MM/MM1   700A 1100A
-   CCRO
TW FTW7B2L 0821/28DEC03
5H  H-***************************************************
5H  H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
5H  H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
5H  H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
5H  H-***************************************************
OS BOS584H 0801/28DEC03
S   AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
S   AA1947Y 28DEC BOSFLL NN/HK1   210P  537P/E
4G*   2237V 28DEC BOSFLL SC/HK  13A NW
OS BOS584H 0754/28DEC03
S   AA1947Y 28DEC BOSFLL NN/SS1   210P  537P/E
```

AA 0024

## Event ID: 03122856

# Passenger Name Record (*PNR)

Cre. ..: 12/28/2003    Rhonda Cobbs      Updated: 12/28/2003    Rhonda Cobbs
     08:29                               08:29

```
BOS  BOS543Q 0740/28DEC03
A5H    H-FLORIDA DL C626 464 67 415 0
BOS  BOS784H 0721/28DEC03
A5H    H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
A4G     5021H 24DEC LGABOS NN/SS    4B NA
FLL  FLL546L 0947/24DEC03
C8     AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
K4G*    2224L 24DEC FLLBOS SC/HK  12A NW
A8     AA 804H 24DEC*FLLLGA NN/SS1  1145A  230P/E
A8     AA5021H 24DEC LGABOS*NN/SS1   500P  615P/E
FLL  FLL546L 0947/24DEC03
A5H    H-TBMEDIT/49AATDS EDITOR SESSION 3
2-     TDSEDITOR/0442/25NOV/SCN
CTM  XTM7SCN 0446/25NOV03
A5H    H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
2-     TDSEMAILEDIT/1901/24NOV/TDS
CTM  XTM7QAD 1904/24NOV03
ITINERARY
CTM  XTM4SCN 1430/24NOV03
C8     AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
C8     AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
C8     AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
C8     AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
C8     AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
A5H    H-TBMEDIT/45AATDS EDITOR SESSION 4
A5H    H-TBMEDIT/1426/24NOV/SCN SENT
3C     AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
3C     AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
2-     TDSEDITOR/1426/24NOV/SCN
CTM  TM4SCN 1429/24NOV03
A5H    4-TBMEDIT/45AATDS EDITOR SESSION 4
A5H    H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
A5H    H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
2-     TDSEDITOR/1238/24NOV/WSC
CTM  XTM5WSC 1242/24NOV03
K4G     2237V 28DEC BOSFLL HK/WK  13A NW
A4G     2237V 28DEC BOSFLL SC/SC  13A NW
3C     AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
A8     AA2237V 28DEC BOSFLL SC/SC1   645A 1015A HRS/E
2-     SC.REAC.E05NOV03 0138/02NOV03
K4G     2224L 24DEC FLLBOS HK/WK  12A NW
K4G     2237V 28DEC BOSFLL HK/WK  13A NW
A4G     2224L 24DEC FLLBOS SC/SC  12A NW
A4G     2237V 28DEC BOSFLL SC/SC  13A NW
C      AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
8      AA2224L 24DEC FLLBOS SC/SC1  1115A  220P HRS/E
C      AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
8      AA2237V 28DEC BOSFLL SC/SC1   655A 1025A HRS/E
```

AA 0025

## Passenger Name Record (*PNR)

Created: 12/28/2003　Rhonda Cobbs　　Updated: 12/28/2003　Rhonda Cobbs
08:29　　　　　　　　　　　　　　　　08:29

```
2-     SC.REAC.E22OCT03 0337/19OCT03
\5H    H-TBMEDIT/45AATDS EDITOR SESSION 1
\5H    H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
\5H    H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
2-     TDSEDITOR/0057/21JUL/WSC
CTM  XTM5WSC 0104/21JUL03
[4G    2224L 24DEC FLLBOS HK/WK   12A NW
[4G    2237V 28DEC BOSFLL HK/WK   13A NW
\4G    2224L 24DEC FLLBOS SC/SC   12A NW
\4G    2237V 28DEC BOSFLL SC/SC   13A NW
IC     AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
\8     AA2224L 24DEC FLLBOS SC/SC1  1124A  228P HRS/E
IC     AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
\8     AA2237V 28DEC BOSFLL SC/SC1   707A 1044A HRS/E
2-     SC.REAC.E23JUL03 0338/20JUL03
[8     AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
[4G*   2223V 28DEC BOSFLL HK/WK  13A NW
\5H    H-TBMEDIT/45AATDS EDITOR SESSION 1
IC     AA2237V 28DEC BOSFLL SC/HK1   750A 1125A HRS/E
2-     TDSEDITOR/0120/25JUN/WSC
CTM  XTM5WSC 0127/25JUN03
\4G    2237V 28DEC BOSFLL SC/SC  13A NW
IC     AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
\8     AA2237V 28DEC BOSFLL SC/SC1   750A 1125A CHG/HRS/E
2-     SC.REAC.E25JUN03 0220/22JUN03
\5H    H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
2-     TDSEMAILEDIT/1216/12JUN/TDS
CTM  XTM7QAD 1222/12JUN03
[5H    H-TBMEDIT/32AATDS EDITOR SESSION 3
\5'    H-TBMEDIT/36AATDS EDITOR SESSION 5
2-     TDSEDITOR/1125/12JUN/EVN
CTM  XTM7EVN 1132/12JUN03
[5H    H-TBMEDIT/41AATDS EDITOR SESSION 1
\5H    H-TBMEDIT/32AATDS EDITOR SESSION 3
C7     TTEXTM12JUN/
\7     T-12JUN-XTM7EAD
CTM  XTM7EAD 1125/12JUN03
[5H    H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
[5H    H-TBMEDIT/28AATDS EDITOR SESSION 4
\N     Z/33180
\N     Z/33180-1731
\5H    H-TBMEDIT/41AATDS EDITOR SESSION 1
\5H    H-M4/PAD - NORMALIZED
2-     TDSEDITOR/1104/12JUN/POS
CTM  XTM7POS 1110/12JUN03
[5F    -TBM*DS6011001850655533?03/05
[5F    -JOHN CERQUEIRA
[5H    H-/T?DOC?VCR
[5H    H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM?FREE
[5H    H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
\9     QHF510-579-3488-C/B
[5F    -TBMXX-ADD
\5H    H-/T?TTR11/13.00/100.00/N1 1
```

AA 0026

Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003     Rhonda Cobbs          Updated: 12/28/2003     Rhonda Cobbs
            08:29                                      08:29

```
A5H  H-/T?TTE12/VCR0012147100338/C1-2
A5H  H-/T?DOC?VCR
A5H  H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
A5H  H-/T?QHF ECK
A5H  H-/T?TBM*D86011001850655533?03/05
A5H  H-/T?JOHN CERQUEIRA
C7   T-09MAY-XTM7W1K
A7   TTEXTM12JUN/
t-   JOHN
)HF  QHF1ECK 1057/12JUN03
A4G     2224L 24DEC FLLBOS NN/SS   12A NW
A4G     2223V 28DEC BOSFLL NN/SS   13A NW
t-   JOHN
)HF  QHF1ECK 1053/12JUN03
CS   AA4153N 20JUN TYSORD NN/HK1    226P   304P /DCAA*FJZSQY
RRS/E
CS   AA4084N 22JUN ORDTYS NN/HK1    716P   945P /DCAA*FJZSQY
RRS/E
A4G*    4153N 20JUN TYSORD SS/HK    8A NA
A4G*    4084N 22JUN ORDTYS SS/HK   16A NAH
A8   AA2224L 24DEC FLLBOS NN/SS1   1105A  209P/E
A8   AA2223V 28DEC BOSFLL NN/SS1    750A 1125A/E
:-   JOHN CERQUEIRA
)HF  QHF1ECK 1053/12JUN03
A5H  H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
:-   TDSEMAILEDIT/1045/09MAY/TDS
.TM  XTM7QAD 1050/09MAY03
A5H  H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
A5H  H-TBMEDIT/28AATDS EDITOR SESSION 4
A5F  '-TKTED PQ DELETED AND PLACED INTO HISTORY
A7   .ACXTM09MAY/
A7   T-09MAY-XTM7W1K
:-   TDSEDITOR/1021/09MAY/W1F
.TM  XTM7W1K 1026/09MAY03
```

AA 0027

# Exhibit 13

to

PLAINTIFF JOHN D. CERQUEIRA'S
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT

Excerpts of Deposition of Rhonda Cobbs
with Deposition Exhibit Nos. 12 & 14

# 05-11652-WGY


## John D. Cerqueira

