## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,

                    Plaintiff,

v.                                                            Civil Action No. 05-11652-WGY

AMERICAN AIRLINES, INC.,

                    Defendant.

### PLAINTIFF JOHN D. CERQUEIRA'S MEMORANDUM IN SUPPORT OF HIS MOTION TO STRIKE DEFENDANT'S EXPERT DISCLOSURE SERVED OUT OF TIME

Pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure and Local Rules 1.3 and 37.1, plaintiff John D. Cerqueira seeks an order striking defendant American Airlines, Inc.'s (AA) disclosure of expert witness John Beardslee. The expert disclosures required by Fed. R. Civ. P. 26(a)(2) were due, at the latest, by September 5, 2006, but AA did not provide its disclosure with respect to Mr. Beardslee until October 2, 2006.

### Facts

This is a civil rights case brought by a victim of racial profiling. On December 28, 2003, AA caused Mr. Cerqueira to be removed from an AA flight, detained, and interrogated by the Massachusetts State Police. After Mr. Cerqueira was released from questioning and cleared for further travel, AA again refused to serve him. AA had no legitimate nondiscriminatory reason to justify its treatment of Mr. Cerqueira; rather, it based its actions on Mr. Cerqueira's perceived race, color, national origin, ethnicity, or ancestry. To vindicate his right to be free of unlawful discrimination, Mr. Cerqueira brought this action under 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and M.G.L. c. 272 § 98.

On December 19, 2005, the court held a scheduling conference. The final pretrial conference was set for December 4, 2006, at 2:00 pm, and the case was set for jury trial on the running trial list of January 2, 2007. *See* Docket Text of Dec. 19, 2005. On December 20, 2005, the court entered an electronic order that discovery be completed by July 28, 2006, and that dispositive motions be filed by October 1, 2006. *See* Docket Text of Dec. 20, 2005.

On October 2, 2006, AA served "Defendant's Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2)" and attached a report from John Beardslee. AA's disclosure and Mr. Beardslee's report are attached to this memorandum as Exhibit 1. In the introduction to his report, Mr. Beardslee states:

> I have been retained to review the above referenced case and to provide expert testimony regarding the state of the U.S. commercial aviation industry on December 28, 2003. I have also been asked to provide expert testimony on the performance of AA personnel on Flight 2237 regarding U.S. commercial aviation standards in existence on December 28, 2003. I have further been asked to rebut Douglas R. Laird's testimony.

Douglas R. Laird is an aviation security expert retained by plaintiff to testify in this case. Plaintiff served his disclosure regarding Mr. Laird on June 26, 2006. Plaintiff's disclosure and Mr. Laird's report are attached to this memorandum as Exhibit 2.

### Argument

AA's expert disclosure with regard to Mr. Beardslee was served late and should be stricken. Local Rules 16.5(c) and 26.4(a) provide that "the disclosure regarding experts required by Fed. R. Civ. P. 26(a)(2) shall be made at least 90 days before the final pretrial conference." The final pretrial conference is set for December 4, 2006. Thus, expert disclosures were due by September 5, 2006. AA did not serve its disclosure until October 2, 2006. AA did not seek leave to file its disclosure out of time, and AA has no justification for its failure to timely serve the disclosure.

Indeed, because Mr. Beardslee addresses the same subject matter as Mr. Laird (*compare* Ex. 1 *with* Ex. 2), AA's disclosure should have been provided within 30 days after plaintiff's disclosure. *See* Fed. R. Civ. P. 26(a)(2)(C) (rebuttal expert disclosures shall be made "within 30 days after the disclosure made by the other party").  AA waited 98 days after it received Mr. Laird's report before serving the report of Mr. Beardslee.

Plaintiff is prejudiced by AA's untimely disclosure of Mr. Beardslee's testimony.  Discovery closed on July 28, 2006.  Plaintiff has only until October 18, 2006, to respond to AA's motion for summary judgment (*see* electronic order of August 29, 2006), and only until November 3, 2006, to make the pretrial disclosures required by Fed. R. Civ. P. 26(a)(3).  *See* LR 16.5(c).  Had AA timely served its disclosure regarding Mr. Beardslee, plaintiff would have been able to review it, take appropriate discovery, and disclose any necessary rebuttal information well in advance of the other deadlines.  If AA's untimely expert disclosure is not stricken, plaintiff will incur substantial costs to depose Mr. Beardslee and to supplement plaintiff's disclosures.

### Conclusion

AA's expert disclosure with regard to Mr. Beardslee was served late and should be stricken.

Respectfully submitted,

**JOHN D. CERQUEIRA**

By his attorneys,


/s/ Michael T. Kirkpatrick

_____
Michael T. Kirkpatrick
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
(202) 588-1000
mkirkpatrick@citizen.org

David S. Godkin (BBO #196530)
Erica Abate Recht (BBO #641452)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100

Dated: October 4, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 4, 2006.

/s/ Michael T. Kirkpatrick

_____
Michael T. Kirkpatrick

## CERTIFICATE OF CONFERENCE

I hereby certify that on October 4, 2006, at 10:45 am, I conferred by telephone with Amy Cashore Mariani, counsel for defendant, and attempted in good faith to resolve or narrow the issue presented in this motion, but the parties were unable to resolve the issue or narrow the areas of disagreement.

/s/ Michael T. Kirkpatrick

_____
Michael T. Kirkpatrick

# Exhibit 1

To

**PLAINTIFF JOHN D. CERQUEIRA'S MEMORANDUM
IN SUPPORT OF HIS MOTION TO STRIKE DEFENDANT'S
EXPERT DISCLOSURE SERVED OUT OF TIME**

Defendant's Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2)
with attached report of John H. Beardslee, served October 2, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN D. CERQUEIRA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: 05-11652 WGY |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S EXPERT DISCLOSURE
## PURSUANT TO FED.R.CIV.P. 26(a)(2)

The defendant, American Airlines, Inc. ("American") hereby submits its expert disclosure pursuant

Fed.R.Civ.P. 26(a)(2).

### Defendant, American Airlines, Inc.'s Expert Witness

1.    Mr. John Beardslee
      8 Dunlin Meadow Drive
      The Woodlands, TX  77381

Mr. Beardslee's  Report, and his *Curriculum Vitae* are attached hereto as Exhibit A.  Mr.

Beardslee is being compensated at the rate of $250 per hour for his opinions and reports, and $350 per

hour plus expenses for his testimony.  Mr. Beardslee has not testified as an expert witness at any trial or

deposition within the preceding 4 years.

Mr. Beardslee's report, which summarizes his opinions, the information used in the formulation of

those opinions, and the bases for his opinions, is attached hereto as Exhibit A.  Mr. Beardslee may provide

testimony on issues of airline security and safety procedures.  In addition, Mr. Beardslee may testify in

rebuttal of the testimony of Douglas R. Laird, expert witness for the plaintiff.

American reserves the right to supplement the foregoing disclosure pursuant to Fed.R.Civ.P 26(e).

