UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
JOHN D. CERQUEIRA,                          )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )
                                            )    CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                    )
                                            )
        Defendant.                          )
_____)

## AMERICAN AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, American Airlines, Inc. ("American") opposes plaintiff's motion for partial summary judgment on the issue of liability because two of the statutes under which plaintiff asserts causes of action do not apply to American, because the plaintiff has no evidence of intent to discriminate by American or its employees, because American has articulated a legitimate, non-discriminatory reason for the actions that it took in denying boarding and travel to the plaintiff on December 28, 2003, and because plaintiff's claims are pre-empted, in whole or in part, by federal laws governing commercial aviation.

As a preliminary matter, plaintiff's motion for summary judgment is untimely. In their scheduling plan, the parties agreed to a deadline for summary judgment motions of August 22, 2006. American believes that the Court's electronic orders relative to the scheduling conference conducted in this case adopted the deadlines established within that plan. Therefore, plaintiff's motion, filed a month after the August 22, 2006 date agreed upon by the parties, is untimely.

## FACTS

Plaintiff was a scheduled passenger on American Airlines Flight 2237 from Boston to Fort Lauderdale on December 28, 2003. *See* American Airlines, Inc.'s Statement of Material Facts in Support of Its Opposition to Plaintiff's Motion for Partial Summary Judgment, hereinafter "SOF," ¶1. After clearing security, he proceeded to the gate area where he approached Sally Walling, an American flight attendant with thirty-seven years of experience on the job. SOF, ¶2. Plaintiff asked Ms. Walling to change his seat assignment. SOF, ¶3. Ms. Walling informed him that she was not a gate agent, that she could not assist him with his request, and that he would need to wait in the seats near the ticket counter for someone who could help him. SOF, ¶4. According to Ms. Walling, plaintiff lingered near the ticket counter for a considerable period of time before taking a seat. SOF, ¶5. During that time, he stared at her and exhibited a demeanor that was "hostile and insistent." SOF, ¶6. This incident disturbed Ms. Walling sufficiently for her to express to the other flight attendants, prior to boarding the flight for their pre-flight activities, that there was a passenger who made her uncomfortable. SOF, ¶7.

While Ms. Walling was performing her pre-flight assignments in a darkened coach cabin, she noted that plaintiff boarded before any other coach passenger and before most of the first class cabin had boarded. SOF, ¶8. She further noted that, after placing his belongings at a seat in the exit row, plaintiff proceeded immediately to the aft lavatory in the aircraft where he remained for four to five minutes. SOF, ¶9. A little while later, several passengers indicated to Ms. Walling that they had been made uncomfortable by comments made by the gentlemen seated in the exit row. SOF, ¶10. Ms. Walling went to the exit row and found three gentlemen, including plaintiff, who appeared to be asleep amidst the commotion of boarding. SOF, ¶11.

Though Ms. Walling found plaintiff's behavior and that of the two other gentlemen seated in the exit row to be unusual in light of her thirty-seven years of experience as a flight attendant, she kept her concerns to herself at that time.  SOF, ¶12.

Other members of the flight crew had unusual interactions with some or all of the gentlemen, including plaintiff, seated in the exit row as well.  SOF, ¶13.  Prior to boarding, the two gentlemen seated in the exit row next to plaintiff, one of whom had a ponytail, approached Captain John Ehlers, a seasoned pilot with approximately twenty years of commercial aviation experience, and asked him if he was the captain for Flight 2237.  SOF, ¶14.  When they learned that he was, the man with a ponytail stated to Captain Ehlers, "That's good.  I'm going with you.  We're going to have a good trip today."  SOF, ¶15.  Prior to December 28, 2003, no passenger had made a similar comment to Captain Ehlers in twenty years of commercial aviation experience.  SOF, ¶16.  Captain Ehlers found the comment and the circumstances surrounding it to be unusual.  SOF, ¶17.

Additionally, flight attendant Lois Sargent considered the behavior of plaintiff and the other two gentlemen seated in the exit row to be unusual.  SOF, ¶18.  While Ms. Sargent conducted the exit row briefing, she observed that the gentlemen seated next to plaintiff (in seats 20D and E), making strange comments and laughing inappropriately.  SOF, ¶19.  She also observed plaintiff, seated in 20F, laughing at the comments made by the gentlemen seated next to him.  SOF, ¶20.  Ms. Sargent considered the behavior of the gentlemen seated in the exit row to be atypical of that of passengers seated in the exit row during a routine safety briefing.  SOF, ¶21.

