UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JOHN D. CERQUEIRA,                      )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )
                                        )    CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                )
                                        )
        Defendant.                      )
_____)

## AMERICAN AIRLINES, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant American Airlines, Inc. ("AA") submits this statement of material facts in support of its Opposition to Plaintiff's Motion for Partial Summary Judgment.

### Statement of Facts

1.  Plaintiff was a scheduled passenger on American Airlines Flight 2237 from Boston to Fort Lauderdale on December 28, 2003.  *See* Amended Complaint, hereinafter "Complaint," attached as Exhibit "A" to American Airlines, Inc.'s Statement of Undisputed Facts In Support of Its Motion for Summary Judgment ("American's MSJ"), at ¶13.

2.  After clearing security, he proceeded to the gate area where he approached Sally Walling, an American flight attendant with thirty-seven years of experience on the job.  *See* Deposition of John D. Cerqueira, hereinafter "Cerqueira Dep.," attached as Exhibit "B" to American's MSJ, at 27:19; Deposition of Sally Walling, attached as Exhibit "D" to American's MSJ, hereinafter "Walling Dep.," at 7-8.

3.      Plaintiff asked Ms. Walling to change his seat assignment.  Cerqueira Dep. at 30:23-
        31:9; Walling Dep. at 8:3-5.

4.      Ms. Walling informed him that she was not a gate agent, that she could not assist him
        with his request, and that he would need to wait in the seats near the ticket counter for
        someone who could help him.  Walling Deposition at 8:13, 18:4-14; Cerqueira Dep.
        33:3-5.

5.      According to Ms. Walling, plaintiff lingered near the ticket counter for a considerable
        period of time before taking a seat.  Walling Deposition at 17:17.  *See also* AMR
        Event Call Center Report, completed by Sally Walling, hereinafter "Walling Event
        Report," attached to American's MSJ as Exhibit "E," at page 2

6.      During that time, he stared at her and exhibited a demeanor that was "hostile and
        insistent."  Walling Dep. at 8:19, 17:17.

7.      This incident disturbed Ms. Walling sufficiently for her to express to the other flight
        attendants, prior to boarding the flight for their pre-flight activities, that there was a
        passenger who made her uncomfortable.  Walling Dep. 10:17-11:21; Walling Event
        Report at 2; Deposition of Lois Sargent, hereinafter "Sargent Dep.," attached at
        Exhibit "G" to American's MSJ, at 14:9-21.

8.      While Ms. Walling was performing her pre-flight assignments in a darkened coach
        cabin, she noted that plaintiff boarded before any other coach passenger and before
        most of the first class cabin had boarded.  Walling Dep. at 12:10-23; Walling Event
        Report at 2.

9.      She further noted that, after placing his belongings at a seat in the exit row, plaintiff
        proceeded immediately to the aft lavatory in the aircraft where he remained for four

to five minutes.  Walling Dep. at 12:10-23, 17:8, 19:18.  Cerqueira Dep. at 41:2, Walling Event Report at 2.

10.   A little while later, several passengers indicated to Ms. Walling that they had been made uncomfortable by comments made by the gentlemen seated in the exit row. Walling Dep. at 19:9 – 20:1, 20:21 – 21:14.

11.   Ms. Walling went to the exit row and found three gentlemen, including plaintiff, who appeared to be asleep amidst the commotion of boarding.  Walling Dep. at 21:12, 22:15-22.

12.   Though Ms. Walling found plaintiff's behavior and that of the two other gentlemen seated in the exit row to be unusual in light of her thirty-seven years of experience as a flight attendant, she kept her concerns to herself at that time.  Walling Dep. at 22:15-22, 26:14-18.

13.   Other members of the flight crew had unusual interactions with some or all of the gentlemen, including plaintiff, seated in the exit row as well.  Sargent Dep. at 7:16-22; Ehlers Dep. at 16:8-22.

14.   Prior to boarding, the two gentlemen seated in the exit row next to plaintiff, one of whom had a ponytail, approached Captain John Ehlers, a seasoned pilot with approximately twenty years of commercial aviation experience, and asked him if he was the captain for Flight 2237.  Ehlers Dep. at 16:9-12.

15.   When they learned that he was, the man with a ponytail stated to Captain Ehlers, "That's good.  I'm going with you.  We're going to have a good trip today."  Ehlers Dep. at 16:13-15; 19:5-7.

16.    Prior to December 28, 2003, no passenger had made a similar comment to Captain Ehlers in twenty years of commercial aviation experience. Ehlers Dep. at 16:22-17:2.

17.    Captain Ehlers found the comment and the circumstances surrounding it to be unusual. Ehlers Dep. at 16:20.

18.    Additionally, flight attendant Lois Sargent considered the behavior of plaintiff and the other two gentlemen seated in the exit row to be unusual. Sargent Dep. at 7:16-22.

19.    While Ms. Sargent conducted the exit row briefing, she observed that the gentlemen seated next to plaintiff (in seats 20D and E), making strange comments and laughing inappropriately. Sargent Dep. at 7:16-22.

20.    She also observed plaintiff, seated in 20F, laughing at the comments made by the gentlemen seated next to him. Sargent Dep. at 7:20-22, 11:17.

21.    Ms. Sargent considered the behavior of the gentlemen seated in the exit row to be atypical of that of passengers seated in the exit row during a routine safety briefing. Sargent Dep. at 7:16-22.

22.    Therefore, three separate members of the flight crew (Ms. Walling, Ms. Sargent and Captain Ehlers) each had interactions with passengers that they considered to be unusual before conversing with one another.    Walling Dep. at 8:13-20, 17:17, 22:15-22, 26:14-18; Sargent Dep. at 7:16-22, 10:20-11:7; Ehlers Dep. at 16:13-20; 19:5-7.

23.    After Ms. Sargent reported the reaction of the gentlemen seated in 20D, E and F to the safety briefing to the Captain, Ms. Walling, Captain Ehlers and Ms. Sargent began to share the unusual interactions described supra with one another. Sargent Dep. at 16:2-11, 16:18- 17:7, Walling Dep. at 23:18-23, 26:24-27:13; Ehlers Dep. at 22:21-23:8, 25:8-15.

24.     Captain Ehlers asked Ms. Walling to check on the location of the man with the ponytail; she found him to be seated next to plaintiff. Walling Dep. at 23:18-23.

25.     At that time, Captain Ehlers decided to consult with Systems Operations because of the multiple instances of unusual behavior demonstrated by several passengers seated in proximity to one another, observed independently by three separate crew members. Ehlers Dep. at 30:11-31:12; Sargent Dep. at 17:3-7.

26.     Captain Ehlers had no interaction with the plaintiff at any time, and had no knowledge of his appearance, or of his actual or perceived race, ethnicity or religion at the time he contacted Systems Operations. Elhers Dep. at 16:2, 19:18-20; *see also* Affidavit of John M. Ehlers In Support of American Airlines, Inc.'s Motion for Summary Judgment, hereinafter "Ehlers Affidavit," attached as Exhibit "H" to American's MSJ.

27.     In connection with Captain Ehlers and the Massachusetts State Police, Systems Operations then made the decision to remove the passengers seated in seats 20D, E and F for further questioning. Elhers Dep. at 14:14, 25:8-12, 29:18-21.

28.     Neither the Corporate Complaint Resolution Officer ("CCRO") nor the Manager on Duty ("MOD"), the two ground control officers in charge of determining if passengers will be permitted to travel, knew what plaintiff looked like or had any understanding of his actual or perceived race, ethnicity or religion at the time the decision was made to remove plaintiff and the other passengers for further questioning. *See* Affidavit of Craig Marquis ("Marquis Affidavit") and Affidavit of Rhonda Cobbs ("Cobbs Affidavit") In Support of American Airlines, Inc.'s Motion

for Summary Judgment attached as Exhibits "I" and "J," respectively to American's MSJ.

29.    The only evidence in the record regarding the appearance of any of the passengers seated in seats 20D, E and F is that they each had dark hair.  Walling Dep. at 31:19-24.

30.    Additionally, one of the passengers had a ponytail.  Elhers Dep. at 19:5-7.

31.    Beyond that, other than plaintiff's subjective opinion that he looked like the other two passengers removed from the flight, the record lacks any information regarding the physical characteristics and attire of the gentlemen seated in 20D, E and F.  *See generally* Elhers Dep., Walling Dep. *generally* and at 31:9-20, Sargent Dep. *generally* and at 12:12-13:11, *see also* Plaintiff John D. Cerqueira's Responses to Defendant American Airlines, Inc.'s Interrogatories to Plaintiff, attached as Exhibit "C" to American's MSJ, hereinafter "Cerqueira Ints.," at ¶2.

32.    The record further establishes that each member of the flight crew knew that American did not allow them to suggest or take action against a passenger on the basis of his actual or perceived appearance, race, ethnicity or religion.  Ehlers Dep. at 73:9-14, 75:19-76:2; Sargent Dep. at 42:6-12, 44:10-18; Walling Dep. at 55:3-9; *see also* Deposition of Amy Milenkovic, hereinafter "Milenkovic Dep.," attached hereto as Exhibit 1, at 30:11-19.

33.    After plaintiff and the other two passengers were removed for questioning, another passenger informed the flight crew that one of the removed passengers had had a prohibited object removed from him during security screening.  Ehlers Dep. at 42:19-22, 43:6-9, 43:13-15.

34.   Based on that information and the significant period of time spent by plaintiff in the lavatory upon boarding the aircraft, the Massachusetts State Police and TSA removed all remaining passengers and luggage for rescreening.  Ehlers Dep. at 44:19 – 45:5.

35.   The Massachusetts State Police then informed Captain Ehlers that the three removed passengers would not be traveling with him that day.  Ehlers Dep. at 48:19-49:2.

36.   Based on the information described supra, SOC made the determination that the three removed passengers would not be rebooked for travel on that day.  *See generally* Ehlers Dep.; *see also* Passenger Name Record, hereinafter "PNR," attached hereto as Exhibit 2.

37.   The decision makers (Captain Ehlers, the CCRO and the MOD) have all testified at deposition and/or by way of affidavit that they did not know what the plaintiff's actual or perceived race, ethnicity or religion were at the time decisions were taken. Captain Ehlers testified, "at the time that [he] made the decision to request assistance from Systems Operations Control with regard to the passengers in seats 20D, E and F of Flight 2237, [he] did not have any knowledge of the plaintiff, John D. Cerqueira's appearance, or his actual or perceived race, ethnicity or religion."  Ehlers Affidavit; Cobbs Affidavit; Marquis Affidavit.

38.   Rhonda Cobbs, the CCRO, testified that she was in Dallas with no opportunity to observe the plaintiff at the time of the incident, as was Craig Marquis, the MOD.  Ms. Cobbs and Mr. Marquis both testified that "because [they were] located in Texas on December 28, 2003, [they] had no opportunity to observe Mr. Cerqueira on that day." Cobbs Affidavit; Marquis Affidavit.

39.    When asked if the passengers were Middle Eastern, Ms. Walling stated that she had "no idea."  Walling Dep. at 31:5-8.

