UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                         )
JOHN D. CERQUEIRA,                       )
                                         )
         Plaintiff,                      )
                                         )
v.                                       )
                                         )    CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                 )
                                         )
         Defendant.                      )
_____)

## AMERICAN AIRLINES, INC.'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant, American Airlines, Inc. ("AA") submits this response to the Statement of Undisputed Facts ("Cerqueira SOF") submitted by Plaintiff John D. Cerqueira in support of his Motion for Partial Summary Judgment.

1.    Undisputed for purposes of Local Rule 56.1.

2.    Undisputed for purposes of Local Rule 56.1.

3.    Undisputed for purposes of Local Rule 56.1.

4.    Disputed.  This statement is founded upon Plaintiff's subjective beliefs and is not based on admissible evidence.

5.    Disputed.  AA does not receive federal financial assistance as a whole and has not admitted to receiving the same.  In its Answer to Interrogatory No. 18, AA simply states that it is not advancing the contention that it does not receive federal financial assistance within the context of this litigation.  *See* American Airline Inc.'s Answers to Plaintiff's First Set of Interrogatories, hereinafter "AA Int. Responses," at ¶18, attached hereto as Exhibit "A."

Additionally, AA does not receive federal financial assistance as that term is defined in 42 U.S.C. § 2000d-1. Though the issue does not yet appear to have been addressed in the First Circuit, well-reasoned case law from two other circuits clearly establishes that receipt of federal funds pursuant to the Stabilization Act is not "federal financial assistance" for purposes of the Rehabilitation Act. *Shotz v. American Airlines, Inc.*, 420 F.3d 1332 (11th Cir. 2005); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir. 1984).

6.     Disputed. AA admitted in its Answer to the Amended Complaint ("Answer") that Mr. Cerqueira purchased a ticket with American Airlines. AA stated that it lacked sufficient information to respond to remaining allegations of ¶7 of the Amended Complaint, therefore Plaintiff has inaccurately cited to AA's Answer. *See* Defendant's Answer to Plaintiff's Amended Complaint, hereinafter "Answer," at ¶7, attached hereto as Exhibit "B."

7.     Undisputed for purposes of Local Rule 56.1.

8.     Undisputed for purposes of Local Rule 56.1.

9.     Disputed. There is no evidence in either AA's Answer nor the Plaintiff's Responses to Interrogatories that Mr. Cerqueira "passed all security without incident." *See generally,* Answer; *see also*, Plaintiff John D. Cerqueira's Responses to Defendant American Airlines, Inc.'s Interrogatories to Plaintiff, hereinafter "Cerqueira Ints.," attached as Exhibit "C" to American Airlines, Inc.'s Statement of Undisputed Facts in Support of Its Motion for Summary Judgment ("American's MSJ").

10.     Undisputed for purposes of Local Rule 56.1.

11.     Disputed. Mr. Cerqueira testified during deposition that he arrived at his gate at roughly 5 a.m. and that he sat down and worked on his computer. No mention is made in this portion of his deposition that either the gate counter was staffed, or that Mr. Cerqueira sat down

"and waited." *See* Deposition of John D. Cerqueira, attached as Exhibit "B" to American's MSJ, hereinafter "Cerqueira Dep.," at 29:22-30:3.

12.    Disputed.  Mr. Cerqueira testified from page 30:24 to 31:22 of his deposition that he recalls that the individual he approached at the gate may have been a female, and that he asked that individual for an exit row or bulkhead seat.  No evidence has been cited to support Mr. Cerqueira's contentions that a) the first AA employee to arrive was Sally Walling, b) Mr. Cerqueira did not realize she was not a gate agent, c) Mr. Cerqueira requested an exit or bulkhead seat so that he would have more leg room, or d) that Mr. Cerqueira did not request a particular seat.  Cerqueira Dep. at 30:24 to 31:22.

13.    Disputed.  Flight Attendant Walling (hereinafter "Walling") testified that Mr. Cerqueira was "hostile and insistent" with her at the gate, and "continued to stand in front of [her] after [she] told him 'I am not a gate agent.  I cannot help you'."  Furthermore, Walling testified that Mr. Cerqueira followed her request to sit down "eventually," and only after he "stood very close to [her] and watched [her] for 20 minutes." *See* Deposition of Sally Walling, attached as Exhibit "D" to American's MSJ, hereinafter "Walling Dep.," at 17:17 – 18:19. Finally, the plaintiff lacks support in his citation to Mr. Cerqueira's deposition testimony and AA's Answer for the contention that Mr. Cerqueira was assigned a new seat "after an American Airlines gate agent arrived," as no mention of this detail is made in Plaintiff's citations.  Answer at ¶10; Cerqueira Dep. at 34:23-35:6.

14.    Disputed.  First, AA points out that there is no mention made in Amy Milenkovic's deposition testimony at 5:21 – 6:3 that Lois Sargent and Sally Walling were part of the flight crew of flight 2237.  Secondly, the plaintiff mis-quotes Ms. Sargent's testimony at 14:16-21 in that Ms. Sargent recalls Ms. Walling saying that the plaintiff "was annoying her or

whatever" during the events described in Plaintiff's Undisputed Facts ¶14, rather than that Ms. Walling found Mr. Cerqueira "annoying" as a person.  Ms. Walling did not testify at her deposition that she found Mr. Cerqueira "annoying."  Lastly, AA disputes the last sentence of ¶14 in that it should be revised to state "Ms. Walling did not indicate *at that time* that she thought Mr. Cerqueira was a security threat." (emphasis provided) AA further points out that in Walling's deposition at 11:17-21, she did testified that she recalls telling the other flight attendants that "there was a passenger [she] felt very uncomfortable with," in reference to Mr. Cerqueira. *See* Deposition of Amy Milenkovic, attached hereto as Exhibit "C," hereinafter "Milenkovic Dep." at 5:21 – 6:3; Deposition of Lois Sargent, attached to American's MSJ as Exhibit "G," hereinafter "Sargent Dep." at 14:16-21; Walling Dep., *generally* and at 11:17-21.

15.     Disputed.  Walling testified that Mr. Cerqueira "was not supposed to be on the airplane" at the time of his boarding because "he was a coach passenger" and "[f]irst class had just barely begun to board."  Walling Dep. at 12:22- 13:4.  According to her sworn statement, general practice dictates that "no coach passengers come on, in [her] recollection, before first class." *Id.*  Therefore, Mr. Cerqueira did not board the aircraft at the appropriate time.

16.     Undisputed for purposes of Local Rule 56.1.

17.     Disputed.  Mr. Cerqueira's accurate testimony at 41:20-42:3 of his deposition states "he would *assume* that the two guys sitting next to [him] arrived approximately ten minutes after [he] had *boarded*" the plane.  (emphasis provided).  Cerqueira Dep. at 41:20-42:3.

18.     Disputed.  The Plaintiff, in ¶18 of his Statement of Undisputed Facts, has misrepresented the testimony of all three AA Flight Attendants:  Sally Walling, Amy Milenkovic, and Lois Sargent.  Not one of these women testified that the gentlemen sitting next to Mr. Cerqueira on Flight 2237 "had a color and physical appearance similar to that of [the

plaintiff]." Cerqueira SOF at ¶18. According to Walling's testimony, the three gentlemen "looked similar" because they "had dark hair." Walling Dep. at 31:16-24. Amy Milenkovic testified that she didn't remember if the three men looked similar, and had a "vague" recollection that they had "dark hair." Milenkovic Dep. at 18:16-24. Lois Sargent produced no specific testimony about the similar physical appearance of the three men, only that they "appeared" to be "foreign nationals" that she assumed were traveling together. Sargent Dep. at 11:22-13:18. Ms. Sargent further testified that "[the gentlemen's] skin color was normal," and that her perception that the men were foreign nationals was affected by the fact that she knew after the incident in question that some of the men were carrying foreign passports. *Id*.

19.    Undisputed for purposes of Local Rule 56.1.

20.    Disputed. Lois Sargent testified that she witnessed Mr. Cerqueira "laughing at" and "observing" the men seated in his row, who were "acting very bizarre, laughing, and asking questions and just not conducting themselves in the way that most people do" while she was performing her safety briefing. Sargent Dep. at 7:16-22.

21.    Disputed. According to the testimony of Sally Walling, Mr. Cerqueira and the other gentlemen in his row appeared to be feigning sleep. Walling Dep. at 23:2-14.

22.    Undisputed for purposes of Local Rule 56.1.

23.    Undisputed for purposes of Local Rule 56.1.

24.    Undisputed for purposes of Local Rule 56.1.

25.    Undisputed for purposes of Local Rule 56.1.

26.    Disputed. Ms. Walling testified that she was unsure whether the gentlemen in the exit row were traveling together. Walling Dep. at 29:6-10. When describing the gentlemen seated in the exit row, she used the term "dark" only to describe the color of their hair. Walling

Dep. at 31:14-24.  Although Ms. Walling did not observe Mr. Cerqueira with Mr. Ashmil or Mr. Rokah in the gate area, she was uncomfortable with Mr. Cerqueira before he boarded the plane because of his "hostile and insistent" demeanor.  Walling Dep. at 8:19, 17:17.

27.     Disputed.  Amy Milenkovic testified that she "may have" perceived the man with the ponytail to be of Middle Eastern decent.  Milenkovic Dep. at 18:9.  She further testified that she stated in her report that the man with the ponytail had a heavy accent in order to differentiate him in her memory.  Milenkovic Dep. 10:13.  Amy Milenkovic did not make any particular observations about Mr. Cerqueira because she had the least interaction with the gentlemen in the exit row by virtue of the fact that she was working the first class cabin.  Milenkovic Dep. 16:20-17:2.  She also indicated that she made no assumptions about the race, religion or ethnicity of the gentlemen in the exit row.  *Id.*

28.     Disputed.  Ms. Sargent testified that while the gentlemen in the exit row "seemed to be" foreign nationals, her assessment on that point is "shaded" by the fact that she later learned, after security had already been called, that some of them had foreign passports.  Sargent Dep. at 11:22-13:22.

29.     Undisputed for purposes of Local Rule 56.1.

30.     Undisputed for purposes of Local Rule 56.1.

31.     Undisputed for purposes of Local Rule 56.1.  AA clarifies this response by stating that Walling explained to Captain Ehlers what had happened at the gate in regards to one of the gentleman seated in the exit row.  At the gate, Sally Walling had found Mr. Cerqueira to be "hostile and insistent."   Walling Dep. at 27:11-13, 8:19, 17:17.

32.     Disputed.  Walling testified that Mr. Cerqueira "was not supposed to be on the airplane" at the time of his boarding because "he was a coach passenger" and "[f]irst class had

6

just barely begun to board." Walling Dep. at 12:22- 13:4. According to her sworn statement, general practice dictates that "no coach passengers come on, in [her] recollection, before first class." *Id.* Contrary to Plaintiff's assertions in ¶32 of the Cerqueira SOF, Walling also testified that passengers are "not *typically*" denied service for boarding the plane ahead of their scheduled group, that sole factor considered. (emphasis supplied) Walling Dep. at 13:22.

33.     Undisputed for purposes of Local Rule 56.1. AA clarifies this response by stating that all of the AA flight attendants from Flight 2237 testified that a passenger is not typically removed from flight based on that passenger's use of the lavatory upon boarding, that sole factor considered. Milenkovic Dep. at 13:1-3; Walling Dep. at 14:4-7; Sargent Dep. at 22:4-7. Amy Milenkovic testified that, although using the lavatory upon boarding was not unusual, "it is very common that a lot of people go to the bathroom right away [in the terminal], before [sitting down on the plane." Milenkovic Dep. at 12:22-24. Even Mr. Cerqueira testified that he "[didn't] know why [he] didn't use the facilities in the terminal." Cerqueira Dep. at 41:5-6.

34.     Disputed. Walling testified that although she was not sure if the gentlemen seated in the exit row were feigning sleep, it was her belief at the time that they were in fact "pretending" to sleep. Walling Dep. at 23:14. Ms. Walling testified that passengers are not refused service for sitting back and closing their eyes, or for falling asleep during boarding, if each action was considered individually. Walling Dep. at 34:6-14, 26:19-23. Additionally, Ms. Walling testified that the behavior and body language of Mr. Ashmil, Mr. Rokah, and Mr. Cerqueira, who were sitting with their "seat back" and "eyes closed" during boarding "seemed hostile." Walling Dep. at 22:15-18, 33:17. Ms. Walling found the three men's behavior to be "unusual for the boarding process," and Captain Ehlers stated that it is "very rare that [the flight crew] had anyone attempting to sleep at all" during that time. Walling Dep. at 22:15-18;

Deposition of John Ehlers, attached as Exhibit "F" to American's MSJ, hereinafter "Ehlers Dep." at 25:18-19.

35.     Disputed.  Captain Ehlers testified that he did not make the decision to have Mr. Cerqueira removed from the flight for questioning, nor did he make any recommendation of the same to the gate agent or ground security coordinator.  Elhers Dep. at 29:11- 30:1.  Furthermore, both Captain Ehlers and Flight Attendant Sargent testified that they had their own concerns about Mr. Cerqueira which were communicated to security personnel.  Ehlers Dep. at 31:13-15, 32:6-12, 33:18-20; Sargent Dep. at 16:16-21, 20:22-21:2, 33:4-9.

36.     Undisputed for purposes of Local Rule 56.1.

37.      Undisputed for purposes of Local Rule 56.1.

38.     Undisputed for purposes of Local Rule 56.1.

39.     Disputed.  The testimony cited by the Cerqueira SOF at ¶39 shows no evidence that Mr. Ashmil and Mr. Rokah informed the state troopers that they did not know Mr. Cerqueira, nor that Mr. Ashmil and Mr. Rokah were from Israel.  Cerqueira Dep. at 53:20-54:5, 55:12-16, 56:9-17, 57:2-9.

40.      Undisputed for purposes of Local Rule 56.1.

41.     Disputed.  There is no evidence in the testimony cited by Plaintiff at ¶41 of the Cerqueira SOF that supports Plaintiff's contentions that the Massachusetts State Police's investigation revealed Mr. Cerqueira posed no security threat, nor does it show that the sole reason for his removal from Flight 2237 was based on his association with the gentlemen seated next to him.  Cerqueira Dep. at 73:7-13.  In addition, the Massachusetts State Police Administrative Log Report for the day in question makes no mention that any of the passengers were cleared of being a potential security threat, and lists several of the reasons why each

8

gentleman was under investigation for security threat.  *See* Massachusetts State Police Daily Administrative Log (Cerqueira Deposition Exhibit 1, CRQ 0010), December 28, 2003, hereinafter "Police Report," attached hereto as Exhibit "D."

42.    Undisputed for purposes of Local Rule 56.1.

43.    Disputed.  Mr. Cerqueira was cleared by the Massachusetts State Police, but was not "cleared for travel" by AA.  *See* Police Report.

