UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA,<br><br>                Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>                Defendant. | Civil Action No. 05-11652-WGY |

**PLAINTIFF JOHN D. CERQUEIRA'S RESPONSE TO AMERICAN
AIRLINES, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT
OF AMERICAN AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, plaintiff John D. Cerqueira submits this response to American Airlines, Inc.'s (AA) statement of facts in support of AA's opposition to plaintiff's motion for partial summary judgment (Doc. No. 33). The documents cited herein are either pleadings on file with the Court or exhibits attached to plaintiff's statement of undisputed facts in support of his motion for partial summary judgment (Doc. No. 22).

**Fact No.**     **Plaintiff's Response**

1.        Undisputed.

2.        Undisputed.

3.        Undisputed.

4.        Disputed in part. Ms. Walling told Mr. Cerqueira that she could not assist him and she asked him to sit down and wait. Mr. Cerqueira complied with Ms. Walling's instructions. Cerqueira Dep. 30:24-31:22; Walling Dep. 18:12-16. Ms. Walling did

|     |     |
| --- | --- |
|     | explain that the reason she could not help him was because she was not a gate agent. Cerqueira Dep. 32:3-13, 37:5-10. |
| 5.  | Disputed. Ms. Walling admits that Mr. Cerqueira followed her instructions when she told him to sit down in the seats near the gate counter. Walling Dep. 18:12-19. |
| 6.  | Disputed. Mr. Cerqueira was not hostile or insistent. Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0037). |
| 7.  | Disputed. Ms. Walling did not testify that she was "disturbed." Walling Dep. 11:17-21. According to flight attendant Sargent, Ms. Walling was merely "annoyed." Sargent Dep. 14:16-21. |
| 8.  | Disputed. Mr. Cerqueira boarded the aircraft when his assigned group was called. He was among the first coach passengers to board. Ans. ¶ 11.[1] There is no evidence that Mr. Cerqueira boarded a "darkened" coach cabin. |
| 9.  | Undisputed. |
| 10. | Disputed in part and immaterial. According to Ms. Walling, *two* passengers had told her that they felt uneasy with things that were said by the passengers in the exit row. Walling Dep. 19:9-13, 20:21-24. According to Ms. Walling, the passengers were uncomfortable because either Mr. Ashmil or Mr. Rokah, but not Mr. Cerqueira, was heard wishing other passengers a "happy new year." Walling Dep. 24:15-22. Mr. |

---

[1]Because this admission was made in AA's Answer (Doc. No. 5), it is a judicial admission that binds AA. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.") (quotation omitted); *United States v. Belculfine*, 527 F.2d 941, 944 (1st. Cir. 1975) ("[J]udicial admissions are conclusive on the party making them.").

|     | |
| --- | --- |
|     | Cerqueira did not speak to anyone on board the airplane until he was awakened and asked for his boarding pass sometime later. Cerqueira Dep. 44:15-21. The report that two passengers were uncomfortable with comments made by Mr. Ashmil or Mr. Rokah is immaterial because it has nothing to do with Mr. Cerqueira's behavior. |
| 11. | Disputed in part. There is no evidence of any "commotion." |
| 12. | Disputed in part. Although Ms. Walling initially testified that she felt it was unusual for passengers to be resting with their eyes closed while other passengers were boarding, Ms. Walling later admitted that it is not uncommon for passengers to sit back and close their eyes. Walling Dep. 34:6-9. It is undisputed that Ms. Walling was not sufficiently concerned about the behavior of the men in the exit row that she felt any need to bring it to Capt. Ehler's attention. Rather, Ms. Walling reported her concerns about Mr. Cerqueira only *after* Capt. Ehlers asked her to check on the passenger with the ponytail, and she did so only because she thought—based on Mr. Cerqueira's physical appearance—that Mr. Cerqueira was traveling with the men seated next to him. Walling Dep. 23:18-23, 26:24-27:9, 31:2-33:1; Ehlers Dep. 21:15-22:2, 22:20-21. |
| 13. | Disputed and immaterial. No member of the flight crew had any unusual interaction with Mr. Cerqueira. First, it is not unusual for passengers to ask for a seat change at the gate counter. Walling Dep. 8:6-8; Sargent Dep. 14:22-15:1. Second, it is not unusual for a passenger to board when called. *See* Ans. ¶ 11. Third, it is not unusual for a passenger to use the lavatory upon boarding a flight. Ehlers Dep. 25:23-26:2; Walling Dep. 14:4-7; Milenkovic Dep. 12:16-19; Sargent Dep. 21:24-22:3. Fourth, |

