UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA,<br><br>                Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>                Defendant. | Civil Action No. 05-11652-WGY |

**PLAINTIFF'S SECOND MOTION *IN LIMINE* TO PRECLUDE
DEFENDANT FROM CONTRADICTING ITS JUDICIAL ADMISSION
THAT CAPT. JOHN EHLERS MADE THE DECISION TO HAVE
PLAINTIFF REMOVED FROM FLIGHT 2237**

In paragraph 32 of his Amended Complaint (Doc. No. 3), plaintiff John D. Cerqueira alleged:

On information and belief, John Ehlers was the captain of American Airlines flight 2237 on December 28, 2003. Capt. Ehlers made the decision to have Mr. Cerqueira removed from the flight.

In paragraph 32 of its Answer (Doc. No. 5), defendant American Airlines (AA) stated: "AA admits to the allegations in paragraph 32 of the Amended Complaint."

Admissions made in a pleading are judicial admissions, and they are binding. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.") (quotation omitted); *United States v. Belculfine*, 527 F.2d 941, 944 (1st. Cir. 1975) ("[J]udicial admissions are conclusive on the party making them."). Despite its judicial admission to the contrary, AA is expected to seek to offer evidence that the decision to remove Mr. Cerqueira from flight 2237 was made by someone other than Capt. Ehlers. Such evidence should not be allowed.

Indeed, in addition to the admission in paragraph 32 of its Answer, AA has repeatedly asserted that Capt. Ehlers made the decision to have Mr. Cerqueira removed from flight 2237. For example, in response to an inquiry from the United States Department of Transportation, AA stated that "Captain Ehlers made the decision to remove these three passengers from the flight, so that they could be questioned by the authorities." Letter of June 14, 2004, from Alec Bramlett to Samuel Podberesky (attached as Exh. 1). Similarly, AA stated in its supplemental automatic disclosures that the members of the flight crew have knowledge of the events "which gave rise to Captain Ehlers' refusal to permit the plaintiff on the flight . . . ." Def. Supp. Automatic Disclosures, at 3 (attached as Exh. 2). Moreover, flight attendants Amy Milenkovic and Lois Sargent testified at their depositions that Capt. Ehlers made the decision to have Mr. Cerqueira removed from flight 2237, and First Officer Donald Ball testified that it is the Captain's responsibility to decide whether to remove passengers from a flight. Milenkovic Dep. 25:18-26:3 (attached as Exh. 3); Sargent Dep. 29:8-11 (attached as Exh. 4); Ball Dep. 15:2-4, 23:22-23, 30:5-7 (attached as Exh. 5).

AA should be precluded from eliciting testimony or offering any exhibit that contradicts its judicial admission that Capt. Ehlers made the decision to have Mr. Cerqueira removed from flight 2237, or from arguing to the jury that the decision was made by anyone other than Capt. Ehlers.

        **JOHN D. CERQUEIRA**
        By his attorneys,

        */s/ Michael T. Kirkpatrick*
        _____
        Michael T. Kirkpatrick
        Public Citizen Litigation Group
        1600 20th Street NW
        Washington, DC  20009
        (202) 588-1000
        mkirkpatrick@citizen.org

|  |  |
|---|---|
|  | David S. Godkin (BBO #196530) |
|  | Darleen F. Cantelo (BBO #661733) |
|  | Birnbaum & Godkin, LLP |
|  | 280 Summer Street |
|  | Boston, MA 02210 |
| Dated: November 17, 2006 | 617-307-6100 |

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 17, 2006.

/s/ Michael T. Kirkpatrick
_____
Michael T. Kirkpatrick

**CERTIFICATE OF CONFERENCE**

I hereby certify that on November 14, 2006, at 1:00 pm, I conferred by telephone with Amy Cashore Mariani, counsel for defendant, and attempted in good faith to resolve or narrow the issue presented in this motion, but the parties were unable to resolve the issue or narrow the areas of disagreement.

