UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN D. CERQUEIRA,

          Plaintiff,

v.

AMERICAN AIRLINES, INC.,

          Defendant.

Civil Action No. 05-11652-WGY

**PLAINTIFF'S EIGHTH MOTION *IN LIMINE* TO
EXCLUDE TESTIMONY OF JOHN BEARDSLEE**

Plaintiff John D. Cerqueira moves *in limine* to exclude the testimony of American Airlines's (AA) expert witness, John Beardslee. Mr. Beardslee's testimony should be excluded because: 1) it is based on Mr. Beardslee's review and consideration of documents that have not been produced to plaintiff; 2) Mr. Beardslee is expected to testify about issues that are not the appropriate subject matter of expert testimony; 3) Mr. Beardslee is expected to testify to facts that are not present in this case; and 4) Mr. Beardslee's testimony is based on speculation. *See* Expert Report of John H. Beardslee (attached as Exh. 1).

Mr. Beardslee's proposed testimony will rely on documents that have not been produced to Mr. Cerqueira, such as the pre- and post- September 11th "Common Strategy," "annual recurrent training for flight crews and Ground Security Coordinators," and the "industry standards as they existed on December 28, 2003," all referenced in his expert report. Beardslee Report at 5. Mr. Cerqueira requested "[a]ll documents provided to, considered or relied upon by any expert witness engaged by American Airlines in connection with this matter," Pl.'s Req. For Documents No. 10 (attached as Exh. 2), but AA has not provided the documents. Therefore, to the extent Mr.

Beardslee's testimony relies on such documents, it should be excluded. *See* Fed. R. Civ. P. 26(a)(2)(B); *see also Suskind v. Home Depot Corp.*, No. 99-10575-NG, 2001 WL 92183, at *4 (D. Mass. Jan. 2, 2001) (mandatory disclosure of documents considered by experts includes documents attorney provides to expert); *Regional Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697 (6th Cir. 2006) (affirming order compelling production of documents relied upon by expert); *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745 (7th Cir. 2005) ("A litigant is required to disclose to his opponent any information 'considered' by the litigant's testifying expert . . . and the sanction for violating this rule can include barring the expert from testifying.") (citations omitted).

Mr. Beardslee's testimony should also be excluded because he is prepared to testify about subject matters not appropriate for expert testimony. For example, Mr. Beardslee's report asserts that airline pilots are imposing authority figures because they wear uniforms and that after September 11th, flight attendants began to consider their own mortality. Beardslee Report at 4. These are not specialized, technical, or scientific issues, but instead are issues of common knowledge and understanding such that the jury can make its own conclusions without the aid of an expert. *See United States v. Sebaggala*, 256 F.3d 59, 65-67 (1st Cir. 2001); *Figueroa v. Simplicity Plan De Puerto Rico*, 267 F. Supp.2d 161, 165-66 (D. Puerto Rico 2003) (expert testimony not needed for jury to determine credibility of plaintiff).

Further, Mr. Beardslee is prepared to testify about post-September 11th changes in airline procedures. Beardslee Report at 4-6. Such testimony is inappropriate and should be excluded because there is no evidence that such procedures were put in place at AA and, in particular, were in place on December 28, 2003. *See Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376 (1st Cir.

2000) (expert's testimony inadmissible where expert prepared to testify regarding facts not present in case); *Saia v. Sears Roebuck & Co.*, 47 F. Supp. 2d 141 (D. Mass. 1999) (non-case-specific testimony would not assist and would confuse jury).

Finally, to the extent that Mr. Beardslee's testimony is based on speculation, it should be excluded. For example, Mr. Beardslee was retained by AA to provide expert testimony regarding the commercial aviation industry, not the law enforcement industry. However, throughout his report, Mr. Beardslee addresses the role of law enforcement in handling airline passengers. Beardslee Report at 5, 12. Any testimony that Mr. Beardslee might provide regarding the evaluation and investigation performed by the Massachusetts State Police is based on speculation and should be excluded. *See Sebaggala*, 256 F.3d at 66 (speculative testimony inadmissible and would not assist jury); *Figueroa*, 267 F. Supp. 2d at 165-66 (same).

