UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JOHN D. CERQUEIRA,                      )
                                        )
         Plaintiff,                     )
                                        )
    v.                                  )
                                        )    CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                )
                                        )
         Defendant.                     )
_____)

**DEFENDANT AMERICAN AIRLINES, INC.'S MOTION IN LIMINE TO
EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, DOUGLAS LAIRD**

For the reasons set forth more fully herein, Defendant American Airlines, Inc. ("American") moves in limine to exclude opinions that it anticipates plaintiff's expert witness on aviation security, Douglas Laird, intends to offer at trial. To the extent that Mr. Laird is permitted to testify at trial, American also seeks to limit Mr. Laird's testimony on certain other opinions.

**I.    MR. LAIRD'S OPINIONS SHOULD BE EXCLUDED FROM EVIDENCE BECAUSE THEY DO NOT MEET THE STANDARDS SET FORTH IN *KUMHO TIRE*.**

First, some or all of Mr. Laird's opinions should be excluded from evidence because they fail to meet the standards for reliability set forth in those rules and under *Kumho Tire*. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Specifically, Mr. Laird seeks to offer opinions regarding passenger security concerns at a U.S. flag carrier after September 11, 2001 where he has testified that he has had no involvement with the development of training, protocol or procedures regarding passenger security concerns since leaving Northwest Airlines in 1995.

At deposition, Mr. Laird testified:

"Q    Subsequent to that meeting with representatives from the AFPA, do you recall any other circumstances in which you have been asked to comment on or address the issues of onboard passenger security?
A    For who?
Q    In your profession as a consultant for a U. S. flag carrier or related entity?
A    I have not been -- I have not been consulting to any U. S. flag carriers on any of those issues post 9/11."

Deposition of Douglas R. Laird, attached hereto as Exhibit 1, hereinafter "Laird Dep." at 18:4-13.

In light of that testimony, Mr. Laird clearly has no knowledge that would assist the average juror in understanding the state of aviation security after September 11, 2001, and on the date of the incident in question.

*Kumho Tire* and its progeny require that experts offering testimony must provide information that is "relevant to the task at hand." *Kumho Tire*, 526 U.S. at 141. Mr. Laird's expert report and testimony make it clear that he cannot meet that evidentiary burden. Because Mr. Laird does not have any knowledge that would assist the jury in understanding the state of passenger security measures after September 11, 2001, he should not be permitted to offer opinions related to passenger security concerns on December 28, 2003, or indeed for any period of time subsequent to September 11, 2001. *Kumho Tire*, 526 U.S. at 141; F.R.E. 702 and 703.

Furthermore, any such opinions offered by Mr. Laird also rely in whole or in part on non-authoritative publications.  Laird Dep. at 50:8-19; 51:25-52:13; 63:2-6; 66:21-24; 67:20-23; 70:20-25. Testimony predicated on theories or opinions not validated and accepted as authoritative within the relevant scientific or professional community should not be offered to the jury.  F.R.E. 702(2); 703. Therefore, the opinions he intends to offer at trial are inherently unreliable and should be excluded from evidence.  F.R.E. 702; F.R.E. 703.

II.    **MR. LAIRD'S CONCLUSION AS TO THE ULTIMATE ISSUE, WHETHER AMERICAN'S EMPLOYEES ENGAGED IN RACIAL PROFILING, MUST BE EXCLUDED FROM EVIDENCE.**

Second, Mr. Laird intends to opine that plaintiff's removal from flight 2237 on December 28, 2003 stemmed from racial profiling.  However, Mr. Laird admits that another security professional may have reached a different conclusion on the same evidence.  Laird Dep. at 125:12-16.  In light of that admission, a jury would not be assisted in any way by hearing Mr. Laird's opinions, and should be permitted to make its own evaluation of the evidence in question.  F.R.E. 702.  *See, e.g, Hoffmann v. Caterpillar, Inc.,* 368 F.3d 709, 714 (7th Cir. 2004); *Smith v. Colorado Interstate Gas Co.*, 794 F.Supp. 1035, 1044 (D.Colo. 1992) ("Gender and race discrimination issues are issues an average person can evaluate and understand without the assistance of an expert"); *Lipsett v. University of Puerto Rico*, 740 F.Supp. 921, 924-925 (D.P.R. 1990) ("…this subject does not lend itself to expert testimony because it deals with common occurrences that the jurors have knowledge of through their experiences in everyday life…") (discussing sexual harassment claim).  Moreover, Mr. Laird's admission that another security professional could reach a different conclusion calls into question the reliability of the methodology and principles used by him in formulating his opinions.  F.R.E. 702(3).

III.   **MR. LAIRD CANNOT TESTIFY REGARDING AMERICAN'S ALLEGED FAILURE TO FOLLOW PROCEDURES AND PROTOCOLS BECAUSE HE HAS NO KNOWLEDGE OF THOSE PROCEDURES AND PROTOCOLS AND NO KNOWLEDGE OF THE INDUSTRY STANDARDS REGARDING SUCH PROCEDURES AND PROTOCOLS FOR THE RELEVANT PERIOD OF TIME.**

Third, Mr. Laird's opinions regarding American's alleged failure to follow appropriate protocols and procedures must be rejected where he testified that a) he has no knowledge of what AA's protocols and procedures were on December 28, 2003 and b) he has had no involvement with the development of such protocols and procedures for a U.S. flag carrier since leaving

Northwest Airlines in 1995. Laird Dep. 18:4-13; 22:6-21; 54:23-55:7; 99:17-23; 109:13-15. Even if qualified as an expert, he cannot opine on issues for which an adequate evidentiary foundation has not been laid. *Casas Office Machines, Inc. v. Mita Copystar America, Inc. et al.,* 42 F.3d 668, 681 (1st Cir.1994), citing *Quinones-Pacheco v. American Airlines, Inc.,* 979 F.2d 1, 6 (1st Cir.1992); *Schubert v. Nissan Motor Corporation in U.S.A,* 148 F.3d 25, 31 (1st Cir.1998); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 417-18 (7th Cir.2005) (reliance on experience insufficient basis to sustain expert opinion); *Salas v. Carpenter*, 980 F.2d 299, 304-305 (5th Cir.1992) (opinion as to ultimate issue inadmissible without adequate factual foundation); *Wurtzel v. Starbucks Coffee*, 257 F.Supp.2d 520, 525-526 (E.D.N.Y. 2003) (where proposed opinions offered by expert do not fit facts of case, opinion is inadmissible), *citing Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2nd Cir.2000) (holding that opinion of expert was inadmissible where expert had no knowledge of essential facts). His opinion as to whether American's employees failed to follow American's protocols and procedures on December 28, 2003 is worthless because he does not know what those policies and procedures were or even what the industry was doing in regard to such policies and procedures during the time period in question. *See generally* F.R.E. 702(1); *Apostol v. U.S.,* 838 F.2d 595, 599 (1st Cir.1988); and cases cited *supra*.

WHEREFORE, American respectfully requests that this Court exclude the testimony of Plaintiff's expert, Douglas R. Laird, according to the provisions set forth above.

Respectfully submitted,
**AMERICAN AIRLINES, INC.**
By its Attorneys,


Dated: November 20, 2006          _/s/ Amy Cashore Mariani_____

Michael A. Fitzhugh, (BBO 169700)
Amy Cashore Mariani, (BBO #630160)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 20, 2006


_/s/ Amy Cashore Mariani_____
Amy Cashore Mariani


## CERTIFICATE OF CONFERENCE

I hereby certify that on November 14, 2006 at approximately 1:00 p.m., Attorney Kirkpatrick and I held a conference to discuss any issues brought by Plaintiff with regard to this submission. On November 15, 2006 at 4:08 p.m., I forwarded a courtesy copy of the instant motion via electronic mail to plaintiff's counsel, Michael Kirkpatrick for his consideration and have heard no further comments in this regard that would narrow the issues addressed herein.


___/s/ Amy Cashore Mariani__
Amy Cashore Mariani

Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF MASSACHUSETTS
-oOo-

JOHN D. CERQUEIRA,                  :
                                    :
            Plaintiff,              :
                                    :
    vs.                             :  Case No.
                                    :  05-11652 WGY
AMERICAN AIRLINES, INC.,            :
                                    :
            Defendants.             :
===========================================================

DEPOSITION OF

DOUGLAS R. LAIRD

TUESDAY, OCTOBER 10, 2006

RENO, NEVADA

Reported by:   JANET MENGES, CCR #206, RPR, CP
                  California CCR # 5785
Transcription:      ---- Computer ----
  DIGITAL COURT REPORTING & VIDEO, 1111 FOREST, RENO, NEVADA
          Telephone: (866) 954-0352

0237d948-7c45-4c20-8cf1-90254420a66f

Page 2

1
2
3
4    A P P E A R A N C E S
5
6
7        FOR THE PLAINTIFF:
     PUBLIC CITIZEN LITIGATION GROUP
8      By:  MICHAEL T. KIRKPATRICK
         1600 20th Street, NW
9        Washington, DC
10
11
         FOR THE DEFENDANTS:
12     FITZHUGH, PARKER & ALVARO
           Attorneys at Law
13       By:  AMY CASHORE MARIANI
         155 Federal Street, suite 1700
14         Boston, Massachusetts
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        ATTORNEY'S NOTES/CORRECTIONS
2    PAGE LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2
3        I N D E X
4
   EXAMINATION BY                PAGE
   MS. MARIANI              6
5
   EXHIBITS
6    1 - Laird & Associates, Inc.          5
     2 - Annex 17                    5
7    3 - President's Commission on Aviation Security
         And Terrorism           5
8
     4 - The 9/11 Commission Report        5
9    5 - Aviation and Airport Security         5
     6 - The Naked Crowd              5
10   7 - The Culture of Fear             5
     8 - America the Vulnerable           5
11   9 - How Safe are Our Skies          5
     10 - Disinformation              5
12   11 - Regulation: Perception and Reality      5
     12 - Protection, Security and Safeguards     5
13   13 - Grounding Terrorists           5
     14 - Fighting Fraud on the Fly         5
14   15 - Laird's report                5
     16 - Laird's report               5
15   17 - Jesper/Laisen/DK
     18 - Passenger Screening in No-Fly Zone    5
16   19 - Five Years After 9/11
     20 - Random Security             5
17   21 - One Year Later: The Shaky State of Security  5
     22 - Aviation Security Advisory Committee    5
18   23 - Police log                 95
19
20
21
22
23
24
25

Page 5

1        RENO, NEVADA, TUESDAY, OCTOBER 10, 2006, 9:35 A.M.
2                -oOo-
3
4        PURSUANT TO NOTICE, and on Tuesday, the 10th day of
5    October, 2006, at the hour of 9:35 a.m. of said day, at
6    the offices of Bonanza Reporting, 1111 Forest Street,
7    Reno, Nevada, before me, Janet Menges, a notary public,
8    personally appeared Douglas R. Laird.
9                -oOo-
10
11        (Exhibits 1 - 23 were marked.)
12
13        DOUGLAS R. LAIRD
14    having been duly sworn by the notary public,
15      was examined and testified as follows:
16
17        MS. MARIANI:  Before we proceed, with respect
18    to stipulations I'm assuming we are reserving objections
19    as to form until the time of trial, reserve motions to
20    strike as well.
21        MR. KIRKPATRICK:  Agreed.
22        MS. MARIANI:  The witness will have 30 days to
23    read and sign and we can waive the notary requirement,
24    if that is acceptable.
25        MR. KIRKPATRICK:  That's fine.

2 (Pages 2 to 5)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

---

Page 6

1  EXAMINATION
2  BY MS. MARIANI:
3  Q   Can you state your full name for the record,
4  sir?
5  A   Douglas Robert Laird, Sr.
6  Q   My name is Amy Mariani and I represent American
7  Airlines in litigation brought by John D. Cerqueira
8  against American Airlines.
9       Before we begin today, I will give you some of
10 the basic ground rules that will help the court reporter
11 to take down an accurate transcript. First of all, it's
12 extremely important that you wait for me to complete my
13 question before beginning your response so that the
14 court reporter can accurately record what we are both
15 saying.
16      Second, if you do not understand my question,
17 please let me know. I will be happy to rephrase it.
18      Third, if you need to take a break at any time,
19 please let me know. I will be happy to take a break for
20 a few minutes once you have answered the question that
21 is pending, and fourth, it's very important that all of
22 your responses be verbal because the court reporter
23 cannot take down gestures or head nods or things like
24 that.
25 A   Yes.

---

Page 7

1  Q   If you have any questions at any time, please
2  let me know and I would be happy to respond to them.
3       Could you describe for me briefly your
4  professional background and qualifications, sir?
5  A   With regard to law enforcement and security
6  issues, my career started with the Marine Corps. I was
7  a captain in the Marine Corps. I was a brig officer,
8  which is a little bit different side of law enforcement.
9       Following that I was a special agent with the
10 Office of Naval Intelligence. From there I went to Los
11 Angeles Police Department, and then I did a 20 year
12 career with the United States Secret Service, spent a
13 lot of time in what is called Protective Intelligence,
14 excuse the term, but profiling.
15      After I left Northwest in June of 1995 and
16 started my own company, Laird and Associates. A year
17 later I merged my company with BGI with Ambassador
18 Morris Busby and Ambassador Louis Guno and Larry
19 Johnson. I was the aviation person. Ambassador Busby
20 was the ambassador for counter terrorism for the United
21 States. So he did the counter terrorism thing. I did
22 the aviation thing. It was a nice mix. That is why
23 they brought me into the company.
24      Ambassadors Guno and Busby were both -- I think
25 Bus about 70, Lou is 72. They both got to the point in

---

Page 8

1  life where they would rather not work, so I went back --
2  We dissolved the company about two and a half years ago,
3  and I went back to Laird and Associates, which had
4  always been in existence. Basically even though I was
5  one of the owners of BGI they paid Laird and Associates
6  is how it worked. That company has always been in
7  existence.
8       What I have done since leaving Northwest most
9  of my time was spent in helping leading edge technology
10 merge into the security market. My first client was
11 InVision, the company that makes the CAT Scan machines.
12 We brought Chaup metal detectors to the United States,
13 that sort of thing. I helped on the technical side,
14 spent a lot of time with the FAA at the tech center and
15 that sort of thing.
16      Let's see, the other thing of note I think is
17 at Northwest we were looking at computer tomography or
18 the InVision, the thing that scans your luggage. We
19 were looking at that in the early '90s and we needed a
20 way to make it -- increase the throughput and that is
21 how we developed what is known as CAPPS, and the reason
22 we came up with CAPPS is that we could then tell the
23 machine how many slices to do per bag and get the
24 greater throughput. Taking it to the extreme, if you're
25 a million miler you're probably not a terrorist and get

---

Page 9

1  a better score than somebody who has never flown. That
2  is how it works. It doesn't look for the bad guy, it
3  looks for how well-known you are.
4       I have dabbled in that sort of thing since '95.
5  I have done a lot of work as a subject matter expert for
6  Raycon, Lockheed, Galaxy, you name them. I have done
7  them all and what that means is they get large
8  government contracts, FAA contracts and they bring in
9  people like me to help them with the technical issues.
10 Q   When you say technical issues to what are you
11 referring without disclosing anything which is subject
12 to a confidentiality agreement or --
13 A   Sure.
14      Well, for example, we had a -- It's kind of
15 hard to explain. We had a contract with the FAA pre
16 9/11 to examine the use of computer tomography at
17 existing airports. So the FAA paid us to look at 30
18 airports around the world and because of my Northwest
19 days I did -- You know, we had 30 airports in Asia and I
20 went there and 12 in Europe, so I did Europe and Asia.
21 So I, for example, surveyed the new Hong Kong airport on
22 behalf of the FAA, not to say how they were screening
23 passengers per se, but how did their technology, how did
24 they implement their technology, and I would call myself
25 the reality check with a room full of PhD engineer

---

3 (Pages 6 to 9)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 10

1  types. They might know this technology, but they don't
2  know operations. So I'm the reality check.
3      So that is the sort of thing. I have done
4  that -- You name it, I have done all of the big guys.
5      Q   You testified that you joined Northwest after
6  20 years with the secret service. Was your experience
7  at Northwest the first experience you had in the
8  aviation industry?
9      A   Depends what you mean by experience. I had
10 done surveys for the president and vice-president of
11 literally hundreds of airports throughout the world, but
12 I had never worked for an airline.
13     Q   When you say you had done surveys of airports,
14 are you referring to the investigation of the technical
15 components that you have been discussing earlier such as
16 the screening capabilities?
17     A   No, in my secret service days we don't screen
18 protectees. You put the president right on the
19 airplane.
20     No, what I was looking at was perimeter
21 security, security of the terminal, more of an
22 operational security.
23     Q   So your experience in evaluating airports in
24 connection with your secret service work was in
25 connection with protective services detail for the

Page 11

1  president and vice-president and other dignitaries; is
2  that correct?
3      A   Yes, that is a fair statement.
4      Q   Is it also fair to say that you were not
5  involved in evaluating the security procedures at those
6  airports independent of the times when you were moving
7  the dignitaries through?
8      A   That's correct.
9      Q   I'm showing what you has been marked as
10 Exhibit 1 to your deposition, sir.
11     First of all, do you recognize that document?
12     A   Yes, I do.
13     Q   What is that document?
14     A   It's an explanation of what I do, what my
15 company does.
16     Q   Is it an accurate summary of your curriculum
17 vitae as of this point in time?
18     A   Yes, it is.
19     Q   Could you describe for me any education that
20 you have received beyond that which is reflected in
21 Exhibit 1?
22     A   I'm a Certified Protection Professional under
23 the American Society of Industrial Security and I'm
24 required to maintain my certification. I had to pass
25 tests obviously to get the certification, but then I'm

Page 12

1  required every year to undergo continuing education to
2  get points and that sort of thing.
3      When you say education, I go to lectures and
4  I'm sure like you do in your career. There are things
5  that we do every year to make sure that we are qualified
6  to keep our certifications.
7      I have instructed. I have done a lot of
8  training, but I have not been to an aviation school,
9  quote unquote, if that is what you're asking.
10     Q   As a Certified Protection Professional what
11 training, if any, do you receive that is specific to the
12 aviation industry?
13     A   Most of the training -- Let me try to think how
14 to describe it.
15     ASIS International, the association has a
16 yearly convention somewhere in the United States. It
17 was just in San Diego actually and it's four days in
18 length and each day there is probably 15 or 20 courses
19 offered. Very rarely is there a specific aviation
20 course, although I in fact on, I think, either -- I
21 think three occasions since '95 I have actually done
22 courses at the ASIS International National Seminar in
23 aviation security issues, but I look at each day's
24 schedule and I go to those courses that have some
25 relevance to what I do.

