# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA, | |
| Plaintiff, | |
| v. | Civil Action No. 05-11652-WGY |
| AMERICAN AIRLINES, INC., | |
| Defendant. | |

## JOINT PRETRIAL MEMORANDUM

Pursuant to Local Rule 16.5(d), counsel for the parties submit this joint pretrial memorandum.

## I.    SUMMARY OF THE EVIDENCE

### A.    Plaintiff's Summary

#### 1.    Liability

Plaintiff John D. Cerqueira will present evidence to show that, on December 28, 2003, defendant American Airlines (AA) discriminated against him in two separate incidents. First, AA caused Mr. Cerqueira to be removed from AA flight 2237, detained, and interrogated by the Massachusetts State Police. Second, AA refused to provide service to Mr. Cerqueira after he was released from questioning and cleared for further travel. The evidence will show that AA had no legitimate nondiscriminatory reason to justify its treatment of Mr. Cerqueira; rather, AA based its actions on Mr. Cerqueira's perceived race, color, national origin, ethnicity, or ancestry.

Mr. Cerqueira will show that he purchased a ticket to fly from Boston to Ft. Lauderdale on AA flight 2237 on December 28, 2003. An airline ticket is a contract for carriage, AA is a recipient

of federal financial assistance as a whole, and AA's flights are places of public accommodation. Mr. Cerqueira is of Portuguese national origin, but his color and physical appearance is similar to that of individuals who are Arab, Middle Eastern, or South Asian.

The evidence will show that on December 28, 2003, Mr. Cerqueira went to Logan Airport, checked a bag, received his boarding pass, and proceeded to his gate. Sally Walling, an AA flight attendant, was the first AA employee to arrive at the gate. Because Ms. Walling was in an AA uniform and standing at the computer terminal behind the gate counter, and because it was at a time when a gate agent typically is available for flight check-in, Mr. Cerqueira thought Ms. Walling was a gate agent. Mr. Cerqueira requested that his seat assignment be changed to an exit row or bulkhead so that he would have more leg room. Mr. Cerqueira is a frequent air traveler, and it is his usual practice to request such a seat change from the airline personnel at the gate counter. Mr. Cerqueira did not make his request in an insistent or hostile manner. Ms. Walling told Mr. Cerqueira that she could not help him and asked him to sit down and wait for someone who could assist him with his request. Mr. Cerqueira followed Ms. Walling's instructions. Once a gate agent arrived, Mr. Cerqueira was assigned seat number 20F, which was a window seat in an exit row.

The evidence will show that Mr. Cerqueira boarded when his assigned group was called. He found his seat, stowed his carry-on items, used the lavatory, then returned to his seat and began working on his laptop computer. After Mr. Cerqueira took his seat, two men, Oren Ashmil and Vittorio Daniel Rokah, boarded and sat in seat numbers 20D and 20E. Either Mr. Ashmil or Mr. Rokah had a ponytail. Mr. Cerqueira did not know either man, and he did not speak to them or interact with them in any way. Mr. Cerqueira noticed that Mr. Ashmil and Mr. Rokah had a color and physical appearance similar to his own, and they were speaking loudly to each other, partly in

2

English and partly in a foreign language.  Mr. Cerqueira later learned that Mr. Ashmil and Mr. Rokah are Israeli.  Mr. Cerqueira did not laugh or otherwise react to anything that Mr. Ashmil or Mr. Rokah said or did.  When the announcement was made to turn off electronic devices, Mr. Cerqueira stowed his laptop computer and fell asleep.

The evidence will show that John Ehlers was the captain of AA flight 2237 on December 28, 2003.  According to Capt. Ehlers, either Mr. Ashmil or Mr. Rokah had approached Capt. Ehlers in the gate area before the flight and inquired whether he was the Captain going to Fort Lauderdale. Capt. Ehlers replied that he was and, according to Capt. Ehlers, either Mr. Ashmil or Mr. Rokah said: "That's good.  I'm going with you.  We're going to have a good trip today."

The evidence will show that after the crew and passengers had boarded, Capt. Ehlers asked Ms. Walling to check on the passenger with a ponytail.  Ms. Walling did so and noticed that the man with the ponytail was sitting in the same row as Mr. Cerqueira.  The evidence will show that Ms. Walling then told Capt. Ehlers that she had concerns about Mr. Cerqueira.

The evidence will show that if Capt. Ehlers had not inquired about the man with the ponytail, Ms. Walling would not have expressed any concerns about Mr. Cerqueira.  After Capt. Ehlers asked about the man with the ponytail, Ms. Walling told the Captain that she had concerns about Mr. Cerqueira because Ms. Walling thought—based on Mr. Cerqueira's physical appearance— that Mr. Cerqueira was traveling with the men seated next to him.

Ms. Walling told Capt. Ehlers that Mr. Cerqueira had requested a seat change in an insistent manner, was the first coach passenger to board, had used the lavatory, and was sleeping.  The evidence will show that such behavior is common among airline passengers and does not ordinarily result in a denial of service.  Because Ms. Walling expressed concern about Mr. Cerqueira's use of

the lavatory, Capt. Ehlers asked the First Officer, Donald Ball, to check the lavatory. The First Officer did so and reported that he found nothing unusual.

The evidence will show that two passengers told Ms. Walling that they felt uncomfortable because Mr. Ashmil and Mr. Rokah were heard wishing other passengers a "happy new year," and that Mr. Ashmil and Mr. Rokah joked with the flight attendant who did the exit row briefing. Mr. Cerqueira did not make any comments to anyone on the plane and he did not laugh or joke during the exit row briefing.

AA's personnel thought Mr. Cerqueira was traveling with Mr. Ashmil and Mr. Rokah because the three men share a similar Middle Eastern appearance. None of AA's personnel observed Mr. Cerqueira conversing with Mr. Ashmil or Mr. Rokah, nor were they seen together in the gate area before boarding. AA's personnel knew that Mr. Cerqueira had not boarded at the same time as Mr. Ashmil and Mr. Rokah. None of the AA personnel involved in the decision to remove Mr. Cerqueira from flight 2237 checked to see if Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah had purchased their tickets together or had requested to sit together.

The flight attendants' written reports from the day of the incidents demonstrate that the flight attendants were concerned about the behavior of the three men in the exit row because the men were perceived to be Middle Eastern. The flight attendants specifically noted that Mr. Ashmil and Mr. Rokah had an accent, foreign passports, and "Arabic names." AA has admitted that its personnel perceived Mr. Cerqueira to be traveling with Mr. Rokah and Mr. Ashmil.

The evidence will show that Capt. Ehlers decided to have Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah removed from flight 2237. The evidence will show that Capt. Ehlers thought that the three men were traveling together. Capt. Ehlers pointed them out to customer service manager Ynes

Flores and asked Mr. Flores to ask the men for their boarding passes.  Mr. Cerqueira was awoken

by Mr. Flores.  Mr. Flores asked Mr. Cerqueira for his boarding pass.  Mr. Cerqueira was unable to

immediately locate his boarding pass, but he handed Mr. Flores the AA receipt for his itinerary, and

Mr. Flores indicated that the receipt was sufficient.  Mr. Flores also asked Mr. Ashmil and Mr.

Rokah for their boarding passes.  Mr. Flores left and gave the boarding passes and receipt to Capt.

Ehlers.

The evidence will show that soon after Mr. Flores left, four troopers from the Massachusetts

State Police boarded the airplane and demanded that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah

immediately deplane with their carry-on luggage.  Neither the police nor any representative of AA

told Mr. Cerqueira why he was being removed from the plane.  The three men were questioned by

the troopers on the jet bridge.  Mr. Cerqueira surrendered his Florida driver's license, and Mr.

Ashmil and Mr. Rokah surrendered their Israeli passports.  Mr. Cerqueira informed the troopers that

he did not know, and was not traveling with, Mr. Ashmil and Mr. Rokah.  Mr. Ashmil and Mr.

Rokah confirmed that they were not with, and did not know, Mr. Cerqueira.

After initial questioning on the ramp, the troopers escorted the three men to a small room

where they were held and interrogated for about two hours.  Mr. Cerqueira repeatedly told the

troopers that he was traveling home, by himself, after a family visit for the holidays, and that he did

not know Mr. Ashmil or Mr. Rokah.  The troopers completed their investigation and released Mr.

Cerqueira, Mr. Ashmil, and Mr. Rokah.  The investigation revealed no reason to suspect that Mr.

Cerqueira posed a security threat.  The last trooper to interrogate Mr. Cerqueira concluded that Mr.

Cerqueira had been removed from the flight and questioned solely because he happened to be sitting

next to Mr. Ashmil and Mr. Rokah.

The evidence will show that the troopers escorted Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah to the AA ticket counter and expected that the three would be rebooked on another flight. Although Mr. Cerqueira was cleared for further travel, AA refused to provide service to Mr. Cerqueira after he was released from questioning following his removal from flight 2237.

The evidence will show that the decision whether to rebook a passenger following a removal for questioning is made by AA's System Operations Control (SOC) manager on duty. Craig Marquis was the SOC manager on duty on the morning of December 28, 2003, and Mr. Marquis made the decision to deny service to Mr. Cerqueira after he was released from questioning by the State Police. Mr. Marquis does not recall the reason for the decision, and he did not prepare any written report related to the incidents of December 28, 2003.