### vs.

## American Airlines


### Deposition of Rhonda Cobbs

### June 15, 2006




COLLINS
REALTIME
REPORTING

Thu Bui, CSR
Collins Realtime Reporting
Dallas, Texas 75201
214-220-2449
www.collinsrealtime.net

[1]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,        )
   Plaintiff          )
V.               )  CIVIL ACTION NO.
             )    05-11652-WGY
AMERICAN AIRLINES, INC.,  )
   Defendant          )

*********************************
ORAL DEPOSITION OF
RHONDA COBBS
JUNE 15, 2006
*********************************

   ORAL DEPOSITION OF RHONDA COBBS, produced as a
witness at the instance of the Plaintiff, and duly sworn,
was taken in the above-styled and numbered cause on the
15th of June, 2006, from 12:24 p.m. to 2:15 p.m., before
Thu Bui, CSR in and for the State of Texas, reported by
machine shorthand, at the offices of American Airlines,
4333 Amon Carter Boulevard, Fort Worth, Texas, pursuant
to the Fed.R.Civ.P.30.

[2]

A P P E A R A N C E S
Mr. Michael T. Kirkpatrick
PUBLIC CITIZENS LITIGATION GROUP
1600 200th Street, N.W.
Washington, D.C. 20009
Phone: 202-588-7728  Fax: 202-588-7795
Email: mkirkpatrick@citizen.org

APPEARING FOR THE PLAINTIFF

Mr. Michael A. Fitzhugh
FITZHUGH, PARKER & ALVARO LLP
155 Federal Street, Suite 1700
Boston, Massachusetts 02110-1727
Phone: 617-695-2330  Fax: 617-695-2335
Email: mfitzhugh@fitzhughlaw.com

APPEARING FOR THE DEFENDANT

[3]

INDEX
                                          PAGE
Appearances.................................    2
Stipulations................................    4
RHONDA COBBS
   Examination by Mr. Kirkpatrick........    4
Signature and Changes......................   67
Reporter's Certificate....................   69

EXHIBITS
NO.    DESCRIPTION              PAGE
18  Detail Note                    31
19  Letter to crew member from Jane Allen    63

[4]

RHONDA COBBS,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. KIRKPATRICK:
   Q  Good afternoon, Ms. Cobbs.
   A  Good afternoon.
   Q  We met earlier, but I just want to introduce
myself on the record.  I'm Michael Kirkpatrick and I
represent the plaintiff in this lawsuit, which is John
Cerqueira versus American Airlines.
      MR. KIRKPATRICK:  Mr. Fitzhugh, do you want
to recite our stipulations?
      MR. FITZHUGH:  Certainly.  I believe we
stipulated that the witness will be allowed to read and
sign her deposition transcript, but we will waive the
notarization; that all objections except as to the form
of the question will be reserved until the time of trial,
and motions to strike will be reserved until the time of
trial.
      MR. KIRKPATRICK:  Agreed.
   Q  Ms. Cobbs, would you just state your name and
address for the record, please?
   A  My name is a Rhonda Cobbs; it's 5211
Bellefontaine Drive, Arlington, Texas, 76017.
   Q  Ms. Cobbs, have you ever had your deposition

Rhonda Cobbs

[5]

1  taken before?
2      A  No, I haven't.
3      Q  I'd like to just give you a few instructions on
4  what we're going to do here this morning.  I'm going to
5  be asking you questions, and your job is just to give me
6  your best answer.  You are under oath as though we were
7  in a courtroom, even though we're in this informal
8  atmosphere of -- of a conference room.  It's important
9  that you wait for me to finish my questions before you
10  give your answers, so that the court reporter can take
11  down in full what everybody says.  We don't want to be
12  speaking at the same time.  Also, it's important that you
13  speak up and not just answer with a nod or a shake of the
14  head.
15      If you don't understand one of my
16  questions, please let me know, just ask me to repeat or
17  rephrase and I'll be happy to do that.  I'm not trying to
18  trick you or anything today, I just want information.
19  And if you don't understand the question, it's important
20  that you get a better understanding of it before you
21  attempt to answer.
22      If Mr. Fitzhugh objects to some of my
23  questions, unless he instructs you not to answer, you
24  should still answer the question to the best of your
25  ability.  The objections are to preserve that for a later

[6]

1  time, if it's necessary, to resolve any objections, but
2  unless there's an instruction not to answer, Mr.
3  Fitzhugh's objection should not interfere with your
4  giving me your best answer.
5      If you need a break today, please let me
6  know, and I'm happy to take a break.  I would ask though
7  that if there's a question pending, we finish that
8  question and perhaps finish the sort of line of
9  questioning, and then I'll find a convenient time for us
10  to take a break.  It may not be necessary for us to break
11  at all, but we'll just see as that goes on.  Do you
12  understand these instructions?
13      A  I do.
14      Q  Do you know of any reason why you can't give me
15  your best full and honest answers today?
16      A  No.  I know of no reason.
17      Q  Okay.  Very good.  Did you do anything to
18  prepare for the deposition today?
19      A  I spoke with Mr. Fitzhugh.
20      Q  For about how long?
21      A  Probably a total of, I don't know, two or three
22  hours; longer than anticipated.
23      Q  Yes.  That was -- that was today that you met
24  with Mr. Fitzhugh?
25      A  Exactly.

[7]

1      Q  Before talking to Mr. Fitzhugh today, did you
2  discuss this deposition with anyone else?