Dated: October 2, 2006

Respectfully submitted,

**AMERICAN AIRLINES, INC.**

By Its Attorneys,

Michael A. Fitzhugh, BBO #169700
Amy Cashore Mariani, BBO #630160
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110
(617) 695-2330

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the forgoing to be served upon opposing counsel of record set forth below, by first class mail postage prepaid, this _2nd_ day of _October_, 2006. and electronic mail

David S. Godkin, Esq.
Erica Abate Recht, Esq.
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02110

Michael T. Kirkpatrick, Esq.
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

Amy Cashore Mariani

## *EXPERTO CREDITE LLC*
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**

**By: John H. Beardslee**

**In the Matter of: John D. Cerqueira, Plaintiff,**
**vs.**
**American Airlines, Inc., Defendant**

**CA No. 05-11652-WGY**

**Introduction**
At the request of Fitzhugh, Parker & Alvaro LLP, 155 Federal Street, Suite 1700, Boston, MA 02110-1727 I have been retained to review the above referenced case and to provide expert testimony regarding the state of the U.S. commercial aviation industry on December 28, 2003. I have also been asked to provide expert testimony on the performance of AA personnel on Flight 2237 regarding U.S. commercial aviation standards in existence on December 28, 2003. I have further been asked to rebut Douglas R. Laird's testimony.

**Summary of Qualifications:**
A copy of my curriculum vitae, describing my 41 year career in aviation, is attached to this report.

My background in aviation began with enlistment in the Air Force in 1964 and discharge as a Captain in 1968, continued through employment with three airlines from 1968 until my retirement from Continental Airlines in 2005, and continues today through my activities as an aviation security consultant. Since approximately 1975 my area of specialization has been commercial aviation security. For over two decades I headed up a major airline corporate security department, first for Republic Airlines from 1982-1985 and then Continental Airlines from 1985-2005.

**Publications Authored Co-authored or edited in the past 10 years:**
None.

**Testimony at Trial or Deposition over the Past Four Years:**
None.

**Compensation:**
Review and study: $250/hour
Deposition and Testimony: $350/hour

# *EXPERTO CREDITE LLC*
## Specializing in Aviation Security
### Email: JohnBeardslee@houston.rr.com

**Materials Reviewed:**
- Amended Complaint
- Plaintiff's Answers to Interrogatories
- Plaintiff's Automatic Disclosures
- American Airlines' Answers to Interrogatories
- American Airlines' Answers to Interrogatories
- Deposition of Sally Walling, with Exhibits
- Deposition of Lois Sargent, with Exhibits
- Deposition of Amy Milenkovic, with Exhibits
- Deposition of Nicole Traer, with Exhibits
- Deposition of Ynes Flores, with Exhibits
- Deposition of John Ehlers, with Exhibits
- Deposition of Rhonda Cobbs, with Exhibits
- Deposition of Craig Marquis, with Exhibits
- Deposition of John Cerqueira, with Exhibits (confidential portions of testimony redacted)

**Summary of Event:**

At approximately 5:30am on the morning of December 28, 2003, Gate 29, American Airlines ("AA") Flight Attendant ("FA") Sally Walling was doing some work at the Gate 29 counter. She was approached by a man, later determined to be Mr. John D. Cerqueira, a passenger waiting in the gate area to board AA Flight 2237 to Ft. Lauderdale, FL. Mr. Cerqueira asked FA Walling to change his seat. FA Walling told Mr. Cerqueira she could not change his seat, because she was not a ticket agent. Mr. Cerqueira became very insistent and repeatedly asked to have his seat changed, even after FA Walling had told him she could not do it.

As FA Walling was boarding the aircraft for Flight 2237, she told the other two FAs working the flight, Amy Milenkovic and Lois Sargent that there was a passenger on the flight with whom she felt very uncomfortable.

FA Walling next encountered Mr. Cerqueira when he was the first passenger to enter the coach section of the aircraft. During the period of time in which Mr. Cerqueira boarded, FA Walling believed boarding was restricted to first class customers. Upon boarding, Mr. Cerqueira went to exit row seat 20F and then to an aft rear lavatory where, according to FA Walling he spent four to five minutes, after which he returned and sat in seat 20F.

# EXPERTO CREDITE LLC
## Specializing in Aviation Security
Email: JohnBeardslee@houston.rr.com

The Captain of Flight 2237, John M. Ehlers, was walking towards Gate 29, prior to taking command of the flight when, for the first time in his 20 year career, he was approached by an individual who stopped him and asked him if he was the Captain going to Ft. Lauderdale, to which he responded he was. The individual, who had a pony tail, looked at him and said, "That's good. I'm going with you. We're going to have a good trip today." Then the individual walked away. Because of this unusual experience, Captain Ehlers asked FA Walling to check for a passenger with a pony tail. FA Walling did so, and found that the passenger with the pony tail was sitting in the same row as Mr. Cerqueira. FA Walling then relayed her experiences with Mr. Cerqueira to the Captain.

FA Lois Sargent also reported to the Captain that the passengers in seats 20D and 20E were behaving in an erratic and unusual manner during her exit row briefing. They were laughing, asking questions and were generally not taking the briefing seriously. It appeared to her the passenger in seat 20F "was kind of just laughing at the whole thing."

When FA Sargent reported her concerns about the behavior of the passengers in seats 20D, E and F during the exit briefing to Captain Ehlers he observed the passengers in question and confirmed that one of them was the individual who intercepted him in the gate area. While FA Sargent was making her report to Captain Ehlers, FA Walling came up to report "Now they're wishing everybody 'Happy New Year.'"

Captain Ehlers called AA ground operations and asked for an AA Ground Security Coordinator ("GSC") and an agent to come to the aircraft. Captain Ehlers then called AA System Operations Control ("SOC"). Captain Ehlers also briefed Mass. State Troopers who had come to the flight in response to a security gate return communication from ground operations. Captain Ehlers reported to all of the aforementioned parties the unusual occurrences involving him, two of the FAs, and the passengers in row 20 seats D, E and F. It was decided the best course of action would be to remove the passengers in question from the aircraft for questioning. About half an hour after the State Troopers became involved, they informed Captain Ehlers that the three passengers removed for questioning would not be traveling with him. AA SOC made a decision to deny further transportation that day to all three passengers removed for questioning by instructing BOS ground personnel to cancel their respective Passenger Name Records and to refund the unused portion of their tickets.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

Flight 2237 departed without the three passengers who had been removed for questioning. The original cabin crew asked to be relieved from duty on that flight. All of the checked luggage for Flight 2237 was re-screened by the TSA as were the remaining passengers. Massachusetts State Troopers also searched the aircraft for explosive devices, using bomb sniffing dogs.

**Opinions:**

I have formed these opinions based on over three decades of experience in aviation security, including my experiences as the Sr. Director – Corporate Security for Continental Airlines from well prior to 9/11 until my retirement in 2005. I witnessed first hand the commercial aviation security changes brought on by 9/11 and their impact on flight crews. I witnessed the changes in training, procedures and aircraft modifications. I reviewed the depositions of AA personnel in this case as well as the reported activities of the police and TSA representatives who responded to determine their adherence to post 9/11 aviation security standards as I understand them.