Therefore, three separate members of the flight crew (Ms. Walling, Ms. Sargent and Captain Ehlers) each had interactions with passengers that they considered to be unusual before

conversing with one another.  SOF, ¶22.  After Ms. Sargent reported the reaction of the gentlemen seated in 20D, E and F to the safety briefing to the Captain, Ms. Walling, Captain Ehlers and Ms. Sargent began to share the unusual interactions described supra with one another. SOF, ¶23.  Captain Ehlers asked Ms. Walling to check on the location of the man with the ponytail; she found him to be seated next to plaintiff.  SOF, ¶24.

At that time, Captain Ehlers decided to consult with Systems Operations because of the multiple instances of unusual behavior demonstrated by several passengers seated in proximity to one another, observed independently by three separate crew members.  SOF, ¶25.  Captain Ehlers had no interaction with the plaintiff at any time, and had no knowledge of his appearance, or of his actual or perceived race, ethnicity or religion at the time he contacted Systems Operations.  SOF, ¶26.

In connection with Captain Ehlers and the Massachusetts State Police, Systems Operations then made the decision to remove the passengers seated in seats 20D, E and F for further questioning.  SOF, ¶27.  Neither the Corporate Complaint Resolution Officer ("CCRO") nor the Manager on Duty ("MOD"), the two ground control officers in charge of determining if passengers will be permitted to travel, knew what plaintiff looked like or had any understanding of his actual or perceived race, ethnicity or religion at the time the decision was made to remove plaintiff and the other passengers for further questioning.  SOF, ¶28.

The only evidence in the record regarding the appearance of any of the passengers seated in seats 20D, E and F is that they each had dark hair.  SOF, ¶29.  Additionally, one of the passengers had a ponytail.  SOF, ¶30.  Beyond that, other than plaintiff's subjective opinion that he looked like the other two passengers removed from the flight, the record lacks any information regarding the physical characteristics and attire of the gentlemen seated in 20D, E

and F. SOF, ¶31. The record further establishes that each member of the flight crew knew that American did not allow them to suggest or take action against a passenger on the basis of his actual or perceived appearance, race, ethnicity or religion. SOF, ¶32.

After plaintiff and the other two passengers were removed for questioning, another passenger informed the flight crew that one of the removed passengers had had a prohibited object removed from him during security screening. SOF, ¶33. Based on that information and the significant period of time spent by plaintiff in the lavatory upon boarding the aircraft, the Massachusetts State Police and TSA removed all remaining passengers and luggage for rescreening. SOF, ¶34. The Massachusetts State Police then informed Captain Ehlers that the three removed passengers would not be traveling with him that day. SOF, ¶35. Based on the information described supra, SOC made the determination that the three removed passengers would not be rebooked for travel on that day. SOF, ¶36.

## **ARGUMENT**

### I.    **PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C. § 2000d AND M.G.L. c. 272 §98 FAIL AS A MATTER OF LAW.**

Contrary to plaintiff's assertions, American does not receive federal financial assistance as that term is defined in 42 U.S.C. § 2000d-1. Though the issue does not yet appear to have been addressed in the First Circuit, well-reasoned case law from two other circuits clearly establishes that receipt of federal funds pursuant to the Stabilization Act is not "federal financial assistance" for purposes of the Rehabilitation Act. *Shotz v. American Airlines, Inc.*, 420 F.3d 1332 (11th Cir.2005); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir.1984). Therefore, plaintiff's claims under 42 U.S.C. 2000d fail.

Similarly, as a matter of law, plaintiff cannot recover under M.G.L. c. 272 § 98. Chapter 272 §98 is a criminal statute enforcing civil rights laws. In *Jones v. City of Boston*, the District Court

held that American cannot be held liable under a theory of respondeat superior for the actions of employees who violate criminal statutes that enforce civil rights laws like Chapter 272 § 98. *Jones v. City of Boston*, 738 F.Supp. 604, 605-06 (D.Mass. 1990), *see also Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-823 (1985) (remedy under G.L. c. 12, § 11I [is] coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not). Therefore, plaintiff's claims under Chapter 272, § 98 also fail.