40.    When asked if they were foreign, she testified that "No, I didn't know that".  Walling Dep. at 31:9-13.

41.    When asked if they looked similar, she testified "They were dark.  They could have been any nationality."  Walling Dep. at 31:14-20.

42.    When asked if their skin was dark, she testified, "Well, their hair was dark.  They had dark hair."  Walling Dep. at 31:21-24.

43.    Ms. Walling, who is being accused of racial discrimination because she purportedly assumed that plaintiff was traveling with the other gentlemen seated in the exit row, also testified that she "wasn't sure" that plaintiff was traveling with the other gentlemen seated in the exit row, and that she did not see him with the other gentlemen prior to boarding.  Walling Dep. at 29:6-10, 30:21-31:1, 32:11-33:1.

44.    She further testified that she thought they might have been traveling together because they all appeared to be feigning sleep at the same time and they all seemed to be hostile on board the flight since they would not make eye contact (even while they were not sleeping) and exuded hostility through their body language.  Walling Dep. at 33:2-17.

45.    Flight Attendant Amy Milenkovic, who had the least interaction with the gentlemen in the exit row by virtue of the fact that she was working the first class cabin, similarly indicated that she made no assumptions about the race, religion or ethnicity of the gentlemen in the exit row.  Milenkovic Dep. at 16:20-17:2.

46.     Specifically, when asked if anyone stated anything about plaintiff and when told that
        plaintiff was in the window seat of Row 20, Ms. Milenkovic stated "I don't remember
        him, so that doesn't help me as far as remembering anything specific about him."
        Milenkovic Dep. at 13:23-14:7.

47.     Ms. Milenkovic also testified that she doesn't know if she perceived the three
        gentlemen seated in the exit row as traveling together because the only one of the
        three gentlemen in the exit row whom she remembered was the man with a ponytail,
        whom she stated she "may have" thought was Middle Eastern.  Milenkovic Dep. at
        17:11-18:9.

48.     Ms. Milenkovic further stated that she recalled the gentleman with the ponytail
        traveling with one other person, not two.  Milenkovic Dep. at 19:21-20:4.

49.     Ms. Sargent testified at deposition that the skin color of all of the persons seated in
        the exit row was "normal", and that, while they "seemed to be" foreign nationals, her
        assessment on that point is "shaded" by the fact that she later learned, after security
        had already been called, that some of them had foreign passports.  Sargent Dep. at
        11:22-13:22.

50.     Plaintiff relies extensively on the fact that the flight attendants' reports, prepared after
        the incident concluded, state that the removed passengers had accents, foreign
        passports, and Arabic names.  With the possible exception of the fact that one of the
        removed passengers had an accent, each of these facts was not known to the flight
        crew until after Captain Ehlers had contacted SOC and the Massachusetts State Police
        became involved in investigating the passengers in question. Amended Complaint,
        *generally* at ¶¶14, 42, and 43; Cerqueira Ints., *generally*, and at ¶¶2, 3, and 4;

Cerqueira Dep., *generally*, and at 120:11-19;  Sargent Dep. at 13:12-22; Walling Dep.

31:5-13; Ehlers Dep. 46:6-47:9; Milenkovic Dep. at 16:20-17:2.

51.    Ms. Sargent in fact testified that plaintiff looked different from the other two

gentlemen in the exit row, stating that "He was much taller and seemed to be, I would

say, dressed in a more business-like manner than the other two" and when asked if

plaintiff's skin color was similar to that of the other two gentlemen, she stated, "No, I

didn't perceive that."  Sargent Dep. at 24:21-25:9.

52.    Significantly, all three of the flight attendants, as well as Captain Ehlers, the CCRO

and the MOD, all testified that American does not tolerate discrimination and that

race, ethnicity and religion cannot form the basis of decisions made with regard to

providing passenger services.  Ehlers Dep. at 73:9-14, 75:19-76:2; Sargent Dep. at

42:6-12, 44:10-18; Walling Dep. at 55:3-9; Milenkovic Dep. at 30:11-19.

53.    The evidence shows he approached a uniformed crew member and acted hostilely

toward her, that he boarded at a time when he presumably should not have been on

the plane, that he proceeded immediately to a lavatory upon boarding the flight when

lavatory facilities were available to him in close proximity in the airport, that he

remained in the lavatory for an unusual period of time, and that he reacted in a

laughing manner to inappropriate comments and behavior by his seatmates during an

important exit row safety briefing.  Walling Dep. at 8:19, 7:17, 12:18-23, 17:8-21;

Milenkovic Dep. at 12:22-24; Sargent Dep. at 7:16-22, 11:17.

54.    While plaintiff contends that all of his behaviors were normal, everyday passenger

behavior, the experienced flight crew did not believe that the totality of his actions

constituted normal, everyday passenger behavior.  *See* Cerqueira Ints. at pg. 7; *see*

*generally*, Cerqueria Dep.; Sargent Dep. at 7:16-22, 10:20-11:7; Walling Dep. at 8:19-20, 12:11-23, 22:15-22, 26:14-18

55.    Though the MOD may not have a present recollection as to the specific factors that he took into consideration in denying service on December 28, 2003, the record evidence demonstrates that the denial was based on "Security Concerns."  *See* PNR at 2.

**AMERICAN AIRLINES, INC.**
By its Attorneys,

   */s/ Amy Cashore Mariani*
Michael A. Fitzhugh, (BBO 169700)
Amy Cashore Mariani, (BBO #630160)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October18th, 2006.

   */s/ Amy Cashore Mariani*
Amy Cashore Mariani

# In The Matter Of:

## *John D. Cerqueira   v.*
## *American Airlines, Inc.*

---

## *Amy Milenkovic*
## *Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File MILENKOV.V1, 34 Pages*
*Min-U-Script® File ID: 3932626046*

# Word Index included with this Min-U-Script®



Page 1

Volume I
Pages 1 to 34
Exhibits 8 and 9
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
JOHN D. CERQUEIRA,                :
        Plaintiff,               :
vs.                              : Civil Action
                                 : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,         :
        Defendant.               :

DEPOSITION OF AMY MILENKOVIC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 4:59 p.m.

PRESENT:
Birnbaum & Godkin, LLP
    (By Erica Abate Recht, Esq.)
280 Summer Street, Boston, MA  02210,
    for the Plaintiff.
Fitzhugh, Parker & Alvaro LLP
    (By Amy Cashore Mariani, Esq.)
155 Federal Street, Suite 1700, Boston, MA
    02110-1727, for the Defendant.

Page 2

INDEX
WITNESS        DIRECT   CROSS
AMY MILENKOVIC
BY MS. ABATE RECHT        3
            EXHIBITS
NO.    DESCRIPTION              PAGE
 8    Document entitled "Detail Note"    6
      Bates stamped AA 0031
 9    Document entitled "AMR Event Call   7
      Center Report" Bates stamped AA 0015
      to 0017

Page 3

[1]                PROCEEDINGS
[2]      MS. MARIANI: And the same stipulations, I
[3] imagine?
[4]      MS. ABATE RECHT: Yes.
[5]              AMY MILENKOVIC
[6] a witness called for examination by counsel for the
[7] Plaintiff, having been satisfactorily identified by
[8] the production of her driver's license and being
[9] first duly sworn by the Notary Public, was examined
[10] and testified as follows:
[11]            DIRECT EXAMINATION
[12]            BY MS. ABATE RECHT:
[13]     Q: Can you please state your full name for the
[14] record.
[15]     A: Amy Marie Milenkovic.
[16]     Q: Can you spell your last name, please.
[17]     A: It's M-I-L-E-N-K-O-V-I-C.
[18]     Q: What is your address?
[19]     A: 867 Cleveland Avenue, and it's Apartment
[20] 0-10, and it's in St. Paul, Minnesota 55116.
[21]     Q: Did you do anything to prepare for today's
[22] deposition?
[23]     A: No, other than just talking to Amy and Alec
[24] Bramlett, as far as, like, making me aware of the

Page 4

[1] deposition and possibly when it would take place and
[2] all of that.
[3]      MS. MARIANI: I'm going to ask you not to
[4] disclose the substance of communications with myself
[5] or Mr. Bramlett, who is a member of the AA legal
[6] department.
[7]      Q: Did you review any documents in preparation
[8] for the deposition?
[9]      A: No, just I received a report that I had
[10] written at the time, a copy of it, and I looked over
[11] that.
[12]     Q: Are you referring to your AMR Event Call
[13] Center Report?
[14]     A: Yes.
[15]     Q: Did you speak to anyone else about the
[16] deposition?
[17]     A: My husband is aware that I had to come
[18] here, and then people at American Airlines, as far
[19] as my supervisor and people in the office, to make
[20] arrangements for me to come here.
[21]     Q: Were there conversations solely about
[22] scheduling or did you talk about the substance?
[23]     A: No, solely about scheduling, and that I had
[24] a deposition.

Amy Milenkovic
Vol. 1, March 28, 2006

Case 1:05-cv-11652-WGY    Document 33-2    Filed 10/18/2006

John D. Cerqueira  v.
American Airlines, Inc.

Page 3 of 13

Page 5

[1] **Q:** Are you currently employed by American
[2] Airlines?
[3] **A:** Yes.
[4] **Q:** How long have you been employed by
[5] American?
[6] **A:** Since October of '92.
[7] **Q:** What is your position?
[8] **A:** I'm a flight attendant.
[9] **Q:** And have you held that position since
[10] October of '92?
[11] **A:** Yes.
[12] **Q:** Were you previously employed?
[13] **A:** I was a student, and I had odd jobs, as far
[14] as restaurants and clerk type of jobs before that.
[15] **Q:** So this was your first flight attendant
[16] job?
[17] **A:** First, yes.
[18] **Q:** What is your educational background?
[19] **A:** I have a Bachelor of Arts in journalism and
[20] history.
[21] **Q:** Were you a member of the flight crew for
[22] American Airlines Flight 2237 on December 28, 2003?
[23] **A:** Can you tell me the destination? I don't
[24] remember flight numbers.

Page 6

[1] **Q:** Okay. It was a flight from Boston to Fort
[2] Lauderdale.
[3] **A:** Yes.
[4] **MS. ABATE RECHT:** And I'll just mark as
[5] Exhibit 8 a document with Bates Nos. AA 0031.
[6] (Document marked as Milenkovic
[7] Exhibit 8 for identification)
[8] **Q:** And does this document refresh your
[9] recollection that you were a member of the flight
[10] crew of Flight 2237 on December 28, 2003?
[11] **A:** Yes.
[12] **Q:** Do you remember a passenger by the name of
[13] Mr. Cerqueira?
[14] **A:** No. As far as I only since being referred
[15] to the deposition, hearing the name now. I don't
[16] remember the name at the time of the flight.
[17] **Q:** Do you remember that on that flight, three
[18] passengers were removed from the plane?
[19] **A:** Yes.
[20] **Q:** And do you remember those three passengers?
[21] **A:** No. As far as how they look or as far as
[22] how — I remember certain behavioral actions from
[23] some of them. But as far as to see someone on the
[24] street and recognize them, no.