44.    Undisputed for purposes of Local Rule 56.1.

45.    Disputed.  Although Craig Marquis did not, at the time of his deposition, recall the events surrounding Mr. Cerqueira's removal from Flight 2237, the Passenger Name Record ("PNR") created by Rhonda Cobbs of the Corporate Complaint Resolution Office (CCRO) on December 28, 2003 clearly states that Mr. Marquis "denied travel" to Mr. Cerqueira "due to security issues," and stated that Mr. Cerqueira could not be "rebook[ed] on [an] AA" flight that day because of said security issues.  *See* Passenger Name Record, attached hereto as Exhibit "E," hereinafter "PNR," at 2.

46.    Undisputed for purposes of Local Rule 56.1.

47.    Undisputed for purposes of Local Rule 56.1.

48.    Undisputed for purposes of Local Rule 56.1.

49.    Undisputed for purposes of Local Rule 56.1.

50.    Undisputed for purposes of Local Rule 56.1.  AA points out that, after the incident in question, a customer relations representative from AA wrote an email to Mr. Cerqueira explaining the reasons for his removal and stating that "there [was] no indication that [he would] be denied boarding in the future."  *See* January 6, 2004 email from Shirley Womack to John Cerqueira, Exhibit 5 to Cerqueira Dep., attached hereto as Exhibit "F."

51.     Undisputed for purposes of Local Rule 56.1

52.     Undisputed for purposes of Local Rule 56.1

53.     Undisputed for purposes of Local Rule 56.1

54.     Undisputed for purposes of Local Rule 56.1

55.     Undisputed for purposes of Local Rule 56.1

56.     Undisputed for purposes of Local Rule 56.1

57.     Undisputed for purposes of Local Rule 56.1

58.     AA objects to ¶58 of the Cerqueira SOF on the grounds that the claims stated therein are immaterial and irrelevant to the instant action pending before this Court.

59.     Undisputed for purposes of Local Rule 56.1.  To the extent that ¶59 of the Cerqueira SOF seeks to assert any finding by the Massachusetts Commission Against Discrimination ("MCAD"), AA objects to such assertions.

60.     AA objects to ¶60 of the Cerqueira SOF on the grounds that the claims stated therein are immaterial and irrelevant to the instant action.  AA hereby moves to strike ¶60 from the record based on its objection.


                                        Respectfully submitted,

Dated: October 18, 2006                 **AMERICAN AIRLINES, INC.**
                                        By its Attorneys,

                                         _/s/ Amy Cashore Mariani_____
                                        Michael A. Fitzhugh, (BBO 169700)
                                        Amy Cashore Mariani, (BBO #630160)
                                        **FITZHUGH, PARKER & ALVARO LLP**
                                        155 Federal Street, Suite 1700
                                        Boston, MA 02110-1727
                                        (617) 695-2330

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 18th, 2006.

 _/s/ Amy Cashore Mariani_____
Amy Cashore Mariani

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA, )<br><br>Plaintiff, )<br><br>v. )<br><br>AMERICAN AIRLINES, INC., )<br><br>Defendant. ) | CIVIL ACTION NO.: 05-11652 WGY |

## AMERICAN AIRLINES, INC.'S ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed.R.Civ.P 33, defendant American Airlines, Inc. ("American" or "American Airlines") responds as follows to the interrogatories propounded by the plaintiff, John D. Cerqueira.

## GENERAL OBJECTIONS

I.    American objects to any interrogatory request insofar as it seeks materials or information covered by one or more of the following:

(a)    attorney-client privilege;
(b)    attorney's work product and mental impressions of the attorney;
(c)    materials prepared in anticipation of or for litigation; and
(d)    materials prepared for, at the request of, or by an expert.

II.    American objects to any interrogatory that is burdensome, oppressive, seeks information which is already known by the party, or which is not calculated to lead to the discovery of admissible evidence.

III.    American objects to any interrogatory which seeks the home address, telephone number or wages of any employee, representative, or agent of the defendant, and the defendant will not reveal such information for fear of violating the privacy of such persons who are not parties to this litigation.

IV.    American also objects to any interrogatory to the extent that it seeks, or a response would call for, the disclosure of Sensitive Security Information that it is prohibited by federal law from disclosing, per 49 CFR § 1520. Any and all subsequent responses are given subject to this objection, and with notice that no such disclosure will be made in any of the ensuing responses.

The foregoing General Objections shall apply to all requests, whether or not any reference is made to such objections in the defendant's response.

## RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1:

Identify the person(s) who made the decision to have John D. Cerqueira removed from American Airlines flight 2237 on December 28, 2003, state the basis for the decision, and identify any other person(s) who participated in making the decision and describe their participation.

**Response:**    Under the Federal Aviation Act, 49 U.S.C. § 44902, which affords an airline and its employees the discretion to refuse transport of a passenger who is or may be inimical to airline safety, Captain John Ehlers made an assessment that certain behavior exhibited by Mr. Cerqueira and other passengers who appeared to be traveling with him might pose a security risk. Captain Ehlers notified American Airlines' Ground Security Coordinator of these concerns, and thereafter all passengers were removed for re-screening, as was all baggage. Members of federal and state law enforcement agencies, including the Massachusetts State Police, then conducted interviews of some of the passengers, including Mr. Cerqueira. The State Police officers who were involved with the situation then notified Captain Ehlers that they were making the decision to "take this out of his hands," and detain Mr. Cerqueira for further questioning. Thus, the plaintiff was initially "removed" from the flight along with all of the other passengers as a result of Captain Ehlers' decision, but was subsequently not able to re-board the flight by virtue of the actions of the Massachusetts State Police. American Airlines also incorporates herein as a part of its response to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 2:

Identify the person(s) who made the decision to refuse service to John D. Cerqueira after he was released from questioning following his removal from American Airlines flight 2237 on December 28, 2003, state the basis for the decision, and identify any other person(s) who participated in making the decision and describe their participation.

**Response:**    On information and belief, Mr. Craig Marquis made this decision based upon information that he obtained from law enforcement officers involved with the incident, and other American Airlines personnel.

2

INTERROGATORY NO. 3:

If you have ever stated that Mr. Cerqueira was removed from flight 2237 or refused service for any reason(s) other than those set forth in response to Interrogatory Nos. 1 and 2, state each such reason and identify by whom and to whom the reason was communicated.

**Response:** Not applicable.

INTERROGATORY NO. 4:

Identify all American Airlines personnel who communicated with Mr. Cerqueira on or after December 28, 2003, and state the substance of the communications.

**Response:** Flight Attendant Sally Walling had a conversation with Mr. Cerqueira in the gate area prior the flight being boarded, when Mr. Cerqueira asked her if she would change his seat assignment to an exit row. She informed him that a gate agent would be coming along who could accommodate his request. Ms. Walling also subsequently spoke to Mr. Cerqueira after he had boarded the flight, and the substance of the conversation was to advise Mr. Cerqueira to raise his seat back and follow other general safety instructions that are given prior to all departures. Flight Attendant Lois Sargent discussed with him and the others seated alongside him in the exit row the responsibilities for being seated there, including being able to physically manage opening the door in case of an emergency. Mr. Ynes Flores, a Customer Service Manager, subsequently asked Mr. Cerqueira and those seated alongside him to accompany him off of the plane in order to resolve some issues concerning their seat assignments. In addition, Ms. Nicole Traer, at that time a Customer Service Manager, later discussed with Mr. Cerqueira the fact that he would not be allowed passage on a subsequent American Airlines flight that day. American Airlines also incorporates herein as a part of its response to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 5:

Identify each person who, on December 28, 2003, communicated information about Mr. Cerqueira to the person(s) who made the decision to have Mr. Cerqueira removed from American Airlines flight 2237, and state the substance of the communication.

**Response:** Sally Walling, Amy Mikenkovic, Lois Sargent and Captain Ehlers communicated their observations of Mr. Cerqueira and resulting concerns to the law enforcement agencies mentioned in the response to Interrogatory Number 1, above. The identity of the Massachusetts State Police officer(s) that made the decision to detain Mr. Cerqueira has not been determined at this time, but discovery is continuing and American will supplement its responses accordingly if further information becomes known. Captain Ehlers also had other communications with additional personnel of American's Systems Operations Control and personnel stationed at Logan, the substance of which were his concerns and observations as expressed in the above response to Interrogatory 1. American Airlines also incorporates herein as a part of its response

3

to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 6:

Identify each person who, on December 28, 2003, communicated information about Mr. Cerqueira to the person(s) who made the decision to refuse service to Mr. Cerqueira after he was released from questioning, and state the substance of the communication.

**Response:**    Ms. Rhonda Cobbs communicated information that is described in the above response to Interrogatory 1.

INTERROGATORY NO. 7:

If you contend that you are not liable to plaintiff because plaintiff's injuries were caused, in whole or in part, by any person(s) other than American Airlines, identify the person(s) and state the basis of your contention.

**Objection:**    American objects to responding to this interrogatory as it is without knowledge or belief that plaintiff sustained any "injuries" as a result of being refused service by American.

**Response:**    Subject to and without waiver of the foregoing objection, American answers as follows: If the plaintiff was "injured," American is unaware of any person or entity that caused or contributed to his "injuries."

INTERROGATORY NO. 8:

Identify all persons who witnessed or participated in the incidents on which the Complaint is based, and any other persons whom you believe have knowledge of relevant facts, and identify the issues on which you believe they have knowledge.

**Objection:**    American objects to this interrogatory as compound, vague and unduly burdensome.

**Response:**    Subject to and without waiver of the foregoing objection, Sally Walling, Amy Milenkovic, Captain John Ehlers, First Officer Donald M. Ball and Lois Sargent all have knowledge of the plaintiff's unusual behavior both before and after boarding. American Airlines also incorporates herein as a part of its response to this interrogatory its prior responses hereto, the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 9:

Identify all investigations conducted, reports made, or statements obtained, concerning the incidents on which the Complaint is based, and identify the person(s) involved and all related documents.

**Response:**   All such documents were attached to American's Automatic Disclosures, or will be provided in response to the plaintiff's Rule 34 request.


INTERROGATORY NO. 10:

If you contend that any person(s) communicated to Mr. Cerqueira the reason(s) why he was removed from flight 2237, or the reason(s) why he was refused service after his release from questioning, identify the person(s) and state the substance of each communication.

**Response:**  Mr. Ynes Flores communicated to Mr. Cerqueira the basis for his being initially asked to disembark from Flight 2237.  American is informed and believes that Ms. Nicole Traer later explained to Mr. Cerqueira that he was being refused service because his behavior and that of persons with whom he appeared to be traveling caused concerns among the passengers and crew of flight 2237.


INTERROGATORY NO. 11:

If the decisions to remove Mr. Cerqueira from flight 2237 and to refuse service to Mr. Cerqueira after his release from questioning were made pursuant to any policy, procedure, manual, or guideline, whether written or unwritten, identify and state the substance of the policy, procedure, manual, or guideline.

**Objection:**   American objects to this interrogatory on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security.

**Response:**    Subject to and without waiver of the foregoing objection, American states generally that perceived security concerns are dealt with on an *ad hoc* basis and that the particular action taken, and people or departments involved, depends on the circumstances of the situation. In a particular situation, a security concern may be dealt with solely by airport personnel or may also involve flight crew members, law enforcement authorities, security personnel, or AA headquarters personnel.  As a general proposition, if American determines that a passenger is a security risk and/ or should be denied boarding, the accepted procedure is to deny boarding or to otherwise effectively address the perceived risk so as to protect the safety of American's passengers and crew members.

INTERROGATORY NO. 12:

State whether any of the American Airlines personnel involved in the incidents on which the Complaint is based have been involved in other incidents in which a customer was removed from a flight, denied boarding, or refused service, and, if so, describe each incident and identify the persons involved.

**Objection:** American objects to this request as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to a particular time frame. Thus, a response would require that a commercial airline that serves a world wide market attempt to determine every such instance where one of its staff named above was "involved" in a situation where a passenger was denied or refused boarding. American's passenger division is the largest scheduled passenger airline in the world. American provides scheduled jet service to destinations throughout North America, the Caribbean, Latin America, Europe and the Pacific, serving 172 cities with a fleet of 840 aircraft. On an average day, American will complete 2,600 (two thousand, six hundred) flights. On any given day, 4 or 5 passengers are denied boarding for various reasons, including but not limited to behavior, illness, improper or insufficient identification and other lawful reasons. Thus, answering this interrogatory is not feasible. American also objects to this interrogatory as being unduly vague, in that it seeks to have American determine the meaning of its personnel who were "involved" in "the incidents on which the Complaint is based," as well as "involved in" other "incidents" which are not clearly defined.

INTERROGATORY NO. 13:

State whether any of the American Airlines personnel involved in the incidents on which the Complaint is based have been the subject of a discrimination complaint by an American Airlines customer, and, if so, describe each complaint and identify the persons involved.

**Objection:** American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to a particular time frame. Thus, a response would require that a commercial airline serving a worldwide market attempt to determine every such instance where one of its staff named above was "the subject of a discrimination complaint" in all places where American does business. American also objects to this interrogatory as being unduly vague, in that it seeks to have American determine the meaning of its personnel who were "involved" in the "incidents on which the Complaint is based... ."

**Response:** Subject to and without waiver of the foregoing objection, American states that it believes none of its employees mentioned in the above interrogatory responses have been named as a Respondent or a Defendant in any other administrative or legal proceeding alleging unlawful discrimination by a passenger. Those employees are: Nicole Traer, Ynes Flores, John Ehlers, Donald M. Ball, Sally Walling, Lois Sargent, Amy Milenkovich, Craig Marquis, and Rhonda Cobbs.

INTERROGATORY NO. 14:

State whether you have provided any of the American Airlines personnel involved in the incidents on which the Complaint is based any training, instruction, or written materials concerning the circumstances under which a passenger may be removed from a flight, denied boarding, or refused service, and, if so, identify and state the substance of the training, instruction, or written materials.

**Objection:**   American objects to this interrogatory on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security.   American also objects to this interrogatory as being unduly vague, in that it seeks to have American determine the meaning of its personnel who were "involved" in "the incidents on which the Complaint is based... ."

**Response:**   Subject to and without waiver of the foregoing objection, American states generally that perceived security concerns are dealt with on an *ad hoc* basis and that the particular action taken, and people or departments involved, depends on the circumstances of the situation. In a particular situation, a security concern may be dealt with solely by airport personnel or may also involve flight crew members, law enforcement authorities, security personnel, or AA headquarters personnel.  As a general proposition, if American determines that a passenger is a security risk and/ or should be denied boarding, the accepted procedure is to deny boarding or to otherwise effectively address the perceived risk so as to protect the safety of American's passengers and crew members.

INTERROGATORY NO. 15:

State whether you have provided any of the American Airlines personnel involved in the incidents on which the Complaint is based any training, instruction, or written materials concerning whether a passenger's race, color, national origin, ethnicity, or ancestry may be considered in determining whether a passenger should be removed from a flight, denied boarding, or refused service, and, if so, identify and state the substance of the training, instruction, or written materials.