|     |     |
| --- | --- |
|     | it is not uncommon for passengers to sit back and close their eyes. Walling Dep. 34:6-14. Any allegedly "unusual" behavior by the men seated next to Mr. Cerqueira is immaterial because it has nothing to do with Mr. Cerqueira's behavior. |
| 14. | Immaterial. This fact has nothing to do with Mr. Cerqueira's behavior. |
| 15. | Immaterial. This fact has nothing to do with Mr. Cerqueira's behavior. |
| 16. | Immaterial. This fact has nothing to do with Mr. Cerqueira's behavior. |
| 17. | Immaterial. This fact has nothing to do with Mr. Cerqueira's behavior. |
| 18. | Disputed and immaterial. Ms. Sargent testified that the passengers in seats D and E were behaving in a manner she found unusual. Sargent Dep. 7:14-8:4. Mr. Cerqueira did not laugh or otherwise react to any conversation that may have occurred between the flight attendant and the men seated next to him. Cerqueira Dep. 45:1-20; Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0038 n.1). This allegation is immaterial because Capt. Ehlers did not base his decision to remove Mr. Cerqueira on anything reported by Ms. Sargent. Capt. Ehlers decided to have Mr. Cerqueira removed from the flight based on information and opinions communicated to Capt. Ehlers by flight attendant Sally Walling. Ans. ¶ 33; Ehlers Dep. 22:15-19. |
| 19. | Immaterial. This fact has nothing to do with Mr. Cerqueira's behavior. |
| 20. | Disputed. Mr. Cerqueira did not laugh or otherwise react to any conversation that may have occurred between the flight attendant and the men seated next to him. Cerqueira Dep. 45:1-20; Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0038 n.1). |

21. Disputed and immaterial. Ms. Sargent testified that the passengers in seats D and E were behaving in a manner she found atypical. Sargent Dep. 7:14-8:4. Mr. Cerqueira did not laugh or otherwise react to any conversation that may have occurred between the flight attendant and the men seated next to him. Cerqueira Dep. 45:1-20; Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0038 n.1). This allegation is immaterial because Capt. Ehlers did not base his decision to remove Mr. Cerqueira on anything reported by Ms. Sargent. Capt. Ehlers decided to have Mr. Cerqueira removed from the flight based on information and opinions communicated to Capt. Ehlers by flight attendant Sally Walling. Ans. ¶ 33; Ehlers Dep. 22:15-19.

22. Disputed and Immaterial. No member of the flight crew had any unusual interaction with Mr. Cerqueira. First, it is not unusual for passengers to ask for a seat change at the gate counter. Walling Dep. 8:6-8; Sargent Dep. 14:22-15:1. Second, it is not unusual for a passenger to board when called. *See* Ans. ¶ 11. Third, it is not unusual for a passenger to use the lavatory upon boarding a flight. Ehlers Dep. 25:23-26:2; Walling Dep. 14:4-7; Milenkovic Dep. 12:16-19; Sargent Dep. 21:24-22:3. Fourth, it is not uncommon for passengers to sit back and close their eyes. Walling Dep. 34:6-14. Any allegedly "unusual" behavior by the men seated next to Mr. Cerqueira is immaterial because it has nothing to do with Mr. Cerqueira's behavior.