/s/ Michael T. Kirkpatrick
_____
Michael T. Kirkpatrick

**Exhibit 1**

to

**PLAINTIFF'S SECOND MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM CONTRADICTING ITS JUDICIAL ADMISSION THAT CAPT. JOHN EHLERS MADE THE DECISION TO HAVE PLAINTIFF REMOVED FROM FLIGHT 2237**

Letter of June 14, 2004, from Alec Bramlett to Samuel Podberesky

# AmericanAirlines®

ALEC BRAMLETT  
SENIOR ATTORNEY

DIRECT DIAL (817) 931-4358  
FACSIMILE NO. (817) 963-1469  
EMAIL: ALEC.BRAMLETT@AA.COM

June 14, 2004

Mr. Samuel Podberesky  
Assistant General Counsel for  
Aviation Enforcement and Proceedings  
U.S. Department of Transportation  
Office of the Secretary of Transportation  
400 Seventh St., S.W.  
Washington, D.C. 20590

Dear Mr. Podberesky:

    I am pleased to respond to your request of April 28, 2004, regarding the allegations of discrimination by Mr. John D. Cerqueira against American relating to his removal from Flight 2237 on December 28, 2003.

    American has thoroughly investigated the assertion that it engaged in improper discrimination when removing Mr. Cerqueira from the flight in Boston. We have concluded that discrimination played no part in American's decision to remove him from the flight. The decision to remove Mr. Cerqueira and the two passengers seated next to him was based on a combination of observed behaviors on the part of the three passengers.

    Mr. Cerqueira was removed from Flight 2237 on December 28, 2003 because his behavior, both before and after boarding, was perceived as threatening by one of our flight attendants. Additionally, he was seated next to two passengers whose behavior also aroused the suspicions of some passengers and crew members. Although Mr. Cerqueira stated that he was not traveling with the two passengers, it appeared to the crew and some of the other passengers that they were together. Therefore, a decision was made by the captain to remove all three passengers from the flight.

    You requested information as to how and why state troopers became involved. Due to a chain of events described in detail below, Captain John Ehlers contacted the gate personnel, as well as American Airlines Systems Operations Control ("SOC"). The state police onsite at Boston Logan were contacted by the gate personnel and/or SOC personnel. As Captain Ehlers' report on this incident indicates, the TSA and Air Marshals were also involved in this incident.

    The other passengers who were removed with Mr. Cerqueira were Vittorio D. Rokah and Oren Ashmil. The sequence of events that led to the removal of these

AA 0009

Mr. Samuel Podberesky
June 3, 2004
Page 2

passengers began with the very early arrival of Mr. Cerqueira at the gate. The gate personnel had not yet arrived. Mr. Cerqueira had an encounter with Sally Walling, a 36-year veteran flight attendant with American, who was at the counter checking in for the flight. He requested a seat change in a very insistent manner. She advised him that he would have to wait for the gate agent. While waiting for the gate agent, Mr. Cerqueira remained near the counter, and he stared at Ms. Walling in a manner that made her feel very uncomfortable.

Later, during the boarding of first class passengers, Ms. Walling noticed that Mr. Cerqueira, a coach passenger, boarded and immediately proceeded to a coach lavatory. Ms. Walling was surprised to see a coach passenger on board at a time when only first class passengers had been called. The fact that Mr. Cerqueira was on the aircraft before he was supposed to be was another factor that concerned Ms. Walling.

Prior to departure, Mr. Rokah or Mr. Ashmil made some inappropriate comments to Captain Ehlers, as described in his report. As they boarded, they were observed by the crew and several passengers as behaving strangely and making loud and inappropriate remarks. Some passengers became concerned about Mr. Rokah's and Mr. Ashmil's behavior. Soon after they were seated, Mr. Rokah and Mr. Ashmil appeared to be asleep, as did Mr. Cerqueira. These three passengers appeared to be sleeping soundly throughout a great deal of activity on the aircraft. Ms. Walling noticed the three sleeping passengers, and she was surprised they were sleeping through all the noise. She suspected that they might be feigning sleep.

Before the aircraft pulled away from the gate, Captain Ehlers conferred with Ms. Walling. They discussed the strange questions Mr. Rokah or Mr. Ashmil had asked Captain Ehlers, as well as the comments they had made to some of the passengers. Captain Ehlers asked Ms. Walling if she had seen anything suspicious. She reported her confrontation with Mr. Cerqueira at the gate, and the fact that he boarded the plane before he was supposed to. They discussed the fact that the three passengers were all seated together, and all appeared to be sleeping deeply, despite the level of noise in the cabin.