Because Mr. Beardslee's proposed testimony relies on documents not produced in discovery, because Mr. Beardslee will testify about issues not appropriate for expert testimony and as to facts not present in this action, and because his testimony is based on speculation, his proposed testimony should be excluded from trial.

        **JOHN D. CERQUEIRA**
By his attorneys,

*/s/ Michael T. Kirkpatrick*
_____
Michael T. Kirkpatrick
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC  20009
(202) 588-1000
mkirkpatrick@citizen.org

David S. Godkin (BBO #196530)
Darleen F. Cantelo (BBO #661733)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210

Dated: November 17, 2006    617-307-6100

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 17, 2006.

*/s/ Michael T. Kirkpatrick*
_____
Michael T. Kirkpatrick

## CERTIFICATE OF CONFERENCE

I hereby certify that on November 14, 2006, at 1:00 pm, I conferred by telephone with Amy Cashore Mariani, counsel for defendant, and attempted in good faith to resolve or narrow the issue presented in this motion, but the parties were unable to resolve the issue or narrow the areas of disagreement.

*/s/ Michael T. Kirkpatrick*
_____
Michael T. Kirkpatrick

**Exhibit 1**

to

**PLAINTIFF'S EIGHTH MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF JOHN BEARDSLEE**

Expert Report of John H. Beardslee

# *EXPERTO CREDITE LLC*
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

By: John H. Beardslee

In the Matter of: John D. Cerqueira, Plaintiff,
vs.
American Airlines, Inc., Defendant

CA No. 05-11652-WGY

**Introduction**
At the request of Fitzhugh, Parker & Alvaro LLP, 155 Federal Street, Suite 1700, Boston, MA 02110-1727 I have been retained to review the above referenced case and to provide expert testimony regarding the state of the U.S. commercial aviation industry on December 28, 2003. I have also been asked to provide expert testimony on the performance of AA personnel on Flight 2237 regarding U.S. commercial aviation standards in existence on December 28, 2003. I have further been asked to rebut Douglas R. Laird's testimony.

**Summary of Qualifications:**
A copy of my curriculum vitae, describing my 41 year career in aviation, is attached to this report.

My background in aviation began with enlistment in the Air Force in 1964 and discharge as a Captain in 1968, continued through employment with three airlines from 1968 until my retirement from Continental Airlines in 2005, and continues today through my activities as an aviation security consultant. Since approximately 1975 my area of specialization has been commercial aviation security. For over two decades I headed up a major airline corporate security department, first for Republic Airlines from 1982-1985 and then Continental Airlines from 1985-2005.

**Publications Authored Co-authored or edited in the past 10 years:**
None.

**Testimony at Trial or Deposition over the Past Four Years:**
None.

**Compensation:**
Review and study: $250/hour
Deposition and Testimony: $350/hour

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

**Materials Reviewed:**
- Amended Complaint
- Plaintiff's Answers to Interrogatories
- Plaintiff's Automatic Disclosures
- American Airlines' Answers to Interrogatories
- American Airlines' Answers to Interrogatories
- Deposition of Sally Walling, with Exhibits
- Deposition of Lois Sargent, with Exhibits
- Deposition of Amy Milenkovic, with Exhibits
- Deposition of Nicole Traer, with Exhibits
- Deposition of Ynes Flores, with Exhibits
- Deposition of John Ehlers, with Exhibits
- Deposition of Rhonda Cobbs, with Exhibits
- Deposition of Craig Marquis, with Exhibits
- Deposition of John Cerqueira, with Exhibits (confidential portions of testimony redacted)

**Summary of Event:**
At approximately 5:30am on the morning of December 28, 2003, Gate 29, American Airlines ("AA") Flight Attendant ("FA") Sally Walling was doing some work at the Gate 29 counter. She was approached by a man, later determined to be Mr. John D. Cerqueira, a passenger waiting in the gate area to board AA Flight 2237 to Ft. Lauderdale, FL. Mr. Cerqueira asked FA Walling to change his seat. FA Walling told Mr. Cerqueira she could not change his seat, because she was not a ticket agent. Mr. Cerqueira became very insistent and repeatedly asked to have his seat changed, even after FA Walling had told him she could not do it.