Page 13

1      Sometimes it's difficult because there is not a
2  lot of, what can I say. It's hard to find aviation
3  courses, put it that way.
4      Q   You testified earlier that you had to pass
5  examinations to become a Certified Protection
6  Professional. Did any of those examinations involve
7  issues pertaining to aviation security?
8      A   Yes, they did.
9      Q   In what way?
10     A   It's changed since I was certified. In the
11 time that I did it you took a general knowledge test of
12 the entire security industry. You also then had to
13 identify three subsets where you tested in those
14 specific areas. One of the areas that I selected, one
15 of the three that I selected was what was called
16 transportation. That included aviation as well as air,
17 sea and trains and I passed, of course.
18     Q   Is there an accreditation for subspecialties
19 within the community of Certified Protection
20 Professionals?
21     A   No, no.
22     When I said I did transportation as one of my
23 subsets, there was probably -- I'm guessing, 12 or 15
24 subsets that you could choose from. You had to test in
25 three and I -- because I was -- I thought I knew, I had

4 (Pages 10 to 13)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 14

1  a pretty good knowledge of that subject area I chose
2  transportation.
3      Now, how did I prepare to pass the examination.
4  I took a 3-day class and they helped us understand the
5  process and then I probably read four or five books
6  relating to aviation, trucking, maritime so I could pass
7  the test.
8      Q   Do you remember which books you read pertinent
9  to aviation?
10     A   No, I mean this is 20 years ago.  Whatever was
11  available at the time.
12     Q   You testified earlier that you left Northwest
13  in 1995; is that correct?
14     A   June of '95, yes.
15     Q   Since June of '95 have you been employed as a
16  consultant or employee by a U. S. flag carrier?
17     A   Yes.
18     Q   In what capacity have you been employed?
19     A   I really can't get into details, but I was --
20  right after TWA 800 I was hired by the board of
21  directors of TWA to do some work, but I signed
22  confidentiality agreements, but I went all over the
23  world and looked at all of their gateway operations
24  worldwide.
25     Q   Since your involvement with TWA 800 have you

Page 15

1  been employed either as an employee or consultant by a
2  U. S. flag carrier?
3      A   Yes.
4      Q   Who next employed you as an employee or
5  consultant?
6      A   U. S. Airways.
7      Q   In what capacity, to the extent that you're
8  capable of testifying about that?
9      A   They were having trouble at Orlando Airport
10  with throughput at the checkpoint, and I evaluated their
11  procedures and helped them through technology and policy
12  procedures improve the throughput.
13     Q   When you say throughput at the checkpoints,
14  could you describe for the record what you mean?
15     A   If you look at a checkpoint in an airport where
16  you're screened, if you understand the technology and
17  the placement of technology there are tremendous
18  improvements in throughput that can be obtained and that
19  is the sort of thing that I work on.
20     Q   By throughput do you mean --
21     A   The number of passengers -- the number of
22  people you can process per hour without a decrease in
23  security.
24     Q   Okay.
25         Subsequent to working for U. S. Airways in

Page 16

1  their Orlando operation to improve their throughput,
2  have you worked for a U. S. flag carrier as an employee
3  or consultant?
4      A   No, but I have interviewed many, many airline
5  employees at airports on FAA projects, but there I was
6  employed by Lockheed Martin kind of company to help the
7  FAA better understand the problem.
8      Q   And again those problems were related to
9  throughput and technology issues; is that correct, if I
10  understand your previous testimony?
11     A   Yes.
12     Q   Can you describe approximately the time frame
13  that you worked with TWA on the flight 800 issues?
14     A   It was immediately after 800 and probably for
15  eight or nine months.
16     Q   What was the period of time during which you
17  worked with U. S. Air on their throughput issues in
18  Orlando?
19     A   You know I don't -- I'm guessing '98 sometime.
20  How long was it for?
21     Q   For approximately how long, yes, sir?
22     A   I went down and spent a day and then wrote a
23  report.
24     Q   Since leaving Northwest in 1995 have you had
25  any involvement in developing training with regard to

Page 17

1  passenger security, onboard passenger security issues?
2      A   I have consulted with -- Yes, I have consulted
3  with -- I was hired by the -- It's the airline, it's the
4  flight attendant union for American Airlines.  I can't
5  remember the exact title of that company or union.
6      Q   When were you a consultant with the flight
7  attendant union of American Airlines?
8      A   I was hired for a day to meet with them.  They
9  came to Minneapolis and we discussed what training
10  American Airlines flight attendants could receive with
11  regard to what happened in 9/11, but again I was hired
12  by, I think it's called the Association of Professional
13  Flight Attendants.  I was hired by them to talk with
14  them about what I thought would make sense.
15     Q   Do you recall what information you imparted to
16  them on that day?
17     A   They were very concerned with what to do in a
18  similar situation and they had been approached -- They
19  didn't say this, but by the question they asked I'm
20  just concluding this that they were very serious about
21  training the flight attendants in hand-to-hand combat
22  situations.
23         My advice was it's a waste of time and I think
24  they did it anyway.
25     Q   Besides this interaction with the AFPA in

5 (Pages 14 to 17)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 18

1  Minneapolis -- Do you recall approximately how long
2  after 9/11 that was, by the way?
3     A   Within a month or two.
4     Q   Subsequent to that meeting with representatives
5  from the AFPA, do you recall any other circumstances in
6  which you have been asked to comment on or address the
7  issues of onboard passenger security?
8     A   For who?
9     Q   In your profession as a consultant for a U. S.
10 flag carrier or related entity?
11    A   I have not been -- I have not been consulting
12 to any U. S. flag carriers on any of those issues post
13 9/11.
14    Q   Prior to 9/11 did you consult with any U. S.
15 flag carrier on those issues?
16    A   On which issues?
17    Q   On issues related to onboard passenger
18 security?
19    A   I have consulted with various law firms, and I
20 have a list, on similar issues none of which have gone
21 to trial or deposition, but that I have, you know,
22 discussed situations, two of which as I recall the law
23 firm represented American Airlines actually and I helped
24 them understand the issues.
25        I had no contact with American Airlines.  This

Page 19

1  was outside counsel.  I think those cases -- I never
2  know what happens.  I think they were settled.
3     Q   Do you recall which law firms representing
4  American Airlines you consulted with?
5     A   I can look in my notes.
6     Q   If you would that would be helpful.
7     A   I don't recall.
8     Q   Sure.
9     A   I know I have it here.
10        I did work for Condon and Forsyth, New York
11 City, representing American Airlines, United Airlines
12 and 9/11 issues.  Following 9/11 they paid me to help
13 put together an expert witness team and I don't feel
14 comfortable saying any more than that.  They know who I
15 am.
16        I went to Lyon Beach and did some work with
17 Ford, Walker, Haggarty and Behard regarding an inflight
18 incident and they represented American Airlines and it
19 was a disruptive passenger that was taken off of a
20 flight.
21        I'm sorry, are you asking about American or
22 just airlines?
23    Q   American first and my next question will be
24 with regard to other airlines.
25    A   I think those were the two Americans.

Page 20

1        Then I did work with Fulbright and Jawarski of
2  Houston, Texas.  They represent Continental.  I think
3  they are outside counsel.  I'm sure they are.
4        I have done work with Perry and Spann, which is
5  an outside counsel for Southwest Airlines regarding the
6  death -- the death of an inflight passenger representing
7  Southwest.
8        I have done work with Relman and Associates out
9  of Washington, D.C.  There I was on the plaintiff's
10 side.
11        I have done work with Silicone Valley Law Group
12 out of San Jose and in that particular incident we
13 represented the plaintiff.
14        I have done, am doing work with Simpson,
15 Thatcher and Bartlett out of New York.  They are
16 representing Argenbright in 9/11.
17        I have done work for Zucker, Scout and
18 Rasenberger, Washington, D.C.  I did a presentation to
19 their key corporate clients, top 100 corporations on
20 aviation safety issues.
21        I have done work with Speigel and McDermitt out
22 of Washington, D.C. advising them on explosive trace
23 detection research.
24        That is about it.
25    Q   Any other representation of plaintiffs besides

Page 21

1  the Relman and Associates case, the Silicon Valley Law
2  Group case and the instant case in which you have been
3  involved?
4     A   Not that I recall.  I don't think so, no.
5     Q   Could you describe for me briefly to the extent
6  that you can under court order what the case involving
7  Relman and Associates dealt with?
8     A   That was a case against Northwest Airlines and
9  it involved the removal of a passenger.
10    Q   Prior to boarding or prior to --
11    A   Prior to takeoff, yes.
12    Q   And were there allegations that that removal
13 was in some way discriminatory?
14    A   Yes.
15    Q   Do you happen to have the case name?
16    A   Sure.
17        First name is Arshad.  The last name is
18 Chowdhury.
19    Q   Your work for the Silicon Valley Law Group,
20 what did that entail to the extent you can disclose that
21 information under court order?
22    A   The plaintiff was Esther Dazo, and I believe it
23 involved theft at a checkpoint.  The defendant in the
24 case was Globe Aviation Services.
25    Q   Do you know if either of those two cases are

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.   LAIRD - October 10, 2006

Page 22

1  still pending?
2     A   I think they have all settled.  I know they
3  have settled.  I don't know the dates.  I just know that
4  they settled.
5     Q   Okay.
6        During the time that you were employed at
7  Northwest were you involved in developing and
8  implementing procedures for responding to onboard
9  passenger security issues?
10    A   Yes.
11    Q   Subsequent to that time have you been involved
12 in developing and implementing procedures for onboard
13 passenger security issues?
14    A   Only to the degree that several days literally
15 after 9/11 I was employed, retained by SAIC, Science
16 Applications International Corporation, and went to
17 Washington, D.C. and met with them and key officials of
18 the Department of Transportation and FAA to outline a
19 program to deploy, vastly expand the air marshal program
20 and SAIC won the contract.  I had no further
21 involvement.
22    Q   No further involvement with the program or no
23 further involvement in developing procedures and
24 protocols for ongoing passenger security issues or both?
25    A   I'm getting lost.

Page 23

1     Q   Right.
2        Have you had any further involvement with SAIC
3  with regard to the air marshal program?
4     A   No, we just helped them present their case and
5  they won the contract to train the air marshals.
6        You asked earlier about Northwest, I think.
7     Q   Yes, that's correct.
8     A   We had policies and procedures which I wrote or
9  modified or some were in place, of course, before I got
10 there, and we were required, I guess -- We did it
11 anyway.  I'm not sure we were required, but in the
12 course of their initial pilot and flight attendant
13 training, their syllabus, and also in their recurrent
14 training.  We did a recurrent training program for our
15 10,000 flight attendants and 7500 pilots.
16       I don't know what American does, but we did
17 that by video because I couldn't talk to 10,000 flight
18 attendants.  So in their recurrent training they had to
19 watch, you know, me pontificate about what had happened
20 in the last year, this is what I did, what has happened
21 in the last year and what that means for the future.  So
22 we did that, yes.
23    Q   Since 1995 other than your involvement with
24 SAIC and the expanded air marshal program subsequent to
25 9/11 have you been involved in developing any policies

Page 24

1  or procedures with respect to onboard passenger safety
2  security issues?
3     A   Yes, on the Ganda Airways project.  We helped
4  them design a program for inflight situations for their
5  flight crews and also reviewed and made some
6  modifications to their air marshal program.
7     Q   When was that, sir?
8     A   I think the spring of '97.
9     Q   Since the Ganda Airways project have you been
10 involved in any other project in which you have
11 personally worked on developing onboard policies and
12 procedures relative to onboard passenger safety issues?
13    A   Onboard, no.
14    Q   You testified earlier that you have worked with
15 the FAA in a number of instances pursuant to contracts
16 with Lockheed Martin and other contractors.
17       Have any of those contracts involved
18 development of standards or regulations regarding
19 onboard passenger security issues?
20    A   No.
21    Q   Since the TSA was created have you been hired
22 by anyone affiliated with the TSA relative to developing
23 policies and procedures in responding to onboard safety,
24 passenger safety issues?
25    A   No, I have not.

Page 25

1     Q   Are you familiar with the FAA's mandates
2  regarding the inflight security coordinator program?
3     A   Sure.
4     Q   When is the last time you reviewed those
5  mandates?
6     A   In my Northwest days.  I probably -- Yes.  I
7  can't relate that to Ganda, because -- All airlines of
8  the world basically have the same policies and
9  procedures as a result of ICAO Annex 17.  So I reviewed
10 theirs, but I didn't -- That is not from the FAA.  That
11 is from their -- similar document.
12    Q   In connection with the litigation filed by Mr.
13 Cerqueira against American Airlines, what work have you
14 performed to date, sir?
15    A   With regard to --
16    Q   This case, yes, sir.
17    A   I reviewed this file that I was sent and I
18 thought these particular books had relevance, and then I
19 reviewed the materials and wrote a report which you have
20 a copy of.
21    Q   Any other work that you have performed in
22 addition to what you have just described?
23    A   No.
24    Q   Have you been paid for your work performed to
25 date?

7 (Pages 22 to 25)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 26

1    A   Yes, I have.
2    Q   How have you been paid?
3    A   What do you mean how?
4    Q   Have you been paid by retainer or --
5    A   I sent them an invoice and they sent me a
6    check.
7    Q   Do you know approximately how much you have
8    billed on this case to date?
9    A   A little over $4,000.
10   Q   Do you know approximately how much time you
11   have spent on this case to date?
12   A   I can tell you exactly.  It doesn't tell me.
13   The fee is $250 per hour.  So divide that into $4,084,
14   if I remember.
15   Q   So you have billed approximately 4,000 -- a
16   little over $4,000 in connection with this case at a
17   rate of $250 an hour?
18   A   Yes.
19   Q   Sir, I'm showing you what has been marked as
20   Exhibit 16 to your deposition.  I have a copy for
21   counsel, if I can find it.
22   A   Do you want this back?
23   Q   No, you may have that, sir.  Actually let's put
24   that in the middle.
25       Is that a copy of the report that you just

Page 27

1    described, sir?
2    A   Yes, it is.
3    Q   In that report do you provide a listing of
4    materials that you relied on in preparing your opinions?
5    A   Um-hum.
6    Q   Sir, you have to give a verbal response.
7    A   Yes, yes.
8    Q   Is the first item in that list the
9    International Standards and Recommended Practices
10   Security Annex 17, Fifth Edition?
11   A   Yes.
12   Q   Of what significant to your opinions is that
13   document?
14   A   Annex 17 relates to international aviation, in
15   other words going between countries, but basically it is
16   too difficult to have different sets of rules totally
17   different from domestic versus international.  So it
18   sets the baseline for aviation security worldwide in all
19   aspects, not just security, but communications and you
20   name it, but Annex 17, as you know, is security related.
21   So it lays out policies and recommendations as to how to
22   deal with incidents.
23   Q   You testified earlier that each country does
24   things a little bit differently with respect to
25   security.

Page 28

1        Are the mandates of the FAA and now TSA more
2    stringent than those set forth in Annex 17?
3    A   Stringent obviously is the key word.
4        Again I can give you an example.  Annex 17 says
5    that you will screen all checked luggage.  The United
6    States, of course, would say that you use computer
7    tomography to scan the luggage because that is the best
8    way to do it.  You're reaching nearly 100 percent,
9    you're finding what you're looking for.
10       You cannot -- The Gandas of the world, I will
11   use that as an example, cannot afford CT, but they
12   screen luggage, checked luggage.  They screen it by
13   literally taking it apart and looking at it.
14       So when you say are we more stringent, it's
15   hard to say.  I think we do a better job, but we all --
16   If you do not meet the requirements of Annex 17 you
17   can't fly.  So I'm not sure I have answered your
18   question.
19   Q   Let me see if I can ask it differently.
20       Does the TSA require more of U. S. flag
21   carriers and those operating domestically within the
22   United States than is required under Annex 17?
23   A   I think that is a fair statement, yes.  I mean,
24   certain people might argue otherwise, but I think we do
25   a better job, yes.

Page 29

1    Q   I'm showing you what has been marked as
2    Exhibit 2 to your deposition, sir.
3    A   Okay.
4    Q   I apologize if this is in a form with which
5    you're not familiar, but is this in fact the Annex 17 to
6    which we have been referring?
7    A   This is the -- You have Annex 17 Security,
8    Safeguarding, blah, blah, blah.  This is basically an
9    overview of it.  This is the actual document here.
10   Q   If you turn a couple of pages further in that
11   document, sir, is that in fact additional discussion of
12   the standards?
13   A   I'm not sure where you are.
14   Q   I'm on the page beginning general concepts,
15   direction, guidance and definitions?
16   A   Yes, I see it.
17   Q   Is that, in fact, additional information
18   describing requirements of the convention and the
19   purposes to the annexes?
20   A   As I see it here, this describes what the
21   various annexes are and what they are purported to
22   require, but it's not the detail that I'm -- that I
23   refer to as Annex 17.  This is like a preface.
24   Q   Let's turn to the detail that you have in the
25   volume before you.

8 (Pages 26 to 29)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 30

1      Are there particular sections of the annex that
2   are relevant to your analysis in this case?
3      A   In a general sense, part 1, chapter 3, 1-3-23,
4   section 3.8.22, aircraft crew members, section subset D
5   as in David, crew response to acts of unlawful
6   interference.  What it says is that you must train your
7   people to deal with situations occurring on aircraft.
8      Q   Anything else contained in Annex 17 upon which
9   you relied in preparing your report?
10     A   No.
11     Q   When were these standards prepared, sir?
12     A   This is the sixth edition dated 2002.
13     Q   Do you recall when the fifth edition referred
14  to in your report was prepared?
15     A   Boy, that was many years earlier, yes.
16         They didn't -- I should preface this by saying
17  there are not radical changes.  If you look at the fifth
18  edition versus the sixth, the section that I'm looking
19  at that are you required to train crew, that hasn't
20  changed.
21     Q   Did you consult the sixth edition or the fifth
22  edition when you prepared your report?
23     A   Actually I did both and I referenced the fifth
24  and I in reality should have referenced the sixth, but
25  if you put them side by side in that particular chapter,

Page 31

1   paragraph you're going to find they are the same.
2      Q   Did you in fact put them side by side and make
3   a comparison?
4      A   Have I, no.  I just know it.
5      Q   Is the next item listed in your report, sir,
6   upon which you relied the report of the President's
7   Commission on Aviation Security and Terrorism?
8      A   Um-hum.
9      Q   You have to respond either affirmatively or no.
10     A   I'm sorry, I lost you.
11     Q   Is the next item listed on your report as being
12  significant to your opinions the report on the
13  President's Commission on Aviation Security and
14  Terrorism?
15     A   Yes.
16     Q   Dated 1990?
17     A   Yes.
18     Q   Showing you what has been marked as Exhibit 3
19  to your deposition.
20         Off the record.
21         (A discussion was held off the record.)
22  BY MS. MARIANI:
23     Q   Is what has been marked as Exhibit 3 to your
24  deposition the report to which you're referring, sir, in
25  your report in this matter?

Page 32

1      A   You gave me Exhibit 3 and it's the executive
2   summary, yes.
3      Q   Is there a more complete version upon which you
4   relied in preparing your report in this case?
5      A   I have the -- I have the complete, which is a
6   couple hundred pages report.  This is just a summary.
7      Q   Are there particular sections of this report
8   that were pertinent to your analysis in this case?
9      A   Yes.
10     Q   What sections were those, sir?
11     A   You know, I was unable to find my copy of that.
12  I didn't have time to print it out online because it's a
13  couple hundred pages, but the reason I referred to it is
14  the basis for an awful lot that has happened since Pan
15  Am 103 having to do with how we screen passengers.
16     Q   Can you describe for me, to the best of your
17  recollection --
18     A   I can print it out or your people can print it.
19  I just don't have it right this minute.
20     Q   Can you describe to me what changes were
21  recommended and have been made since Pan Am 103 in that
22  report?
23     A   What I was referring to from the President's
24  Commission regarding 103, there is a section there that
25  deals with the profiling of passengers.

Page 33

1      Q   What do you recall about that section, sir?
2      A   They say we have to do a better job of
3   identifying people that present threats.
4      Q   Do you recall if they presented specific
5   recommendations as to how to identify passengers who
6   present with potential threats?
7      A   No, they just said that we need to spend -- in
8   those days it was the FAA, that we need to spend more
9   money and do more research.  It was pretty ambiguous.
10     Q   In what way did that influence the opinions
11  that you rendered in this case, if at all?
12     A   Profiling -- Everybody profiles one way or
13  another.  We just call it various different things.
14         It's a way of winnowing down who you spend time
15  looking at and who you don't.  I think it has relevance
16  to what we're looking at here today.  It was also the
17  reason that in my days at Northwest we came up with
18  CAPPS.  We had had some situations in Detroit.  If you
19  Google me on the Detroit Free Press you see I made the
20  front page for quite a few days running because of our
21  profiling, quote unquote.
22         One of the reasons we came up with CAPPS is
23  there is a way to screen passengers using a politically
24  incorrect term of profiling where you do not use race or
25  ethnic background.  CAPPS does not use any of those

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 34

1  things, and I might add that that program that we
2  developed at Northwest known as CAPPS it became,
3  identified nine or ten, depending on how you read, nine
4  or ten of the hijackers on September 11th not using
5  ethnic background.
6     Q   Have there been commissions established
7  subsequent to this commission in 1990 whose
8  recommendations and findings had any significance or
9  impact on your report in this case?
10    A   Following -- Yes, referred to many times as the
11  Gore Commission following TWA 800 and they made similar
12  recommendations.
13       Most of these reports, it takes a long time for
14  the government to do things. They make the same
15  recommendations again and again. I didn't refer to
16  that, I don't think. I did not.
17    Q   I believe the next item you reference in your
18  report is the 9/11 Commission Report; is that correct?
19    A   Um-hum.
20    Q   Is that yes, sir?
21    A   Yes, I'm sorry.
22    Q   I'm showing you what has been marked as
23  Exhibit 4 to your deposition.
24    A   Yes.
25    Q   My apologies to Attorney Kirkpatrick who will

Page 35

1  have to take back, if he so chooses, a copy of the 9/11
2  Commission Report to Washington on his flight today,
3  since it's about two inches thick and about four pounds.
4       Off the record.
5       (A discussion was held off the record.)
6  BY MS. MARIANI:
7     Q   Sir, to what extent did you rely on the 9/11
8  Commission Report in preparing your report?
9     A   I make reference to page 393 in the book where
10  they are talking about CAPPS.
11    Q   And of what significance was page 393 and the
12  references therein to CAPPS pertinent to your analysis?
13    A   They talk about CAPPS and that time and money
14  obviously needs to be spent by TSA in refining the CAPPS
15  process of profiling passengers.
16    Q   And is the section to which you're referring
17  the section that begins Recommendation, Improved Use of
18  no-fly and automatic selectee lists should not be
19  delayed while the argument about a successor to CAPPS
20  continues?
21    A   Yes, yes.
22    Q   What is your understanding of what has been
23  done in regard to this recommendation since the 9/11
24  Commission issued it?
25    A   Very little. I don't know how much detail you

Page 36

1  want me to go into.
2     Q   If you could briefly explain your answer that
3  would be helpful.
4     A   I follow this sort of thing obviously. CAPPS
5  took what I would call commercially available
6  information from the PNR, Passenger Name Record,
7  information you provide when you buy a ticket and it
8  made a determination on how well we knew you, for lack
9  of a better term.
10       It was not trying to identify terrorists. What
11  it was trying to do was give you a number. That number
12  may be -- You may be a grandmother from Dubuque that has
13  never flown and you're 83 and you could get a really bad
14  number, and you could be a million miler and you would
15  get a really good number, but again we weren't trying to
16  identify terrorists. We were trying to identify -- The
17  original concept was giving you a number to tell the CT
18  machine how many slices to give to your checked bag.
19       Every bag is screened, don't get me wrong, but
20  depending on your score -- Every bag gets three slices,
21  but depending on your score you get 7, 9, 12, 15, that's
22  time. That was the whole concept.
23       Following 9/11 what the Commission, as I read
24  it, says you need to spend more time to refine that and
25  the rest has been covered in the press quite adequately,