The evidence will show that Rhonda Cobbs was the Corporate Complaint Resolution Official (CCRO) on duty at AA's SOC on the morning of December 28, 2003. When the SOC manager on duty decides that a passenger should not be rebooked, he tells the CCRO and the CCRO enters that information into the computer system. Ms. Cobbs made an entry to Mr. Cerqueira's computerized Passenger Name Record. Ms. Cobbs's entry indicated that Mr. Cerqueira was denied boarding on flight 2237 per the SOC manager on duty due to "security issues" and that Mr. Cerqueira's ticket should be refunded and he should not be rebooked on AA. Ms. Cobbs does not recall what the "security issues" were that formed the basis of the decision not to rebook Mr. Cerqueira.

The evidence will show that Nicole Traer was working as an AA customer service manager at Logan Airport on December 28, 2003, and that Mr. Marquis advised Ms. Traer that Mr. Cerqueira was denied travel on AA and told her to refund the price of Mr. Cerqueira's ticket. Ms. Traer did not ask Mr. Marquis why Mr. Cerqueira was being denied service, and Mr. Marquis did not tell her.

6

Ms. Traer did not know the basis for Mr. Marquis's decision that Mr. Cerqueira not be rebooked, and she did not know the reason that Mr. Cerqueira had been removed from the plane. Ms. Traer did not know for how long Mr. Cerqueira was being denied travel on AA. After Mr. Marquis told Ms. Traer that Mr. Cerqueira would be refused further service, Ms. Traer added an entry to Mr. Cerqueira's computerized Passenger Name Record. Ms. Traer's entry indicated that Mr. Cerqueira was being denied travel because of a "security issue" and that his ticket cost would be refunded due to the denial of service.

The evidence will show that when Mr. Cerqueira was escorted to the AA ticket counter following his release from questioning, a ticket agent told Mr. Cerqueira that there was a seat available on an AA flight from Boston to Fort Lauderdale departing in the early afternoon, but that she needed to ask a supervisor about the situation. Ms. Traer arrived at the ticket counter and spoke first to Mr. Ashmil and Mr. Rokah. She told them that AA was denying them service and that she was refunding the cost of the Boston to Florida portion of their tickets. When they asked how they were to get back to Florida, Ms. Traer told them that they were on their own. When they asked why AA would not serve them, Ms. Traer replied that it was based on something they said on the plane.

The evidence will show that Mr. Cerqueira was called to the counter and Ms. Traer told him that AA was denying him service and that she was refunding the cost of the return portion of his ticket. Mr. Cerqueira asked why he was being denied service and for how long, and Ms. Traer told him that she was not sure why he was being denied service, that it had to do with something he said on the plane, and that she had no further information. Ms. Traer told Mr. Cerqueira that if he wanted further information he would need to contact customer service, and she suggested that he do so through the AA website.

Mr. Cerqueira attempted to find another flight home to Florida on December 28, 2003, but he was unable to find a reasonably priced ticket for travel that day.  Mr. Cerqueira called his family and they drove back to Logan airport to pick him up.  On December 29, 2003, Mr. Cerqueira flew home on a U.S. Airways flight connecting through Philadelphia.

The evidence will show that on December 28, 2003, Mr. Cerqueira contacted AA by e-mail in an attempt to determine why he had been removed from flight 2237, why he had been denied further service even after being questioned and cleared for further travel, and how long the denial of service would last.  Mr. Cerqueira received an "auto-response" indicating that someone would respond to his message at a later time.  On about January 5, 2004, Mr. Cerqueira again contacted AA by e-mail to cancel a reservation he had for a future AA flight and to request a refund for that ticket.

The evidence will show that, on January 6, 2004, AA sent Mr. Cerqueira an e-mail response to his inquiry of December 28, 2003, in which AA stated that Mr. Cerqueira was removed from flight 2237 because AA "personnel perceived certain aspects of [Mr. Cerqueira's] behavior, which could have made other customers uncomfortable on board the aircraft."  AA further stated that there was "no indication" that Mr. Cerqueira would be denied boarding in the future.

The evidence will show that Mr. Cerqueira traveled frequently on AA before the incidents of December 28, 2003, but he has not traveled on any AA flight since then.  Mr. Cerqueira continues to travel frequently to destinations served by AA, but he avoids AA out of fear of discriminatory treatment.

The evidence will show that the U.S. Department of Transportation (DOT) has found that, following the attacks of September 11, 2001, AA unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent, by causing such passengers to be

removed from flights, denied boarding, or refused service. In an enforcement action brought by DOT against AA, DOT cited eleven separate instances in which AA had engaged in such discrimination. The enforcement proceeding resulted in a Consent Order finding that AA acted in a manner inconsistent with the requirements of federal anti-discrimination law.

The evidence will show that before the incidents of December 28, 2003, DOT had repeatedly warned AA not to discriminate against passengers perceived to be of Arab, Middle Eastern, or South Asian descent. Although AA personnel have engaged in such discrimination, AA has never disciplined any AA employee for such conduct.

The evidence will show that on October 14, 2004, Mr. Cerqueira filed a complaint of discrimination with the Massachusetts Commission Against Discrimination (MCAD) charging American Airlines with discrimination in a place of public accommodation. MCAD investigated Mr. Cerqueira's complaint and issued a decision concluding that Mr. Cerqueira had established a *prima facie* case of discrimination and finding probable cause to credit the allegations in Mr. Cerqueira's complaint.

Finally, the evidence will show that AA has offered inconsistent explanations for its actions with regard to Mr. Cerqueira; Mr. Cerqueira was a victim of racial profiling; racial profiling does not make air travel safer; Mr. Cerqueira's behavior did not indicate a security threat; and AA's personnel mishandled the situation.

### 2.    Damages

Mr. Cerqueira seeks damages for emotional distress, lost income, and out-of-pocket expenses resulting from the incidents of December 28, 2003. In addition, Mr. Cerqueira seeks punitive damages, declaratory and injunctive relief, attorneys' fees, and litigation costs.

The evidence will show that Mr. Cerqueira was severely traumatized by the events of December 28, 2003.  As a result of the incidents, Mr. Cerqueira endured fear, humiliation, embarrassment, mental pain, suffering, and inconvenience.  He has had difficulty sleeping, difficulty getting up in the morning, nightmares, fatigue, apathy, procrastination, trouble concentrating and focusing on tasks, feelings of anger and anxiety, mood swings, and depression.  For several months following the incidents, Mr. Cerqueira had difficulty performing basic living activities, such as eating, bathing, and working.  Because of the incidents, air travel has become more difficult for Mr. Cerqueira.  He feels paranoid, anxious, and hyper-vigilant when traveling by air, has difficulty sleeping on airplanes, and avoids conversation with other passengers.

The evidence will show that shortly after the incidents, Mr. Cerqueira was diagnosed by his treating primary care physician, Dr. Barry Blumenthal, as suffering from Post Traumatic Stress Disorder ("PTSD").  Dr. Blumenthal referred Mr. Cerqueira to a psychiatrist for treatment.

The evidence will show that since January 2005, Mr. Cerqueira has been under the care of Dr. Richard Faulk, a board-certified psychiatrist.  Dr. Faulk diagnosed Mr. Cerqueira with an anxiety disorder traceable to the incidents of December 28, 2003, and prescribed Zoloft.  Mr. Cerqueira continues to take Zoloft to treat his condition.

The evidence will show that as a result of the incidents of December 28, 2003, Mr. Cerqueria suffered a disruption in his capacity to function as a computer consultant, and that Mr. Cerqueira has lingering anxiety when boarding airplanes.  Although Mr. Cerqueira continues to suffer symptoms related to the incidents of December 28, 2003, and continues under Dr. Faulk's treatment for anxiety disorder, he has been able to resume a full work schedule.  However, Mr. Cerqueira was unable to work at all for several months following these incidents, and worked a reduced schedule for several

months after he resumed his work as a computer consultant. The effect on Mr. Cerqueira's income was dramatic. For example, in 2003, Mr. Cerqueira had total income of $153,762. In 2004, his total income dropped to $27,655, before rebounding to $141,661 in 2005.

The evidence will also show that Mr. Cerqueira has incurred, and will continue to incur, expenses for medical treatment and prescription medications. In addition, Mr. Cerqueira paid an additional $59.86 over the cost of his ticket on flight 2237 ($144.64) and the cost of the ticket ($204.50) he purchased to travel to Ft. Lauderdale on U.S. Airways on December 29, 2003.

The evidence will show AA acted with reckless indifference to Mr. Cerqueira's right to be free of unlawful discrimination and that punitive damages are necessary to deter AA from engaging in similar conduct in the future. In addition, the Court should declare AA's conduct to be unlawful and enter a permanent injunction ordering AA to take affirmative steps to remedy the effects of its discriminatory conduct and to prevent similar occurrences in the future.

Finally, Mr. Cerqueira seeks his attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and M.G.L. c. 151B, § 9.