3      A  No.
4      Q  Have you had a chance to talk to Craig Marquis
5  about this deposition?
6      A  No.
7      Q  Did you review any documents in --
8      A  I did.
9      Q  -- preparation?  What did you look at?
10      A  I don't know the titles of them all, just
11  various letters, interrogatories.  I'm -- I'm not sure of
12  the titles of them, but probably if you showed them to me
13  I could tell you if I've seen them before.
14      Q  Okay.  Is it your understanding that those are
15  documents that have been exchanged between the parties
16  during this case?
17      A  Yes.
18      Q  Did you review any other documents?
19      A  No.
20      Q  Are you currently employed by American Airlines?
21      A  I am.
22      Q  What is your current position?
23      A  I'm the analyst and CCRO for system operations
24  control.
25      Q  What is CCRO?

[8]

1      A  It's stands for corporate complaint resolution
2  official.
3      Q  And what is the relationship between CCRO and
4  system operations control, which I guess we'll call SOC?
5      A  Are you asking me what my job function is?
6      Q  Well, is CCRO part of SOC?
7      A  CCRO is part of SOC.
8      Q  Okay.  And is CCRO is just a particular job
9  function within SOC?
10      A  It is.
11      Q  How long have you been in that position?
12      A  In that position, a little more than three
13  years.
14      Q  Can you describe for me your duties as an
15  analyst or CCRO?
16      A  Okay.  It's actually an interchangeable desk.
17  One day I may be working at the analyst position; one day
18  at the CCRO position.
19      Q  I see.  I didn't understand before.  So you have
20  two different positions that you --
21      A  Correct.
22      Q  -- switch between?  Okay.  And --
23      A  Not on the same day, but.
24      Q  Right.
25      A  Today I may go in and work one desk; the other

Rhonda Cobbs                                                    June 15, 2006

[9]

1   day I go in and work another desk.
2      Q   Okay. Tell me what your duties are when you're
3   working the analyst position.
4      A   As the analyst, I help the center manager, the
5   sector managers, in keeping track of the daily operation
6   of the airline, compiling information, tracking flight
7   irregularities. Also if -- if a dispatcher calls in
8   sick, we cover the -- the sick call by calling in
9   overtime. It's -- it's like the right-hand person to the
10  center manager.
11     Q   Okay. And when you're working the CCRO
12  position, what are your duties?
13     A   I act as a liaison between passenger service and
14  SOC, responsible for passenger acceptance issues with
15  regard to physical or medical disabilities, if there's a
16  misconduct issue.
17     Q   And in your duties as a liaison between
18  passenger service and SOC, what are the kinds of things
19  that you would do, what kinds of tasks?
20     A   I'm not sure I understand that, really.
21     Q   I guess I'm just trying to get an understanding
22  for what -- what the liaison role is. You've told me
23  that you're a liaison between passenger service and SOC,
24  and I'm wondering what -- what exactly do you do when
25  you're working the CCRO position?

[10]

1      A   Okay. The -- the CCRO is a federally mandated
2   position in that we have to be available 24 hours a day,
3   7 days a week whether it be on property, on an airport,
4   or by phone; that's the position where I am able to
5   assist people in the field, if there's questions
6   regarding passenger acceptance or a passenger misconduct.
7   If there's -- if there's an en route landing because a
8   person has a medical emergency, then we assist the
9   passengers in -- in getting on to their destination.
10     Q   I see. I think you told me that you had been in
11  these positions for about three years --
12     A   Uh-huh.
13     Q   -- is that right? What did you do before that?
14     A   I worked in airport operations at DFW.
15     Q   How long were you in airport operations?
16     A   10 or 12 years, just a guess.
17     Q   And was that for American Airlines?
18     A   It was.
19     Q   Did you have any positions with American before
20  that?
21     A   I did.
22     Q   What did you do?
23     A   Clerical work or a staff assistant in employee
24  relations. Prior to that, I was in the personnel
25  department, and prior to that, in marketing, all as a

[11]

1   staff assistant.
2      Q   So when did you start working for American
3   Airlines?
4      A   In 1986.
5      Q   Were you working on December 28th of 2003?
6      A   I was.
7      Q   What was your position that day?
8      A   The CCRO.
9      Q   Do you remember what time your shift started?
10     A   At 6:00 o'clock in the morning.
11     Q   Who was your supervisor?
12     A   Do you mean who was the center manager?
13     Q   Yes. If that's the person that you would report
14  to.
15     A   I don't remember, but I am assuming it was Craig
16  Marquis from the -- all the documents that I've reviewed.
17     Q   Okay. And on December 28th, 2003, did you
18  become aware that there was some type of incident or
19  problem with respect to Flight 2237, a flight scheduled
20  to leave Boston Logan Airport for Ft. Lauderdale?
21     A   Off the top of my head, no, I don't remember
22  that.
23     Q   Do you have any recollection of being involved
24  with incidents relating to that flight and security
25  concerns with certain passengers?

[12]

1      A   No, I don't.
2      Q   When did your shift end that day?
3      A   At 2:00 p.m.
4      Q   Did you have any role on December 28th in making
5   the decision to remove three passengers from Flight 2237
6   for questioning by law enforcement?
7      A   Did I have a role in it, meaning did I make some
8   type of decision in removing those passengers?
9      Q   Either making some type of decision or providing
10  information, doing background checks on the passengers,
11  responding to telephone calls or communications from
12  folks on the ground and Boston, anything like that?
13     A   I -- I don't remember doing that, but according
14  to the documents, I was there.
15     Q   Okay. That's fine. And I certainly understand
16  it's been some time. And if you don't remember, you
17  don't remember. What I'd like to do is to the extent you
18  do remember any specifics with regard to what you did or
19  were told with regard to that flight, I'd like to walk
20  through each of those things chronologically. Do you
21  have any recollection of working in your position as a
22  CCRO on December 28th, 2003, working on an issue
23  surrounding this flight from Boston to Ft. Lauderdale?
24     A   No, I don't.
25     Q   So I take it you don't know who made the

[21]

1  Q  And does SOC Craig, does that refer to Craig
2  Marquis?
3  A  I believe it does.
4  Q  What does the notation, CCRO will add event
5  number shortly, what does that mean?
6  A  If -- if you'll look down in Line 14, there's an
7  event and a number behind it.
8  Q  Yes.
9  A  Which is the same, that is, the event ID number
10  underneath the words, detail note.
11  Q  Okay.  And did you add that number?
12  A  I did.
13  Q  Do you know at what time that number was added?
14  A  It looks like it's 8:08 central time.
15  Q  Where -- where do you see that?  Okay.  Line 18?
16  A  Uh-huh.
17  Q  I see.  Were Lines 14 through 18, were they
18  added at the same time?
19  A  As?
20  Q  I --
21  A  Oh, yes, you mean all together?
22  Q  -- that went in as one entry?
23  A  Right.
24  Q  Yes.  So that's correct, they were added?
25  A  That's correct.

[22]

1  Q  Okay.  And you made that notation?
2  A  I did.
3  Q  Could you just tell me again, like you did for
4  the other entry, what -- what the various abbreviations
5  mean, if you could just read that in -- in plain English?