**Differences in Airline Security Prior and Subsequent to 9/11**:

Due to my experience as a major airline security director before, during and after 9/11, I am of the opinion the tragic events of 9/11 led to a seismic shift in aviation security standards and practices. Two of the most significant changes involved the relationship between the cockpit and the cabin crew, and the relationship between the cabin crew and the passengers. Airline pilots wearing imposing uniforms, many of whom are former military, have always been authority figures. Prior to 9/11, FAs counted on intervention by Captains and First Officers to help them through difficult confrontations with passengers; the flight crew was a team. After 9/11, while flight crews were still a team, the cockpit members of the team were behind bullet and blast resistant doors, and had been given explicit instructions not to render physical aid, no matter what was happening in the cabin. In the event of a security event, post 9/11, the cockpit crew members' goal was not to render aid to the cabin crew; it was to land the aircraft to ensure it could not be used as a flying bomb. While cabin crews got conflict resolution and self defense training, many communicated to me in my role as security director, that they felt they were on their own. Prior to 9/11, even hijackings were met with passive resistance; airlines and our government wanted everyone involved, even the hijacker, to come out alive. After 9/11 everyone was forced to accept the fact that passengers could be suicidal terrorists, intent on killing everyone on the aircraft and as many other innocent people as they could. FAs began to consider their own mortality as they served meals and they became hyper vigilant, knowing they would not have the help of the cockpit crew in the event of difficulty with a passenger during a flight. Especially since 9/11, FAs have sought to make sure any possible difficulty with a potentially disruptive passenger was settled on the ground. This is consistent with their training and the realities that exist within the airline industry since 9/11.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**

**Industry Standards for Training Ground Security, In-Flight, and Operations Personnel on Passenger Security Issues as of December 2003**:

My pre and post 9/11 experience with the TSA and Continental's Flight Operations and In-Flight training departments caused me to form the opinion that the most radical training change to industry standards after 9/11 was to the Common Strategy. Published initially by the FAA and now by the TSA (with airline involvement), the Common Strategy is a process, including training requirements, for dealing with commercial air carrier security incidents. It involves every entity connected with a flight, including FAA aircraft controllers. While the Common Strategy continues to have as its goal the preservation of life, prior to 9/11 it was not envisioned that complying with the hijacker's demands would lead to purposeful loss of life, especially the lives of those on the ground. After 9/11, in addition to the lives of those on the aircraft, one now must consider the lives of potential victims on the ground; the shooting down of a commercial aircraft to save lives on the ground became a reality. The passive resistance embodied in the pre 9/11 Common Strategy morphed on that very day to the active resistance displayed on United Flight 93. The future became more menacing for everyone involved, especially the flight crews, who are trained in the new realities.

**Interaction between Airlines and Local, State and Federal Law Enforcement in Handling Passenger Security Issues as of December 2003**:

As a major airline security director for over two decades, I participated in the resolution of numerous security incidents. In my opinion the interaction between Local, State and Federal Law Enforcement did not change after 9/11. Once an airline calls in law enforcement or if law enforcement responds on their own initiative, law enforcement handles the situation and those involved according to their own procedures and protocols. An airline representative can explain a situation to law enforcement, but law enforcement will decide if and how to respond. For an airline there are two types of situations in which law enforcement is generally called. The first is where the airline believes a crime has been committed and is hoping for an arrest, trial, conviction and restitution. The second is where the airline is concerned about a situation or a passenger and asks law enforcement to apply their own information gathering and analysis techniques, in case there is more to the situation or individuals than the airline personnel have been able to discern. Police have access to information to which an airline does not, information about open warrants, criminal convictions and classified intelligence. Law enforcement also has superior interview capabilities. I am not aware of situations where police would release an individual and instruct the airline the passenger was cleared to fly. The most law enforcement would do would be to tell the airline that so far as law enforcement is concerned the individual is cleared to fly. Law enforcement does not infringe on an airline's prerogative to deny boarding to a passenger whom airline personnel are concerned could become disruptive once the flight is airborne.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

**Industry Standards for Decision Making on Passenger Security Issues as of December 2003:**

Based on my role as an airline security director, before, on and after 9/11, it is my opinion that, since 9/11, there has been a continuing and heightened sense within the airline industry that security incidents may well involve life and death impacting decisions. That heightened sense has not abated due to ongoing terrorist activity. An airline's willingness to inconvenience passengers, based on security concerns, is grounded in the belief that its actions could potentially save lives. Being on the alert for unusual occurrences and communicating your concerns has become the responsibility of all airline employees who interact with the public. If one can't define how one's enemy will behave, but one can define how the typical person who is not an enemy will behave, then one has to work from the premise that one's enemy may be more nervous than the typical passenger or that the enemy may be more intense or unusual in other ways. During annual recurrent training for flight crews and Ground Security Coordinators ("GSCs"), the classes usually review security incidents using these criteria to improve their decision making skills. The crew on flight 2237 was applying these principles which have become standard throughout the industry, especially since 9/11.

**What Constitutes Unusual Behavior Sufficient To Give Rise To An Investigation:**

Based on many years of involvement in the assessment of security incidents, as an airline security director, it is my opinion we cannot define unusual behavior in a vacuum; it must be defined in the context of prior behavior and the nature of the situation. For example, using a lavatory is not unusual, but since the lavatory offers a degree of privacy not found elsewhere on the aircraft, if you use a lavatory for too long, too often or during an unusual time it may arouse suspicions. Lavatories are areas of particular concern on flights, as evidenced by the bans on their use subsequent to departure and prior to landing in Washington DC that were in place for some time after 9/11.

The depositions of the flight crew on Flight 2237 all describe specific occurrences, involving one or more of the passengers in row 20 seats D, E and F, that flight crew members found to be unusual and made them uncomfortable. These include Mr. Cerqueira's interaction with FA Walling, the Captain's interaction with the pony tailed customer, FA Sergeant's interaction with the passengers seated in row 20 D, E and F during the exit row briefing and Mr. Cerqueira's unusual boarding and use of the lavatory.

The fact that Mr. Cerqueira was a frequent flyer is not a fact mitigating in his favor. Most frequent flyers know FAs can neither check them in nor change their seat assignments. As a frequent flyer Mr. Cerqueira's insistence on having his seat changed after FA Walling explained that he would have to wait for a gate agent is unusual.

# EXPERTO CREDITE LLC
## Specializing in Aviation Security
**Email: JohnBeardslee@houston.rr.com**


Unusual behavior sufficient to warrant reporting it to a superior for a single incident can include the type of insistent behavior reported by FA Walling in her interactions with Mr. Cerqueira in the gate area. If a member of a flight crew, trained to recognize and be sensitive to unusual interactions with the flying public, reports such behavior, the wisest course of action is to attempt to resolve any conflict or problem before the flight leaves the ground.

Frequently, however, situations occur where there are a number of unusual actions observed by a number of crew members, with no single action warranting investigation, as was the case in this situation. Having multiple occurrences and reporters would have buttressed the validity of the individual reports in the eyes of the SOC manager and increased the likelihood of a protective reaction.

**Assessment of Actions of FAs on Flight 2237 on December 28 2003 in Light of Then-Existing Industry Standards:**
The actions of the AA FAs on Flight 2237 on December, 28, 2003 demonstrated teamwork, consultation and adherence to post 9/11 industry standards and response norms to unusual occurrences, based on my experience as a major airline security director on the day in question. The FAs did not attempt to take independent action; they properly shared their concerns with one another and with the In-flight Security Coordinator. One of the tragedies of 9/11 was the lack of intelligence sharing among groups charged with evaluating and responding the terrorist threat. It is important for front line personnel to be able to share concerns in a supportive environment, as was demonstrated by these FAs. Greater intelligence sharing has become a standard practice since 9/11. If every fear had to be proven correct or if every suspicion had to be confirmed as being justified, to avoid the "mishandled" label, information sharing would gradually cease and our skies would be less safe for it.