## II.    PLAINTIFF FAILS TO SET FORTH ANY EVIDENCE OF INTENT TO DISCRIMINATE BY AMERICAN OR ITS EMPLOYEES, PRECLUDING HIM FROM PRESENTING A PRIMA FACIE CASE ON ANY OF HIS ALLEGED CAUSES OF ACTION.

In his motion, plaintiff glosses over the fact that he must set forth a prima facie case of discrimination, including demonstrating adequate evidence of intent to discriminate on the part of American or its employees, before American must articulate a legitimate, non-discriminatory reason for its actions. Plaintiff does so because he cannot articulate a prima facie case of discrimination because the record lacks any evidence from which a reasonable factfinder could conclude that American or its employees intended to discriminate against the plaintiff. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Goodman v. Bowdoin College*, 380 F.3d 33, 43 (1st Cir.2004) (analyzing claims under 42 U.S.C. 2000d); *Garrett v. Tandy Corp.* 295 F.3d 94, 98 (1st Cir.2002) (discussing proof required under 42 U.S.C. § 1981); *Gutierrez v. Massachusetts Bay Transportation Authority*, 437 Mass. 396, 411 (2002). Plaintiff's own naked assertions that he was assumed to be Middle Eastern because he looked like the people next to whom he was sitting cannot be credited. *Scott v. Macy's East, Inc.*, 2002 WL 3149745, at 5 (D.Mass. 2002) *citing Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989). American has briefed this issue at length in its memorandum submitted in support of its own motion for summary judgment, and, rather than repeat those arguments in toto herein, incorporates them by

reference.  American instead focuses its argument on rebutting the inaccurate facts recited and improper conclusions drawn by plaintiff in his motion.

Contrary to the broad and unsupported allegations made by plaintiff in his motion, the record before the Court lacks any evidence from which an intent to discriminate can be derived.  The decision makers (Captain Ehlers, the CCRO and the MOD) have all testified at deposition and/or by way of affidavit that they did not know what the plaintiff's actual or perceived race, ethnicity or religion were at the time decisions were taken.  Captain Ehlers testified, "at the time that [he] made the decision to request assistance from Systems Operations Control with regard to the passengers in seats 20D, E and F of Flight 2237, [he] did not have any knowledge of the plaintiff, John D. Cerqueira's appearance, or his actual or perceived race, ethnicity or religion." SOF, ¶37.  The statements made by the passenger with the ponytail, coupled with the other unusual interactions noted by the crew, justified Captain Ehlers' heightened concerns regarding the safety of the passengers and aircraft in question.  *See Al-Quhai'een v. America West Airlines, Inc.*, 267 F.Supp.2d 841, 847-48 (S.D.Ohio 2003) (where passengers disobeyed flight attendant's instructions, changed seats without permission, entered the first class area and asked questions regarding whether the flight would be the same one on which travel continued to Washington, decision to remove passengers found to be supported by the evidence, resulting in immunity under 49 U.S.C. §44902(b)).  Rhonda Cobbs, the CCRO, testified that she was in Dallas with no opportunity to observe the plaintiff at the time of the incident, as was Craig Marquis, the MOD. Ms. Cobbs and Mr. Marquis both testified that "because [they were] located in Texas on December 28, 2003, [they] had no opportunity to observe Mr. Cerqueira on that day."  SOF, ¶38.

Contrary to plaintiff's contention, the flight attendants have not testified that they believed plaintiff to be of any particular racial, ethnic or religious background.  Plaintiff distorts the

answers provided by the flight attendants to questions regarding the physical appearances of the gentlemen, including the plaintiff, seated in the exit row in material ways.

For example, when asked if the passengers were Middle Eastern, Ms. Walling stated that she had "no idea." SOF, ¶39. When asked if they were foreign, she testified that "No, I didn't know that." SOF, ¶40. When asked if they looked similar, she testified "They were dark. They could have been any nationality." SOF, ¶41. When asked if their skin was dark, she testified, "Well, their hair was dark. They had dark hair." SOF, ¶42.