Page 7

[1] **Q:** Did you have any conversations with a
[2] flight attendant by the name of Sally Walling
[3] regarding Mr. Cerqueira or the other two gentlemen
[4] who you recall were the ones who were removed from
[5] the flight?
[6] **A:** Yes. She — yes. She called me on our
[7] intercom phone as far as making me aware that there
[8] were some issues going on in the main cabin.
[9] **MS. ABATE RECHT:** I'm going to mark as
[10] Exhibit 9 a document with Bates Nos. AA 0015 through
[11] 17.
[12] (Document marked as Milenkovic
[13] Exhibit 9 for identification)
[14] **Q:** Do you recognize this document?
[15] **A:** Yes. This is the report I wrote up
[16] afterwards.
[17] **Q:** And this is the report that you referred to
[18] earlier that you had reviewed?
[19] **A:** Yes.
[20] **Q:** Do you see you wrote, "The No. 4 mentioned
[21] to me as we're getting onboard the AC" — which I
[22] assume stands for "aircraft"?
[23] **A:** Aircraft, yes.
[24] **Q:** — "that a passenger at the gate kept

Page 8

[1] asking her if he could change his seat and kept
[2] staring at her when she told him she was the flight
[3] attendant." Do you see that there?
[4] **A:** Yes.
[5] **Q:** Does that refresh your recollection at all
[6] as to any discussions you had with Ms. Walling
[7] before you were in the main cabin?
[8] **A:** Just as I said in my report, she mentioned
[9] it to me getting on the airplane, but she did not
[10] refer to — she just said "passenger." She didn't
[11] refer to as far as the way anyone looked or — it
[12] was just the behavior of what I mentioned in the
[13] report.
[14] **Q:** Did she say anything else to you that's not
[15] written in the report?
[16] **A:** I don't remember.
[17] **Q:** Ms. Walling is the No. 4 who's referred to
[18] here; is that right?
[19] **A:** Yes, that's correct.
[20] **Q:** You also wrote, "She told me she had a very
[21] bad feeling from him." Do you recall what she told
[22] you about that?
[23] **A:** No, I don't.
[24] **Q:** Do you recall anything else about that

Page 9

[1] conversation with Ms. Walling?

[2] **A:** Not — I'm sorry, no.

[3] **Q:** You next write, "A passenger with a
[4] ponytail and heavy accent made a comment to the
[5] captain, asking him if he was their captain." Did
[6] you hear the passenger make that comment?

[7] **A:** How do I word this. I wasn't directly
[8] staring at him and heard him say it. I was doing
[9] other things in my galley, which is right where
[10] everyone boards. And so I did kind of hear him —
[11] someone make a comment to the captain, and I then
[12] turned to look.

[13] **Q:** And then you saw that it was the passenger
[14] with the ponytail?

[15] **A:** Yes, correct.

[16] **Q:** Do you recall whether Mr. Cerqueira had a
[17] ponytail?

[18] **A:** No.

[19] **Q:** Do you recall whether Mr. Cerqueira had an
[20] accent?

[21] **A:** No.

[22] **Q:** You also wrote after that, "I thought that
[23] seemed a little strange." Why did you think that
[24] seemed strange?

Page 10

[1] **A:** You mean, why he asked if the captain
[2] standing in the front of the airplane was our
[3] captain? Because it's obvious he is our captain,
[4] because he's standing right there in the door to the
[5] cockpit. And this is after September 11th, so no
[6] one else — any other crew members — I'll rephrase
[7] that. No other pilots from other airlines or anyone
[8] else would be standing there. So I thought that was
[9] a strange comment.

[10] **Q:** Why did you comment that this man had a
[11] heavy accent?

[12] **A:** I don't know. It was just something to
[13] differentiate who that person was in the ponytail.

[14] **Q:** What happened next?

[15] **A:** I would have to refer to the report.

[16] **Q:** You can refer to the report if that will
[17] refresh your recollection.

[18] **A:** Obviously, the captain told me that he had
[19] been approached by the same person in the terminal.
[20] So that made us a little bit suspicious, why the
[21] same person would have approached that same — our
[22] captain, both at the terminal and then make that
[23] comment that he made on the airplane. And I believe
[24] that's, you know, what the captain had said also.

Page 11

[1] **Q:** What did the captain tell you about his
[2] encounter with the passenger at the terminal?

[3] **A:** Just as far as I remember, was that he
[4] just — the passenger had come up to ask him about
[5] the flight or about if he was — if he was flying
[6] the airplane to Fort Lauderdale. And then the
[7] reason I remember it being strange is because the
[8] captain said it was the same person that just asked
[9] him when he got on the plane for the second time if
[10] it was the same captain.

[11] **Q:** Did the captain say anything else to you
[12] about that incident?

[13] **A:** Not that I remember.

[14] **Q:** You then wrote, "After all the passengers
[15] were boarded and the door closed, the No. 4 called
[16] the captain and said the passenger at 20F that had
[17] disturbed her in the terminal had been the first one
[18] on and had immediately gone to the right-hand lav in
[19] the rear." Do you see that?

[20] **A:** Yes.

[21] **Q:** Is the "4" again referring to Ms. Walling?

[22] **A:** Yes.

[23] **Q:** Did you hear Ms. Walling's conversation
[24] with the captain?

Page 12

[1] **A:** No. If I did, I don't remember it.

[2] **Q:** Was she in the back of the plane at this
[3] time?

[4] **A:** She was — I do remember she was in the
[5] back. And then also as things developed, she would
[6] come up and speak to the captain, who was in the
[7] cockpit at the time. So it was both in the back
[8] over the phone and coming up in person.

[9] **Q:** If she was in the back on the phone, would
[10] you have heard what she was saying?

[11] **A:** No, I would not.

[12] **Q:** Other than what you've written here, did
[13] you overhear Ms. Walling tell anything else to the
[14] captain?

[15] **A:** Not that I remember.

[16] **Q:** In your experience, is it unusual for
[17] passengers to use the lavatory in the bathroom upon
[18] boarding the plane?

[19] **A:** Not unusual; but in Boston there are
[20] bathrooms outside by the gates, so — we have some
[21] gates in our system where there are no bathrooms, so
[22] it is very common that a lot of people go to the
[23] bathroom right away, before, you know, they sit
[24] down. But, no, it's not unusual.

Amy Milenkovic
Vol. 1, March 28, 2006

Case 1:05-cv-11652-WGY    Document 33-2    Filed 10/18/2006

John D. Cerqueira  v.
American Airlines, Inc.

Page 5 of 13

Page 13

[1] **Q:** So certainly passengers aren't denied
[2] service because they used the bathroom on boarding?
[3] **A:** No.
[4] **MS. MARIANI:** Objection. You may answer.
[5] **Q:** You then wrote, "Passengers started to tell
[6] us the passenger in 20D had started yelling everyone
[7] around him 'Happy New Year.'" Is that right?
[8] **A:** Yes.
[9] **Q:** Did you talk to those passengers
[10] personally?
[11] **A:** I don't remember if I spoke to them or if
[12] Lois or Sally spoke to them.
[13] **Q:** Do you remember where these passengers were
[14] seated?
[15] **A:** If I wrote, "Passengers started to tell us
[16] about the passenger in 20D, those passengers must
[17] have been in the main cabin."
[18] **Q:** Do you remember specifically or are you
[19] guessing?
[20] **A:** I don't remember. I'm reading what I
[21] wrote, but I don't remember where these passengers
[22] sat.
[23] **Q:** Did anyone say anything about Mr. Cerqueira
[24] in particular?

Page 14

[1] **A:** I don't remember. I don't know.
[2] **Q:** Would it refresh your recollection as to
[3] who Mr. Cerqueira was if I told you that he was
[4] seated in the window seat of the exit row in Row 20?
[5] **A:** I don't remember him, so that doesn't help
[6] me as far as remembering anything specific about
[7] him.
[8] **Q:** Did these passengers mention this to you or
[9] the other flight — strike that.
[10] Did these passengers mention this to you
[11] before the three gentlemen in Row 20 were removed
[12] from the plane?
[13] **A:** I don't remember.
[14] **Q:** You then say, "The State Police were called
[15] and Passenger Service." When did that happen?
[16] **A:** I don't know the time frame or the
[17] timeline, but it was obviously after there was
[18] calling back and forth to the captain about the
[19] three passengers. So I don't know exactly when this
[20] all took place. It was after the airplane was
[21] boarded. I do know that. I mean, everyone was on
[22] the airplane.
[23] **Q:** Did you have any conversations with Captain
[24] Ehlers about his decision to remove these three

Page 15

[1] passengers from the plane?
[2] **A:** Yes, because all three flight attendants —
[3] we were all working the flight, so he had to discuss
[4] this with all three of us. I don't remember my
[5] conversation with him, so I cannot say exactly what
[6] we discussed.
[7] **Q:** Do you remember generally what was
[8] discussed?
[9] **A:** It would have been what Sally and Lois saw
[10] in the main cabin. It would have been, you know —
[11] **Q:** Do you remember what Lois saw?
[12] **A:** No, I don't.
[13] **Q:** Did she ever tell you anything that she
[14] saw?
[15] **A:** No. I mean, not that I remember.
[16] **Q:** I'm sorry, you can finish your answer.
[17] **A:** So we just would have discussed how we felt
[18] about — that we would have had to discuss the
[19] reason we wanted the State Police and Passenger
[20] Service to come out. And so then the captain made
[21] that decision.
[22] **Q:** And what were your reasons for wanting the
[23] State Police and Passenger Service to come out?
[24] **A:** Well, I do know that there had been time

Page 16

[1] that had gone by. What I remember, it had been
[2] probably an hour that had gone by, and so —
[3] **Q:** An hour from what?
[4] **A:** From the time the flight attendants had
[5] gotten on the airplane. And I don't believe it was
[6] an hour after boarding, but it would have been after
[7] departure time. And my feelings were if the crew
[8] members don't feel comfortable, if we all don't feel
[9] comfortable with something, it's a security issue,
[10] and we have to address that.
[11] **Q:** What did you feel uncomfortable with?
[12] **A:** I felt uncomfortable that the passengers
[13] were making strange comments to both the captain and
[14] to just people they didn't know as they were getting
[15] on the airplane.
[16] **Q:** Do you recall whether Mr. Cerqueira, who
[17] was the passenger who was seated in the window seat,
[18] was making any of those comments?
[19] **A:** No, I don't remember.
[20] **Q:** What other behavior did you feel was
[21] suspicious?
[22] **MS. MARIANI:** Objection. You may answer.
[23] **A:** I did not see a lot of things. I was in
[24] the front part of the aircraft, so I did not see,

Case 1:04-cv-11652-WGY    Document 33-2    Filed 10/18/2006    Page 2 of 12

Page 17

[1] actually, any of the — a lot of the things that
[2] were going on. But I — as the time continued on, I
[3] did not feel comfortable that the rest of the crew
[4] did not — had seen these things, and it was a
[5] unanimous decision that we would have to, you know,
[6] talk to the captain and have the State Police. And
[7] these are things that we're trained for, as far as
[8] you have to listen to your fellow crew members, even
[9] if you haven't seen anything. So I was basically
[10] doing my job.
[11]    Q: Did you perceive the three passengers
[12] seated in Row 20 in the emergency exit row, Mr.
[13] Cerqueira's row, to be traveling together?
[14]    A: I don't know. I do know I had walked back
[15] there, and so I would have glanced at the row, but I
[16] didn't perceive that they — I don't know.
[17]    Q: So is it fair to say that you didn't really
[18] take any particular notice of them?
[19]    MS. MARIANI: Objection. You may answer.
[20]    A: Well, I did notice, because the gentleman
[21] with the ponytail was sitting in that row. And he's
[22] the one that I — to be honest, he's the one that I
[23] remember the most, just because he made comments to
[24] the captain, and I had more interaction with him.