**Objection:**   American objects to this interrogatory on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security.

**Response:** Subject to and without waiver of the foregoing objection, American states that it has, and did have in effect during the relevant time period, a strict policy that forbids unlawful discrimination of any kind against any passenger.

INTERROGATORY NO. 16:

Identify by name, date, and forum, every lawsuit, administrative complaint, charge, or enforcement action brought against American Airlines during the last five years which involved an allegation that a passenger's race, color, national origin, ethnicity, or ancestry was a motivating factor for a decision to have the passenger removed from a flight, denied boarding, or refused service.

**Objection:**    American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought seeks this information from a commercial airline with thousands of employees serving a worldwide market. American further objects to this interrogatory because much of this information is a matter of public record, and is therefore equally available to the plaintiff.

INTERROGATORY NO. 17:

State whether, during the last five years, you have taken disciplinary action against any employee for considering a passenger's race, color, national origin, ethnicity, or ancestry in determining whether a passenger should be removed from a flight, denied boarding, or refused service, and, if so, describe each incident and identify the persons involved.

**Objection:**    American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to the Boston station, and thus seeks this information from a commercial airline with thousands of employees serving a worldwide market.

INTERROGATORY NO. 18:

If you contend that American Airlines does not receive federal financial assistance as a whole, identify and describe the source and purpose of any federal financial assistance received by American Airlines during the five years preceding December 28, 2003.

**Objection:** American objects to this interrogatory as being vague and seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**Response:**    Subject to and without waiver of the foregoing objection, American states that it has not advanced any such contention.

INTERROGATORY NO. 19:

Identify each person whom American Airlines expects to call as an expert witness at trial.

**Response:**    American has not designated an expert witness to testify at this time. Discovery is continuing, and American will promptly supplement this answer in the event that it designates any expert.

INTERROGATORY NO. 20:

With regard to each person identified in response to the previous interrogatory, state:

(a)    The subject matter on which the expert is expected to testify;
(b)    The substance of the facts and opinions to which the expert is expected to testify; and
(c)    The summary of the grounds for each opinion.

**Response:**    Please see American's response to Interrogatory No. 19.

    I hereby certify under the pains and penalties of perjury this 14th day of February, 2006, that based upon information I have obtained in response to reasonably thorough and diligent inquiries that I have made upon the agents and employees of American Airlines, Inc., the foregoing responses are true and correct to the best of my knowledge, information and belief.

_____
Alec Bramlett, Senior Attorney
American Airlines, Inc.

Dated: February 14, 2006

_____
Notary Public
My Commission Expires 5/ 9 /0 8

Objections Submitted by:

_____
Michael A. Fitzhugh, (BBO 169700)
Anne-Marie H. Gerber, (BBO #649337)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330

9

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the forgoing to be served upon opposing counsel of record set forth below, by electronic mail and first class mail postage prepaid, this _15th_ day of February 2006.

David S. Godkin, Esq.
Erica Abate Recht, Esq.
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02110

Michael T. Kirkpatrick, Esq.
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

_____
Anne Marie Gerber, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*COURTESY COPY DO NOT SCAN*

| | |
|---|---|
| JOHN D. CERQUEIRA, ) | |
| ) | |
| Complainant, ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: 05-11652 WGY |
| ) | |
| AMERICAN AIRLINES, INC., ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

The Defendant, American Airlines, Inc. ("AA"), hereby answers the Amended Complaint of the Plaintiff, John Cerqueira ("Plaintiff"), as follows:

### INTRODUCTION

1.    No response from AA is required as to Paragraph 1 of Plaintiff's Complaint ("the Amended Complaint"), as it is merely a summary recitation of Plaintiff's claims.

### JURISDICTION AND VENUE

2.    AA neither admits nor denies the allegations in paragraph 2 of the Amended Complaint, as they constitute conclusions of law to which no response is required.

3.    AA admits to the allegations in paragraph 3 of the Amended Complaint insofar as facts are alleged but neither admits no denies those portions of the allegations that are conclusions of law to which no response is required.

**PARTIES**

4.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 4 of the Amended Complaint.

5.     AA admits to the allegations in paragraph 5 of the Amended Complaint.

**FACTS**

6.     AA admits to the allegations in the first sentence of paragraph 6 of the Amended Complaint. AA is without sufficient knowledge or information to either admit or deny the remaining allegations of paragraph 6.

7.     AA admits to the Plaintiff purchasing his ticket, however, is without sufficient knowledge or information to either admit or deny the remaining allegations of paragraph 7 of the Amended Complaint.

8.     AA is without sufficient knowledge to either admit or deny the allegations in paragraph 8 of the Amended Complaint.

9.     AA lacks sufficient knowledge to either admit or deny how the plaintiff checked his baggage, but otherwise admits to the remaining allegations in paragraph 9 of the Amended Complaint.

10.     AA admits to the allegations in paragraph 10 of the Amended Complaint insofar as they pertain to the plaintiff requesting to change his seat assignment and his ultimate seat assignment, but lacks sufficient knowledge to either admit or deny the remaining allegations.

11.     AA admits to the allegations in paragraph 11 of the Amended Complaint.

12.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 12 of the Amended Complaint.

13.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 13 of the Amended Complaint.

14.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 14 of the Amended Complaint.

15.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 15 of the Amended Complaint.

16.     AA admits to the allegations in paragraph 16 of the Amended Complaint insofar as they relate to the plaintiff and adjacent passengers being asked for their boarding passes, but lacks sufficient knowledge to either admit or deny the remaining allegations.

17.     AA admits that the flight attendant left with Mr. Cerqueira's receipt and the boarding passes of the two other men, and troopers from the Massachusetts State Police boarded the plane  and demanded the two individuals and the Plaintiff to immediately deplane with their carry-on  luggage.  AA denies the remaining allegations of paragraph 17 of the Amended Complaint.

18.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 18 of the Amended Complaint.

19.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 19 of the Amended Complaint.

20.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 20 of the Amended Complaint.

21.     AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 21 of the Amended Complaint.

22.    AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 22 of the Amended Complaint.

23.    AA admits that the plaintiff was escorted to the ticket counter and was cleared for further travel, but lacks sufficient knowledge to either admit or deny the remaining allegations in paragraph 23 of the Amended Complaint.

24.    AA admits to the allegations in paragraph 24 of the Amended Complaint.

25.    AA admits to the allegations in paragraph 25 of the Amended Complaint with the exception of what Ms. Traer said to the two men in question, because it lacks sufficient knowledge to either admit or deny the substance of that conversation.

26.    AA admits to Ms. Traer refunding the cost of the return portion of the Plaintiff's ticket and that she suggested he contact AA customer service, however, it denies the remaining allegations in paragraph 26 of the Amended Complaint.

27.    AA admits to the allegations in paragraph 27 of the Amended Complaint insofar as they allege that the recited communication was sent by the plaintiff, but lacks sufficient knowledge to either admit or deny the remaining allegations.

28.    AA admits to the allegations in paragraph 28 of the Amended Complaint.

29.    AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 29 of the Amended Complaint.

30.    AA admits to the allegations in paragraph 30 of the Amended Complaint.

31.    AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 31 of the Amended Complaint.

32.    AA admits to the allegations in paragraph 32 of the Amended Complaint.

33.    AA admits to the allegations in paragraph 33 of the Amended Complaint.

34.   AA admits to the allegations in paragraph 34 of the Amended Complaint.

35.   AA admits to the allegations in paragraph 35 of the Amended Complaint.

36.   AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 36 of the Amended Complaint.

37.   AA admits to the allegations in paragraph 37 of the Amended Complaint insofar as they allege that the plaintiff was refused service, but denies that it was Ms. Traer's decision.

38.   AA admits to the allegations in paragraph 38 of the Amended Complaint insofar as they allege action taken by Ms. Traer and the basis of the same, but denies the characterization it being her decision.

39.   AA admits to the allegations in paragraph 39 of the Amended Complaint insofar as they allege that she was an agent and employee of AA at all relevant times, but denies the characterization her actions as being her decision.

40.   AA admits to the allegations in paragraph 40 of the Amended Complaint.

41.   AA denies the allegations in paragraph 41 of the Amended Complaint.

42.   AA denies the allegations in paragraph 42 of the Amended Complaint.

43.   AA denies the allegations in paragraph 43 of the Amended Complaint.

44.   AA is without sufficient knowledge or information to either admit or deny the allegations of paragraph 44 of the Amended Complaint insofar as they allege the plaintiff's damages, but in further answering denies that it engaged in any unlawful conduct.

45.   AA denies the allegations in paragraph 45 of the Amended Complaint.

46.   AA admits to the allegations in paragraph 46 of the Amended Complaint.

## COUNT I: 42 U.S.C. § 1981

47.    AA restates and re-alleges its responses to paragraphs 1-46 as if fully set forth herein.

48.    AA denies the allegations in paragraph 48 of the Amended Complaint.

49.    AA denies the allegations in paragraph 49 of the Amended Complaint.

## COUNT II: TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000d)

50.    AA restates and re-alleges its responses to paragraphs 1-49 as if fully set forth herein.

51.    AA denies the allegations in paragraph 51 of the Amended Complaint.

52.    AA denies the allegations in paragraph 52 of the Amended Complaint.

## COUNT III: M.G.L.c. 272,§ 98

53.    AA restates and re-alleges its responses to paragraphs 1-52 as if fully set forth herein.

54.    AA denies the allegations in paragraph 54 of the Amended Complaint.

55.    AA admits denying Mr. Cerqueira access to AA flight number 2237, however, it denies the remaining allegations on paragraph 55 of the Amended Complaint.

56.    AA denies the allegations in paragraph 56 of the Amended Complaint.

57.    AA denies the allegations in paragraph 57 of the Amended Complaint.

## AFFIRMATIVE DEFENSES

### First Defense

The Amended Complaint fails to state a claim upon which injunctive relief may be granted.

### Second Defense

The Plaintiff **cannot** demonstrate a likelihood of success on the merits, therefore, he is not entitled to **any** temporary or preliminary injunctive relief he seeks against American Airlines.

### Third Defense

The Plaintiff **cannot obtain** the permanent injunctive relief he seeks here based upon the facts alleged, **or** those that he might ultimately prove at the trial of this action.

### Fourth Defense

The actions of **Captain Ehlers** were permitted, because he reasonably relied upon information given to **him**, which information caused him to have a reasonable belief that the Plaintiff was or **may have** posed a risk to the security of the flight.

### Fifth Defense

The actions of **Captain Ehlers** were not arbitrary and capricious, and all of his actions were taken in **accordance** with the duty imposed upon him by Federal Aviation Act, 49 U.S.C. § 44902, which affords an airline and its employees the discretion to refuse transport of a **passenger who** is or may be inimical to airline safety or security.

### Sixth Defense

The actions of **American Airlines** and Captain Ehlers were not the result in whole or in part of any unlawful discrimination prohibited by M.G.L. c. 272, §§ 92A and 98; 42 U.S.C. § 1981 and 42 U.S.C. § 2000d.

### Seventh Defense

Plaintiff cannot establish that American Airlines or any of its employees acted with deliberate discriminatory intent.

### Eighth Defense

Pursuant to 42 U.S.C. § 2000d, Plaintiff has failed to establish that he is the intended beneficiary of the federally funded program from which American Airlines is alleged to have received assistance, and thus lacks standing to sue under this statute.

### Ninth Defense

Pursuant to 42 U.S.C. § 2000d, Plaintiff has failed to establish that American Airlines' actions were intentional, wanton, malicious, callous or showed reckless disregard to Plaintiff's civil rights.

### Tenth Defense

The Plaintiff is not entitled to the declaratory relief sought.

### Eleventh Defense

The Plaintiff's injuries were proximately caused by intervening or superseding acts of a third person or persons for whom American Airlines had no responsibility or control, and therefore the Plaintiff may not recover against it.

### Twelfth Defense

The Amended Complaint fails to state a claim for punitive damages upon which relief can be granted, because even if all the facts alleged are taken as true, they do not allege nor establish the requisite elements of such a claim.

**THE DEFENDANT RESERVES THE RIGHT TO ADD
ADDITIONAL AFFIRMATIVE DEFENSES.**

**AMERICAN AIRLINES, INC., DEMANDS A TRIAL BY JURY ON ALL ISSUES
SO TRIABLE.**

**WHEREFORE**, the Defendant, American Airlines, Inc., requests the following relief:

1. That this Court enter judgment in its favor on all claims set forth in Count I of the Plaintiff's amended complaint;

2. That this Court enter judgment in its favor on all claims set forth in Count II of the Plaintiff's amended complaint;

3. That this Court enter judgment in its favor on all claims set forth in Count III of the Plaintiff's amended complaint;

4. That this Court deny the Plaintiff's request for injunctive relief;

5. That this Court deny Plaintiff's request for declaratory relief; and

6. That this Court grant American Airlines, Inc. such other and further relief as may be appropriate.

Respectfully Submitted,
**AMERICAN AIRLINES, INC.**
By Its Attorneys,

/s/ Michael A. Fitzhugh
Michael A. Fitzhugh, BBO 169700
Sonia L. Skinner, BBO # 631858
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the forgoing to be served upon opposing counsel of record set forth below, by first class mail postage prepaid, this 30th day of September, 2005.

/s/ Melissa M. Wangenheim
Melissa M. Wangenheim

9

# In The Matter Of:

*John D. Cerqueira    v.*
*American Airlines, Inc.*

---

*Amy Milenkovic*
*Vol. 1, March 28, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File MILENKOV.V1, 34 Pages*
*Min-U-Script® File ID: 3932626046*

# Word Index included with this Min-U-Script®



**Page 1**

Volume I
Pages 1 to 34
Exhibits 8 and 9
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,      :
    Plaintiff,          :
    vs.                 : Civil Action
                        : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,  :
    Defendant.          :

DEPOSITION OF AMY MILENKOVIC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 4:59 p.m.

PRESENT:
Birnbaum & Godkin, LLP
(By Erica Abate Recht, Esq.)
280 Summer Street, Boston, MA  02210,
for the Plaintiff.
Fitzhugh, Parker & Alvaro LLP
(By Amy Cashore Mariani, Esq.)
155 Federal Street, Suite 1700, Boston, MA
02110-1727, for the Defendant.