23. Disputed and immaterial. Mr. Cerqueira did not engage in any "unusual interactions," and any allegedly "unusual interactions" between the flight crew and the men seated next to Mr. Cerqueira are immaterial because they have nothing to do

with Mr. Cerqueira's behavior. Capt. Ehlers testified that other than listening to Ms. Walling's concerns, he had no discussions, prior to the flight, with the other flight attendants regarding Mr. Cerqueira or the two men seated next to him. Ehlers Dep. 22:15-19.

24. Disputed in part. Capt. Ehlers asked Ms. Walling to check on the man with the ponytail, but not specifically on the man's location. Ms. Walling noted that the man with the ponytail was seated in the same row as—but not necessarily next to—Mr. Cerqueira. Walling Dep. 23:18-23.

25. Disputed. There was nothing unusual about Mr. Cerqueira's behavior. Capt. Ehlers testified that he contacted the gate agent, the ground security coordinator, and System Operations Control, to relay Ms. Walling's concerns. Ehlers Dep. 22:15-19, 29:15-30:1, 31:5-32:24.

26. Disputed in part. Capt. Ehlers never had any direct conversations or interactions with Mr. Cerqueira on December 28, 2003, and Capt. Ehlers did not observe Mr. Cerqueira prior to boarding the plane. Ehlers Dep. 15:20-16:2. Although Capt. Ehlers claims not to have looked at the passengers in seats 20D, E, and F, Customer Service Manager Ynes Flores testified that Capt. Ehlers pointed out the passengers seated in the exit row and instructed Mr. Flores to ask them for their boarding passes. Flores Dep. 11:5-9, 11:23-24, 22:5-9. Similarly, Ms. Sargent testified that Capt. Ehlers came out and looked at the passengers in the exit row. Sargent Dep. 16:10-11. Further, Capt. Ehlers knew that Ms. Walling perceived Mr. Cerqueira to be traveling with the two other men seated in his row. Ehlers Dep. 21:15-22:2.

27.  Disputed. AA has made a judicial admission that Capt. Ehlers made the decision to have Mr. Cerqueira removed from the flight. Ans. ¶ 32.

28.  Disputed. Neither Mr. Marquis nor Ms. Cobbs can remember the details of what they knew about Mr. Cerqueira on December 28, 2003. Marquis Dep. 10:1-25, 12:15-14:5; Cobbs Dep. 14:10-15:24, 33:19-34:14, 43:8-25.

29.  Disputed. Record evidence shows that Mr. Cerqueira's color and physical appearance are similar to those commonly associated with individuals of Arab, Middle Eastern, or South Asian descent, and that Mr. Ashmil and Mr. Rokah have a color and physical appearance similar to that of Mr. Cerqueira. Walling Dep. 31:14-24; Milenkovic Dep. 18:16-20; Sargent Dep. 11:22-12:3; Cerqueira Dep. 93:23-24, 128:12-13, 133:3-8; Pl. Resp. to Interr. No. 2.

30.  Undisputed.

31.  Disputed. Record evidence shows that Mr. Cerqueira's color and physical appearance are similar to those commonly associated with individuals of Arab, Middle Eastern, or South Asian descent, and that Mr. Ashmil and Mr. Rokah have a color and physical appearance similar to that of Mr. Cerqueira. Walling Dep. 31:14-24; Milenkovic Dep. 18:16-20; Sargent Dep. 11:22-12:3; Cerqueira Dep. 93:23-24, 128:12-13, 133:3-8; Pl. Resp. to Interr. No. 2.

32.  Undisputed.

33.  Immaterial and incomplete. Because Mr. Cerqueira had already been removed from the flight, this allegation is immaterial because it could not have been a basis for the decision to remove Mr. Cerqueira. It is further immaterial because it has nothing to