Captain Ehlers and Ms. Walling perceived Mr. Cerqueira to be traveling with Mr. Rokah and Mr. Ashmil. He adamantly requested a seat change, and was ultimately seated next to them. All three passengers were observed engaging in behavior that was disturbing and suspicious to others. Ultimately, Captain Ehlers made the decision to remove these three passengers from the flight, so that they could be questioned by the authorities.

Pursuant to your request for supporting documentation, I am attaching the incident reports made by Captain John Ehlers and the three flight attendants on Flight 2237 - Lois Sargent, Amy Milenkovic, and Sally Walling. Other personnel involved in this incident include First Officer D. M. Ball, Customer Service Managers Ynes Flores and Nicole Traer, Assistant Chief Pilot - BOS, Doug Wood, SOC Analyst Rhonda

AA 0010

Mr. Samuel Podberesky
June 3, 2004
Page 3

Cobbs, and SOC Manager Craig Marquis. Should you wish to contact these employees, I would be pleased to arrange that.

American does not have any information about the identity of the state trooper(s) involved in this incident, nor does it have any reports created as a result of the interrogation of these passengers. It does not have any statements given by passengers relating to this incident.

The decision not to reroute these passengers was made by SOC personnel. Decisions such as this are made on a case-by-case basis, depending on the level of threat that is perceived by law enforcement personnel and American employees. In this situation, the entire aircraft was evacuated and searched by state troopers and canine officers. All passengers were re-screened prior to reboarding the flight. The three flight attendants were replaced. These factors indicate that the three passengers were perceived, at the time, to pose a significant safety threat. SOC personnel do not, however, recall the specifics regarding this incident.

With regard to your question about whether the American employees involved in the removal of Mr. Cerqueira have ever received civil rights training, please refer to my previous letters on this topic.

Pursuant to 14 CFR 302.12, I request that the information contained in this letter, along with the attached reports, receive confidential treatment. Further, I request notice, and the opportunity to object, prior to the release of this information under the Freedom of Information Act.

Very truly yours,

Alec Bramlett

Enclosures

cc: Annette Hernandez

AA 0011

**Exhibit 2**

to

**PLAINTIFF'S SECOND MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM CONTRADICTING ITS JUDICIAL ADMISSION THAT CAPT. JOHN EHLERS MADE THE DECISION TO HAVE PLAINTIFF REMOVED FROM FLIGHT 2237**

Page 3 of Def.'s Supp. Automatic Disclosures

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>) CIVIL ACTION NO.: 05-11652 WGY<br>AMERICAN AIRLINES, INC., )<br>)<br>Defendant. )<br>) | |

## DEFENDANT'S SUPPLEMENTAL AUTOMATIC DISCLOSURES PURSUANT TO FED.R.CIV.P. 26(a) AND L.R. 26.2

Pursuant to Rule 26(a)(1)(A), (B), (C) and (D) of the Federal Rules of Civil Procedure, and Local Rule 26.2, defendant American Airlines, Inc. ("American") supplements its initial disclosures as set forth below. These disclosures are based on information reasonably available to American as of the date of this submission. American reserves the right to supplement these disclosures based on information developed in the course of discovery or further factual investigation.

American generally understands that the plaintiff is alleging economic losses, humiliation, embarrassment, emotional distress, and a deprivation of his right to enter and enforce a contract to travel as a passenger in air transportation regardless of his race, color, ethnicity, alienage, ancestry and national origin. American disputes these allegations, and bases its disclosures herein on this understanding of the nature of the plaintiff's claims.

      American Airlines, Inc.

      Lynn, MA ▇▇▇

8. Doug Wood
   Assistant Chief Pilot
   American Airlines, Inc.

9. Rhonda Cobbs
   Systems Operations Control Analyst
   American Airlines, Inc.
   
   Arlington, TX ▇▇▇

10. Craig Marquis
    Systems Operations Control Manager
    American Airlines, Inc.
    
    Arlington, TX ▇▇▇

11. Vittorio Rokah
    Address and telephone number unknown

12. Oren Ashmil
    Address and telephone number unknown

13. Jason McGill
    
    Brooklyn, NY ▇▇▇

14. Members of the Cerqueira family (first names unknown)
    Address and telephone number unknown

Captain Ehlers, Ms. Walling, Ms. Sargent, Ms. Milenkovic, and First Officer Ball likely have knowledge of the actions of the plaintiff and of the two passengers seated next to him, Messrs. Rokah and Ashmil, on Flight 2237 on December 28, 2003 which gave rise to Captain Ehlers' refusal to permit the plaintiff on the flight, including, but not limited to, Ms. Walling's observations of the plaintiff before and immediately after he boarded the flight, Ms. Sargent's observations of the plaintiff, Mr. Rokah and Mr. Ashmil