As FA Walling was boarding the aircraft for Flight 2237, she told the other two FAs working the flight, Amy Milenkovic and Lois Sargent that there was a passenger on the flight with whom she felt very uncomfortable.

FA Walling next encountered Mr. Cerqueira when he was the first passenger to enter the coach section of the aircraft. During the period of time in which Mr. Cerqueira boarded, FA Walling believed boarding was restricted to first class customers. Upon boarding, Mr. Cerqueira went to exit row seat 20F and then to an aft rear lavatory where, according to FA Walling he spent four to five minutes, after which he returned and sat in seat 20F.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**

The Captain of Flight 2237, John M. Ehlers, was walking towards Gate 29, prior to taking command of the flight when, for the first time in his 20 year career, he was approached by an individual who stopped him and asked him if he was the Captain going to Ft. Lauderdale, to which he responded he was. The individual, who had a pony tail, looked at him and said, "That's good. I'm going with you. We're going to have a good trip today." Then the individual walked away. Because of this unusual experience, Captain Ehlers asked FA Walling to check for a passenger with a pony tail. FA Walling did so, and found that the passenger with the pony tail was sitting in the same row as Mr. Cerqueira. FA Walling then relayed her experiences with Mr. Cerqueira to the Captain.

FA Lois Sargent also reported to the Captain that the passengers in seats 20D and 20E were behaving in an erratic and unusual manner during her exit row briefing. They were laughing, asking questions and were generally not taking the briefing seriously. It appeared to her the passenger in seat 20F "was kind of just laughing at the whole thing."

When FA Sargent reported her concerns about the behavior of the passengers in seats 20D, E and F during the exit briefing to Captain Ehlers he observed the passengers in question and confirmed that one of them was the individual who intercepted him in the gate area. While FA Sargent was making her report to Captain Ehlers, FA Walling came up to report "Now they're wishing everybody 'Happy New Year.'"

Captain Ehlers called AA ground operations and asked for an AA Ground Security Coordinator ("GSC") and an agent to come to the aircraft. Captain Ehlers then called AA System Operations Control ("SOC"). Captain Ehlers also briefed Mass. State Troopers who had come to the flight in response to a security gate return communication from ground operations. Captain Ehlers reported to all of the aforementioned parties the unusual occurrences involving him, two of the FAs, and the passengers in row 20 seats D, E and F. It was decided the best course of action would be to remove the passengers in question from the aircraft for questioning. About half an hour after the State Troopers became involved, they informed Captain Ehlers that the three passengers removed for questioning would not be traveling with him. AA SOC made a decision to deny further transportation that day to all three passengers removed for questioning by instructing BOS ground personnel to cancel their respective Passenger Name Records and to refund the unused portion of their tickets.

## *EXPERTO CREDITE LLC*
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**

Flight 2237 departed without the three passengers who had been removed for questioning. The original cabin crew asked to be relieved from duty on that flight. All of the checked luggage for Flight 2237 was re-screened by the TSA as were the remaining passengers. Massachusetts State Troopers also searched the aircraft for explosive devices, using bomb sniffing dogs.

**Opinions:**
I have formed these opinions based on over three decades of experience in aviation security, including my experiences as the Sr. Director – Corporate Security for Continental Airlines from well prior to 9/11 until my retirement in 2005. I witnessed first hand the commercial aviation security changes brought on by 9/11 and their impact on flight crews. I witnessed the changes in training, procedures and aircraft modifications. I reviewed the depositions of AA personnel in this case as well as the reported activities of the police and TSA representatives who responded to determine their adherence to post 9/11 aviation security standards as I understand them.