Page 37

1  I think, and that was they came up with -- They keep
2  changing the names of it, but they came up with ways to
3  implement what they refer to as a watch list where
4  you're looking for names.
5       I have always felt, and this goes back to my
6  days in the secret service in the '70s when I was in
7  Washington in the intelligence division, protective
8  intelligence, that I think names are basically useless
9  because people simply change names and they get valid
10  passports issued in fake names. So I don't think -- I
11  have never been a fan of names, but following 9/11 there
12  was a hew and a cry, my opinion, by many, many agencies,
13  law enforcement intelligence that we have to look for
14  names and I think the rest is history. The whole thing
15  just bogged down in bureaucratic fighting. There were
16  some easy solutions and it got lost in bureaucracy of
17  all the entities that wanted a piece of the action.
18       So they didn't carry out, in my opinion, what
19  the Commission said they should do and that battle is
20  still being fought as is what now they are referring to
21  as the registered traveller.
22    Q   Now, CAPPS you testified a few minutes ago
23  dealt with checked bags as opposed to passenger
24  screening; is that correct?
25    A   No, CAPPS -- The computer processed the

10 (Pages 34 to 37)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.   LAIRD - October 10, 2006

Page 38

1  information for every passenger.
2    Q   But what it did --
3    A   The concept of why we came up with CAPPS was
4  that we wanted to increase the throughput for checked
5  luggage, yes.
6    Q   But when a passenger goes to a security
7  checkpoint after having already checked their luggage,
8  CAPPS doesn't influence in any way what happens when the
9  passenger goes through the security checkpoint, does it?
10   A   It does not.  It should, but it does not.
11       Every passenger going through the screening
12  checkpoint whether it's TSA today or FAA before is
13  treated exactly the same.  Part of the concept that we
14  had, which was never implemented and then I left
15  Northwest, was to have the screener, whether it be FAA
16  or TSA, know what your score was as you came through the
17  process.
18    Q   Of what significance would it be for that
19  screener to know your score?
20    A   If you were what is termed a selectee or
21  overseas a high selectee you would want to do a much
22  more thorough search.  There are different rules
23  domestically and internationally.
24        Internationally if you're flying a U. S. flag
25  and you're determined to be a high selectee, you get a

Page 39

1  very, very thorough search of your person and your hand
2  carried and your luggage.  They dump everything.  They
3  squeeze your tooth paste, the whole thing.
4        Internationally at Amsterdam or Frankfurt or
5  whatever then they physically escort you to the airplane
6  and put you on.  They don't do that in the United
7  States.
8        So in a sense the regulators are talking out of
9  both sides of their mouths.  I think it would be very
10  beneficial for the screeners today, the TSA screeners to
11  know what my classification was as I came through the
12  line.
13    Q   Are you aware of what information is under
14  consideration to create that classification at the
15  present time?
16    A   I don't have access to that.  That is not
17  classified.  It's security sensitive.
18    Q   As of the time that you were involved in
19  developing CAPPS at Northwest, what information beyond
20  that obtained from the PNR did you consider to be
21  relevant in making determinations on screening
22  decisions?
23    A   I'm not sure I understand.  That is all we had,
24  so I'm --
25    Q   If there is anything you could have added to

Page 40

1  CAPPS besides the information from the PNR, what would
2  it have been?
3    A   One of the things that CAPPS early on was
4  capable of doing to some degree was checking some names
5  against watch lists.  What the FAA did after I left
6  Northwest with regard to that, I don't know.
7        The problem was pre-CAPPS the way you found out
8  of a person on a watch list was flying and I think this
9  holds true for all carriers, was that you would put the
10  name, a name into the computer system and during down
11  time, you know, 1:00 in the morning they would run the
12  name.  You might come out with ten or fifteen pages of
13  possible hits and then at Northwest anyway we had one
14  person, her job was every morning to go through the hits
15  and look at some files that we had from various
16  government agencies that were looking for people and see
17  if we thought there was a match.  If there was then we
18  would call whatever agency was looking for this person,
19  very time consuming process.  Also if a person just
20  showed up and flew we wouldn't know about it until the
21  next day.
22        Part of what CAPPS did was take some of those
23  names and be able to operate in front of the computer.
24  It's kind of hard to explain.  So we could do a little
25  bit more realtime looking for people.

Page 41

1    Q   Are there any other sections of the 9/11
2  Commission Report besides the information that you have
3  referred to on page 393 that was of significance to you
4  in formulating your opinions in this case?
5    A   No.
6        Well, let me rephrase it, not that I recall.  I
7  have read it a couple of times, but I think that was the
8  pertinent section.
9    Q   Could you turn to page 387 in the report, sir.
10   A   Okay.
11   Q   And directing your attention to the first full
12  paragraph beginning with a special note on the
13  importance of trusting subjective judgment.  Do you see
14  that?
15   A   Yes, I do.
16   Q   Are you familiar with that section of the
17  report?
18   A   Let me look at it.
19   Q   Sure.
20   A   Yes.
21       I'm sorry, your question.
22   Q   Do you agree with the Commission's implication
23  there that there is an importance to trusting the
24  subjective judgment of the personnel on the ground
25  making decisions?

11 (Pages 38 to 41)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.   LAIRD - October 10, 2006

Page 42

1    A    Partially.
2    Q    In what way do you disagree?
3    A    I believe that the incident that they are
4  referring to of the inspector turning somebody away, I
5  think as I understand it and again from reading because
6  I haven't worked with the customs immigration people
7  specifically on this, there are either six or seven
8  criteria that are used and I think only two have to do
9  with the subjective judgment of the border agent,
10 customs agent, and from what I read of this particular
11 incident that they are referring to there were far more
12 indicators that something was amiss than the agent's
13 subjective evaluation of what was taking place.
14   Q    Do you agree, however, that subjective
15 evaluation needs to play some role in assessing
16 potential security problems?
17   A    It's very -- Yes and no.  It's a very slippery
18 slope.  Let me explain.
19        I'm very familiar with the profiling methods
20 that the FAA said U. S. flight carriers should use after
21 Pan Am 103 for people coming from Europe and Asia into
22 the United States.  At Northwest we hired an Israeli
23 Company, ICTS International Consultants and Target
24 Security.  I haven't done the whole course, but I have
25 sat in on many of their training sessions around the

Page 43

1  world, introduced myself and said you're doing a great
2  job, blah, blah, blah, you know, and I think on certain
3  flights I think there is some -- something useful for
4  that sort of subjective judgment.
5        The problem is you have to have intelligent
6  people.  You have to have people that are very well
7  trained and you have to have people that have undergone
8  on-the-job training and been supervised by people that
9  really understand the system or you can have all sorts
10 of false alarms.  Part of the reason we came up with
11 CAPPS was that we had a number of situations worldwide
12 where the ICTS profiling methods made people what they
13 call high selectees and not random selectees, high
14 selectees.  When you looked at the details, looked at
15 the facts of why were you made a selectee, they just
16 didn't -- I didn't think they held water and we said
17 there has to be a better way.
18        So I'm very concerned about this sort of thing.
19 You can use that type of subjective judgment again if
20 you have been trained and you really understand the
21 issues and can sort out the noise, so to speak.  What
22 happens, and this is a problem we had in Detroit, if you
23 pull up where they say not nice things about me in
24 Detroit, what one of the things we had happening was
25 that there is a very, very large Mid Eastern community

Page 44

1  in Dearborn.  I know those people very, very well as I
2  went down and met with them many, many times with the
3  American Araban discrimination people.  We were able to
4  sort all that out once they understood why some of the
5  folks were being what they said harassed was simply the
6  way a ticket agent, a travel agent was processing their
7  paperwork.
8        Once we fixed -- took some of those kinks out
9  most of the problems went away and they could live with
10 our profiling methods because we were voluntarily
11 profiling on flights from Detroit to Europe.  We didn't
12 have to.  We did that on our own, but again the key to
13 that whole thing was that we had to make sure that our
14 people were adequately trained, again not to make false
15 assumptions, again because these are key passengers of
16 ours and partially that was one of the reasons we
17 adopted CAPPS was that CAPPS doesn't know anything about
18 you other than the facts on the sheet.
19        What was happening is that we were having
20 ticket agents at the ticket counter -- I can't recall
21 inflight anything happening, but at the ticket counter
22 not liking the way somebody looked, quote unquote, and
23 then creating a situation and the guy was a doctor from
24 Dearborn, a surgeon or something.  That is what we were
25 trying to eliminate, not making opinion based on just

Page 45

1  simply on the way a person looked.
2    Q    Were there any formal complaints of
3  discrimination lodged against Northwest based on the
4  actions of the ticket agents?
5    A    Yes.
6    Q    In addition to speaking with the community and
7  implementing CAPPS, what other steps did you take, if
8  any, to address those issues of discrimination,
9  perceived discrimination?
10   A    There may have been some at the legal,
11 corporate legal level.  I wasn't involved in any
12 lawsuits, but I know there were some, but again as I
13 said once the leadership in that community understood
14 that through no fault of their own some of the things a
15 couple of travel agents were doing simply made every
16 single one of them a selectee.  It had nothing to do
17 with our profile.
18        What they were doing is if you were flying to
19 Yemen or something, you would buy the ticket from the
20 travel agent in your community and that person as a
21 service to you would pick up your luggage and take it to
22 the airport and then when you came two or three hours
23 later they would say here is your luggage and then of
24 course the profile person would say has the luggage been
25 in your possession, no, it has not.  They would answer

12  (Pages 42 to 45)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

Page 46

1 honestly and then they would get the full service
2 treatment.
3        Once we got those details straightened out and
4 I met them at the airport and we observed their
5 community people being processed they had no problem.
6 Again this is the leadership of the communities who were
7 doctors and lawyers.  These were, you know, bright
8 people.  I don't know the rank and file necessarily, but
9 I think the problem -- I know the problem went away.
10   Q   What other behaviors besides having someone
11 else deliver the luggage to the airport were triggers
12 for the ticket agents during that period of time?
13   A   I can't really say other than to speculate it
14 was -- because not much happens in front of the ticket
15 counter.  They just didn't like their appearance was my
16 best take on it, and what we did, partially what we did
17 with the CAPPS program is we educated our ticket agents,
18 gate agents, et cetera, that once CAPPS was up and
19 running, we ran CAPPS six months before anybody else did
20 and then it went to all the carriers, but we did a lot
21 of time training those people on unless something
22 really, really bites you pretty good, we want you to --
23 we do trust the system, so let the system decide.
24   Q   Directing your attention back to the
25 Commission's report, are you familiar with the

Page 47

1 Commission's conclusion that no-fly and automatic
2 selectee lists aren't enough to safeguard passenger
3 safety?
4   A   Um-hum.
5   Q   Is that yes, sir?
6   A   Yes, I'm sorry.
7   Q   Do you agree with that conclusion?
8   A   Yes, sure.
9   Q   Do you also agree with the Commission's
10 conclusion that the CAPPS system needs to be replaced?
11   A   No, I do not.  The CAPPS system again I think
12 proved itself on 9/11.  There is not another system in
13 the world that I'm aware of that has ever had the
14 success that CAPPS had on 9/11.  What failed on 9/11 was
15 what the people did with the people identified as
16 selectees.  That thing could have been derailed that
17 morning, could have been.
18        Now, should CAPPS be worked on, sure.  It can
19 always be improved, but should it be -- I totally
20 disagree it should be replaced.
21   Q   What improvements would you make to CAPPS?
22   A   I would have to spend more time looking at it,
23 but anything can get better over time.  It can be
24 refined.  I just -- I think it's irresponsible to say it
25 should be replaced.  I think what happened on 9/11 was

Page 48

1 that the lowly screeners took the fall.
2   Q   Directing your attention to what has been
3 marked as Exhibit 5 to your deposition, is Exhibit 5 a
4 book entitled Aviation and Airport Security something
5 upon which you relied in formulating your opinions in
6 this case?
7   A   Yes.
8   Q   And to what extent did you rely on the
9 publication Aviation and Airport Security in preparing
10 your opinions?
11   A   This book?
12   Q   Yes.
13   A   I read the book and there are sections that I
14 think are pertinent.
15   Q   Can you identify for me those sections that you
16 believe are pertinent?
17   A   I think chapter 4, page 68.
18   Q   What on page 68 is significant?
19   A   The third or the second full paragraph
20 Department of Transportation, blah, blah, blah, and it
21 gets down to the last sentence.  The report also
22 concludes that there is no evidence that the system
23 recording an individual's age, race, color, national
24 ethnic origin, gender should be part of the program.  I
25 agree with that.

Page 49

1   Q   So you agree that those factors should not be
2 taken into consideration in determining whether someone
3 is or is not a potential terrorist; is that correct?
4   A   Not in and of themselves.
5        Now, if somebody -- If there is a whole series
6 of events I can see down the road a bit, there may be,
7 but some people would say if you're a certain ethnic
8 group you should immediately go to that line.  I think
9 that is wrong.  I don't think factually -- I just don't
10 think you can support -- we can support that as being
11 valid in a security sense.
12   Q   Is it valid in a security sense to once
13 suspicions have already been raised to take ethnicity
14 and race into account in your opinion?
15   A   I don't think ethnicity -- I'm not sure of the
16 definition exactly.  If a person came from a certain
17 country possibly and there is a whole bunch of other
18 indicators you might want to spend more time with them.
19 All I'm saying is it isn't shouldn't be a factor in
20 doing the initial sort in my opinion.
21   Q   It shouldn't be a red flag in the initial sort,
22 but it might come into play later on down the road?
23   A   It could, yes, but should it determine whether
24 or not a person flies or not, I don't believe so.
25   Q   Any other sections of Aviation and Airport

13 (Pages 46 to 49)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

1  Security on which you relied upon in preparing your
2  opinion?
3      A   I have read the book and I have known Kathy
4  Sweet for many years.  It's the best book today
5  available on the subject.  I have read it a couple of
6  times and I have recommended it to people that teach
7  aviation security.  It's a very good overview.
8      Q   Would you describe Exhibit 5, Aviation and
9  Airport Security, a resource upon which aviation
10 professionals rely?
11     A   Everybody should read it.
12     Q   But is it, sir, something that specifically
13 aviation security professionals should rely in
14 performing work related to their profession?
15     A   I don't know that.
16     Q   Do you know whether aviation security
17 professionals rely on the 9/11 Commissions Report in
18 performing their day-to-day professional duties?
19     A   I would hope so, but I don't know that.
20         I don't know what the security director at
21 Northwest reads.  I mean, I took it upon myself when I
22 left the secret service and came to Northwest, I took it
23 upon myself to read everything that I could and it took
24 me about a year to really get up to speed and understand
25 to some degree how -- It's a very complex thing, how it

1  all fits together and works, especially reading all
2  the -- Not only the government rules and regulations,
3  but the history thereof, the legislative intent and that
4  sort of thing.
5         So I literally spent hundreds of hours.  You
6  asked about classes.  I never went to any classes per se
7  that taught me that stuff, because I don't know of any.
8  There are starting to be now programs in aviation
9  security in a couple of colleges, who by the way have
10 contacted me to see if I would be willing to be
11 involved.  I have not for a variety of reasons.  I have
12 no interest in that, but it's a difficult subject to
13 learn because again there is nobody teaching it that I'm
14 aware of.
15     Q   Do you know whether aviation security
16 professionals rely on the report of the Presidents's
17 Commission on Aviation Security and Terrorism from 1990
18 in performing their day-to-day activities?
19     A   Yes, they do.  I can say that because there is
20 a group called the Air Transport Association, and I was
21 a co-chair and I chaired that group for a number of
22 years and I was the one of two U. S. representatives to
23 Montreal and Geneva.  So, sure, we discussed it in great
24 detail.
25     Q   How about the Annex 17 that we discussed

1  earlier, is that something that is relied upon by
2  aviation security professionals in their day-to-day
3  activities?
4      A   I would certainly hope that they are aware of
5  it.  I can't recall specifically at IATA meetings where
6  we got out Annex 17 and said what do you think of 3.3.6.
7         You come at it a different way.  You realize
8  everybody sitting around the table has read it and
9  understands it because they have had to implement it in
10 their countries have had to implement it to meet the
11 requirements, but it's not something that you talk about
12 per se.
13         I don't know.  You kind of burrow down to the
14 specifics of a particular paragraph and what is the best
15 way to do this in a third world country, that kind of
16 thing.  I don't know if that helps you or not.
17     Q   In Aviation and Airport Security at page 161,
18 the author makes reference to the fact that final
19 decisions regarding boarding rest with airlines rather
20 than law enforcement.
21         Do you agree with that conclusion?
22     A   What does she say?  Where is it?
23     Q   On page 161, just subsequent to the note.
24 "There are also rare situations in which local law
25 enforcement may clear a passenger for boarding but the

1  airline still does not want to board them."
2         Do you agree that the final decision regarding
3  boarding rests with the airline as opposed to local law
4  enforcement?
5      A   The final decision whether or not you board a
6  passenger rests with the captain, not with the airline.
7  The captain can do whatever he or she deems appropriate
8  and there is nothing that the airline can do about it.
9  Sometimes captains will make inappropriate decisions and
10 the pilot, the captain will be called before the chief
11 pilot and there will be a chat, but ultimately under
12 international law the pilot makes the decision.
13     Q   Is it a fair statement that airlines have
14 different policies and procedures with respect to
15 handling the pilot's ultimate decision?
16     A   I don't know that.  I just know that -- I know
17 that in my Northwest days systems operation control
18 always knew where I was and I had a cell phone.  They
19 knew where all my people were and when a situation
20 arose, because we were a worldwide operation, I would be
21 called and many times briefed by the SOC and then
22 patched through to the captain and it may have been
23 halfway across the Pacific somewhere, had an incident.
24 We would chat about it.
25         The captain would make the ultimate decision,

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

Page 54

1  not me. My job was to listen to all the facts and say,
2  you know, I'm aware of what is happening in Sydney,
3  Australia and based on what you have told me from a
4  security sense I have no reason to say you should not
5  continue on to LA. You know, the decision is yours,
6  captain, but blah, blah, blah. Sometimes the guy would
7  say no, I am going the land in Honolulu. I was out of
8  it at that point.
9       I do know that the chief pilot, I know there
10  would be some discussions as to what is your rationale,
11  but I wasn't involved in any of that. That is between
12  the pilot group, but again the real job for me as
13  security director was to know that what they call group
14  captains, I don't know what they are at American. We
15  had a group of 25 747 drivers, 25 DC 10 guys who were
16  selected by their peers, not by seniority but because
17  they are really sharp people, respected, good pilots,
18  good heads, and I met with those people. I tried to
19  meet with them at least twice a year, because I knew
20  that I had to have rapport and trust because I wanted --
21  part of my job again was to help them sort out issues
22  and make the right decision.
23    Q   Do you have any understanding as to what the
24  policies and procedures at American Airlines were in
25  December of 2003 with respect to boarding decisions?

Page 55

1    A   I have no idea.
2       I can only speculate that they were similar to
3  what I experienced in my Northwest days, but I haven't
4  seen their manuals.
5    Q   That is again based on your experience at
6  Northwest that ended in 1995; is that correct?
7    A   That is correct.
8    Q   You next refer in your report, sir, to a
9  publication called Combating Air Terrorism; is that
10  correct?
11    A   Yes.
12    Q   Of what significance is that publication to
13  your opinions in this matter?
14    A   Combating Air Terrorism by Rodney Wallis.
15  Rodney Wallis is kind of the dean of aviation security.
16  He was the former director of IATA. Until Kathy Sweet
17  came out with her book, which is referenced, this was
18  probably the Bible of -- for the entire aviation
19  security community worldwide. I thought a particular
20  section by Mr. Wallis on page 81 made some sense.
21    Q   What section was that, sir?
22    A   It's the second paragraph.
23    Q   To what does it pertain?
24    A   It says that the policies and procedures within
25  the airline senior security executive group may be

Page 56

1  restricted to his or her own staff, but the policies
2  developed and adopted by the company would be need to be
3  implemented by the line managers and the inflight and
4  other operations departments. The functions corporate
5  line managers should not be provided -- should not
6  provide loopholes to which required procedures are not
7  followed.
8       I think what they are saying is that it's
9  important that the security people, the security
10  director implements, has policy in place that is put out
11  to all parts of the company and that adequate training
12  is done so people carry out the policies.
13       It's important -- It's extremely important from
14  my experience to adequately train the people and get buy
15  in for something to work. A good example would be again
16  in my Northwest days at Detroit. There was -- The FAA
17  came through Detroit and issued literally hundreds of
18  penalties against American, United, Northwest, Delta,
19  everybody that flies out of Detroit, although Northwest
20  is the big guy. It was pretty bad, and I think you know
21  the business. They weren't challenging is the problem
22  and we did extensive training. We brought in labor and
23  management and brought in the FAA and did an extensive
24  training program.
25       Six months later they came through again and we

Page 57

1  had zero violations and some of the other carriers that
2  I just mentioned still had hundreds of violations and
3  the difference was training and buy in. If you don't
4  get buy in by the employees and an understanding of why
5  you're doing what you're doing you fail, and I think
6  that is what Mr. Wallis is alluding to in that section.
7    Q   Any other sections of the publication Combating
8  Air Terrorism on which you're relying in your report?
9    A   I have read the book a number of times, but
10  nothing that comes to mind. It's a good book.
11    Q   The next publication you mention in your
12  report, sir, is a book entitled The Naked Crowd which
13  has been marked as Exhibit 6 to your deposition.
14       Of what significance is that publication?
15    A   A whole bunch.
16    Q   Could you describe for me --
17    A   Do you have it?
18    Q   Yes, I do.
19       Could you describe for me what section or
20  sections you relied on in preparing your opinions?
21    A   Can I give you page numbers?
22    Q   You certainly can.
23    A   Page 26 -- Well, if you look in the index
24  anything having to do with CAPPS, but 28, for example.
25       Let's go to page 28. That is better than 26.