**B.    Defendant's Summary of the Evidence**

      **1.    Liability**

AA expects the evidence at trial will demonstrate that plaintiff and two other passengers were removed from AA Flight 2237 on December 28, 2003 because three separate flight crew members had concerns about these passengers due to their unusual behavior. Specifically, AA expects the evidence will show that plaintiff acted hostilely toward a flight attendant before boarding the flight, that plaintiff boarded the flight out of turn, that plaintiff spent an inordinate amount of time in the lavatory facilities on board the flight before it departed, that plaintiff appeared to be feigning sleep

during the hectic boarding process, and that plaintiff reacted inappropriately to flight crew instructions during an exit row safety briefing. AA further expects the evidence to show that the two passengers seated next to the plaintiff in the exit row approached the captain of the flight before boarding and made strange comments to him, that those passengers made odd comments to passengers aboard the flight, and that those passengers acted inappropriately during an exit row safety briefing.

Based on the foregoing, AA expects to show at trial that the flight attendants and captain of the flight conferred regarding the unusual behavior that each observed, and that the captain then decided to contact AA's Systems Operation Control Department ("SOC") to determine how best to handle the situation. AA also expects that the evidence will show that it decided to remove the three passengers for additional questioning as a precautionary measure, and that the State Police and Transportation Security Administration (TSA) were called in to conduct that questioning.

AA also expects the evidence will show that the State Police and TSA believed it necessary to rescreen all of the passengers and to have bomb-sniffing dogs come aboard the aircraft after another passenger reported that one of the removed passengers had a box-cutter taken away from him at the security check point. AA also expects to show at trial that AA made the decision not to allow any of the three passengers to continue on their travels on AA that day because of the security concerns described above, but that plaintiff has not been precluded from traveling on AA since that time.

AA expects that there will be no evidence of any intent to discriminate on the part of the flight attendants, captain or ground personnel on the date in question. Moreover, AA expects that

12

there will be no evidence as to the appearance of the two individuals seated next to plaintiff beyond his own cursory conclusion that he looked like them.

AA finally expects to demonstrate at trial that the actions of the flight attendants, captain and ground personnel in connection with Flight 2237 on December 28, 2003 comported with prevailing industry standards at that time.

### 2. Damages

Plaintiff contends that he is entitled to recover damages for emotional distress and for lost income because his ability to work has been impacted due to the events of December 28, 2003. AA disputes that Plaintiff is entitled to any damages because there is no evidence that would support a finding of liability against AA. In the unlikely event that a jury finds AA liable under any of the statutes cited in Plaintiff's complaint, AA expects that the evidence will show that Plaintiff's damages are limited to a discrete period of time of several months in early 2004. AA expects that Plaintiff will be unable to prove specific job assignments that he turned down as a result of alleged emotional distress, and that the evidence will demonstrate Plaintiff was contemplating, and had been contemplating for some time, a change in careers because he was unhappy with his travel schedule well in advance of the events of December 28, 2003. AA further expects that the evidence will demonstrate that, after a few months in early 2004, plaintiff resumed in toto his daily living activities and his active work and travel schedule with no limitations.

## II.    FACTS ESTABLISHED BY PLEADINGS OR BY STIPULATIONS OR ADMISSIONS OF COUNSEL

A.    AA is an air carrier engaged in the business of transporting passengers.

B.    Mr. Cerqueira is a frequent flier and has accumulated over 370,000 miles in AA's frequent flyer program.

C.    AA operated flight 2237 from Boston, Massachusetts to Fort Lauderdale, Florida on December 28, 2003.

D.    Mr. Cerqueira had purchased a ticket and was a scheduled passenger on flight 2237 on December 28, 2003.

E.    On December 28, 2003, Mr. Cerqueira arrived at Logan Airport, checked a bag, received his boarding pass, and proceeded to the gate for AA flight 2237.

F.    The flight attendants scheduled to work on flight 2237 on December 28, 2003 were Sally Walling, Lois Sargent, and Amy Milenkovic.

G.    Captain John Ehlers was the pilot of flight 2237 on December 28, 2003.

H.    The First Officer of flight 2237 on December 28, 2003 was Donald Ball.

I.    Ynes Flores was working as an AA customer service manager at Logan Airport on December 28, 2003.

J.    Nicole Traer was working as an AA customer service manager at Logan Airport on December 28, 2003.

K.    Craig Marquis was AA's System Operations Control (SOC) manager on duty on the morning of December 28, 2003.

L.    Rhonda Cobbs was AA's Corporate Complaint Resolution Official (CCRO) on duty at AA's SOC on the morning of December 28, 2003.

M.    Mr. Cerqueira approached Sally Walling at the gate counter before the flight boarded. Mr. Cerqueira requested a change to his seat assignment.

14

N.    Mr. Cerqueira's seat assignment was changed to seat 20F. Seat 20F was a window seat in one of the exit rows.

O.    Oren Ashmil and Vittorio Daniel Rokah were seated in seats 20D and 20E on flight 2237 on December 28, 2003.

P.    After he boarded, Mr. Cerqueira used the lavatory on the aircraft for approximately four to five minutes.

Q.    Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were removed from flight 2237 on December 28, 2003.

R.    Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah were questioned by Massachusetts State Police on December 28, 2003.

S.    Mr. Cerqueira was escorted to the ticket counter and was cleared for further travel by the Massachusetts State Police.

T.    Mr. Cerqueira was not rebooked on another AA flight after he was released from questioning following his removal from flight 2237.

III.    **CONTESTED ISSUES OF FACT**

A.    Whether Mr. Cerqueira's color and physical appearance was a substantial or motivating factor in AA's decision to have Mr. Cerqueira removed from AA flight 2237, detained, and interrogated by the Massachusetts State Police?

B.    Whether Mr. Cerqueira's color and physical appearance was a substantial or motivating factor in AA's decision to deny service to Mr. Cerqueira after he was released from questioning?

15

C.      Whether AA had legitimate nondiscriminatory reasons for its treatment of Mr. Cerqueira?

D.      Whether Mr. Cerqueira's color and physical appearance is similar to that of individuals who are Arab, Middle Eastern, or South Asian?

E.      Whether Mr. Cerqueira requested in a hostile manner that Ms. Walling change his seat assignment?

F.      Whether Mr. Cerqueira boarded the aircraft before his assigned group was called?

G.      Whether Mr. Cerqueira looked like Mr. Ashmil and Mr. Rokah?

H.      What Mr. Ashmil and Mr. Rokah looked like?

I.      Whether the flight crew believed that Mr. Cerqueira was traveling with Mr. Ashmil and Mr. Rokah?

J.      Whether the flight crew thought the three men were together because they had a similar physical appearance?

K.      Whether Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah acted inappropriately during the exit row safety briefing?

L.      Whether Mr. Cerqueira laughed or otherwise reacted to anything that Mr. Ashmil or Mr. Rokah said or did?

M.      Whether Mr. Cerqueira's actions, taken in toto, were unusual in the experience of the flight crew?

N.      Whether Mr. Cerqueira's behavior indicated that he was a security threat?

O.      Whether the actions of Mr. Ashmil and Mr. Rokah, taken in toto, were unusual in the experience of the flight crew?

P.    Whether the behavior of Mr. Ashmil and Mr. Rokah indicated that they were a security threat?

Q.    Whether Mr. Cerqueira's actions, taken in toto, were sufficiently unusual to justify a request by AA to have him questioned by the State Police and the TSA?

R.    Whether the actions of Mr. Ashmil and Mr. Rokah, taken in toto, were sufficiently unusual to justify a request by AA to have them questioned by the State Police and the TSA?

S.    Whether Mr. Cerqueira's actions, when coupled with the actions of Mr. Ashmil and Mr. Rokah, taken in toto, were sufficiently unusual to justify a request by AA to have Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah questioned by the State Police and the TSA?

T.    Whether the behavior of Mr. Ashmil and Mr. Rokah was imputed to Mr. Cerqueira because the three men shared a similar Middle Eastern appearance?

U.    Whether the information possessed by AA on December 28, 2003 raised sufficient security concerns to preclude Mr. Cerqueira from further travel with AA on that date where the State Police and TSA were sufficiently concerned about the safety of the flight to order rescreening of all of the passengers and to order bomb-sniffing dogs to search the plane?

V.    Whether the crew was concerned about the behavior of Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah because the crew perceived the three men to be Middle Eastern?

W.    Whether, prior to January 6, 2004, AA provided Mr. Cerqueira any indication as to how long he would be denied service?

17

IV.    **JURISDICTIONAL QUESTIONS**

None.

V.    **QUESTIONS RAISED BY PENDING MOTIONS**

A.    May AA contradict its judicial admission that Mr. Cerqueira boarded flight 2237 when his assigned group was called?

B.    May AA contradict its judicial admission that Capt. John Ehlers made the decision to have Mr. Cerqueira removed from flight 2237?

C.    May AA contradict its judicial admission that it is a recipient of federal financial assistance, and may AA contend that it is not subject to Title VI?

D.    May AA offer speculation about possible bases for its refusal to rebook Mr. Cerqueira?

E.    May AA offer evidence regarding incidents that occurred with respect to flight 2237 after AA had decided to have Mr. Cerqueira removed from the flight?

F.    May AA refer to policies, protocols, and training materials that it has not produced, including materials withheld pending a determination of whether the information is "Sensitive Security Information" (SSI)?