6  A  Above passenger denied boarding Flight 2237/27,
7  Boston-Ft. Lauderdale per SOCMOD due security issues,
8  refund ticket, do not rebook on American Airlines.  And
9  then that CCRO archived 28th of December at 8:08 central.
10  Q  That 8:08 central -- did Boston customer service
11  manager Traer, did she make the entry above that before
12  you made the 8:08 central time entry?
13  A  I can't tell from looking at this.
14  Q  Okay.  I was just wondering whether these
15  ordinarily, you know, are sort of chronological; that
16  anything that shows up later was added later?
17  A  Not necessarily.
18  Q  Okay.  But the indication in Ms. Traer's
19  notation that CCRO will add event number shortly, then
20  below that that's reflecting you adding the event number;
21  is that correct?
22  A  Correct.
23  Q  When it -- when it says here, per SOCMOD, what
24  does that mean?
25  A  System operations control manager on duty.

[23]

1  Q  And it says due security issues, do you recall
2  what the security issues were?
3  A  No, I don't.
4  Q  You typed in the notation, do not rebook on AA;
5  is that correct?
6  A  That's correct.
7  Q  Do you know why?
8  A  Due to security issues.
9  Q  Did you make the decision that this passenger
10  should not be rebooked on American Airlines?
11  A  I don't know.
12  Q  Do you recall whether Craig Marquis told you
13  that he -- this passenger should not be rebooked on
14  American Airlines?
15  A  I don't recall.
16  Q  The indication, do not rebook on American
17  Airlines, for how long would that instruction last?
18  A  Normally?
19  Q  Yes.
20  A  For that day.
21  Q  So would this passenger have been eligible to go
22  to American Airlines, for example, the following day and
23  purchase a ticket for travel?
24  A  So far as I know.
25  Q  In other words, would this notation in the

[24]

1  passenger name record, would it have interfered with this
2  passenger's ability to travel on another -- on another
3  day, a future day on American Airlines?
4  A  No.
5  Q  Are some passengers denied for the travel for
6  more than the current day?
7  A  I don't know.
8  Q  In your experience, have you ever made a
9  notation, passenger name record, to the effect that this
10  person should not be allowed to fly ever on American
11  Airlines?
12  A  No, I haven't.
13  Q  Moving further down this passenger name record
14  then, can you tell me what these next entries mean
15  starting with baggage information?
16  A  I believe it's -- it's bag tag numbers.
17  Q  And this would have been for the December 24th
18  2003 flight?
19  A  It looks like it.
20  Q  And what -- the next entry under Cerqueira/John,
21  can you tell me what that entry means?
22  A  It appears to be the same.  It's baggage tag
23  information for Flight 514 on the 28th.  I -- I'm
24  guessing.  I don't know that.  I -- I'm just going by
25  what it -- what the entry above that says.

Rhonda Cobbs                                                        June 15, 2006

[41]

1    Q   Okay.  And then if we could look on the last
2   page, AA0034, what is this?
3    A   This is -- I had -- apparently when this was
4   entered, this is the on list of the passengers that are
5   on board.  When this was requested there were no
6   passengers on board.  I don't know.  I don't know why it
7   didn't bring that information.  It could have been
8   because the flight had already returned to the gate and
9   they have been -- they had to deplane the passengers.
10   Q   Okay.  And, again, is this passenger list the
11  kind of information generated automatically whenever
12  there's an abnormal event?
13   A   It is.
14   Q   Thank you.  Ms. Cobbs, I'm going to hand you a
15  page that's been previously marked as Exhibit 14.  This
16  is a one-page document Bates Number AA0021.  Can you tell
17  me what this is?
18   A   This is a copy of the SS -- I don't even know
19  what it stands for.  Data that can be entered into the
20  flight log, if there -- it's a free text form that I can
21  put information in there was any abnormality or
22  irregularity.
23   Q   And did you enter this information?
24   A   I did.
25   Q   Could you -- and would you have entered this at

[42]

1   8:53 a.m. central time?
2    A   Into the event.
3    Q   Okay.  Could you, again, walk me through what
4   this means?  And I think we can -- well, some of these
5   things we have -- maybe we haven't talked about.  If you
6   can just quickly walk me through what this means in plain
7   English.
8    A   Okay.  We have the flight number, the aircraft
9   number, the city, the -- the issue as a security removal,
10  the Flight 2237, Aircraft 233 from Boston to
11  Ft. Lauderdale was delayed in removing three male
12  passengers/bags, passengers and bags, from the aircraft
13  due to security concern.
14       Passengers reportedly exhibited susp --
15  suspicious behavior in the airport toward the captain,
16  and on the aircraft observed by the Number 2 flight
17  attendant, Boston based S. Walling.  Law enforcement
18  officials removed the passengers, detained, questioned,
19  and released them.  Per system operations control manager
20  on duty, passengers denied boarding and tickets refunded.
21  Security search of the aircraft per -- performed by dogs.
22  Flight attendants were replaced due to trauma.  And then
23  it -- the PNR's are these passenger name records, that's
24  the reservation number of each passenger that was
25  removed.

[43]

1   The event number is tagged on there --
2    Q   Uh-huh.
3    A   -- and then my sign.
4    Q   Where did you get this information to enter in
5   the CCRO history?
6    A   It's -- it's what I had compiled throughout
7   the -- the whole incident.
8    Q   And do you recall the sources that you used to
9   compile this information?
10   A   No.
11   Q   Do you know whether you spoke to the captain?
12   A   I don't know.
13   Q   Do you know whether you spoke to the flight
14  attendants?
15   A   I don't know.
16   Q   How about the law enforcement officers?
17   A   I don't know.
18   Q   Certain information, for example, the law
19  enforcement officers had detained, questioned, and
20  released these passengers, do you know how you learned
21  that?
22   A   It -- no, I don't.
23       MR. FITZHUGH:  So you don't know, or you
24  don't recall?
25   A   I don't recall.

[44]

1    Q   So sitting here today you don't know?
2    A   Right.
3    Q   Yes.
4    A   Well --
5    Q   You're right.
6    A   Okay.
7    Q   I know.  I understand.
8    A   Okay.
9    Q   I understand your answer.
10   A   Okay.
11   Q   Do you know whether the entries here are written
12  essentially in -- in a chronological order, in other
13  words, do we know that the suspicious behavior in the
14  airport toward the captain happened before what was
15  observed by S. Walling, and that that was before -- in
16  other words, is this chronologically written?
17   A   It's -- it's just a Reader's Digest version
18  of -- of the event --
19   Q   Okay.
20   A   -- of what took place.  Obviously, in the
21  airport toward the captain would be before they got on
22  the aircraft and it was observed by the flight attendant.
23   Q   Uh-huh.  Do you recall whether the SOC manager
24  on duty told you why these passengers should be denied
25  boarding and tickets refunded?

Thu Bui, CSR                Collins Realtime Reporting               214-220-2449

Rhonda Cobbs

[45]

1    A  I don't recall.  I know it says for suspicious
2  behavior.