**Assessment of Actions of John Ehlers on Flight 2237 on December 28 2003 in Light of Then-Existing Industry Standards:**
It is my opinion, based on over two decades of experience, until 2005, as an airline security and being involved in the resolution of security incidents, Captain Ehlers reacted appropriately to the concerns of his FAs. The fact that he had experienced an unusual occurrence with one of the passengers about whom the FAs were concerned heightened his overall concern for the safety of the flight and led to his decision to report the situation to SOC. He acted with appropriate restraint in that prior to listening to the FAs concerns; he took no independent action regarding the unusual occurrence he was involved in. He, properly, took the additional precautionary action of having the lavatory Mr. Cerqueira used checked by the First Officer for suspicious items.  Captain Ehlers cooperated with law enforcement and the TSA, as he should have. Finally, after the incident was resolved Captain Ehlers remained on duty to pilot the delayed flight.

## EXPERTO CREDITE LLC
### Specializing in Aviation Security
**Email: JohnBeardslee@houston.rr.com**

**Assessment of Actions of Ground Security Coordinator and Operations with regard to Flight 2237 on December 28, 2003 in Light of Then-Existing Industry Standards:**
The overall actions of the GSC and Operations were consistent with industry standards as they existed on December 28, 2003 based on my understanding of the standards, as a major airline security director on the date in question and for years before and after. Notification of airport law enforcement and the TSA is common practice in a security situation, as is following instructions from SOC as to how passengers who have generated the security concerns are to be treated. Additionally, cooperation with airport law enforcement and the TSA is expected and occurred. It is also a common practice not to restrict travel by those denied boarding and not taken into custody beyond the day in question.

**Overall Assessment of American's Handling of Situation on Flight 2237 on December 28, 2003:**
Based on my experience as an airline security director from 1982 until 2005 AA handling of the security incident involving AA Flight 2237 on December 28, 2003 was consistent with industry norms and standards at that time. The AA flight crew did not seek out the passengers removed from Flight 2237; they did not "eyeball" passengers as they were boarding. Each passenger removed from the flight initiated an unusual interaction with a flight crew member, generating security concerns that, in total, justified the Captain calling SOC. The appropriateness of AA actions was buttressed by the determination by State Police to employ explosives detecting canines to search the aircraft and by the TSA to rescreen all passengers continuing on AA Flight 2237. AA handling of the situation was consistent with industry standards.

FA Walling, FA Sargent, FA Milenkovic and Captain Ehlers lost fellow AA crewmembers on 9/11. After that, all flight crews, including but not limited to, those on AA and United Airlines flights became even more sensitive to security concerns; their SOC managers would respond affirmatively to their security concerns. Having a potential security incident on board a flight originating in BOS (one of the 9/11 originating flight airports) would only serve to heighten that vigilance. Based on my experience as the individual in charge of security for a major airline, both before and after 9/11, the concerns expressed by FA Walling, FA Sargent and Captain Ehlers over what they believed to be unusual behavior exhibited by the three passengers cannot be properly evaluated in hindsight. Moreover those concerns cannot be adequately assessed by those who do not understand the post 9/11 mindset of professionals within the airline industry. AA flight crews and the SOC personnel were helpless as they watched their aircraft veer off course on 9/11. In consequence, some security incidents, including Mr. Cerqueira's situation, now evolve when people elect to err on the side of caution, based on unusual behavior that raises flight crew suspicions. The fact that the cabin crew was unable to continue the trip indicates the level of their concern.

# EXPERTO CREDITE LLC
## Specializing in Aviation Security
**Email: JohnBeardslee@houston.rr.com**

Of note in analyzing the facts of this case are several key elements of testimony. First, the depositions of all AA personnel involved demonstrate that they are aware that AA has a non-discrimination policy and that AA does not consider racial profiling to be an acceptable justification for being suspicious of a passenger. The depositions of AA personnel involved in this incident demonstrate there was coordination among the crew, AA ground personnel and headquarters staff. The depositions establish that AA coordinated with law enforcement and the TSA.

**Analysis and Rebuttal of Opinions and Information in Document Authored by Douglas R. Laird:**

It is my opinion, based on being in charge of security at a major airline for over two decades, that, had Mr. Cerqueira taken his originally assigned seat, had not approached FA Walling before and after boarding, and had not sat next to the two gentlemen who also behaved in a manner that aroused flight crew suspicions, that Mr. Cerqueria would not have been removed for questioning. FA Walling did not attempt to have Mr. Cerqueria evaluated by security after he unnerved her at the gate check-in counter, and she did not attempt to have him evaluated by security after she felt he remained in the lavatory an unusually long time. FA Walling set aside her own unease; it was only when her concerns were added to concerns about the passengers seated with Mr. Cerqueira in the exit row, including their unusual comments to the Captain and their unusual response to the exit row briefing, that action commenced. It is my opinion, based on personal involvement in the resolution of numerous security concerns reported to the SOC at Continental Airlines, that if Mr. Cerqueira had taken his originally assigned seat or his seat mates had not acted strangely before and after boarding, he would have not been selected for security scrutiny. It was the combined pre and post boarding actions of the passengers in row 20 seats D,E and F that were the cause of the incident, not racial profiling.

Regarding Mr. Laird's "Conclusion And Opinion" that "Racial profiling does not make air travel safer" I saw nothing in any of the depositions related to this case to indicate that anyone deposed was of the opinion that racial profiling makes air travel safer. Clearly AA held no such position; AA has a published policy on the prohibition of racial profiling and all of the crew members were aware of that policy.

# *EXPERTO CREDITE LLC*
## Specializing in Aviation Security
Email: JohnBeardslee@houston.rr.com

Mr. Laird's "Conclusion And Opinion" states that "Mr. Cerqueira's behavior did not indicate a security threat." to support his opinion that FA Wallings engaged in racial profiling. Listing the behaviors mentioned in the flight crew depositions, Mr. Laird also states that "None of the following 'behaviors' reported as abnormal are indicative of a security threat." My understanding of flight crew security training, based on over two decades of interaction with Flight Operations and In-Flight personnel on security training content, is consistent with that of FA Milenkovic, who stated at deposition that in-flight personnel are told to look for unusual behavior. This means that any behavior outside the norm which could be indicative of unusual nervousness (going to the lavatory, feigning sleep, boisterous behavior, strange questions), unusual resolve (being insistent, staring, being first to board, strange questions) or hostile intent. In my opinion, based on over two decades of involvement in the resolution of flight crew reported security issues and security training, the behaviors listed by Mr. Laird, when taken in context and viewed cumulatively, could be indicative of ill intentions and warrant further investigation. Any single behavior, in and of itself, does not have to rise to the level of a "security threat." Rather, alarm bells usually do not go off until there have been multiple examples of unusual behavior; when those multiple examples are the result of actions by multiple individuals in a close physical proximity to one another, concerns become even more heightened.

Also under "Conclusions And Opinions" Mr. Laird states "Because the situation was mishandled an innocuous series of events was allowed to turn into a security incident." It is my opinion, based on decades of active involvement in the resolution of security incidents that there are few security events where a post incident review does not yield opportunities for people to claim that the situation was mishandled. This is particularly true when multiple actors, multiple sources of information and remote decision makers become involved in situations where the potential exists for life and death consequences, particularly when the concerns leading to the incident are later deemed to be unfounded.

In this case the series of events was not "innocuous" to the flight crew (as demonstrated by the fact that three separate members of that crew had concerns and the cabin crew was unable to continue to work that flight). Furthermore when the concerns were communicated to the SOC, SOC elected to deny boarding to the passengers involved.