Critically, Ms. Walling, who is being accused of racial discrimination because she purportedly assumed that plaintiff was traveling with the other gentlemen seated in the exit row, also testified that she "wasn't sure" that plaintiff was traveling with the other gentlemen seated in the exit row, and that she did not see him with the other gentlemen prior to boarding. SOF, ¶43. She further testified that she thought they might have been traveling together because they all appeared to be feigning sleep at the same time and they all seemed to be hostile on board the flight since they would not make eye contact (even while they were not sleeping) and exuded hostility through their body language. SOF, ¶44.

Flight Attendant Amy Milenkovic, who had the least interaction with the gentlemen in the exit row by virtue of the fact that she was working the first class cabin, similarly indicated that she made no assumptions about the race, religion or ethnicity of the gentlemen in the exit row. SOF, ¶45. Specifically, when asked if anyone stated anything about plaintiff and when told that plaintiff was in the window seat of Row 20, Ms. Milenkovic stated "I don't remember him, so that doesn't help me as far as remembering anything specific about him." SOF, ¶46. Ms. Milenkovic also testified that she doesn't know if she perceived the three gentlemen seated in the exit row as traveling together because the only one of the three gentlemen in the exit row whom

she remembered was the man with a ponytail, whom she stated she "may have" thought was Middle Eastern. SOF, ¶47. Ms. Milenkovic further stated that she recalled the gentleman with the ponytail traveling with one other person, not two. SOF, ¶48.

Ms. Sargent testified at deposition that the skin color of all of the persons seated in the exit row was "normal", and that, while they "seemed to be" foreign nationals, her assessment on that point is "shaded" by the fact that she later learned, after security had already been called, that some of them had foreign passports. SOF, ¶49.[1] Ms. Sargent in fact testified that plaintiff looked different from the other two gentlemen in the exit row, stating that "He was much taller and seemed to be, I would say, dressed in a more business-like manner than the other two" and when asked if plaintiff's skin color was similar to that of the other two gentlemen, she stated, "No, I didn't perceive that." SOF, ¶51.

Significantly, all three of the flight attendants, as well as Captain Ehlers, the CCRO and the MOD, all testified that American does not tolerate discrimination and that race, ethnicity and religion cannot form the basis of decisions made with regard to providing passenger services. SOF, ¶52.

Even if the testimony of the flight attendants established some basis for concluding that they had biases against plaintiff or the other two gentlemen in the exit row, plaintiff errs in asserting that such biases give rise to liability on the part of American. As discussed extensively in American's Memorandum in Support of its Motion for Summary Judgment at pages 9-12, case law clearly provides that a captain is entitled to rely on information provided to him by his crew even if that information is false or contains exaggerations. *Al-Qudhai'een*, 267 F.Supp.2d at

---

[1] This point is of particular significance because plaintiff relies extensively on the fact that the flight attendants' reports, prepared after the incident concluded, state that the removed passengers had accents, foreign passports, and Arabic names. With the possible exception of the fact that one of the removed passengers had an accent, each of these facts was **not** known to the flight crew until after Captain Ehlers had contacted SOC and the Massachusetts State Police became involved in investigating the passengers in question. SOF, ¶50.

847, *citing Christel v. AMR Corp*, 222 F.Supp.2d 335, 340 (E.D.N.Y. 2002). Moreover, case law further provides that boarding decisions cannot be examined in hindsight, but rather must be examined in light of exigencies of the circumstances surrounding the decision. *Cordero v. CIA Mexicana de Aviacion, S.A.*, 681 F.2d 669, 671-72 (9th Cir.1982), citing *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2nd Cir.1975).

### III.   AMERICAN'S LEGITIMATE AND NON-DISCRIMINATORY INTEREST IN PRESERVING THE SECURITY OF ITS PASSENGERS PREVENTS PLAINTIFF FROM SUCCEEDING ON ANY OF HIS CLAIMS.