Page 18

[1] And so he was sitting in that row. So of course, I
[2] would have looked at the whole row, not just him.
[3]    Q: Did you recall whether you thought the
[4] three passengers were Middle Eastern?
[5]    MS. MARIANI: Objection. You may answer.
[6]    A: I don't remember, because I don't remember
[7] other than the gentleman with the ponytail.
[8]    Q: Did you think he was Middle Eastern?
[9]    A: I may have, yes.
[10]    Q: Did you witness Mr. Cerqueira talking or
[11] interacting with the gentleman with the ponytail in
[12] any way?
[13]    A: No.
[14]    Q: Do you recall whether you remember —
[15] strike that. It's a long day.
[16]    Did you think that the three passengers
[17] looked similar to each other?
[18]    MS. MARIANI: Objection. You may answer.
[19]    A: I don't remember, but I remember that they
[20] all had dark hair; you know, just very vague things.
[21]    Q: Do you recall whether they had a similar
[22] skin color?
[23]    MS. MARIANI: Objection. You may answer.
[24]    A: No. Like I said, I mainly remember the

Page 19

[1] gentleman with the ponytail.
[2]    Q: And did it make you feel uncomfortable that
[3] he had an accent?
[4]    MS. MARIANI: Objection. You may answer.
[5]    A: No. Those things don't make me feel
[6] uncomfortable. My husband has an accent. But it's
[7] just something that you pay close attention to, you
[8] know, specifically since September 11th.
[9]    Q: Did you check to see whether those
[10] passengers had purchased their tickets together?
[11]    A: I don't remember if I — no, I don't know
[12] how to do the purchasing — to look at what they
[13] purchased. But I don't remember if I looked at
[14] their boarding passes or not.
[15]    Q: Do you know whether these three passengers
[16] requested seats together?
[17]    A: No, I don't.
[18]    Q: Did you witness any of these three
[19] passengers in the gate area before boarding?
[20]    A: No.
[21]    Q: Do you recall whether they boarded the
[22] flight at the same time?
[23]    A: No, I don't. I just remember the gentleman
[24] with the ponytail was with another gentleman. But I

Page 20

[1] don't remember how he looks.
[2]    Q: So you recall that he was with one
[3] gentleman, not two gentlemen?
[4]    A: Correct.
[5]    Q: Did you personally observe any other
[6] unusual or suspicious behavior that we haven't
[7] talked about yet?
[8]    MS. MARIANI: Objection. You may answer.
[9]    A: No, I don't remember.
[10]    Q: Did you personally observe any unusual or
[11] suspicious behavior on the part of anyone other than
[12] the man with the ponytail?
[13]    MS. MARIANI: Objection. You may answer.
[14]    A: No.
[15]    Q: You mentioned earlier that when you
[16] witnessed the behavior that you thought was
[17] suspicious and made you uncomfortable, it was based
[18] on training you had had. Can you elaborate on that,
[19] what kind of training you've had to identify
[20] suspicious behavior?
[21]    MS. MARIANI: I'm going to object. And I'm
[22] going to instruct the witness to answer only in
[23] general terms and not to provide any specifics that
[24] may implicate Sensitive Security Information. She

**Amy Milenkovic**
**Vol. 1, March 28, 2006**

Case 1:05-cv-11652-WGY    Document 33-2    Filed 10/18/2006

**John D. Cerqueira v.**
**American Airlines, Inc.**

Page 7 of 13

Page 21

[1] may answer with respect to generalities.

[2]    **A:** We are trained that we must constantly keep
[3] an eye open to anything that seems unusual behavior.
[4] And one example would be going to the lavatory, but
[5] going constantly, like getting up and going every
[6] few minutes. Obviously you ask if they're ill or
[7] something like that. But we just — there are
[8] certain things that we are trained to look for. And
[9] generally it's odd behavior. I don't know what
[10] other things to say.

[11]    Since September 11th, it's the one thing
[12] that they stress to us, especially every year. We
[13] have recurrent training. We get memos constantly
[14] about, you know, keeping our eyes and ears open to a
[15] lot of things.

[16]    **Q:** Are there any other particular examples in
[17] addition to, you know, someone using the lavatory
[18] every few minutes that you can think of that would
[19] be considered unusual or suspicious behavior?

[20]    **MS. MARIANI:** I'm going to instruct the
[21] witness not to answer on the basis that that
[22] component of the training constitutes Sensitive
[23] Security Information and is part of materials that
[24] the TSA may consider to be Sensitive Security

Page 22

[1] Information.

[2]    **Q:** Did you notice whether Mr. Cerqueira used
[3] the bathroom multiple times that morning?

[4]    **A:** I did not notice anything.

[5]    **Q:** Do you recall that Mr. Cerqueira and the
[6] other two passengers seated in his row were removed
[7] from the plane by law enforcement officials?

[8]    **A:** Yes, I did see that.

[9]    **Q:** Do you recall who removed them from the
[10] plane?

[11]    **A:** I believe it was — no, I don't know who
[12] actually removed them, because the State Police were
[13] onboard and also people from Passenger Service were
[14] onboard. So I don't know specifically who removed
[15] them.

[16]    **Q:** Okay. Do you recall any of the individuals
[17] who were onboard who were involved in that process?

[18]    **A:** Do you mean the Passenger Service people or
[19] the actual passengers?

[20]    **Q:** The Passenger Service people.

[21]    **A:** No, I don't remember who that was or their
[22] names or anything.

[23]    **Q:** And do you recall any of the names of the
[24] State Police officers who were onboard?

Page 23

[1]    **A:** No, I don't.

[2]    **Q:** These three passengers were removed from
[3] the plane before the decision was made to deplane
[4] and rescreen the remainder of the passengers; is
[5] that correct?

[6]    **A:** I believe that is correct.

[7]    **Q:** Do you know why these passengers were
[8] removed from the plane?

[9]    **A:** I know they wanted to check their
[10] itineraries and also check their identification
[11] again. But as far as I remember, that's all that I
[12] was aware of.

[13]    **Q:** Did you continue on to Fort Lauderdale with
[14] this flight?

[15]    **A:** No, I did not.

[16]    **Q:** Why not?

[17]    **A:** The three of us flight attendants, along
[18] with the captain, we made a unanimous decision that
[19] we did not feel comfortable mentally continuing on
[20] that flight to work. We were all — we had been up
[21] very early. We felt stressed by this point. And
[22] the captain, with his — he agreed, and it was a
[23] unanimous decision that we all three stayed behind.

[24]    **Q:** So was your decision just based on the fact

Page 24

[1] that you were tired, you felt stressed from the
[2] incident or were you fearful that there could still
[3] be a problem with the plane?

[4]    **MS. MARIANI:** Objection. You may answer.

[5]    **A:** For me, both. I felt — at this point I
[6] felt uncomfortable. Obviously I was stressed and
[7] tired, but I didn't feel comfortable continuing on.
[8] And I also respect my other fellow crew members, and
[9] they were adamant they were not going. And we try
[10] to always stay together as a crew.

[11]    **Q:** Why didn't you feel comfortable continuing
[12] on?

[13]    **A:** We had not received any information about
[14] the passengers they had removed. We didn't know
[15] what was going on. You know, I didn't know if they
[16] even had checked luggage. At that point I did not
[17] feel comfortable.

[18]    **Q:** Other than the statement that we've been
[19] looking at that you wrote, did you write anything
[20] else regarding this incident?

[21]    **A:** No.

[22]    **Q:** Did you speak with anyone else regarding
[23] this incident?

[24]    **A:** No.

Page 25

[1] **Q:** Did you speak with any supervisor that you
[2] had regarding this incident?
[3] **A:** No, I did not.
[4] **Q:** So is it fair to say that no one from
[5] American contacted you to discuss this incident
[6] further?
[7] **A:** No.
[8] **Q:** Did you communicate with law enforcement
[9] concerning the incident?
[10] **A:** Do I understand, afterwards or at the time
[11] of the incident?
[12] **Q:** At the time of the incident.
[13] **A:** The only — I don't think I even spoke to
[14] the police officers that came onboard.
[15] **Q:** Did you communicate with law enforcement
[16] after the incident?
[17] **A:** No.
[18] **Q:** I'm going to ask you about some other
[19] American Airlines employees, and I'm basically just
[20] going to ask you — the question is, What is the
[21] involvement with these individuals with this
[22] incident.
[23]     The first is Captain Ehlers.
[24] **A:** He was our captain on the flight.

Page 26

[1] **Q:** And did he make the decision to remove the
[2] passengers from the flight?
[3] **A:** Yes.
[4] **Q:** How about Nicole Traer?
[5] **A:** I don't recall who that is.
[6] **Q:** Lois Sargent?
[7] **A:** That was the other flight attendant that I
[8] was working with.
[9] **Q:** And did she say anything to you about any
[10] behavior that she had witnessed from any of these
[11] three passengers?
[12] **A:** I don't remember.
[13] **Q:** Sally Walling?
[14] **A:** She was the other crew member.
[15] **Q:** And other than the conversations we've
[16] already talked about with respect to the behavior
[17] she witnessed, did she say anything else to you
[18] about this incident?
[19] **A:** I don't recall.
[20] **Q:** D.M. Ball?
[21] **A:** I believe he was the first officer.
[22] **Q:** And did he do anything with respect to the
[23] incident?
[24] **A:** No, not that I remember.

Page 27

[1] **Q:** Ynes Flores?
[2] **A:** I don't recall who that is.
[3] **Q:** Doug Wood?
[4] **A:** I know the name. I know he's a chief pilot
[5] in Boston. But as far as the incident, I don't know
[6] what his involvement has been.
[7] **Q:** What are the responsibilities of a chief
[8] pilot?
[9] **A:** I don't know the exact definition or exact
[10] duties, because it's separate. I'm a flight
[11] attendant. He's a pilot. But he represents kind of
[12] the core of all the pilots for American at Boston,
[13] specifically in Boston.
[14] **Q:** Rhonda Cobbs?
[15] **A:** I don't know the name.
[16] **Q:** Craig Marquis?
[17] **A:** I don't recall the name.
[18] **Q:** Does American have a policy regarding the
[19] removal of passengers from flights?
[20] **MS. MARIANI:** Objection. You may answer.
[21] **A:** I don't know if they have a specific
[22] policy; but I mean, it happens on flights. But I
[23] don't know word-to-word what the policy is, if there
[24] is one.