**Page 2**

INDEX
WITNESS          DIRECT   CROSS
AMY MILENKOVIC
BY MS. ABATE RECHT          3

EXHIBITS
NO.     DESCRIPTION          PAGE
8    Document entitled "Detail Note"    6
    Bates stamped AA 0031
9    Document entitled "AMR Event Call   7
    Center Report" Bates stamped AA 0015
    to 0017

**Page 3**

PROCEEDINGS

[1]
[2]     MS. MARIANI: And the same stipulations, I
[3] imagine?
[4]     MS. ABATE RECHT: Yes.
[5]         AMY MILENKOVIC
[6] a witness called for examination by counsel for the
[7] Plaintiff, having been satisfactorily identified by
[8] the production of her driver's license and being
[9] first duly sworn by the Notary Public, was examined
[10] and testified as follows:
[11]     DIRECT EXAMINATION
[12]     BY MS. ABATE RECHT:
[13]     Q: Can you please state your full name for the
[14] record.
[15]     A: Amy Marie Milenkovic.
[16]     Q: Can you spell your last name, please.
[17]     A: It's M-I-L-E-N-K-O-V-I-C.
[18]     Q: What is your address?
[19]     A: 867 Cleveland Avenue, and it's Apartment
[20] 0-10, and it's in St. Paul, Minnesota 55116.
[21]     Q: Did you do anything to prepare for today's
[22] deposition?
[23]     A: No, other than just talking to Amy and Alec
[24] Bramlett, as far as, like, making me aware of the

**Page 4**

[1] deposition and possibly when it would take place and
[2] all of that.
[3]     MS. MARIANI: I'm going to ask you not to
[4] disclose the substance of communications with myself
[5] or Mr. Bramlett, who is a member of the AA legal
[6] department.
[7]     Q: Did you review any documents in preparation
[8] for the deposition?
[9]     A: No, just I received a report that I had
[10] written at the time, a copy of it, and I looked over
[11] that.
[12]     Q: Are you referring to your AMR Event Call
[13] Center Report?
[14]     A: Yes.
[15]     Q: Did you speak to anyone else about the
[16] deposition?
[17]     A: My husband is aware that I had to come
[18] here, and then people at American Airlines, as far
[19] as my supervisor and people in the office, to make
[20] arrangements for me to come here.
[21]     Q: Were there conversations solely about
[22] scheduling or did you talk about the substance?
[23]     A: No, solely about scheduling, and that I had
[24] a deposition.

**Amy Milenkovic**
**Vol. 1, March 28, 2006**

Case 1:05-cv-11652-WGY    Document 34-4    Filed 10/18/2006

**John D. Cerqueira    v.**
**American Airlines, Inc.**

Page 3 of 13

Page 5

[1] **Q:** Are you currently employed by American
[2] Airlines?
[3] **A:** Yes.
[4] **Q:** How long have you been employed by
[5] American?
[6] **A:** Since October of '92.
[7] **Q:** What is your position?
[8] **A:** I'm a flight attendant.
[9] **Q:** And have you held that position since
[10] October of '92?
[11] **A:** Yes.
[12] **Q:** Were you previously employed?
[13] **A:** I was a student, and I had odd jobs, as far
[14] as restaurants and clerk type of jobs before that.
[15] **Q:** So this was your first flight attendant
[16] job?
[17] **A:** First, yes.
[18] **Q:** What is your educational background?
[19] **A:** I have a Bachelor of Arts in journalism and
[20] history.
[21] **Q:** Were you a member of the flight crew for
[22] American Airlines Flight 2237 on December 28, 2003?
[23] **A:** Can you tell me the destination? I don't
[24] remember flight numbers.

Page 7

[1] **Q:** Did you have any conversations with a
[2] flight attendant by the name of Sally Walling
[3] regarding Mr. Cerqueira or the other two gentlemen
[4] who you recall were the ones who were removed from
[5] the flight?
[6] **A:** Yes. She — yes. She called me on our
[7] intercom phone as far as making me aware that there
[8] were some issues going on in the main cabin.
[9] **MS. ABATE RECHT:** I'm going to mark as
[10] Exhibit 9 a document with Bates Nos. AA 0015 through
[11] 17.
[12]     (Document marked as Milenkovic
[13] Exhibit 9 for identification)
[14] **Q:** Do you recognize this document?
[15] **A:** Yes. This is the report I wrote up
[16] afterwards.
[17] **Q:** And this is the report that you referred to
[18] earlier that you had reviewed?
[19] **A:** Yes.
[20] **Q:** Do you see you wrote, "The No. 4 mentioned
[21] to me as we were getting onboard the AC" — which I
[22] assume stands for "aircraft"?
[23] **A:** Aircraft, yes.
[24] **Q:** — "that a passenger at the gate kept

Page 6

[1] **Q:** Okay. It was a flight from Boston to Fort
[2] Lauderdale.
[3] **A:** Yes.
[4] **MS. ABATE RECHT:** And I'll just mark as
[5] Exhibit 8 a document with Bates Nos. AA 0031.
[6]     (Document marked as Milenkovic
[7] Exhibit 8 for identification)
[8] **Q:** And does this document refresh your
[9] recollection that you were a member of the flight
[10] crew of Flight 2237 on December 28, 2003?
[11] **A:** Yes.
[12] **Q:** Do you remember a passenger by the name of
[13] Mr. Cerqueira?
[14] **A:** No. As far as I only since being referred
[15] to the deposition, hearing the name now. I don't
[16] remember the name at the time of the flight.
[17] **Q:** Do you remember that on that flight, three
[18] passengers were removed from the plane?
[19] **A:** Yes.
[20] **Q:** And do you remember those three passengers?
[21] **A:** No. As far as how they look or as far as
[22] how — I remember certain behavioral actions from
[23] some of them. But as far as to see someone on the
[24] street and recognize them, no.

Page 8

[1] asking her if he could change his seat and kept
[2] staring at her when she told him she was the flight
[3] attendant." Do you see that there?
[4] **A:** Yes.
[5] **Q:** Does that refresh your recollection at all
[6] as to any discussions you had with Ms. Walling
[7] before you were in the main cabin?
[8] **A:** Just as I said in my report, she mentioned
[9] it to me getting on the airplane, but she did not
[10] refer to — she just said "passenger." She didn't
[11] refer to as far as the way anyone looked or — it
[12] was just the behavior of what I mentioned in the
[13] report.
[14] **Q:** Did she say anything else to you that's not
[15] written in the report?
[16] **A:** I don't remember.
[17] **Q:** Ms. Walling is the No. 4 who's referred to
[18] here; is that right?
[19] **A:** Yes, that's correct.
[20] **Q:** You also wrote, "She told me she had a very
[21] bad feeling from him." Do you recall what she told
[22] you about that?
[23] **A:** No, I don't.
[24] **Q:** Do you recall anything else about that

[1] conversation with Ms. Walling?

[2] **A:** Not — I'm sorry, no.

[3] **Q:** You next write, "A passenger with a
[4] ponytail and heavy accent made a comment to the
[5] captain, asking him if he was their captain." Did
[6] you hear the passenger make that comment?

[7] **A:** How do I word this. I wasn't directly
[8] staring at him and heard him say it. I was doing
[9] other things in my galley, which is right where
[10] everyone boards. And so I did kind of hear him —
[11] someone make a comment to the captain, and I then
[12] turned to look.

[13] **Q:** And then you saw that it was the passenger
[14] with the ponytail?

[15] **A:** Yes, correct.

[16] **Q:** Do you recall whether Mr. Cerqueira had a
[17] ponytail?

[18] **A:** No.

[19] **Q:** Do you recall whether Mr. Cerqueira had an
[20] accent?

[21] **A:** No.

[22] **Q:** You also wrote after that, "I thought that
[23] seemed a little strange." Why did you think that
[24] seemed strange?

[1] **A:** You mean, why he asked if the captain
[2] standing in the front of the airplane was our
[3] captain? Because it's obvious he is our captain,
[4] because he's standing right there in the door to the
[5] cockpit. And this is after September 11th, so no
[6] one else — any other crew members — I'll rephrase
[7] that. No other pilots from other airlines or anyone
[8] else would be standing there. So I thought that was
[9] a strange comment.

[10] **Q:** Why did you comment that this man had a
[11] heavy accent?

[12] **A:** I don't know. It was just something to
[13] differentiate who that person was in the ponytail.

[14] **Q:** What happened next?

[15] **A:** I would have to refer to the report.

[16] **Q:** You can refer to the report if that will
[17] refresh your recollection.

[18] **A:** Obviously, the captain told me that he had
[19] been approached by the same person in the terminal.
[20] So that made us a little bit suspicious, why the
[21] same person would have approached that same — our
[22] captain, both at the terminal and then make that
[23] comment that he made on the airplane. And I believe
[24] that's, you know, what the captain had said also.

[1] **Q:** What did the captain tell you about his
[2] encounter with the passenger at the terminal?

[3] **A:** Just as far as I remember, was that he
[4] just — the passenger had come up to ask him about
[5] the flight or about if he was — if he was flying
[6] the airplane to Fort Lauderdale. And then the
[7] reason I remember it being strange is because the
[8] captain said it was the same person that just asked
[9] him when he got on the plane for the second time if
[10] it was the same captain.

[11] **Q:** Did the captain say anything else to you
[12] about that incident?

[13] **A:** Not that I remember.

[14] **Q:** You then wrote, "After all the passengers
[15] were boarded and the door closed, the No. 4 called
[16] the captain and said the passenger at 20F that had
[17] disturbed her in the terminal had been the first one
[18] on and had immediately gone to the right-hand lav in
[19] the rear." Do you see that?

[20] **A:** Yes.

[21] **Q:** Is the "4" again referring to Ms. Walling?

[22] **A:** Yes.

[23] **Q:** Did you hear Ms. Walling's conversation
[24] with the captain?

[1] **A:** No. If I did, I don't remember it.

[2] **Q:** Was she in the back of the plane at this
[3] time?

[4] **A:** She was — I do remember she was in the
[5] back. And then also as things developed, she would
[6] come up and speak to the captain, who was in the
[7] cockpit at the time. So it was both in the back
[8] over the phone and coming up in person.

[9] **Q:** If she was in the back on the phone, would
[10] you have heard what she was saying?

[11] **A:** No, I would not.

[12] **Q:** Other than what you've written here, did
[13] you overhear Ms. Walling tell anything else to the
[14] captain?

[15] **A:** Not that I remember.

[16] **Q:** In your experience, is it unusual for
[17] passengers to use the lavatory in the bathroom upon
[18] boarding the plane?

[19] **A:** Not unusual; but in Boston there are
[20] bathrooms outside by the gates, so — we have some
[21] gates in our system where there are no bathrooms, so
[22] it is very common that a lot of people go to the
[23] bathroom right away, before, you know, they sit
[24] down. But, no, it's not unusual.

---

Page 13

[1] **Q:** So certainly passengers aren't denied
[2] service because they used the bathroom on boarding?
[3] **A:** No.
[4] **MS. MARIANI:** Objection. You may answer.
[5] **Q:** You then wrote, "Passengers started to tell
[6] us the passenger in 20D had started yelling everyone
[7] around him 'Happy New Year.'" Is that right?
[8] **A:** Yes.
[9] **Q:** Did you talk to those passengers
[10] personally?
[11] **A:** I don't remember if I spoke to them or if
[12] Lois or Sally spoke to them.
[13] **Q:** Do you remember where these passengers were
[14] seated?
[15] **A:** If I wrote, "Passengers started to tell us
[16] about the passenger in 20D, those passengers must
[17] have been in the main cabin."
[18] **Q:** Do you remember specifically or are you
[19] guessing?
[20] **A:** I don't remember. I'm reading what I
[21] wrote, but I don't remember where these passengers
[22] sat.
[23] **Q:** Did anyone say anything about Mr. Cerqueira
[24] in particular?

---

Page 14

[1] **A:** I don't remember. I don't know.
[2] **Q:** Would it refresh your recollection as to
[3] who Mr. Cerqueira was if I told you that he was
[4] seated in the window seat of the exit row in Row 20?
[5] **A:** I don't remember him, so that doesn't help
[6] me as far as remembering anything specific about
[7] him.
[8] **Q:** Did these passengers mention this to you or
[9] the other flight — strike that.
[10] Did these passengers mention this to you
[11] before the three gentlemen in Row 20 were removed
[12] from the plane?
[13] **A:** I don't remember.
[14] **Q:** You then say, "The State Police were called
[15] and Passenger Service." When did that happen?
[16] **A:** I don't know the time frame or the
[17] timeline, but it was obviously after there was
[18] calling back and forth to the captain about the
[19] three passengers. So I don't know exactly when this
[20] all took place. It was after the airplane was
[21] boarded. I do know that. I mean, everyone was on
[22] the airplane.
[23] **Q:** Did you have any conversations with Captain
[24] Ehlers about his decision to remove these three

---

Page 15

[1] passengers from the plane?
[2] **A:** Yes, because all three flight attendants —
[3] we were all working the flight, so he had to discuss
[4] this with all three of us. I don't remember my
[5] conversation with him, so I cannot say exactly what
[6] we discussed.
[7] **Q:** Do you remember generally what was
[8] discussed?
[9] **A:** It would have been what Sally and Lois saw
[10] in the main cabin. It would have been, you know —
[11] **Q:** Do you remember what Lois saw?
[12] **A:** No, I don't.
[13] **Q:** Did she ever tell you anything that she
[14] saw?
[15] **A:** No. I mean, not that I remember.
[16] **Q:** I'm sorry, you can finish your answer.
[17] **A:** So we just would have discussed how we felt
[18] about — that we would have had to discuss the
[19] reason we wanted the State Police and Passenger
[20] Service to come out. And so then the captain made
[21] that decision.
[22] **Q:** And what were your reasons for wanting the
[23] State Police and Passenger Service to come out?
[24] **A:** Well, I do know that there had been time

---

Page 16

[1] that had gone by. What I remember, it had been
[2] probably an hour that had gone by, and so —
[3] **Q:** An hour from what?
[4] **A:** From the time the flight attendants had
[5] gotten on the airplane. And I don't believe it was
[6] an hour after boarding, but it would have been after
[7] departure time. And my feelings were if the crew
[8] members don't feel comfortable, if we all don't feel
[9] comfortable with something, it's a security issue,
[10] and we have to address that.
[11] **Q:** What did you feel uncomfortable with?
[12] **A:** I felt uncomfortable that the passengers
[13] were making strange comments to both the captain and
[14] to just people they didn't know as they were getting
[15] on the airplane.
[16] **Q:** Do you recall whether Mr. Cerqueira, who
[17] was the passenger who was seated in the window seat,
[18] was making any of those comments?
[19] **A:** No, I don't remember.
[20] **Q:** What other behavior did you feel was
[21] suspicious?
[22] **MS. MARIANI:** Objection. You may answer.
[23] **A:** I did not see a lot of things. I was in
[24] the front part of the aircraft, so I did not see,

---

Page 17

[1] actually, any of the — a lot of the things that
[2] were going on. But I — as the time continued on, I
[3] did not feel comfortable that the rest of the crew
[4] did not — had seen these things, and it was a
[5] unanimous decision that we would have to, you know,
[6] talk to the captain and have the State Police. And
[7] these are things that we're trained for, as far as
[8] you have to listen to your fellow crew members, even
[9] if you haven't seen anything. So I was basically
[10] doing my job.
[11]    Q: Did you perceive the three passengers
[12] seated in Row 20 in the emergency exit row, Mr.
[13] Cerqueira's row, to be traveling together?
[14]    A: I don't know. I do know I had walked back
[15] there, and so I would have glanced at the row, but I
[16] didn't perceive that they — I don't know.
[17]    Q: So is it fair to say that you didn't really
[18] take any particular notice of them?
[19]    MS. MARIANI: Objection. You may answer.
[20]    A: Well, I did notice, because the gentleman
[21] with the ponytail was sitting in that row. And he's
[22] the one that I — to be honest, he's the one that I
[23] remember the most, just because he made comments to
[24] the captain, and I had more interaction with him.