|     |     |
| --- | --- |
|     | do with Mr. Cerqueira's behavior. Moreover, Capt. Ehlers admits that the passenger's allegation regarding a prohibited object was false. Ehlers Dep. 43:10-12. |
| 34. | Disputed and immaterial. There is no evidence that the State Police or TSA did anything based on Mr. Cerqueria having used the lavatory. Mr. Cerqueira was in the lavatory for approximately four to five minutes. Cerqueira Dep. 40:16-41:2; Walling Dep. 17:6-8. The First Officer checked the lavatory and reported that he did not find anything. Ehlers Dep. 44:3-14. Capt. Ehlers testified that he believes the false allegation about a prohibited object was a "factor" in the decision to deplane all the passengers and rescreen the luggage. Ehlers Dep. 45:3-5. The fact that a decision was made to deplane all the passengers and rescreen the luggage is immaterial because the decision was made after Mr. Cerqueira had been removed from the flight. |
| 35. | Immaterial. Any information provided to Capt. Ehlers after Mr. Cerqueira was removed is immaterial because it could not have been a basis for Capt. Ehler's decision to have Mr. Cerqueira removed from the flight, and Capt. Ehlers was not involved in the decision to deny service to Mr. Cerqueira after his release from police questioning. Ehlers Dep. 64:1-5. |
| 36. | Disputed. Craig Marquis was the manager on duty at AA's System Operations Control (SOC) on the morning of December 28, 2003. Marquis Dep. 7:10-13, 9:13-14, 18:3-4. Mr. Marquis made the decision to deny service to Mr. Cerqueira after he was released from questioning by the State Police. Def. Resp. to Interr. No. 2. Mr. Marquis has no recollection of his actions on December 28, 2003, with respect to any of the incidents involving Mr. Cerqueira. Marquis Dep. 10:1-25, 12:15-14:5. Mr. |

|   |   |
|---|---|
|   | Marquis does not recall making the decision that the three passengers removed from the airplane for questioning would not be rebooked on a later AA flight, and he does not recall the basis for the decision to deny service to those passengers. Marquis Dep. 13:11-17. At the time Mr. Cerqueira was denied service, he was offered no information regarding how long he would be barred from travel on AA. Nine days later, on January 6, 2004, AA sent Mr. Cerqueira an e-mail stating that "[t]here is no indication that you will be denied boarding in the future." Ans. ¶ 30. |
| 37. | Disputed and immaterial. Although Capt. Ehlers claims not to have looked at the passengers in seats 20D, E, and F, Customer Service Manager Ynes Flores testified that Capt. Ehlers pointed out the passengers seated in the exit row and instructed Mr. Flores to ask them for their boarding passes. Flores Dep. 11:5-9, 11:23-24, 22:5-9. Similarly, Ms. Sargent testified that Capt. Ehlers came out and looked at the passengers in the exit row. Sargent Dep. 16:10-11. Further, Capt. Ehlers knew that Ms. Walling perceived Mr. Cerqueira to be traveling with the two other men seated in his row. Ehlers Dep. 21:15-22:2. Neither Mr. Marquis nor Ms. Cobbs can remember the details of what they knew about Mr. Cerqueira on December 28, 2003. Marquis Dep. 10:1-25, 12:15-14:5; Cobbs Dep. 14:10-15:24, 33:19-34:14, 43:8-25. Allegations regarding the decisionmakers' knowledge of Mr. Cerqueira's protected characteristics are immaterial because it is well-settled that a decisionmaker need not be biased if the decisionmaker acted on biased information provided by another. *See, e.g., Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 83 (1st Cir. 2004); *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484-88 (10th Cir. 2006); *Zades v.* |

          *Lowe's Home Ctrs., Inc.*, 446 F. Supp. 2d 29, 40 (D. Mass. 2006); *Harlow v. Potter*, 353 F. Supp. 2d 109, 116-18 (D. Me. 2005).

38.    Immaterial.  Whether Ms. Cobbs or Mr. Marquis had an opportunity to observe Mr. Cerqueira at the time of the incident is irrelevant.  Even if AA's decisionmakers knew nothing of Mr. Cerqueira's appearance—which has not been established—AA will still be liable if its decisionmakers acted on information provided by someone who did have such knowledge and was motivated by discrimination.  *See, e.g., Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 83 (1st Cir. 2004); *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484-88 (10th Cir. 2006); *Zades v. Lowe's Home Ctrs., Inc.*, 446 F. Supp. 2d 29, 40 (D. Mass. 2006); *Harlow v. Potter*, 353 F. Supp. 2d 109, 116-18 (D. Me. 2005).