**Exhibit 3**

to

**PLAINTIFF'S SECOND MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM CONTRADICTING ITS JUDICIAL ADMISSION THAT CAPT. JOHN EHLERS MADE THE DECISION TO HAVE PLAINTIFF REMOVED FROM FLIGHT 2237**

Milenkovic Deposition Transcript, pages 25-26

Page 25

[1] Q: Did you speak with any supervisor that you
[2] had regarding this incident?
[3] A: No, I did not.
[4] Q: So is it fair to say that no one from
[5] American contacted you to discuss this incident
[6] further?
[7] A: No.
[8] Q: Did you communicate with law enforcement
[9] concerning the incident?
[10] A: Do I understand, afterwards or at the time
[11] of the incident?
[12] Q: At the time of the incident.
[13] A: The only — I don't think I even spoke to
[14] the police officers that came onboard.
[15] Q: Did you communicate with law enforcement
[16] after the incident?
[17] A: No.
[18] Q: I'm going to ask you about some other
[19] American Airlines employees, and I'm basically just
[20] going to ask you — the question is, What is the
[21] involvement with these individuals with this
[22] incident.
[23]    The first is Captain Ehlers.
[24] A: He was our captain on the flight.

Page 26

[1] Q: And did he make the decision to remove the
[2] passengers from the flight?
[3] A: Yes.
[4] Q: How about Nicole Traer?
[5] A: I don't recall who that is.
[6] Q: Lois Sargent?
[7] A: That was the other flight attendant that I
[8] was working with.
[9] Q: And did she say anything to you about any
[10] behavior that she had witnessed from any of these
[11] three passengers?
[12] A: I don't remember.
[13] Q: Sally Walling?
[14] A: She was the other crew member.
[15] Q: And other than the conversations we've
[16] already talked about with respect to the behavior
[17] she witnessed, did she say anything else to you
[18] about this incident?
[19] A: I don't recall.
[20] Q: D.M. Ball?
[21] A: I believe he was the first officer.
[22] Q: And did he do anything with respect to the
[23] incident?
[24] A: No, not that I remember.

Page 27

[1] Q: Ynes Flores?
[2] A: I don't recall who that is.
[3] Q: Doug Wood?
[4] A: I know the name. I know he's a chief pilot
[5] in Boston. But as far as the incident, I don't know
[6] what his involvement has been.
[7] Q: What are the responsibilities of a chief
[8] pilot?
[9] A: I don't know the exact definition or exact
[10] duties, because it's separate. I'm a flight
[11] attendant. He's a pilot. But he represents kind of
[12] the core of all the pilots for American at Boston,
[13] specifically in Boston.
[14] Q: Rhonda Cobbs?
[15] A: I don't know the name.
[16] Q: Craig Marquis?
[17] A: I don't recall the name.
[18] Q: Does American have a policy regarding the
[19] removal of passengers from flights?
[20] MS. MARIANI: Objection. You may answer.
[21] A: I don't know if they have a specific
[22] policy; but I mean, it happens on flights. But I
[23] don't know word-to-word what the policy is, if there
[24] is one.

Page 28

[1] Q: And other than the testimony that you've
[2] already given regarding your training, do you have
[3] anything to add to your previous testimony regarding
[4] how you identify suspicious behavior?
[5] MS. MARIANI: And I'm going to repeat my
[6] objection from earlier. The witness may include any
[7] additional general information, but should not
[8] provide any specifics that would implicate the
[9] Sensitive Security Information Act.
[10] A: No, other than going into specifics.
[11] Q: Does American have protocols for what you
[12] should do if you think a passenger is suspicious?
[13] MS. MARIANI: Objection. You may answer.
[14] A: Not that I'm aware of specifics. It's very
[15] case-by-case. Each incident is always different.
[16] Actually, I can say specifically there are certain
[17] rules as far as intoxicated passengers. So, you
[18] know, there are definite rules with removal towards
[19] those type of things or hitting me or another flight
[20] attendant, crew member or passenger, that type of
[21] thing.
[22] Q: Are there protocols with respect to when
[23] you think someone is engaging in suspicious
[24] behavior, like we've been talking about today?