**Differences in Airline Security Prior and Subsequent to 9/11:**
Due to my experience as a major airline security director before, during and after 9/11, I am of the opinion the tragic events of 9/11 led to a seismic shift in aviation security standards and practices. Two of the most significant changes involved the relationship between the cockpit and the cabin crew, and the relationship between the cabin crew and the passengers. Airline pilots wearing imposing uniforms, many of whom are former military, have always been authority figures. Prior to 9/11, FAs counted on intervention by Captains and First Officers to help them through difficult confrontations with passengers; the flight crew was a team. After 9/11, while flight crews were still a team, the cockpit members of the team were behind bullet and blast resistant doors, and had been given explicit instructions not to render physical aid, no matter what was happening in the cabin. In the event of a security event, post 9/11, the cockpit crew members' goal was not to render aid to the cabin crew; it was to land the aircraft to ensure it could not be used as a flying bomb. While cabin crews got conflict resolution and self defense training, many communicated to me in my role as security director, that they felt they were on their own. Prior to 9/11, even hijackings were met with passive resistance; airlines and our government wanted everyone involved, even the hijacker, to come out alive. After 9/11 everyone was forced to accept the fact that passengers could be suicidal terrorists, intent on killing everyone on the aircraft and as many other innocent people as they could. FAs began to consider their own mortality as they served meals and they became hyper vigilant, knowing they would not have the help of the cockpit crew in the event of difficulty with a passenger during a flight. Especially since 9/11, FAs have sought to make sure any possible difficulty with a potentially disruptive passenger was settled on the ground. This is consistent with their training and the realities that exist within the airline industry since 9/11.

## *EXPERTO CREDITE LLC*
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**


**Industry Standards for Training Ground Security, In-Flight, and Operations Personnel on Passenger Security Issues as of December 2003:**
My pre and post 9/11 experience with the TSA and Continental's Flight Operations and In-Flight training departments caused me to form the opinion that the most radical training change to industry standards after 9/11 was to the Common Strategy. Published initially by the FAA and now by the TSA (with airline involvement), the Common Strategy is a process, including training requirements, for dealing with commercial air carrier security incidents. It involves every entity connected with a flight, including FAA aircraft controllers. While the Common Strategy continues to have as its goal the preservation of life, prior to 9/11 it was not envisioned that complying with the hijacker's demands would lead to purposeful loss of life, especially the lives of those on the ground. After 9/11, in addition to the lives of those on the aircraft, one now must consider the lives of potential victims on the ground; the shooting down of a commercial aircraft to save lives on the ground became a reality. The passive resistance embodied in the pre 9/11 Common Strategy morphed on that very day to the active resistance displayed on United Flight 93. The future became more menacing for everyone involved, especially the flight crews, who are trained in the new realities.

**Interaction between Airlines and Local, State and Federal Law Enforcement in Handling Passenger Security Issues as of December 2003:**
As a major airline security director for over two decades, I participated in the resolution of numerous security incidents. In my opinion the interaction between Local, State and Federal Law Enforcement did not change after 9/11. Once an airline calls in law enforcement or if law enforcement responds on their own initiative, law enforcement handles the situation and those involved according to their own procedures and protocols. An airline representative can explain a situation to law enforcement, but law enforcement will decide if and how to respond. For an airline there are two types of situations in which law enforcement is generally called. The first is where the airline believes a crime has been committed and is hoping for an arrest, trial, conviction and restitution. The second is where the airline is concerned about a situation or a passenger and asks law enforcement to apply their own information gathering and analysis techniques, in case there is more to the situation or individuals than the airline personnel have been able to discern. Police have access to information to which an airline does not, information about open warrants, criminal convictions and classified intelligence. Law enforcement also has superior interview capabilities. I am not aware of situations where police would release an individual and instruct the airline the passenger was cleared to fly. The most law enforcement would do would be to tell the airline that so far as law enforcement is concerned the individual is cleared to fly. Law enforcement does not infringe on an airline's prerogative to deny boarding to a passenger whom airline personnel are concerned could become disruptive once the flight is airborne.

## *EXPERTO CREDITE LLC*
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**

**Industry Standards for Decision Making on Passenger Security Issues as of December 2003:**
Based on my role as an airline security director, before, on and after 9/11, it is my opinion that, since 9/11, there has been a continuing and heightened sense within the airline industry that security incidents may well involve life and death impacting decisions. That heightened sense has not abated due to ongoing terrorist activity. An airline's willingness to inconvenience passengers, based on security concerns, is grounded in the belief that its actions could potentially save lives. Being on the alert for unusual occurrences and communicating your concerns has become the responsibility of all airline employees who interact with the public. If one can't define how one's enemy will behave, but one can define how the typical person who is not an enemy will behave, then one has to work from the premise that one's enemy may be more nervous than the typical passenger or that the enemy may be more intense or unusual in other ways. During annual recurrent training for flight crews and Ground Security Coordinators ("GSCs"), the classes usually review security incidents using these criteria to improve their decision making skills. The crew on flight 2237 was applying these principles which have become standard throughout the industry, especially since 9/11.