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 58

1  They talk about human intelligence has proved far more
2  effective than machines and they talk about the EL AL
3  methods, you know, profiling. They talk about guards
4  that are trained to look for changes in facial
5  expression, body language, all this sort of thing.
6  Ability to pick out a suspicious traveller out of the
7  crowd.
8      Q   Is that the kind of training that you referred
9  to with regard to ICTS --
10     A   Yes.
11     Q   -- a few minutes ago?
12     A   EL AL tries to determine whether a particular
13 passenger poses a serious risk after he or she has been
14 questioned by a human security guard in psychological
15 analysis.
16     I have nothing against profiling per se. Again
17 the key issue for profiling to me is adequate training
18 to not do a whole bunch of false positives for the wrong
19 reason.
20     All the sections that I have in here have to do
21 with that sort of thing. Another one is on page 105.
22 "There seems to be general agreement among psychologists
23 that there is no particular psychological attribute that
24 can be used to describe the terrorist or any personality
25 that is distinctive of terrorists. For this reason, the

Page 59

1  U.S. Secret Service, which once looked for people who
2  fit profiles of stereotypes of presidential assassins,
3  has abandoned its personality profiles and now looks for
4  patterns of motive and behavior."
5      I was involved, I might add, in '71 and '72
6  with a team of four or five PhD's that studied the
7  secret service files for years and we were using punch
8  cards in those days with an IBM main frame. We could
9  not come up with a useful profile. To the best of my
10 knowledge when I retired in '89 we never did go back to
11 a profile in that sense.
12     Q   I note you have a number of stickies in your
13 copy. Could you just identify for the record on what
14 pages the stickies appear?
15     A   Yes, some of them don't really apply.
16     Like on this page, it just talks about CAPPS
17 used at airports, but I will give it to you. Page 26,
18 page 28, which I just read to you from, page 102. Page
19 102 they are talking about data mining. Page 105, page
20 107, page 147, page 196, page 214, that's it.
21     Q   During --
22     A   I might clarify, too.
23     On one of those toward the end, I can't
24 remember which, when I said data mining I did have a
25 contract after 9/11 with Experion. They were trying to

Page 60

1  win a contract to do data mining, and that is all I can
2  say about it. They didn't get the contract.
3      Q   Directing your attention to page 107, which is
4  one of the pages that you referenced, on that page the
5  author makes the assertion in the first full paragraph
6  that, "An expanded CAPPS profile might also be easy for
7  terrorists to defeat."
8      Do you agree with that assertion?
9      A   I don't think the author understands CAPPS.
10 Let me clarify that.
11     You may by a number of methods possibly figure
12 out a way to get a better or better/worse depends on how
13 you want to look at. In other words, you're a good guy.
14 Not a good guy, bad guy. You're better known than that
15 person.
16     What this person does -- What the author does
17 not understand in this case is that you don't defeat the
18 system because every single bag is scanned. It's just a
19 matter of to what degree you scan the bag. So I don't
20 consider that defeating the system.
21     Q   So to the extent that someone could lower their
22 score by taking particular actions you would agree with
23 the conclusion; is that correct?
24     A   You possibly you could have an -- you could
25 influence your score. I don't think that means you have

Page 61

1  defeated the system, because we don't say have a nice
2  flight and we don't -- and not check you or your
3  luggage. You are still scanned. Your luggage is
4  checked, et cetera, et cetera.
5      Q   So for example, one of the criteria that I
6  believe you have mentioned that is factored into the
7  CAPPS system is frequency of flight; is that correct?
8      A   Yes.
9      Q   So if you took a certain number of flight
10 segments would that have a potential impact on your
11 CAPPS score?
12     A   Right.
13     The part that I can't talk about is the number
14 to influence the score, but it's more than two or three,
15 and the theory behind that quite clearly is that when we
16 designed that program we didn't believe that somebody
17 was going to take an inordinate number of flights, 25,
18 50, I don't know what the number is that they finally
19 agreed on. They just don't have the time or the
20 inclination to do that, in my opinion.
21     Q   As a corollary to that, participation in
22 frequent flier programs is also a factor that could
23 reduce your CAPPS score; is that correct?
24     A   Right, but you would have to be -- You would
25 have to be elite, not -- You can't just fly again, like

16 (Pages 58 to 61)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.   LAIRD - October 10, 2006

Page 62

1  I say, 10,000 miles and that makes you have a good
2  score.
3      Q   The author also asserts on page 107 that
4  Mohammad Atta tested the CAPPS system prior to 9/11 by
5  flying the flights that he intended to hijack.  Are you
6  aware of that, sir?
7      A   Just from what I have read, yes.
8      Q   Based on that information that you have read,
9  do you believe that it would be possible for others to
10  do the same thing in the future?
11     A   You mean do a 9/11 scenario?
12     Q   For others to test the CAPPS system in the way
13  that Mr. Atta did?
14     A   From what I have read I don't believe that any
15  of those folks flew enough to modify their score.  I'm
16  still not sure where you're going.
17     Q   Sure.
18         Regardless of the score that they had, would it
19  be possible for someone to test run the flights on which
20  they intended to commit criminal activity?
21     A   That is a very common thing.  If you look at
22  the history of aviation sabotage and other sabotage
23  issues unrelated, that is one of the ways that people
24  manage to get caught is that they hang around at a
25  location too long or they make too many trips.  Sure,

Page 63

1  that is a consideration.
2      Q   Are you aware of whether aviation professionals
3  refer to and rely upon the Naked Crowd in making
4  day-to-day decisions as aviation security officials?
5      A   I would hope so, but I don't know.  I don't
6  know what my colleagues read.
7      Q   Directing your attention to the next
8  publication on the list, which I believe is The Culture
9  of Fear, of what significance was that publication to
10  your opinions recited in your report?
11     A   On page 200 they talk about Newsweek and the
12  reporting by the media of aviation incidents and how it
13  raises the fear of the public.
14     Q   Of what significance is that specifically to
15  your report?
16     A   I believe that the 9/11, events of 9/11 raised
17  the level of consciousness in the flying public or the
18  public, the flying public in particular of what could
19  happen particularly right after 9/11.  I think that, I
20  would call it nearly hysteria peaked right around there.
21         I was actually involved in an incident on a
22  Northwest flight, inflight the third day after we were
23  flying again.  I didn't work for Northwest, but I was
24  flying to Washington, DC on the first day available to
25  do some meetings, and I think on that A-320 I think

Page 64

1  there must have been all of eight or nine of us.
2          The entire passengers were in first class.  I
3  think there was one person in the back.  They just moved
4  everybody up and there was a Semitic looking fellow
5  sitting on 1A.  I was on 1D doing a Power Point that I
6  had to present when I got to Washington, and the flight
7  attendant said Mr. Laird.  I said I don't work here.
8  She said we have to talk to you.  We went up to behind
9  the curtain.  She said have you seen the guy in 1A.  I
10  said no, I have been busy.  I have work to do.  She said
11  well, look at him.  I looked through the curtain.  He
12  was very Semitic, Mid Eastern looking guy, young guy,
13  and I said I would recommend -- I don't work here.  I
14  would recommend that you have the captain go through
15  ACARS, the computer system, and contact the SOC and see
16  what you know about this guy.  He is not doing anything.
17  He is reading a paperback book.  Let's calm down and I
18  sat down and it was out of the bag, so to speak.
19         So I went back up in a few minutes and he was a
20  business guy employed by a known corporation.  I can't
21  remember his status, but flying a lot on Northwest.  I
22  said let's just -- But it was beyond -- At that point it
23  was out of control.  They were really spooked, and there
24  was two gals and a guy, and the guy was in the back.
25  The flight attendant a great big guy.

Page 65

1          I said look it, whatever his name was, why
2  don't you take Mary's place.  You work the front.  You
3  stay up here by the cockpit door, because we were
4  already starting down at that point.  I said Mary, you
5  go in the back and if he comes forward, you know, you
6  stand between him and the cockpit door.  I will take
7  care of him from the back.  I know how to -- I'm trained
8  by the LAPD to do certain things to people and I knew
9  what I could do, if I had to.
10         We landed without incident and we taxied up to
11  the tractor thing, you know how they take you in, and
12  everybody got up and the station manager came on.
13  Northwest, you know I know all these people and said
14  everybody sit down, and they said Mr. Laird please get
15  off the plane and I got up and went into the whatever
16  they call those conveyances and here is five or six
17  uniform policemen, and I said to the station manager,
18  this thing is totally out of control, and as you know
19  better than I there were hundreds if not thousands of
20  these incidents going on and I think that is what they
21  refer to here.
22         I personally would have flown the next day, but
23  I believe in statistics.
24     Q   To what extent, if any, does that perception
25  created by the media, has you have mentioned on page 200

17 (Pages 62 to 65)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

Page 66

1 here, influence your opinions rendered in your report?
2     A  I'm not sure how to take that.
3     Q  Does the perception that the media created as
4 described on page 200 have any role in what you think
5 occurred on December 28th, 2003?
6     A  For my opinion?
7     Q  From your perspective.
8     A  Partially.
9        I think the events of 9/11 in and of themselves
10 obviously have to be reported in a big, big way, but I
11 think the more that sort of thing is reported and you
12 see it again and again and again, I think that raises
13 the level of apprehension in people.  Also I think
14 particularly in the airline industry, whether it's
15 United or American who lost friends, I think all these
16 things go to make people pretty sensitive to what they
17 perceive to be happening around them, yes.
18     Q  Any other sections of the Culture of Fear on
19 which you relied in preparing your report?
20     A  No.
21     Q  Do you know whether aviation security
22 professionals rely on the Culture of Fear in performing
23 their day-to-day aviation security activities?
24     A  I don't know that.
25        My guess is after 9/11 they were so busy for

Page 67

1 the next couple of years they probably didn't even read
2 the newspaper.
3     Q  Directing your attention to the next
4 publication listed in your report, which I believe is
5 entitled America the Vulnerable, in what way is that
6 publication significant to the opinions rendered in your
7 report?
8     A  On page 74 they quote Rafi Ron, who was
9 security director of Ben Gurion Airport in Tel Aviv
10 about behavioral, what I would call behavioral profiling
11 and a program he set up.  He was hired by the Boston
12 Airport and set up a program called Logan Watch where
13 people are trained to look for behavioral patterns.
14        Again I think in concept I have -- I believe in
15 the process.  I just think giving somebody a one or two
16 hour class I think is in my opinion irresponsible.
17     Q  Any other sections of that publication which
18 are of significance in your report?
19     A  No.
20     Q  Do you know whether America the Vulnerable is a
21 publication upon which aviation safety professionals
22 rely on in their day-to-day activities?
23     A  I don't know that.  I can say that I obviously
24 was not at Northwest on 9/11, but I was at Northwest
25 when the first call for war took place and I know what

Page 68

1 it's like to work 24 hours a day for a week and have the
2 phone ringing constantly from around the world with
3 quote unquote incidents.  I have lived through that
4 hysteria and in that particular instance luckily it
5 didn't happen in the United States, but again I have
6 been through those sorts of situations where, what do
7 you call it, people are extremely sensitive to a lot of
8 things.
9     Q  Directing your attention to the next
10 publication listed which is How Safe Are Our Skies, and
11 it has been marked as Exhibit 9 to your deposition, of
12 what significance is that publication to your opinions
13 rendered in this case?
14     A  Page 102.
15     Q  Of what significance is page 102?
16     A  They talk about security training given by the
17 airlines to their ground staff and flight crews under
18 the auspices of the Federal Aviation Authority.  It
19 talks about the need for dealing with obnoxious
20 passengers, air raged people, and that sort of thing.
21 It's the first -- that real long paragraph in the middle
22 of the page.  The use of role playing.
23        Anyway it stresses the importance of training,
24 training crews in how to deal with inflight incidents.
25     Q  Of what significance is that particular

Page 69

1 paragraph in your opinions in this case?
2     A  From the materials, the depositions and so
3 forth that have been provided it appears to me there may
4 have been -- There is some question as to -- in my mind
5 whether or not the people received adequate training.
6     Q  Are you aware, sir, that the flight crew were
7 not permitted to answer a number of questions with
8 regard to the nature of their training because that
9 information constitutes what the TSA might consider to
10 be sensitive security information?
11     A  I saw that and that creates a dilemma because
12 it's hard for me to comment when they won't let me read
13 the material.
14     Q  Is it your understanding, sir, that the TSA is
15 responsible for determining whether or not that
16 information may or may not be released rather than
17 American Airlines?
18     A  I understand that very well.
19        I'm involved in other issues surrounding 9/11
20 and on a much larger scale than this case and one of the
21 major battles with the law firms that I'm involved with,
22 which has been sought for several years and eventually
23 won was on that very issue.  How can we defend ourselves
24 when we can't get the documents?
25     Q  Are there other sections of How Safe Are Our

18 (Pages 66 to 69)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 70

1  Skies that are pertinent to your analysis in this case?
2      A   Not that I recall.
3      Q   I believe the last publication that you make
4  reference to in your report is a book called
5  Disinformation that has been marked as Exhibit 10 to
6  your deposition.
7          Of what significance is that publication to
8  your analysis in this case?
9      A   Page 167 and 168 dealing with racial profiling
10 of terrorists.
11     Q   Why are those pages of significance to you in
12 your opinions?
13     A   I think the author quite clearly states that
14 the -- using a profile to identify a terrorist based on
15 race is not founded in fact.
16     Q   Any other sections of this publication which
17 are of significance to you in preparing your opinions in
18 this case?
19     A   No.
20     Q   Do you know, sir, whether How Safe Are Our
21 Skies is a publication relied upon by aviation safety
22 professionals in performing their day-to-day duties?
23     A   I have no knowledge of that.
24     Q   How about Disinformation?
25     A   I have no knowledge of their reading habits.

Page 71

1      Q   You also list in your report, sir, a number of
2  publications that you have prepared or assisted in
3  preparing?
4      A   Yes.
5      Q   The first of those is an article entitled
6  Perception and Reality.
7          Was that publication of significance to you in
8  preparing your opinions in this case?  It has been
9  marked as Exhibit 11 to your deposition.
10     A   To the extent that it's, you know, part of who
11 I am and how I have formed my opinions.
12     Q   Is there anything specific in that publication,
13 sir, that is of relevance to your opinions in this case?
14     A   As I recall, only that perception is reality
15 and the perception may be incorrect, that's all.
16     Q   The next publication that you reference, sir,
17 is Airline Security Regulatory Framework and Protection
18 Security and Safeguards Practical Approaches and
19 Perspectives contained within Protection Security and
20 Safeguards.  I'm sorry, I repeated myself there.  It has
21 been marked as Exhibit 12 to your deposition.
22         Of what significance, if any, is that document
23 to the opinions rendered by you in this case?
24     A   I was asked to do a chapter or two in this book
25 and what it had to do with was the need for individuals

Page 72

1  that write regulations understand the industry in which
2  they work, and one of the examples I used is that people
3  will write how to regulate security in a flight kitchen,
4  but they have never even seen a flight kitchen.  That
5  was the point I was trying to get across and there are a
6  couple of the different incidences.
7          The reason I listed this in the documents
8  you're going through right now is I was asked to list
9  documents that I had written on aviation security.
10     Q   I understand that, sir.  I'm just trying to see
11 if there is any particular relevance.
12     A   I didn't see that I can quote a paragraph in
13 here, but again it's part of what I believe and who I am
14 and perception to me is reality.
15     Q   Okay.
16         Directing your attention to what has been
17 marked as Exhibit 13 to your deposition, it's an excerpt
18 entitled Grounding Terrorists published with a Larry C.
19 Johnson.
20         Is that the next publication listed in your
21 report?
22     A   Yes.
23     Q   Is there any significance of that article
24 co-authored by you in your opinions rendered in this
25 case?

Page 73

1      A   I would say the same.
2          Grounding Terrorists was in the aviation
3  security magazine, which is the publication of ASIS
4  International, probably the leading security journal in
5  the world.  Larry and I -- Larry is a CIA State
6  Department type counter terrorism expert.  Larry and I
7  were in BGI at this time.  We were partners in the
8  company with the two ambassadors.  We were asked to
9  write this article as a result of what was happening in
10 the industry, what had happened with Pan Am 103.
11         Again I didn't read this, reread this in
12 relation to this case and say this is important.  I
13 listed this because this is what I believe to be true.
14     Q   You make reference in this article to passenger
15 profiling as a means of identifying potential
16 terrorists.
17         What criteria beyond those that we have already
18 discussed as personified in CAPPS do you believe should
19 be used in passenger profiling according to this
20 article?
21     A   I don't understand what you're getting at.
22     Q   You make reference as --
23     A   One of the tools is profiling.
24     Q   One of the tools in Grounding Terrorists is to
25 profile and that specific criteria should be used to

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

Page 74

1  identify potential terrorists.
2       You have testified earlier today about the
3  information that was used in CAPPS.  What other
4  criteria, if any, do you believe needs to be taken into
5  account to determine if someone is a potential terrorist
6  to profile them adequately?
7    A   I think the CAPPS program that is still in
8  place and running, because nothing has replaced it yet,
9  does an adequate job of identifying who we should take a
10  better look at.
11       Once a person -- In my opinion what failed in
12  9/11 was they identified some people as, actually nine
13  or ten, as I said, as selectees at various airports
14  actually.  At that point I think is when you start doing
15  profiling, so to speak, in that more in the line of the
16  way the FAA adopted the Israeli EL AL methods.  They
17  didn't copy them.  They kind of modified what they do
18  and you go through a matrix of like 32 items.
19       At that point you need a professional person to
20  do their profile called an evaluation to go through the
21  whole scenario and you might clear the individual after
22  two or three questions.  You might after five or six or
23  ten questions call the police.  I mean, that is I think
24  the role of profiling.
25    Q   So is it fair to say, sir, what you would do is

Page 75

1  supplement the existing CAPPS system with the use of
2  professional profilers in the manner in which the
3  Israelis have performed that profiling function?
4    A   Yes.
5    Q   The next article that you reference in your
6  report, sir, is entitled Fighting Fraud on the Fly.  It
7  has been marked as Exhibit 14 to your deposition.
8    A   Yes.
9    Q   Is there any significance of this article to
10  your opinions rendered in this case?
11    A   No, I just listed this because you wanted
12  publications.  This deals with airline ticket fraud.
13    Q   The last publication listed in your report is
14  Airline Passenger Security Screening New Technologies
15  and Implementation Issues dated 1996.  It's been marked
16  as Exhibit 16 to your deposition.
17       I believe you mentioned in your report that you
18  made comments to this report.  Are you aware of whether
19  your comments actually appear in this publication or
20  not?
21    A   No, they do not.
22    Q   Do you recall what comments you made in
23  connection with this publication?
24    A   I was provided -- Well, as you will see here,
25  Homer Boynton, former director of security at American,

Page 76

1  who I have done some things with in the past, Homer
2  discussed -- Also Wilfred Jackson is a good friend from
3  the University of North Dakota at the time.  They
4  suggested that I be on a review panel.  So before this
5  sort of thing is published they send it out to ten or
6  fifteen people and we comment.  I did comment.  What did
7  I say, I don't know.  I can't tell you.  I don't know.
8  You know they send out a double space and you write
9  comments.
10    Q   Directing your attention to the second to the
11  last page of that publication.
12    A   This one, the one we just talked about?
13    Q   Yes, the one we just talked about, Air
14  Passenger Security, directing your attention to the last
15  paragraph on that page.
16    A   The Role of Operators In Passenger Screening.
17    Q   Yes, the last paragraph in that subsection.
18    A   Yes.
19    Q   Beginning with to aid carriers?
20    A   Yes.
21    Q   You agree with the panel's conclusion that even
22  without adding more advanced screening equipment current
23  screening systems and procedures can be improved
24  significantly by placing greater emphasis on human
25  factors?