G.    May AA argue to the jury that the allegedly unusual behavior of Mr. Ashmil and Mr. Rokah can provide a nondiscriminatory reason for AA's treatment of Mr. Cerqueira?

H.    Should the testimony of AA's expert, John Beardslee, be excluded because: 1) it is based on Mr. Beardslee's review and consideration of documents that have not been produced to plaintiff; 2) Mr. Beardslee is expected to testify about issues that are not the appropriate subject matter of expert testimony; 3) Mr. Beardslee is expected to

18

testify to facts that are not present in this case; and 4) Mr. Beardslee's testimony is based on speculation?

I.      Is plaintiff's expert, Douglas Laird, permitted to testify regarding issues involving passenger security concerns at a U.S. flag carrier post-9/11 where he has testified that he has had no involvement with the development of training, protocol or procedures regarding passenger security concerns since leaving Northwest Airlines in 1995?

J.      Is plaintiff's expert, Douglas Laird, permitted to testify regarding opinions that rely in whole or in part on non-authoritative publications?

K.      May plaintiff's expert, Douglas Laird, opine that plaintiff's removal from flight 2237 on December 28, 2003 stemmed from racial profiling where Mr. Laird admits that another security professional may have reached a different conclusion on the same evidence?

L.      May plaintiff's expert, Douglas Laird, opine that AA's employees failed to follow appropriate protocols and procedures where he testified that a) he has no knowledge of what AA's protocols and procedures were on December 28, 2003 and b) he has had no involvement with the development of such protocols and procedures for a U.S. flag carrier since leaving Northwest Airlines in 1995?

M.      Is plaintiff's treating physician, Barry Blumenthal, permitted to testify as to projected treatment and prognosis beyond that which is contained in his treatment notes where he has not been disclosed as an expert and has not proffered an expert report?

N.    Is plaintiff's treating psychiatrist, Richard Faulk, permitted to testify as to projected treatment and prognosis beyond that which is contained in his treatment notes where he has not been disclosed as an expert and has not proffered an expert report?

O.    Can plaintiff introduce into evidence a state police log that contains inadmissible hearsay and that contains multiple errors of fact?

P.    May plaintiff introduce into evidence and/or make reference to a Consent Order and materials related to litigation underlying the Consent Order between AA and the Department of Transportation where the express terms of that Consent Order indicate it may not be used as evidence in other legal proceedings?

## VI.    ISSUES OF LAW AND SUPPORTING AUTHORITY

### A.    General Issues

1.    Whether plaintiff's claims must be dismissed because he has failed to set forth a *prima facie* case of discrimination, a necessary prerequisite under all three of the statutes pursuant to which he asserts claims and where the decisions made by AA must be considered in light of the exigencies of the circumstances surrounding the decisions made?  AA contends that they must be dismissed for the reasons set forth in its memorandum of law in connection with its motion for summary judgment. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Goodman v. Bowdoin College*, 380 F.3d 33, 43 (1st Cir.2004); *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir.2002); *Cordero v. CIA Mexicana de Aviacion S.A.*, 681 F.2d 669, 671-72 (9th Cir.1982), *citing Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2nd Cir.1975); *Al-Quahai'een v. America West Airlines, Inc.*, 267 F.Supp.2d 841, 847-48 (S.D.Ohio

20

2003); *Christel v. AMR Corp.*, 222 F.Supp.2d 335, 340 (E.D.N.Y. 2002); *Scott v. Macy's East*, Inc., 2002 WL 3149745, at 5 (D.Mass. 2002), *citing Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989); *Gutierrez v. Massachusetts Bay Transportation Authority*, 437 Mass. 396, 411 (2002). Plaintiff contends that he has established a *prima facie* case of discrimination under each of his three causes of action because the only passengers removed from flight 2237 and refused further service had a color and physical appearance similar to those commonly associated with individuals who are Arab, Middle Eastern, or South Asian. This fact creates a presumption of illegal discrimination and shifts the burden to defendant to articulate a legitimate nondiscriminatory reason for the challenged acts. *See* Doc. Nos. 21, 30, & 37, and authorities cited therein.

2.    Whether plaintiff's claims must be dismissed because AA had a legitimate security concern regarding plaintiff, thereby barring plaintiff's claims pursuant to 49 U.S.C. §44902(b) and 49 U.S.C. §41713(b)? AA contends that plaintiff's claims are barred. *See, e.g., Smith v. Comair, Inc.,* 134 F.3d 254, 259 (4th Cir.1998); *O'Carroll v. American Airlines, Inc.,* 863 F.2d 11, 12 (5th Cir.1989); *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2nd Cir.1975); *Alshrafi v. American Airlines, Inc.,* 321 F.Supp.2d 150, 163 (D.Mass. 2004); *Al-Quhai'een v. America West Airlines, Inc.,* 267 F.Supp.2d 841, 847-48 (S.D.Ohio 2003); *Dasrath v. Continental Airlines, Inc.*, 228 F.Supp.2d 531, 538 (D.N.J. 2002); *Norman v. Trans World Airlines, Inc.,* 2000 WL 1480367, at 3-4 (S.D.N.Y. 2000); *Huggar v. Northwest Airlines, Inc.*, 1999 WL 59841, at 9 (N.D.Ill. 1999); *Sedigh v. Delta Airlines, Inc.*, 850 F.Supp. 197, 201-202

(E.D.N.Y. 1994); *Zervignon v. Piedmont Aviation, Inc.,* 558 F.Supp. 1305, 1306 (S.D.N.Y. 1983); *Rubin v. United Air Lines, Inc.,* 117 Cal.Rptr.2d 109, 119 (Cal.App. 2002); *Adamsons v. American Airlines, Inc.*, 444 N.E.2d 21, 24 (N.Y. 1982). Plaintiff contends that 49 U.S.C. § 44902(b) is inapposite because there is no conflict between prohibiting discrimination and allowing airlines the discretion to refuse to carry passengers for rational safety reasons. As this Court noted in *Alshrafi v. American Airlines, Inc.*, 321 F. Supp. 2d 150, 162 (D. Mass. 2004), actions motivated by unlawful discrimination "are necessarily arbitrary and capricious, and therefore beyond the scope of the discretion granted by Section 44902." Plaintiff contends that his state-law discrimination claim is not preempted by the Airline Deregulation Act (ADA), 49 U.S.C. § 41713(b). As this Court stated in *Alshrafi*, unlawful discrimination has "'nothing whatsoever to do with any legitimate or quasi-legitimate industry-wide practice of affording airline service' under the [ADA]'s express preemption provision." 321 F. Supp. 2d at 162 (quoting *Doricent v. American Airlines, Inc.*, Civ. A. No. 91-12084Y, 1993 WL 437670, *5 (D. Mass. Oct. 19, 1993)). Accordingly, state-law claims based on such illegitimate conduct would not "impair the [ADA]'s purpose to promote 'maximum reliance on competitive forces.'" *Id.* (quoting *Morales v. Trans World Airlines*, 504 U.S. 374, 378-79 (1992)).

3.  Whether plaintiff's claims under M.G.L. c. 272 §98 must be dismissed because AA cannot be held liable under a theory of respondeat superior in connection with that statute? AA contends that plaintiff's claims under M.G.L. c. 272 §98 cannot proceed

because that statute does not apply to employers on a respondeat superior basis.

*Jones v. City of Boston*, 738 F.Supp. 604, 605-06 (D.Mass. 1990); *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-823 (1985). Plaintiff contends that § 98 can be enforced through civil actions by private parties and that ordinary principles of vicarious liability apply. Specifically, § 98 provides that "any person aggrieved" by discrimination in a place of public accommodation may recover damages. Indeed, § 98 is primarily enforced through M.G.L. c. 151B §§ 5 and 9. The Massachusetts Commission Against Discrimination (MCAD), a civil agency authorized to enforce the statute, may impose civil penalties for violations of § 98, and Chapter 151B § 9 provides that any person aggrieved by any "unlawful practice within the jurisdiction of the commission, may . . . bring a civil action for damages or injunctive relief or both in the superior or probate court for the county in which the alleged unlawful practice occurred." The statute also provides that the court "may award the petitioner actual and punitive damages." Thus, because § 98 provides for civil liability, AA may be held liable for the discriminatory acts of its employees under the doctrine of respondeat superior. *College-Town, Div. of Interco, Inc. v. MCAD*, 508 N.E.2d 587, 593 (Mass. 1987); *Sarvis v. Boston Safe Deposit & Trust Co.*, 711 N.E.2d 911, 921 (Mass. App. Ct. 1999); *Carpenter v. Yellow Cab Co.*, 2001 WL 1602758, at *2 (MCAD Feb. 23, 2001); *Wilder v. Diamond Cab Co.*, 2001 WL 1602757, at *3 (MCAD Feb. 23, 2001).

23

B.    **Evidentiary Issues**

1.    May AA contradict its judicial admission that Mr. Cerqueira boarded flight 2237 when his assigned group was called?  Plaintiff contends that AA may not do so because judicial admissions are binding.  *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992); *United States v. Belculfine*, 527 F.2d 941, 944 (1st. Cir. 1975).  AA contends that a pleading cannot stand as a judicial admission against an alternative pleading in the same case, that the alleged admission in question is not supported by sworn testimony in the instant action, and that Plaintiff may not seek to admit a pleading as evidence at trial to contradict sworn testimony and documents proffered by the Defendant.  Schott, 976 F.2d at 61-62; *United States v. Cline,* 388 F.2d 294, 296 (4th Cir.1968); *Avemco Insurance Company v. Aerotech, Ltd. et al,* 677 F. Supp. 35, 39 (D.Mass. 1987), *Gaines v. General Motors Corporation*, 789 F. Supp. 38, 40 FN1 (D.Mass. 1991).