3    Q  Is there -- you referred to this as sort of a
4  Reader's Digest version of what happened.  Are there
5  other notes kept in the course of an event like this that
6  might provide more detail?
7    A  Not that I'm aware of.
8    Q  You didn't keep any --
9    A  Huh-uh.
10    Q  -- additional notes?
11    A  Huh-uh.
12    Q  I'll take that one back, and we'll look at
13  another.  I'm handing you what's previously been marked
14  as Exhibit 13; this is a page Bates numbered AA0028.
15  What is Exhibit 13?
16    A  It's an event note, and it's basically just cut
17  and pasted out of the SS history that I just read.
18    Q  Okay.  And what is the sort of different role of
19  an event note versus a SSCRO history?
20    A  The event note is -- it's just in a
21  different place in the event in the report.
22    Q  Okay.  And all of the notes are tied together
23  through the common event ID number; is that correct?
24    A  Correct.
25    Q  Okay.  Let me take that back.  Thank you.

[46]

1  Ms. Cobbs, I'm handing you what's been previously marked
2  as Exhibit Number 11; this is a document Bates numbered
3  AA0022.  Can you tell me what this is?
4    A  This is an activity note in the event that is
5  generated from the flight service department when they
6  receive notification that an irregularity has taken
7  place, that this is their note querying the crew for
8  their reports.
9    Q  Okay.
10    A  Do you want me to read it to you?
11    Q  No.  I think I understand the -- these
12  entries --
13    A  Okay.
14    Q  -- these codes and abbreviations.  Were
15  individuals in your department asked to submit any
16  reports, sort of like this is for the -- the flight
17  service people to submit a report, is anybody within SOC
18  requested to write up a report about what happened other
19  than what we've already looked at?
20    A  Not that I'm aware of.
21    Q  You weren't asked to write anything else?
22    A  No, no.  The SSCRO history is my report.
23    Q  Okay.  So that's the totality of what you wrote
24  about the incident?
25    A  Correct.

[47]

1    Q  Okay.  You can hand that one back.  Do you know
2  whether the flight service personnel submitted reports
3  regarding this incident?
4    A  Yes, they did.
5    Q  Okay.  Did you have an opportunity to review
6  those reports?
7    A  I did.
8    Q  When was that?
9    A  Within the last few days, I suppose.
10    Q  In preparation for the deposition?
11    A  Right, right.
12    Q  Did you on December 28th, 2003 or within the
13  first couple of days after that, did you ever review the
14  reports submitted by the flight attendants or the pilot?
15    A  No, I would have no reason to.  My part was
16  finished.
17    Q  I'm going to show you, just very quickly, these
18  reports, and ask whether these are reports that you have
19  had an opportunity to review.  The first one is
20  Exhibit 1.  Is this one of the reports that you reviewed
21  for the first time in preparation for the deposition?
22  And just for the record, I believe this is flight
23  attendant Walling's statement.
24        MR. FITZHUGH:  Yeah.  You identified --
25    A  Okay.

[48]

1        MR. FITZHUGH:  -- the crew facts.
2    A  Yes.
3    Q  And I'm going to show you Exhibit Number 5,
4  which has been identified as flight attendant, Sargent's
5  report.  Did you review those for the first time in
6  preparation for the deposition?
7    A  I believe I did, yes.
8    Q  And Exhibit 9 is flight attendant, Milenkovic's
9  report to the incident.  Did you review Exhibit Number 9
10  for the first time in preparation for this deposition?
11    A  Yes.
12    Q  Thank you.  And I'm going to hand you what's
13  previously been marked as Exhibit 6, and this is a
14  further report from the Number 4 flight attendant on that
15  day.  Have you seen Exhibit 6 before?
16    A  I don't know.  This one doesn't look familiar.
17  I don't think so.
18    Q  Okay.
19    A  I don't think I've seen that one.
20    Q  I don't believe it bears the flight attendant's
21  name, just that it was Flight Attendant Number 4.
22        MR. FITZHUGH:  I'm trying to read the
23  stamp, bear with me.
24        MR. KIRKPATRICK:  I believe this was during
25  the Sargent deposition.

[49]

1        MR. FITZHUGH:  Okay.  Thank you.
2    Q   Okay.  And finally, I am showing you what's been
3   marked as Exhibit 16.  Have you seen Exhibit 16 before?
4    A   Yes, I saw this.
5    Q   Did you see it for the first time in preparation
6   for today's deposition?
7    A   Yes.
8        MR. FITZHUGH:  That's the Ehlers' report?
9        MR. KIRKPATRICK:  It is.
10       MR. FITZHUGH:  E-h-l-e-r-s.
11   Q   Do you know why the Ehlers' report is written in
12  a format with the event ID number and -- and detail note
13  similar to the other documents we looked at before, and
14  it's labeled as secured note as opposed to the flight
15  attendant reports?
16   A   No, I don't.  It's copied into the event, and I
17  did notice that secured note and I didn't know what that
18  means.  I probably don't have access to it.
19   Q   Okay.  Do you know who Randy Engberg is?
20   A   He's in another department.  I mean, I know him
21  but I don't know what his function is.
22   Q   Okay.  And from the date and time stamp, does it
23  appear that Randy Engberg entered this information into
24  the system on June 1st, 2004?
25   A   If -- if I'm understanding the time stamp, yes.

[50]

1    Q   Okay.
2        MR. FITZHUGH:  It's E-n-g-b-e-r-g.
3        MR. KIRKPATRICK:  Thank you.
4    Q   Other than the exhibits I've just shown you, are
5   there any other reports written by American Airlines'
6   personnel that you've reviewed, reports relating to this
7   incident on -- on December 28th, 2003?
8    A   Reports?
9    Q   Right.
10   A   American Airlines' reports?
11   Q   Yes.
12   A   No, not that I'm aware of.
13   Q   Okay.  After December 28th, 2003, when was the
14  next time anyone from American Airlines contacted you to
15  discuss this incident?
16   A   Maybe a month ago, if that long, three weeks or
17  four weeks.
18   Q   But for the first couple of years after the
19  incident, nobody contacted you?
20   A   Correct.
21   Q   Other than preparing for this deposition today,
22  have you done any follow-up with anyone from American
23  Airlines regarding this incident?
24   A   No.
25   Q   What about -- have you had any interaction with

[51]

1   any law enforcement or government agencies regarding this
2   incident?
3    A   No, I haven't.
4        (Interruption.)
5        MR. KIRKPATRICK:  Let's go off the record.
6        (Off the record from 1:43 to 1:43 p.m.)
7    Q   Do you know who made the decision to have the
8   dogs brought onto the plane?
9    A   No, I don't.
10   Q   Do you know who made the decision to have all of
11  the passengers deplane and re-screened?
12   A   No, I do not.
13   Q   Do you recall any specific information that you
14  provided to Craig Marquis on the date of the incident
15  regarding this incident?
16   A   I do not recall.
17   Q   Do you know how the decision not to rebook these
18  passengers was conveyed to the ticket counter personnel
19  in Boston?