## EXPERTO CREDITE LLC
### Specializing in Aviation Security
Email: JohnBeardslee@houston.rr.com

Mr. Laird also opines "The Captain did not take control of the developing situation and thus allowed an innocuous series of events to escalate in to a security incident." To the contrary, professional law enforcement was brought in to determine if the suspicious actions were linked to any illegal activity and SOC was brought in to render a boarding decision. Based on my understanding of an industry standard definition of "mishandled" gleaned over decades of involvement with airline industry trade associations, although Mr. Cerqueira in retrospect did not represent a danger to AA Flight 2237, it does not mean the situation was "mishandled."

Mr. Laird offers suggestions as to "A number of things could have been done to have prevented this series of events turning into an incident." In my opinion, based on over two decades of involvement in the resolution of security incidents, none of Mr. Laird's suggestions, had they been undertaken, would have resulted in a different outcome. He suggests checking the No-Fly list. However, it had already been checked; it must be checked for every passenger before they check-in. He suggests a PNR check would have shown the individuals were not flying together, however, individuals working together to hijack aircraft often purposely don't travel together. Checking the PNR might help confirm suspicions, but it could not refute them. He suggests checking to see whether exit row seats are assigned by ground personnel; that information would not have helped. He suggests checking to see Mr. Cerqueira's frequent flyer status; this may have been done and discounted. He suggests the GSC could have been summoned sooner; it's impossible to tell if this would have changed the outcome. He suggests the Captain could have calmed the FAs; the Captain was concerned as well, having been approached in an unusual manner by one of the exit row individuals. He suggests having ground personnel remove the passengers, not the Troopers; that suggestion is reasonable but would not have changed the outcome. He suggests SOC and Corporate Complaint Resolution Officer ("CCRO") could have provided guidance to the Captain; SOC did provide guidance to the Captain and ground personnel. SOC denied boarding, canceled the existing booking and required refund of the unused portion of ticket. Finally, he suggests SOC should have advised the Captain to call CCRO. As the CCRO states in her deposition, the resolution of incidents involving suspicious passengers rests with SOC; the outcome would have remained the same whether the CCRO was contacted or not.

## EXPERTO CREDITE LLC
### Specializing in Aviation Security
**Email: JohnBeardslee@houston.rr.com**

The final item under Mr. Laird's "Conclusions And Opinions" states: "The refusal to allow Mr. Cerqueira to travel on AA after he was questioned was not justified." In his "Summary of Event" Mr. Laird concludes "It appears that the assumption was made by the AA flight crew that Mr. Cerqueira and the individuals seated in 20D and 20E were traveling together" without any reference as to how he arrived at the conclusion that the AA flight crew assumed the customers in row 20 E, D and F were traveling together. In my opinion, based on more than two decades of involvement in the analysis of documents pertaining to aviation security investigations, the AA documents do not support that conclusion, nor does the police report. Mr. Laird also concludes the police investigation was limited to determining that "he (Cerqueira) was not traveling with the passengers seated in 20D and 20E" and after that determination was made "he was cleared for travel and escorted to the AA ticket counter." Based on over two decades of interaction with police during security incident investigations, customers' travel relationship is only one of the factors police evaluate. Police often determine if the individuals in question have any open warrants, if they have records with pertinent convictions, if they are traveling with forged documents, if they are carrying any illegal substances, documents or items indicative of illegal activity. Whether or not the individuals are traveling together is only of interest as it relates to other aspects of the investigation. Actually, consistent with the concerns of the Captain and FAs, the State Troopers' report shows they were called concerning the passengers in 20E and 20F (20F being Mr. Cerqueira). Furthermore, police do not clear a person for travel unless they had concerns about the person traveling in the first place. Airline concerns have to be resolved by the airline; a clearance to fly by the police does necessarily resolve those concerns.

Finally, contrary to Mr. Laird's assertions, it appears from the depositions I reviewed that Mr. Cerqueira was not allowed to travel on the then existing PNR and associated ticket. This was an SOC decision in response to crewmember concerns, not a permanent or even temporary ban. Other AA flights, booked through normal channels were, after the incident was closed, open to Mr. Cerqueira.

# JOHN H. BEARDSLEE

8 Dunlin Meadow Dr                                           Phone: 281-292-3973
The Woodlands, TX  77381                        Email: JohnBeardslee@houston.rr.com

## Overview

Over three decades of innovation and increasing responsibility in aviation security, with almost 20 years as Senior Director, Corporate Security for Continental Airlines. Responsible for policy development and execution in the areas of Threat Analysis and response, Fraud/Theft detection and investigation, Executive Protection, Terrorist and Fraud profiling, Narcotics and Contraband interdiction, Strike and labor unrest responses, TSA/FAA/ICE/CPB security requirements implementation, Security Equipment testing and evaluation, and security related training.

## Highlights

- Proposed and chaired the FAA/ATA Task Force that developed Positive Target Identification, the analysis tool for bomb threats currently used successfully by most major US airlines.
- Developed passenger screening and crew protection procedures which allowed Continental to continue flying to Tel Aviv, and over-nighting crews, while the other US and some European airlines discontinued service, with the remaining European airlines ferrying aircraft and crews to other locations.
- Led the Continental team working with International Consultants on Targeted Security (ICTS) in the development of the highly successful automated profiling system (APS) for improving precision and customer service during FAA/TSA required profiling of passengers traveling from international Extraordinary Security stations to the US.
- Pioneered the use of data warehouse queries for targeting investigative resources, gathering evidence of wrongdoing and supporting prosecutions.
- Introduced web based training for Ground Security Coordinators and Fraud Prevention.

## Employment History

- 2005 – Present    Aviation Security Consultant
- 1985 – 2005        Continental Airlines, Senior Director Corporate Security
- 1982 – 1985        Republic Airlines, Director Security Services
- 1968 – 1981        TWA, Manager Security Programs / Manager Cargo Customer Service JFK / Senior Strategy Planner / Ramp Supervisor JFK / Senior Personnel Representative
- 1964 – 1968        USAF, Captain – Management Engineering Officer

## Education

- 1964 BS, New York University – Industrial Relations
- 1972 MBA, Long Island University – Organizational Behavior

## Other Accomplishments

- Received Commendation from the Federal Bureau of Investigation for Counter Intelligence Strategy efforts, subsequent to 9/11
- Issued U.S. Patent No. 4,797,657, for security device used on large commercial aircraft
- Granted Secret Clearance by the Department of Defense
- Twice elected Chair of the Air Transport Association Security Committee
- Received award for coining and developing "Excel at the Basics" management concept

# Exhibit 2

To

**PLAINTIFF JOHN D. CERQUEIRA'S MEMORANDUM
IN SUPPORT OF HIS MOTION TO STRIKE DEFENDANT'S
EXPERT DISCLOSURE SERVED OUT OF TIME**

Plaintiff's Disclosure of Expert Testimony Pursuant to Fed. R. Civ. P. 26(a)(2)
with attached report of Douglas R. Laird, served June 26, 2006

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,

                Plaintiff,

v.

AMERICAN AIRLINES, INC.,

                Defendant.

Civil Action No. 05-11652-WGY

## PLAINTIFF'S DISCLOSURE OF EXPERT TESTIMONY
## PURSUANT TO FED. R. CIV. P. 26(a)(2)

Pursuant to Fed. R. Civ. P. 26(a)(2) and LR 26.4(a), Plaintiff John D. Cerqueira submits

this expert disclosure.

### Plaintiff John D. Cerqueira's Expert Witness

1.     Douglas R. Laird, CPP
      Laird & Associates, Inc.
      2618 Edgerock Road
      Reno, Nevada 89509-5765
      (775) 770-0136

Mr. Laird's report is attached to this disclosure as Exhibit A. The report and its

attachments contain the information required by Fed. R. Civ. P. 26(a)(2)(B). Plaintiff reserves

the right to supplement this disclosure pursuant to Fed. R. Civ. P. 26(e)(1).