American had the best of reasons for removing plaintiff from Flight 2237 and denying further service on that date: the safety and security of its passengers. In spite of plaintiff's protestations to the contrary, plaintiff's own actions were sufficient to raise security concerns about him. The evidence shows he approached a uniformed crew member and acted hostilely toward her, that he boarded at a time when he presumably should not have been on the plane, that he proceeded immediately to a lavatory upon boarding the flight when lavatory facilities were available to him in close proximity in the airport, that he remained in the lavatory for an unusual period of time, and that he reacted in a laughing manner to inappropriate comments and behavior by his seatmates during an important exit row safety briefing. SOF, ¶53. While plaintiff contends that all of his behaviors were normal, everyday passenger behavior, the experienced flight crew did not believe that the totality of his actions constituted normal, everyday passenger behavior. SOF, ¶54. In fact, each of the behaviors mentioned supra called attention to him; when coupled with unusual behavior of his seatmates, the totality of the circumstances merited further investigation.

Plaintiff further contends that there was no reason to deny him service on another flight on December 28, 2003, presumably because he had been "cleared for travel" by the Massachusetts State Police. As a preliminary matter, plaintiff misunderstands the interplay

between law enforcement and airlines with regard to passenger boarding decisions. Airlines retain the ultimate authority to make decisions regarding who will be permitted to travel on their aircraft, not the state police. At the time that plaintiff was released from questioning by the state police, American still had security concerns about plaintiff and the other two passengers traveling in the exit row. These concerns included, but were not limited to, concerns about their behavior prior to and after boarding and reports from a passenger that one of them had a box cutter removed at the security checkpoint. Though the MOD may not have a present recollection as to the specific factors that he took into consideration in denying service on December 28, 2003, the record evidence demonstrates that the denial was based on "Security Concerns." SOF, ¶55. Concerns over security are a sufficient basis to deny service, and constitute a legitimate, non-discriminatory reason sufficient to rebut a prima facie case of discrimination. 49 U.S.C. § 44902(b). *See also Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir.1998); *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2nd Cir.1975); *Adamsons v. American Airlines, Inc.*, 444 N.E.2d 21, 24 (N.Y. 1982).

### IV.  FEDERAL LAW REGARDING COMMERCIAL AVIATION PRECLUDES PLAINTIFF'S CLAIMS.

   A. 49 USC Sec. 44902(b) Bars Plaintiff's Claims Because American Has Demonstrated That It had Legitimated, Non-Discriminatory Safety-Based Concerns Upon Which It Refused Service To Plaintiff on December 28, 2003.

Airlines have broad discretion in deciding which passengers may be inimical to safety. *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir.1998); *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2nd Cir.1975); *Adamsons v. American Airlines, Inc.*, 444 N.E.2d 21, 24 (N.Y. 1982). Airlines may refuse service to passengers deemed "inimical to safety" unless the reasons for refusing service are arbitrary and capricious. 49 U.S.C. § 44902(b). Legitimate security concerns are both non-discriminatory and not arbitrary or capricious. In this opposition and in its

Memorandum in Support of Its Motion for Summary Judgment (relevant portions of which are incorporated here by reference so as to avoid duplication of arguments), American has laid before the Court the legitimate, security based rationale for refusing service to plaintiff on December 28, 2003. In consequence, plaintiff's claims are barred by 49 USC § 44902(b).

Plaintiff alleges that he has met his burden of proof. For the reasons set forth supra, he has not. Therefore, because he cannot establish an intent to discriminate, in light of the circumstances in question (including, but not limited to, the risk of terrorist activity on airplanes, the consequences flowing therefrom, and the short time frame in which decisions regarding denial of service must be made), the plaintiff's claims should be dismissed at summary judgment. *Dasrath v. Continental Airlines, Inc.*, 228 F.Supp.2d 531, 538 (D.N.J. 2002). Plaintiff makes much of the notion that Captain Ehlers should have done more, including performed his own investigation. However, airlines and their pilots have no duty to investigate a passenger's status before making decisions regarding whether they will or will not transport a passenger on a particular flight. *Id*. at n. 9. *See also Sedigh v. Delta Airlines, Inc.*, 850 F.Supp. 197, 201-02 (E.D.N.Y. 1994); *Zervigon v. Piedmont Aviation, Inc.*, 558 F.Supp. 1305, 1306 (S.D.N.Y. 1983); *Norman v. Trans World Airlines, Inc.*, 2000 WL 1480367, at 3-4 (S.D.N.Y. 2000); *Huggar v. Northwest Airlines, Inc.*, 1999 WL 59841, at 5-6 (N.D.Ill. 1999); *Rubin v. United Air Lines, Inc.*, 117 Cal.Rptr.2d 109, 119 (Cal.App. 2002); *O'Carroll v. American Airlines, Inc.*, 863 F.2d 11, 12 (5th Cir.1989).