Page 28

[1] **Q:** And other than the testimony that you've
[2] already given regarding your training, do you have
[3] anything to add to your previous testimony regarding
[4] how you identify suspicious behavior?
[5] **MS. MARIANI:** And I'm going to repeat my
[6] objection from earlier. The witness may include any
[7] additional general information, but should not
[8] provide any specifics that would implicate any
[9] Sensitive Security Information Act.
[10] **A:** No, other than going into specifics.
[11] **Q:** Does American have protocols for what you
[12] should do if you think a passenger is suspicious?
[13] **MS. MARIANI:** Objection. You may answer.
[14] **A:** Not that I'm aware of specifics. It's very
[15] case-by-case. Each incident is always different.
[16] Actually, I can say specifically there are certain
[17] rules as far as intoxicated passengers. So, you
[18] know, there are definite rules with removal towards
[19] those type of things or hitting me or another flight
[20] attendant, crew member or passenger, that type of
[21] thing.
[22] **Q:** Are there protocols with respect to when
[23] you think someone is engaging in suspicious
[24] behavior, like we've been talking about today?

**Amy Milenkovic**
**Vol. 1, March 28, 2006**

Case 1:05-cv-11652-WGY    Document 33-2    Filed 10/18/2006

**John D. Cerqueira v.**
**American Airlines, Inc.**

Page 9 of 13

Page 29

[1]    MS. MARIANI: Objection. You may answer.
[2]    A: Like I said, it's each — each incident is
[3] very different, so there aren't any exact specifics
[4] on that.
[5]    Q: Has American ever instructed you on whether
[6] it is okay to consider a passenger's ethnicity in
[7] determining whether they may pose some sort of
[8] threat?
[9]    MS. MARIANI: Objection. You may answer.
[10]    A: No.
[11]    Q: Have you ever been involved in any other
[12] incident in which a passenger was removed from a
[13] flight, denied boarding or refused service?
[14]    A: For an unruly passenger, I've had — as far
[15] as he was drunk, I've had an incident here and there
[16] for that type of incidents.
[17]    Q: Do you recall what those incidents were?
[18]    A: No. Just in general, probably drunk.
[19]    Q: Have you been involved in any other
[20] incident other than when a passenger is drunk?
[21]    A: No.
[22]    Q: Have you ever been the subject of a
[23] discrimination complaint by an American Airlines
[24] customer?

Page 30

[1]    A: No.
[2]    Q: And by that, I'm not limiting that to
[3] formal litigation, but any kind of complaint
[4] whatsoever.
[5]    A: No, not that I'm aware of.
[6]    Q: Is it possible that you were the subject of
[7] a discrimination complaint that American would not
[8] have brought to your attention?
[9]    A: No. They would have brought it to my
[10] attention.
[11]    Q: Has American provided you with any training
[12] instruction or written materials concerning whether
[13] a passenger's race, color, national origin,
[14] ethnicity or ancestry may be considered in
[15] determining whether a passenger should be removed
[16] from a flight, denied boarding or refused service?
[17]    MS. MARIANI: Objection. You may answer.
[18]    A: No. They do the opposite. We're not
[19] supposed to look at those things at all.
[20]    Q: And is that written in any training
[21] materials or instructions that you've received from
[22] American?
[23]    A: No, not that I remember.
[24]    Q: Has American ever taken any disciplinary

Page 31

[1] action against you for considering a passenger's
[2] race, color, national origin, ethnicity or ancestry
[3] in determining whether they should be removed from a
[4] flight, denied boarding or refused service?
[5]    MS. MARIANI: Objection. You may answer.
[6]    A: No.
[7]    Q: Do you know any other American employee who
[8] has been disciplined for that behavior?
[9]    MS. MARIANI: Objection. You may answer.
[10]    A: No, I don't.
[11]    Q: You testified earlier that you attend a
[12] training session once a year?
[13]    A: Correct.
[14]    Q: What is — strike that.
[15] Do you receive training regarding
[16] identifying suspicious behavior at that training
[17] session?
[18]    A: Yes.
[19]    Q: Are any written materials given to you at
[20] that training session?
[21]    A: No, because it's all verbal and slides.
[22] And if it is, we don't take anything with us,
[23] because it is a security-sensitive subject.
[24]    Q: Do you have a flight training manual?

Page 32

[1]    A: Yes.
[2]    Q: Does that contain instruction on
[3] identifying suspicious behavior?
[4]    A: No.
[5]    Q: Does that manual provide instruction on
[6] when a passenger may be removed from the airplane?
[7]    A: I believe it does. It has about the
[8] intoxicated passenger, also about abuse, as far as
[9] hitting us and that type of thing. But unless I
[10] look at my manual, I don't know — I can't recall.
[11]    MS. ABATE RECHT: I have no further
[12] questions.
[13]    MS. MARIANI: I have no questions.
[14]    (Whereupon, the deposition was
[15] concluded at 5:37 p.m.)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 33

[1]              CERTIFICATE
[2]   I, AMY MILENKOVIC, do hereby certify that I have
[3]   read the foregoing transcript of my testimony, and
[4]   further certify that said transcript (with/without)
[5]   suggested corrections is a true and accurate record
[6]   of said testimony.
[7]     Dated at ___, this _____ day of _____,
[8]   2006.
[9]
[10]
[11]
[12]
[13]
[14]
[15]     On this ____ day of _____, 2006, before
[16]   me, the undersigned Notary Public, personally
[17]   appeared _____ and proved to
[18]   me through satisfactory evidence of identification,
[19]   which was _____, to be the person
[20]   whose name is signed above.
[21]
[22]
[23]   Notary Public
[24]   My commission expires: _____

Page 34

[1]   COMMONWEALTH OF MASSACHUSETTS)
[2]   SUFFOLK, SS.                                )
[3]     I, Jane M. Williamson, Registered Merit Reporter
[4]   and Notary Public in and for the Commonwealth of
[5]   Massachusetts, do hereby certify that there came
[6]   before me on the 28th day of March, 2006, at 4:59
[7]   p.m., the person hereinbefore named, who was by me
[8]   duly sworn to testify to the truth and nothing but
[9]   the truth of her knowledge touching and concerning
[10]   the matters in controversy in this cause; that she
[11]   was thereupon examined upon her oath, and her
[12]   examination reduced to typewriting under my
[13]   direction; and that the deposition is a true record
[14]   of the testimony given by the witness.
[15]     I further certify that I am neither attorney or
[16]   counsel for, nor related to or employed by, any
[17]   attorney or counsel employed by the parties hereto
[18]   or financially interested in the action.
[19]     In witness whereof, I have hereunto set my hand
[20]   and affixed my notarial seal this  day of April
[21]   2006.
[22]
[23]              Notary Public
[24]        My commission expires: 1/19/07

## 0

**0-10** 3:20
**0015** 7:10
**0031** 6:5

## 1

**11th** 10:5; 19:8; 21:11
**17** 7:11

## 2

**20** 14:4, 11; 17:12
**2003** 5:22; 6:10
**20D** 13:6, 16
**20F** 11:16
**2237** 5:22; 6:10
**28** 5:22; 6:10

## 4

**4** 7:20; 8:17; 11:15, 21

## 5

**55116** 3:20
**5:37** 32:15

## 8

**8** 6:5, 7
**867** 3:19

## 9

**9** 7:10, 13
**92** 5:6, 10

## A

**AA** 4:5; 6:5; 7:10
**ABATE** 3:4, 12; 6:4; 7:9; 32:11
**abuse** 32:8
**AC** 7:21
**accent** 9:4, 20; 10:11; 19:3, 6
**Act** 28:9
**action** 31:1
**actions** 6:22
**actual** 22:19
**actually** 17:1; 22:12; 28:16
**adamant** 24:9
**add** 28:3
**addition** 21:17
**additional** 28:7

**address** 3:18; 16:10
**afterwards** 7:16; 25:10
**again** 11:21; 23:11
**against** 31:1
**agreed** 23:22
**aircraft** 7:22, 23; 16:24
**Airlines** 4:18; 5:2, 22; 10:7; 25:19; 29:23
**airplane** 8:9; 10:2, 23; 11:6; 14:20, 22; 16:5, 15; 32:6
**Alec** 3:23
**along** 23:17
**always** 24:10; 28:15
**American** 4:18; 5:1, 5, 22; 25:5, 19; 27:12, 18; 28:11; 29:5, 23; 30:7, 11, 22, 24; 31:7
**AMR** 4:12
**AMY** 3:5, 15, 23
**ancestry** 30:14; 31:2
**Apartment** 3:19
**approached** 10:19, 21
**area** 19:19
**around** 13:7
**arrangements** 4:20
**Arts** 5:19
**assume** 7:22
**attend** 31:11
**attendant** 5:8, 15; 7:2; 8:3; 26:7; 27:11; 28:20
**attendants** 15:2; 16:4; 23:17
**attention** 19:7; 30:8, 10
**Avenue** 3:19
**aware** 3:24; 4:17; 7:7; 23:12; 28:14; 30:5
**away** 12:23

## B

**Bachelor** 5:19
**back** 12:2, 5, 7, 9; 14:18; 17:14
**background** 5:18
**bad** 8:21
**Ball** 26:20
**based** 20:17; 23:24
**basically** 17:9; 25:19
**basis** 21:21
**Bates** 6:5; 7:10
**bathroom** 12:17, 23; 13:2; 22:3
**bathrooms** 12:20, 21
**behavior** 8:12; 16:20; 20:6, 11, 16, 20; 21:3, 9, 19; 26:10, 16; 28:4, 24; 31:8, 16; 32:3
**behavioral** 6:22
**behind** 23:23
**bit** 10:20
**boarded** 11:15; 14:21;

**19**:21
**boarding** 12:18; 13:2; 16:6; 19:14, 19; 29:13; 30:16; 31:4
**boards** 9:10
**Boston** 6:1; 12:19; 27:5, 12, 13
**both** 10:22; 12:7; 16:13; 24:5
**Bramlett** 3:24; 4:5
**brought** 30:8, 9