Page 18

[1] And so he was sitting in that row. So of course, I
[2] would have looked at the whole row, not just him.
[3]    Q: Did you recall whether you thought the
[4] three passengers were Middle Eastern?
[5]    MS. MARIANI: Objection. You may answer.
[6]    A: I don't remember, because I don't remember
[7] other than the gentleman with the ponytail.
[8]    Q: Did you think he was Middle Eastern?
[9]    A: I may have, yes.
[10]    Q: Did you witness Mr. Cerqueira talking or
[11] interacting with the gentleman with the ponytail in
[12] any way?
[13]    A: No.
[14]    Q: Do you recall whether you remember —
[15] strike that. It's a long day.
[16]    Did you think that the three passengers
[17] looked similar to each other?
[18]    MS. MARIANI: Objection. You may answer.
[19]    A: I don't remember, but I remember that they
[20] all had dark hair; you know, just very vague things.
[21]    Q: Do you recall whether they had a similar
[22] skin color?
[23]    MS. MARIANI: Objection. You may answer.
[24]    A: No. Like I said, I mainly remember the

Page 19

[1] gentleman with the ponytail.
[2]    Q: And did it make you feel uncomfortable that
[3] he had an accent?
[4]    MS. MARIANI: Objection. You may answer.
[5]    A: No. Those things don't make me feel
[6] uncomfortable. My husband has an accent. But it's
[7] just something that you pay close attention to, you
[8] know, specifically since September 11th.
[9]    Q: Did you check to see whether those
[10] passengers had purchased their tickets together?
[11]    A: I don't remember if I — no, I don't know
[12] how to do the purchasing — to look at what they
[13] purchased. But I don't remember if I looked at
[14] their boarding passes or not.
[15]    Q: Do you know whether these three passengers
[16] requested seats together?
[17]    A: No, I don't.
[18]    Q: Did you witness any of these three
[19] passengers in the gate area before boarding?
[20]    A: No.
[21]    Q: Do you recall whether they boarded the
[22] flight at the same time?
[23]    A: No, I don't. I just remember the gentleman
[24] with the ponytail was with another gentleman. But I

Page 20

[1] don't remember how he looks.
[2]    Q: So you recall that he was with one
[3] gentleman, not two gentlemen?
[4]    A: Correct.
[5]    Q: Did you personally observe any other
[6] unusual or suspicious behavior that we haven't
[7] talked about yet?
[8]    MS. MARIANI: Objection. You may answer.
[9]    A: No, I don't remember.
[10]    Q: Did you personally observe any unusual or
[11] suspicious behavior on the part of anyone other than
[12] the man with the ponytail?
[13]    MS. MARIANI: Objection. You may answer.
[14]    A: No.
[15]    Q: You mentioned earlier that when you
[16] witnessed the behavior that you thought was
[17] suspicious and made you uncomfortable, it was based
[18] on training you had had. Can you elaborate on that,
[19] what kind of training you've had to identify
[20] suspicious behavior?
[21]    MS. MARIANI: I'm going to object. And I'm
[22] going to instruct the witness to answer only in
[23] general terms and not to provide any specifics that
[24] may implicate Sensitive Security Information. She

Page 21

[1] may answer with respect to generalities.

[2]     **A:** We are trained that we must constantly keep
[3] an eye open to anything that seems unusual behavior.
[4] And one example would be going to the lavatory, but
[5] going constantly, like getting up and going every
[6] few minutes. Obviously you ask if they're ill or
[7] something like that. But we just — there are
[8] certain things that we are trained to look for. And
[9] generally it's odd behavior. I don't know what
[10] other things to say.

[11]     Since September 11th, it's the one thing
[12] that they stress to us, especially every year. We
[13] have recurrent training. We get memos constantly
[14] about, you know, keeping our eyes and ears open to a
[15] lot of things.

[16]     **Q:** Are there any other particular examples in
[17] addition to, you know, someone using the lavatory
[18] every few minutes that you can think of that would
[19] be considered unusual or suspicious behavior?

[20]     **MS. MARIANI:** I'm going to instruct the
[21] witness not to answer on the basis that that
[22] component of the training constitutes Sensitive
[23] Security Information and is part of materials that
[24] the TSA may consider to be Sensitive Security

Page 22

[1] Information.

[2]     **Q:** Did you notice whether Mr. Cerqueira used
[3] the bathroom multiple times that morning?

[4]     **A:** I did not notice anything.

[5]     **Q:** Do you recall that Mr. Cerqueira and the
[6] other two passengers seated in his row were removed
[7] from the plane by law enforcement officials?

[8]     **A:** Yes, I did see that.

[9]     **Q:** Do you recall who removed them from the
[10] plane?

[11]     **A:** I believe it was — no, I don't know who
[12] actually removed them, because the State Police were
[13] onboard and also people from Passenger Service were
[14] onboard. So I don't know specifically who removed
[15] them.

[16]     **Q:** Okay. Do you recall any of the individuals
[17] who were onboard who were involved in that process?

[18]     **A:** Do you mean the Passenger Service people or
[19] the actual passengers?

[20]     **Q:** The Passenger Service people.

[21]     **A:** No, I don't remember who that was or their
[22] names or anything.

[23]     **Q:** And do you recall any of the names of the
[24] State Police officers who were onboard?

Page 23

[1]     **A:** No, I don't.

[2]     **Q:** These three passengers were removed from
[3] the plane before the decision was made to deplane
[4] and rescreen the remainder of the passengers; is
[5] that correct?

[6]     **A:** I believe that is correct.

[7]     **Q:** Do you know why these passengers were
[8] removed from the plane?

[9]     **A:** I know they wanted to check their
[10] itineraries and also check their identification
[11] again. But as far as I remember, that's all that I
[12] was aware of.

[13]     **Q:** Did you continue on to Fort Lauderdale with
[14] this flight?

[15]     **A:** No, I did not.

[16]     **Q:** Why not?

[17]     **A:** The three of us flight attendants, along
[18] with the captain, we made a unanimous decision that
[19] we did not feel comfortable mentally continuing on
[20] that flight to work. We were all — we had been up
[21] very early. We felt stressed by this point. And
[22] the captain, with his — he agreed, and it was a
[23] unanimous decision that we all three stayed behind.

[24]     **Q:** So was your decision just based on the fact

Page 24

[1] that you were tired, you felt stressed from the
[2] incident or were you fearful that there could still
[3] be a problem with the plane?

[4]     **MS. MARIANI:** Objection. You may answer.

[5]     **A:** For me, both. I felt — at this point I
[6] felt uncomfortable. Obviously I was stressed and
[7] tired, but I didn't feel comfortable continuing on.
[8] And I also respect my other fellow crew members, and
[9] they were adamant they were not going. And we try
[10] to always stay together as a crew.

[11]     **Q:** Why didn't you feel comfortable continuing
[12] on?

[13]     **A:** We had not received any information about
[14] the passengers they had removed. We didn't know
[15] what was going on. You know, I didn't know if they
[16] even had checked luggage. At that point I did not
[17] feel comfortable.

[18]     **Q:** Other than the statement that we've been
[19] looking at that you wrote, did you write anything
[20] else regarding this incident?

[21]     **A:** No.

[22]     **Q:** Did you speak with anyone else regarding
[23] this incident?

[24]     **A:** No.

**Page 25**

[1]  **Q:** Did you speak with any supervisor that you
[2] had regarding this incident?
[3]  **A:** No, I did not.
[4]  **Q:** So is it fair to say that no one from
[5] American contacted you to discuss this incident
[6] further?
[7]  **A:** No.
[8]  **Q:** Did you communicate with law enforcement
[9] concerning the incident?
[10]  **A:** Do I understand, afterwards or at the time
[11] of the incident?
[12]  **Q:** At the time of the incident.
[13]  **A:** The only — I don't think I even spoke to
[14] the police officers that came onboard.
[15]  **Q:** Did you communicate with law enforcement
[16] after the incident?
[17]  **A:** No.
[18]  **Q:** I'm going to ask you about some other
[19] American Airlines employees, and I'm basically just
[20] going to ask you — the question is, What is the
[21] involvement with these individuals with this
[22] incident.
[23]  The first is Captain Ehlers.
[24]  **A:** He was our captain on the flight.

**Page 26**

[1]  **Q:** And did he make the decision to remove the
[2] passengers from the flight?
[3]  **A:** Yes.
[4]  **Q:** How about Nicole Traer?
[5]  **A:** I don't recall who that is.
[6]  **Q:** Lois Sargent?
[7]  **A:** That was the other flight attendant that I
[8] was working with.
[9]  **Q:** And did she say anything to you about any
[10] behavior that she had witnessed from any of these
[11] three passengers?
[12]  **A:** I don't remember.
[13]  **Q:** Sally Walling?
[14]  **A:** She was the other crew member.
[15]  **Q:** And other than the conversations we've
[16] already talked about with respect to the behavior
[17] she witnessed, did she say anything else to you
[18] about this incident?
[19]  **A:** I don't recall.
[20]  **Q:** D.M. Ball?
[21]  **A:** I believe he was the first officer.
[22]  **Q:** And did he do anything with respect to the
[23] incident?
[24]  **A:** No, not that I remember.

**Page 27**

[1]  **Q:** Ynes Flores?
[2]  **A:** I don't recall who that is.
[3]  **Q:** Doug Wood?
[4]  **A:** I know the name. I know he's a chief pilot
[5] in Boston. But as far as the incident, I don't know
[6] what his involvement has been.
[7]  **Q:** What are the responsibilities of a chief
[8] pilot?
[9]  **A:** I don't know the exact definition or exact
[10] duties, because it's separate. I'm a flight
[11] attendant. He's a pilot. But he represents kind of
[12] the core of all the pilots for American at Boston,
[13] specifically in Boston.
[14]  **Q:** Rhonda Cobbs?
[15]  **A:** I don't know the name.
[16]  **Q:** Craig Marquis?
[17]  **A:** I don't recall the name.
[18]  **Q:** Does American have a policy regarding the
[19] removal of passengers from flights?
[20]  **MS. MARIANI:** Objection. You may answer.
[21]  **A:** I don't know if they have a specific
[22] policy; but I mean, it happens on flights. But I
[23] don't know word-to-word what the policy is, if there
[24] is one.

**Page 28**

[1]  **Q:** And other than the testimony that you've
[2] already given regarding your training, do you have
[3] anything to add to your previous testimony regarding
[4] how you identify suspicious behavior?
[5]  **MS. MARIANI:** And I'm going to repeat my
[6] objection from earlier. The witness may include any
[7] additional general information, but should not
[8] provide any specifics that would implicate the
[9] Sensitive Security Information Act.
[10]  **A:** No, other than going into specifics.
[11]  **Q:** Does American have protocols for what you
[12] should do if you think a passenger is suspicious?
[13]  **MS. MARIANI:** Objection. You may answer.
[14]  **A:** Not that I'm aware of specifics. It's very
[15] case-by-case. Each incident is always different.
[16] Actually, I can say specifically there are certain
[17] rules as far as intoxicated passengers. So, you
[18] know, there are definite rules with removal towards
[19] those type of things or hitting me or another flight
[20] attendant, crew member or passenger, that type of
[21] thing.
[22]  **Q:** Are there protocols with respect to when
[23] you think someone is engaging in suspicious
[24] behavior, like we've been talking about today?

Amy Milenkovic
Vol. 1, March 28, 2006

Case 1:05-cv-11652-WGY    Document 34-4    Filed 10/18/2006

John D. Cerqueira v.
American Airlines, Inc.

Page 9 of 13

Page 29

[1] **MS. MARIANI:** Objection. You may answer.
[2] **A:** Like I said, it's each — each incident is
[3] very different, so there aren't any exact specifics
[4] on that.
[5] **Q:** Has American ever instructed you on whether
[6] it is okay to consider a passenger's ethnicity in
[7] determining whether they may pose some sort of
[8] threat?
[9] **MS. MARIANI:** Objection. You may answer.
[10] **A:** No.
[11] **Q:** Have you ever been involved in any other
[12] incident in which a passenger was removed from a
[13] flight, denied boarding or refused service?
[14] **A:** For an unruly passenger, I've had — as far
[15] as he was drunk, I've had an incident here and there
[16] for that type of incidents.
[17] **Q:** Do you recall what those incidents were?
[18] **A:** No. Just in general, probably drunk.
[19] **Q:** Have you been involved in any other
[20] incident other than when a passenger is drunk?
[21] **A:** No.
[22] **Q:** Have you ever been the subject of a
[23] discrimination complaint by an American Airlines
[24] customer?

Page 30

[1] **A:** No.
[2] **Q:** And by that, I'm not limiting that to
[3] formal litigation, but any kind of complaint
[4] whatsoever.
[5] **A:** No, not that I'm aware of.
[6] **Q:** Is it possible that you were the subject of
[7] a discrimination complaint that American would not
[8] have brought to your attention?
[9] **A:** No. They would have brought it to my
[10] attention.
[11] **Q:** Has American provided you with any training
[12] instruction or written materials concerning whether
[13] a passenger's race, color, national origin,
[14] ethnicity or ancestry may be considered in
[15] determining whether a passenger should be removed
[16] from a flight, denied boarding or refused service?
[17] **MS. MARIANI:** Objection. You may answer.
[18] **A:** No. They do the opposite. We're not
[19] supposed to look at those things at all.
[20] **Q:** And is that written in any training
[21] materials or instructions that you've received from
[22] American?
[23] **A:** No, not that I remember.
[24] **Q:** Has American ever taken any disciplinary

Page 31

[1] action against you for considering a passenger's
[2] race, color, national origin, ethnicity or ancestry
[3] in determining whether they should be removed from a
[4] flight, denied boarding or refused service?
[5] **MS. MARIANI:** Objection. You may answer.
[6] **A:** No.
[7] **Q:** Do you know any other American employee who
[8] has been disciplined for that behavior?
[9] **MS. MARIANI:** Objection. You may answer.
[10] **A:** No, I don't.
[11] **Q:** You testified earlier that you attend a
[12] training session once a year?
[13] **A:** Correct.
[14] **Q:** What is — strike that.
[15] Do you receive training regarding
[16] identifying suspicious behavior at that training
[17] session?
[18] **A:** Yes.
[19] **Q:** Are any written materials given to you at
[20] that training session?
[21] **A:** No, because it's all verbal and slides.
[22] And if it is, we don't take anything with us,
[23] because it is a security-sensitive subject.
[24] **Q:** Do you have a flight training manual?