39.    Undisputed but incomplete.  Ms. Walling testified that she thought the three passengers looked similar because "[t]hey were dark."  Walling Dep. 31:14-19.  Mr. Cerqueira's color and physical appearance are similar to those commonly associated with individuals of Arab, Middle Eastern, or South Asian descent, and Mr. Ashmil and Mr. Rokah have a color and physical appearance similar to that of Mr. Cerqueira.  Walling Dep. 31:14-24; Milenkovic Dep. 18:16-20; Sargent Dep. 11:22-12:3; Cerqueira Dep. 93:23-24, 128:12-13, 133:3-8; Pl. Resp. to Interr. No. 2.

40.    Undisputed but incomplete.  Ms. Walling testified that she thought the three passengers looked similar because "[t]hey were dark."  Walling Dep. 31:14-19.  Mr. Cerqueira's color and physical appearance are similar to those commonly associated with individuals of Arab, Middle Eastern, or South Asian descent, and Mr. Ashmil

and Mr. Rokah have a color and physical appearance similar to that of Mr. Cerqueira. Walling Dep. 31:14-24; Milenkovic Dep. 18:16-20; Sargent Dep. 11:22-12:3; Cerqueira Dep. 93:23-24, 128:12-13, 133:3-8; Pl. Resp. to Interr. No. 2.

41. Undisputed but incomplete. Ms. Walling testified that she thought the three passengers looked similar, and she thought they looked similar because "[t]hey were dark." Walling Dep. 31:14-19.

42. Undisputed.

43. Disputed in part. Although Ms. Walling could not say for sure that the three men were traveling together, she assumed that they were on the basis of their similar appearance. Capt. Ehlers testified that Ms. Walling perceived Mr. Cerqueira to be traveling with Mr. Ashmil and Mr. Rokah. Ehlers Dep. 21:15-22:2. Ms. Walling did not witness Mr. Cerqueira talking with Mr. Ashmil or Mr. Rokah or interacting with them in any way. Walling Dep. 31:2-4. Ms. Walling thought that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah looked similar because they were "dark" and had dark hair. Walling Dep. 31:14-24. Ms. Walling did not check to see if Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah had purchased their tickets together and she did not know if they had requested to sit together. Walling Dep. 32:1-10. Ms. Walling did not see Mr. Cerqueira with Mr. Ashmil or Mr. Rokah in the gate area before boarding. Walling Dep. 32:11-33:1.

44. Undisputed but incomplete. Ms. Walling also testified that she thought the three passengers looked similar, and she thought they looked similar because "[t]hey were dark." Walling Dep. 31:14-19.

45. Disputed. Ms. Milenkovic thought that the man with the ponytail, either Mr. Ashmil or Mr. Rokah, was Middle Eastern. Milenkovic Dep. 18:3-9. She also noticed that he had a heavy accent. Milenkovic Dep. 10:10-13, Dep. Ex. 9. Ms. Milenkovic noticed that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah all had dark hair. Milenkovic Dep. 18:16-20. Since the events of September 11, 2001, Ms. Milenkovic pays close attention to whether a passenger has an accent. Milenkovic Dep. 19:2-8.

46. Disputed. At the time of her deposition, Ms. Milenkovic did not remember Mr. Cerqueira, but she testified that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah all had dark hair. Milenkovic Dep. 18:16-20.

47. Disputed. Ms. Milenkovic testified that, at the time of her deposition, she could not remember whether she perceived the three men to be traveling together. Milenkovic Dep. 17:11-16.

48. Undisputed.

49. Disputed. Flight attendant Sargent thought that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were foreign nationals because of their appearance. Sargent Dep. 11:22-12:3, Dep. Ex. 5. Ms. Sargent believed that a review of the passenger manifest had revealed that Mr. Ashmil and Mr. Rokah had Israeli passports but Arabic names. Sargent Dep. 13:12-18, 31:6-32:2, Dep. Ex. 6.