**Exhibit 4**

to

**PLAINTIFF'S SECOND MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM CONTRADICTING ITS JUDICIAL ADMISSION THAT CAPT. JOHN EHLERS MADE THE DECISION TO HAVE PLAINTIFF REMOVED FROM FLIGHT 2237**

Sargent Deposition Transcript, page 29

Page 29

[1] **Q:** So it's possible that if you were already
[2] sleeping, you wouldn't notice security coming onto
[3] the plane?
[4]    **MS. MARIANI:** Objection. You may answer.
[5] **A:** Except it would seem to me that one
[6] wouldn't be in such a deep sleep in such a short
[7] period of time.
[8] **Q:** Did you have any discussions with the
[9] captain about his decision to call security?
[10] **A:** I don't believe I had specifically had any
[11] conversation with him. It was his decision.
[12] **Q:** When was the passenger manifest reviewed?
[13] **A:** When security came onboard, they brought
[14] it. I can't be specific about the exact time.
[15]    **MS. ABATE RECHT:** I'm going to ask the
[16] court reporter to mark as Exhibit 7 a document that
[17] is not Bates numbered. It's entitled "Snapshot of
[18] ON List."
[19]    (Document marked as Sargent
[20] Exhibit 7 for identification)
[21] **Q:** Do you recognize this document?
[22] **A:** I would think it's the list of passengers,
[23] a passenger list.
[24] **Q:** Is this the passenger manifest that you're

Page 30

[1] referring to in your report?
[2] **A:** I would assume, yes. I mean, it usually
[3] isn't printed out like this on nice white paper.
[4] **Q:** The first column that's AA and then it's
[5] numbered, are those row numbers?
[6] **A:** I would assume so, yes.
[7] **Q:** And it doesn't appear that —
[8] **A:** I'm not sure.
[9] **Q:** You're not sure?
[10] **A:** (Witness reviews document) No, it would be
[11] printed out. What I'm used to seeing is something
[12] that has, like, "27A," "27B." I don't know. I
[13] guess this is just a listing of the passengers that
[14] came onboard, because this is not what I'm used to
[15] seeing.
[16] **Q:** It does not appear to me that Mr.
[17] Cerqueira's name is on this list. Do you see it
[18] anywhere? It's not a trick question. I just really
[19] don't see Mr. Cerqueira's name on this list.
[20]    **MS. MARIANI:** Off the record.
[21]    (Discussion off the record)
[22] **A:** This was not a list — this was not the
[23] manifest that we looked at.
[24] **Q:** Okay. So does this appear to you to look

Page 31

[1] like a list of the passengers who actually continued
[2] on the flight?
[3] **A:** I would assume so. I have to admit, I
[4] really have never seen a listing like this. Our
[5] listings are by seat and row.
[6] **Q:** Okay. You state in your report, "A review
[7] of the passenger manifest revealed these three
[8] passengers had Israeli passports but Arabic names."
[9] **A:** No, two of them did.
[10] **Q:** Do you see in your report how it says
[11] "these three passengers"?
[12] **A:** Well, that should be corrected, then,
[13] because it was two. Which report are you looking
[14] at?
[15] **Q:** I'm looking at the report that was marked
[16] as Exhibit —
[17] **A:** 5?
[18] **Q:** The NASA report that you're holding. So
[19] it's Exhibit 6.
[20] **A:** Okay.
[21] **Q:** On the second page.
[22] **A:** Okay. That, then, should be corrected,
[23] because it was two passengers did.
[24] **Q:** Okay. And those two passengers didn't

Page 32

[1] include Mr. Cerqueira, correct?
[2] **A:** I would assume not.
[3] **Q:** And you're just assuming that based on —
[4] **A:** Yeah, I don't remember, you know, at this
[5] point exactly what the names — except for the fact
[6] that we got this case going, I would not recall the
[7] names of the three passengers. So I wouldn't
[8] remember the names of the other two, either.
[9] **Q:** Did you notice any other behavior that you
[10] thought was suspicious that we have not discussed?
[11]    **MS. MARIANI:** Objection. You may answer.
[12] **A:** I think we've pretty much covered it.
[13] **Q:** Mr. Cerqueira and the other two passengers
[14] were removed by the State Police; is that correct?
[15] **A:** I'm not sure if they were State Police or
[16] airport security. They were uniformed airport
[17] personnel, and I don't know specifically. I would
[18] not want to say specifically if they were State
[19] Police or airport security, transportation security.
[20] **Q:** Okay. So Mr. Cerqueira and the other two
[21] gentlemen were removed from the plane by some sort
[22] of security personnel?
[23] **A:** Security.
[24] **Q:** This was done before the decision was made