**What Constitutes Unusual Behavior Sufficient To Give Rise To An Investigation:**
Based on many years of involvement in the assessment of security incidents, as an airline security director, it is my opinion we cannot define unusual behavior in a vacuum; it must be defined in the context of prior behavior and the nature of the situation. For example, using a lavatory is not unusual, but since the lavatory offers a degree of privacy not found elsewhere on the aircraft, if you use a lavatory for too long, too often or during an unusual time it may arouse suspicions. Lavatories are areas of particular concern on flights, as evidenced by the bans on their use subsequent to departure and prior to landing in Washington DC that were in place for some time after 9/11.

The depositions of the flight crew on Flight 2237 all describe specific occurrences, involving one or more of the passengers in row 20 seats D, E and F, that flight crew members found to be unusual and made them uncomfortable. These include Mr. Cerqueira's interaction with FA Walling, the Captain's interaction with the pony tailed customer, FA Sergeant's interaction with the passengers seated in row 20 D, E and F during the exit row briefing and Mr. Cerqueira's unusual boarding and use of the lavatory.

The fact that Mr. Cerqueira was a frequent flyer is not a fact mitigating in his favor. Most frequent flyers know FAs can neither check them in nor change their seat assignments. As a frequent flyer Mr. Cerqueira's insistence on having his seat changed after FA Walling explained that he would have to wait for a gate agent is unusual.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

Unusual behavior sufficient to warrant reporting it to a superior for a single incident can include the type of insistent behavior reported by FA Walling in her interactions with Mr. Cerqueira in the gate area. If a member of a flight crew, trained to recognize and be sensitive to unusual interactions with the flying public, reports such behavior, the wisest course of action is to attempt to resolve any conflict or problem before the flight leaves the ground.

Frequently, however, situations occur where there are a number of unusual actions observed by a number of crew members, with no single action warranting investigation, as was the case in this situation. Having multiple occurrences and reporters would have buttressed the validity of the individual reports in the eyes of the SOC manager and increased the likelihood of a protective reaction.

**Assessment of Actions of FAs on Flight 2237 on December 28 2003 in Light of Then-Existing Industry Standards:**
The actions of the AA FAs on Flight 2237 on December, 28, 2003 demonstrated teamwork, consultation and adherence to post 9/11 industry standards and response norms to unusual occurrences, based on my experience as a major airline security director on the day in question. The FAs did not attempt to take independent action; they properly shared their concerns with one another and with the In-flight Security Coordinator. One of the tragedies of 9/11 was the lack of intelligence sharing among groups charged with evaluating and responding the terrorist threat. It is important for front line personnel to be able to share concerns in a supportive environment, as was demonstrated by these FAs. Greater intelligence sharing has become a standard practice since 9/11. If every fear had to be proven correct or if every suspicion had to be confirmed as being justified, to avoid the "mishandled" label, information sharing would gradually cease and our skies would be less safe for it.

**Assessment of Actions of John Ehlers on Flight 2237 on December 28 2003 in Light of Then-Existing Industry Standards:**
It is my opinion, based on over two decades of experience, until 2005, as an airline security and being involved in the resolution of security incidents, Captain Ehlers reacted appropriately to the concerns of his FAs. The fact that he had experienced an unusual occurrence with one of the passengers about whom the FAs were concerned heightened his overall concern for the safety of the flight and led to his decision to report the situation to SOC. He acted with appropriate restraint in that prior to listening to the FAs concerns; he took no independent action regarding the unusual occurrence he was involved in. He, properly, took the additional precautionary action of having the lavatory Mr. Cerqueira used checked by the First Officer for suspicious items. Captain Ehlers cooperated with law enforcement and the TSA, as he should have. Finally, after the incident was resolved Captain Ehlers remained on duty to pilot the delayed flight.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