Page 77

1    A   Just a minute.  I have to read this.
2       I take that, that the use of the word of human
3  factors different than you do.  They are not talking
4  about profiling.  They are talking about in the FAA
5  parlance back in '06.  Human factors are the way that
6  the screeners interact with their technology.  It's
7  not -- It has nothing to do with profiling.
8    Q   So it's technology based in terms of operating
9  the actual equipment?
10    A   Understanding the equipment, how to use the
11  equipment, that kind of thing, because many times what
12  happens, my experience has been that the screeners
13  aren't -- They are not given adequate training to
14  understand the technology that are utilizing.
15       An example I could use would be I used to wear
16  glasses and I would walk through the screening
17  checkpoint and I would set off the mechanical detector
18  and I would say here, hold my glasses and they would say
19  no, that's not it, and I would say yeah, it is, believe
20  me.  I would go back and I would walk through and they
21  would hand me my glasses and they had a puzzled look.
22       Well, they didn't understand if you take a
23  metal framed glass like this, not very big, and put it
24  in your pocket and walk through the metal detector, this
25  sphere of metal, ring of metal that holds the lens

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 78

1  becomes a solid piece of metal because of the magnetic
2  fields and to me that is a disservice to the screener.
3  They don't understand their own technology.
4      That is what they are talking about in my
5  opinion, that is human factors. There was a whole
6  section at the FAA lab in Atlantic City called human
7  factors and that is what they dealt with was those kinds
8  of issues. How can the human interact with the process.
9      Q   Okay.
10     A   That is how I read that.
11         MS. MARIANI: Off the record.
12         (A recess was taken.)
13  BY MS. MARIANI:
14     Q   Sir, one of the things that we will do here
15  today is ask you a series of questions about the
16  opinions you have prepared in this case, and I would
17  like to start with the summary of events that is listed
18  in your opinions.
19         Let me actually give you the copy that has been
20  marked for purposes of your deposition. It's been
21  marked as Exhibit 16 to your deposition.
22     A   Yes.
23     Q   First of all, sir, you state in the summary of
24  events that Flight Attendant Walling advised Captain
25  Ehlers that she was alarmed by suspicious activity by a

Page 79

1  person in seat 20F; is that correct?
2      A   Yes.
3      Q   Did you review the depositions of Flight
4  Attendant Walling, Flight Attendant Sergeant, Flight
5  Attendant Malankovich and Captain Ehlers in this case?
6      A   Yes, I did.
7      Q   Did you see that Flight Attendant Walling
8  before boarding advised the other flight attendants that
9  she was concerned about a particular passenger?
10     A   As I recall that happened, yes.
11     Q   And did you see in those depositions that
12  Captain Ehlers had concerns about two passengers prior
13  to boarding?
14     A   Yes.
15     Q   And did you see that Captain Ehlers made
16  contact with Ms. Walling about that information?
17     A   I'm not -- My recollection isn't quite clear if
18  he made the initiation or she did, but yes, they did
19  talk.
20     Q   Are those important pieces of the puzzle in
21  forming your opinions?
22         MR. KIRKPATRICK: Objection to the form of the
23  question.
24  BY MS. MARIANI:
25     Q   Are those important pieces of information that

Page 80

1  you considered in forming your opinions?
2      A   Yes.
3      Q   And are they reflected in your report?
4      A   I believe so.
5      Q   You also state in your summary of events that
6  an assumption was made that the passengers in row 20
7  were traveling together.
8          What is the basis for that conclusion, if you
9  know?
10     A   Reading the depositions.
11     Q   Whose deposition specifically?
12     A   I believe Walling, flight attendant. I think
13  she was the lead, lead flight attendant.
14     Q   So the lead flight attendant, the testimony of
15  the lead flight attendant is what led you to believe
16  that?
17     A   Walling, I think she was the lead, maybe she
18  wasn't, correct me if I'm wrong. I will just refer to
19  her as Walling.
20     Q   Any other bases besides the deposition of the
21  flight attendant who you believe to be Walling that
22  supports the assumption that the passengers in row 20
23  were traveling together according to the American
24  Airline personnel on board that flight?
25     A   No, all I know is what I read in the

Page 81

1  deposition. As I recall she is the one that made the
2  assumption. That assumption may have been made in
3  relation to her comments -- I imagine she must have -- I
4  can't recall whether she called on the phone or she went
5  and talked with him, but with the captain and there was
6  a whole ponytail thing that these guys must be together.
7      Q   When you say they said these guys must be
8  together, what information do you base that on?
9      A   Again on the deposition. I think primarily on
10  Walling's and then her exchange with the captain. This
11  is further on into the series of events.
12         There is a series of things that happened at
13  the gate and then aboard the aircraft.
14     Q   And is it your understanding that Flight
15  Attendant Walling and Captain Ehlers did or did not have
16  knowledge of the incidents involving the others at the
17  gate before boarding the flight?
18     A   I'm not clear what you're saying.
19     Q   Sure, let me rephrase.
20         Do you know if Captain Ehlers knew of the
21  incident involving Flight Attendant Walling and a
22  passenger at the ticket counter beforehand?
23     A   I don't believe so.
24     Q   Do you know whether Flight Attendant Walling
25  had any knowledge of Captain Ehlers being approached by

21 (Pages 78 to 81)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 82

1  two passengers in the lounge area before she boarded the
2  flight?
3     A   As I recall, no.
4     Q   Do you recall where Mr. Cerqueira was seated on
5  the flight?
6     A   On the window -- He asked to be relocated to an
7  exit row and he was reassigned an exit row seat, I think
8  26 or something.  I don't recall the exact number.
9     Q   Would 20F sound familiar?
10    A   Yes, there it is.  That is a window seat on the
11 right side.
12    Q   Do you know where the passengers who approached
13 Captain Ehlers were seated?
14    A   The next two seats over, E and F.
15    Q   D and F?
16    A   D and E, excuse me.  Yes, it's three and three.
17    Q   Okay.
18        Do you know if any other members of the flight
19 crew had concerns about the passengers seated in 20D, E
20 or F?
21    A   I believe, as I recall again from the
22 depositions, that Walling may have talked to other
23 flight attendants.  I don't recall the exact specifics.
24        As I recall, they independently didn't come to
25 Walling and say I'm concerned about those.  As I recall

Page 83

1  it went the other direction.
2     Q   Do you recall whether Flight Attendant Lois
3  Sergeant expressed concerns at any time about any of the
4  passengers seated in row 20 seats D, E or F?
5     A   I believe after -- Again after talking with
6  Walling, as I recall.
7     Q   Do you know whether Flight Attendant Sergeant
8  did anything to address her concerns regarding the
9  passengers seated in 20D, E and F?
10    A   As I recall the only thing that transpired
11 between the flight attendants was that Sergeant and
12 Walling had talked.
13    Q   Do you recall any testimony that Flight
14 Attendant Sergeant spoke to Captain Ehlers directly?
15    A   I don't recall that.  I'm not saying it didn't
16 happen, I just don't recall it.
17    Q   Sure.
18        Do you recall the nature of the concerns that
19 Flight Attendant Sergeant had with regard to the
20 passengers seated in 20D, E and F?
21    A   I don't.
22        Well, what I'm not certain of in my mind from
23 reading the depositions, I can't recall the exact
24 sequence of events.  I know that the flight attendants
25 talked about the people in that row and my recollection

Page 84

1  is that it was initiated by Walling, Flight Attendant
2  Walling.
3     Q   You also mention the involvement of the state
4  police in your summary of events.
5        Are you aware of the nature of the
6  investigation conducted by the state police in this
7  case?
8     A   Just from the information that I was provided
9  by counsel.
10    Q   What was the nature of that information, sir?
11    A   I believe it was a police report and then the
12 depositions of the flight crew and the ground security
13 coordinators and so forth and so on.
14    Q   Could you summarize for me generally what your
15 understanding is about the role of the state police in
16 this investigation?
17    A   The state police were called to remove these
18 people from the aircraft, which they did, and they
19 were -- the state police questioned these folks,
20 determined who they were, et cetera, et cetera, and
21 eventually determined they weren't of any risk and
22 delivered them to the ticket counter.
23    Q   What is your understanding of the manner in
24 which law enforcement interacts with airline and airline
25 security personnel as of December of 2003?

Page 85

1     A   I'm not -- Say it a different way.
2     Q   Let me narrow it down a little bit.
3        Do you have an understanding, sir, as to the
4  manner in which law enforcement and airline security
5  operated when issues of passenger security were involved
6  as of December 2003?
7     A   I have knowledge of how it happened in my days
8  at Northwest.  I have no reason to believe that it's
9  changed, and I say that simply because I have an ongoing
10 relationship with various airport police chiefs and TSA
11 officials and we discuss these sorts of things.
12        So all I can say is based on my experience in
13 the industry police do not get involved, particularly
14 aboard an aircraft unless they are called.  Police do
15 not come to the gate and say that I'm going to look at
16 who is on your airplane, unless there is a very specific
17 reason, but I have never seen that happen.
18    Q   When they do come to the aircraft and ask to
19 participate or decide they are going to participate in
20 an investigation, what type of investigation do they
21 undertake?
22    A   I am not sure what you mean by type, but I was
23 a policeman for a number of -- many, many years ago.
24        Normally what happens is you're called to
25 assist on something or other and you talk to the person

22 (Pages 82 to 85)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 86

1  that called you and then you interview the people
2  involved, in this case remove them from the aircraft and
3  talk with them. There very likely was not a detailed
4  police report involved, but something on what we used to
5  call a shift report. You have to note that something
6  happened. I imagine that is what they did.
7      Q   What kind of information do they consult, if
8  any, in investigating passengers who are considered to
9  be potential safety risks?
10     A   In a case like this?
11     Q   Yes.
12     A   They would want identification. They would
13  want to see driver's license, passports, that sort of
14  thing to determine you are who you say you are, and they
15  would run those names. I would assume they would run
16  them. I would hope they would run them against various
17  indices and then interview the people and probably
18  separately, if it's good police work, and then compare
19  stories and make a decision whether there is anything to
20  pursue.
21     In my understanding again from reading
22  information I was provided they had no interest in these
23  people.
24     Q   Based on the information that you were
25  provided, do you have any understanding as to what

Page 87

1  resources the state police consulted?
2      A   I don't recall.
3      Q   Do you have any understanding as to whether the
4  individuals were questioned collectively or separately?
5      A   I believe separately, at least our client.
6      Q   Do you have any understanding as to how long it
7  took the state police to perform an investigation of the
8  individuals who were removed from the flight?
9      A   Just minutes, not hours. I don't recall
10  whether it was 23 minutes or 39. It wasn't too long.
11     Q   Are you familiar with Mr. Cerqueira's
12  deposition testimony?
13     A   Yes.
14     Q   Are you familiar with the fact that he
15  testified that he was placed in a narrow room with the
16  other two individuals for approximately two hours before
17  he was released?
18     A   I don't recall that. I'm wrong on the time,
19  but --
20     Q   Why would it take two hours to check the kind
21  of information that you mentioned before?
22     A   I have no idea.
23     From my experience both in police work, uniform
24  police and secret service, we would never leave anybody
25  in the cell for two hours.

Page 88

1      Q   Are you aware of the fact that the flight in
2  question had all passengers removed and all luggage
3  rescreened?
4      A   Yes.
5      Q   Do you know why that occurred?
6      A   Somebody made the decision, but I can -- I
7  mean, I know why it happened. I don't know -- I just
8  know from experience when I have been involved in
9  similar situations if you do not get control of the
10  situation early on it literally has a life of its own
11  and you -- Once that thing starts down the slope, so to
12  speak, there is no undoing it.
13     It's kind of like calling the fire department.
14  You can't call back and say never mind. Once the rig
15  leaves the station it's coming to your house. The same
16  thing there.
17     So what you want to do in a security sense is
18  get security people involved as, this is what we taught,
19  as soon as possible. You worry about the airplane. Let
20  us worry about the security incident.
21     Q   When you say this is what we taught, are you
22  referring to what you --
23     A   At Northwest.
24     Q   -- what you were involved in teaching at
25  Northwest prior to the time that you left in June of

Page 89

1  1995?
2      A   I was on a flight one time in Minneapolis when
3  I was still with Northwest in first class on a domestic
4  flight and some guy right before they shut the door said
5  I have to get off and he just got off. He had a
6  briefcase and he got off and a couple of the passengers
7  said, this is pre-9/11, said how do we know he didn't
8  leave something on the plane and we ended up -- It's
9  gone. I mean, it's hysteria. He didn't leave anything
10  on the plane. We didn't know that until everybody got
11  off and there is nothing on the plane. You know, you
12  take a two hour delay to sort out the mess and some
13  people say I don't want to fly. The whole thing falls
14  apart on you.
15     Q   Do you agree with the fact that -- Strike that.
16     Is it appropriate in your assessment to err on
17  the side of caution when you have a situation such as
18  the one you have described and verify that that
19  individual did not leave anything on board?
20     A   That is a very difficult question to ask or to
21  answer.
22     I can use an example coming at it from a
23  different way. Hopefully it will help and that is
24  dealing with bomb threats. Based on experience there is
25  a very definite way all airlines of the world deal with

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

Page 90

1 bomb threats.  If not you would be landing many, many
2 planes every day, and so this is not the sort of thing
3 that you discuss with the public because the public
4 would say if there is a bomb threat you land the plane.
5      You do not land the plane if there is a bomb
6 threat unless there is credible information within the
7 threat based on 50 years of experience by all the
8 airlines of the world that we don't believe this to be
9 true.  So part of training, my job as I saw it at
10 Northwest in the training sense was I had an agreement
11 with the pilots at Northwest.  I don't know what they do
12 at American, but I had an agreement with them that we
13 would process the threats.  I'm not going to bother you
14 with them, because all it does -- You have too many
15 other things to worry about and they trusted me on it.
16      If there was a threat that I thought credible
17 we would ground the plane or dump it or do whatever we
18 had to do.  It's the same sort of thing based on a whole
19 bunch of facts and circumstances and what does the GSC
20 say, it's hard to answer that question.
21      Q   Is it a fair statement, sir, that each
22 particular security incident has to be evaluated
23 individually based on the information available?
24      A   Yes, and it's -- Yes, that is true, and it's --
25 Each one is slightly different and it's critical that

Page 91

1 you get all the information early on, as soon as
2 possible and you keep the situation contained.
3      Q   And is it also a fair statement, sir, that when
4 you're looking at a situation involving the potential
5 removal of passengers, those decisions literally need to
6 be made in a matter of minutes?
7      A   Yes.
8      Q   We talked a little while ago about the fact
9 that there was an assumption in your reading of the
10 depositions that the passengers in 20D, E and F were
11 traveling together?
12      A   I think so.
13      Q   From a security professional standpoint would
14 it matter if they were traveling together or not
15 traveling together if all three exhibited suspicious
16 behavior?
17      A   As we said earlier, every situation is
18 different.
19      My conclusion would have been, and I wasn't
20 there, but my conclusion would be again from reading the
21 depositions of what happened and when you read multiple
22 depositions they sort of seem to come together.  I have
23 no reason to doubt what was said.
24      My assumption would be that these people
25 probably were not -- How can I put it, were not related

Page 92

1 in a bad sense in that if I were to do something in a
2 terroristic sense I certainly wouldn't sit three in a
3 row and I certainly wouldn't bring attention to myself.
4 If that call had come to me that is one of the things I
5 would be asking.
6      The other thing that I noted in the
7 depositions, and I could have missed it.  I forgot the
8 two hours.  I thought it was more like half an hour or
9 something.  Again based on my experience and the carrier
10 I was at, I saw nothing to indicate that the security
11 department of American Airlines was ever contacted.  In
12 Northwest, as I alluded to I think earlier in our
13 questioning, anything regarding security the SOC would
14 call me.  If I was on my way to Tokyo and they couldn't
15 patch through to the plane they would call the deputy.
16 Security would be called.
17      The answer might be after 9/11 we were too damn
18 busy.  It wasn't as bad as 9/11, but the Gulf crisis in
19 '92 I stayed at work for a couple of days and slept on
20 the couch.  So I know what busy is.  So we always either
21 had somebody in the SOC or the SOC patched through so we
22 could get involved in talking to the GSC's.
23      Keep in mind, we trained the GSC's.  We trained
24 the inflight security coordinators.  In our company in
25 my day, I don't know what they do today, in my day if I

Page 93

1 didn't call the captain, the captain would call me or
2 the flight attendants, because if you look back in our
3 Northwest materials in the -- I can't remember what they
4 call them, the book the flight attendants carry with all
5 the rules and the book all the captains carry and the
6 pilots carry there is my work phone, my cell phone, my
7 home phone.  I'm available 24 hours a day, 365 days a
8 year, and as I used to tell particularly the flight
9 attendants, if you're worried enough to call me at 3:00
10 a.m., call me at 3:00 a.m.  I will be glad to talk to
11 you.
12      As a result of doing that you get very few
13 calls, maybe one a month.  A couple of times we were
14 able to help people with the incidents happening in a
15 hotel and God only knows where, something wasn't right.
16 You called the front desk and they called you.  Well,
17 call the front desk.
18      All I'm saying is I think it's a whole matter
19 of training and developing policies and procedures that
20 things connect like they should in a very rapid manner,
21 because as you said earlier you only have minutes and
22 whether it's the flight crew or the passengers, any of
23 those things can triple a chain reaction and all of the
24 sudden it's out of your control.
25      Q   I'm not sure that we got an answer to my

DIGITAL COURT REPORTING & VIDEO
866-721-0972

DOUGLAS R.  LAIRD - October 10, 2006

Page 94

1 original question, which was from a security
2 professional's perspective whether it would make a
3 difference if the passengers were traveling together or
4 not, and I believe your answer began addressing that by
5 indicating that if you were planning some kind of
6 criminal activity you wouldn't draw attention to
7 yourself by sitting with the other perpetrators?
8     A    That's correct.
9     Q    So it fair to say that it's immaterial whether
10 they are or are not traveling together in examining
11 whether or not it's a security incident?
12     A    From my perspective the fact that they were
13 sitting together would not indicate that -- to me that
14 anything was amiss.
15         I would think to me it would be a factor on the
16 other side of the ledger because what you do is you add
17 up a whole bunch of things and then make a decision.  A
18 lot of what they were reported to have been doing to me
19 doesn't make a lot of sense that they were up to
20 nefarious ends, but again I -- I just read the
21 depositions.  I can tell you how it affects me.
22     Q    Do you recall from the police report that the
23 police stated they were called in concerning passengers
24 in seats 20E and 20F?
25     A    I do not.

Page 95

1         I know that I recall obviously that they were
2 called.  I don't recall the seat numbers.
3         MS. MARIANI:  May we have this marked as the
4 next exhibit.
5         (Exhibit 23 was marked.)
6 BY MS. MARIANI:
7     Q    Sir, I will show what you has been marked as
8 Exhibit 23 to your deposition.
9         Directing your attention to the second page of
10 that document, does that appear to be the police report
11 that was included in the materials that you reviewed?
12     A    It would have been.  I mean, I'm not looking
13 through my binder, but if you say it is I have no reason
14 to doubt it.
15     Q    Is reference made there, sir, to the seat
16 numbers of the passengers about whom American Airlines
17 was concerned?
18     A    Yes, of course.
19     Q    What are those seat numbers?
20     A    20E and 20F.
21     Q    Do you recall what seat number Mr. Cerqueira
22 was in?
23     A    F.
24     Q    In your summary of events in the report that
25 has been marked as Exhibit 16, sir, you make reference

Page 96

1 to the fact that Mr. Cerqueira was cleared for travel by
2 the state police.
3         What do you mean when you say cleared for
4 travel?
5     A    As I recall, they took him to the ticket
6 counter in the terminal and said something to either he
7 and/or the ticket agent there that we're finished with
8 him or something to that effect.
9     Q    And do you know whether being cleared for
10 travel by the state police is different from or the same
11 as being cleared for travel by the airline?
12     A    Whether or not the passenger is allowed to
13 travel, that is an airline decision, not the police
14 decision.
15         The police could have made a decision to arrest
16 them or deport them or any number of things, but that is
17 not the case.  Basically the police said we're finished.
18     Q    So from the police perspective the police
19 aren't taking further action, that doesn't necessarily
20 mean he gets to fly on that particular day, is that a
21 fair summary?
22     A    Yes, it's a decision that is made by the
23 airline.
24     Q    While you were at Northwest is that a decision
25 that you observed happening at any point in time?

Page 97

1     A    Yes.
2     Q    And on how many occasions do you recall that
3 happening?
4     A    It's a wild guess, a couple of times a month,
5 not an awful lot.
6     Q    But it's fair to say that it was --
7     A    It does happen, yes.
8         I guess I'm losing track of the sequence of
9 events.  At Northwest generally speaking, I can't say
10 100 percent of the time, but I would have been involved
11 in this incident fairly early on.
12     Q    But you do recall as frequently as one or two
13 times a month having circumstance where the police
14 cleared -- said somebody was okay to go from custody or
15 from questioning, but Northwest still made the decision
16 not to let them fly that day?
17     A    Oh, not to fly.
18         No, then, I didn't quite understand what you
19 were saying.
20     Q    Let me rephrase the question.
21     A    No, I understand now.
22         Once or twice a month, I'm guessing, not very
23 often, there is a situation where a person is for one
24 reason or another taken off the airplane and talked to
25 by the police.  Sometimes they would be put back on

25  (Pages 94 to 97)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.    LAIRD - October 10, 2006

Page 98

1  another flight, because in my days we were the on-time
2  airline.  I mean, the idea was if there is a decision
3  that has to be sorted out get them off the plane.  We're
4  not going to hold the plane for 20 minutes while the
5  police talk to this guy.
6      So yeah, occasionally there would be a
7  situation where you would not rebook.
8      Q  Do you recall approximately how many times you
9  didn't rebook on the same day?
10     A  Very few times we did not rebook.  Most of the
11 times we did not rebook, that I recall -- You know,
12 you're looking over many years.  Most of the time if we
13 did not rebook it was because it wasn't a security
14 issue -- Well, security in a sense.  It was because the
15 person was intoxicated and we said we're not going to
16 fly you until you're sober.
17     I had one case in Memphis where the woman said
18 dammit, went out and took a cab to DC and there are some
19 bizarre things that happen.  Other times they get a
20 hotel room and come back the next day and we rebook
21 them.  I mean, that they are sober.
22     I can't recall ever -- You talked about
23 clearing, not clearing.  I mean, as I recall the fact to
24 us was if there was a situation and the police came with
25 you to the counter and said hi, here she is, that

Page 99

1  indicated that you were -- Our people at the station
2  know the police well enough to know that it's okay,
3  you're okay.
4      Likewise in our situation, either me or one of
5  my people would have been more than likely talking to
6  the police.  We wouldn't leave that to the SOC.
7      Q  Okay.
8      A  Not that the SOC can't do it.  If for some
9  reason they couldn't find us.  Let's say, the two key
10 people, myself and one other guy were over in Tokyo
11 giving GSC training, maybe they can't get ahold of us
12 because we were out to dinner and our cell phones in
13 those days didn't work in Tokyo.  So the SOC has to make
14 the decision.  In those days all the directors in the
15 SOC are GSC's as well.  So we trusted each other and
16 they generally made a pretty good decision.
17     Q  Fair to say that your practices and procedures
18 at Northwest when you left in June of 1995 may have been
19 different from those in place at American Airlines in
20 December of 2003?
21     A  I don't know their policies and procedures.
22     Q  It's fair to say they may have differed?
23     A  They may have been different.
24     Although I can say to clarify that, if you read
25 about the intent and purposes of the GSC and the

Page 100

1  inflight security coordinator, and the FAA/TSA says it's
2  pretty clear what the role of those positions are.  So I
3  don't know about the crossing the T's and dotting the
4  I's specifically, but I can't believe that they don't do
5  it -- The American, United, Delta, Northwest they all
6  pretty much follow the same game plan.
7      Q  Do you recall the testimony of Mr. Cerqueira
8  with regard to being denied rebooking on the date in
9  question?
10     A  I don't recall anything specific other than
11 that he was not and they couldn't explain why.
12     Q  Do you recall that he was informed -- that he
13 testified that he was informed he could not fly per
14 instructions from systems operations control?
15     A  I believe that is what he said.  I don't know.
16 I assume that that was said because generally speaking
17 the flying public would have no idea what systems
18 operations control is.  So I am assuming he heard
19 something correctly.
20     Q  Do you know whether the restriction on flying
21 was in place for that day or for a longer period of time
22 than just that day?
23     A  I have no idea.
24     Q  Do you know whether Mr. Cerqueira could have
25 flown on American the following day?