2.    May AA contradict its judicial admission that Capt. John Ehlers made the decision to have Mr. Cerqueira removed from flight 2237?  Plaintiff contends that AA may not do so because judicial admissions are binding.  *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992); *United States v. Belculfine*, 527 F.2d 941, 944 (1st. Cir. 1975).  AA contends that a pleading cannot stand as a judicial admission against an alternative pleading in the same case, that the alleged admission in question is not supported by sworn testimony in the instant action, and that Plaintiff may not seek to admit a pleading as evidence at trial to contradict sworn testimony and documents proffered by the Defendant.  Schott, 976 F.2d at 61-62;

24

*United States v. Cline,* 388 F.2d 294, 296 (4th Cir.1968); *Avemco Insurance Company v. Aerotech, Ltd. et al,* 677 F. Supp. 35, 39 (D.Mass. 1987), *Gaines v. General Motors Corporation*, 789 F. Supp. 38, 40 FN1 (D.Mass. 1991).

3.    May AA contradict its judicial admission that it is a recipient of federal financial assistance, and may AA contend that it is not subject to Title VI?  Plaintiff contends that AA may not. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992); *United States v. Belculfine*, 527 F.2d 941, 944 (1st. Cir. 1975); 42 U.S.C. §§ 2000d & 2000d-4a(3)(A)(i).  AA contends that a pleading cannot stand as a judicial admission against an alternative pleading in the same case, that the alleged admission in question is not supported by sworn testimony in the instant action, and  that Plaintiff may not seek to admit a pleading as evidence at trial to contradict sworn testimony and documents proffered by the Defendant.  Schott, 976 F.2d at 61-62; *United States v. Cline,* 388 F.2d 294, 296 (4th Cir.1968); *Avemco Insurance Company v. Aerotech, Ltd. et al,* 677 F. Supp. 35, 39 (D.Mass. 1987), *Gaines v. General Motors Corporation*, 789 F. Supp. 38, 40 FN1 (D.Mass. 1991).  Moreover, AA has never admitted that it receives federal funds for the purposes of Title VI, or that it is subject to Title VI.  Rather, it has answered plaintiff's allegations and interrogatories honestly and accurately based on the wording of those allegations and interrogatories, interposing objections as to the vagueness of the language used when appropriate.

4.    May AA offer speculation about possible bases for its refusal to rebook Mr. Cerqueira?  Plaintiff contends that speculation is inadmissible and a generalized

claim that a decision was made because of non-specific "security issues" is insufficient to rebut a *prima facie* case of discrimination. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.5 (1st Cir. 1979); *see also Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 251 (1st Cir. 2000); *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990); *Simmons v. American Airlines*, 34 Fed. Appx. 573, 575-76 (9th Cir. 2002). AA contends that it has advanced concrete evidence regarding security issues in existence at the time it made the decision to deny rebooking to Mr. Cerqueira on December 28, 2003, that the evidence in question is supported by contemporaneous documentation showing valid security concerns on the part of not only AA's personnel but also on the part of law enforcement agencies with whom the decisionmaker, Craig Marquis, was in contact, and that, though Mr. Marquis may not have a specific memory as to the bases for his decision at this time, the record evidence demonstrates clearly that there was adequate information to support his decision to deny further travel to plaintiff on the date in question.

5.    May AA offer evidence regarding incidents that occurred with respect to flight 2237 after AA had decided to have Mr. Cerqueira removed from the flight? Plaintiff contends that such evidence should be excluded under Fed. R. Evid. 402 because it is not relevant to any issue in this case, or it should be excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403; *see also Simmons v. American Airlines*, 34 Fed. Appx. 573, 575 n.1 (9th Cir. 2002). AA contends that such evidence demonstrates that Mr. Marquis had adequate information

on which to base his decision not to rebook plaintiff, and that the information is relevant and probative. Moreover, it is not unfairly prejudicial. *Daigle v. Maine Medical Center*, 14 F.3d 684, 690 (1ST Cir. 1994). *See also Swajian v. General Motors Corp.*, 916 F.2d 31, 34 (1ST Cir.1990). " 'Unfair prejudice' ⋯ means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Note, Fed. R. Evid. 403.

6.  May AA refer to policies, protocols, and training materials that it has not produced, including materials withheld pending a determination of whether the information is "Sensitive Security Information" (SSI)? Plaintiff contends that AA should be precluded from referencing any policies, protocols, and training materials that it has not produced in response to plaintiff's discovery requests. AA contends that it could not produce the requested information by operation of law, that it cannot introduce into evidence the contents of that information, but that it should not be prevented from mentioning that such policies, procedures, protocols and training materials exist. *See generally Chowdhury v. Northwest Airlines,* 226 F.R.D. 608 (N.D. Cal. 2004) (Information designated as Sensitive Security Information is privileged and may not be produced, even subject to court order; question as to whether defendant can utilize contents of material in defense of case determined to be premature in light of fact that defendant had not sought to do so at time of motion).

7.  May AA argue to the jury that the allegedly unusual behavior of Mr. Ashmil and Mr. Rokah can provide a nondiscriminatory reason for AA's treatment of Mr. Cerqueira? Plaintiff contends that because the behavior of Mr. Ashmil and Mr. Rokah has

nothing to do with Mr. Cerqueira's behavior it is irrelevant to AA's defense. Fed. R. Evid. 402. Even if the behavior of Mr. Ashmil and Mr. Rokah had some marginal relevance to AA's defense, it should not be allowed to be used for that purpose because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403. AA contends that the behavior of other passengers aboard Flight 2237 on the date in question bears directly on the issue of whether the actions of its personnel were justified by legitimate security concerns. The law requires that security concerns cannot be evaluated in a vacuum; rather, one must look to the totality of the circumstances to determine if removal of a passenger or denial of boarding is rational and reasonable. Therefore, the conduct of plaintiff's seatmates is relevant, probative, and not unfairly prejudicial. *Zervignon v. Piedmont*, 558 F.Supp. 1305, 1306-07 (D.C.NY 1983), *citing Williams v. TWA*, 509 F.2d 942, 948 (2nd Cir. 1975); *see also Swajian*, 916 F.2d at 34.

8. Should the testimony of AA's expert, John Beardslee, be excluded because: 1) it is based on Mr. Beardslee's review and consideration of documents that have not been produced to plaintiff; 2) Mr. Beardslee is expected to testify about issues that are not the appropriate subject matter of expert testimony; 3) Mr. Beardslee is expected to testify to facts that are not present in this case; and 4) Mr. Beardslee's testimony is based on speculation? Plaintiff contends that Mr. Beardslee's testimony should be excluded. Fed. R. Civ. P. 26(a)(2)(B); *Regional Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697 (6th Cir. 2006); *Fidelity Nat'l Title Ins. Co. of New York v.*

28

*Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745 (7th Cir. 2005); *United States v. Sebaggala*, 256 F.3d 59, 65-67 (1st Cir. 2001); *Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376 (1st Cir. 2000); *Figueroa v. Simplicity Plan De Puerto Rico*, 267 F. Supp.2d 161, 165-66 (D. Puerto Rico 2003);  *Suskind v. Home Depot Corp.*, No. 99-10575-NG, 2001 WL 92183, at *4 (D. Mass. Jan. 2, 2001); *Saia v. Sears Roebuck & Co.*, 47 F. Supp. 2d 141 (D. Mass. 1999).  AA contends that Mr. Beardslee's testimony satisfies all criteria for admissibility established under the Federal Rules of Evidence as well as the standards set forth in Kumho Tire and that it has complied with the applicable Federal Rules of Civil Procedure in disclosing his opinions and the bases thereof.  Contrary to plaintiff's contentions, Mr. Beardslee's testimony is not predicated on "review and consideration of documents that have not been produced to plaintiff"; Mr. Beardslee has, in forming his opinions, taken into account his education, training, background and experiences as an aviation security professional.  Those experiences necessarily incorporate an understanding and awareness of regulatory materials such as the Common Strategy referenced in his expert disclosures; Mr. Beardslee did not review those materials, or any others that have not been produced to plaintiff,  in connection with the preparation of his opinions in this case.  Similarly, Mr. Beardslee's testimony comports with the requirements for admission of expert testimony under F.R.E. 702, as he intends to offer testimony regarding subject matters beyond the knowledge of the average juror that will assist the jury in its determinations and that meet the criteria set forth in

29

F.R.E. 702, including, but not limited to, offering opinion testimony based on sufficient facts or data.