20   A   Do I recall?
21   Q   Yes.
22   A   No, I don't.
23   Q   How ordinarily would that information be
24  conveyed?
25   A   A phone call, the documentation in the -- in the

[52]

1   reservation.
2    Q   And you don't recall whether -- do you recall
3   whether you spoke to any of the ticket counter personnel
4   in Boston?
5    A   I do not recall.
6    Q   Ordinarily, if a passenger is removed or denied
7   boarding and subjected to further investigation, and that
8   investigation reveals no basis for concern, is the
9   passenger rebooked?
10   A   You say ordinarily.
11   Q   In your experience, if -- if there is indication
12  of suspicious behavior, a decision is made to investigate
13  further, the further investigation reveals nothing that
14  strikes anyone as a safety concern, is that passenger
15  ordinarily rebooked?
16   A   Every situation is -- is based on its own merit.
17  There's no -- there's no answer that I can give you that
18  is an -- an ordinarily we do this, or normally we do
19  that.  I can't -- I can't give you an answer to that
20  because there's not one.
21   Q   Okay.  When the CCRO is contacted regarding --
22  or a removal for suspicious behavior, what does the CCRO
23  do to further investigate the passenger --
24   A   Take it --
25   Q   -- if anything?

  

Rhonda Cobbs                                                                    June 15, 2006

[53]

1    A  My -- my part would be taking it to the center
2    manager.
3    Q  Which in this case would be Craig Marquis?
4    A  Correct.
5    Q  And is your role in this type of situation
6    simply to compile information provided by others, or do
7    you go out and do any kind of investigation to -- to
8    compile information yourself?
9    A  In a circumstance such as this, it would be -- I
10   would only compile the information.
11   Q  And from what sources would you generally be
12   receiving that information?
13   A  More than likely the center manager.
14   Q  And the center manager would be the person in
15   direct communication with folks in Boston in an incident
16   such as this?
17   A  Yes.
18   Q  But the CCRO would simply compile the
19   information that the SOC manager was passing along; is
20   that correct?
21   A  Correct.
22   Q  Do you know if it is permissible under your work
23   rules to consider a passenger's ethnicity in determining
24   whether they might be a security risk?
25        MR. FITZHUGH:  Objection, form.

[54]

1        You can still answer.
2    A  Is -- is ethnicity --
3    Q  Ethnicity.
4    A  -- a factor?
5    Q  Yes.  For example, where somebody was born or
6    what their nationality is --
7    A  As to whether or not they'll be allowed to
8    travel?
9    Q  Yes.
10   A  No, absolutely not.
11   Q  Have you received civil rights training from
12   American Airlines?
13   A  No, I haven't.
14        MR. FITZHUGH:  Can you define civil rights
15   training?
16        MR. KIRKPATRICK:  Yes.  I wasn't clear.
17   Q  By civil rights training, I mean instructions in
18   the importance of not considering things such as race,
19   national origin, religion, those kinds of characteristics
20   in making determinations about whether somebody poses a
21   risk.
22   A  So you're -- you're saying are we trained as
23   American Airlines employees to --
24   Q  Right.  Does American Airlines provide you
25   training to explain that those kinds of characteristics

[55]

1    are not to be considered in making determinations about
2    whether somebody is --
3    A  Absolutely.
4    Q  -- is a security concern?
5    A  Absolutely.
6    Q  How often do you have that sort of training?
7    A  We just -- actually, since from the day that
8    you're hired, we're trained to be nondiscr --
9    nondiscriminatory and respect the values of others, their
10   cultures, their religious beliefs; it's just something
11   that -- that's preached to us on a daily basis ever since
12   I worked for the company.
13   Q  Has that training changed at all since December
14   28th of 2003?
15   A  There was an online computer training course
16   that we all were required to take last year; that's the
17   first time that I've seen that.
18   Q  Has American Airlines ever passed along to you
19   any guidelines or instructions from the federal
20   government, for example, the Department of
21   Transportation, regarding the importance of carrying out
22   your duties in a nondiscriminatory way?
23   A  All right.  Say that again?
24   Q  My question is whether you've been provided by
25   American Airlines any materials that came from the

[56]

1    government, from the Department of Transportation or the
2    FAA, for example, regarding the importance of airline
3    personnel carrying out their duties in a
4    nondiscriminatory way?
5    A  I'm sure we have.
6    Q  You don't recall specifically ever receiving
7    that?
8    A  (Moves head side to side.)
9        MR. FITZHUGH:  You have to say yes or no --
10   A  No.
11        MR. FITZHUGH:  -- or verbally.
12   Q  Does American Airlines have a procedure or
13   protocol to follow in how to respond if a member of a
14   flight crew thinks a passenger is suspicious, as far as
15   you know?
16        THE WITNESS:  Is -- is that not security
17   sensitive information?
18        MR. FITZHUGH:  The question is whether
19   there is a procedure.
20        THE WITNESS:  Okay.
21   A  There is a -- there is a procedure.
22   Q  And I understand some of the details may be
23   security sensitive information, but, in general, can you
24   describe for me what that protocol is?
25        MR. FITZHUGH:  No.  I'm going to instruct

## CORRECTIONS TO DEPOSITION OF JUNE 15, 2006
## RHONDA COBBS

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 18 | 24 | "lost question" to "lost the question" | Stenographer error |
| 22 | 9 | "that CCRO archived" to "that's CCRO R. Cobbs" | Stenographer error |
| 27 | 9 | "reservation" to "Reservations" | Stenographer error |
| 37 | 23 | "this is is" to "this is, it's" | Stenographer error |
| 46 | 22 | "SSCRO" to "SSCCRO" | Stenographer error |
| 55 | 12 | "I" to "I've" | Stenographer error |

_Rhonda Cobbs_ 07/07/06
Rhonda Cobbs

Rhonda Cobbs                                          June 15, 2006

Page 68

1      I, RHONDA COBBS, have read the foregoing deposition

2   and hereby affix my signature that same is true and

3   correct, except as noted above.

4

5                                    *Rhonda Cobbs*

6                                    RHONDA COBBS   07/07/06

7   THE STATE OF                )

8   COUNTY OF                   )

9      Before me,                     , on this day personally

10  appeared RHONDA COBBS known to me (or proved to me under

11  oath of through                   ) (description of

12  identity card or other document) to be the person whose

13  name is subscribed to the foregoing instrument and

14  acknowledged to me that they executed the same for the

15  purposes and consideration therein expresses.

16     Given under my hand and seal of office this

17  day of              ,              .