Dated: June 26, 2006

**JOHN D. CERQUEIRA**
By his attorneys,

Michael T. Kirkpatrick
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
(202) 588-1000

David S. Godkin (BBO #196530)
Erica Abate Recht (BBO #641452)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100

CERTIFICATE OF SERVICE

I, Michael T. Kirkpatrick, hereby certify that a true and correct copy of the foregoing document was delivered to all counsel of record on June 26, 2006, by first class mail and electronic transmission.

Michael T. Kirkpatrick

# Laird & Associates, Inc.

LairdAssoc.com

## Introduction

At the request of Michael T. Kirkpatrick, Esq., Public Citizen Litigation Group, 1600 Twentieth Street, NW, Washington, DC 20009 I was retained to review the circumstances surrounding the denial of service to John D. Cerqueira by American Airlines, Inc. on Flight #2237 from Boston (BOS) to Fort Lauderdale (FLL) and American Airlines refusal to provide transportation on a later flight to Fort Lauderdale. Following is my report with findings and conclusion based upon documents available to me as of this date. As additional work may be done in this matter, any conclusions and opinions expressed herein will be amended or supplemented as required.

## Materials Reviewed

On June 20, 2006 I received, via UPS, copies of documents related to the case of John D. Cerqueira v. American Airlines, Inc. CA No. 05-11652-WGY which Mr. Kirkpatrick requested that I review. A copy of Mr. Kirkpatrick's letter of transmittal that itemizes the materials provided is attached to this report and titled Attachment 1.

Additional materials related to applicable security standards and government aviation regulations were also reviewed and are as follows:

1. Internal Standards and Recommended Practices – Security, Annex 17, Fifth Edition, Montreal, 1992
2. The White House Commission on Aviation Safety and Security, GPO, Washington, DC, May 1990
3. The 9/11 Commission Report, W. W. Norton & Company, New York, 2004
4. Aviation And Airport Security, Kathleen M. Sweet, Esq., Pearson Prentice Hall, Upper Saddle River, New Jersey, 2004
5. Combating Air Terrorism, Rodney Wallis, Brassey's US, Washington, DC, 1993
6. The Naked Crowd, Jeffrey Rosen, Random House, New York, NY, 2004
7. The Culture of Fear, Barry Glassner, Basic Books, New York, NY, 1999
8. America the Vulnerable, Stephen Flynn, HarperCollins, New York, NY, 2004
9. How Safe Are Our Skies, Rodney Wallis, Praeger, Westport, CN, 2003
10. Disinformation, Richard Miniter, Regnery Publishing, Washington, DC, 2005

## Summary of Event

Mr. John D. Cerqueira, Aventura, FL, flew on an American Airlines flight from Fort Lauderdale, FL to Boston on December 24, 2003. On December 28, 2003 he arrived at Boston's Logan Airport at approximately 5:15 A.M. to fly on American Airlines flight #2237 to Fort Lauderdale, FL. He arrived early as Transportation Security Administration (TSA) advises an early arrival to allow time for security screening. He checked luggage curbside and proceeded to the departure gate after clearing TSA screening without incident. When he saw an American Airlines staff member at the gate podium he addressed her and asked if he could be reassigned a bulk-head or exit row seat. Flight Attendant Sally Walling, the person at the podium advised Mr. Cerqueira that he'd have to wait for a gate agent to request a seat change.

Mr. Cerqueira ultimately was assigned an exit row seat, 20F, and boarded the aircraft when his "group" was called by the gate agent. Upon reaching his assigned seat Mr. Cerqueira stowed his carry-on items and proceeded to a lavatory at the rear of the aircraft. After his lavatory visit he returned to his assigned seat and worked on his laptop computer until all passengers were advised by the crew to turn off all electrical items in preparation for departure. Mr. Cerqueira, having arisen at 3:00AM to travel to the airport, then fell asleep.

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele:·1.775.770.0136 · Mobile:·1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

**Exhibit A**

# Laird & Associates, Inc.

LairdAssoc.com

FA Walling advised Captain Ehlers that she was alarmed by suspicious activity by the individual in seat 20F, Mr. Cerqueira, both before the flight was boarded and after he boarded the flight. She claimed that he had "stared" at her after he'd insisted she reassign his seat while at the podium, that he'd boarded out of sequence, that he'd gone to the aft lavatory and stayed in the lavatory a "long time" and that prior to push-back he was "feigning" sleep.

American Airlines Customer Service Manager Ynes Flores was summoned to the aircraft, it is not clear by whom, and requested the boarding passes from Mr. Cerqueira and the individuals seated in 20D and 20E. It appears that the assumption was made by the American Airlines flight crew that Mr. Cerqueira and the individuals seated in 20D and 20E were traveling together. Mr. Flores provided the documents to Captain Ehlers and departed the aircraft.

Mr. Cerqueira was subsequently removed from the aircraft by Massachusetts State Troopers and questioned by law enforcement authorities. After it was determined that he was not traveling with the passengers seated in 20D and 20E, he was cleared for travel and escorted to the American Airlines ticket counter.

Mr. Cerqueira attempted to get rebooked on a later American Airlines flight to Fort Lauderdale. At the ticket counter Ms. Nicole Traer, then an American Airlines customer service agent, advised him that she was refunding his ticket and that he could not fly on American Airlines as those were the instructions she had received from System Operations Control, Dallas, TX. The next day Mr. Cerqueira flew to Fort Lauderdale on another carrier without incident.

## Qualifications

A copy of my curriculum vitae which describes my forty-two year security career is attached to this report as Attachment 2. The C.V. provides an overview of my duties and responsibilities as security director for a U. S. Flag Carrier.

Since departing Northwest Airlines in May of 1995 I have provided security consultation to most of the international aviation community, to include: Airports – Domestic and International; Airlines – U. S. Flag and International; Governments – U. S. and Foreign; Manufacturers – U. S. and Foreign; Security Providers – U. S. and Foreign; Service Providers – U. S. and Foreign, and Universities.

I have been designated an aviation security subject matter expert by the Federal Aviation Administration and worked on a variety of projects for the FAA the most significant being:

1. Vulnerability Assessments of the airports at Miami and Jacksonville, FL to assist the FAA to identify a VA model suitable for use by all U. S. airports.

2. Develop aviation security system architecture and define the aviation security concept of operations as an integral part of and essential element of the system architecture.

3. Survey thirty (30) existing or planned domestic Category X through CAT III airport terminal designs to determine if generic terminal configuration types or groupings exist for the purpose of employing enhancements in checked baggage transport and security screening and checkpoint design configurations. Additionally, samplings of existing and planned foreign airport terminal design layouts were surveyed to assess their security screening concepts and techniques to determine applicability to U.S. security needs. In total, thirty-five airports were visited and surveyed, including Frankfurt, Germany; Schiphol Airport, Amsterdam, the Netherlands; London (Gatwick), U.K.; Hong Kong, Hong Kong and Tokyo (Narita), Japan.

# Laird & Associates, Inc.

LairdAssoc.com

During the last four years I have not testified at trial or by deposition.