The *Norman* and *Al-Qudhai'een* cases are instructive. In *Norman*, the judge found that the sincerity of the flight attendant's conclusions did not matter in deciding whether the decision to remove the plaintiff in that case was arbitrary and capricious. *Id*. The court deciding the case of *Al-Qudhai'een v. America West Airlines, Inc.* similarly held that airlines bear no burden to

conduct complete and formal investigations into safety concerns before acting upon them, or to hold flights while they review safety concerns. *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F.Supp.2d 841, 847 (S.D.Oh. 2003)[2]. *See also Christel v. AMR Corp.*, 222 F.Supp.2d 335, 340 (E.D.N.Y. 2002). Denial of services cases involve decisions made "on the spur of the moment, shortly before the plane takes off and therefore without the benefit of complete and accurate information." *Ruta v. Delta Airlines, Inc.*, 322 F.Supp.2d 391, 397 (S.D.N.Y. 2004). Therefore, a captain of an aircraft should be entitled to rely upon, without further inquiry, information provided to him by the flight attendants. *Id.*

      B.  <u>Consistent With Anti-Discrimination Laws, The Airline Deregulation Act Precludes The Plaintiff's Claims</u>.

As American argued in its Memorandum of Law in Support of its Motion for Summary Judgment, pertinent portions of which are incorporated herein by reference to avoid redundancy, the plaintiff has no evidence upon which a reasonable factfinder could conclude that American's actions on December 28, 2003 were motivated by anything other than safety. In light of the evidence, the Airline Deregulation Act ("ADA") precludes plaintiff's state law claims. 42 U.S.C. §41713(b). *See also Alshrafi v. American Airlines, Inc.*, 321 F.Supp.2d at 163; *Huggar v. Northwest Airlines, Inc.*, 1999 WL 59841, at 9 (N.D. Ill. 1999). The *Huggar* case, discussed extensively by this Court in its ruling in *Alshrafi*, demonstrates clearly that where an airline has legitimate security concerns deriving from a passenger's unusual behavior, and where there is no evidence of intent to discriminate, that passenger's claims of discrimination are related to services as that term is defined in 42 U.S.C. § 41713(b). *Alshrafi*, 321 F.Supp.2d at 163;

---

[2] The *Al-Qudhai'een* case bears some resemblances to this case. 267 F.Supp.2d at 842. In that matter, one of the plaintiffs requested a change in seat assignment to sit next to a companion with whom he was traveling. *Id.* In this case, Flight Attendant Walling was aware that the plaintiff sought to have his seat changed, though she did not know where to until seeing him seated next to the gentlemen in seats 20D and 20E. Deposition of Sally Walling, Exhibit D to American's Statement of Facts in Support of Its Motion for Summary Judgment, at 30. Logically, she could have concluded that he requested a seat change to sit next to them.

*Huggar*, 1999 WL 59841 at 6, 9-10.  Because the plaintiff's claims under M.G.L. c. 272 § 98

relate to services as that term is defined under 42 U.S.C. §41713(b), the ADA bars those claims.

**V.    CONCLUSION**

For the reasons set forth herein, the plaintiff's motion should be denied.

**REQUEST FOR ORAL ARGUMENT**

American requests oral argument.

Respectfully submitted,

Dated: October 18, 2006                **AMERICAN AIRLINES, INC.**
                                       By its Attorneys,


                                       ____*/s/ Amy Cashore Mariani*_____
                                       Michael A. Fitzhugh, (BBO 169700)
                                       Amy Cashore Mariani, (BBO #630160)
                                       **FITZHUGH, PARKER & ALVARO LLP**
                                       155 Federal Street, Suite 1700
                                       Boston, MA 02110-1727
                                       (617) 695-2330



**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 18th, 2006.

                                       ____*/s/ Amy Cashore Mariani*_____
                                       Amy Cashore Mariani