## C

**cabin** 7:8; 8:7; 13:17; 15:10
**Call** 4:12
**called** 3:6; 7:6; 11:15; 14:14
**calling** 14:18
**came** 25:14
**Can** 3:13, 16; 5:23; 10:16; 15:16; 20:18; 21:18; 28:16
**captain** 9:5, 5, 11; 10:1, 3, 3, 18, 22, 24; 11:4, 10, 11, 16, 24; 12:6, 14; 14:18, 23; 15:20; 16:13; 17:6, 24; 23:18, 22; 25:23, 24
**case-by-case** 28:15
**Center** 4:13
**Cerqueira** 6:13; 7:3; 9:16, 19; 13:23; 14:3; 16:16; 18:10; 22:2, 5
**Cerqueira's** 17:13
**certain** 6:22; 21:8; 28:16
**certainly** 13:1
**change** 8:1
**check** 19:9; 23:9, 10
**checked** 24:16
**chief** 27:4, 7
**clerk** 5:14
**Cleveland** 3:19
**close** 19:7
**closed** 11:15
**Cobbs** 27:14
**cockpit** 10:5; 12:7
**color** 18:22; 30:13; 31:2
**comfortable** 16:8, 9; 17:3; 23:19; 24:7, 11, 17
**coming** 12:8
**comment** 9:4, 6, 11; 10:9, 10, 23
**comments** 16:13, 18; 17:23
**common** 12:22
**communicate** 25:8, 15
**communications** 4:4
**complaint** 29:23; 30:3, 7
**component** 21:22
**concerning** 25:9; 30:12
**concluded** 32:15
**consider** 21:24; 29:6
**considered** 21:19; 30:14

**considering** 31:1
**constantly** 21:2, 5, 13
**constitutes** 21:22
**contacted** 25:5
**contain** 32:2
**continue** 23:13
**continued** 17:2
**continuing** 23:19; 24:7, 11
**conversation** 9:1; 11:23; 15:5
**conversations** 4:21; 7:1; 14:23; 26:15
**copy** 4:10
**core** 27:12
**counsel** 3:6
**course** 18:1
**Craig** 27:16
**crew** 5:21; 6:10; 10:6; 16:7; 17:3, 8; 24:8, 10; 26:14; 28:20
**currently** 5:1
**customer** 29:24

## D

**D.M** 26:20
**dark** 18:20
**day** 18:15
**December** 5:22; 6:10
**decision** 14:24; 15:21; 17:5; 23:3, 18, 23, 24; 26:1
**definite** 28:18
**definition** 27:9
**denied** 3:11; 29:13; 30:16; 31:4
**department** 4:6
**departure** 16:7
**deplane** 23:3
**deposition** 3:22; 4:1, 8, 16, 24; 6:15; 32:14
**destination** 5:23
**determining** 29:7; 30:15; 31:3
**developed** 12:5
**different** 28:15; 29:3
**differentiate** 10:13
**DIRECT** 3:11
**directly** 9:7
**disciplinary** 30:24
**disciplined** 31:8
**disclose** 4:4
**discrimination** 29:23; 30:7
**discuss** 15:3, 18; 25:5
**discussed** 15:6, 8, 17
**discussions** 8:6
**disturbed** 11:17
**document** 6:5, 6, 8; 7:10, 12, 14
**documents** 4:7
**door** 10:4; 11:15

**Doug** 27:3
**down** 12:24
**driver's** 3:8
**drunk** 29:15, 18, 20
**duly** 3:9
**duties** 27:10

## E

**earlier** 7:18;  20:15; 28:6; 31:11
**early** 23:21
**ears** 21:14
**Eastern** 18:4, 8
**educational** 5:18
**Ehlers** 14:24 ; 25:23
**elaborate** 20:18
**else** 4:15; 8:1, 4, 24; 10:6, 8; 11:11; 12:1 3; 24:20, 22; 26:17
**emergency** 17:12
**employed** 5: 1, 4, 12
**employee** 31:7
**employees** 25:19
**encounter** 1 1:2
**enforcement** 22:7; 25:8, 15
**engaging** 28:23
**especially** 21:12
**ethnicity** 29:6; 30:14; 31:2
**even** 17:8; 24:16; 25:13
**Event** 4:12
**everyone** 9:1 0; 13:6; 14:21
**exact** 27:9, 9; 29:3
**exactly** 14:19; 15:5
**examination** :3:6, 11
**examined** 3:9
**example** 21:4
**examples** 21:16
**Exhibit** 6:5, 7; 7:10, 13
**exit** 14:4; 17:1 2
**experience** 12:16
**eye** 21:3
**eyes** 21:14

## F

**fact** 23:24
**fair** 17:17; 25:4
**far** 3:24; 4:18; 5:13; 6:14, 21, 21, 23; 7:7; 8:11; 11:3; 14:6; 17:7; 23:11; 27:5; 28:17; 29:14; 32:8
**fearful** 24:2
**feel** 16:8, 8, 11, 20; 17:3; 19:2, 5; 23:19; 24:7, 11, 17
**feeling** 8:21
**feelings** 16:7
**fellow** 17:8; 24:8

**Amy Milenkovic**
**Vol. 1, March 28, 2006**

Case 1:05-cv-11652-WGY    Document 33-2    Filed 10/18/2006

**John D. Cerqueira** v.
**American Airlines, Inc.**

Page 12 of 13

**felt** 15:17; 16:12; 23:21;
24:1, 5, 6
**few** 21:6, 18
**finish** 15:16
**first** 3:9; 5:15, 17; 11:17;
25:23; 26:21
**flight** 5:8, 15, 21, 22, 24;
6:1, 9, 10, 16, 17; 7:2, 5;
8:2; 11:5; 14:9; 15:2, 3;
16:4; 19:22; 23:14, 17, 20;
25:24; 26:2, 7; 27:10;
28:19; 29:13; 30:16; 31:4,
24
**flights** 27:19, 22
**Flores** 27:1
**flying** 11:5
**follows** 3:10
**formal** 30:3
**Fort** 6:1; 11:6; 23:13
**forth** 14:18
**frame** 14:16
**front** 10:2; 16:24
**full** 3:13
**further** 25:6; 32:11

**G**

**galley** 9:9
**gate** 7:24; 19:19
**gates** 12:20, 21
**general** 20:23; 28:7;
29:18
**generalities** 21:1
**generally** 5:7; 21:9
**gentleman** 17:20; 18:7,
11; 19:1, 23, 24; 20:3
**gentlemen** 7:3; 14:11;
20:3
**given** 28:2; 31:19
**glanced** 17:15
**guessing** 13:19

**H**

**hair** 18:20
**happen** 14:15
**happened** 10:14
**happens** 27:22
**Happy** 13:7
**hear** 9:6, 10; 11:23
**heard** 9:8; 12:10
**hearing** 6:15
**heavy** 9:4; 10:11
**held** 5:9
**help** 14:5
**history** 5:20
**hitting** 28:19; 32:9
**honest** 17:22
**hour** 16:2, 3, 6
**husband** 4:17; 19:6

**I**

**identification** 6:7; 7:13;
23:10
**identified** 3:7
**identify** 20:19; 28:4
**identifying** 31:16; 32:3
**ill** 21:6
**imagine** 3:3
**immediately** 11:18
**implicate** 20:24; 28:8
**incident** 11:12; 24:2, 20,
23; 25:2, 5, 9, 11, 12, 16,
22; 26:18, 23; 27:5; 28:15;
29:2, 12, 15, 20
**incidents** 29:16, 17
**include** 28:6
**individuals** 22:16; 25:21
**Information** 20:24;
21:23; 22:1; 24:13; 28:7, 9
**instruct** 20:22; 21:20
**instructed** 29:5
**instruction** 30:12; 32:2, 5
**instructions** 30:21
**interacting** 18:11
**interaction** 17:24
**intercom** 7:7
**into** 28:10
**intoxicated** 28:17; 32:8
**involved** 22:17; 29:11, 19
**involvement** 25:21; 27:6
**issue** 16:9
**issues** 7:8
**itineraries** 23:10

**J**

**job** 5:16; 17:10
**jobs** 5:13, 14
**journalism** 5:19

**K**

**keep** 21:2
**keeping** 21:14
**kept** 7:24; 8:1
**kind** 9:10; 20:19; 27:11;
30:3

**L**

**last** 3:16
**Lauderdale** 6:2; 11:6;
23:13
**lav** 11:18
**lavatory** 12:17; 21:4, 17
**law** 22:7; 25:8, 15
**legal** 4:5
**license** 3:8
**limiting** 30:2

**listen** 17:8
**litigation** 30:3
**little** 9:23; 10:20
**Lois** 13:12; 15:9, 11; 26:6
**long** 5:4; 18:15
**look** 6:21; 9:12; 19:12;
21:8; 30:19; 32:10
**looked** 4:10; 8:11; 18:2,
17; 19:13
**looking** 24:19
**looks** 20:1
**lot** 12:22; 16:23; 17:1;
21:15
**luggage** 24:16

**M**

M-I-L-E-N-K-O-V-I-C
3:17
**main** 7:8; 8:7; 13:17;
15:10
**mainly** 18:24
**making** 3:24; 7:7; 16:13,
18
**man** 10:10; 20:12
**manual** 31:24; 32:5, 10
**MARIANI** 3:2; 4:3; 13:4;
16:22; 17:19; 18:5, 18, 23;
19:4; 20:8, 13, 21; 21:20;
24:4; 27:20; 28:5, 13; 29:1,
9; 30:17; 31:5, 9; 32:13
**Marie** 3:15
**mark** 6:4; 7:9
**marked** 6:6; 7:12
**Marquis** 27:16
**materials** 21:23; 30:12,
21; 31:19
**may** 13:4; 16:22; 17:19;
18:5, 9, 18, 23; 19:4; 20:8,
13, 24; 21:1, 24; 24:4;
27:20; 28:6, 13; 29:1, 7, 9;
30:14, 17; 31:5, 9; 32:6
**mean** 10:1; 14:21; 15:15;
22:18; 27:22
**member** 4:5; 5:21; 6:9;
26:14; 28:20
**members** 10:6; 16:8;
17:8; 24:8
**memos** 21:13
**mentally** 23:19
**mention** 14:8, 10
**mentioned** 7:20; 8:8, 12;
20:15
**Middle** 18:4, 8
**MILENKOVIC** 3:5, 15;
6:6; 7:12
**Minnesota** 3:20
**minutes** 21:6, 18
**more** 17:24
**morning** 22:3
**most** 17:23
**multiple** 22:3
**must** 13:16; 21:2

**myself** 4:4

**N**

**name** 3:13, 16; 6:12, 15,
16; 7:2; 27:4, 15, 17
**names** 22:22, 23
**national** 30:13; 31:2
**New** 13:7
**next** 9:3; 10:14
**Nicole** 26:4
**Nos** 6:5; 7:10
**Notary** 3:9
**notice** 17:18, 20; 22:2, 4
**numbers** 5:24

**O**

**object** 20:21
**Objection** 13:4; 16:22;
17:19; 18:5, 18, 23; 19:4;
20:8, 13, 24; 27:20; 28:6,
13; 29:1, 9; 30:17; 31:5, 9
**observe** 20:5, 10
**obvious** 10:3
**Obviously** 10:18; 14:17;
21:6; 24:6
**October** 5:6, 10
**odd** 5:13; 21:9
**office** 4:19
**officer** 26:21
**officers** 22:24; 25:14
**officials** 22:7
**onboard** 7:21; 22:13, 14,
17, 24; 25:14
**once** 31:12
**one** 10:6; 11:17; 17:22,
22; 20:2; 21:4, 11; 25:4;
27:24
**ones** 7:4
**only** 6:14; 20:22; 25:13
**open** 21:3, 14
**opposite** 30:18
**origin** 30:13; 31:2
**out** 15:20, 23
**outside** 12:20
**over** 4:10; 12:8
**overhear** 12:13