Page 32

[1] **A:** Yes.
[2] **Q:** Does that contain instruction on
[3] identifying suspicious behavior?
[4] **A:** No.
[5] **Q:** Does that manual provide instruction on
[6] when a passenger may be removed from the airplane?
[7] **A:** I believe it does. It has about the
[8] intoxicated passenger, also about abuse, as far as
[9] hitting us and that type of thing. But unless I
[10] look at my manual, I don't know — I can't recall.
[11] **MS. ABATE RECHT:** I have no further
[12] questions.
[13] **MS. MARIANI:** I have no questions.
[14] (Whereupon, the deposition was
[15] concluded at 5:37 p.m.)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 33

[1]                 CERTIFICATE
[2]     I, AMY MILENKOVIC, do hereby certify that I have
[3]   read the foregoing transcript of my testimony, and
[4]   further certify that said transcript (with/without)
[5]   suggested corrections is a true and accurate record
[6]   of said testimony.
[7]       Dated at ___, this _____ day of _____,
[8]   2006.
[9]
[10]
[11]
[12]
[13]
[14]
[15]       On this ____ day of _____, 2006, before
[16]   me, the undersigned Notary Public, personally
[17]   appeared _____ and proved to
[18]   me through satisfactory evidence of identification,
[19]   which was _____, to be the person
[20]   whose name is signed above.
[21]
[22]
[23]   Notary Public
[24]   My commission expires: _____

Page 34

[1]   COMMONWEALTH OF MASSACHUSETTS)
[2]   SUFFOLK, SS.                                    )
[3]     I, Jane M. Williamson, Registered Merit Reporter
[4]   and Notary Public in and for the Commonwealth of
[5]   Massachusetts, do hereby certify that there came
[6]   before me on the 28th day of March, 2006, at 4:59
[7]   p.m., the person hereinbefore named, who was by me
[8]   duly sworn to testify to the truth and nothing but
[9]   the truth of her knowledge touching and concerning
[10]   the matters in controversy in this cause; that she
[11]   was thereupon examined upon her oath, and her
[12]   examination reduced to typewriting under my
[13]   direction; and that the deposition is a true record
[14]   of the testimony given by the witness.
[15]     I further certify that I am neither attorney or
[16]   counsel for, nor related to or employed by, any
[17]   attorney or counsel employed by the parties hereto
[18]   or financially interested in the action.
[19]     In witness whereof, I have hereunto set my hand
[20]   and affixed my notarial seal this  day of April
[21]   2006.
[22]
[23]                 Notary Public
[24]           My commission expires: 1/19/07

**O**

0-10 3:20
0015 7:10
0031 6:5

**1**

11th 10:5; 19:8; 21:11
17 7:11

**2**

20 14:4, 11; 17:12
2003 5:22; 6:10
20D 13:6, 16
20F 11:16
2237 5:22; 6:10
28 5:22; 6:10

**4**

4 7:20; 8:17; 11:15, 21

**5**

55116 3:20
5:37 32:15

**8**

8 6:5, 7
867 3:19

**9**

9 7:10, 13
92 5:6, 10

**A**

AA 4:5; 6:5; 7:10
ABATE 3:4, 12; 6:4; 7:9;
32:11
abuse 32:8
AC 7:21
accent 9:4, 20; 10:11;
19:3, 6
Act 28:9
action 31:1
actions 6:22
actual 22:19
actually 17:1; 22:12;
28:16
adamant 24:9
add 28:3
addition 21:17
additional 28:7

address 3:18; 16:10
afterwards 7:16; 25:10
again 11:21; 23:11
against 31:1
agreed 23:22
aircraft 7:22, 23; 16:24
Airlines 4:18; 5:2, 22;
10:7; 25:19; 29:23
airplane 8:9; 10:2, 23;
11:6; 14:20, 22; 16:5, 15;
32:6
Alec 3:23
along 23:17
always 24:10; 28:15
American 4:18; 5:1, 5,
22; 25:5, 19; 27:12, 18;
28:11; 29:5, 23; 30:7, 11,
22, 24; 31:7
AMR 4:12
AMY 3:5, 15, 23
ancestry 30:14; 31:2
Apartment 3:19
approached 10:19, 21
area 19:19
around 13:7
arrangements 4:20
Arts 5:19
assume 7:22
attend 31:11
attendant 5:8, 15; 7:2;
8:3; 26:7; 27:11; 28:20
attendants 15:2; 16:4;
23:17
attention 17:7; 30:8, 10
Avenue 3:19
aware 3:24; 4:17; 7:7;
23:12; 28:14; 30:5
away 12:23

**B**

Bachelor 5:19
back 12:2, 5, 7, 9; 14:18;
17:14
background 5:18
bad 8:21
Ball 26:20
based 20:17; 23:24
basically 17:9; 25:19
basis 21:21
Bates 6:5; 7:10
bathroom 12:17, 23;
13:2; 22:3
bathrooms 12:20, 21
behavior 8:12; 16:20;
20:6, 11, 16, 20; 21:3, 9,
19; 26:10, 16; 28:4, 24;
31:8, 16; 32:3
behavioral 6:22
behind 23:23
bit 10:20
boarded 11:15; 14:21;

19:21
boarding 12:18; 13:2;
16:6; 19:14, 19; 29:13;
30:16; 31:4
boards 9:10
Boston 6:1; 12:19; 27:5,
12, 13
both 10:22; 12:7; 16:13;
24:5
Bramlett 3:24; 4:5
brought 30:8, 9

**C**

cabin 7:8; 8:7; 13:17;
15:10
Call 4:12
called 3:6; 7:6; 11:15;
14:14
calling 14:18
came 25:14
Can 3:13, 16; 5:23; 10:16;
15:16; 20:18; 21:18; 28:16
captain 9:5, 5, 11; 10:1, 3,
3, 18, 22, 24; 11:3, 8, 10,
11, 16, 24; 12:6, 14; 14:18,
23; 15:20; 16:13; 17:6, 24;
23:18, 22; 25:23, 24
case-by-case 28:15
Center 4:13
Cerqueira 6:13; 7:3;
9:16, 19; 13:23; 14:3;
16:16; 18:10; 22:2, 5
Cerqueira's 17:13
certain 6:22; 21:8; 28:16
certainly 13:1
change 8:1
check 19:9; 23:9, 10
checked 24:16
chief 27:4, 7
clerk 5:14
Cleveland 3:19
close 19:7
closed 11:15
Cobbs 27:14
cockpit 10:5; 12:7
color 18:22; 30:13; 31:2
comfortable 16:8, 9;
17:3; 23:19; 24:7, 11, 17
coming 12:8
comment 9:4, 6, 11; 10:9,
10, 23
comments 16:13, 18;
17:23
common 12:22
communicate 25:8, 15
communications 4:7
complaint 29:23; 30:3, 7
component 21:22
concerning 25:9; 30:12
concluded 32:15
consider 21:24; 29:6
considered 21:19; 30:14

considering 31:1
constantly 21:2, 5, 13
constitutes 21:22
contacted 25:5
contain 32:2
continue 23:13
continued 17:2
continuing 23:19; 24:7,
11
conversation 9:1; 11:23;
15:5
conversations 4:21; 7:1;
14:23; 26:15
copy 4:10
core 27:12
counsel 3:6
course 18:1
Craig 27:16
crew 5:21; 6:10; 10:6;
16:7; 17:3, 8; 24:8, 10;
26:14; 28:20
currently 5:1
customer 29:24

**D**

D.M 26:20
dark 18:20
day 18:15
December 5:22; 6:10
decision 14:24; 15:21;
17:5; 23:3, 18, 23, 24; 26:1
definite 28:18
definition 27:9
denied 13:1; 29:13;
30:16; 31:4
department 4:6
departure 16:7
deplane 23:3
deposition 3:22; 4:1, 8,
16, 24; 6:15; 32:14
destination 5:23
determining 29:7; 30:15;
31:3
developed 12:5
different 28:15; 29:3
differentiate 10:13
DIRECT 3:11
directly 9:7
disciplinary 30:24
disciplined 31:8
disclose 4:4
discrimination 29:23;
30:7
discuss 15:3, 18; 25:5
discussed 15:6, 8, 17
discussions 8:6
disturbed 11:17
document 6:5, 6, 8; 7:10,
12, 14
documents 4:7
door 10:4; 11:15

Doug 27:3
down 12:24
driver's 3:8
drunk 29:15, 18, 20
duly 3:9
duties 27:10

**E**

earlier 7:18; 20:15; 28:6;
31:11
early 23:21
ears 21:14
Eastern 18:4, 8
educational 5:18
Ehlers 14:24; 25:23
elaborate 20:18
else 4:15; 8:1, 4, 24; 10:6,
8; 11:11; 12:13; 24:20, 22;
26:17
emergency 17:12
employed 5:1, 4, 12
employee 31:7
employees 25:19
encounter 11:2
enforcement 22:7; 25:8,
15
engaging 28:23
especially 21:12
ethnicity 29:6; 30:14;
31:2
even 17:8; 24:16; 25:13
Event 4:12
everyone 9:10; 13:6;
14:21
exact 27:9, 9; 29:3
exactly 14:19; 15:5
examination 3:6, 11
examined 3:9
example 21:4
examples 21:16
Exhibit 6:5, 7; 7:10, 13
exit 14:4; 17:12
experience 12:16
eye 21:3
eyes 21:14

**F**

fact 23:24
fair 17:17; 25:4
far 3:24; 4:18; 5:13; 6:14,
21, 21, 23; 7:7; 8:11; 11:3;
14:6; 17:7; 23:11; 27:5;
28:17; 29:14; 32:8
fearful 24:2
feel 16:8, 8, 11, 20; 17:3;
19:2, 5; 23:19; 24:7, 11, 17
feeling 8:21
feelings 16:7
fellow 17:8; 24:8

felt 15:17; 16:12; 23:21; 24:1, 5, 6
few 21:6, 18
finish 15:16
first 3:9; 5:15, 17; 11:17; 25:23; 26:21
flight 5:8, 15, 21, 22, 24; 6:1, 9, 10, 16, 17; 7:2, 5; 8:2; 11:5; 14:9; 15:2, 3; 16:4; 19:22; 23:14, 17, 20; 25:24; 26:2, 7; 27:10; 28:19; 29:13; 30:16; 31:4, 24
flights 27:19, 22
Flores 27:1
flying 11:5
follows 3:10
formal 30:3
Fort 6:1; 11:6; 23:13
forth 14:18
frame 14:16
front 10:2; 16:24
full 3:13
further 25:6; 32:11

**G**

galley 9:9
gate 7:24; 19:19
gates 12:20, 21
general 20:23; 28:7; 29:18
generalities 21:1
generally 5:7; 21:9
gentleman 17:20; 18:7, 11; 19:1, 23, 24; 20:3
gentlemen 7:3; 14:11; 20:3
given 28:2; 31:19
glanced 17:15
guessing 13:19

**H**

hair 18:20
happen 14:15
happened 10:14
happens 27:22
Happy 13:7
hear 9:6, 10; 11:23
heard 9:8; 12:10
hearing 6:15
heavy 9:4; 10:11
held 5:9
help 14:5
history 5:20
hitting 28:19; 32:9
honest 17:22
hour 16:2, 3, 6
husband 4:17; 19:6

**I**

identification 6:7; 7:13; 23:10
identified 3:7
identify 20:19; 28:4
identifying 31:16; 32:3
ill 21:6
imagine 3:3
immediately 11:18
implicate 20:24; 28:8
incident 11:12; 24:2, 20, 23; 25:2, 5, 9, 11, 12, 16, 22; 26:18, 23; 27:5; 28:15; 29:2, 12, 15, 20
incidents 29:16, 17
include 28:6
individuals 22:16; 25:21
Information 20:24; 21:23; 22:1; 24:13; 28:7, 9
instruct 20:22; 21:20
instructed 29:5
instruction 30:12; 32:2, 5
instructions 30:21
interacting 18:11
interaction 17:24
intercom 7:7
into 28:10
intoxicated 28:17; 32:8
involved 22:17; 29:11, 19
involvement 25:21; 27:6
issue 16:9
issues 7:8
itineraries 23:10

**J**

job 5:16; 17:10
jobs 5:13, 14
journalism 5:19

**K**

keep 21:2
keeping 21:14
kept 7:24; 8:1
kind 9:10; 20:19; 27:11; 30:3

**L**

last 3:16
Lauderdale 6:2; 11:6; 23:13
lav 11:18
lavatory 12:17; 21:4, 17
law 22:7; 25:8, 15
legal 4:5
license 3:8
limiting 30:2

listen 17:8
litigation 30:3
little 9:23; 10:20
Lois 13:12; 15:9, 11; 26:6
long 5:4; 18:15
look 6:21; 9:12; 19:12; 21:8; 30:19; 32:10
looked 4:10; 8:11; 18:2, 17; 19:13
looking 24:19
looks 20:1
lot 12:22; 16:23; 17:1; 21:15
luggage 24:16

**M**

M-I-L-E-N-K-O-V-I-C 3:17
main 7:8; 8:7; 13:17; 15:10
mainly 18:24
making 3:24; 7:7; 16:13, 18
man 10:10; 20:12
manual 31:24; 32:5, 10
MARIANI 3:2; 4:3; 13:4; 16:22; 17:19; 18:5, 18, 23; 19:4; 20:8, 13, 21; 21:20; 24:4; 27:20; 28:5, 13; 29:1, 9; 30:17; 31:5, 9; 32:13
Marie 3:15
mark 6:4; 7:9
marked 6:6; 7:12
Marquis 27:16
materials 21:23; 30:12, 21; 31:19
may 13:4; 16:22; 17:19; 18:5, 9, 18, 23; 19:4; 20:8, 13, 24; 21:1, 24; 24:4; 27:20; 28:6, 13; 29:1, 7, 9; 30:14, 17; 31:5, 9; 32:6
mean 10:1; 14:21; 15:15; 22:18; 27:22
member 4:5; 5:21; 6:9; 26:14; 28:20
members 10:6; 16:8; 17:8; 24:8
memos 21:13
mentally 23:19
mention 14:8, 10
mentioned 7:20; 8:8, 12; 20:15
Middle 18:4, 8
MILENKOVIC 3:5, 15; 6:6; 7:12
Minnesota 3:20
minutes 21:6, 18
more 17:24
morning 22:3
most 17:23
multiple 22:3
must 13:16; 21:2

myself 4:4

**N**

name 3:13, 16; 6:12, 15, 16; 7:2; 27:4, 15, 17
names 22:22, 23
national 30:13; 31:2
New 13:7
next 9:3; 10:14
Nicole 26:4
Nos 6:5; 7:10
Notary 3:9
notice 17:18, 20; 22:2, 4
numbers 5:24