50. Disputed. Ms. Sargent testified that she does not recall whether the flight crew looked up the passport information before or after the decision to remove the passengers had been made. Sargent Dep. 13:19-14:8.

51. Disputed. Flight attendant Sargent thought that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were foreign nationals because of their appearance. Sargent Dep. 11:22-12:3, Dep. Ex. 5.

52. Disputed. The U.S. Department of Transportation (DOT) has found that, following the attacks of September 11, 2001, American Airlines unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent, by causing such passengers to be removed from flights, denied boarding, or refused service. On April 25, 2003, the DOT brought an enforcement action against American Airlines. Docket OST-2003-15046. In its

   Complaint, DOT cited eleven separate instances in which American Airlines unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent by removing them from flights or denying boarding to them. The enforcement proceeding was concluded on February 27, 2004, pursuant to a Consent Order finding that American Airlines acted in a manner inconsistent with the requirements of Federal anti-discrimination law, and ordering American Airlines to cease and desist from future violations and to spend at least $1.5 million to provide civil rights training to its flight and cabin crewmembers and passenger service representatives. Pl. Resp. to Interr. No. 4.

53. Disputed. Mr. Cerqueira did not make his request for a seat change in an insistent or hostile manner. Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0037). AA has made a judicial admission that Mr. Cerqueira boarded when his assigned group was called. Ans. ¶ 11. Mr. Cerqueira was in the lavatory for less

than five minutes. Cerqueira Dep. 41:2; Walling Dep. 17:8. Mr. Cerqueira did not laugh or otherwise react to any conversation that may have occurred between the flight attendant and the men seated next to him. Cerqueira Dep. 45:1-20; Pl. Resp. to Interr. No. 2 (incorporating by reference CRQ 0038 n.1).

54.    Disputed. There was nothing unusual about Mr. Cerqueira's behavior. First, it is not unusual for passengers to ask for a seat change at the gate counter. Walling Dep. 8:6-8; Sargent Dep. 14:22-15:1. Second, it is not unusual for a passenger to board when called. *See* Ans. ¶ 11. Third, it is not unusual for a passenger to use the lavatory upon boarding a flight. Ehlers Dep. 25:23-26:2; Walling Dep. 14:4-7; Milenkovic Dep. 12:16-19; Sargent Dep. 21:24-22:3. Fourth, it is not uncommon for passengers to sit back and close their eyes. Walling Dep. 34:6-14.

55.    Immaterial. AA cannot satisfy its burden by pointing to a computer entry indicating that the denial of service was due to "security concerns," because conclusory statements are insufficient to shift the burden back to plaintiff. *See, e.g., IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (holding that where plaintiff established a *prima facie* case, conclusory statement that defendant selected the best qualified applicant was insufficient to satisfy defendant's rebuttal burden); *Simmons v. American Airlines*, 34 Fed. Appx. 573, 576 (9th Cir. 2002) (holding that "American did not satisfy its burden of articulating a legitimate, non-discriminatory reason for removing [plaintiff]" from a flight, because American's evidence was insufficient to justify its claim that it removed plaintiff for safety reasons).

          **JOHN D. CERQUEIRA**

          By his attorneys,

          */s/ Michael T. Kirkpatrick*
          _____
          Michael T. Kirkpatrick
          Public Citizen Litigation Group
          1600 20th Street NW
          Washington, DC  20009
          (202) 588-1000
          mkirkpatrick@citizen.org

          David S. Godkin (BBO #196530)
          Darleen F. Cantelo (BBO #661733)
          Birnbaum & Godkin, LLP
          280 Summer Street
          Boston, MA  02210
Dated: November 1, 2006      617-307-6100

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 1, 2006.

          */s/ Michael T. Kirkpatrick*
          _____
          Michael T. Kirkpatrick