**Exhibit 5**

to

**PLAINTIFF'S SECOND MOTION *IN LIMINE* TO PRECLUDE DEFENDANT FROM CONTRADICTING ITS JUDICIAL ADMISSION THAT CAPT. JOHN EHLERS MADE THE DECISION TO HAVE PLAINTIFF REMOVED FROM FLIGHT 2237**

Ball Deposition Transcript, pages 15, 23, and 30

Page 13

[1] seated in the exit row in Seats 20D, E and F to be
[2] traveling together?
[3]    MR. FITZHUGH: Objection. You can still
[4] answer, if you can.
[5]    THE WITNESS: I would like her to repeat
[6] the question.
[7]    Q. Was it unclear to you?
[8]    A. Yes.
[9]    Q. Okay.
[10]    MR. FITZHUGH: Are we continuing the same
[11] objections as -- the same stipulations, I mean, from
[12] the prior depositions?
[13]    MS. ABATE RECHT: Yes. We'll continue the
[14] same, which was we'll object to form and save all
[15] other objections until the time of trial.
[16]    MR. FITZHUGH: And motions to strike to the
[17] time of trial?
[18]    MS. ABATE RECHT: Yes.
[19]    MR. FITZHUGH: Okay.
[20] BY MS. ABATE RECHT:
[21]    Q. Did you notice at all the three men seated
[22] in the exit row in Seats 20D, E and F?
[23]    A. I'm not understanding that question. I'm
[24] sorry. Please repeat.

Page 14

[1]    Q. Did you notice the three men seated in the
[2] exit rows, which were Seats 20D, E and F?
[3]    A. I don't have any recollection of noticing
[4] the three men seated in D, E, and F.
[5]    Q. During the discussion at the front of the
[6] plane that you testified about earlier between the
[7] captain and some of the flight attendants when you
[8] were there, does that refresh your recollection as
[9] to whether you took a look at the three men seated
[10] in Seats 20D, E and F?
[11]    A. I have no clear recollection of noticing
[12] the men in 20D, E and F.
[13]    Q. Did you personally notice any behavior on
[14] the part of the three men seated in seats 20D, E and
[15] F that you thought was suspicious?
[16]    A. I have no recollection of noticing any
[17] behavior.
[18]    Q. Who made the decision to remove Mr.
[19] Cerqueira and the two men seated next to him from
[20] the flight?
[21]    MR. FITZHUGH: Objection. Form. You can
[22] still answer.
[23]    A. I have no specific recollection of the
[24] decision made. I would believe that it would be the

Page 15

[1] captain that made that decision.
[2]    Q. Is it the captain's responsibility to make
[3] decisions such as that?
[4]    A. Yes.
[5]    Q. Do you know the basis for Captain Ehlers'
[6] decision to remove these three passengers from the
[7] flight?
[8]    MR. FITZHUGH: Objection. Form and
[9] foundation.
[10]    A. I don't have a specific recollection of
[11] Captain Ehlers telling me what his reasons were for
[12] removing these people off the plane.
[13]    Q. Did you have any independent understanding
[14] of what his reasons were?
[15]    A. I understand generally that his reasoning
[16] was based on behavior of the passengers.
[17]    Q. Do you know what those behaviors were?
[18]    A. I generally recollect comments made -- a
[19] comment made by the captain about someone talking to
[20] him in the gate area. I don't remember any specific
[21] comments by the flight attendants.
[22]    Q. So did the captain actually tell you what
[23] this passenger said to him in the gate area?
[24]    A. I don't recall the conversation. I don't

Page 16

[1] specifically recall what the captain said to me.
[2] And it's a vague recollection that the captain and I
[3] had a conversation about this very event.
[4]    Q. So your understanding is that the captain
[5] decided to have these three passengers removed from
[6] the flight because of a comment made to him in the
[7] gate area?
[8]    MR. FITZHUGH: Objection. You can still
[9] answer.
[10]    A. No. It was more than that.
[11]    Q. Okay. Do you recall what more --
[12]    A. Again, generally speaking, it was about the
[13] behavior of the passengers. I do not have a
[14] separate recollection of each and every behavior
[15] either noted by the flight attendants or by the
[16] captain.
[17]    Q. Do you know whether Captain Ehlers
[18] investigated whether the three men seated in seats
[19] 20D, E and F were traveling together?
[20]    A. I don't have any recollection of that. And
[21] I...
[22]    Q. Do you know whether Captain Ehlers had any
[23] discussions with passengers on the plane concerning
[24] these three men?