**Assessment of Actions of Ground Security Coordinator and Operations with regard to Flight 2237 on December 28, 2003 in Light of Then-Existing Industry Standards:**
The overall actions of the GSC and Operations were consistent with industry standards as they existed on December 28, 2003 based on my understanding of the standards, as a major airline security director on the date in question and for years before and after. Notification of airport law enforcement and the TSA is common practice in a security situation, as is following instructions from SOC as to how passengers who have generated the security concerns are to be treated. Additionally, cooperation with airport law enforcement and the TSA is expected and occurred. It is also a common practice not to restrict travel by those denied boarding and not taken into custody beyond the day in question.

**Overall Assessment of American's Handling of Situation on Flight 2237 on December 28, 2003:**
Based on my experience as an airline security director from 1982 until 2005 AA handling of the security incident involving AA Flight 2237 on December 28, 2003 was consistent with industry norms and standards at that time. The AA flight crew did not seek out the passengers removed from Flight 2237; they did not "eyeball" passengers as they were boarding. Each passenger removed from the flight initiated an unusual interaction with a flight crew member, generating security concerns that, in total, justified the Captain calling SOC. The appropriateness of AA actions was buttressed by the determination by State Police to employ explosives detecting canines to search the aircraft and by the TSA to rescreen all passengers continuing on AA Flight 2237. AA handling of the situation was consistent with industry standards.

FA Walling, FA Sargent, FA Milenkovic and Captain Ehlers lost fellow AA crewmembers on 9/11. After that, all flight crews, including but not limited to, those on AA and United Airlines flights became even more sensitive to security concerns; their SOC managers would respond affirmatively to their security concerns. Having a potential security incident on board a flight originating in BOS (one of the 9/11 originating flight airports) would only serve to heighten that vigilance. Based on my experience as the individual in charge of security for a major airline, both before and after 9/11, the concerns expressed by FA Walling, FA Sargent and Captain Ehlers over what they believed to be unusual behavior exhibited by the three passengers cannot be properly evaluated in hindsight. Moreover those concerns cannot be adequately assessed by those who do not understand the post 9/11 mindset of professionals within the airline industry. AA flight crews and the SOC personnel were helpless as they watched their aircraft veer off course on 9/11. In consequence, some security incidents, including Mr. Cerqueira's situation, now evolve when people elect to err on the side of caution, based on unusual behavior that raises flight crew suspicions. The fact that the cabin crew was unable to continue the trip indicates the level of their concern.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

Of note in analyzing the facts of this case are several key elements of testimony. First, the depositions of all AA personnel involved demonstrate that they are aware that AA has a non-discrimination policy and that AA does not consider racial profiling to be an acceptable justification for being suspicious of a passenger. The depositions of AA personnel involved in this incident demonstrate there was coordination among the crew, AA ground personnel and headquarters staff. The depositions establish that AA coordinated with law enforcement and the TSA.

**Analysis and Rebuttal of Opinions and Information in Document Authored by Douglas R. Laird:**
It is my opinion, based on being in charge of security at a major airline for over two decades, that, had Mr. Cerqueira taken his originally assigned seat, had not approached FA Walling before and after boarding, and had not sat next to the two gentlemen who also behaved in a manner that aroused flight crew suspicions, that Mr. Cerqueria would not have been removed for questioning. FA Walling did not attempt to have Mr. Cerqueria evaluated by security after he unnerved her at the gate check-in counter, and she did not attempt to have him evaluated by security after she felt he remained in the lavatory an unusually long time. FA Walling set aside her own unease; it was only when her concerns were added to concerns about the passengers seated with Mr. Cerqueria in the exit row, including their unusual comments to the Captain and their unusual response to the exit row briefing, that action commenced. It is my opinion, based on personal involvement in the resolution of numerous security concerns reported to the SOC at Continental Airlines, that if Mr. Cerqueira had taken his originally assigned seat or his seat mates had not acted strangely before and after boarding, he would have not been selected for security scrutiny. It was the combined pre and post boarding actions of the passengers in row 20 seats D,E and F that were the cause of the incident, not racial profiling.