Page 101

1      A  I don't recall.
2      Q  Do you know whether Mr. Cerqueira could
3  presently fly on American?
4      A  I don't know that.
5      Q  Directing your attention to the section in your
6  report entitled qualifications.  Under number 2 you
7  indicate that you have worked for the FAA developing
8  aviation security system architecture and define the
9  aviation security concept of operations as an integral
10 part of and essential element of the system
11 architecture.
12     Could you define that for me in laymen's terms?
13     A  It's putting together a security system to
14 screen passengers that carry on and their checked
15 luggage in a logical sequence of events and tie that
16 together with the security policies of the FAA, TSA for
17 that matter.  Too many times things were sort of
18 incongruent to one another.  You put this gadget here
19 and you really wanted to have logical sequence of
20 events.
21     That is easier to do in a new airport than
22 existing airport and that is one of the reasons that we
23 looked at those 30 airports around the world, number 3,
24 to find out what is the better way of implementing new
25 technology and procedures in an old environment.  It's

26 (Pages 98 to 101)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 102

1 easy when you build a new airport.  You just build it
2 right.
3    Q   Directing your attention to page 3 of your
4 report in which you cite some conclusions and opinions,
5 I would like to go through each of the opinions with
6 you.
7        First of all, in number 1 you state that Mr.
8 Cerqueira was a victim of racial profiling.  On what
9 evidence do you base that opinion?
10    A   Again by reading the depositions and what took
11 place I can only -- I can only come to the conclusion
12 that -- because it's a different end than I would have
13 reached was that it had to be the way he looked.
14    Q   Why is the only conclusion that you can come to
15 that it was racial profiling?
16    A   Because I just eliminated everything else.
17    Q   On what basis did you eliminate everything
18 else?
19    A   Reading the depositions.
20    Q   And what were the other things that you
21 considered?
22    A   The whole series of events that took place on
23 how the opinion was formed that he should be removed
24 from the aircraft.
25    Q   What specifically led you to the conclusion

Page 103

1 that the only possible reason for what occurred to Mr.
2 Cerqueira was racial profiling?
3    A   I don't know how I can restate it.  I looked at
4 all the events or the things that were stated in the
5 depositions about what raised the concerns and none of
6 those in and of themselves raised a concern and there
7 was something there about the appearance of these
8 people.  I can't remember how they put it, again which
9 led me to the conclusion that how they looked based on
10 these other factors led to the conclusion that it had to
11 do with where they were from or where they were thought
12 to be from, that sort of thing.
13        I think there was something said about, might
14 have been said they spoke with an accent or something
15 like that.
16    Q   What concerns do you remember being raised in
17 the deposition testimony?
18    A   That they were seated together, that Cerqueira,
19 the fellow by the window was perceived to be feigning
20 sleep.  The other people were loud and boisterous,
21 wishing people Happy New Year's inappropriately and that
22 sort of thing, that he had, according to Walling he had
23 gotten on the flight before his turn.  He had gone to
24 the lavatory.
25        There was a whole bunch of I think

Page 104

1 insignificant events that were chained together to
2 form -- which allowed her to form her conclusion that
3 these people were up to something.
4    Q   Do you agree, sir, that it's the series of
5 events that led Flight Attendant Walling to conclude
6 that something may be awry?
7    A   I think it was the series of events plus again
8 the statements made in the depositions about their
9 appearance or their foreign accent or some such thing.
10 I think it was a combination of things.  I think it did
11 play a role.  I think if you and I and Mr. Kirkpatrick
12 were sitting there, I don't think we would have had the
13 same results.  That is just my opinion.
14    Q   Do you agree, sir, that there are situations
15 where seemingly innocuous events when coupled together
16 in sequence may give rise to security concerns?
17    A   That can be possible, and that again is, as I
18 have tried to allude to earlier with profiling, is a
19 system of training and experience.
20    Q   Are you aware, sir, of the restrictions placed
21 on lavatory use subsequent to 9/11?
22    A   Yes.
23    Q   And are you aware, sir, that subsequent to 9/11
24 lavatories have been considered a safety sensitive area
25 of an aircraft because it's an area where an individual

Page 105

1 is afforded privacy that doesn't exist in the main
2 cabin?
3    A   I'm very familiar with lavatories in airplanes,
4 because one of the things that we did in my Northwest
5 days in '92, first Gulf War is that we actually in all
6 of our lavatories and all of our international fleet
7 sealed everything so we could tell whether or not
8 anybody had access to various parts of the lavatory.
9        Most airlines didn't do that.  I know
10 lavatories very well.  I have been under, around, over
11 and through.  I understand how to search.
12    Q   Is it a fair statement that someone who spends
13 more time than expected in the lavatory draws attention
14 to themselves?
15    A   You know, I don't know what is the term, what
16 an unusual amount of time is.  When I read the
17 depositions initially or maybe when he explained what
18 had happened before I even read the depositions I had a
19 feeling for it because I have honestly taken that -- not
20 that flight, a different carrier, but I have taken the
21 6:20 flight out of Boston.  I got up at 4:00 and I had a
22 couple of cups of coffee while I shaved and packed and
23 came from downtown to the airport.  I was first in line
24 through the checkpoint so they made me a selectee
25 because I'm first in line, don't ask me what that means.

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 106

1  So after I dumped all my stuff and barely made the
2  flight, the first thing I did was put my junk in my seat
3  and went right to the bathroom.
4      Q   Mr. Cerqueira had been in the gate area,
5  however, for an hour to hour and a half before boarding;
6  is that correct?
7      A   I think so.
8      Q   Is it fair to say that that is certainly
9  adequate time to make use of a lavatory before boarding
10 a flight?
11     A   All I can say is that I do many, many miles a
12 year for many years.  Maybe I'm unusual, maybe it's my
13 age or something.  It's not uncommon at all for me to be
14 at the airport quite a bit ahead of time, maybe having
15 meetings with airport people, and whatever airport I am
16 in I nose around to look at things.  I'm curious what
17 people are doing, which interestingly enough has not
18 aroused any suspicion because I take a lot of pictures.
19     Most times honestly I get on an airplane and
20 the first thing I do is go to the lavatory.  I'm
21 normally boarded first because I am a gazillion mile fly
22 guy and I go right to the bathroom because I don't want
23 to do it once everybody else is there.  It's just
24 easier.  It's part of my routine.
25     So I don't -- I don't find it unusual at all.

Page 107

1      Q   In your flying experiences, sir, how many
2  people engage in that same pattern of behavior that you
3  do, going to the lavatory immediately upon boarding?
4      A   You know, I may be -- I can't maybe give you
5  the answer you want because I'm always upgraded to first
6  and it's pretty common in first class for people to do
7  that and many times when you walk up to the front the
8  captain will be standing there and, you know, they
9  haven't locked the door yet, hi, how are.
10     On Northwest many of them still know me after
11 all these years and we chat and I hit the bathroom.  I
12 don't fly coach much so I don't know what really goes on
13 back there.  So I think people -- I think if I were
14 flying coach I would have even a greater necessity to
15 hit the lavatory early on again because it gets to be
16 such a zoo back there.  I have flown occasionally, but
17 you know --
18     Q   When you have flown coach, sir, isn't it true
19 that if you're seated in the middle of cabin where the
20 exit rows are usually located, oftentimes if you go to
21 the lavatory in the back you cannot return to your seat
22 for a considerable period of time because other
23 passengers are boarding?
24     A   Yes, it can be a challenge, but that certainly
25 wouldn't keep me from doing it, I will tell you that,

Page 108

1  especially if I'm on the window seat because I don't
2  want -- I'm a big coffee drinker.  I want to take care
3  of it early on.
4      Q   You mentioned in addition to going to the
5  lavatory that Mr. Cerqueira boarded early according to
6  the Flight Attendant Walling.
7      A   She thought he boarded early.
8      Q   Correct.
9      Do you recall from her deposition testimony
10 that her testimony was that he boarded at a time when
11 the coach cabin was still dark?
12     A   I don't recall dark, but as I recall the
13 deposition by Flight Attendant Walling was that he
14 boarded before it was his turn, quote unquote.
15     Q   Do you recall that she testified that he
16 boarded before many of the first class passengers had
17 boarded?
18     A   Yes.
19     Q   And would you agree with me, sir, that boarding
20 significantly before your boarding class has been called
21 is another factor that calls attention to yourself or
22 could call attention to yourself?
23     A   When you talk about something about the
24 lighting in the cabin, the lighting is always on, I
25 think, when the aircraft is being boarded.  So I'm not

Page 109

1  sure where that came from.
2      Secondly, I fly American, United, I fly all of
3  them, mostly Northwest and KLM, but I do fly everybody
4  depending on where I'm going and what the client -- how
5  the client wants to buy the ticket.  It's not unusual
6  for -- They make the announcements for first class
7  passengers and then they say, a lot of carriers say, you
8  know platinum or whatever elites can board and exit
9  rows.
10     So I'm not sure that the flight attendant in
11 the back of the airplane really knows what is going on
12 at the jetway.
13     Q   Are you familiar with the boarding processes
14 that American had in place as of December of 2003?
15     A   No, I'm not.
16     Q   Are you aware of testimony in both Mr.
17 Cerqueira's deposition and Flight Attendant Walling's
18 deposition that he approached the gate counter prior to
19 boarding and requested a seat change from Flight
20 Attendant Walling?
21     A   Yes, I read that.
22     Q   Are you familiar with Flight Attendant
23 Walling's testimony about Mr. Cerqueira's manner?
24     A   Yes.
25     Q   And what is your recollection of that

28 (Pages 106 to 109)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 110

1  testimony?
2      A   She was concerned, as I recall, that he was
3  insistent and that after she explained that she was a
4  flight attendant and she couldn't -- I mean, that is
5  true that she can't take of that for him, wait for the
6  gate agent, he went and sat down and stared at her.
7      Q   Do you recall her description of his demeanor
8  as hostile?
9      A   I don't remember hostile as much as insistent.
10  It could have been.  I just don't recall the word
11  specifically.  I remember insistent being there.
12  Insistent may be perceived as hostile, I don't know.
13      Q   Do you have an understanding as to how many
14  years of experience Flight Attendant Walling had as of
15  the time of this particular flight?
16      A   Many years.  She definitely wasn't new.  I
17  don't recall specifically, but she was an experienced
18  flight attendant.
19      Q   Do you recall Flight Attendant Walling
20  describing this interaction with Mr. Cerqueira as
21  atypical in her experience?
22      A   Yes.
23      Q   Is that yet another factor that might draw
24  attention to Mr. Cerqueira as a passenger on this
25  flight?

Page 111

1      A   Yes, but as we said earlier on perception is
2  reality.  So yes, I have no reason to doubt where she
3  was coming from at that point in time.
4      Q   You testified that the concerns about which the
5  flight crew testified were in your mind insufficient to
6  substantiate any kind of reason for removal of Mr.
7  Cerqueira from this flight other than that of racial
8  profiling?
9      A   Yes.
10      Q   Are there any other concerns raised by the
11  flight crew in their depositions upon which you relied
12  in making that assessment?
13      A   I'm sorry, one more time.
14      Q   Sure.
15      You testified that in your view the concerns of
16  the flight crew were insufficient to support any other
17  conclusion than that Mr. Cerqueira was a victim of
18  racial profiling, and the concerns that you named for me
19  were that the three passengers removed were seated
20  together, Mr. Cerqueira was feigning sleep or appeared
21  to be feigning sleep, the passengers seated next to him
22  were loud and boisterous and inappropriately wishing
23  people Happy New Year, that Mr. Cerqueira boarded early,
24  that Mr. Cerqueira went to the lavatory, and we have
25  also discussed the fact that he approached Flight

Page 112

1  Attendant Walling at the ticket counter.
2      Are there any other concerns that you recall
3  being raised in the depositions of the flight crew?
4      A   Yes, and I list them on page 4 of my report
5  under discussion that I don't think we have touched on.
6      One was the strange questions to the captain in
7  the gate area.  I don't think we mentioned that.
8  Suspicious behaviors was named a couple of times in the
9  deposition, but it was never defined per se in some
10  instances where it was used.  Yes, that covers it.
11      Q   So other than the factors listed on page 4, are
12  there any other factors that you took into consideration
13  in coming to the conclusion that the concerns were
14  insufficient to justify a conclusion of anything other
15  than racial profiling?
16      A   No, those are what I believe.
17      Q   When you use the term racial profiling in the
18  context of your report, how do you define that term?
19      A   I believe in this case it has to do with
20  appearance.
21      The problem with that sort of thing obviously
22  is unless you're familiar with certain parts of the
23  world you can't tell one ethnic group from another and
24  so you make assumptions that many times aren't correct.
25      Q   Do you have any understanding as to the flight

Page 113

1  experiences of any of the members of the flight crew in
2  terms of the destinations and airports that they had
3  served?
4      A   I have no knowledge of their international
5  experience, although I can't recall to the best of my
6  recollection that American is a big operator in the Mid
7  East.
8      Q   Do you have any understanding as to whether
9  American has significant operations in South America?
10      A   Yes, they do.
11      Q   Do you have any understanding as to whether
12  Captain Ehlers had flown international routes?
13      A   To tell you the truth I never gave that much
14  thought.  What was he flying?  I can't remember the
15  airplane.
16      Q   To be honest, sir, I don't remember off the top
17  of my head either, but we can certainly find that
18  information in the records.
19      A   I guess it's immaterial.  Sometimes you can
20  tell by the type of aircraft that they fly, but I
21  never -- That wasn't a consideration.
22      Q   Was the international flight experience of any
23  of the flight attendants a consideration that you took
24  into account?
25      A   No, it was not.

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 114

1    Q   Do you have any understanding of the racial
2  composition of flights originating from Boston?
3    A   Varied.
4    Q   Do you have any understanding --
5    A   I know that because I have spent a lot of time
6  in Boston with the Northwest operation going to Europe.
7    Q   Do you have any understanding as to the
8  composition of the passenger group on December 28th,
9  2003 with respect to race or ethnicity?
10   A   I have not seen that. I have not seen anything
11 that gave any indication of what that was.
12   Q   So is it fair to say, sir, that you don't have
13 an understanding as to how many people of Middle Eastern
14 descent were on that flight?
15   A   No idea.
16   Q   Have you ever seen Mr. Cerqueira?
17   A   I have never seen him. I haven't talked to him
18 or seen a picture of him.
19   Q   Have you ever seen pictures of the two
20 gentlemen seated in seats 20D and E?
21   A   I'm unaware of any pictures. I don't know if
22 there are any pictures. I have read the descriptions.
23   Q   What do you recall about those descriptions?
24   A   I don't recall the words specifically, but the
25 word foreign was mentioned and also the word accent.

Page 116

1    A   Yes, that is true.
2    Q   Fair to say that a number of resident of the
3  Houston Texas area have a different type of accent?
4    A   Um-hum.
5    Q   Is that a yes, sir?
6    A   That is a yes.
7    Q   Is it fair to say that residents of New York
8  City frequently have a certain type of accent?
9    A   Right, but the series of events taking place on
10 this particular day and time, I don't think a Texas
11 accent would have sparked concern.
12   Q   Fair to say that people who reside in South
13 America may have a different type of accent?
14   A   They may.
15   Q   And the same holds true for Canada; true?
16   A   Yes.
17   Q   How about Asian residents?
18   A   Yes.
19   Q   And Africa residents?
20   A   Yes.
21   Q   Is it fair to say, sir, that without further
22 clarification we don't know what type of accent the
23 flight attendant purportedly overheard on the day in
24 question?
25   A   I repeat what I said earlier, based on 9/11 and

Page 115

1    Q   Do you recall testimony to the effect of the
2  flight crew learning that two of the people seated in
3  row 20 were foreign nationals after they were removed
4  from the flight?
5    A   Yes.
6    Q   Are you aware of testimony to the effect that
7  the flight crew cannot distinguish what they knew about
8  whether these people were foreign nationals because they
9  later learned they were foreign nationals?
10       Let me rephrase that question before we receive
11 an objection from Mr. Kirkpatrick.
12       Are you aware of the fact that one of the
13 flight attendants testified that the reason she
14 testified at deposition that she believed they were
15 foreign nationals is because she learned from the state
16 police that they carried foreign passports?
17   A   I don't recall that.
18   Q   Do you recall any information in the
19 depositions that you read that indicates what type of
20 accent one of the flight attendants overheard?
21   A   All I recall is accent. I made the assumption
22 based on the whole series of events, of history since
23 9/11 that the accent probably was not Swedish.
24   Q   Fair to say that a number of residents of the
25 greater Boston area have a particular accent?

Page 117

1  the history of what has happened post 9/11, reading the
2  report and the depositions I made the assumption that
3  when they mentioned an accent it was probably not a
4  Canadian accident, it was probably not a Bolivian
5  accent. It was probably an accent that concerned them.
6    Q   In your mind an accent that concerns them would
7  be a Middle Eastern accent; is that right?
8    A   Something they perceived to be a Mid East
9  accent. The problem is unless you're familiar with that
10 part of the world you could certainly be misled or come
11 to the wrong conclusion.
12   Q   Is it fair to say you don't have any
13 understanding of what each of the flight crew's
14 experiences were with people of different ethnic and
15 national backgrounds?
16   A   I don't know that.
17   Q   Are you familiar with testimony by the American
18 Airlines personnel aboard flight 2237 regarding American
19 Airline's position on discrimination?
20   A   Comments they made in their depositions when
21 they were interviewed?
22   Q   Yes.
23   A   Yes, I remember some comments.
24   Q   What do you recall about those comments?
25   A   That they didn't recall that they had received

30 (Pages 114 to 117)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 118

1  training in those areas.
2     Q   Do you recall the flight attendants and captain
3  stating that American Airlines does not tolerate
4  discrimination?
5     A   I don't remember, but I remember some of them
6  saying, one was Walling saying she doesn't recall ever
7  receiving training in that regard. That doesn't mean
8  that she did, but I remember in the depositions she was
9  asked that specifically and she said she didn't recall
10 anything.
11    Q   Do you recall any discussion by the flight
12 attendants and Captain Ehlers about whether ethnicity,
13 race, religion and other factors like those can be taken
14 into account when making denial of boarding decisions?
15    A   I don't recall that being said.
16    Q   In reviewing the depositions did you note that
17 Flight Attendant Malankovich testified that their
18 training involves looking for unusual behaviors?
19    A   I don't specifically recall that.
20    Q   In your experience within the aviation
21 industry, is it a fair statement that one thing on which
22 flight attendants are trained is the observation of
23 unusual behaviors?
24    A   I'm not familiar with specific training that
25 flight attendants overall receive in what you refer to

Page 119

1  as unusual, is that it, unusual behavior?
2     Q   Yes.
3     A   There may be -- There may have been some
4  training -- You know, prior to 9/11, a couple of years
5  there was a number of incidents of air rage, what is
6  referred to as air rage and there had to be action taken
7  to kind of let people know that that wasn't appropriate.
8        To my understanding flight attendants, fly
9  crews received some training in that regard, but to my
10 knowledge they have never received any training as to
11 the identification, recognition of unusual behavior that
12 could indicate terrorists.
13       It's not inconceivable that something could
14 have happened after 9/11 that I'm not aware of, of
15 things to look for. I don't know that.
16    Q   How would you define unusual behavior as an
17 aviation security professional?
18    A   With regard to --
19    Q   With regard to onboard passenger activity?
20    A   There is really -- If I was on the flight and I
21 was watching to see what was taking place, like an air
22 marshal kind of thing, and I was looking to see what was
23 happening to say I'm concerned about that person, there
24 is no one thing. That is what is so dangerous about
25 that sort of thing, because unusual behavior for one

Page 120

1  person might be profuse sweating, but it also might mean
2  that the person was sick. One person may withdraw, one
3  person may be boisterous. There is no one thing at all.
4  It's a whole combination of things. There are things
5  that you can do, I believe, to resolve or help resolve
6  those sorts of situations if you think the person in
7  22A, I'm really concerned about. One of the things that
8  I always taught people for the flight attendant to have
9  the captain call the SOC and have them run the PNR and
10 see who this guy or woman is. You get a lot of
11 information out of a PNR, particularly if you're
12 concerned about sabotaging the aircraft, that sort of
13 thing, post 9/11 concerns. If the person is, for
14 example, in Minneapolis a 3M employee and a million
15 miler, I don't care if they are sweating profusely. He
16 is probably sick, but he has to be at a meeting. I have
17 flown sick before and look like hell, but you have to be
18 there. It's not as easy as that.
19    Q   Do you have any indication as to whether the
20 PNR's were checked in this case?
21    A   I saw nothing to indicate that.
22    Q   Did you see anything to indicate that they
23 weren't?
24    A   No, it was not addressed.
25    Q   Directing your attention to the second

Page 121

1  conclusion and opinion identified in your report, you
2  state that racial profiling does not make air travel
3  safer.
4        What evidence do you have to support that
5  opinion?
6     A   I think if you clearly -- if you look at the
7  numbers involved, and a good example for us, for me
8  would be Detroit where you have several hundred --
9  300,000 people of Mid Eastern extraction. I just
10 don't -- I can't conceive of what racial profiling would
11 mean. I think it's meaningless.
12       I think there can be hysteria and say well, you
13 know, a lot of my friends who I consider to be pretty
14 intelligent people say well, why don't we screen, extra
15 screen every Arab, dammit. We have all heard those
16 things, and I try to explain what do you do in a place
17 like Detroit where every flight has many, many people
18 that appear to be that extraction. They might be second
19 or third generation Americans. They are about as Arabic
20 as you and I are, but I think it's a very dangerous
21 approach to take. I'm not sure I answered your
22 question.
23    Q   Are there any specific treatises or
24 publications on which you rely in making the assertion
25 that racial profiling does not make air travel safer?