9.    Whether Douglas Laird's opinions must be limited in accordance with AA's motion in limine for the reasons set forth therein?  AA contends that they must be limited in accordance with F.R.E.s 702 and 703 because they fail to meet the standards for reliability set forth in those rules and under *Kumho Tire.  Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  Plaintiff contends that Mr. Laird's testimony satisfies all criteria for admissibility established under the Federal Rules of Evidence as well as the standards set forth in *Kumho Tire* and that he has complied with the applicable Federal Rules of Civil Procedure in disclosing his opinions and the bases thereof.  Mr. Laird intends to offer testimony regarding subject matters beyond the knowledge of the average juror that will assist the jury in its determinations and that meet the criteria set forth in FRE 702, including, but not limited to, offering opinion testimony based on sufficient facts or data.

10.    Whether Barry Blumenthal, in accordance with AA's motion in limine, is barred from offering opinion testimony regarding plaintiff's expected prognosis and treatment beyond that which is reflected in his treatment notes where he has not been disclosed as an expert witness and has not proffered expert disclosures?  AA contends that Dr. Blumenthal's testimony and opinions must be limited to those set forth in and reasonably derived from his treatment notes.  *See, e.g., Gonzalez v. Executive Airlines, Inc.*, 236 F.R.D. 73, 78 (D.Puerto Rico 2006); *Garcia v. City of Springfield Police Department*, 230 F.R.D. 247, 249-50 (D.Mass. 2005).  *See also*

Fed.R.Civ.P. 26(b)(2). Plaintiff contends that Dr. Blumenthal's testimony regarding his diagnosis and treatment of Mr. Cerqueira is admissible and need not be limited to Dr. Blumenthal's treatment notes. Because Dr. Blumenthal was Mr. Cerqueira's treating physician and his testimony is based on first-hand knowledge and observations made during the course of treatment, Dr. Blumenthal's testimony is admissible and expert disclosures are not required. *See, e.g., Gonzalez v. Executive Airlines, Inc.*, 236 F.R.D. 73, 78 (D. Puerto Rico 2006); *Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249-50 (D. Mass. 2005); *see also* Fed. R. Civ. P. 26(a)(2)(B).

11.   Whether Richard Faulk, in accordance with AA's motion in limine, is barred from offering opinion testimony regarding plaintiff's expected prognosis and treatment beyond that which is reflected in his treatment notes where he has not been disclosed as an expert witness and has not proffered expert disclosures? AA contends that Dr. Faulk's testimony and opinions must be limited to those set forth in and reasonably derived from his treatment notes. *See, e.g., Gonzalez v. Executive Airlines, Inc.*, 236 F.R.D. 73, 78 (D.Puerto Rico 2006); *Garcia v. City of Springfield Police Department*, 230 F.R.D. 247, 249-50 (D.Mass. 2005). *See also* Fed.R.Civ.P. 26(b)(2). Plaintiff contends that Dr. Faulk's testimony regarding Mr. Cerqueira's prognosis and treatment is admissible and need not be limited to Dr. Faulk's treatment notes. Because Dr. Faulk is Mr. Cerqueira's treating psychiatrist and his testimony is based on first-hand knowledge and observations made during the course of treatment, Dr. Faulk's testimony is admissible and expert disclosures are not

required. *See, e.g., Gonzalez v. Executive Airlines, Inc.*, 236 F.R.D. 73, 78 (D. Puerto Rico 2006); *Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249-50 (D. Mass. 2005); *see also* Fed. R. Civ. P. 26(a)(2)(B).

12.    Whether the Massachusetts State Police Log proffered by plaintiff as an exhibit constitutes inadmissible hearsay?  AA contends that the majority of the contents of the log are inadmissible hearsay that must be excluded under F.R.E. 801.  *See also United States v. Mackey*, 117 F.3d 24, 28 (1st Cir.1997).  Plaintiff contends that the Massachusetts State Police Log is admissible under a number of exceptions to the hearsay rule, including the business records exception (FRE 803(6)) and the public records and reports exception (FRE 803(8)).  *See United States v. Garcia*, No. 92-30384, 1993 WL 310635, at *3 (9th Cir. Aug. 10, 1993) (unpublished opinion); *United States v. Versaint*, 849 F.2d 827, 831-832 (3rd Cir. 1988); *Vasquez v. McPherson*, 285 F. Supp. 2d 334, 338 (S.D.N.Y. 2003); *Sage v. Rockwell Int'l Corp.*, 477 F. Supp. 1205, 1207-1210 (D. N.H. 1979).

13.    Whether the Massachusetts State Police Log proffered by plaintiff as an exhibit is inherently unreliable?  AA contends that the log, riddled with factual errors, must be excluded pursuant to F.R.E. 403 and 803(8) as inherently unreliable.  *See also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988).  Plaintiff contends that the Massachusetts State Police Log is admissible under the public records and reports exception to the hearsay rule and no sources of information or other circumstances indicate lack of trustworthiness. *See United States v. Garcia*, No. 92-30384, 1993 WL 310635, at *3 (9th Cir. Aug. 10, 1993) (unpublished opinion); *United States v.*

32

*Versaint*, 849 F.2d 827, 831-832 (3rd Cir. 1988); *Vasquez v. McPherson*, 285 F. Supp. 2d 334, 338 (S.D.N.Y. 2003); *Sage v. Rockwell Int'l Corp.*, 477 F. Supp. 1205, 1207-1210 (D. N.H. 1979).

14.    Whether the Consent Order entered into by AA and the Department of Transportation and materials related to the proceedings underlying the Consent Order are admissible, and/or whether the Consent Order and related materials may be referenced or mentioned at trial? AA contends that they are inadmissible because parties are entitled to rely on the plain language of a consent order into which they enter. *Porrata v. Gonzalez-Rivera*, 958 F.2d 6, 8 (1st Cir.1992). Such language controls and should be enforced, and courts should limit their consideration of the significance of consent decrees based on the terms and conditions set forth therein unless ambiguities exist. *Inmates of Suffolk County Jail v. Kearney*, 928 F.2d 33, 35 (1st Cir.1991); *US v. Boston Scientific Corp.*, 167 F.Supp.2d 424, 433 (D.Mass. 2001). Plaintiff contends that the Consent Order is admissible. *See, e.g., Lodge v. Shell Oil Co.*, 747 F.2d 16, 20 (1st Cir. 1984), *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir. 1968); *United States v. Serian*, 895 F.2d 432, 434-435 (8th Cir. 1990); *United States v. Warren*, No. 7:04 CR 00021, 2005 WL 1164195, at * 3-4 (W.D. Va. May 17, 2005); *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 257 F. Supp. 2d 751, 758-759 (S.D.N.Y. 2003).

## VII.    REQUESTED AMENDMENTS TO THE PLEADINGS

In paragraph 5 of his Amended Complaint (Doc. No. 3), plaintiff alleged, in relevant part, that "American Airlines is a recipient of federal financial assistance." In paragraph 5 of its Answer

(Doc. No. 5), defendant stated: "AA admits to the allegations in paragraph 5 of the Amended Complaint." Plaintiff's Interrogatory No. 18 requested:

> If you contend that American Airlines does not receive federal financial assistance as a whole, identify and describe the source and purpose of any federal financial assistance received by American Airlines during the five years preceding December 28, 2003.

AA responded, in relevant part: "American states that it has not advanced any such contention."

AA requests permission to modify its answer to paragraph 5 of the Complaint and Response No. 18 to plaintiff's First Set of Interrogatories to specify that, while it has received federal funds, it is not a recipient of federal funding for purposes of 42 U.S.C. 2000d under prevailing case authority. *Shotz v. American Airlines, Inc.*, 420 F.3d 1332, 1335 (11th Cir. 2005); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir.1984).

Plaintiff contends that it is much too late for AA to amend its answer and response to Interrogatory No. 18 and that plaintiff will be prejudiced if AA is allowed to do so. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits discrimination in "any program or activity receiving Federal financial assistance," and the term "program or activity" means "all of the operations of . . . an entire corporation . . . if assistance is extended to such corporation . . . as a whole." 42 U.S.C. § 2000d-4a(3)(A)(i). Plaintiff relied on AA's judicial admission that it receives federal financial assistance, and AA's representation that it would not contend that such assistance was limited to any particular program or activity, to establish Title VI coverage.

## VIII.   ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE ACTION

None.

34

IX.    **PROBABLE LENGTH OF TRIAL**

The parties anticipate that this matter will require five full trial days in addition to empanelment.

X.    **WITNESSES TO BE CALLED**

A.    **Plaintiff's Proposed Witnesses**

1.    John D. Cerqueira
       Aventura, FL

2.    Barry M. Blumenthal, D.O.
       Aventura, FL

3.    Richard S. Faulk, M.D.
       Boca Raton, FL

4.    Douglas R. Laird
       Reno, NV

5.    Custodian of Records
       Massachusetts State Police
       Framingham, MA

6.    Donald Ball
       Groveland, MA

7.    Rhonda Cobbs
       Arlington, TX

8.    John Ehlers
       Concord, MA

9.    Ynes Flores
       Lynn, MA

10.   Craig Marquis
       Arlington, TX

11.   Amy Milenkovic
       St. Paul, MN

      12.     Lois Sargent
               Salem, MA

      13.     Nicole Traer
               Weymouth, MA

      14.     Sally Walling
               Hampton, NH

Plaintiff expects to present the testimony of Drs. Blumenthal and Faulk by videotaped deposition.

Plaintiff may present the testimony of Mr. Ball, Ms. Cobbs, Mr. Ehlers, Mr. Flores, Mr. Marquis, Ms. Milenkovic, Ms. Sargent, Ms. Traer, and Ms. Walling by deposition if they are not available at time of trial.