18

19                              NOTARY PUBLIC IN AND FOR
                                THE STATE OF TEXAS
20

21

22

23

24

25

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

**EXHIBIT 12**

Event ID: 03122856

**Passenger Name Record (*PNR)**

Created: 12/28/2003   Rhonda Cobbs        Updated: 12/28/2003   Rhonda Cobbs
08:29                                      08:29

```
.1CERQUEIRA/JOHN
    ARNK
  AA9124Y 01MAR M AVSFSG MM1    700A 1100A
TKT/TIME LIMIT
.T-12JUN-XTM7EAD
.TE 0012147100338 CERQU/J XTM7W1K 1026/09MAY 1B*254202
.TE 0012147973213 CERQU/J XTM7EAD 1125/12JUN 1B*254206
.TK 0010494109138 CERQU/J BOS584H 0918/28DEC
CR COUPON DATA EXISTS  *VI TO DISPLAY
PHONES
.WWW1510-579-3488-B
.WWWSAPTECH?ALYCOS.COM-E
.QHF510-579-3488-C/B
ADDRESS
/JOHN CERQUEIRA
/3675 N COUNTRY CLUB DR 120
/AVENTURA, FL
/33180-1731
PRICE QUOTE RECORD EXISTS - *PQS
FREQUENT TRAVELER
.AA KDV1522              HK AA   1.1 CERQUEIRA/JOHN
.AA KDV1522              HK AX   1.1 CERQUEIRA/JOHN
REMARKS
.-TBMXX-ADD
.H-TBMEDIT/49AATDS EDITOR SESSION 3
.H-TBMEDIT/45AATDS EDITOR SESSION 4
.H-TBMEDIT/45AATDS EDITOR SESSION 4
.H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
.H-TBMEDIT/45AATDS EDITOR SESSION 1
.H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
0.H-TBMEDIT/45AATDS EDITOR SESSION 1
1.H-TBMEDIT/36AATDS EDITOR SESSION 5
2.H-/T?TTE11/13.00/100.00/N1.1
3.H-/T?TTE12/VCR0012147100338/C1-2
4.H-/T?DOC?VCR
5.H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
6.H-/T?QHF ECK
7.H-/T?TBM*DS601001850655533?03/05
8.H-/T?JOHN CERQUEIRA
9.H-BOOKING MADE VIA AMERICAN AIRLINES WEBSITE
0.H-PTICERQUEIRA/JOHN-ADT
1.XXTACXTM09MAY/
2.H-TKTED PQ DELETED AND PLACED INTO HISTORY
3..
4.H-M4/PAD - NORMALIZED
5.XXAUTH/012352 *Z
6.XXTTEXTM12JUN/
7.H?EXCHANGE PROCESSED BY ETDS AUTOMATED EDITOR
8.H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
9.H-TBMEDIT/1426/24NOV/SCN SENT
0.?NAME?JOHN CERQUEIRA
  ?PNR?EJZSQY
2.?TYPE?SCN
3.?DLV?EMAIL?SAPTECH?ALYCOS.COM
4.H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
5.H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
.BAG-TAG FLL890684 SCANNED 28DEC2003 0521L/BOS/SG1
.F *FLORIDA DL C626 464 67 415 0
```



Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003　Rhonda Cobbs　　　Updated: 12/28/2003　Rhonda Cobbs
　　　　08:29　　　　　　　　　　　　　　　　08:29

```
8.H-*****************************************************
9.H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
0.H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
1.H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
2.H-*****************************************************
3.H-C-..................................
4.H-C-EVENT 03122856.
5.H-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
6.H-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
7.H-C-TICKET...DO NOT REBOOK ON AA.
8.H-C-CCRO/R.COBBS/28DEC03/0808C.
9.H-C-..................................
AGGAGE INFORMATION
ASSENGER REROUTED
OUTING-AA    804 LGA  /AA  5021 BOS
ERQUEIRA/JOHN
OS  AA 905071 - BY FLL546L 1048/24DEC03
OS  AA 905072 - BY FLL546L 1048/24DEC03
OUTING-AA  2237 FLL
ERQUEIRA/JOHN
LL  AA 890684 - BY BOS4DO1 0514/28DEC03
ECEIVED FROM - WWW?KDV1522
WW.HDQ2EAU 0919/09MAY03 FJZSQY H
NO PSGR DATA?
 AA 804H 24DEC*FLLLGA HK1  1145A  230P/E
 AA5021H 24DEC LGABOS*HK1   500P  615P HRS/E
021H 24DEC LGABOS HK  4B NA      1.1 CERQUEIRA/JOHN
5H  H-C-..................................
5H  H-C-EVENT 03122856.
5H  .-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
5H  .-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
5H  H-C-TICKET...DO NOT REBOOK ON AA.
5H  H-C-CCRO/R.COBBS/28DEC03/0808C.
5H  H-C-..................................
8   AA9124Y 01MAR AVSFSG MM/MM1   700A 1100A
-   CCRO
TW FTW7B2L 0821/28DEC03
5H  H-*****************************************************
5H  H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
5H  H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
5H  H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
5H  H-*****************************************************
OS BOS584H 0801/28DEC03
8   AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
8   AA1947Y 28DEC BOSFLL NN/HK1   210P  537P/E
4G*   2237V 28DEC BOSFLL SC/HK  13A NW
OS BOS584H 0754/28DEC03
8   AA1947Y 28DEC BOSFLL NN/SS1   210P  537P/E
```

AA 0024

## Event ID: 03122856

# Passenger Name Record (*PNR)

Cre. .: 12/28/2003　Rhonda Cobbs　　Updated: 12/28/2003　Rhonda Cobbs
08:29　　　　　　　　　　　　　　08:29

```
BOS  BOS543Q 0740/28DEC03
A5H   H-FLORIDA DL C626 464 67 415 0
BOS  BOS784H 0721/28DEC03
A5H   H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
A4G    5021H 24DEC LGABOS NN/SS   4B NA
FLL  FLL546L 0947/24DEC03
CS    AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
C4G*   2224L 24DEC FLLBOS SC/HK  12A NW
AS    AA 804H 24DEC*FLLLGA NN/SS1  1145A  230P/E
AS    AA5021H 24DEC LGABOS*NN/SS1   500P  615P/E
FLL  FLL546L 0947/24DEC03
A5H   H-TBMEDIT/49AATDS EDITOR SESSION 3
A-    TDSEDITOR/0442/25NOV/SCN
CTM  XTM7SCN 0446/25NOV03
A5H   H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
A-    TDSEMAILEDIT/1901/24NOV/TDS
CTM  XTM7QAD 1904/24NOV03
ITINERARY
CTM  XTM4SCN 1430/24NOV03
CS    AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
CS    AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
CS    AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
CS    AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
CS    AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
A5H   H-TBMEDIT/45AATDS EDITOR SESSION 4