## Compensation

In a letter of agreement between Laird & Associates, Inc. and the Public Citizen Litigation Group, dated June 19, 2006, Michael T. Kirkpatrick, Esq. has agreed to pay a retainer of $ 2,000 toward the work of Douglas R. Laird at the rate of $ 250 per hour for review and preparation and $ 350 per hour for deposition(s) and testimony in the case of John D. Cerqueira v. American Airlines, Inc., CA No. 05-11652-WGY.

## Publications

I have written about aviation security and been published in the following books, magazines and journals:

Books

"Airline Security Regulatory Framework", Chapter 18, p. 251-260, Protection, Security, and Safeguards, CRC Press, New York, 2000

Magazines

"Grounding Terrorists", p. 58-61, Security Management, December 1995
"Fighting Fraud on the Fly", p. 77-80, Security Management, April 1996

Professional Journals

"Regulation: Perception and Reality", p. 238-241, Journal of Testing and Evaluation, Vol. 22. Number 3, May 1994,

Professional Review

On two occasions I have been asked by the Committee on Commercial Aviation Security Panel and Passenger Screening, National Materials Advisory Board, Commission on Engineering and Technical Systems, National Research Council, to review their publication "Airline Passenger Security Screening – New Technologies and Implementation Issues", Publication NMAB-482-1, 19 and 2002 and provide comments prior to publication. In both instances I provided written comments.

## Conclusions And Opinions

Based on my review of the materials referenced, as well as my experience and training in security, specializing in aviation security, I have reached the following conclusions and opinions to date with regard to the relevant events of December 28, 2003 and the denial of service to Mr. Cerqueira at Boston Logan Airport:

1.  Mr. Cerqueira was a victim of racial profiling;
2.  Racial profiling does not make air travel safer;
3.  Mr. Cerqueira behavior did not indicate a security threat;
4.  Because the situation was mishandled an innocuous series of events was allowed to turn in to a security incident;

**Laird & Associates, Inc.**

LairdAssoc.com

5.  The refusal to allow Mr. Cerqueira to travel on American Airlines after he was questioned was not justified.

## Discussion

While security director at Northwest Airlines I oversaw a Federal Aviation Administration mandated profiling system that had to be carried out on our flights departing certain airports in Europe and the Pacific which was administered by a contract company.  On numerous occasions I observed the "profile" training and watched the process being carried out at foreign airports.  The profile training consisted of two weeks of classroom instruction and one month of on-the-job observation/training, and only experienced screeners were allowed to take the class. There were many false-positives and very few positives, none of which were direct aviation security issues. Therefore, Northwest Airlines Security Department developed what became known as CAPPS (Computer Assisted Pre-passenger Screening) and following the TWA#800 crash the CAPPS program was mandated by the FAA for use by all U. S. Flag carriers.  On 9/11 CAPPS identified ten (10) of the hijackers.  Ethnicity is not a factor in the CAPPS program.

Mr. Cerqueira was a victim of racial profiling in that none of the activities noted in the depositions as suspicious were of a security interest.

None of the following "behaviors" reported as abnormal are indicative of a security threat.  Specifically:

- Being "insistent"
- "Staring"
- Being "first to board"
- Going to the lavatory
- Sleeping while other passengers are being boarded
- Passengers in 20D and 20E being boisterous
- "Suspicious" behavior, not further defined
- "Strange questions" to Captain by passenger(s) 20D and 20E

The documents I have reviewed do not show that any of the American Airline staff involved in this event had received any meaningful training in behavioral profiling.

I have not seen the American Airlines policy or training program for In-Flight Security Coordinators (pilots) but know the philosophy of the In-Flight Security Coordinator program as mandated by the Federal Aviation Administration.  Although the Captain has ultimate command of the aircraft it is the Ground Security Coordinator that supervises the security process until the boarding of the aircraft has been completed and the GSC advises the In-Flight Security Coordinator that the "flight is secure" and the aircraft is cleared to pushback from the gate. American Airlines Chief Pilot and the Vice President of Flight made the role of the In-Flight Security Coordinator quite clear in messages to the pilot group.

The Captain did not take control of the developing situation and thus allowed an innocuous series of events to escalate in to a security incident.  A number of things could have been done to have prevented this series of events turning into an incident.  For example:

- The TSA's "No-Fly" list could have been checked;
- The Passenger Name Records (PNR) of Cerqueira, Rokah and Ashmil could have been checked which would have shown that they were not traveling together;

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele:¹1.775.770.0136 · Mobile:¹1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

**Laird & Associates, Inc.**

LairdAssoc.com

- Checking with knowledgeable ground staff would have shown that exit-row seats are assigned by station personnel;
- A computer check would have shown that Mr. Cerqueira was an elite member of the American Airlines Frequent Flyer Program;
- The GSC could have been summoned to the aircraft sooner and thus have had time to sort out the facts and provide input to the Captain;
- The Captain could have independently verified the available facts, discussed the situation with the GSC and attempted to calm down the flight attendants;
- If additional questioning was needed the three passengers in the exit row could have been escorted from the aircraft by ground personnel and thus avoided the State Troopers from boarding the aircraft and alarming the other passengers;
- The SOC and CCRO should have provided guidance to the Captain as how to deal with the situation;
- SOC should have advised Captain to call CCRO for guidance had he not already done so.

To the extent American Airlines did any investigation of Mr. Cerqueira following his removal from the aircraft it would show that American Airlines was not justified in refusing to rebook Mr. Cerqueira after he was released from questioning by the Massachusetts State Police. A simple review of the facts available to American Airlines combined with the findings of the State Police would show that Mr. Cerqueira was not a security threat.

## Conclusion

In summation, it is my opinion that FA Walling's concerns were a result of racial profiling that lead her to believe that there was a security threat. She reported this to Captain Ehlers who as the In-Flight Security Coordinator failed to thoroughly investigate and coordinate with the ground security coordinator and gain control of the event. The SOC made a decision to deny travel on American Airlines to Mr. Cerqueira with no basis in fact and made no record of how the decision was reached. Mr. Cerqueira was never a security threat to the flight and should have been rebooked by American Airlines and allowed to continue to Fort Lauderdale, FL.

Although American Airlines has a published policy on the prohibition of racial profiling and a denied boarding process the depositions I reviewed showed that the staff and crew had little understanding of the policy and its intent.

The breakdown in communication between the In-Flight Security Coordinator and the Ground Security Coordinator and the lack of an agreed upon definite chain-of-command lead to an incident that was not called for by the circumstances.

If any additional information has become available, please forward it to my office so that it may be reviewed and my report updated accordingly.