**P**

**p.m** 32:15
**part** 16:24; 20:11; 21:23
**particular** 13:24; 17:18;
21:16
**passenger** 6:12; 7:24;
8:10; 9:3, 6, 13; 11:2, 4,
16; 13:6, 16; 14:15; 15:19,
23; 16:17; 22:13, 18, 20;
28:12, 20; 29:12, 14, 20;
30:15; 32:6, 8
**passenger's** 29:6; 30:13;

31:1
**passengers** 6:18, 2❶;
11:14; 12:17; 13:1, 5,   9,
13, 15, 16, 21; 14:8, 1 ❶,
19; 15:1; 16:12; 17:1 ❶;
18:4, 16; 19:10, 15, 1❾;
22:6, 19; 23:2, 4, 7; 2❹:14;
26:2, 11; 27:19; 28:1❼
**passes** 19:14
**Paul** 3:20
**pay** 19:7
**people** 4:18, 19; 12:2❷;
16:14; 22:13, 18, 20
**perceive** 17:11, 16
**person** 10:13, 19, 21  ;
11:8; 12:8
**personally** 13:10; 20:5,
10
**phone** 7:7; 12:8, 9
**pilot** 27:4, 8, 11
**pilots** 10:7; 27:12
**place** 4:1; 14:20
**Plaintiff** 3:7
**plane** 6:18; 11:9; 12:2,
18; 14:12; 15:1; 22:7,  10;
23:3, 8; 24:3
**please** 3:13, 16
**point** 23:21; 24:5, 16
**Police** 14:14; 15:19, 2❸;
17:6; 22:12, 24; 25:14
**policy** 27:18, 22, 23
**ponytail** 9:4, 14, 17;
10:13; 17:21; 18:7, 11 ;
19:1, 24; 20:12
**pose** 29:7
**position** 5:7, 9
**possible** 30:6
**possibly** 4:1
**preparation** 14:5
**prepare** 3:21
**previous** 28:3
**previously** 5:12
**probably** 16:2; 29:18
**problem** 24:3
**PROCEEDINGS** 3:1
**process** 22:17
**production** 3:8
**protocols** 28:11, 22
**provide** 20:23; 28:8; 32:5
**provided** 30:11
**Public** 3:9
**purchased** 19:10, 13
**purchasing** 19:12

**R**

**race** 30:13; 31:2
**reading** 13:20
**really** 17:17
**rear** 11:19
**reason** 11:7; 15:19
**reasons** 15:22

recall 7:4; 8:21, 24; 9:16, 19; 16:16; 18:3, 14, 21; 19:21; 20:2; 22:5, 9, 16, 23; 26:5, 19; 27:2, 17; 29:17; 32:10
receive 31:15
received 4:9; 24:13; 30:21
RECHT 3:4, 12; 6:4; 7:9; 32:11
recognize 6:24; 7:14
recollection 6:9; 8:5; 10:17; 14:2
record 3:14
recurrent 21:13
refer 8:10, 11; 10:15, 16
referred 6:14; 7:17; 8:17
referring 4:12; 11:21
refresh 6:8; 8:5; 10:17; 14:2
refused 29:13; 30:16; 31:4
regarding 7:3; 24:20, 22; 25:2; 27:18; 28:2, 3; 31:15
remainder 23:4
remember 5:24; 6:12, 16, 17, 20, 22; 8:16; 11:3, 7, 13; 12:1, 4, 15; 13:11, 13, 18, 20, 21; 14:1, 5, 13; 15:4, 7, 11, 15; 16:1, 19; 17:23; 18:6, 6, 14, 19, 19, 24; 19:11, 13, 23; 20:1, 9; 22:21; 23:11; 26:12, 24; 30:23
remembering 14:6
removal 27:19; 28:18
remove 14:24; 26:1
removed 6:18; 7:4; 14:11; 22:6, 9, 12, 14; 23:2, 8; 24:14; 29:12; 30:15; 31:3; 32:6
repeat 28:5
rephrase 10:6
report 4:9, 13; 7:15, 17; 8:8, 13, 15; 10:15, 16
represents 27:11
requested 19:16
rescreen 23:4
respect 21:1; 24:8; 26:16, 22; 28:22
responsibilities 27:7
rest 17:3
restaurants 5:14
review 4:7
reviewed 7:18
Rhonda 27:14
right 8:18; 9:9; 10:4; 12:23; 13:7
right-hand 11:18
row 14:4, 4, 11; 17:12, 12, 13, 15, 21; 18:1, 2; 22:6
rules 28:17, 18

**S**

Sally 7:2; 13:12; 15:9; 26:13
same 3:2; 10:19, 21, 21; 11:8, 10; 19:22
Sargent 26:6
sat 13:22
satisfactorily 3:7
saw 9:13; 15:9, 11, 14
saying 12:10
scheduling 4:22, 23
seat 8:1; 14:4; 16:17
seated 13:14; 14:4; 16:17; 17:12; 22:6
seats 19:16
second 11:9
security 16:9; 20:24; 21:23, 24; 28:9
security-sensitive 31:23
seemed 9:23, 24
seems 21:3
Sensitive 20:24; 21:22, 24; 28:9
separate 27:10
September 10:5; 19:8; 21:11
service 13:2; 14:15; 15:20, 23; 22:13, 18, 20; 29:13; 30:16; 31:4
session 31:12, 17, 20
similar 18:17, 21
sit 12:23
sitting 17:21; 18:1
skin 18:22
slides 31:21
solely 4:21, 23
someone 6:23; 9:11; 21:17; 28:23
sorry 9:2; 15:16
sort 29:7
speak 4:15; 12:6; 24:22; 25:1
specific 14:6; 27:21
specifically 13:18; 19:8; 22:14; 27:13; 28:16
specifics 20:23; 28:8, 10, 14; 29:3
spell 3:16
spoke 13:11, 12; 25:13
St 3:20
standing 10:2, 4, 8
stands 7:22
staring 8:2; 9:8
started 13:5, 6, 15
state 3:13; 14:14; 15:19, 23; 17:6; 22:12, 24
statement 24:18
stay 24:10
stayed 23:23
still 24:2

stipulations 3:2
strange 9:23, 24; 10:9; 11:7; 16:13
street 6:24
stress 21:12
stressed 23:21; 24:1, 6
strike 14:9; 18:15; 31:14
student 5:13
subject 29:22; 30:6; 31:23
substance 4:4, 22
supervisor 4:19; 25:1
supposed 30:19
suspicious 10:20; 16:21; 20:6, 11, 17, 20; 21:19; 28:4, 12, 23; 31:16; 32:3
sworn 3:1
system 12:21

**T**

talk 4:22; 13:9; 17:6
talked 20:7; 26:16
talking 3:23; 18:10; 28:24
terminal 10:19, 22; 11:2, 17
terms 20:23
testified 3:10; 31:11
testimony 28:1, 3
thought 9:22; 10:8; 18:3; 20:16
threat 29:8
three 6:17, 20; 14:11, 19, 24; 15:2, 4; 17:11; 18:4, 16; 19:15, 18; 23:2, 17, 23; 26:11
tickets 19:10
timeline 14:17
times 22:3
tired 24:1, 7
today 28:24
today's 3:21
together 17:13; 19:10, 16; 24:10
told 8:2, 20, 21; 10:18; 14:3
took 14:20
towards 28:18
Traer 26:4
trained 17:7; 21:2, 8
training 20:18, 19; 21:13, 22; 28:2; 30:11, 20; 31:12, 15, 16, 20, 24
traveling 17:13
try 24:9
TSA 21:24
turned 9:12
two 7:3; 20:3; 22:6
type 5:14; 28:19, 20; 29:16; 32:9

**U**

unanimous 17:5; 23:18, 23
uncomfortable 16:11, 12; 19:2, 6; 20:17; 24:6
unless 32:9
unruly 29:14
unusual 12:16, 19, 24; 20:6, 10; 21:3, 19
up 11:1; 11:4; 12:6, 8; 21:5; 23:20
upon 12:17
use 12:17
used 13:2; 22:2
using 21:17

**V**

vague 18:20
verbal 31:21

**W**

walked 17:14
Walling 7:2; 8:6, 17; 9:1; 11:21; 12:13; 26:13
Walling's 11:23
way 8:11; 18:12
whatsoever 30:4
Whereupon 32:14
who's 8:17
whole 18:2
window 14:4; 16:17
witness 3:6; 18:10; 19:18; 20:22; 21:21; 28:6
witnessed 20:16; 26:10, 17
Wood 27:3
word 9:7
word-to-word 27:23
work 23:20
working 15:3; 26:8
write 9:3; 24:19
written 4:10; 8:15; 12:12; 30:12, 20; 31:19
wrote 7:15, 20; 8:20; 9:22; 11:14; 13:5, 15, 21; 24:19

**Y**

Year 13:7; 21:12; 31:12
yelling 13:6
Ynes 27:1

05/07/2004

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003          Rhonda Cobbs          Updated: 12/28/2003          Rhonda Cobbs
08:29                                            08:29
```
1.1CERQUEIRA/JOHN
3    ARNK
4 AA9124Y 01MAR M AVSFSG MM1   700A 1100A
TKT/TIME LIMIT
1.T-12JUN-XTM7EAD
2.TE 0012147100338 CERQU/J XTM7W1K 1026/09MAY 1B*254202
3.TE 0012147973213 CERQU/J XTM7EAD 1125/12JUN 1B*254206
4.TK 0010494109138 CERQU/J BOS584H 0918/28DEC
VCR COUPON DATA EXISTS  *VI TO DISPLAY
PHONES
1.WWW1510-579-3488-B
2.WWWSAPTECH?ALYCOS.COM-E
3.QHF510-579-3488-C/B
ADDRESS
N/JOHN CERQUEIRA
A/3675 N COUNTRY CLUB DR 120
C/AVENTURA, FL
Z/33180-1731
PRICE QUOTE RECORD EXISTS - *PQS
FREQUENT TRAVELER
1.AA KDV1522         HK AA   1.1 CERQUEIRA/JOHN
2.AA KDV1522         HK AX   1.1 CERQUEIRA/JOHN
REMARKS
1.-TBMXX-ADD
2.H-TBMEDIT/49AATDS EDITOR SESSION 3
3.H-TBMEDIT/45AATDS EDITOR SESSION 4
4.H-TBMEDIT/45AATDS EDITOR SESSION 4
5.H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
6.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
7.H-TBMEDIT/45AATDS EDITOR SESSION 1
8.H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
9.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
10.H-TBMEDIT/45AATDS EDITOR SESSION 1
11.H-TBMEDIT/36AATDS EDITOR SESSION 5
12.H-/T?TTE11/13.00/100.00/N1.1
13.H-/T?TTE12/VCR0012147100338/C1-2
14.H-/T?DOC?VCR
15.H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
16.H-/T?QHF ECK
17.H-/T?TBM*DS6011001850655533?03/05
18.H-/T?JOHN CERQUEIRA
19.H-BOOKING MADE VIA AMERICAN AIRLINES WEBSITE
20.H-PTICERQUEIRA/JOHN-ADT
21.XXTACXTM09MAY/
22.H-TKTED PQ DELETED AND PLACED INTO HISTORY
23..
24.H-M4/PAD - NORMALIZED
25.XXAUTH/012352 *Z
26.XXTTEXTM12JUN/
27.H?EXCHANGE PROCESSED BY ETDS AUTOMATED EDITOR
28.H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
29.H-TBMEDIT/1426/24NOV/SCN SENT
30.?NAME?JOHN CERQUEIRA
31.?PNR?FJZSQY
32.?TYPE?SCN
33.?DLV?EMAIL?SAPTECH?ALYCOS.COM
34.H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
35.H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
36.BAG-TAG FLL890684 SCANNED 28DEC2003 0521L/BOS/SG1
37.H-FLORIDA DL C626 464 67 415 0
```