**O**

object 20:21
Objection 13:4; 16:22; 17:19; 18:5, 18, 23; 19:4; 20:8, 13, 24; 24:4; 27:20; 28:6, 13; 29:1, 9; 30:17; 31:5, 9
observe 20:5, 10
obvious 10:3
Obviously 10:18; 14:17; 21:6; 24:6
October 5:6, 10
odd 5:13; 21:9
office 4:19
officer 26:21
officers 22:24; 25:14
officials 22:7
onboard 7:21; 22:13, 14, 17, 24; 25:14
once 31:12
one 10:6; 11:17; 17:22, 24; 20:22; 21:4, 11; 25:4; 27:24
ones 7:4
only 6:14; 20:22; 25:13
open 21:3, 14
opposite 30:18
origin 30:13; 31:2
out 15:20, 23
outside 21:10
over 4:10; 12:8
overhear 12:13

**P**

p.m 32:15
part 16:24; 20:11; 21:23
particular 13:24; 17:18; 21:16
passenger 6:12; 7:24; 8:10; 9:3, 6, 13; 11:2, 4, 16; 13:6, 16; 14:15; 15:19, 23; 16:17; 22:13, 18, 20; 28:12, 20; 29:12, 14, 20; 30:15; 32:6, 8
passenger's 29:6; 30:13;

31:1
passengers 6:18, 20; 11:14; 12:17; 13:1, 5, 9, 13, 15, 16, 21; 14:8, 10, 19; 15:1; 16:12; 17:11; 18:4, 16; 19:10, 15, 19; 22:6, 19; 23:2, 4, 7; 24:14; 26:2, 11; 27:19; 28:17
passes 19:14
Paul 3:20
pay 19:7
people 4:18, 19; 12:22; 16:14; 22:13, 18, 20
perceive 17:11, 16
person 10:13, 19, 21; 11:8; 12:8
personally 13:10; 20:5, 10
phone 7:7; 12:8, 9
pilot 27:4, 8, 11
pilots 10:7; 27:12
place 4:1; 14:20
Plaintiff 3:7
plane 6:18; 11:9; 12:2, 18; 14:12; 15:1; 22:7, 10; 23:3, 8; 24:3
please 3:13, 16
point 23:21; 24:5, 16
Police 14:14; 15:19, 23; 17:6; 22:12, 24; 25:14
policy 27:18, 22, 23
ponytail 9:4, 14, 17; 10:13; 17:21; 18:7, 11; 19:1, 24; 20:12
pose 29:7
position 5:7, 9
possible 30:6
possibly 4:1
preparation 4:9
prepare 3:21
previous 28:3
previously 5:12
probably 16:2; 29:18
problem 24:3
PROCEEDINGS 3:1
process 22:17
production 3:8
protocols 28:11, 22
provide 20:23; 28:8; 32:5
provided 30:11
Public 3:9
purchased 19:10, 13
purchasing 19:12

**R**

race 30:13; 31:2
reading 13:20
really 17:17
rear 11:19
reason 11:7; 15:19
reasons 15:22

recall 7:4; 8:21, 24; 9:16,
19; 16:16; 18:3, 14, 21;
19:21; 20:2; 22:5, 9, 16,
23; 26:5, 19; 27:2, 17;
29:17; 32:10
receive 31:15
received 4:9; 24:13;
30:21
RECHT 3:4, 12; 6:4; 7:9;
32:11
recognize 6:24; 7:14
recollection 6:9; 8:5;
10:17; 14:2
record 3:14
recurrent 21:13
refer 8:10, 11; 10:15, 16
referred 6:14; 7:17; 8:17
referring 4:12; 11:21
refresh 6:8; 8:5; 10:17;
14:2
refused 29:13; 30:16;
31:4
regarding 7:3; 24:20, 22;
25:2; 27:18; 28:2, 3; 31:15
remainder 23:4
remember 5:24; 6:12, 16,
17, 20, 22; 8:16; 11:3, 7,
13; 12:1, 4, 15; 13:11, 13,
18, 20, 21; 14:1, 5, 13;
15:4, 7, 11, 15; 16:1, 19;
17:23; 18:6, 6, 14, 19, 19,
24; 19:11, 13, 23; 20:1, 9;
22:21; 23:11; 26:12, 24;
30:23
remembering 14:6
removal 27:19; 28:18
remove 14:24; 26:1
removed 6:18; 7:4;
14:11; 22:6, 9, 12, 14;
23:2, 8; 24:14; 29:12;
30:15; 31:3; 32:6
repeat 28:5
rephrase 10:6
report 4:9, 13; 7:15, 17;
8:8, 13, 15; 10:15, 16
represents 27:11
requested 19:16
rescreen 23:4
respect 21:1; 24:8;
26:16, 22; 28:22
responsibilities 27:7
rest 17:3
restaurants 5:14
review 4:7
reviewed 7:18
Rhonda 27:14
right 8:18; 9:9; 10:4;
12:23; 13:7
right-hand 11:18
row 14:4, 4, 11; 17:12, 12,
13, 15, 21; 18:1, 2; 22:6
rules 28:17, 18

**S**

Sally 7:2; 13:12; 15:9;
26:13
same 3:2; 10:19, 21, 21;
11:8, 10; 19:22
Sargent 26:6
sat 13:22
satisfactorily 3:7
saw 9:13; 15:9, 11, 14
saying 12:10
scheduling 4:22, 23
seat 8:1; 14:4; 16:17
seated 13:14; 14:4;
16:17; 17:12; 22:6
seats 19:16
second 11:9
security 16:9; 20:24;
21:23, 24; 28:9
security-sensitive
31:23
seemed 9:23, 24
seems 21:3
Sensitive 20:24; 21:22,
24; 28:9
separate 27:10
September 10:5; 19:8;
21:11
service 13:2; 14:15;
15:20, 23; 22:13, 18, 20;
29:13; 30:16; 31:4
session 31:12, 17, 20
similar 18:17, 21
sit 12:23
sitting 17:21; 18:1
skin 18:22
slides 31:21
solely 4:21, 23
someone 6:23; 9:11;
21:17; 28:23
sorry 9:2; 15:16
sort 29:7
speak 4:15; 12:6; 24:22;
25:1
specific 14:6; 27:21
specifically 13:18; 19:8;
22:14; 27:13; 28:16
specifics 20:23; 28:8, 10,
14; 29:3
spell 3:16
spoke 13:11, 12; 25:13
St 3:20
standing 10:2, 4, 8
stands 7:22
staring 8:2; 9:8
started 13:5, 6, 15
state 3:13; 14:14; 15:19,
23; 17:6; 22:12, 24
statement 24:18
stay 24:10
stayed 23:23
still 24:2

stipulations 3:2
strange 9:23, 24; 10:9;
11:7; 16:13
street 6:24
stress 21:12
stressed 23:21; 24:1, 6
strike 14:9; 18:15; 31:14
student 5:13
subject 29:22; 30:6;
31:23
substance 4:4, 22
supervisor 4:19; 25:1
supposed 30:19
suspicious 10:20; 16:21;
20:6, 11, 17, 20; 21:19;
28:4, 12, 23; 31:16; 32:3
sworn 3:10
system 12:21

**T**

talk 4:22; 13:9; 17:6
talked 20:7; 26:16
talking 3:23; 18:10; 28:24
terminal 10:19, 22; 11:2,
17
terms 20:23
testified 3:10; 31:11
testimony 28:1, 3
thought 9:22; 10:8; 18:3;
20:16
threat 29:8
three 6:17, 20; 14:11, 19,
24; 15:2, 4; 17:11; 18:4,
16; 19:15, 18; 23:2, 17, 23;
26:11
tickets 19:10
timeline 14:17
times 22:3
tired 24:1, 7
today 28:24
today's 3:21
together 17:13; 19:10,
16; 24:10
told 8:2, 20, 21; 10:18;
14:3
took 14:20
towards 28:18
Traer 26:4
trained 17:7; 21:2, 8
training 20:18, 19; 21:13,
22; 28:2; 30:11, 20; 31:12,
15, 16, 20, 24
traveling 17:13
try 24:9
TSA 21:24
turned 9:12
two 7:3; 20:3; 22:6
type 5:14; 28:19, 20;
29:16; 32:9

**U**

unanimous 17:5; 23:18,
23
uncomfortable 16:11,
12; 19:2, 6; 20:17; 24:6
unless 32:9
unruly 29:14
unusual 12:16, 19, 24;
20:6, 10; 21:3, 19
up 11:11; 11:4; 12:6, 8;
21:5; 23:20
upon 12:17
use 12:17
used 13:2; 22:2
using 21:17

**V**

vague 18:20
verbal 31:21

**W**

walked 17:14
Walling 7:2; 8:6, 17; 9:1;
11:21; 12:13; 26:13
Walling's 11:23
way 8:11; 18:12
whatsoever 30:4
Whereupon 32:14
who's 8:17
whole 18:2
window 14:4; 16:17
witness 3:6; 18:10;
19:18; 20:22; 21:21; 28:6
witnessed 20:16; 26:10,
17
Wood 27:3
word 9:7
word-to-word 27:23
work 23:20
working 15:3; 26:8
write 9:3; 24:19
written 4:10; 8:15; 12:12;
30:12, 20; 31:19
wrote 7:15, 20; 8:20;
9:22; 11:14; 13:5, 15, 21;
24:19

**Y**

Year 13:7; 21:12; 31:12
yelling 13:6
Ynes 27:1



*The Commonwealth of Massachusetts*
*Department of State Police*

**MITT ROMNEY**
*GOVERNOR*

**KERRY HEALEY**
*LIEUTENANT GOVERNOR*

**EDWARD A. FLYNN**
*SECRETARY*

**COLONEL THOMAS G. ROBBINS**
*SUPERINTENDENT*

*Headquarters, Troop "F"*
*Massachusetts State Police*
*Logan International Airport*
*East Boston, MA 02128*

*Telephone Number 617/561-1700*
*Sub-Station Fax: 617/561-1720*

## FAX TRANSMITTAL SHEET

**TO:** *Dawn*

**Company:**

**Fax:**

**FROM:**

**Company:**    Massachusetts State Police

**Date:**

**Pages:**    2    (Including Cover Sheet)

**COMMENTS:**

### NOTICE OF CONFIDENTIALITY

The documents accompanying this facsimile transmission contain information from the Massachusetts State Police which may be confidential and/or privileged. The information is intended for use by the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that disclosure, copying of distribution or use of the contents of this transmission is prohibited. If you have received this facsimile in error, please notify us by telephone immediately.

*Excellence In Service Through Quality Policing*

CRQ 0009




Roll Call held all inform. disseminated..

CERQUEIRA
Deposition
Exhibit No. 21
kmm    04/04/06

0714: AA calls and advs that at gate # 29 possible suspicious parties seaqts 20 E and F. Sec R and Z-3 enrte. Lt. Toomey advs.

0718: Tpr, Crowther advs that that the two subj.s made a statemnet in context of " Good Luck w/ flight"., TSA enrte and both passangers wll; be taken from flight #    (2237) to FLA. .

0742" Capt of flight at gate # 29 de-planed all passangers and requests K-9 at scene.

0745: DO contacts FBI agent McCall and left msg.

0749: Major Robbins contacted.

0823: Tpr. Bolke advs that all passangers have been de-planed and re- screened.

0842: Tpr. D. Sullivan advs that passangers name:
     1. John Cerqueira (11-15-67)
     2. Danile Vittorio  (02-10-80)
     3. Oren Ashami  (1-23-80).
     neg 14 and INS and HLS watch list.
     Subj. # 2. orginated conversation w/ flight attendent at AA counter and mentioned (to change seat.,Constantly stearing at her while at ticket counter. While subj #2,, boarded plane gave same evil steer at flg. attentent. Sub. #2 made the communication re: 07:18 entry. All (3) subjs. sat together on aircraft, thus the Capt. felt uncomfatable and asked for plane to be searched.

0900: Z-3 advs all (#) subjs. denied boarding & will be re-booked.(no -charges)>

0933: Sec R Tpr. Bolke advs flight # 2237 push back from gate 29.

BackUp: 2291 Trooper Yee, Frederick F UNKN @ F-H

BackUp: 0625 Trooper Bolke, Joseph J UNKN @ F-H

BackUp: 2024 Trooper Ventura, Donald J UNKN @ F-H

Primary: 1953 Trooper Sullivan, Daniel E UNKN @ F-H

BackUp: 2613 Trooper Crowther, David UNKN @ F-H

Logan : 1200/2200 Terminal Road : B Terminal

---

Airline Passenger: Ashmil, Oren
DOB: 01/23/1980    SSN: ___-__-____
3801 Oceancrest E  Ocean Dr HOLLYWOOD, FL 33020

OSF1200303030:No Action
Injury:

---

Airline Passenger: Vittorio, Daniel
DOB: __/10/1980    SSN: ___-__-____
30__ ___ Buren Sr HOLLYWOOD, FL 33020

OSF1200303038:No Action
Injury:

---

Airline Passenger: Cerqueira, John D
DOB: 11/15/1967    SSN: ___-__-____
1007 N Federal Hgwy FORT LAUDERDALE, FL 33304

OSF1200303058:No Action
Injury:

---

CRQ 0010

05/07/2004

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003        Rhonda Cobbs         Updated: 12/28/2003        Rhonda Cobbs
08:29                                           08:29
1.1CERQUEIRA/JOHN
3    ARNK
4 AA9124Y 01MAR M AVSFSG MM1    700A 1100A
TKT/TIME LIMIT
1.T-12JUN-XTM7EAD
2.TE 0012147100338 CERQU/J XTM7W1K 1026/09MAY 1B*254202
3.TE 0012147973213 CERQU/J XTM7EAD 1125/12JUN 1B*254206
4.TK 0010494109138 CERQU/J BOS584H 0918/28DEC
VCR COUPON DATA EXISTS  *VI TO DISPLAY
PHONES
1.WWW1510-579-3488-B
2.WWWSAPTECH?ALYCOS.COM-E
3.QHF510-579-3488-C/B
ADDRESS
N/JOHN CERQUEIRA
A/3675 N COUNTRY CLUB DR 120
C/AVENTURA, FL
Z/33180-1731
PRICE QUOTE RECORD EXISTS - *PQS
FREQUENT TRAVELER
1.AA KDV1522            HK AA   1.1 CERQUEIRA/JOHN
2.AA KDV1522            HK AX   1.1 CERQUEIRA/JOHN
REMARKS
1.-TBMXX-ADD
2.H-TBMEDIT/49AATDS EDITOR SESSION 3
3.H-TBMEDIT/45AATDS EDITOR SESSION 4
4.H-TBMEDIT/45AATDS EDITOR SESSION 4
5.H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
6.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
7.H-TBMEDIT/45AATDS EDITOR SESSION 1
8.H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
9.H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
10.H-TBMEDIT/45AATDS EDITOR SESSION 1
11.H-TBMEDIT/36AATDS EDITOR SESSION 5
12.H-/T?TTE11/13.00/100.00/N1.1
13.H-/T?TTE12/VCR0012147100338/C1-2
14.H-/T?DOC?VCR
15.H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
16.H-/T?QHF ECK
17.H-/T?TBM*DS6011001850655533?03/05
18.H-/T?JOHN CERQUEIRA
19.H-BOOKING MADE VIA AMERICAN AIRLINES WEBSITE
20.H-PTICERQUEIRA/JOHN-ADT
21.XXTACXTM09MAY/
22.H-TKTED PQ DELETED AND PLACED INTO HISTORY
23..
24.H-M4/PAD - NORMALIZED
25.XXAUTH/012352 *Z
26.XXTTEXTM12JUN/
27.H?EXCHANGE PROCESSED BY ETDS AUTOMATED EDITOR
28.H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
29.H-TBMEDIT/1426/24NOV/SCN SENT
30.?NAME?JOHN CERQUEIRA
31.?PNR?FJZSQY
32.?TYPE?SCN
33.?DLV?EMAIL?SAPTECH?ALYCOS.COM
34.H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
35.H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
36.BAG-TAG FLL890684 SCANNED 28DEC2003 0521L/BOS/SG1
37.H-FLORIDA DL C626 464 67 415 0