**Page 21**

[1] document?
[2] A. I'm a first officer, just so we're clear on
[3] that.
[4] Q. I'm sorry.
[5] A. It's okay. Do I recognize this document?
[6] I believe I've seen it before. I don't know if the
[7] first time was in preparation for this meeting. And
[8] I recognize the form generally as a message from
[9] Captain Kudwa.
[10] Q. Can you just fill us in a little bit on
[11] Captain Kudwa's practice in sending out these
[12] messages to pilots.
[13] A. Could you explain your question.
[14] Q. Do you typically get these kind of messages
[15] from Captain Kudwa?
[16]    MR. FITZHUGH: Can we have a point in time.
[17]    MS. ABATE RECHT: Around September of '01.
[18] A. There were many messages, both from Captain
[19] Kudwa and CEO Don Carty, following the events on
[20] 9/11/2001, mainly of a security nature. And they
[21] were sent out -- well, we got new messages probably
[22] every day or every other day, at least, during that
[23] period of time from corporate leadership.
[24] Q. I'm going to direct your attention to the

**Page 22**

[1] third message on that page --
[2] A. Okay.
[3] Q. -- dated the 23rd of September 2001. And
[4] it states, "We have received reports of captains
[5] refusing to accept certain passengers on flights
[6] because of the passengers' ethnic or religious
[7] backgrounds. All passengers are subjected to a
[8] rigorous screening process. The SECOK" --
[9] S-E-C-O-K -- on your closeout indicates all
[10] passengers have cleared this process. If you have
[11] any questions regarding a particular passenger's
[12] acceptance, please contact the CCRO at ICS
[13] 967-7299." Do you see that?
[14] A. I do see that.
[15] Q. First, what is the CCRO?
[16] A. I think it stands for Customer Complaint
[17] Resolution Office. That's my recollection.
[18] Q. And what is ICS?
[19] A. It's the name of our phone system, you
[20] know, like ABRS -- but it's the name of our phone
[21] system, I'm pretty sure. So that's a -- yeah.
[22]    MR. FITZHUGH: Off the record.
[23]    (Discussion off the record)
[24]    MR. FITZHUGH: Back on.

**Page 23**

[1] BY MS. ABATE RECHT:
[2] Q. Do you recall whether CCRO was contacted
[3] with respect to Mr. Cerqueira and the other two
[4] passengers seated next to him on December 27, 2003?
[5] A. I do not have a specific recollection,
[6] though that is the procedure.
[7] Q. Whose responsibility is it to contact a
[8] CCRO?
[9]    MR. FITZHUGH: Objection. Foundation.
[10] Under what circumstances?
[11] Q. Under the circumstances set forth in this
[12] directive -- "if you have any questions regarding a
[13] particular passenger's acceptance, please contact
[14] the CCRO" -- whose responsibility is it to contact
[15] the CCRO?
[16] A. It's the captain's responsibility, to my
[17] knowledge.
[18] Q. Does the captain have complete discretion
[19] as to whether to deny service to a passenger?
[20]    MR. FITZHUGH: Objection. Form and
[21] foundation.
[22] A. Yes. I believe the captain does have final
[23] authority as to who remains on the plane for a trip.
[24] Q. I'm going to show you a document, a second

**Page 24**

[1] page of which was previously marked as Exhibit 4.
[2] At the time we did not have the first page from
[3] American Airlines. This document also is not Bates
[4] numbered. The first page states, "KUDWA HOTLINE
[5] MESSAGE, September 20, 2001."
[6]    Feel free to look at the whole document,
[7] but I'm going to be asking you about on the second
[8] page, the first full paragraph.
[9]    MR. FITZHUGH: Read the entire document
[10] first, please.
[11] A. (Witness reviews document) And this is the
[12] paragraph, this full paragraph (indicating)?
[13] Q. Yes, the first full paragraph on the second
[14] page.
[15] A. Okay.
[16]    MR. FITZHUGH: Off the record for a second.
[17]    (Discussion off the record)
[18] A. (Witness reviews document) Okay.
[19] Q. That paragraph states, "I need to caution
[20] you, when you are out on the line, not to turn into
[21] judge and jury. We have had some instances where
[22] crews decided they were uncomfortable with some of
[23] the passengers and decided to refuse boarding. I
[24] believe that you have the right to question any