Regarding Mr. Laird's "Conclusion And Opinion" that "Racial profiling does not make air travel safer" I saw nothing in any of the depositions related to this case to indicate that anyone deposed was of the opinion that racial profiling makes air travel safer. Clearly AA held no such position; AA has a published policy on the prohibition of racial profiling and all of the crew members were aware of that policy.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

Mr. Laird's "Conclusion And Opinion" states that "Mr. Cerqueira's behavior did not indicate a security threat." to support his opinion that FA Wallings engaged in racial profiling. Listing the behaviors mentioned in the flight crew depositions, Mr. Laird also states that "None of the following 'behaviors' reported as abnormal are indicative of a security threat." My understanding of flight crew security training, based on over two decades of interaction with Flight Operations and In-Flight personnel on security training content, is consistent with that of FA Milenkovic, who stated at deposition that in-flight personnel are told to look for unusual behavior. This means that any behavior outside the norm which could be indicative of unusual nervousness (going to the lavatory, feigning sleep, boisterous behavior, strange questions), unusual resolve (being insistent, staring, being first to board, strange questions) or hostile intent. In my opinion, based on over two decades of involvement in the resolution of flight crew reported security issues and security training, the behaviors listed by Mr. Laird, when taken in context and viewed cumulatively, could be indicative of ill intentions and warrant further investigation. Any single behavior, in and of itself, does not have to rise to the level of a "security threat." Rather, alarm bells usually do not go off until there have been multiple examples of unusual behavior; when those multiple examples are the result of actions by multiple individuals in a close physical proximity to one another, concerns become even more heightened.

Also under "Conclusions And Opinions" Mr. Laird states "Because the situation was mishandled an innocuous series of events was allowed to turn into a security incident." It is my opinion, based on decades of active involvement in the resolution of security incidents that there are few security events where a post incident review does not yield opportunities for people to claim that the situation was mishandled. This is particularly true when multiple actors, multiple sources of information and remote decision makers become involved in situations where the potential exists for life and death consequences, particularly when the concerns leading to the incident are later deemed to be unfounded.

In this case the series of events was not "innocuous" to the flight crew (as demonstrated by the fact that three separate members of that crew had concerns and the cabin crew was unable to continue to work that flight). Furthermore when the concerns were communicated to the SOC, SOC elected to deny boarding to the passengers involved.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
Email: JohnBeardslee@houston.rr.com

Mr. Laird also opines "The Captain did not take control of the developing situation and thus allowed an innocuous series of events to escalate in to a security incident." To the contrary, professional law enforcement was brought in to determine if the suspicious actions were linked to any illegal activity and SOC was brought in to render a boarding decision. Based on my understanding of an industry standard definition of "mishandled" gleaned over decades of involvement with airline industry trade associations, although Mr. Cerqueira in retrospect did not represent a danger to AA Flight 2237, it does not mean the situation was "mishandled."

Mr. Laird offers suggestions as to "A number of things could have been done to have prevented this series of events turning into an incident." In my opinion, based on over two decades of involvement in the resolution of security incidents, none of Mr. Laird's suggestions, had they been undertaken, would have resulted in a different outcome. He suggests checking the No-Fly list. However, it had already been checked; it must be checked for every passenger before they check-in. He suggests a PNR check would have shown the individuals were not flying together, however, individuals working together to hijack aircraft often purposely don't travel together. Checking the PNR might help confirm suspicions, but it could not refute them. He suggests checking to see whether exit row seats are assigned by ground personnel; that information would not have helped. He suggests checking to see Mr. Cerqueira's frequent flyer status; this may have been done and discounted. He suggests the GSC could have been summoned sooner; it's impossible to tell if this would have changed the outcome. He suggests the Captain could have calmed the FAs; the Captain was concerned as well, having been approached in an unusual manner by one of the exit row individuals. He suggests having ground personnel remove the passengers, not the Troopers; that suggestion is reasonable but would not have changed the outcome. He suggests SOC and Corporate Complaint Resolution Officer ("CCRO") could have provided guidance to the Captain; SOC did provide guidance to the Captain and ground personnel. SOC denied boarding, canceled the existing booking and required refund of the unused portion of ticket. Finally, he suggests SOC should have advised the Captain to call CCRO. As the CCRO states in her deposition, the resolution of incidents involving suspicious passengers rests with SOC; the outcome would have remained the same whether the CCRO was contacted or not.