31 (Pages 118 to 121)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 122

1    A   One of the books there deals with it that
2  section that I gave you.  There is a whole chapter on
3  racial profiling and they give some pretty good examples
4  of why it doesn't work.
5    Q   In addition to the materials that we have
6  discussed earlier, are there any other treatises or
7  publications on which you rely in asserting that racial
8  profiling does not make air travel safer?
9    A   Nothing specifically that I read prior to
10 writing this report.  There has been a very good
11 commentary in the New York Times just recently on the
12 subject by a law professor from the University of
13 Chicago which explains a lot better than I can why it
14 doesn't work, but I didn't read that -- I would have
15 included it here, but I didn't read it until just
16 recently when it came out.
17    It's a very -- I'm not against profiling at
18 all.  We do it all the time and call it something else
19 in all areas of our lives, but again I think there is a
20 lot better ways -- Let me put it this way.  I don't
21 think we should use it as a primary screening device.  I
22 think it's something to be considered down here some
23 place, but not right up front.
24    When you take it to the extreme I think it goes
25 back to the '50s and '60s of my early police days when

Page 123

1  there was a lot of racial profiling based on the
2  color -- if you were an African American.  I thought we
3  had gotten beyond that, and my real concern as I see
4  events unfold is that I hope we don't -- I understand
5  people's concern.  We all have a concern, but at the
6  same time let's make sure that we do it the right way
7  and that we're not causing people problems.
8    I mean, I know a senior captain from United.
9  After I left Northwest I had a contract for three years
10 with ALPA, Airline Pilot's Association, consulted them
11 on security issues for all ALPA airlines.  There is what
12 is called the security committee of ALPA, two senior
13 pilots from each carrier, and one of the representatives
14 from United was a very senior captain, 27 years, about
15 ready to retire Egyptian, and even after '92 with the
16 Gulf War he was always hassled, even in uniform because
17 he looked very Semitic.
18    I used to say he had a better attitude than I
19 do.  I would get sick of it.  I'm a captain of United
20 Airlines.  I'm not the threat.  I think we have to be
21 very careful.
22    Q   Directing your attention to conclusion number 3
23 you state that Mr. Cerqueira's behavior did not indicate
24 a security threat.
25    Is there any evidence that we have not

Page 124

1  previously discussed which supports your conclusion that
2  he did not constitute a security threat?
3    A   I don't think anything that occurred in and of
4  itself indicated that he was a threat, and furthermore I
5  think the fact that he was questioned by the police and
6  then returned to American I think kind of clearly shows
7  he is not a threat.  Unless there is something that I'm
8  totally missing I just don't see why he wasn't put on
9  the next flight and probably upgraded.
10    Q   You testified earlier that your assessment of
11 the situation was that there was no other conclusion
12 that could be drawn, but that he was a victim of racial
13 profiling; is that correct?
14    A   I think it played -- I think it is what tipped
15 the scales.
16    Q   When you say tipped the scales, what do you
17 mean?
18    A   I think there was -- Like I said in my report,
19 I think I said this, there was a series of innocuous
20 incidents that when combined and then also looking at
21 him sort of made people very concerned.
22    Q   You have never seen him, though; is that right?
23    A   No.
24    Q   You don't know how other people perceived him,
25 do you?

Page 125

1    A   I don't even know what he looks like.
2    Q   So is it fair to say that you don't know how
3  other people perceived him to look; is that correct?
4    A   I wasn't there, that's correct.
5    Q   Is it fair to say that other people could
6  interpret those innocuous events in a manner different
7  from you?
8    A   Other people could, and as I have alluded to
9  earlier I believe based on experience and training you
10 want to try to put those variables in a logical sequence
11 so you don't get carried away by the events.
12    Q   Is it fair to say that another person with
13 experience in the aviation security business could come
14 to a different conclusion than you?
15    A   You can always come to multiple conclusions and
16 I'm sure you will find somebody who does.  I mean, yes,
17 but I can also say what I wrote here is what I believe
18 based on reading the depositions and the conclusions the
19 American Airlines people came to in good faith, I think,
20 were not the conclusions I believe were the correct
21 conclusions.
22    Q   Anything else that leads you to the conclusion
23 that Mr. Cerqueira's behavior did not indicate a
24 security threat other than what we have previously
25 discussed?

32 (Pages 122 to 125)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 126

1    A    That his behavior did not --
2    Q    Constitute a security threat?
3    A    No.
4    Q    We have talked a little bit about a quote
5  unquote innocuous series of events and that leads us to
6  your next conclusion, which if I'm reading your report
7  correctly states, "Because the situation was mishandled
8  an innocuous series of events was allowed to turn into a
9  security incident."
10      I want to break up that conclusion into a
11 couple of separate parts, if you don't mind.
12   A    Sure.
13   Q    First of all, what evidence do you have upon
14 which you base the statement that the situation was
15 mishandled?
16   A    Mishandled might have been -- might be just a
17 little strong. I'm trying to think of another word for
18 that. I believe that if the GSC would have been called
19 early on and been sort of a neutral party coming onto
20 the scene, I think the thing probably could have been
21 diffused a bit sooner.
22      I think by letting things perk along for a
23 while, like I said earlier, I have seen a lot of these
24 situations they do develop a life of their own. It
25 sounds trite, but once the horse is out of the barn it's

Page 127

1  hell getting it back. I have been on the phone
2  listening to it fall apart on the other end. There is a
3  reason there is a GSC and I think it could have been
4  handled better.
5    Q    Do you know how soon into the incident the GSC
6  was contacted?
7    A    I don't remember minutes, but I just recall
8  reading in the depositions in my opinion it was quite
9  far along by the time the GSC showed up.
10   Q    Do you know how long the total series of events
11 transpired?
12   A    I don't recall.
13   Q    So is it fair to say that you don't have an
14 understanding as to whether what transpired happened in
15 10 minutes or 30 minutes?
16   A    No, I think it was closer to 30 than 10. They
17 took a major delay because they got everybody off the
18 airplane.
19   Q    But as of the time that the decision was made
20 to contact the GSC, do you have any understanding of how
21 long the incident had been in progress?
22   A    I don't want to say 10 minutes or 15 or 18, but
23 again reading the depositions I thought why didn't they
24 call the GSC right away. When you realize it is going
25 south, get the GSC right now.

Page 128

1      It's always better sooner than later. You
2  talked about err on the side -- We always told people to
3  err on the side of GSC right now, get them down. They
4  have more training than the other people and they know
5  the law enforcement. They are the people that deal with
6  these situations, not just this but all kinds of
7  situations. Get them involved.
8    Q    In addition to getting the GSC involved, what
9  other steps, if any, do you think could have been taken
10 that might have prevented this from spiraling as you, I
11 believe, testified?
12   A    I saw nothing in the paperwork that I have seen
13 that indicated, and I think I mentioned this earlier,
14 that anybody in the security apparatus, I'm talking
15 about corporate, at American was involved.
16   Q    Do you know whether American requires
17 involvement of corporate security in such incidents?
18   A    I don't know their policy and procedures. I
19 don't know what tips the scale, now you call corporate,
20 now you don't. I don't know when SOC at American calls
21 corporate security and when they don't. Maybe they
22 don't, but again the idea behind calling the corporate
23 or having SOC plug in the security people is that they
24 are people with a security background that have far more
25 experience than the fly crews.

Page 129

1    Q    Directing your attention to the bottom of page
2  4, you have listed in bullet points a number of various
3  things that you believe could have been done to prevent
4  the situation from escalating.
5      You mentioned that the no fly list could have
6  been checked. Isn't the no fly list checked before a
7  passenger even boards?
8    A    Yes, it is.
9    Q    What would be the purpose of checking the TSA
10 no fly list again?
11   A    I would check it again just to make sure there
12 wasn't a mistake. I don't trust computers.
13   Q    It would essentially be a redundancy; is that
14 correct?
15   A    Something may have happened since they spun the
16 names through the machine. I just think it's good
17 practice to always look a second time.
18   Q    We talked a little bit before about how you
19 don't see any evidence in the records as to whether or
20 not the PNR's were checked or were not checked for the
21 three passengers; is that correct?
22   A    I didn't see anything indicating that. I think
23 if -- Again I said what I thought. If they had checked
24 I think they would have seen these people. There is no
25 indication they are together.

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 130

1    Q   As you testified before, learning whether they
2  were or were not together was not of particular
3  significance; is that correct?  Actually strike that.
4       I believe you testified before that to you it
5  would be of more significance if they were not traveling
6  together than if they were; is that correct?
7    A   To me, yes.
8    Q   What would checking the PNR status of Mr.
9  Cerqueira and the other passengers have done if the
10 conclusion already been drawn that their behaviors were
11 suspicious?
12   A   From reading the depositions, my understanding
13 of the way they formed part of their opinion or the
14 conclusion that they came to was that these guys were
15 traveling together and they listed all this stuff.
16      If they looked at the PNR they would see that
17 they weren't traveling together.  I think -- I mean, I
18 think that would help -- to me that would help diffuse
19 it from their perspective.
20   Q   As you have testified earlier, even if they
21 weren't traveling together your suspicions might
22 actually be heightened if they were not; is that
23 correct?
24   A   Right, but I'm looking at it from their
25 perspective because several of them made comments that

Page 131

1  they were traveling together, but see I'm coming at it
2  from a different perspective than they are.
3    Q   Directing your attention to the next bullet
4  point in your list here, you state that checking with
5  knowledgeable ground staff would have shown that exit
6  row seats are assigned by station personnel.
7       Of what significance is that to your opinions?
8    A   You can't go up to the gate agent and say I
9  would like an exit row seat because I want a seat that
10 goes back further.  They assign the seat.  People don't
11 come up and say I want seat 20F.  I guess you could, but
12 I have never seen it done that way.  I don't know it to
13 be done that way, because for one thing you don't
14 know -- as a passenger you don't know even if there are
15 seats available.
16      So generally if I were to get stuck back there
17 I always say I want an exit row seat and they tell you
18 where to sit.
19   Q   So is it fair to say that that is of
20 significance to your conclusions in so far as it
21 establishes that they were not traveling together?
22   A   Well, because again we're -- I'm looking at it
23 differently than they are.  I was trying to look at how
24 I thought they formed the opinion they did, and they
25 thought well, they were traveling together and he

Page 132

1  requested the seat.
2       The flight attendant I don't think understands
3  how exit row seats are assigned.  Airlines are pretty
4  compartmentalized.  You might be a 15, 20, 25-year
5  flight attendant or pilot and have no idea about key
6  components of how the whole thing comes together.
7  Really they don't.  That is not a fault.  It's just not
8  something they do.  So there were assumptions made that
9  he tried to sit with these people, which I don't think
10 was true.
11   Q   And checking with the ground staff would have
12 shown that those exit row seats were assigned
13 separately?
14   A   Yes, the PNR would show that.
15   Q   You also indicate that a computer check would
16 have shown that Mr. Cerqueira was an elite member of the
17 frequent flier program.  Why was that of significance?
18   A   Again I think, I believe that history has shown
19 that a terrorist is not an elite flier.
20   Q   Do you have any information suggesting that
21 American did not check Mr. Cerqueira's frequent flier
22 status?
23   A   I do not, but I have nothing to indicate that
24 they did either, so --
25   Q   You testified earlier that you believe that the

Page 133

1  ground security coordinator could have been summoned to
2  the aircraft sooner and had time to sort out the facts
3  and provide input to the captain.
4       Anything else that you have not previously
5  mentioned that is pertinent to your opinions on that
6  particular subject?
7    A   No, I think we have covered that.  I mean,
8  there is a definite -- in the training there is a
9  definite relationship between the ground security
10 coordinator and the inflight security coordinator that
11 are clearly defined in training.  I just believe they
12 should have used the resources of the GSC sooner.
13   Q   The next item you have listed here is that the
14 captain could have independently verified the available
15 facts, discussed the situation with the GSC and
16 attempted to calm down the flight attendants.
17      What could the captain have investigated
18 personally?
19   A   He or she, I guess it's a man, he should not
20 have gone back in the aircraft obviously.  They are
21 taught that especially after 9/11, but the role of the
22 captain, he is kind of the leader of the team and the
23 role of the captain is to get all the facts from various
24 sources and make a value judgment based on facts.  Again
25 if you do not get things sorted out early on it falls

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 134

1  apart.
2       The very good captains that I have observed in
3  my Northwest days I flew to Asia ten days out of every
4  month because we have 31 airports over there, and I
5  generally would go on the aircraft early with the crew
6  and I would listen to the captains brief the crew, and
7  there is a whole range of abilities of captains, believe
8  me, but a good share of them are pretty darn good at
9  getting the people all together and having a little
10  chat, because they are always different, and
11  establishing the pecking order and you let them know
12  clearly I'm in charge and I want to know what is
13  happening and I'm always open blah, blah and then they
14  also talk about security issues, and one of the things
15  that we did at Northwest is we came up with weekly and
16  then in times of crisis damn near hourly briefings for
17  the captains, not for the flight attendants, for the
18  captains because that is the person in charge.  That is
19  the inflight security coordinator, and I have heard many
20  of these people and they are wonderful.  They really can
21  take 15, 18 flight attendants and tell them, you know,
22  this is how we are going to operate and this is why and
23  this is what I know and blah, blah, blah, and it's real
24  important.
25    Q    Was there any testimony that you read that

Page 135

1  indicates what Captain Ehlers did or did not do before
2  passengers began boarding flight 2237?
3    A    There is nothing there as to that.
4    Q    Based on your recollection of the testimony, is
5  it fair to say that Captain Ehlers collected information
6  from Flight Attendants Walling and Sergeant after he had
7  independent concerns of his own?
8    A    He had independent, as I understand it from the
9  depositions, he had concerns about what happened with
10  the two fellows, the ponytail in particular, as I
11  recall, prior to coming on the aircraft.  I think the
12  putting the groups together I think that was done by
13  talking with Flight Attendant Walling.
14    Q    So is it fair to say there was an exchange of
15  information among the captain and the flight attendants?
16    A    Yes.
17       Was it adequate and early enough, that is where
18  I have some concern.
19    Q    When you say --
20    A    And I will admit there is a vast difference
21  between a 747 400 crew flying to Tokyo than a domestic
22  flight.  It takes more time to board, they board the
23  crew earlier, you have more time, you know, but that
24  being said again I think it's important that the captain
25  clearly -- that it's clearly understood by the flight

Page 136

1  attendants that the captain is there to help sort things
2  out and call me sooner rather than later.  I don't see
3  anything that indicates that.
4    Q    When you state that your concerns are with the
5  adequacy and the timing of the communications, what are
6  those specific concerns?
7    A    It seems to me again as I said earlier that the
8  sooner the flight -- the GSC could have been called, it
9  could have been a neutral party to sort it out.  I think
10  it could have been sooner.  It should have been sooner
11  than later when it was.  At the same time, there is
12  nothing in the depositions that makes it clear to me
13  that the captain was getting enough information for all
14  the people to make a determination.  I think it just
15  spun away from him.
16    Q    In your experience is the captain entitled to
17  rely on the observations of his flight attendants in
18  making decisions?
19    A    The captain has no choice because they are the
20  ones back there where it's happening and again post 9/11
21  the captain -- even pre 9/11.
22       For example on our -- Because we in Northwest
23  went to A-320s and we had the largest A-320 fleet in
24  the world, two man cockpits and it was very clear in our
25  training that the captain, pilots do not leave the

Page 137

1  cockpit.  You don't go back and help sort out the fight.
2  You just don't do that.  That is pre 9/11.
3       So no, he or she, the captain has to rely on
4  what they are getting and ask the right questions  and
5  again to me that is a function of leadership.
6    Q    Anything else that Captain Ehlers could have
7  done or should have done in your assessment on the date
8  in question?
9    A    I think we have covered it.
10    Q    You also indicate that Captain Ehlers should
11  have calmed the flight attendants.  What in the
12  materials that you have reviewed suggests that they were
13  in need of calming, for lack of a better expression?
14    A    Again from reading the depositions it seemed to
15  me that this series of events was leading to -- It was
16  growing and growing as it progressed over a matter of
17  10 minutes or whatever, 15 minutes.
18       It's very important -- It's very important to
19  talk to the flight attendants, for the captain to talk
20  to them, and as I say calm people down because I have
21  been involved in these things.  They do get a life of
22  their own and it's very difficult.
23       So you need to deal with facts and listen.  I
24  have been involved in these situations and it's very
25  critical that you get the right people involved early on

35 (Pages 134 to 137)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 138

1  so they don't get out of control, because once people
2  start getting frightened and then the crew is going to
3  walk on you, then you have all kinds of other issues and
4  sometimes, to be fair to Captain Ehlers and I don't
5  know, sometimes it's beyond your control.
6        By the time Flight Attendant Walling called
7  him, I don't know this, but she may have -- The flight
8  attendants may very well have talked among themselves
9  and decided we're not flying this thing.  There has been
10  a number of those, too, that is based upon I don't like
11  the way the guy looks.  So a lot of it comes down to the
12  way the captain handles the situation.  Sometimes you
13  can win them.  Sometimes there is no way.  They are not
14  going to fly.
15     Q   Is there anything in the record that indicates
16  that Captain Ehlers did not calm the flight attendants
17  down, if in fact they were in need of calming?
18     A   I'm a little uneasy with the word calming, but
19  you want to downplay the emotion is what I'm saying.
20  Let's just take a deep breath and count to three and
21  then talk about it some more and that comes down again
22  to leadership, and sometimes it's out of your control by
23  the time the captain picks up the headset, nothing the
24  captain can do at that point.
25     Q   Is there anything in the record that suggests

Page 139

1  that he didn't have them on the three count as you have
2  just described?
3     A   I don't know.  There is nothing to indicate
4  that he did so I'm assuming that he didn't.
5     Q   Directing your attention back to your report,
6  you next mention if additional questioning was needed
7  the three passengers in the exit row could have been
8  escorted from the aircraft by ground personnel and thus
9  avoided the state troopers from boarding the aircraft
10  and alarming the other passengers.
11        How would that have made a difference in the
12  overall situation?
13     A   When you're waiting to push back and uniform
14  police come on and, you know, take three people off the
15  airplane, things are going to fall apart on you.
16        I would have had the GSC come on, say I need to
17  talk with you a second, can you please step in the
18  jetway.
19     Q   Do you have an understanding as to whether or
20  not the door had been closed before contact was made
21  with the GSC?
22     A   I don't recall.
23     Q   Would that make a difference in whether the
24  state police responded if the door had been closed?
25     A   Well, I don't see why.  You know, the way it

Page 140

1  works is the GSC oversees the aircraft until the door is
2  closed.  That is the way it's supposed to work.  The
3  captain, first officer they have their own concerns.
4  They have plenty to do.
5        So the GSC should take care of all that stuff
6  in the back.  When the door is shut on an international
7  flight in particular, the requirements are that the
8  GSC -- On a domestic flight the GSC's are assigned by
9  concourse.  So they could have 15, 20 flights.  They are
10  there to oversee and called if there is an issue.
11        On an international flight the GSC literally
12  hands off the aircraft to the inflight security
13  coordinator, I mean literally.  So there is a real
14  difference.  When the door shuts then it's the inflight
15  security coordinator.
16        The fact, I guess what you're alluding to, I
17  mean from what you're saying the door was shut and they
18  decided to open it, maybe because that had happened then
19  it formed an opinion that the situation was more dire
20  than it was.  I don't know that.
21     Q   Once the door is closed, if it's going to be
22  reopened doesn't the tower need to be notified?
23     A   I don't know ground control.  All airports are
24  different.  I don't know what happens in Boston.  You
25  know, as various things happen you hand off.