**B.**    **Defendant's Proposed Witnesses Likely To Be Called At Trial**

      1.      Sally Walling
               Hampton, NH

      2.      Lois Sargent
               Salem, MA

      3.      Amy Milenkovic
               St. Paul, Minnesota

      4.      John Ehlers
               Concord, MA

      5.      Craig Marquis
               Arlington, TX

      6.      Martin Kelly, M.D.
               Chestnut Hill, MA

      7.      John Beardslee
               The Woodlands, TX

C.    **Defendant's Proposed Witnesses Who May Be Called At Trial**

1.    Donald Ball
      Groveland, MA

2.    Ynes Flores
      Lynn, MA

3.    Nicole Traer
      Weymouth, MA

4.    Rhonda Cobbs
      Arlington, TX

5.    John Cerqueira
      Adventura, FL

6.    Trooper Daniel E. Sullivan
      East Boston, MA

7.    Trooper Fredrick F. Yee
      East Boston, MA

8.    Trooper Joseph J. Boike
      East Boston, MA

9.    Trooper Donald J. Ventura
      East Boston, MA

10.   Trooper David Crowther
      East Boston, MA

11.   Oren Ashmil
      Hollywood, FL

12.   Daniel Vittorio a/k/a Vittorio Rokah
      Hollywood, FL

Barring the unforeseen unavailability of the witnesses identified above, AA does not anticipate that it will introduce any testimony by way of deposition except for impeachment and

rebuttal purposes.  AA has counter-designated testimony of plaintiff's treating physician, Barry Blumenthal, and treating psychiatrist, Richard Faulk.

## XI.    PROPOSED EXHIBITS TO WHICH THERE IS NO OBJECTION

Subject to any redactions that may be necessary based on the resolution of the pending motions *in limine*, the parties have agreed that the following exhibits may be admitted at trial.

| ID No. | Description | Dep. ID No. | Bates No. |
|--------|-------------|-------------|-----------|
| J-1 | Passenger Itinerary | | CRQ 0001 |
| J-2 | Boarding Pass | | CRQ 0002 |
| J-3 | Credit Card Refund Receipt | | CRQ 0003 |
| J-4 | Orbitz Travel Document | | CRQ 0004-5 |
| J-5 | AMR Event Call Center Report of Sally Walling | Deposition Exh. 1 | AA 0018-20 |
| J-6 | AMR Event Call Center Report of Lois Sargent | Deposition Exh. 5 | AA 0012-14 |
| J-7 | AMR Event Call Center Report of Amy Milenkovic | Deposition Exh. 9 | AA 0015-17 |
| J-8 | Detail Note, Event ID: 03122856 | Deposition Exh. 16 | AA 0035 |
| J-9 | Detail Note, Event ID: 03122856. SS CCRO History. | Deposition Exh. 14 | AA 0021 |
| J-10 | Detail Note, Event ID: 03122856. Activity Note. | Deposition Exh. 11 | AA 0022 |
| J-11 | Detail Note, Event ID: 03122856. Passenger Name Record. | Deposition Exh. 12 | AA 0023-27 |
| J-12 | Detail Note, Event ID: 03122856. Event Note | Deposition Exh. 13 | AA 0028 |
| J-13 | Detail Note, Event ID: 03122856. Notification Note, Aircraft Routing, Crew List, DM Delay Message, Flight/Gate Info, Passenger List | Deposition Exh. 18 | AA 0029-34 |

| J-14 | E-Mail Exchange between AA Customer Relations and John D. Cerqueira | AA 0037 is Cerqueira Deposition Exh. 4 | AA 0036-38 |
| J-15 | E-mail Message from John D. Cerqueira to American Airlines | | CRQ 0007 |
| J-16 | American Airline's E-mail Message to John D. Cerqueira on January 6, 2004 | Cerqueira Deposition Exh. 5 | CRQ 0008 |
| J-17 | Prescription Records | | CRQ 0469-0476 |
| J-18 | 2002 Tax Return | | CRQ 0331-359 |
| J-19 | 2003 Tax Return | Cerqueira Deposition Exh. 23 | CRQ 0360-380 |
| J-20 | 2004 Tax Return | Cerqueira Deposition Exh. 24 | CRQ 0381-395 |
| J-21 | 2005 Tax Return | | CRQ 0457-468 |

## XII.   OBJECTIONS TO THE EVIDENCE

### A.   Defendant's Objections to Plaintiff's Proposed Exhibits and Plaintiff's Response

| ID No. | Description | Objection | Response |
| --- | --- | --- | --- |
| P-1 | Amended Complaint (Doc. No. 3) | Pleadings inadmissible; FRE 401-403, 802 | Necessary to identify admissions in Answer; relevant to liability; FRE 802(d)(2). Impeachment. |
| P-2 | Defendant's Answer to Plaintiff's Amended Complaint (Doc. No. 5) | Pleadings inadmissible; FRE 401-403, 802 | Admissions relevant to liability; FRE 802(d)(2). Impeachment. |

| P-3 | American Airlines's Answers to Plaintiff's First Set of Interrogatories (Deposition Exh. 2) | FRE 401-403, 802 | Admissions relevant to liability, punitive damages, and injunctive relief; FRE 802(d)(2). Impeachment. |
|---|---|---|---|
| P-4 | American Airlines's Supplemental Answers to Plaintiff's First Set of Interrogatories | FRE 401-403, 802 | Admissions relevant to liability, punitive damages, and injunctive relief; FRE 802(d)(2). Impeachment. |
| P-5 | NASA Aviation Safety Report of Lois Sargent (Deposition Exh. 6) | 401-403 | Relevant to liability. |
| P-6 | Letter of June 14, 2004, from Alec Bramlett to Samuel Podberesky (Deposition Exh. 15) (AA 0009-11) | FRE 401-403, 802 | Contains admissions relevant to liability; FRE 802(d)(2). |
| P-7 | Massachusetts State Police Daily Administrative Log (included in Cerqueira Deposition Exh. 21) (CRQ 0010) | See motion in limine | See opposition to motion in limine |
| P-8 | Kudwa Hotline Message, September 20, 2001 (Second page is Deposition Exh. 4) (AA 0047-48) | FRE 401-403, 802 | Relevant to liability, punitive damages, and injunctive relief; FRE 802(d)(2); 803(6). |

| P-9 | DOT message to airlines, September 21, 2001 (AA 0050) (also CRQ 0060) | FRE 401-403, 802 | Relevant to punitive damages and injunctive relief; FRE 803(6); 803(8). |
|---|---|---|---|
| P-10 | DOT guidance on nondiscrimination (CRQ 0058-59) (also AA 0051-53) | FRE 401-403, 802 | Relevant to punitive damages and injunctive relief; FRE 803(6); 803(8). |
| P-11 | Kudwa messages to pilots (Deposition Exh. 10) (AA 0056-0057) | FRE 401-403, 802 | Relevant to liability, punitive damages, and injunctive relief; FRE 802(d)(2); 803(6). |
| P-12 | "Dear Crewmember" letter dated June 26, 2002 (Deposition Exh. 19) (AA 0096) | FRE 401-403, 802 | Relevant to liability, punitive damages, and injunctive relief; FRE 802(d)(2); 803(6). |
| P-13 | Kudwa Hotline Message, August 12, 2002 (Deposition Exh. 17) (AA 0097-98) | FRE 401-403, 802 | Relevant to liability, punitive damages, and injunctive relief; FRE 802(d)(2); 803(6). |

| P-14 | DOT policy statements and guidance regarding unlawful discrimination (CRQ 0058-61) | FRE 401-403, 802 | Relevant to punitive damages and injunctive relief; FRE 803(6); 803(8). |
|------|-----------------------------------------------|-------------------|--------------------------|
| P-15 | Documents re: DOT Enforcement Proceeding, OST No. 2003-15046 (CRQ 0062-133) | See motion in limine | See opposition to motion in limine |
| P-16 | Blumenthal Curriculum Vitae (Blumenthal Deposition Exh. 1) (CRQ 0448-451) | FRE 802 | FRE 803(6) |
| P-17 | Psychiatry Referral (Blumenthal Deposition Exh. 2) (CRQ 0165) | FRE 802 | FRE 803(3); 803(4); 803(6). |
| P-18 | Faulk Curriculum Vitae (Faulk Deposition Exh. 1) (CRQ 0446-447) | FRE 802 | FRE 803(6) |
| P-19 | Medical Records (Faulk Deposition Exh. 2) (CRQ 0166-174, 453-456) | Objections to portions - FRE 401-403, 602, 802 | FRE 803(3); 803(4); 803(6). |
| P-20 | Insurance Notices (CRQ 0212-216, 218, 220-223) | FRE 401-403, 802 | Relevant to damages; FRE 803(6). |

**B.    Plaintiff's Objections to Defendant's Proposed Exhibits**

None.

**C.    Defendant's Objections to Plaintiff's Witnesses**

AA's objections to plaintiff's proposed witnesses are set forth in its motions in limine regarding the testimony of Douglas Laird, Barry Blumenthal and Richard Faulk.