A5H   H-TBMEDIT/1426/24NOV/SCN SENT
AC    AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
AC    AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
A-    TDSEDITOR/1426/24NOV/SCN
CTM  TM4SCN 1429/24NOV03
A5H   A-TBMEDIT/45AATDS EDITOR SESSION 4
A5H   H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
A5H   H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
A-    TDSEDITOR/1238/24NOV/WSC
CTM  XTM5WSC 1242/24NOV03
X4G    2237V 28DEC BOSFLL HK/WK  13A NW
A4G    2237V 28DEC BOSFLL SC/SC  13A NW
AC    AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
AS    AA2237V 28DEC BOSFLL SC/SC1   645A 1015A HRS/E
A-    SC.REAC.E05NOV03 0138/02NOV03
X4G    2224L 24DEC FLLBOS HK/WK  12A NW
X4G    2237V 28DEC BOSFLL HK/WK  13A NW
A4G    2224L 24DEC FLLBOS SC/SC  12A NW
A4G    2237V 28DEC BOSFLL SC/SC  13A NW
AC    AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
AS    AA2224L 24DEC FLLBOS SC/SC1  1115A  220P HRS/E
AC    AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
AS    AA2237V 28DEC BOSFLL SC/SC1   655A 1025A HRS/E
```

AA 0025

Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003   Rhonda Cobbs       Updated: 12/28/2003   Rhonda Cobbs
         08:29                                    08:29
```
1-    SC.REAC.E22OCT03 0337/19OCT03
15H   H-TBMEDIT/45AATDS EDITOR SESSION 1
15H   H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
15H   H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
1-    TDSEDITOR/0057/21JUL/WSC
CTM XTM5WSC 0104/21JUL03
14G     2224L 24DEC FLLBOS HK/WK   12A NW
14G     2237V 28DEC BOSFLL HK/WK   13A NW
14G     2224L 24DEC FLLBOS SC/SC   12A NW
14G     2237V 28DEC BOSFLL SC/SC   13A NW
1C    AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
18    AA2224L 24DEC FLLBOS SC/SC1  1124A  228P HRS/E
1C    AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
18    AA2237V 28DEC BOSFLL SC/SC1   707A 1044A HRS/E
1-    SC.REAC.E23JUL03 0338/20JUL03
18    AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
14G*    2223V 28DEC BOSFLL HK/WK  13A NW
15H   H-TBMEDIT/45AATDS EDITOR SESSION 1
1C    AA2237V 28DEC BOSFLL SC/HK1   750A 1125A HRS/E
1-    TDSEDITOR/0120/25JUN/WSC
CTM XTM5WSC 0127/25JUN03
14G     2237V 28DEC BOSFLL SC/SC   13A NW
1C    AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
18    AA2237V 28DEC BOSFLL SC/SC1   750A 1125A CHG/HRS/E
1-    SC.REAC.E25JUN03 0220/22JUN03
15H   H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
1-    TDSEMAILEDIT/1216/12JUN/TDS
CTM XTM7QAD 1222/12JUN03
15H   H-TBMEDIT/32AATDS EDITOR SESSION 3
15    H-TBMEDIT/36AATDS EDITOR SESSION 5
1-    TDSEDITOR/1125/12JUN/EVN
CTM XTM7EVN 1132/12JUN03
15H   H-TBMEDIT/41AATDS EDITOR SESSION 1
15H   H-TBMEDIT/32AATDS EDITOR SESSION 3
17    TTEXTM12JUN/
17    T-12JUN-XTM7EAD
1-    TDSEDITOR/1119/12JUN/EAD
CTM XTM7EAD 1125/12JUN03
15H   H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
15H   H-TBMEDIT/28AATDS EDITOR SESSION 4
1N    Z/33180
1W    Z/33180-1731
15H   H-TBMEDIT/41AATDS EDITOR SESSION 1
15H   H-M4/PAD - NORMALIZED
1-    TDSEDITOR/1104/12JUN/POS
CTM XTM7POS 1110/12JUN03
15F   -TBM*DS601100185065553370 3/05
15F   -JOHN CERQUEIRA
15H   H-/T?DOC?VCR
15H   H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM?FREE
15H   H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
19    QHF510-579-3488-C/B
15F   -TBMXX-ADD
15H   H-/T?TTR11/13.00/100.00/N1_1
```

AA 0026

## Passenger Name Record (*PNR)

Created: 12/28/2003   08:29   Rhonda Cobbs     Updated: 12/28/2003   08:29   Rhonda Cobbs

```
H5H   H-/T?TTE12/VCR0012147100338/C1-2
H5H   H-/T?DOC?VCR
H5H   H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
H5H   H-/T?QHF ECK
H5H   H-/T?TBM*D86011001850655533?03/05
H5H   H-/T?JOHN CERQUEIRA
C7    T-09MAY-XTM7W1K
N7    TTEXTM12JUN/
t-    JOHN
)HF   QHF1ECK 1057/12JUN03
N4G     2224L 24DEC FLLBOS NN/SS   12A NW
N4G     2223V 28DEC BOSFLL NN/SS   13A NW
t-    JOHN
)HF   QHF1ECK 1053/12JUN03
CS    AA4153N 20JUN TYSORD NN/HK1   226P  304P /DCAA*FJZSQY
IRS/E
CS    AA4084N 22JUN ORDTYS NN/HK1   716P  945P /DCAA*FJZSQY
IRS/E
N4G*    4153N 20JUN TYSORD SS/HK   8A NA
N4G*    4084N 22JUN ORDTYS SS/HK   16A NAH
N8    AA2224L 24DEC FLLBOS NN/SS1  1105A  209P/E
N8    AA2223V 28DEC BOSFLL NN/SS1   750A 1125A/E
:-    JOHN CERQUEIRA
)HF   QHF1ECK 1053/12JUN03
H5H   H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
:-    TDSEMAILEDIT/1045/09MAY/TDS
:TM   XTM7QAD 1050/09MAY03
H5H   H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
H5H   H-TBMEDIT/28AATDS EDITOR SESSION 4
H5F   '-TKTED PQ DELETED AND PLACED INTO HISTORY
C7    .ACXTM09MAY/
C7    T-09MAY-XTM7W1K
:-    TDSEDITOR/1021/09MAY/W1F
:TM   XTM7W1K 1026/09MAY03
```

AA 0027

**EXHIBIT 14**

## Event ID: 03122856

**SS CCRO History**

Cre   . 12/28/2003   Rhonda Cobbs        Updated: 12/28/2003   Rhonda Cobbs
        08:53                                    08:53



FL 2237/28DEC BOS/SS ACFT 233
28  1453   7D950A FTW-B2L
SS*2237/28 BOS SS
**** SECURITY REMOVAL ****
-2237/28 N233 BOS-FLL DLYD RMVG 3 ML PAX/BAGS FRM
ACFT DUE SECURITY CONCERN. PAX RPRTDLY EXHIBITED
SUSPICIOUS BEHAVIOR IN ARPRT TOWARD CAPTAIN, AND ON ACFT
OBSERVED BY N2 FA BOS BASED S. WALLING. LEO RMVD PAX,
DETAINED/QUESTIONED AND RELEASED THEM. PER SOC MOD
PAX DENIED BOARDING AND TICKETS REFUNDED. SECURITY SEARCH
OF ACFT PERFORMED BY DOGS. FA-S WERE RPLCD DUE TRAUMA.
FLT INCURRED 172 MINS DEPARTURE DELAY.
PNRS DVPQQX/FEBBLI/FJZSQY. EVENT 03122856.
FTWCR/COBBS/28DEC03/0845C.

END HISTORY

AA 0021