Douglas R. Laird, CPP

June 23, 2006

Attachments

1) Letter of Transmittal, Michael T. Kirkpatrick, June 19, 2006
2) Curriculum Vitae of Douglas R. Laird

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele: 1.775.770.0136 · Mobile: 1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

**PUBLIC CITIZEN LITIGATION GROUP**
1600 TWENTIETH STREET, NW
WASHINGTON, DC 20009
(202) 588-1000
(202) 588-7795 (fax)

MICHAEL T. KIRKPATRICK
Direct Dial: (202) 588-7728
E-mail: mkirkpatrick@citizen.org

June 19, 2006

Douglas R. Laird
Laird & Associates, Inc.
2618 Edgerock Road
Reno, NV 89509-5765

      Re:    *John D. Cerqueira v. American Airlines, Inc.*, CA No. 05-11652-WGY

Dear Doug:

      Please find enclosed a check payable to Laird & Associates in the amount of $2,000.00. I have also enclosed a tabbed binder containing the following documents:

    1)     Amended Complaint
    2)     Defendant's Answer
    3)     Protective Order
    4)     Plaintiff's Initial Disclosure
    5)     Plaintiff's Responses to Interrogatories
    6)     Plaintiff's Responses to Requests for Production
    7)     Documents Bates Nos. CRQ 0001-0133
    8)     Defendant's Automatic Disclosures
    9)     Defendant's Supplemental Automatic Disclosures
    10)   Defendant's Answers to Interrogatories
    11)   Defendant's Supplemental Answers to Interrogatories
    12)   Defendant's Responses to Requests for Production
    13)   Documents Bates Nos. AA 0001-0038
    14)   Transcript of Deposition of Sally Walling
    15)   Transcript of Deposition of Lois Sargent
    16)   Transcript of Deposition of Amy Milenkovic
    17)   Transcript of Deposition of Donald M. Ball
    18)   Transcript of Deposition of Ynes F. Flores
    19)   Transcript of Deposition of Nicole Traer
    20)   Transcript of Deposition of John M. Ehlers

**Attachment 1**

21) Index describing Deposition Exhibit Nos. 1-17 and attaching Exhibit No. 6 (the other deposition exhibits are among the documents already included in the binder or are subject to protective order)

22) Transcript of Deposition of John D. Cerqueira

23) Cerqueira Deposition Exhibit Tab Nos. 1, 2, and 3.

The binder does not contain documents bearing Bates Nos. CRQ 0134-0445 because they are relevant only to damages. I have not enclosed documents bearing Bates Nos. AA 0039--0098 because defendant produced them subject to the protective order.

Please note that the transcripts of the depositions of the American Airlines employees refer to deposition Exhibits 1 through 17. Deposition Exhibit Nos. 2 and 6 are not Bates numbered and can be found in your binder behind Tabs 10 and 21, respectively. The other deposition exhibits correspond to the following Bates Nos. and are found behind Tab 7 or 13 or have been withheld because of the protective order:

| Deposition Exhibit No. | Bates Nos. |
| --- | --- |
| 1 | AA 0018-20 |
| 2 | No Bates No. (Tab 10 in binder) |
| 3 | CRQ 0029-35 |
| 4 | AA 0047-48 (withheld) |
| 5 | AA 0012-14 |
| 6 | No Bates No. (Tab 21 in binder) |
| 7 | AA 0043-46 (withheld) |
| 8 | AA 0031 |
| 9 | AA 0015-17 |
| 10 | AA 0056-57 (withheld) |
| 11 | AA 0022 |
| 12 | AA 0023-27 |
| 13 | AA 0028 |
| 14 | AA 0021 |
| 15 | AA 0009-11 |
| 16 | AA 0035 |
| 17 | AA 0097-98 (withheld) |

The Cerqueira deposition used a binder of exhibits tabbed with Nos. 1 through 24. Cerqueira deposition exhibits 1, 2, and 3 are in your binder behind Tab 23. The other Cerqueira deposition exhibits correspond to Bates Nos. or Tabs in your binder as follows:

| Cerqueira Deposition Exhibit No. | Bates Nos. |
| --- | --- |
| 4 | AA 0037 |
| 5 | CRQ 0008 |
| 6 | AA 0004-8 |
| 7 | AA 0001-3 |
| 8 | AA 0009-11 |

2

| | |
|---|---|
| 9 | CRQ 0021-28 |
| 10 | CRQ 0029-35 |
| 11 | CRQ 0036-40 |
| 12 | Same as your Tab 1 |
| 13 | Same as your Tab 5 |
| 14 | Same as your Tab 10 |
| 15 | AA 0012-14 |
| 16 | AA 0015-17 |
| 17 | AA 0018-20 |
| 18 | AA 0035 |
| 19 | AA 0023-27 |
| 20 | AA 0021 |
| 21 | CRQ 0009-10 |
| 22-24 | withheld because relevant only to damages |

Please call me with any questions.

Sincerely,

Michael T. Kirkpatrick

Enclosures

cc:    David S. Godkin (w/o enc.)
       Erica Abate Recht (w/o enc.)

3



# Laird & Associates, Inc.

LairdAssoc.com

## Douglas R. Laird

Mr. Laird, President, Laird & Associates, Inc. is an expert in aviation security. He devotes the majority of his time consulting with the international aviation industry and governments, specializing in operational and technical issues involving security. He has published articles on aviation security in international venues, including Security Management Magazine and ASTM's Journal of Testing and Evaluation and provided editorial review to the National Research Council's National Materials Advisory Board. He was a contributing author of Protection, Security, and Safeguards by CRC Press and is a frequent presenter and/or panel member at international aviation security conferences.

Mr. Laird founded Laird & Associates, Inc., in 1995 and between 1997 and 2002 was the Vice President of BGI International Consulting Services, Inc., Washington, DC., a company providing counterterrorism and aviation security advice to a variety of public and private sector international clients. Prior to 1995 he had a successful career as the Security Director for Northwest Airlines, Inc., where he was responsible for the overall planning, direction, and management of security for an airline serving 240 cities in 22 countries on four continents. His duties included coordinating the implementation of U. S. Federal Aviation Administration regulations and host country rules at all locations served by the carrier. He supervised the audit of those procedures and was instrumental in developing contingency/disaster plans for Northwest Airlines, the world's fourth largest carrier with more than 46,000 employees, and coordinated consequence management activities at disaster sites. While at Northwest Airlines he conceptualized the original CAPPS program, which is now used by all U. S. Flag Carriers, and presented CAPPS to the Federal Aviation Administration for initial approval and funding.

Mr. Laird enjoyed a distinguished twenty-year career with the U. S. Secret Service. During his career he served in a supervisory capacity in the Protective Intelligence Division, supporting all Secret Service Protective Divisions, as well as visiting Heads-of-State. Mr. Laird's protective assignments included the Vice Presidential Detail (two administrations) and Dr. Kissinger during his shuttle-diplomacy days.

The American Society of Industrial Security (ASIS) recognized Mr. Laird as a **Certified Protection Professional** (CPP) in 1983. He is a member of a number of professional organizations devoted to security, including the International Association of Professional Security Consultants (IAPSC), the American Society for Industrial Security (ASIS) and the American Association of Airport Executives (AAAE). He chairs the Airlines/Airport Subcommittee of the ASIS Transportation Council and has chaired the Air Transport Association of America (ATA) security committee. He is an alumnus of the U. S. Department of State's Overseas Security Advisory Council (OSAC) Executive Board.

Mr. Laird has served as a technical advisor to the President of the National Safe Skies Alliance (NSSA) and has advised various working groups of the U. S. General Accounting Office and the Inspector General for the U. S. Department of Transportation. He has served as a subject matter expert on aviation security matters to corporations, including: Abacus Technology Corporation, Bechtel, Experian; Galaxy Scientific; Lockheed Martin; Science Applications International Corporation; Raytheon; and TASC.

Mr. Laird is called upon to comment on aviation security matters by The New Hour with Jim Lehrer, NBC's DateLine; CNN, Fox News, Good Morning America, The BBC, National Public Radio's All Things Considered and Talk of the Nation, The New York Times, The Wall Street Journal, The Washington Post and other leading newspapers and magazines.

The George Washington University, Washington, DC awarded Mr. Laird a Master's of Science degree in 1975 and in 1964 he was awarded a Bachelor's of Science degree from Minnesota State University, Mankato, Minnesota. Mr. Laird served in the U. S. Marine Corps and was released from active duty in 1968 as a Captain.

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele:·1.775.770.0136 · Mobile:·1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

**Attachment 2**