AA 0023

05/07/2004

# Detail Note

## Event ID: 03122856

### Passenger Name Record (*PNR)

Created: 12/28/2003    Rhonda Cobbs    Updated: 12/28/2003    Rhonda Cobbs
         08:29                                08:29

```
38.H-*****************************************************
39.H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
40.H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
41.H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
42.H-*****************************************************
43.H-C-..................................
44.H-C-EVENT 03122856.
45.H-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
46.H-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
47.H-C-TICKET...DO NOT REBOOK ON AA.
48.H-C-CCRO/R.COBBS/28DEC03/0808C.
49.H-C-..................................
BAGGAGE INFORMATION
PASSENGER REROUTED
ROUTING-AA   804 LGA  /AA  5021 BOS
CERQUEIRA/JOHN
BOS  AA 905071 - BY FLL546L 1048/24DEC03
BOS  AA 905072 - BY FLL546L 1048/24DEC03
ROUTING-AA  2237 FLL
CERQUEIRA/JOHN
FLL  AA 890684 - BY BOS4DO1 0514/28DEC03
RECEIVED FROM - WWW?KDV1522
WWW.HDQ2EAU 0919/09MAY03 FJZSQY H
?NO PSGR DATA?
1 AA 804H 24DEC*FLLLGA HK1   1145A  230P/E
2 AA5021H 24DEC LGABOS*HK1    500P  615P HRS/E
5021H 24DEC LGABOS HK  4B NA        1.1 CERQUEIRA/JOHN
A5H   H-C-..................................
A5H   H-C-EVENT 03122856.
A5H   H-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
A5H   H-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
A5H   H-C-TICKET...DO NOT REBOOK ON AA.
A5H   H-C-CCRO/R.COBBS/28DEC03/0808C.
A5H   H-C-..................................
AS    AA9124Y 01MAR AVSFSG MM/MM1   700A 1100A
R-    CCRO
FTW FTW7B2L 0821/28DEC03
A5H   H-*****************************************************
A5H   H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
A5H   H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
A5H   H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
A5H   H-*****************************************************
BOS BOS584H 0801/28DEC03
XS    AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
XS    AA1947V 28DEC BOSFLL NN/HK1   210P  537P/E
X4G*  2237V 28DEC BOSFLL SC/HK  13A NW
BOS BOS584H 0754/28DEC03
AS    AA1947Y 28DEC BOSFLL NN/SS1   210P  537P/E
```

# Detail Note

### Event ID: 03122856

## Passenger Name Record (*PNR)

```
Created: 12/28/2003      Rhonda Cobbs          Updated: 12/28/2003      Rhonda Cobbs
          08:29                                           08:29
BOS BOS543Q 0740/28DEC03
A5H  H-FLORIDA DL C626 464 67 415 0
BOS BOS784H 0721/28DEC03
A5H  H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
A4G     5021H 24DEC LGABOS NN/SS    4B NA
FLL FLL546L 0947/24DEC03
XS   AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
X4G*   2224L 24DEC FLLBOS SC/HK   12A NW
AS   AA 804H 24DEC*FLLLGA NN/SS1  1145A  230P/E
AS   AA5021H 24DEC LGABOS*NN/SS1   500P  615P/E
FLL FLL546L 0947/24DEC03
A5H  H-TBMEDIT/49AATDS EDITOR SESSION 3
R-   TDSEDITOR/0442/25NOV/SCN
XTM XTM7SCN 0446/25NOV03
A5H  H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
R-   TDSEMAILEDIT/1901/24NOV/TDS
XTM XTM7QAD 1904/24NOV03
ITINERARY
XTM XTM4SCN 1430/24NOV03
XS   AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
XS   AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
XS   AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
XS   AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
XS   AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
A5H  H-TBMEDIT/45AATDS EDITOR SESSION 4
A5H  H-TBMEDIT/1426/24NOV/SCN SENT
SC   AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
SC   AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
R-   TDSEDITOR/1426/24NOV/SCN
XTM XTM4SCN 1429/24NOV03
A5H  H-TBMEDIT/45AATDS EDITOR SESSION 4
A5H  H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
A5H  H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
R-   TDSEDITOR/1238/24NOV/WSC
XTM XTM5WSC 1242/24NOV03
X4G     2237V 28DEC BOSFLL HK/WK  13A NW
A4G     2237V 28DEC BOSFLL SC/SC  13A NW
SC   AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
AS   AA2237V 28DEC BOSFLL SC/SC1   645A 1015A HRS/E
R-   SC.REAC.E05NOV03 0138/02NOV03
X4G     2224L 24DEC FLLBOS HK/WK  12A NW
X4G     2237V 28DEC BOSFLL HK/WK  13A NW
A4G     2224L 24DEC FLLBOS SC/SC  12A NW
A4G     2237V 28DEC BOSFLL SC/SC  13A NW
SC   AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
AS   AA2224L 24DEC FLLBOS SC/SC1  1115A  220P HRS/E
SC   AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
AS   AA2237V 28DEC BOSFLL SC/SC1   655A 1025A HRS/E
```

AA 0025

## Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003    Rhonda Cobbs    Updated: 12/28/2003    Rhonda Cobbs
08:29                                    08:29

```
R-      SC.REAC.E22OCT03 0337/19OCT03
A5H   H-TBMEDIT/45AATDS EDITOR SESSION 1
A5H   H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
A5H   H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
R-      TDSEDITOR/0057/21JUL/WSC
XTM  XTM5WSC 0104/21JUL03
X4G      2224L 24DEC FLLBOS HK/WK  12A NW
X4G      2237V 28DEC BOSFLL HK/WK  13A NW
A4G      2224L 24DEC FLLBOS SC/SC  12A NW
A4G      2237V 28DEC BOSFLL SC/SC  13A NW
SC     AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
AS     AA2224L 24DEC FLLBOS HK/SC1  1124A  228P HRS/E
SC     AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
AS     AA2237V 28DEC BOSFLL HK/SC1   707A 1044A HRS/E
R-      SC.REAC.E23JUL03 0338/20JUL03
XS     AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
X4G*    2223V 28DEC BOSFLL HK/WK  13A NW
A5H   H-TBMEDIT/45AATDS EDITOR SESSION 1
SC     AA2237V 28DEC BOSFLL SC/HK1   750A 1125A HRS/E
R-      TDSEDITOR/0120/25JUN/WSC
XTM  XTM5WSC 0127/25JUN03
A4G      2237V 28DEC BOSFLL SC/SC  13A NW
SC     AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
AS     AA2237V 28DEC BOSFLL SC/SC1   750A 1125A CHG/HRS/E
R-      SC.REAC.E25JUN03 0220/22JUN03
A5H   H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
R-      TDSEMAILEDIT/1216/12JUN/TDS
XTM  XTM7QAD 1222/12JUN03
X5H   H-TBMEDIT/32AATDS EDITOR SESSION 3
A5H   H-TBMEDIT/36AATDS EDITOR SESSION 5
R-      TDSEDITOR/1125/12JUN/EVN
XTM  XTM7EVN 1132/12JUN03
X5H   H-TBMEDIT/41AATDS EDITOR SESSION 1
A5H   H-TBMEDIT/32AATDS EDITOR SESSION 3
X7     TTEXTM12JUN/
A7     T-12JUN-XTM7EAD
R-      TDSEDITOR/1119/12JUN/EAD
XTM  XTM7EAD 1125/12JUN03
X5H   H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
X5H   H-TBMEDIT/28AATDS EDITOR SESSION 4
XW     Z/33180
AW     Z/33180-1731
A5H   H-TBMEDIT/41AATDS EDITOR SESSION 1
A5H   H-M4/PAD - NORMALIZED
R-      TDSEDITOR/1104/12JUN/POS
XTM  XTM7POS 1110/12JUN03
X5F   -TBM*DS6011001850655533?03/05
X5F   -JOHN CERQUEIRA
X5H   H-/T?DOC?VCR
X5H   H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM?FREE
X5H   H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
A9     QHF510-579-3488-C/B
A5F   -TBMXX-ADD
A5H   H-/T?TTE11/13.00/100.00/N1.1
```

AA 0026

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

**Created:** 12/28/2003    Rhonda Cobbs    **Updated:** 12/28/2003    Rhonda Cobbs
08:29                                              08:29

```
A5H   H-/T?TTE12/VCR0012147100338/C1-2
A5H   H-/T?DOC?VCR
A5H   H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
A5H   H-/T?QHF ECK
A5H   H-/T?TBM*DS6011001850655533?03/05
A5H   H-/T?JOHN CERQUEIRA
X7    T-09MAY-XTM7W1K
A7    TTEXTM12JUN/
R-    JOHN
QHF QHF1ECK 1057/12JUN03
A4G     2224L 24DEC FLLBOS NN/SS   12A NW
A4G     2223V 28DEC BOSFLL NN/SS   13A NW
R-    JOHN
QHF QHF1ECK 1053/12JUN03
XS    AA4153N 20JUN TYSORD NN/HK1    226P  304P /DCAA*FJZSQY
HRS/E
XS    AA4084N 22JUN ORDTYS NN/HK1    716P  945P /DCAA*FJZSQY
HRS/E
X4G*    4153N 20JUN TYSORD SS/HK   8A NA
X4G*    4084N 22JUN ORDTYS SS/HK  16A NAH
AS    AA2224L 24DEC FLLBOS NN/SS1  1105A  209P/E
AS    AA2223V 28DEC BOSFLL NN/SS1   750A 1125A/E
R-    JOHN CERQUEIRA
QHF QHF1ECK 1053/12JUN03
A5H   H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
R-    TDSEMAILEDIT/1045/09MAY/TDS
XTM XTM7QAD 1050/09MAY03
A5H   H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
A5H   H-TBMEDIT/28AATDS EDITOR SESSION 4
A5H   H-TKTED PQ DELETED AND PLACED INTO HISTORY
X7    TACXTM09MAY/
A7    T-09MAY-XTM7W1K
R-    TDSEDITOR/1021/09MAY/W1F
XTM XTM7W1K 1026/09MAY03
```

AA 0027