AA 0023

05/07/2004

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003      Rhonda Cobbs      Updated: 12/28/2003      Rhonda Cobbs
      08:29                                08:29

```
38.H-*****************************************************
39.H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
40.H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
41.H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
42.H-*****************************************************
43.H-C-...................................
44.H-C-EVENT 03122856.
45.H-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
46.H-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
47.H-C-TICKET...DO NOT REBOOK ON AA.
48.H-C-CCRO/R.COBBS/28DEC03/0808C.
49.H-C-...................................
BAGGAGE INFORMATION
PASSENGER REROUTED
ROUTING-AA   804 LGA  /AA  5021 BOS
CERQUEIRA/JOHN
BOS  AA 905071 - BY FLL546L 1048/24DEC03
BOS  AA 905072 - BY FLL546L 1048/24DEC03
ROUTING-AA  2237 FLL
CERQUEIRA/JOHN
FLL  AA 890684 - BY BOS4DO1 0514/28DEC03
RECEIVED FROM - WWW?KDV1522
WWW.HDQ2EAU 0919/09MAY03 FJZSQY H
?NO PSGR DATA?
1 AA 804H 24DEC*FLLLGA HK1  1145A  230P/E
2 AA5021H 24DEC LGABOS*HK1   500P  615P HRS/E
5021H 24DEC LGABOS HK  4B NA       1.1 CERQUEIRA/JOHN
A5H  H-C-...................................
A5H  H-C-EVENT 03122856.
A5H  H-C-ABOVE PAX DENIED BOARDING F2237/27 BOS-FLL
A5H  H-C-PER SOC MOD DUE SECURITY ISSUES. REFUND
A5H  H-C-TICKET...DO NOT REBOOK ON AA.
A5H  H-C-CCRO/R.COBBS/28DEC03/0808C.
A5H  H-C-...................................
AS   AA9124Y 01MAR AVSFSG MM/MM1   700A 1100A
R-   CCRO
FTW FTW7B2L 0821/28DEC03
A5H  H-*****************************************************
A5H  H-PSGR DENIED TRAVEL ON FLT 2237 PER SOC CRAIG DUE TO
A5H  H-SECURITY ISSUE CCRO WILL ADD EVENT NUMBER SHORTLY
A5H  H-PLZ REFUND TKTS DUE TO DENY  BOSCSM N TRAER
A5H  H-*****************************************************
BOS BOS584H 0801/28DEC03
XS   AA2237V 28DEC BOSFLL SC/HK1  645A 1015A HRS/E
XS   AA1947Y 28DEC BOSFLL NN/HK1  210P  537P/E
X4G* 2237V 28DEC BOSFLL SC/HK  13A NW
BOS BOS584H 0754/28DEC03
AS   AA1947Y 28DEC BOSFLL NN/SS1  210P  537P/E
```

AA 0024

05/07/2004

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003      Rhonda Cobbs          Updated: 12/28/2003      Rhonda Cobbs
08:29                                          08:29

```
BOS BOS543Q 0740/28DEC03
A5H  H-FLORIDA DL C626 464 67 415 0
BOS BOS784H 0721/28DEC03
A5H  H-ALLOWED CHANGE TO 804/5021/ PAX MISSED FLLBOS NONSTOP
A4G   5021H 24DEC LGABOS NN/SS    4B NA
FLL FLL546L 0947/24DEC03
XS   AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
X4G*  2224L 24DEC FLLBOS SC/HK   12A NW
AS   AA 804H 24DEC*FLLLGA NN/SS1  1145A  230P/E
AS   AA5021H 24DEC LGABOS*NN/SS1   500P  615P/E
FLL FLL546L 0947/24DEC03
A5H  H-TBMEDIT/49AATDS EDITOR SESSION 3
R-   TDSEDITOR/0442/25NOV/SCN
XTM XTM7SCN 0446/25NOV03
A5H  H-/T?TBMEDIT/SCHED CHNG EMAIL SENT 1901/24NOV/TDS
R-   TDSEMAILEDIT/1901/24NOV/TDS
XTM XTM7QAD 1904/24NOV03
ITINERARY
XTM XTM4SCN 1430/24NOV03
XS   AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
XS   AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
XS   AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
XS   AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
XS   AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
A5H  H-TBMEDIT/45AATDS EDITOR SESSION 4
A5H  H-TBMEDIT/1426/24NOV/SCN SENT
SC   AA2224L 24DEC FLLBOS SC/HK1  1115A  220P HRS/E
SC   AA2237V 28DEC BOSFLL SC/HK1   645A 1015A HRS/E
R-   TDSEDITOR/1426/24NOV/SCN
XTM XTM4SCN 1429/24NOV03
A5H  H-TBMEDIT/45AATDS EDITOR SESSION 4
A5H  H-TBMEDIT/1 VERIFICATION EDIT/1238/24NOV
A5H  H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
R-   TDSEDITOR/1238/24NOV/WSC
XTM XTM5WSC 1242/24NOV03
X4G   2237V 28DEC BOSFLL HK/WK  13A NW
A4G   2237V 28DEC BOSFLL SC/SC  13A NW
SC   AA2237V 28DEC BOSFLL SC/WK1   655A 1025A HRS/E
AS   AA2237V 28DEC BOSFLL SC/SC1   645A 1015A HRS/E
R-   SC.REAC.E05NOV03 0138/02NOV03
X4G   2224L 24DEC FLLBOS HK/WK  12A NW
X4G   2237V 28DEC BOSFLL HK/WK  13A NW
A4G   2224L 24DEC FLLBOS SC/SC  12A NW
A4G   2237V 28DEC BOSFLL SC/SC  13A NW
SC   AA2224L 24DEC FLLBOS SC/WK1  1124A  228P HRS/E
AS   AA2224L 24DEC FLLBOS SC/SC1  1115A  220P HRS/E
SC   AA2237V 28DEC BOSFLL SC/WK1   707A 1044A HRS/E
AS   AA2237V 28DEC BOSFLL SC/SC1   655A 1025A HRS/E
```

AA 0025

05/07/2004

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

Created: 12/28/2003      Rhonda Cobbs          Updated: 12/28/2003      Rhonda Cobbs
08:29                                          08:29

```
R-      SC.REAC.E22OCT03 0337/19OCT03
A5H     H-TBMEDIT/45AATDS EDITOR SESSION 1
A5H     H-TBMEDIT/1 VERIFICATION EDIT/0057/21JUL
A5H     H-TBMEDIT/C?DEPARTURE EARLIER THAN  15 MINUTES
R-      TDSEDITOR/0057/21JUL/WSC
XTM XTM5WSC 0104/21JUL03
X4G      2224L 24DEC FLLBOS HK/WK   12A NW
X4G      2237V 28DEC BOSFLL HK/WK   13A NW
A4G      2224L 24DEC FLLBOS SC/SC   12A NW
A4G      2237V 28DEC BOSFLL SC/SC   13A NW
SC      AA2224L 24DEC FLLBOS HK/WK1  1105A  209P HRS/E
AS      AA2224L 24DEC FLLBOS HK/SC1  1124A  228P HRS/E
SC      AA2237V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
AS      AA2237V 28DEC BOSFLL HK/SC1   707A 1044A HRS/E
R-      SC.REAC.E23JUL03 0338/20JUL03
XS      AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
X4G*     2223V 28DEC BOSFLL HK/WK   13A NW
A5H     H-TBMEDIT/45AATDS EDITOR SESSION 1
SC      AA2237V 28DEC BOSFLL SC/HK1   750A 1125A HRS/E
R-      TDSEDITOR/0120/25JUN/WSC
XTM XTM5WSC 0127/25JUN03
A4G      2237V 28DEC BOSFLL SC/SC   13A NW
SC      AA2223V 28DEC BOSFLL HK/WK1   750A 1125A HRS/E
AS      AA2237V 28DEC BOSFLL SC/SC1   750A 1125A CHG/HRS/E
R-      SC.REAC.E25JUN03 0220/22JUN03
A5H     H-/T?TBMEDIT/EMAIL SENT 1216/12JUN/TDS
R-      TDSEMAILEDIT/1216/12JUN/TDS
XTM XTM7QAD 1222/12JUN03
X5H     H-TBMEDIT/32AATDS EDITOR SESSION 3
A5H     H-TBMEDIT/36AATDS EDITOR SESSION 5
R-      TDSEDITOR/1125/12JUN/EVN
XTM XTM7EVN 1132/12JUN03
X5H     H-TBMEDIT/41AATDS EDITOR SESSION 1
A5H     H-TBMEDIT/32AATDS EDITOR SESSION 3
X7      TTEXTM12JUN/
A7      T-12JUN-XTM7EAD
R-      TDSEDITOR/1119/12JUN/EAD
XTM XTM7EAD 1125/12JUN03
X5H     H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
X5H     H-TBMEDIT/28AATDS EDITOR SESSION 4
XW      Z/33180
AW      Z/33180-1731
A5H     H-TBMEDIT/41AATDS EDITOR SESSION 1
A5H     H-M4/PAD - NORMALIZED
R-      TDSEDITOR/1104/12JUN/POS
XTM XTM7POS 1110/12JUN03
X5F     -TBM*DS6011001850655533?03/05
X5F     -JOHN CERQUEIRA
X5H     H-/T?DOC?VCR
X5H     H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM?FREE
X5H     H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
A9      QHF510-579-3488-C/B
A5F     -TBMXX-ADD
A5H     H-/T?TTE11/13.00/100.00/N1.1
```

AA 0026

# Detail Note

## Event ID: 03122856

## Passenger Name Record (*PNR)

**Created:** 12/28/2003    Rhonda Cobbs    **Updated:** 12/28/2003    Rhonda Cobbs
08:29                         08:29

```
A5H   H-/T?TTE12/VCR0012147100338/C1-2
A5H   H-/T?DOC?VCR
A5H   H-/T?DLV?EMAIL?SAPTECH?ALYCOS.COM
A5H   H-/T?QHF ECK
A5H   H-/T?TBM*DS6011001850655533?03/05
A5H   H-/T?JOHN CERQUEIRA
X7    T-09MAY-XTM7W1K
A7    TTEXTM12JUN/
R-    JOHN
QHF QHF1ECK 1057/12JUN03
A4G    2224L 24DEC FLLBOS NN/SS  12A NW
A4G    2223V 28DEC BOSFLL NN/SS  13A NW
R-    JOHN
QHF QHF1ECK 1053/12JUN03
XS    AA4153N 20JUN TYSORD NN/HK1    226P  304P /DCAA*FJZSQY
HRS/E
XS    AA4084N 22JUN ORDTYS NN/HK1    716P  945P /DCAA*FJZSQY
HRS/E
X4G*   4153N 20JUN TYSORD SS/HK   8A NA
X4G*   4084N 22JUN ORDTYS SS/HK  16A NAH
AS    AA2224L 24DEC FLLBOS NN/SS1   1105A  209P/E
AS    AA2223V 28DEC BOSFLL NN/SS1   750A 1125A/E
R-    JOHN CERQUEIRA
QHF QHF1ECK 1053/12JUN03
A5H   H-/T?TBMEDIT/EMAIL SENT 1045/09MAY/TDS
R-    TDSEMAILEDIT/1045/09MAY/TDS
XTM XTM7QAD 1050/09MAY03
A5H   H-TBMEDIT/TKT DRIVEN FOR 256.50/1021/09MAY
A5H   H-TBMEDIT/28AATDS EDITOR SESSION 4
A5H   H-TKTED PQ DELETED AND PLACED INTO HISTORY
X7    TACXTM09MAY/
A7    T-09MAY-XTM7W1K
R-    TDSEDITOR/1021/09MAY/W1F
XTM XTM7W1K 1026/09MAY03
```

**LYC`S**    saptech@lycos.com  [ LOG OUT ]  (Not you? click here)    terra  lycos

Lycos Home    Site Map    My Lycos    Lycos Mail    Account Info    January 6, 2004

Search the web:    [ GO ]

Mail Home > INBOX > Read Mail

Help

## MailBox: Read Mail

[ REPLY ]  [ REPLY ALL ]  [ FORWARD ]  [ DELETE ]  -Move to Folder-    Previous  Nex

[ 🖨 printable view ] [ 📥 download message ] [view all headers]

▼ **Mail Home**

**MailBox Folders**
[add/edit/delete]
--------------
📁 **Inbox**
📁 Bulk-Mail [Empty]
📁 Drafts
📁 Sent Mail
📁 Trash [Empty]
--------------
📁 Land
📁 LCFD
📁 To reply to

Compose

Address Book

Options

System Status

**Date:** Tue, 06 Jan 2004 06:21:31 -0600
**From:** "AmericanAirlines wecaare001" <AmericanAirlines.wecaare001@aa.com> [add to address book] [protect or block sender]
**Subject:** R2003/12-27671-00211-001
**To:** <SAPTECH@LYCOS.COM>


CERQUEIRA Deposition Exhibit No. 5 kmm 04/04/06

Text Size: S **M** L **XL**

Dear Mr. Cerqueira:

One of the most difficult decisions our personnel must make is to refuse passage to one of our customers.  Nevertheless, we do have that obligation and that authority when there are manifestations of behavior which could become troublesome during flight.

We have fully reviewed the decision not to let you board your flight to Fort Lauderdale.  Our investigation has revealed that our personnel perceived certain aspects of your behavior which could have made other customers uncomfortable on board the aircraft.  It was for this reason that you were not permitted to travel.

It was also noted in the record that our personnel authorized a refund of the Boston - Fort Lauderdale segment of your ticket.  There is no indication that you will be denied boarding in the future.

We welcome all customer feedback.  Should you wish to contact us again, please do so via http://www.aa.com/customerrelations/, and we'll be back with you as soon as possible.

Sincerely,

Shirley Womack
Customer Relations
American Airlines

This email message and its contents are copyrighted and are proprietary products of American Airlines, Inc.  Any unauthorized use, reproduction, or transfer of this message or its contents, in any medium, is strictly prohibited.

CRQ 0008

[ REPLY ]  [ REPLY ALL ]  [ FORWARD ]  [ DELETE ]  -Move to Folder-    Previous  Nex