Page 29

[1] Ehlers?
    A. I have no specific recollection of that.
[3] Q. Do you recall how the removal process
[4] proceeded?
[5] A. Which removal process?
[6] Q. The removal of these three passengers, Mr.
[7] Cerqueira and the two passengers seated next to him,
[8] from the flight on that day.
[9] A. I have no separate recollection of that. I
[10] have read that a passenger service member came on
[11] the plane and asked the three people to leave the
[12] plane.
[13] Q. When the passenger service member boarded
[14] the plane, had Captain Ehlers already made his
[15] decision to have these three passengers removed?
[16] A. Please repeat the question. It's
[17] important.
[18] Q. Sure.
[19]    MS. ABATE RECHT: Jane, can you repeat it,
[20] please.
[21]    *(Question read)
[22] A. What do you mean by "removed"?
[23] Q. Removed from the plane, asked to disembark
[24] the plane for questioning.

Page 30

[1] A. It was Captain Ehlers' decision -- I
[2] believe it would have been procedure for Captain
[3] Ehlers to have made -- I cannot specifically
[4] remember his decision. I do not specifically
[5] remember him telling somebody to do it, but it would
[6] have been his decision to have them removed for
[7] questioning.
[8] Q. I understand that. My question is a little
[9] different.
[10]    And my question is, when a customer service
[11] person boarded the plane, had Captain Ehlers already
[12] made his decision to have these three individuals
[13] removed from the plane for questioning, or was the
[14] customer service person part of the investigation?
[15] A. I have no specific recollection of that
[16] order of events. I thought you were asking me --
[17] well. Hum. I guess I'm confused. Are you asking
[18] me when the passenger service personnel came on
[19] board to ask the people to come off the plane?
[20] Q. My question is, when the customer service
[21] person came on the plane, had the decision already
[22] been made to have these passengers removed?
[23] A. When the customer service personnel came on
[24] e plane to ask the people to come off the plane, I

Page 31

[1] would assume that the decision had been made to
[2] remove them for questioning.
[3] Q. Okay. Do you recall the State Police
[4] boarding the plane?
[5] A. I have a separate recollection of the
[6] police going on with the dogs. I do not remember
[7] the police actually going on -- oh, that's right,
[8] it's based on recollection of something I've just
[9] read.
[10]    I do not remember the police actually going
[11] on the plane, except for when they went on with the
[12] dogs.
[13] Q. Okay. Do you know what happened to the
[14] three passengers after they were removed from the
[15] plane for questioning?
[16] A. Based on records of that day, I understand
[17] that they were questioned --
[18]    MR. FITZHUGH: It's about your own
[19] independent knowledge. We've all seen the
[20] documents. So just answer Attorney Abate's
[21] questions with respect to your knowledge.
[22]    THE WITNESS: Okay.
[23] Q. But if any documents have refreshed your
[24] recollection, it's certainly okay to rely on that.

Page 32

[1]    MR. FITZHUGH: Agreed.
[2] A. Right. I don't know what happened to
[3] them -- I know that they didn't return to the plane.
[4] Q. Do you know whether they were cleared by
[5] the State Police?
[6]    MR. FITZHUGH: Objection. Form.
[7] Q. Let me rephrase that.
[8]    Do you know whether they were cleared as --
[9] do you know whether the State Police determined that
[10] they posed no security risk?
[11] A. I don't know that.
[12] Q. Do you know whether these three passengers
[13] were denied service on subsequent American Airlines
[14] flights as a result of this incident?
[15]    MR. FITZHUGH: Could we have a point in
[16] time?
[17] Q. On the same day.
[18] A. Only through what I've read. I have no
[19] separate knowledge of that.
[20] Q. Do you know who makes the decision to deny
[21] further service to a passenger after they've been
[22] removed for questioning?
[23] A. It could be a good number of people, but
[24] someone in the passenger service part of the