## EXPERTO CREDITE LLC
**Specializing in Aviation Security**
**Email: JohnBeardslee@houston.rr.com**

The final item under Mr. Laird's "Conclusions And Opinions" states: "The refusal to allow Mr. Cerqueira to travel on AA after he was questioned was not justified." In his "Summary of Event" Mr. Laird concludes "It appears that the assumption was made by the AA flight crew that Mr. Cerqueira and the individuals seated in 20D and 20E were traveling together" without any reference as to how he arrived at the conclusion that the AA flight crew assumed the customers in row 20 E, D and F were traveling together. In my opinion, based on more than two decades of involvement in the analysis of documents pertaining to aviation security investigations, the AA documents do not support that conclusion, nor does the police report. Mr. Laird also concludes the police investigation was limited to determining that "he (Cerqueira) was not traveling with the passengers seated in 20D and 20E" and after that determination was made "he was cleared for travel and escorted to the AA ticket counter." Based on over two decades of interaction with police during security incident investigations, customers' travel relationship is only one of the factors police evaluate. Police often determine if the individuals in question have any open warrants, if they have records with pertinent convictions, if they are traveling with forged documents, if they are carrying any illegal substances, documents or items indicative of illegal activity. Whether or not the individuals are traveling together is only of interest as it relates to other aspects of the investigation. Actually, consistent with the concerns of the Captain and FAs, the State Troopers' report shows they were called concerning the passengers in 20E and 20F (20F being Mr. Cerqueira). Furthermore, police do not clear a person for travel unless they had concerns about the person traveling in the first place. Airline concerns have to be resolved by the airline; a clearance to fly by the police does necessarily resolve those concerns.

Finally, contrary to Mr. Laird's assertions, it appears from the depositions I reviewed that Mr. Cerqueira was not allowed to travel on the then existing PNR and associated ticket. This was an SOC decision in response to crewmember concerns, not a permanent or even temporary ban. Other AA flights, booked through normal channels were, after the incident was closed, open to Mr. Cerqueira.

**Exhibit 2**

to

**PLAINTIFF'S EIGHTH MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF JOHN BEARDSLEE**

Pl.'s Req. For Documents No. 10

7.  Documents concerning policies, procedures, or guidelines regarding whether a passenger's race, color, national origin, ethnicity, or ancestry may be considered in determining whether a passenger should be removed from a flight, denied boarding, or refused service.

**Objection:** American objects to this request on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security.

8.  Documents received from any government agency during the last five years cautioning or warning you not to target, profile, or otherwise discriminate against passengers on the basis of race, color, national origin, ethnicity, or ancestry.

**Objection:** American objects to this request on the basis that it is vague and unintelligible as to "cautioning or warning," overbroad, and seeks information which is irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence. American further objects that much of this information is a matter of public record, and is therefore equally available to the plaintiff.

9.  The passenger manifest for American Airlines flight 2237 on December 28, 2003.

**Objection:** American objects to this request on the basis that it is unduly burdensome, seeks information irrelevant to the subject matter of this action, and is not reasonably calculated to lead to the discovery of admissible evidence. In addition, American Airlines objects to disclosing the names of its passengers, because such disclosure would constitute a needless violation of the passengers' reasonable expectations of privacy.

10. All documents provided to, considered or relied upon by any expert witness engaged by American Airlines in connection with this matter.

**Response:** American has not designated an expert witness to testify at this time. Discovery is continuing, and American will promptly supplement this answer in the event that it designates any expert.

11. All documents concerning your Affirmative Defenses.

**Objection:** American objects to this request on the grounds that it seeks information beyond the scope of Fed.R.Civ.P. 26 (b)(1).

**Response:** Please see American's Position Statement, Answer to Complaint, Automatic Disclosures, and documents attached thereto. Discovery is continuing, and American reserves the right to amend or supplement this response if necessary.