Page 141

1        For example in Detroit when you shut the door
2  to push back, tower has nothing to do with it.
3  Northwest has its own tower.  The tower doesn't pick up
4  the flight until you get in the active taxiway, not in
5  the alley.  We own the alley.  It's not theirs.
6        So I don't know how Boston -- We fly out of
7  Boston, I say we, Northwest.  I don't know exactly what
8  American does at Boston or Chicago.  I imagine if you go
9  to O'Hare American operates just like Northwest does in
10  Detroit because they are so big.  They probably control
11  their own alleys.  FAA doesn't do that.
12     Q   Directing your attention to the second to the
13  last statement on your list of things that could have
14  been done differently, you indicate that the SOC and
15  CCROS should have provided guidance to the captain as to
16  how to deal with the situation.
17        What in your assessment could the SOC or CCRO
18  have done differently?
19     A   I think the SOC and the CCRO would have
20  provided, by bringing in the right people and my
21  question to you earlier was where are the security
22  people, corporate security, bring in the people that
23  have a little bit more specific knowledge of what is
24  happening to help you sort it out.
25        The captain is going to make the final

36 (Pages 138 to 141)

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.    LAIRD - October 10, 2006

Page 142

1  decision, no doubt about it. That is the way it is, but
2  the whole role of the SOC and all the corporate entities
3  are there to help the captain do his job. Maybe they
4  were involved, but I saw nothing in the depositions to
5  so indicate that either one was involved.
6      Q   Do you have a sense from your experience at
7  Northwest as to how many situations an SOC or a CCRO are
8  involved in on a daily basis?
9      A   Security situations?
10     Q   Security situations.
11     A   It depends on what is happening in the world.
12         As I mentioned earlier, during the first Gulf
13 crisis we were averaging about eight bomb threats per
14 hour because it brings -- When you have a crisis in the
15 world and the missiles are shooting over there, it
16 brings all kinds of crazies out and people are just
17 calling. Like I said, eight or nine an hour and, you
18 know, we -- It was all people just raising, trying to
19 cause confusion as far as we were concerned which proved
20 to be right.
21         So again it just varies dramatically. No
22 security incidents for eight or ten hours maybe and then
23 there can be a couple of minor hiccups and then other
24 times the phone doesn't stop.
25     Q   Is it fair to say CCROs and SOCs deal with

Page 143

1  security issues on a daily basis?
2      A   Yes.
3      Q   Is it fair to say over a period of two and a
4  half years one may deal with so many of these incidents
5  that you don't have a particular memory of a particular
6  incident?
7      A   I don't know what American does.
8          The way that is done at Northwest is when the
9  incident such as this happens the captain, flight
10 attendants, everybody involved, I don't recall seeing
11 this in the binder, they fill out what we call a pink
12 slip, and you describe what happened in one page, and
13 you send those -- Those go to the SOC immediately. I
14 mean as fast as they can get there.
15         So overnight anywhere in the world they are
16 there in the SOC and then the SOC looks at it, says it's
17 a safety issue, a security issue, whatever, and then
18 they zing it off to all the appropriate departments and
19 we were required to answer within 24 hours what the
20 ramifications were of that incident so everybody could
21 learn from it. That is what we did.
22         So if this had happened in a Northwest flight
23 you could pull all those documents and see what
24 everybody did.
25     Q   Is it fair to say that even pulling those

Page 144

1  documents, if they exist, an SOC or a CCRO may not have
2  a particular memory of a certain incident because they
3  handle them on such a regular basis?
4      A   You mean the particular guy in the SOC that is
5  talking on the phone?
6      Q   Correct.
7      A   No, that is good question because I'm just
8  trying to be honest with you.
9          At Northwest all those pink slips would be
10 collated regarding a particular incident in flight. I
11 honestly don't know. Everything was computerized at the
12 SOC. So how -- I can't honestly say how they correlate
13 or collate this pile of pink slips that came from the
14 captain and flight attendants, exactly what is attached
15 to that in the SOC at Northwest, I can't tell you.
16         I think that -- I think I'm correct in saying
17 that there is a director in charge. I think what the
18 director does is keep a log, but I don't -- See, I
19 wouldn't see the log. I don't recall that I have ever
20 seen the log other than to see a stack of this is a
21 certain incident, this is a certain incident over at the
22 SOC. I don't know how much detail the director goes
23 into who said what to who. I don't know that, but I
24 know the incident is logged.
25     Q   So the incident may be logged, but the SOC or

Page 145

1  CCRO involved may still have no independent recollection
2  of it; is that correct?
3      A   I don't know that. Could be correct, yes, but
4  again see I don't know -- I have been to the American
5  Airlines SOC before on a tour kind of thing because we
6  used to visit each other's facilities to learn better
7  ways of doing things, but I don't recall -- We didn't go
8  into that kind of detail. So I don't know exactly what
9  they do.
10     Q   Any other things that you believe the SOC or
11 CCRO could have done besides call corporate security?
12     A   I think that would have helped.
13     Q   Anything else that would have helped?
14     A   Not that comes to mind.
15     Q   The last point that you make is that the SOC
16 should have advised the captain to call the CCRO for
17 guidance had he not already done so.
18         Is there anything in the record that indicates
19 that the captain did not contact CCRO?
20     A   Not that I saw, but there is also nothing to
21 indicate that he did so that is why I said that. My
22 belief again is that the captain, this is true, the
23 captain is ultimately in charge. The captain does make
24 the decision and the role of headquarters, staff, et
25 cetera, is to support the captain.

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

Page 146

1    Q   Directing your attention to the fifth item on
2  your conclusions and opinions which reads the refusal to
3  allow Mr. Cerqueira to travel on American Airlines after
4  he was questioned was not justified.
5        What is the basis for that contention?
6    A   I didn't see from reviewing the materials that
7  he presented a threat.  I don't know why he wasn't
8  booked on the next flight.
9    Q   Are you aware of the fact that there was a
10  passenger who indicated she saw one of the three removed
11  passengers have a box cutter taken from him in security?
12    A   I read that, yes.
13    Q   And in light of that allegation and the fact
14  that the TSA took it seriously enough to have everyone
15  on the plane rescreened and all the baggage rechecked,
16  is there a basis for a reasonable person to decide that
17  perhaps the situation required further investigation on
18  the part of American before Mr. Cerqueira could fly
19  again?
20    A   Well, I read the reports regarding the box
21  cutter and it was, you know, an figment of somebody's
22  imagination, and that is what I'm talking about, these
23  things getting a life of their own.  That is why they
24  are so incredibly dangerous.  People say things in good
25  faith.  I don't think that person that reported the box

Page 147

1  cutter, who knows why.  Again from reading it I don't
2  see any indication.  It's just one of those things that
3  happens, but he was able to book on another carrier the
4  next day and I see no reason why he couldn't have
5  booked -- been rebooked on American.
6    Q   Is there any indication that he couldn't have
7  rebooked on American the next day?
8    A   Well, I believe that American when he came up
9  to the ticket counter should have made it clear to him
10  what his options are, put it that way.  I don't think
11  he was -- As I recall, he was not told we would be glad
12  to -- how about the flight at 8:00 o'clock.
13    Q   So that is a customer service issue, then,
14  though, is that not?
15    A   Sure, yes.  I'm not sure what you meant by
16  that.
17        Customer service handles that sort of thing,
18  sure.  You mean as opposed to the GSC?  I don't know
19  where you're going with that.
20    Q   Well, is it fair to say that booking and making
21  travel arrangements is a function of the customer
22  service representatives?
23    A   Right, unless -- The only caveat would be
24  unless they were told not to book him by the SOC.
25    Q   And the fact that the customer service

Page 148

1  representatives are the ones who make those arrangements
2  puts them in the position to explain what the options
3  are; is that correct?
4    A   That's correct.
5    Q   And the fact that they did not explain the
6  options, at least based on the records you have
7  reviewed, is a function of customer service; is that
8  correct?
9    A   Yes.
10    Q   In the conclusion section of your report you
11  indicate that the breakdown in communication between the
12  inflight security coordinator and the ground security
13  coordinator and the lack of agreed upon definite chain
14  of command led to an incident that was not called for by
15  the circumstances.
16        What is the basis for your conclusion that
17  there was a lack of an agreed upon definite chain of
18  command?
19    A   There was some -- I think there was some
20  confusion as to the handing off of the airplane from the
21  GSC to the inflight back to the GSC.  It seemed like
22  there was -- It was bouncing back and forth, and I think
23  it goes back earlier to what I said that the -- I don't
24  think the GSC's were involved soon enough to help
25  diffuse the situation.

Page 149

1    Q   Anything else that supports your contention
2  that there was a lack of agreed upon definite chain of
3  command?
4    A   It was unclear again from reading the
5  depositions as to exactly who in the SOC did what, what
6  did the captain do, what did the GSC do.  Nobody seemed
7  to have a clear understanding of who was doing what in
8  the sequence of events that took place.  There was no
9  incident commander, for lack of a better term.
10        I think after everything had been concluded I
11  think he should have been -- American Airlines should
12  have rebooked him, simple as that.  I will put it
13  another way, I don't see any reason why they should not
14  have rebooked him.
15    Q   But you're not aware of what information the
16  SOC was considering at the time that the decision
17  regarding rebooking was made, are you?
18    A   All I know is what I have read in the
19  depositions.
20    Q   Do you recall giving a quote to the Washington
21  Post on or about January 3rd of 2004 in which you
22  indicated that every time you cancel flights everyone
23  indicates a win for the other side.  I don't think
24  cancelling flights and rescreening of passengers builds
25  confidence.  It does the opposite.

38 (Pages 146 to 149)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R. LAIRD - October 10, 2006

Page 150

1    A   Who was that by, Sara Booh.  I don't recall who
2  the reporter was.
3    Q   It's from an article in the Washington Post on
4  January 3rd.
5    A   I do hundreds of these.  I agree with that.
6    Q   Why do you say that cancelling flights and
7  rescreening passengers does the opposite of building
8  confidence?
9    A   I think it puts fear in people.  I don't think
10  the traveling public is -- gains confidence by seeing
11  that sort of thing happen.
12        If you're in an airport and you see all the
13  bags unloaded and lined up next to the airplane I don't
14  think that is reassuring to people.
15    Q   Is there --
16    A   I'm not saying you don't always have to do it.
17  What I'm trying -- what I was trying to get across there
18  is that it has to be carefully -- It shouldn't happen as
19  much as it does.
20    Q   In the post 9/11 world do you have the sense
21  that airlines are erring on the side of being cautious
22  as opposed to taking some of the measured steps you have
23  discussed?
24    A   I believe that post 9/11 the airlines flying
25  U. S. flags were initially over cautious and as time

Page 151

1  progresses since 9/11 since things have sort of sorted
2  out to a more realistic level, there is no easy answer
3  to that because the TSA was formed and when they formed
4  TSA a lot of what the airlines had done over the years
5  to make the system better, the new leadership of TSA
6  literally threw out.
7        So for example the checkpoint operations guide
8  that helped clarify how things would be done at all
9  airports, they say well, the FAA did it no good.
10  Literally that is what happened.
11        So you had mass confusion, all of this has been
12  documented by the GAO and others, and what happened it
13  took a good year, fifteen months for that to kind of
14  start settling out a bit and it's still in the process.
15  There is a lot of lip service to the fact that we're
16  doing -- the TSA, we're doing this and that for
17  security.  That is not true.  The real issue is that
18  we're still trying to sort the whole process out.
19  People in the industry know that, airline people know
20  that.
21    Q   Is it fair to say that because the TSA is still
22  trying to sort these things out, airlines need to take
23  more steps than they might have had to take in the past
24  to accomplish the same goals?
25    A   Well, I can say that again from my observations

Page 152

1  and reading and talking with people still in the
2  industry, I believe that right after 9/11 I believe
3  there was a tendency to way, way, way overreact on
4  things, like in anything, and I think as time progresses
5  we're back -- Everything is always doing this.  I think
6  we're back to a more balanced approach.  I think that
7  is -- I don't know how else to say it.
8    Q   Would you equate where we are on the scale of
9  balance to a pre 9/11 condition as of today's date in
10  2006?
11    A   I would say that my impression is that we're
12  still probably one or two notches higher than maybe we
13  should be and it will take another year or two and no
14  incidents to bring it down.
15        Are we safer today than we were pre 9/11?  Is
16  post safer than pre, sure it is for a whole bunch of
17  reasons.  Nothing -- I mean, no one thing.  I can name
18  five or six things that make it a little bit better, not
19  a lot better, but some better and it's an evolving
20  process.
21    Q   Are you familiar with a study that was
22  conducted by some MIT students on the CAPPS system?
23    A   Sure.
24    Q   Did you, in fact, provide an interview to the
25  Osgood File on CBS Radio Network with regard to that

Page 153

1  subject?
2    A   Yes.
3    Q   Did you ever obtain results in working with an
4  independent statistician to determine how many tickets a
5  terrorist would need to purchase and routes they would
6  need to fly to determine their CAPPS score?
7    A   No, I did not, although I disagreed with
8  their -- With the findings of -- What was it called?  I
9  can't think of the name of that study.
10        I'm familiar with it, sure, because he said
11  CAPPS was worse than chance.
12    Q   Did you --
13    A   My response to that would be if what he says is
14  true why was it that CAPPS identified nine or ten of the
15  hijackers.  I think that speaks for itself.
16    Q   Do you know whether CAPPS is more complex than
17  the MIT grad students asserted in their study, without
18  disclosing anything that is subject to TSA?
19    A   It's been a while since I have read that.  Who
20  wrote that thing?  I can't remember his name.
21    Q   The study was by two students, Samid Chucrabody
22  and Armbrose?
23    A   When that report first came out I read it, of
24  course, and I track all that stuff and they had some
25  major misconceptions of the mechanics of CAPPS and so

39 (Pages 150 to 153)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

Page 154

1  I -- I'm not a mathematician.  So I don't know about
2  their mathematical formulas to say it's no better or
3  worse than chance, but when I read how they did the
4  study and what it was based upon and what they perceived
5  CAPPS to be, several key issues were totally incorrect.
6      So I don't think if you plug the numbers into
7  their formula I don't think the results are what those
8  two guys think they are.  That got a lot of press for a
9  while and then kind of died.
10     Q   Do you remember giving an interview or quote to
11  Air Safety Week in an article entitled One Year Later
12  The Shaky State of Security, September 16th, 2002?
13     A   No, but go ahead.
14     Q   Well, let me show you what has been marked as
15  Exhibit 21 to your deposition.
16     A   Okay.
17     Q   At the time you provided that quote did you
18  believe that the government was failing to take the
19  steps necessary to protect the security of airline
20  passengers and aircraft?
21     A   Yes.
22     Q   Do you still hold that opinion today?
23     A   Yes.
24     Q   Do you believe that the government's failures
25  place a greater burden on the airlines to protect

Page 155

1  passenger safety and aircraft safety?
2      A   Yes.
3      Q   And in what ways does it create a greater
4  burden on the airlines?
5      A   It's so complex it's really hard to nail it
6  right down.
7      Prior to 9/11 the airlines, of course, were
8  responsible for screening.  9/11 happened.  It had
9  nothing to do with screening.  It had to do with the
10  policies and procedures in place of the FAA, I believe.
11  I mean, I think that will be shown, if I live long
12  enough for it to go to trial.
13     When the TSA took over it totally took the
14  airlines out of the security business, which of course
15  is what the people wanted to do, so they succeeded.  So
16  we now have the TSA.
17     They are responsible.  The TSA is responsible
18  for providing, for lack of a better term, a clean
19  product that comes onto the American Airlines flight.
20  The shortcoming of that whole system is that they are
21  not using -- We have been saying this since the mid
22  '90s, but it was just brought forward again by the
23  incidents in London, all of us in the field have been
24  finding fault for years for the TSA's lack of research
25  and development.  I was intimately involved with the

Page 156

1  Ramsey thing out of Manila.  Nothing was ever done.
2      It's a double edge sword because the airlines
3  got rid of security and have to accept the product
4  delivered by the TSA, and at the same time I'm certain
5  if you honestly talk to them they are not particularly
6  impressed with the results, which means there would be a
7  heightened -- If I was still at Northwest, I would be
8  concerned because I know that things can be a lot better
9  than they are, not that they haven't improved to degree,
10  but they could be better.
11     So yes, that puts the onus on the carriers to
12  say what can we do, but I don't want to be backed in the
13  corner in that to do the job -- for the airlines to do
14  the job in a security sense better, the airlines I don't
15  think, from what I am aware of and what I have observed,
16  have done a very good job in providing the security
17  training to their staffs as adequate.
18     They have provided additional training, some of
19  which I'm aware of, but much of it is good in theory but
20  in practice is inadequate in time and depth.  It's
21  sort of like giving a one hour class to a flight
22  attendant on what to do if you're attacked on an
23  airplane.  I went through five months of one hour,
24  two hours a day hand-to-hand combat training in my LAPD
25  academy days.  I didn't have anything broken, broken

Page 157

1  arms, noses, all kinds of problems learning how to
2  fight.
3      To give a one hour class you can say look at
4  what I have done, but in reality the only person that
5  benefits is the person that sold that baloney to the
6  airline or the union whoever bought and paid for that.
7      In other words, you either do it right or don't
8  do it.  I think that is the terrible dilemma of the
9  airlines today.  I mean, they are all struggling.  So to
10  come up with additional time, which is money, to train
11  people adequately is pretty darn difficult.
12     Q   Do you have a sense as to whether or not the
13  dilemma that you have just described is known to the
14  rank and file members of airlines?
15     A   Oh, yes.
16     I have many, many friends who are very senior
17  captains and retired and flight attendants, 30, 35 years
18  that are good friends that I'm in touch with and nobody
19  in my experience is very happy with it.
20     Q   Do you have a sense as to whether that affects
21  their decision making process?
22     A   Yes, it does, which take us for a loop.  I
23  think back to adequate training.
24     MS. MARIANI:  Let's take a 5-minute break.  I
25  will look over my notes and I think I may be done.

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.  LAIRD - October 10, 2006

---

Page 158

1      MR. KIRKPATRICK:  Great.
2      (A recess was taken.)
3      MS. MARIANI:  I have no further questions at
4  this time.
5      American Airlines does, however, reserve its
6  right to reopen the deposition should Mr. Laird disclose
7  any further opinions or further bases for his testimony
8  in the future.
9      Mr. Kirkpatrick.
10     MR. KIRKPATRICK:  I will reserve my questions
11 for the time of trial.
12     (The deposition was adjourned at 1:30 p.m.)
13
14
15
16         DOUGLAS R. LAIRD
17
18
19
20
21
22
23
24
25

---

Page 159

1
2
3      I, DOUGLAS R. LAIRD, hereby declare under penalty
4  of perjury that I have read the foregoing pages 1 - 158;
5  that any changes made herein were made and initialed by
6  me; that I have hereunto affixed my signature.
7
8    Dated:
9
10
11
12
13         DOUGLAS R. LAIRD
14
15 (If signed before a notary public, have notary public
16 fill out page 161.)
17
18
19
20
21
22
23
24
25

---

Page 160

1  STATE OF NEVADA          )
                            ) ss.
2  COUNTY OF WASHOE         )
3
4      I, JANET MENGES, a Certified Court Reporter and
5  Notary Public in and for the County of Washoe, State of
6  Nevada, do hereby certify:
7      That on Tuesday, the 10th day of October,
8  2006, I reported the deposition of Douglas Laird in the
9  matter entitled herein; that said witness was duly sworn
10 by me; that before the proceedings completion, the
11 reading and signing of the deposition has been requested
12 by the deponent or party;
13     That the foregoing transcript is a true and
14 correct transcript of the stenographic notes of testimony
15 taken by me in the above-captioned matter to the best of
16 my knowledge, skill and ability.
17     I further certify that I am not an attorney or
18 counsel for any of the parties, nor a relative or employee
19 of any attorney or counsel connected with the action, nor
20 financially interested in the action.
21
22
23     _____
24     JANET MENGES, CCR #206, RPR, CP
25        California CCR # 5785

---

Page 161

1  STATE OF NEVADA          )
                            ) ss.
2  COUNTY OF WASHOE         )
3
4
5    I,_____, a notary
6  public in and for the County of_____
7  _____, do hereby certify:
8      That on the _____ day of
9  _____ , 2006, before me
10 personally appeared the witness whose deposition appears
11 herein;
12     That the deposition was read to or by the
13 witness;
14     That any changes in form or in substance desired
15 by the witness were entered upon the deposition by the
16 witness;
17     That the witness thereupon signed the deposition
18 under penalty of perjury.
19     DATED: At _____ this
20 day of _____, 2006.
21
22
23
24
25

---

41 (Pages 158 to 161)

DIGITAL COURT REPORTING & VIDEO
866-721-0972

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.    LAIRD - October 10, 2006

Page 162

1      OFFICER'S ACTIONS RE SIGNING OF DEPOSITION
2      PURSUANT TO NEVADA RULES OF CIVIL PROCEDURE
3
4  DATE
5        LETTER SENT TO WITNESS
6
7  11/2/06   AT DIRECTION OF COUNSEL ORIGINAL
8        WAS SENT TO MR. KIRKPATRICK
9
10      WITNESS SIGNED DEPOSITION
11
12      ORIGINAL SENT TO
13
14          OTHER ACTIONS
15
16
17
18
19
20
21
22
23
24
25

DIGITAL COURT REPORTING & VIDEO
866-721-0972