**D.    Plaintiff's Objections to Defendant's Witnesses**

Plaintiff's objections to defendant's proposed witnesses are set forth in plaintiff's motion in limine to exclude the testimony of John Beardslee.

E.    Deposition Designations, Counter-Designations, and Objections

**Barry Blumenthal, D.O.**

**July 26, 2006**

| Pl.'s Page and Line Designations | AA's Objections | AA's Counter-Designations | Pl.'s Objections | Pl.'s Counter-Designations | AA's Response |
|---|---|---|---|---|---|
| 4:5 – 7:11 | 7:9 – 7:13: FRE 602, 702, 703 (Speculation; beyond scope of expertise) | | | | |
| 7:13 – 10:22 | | | | | |
| 10:25 – 12:17 | 12:15 – 12:22: Object to the admissibility of curriculum vitae (Exhibit 1) FRE 802 (Hearsay) | | | | |
| 12:24 – 13:17 | 13:14 – 13:17: FRE 602, 702, 703 (Speculation; beyond scope of expertise) | | | | |
| 13:20 – 13:21 | 13:20 – 13:21: FRE 602, 702, 703 (Speculation; beyond scope of expertise) | | | | |
| 13:23 – 13:24 | 13:23 – 13:24: FRE 602, 702, 703 (Speculation; beyond scope of expertise) | | | | |
| 14:3 – 14:4 | 14:3 – 14:4: | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Move to strike; FRE 602, 703, 802 (Speculation and hearsay) | | | | |
| 14:6 – 14:12 | 14:6 – 14:12: Move to strike; FRE 602, 703, 802 (Speculation and hearsay) | | | | |
| 14:15 – 14:19 | 14:15 – 14:19: Move to strike; FRE 602, 703, 802 (Speculation and hearsay) | | | | |
| 14:22 – 14:24 | 14:22 – 14:24: FRE 602, 703 (Speculation; beyond scope of expertise) | | | | |
| 14:25 – 15:12 | 14:25 – 15:12: FRE 602, 703 (Speculation; beyond scope of expertise) | | | | |
| 15:16 – 15:18 | 15:16 – 15:18: FRE 401-403 (Relevance) | | | | |
| 15:20 – 15:22 | 15:20 – 15:22: FRE 401-403 (Relevance) | | | | |
| 15:24 – 15:25 | 15:24 – 15:25: FRE 401-403 (Relevance) | | | | |
| 16:3 – 16:4 | | | | | |
| 16:6 – 16:10 | 16:6 – 16:10: Move to strike "I can deal with psychiatric disorders" FRE | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 401-403, 602, 702, 703 ( Beyond scope of expertise; relevance) | | | | |
| 16:13 – 17:4 | | | | | |
| 17:8 – 17:17 | 17:8 – 17:17: Object to the admissibility of the psychiatric referral FRE 602, 702, 703, 802 (Beyond scope of expertise; hearsay) | | | | |
| | | 22:10 – 24:17 | | 24:18 – 25:5 | FRE 611 (Nonresponsive) |
| | | 25:6 – 29:9 | 26:6 – 26:9: F.R.E. 401, 403<br><br>26:16 – 26:18: F.R.E. 401, 403<br><br>27:18 – 27:20: F.R.E. 401, 403<br><br>28:2 – 28:3: F.R.E. 401, 403<br><br>28:22 – 28:23: F.R.E. 401, 403 | 29:10 – 29:20 | FRE 602, 702, 703 (Beyond scope expertise, beyond scope of treatment reflected in notes) |
| | | 29:21 – 30:4 | | | |
| | | 31:2 – 31:22 | | 32:6 – 33:18 | FRE 602, 702, 703 (Beyond scope expertise, beyond |

| | | | | | scope of treatment reflected in notes) |
|---|---|---|---|---|---|
| | | 33:19 – 35:22 | | 35:23 – 36:10 | FRE 602, 702, 703 |
| | | 36:14 – 36:16 | | | |
| | | 36:22 – 37:2 | | 37:9 – 37:15 37:19 – 37:25 | FRE 602, 702, 703 |

**Richard Faulk**

**July 26, 2006**

| Pl.'s Page and Line Designations | AA's Objections | AA's Counter-Designations | Pl.'s Objections | Pl.'s Counter-Designations | AA's Response |
|---|---|---|---|---|---|
| 4:5 – 9:5 | 8:23 – 9:5: Object to introduction into evidence of Exhibit 1, Dr. Faulk's curriculum vitae, FRE 802 (Hearsay) | | | | |
| 9:10 – 10:21 | 10:8 – 10:21: Move to strike; FRE 611 (Non-responsive) | | | | |
| 10:24 – 10:25 | 10:24 – 11:5: FRE 611 (Form) | | | | |
| 11:2 – 11:7 | | | | | |
| 11:10 – 12:4 | 11:25 – 12:4: Object to introduction into evidence | | | | |

46

| | | | | |
|---|---|---|---|---|
| | of Exhibit 2, medical records, FRE 401-403, 802 (Contai inadmissible hearsay, and as being irrelevant, immaterial and unduly prejudicial) | | | |
| 12:11 – 21:7 | 14:5 – 19:3: FRE 611 (Narrative)<br><br>20:6 – 21:8: Move to strike all testimony after diagnosis of anxiety disorder, NOS, which ends at 20:7, FRE 611(Non-responsive). | | | |
| 21:10 – 21:12 | 21:10 – 21:14: FRE 401-403 (Relevance) | | | |
| 21:14 – 22:4 | 22:1 – 22:18: FRE 611 (Form) | | | |
| 22:6 – 22:18 | | | | |
| 23:14 – 23:20 | 23:18 – 24:2: Move to strike; FRE 602 (Speculative) | | | |
| 23:22 – 24:2 | | | | |
| 24:5 – 24:23 | | | | |
| 24:25 – 27:14 | | | | |
| 27:16 – 28:10 | | 28:11 – 29:9 | | |

| | | | | |
|---|---|---|---|---|
| 29:10 – 29:23 | | | | |
| 30:25 – 35:24 | | | | |
| 36:2 – 39:15 | 39:13 – 39:19: Move to strike; FRE 602, 702, 703 (Beyond scope of treatment reflected in notes; speculative) | | | |
| 39:17 – 39:19 | 39:13 – 39:19: Move to strike; FRE 602, 702, 703 (Beyond scope of treatment reflected in notes; speculative) | | | |
| 39:22 – 40:8 | 40:7 – 40:14: Move to strike; FRE 602, 702, 703 (Beyond scope of treatment reflected in notes speculative) | | | |
| 40:10 – 40:14 | 40:7 – 40:14: Move to strike; FRE 602, 702, 703 (Beyond scope of treatment reflected in notes; speculative) | | | |
| 40:17 – 40:18 | 40:17 – 40:20: Move to strike; FRE 602, 611, | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 702, 703 (Beyond scope of treatment reflected in notes; speculative and non-responsive) | | | | |
| 40:20 – 41:18 | | | | | |
| 41:21 – 41:22 | 41:21 – 42:11: Move to strike; FRE 602, 702, 703 (Speculative and non-responsive) | | | | |
| 41:24 – 42:11 | 41:21 – 42:11: Move to strike; FRE 602, 702, 703 (Sspeculative and non-responsive) | | | | |
| 42:14 – 42:24 | 42:14 – 42:24: Move to strike; FRE 602, 703 (Speculative) | | | | |
| | | 43:19 – 48:1 | 47:23 – 48:1: F.R.E. 401, 403 | | |
| | | 48:6 – 48:8 | 48:6 – 48:17: F.R.E. 401, 403 | | |
| | | 48:15 – 49:24 | 49:21 – 50:2: F.R.E. 401, 403 Assumes facts not in evidence | | |
| | | 50:1 – 51:24 | 49:21 – 50:2: F.R.E. 401, 403 Assumes facts not in evidence | | |
| | | 52:24 – 54:13 | | 54:14 – 56:1 | Object to testimony up to |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 55:15 Move to strike FRE 602, 611, 702, 703 (Non-responsive, beyond scope of treatment reflected in notes) |
| | | 56:2 – 57:14 | | | |
| | | 57:18 – 59:4 | | | |
| | | 59:4 – 60:18 | | 60:19 – 61:4 | Counter-designate 61:5 - 62:17 |
| | | 61:5 – 62:17 | | 63:21 – 64:25 | FRE 602, 611, 702, 703 (Form, foundation, beyond scope of treatment reflected in notes) |

Respectfully submitted,

**JOHN D. CERQUEIRA**                          **AMERICAN AIRLINES, INC.**
By his attorneys,                               By its Attorneys,


\_\_\_/s/ Michael T. Kirkpatrick_____          \_\_\_/s/ Amy Cashore Mariani_____
Michael T. Kirkpatrick                          Michael A. Fitzhugh, (BBO 169700)
Public Citizen Litigation Group                 Amy Cashore Mariani, (BBO #630160)
1600 20th Street NW                             FITZHUGH, PARKER & ALVARO LLP
Washington, DC  20009                           155 Federal Street, Suite 1700
(202) 588-1000                                  Boston, MA 02110-1727
mkirkpatrick@citizen.org                        (617) 695-2330

David S. Godkin (BBO #196530)
Darleen F. Cantelo (BBO #661733)
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100


Dated: November 27, 2006