UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
)
JOHN D. CERQUEIRA,                           )
                                             )
          Plaintiff,                         )
                                             )
     v.                                      )
                                             )       CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                     )
                                             )
          Defendant.                         )
———————————————————)

**OPPOSITION TO PLAINTIFF'S SECOND MOTION *IN LIMINE*
REGARDING JUDICIAL ADMISSION RELATED TO DECISION TO
HAVE PLAINTIFF REMOVED FROM FLIGHT 2237**

Defendant, American Airlines, Inc. ("American"), hereby opposes Plaintiff's Second

Motion *In Limine* to Preclude Defendant from Contradicting Its Judicial Admission That Capt.

John Ehlers Made the Decision to Have Plaintiff Removed From Flight 2237 (hereinafter

"Plaintiff's Motion") on the grounds that Plaintiff has misrepresented the meaning of "removal"

in the context of this case, that Plaintiff's interpretation of the admission in question is not

supported by sworn testimony in the instant action, that the Plaintiff has misconstrued witness

testimony to support his Motion, and that Plaintiff may not seek to admit a pleading as evidence

at trial to contradict sworn testimony and documents proffered by the Defendant.  For reasons

more fully set forth below, American asks that Plaintiff's Motion be denied.

**I.    PLAINTIFF HAS MISREPRESENTED THE POSITION OF AMERICAN
       AIRLINES REGARDING MR. CERQUEIRA'S "REMOVAL" FROM
       FLIGHT 2237.**

Although Plaintiff seeks to bind American to its assertion that Captain John Ehlers made

the decision to remove Mr. Cerqueira from Flight 2237, Plaintiff seems to misinterpret the

meaning of the phrase "removed" as it pertains to the facts of the instant litigation, an issue that

was pointed out by American's counsel during Captain Ehlers' deposition. *See* Deposition of John Ehlers, attached as Exhibit F to American's Statement of Facts in Support of its Motion for Summary Judgment (Document 17), hereinafter "Ehlers Dep.," at 29:4-9. At trial, American will present evidence to show that the flight attendants and captain of Flight 2237 each had separate concerns about the behavior of the plaintiff and/or the two passengers seated with him in the exit row. Based upon these concerns, Captain Ehlers made the decision to contact security personnel, including Systems Operations, and the Massachusetts State Police. *See* Ehlers Dep. at 14:6-15, 25:8-12, 29:11-21, 30:11-31:12, 32:6-24, 33:18-24, 34;18-20; Deposition of Nicole Traer, hereinafter "Traer Dep.," attached hereto as Exhibit A, at 10:12-11:1. Thereafter, the questioning and subsequent refusal of service with American to the Plaintiff on the day in question was in the hands of the State Police, the Systems Operations Control Manager on Duty ("SOC MOD"), and the Corporate Complaint Resolution Officer ("CCRO"). Ehlers Dep. at 39:4-21, 44:19-45:5, 48:19-49:5; Traer Dep. 14:1-5. Although the CCRO and SOC MOD for the day in question do not recall the specific details of Mr. Cerqueira's removal from Flight 2237, each testified that American's policies provide that the decision to deny further travel to a passenger is in the hands of personnel other than the captain of the flight. *See* Deposition of Craig Marquis, attached as Exhibit 11 to Plaintiff's Statement of Undisputed Facts in Support of His Motion for Partial Summary Judgment (Document 22), at 27:15-28:5, 31:14-33:20; Deposition of Rhonda Cobbs, attached hereto as Exhibit B, at 52:21-53:4, 62:13-21. Those aspects of the case that cannot now be recalled by the CCRO and SOC MOD are easily compensated for by incident reports and other documents which show that Plaintiff was removed for questioning pursuant to Captain Ehlers' concerns and the concerns of the flight crew, but that Plaintiff was denied further travel by the SOC MOD for security issues. *See* Passenger Name

Record for John Cerqueira, attached as Exhibit 2 to American's Statement of Material Facts in Support of Its Opposition to Plaintiff's Motion for Partial Summary Judgment (Document 33), at pg. 2; Detail Note, AA0021 drafted by Rhonda Cobbs, attached hereto as Exhibit C.

The above-mentioned facts have been consistently supported by American in its submissions.   A detailed account of the chain of events surrounding Plaintiff's removal for questioning and subsequent denial of service on December 28, 2003 is set forth both in American's Answers to Plaintiff's First Set of Interrogatories ("AA Ints") and in American's Memorandum in Support of its Motion for Summary Judgment ("AA MSJ").   *See* AA Ints, attached hereto as Exhibit D, at ¶¶ 1, 2, 4-6; AA MSJ (Document 16) at pgs. 4-5.  Plaintiff's Motion is improper because the admission made by American in its Answer to the Amended Complaint does not conflict with the evidence of the case, nor does it preclude American from introducing evidence which explains in total the implications surrounding the decision to remove and subsequently deny service on December 28, 2003 to Mr. Cerqueira.

## II.   THE PLAINTIFF HAS IMPROPERLY INTERPRETED DEPOSITION TESTIMONY USED IN SUPPORT OF HIS MOTION.

In Plaintiff's Motion, Mr. Cerqueira cites to the deposition testimony of flight attendants Amy Milenkovic, and Lois Sargent in an effort to prove that Captain Ehlers was the sole decisionmaker with regard to Plaintiff's removal from Flight 2237 for questioning by the State Police.  However, Plaintiff has misconstrued the true context of said testimony.  For instance, Plaintiff claims Lois Sargent admitted at her deposition that Captain Ehlers made the decision at issue (to remove Plaintiff from Flight 2237).  However, a more accurate reading of her testimony revels that her exact words were as follows:

"Q.  Did you have any discussions with the captain about his decision to call security?

A.  I don't believe I had specifically had any conversation with him.  It was his decision."

Deposition of Lois Sargent, hereinafter "Sargent Dep.," attached as Exhibit G to American's Statement of Facts in Support of its Motion for Summary Judgment (Document 17), at 29:18-11.

Clearly, Ms. Sargent was responding to counsel's inquiry into Captain Ehlers' decision to contact airline security regarding the suspicious actions of the Plaintiff and the two men seated next to him in the exit row.  As previously stated, American has never denied that Captain Elhers was responsible for contacting security personnel related to the perceived suspicious actions of the Plaintiff.  This particular point of contact is what is being referred to in the above testimony of Lois Sargent.  Furthermore, Ms. Sargent states in her deposition that the concerns of the flight attendants aboard Flight 2237 over the behavior of the Plaintiff and the two men seated next to him in the exit row were what caused Captain Ehlers to "have *security check into* [their removal]." (emphasis provided) Sargent Dep. at 33:4-9.

Further examination of the deposition of Amy Milenkovic (hereinafter "Milenkovic Dep.") demonstrates that she also believed the "decision" made by Captain Ehlers was to contact and express safety concerns to the proper airline security personnel.  Milenkovic Dep. attached as Exhibit 1 to American's Statement of Material Facts in Support of Its Opposition to Plaintiff's Motion for Partial Summary Judgment (Document 33), at 15:17-21, 17:2-6.  She further explains that the "removal" of Mr. Cerqueira and the two men seated with him in the exit row was executed by security personnel and/or American Passenger Service for the purpose of questioning the three gentlemen and investigating their travel documents; Captain Ehlers was not

involved in the decision to deny Mr. Cerqueira further travel on American Airlines on the day in question.  Milenkovic Dep. at 22:5-23:12.

### III.    PLEADINGS ARE NOT ADMISSIBLE AS TRIAL EVIDENCE.

Even if the Court deems American's judicial admission is binding without the further explanation of the above-cited facts, relevant case law clearly shows that a party may not seek to enter pleadings into evidence at trial.  That pleadings shall not be evidence on the trial (M.G.L. c. 231 §87) has been embraced by the case law of this Court.  *See Avemco Insurance Company v. Aerotech, Ltd. et al,* 677 F. Supp. 35, 39 (D.Mass. 1987), *Gaines v. General Motors Corporation*, 789 F. Supp. 38, 40 FN1 (D.Mass. 1991).  Whereas American has established through deposition testimony and other case submissions that Captain Ehlers was not solely responsible for making the decision to remove and subsequently deny service to Mr. Cerqueira, Plaintiff cannot now seek to admit the Defendant's Answer to the Complaint as evidence to the contrary.


WHEREFORE, American Airlines, Inc. respectfully requests that this Court deny the Plaintiff's Motion *In Limine* with prejudice, allow American to admit all evidence relating to the decision to remove Plaintiff from Flight 2237 and subsequently refuse him further service on the day in question, and grant any other relief as the Court deems proper.

5

Respectfully submitted,
**AMERICAN AIRLINES, INC.**
By its Attorneys,


    _/s/ Amy Cashore Mariani_

Michael A. Fitzhugh, (BBO 169700)
Amy Cashore Mariani, (BBO #630160)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 30, 2006.


    _/s/ Amy Cashore Mariani_
    Amy Cashore Mariani

# In The Matter Of:

*John D. Cerqueira v.*
*American Airlines, Inc.*

---

*Nicole Traer*
*April 25, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: 617-426-2432*

Original File traer.v1, Pages 1-48

**Word Index included with this Min-U-Script®**



**Page 1**

Volume I
Pages 1 to 48
Exhibits 12 to 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

JOHN D. CERQUEIRA,          :
            Plaintiff,      :
                            :
    vs.                     : Civil Action
                            : No. 05-11652-WGY
AMERICAN AIRLINES, INC.,    :
            Defendant.      :

- - - - - - - - - - - - - - -x

DEPOSITION OF NICOLE TRAER, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
12, 2006, commencing at 1:37 p.m.

PRESENT:
    Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
        280 Summer Street, Boston, MA 02210,
        for the Plaintiff.
    Fitzhugh, Parker & Alvaro LLP
        (By Michael A. Fitzhugh, Esq.)
        155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.
                * * * * *

**Page 2**

I N D E X

WITNESS                      DIRECT    CROSS

NICOLE TRAER
    BY MS. ABATE RECHT                3

                * * * *

E X H I B I T S

NO.        DESCRIPTION                    PAGE

12    Document entitled "Detail Note"       14
        Bates stamped AA 0023 to AA 0027
13    Document entitled "Detail Note"       18
        Bates stamped AA 0028
14    Document entitled "Detail note"       18
        Bates stamped AA 0021

                * * * *

**Page 3**

P R O C E E D I N G S
NICOLE TRAER

a witness called for examination by counsel for the
Plaintiff, having been satisfactorily identified by
the production of her driver's license and being
first duly sworn by the Notary Public, was examined
and testified as follows:

DIRECT EXAMINATION
BY MS. ABATE RECHT:

Q.  Good afternoon, Ms. Traer.

A.  Hi.

Q.  Can you please state your full name for the
record.

A.  Nicole Traer.

Q.  What is your address?

A.  101 Old Stone Way, Unit 103, Weymouth, MA
02189.

Q.  Did you do anything to prepare for today's
deposition?

A.  I spoke with the lawyers for American in
Attorney Fitzhugh's office.

Q.  Did you speak with anyone else?

A.  No.

Q.  Did you review any documents?

**Page 4**

A.  I looked over just the passenger name
record that was sent to me, and that was it.

Q.  Are you currently employed by American
Airlines?

A.  Yes.

Q.  What is your position?

A.  Manager of operations.

Q.  How long have you been a manager of
operations?

A.  A year and a few months.

Q.  Did you have a position at American before
that?

A.  Yes.

Q.  What was your position?

A.  Customer service manager.

Q.  Did you have any positions before being a
customer service manager?

A.  Yes.

Q.  And what was that?

A.  International departure coordinator and
customer service agent.

Q.  When did you serve as a customer service
manager?

A.  I believe from 1999 until 2005.

Page 5

[1]   **Q.**  How long have you been employed by
[2]  American?
[3]   **A.**  Nine and a half years.
[4]   **Q.**  Were you employed prior to being employed
[5]  by American Airlines?
[6]   **A.**  Yes.
[7]   **Q.**  Where?
[8]   **A.**  The Jupiter Island Club in Florida.
[9]   **Q.**  And before Jupiter Island Club in Florida,
[10]  did you have employment before that?
[11]   **A.**  Yes.
[12]   **Q.**  Where?
[13]   **A.**  Legal Sea Food.
[14]   **Q.**  Was American Airlines your first airline
[15]  job?
[16]   **A.**  Yes.
[17]   **Q.**  What is your educational background?
[18]   **A.**  High school graduate and some college.
[19]   **Q.**  How much college?
[20]   **A.**  A couple of courses over the years.
[21]   **Q.**  What do your responsibilities include as
[22]  manager of operations?
[23]   **A.**  I run the operations department.  I oversee
[24]  the employees.  I oversee the ramp operations and

Page 6

[1]  any other functions that arise.
[2]   **Q.**  What does the operations department do?
[3]   **A.**  We handle the arrivals and departures,
[4]  push-backs off of the gate, on-time performance.
[5]   **Q.**  What did your responsibilities include as a
[6]  customer service manager?
[7]   **A.**  Handling passengers primarily at the ticket
[8]  counter and the gates.
[9]   **Q.**  Were you involved in any way in the
[10]  incident that led Mr. Cerqueira to be removed from
[11]  Flight 2237 on December 28, 2003?
[12]   **MR. FITZHUGH:**  Objection.  Form.
[13]   **A.**  Can you ask that again, please?
[14]   **Q.**  Sure.  Were you involved in any way in the
[15]  incident that led to Mr. Cerqueira being removed
[16]  from Flight 2237?
[17]   **MR. FITZHUGH:**  Same objection.
[18]   **A.**  Can you be more specific in the
[19]  involvement?
[20]   **Q.**  Sure.  Well, why don't you tell me.  When
[21]  did you first become involved in the incident?  Let
[22]  me rephrase that.
[23]   When did you first become aware that Mr.
[24]  Cerqueira and two other passengers had been removed

Page 7

[1]  from Flight 2237 on December 28, 2003?
[2]   **A.**  Are you looking for a time or in the
[3]  sequence of events?  I'm not exactly sure of the
[4]  time frame.
[5]   **Q.**  Do you recall the sequence of events, then?
[6]   **A.**  I know my involvement began when I was
[7]  notified over the radio of a return to gate.
[8]   **Q.**  Who notified you of that?
[9]   **A.**  Operations.
[10]   **Q.**  Do you recall what you were told?
[11]   **A.**  I don't recall the specifics.  Just there
[12]  was a return to gate.
[13]   **Q.**  Were you told the reason why?
[14]   **A.**  No.
[15]   **Q.**  What happened next?
[16]   **A.**  In regards to the flight or my --
[17]   **Q.**  Do you know what happened next with regard
[18]  to the flight?
[19]   **A.**  I don't know what happened to the flight.
[20]  I know I went to the gate to assist the passengers
[21]  who were deplaning.
[22]   **Q.**  So when you say, "the passengers who were
[23]  deplaning," do you mean Mr. Cerqueira and the other
[24]  two passengers or do you mean --

Page 8

[1]   **A.**  I'm not sure where they were.  They were
[2]  off the aircraft already, I believe with the State
[3]  Police, but I'm not sure.
[4]   **Q.**  So you were asked to go to the gate to help
[5]  with the deplaning of the entirety of the
[6]  passengers?
[7]   **A.**  Uh-hum, yes.
[8]   **Q.**  And at that point it's your understanding
[9]  that Mr. Cerqueira and the two other gentlemen had
[10]  already been removed from the plane and were being
[11]  questioned by the State Police?
[12]   **A.**  I believe so, yes.
[13]   **Q.**  After you went to the gate to help with the
[14]  deplaning of the passengers, what happened next?
[15]   **A.**  In regards to the other passengers?
[16]   **Q.**  Yes.
[17]   **A.**  There was some rescreening involving the
[18]  flight with the Transportation Security
[19]  Administration, and the State Police -- several
[20]  units, bomb detection units and canine units came
[21]  down.
[22]   **Q.**  What do you mean by "restraining involving
[23]  the flight"?
[24]   **A.**  We had to rescreen all passengers who were

**Page 9**

[1] on board the aircraft.

[2] **Q.** "Rescreen" or "restrain"?

[3] **A.** Rescreen.

[4] **Q.** Okay, rescreen. I'm sorry, if you could

[5] just speak up. We're trying to get everything.

[6] **MR. FITZHUGH:** Keep your voice up a little

[7] bit.

[8] **A.** Okay.

[9] **Q.** Do you know why the passengers were being

[10] rescreened?

[11] **A.** It was at the instruction of the TSA.

[12] **Q.** Do you know who at the TSA made that

[13] decision?

[14] **A.** No.

[15] **Q.** Did you have any discussions with anyone

[16] from the TSA?

[17] **A.** I had discussions in regards to how and

[18] where this would be performed, but not why.

[19] **Q.** Did you have discussions with any other law

[20] enforcement officers?

[21] **A.** Regarding the situation with the other

[22] passengers or --

[23] **Q.** Or Mr. Cerqueira, either one.

[24] **A.** My involvement with the State Police was

**Page 10**

[1] the canine unit going on the aircraft.

[2] **Q.** What was your understanding of why the

[3] canine unit was going on the aircraft?

[4] **A.** I don't know. It was a procedure that they

[5] were performing. They didn't give me a reason.

[6] **Q.** Did you ask?

[7] **A.** No. They have access to the aircraft.

[8] **Q.** Did you have any discussions with any of

[9] the flight crew?

[10] **A.** No. The flight attendants were not

[11] available when I got there.

[12] **Q.** Did you have any discussions with the

[13] captain or the first officer?

[14] **A.** I spoke with the captain when I gave him

[15] the phone to speak with systems operations control.

[16] **Q.** What was your conversation with the

[17] captain?

[18] **A.** I can't remember specifics, but I remember

[19] I gave him the phone to talk to the manager at

[20] systems operations.

[21] **Q.** What was your understanding of why the

[22] captain needed to speak with systems operation

[23] control?

[24] **A.** It was at the request of the systems

**Page 11**

[1] operations control manager.

[2] **Q.** And do you know why?

[3] **A.** No.

[4] **Q.** Did you have any understanding of what had

[5] happened with respect to Mr. Cerqueira and the two

[6] other gentlemen who were seated next to him?

[7] **A.** No.

[8] **Q.** So is it fair to say that your involvement

[9] occurred only after the plane had returned to the

[10] gate and all the passengers were being removed for

[11] rescreening?

[12] **A.** Yes.

[13] **Q.** Is there anything else you can recall about

[14] that process that we haven't discussed?

[15] **A.** No.

[16] **Q.** Did you communicate with Mr. Cerqueira on

[17] December 28, 2003?

[18] **A.** At the departure gate or at any time?

[19] **Q.** At any time.

[20] **A.** I believe I did. I can't remember the

[21] exact conversation, but I believe he asked why he

[22] was being denied boarding.

[23] **Q.** Okay. Do you recall what you told him?

[24] **A.** Not in exact words, but I believe it was

**Page 12**

[1] something along the lines that I was not sure why.

[2] He would have to contact customer relations at

[3] American.

[4] **Q.** If you could take a look at a document that

[5] has previously been marked as Exhibit 2. And if you

[6] look at the first page, this document is entitled

[7] "American Airlines, Inc.'s Answers to Plaintiff's

[8] First Set of Interrogatories." Did you review this

[9] document in preparation for your deposition?

[10] **A.** I don't think it was this document, but I'm

[11] not 100 percent sure.

[12] **Q.** If you could turn to Page 5. First, let me

[13] just ask, do you know what interrogatories are?

[14] **A.** Yes.

[15] **Q.** So I'll read Interrogatory No. 10, which

[16] was the plaintiff's question to American Airlines,

[17] and then the response below is American Airlines'

[18] response to this question. Do you understand that?

[19] **A.** Yes.

[20] **Q.** Okay. Interrogatory No. 10 asks, "If you

[21] contend that any person(s) communicated to Mr.

[22] Cerqueira the reason(s) why he was removed from

[23] Flight 2237, or the reason(s) why he was refused

[24] service after his release from questioning, identify

Nicole Traer
April 25, 2006

John D. Cerqueira v.
American Airlines, Inc.

---

**Page 13**

[1] the person(s) and state the substance of each
[2] communication."
[3]         And then the second sentence of the
[4] response states, "American is informed and believes
[5] that Ms. Nicole Traer later explained to Mr.
[6] Cerqueira that he was being refused service because
[7] his behavior and that of persons with whom he
[8] appeared to be traveling caused concerns among the
[9] passengers and crew of Flight 2237." Do you see
[10] that?
[11]    **A.** Yes.
[12]    **Q.** Does that refresh your recollection at all
[13] as to whether you had any further discussions with
[14] Mr. Cerqueira regarding why he was being refused
[15] service?
[16]    **A.** No.
[17]    **Q.** Did anyone speak with you about American's
[18] response to this interrogatory?
[19]    **A.** I spoke with the American lawyers and the
[20] attorneys in Mr. Fitzhugh' office, but --
[21]    **Q.** Do you recall when you spoke with them
[22] regarding this answer to interrogatory?
[23]    **A.** I didn't speak to them about an answer to
[24] any question. Just about the case itself.

---

**Page 14**

[1]    **Q.** Do you know who made the decision to not
[2] allow Mr. Cerqueira to board another American
[3] Airlines flight that day?
[4]    **A.** Not specifically, but the outcome and the
[5] answer came from our systems operations control.
[6]    **Q.** Do you know what that decision was based
[7] on?
[8]    **A.** I do not.
[9]    **Q.** Do you know when the decision was made?
[10]    **A.** I do not.
[11]    **MS. ABATE RECHT:** I'm going to ask the
[12] court reporter to mark as Exhibit 12 a document
[13] Bates numbered AA 0023 through 0027.
[14]         (Document marked as Traer
[15]         Exhibit 12 for identification)
[16]    **MR. FITZHUGH:** This is also Cerqueira 19.
[17]    **MS. ABATE RECHT:** Okay.
[18]    **Q.** Do you recognize this document?
[19]    **A.** Yes.
[20]    **Q.** Is this one of the documents you reviewed
[21] in preparation for your deposition?
[22]    **A.** Yes.
[23]    **Q.** Does this document help to refresh your
[24] recollection as to when the decision was made to

---

**Page 15**

[1] refuse service -- further service to Mr. Cerqueira?
[2]    **A.** I don't know when the decision was made.
[3] Just when I was notified.
[4]    **Q.** Do you recall when you were notified?
[5]    **A.** When I documented the record.
[6]    **Q.** What are you pointing to?
[7]    **A.** Second page.
[8]         **MR. FITZHUGH:** Recite the number.
[9]    **Q.** AA 0024?
[10]    **A.** Yes. It doesn't give a line down, but it's
[11] towards the bottom, where there's asterisks going
[12] across, "PASSENGER DENIED TRAVEL ON FLIGHT 2237 PER
[13] SOC CRAIG DUE TO SECURITY ISSUE. CCRO WILL ADD
[14] EVENT NUMBER SHORTLY. PLEASE REFUND TICKETS DUE TO
[15] DENY. BOSCSM N Traer."
[16]    **Q.** Does that mean that you put that --
[17]    **A.** Yes.
[18]    **Q.** Does that mean that you made that entry?
[19]    **A.** Yes.
[20]    **Q.** And right above it, it says "821." Do you
[21] see that?
[22]    **A.** Yes.
[23]    **Q.** "28December" -- "DEC03." Does that mean
[24] that you made that entry at 8:21?

---

**Page 16**

[1]    **A.** I believe -- and I'm not 100 percent
[2] sure -- it's the entry below it, where it shows
[3] "801."
[4]    **Q.** Okay. So is it your understanding, then,
[5] that you made the entry at 8:01?
[6]    **A.** Yes.
[7]    **Q.** Would that be eastern time?
[8]    **A.** I am not sure. It's either central or
[9] eastern.
[10]    **Q.** Is there something that would help you
[11] determine whether it's central or eastern time?
[12]    **A.** I would have to check it on SABRE with
[13] American Airlines, a computer that we use, to see
[14] what the time is that's on the PNR, passenger name
[15] record.
[16]    **Q.** So you're not able to tell from a printout,
[17] but you'd be able to tell from a computer screen?
[18] By actually accessing it on an American Airlines
[19] system?
[20]    **A.** Yes. I could enter something into a PNR
[21] and check the time to see if it was matching up to
[22] eastern or central.
[23]    **Q.** So just so I understand, it's your
[24] testimony that you believe the decision -- that you

---

Page 17

[1] were told to deny service to Mr. Cerqueira at some
[2] time before 8:01 a.m., whether that be eastern time
[3] or central time?
[4]     A.  Could you repeat that first part?
[5]     Q.  Sure.  I just want to understand, is it
[6] your testimony that you were informed sometime
[7] before 8:01 on December 28, 2003 that you were to
[8] deny service to Mr. Cerqueira and the other two
[9] passengers?  Strike that.
[10]         Is it your testimony that at some time
[11] before 8:01 you were told to deny service to Mr.
[12] Cerqueira based on this time entry?
[13]     A.  Yes.
[14]     Q.  Do you know whether this decision was based
[15] on anything communicated to American Airlines from
[16] law enforcement?
[17]     A.  I do not know.
[18]     Q.  Do you know whether American Airlines
[19] considered the fact that Mr. Cerqueira had been
[20] cleared by law enforcement in making their decision
[21] to deny him further service?
[22]     MR. FITZHUGH:  Objection.  No foundation.
[23]     A.  I don't know.
[24]     MS. ABATE RECHT:  I'm going to ask the

Page 18

[1] court reporter to mark as Exhibit 13 a document
[2] Bates numbered AA 0028.
[3]         (Document marked as Traer
[4]         Exhibit 13 for identification)
[5]     MS. ABATE RECHT:  I'm going to ask you to
[6] mark also as No. 14 the document that's Bates
[7] stamped AA 0021.  You can look at these two
[8] documents together.
[9]         (Document marked as Traer
[10]        Exhibit 14 for identification)
[11]    Q.  If would you first look at what was marked
[12] as Exhibit 13, AA 0028.  Do you know who wrote this?
[13]    A.  No.
[14]    Q.  Do you see on the top it says, "Created
[15] 12/28/2003 Rhonda Cobbs"?
[16]    A.  Yes.
[17]    Q.  Would that mean that Ms. Cobbs was the one
[18] who wrote this?
[19]    A.  I don't know.  This is not a document that
[20] we usually use.  It's used in our CCRO office.
[21]    Q.  Can you look at Exhibit 14, AA 0021.  Do
[22] you recognize this document?
[23]    A.  This is not a document that we use either.
[24]    Q.  Okay.  Is this also a CCRO document?

Page 19

[1]     A.  Yes.
[2]     Q.  So is it safe to assume that you don't have
[3] information concerning how this information was
[4] compiled?
[5]     A.  I do not know that.
[6]     Q.  If you look on Exhibit 14, sort of halfway
[7] down the paragraph it says, "PER SOC MOD, PASSENGER
[8] DENIED BOARDING AND TICKETS REFUNDED."  Do you know
[9] what "SOC MOD" is?
[10]    A.  Systems operations control manager on duty.
[11]    Q.  And do you know how we would find out who
[12] the manager on duty is or was?
[13]    A.  American corporate offices.
[14]    Q.  If we could go back to what was marked as
[15] Exhibit 12, AA 0023.  I would just like to go
[16] through it in detail, if we could, so that we can
[17] understand what all of these different entries mean.
[18]        And if you could just go through
[19] line-by-line and interpret this.
[20]    A.  I'm not sure what a lot of this is.
[21]    Q.  Well, you'll see at the top it says,
[22] "Created: 12/282003 Rhonda Cobbs."  Does that mean
[23] that Rhonda Cobbs was the one who was inputting this
[24] information?

Page 20

[1]     A.  I don't know.  Where "1.1" is, that is the
[2] start of the passenger name record.
[3]     Q.  Okay.
[4]     A.  I don't know what the top section is.
[5]     Q.  Okay.  What does "ARNK" stand for on Line
[6] 3?
[7]     A.  I don't know what the actual letters mean,
[8] but it separates different flights in a reservation.
[9] It's used as a space.
[10]    Q.  Do you know what Line 4 means?
[11]    A.  Line 4 is a flight that normally is
[12] inputted by the CCRO.
[13]    Q.  Do you know why it was inputted?
[14]    A.  That saves a record for a set amount of
[15] time, so it doesn't get lost in the system.
[16]    Q.  So do all passengers who fly American have
[17] a passenger name record in which the flights that
[18] they have flown for a particular time are all
[19] recorded on a document like this?
[20]    A.  Each passenger that travels has a PNR.  The
[21] information in it is all different.
[22]    Q.  Does this indicate that -- so this would be
[23] Mr. Cerqueira's PNR; is that right?
[24]    A.  Yes.

Page 21

[1]    Q.   And Line 4, does that indicate that on
[2] March 1, he took American Airlines Flight 9124?
[3]    A.   No.  That is the flight that is inputted by
[4] the CCRO to save the PNR.  It's a fictitious flight
[5] to keep the PNR intact, so it doesn't get lost or
[6] deleted.
[7]    Q.   And the line under that says, "TKT/TIME
[8] LIMIT."  And Line 1 says, "TKT-12June-XTM7EAD."  Do
[9] you know what that means?
[10]    A.   It involves something with the ticket.  I'm
[11] not 100 percent sure what it means.  But it has
[12] something to do with when the ticket was issued or
[13] created.
[14]    Q.   Do you know for what flight it's referring
[15] to?
[16]    A.   I do not.
[17]    Q.   Do you know what Lines 2 through 4 are
[18] referring to?
[19]    A.   Line 2 and Line 3 are tickets.  Line 4 is a
[20] refund.
[21]    Q.   And that refund indicates -- that Line 4
[22] indicates that the refund was issued at 9:18 on
[23] December 28; is that right?
[24]    A.   Yes.

Page 22

[1]    Q.   What does the next line mean, "VCR COUPON
[2] DATA EXISTS"?
[3]    A.   There are electronic tickets in the
[4] reservation, and it's data that exists to those
[5] inside of the display VI.
[6]    Q.   What does the VI display?
[7]    A.   That displays an electronic ticket on the
[8] screen.
[9]    Q.   And the next line, "PHONES" and then 1
[10] through 3 under that.  Are those just contact phone
[11] numbers for the passenger?
[12]    A.   Yes.
[13]    Q.   A couple lines down it says "FREQUENT
[14] TRAVELER."  And then Lines 1 and 2.  What do Lines 1
[15] and 2 mean?
[16]    A.   The frequent flyer traveler number.
[17]    Q.   And then after that it says "REMARKS."  Do
[18] you know what Lines 1 through 30 are referring to?
[19]    A.   I believe it all has to do with the ticket
[20] and issuing of the ticket.
[21]    Q.   Which ticket?
[22]    A.   I don't know which one.  It doesn't
[23] specify.  There's two ticket numbers.
[24]    Q.   Where are the ticket numbers?

Page 23

[1]    Q.   Back with the ticket time limit, Line 2 and
[2] Line 3.
[3]    Q.   So those are two different tickets for two
[4] different flights?
[5]    A.   I'm not sure how many flights are on each
[6] ticket.
[7]    Q.   And then under Remarks 1 through 30, it's
[8] just referring to the issuance of those tickets?
[9]    A.   Yes.
[10]    Q.   What does Line 6 mean, "DEPARTURE EARLIER
[11] THAN 15 MINUTES"?
[12]    A.   I don't know.
[13]    Q.   Whose responsible for inputting all of this
[14] information?
[15]    A.   Tickets by mail input Lines 1 through 11.
[16] I'm not sure on the rest.
[17]    Q.   But Lines 1 through 11 he had purchased --
[18] does that mean Mr. Cerqueira had purchased the
[19] ticket by mail or received the ticket by mail?
[20]    A.   I'm not sure how the tickets by mail
[21] process works with American.  The "TBM" stands for
[22] tickets by mail.
[23]    Q.   Okay.
[24]    A.   And I'm not sure what any of --

Page 24

[1]    Q.   Do you know what in Lines 12 through 18 the
[2] "H-2?" means?
[3]    A.   No.
[4]    Q.   On Line 22, it says "H-TICKETED PQ DELETED
[5] AND PLACED INTO HISTORY."  Do you know what that
[6] means?
[7]    A.   No.
[8]    Q.   If you look at the bottom of the page --
[9] can I just see your copy?  Because I'm not sure
[10] whether mine has been cut off.  (Reviews document)
[11] No, it doesn't look like it has been.  The bottom of
[12] the page it starts numbering from No. 1 again.  Do
[13] you see that?
[14]    A.   Yes.
[15]    Q.   Do you see Line 4?
[16]    A.   Yes.
[17]    Q.   What does that line mean?
[18]    A.   A schedule change email was sent at 19:01
[19] on the 24th of November.
[20]    Q.   What does Line 5 mean?
[21]    A.   It looks as though -- I don't know who
[22] documented that information; "ALLOWED CHANGE
[23] 804/5021 PASSENGER MISSED FLLBOS NONSTOP."
[24]    Q.   What's "FLLBOS"?

**Page 25**

[1] **A.** With just making an assumption, because I
[2] didn't write it, "Fort Lauderdale Boston."
[3] **Q.** So that means a passenger was allowed to
[4] change his flight because he missed a flight from
[5] Fort Lauderdale to Boston?
[6] **A.** I can make an assumption on that, but I
[7] didn't write it, so I don't know for sure.
[8] **Q.** What does Line 6 mean?
[9] **A.** Bag-tag 890684 was security scanned.
[10] **Q.** And that's December 20, 2003?
[11] **A.** Yes.
[12] **Q.** And if there was a problem with the bag,
[13] would that be noted on this printout?
[14] **A.** No.
[15] **Q.** No?
[16] **A.** No.
[17] **Q.** This just indicates that the bag was
[18] scanned?
[19] **A.** Yes.
[20] **Q.** If there was a problem with the bag, where
[21] would it be -- would it be noted anywhere?
[22] **A.** It would depend on the situation.
[23] **Q.** If there was a security concern about the
[24] bag, would that be noted anywhere?

**Page 26**

[1] **A.** It would depend on what the security
[2] concern was or who found the security concern.
[3] **Q.** What are the different scenarios that
[4] you're thinking of?
[5] **A.** Hazardous material inside of a checked bag,
[6] a syringe in a bag, an item that could look
[7] suspicious, but is not or an item that is suspicious
[8] that somebody found.
[9] **Q.** And where would that be recorded?
[10] **A.** It would depend on who was finding the
[11] actual item.
[12] **Q.** What are the different options?
[13] **A.** I don't know what every department uses.
[14] American Airlines would document into the passenger
[15] name record. Other agencies, I don't know what they
[16] do.
[17] **Q.** So if the bag was scanned and something
[18] suspicious was found by American Airlines, it would
[19] be on this report?
[20] **A.** Yes.
[21] **Q.** Do you see anything suspicious being found
[22] on the report?
[23] **A.** There is no suspicious documentation about
[24] something in the bag in a passenger name record.

**Page 27**

[1] **Q.** What does Line 7 mean?
[2] **A.** I don't know.
[3] **Q.** Can you turn the page on Line 39. It says,
[4] "PASSENGER DENIED TRAVEL ON FLIGHT 2237 PER SOC
[5] CRAIG Due TO SECURITY ISSUE. CCRO WILL ADD EVENT
[6] NUMBER SHORTLY. PLEASE REFUND TICKETS DUE TO DENY
[7] BOSCSM N TRAER." Is that what you testified that
[8] you inputted?
[9] **A.** Yes.
[10] **Q.** Did you have any discussions with SOC Craig
[11] about the decision to deny Mr. Cerqueira travel on a
[12] further American Airlines flight that day?
[13] **A.** I was advised he was denied travel on
[14] American and to refund the ticket.
[15] **Q.** Who did you talk to?
[16] **A.** SOC Craig.
[17] **Q.** What did he tell you exactly?
[18] **A.** I don't know the specifics, but that travel
[19] was denied and the ticket was to be refunded.
[20] **Q.** Did you ask him why?
[21] **A.** No.
[22] **Q.** Is that all he told you?
[23] **A.** Yes.
[24] **Q.** Did you have any discussions with Delilah

**Page 28**

[1] MacLeod?
[2] **A.** Yes.
[3] **Q.** What were your discussions with her?
[4] **A.** To refund the ticket. She was a ticket
[5] agent.
[6] **Q.** So you just told her to refund the ticket?
[7] **A.** Yes.
[8] **Q.** When you arrived at the ticket counter, was
[9] Mr. Cerqueira already standing there?
[10] **A.** I followed them up to the ticket counter.
[11] **Q.** Who is "them"?
[12] **A.** Mr. Cerqueira was with the State Police.
[13] **Q.** Okay. Do you recall whether the State
[14] Police told you anything?
[15] **A.** No.
[16] **Q.** You don't recall or they didn't tell you
[17] anything?
[18] **A.** I did not discuss his incident with the
[19] State Police.
[20] **Q.** Was it your understanding that he had been
[21] cleared for travel by the State Police?
[22] **A.** I don't know.
[23] **Q.** Did you have any discussions with Ms.
[24] MacLeod as to whether it was her understanding that

Page 29

[1] he had been cleared to travel by the State Police?

[2] **A.** I didn't discuss that with her.

[3] *Q. Were you told anything else that we haven't

[4] talked about with respect to American Airlines'

[5] decision to deny further service to Mr. Cerqueira?

[6] **A.** Could you repeat that.

[7] **MS. ABATE RECHT:** Sure. Jane, can you

[8] repeat that, please.

[9] *(Question read)

[10] **A.** No.

[11] **Q.** Do you see Line 47? It says, "DO NOT

[12] REBOOK ON AA"?

[13] **A.** Yes.

[14] **Q.** And the next line says

[15] "R.COBBS/28DECEMBER03/0808C"?

[16] **A.** Yes.

[17] **Q.** Is it your understanding that that entry

[18] was made by Ms. Cobbs at 8:08?

[19] **A.** I believe so.

[20] **Q.** And it says there "808C." Is it your

[21] understanding that that would be 8:08 central time?

[22] **A.** Yes.

[23] **Q.** Do you know what "DO NOT REBOOK ON AA"

[24] means? I guess let me be more specific.

Page 30

[1] Is it your understanding that that means,

[2] Do not rebook on American Airlines for the day or

[3] does that mean, Do not rebook on American Airlines

[4] for an indeterminate period of time?

[5] **A.** I don't know.

[6] **Q.** Did you have any discussions with any other

[7] American Airlines personnel regarding Mr. Cerqueira?

[8] **A.** No.

[9] **Q.** So the only person with whom you spoke was

[10] Craig Marquis and Delilah MacLeod?

[11] **A.** Yes.

[12] **Q.** You said you were radioed initially about

[13] the passengers being rescreened. Who radioed you?

[14] **A.** Operations radioed that an aircraft was

[15] returning to the gate.

[16] **Q.** Do you know who in operations?

[17] **A.** No. They didn't have specifics.

[18] **Q.** And are those your only -- the only three

[19] people with whom you communicated regarding Mr.

[20] Cerqueira or this incident?

[21] **A.** Yes. The operations personnel just knew

[22] there was a plane coming back. They didn't know

[23] what the situation was.

[24] **Q.** If you look a couple of lines down, it says

Page 31

[1] "Boston AA 905071." Do you see that?

[2] **A.** Yes.

[3] **Q.** Are those two lines referring to different

[4] flights on December 24, 2003?

[5] **A.** No. Those are two bags -- they were bag

[6] tags.

[7] **Q.** Are they bag tags for a flight on December

[8] 24th?

[9] **A.** Yes.

[10] **Q.** Do you know whether it's American's policy

[11] to deny further service to a passenger who is

[12] initially removed from a flight because of a

[13] security concern?

[14] **A.** I don't know.

[15] **Q.** I may have already asked you this, but I

[16] don't recall, so I'm just going to ask you again.

[17] *Did you know at the time that you

[18] communicated to Mr. Cerqueira that he was not

[19] permitted to fly on American Airlines that he had

[20] been cleared to fly by the State Police?

[21] **A.** Can you ask that again, please.

[22] *(Question read)

[23] **A.** Can you rephrase that? There's a couple of

[24] questions in that.

Page 32

[1] **Q.** At the time you informed Mr. Cerqueira that

[2] he was not permitted to take another American

[3] Airlines flight, were you aware that he had been

[4] cleared to fly by the State Police?

[5] **A.** No, I was not aware of that.

[6] **Q.** Do you recall informing the other two

[7] passengers who had been seated next to Mr. Cerqueira

[8] that they were also denied further travel on

[9] American Airlines?

[10] **A.** Yes.

[11] **Q.** What did you tell them?

[12] **A.** I don't know exactly what it was,

[13] word-for-word, but that they were denied travel on

[14] American Airlines, and their tickets would be

[15] refunded.

[16] **Q.** Do you recall whether you told them that

[17] they were being denied travel on American that day

[18] or for an indeterminate amount of time?

[19] **A.** Just that day.

[20] **Q.** Did you think Mr. Cerqueira was with those

[21] two gentlemen?

[22] **A.** I had no idea.

[23] **Q.** What did you think?

[24] **A.** I didn't think anything. I wasn't involved

---

**Page 33**

[1] in that situation.

[2]    **Q.** Were all three passengers treated the same?

[3]    **MR. FITZHUGH:** Objection. Form,

[4] foundation.

[5]    **A.** I don't know.

[6]    **Q.** Did you tell all three of them the same

[7] thing?

[8]    **MR. FITZHUGH:** You mean in substance? I'm

[9] going to object to the question.

[10]    **A.** In regards to denying them travel?

[11]    **Q.** Denying them further service, yes.

[12]    **A.** I said the same thing to the three.

[13]    **Q.** Okay. Can we go back to the document we

[14] were just looking at. If you look at Line 47, where

[15] we were just talking about, it says, "DO NOT REBOOK

[16] ON AA." And then if we look up at what you wrote on

[17] Lines 39 to 41, "PLEASE REFUND TICKETS DUE TO DENY."

[18] Does that mean the same thing?

[19]    **A.** I can tell you what I meant. What the

[20] other documentation is that I didn't write, I don't

[21] know what they meant to say.

[22]    **Q.** Okay.

[23]    **A.** My reference was to refund the tickets,

[24] because the passengers were denied travel.

---

**Page 34**

[1]    **Q.** And you didn't know whether that was for

[2] one day or forever on American?

[3]    **A.** I don't know.

[4]    **Q.** Is there any way to tell from this document

[5] when it was that SOC Craig made the decision to deny

[6] travel on the flight?

[7]    **A.** No.

[8]    **MR. FITZHUGH:** Objection. Move to strike.

[9]    **Q.** Did you first have a discussion with Mr.

[10] Craig regarding American's decision to deny travel

[11] and then put this entry in?

[12]    **MR. FITZHUGH:** Objection.

[13]    **A.** I'm not sure what you mean.

[14]    **Q.** You testified that you had a discussion

[15] with SOC Craig, correct?

[16]    **A.** Yes.

[17]    **Q.** And he informed you that these passengers

[18] were denied further travel, correct?

[19]    **A.** They were denied travel, yes.

[20]    **Q.** After that conversation -- strike that.

[21]    Did you write this entry, Lines 39 to 41 on

[22] Page AA 0024, after that conversation with Mr.

[23] Craig?

[24]    **A.** Yes.

---

**Page 35**

[1]    **Q.** Who has the -- strike that.

[2]    Does the sole authority to deny further

[3] service rest with the SOC?

[4]    **A.** Yes.

[5]    **Q.** Do you know what constitutes a legitimate

[6] reason to deny service?

[7]    **A.** I don't know.

[8]    **Q.** Did you write anything regarding this

[9] incident?

[10]    **A.** I typed the documentation in the record.

[11]    **Q.** Besides this document, Exhibit 12 that

[12] we've been looking at, did you write anything

[13] regarding this incident?

[14]    **A.** I don't believe so.

[15]    **Q.** Were you asked to write anything regarding

[16] this incident?

[17]    **A.** Not that I can remember.

[18]    **Q.** I'm going to ask you to look at a document

[19] that was previously marked as Exhibit 11. Do you

[20] recall ever receiving this document?

[21]    **A.** No.

[22]    **Q.** If you had received it, would you have

[23] filled out an incident report?

[24]    **A.** The report was phoned in and is documented

---

**Page 36**

[1] on Exhibit 12, on AA 0024, where it states,

[2] "PASSENGER DENIED TRAVEL ON 2237," Lines 39 to 41.

[3]    **Q.** But you didn't write anything in addition

[4] to that?

[5]    **A.** I don't believe so.

[6]    **Q.** Did anyone from American Airlines contact

[7] you to discuss this incident further?

[8]    **A.** I don't believe so.

[9]    **Q.** Did you communicate directly with law

[10] enforcement at any time concerning this incident?

[11]    **A.** In respect to the other passengers boarding

[12] the flight?

[13]    **Q.** With respect to the denial of further

[14] service to Mr. Cerqueira.

[15]    **A.** No.

[16]    **Q.** What were your communications with law

[17] enforcement regarding the rest of the passengers?

[18]    **A.** We were following the instructions of the

[19] Transportation Security Administration, and we just

[20] coordinated the rescreening of the passengers.

[21]    **Q.** Okay. Did you have conversations with any

[22] other American Airlines personnel regarding this

[23] incident?

[24]    **A.** No.

---

Page 37

[1]  **Q.** Did you have conversations with anyone else
[2] concerning this incident?
[3]  **A.** No.
[4]  **Q.** Did you speak with Ms. Cobbs about the
[5] incident?
[6]  **A.** No.
[7]  **Q.** Does American have a policy regarding the
[8] removal of passengers?
[9]  **A.** In respect to why or how or when?
[10]  **Q.** With respect to whether a passenger should
[11] be removed from the plane.
[12]  **A.** I'm not sure on the policy. Anyone denied
[13] travel must go through the systems operations
[14] control.
[15]  **Q.** Are you not sure what the policy is or
[16] you're not sure whether American has a policy?
[17]  **A.** The policy I am aware of is to contact the
[18] systems operation control for any denial of a
[19] passenger. I don't know what their procedures are.
[20]  **Q.** Have you received any training regarding
[21] identifying suspicious behavior?
[22]  **A.** Behavior?
[23]  **Q.** Yes.
[24]  **A.** No.

Page 38

[1]  **Q.** Do you know whether American has protocols
[2] for what you should do if you think a passenger is
[3] acting in a suspicious manner?
[4]  **A.** A suspicious security manner?
[5]  **Q.** Yes.
[6]  **A.** We contact systems operations control.
[7]  **Q.** Is systems operations control based in
[8] Dallas?
[9]  **A.** Yes.
[10]  **Q.** So anything that systems operation
[11] control -- strike that.
[12]      Any decisions made by systems operation
[13] control in Dallas would be based on communications
[14] received from American Airlines personnel in Boston;
[15] is that right?
[16]  **A.** Based upon that and any information that
[17] they have from any other source.
[18]  **Q.** Do you know what other sources they
[19] consider?
[20]  **A.** I don't know.
[21]  **Q.** Has American ever instructed you on whether
[22] it's permissible to consider a passenger's ethnicity
[23] in determining whether to deny them service?
[24]  **A.** We're trained that everyone is equal,

Page 39

[1] nondiscriminatory.
[2]  **Q.** Have you ever been involved in any other
[3] incident in which a passenger was removed from a
[4] flight, denied boarding or refused service?
[5]  **A.** Yes.
[6]  **Q.** How many incidents?
[7]  **A.** I don't know. Many.
[8]  **Q.** "Many," like, more than five?
[9]  **A.** More than five, yes.
[10]  **Q.** More than ten?
[11]  **A.** Yes.
[12]  **Q.** More than 20?
[13]  **A.** Yes.
[14]  **Q.** It must come with your job description,
[15] huh?
[16]  **A.** Yes, yes.
[17]  **Q.** Have you ever been involved in any other
[18] incident in which a passenger was removed from a
[19] flight, denied boarding or refused service based on
[20] security concerns?
[21]  **A.** Yes.
[22]  **Q.** How many?
[23]  **A.** I don't know.
[24]  **Q.** Dozens?

Page 40

[1]  **A.** I couldn't give you an exact -- I couldn't
[2] give you an exact number.
[3]  **Q.** Could you approximate? Is it between 5 and
[4] 10?
[5]  **A.** I would assume it would be definitely more
[6] than five, but I don't know how many for just
[7] security-related reasons. I couldn't begin to tell
[8] you.
[9]  **Q.** Would it be less than 20?
[10]  **A.** I don't think so, but I don't know. It's
[11] been nine and a half years. I couldn't even begin
[12] to tell you how many.
[13]  **Q.** Do you recall any of those incidents in
[14] particular?
[15]  **A.** In regards to security denials?
[16]  **Q.** Yes. Just with respect to security
[17] denials.
[18]  **A.** Yes.
[19]  **Q.** What do you recall?
[20]  **A.** Security due to fraud on a ticket.
[21] Security based upon unattended baggage, based upon
[22] actions by a passenger.
[23]  **Q.** Do you recall the ethnicity of any of these
[24] passengers?

Page 41

[1] **A.** No.
[2] **Q.** Is there anywhere that denials of service
[3] for security reasons are documented?
[4] **A.** I don't know. I can tell you not on a
[5] local level.
[6] **Q.** Is it possible that the SOC keeps a record
[7] of that information?
[8] **A.** I don't know.
[9] **Q.** You testified that you do recall incidents
[10] in which a passenger was denied service due to their
[11] actions. Do you recall what their actions were?
[12] **A.** Disorderly, intoxicated, fighting with
[13] other passengers, employees.
[14] **Q.** Disorderly. What kind of conduct are you
[15] referring to when you say "disorderly"?
[16] **A.** I don't know. The one that comes to mind,
[17] I was called in afterwards, and I was just the
[18] second person on the scene.
[19] **Q.** What do you recall about it?
[20] **A.** Just that I was called down. There was an
[21] incident at a gate, and the passenger was denied
[22] travel. I wasn't the person involved, per se.
[23] **Q.** Do you recall what the incident was?
[24] **A.** Not entirely. Just that there was a

Page 42

[1] passenger, a disorderly passenger in a terminal.
[2] Someone else was handling it. I went to see if
[3] there was assistance needed.
[4] *Q. You recall whether you've been involved in
[5] incidents in which a passenger was denied service
[6] based on security concerns? And by that, I don't
[7] mean intoxication or disorderly conduct, but I'm
[8] referring more to a possible threat of terrorist
[9] activity.
[10] **A.** Can you repeat that.
[11] **MS. ABATE RECHT:** Sure. Can you repeat the
[12] question.
[13] *(Question read)
[14] **A.** I'm not sure what you mean by "terrorist
[15] activity." There are times when we've denied
[16] passengers. I don't know the reason why. It may or
[17] may not have been because of any type of activity,
[18] but I don't know.
[19] **Q.** So, then, is your answer, you don't recall
[20] any such incidents?
[21] **MR. FITZHUGH:** Objection. Her answer is
[22] her answer, as was previously stated.
[23] **MS. ABATE RECHT:** I'm just trying to
[24] understand it.

Page 43

[1] **MR. FITZHUGH:** Ask another question.
[2] **A.** I don't know what you mean.
[3] **Q.** Do you know why Mr. Cerqueira and the other
[4] two passengers were removed from the plane?
[5] **A.** I don't know why.
[6] **Q.** What other type of suspicious behavior are
[7] you aware of that would cause a passenger to be
[8] removed from a plane?
[9] **A.** I don't know, based upon suspicious
[10] behavior the way -- I don't know what the question
[11] is.
[12] **Q.** Are you trained at all in identifying
[13] suspicious behavior?
[14] **A.** No, not behavior.
[15] **Q.** Suspicious actions?
[16] **A.** Actions? No. We go through a ground
[17] security training.
[18] **Q.** What does that training consist of?
[19] **A.** I can't give out that information.
[20] **Q.** Can you say generally? I'm not asking for
[21] specifics.
[22] **A.** Ground security would cover airport
[23] security, perimeter security, passenger baggage
[24] security, TSA regulations.

Page 44

[1] **Q.** Have you ever been the subject of a
[2] discrimination complaint by an American Airlines
[3] customer?
[4] **A.** No.
[5] *Q. Has American ever provided you with any
[6] training regarding the circumstances under which a
[7] passenger may be denied service?
[8] **A.** Training as to who to contact?
[9] **MS. ABATE RECHT:** Can you just repeat the
[10] question, please.
[11] *(Question read)
[12] **A.** Yes. We contact the CCRO.
[13] **Q.** I'm not specifically asking for what the
[14] procedure is. I'm asking, under what circumstances
[15] a passenger can be denied service.
[16] **A.** Again, it could be anything. Intoxication,
[17] security, health reasons.
[18] **Q.** When you say "security," what do you mean
[19] by that?
[20] **A.** It could be anything. Leaving a bag
[21] unattended, a fraudulent ticket, fraudulent
[22] documents.
[23] **Q.** Do you have written materials concerning
[24] that?

---

Page 45

[1] **A.** I don't have any written materials.

[2] **Q.** Has American ever given you any written

[3] materials?

[4] **A.** I have a ground security coordinator

[5] training manual.

[6] **Q.** How often do you undergo that training?

[7] **A.** Once a year.

[8] **Q.** Is that in Dallas?

[9] **A.** It could be anywhere.

[10] **Q.** Has American provided you with any training

[11] concerning whether it's permissible to consider a

[12] passenger's race, ethnicity, national origin or

[13] ancestry in determining whether a passenger should

[14] be denied service?

[15] **A.** We're trained that everyone is equal in a

[16] nondiscriminatory way.

[17] **Q.** Has American ever taken any disciplinary

[18] action against you for considering a passenger's

[19] race, color, national orgin or ancestry in

[20] determining whether or not a passenger should be

[21] denied service?

[22] **A.** Can you repeat the first part of that?

[23] **Q.** Has American ever taken any disciplinary

[24] action against you.

---

Page 46

[1] **A.** No.

[2] **Q.** Do you know whether any other American

[3] airline employee has ever been disciplined for

[4] considering a passenger's race, color, national

[5] origin, ethnicity or ancestry in determining whether

[6] a passenger should be denied service?

[7] **A.** I don't know.

[8] **Q.** Has your training regarding the

[9] circumstances under which a passenger may be removed

[10] from a flight, denied boarding or refused service

[11] changed in any material way from 2003 to the

[12] present?

[13] **A.** I don't believe so.

[14] **MS. ABATE RECHT:** Can we go off the record

[15] for a minute.

[16] (Off the record)

[17] **MS. ABATE RECHT:** I have nothing further.

[18] **MR. FITZHUGH:** No questions of this

[19] witness.

[20] (Whereupon, the deposition was

[21] concluded at 2:43 p.m.)

[22]

[23]

[24]

---

Page 47

[1]           C E R T I F I C A T E

[2]     I, NICOLE TRAER, do hereby certify that I have

[3] read the foregoing transcript of my testimony, and

[4] further certify under the pains and penalties of

[5] perjury that said transcript (with/without)

[6] suggested corrections is a true and accurate record

[7] of said testimony.

[8]     Dated at _____, this ____ day of _____,

[9] 2006.

[10]

[11]

[12]           _____

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

---

Page 48

[1] COMMONWEALTH OF MASSACHUSETTS)

[2] SUFFOLK, SS.          )

[3]     I, Jane M. Williamson, Registered Merit Reporter

[4] and Notary Public in and for the Commonwealth of

[5] Massachusetts, do hereby certify that there came

[6] before me on the 12th day of April 2006, at 1:37

[7] p.m., the person hereinbefore named, who was by me

[8] duly sworn to testify to the truth and nothing but

[9] the truth of her knowledge touching and concerning

[10] the matters in controversy in this cause; that she

[11] was thereupon examined upon her oath, and her

[12] examination reduced to typewriting under my

[13] direction; and that the deposition is a true record

[14] of the testimony given by the witness.

[15]     I further certify that I am neither attorney or

[16] counsel for, nor related to or employed by, any

[17] attorney or counsel employed by the parties hereto

[18] or financially interested in the action.

[19]     In witness whereof, I have hereunto set my hand

[20] and affixed my notarial seal this ____ day of April

[21] 2006.

[22]

[23]           _____

[24]               Notary Public

     My commission expires:  1/19/07

# 05-11652-WGY


## John D. Cerqueira

### vs.

## American Airlines


## Deposition of Rhonda Cobbs

### June 15, 2006



Thu Bui, CSR
Collins Realtime Reporting
Dallas, Texas 75201
214-220-2449
www.collinsrealtime.net

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JOHN D. CERQUEIRA,            )

    Plaintiff              )

V.                        )    CIVIL ACTION NO.
                               05-11652-WGY
AMERICAN AIRLINES, INC.,   )

    Defendant              )




\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
RHONDA COBBS
JUNE 15, 2006

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*




    ORAL DEPOSITION OF RHONDA COBBS, produced as a

witness at the instance of the Plaintiff, and duly sworn,

was taken in the above-styled and numbered cause on the

15th of June, 2006, from 12:24 p.m. to 2:15 p.m., before

Thu Bui, CSR in and for the State of Texas, reported by

machine shorthand, at the offices of American Airlines,

4333 Amon Carter Boulevard, Fort Worth, Texas, pursuant

to the Fed.R.Civ.P.30.

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

---

Page 2

1          A P P E A R A N C E S
2    Mr. Michael T. Kirkpatrick
     PUBLIC CITIZENS LITIGATION GROUP
3    1600 200th Street, N.W.
     Washington, D.C. 20009
4    Phone: 202-588-7728  Fax: 202-588-7795
     Email: mkirkpatrick@citizen.org
5
6          APPEARING FOR THE PLAINTIFF
7
8    Mr. Michael A. Fitzhugh
     FITZHUGH, PARKER & ALVARO LLP
9    155 Federal Street, Suite 1700
     Boston, Massachusetts 02110-1727
10   Phone: 617-695-2330  Fax: 617-695-2335
     Email: mfitzhugh@fitzhughlaw.com
11
12         APPEARING FOR THE DEFENDANT
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

## INDEX

2                        PAGE
3    Appearances................................    2
4    Stipulations...............................    4
5    RHONDA COBBS
6      Examination by Mr. Kirkpatrick........    4
7    Signature and Changes.....................   67
8    Reporter's Certificate....................   69
9
10             EXHIBITS
11   NO.   DESCRIPTION              PAGE
12   18   Detail Note              31
13   19   Letter to crew member from Jane Allen   63
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1              RHONDA COBBS,
2    having been first duly sworn, testified as follows:
3                  EXAMINATION
4    BY MR. KIRKPATRICK:
5      Q  Good afternoon, Ms. Cobbs.
6      A  Good afternoon.
7      Q  We met earlier, but I just want to introduce
8    myself on the record.  I'm Michael Kirkpatrick and I
9    represent the plaintiff in this lawsuit, which is John
10   Cerqueira versus American Airlines.
11         MR. KIRKPATRICK:  Mr. Fitzhugh, do you want
12   to recite our stipulations?
13         MR. FITZHUGH:  Certainly.  I believe they
14   stipulated that the witness will be allowed to read and
15   sign her deposition transcript, but we will waive the
16   notarization; that all objections except as to the form
17   of the question will be reserved until the time of trial,
18   and motions to strike will be reserved until the time of
19   trial.
20         MR. KIRKPATRICK:  Agreed.
21      Q  Ms. Cobbs, would you just state your name and
22   address for the record, please?
23      A  My name is a Rhonda Cobbs; it's 5211
24   Bellefontaine Drive, Arlington, Texas, 76017.
25      Q  Ms. Cobbs, have you ever had your deposition

---

Page 5

1    taken before?
2      A  No, I haven't.
3      Q  I'd like to just give you a few instructions on
4    what we're going to do here this morning.  I'm going to
5    be asking you questions, and your job is just to give me
6    your best answer.  You are under oath as though we were
7    in a courtroom, even though we're in this informal
8    atmosphere of -- of a conference room.  It's important
9    that you wait for me to finish my questions before you
10   give your answers, so that the court reporter can take
11   down in full what everybody says.  We don't want to be
12   speaking at the same time.  Also, it's important that you
13   speak up and not just answer with a nod or a shake of the
14   head.
15         If you don't understand one of my
16   questions, please let me know, just ask me to repeat or
17   rephrase and I'll be happy to do that.  I'm not trying to
18   trick you or anything today, I just want information.
19   And if you don't understand the question, it's important
20   that you get a better understanding of it before you
21   attempt to answer.
22         If Mr. Fitzhugh objects to some of my
23   questions, unless he instructs you not to answer, you
24   should still answer the question to the best of your
25   ability.  The objections are to preserve that for a later

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

---

Page 6

1  time, if it's necessary, to resolve any objections, but
2  unless there's an instruction not to answer, Mr.
3  Fitzhugh's objection should not interfere with your
4  giving me your best answer.
5         If you need a break today, please let me
6  know, and I'm happy to take a break.  I would ask though
7  that if there's a question pending, we finish that
8  question and perhaps finish the sort of line of
9  questioning, and then I'll find a convenient time for us
10 to take a break.  It may not be necessary for us to break
11 at all, but we'll just see as that goes on.  Do you
12 understand these instructions?
13     A  I do.
14     Q  Do you know of any reason why you can't give me
15 your best full and honest answers today?
16     A  No.  I know of no reason.
17     Q  Okay.  Very good.  Did you do anything to
18 prepare for the deposition today?
19     A  I spoke with Mr. Fitzhugh.
20     Q  For about how long?
21     A  Probably a total of, I don't know, two or three
22 hours; longer than anticipated.
23     Q  Yes.  That was -- that was today that you met
24 with Mr. Fitzhugh?
25     A  Exactly.

---

Page 7

1      Q  Before talking to Mr. Fitzhugh today, did you
2  discuss this deposition with anyone else?
3      A  No.
4      Q  Have you had a chance to talk to Craig Marquis
5  about this deposition?
6      A  No.
7      Q  Did you review any documents in --
8      A  I did.
9      Q  -- preparation?  What did you look at?
10     A  I don't know the titles of them all, just
11 various letters, interrogatories.  I'm -- I'm not sure of
12 the titles of them, but probably if you showed them to me
13 I could tell you if I've seen them before.
14     Q  Okay.  Is it your understanding that those are
15 documents that have been exchanged between the parties
16 during this case?
17     A  Yes.
18     Q  Did you review any other documents?
19     A  No.
20     Q  Are you currently employed by American Airlines?
21     A  I am.
22     Q  What is your current position?
23     A  I'm the analyst and CCRO for system operations
24 control.
25     Q  What is CCRO?

---

Page 8

1      A  It's stands for corporate complaint resolution
2  official.
3      Q  And what is the relationship between CCRO and
4  system operations control, which I guess we'll call SOC?
5      A  Are you asking me what my job function is?
6      Q  Well, is CCRO part of SOC?
7      A  CCRO is part of SOC.
8      Q  Okay.  And is CCRO is just a particular job
9  function within SOC?
10     A  It is.
11     Q  How long have you been in that position?
12     A  In that position, a little more than three
13 years.
14     Q  Can you describe for me your duties as an
15 analyst or CCRO?
16     A  Okay.  It's actually an interchangeable desk.
17 One day I may be working at the analyst position; one day
18 at the CCRO position.
19     Q  I see.  I didn't understand before.  So you have
20 two different positions that you --
21     A  Correct.
22     Q  -- switch between?  Okay.  And --
23     A  Not on the same day, but.
24     Q  Right.
25     A  Today I may go in and work one desk; the other

---

Page 9

1  day I go in and work another desk.
2      Q  Okay.  Tell me what your duties are when you're
3  working the analyst position.
4      A  As the analyst, I help the center manager, the
5  sector managers, in keeping track of the daily operation
6  of the airline, compiling information, tracking flight
7  irregularities.  Also if -- if a dispatcher calls in
8  sick, we cover the -- the sick call by calling in
9  overtime.  It's -- it's like the right-hand person to the
10 center manager.
11     Q  Okay.  And when you're working the CCRO
12 position, what are your duties?
13     A  I act as a liaison between passenger service and
14 SOC, responsible for passenger acceptance issues with
15 regard to physical or medical disabilities, if there's a
16 misconduct issue.
17     Q  And in your duties as a liaison between
18 passenger service and SOC, what are the kinds of things
19 that you would do, what kinds of tasks?
20     A  I'm not sure I understand that, really.
21     Q  I guess I'm just trying to get an understanding
22 for what -- what the liaison role is.  You've told me
23 that you're a liaison between passenger service and SOC,
24 and I'm wondering what -- what exactly do you do when
25 you're working the CCRO position?

---

3 (Pages 6 to 9)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                                June 15, 2006

Page 10

1    A   Okay.  The -- the CCRO is a federally mandated
2  position in that we have to be available 24 hours a day,
3  7 days a week whether it be on property, on an airport,
4  or by phone; that's the position where I am able to
5  assist people in the field, if there's questions
6  regarding passenger acceptance or a passenger misconduct.
7  If there's -- if there's an en route landing because a
8  person has a medical emergency, then we assist the
9  passengers in -- in getting on to their destination.
10   Q   I see.  I think you told me that you had been in
11  these positions for about three years --
12   A   Uh-huh.
13   Q   -- is that right?  What did you do before that?
14   A   I worked in airport operations at DFW.
15   Q   How long were you in airport operations?
16   A   10 or 12 years, just a guess.
17   Q   And was that for American Airlines?
18   A   It was.
19   Q   Did you have any positions with American before
20  that?
21   A   I did.
22   Q   What did you do?
23   A   Clerical work or a staff assistant in employee
24  relations.  Prior to that, I was in the personnel
25  department, and prior to that, in marketing, all as a

Page 11

1  staff assistant.
2    Q   So when did you start working for American
3  Airlines?
4    A   In 1986.
5    Q   Were you working on December 28th of 2003?
6    A   I was.
7    Q   What was your position that day?
8    A   The CCRO.
9    Q   Do you remember what time your shift started?
10   A   At 6:00 o'clock in the morning.
11   Q   Who was your supervisor?
12   A   Do you mean who was the center manager?
13   Q   Yes.  If that's the person that you would report
14  to.
15   A   I don't remember, but I am assuming it was Craig
16  Marquis from the -- all the documents that I've reviewed.
17   Q   Okay.  And on December 28th, 2003, did you
18  become aware that there was some type of incident or
19  problem with respect to Flight 2237, a flight scheduled
20  to leave Boston Logan Airport for Ft. Lauderdale?
21   A   Off the top of my head, no, I don't remember
22  that.
23   Q   Do you have any recollection of being involved
24  with incidents relating to that flight and security
25  concerns with certain passengers?

Page 12

1    A   No, I don't.
2    Q   When did your shift end that day?
3    A   At 2:00 p.m.
4    Q   Did you have any role on December 28th in making
5  the decision to remove three passengers from Flight 2237
6  for questioning by law enforcement?
7    A   Did I have a role in it, meaning did I make some
8  type of decision in removing those passengers?
9    Q   Either making some type of decision or providing
10  information, doing background checks on the passengers,
11  responding to telephone calls or communications from
12  folks on the ground and Boston, anything like that?
13   A   I -- I don't remember doing that, but according
14  to the documents, I was there.
15   Q   Okay.  That's fine.  And I certainly understand
16  it's been some time.  And if you don't remember, you
17  don't remember.  What I'd like to do is to the extent you
18  do remember any specifics with regard to what you did or
19  were told with regard to that flight, I'd like to walk
20  through each of those things chronologically.  Do you
21  have any recollection of working in your position as a
22  CCRO on December 28th, 2003, working on an issue
23  surrounding this flight from Boston to Ft. Lauderdale?
24   A   No, I don't.
25   Q   So I take it you don't know who made the

Page 13

1  decision to have Mr. Cerqueira and the two people sitting
2  next to him removed from that flight?
3    A   No, I don't.
4    Q   And you don't know the reason for the decision;
5  am I right?
6    A   That's correct.
7    Q   Do you know whether anybody for American
8  Airlines made a determination that those three passengers
9  posed a threat to safety?
10   A   Can you say that again?
11   Q   Yes.  I'm wondering on December 28th, 2003, did
12  anybody, as far as you know, make a determination that
13  the passengers removed from that flight were a threat to
14  safe operation of the airplane?
15   A   I know -- again, I know what -- what is written
16  in the reports that I obviously signed my name to because
17  I entered the data, but I don't know.  No, I don't.
18   Q   Okay.  How often do you work the CCRO position?
19        MR. FITZHUGH:  Can we get a point in time,
20  Mike?
21   Q   Just in general, over the last -- is it
22  something you do a couple of times a week, once a month?
23   A   Usually four days out of the week.
24   Q   Four days each week?
25   A   Uh-huh.

4 (Pages 10 to 13)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

Page 14

1    Q   How often do you have incidents where there's a
2  question about whether a passenger should be removed from
3  an aircraft or denied boarding because of a security
4  concern?  In other words, is it common or is it very
5  unusual?
6    A   It's -- it's -- I don't want to say that it's
7  common, but I -- but it's something that happens on a
8  day -- a daily, a weekly, a monthly basis.  It's not
9  unusual.
10    Q   So nothing about this particular incident, the
11 December 28th of 2003 incident, anything in particular
12 about it that stands out in your mind that you can
13 remember --
14    A   Abs --
15    Q   -- sitting here today?
16    A   Absolutely nothing.
17    Q   Were you involved in making the decision that
18 the three passengers removed from that flight for
19 questioning should not be rebooked on another American
20 Airlines flight?
21         MR. FITZHUGH:  Objection.
22         You can still answer.
23    A   I don't believe so, but, again, I don't know.  I
24 don't remember.
25    Q   That's fine.  And you're certainly entitled to

Page 15

1  give that answer.  I am going to ask several questions
2  even though -- just for the record.
3    A   Okay.
4    Q   Okay.  Do you have any -- excuse me --
5  recollection, sitting here today, of whether a decision
6  was made not to rebook certain passengers who had been
7  removed from that flight?
8    A   Can you -- can you repeat that one more time?
9    Q   Yes.  Do you remember whether there was a
10 decision made not to rebook certain passengers that had
11 been removed from that Boston to Ft. Lauderdale flight?
12    A   No.
13    Q   Do you recall providing any information to Craig
14 Marquis about the three passengers that had been removed
15 for questioning from the flight?
16    A   No.
17    Q   Do you recall conferring with any American
18 Airlines' personnel in Boston regarding that flight on
19 December 28th, 2003?
20    A   No.
21    Q   Do you recall conferring with any law
22 enforcement authorities, either the Massachusetts State
23 Police or federal law enforcement, regarding that flight?
24    A   No, I don't.
25    Q   Ms. Cobbs, I'm going to hand you what has

Page 16

1  previously been marked as Deposition Exhibit 12.  And for
2  the record, this is a five-page document Bates numbered
3  AA23 to AA27.  Ms. Cobbs, if you could just take a moment
4  to -- to look at Exhibit 12, and then I want to ask you
5  some questions about it.
6         Ms. Cobbs, what is Exhibit 12?
7    A   It's a copy of a passenger name record titled
8  Detail Note.
9    Q   Have you seen this document before?
10    A   I have.
11    Q   When did you see it?
12    A   Within the last few days.
13    Q   In preparation for the deposition?
14    A   Correct.
15    Q   Do you know who drafted what we've marked as
16 Exhibit 12?
17         MR. FITZHUGH:  Objection, form.
18    A   It's -- it's a reservation.  It's a recording of
19 when the passenger first called to make his reservation,
20 and some of it I don't -- I don't even know what it
21 means, so, no.  The reservation agent is the one that
22 initiate -- or started this record.
23    Q   Okay.  And did you have some role in adding
24 information to it or updating it?
25    A   Yes.

Page 17

1    Q   How do you know that?
2    A   By remarks that are -- that are entered into the
3  document.
4    Q   Ms. Cobbs, what I'd like to do is sort of walk
5  through this document line by line, and for the lines
6  that you do know what they mean, I'd like you to -- to
7  tell me.  At the top where it has the -- it says, created
8  12/28/2003, Rhonda Cobbs, what does that indicate to you?
9    A   When there was -- that there's an event that has
10 been created regarding this passenger.
11    Q   And you --
12    A   And that's -- that's when it was entered into
13 the system.
14    Q   Okay.  And the time that is shown as 08:29, do
15 you know if that's central time?
16    A   I believe it's central time.
17    Q   Can you then, just walking down with the -- the
18 first line, Cerqueira/John, tell me what these notations
19 mean, if you know.
20    A   Okay.  Which ones?
21    Q   Well, the first one would appear to be the
22 passenger's name; is that correct?
23    A   That's correct.
24    Q   What does ARNK mean?
25    A   It's -- it's a space when -- to keep the

Rhonda Cobbs                                    June 15, 2006

Page 18

1   reservation open in the system or in the reservation
2   computer system.  Then the next line under that is -- is
3   what's called a pseudo flight number, and then this 1st
4   of March was just to extend this record so it wouldn't
5   purge from the system.
6        Q   I understand.  How often do records purge from
7   the system if nobody goes in and adds something like
8   that?
9        A   These -- as soon as travel's complete.
10       Q   Okay.  Do you know who added that space and
11  the -- the 01 March date to preserve this record?
12       A   I probably did.
13       Q   And for what reason would you have added that?
14       A   To extend the record so it wouldn't purge from
15  the system.
16       Q   And why did you think it might be important to
17  preserve this record?
18       A   From the documentation there was apparently a
19  security issue, a denied boarding with this passenger,
20  which involved putting the remarks in the record so that
21  it could be accessed, I extended it.  And you're asking
22  me again, I think I --
23       Q   No.  I think that --
24       A   -- I lost question.
25       Q   No.  I think you've answered my question.  So

Page 19

1   you wanted to preserve the record because of some of the
2   remarks that had been added --
3        A   Right.
4        Q   -- is that correct?
5        A   Right.
6        Q   Okay.  After those entries, what is the next
7   entry that you recognize and -- and understand?
8        A   The address, the passenger's address, below that
9   is frequent traveler number with his name.
10       Q   Okay.  Do you know what these various entries
11  mean that sort of start with a HTB Medit Editor Session
12  that --
13       A   I believe the TBM is tickets by mail has gone in
14  and edited for some reason their -- their transaction,
15  but I'm -- I don't know what that means.
16       Q   Okay.  If you'll look down, I believe it --
17  well, there's one that says H ticketed, PQ deleted and
18  placed into history; do you know what that means?
19       A   Well, that's an automated -- it's an
20  automatic response that the reservation system gives you
21  once the passenger's been ticketed.  It's ticketed, and
22  the PQ is the price quote has been deleted and placed
23  into the historical data of this reservation.
24       Q   What did -- what is the next entry below that
25  that you can tell me what it means?

Page 20

1        A   It looks like there's a tickets by mail went in
2   and -- and notified the passenger by e-mail of a schedule
3   change --
4        Q   Uh-huh.
5        A   -- on the 24th of November.  It looks like the
6   passenger missed a -- missed a flight and was allowed to
7   change to another flight --
8        Q   Okay.
9        A   -- below that.
10       Q   Then moving on to Page AA0024, can you tell me
11  that first entry there that appears to be about three
12  lines long, what does that mean?
13       A   That's the remarks put in by the Boston CSM.
14       Q   What does CSM stand for?
15       A   Customer service manager.
16       Q   And can you just tell me, 'cause there's some
17  abbreviations and other things, what -- what that entry
18  means, if you could just sort of read it in regular --
19  regular English?
20       A   The one that the CSM input in?
21       Q   Yeah.
22       A   Passenger denied travel on flight 2237 per SOC
23  Craig due to security issue.  CCRO will add event number
24  shortly, please refund tickets due to denied, and that's
25  Boston customer service manager, N. Traer.

Page 21

1        Q   And does SOC Craig, does that refer to Craig
2   Marquis?
3        A   I believe it does.
4        Q   What does the notation, CCRO will add event
5   number shortly, what does that mean?
6        A   If -- if you'll look down in Line 14, there's an
7   event and a number behind it.
8        Q   Yes.
9        A   Which is the same, that is, the event ID number
10  underneath the words, detail note.
11       Q   Okay.  And did you add that number?
12       A   I did.
13       Q   Do you know at what time that number was added?
14       A   It looks like it's 8:08 central time.
15       Q   Where -- where do you see that?  Okay.  Line 18?
16       A   Uh-huh.
17       Q   I see.  Were Lines 14 through 18, were they
18  added at the same time?
19       A   As?
20       Q   I --
21       A   Oh, yes, you mean all together?
22       Q   -- that went in as one entry?
23       A   Right.
24       Q   Yes.  So that's correct, they were added?
25       A   That's correct.

6 (Pages 18 to 21)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

---

Page 22

1    Q   Okay.  And you made that notation?
2    A   I did.
3    Q   Could you just tell me again, like you did for
4  the other entry, what -- what the various abbreviations
5  mean, if you could just read that in -- in plain English?
6    A   Above passenger denied boarding Flight 2237/27,
7  Boston-Ft. Lauderdale per SOCMOD due security issues,
8  refund ticket, do not rebook on American Airlines.  And
9  then that CCRO archived 28th of December at 8:08 central.
10    Q   That 8:08 central -- did Boston customer service
11  manager Traer, did she make the entry above that before
12  you made the 8:08 central time entry?
13    A   I can't tell from looking at this.
14    Q   Okay.  I was just wondering whether these
15  ordinarily, you know, are sort of chronological; that
16  anything that shows up later was added later?
17    A   Not necessarily.
18    Q   Okay.  But the indication in Ms. Traer's
19  notation that CCRO will add event number shortly, then
20  below that that's reflecting you adding the event number;
21  is that correct?
22    A   Correct.
23    Q   When it -- when it says here, per SOCMOD, what
24  does that mean?
25    A   System operations control manager on duty.

---

Page 23

1    Q   And it says due security issues, do you recall
2  what the security issues were?
3    A   No, I don't.
4    Q   You typed in the notation, do not rebook on AA;
5  is that correct?
6    A   That's correct.
7    Q   Do you know why?
8    A   Due to security issues.
9    Q   Did you make the decision that this passenger
10  should not be rebooked on American Airlines?
11    A   I don't know.
12    Q   Do you recall whether Craig Marquis told you
13  that he -- this passenger should not be rebooked on
14  American Airlines?
15    A   I don't recall.
16    Q   The indication, do not rebook on American
17  Airlines, for how long would that instruction last?
18    A   Normally?
19    Q   Yes.
20    A   For that day.
21    Q   So would this passenger have been eligible to go
22  to American Airlines, for example, the following day and
23  purchase a ticket for travel?
24    A   So far as I know.
25    Q   In other words, would this notation in the

---

Page 24

1  passenger name record, would it have interfered with this
2  passenger's ability to travel on another -- on another
3  day, a future day on American Airlines?
4    A   No.
5    Q   Are some passengers denied for the travel for
6  more than the current day?
7    A   I don't know.
8    Q   In your experience, have you ever made a
9  notation, passenger name record, to the effect that this
10  person should not be allowed to fly ever on American
11  Airlines?
12    A   No, I haven't.
13    Q   Moving further down this passenger name record
14  then, can you tell me what these next entries mean
15  starting with baggage information?
16    A   I believe it's -- it's bag tag numbers.
17    Q   And this would have been for the December 24th
18  2003 flight?
19    A   It looks like it.
20    Q   And what -- the next entry under Cerqueira/John,
21  can you tell me what that entry means?
22    A   It appears to be the same.  It's baggage tag
23  information for Flight 514 on the 28th.  I -- I'm
24  guessing.  I don't know that.  I -- I'm just going by
25  what it -- what the entry above that says.

---

Page 25

1    Q   What does the by BOS for DO1, do you know what
2  that means?
3    A   No, I don't.
4    Q   Do you know what the next entry received from --
5  and then there's some sort of code there, do you know
6  what that means?
7    A   I would guess that's probably the agent that put
8  that information in, because before you can edit a
9  reservation and end it and save the information, you have
10  to identify who is making the entry.
11    Q   What does the next entry mean, if you know?
12    A   Passenger data, is that what you're talking
13  about?
14    Q   Well, actually the line above that.  The -- it
15  looks like headquarters to EAU, do you know what that --
16  do you have any idea what that means?
17    A   Well, prior to that is a -- is a WWW so I
18  don't -- I don't know, --
19    Q   Okay.
20    A   -- no.  That's the way it looks.  It's kind of
21  cut off on my paper.
22    Q   All right.
23        (Interruption.)
24        MR. KIRKPATRICK:  Off the record.
25        (Off the record from 12:59 to 1:01 p.m.)

---

Rhonda Cobbs                                      June 15, 2006

---

Page 26

1        MR. KIRKPATRICK:  Back on the record.
2    Q  Ms. Cobbs, the -- the next entry down there, the
3  no passenger data, question mark, do you know what that
4  means?
5    A  This one?  No, I don't know what that means.
6    Q  The next place where it has the event number,
7  that seems to be the same information repeating from
8  above; is that correct?
9    A  That's correct.
10    Q  Do you know why it repeats like that?
11    A  It has to do with the reservation itself.
12  When -- when it's retrieved in its entirety, it pulls up
13  all of the historical data as well as what you initially
14  see when you pull it up on the screen.  Since these
15  comments were placed in the historical data of the
16  reservation, I don't know why, but it just repeats it.
17    Q  Okay.
18    A  So it's -- it's not a new entry, it's the same
19  entry just copied over.
20    Q  Okay.  I understand.  Moving down below
21  Ms. Traer's entry that appears to have repeated there,
22  the entry that begins with AA1947 on 28 December, do you
23  know what that means?
24    A  It looks like it's -- it's possibly trying to
25  make -- I don't know if there was a reservation trying to

---

Page 27

1  be made for that flight because the -- the NN is
2  requesting seats or requesting a seat.  Beyond that, I
3  don't know what that means.
4    Q  Okay.  What does the next line under that means,
5  if you know?
6    A  The 2237 --
7    Q  Yes.
8    A  -- 28th December?  No, I don't know.  It has to
9  do, again, I never worked in reservation so that's why
10  I'm not -- I don't know all of these entries.
11    Q  Okay.
12    A  The 13A may be a seat assignment.  I don't know.
13    Q  Do you know what the next entry below that that
14  starts with the BOS, what that means?
15    A  That's the agent that -- that entered that
16  information into the reservation.
17    Q  Okay.  And that is a -- is a code that reflects
18  the agent or --
19    A  No, it'd be their -- their identifier --
20    Q  I see.
21    A  -- I guess if they -- they worked on the
22  reservation.
23    Q  The 584H?
24    A  Right.
25    Q  All right.  And then the line under that, any

---

Page 28

1  idea what that one means?
2    A  It's another requesting a seat entry, but I --
3  that's all I know.
4    Q  Okay.  Moving on to the next page, it looks
5  like, again, some of this information has repeated from
6  what we saw in the earlier pages.  Do you see any entries
7  just moving down this Page AA0025 that you understand
8  that are different from what we've talked about?
9        MR. FITZHUGH:  Do you understand the
10  question?
11        THE WITNESS:  I -- yeah, I do.
12    Q  In other words, Ms. Cobbs, if you could just
13  look down this page, I know some things we've already
14  talked about, but if you see anything we haven't that you
15  understand what it means, if you could let me know?
16    A  Well, it's -- it looks like where it says, 5021
17  on the 24th of December LGABOS, but I don't know if that
18  means that he -- that a reservation was made for that
19  flight and -- and he actually took it.  I don't know
20  that.
21    Q  Okay.
22    A  But at one point, that was apparently requested.
23    Q  Uh-huh.
24    A  I don't see -- I see nothing else.
25    Q  Okay.  About midway down there are three entries

---

Page 29

1  in a row for AA2237, the -- do you know what each of
2  those means?
3    A  No, no.  I see seat assignments, but that's all
4  I see that I can recognize.
5    Q  Where are the seat assignments?
6    A  The -- where it says 13A, 12A.
7    Q  Okay.
8    A  That's all I see that I can recognize.
9    Q  Okay.  And then if you could please turn the
10  page to AA0026, and I would just ask the same question if
11  there's -- I know much of this information repeats, but
12  if there's anything that we haven't discussed that you
13  understand, if you could tell me what that is?
14    A  No.
15    Q  Okay.  And then if you could look on the last
16  page, AA0027, and the same question.
17    A  No.
18    Q  Ms. Cobbs, as far as you know, is the document
19  we've been looking at, Exhibit Number 12, is it the
20  complete passenger name record for this passenger?
21    A  As far as I know.
22    Q  Does there exist a passenger name record for the
23  other two passengers who were removed from this flight
24  with Mr. Cerqueira?
25    A  There -- there was when they traveled.

Rhonda Cobbs                                          June 15, 2006

---

Page 30

1    Q   And do you recall whether you made the same
2  entry in the passenger name record for the other
3  passengers regarding instructions not to rebook on
4  American Airlines?
5    A   I believe I did.
6    Q   Have you seen those other passengers --
7  passenger name records since the day of the event?
8    A   Since the day of the event, no.
9    Q   If we look at Exhibit 12 at the top it has
10  08:29, does that indicate that no further -- that nothing
11  after 8:29 a.m, central time, on 12/28/2003 has been
12  added to this passenger name record?
13    A   No.  This -- this time stamp is not -- is
14  not -- is not involving the passenger name record.
15  That's a reservation, that's a record of the transaction
16  with the passenger.
17    Q   Okay.
18    A   This time stamp is not in the passenger name
19  record.
20    Q   What does the time stamp mean?
21    A   This time stamp is when the event was created or
22  information was added to it.
23    Q   I see.
24    A   If there were -- when Nicole referred to CCRO
25  would add an event number, that's when this all started.

---

Page 31

1    Q   Okay.
2    A   That's when I opened the event and created it.
3    Q   I see.  All right.  We can set that one aside,
4  or I can actually take that back.  I'm going to ask the
5  court reporter to mark this as Exhibit Number 18.
6         (Deposition Exhibit Number 18 marked.)
7    Q   And for the record, we have marked as deposition
8  Exhibit Number 18 Pages AA0029 through AA0034.
9         Ms. Cobbs, beginning with the first page of
10  Exhibit 18, which is Bates stamped AA0029, can you tell
11  me what this document is?
12    A   It's a copy of the notification that was sent to
13  the responsible department to let them know that there
14  was an irregularity with this flight.
15    Q   And from the time stamp that's on there, 08:00
16  on 12/28/2003, does that indicate that that's when the
17  notification note was sent?
18    A   Yes.
19    Q   Could you just read for me just in -- in plain
20  English, 'cause there are some abbreviations of what this
21  notification note says?
22    A   Flight 2237/28 N233, that is the aircraft
23  number.  Boston-Ft. Lauderdale delayed, removing three
24  passengers and bags due suspicious behavior.  Now
25  replacing flight attendants due to traumatized, estimated

---

Page 32

1  time of departure 9:30 eastern standard time, it's Boston
2  based crew, there are 122 passengers on board, system
3  operations control, my initials.  And the Z is a -- the
4  group or the -- the department that I sent it to.
5    Q   Where is that group or department that's --
6    A   It's the security.
7    Q   Is that in Dallas or in Boston?
8    A   I'm -- I'm not sure who all is in this security
9  group that would have received this information or wanted
10  to be notified about it.  I -- I don't know if they're --
11  they're all in Dallas or if there's one or two in Boston
12  or one in JFK.  I don't --
13    Q   Okay.
14    A   I'd have to look on the actual list, but I don't
15  know.  I don't know off the top of my head.
16    Q   Do you know whether this is the first -- the
17  first document that you created or first message that you
18  sent regarding this incident?
19    A   No, I don't.  I don't.
20    Q   In other words, I was just wondering whether a
21  notification note would be the -- the first thing you
22  would do when you found out there was a -- there was an
23  issue?
24    A   It's -- it's done as -- as soon as it's feasible
25  and that you have enough information to notify --

---

Page 33

1    Q   Okay.
2    A   -- the responsible department really, so.  But I
3  can't say that it was the first thing that was entered
4  into the event.
5    Q   Do you know from whom you received this
6  information that you then put into the note?
7    A   Just from memory, no.
8    Q   Okay.  Can you tell from any of the documents
9  you've reviewed or --
10    A   No, not -- not from the documents.  I just know
11  that it would have been through various phone calls.  The
12  manager on duty would give me information, that that's my
13  job to compile that information and then disseminate it
14  as needed.
15    Q   Do you recall any of the specific telephone
16  calls or conversations with the manager on duty that day?
17    A   I would not have been on the phone with him, no,
18  because I'm right there next to him.
19    Q   Okay.  Do you recall whether you had any
20  telephone conversations with anybody related to this
21  incident?
22    A   No, I don't recall.
23    Q   Do you know whether you were in communication
24  with the people in Boston, either gate agents or ground
25  security coordinator or the pilot, anybody like that?

---

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

Rhonda Cobbs                                                    June 15, 2006

Page 34

1    A  No, I don't.
2    Q  This notation that the flight is delayed and
3  three passengers and bags are being removed due to
4  suspicious behavior, do you know what the suspicious
5  behavior was specifically?
6    A  I know what I read, but I don't remember it.
7    Q  Okay.  Do you -- so you don't recall from that
8  day what the suspicious behavior was?
9    A  Not at all.
10    Q  Okay.  Do you know whether you were told
11  specifically what the suspicious behavior was, or whether
12  you were just told generally there is suspicious
13  behavior?
14    A  I -- I don't recall that.
15    Q  Ordinarily, if there was suspicious behavior and
16  passengers were going to be removed, would the specific
17  basis for concluding that it was suspicious behavior,
18  would that ordinarily be communicated to the CCRO?
19    A  Not necessarily.
20    Q  Do you know -- do you recall, sitting here
21  today, what caused the trauma to the flight attendants
22  that caused them to be replaced?
23    A  No.
24    Q  And anything you know about the specifics of the
25  suspicious behavior, et cetera, is as a result of

Page 35

1  reviewing the documents that you looked at in preparation
2  for the deposition?
3    A  Correct.
4    Q  And did review of any of those documents refresh
5  your recollection such that you now remember something
6  from December 28, 2003, or did you simply learn that
7  information anew from the review of the documents?
8    A  It was anew in reviewing the documents.
9    Q  Okay.  If you could turn the page, please, to
10  AA0030.  Could you tell me what this document is?
11    A  It's a -- a routing of the aircraft where the
12  aircraft has flown over the last seven days or the
13  previous seven days.
14    Q  And what is the significance of this document to
15  the incident?  In other words, why would the event ID and
16  this information be joined?
17    A  When the event is created, it -- it saves all of
18  that information.
19    Q  So that was something that just happens
20  automatically when you create an event?
21    A  Correct.
22    Q  Do you recall whether you did anything with
23  regard to this aircraft routing information on December
24  28 of 2003?
25    A  No.

Page 36

1    Q  Do you know why aircraft routing information is
2  joined with an event of this nature?
3    A  It -- it's a flight irregularity that
4  transpired.  There was something abnormal happening with
5  this flight, whether it be mechanical related, passenger
6  service related, but for whatever reason, it's going to
7  gather the same information and you use of that what you
8  need of that particular circumstance.
9    Q  Okay.  And do you recall whether you used any of
10  this information for this particular circumstance?
11    A  No.  I would have no reason to.
12    Q  Okay.  If you could turn the page then to
13  AA0031.  Can you tell me what this document is?
14    A  That's the crew that was assigned to that
15  flight.
16    Q  And, again, is this information that would
17  automatically be generated when there is some kind of
18  irregularity?
19    A  Yes.
20    Q  In looking at the time stamp on this, it appears
21  to be 06:47?
22    A  Yes.
23    Q  Does that tell you anything about when your
24  involvement with this event began, in other words, by
25  6:47 a.m. --

Page 37

1    A  We knew there was something going on with the
2  flight.
3    Q  Okay.
4    A  So that's when -- that's the first time stamp
5  that I've seen, that could have been when the event was
6  opened.
7    Q  In other words --
8    A  That's what it appears.
9    Q  -- when somebody first contacted your office
10  with information that something was happening abnormal?
11    A  Correct.
12    Q  Did you need to use any of this information on
13  the crew list in dealing with this event?
14    A  I didn't.
15    Q  If you could turn then to the next page, AA0032,
16  can you tell me what this document is?
17    A  Okay.  That's a copy of delay message.  Anytime
18  a -- there is an irregular operation or a delay in a
19  flight departing, we have a -- a system by which we have
20  to be accountable.  The -- the department that is
21  responsible for the delay is held accountable for that
22  delay and -- and, therefore, owes an explanation.
23  That's -- that's what this is is the delay, was 172
24  minutes, for security reasons.
25    Q  Okay.  If you -- forgive me for interrupting.

10  (Pages 34 to 37)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                                        June 15, 2006

Page 38

1    A  Okay.
2    Q  Would you mind walking me through, again, just
3  in -- in plain English what this entry, this delay
4  message, what each of those entries means?
5    A  Well, the top line is the flight.
6    Q  Yes.
7    A  2237 on the 28th of December departing from
8  Boston, and DM is delay message and the aircraft number
9  is 233.
10   Q  Okay.
11   A  The next line, the 28th is the day of the month,
12  15:48 is probably a time stamp.  I'm not sure if that is
13  in Zulu Time or if it's in eastern time or if it's in
14  central time, that I don't know.
15   Q  Okay.
16   A  The next letter is E43CBC, probably it's an
17  agent's identifier that was putting the delay message in.
18  Then Boston, and that's probably part of the next one is
19  part of agent's identifier again.  DM is delay message;
20  2237 is the flight number; 28th is the date; Boston is
21  the station; that's 172 minutes flight was delayed.
22   Q  Okay.
23   A  12 is the security, the reason that it was
24  delayed.  And it says the flight ground interrupted,
25  which means it left and came back, left the gate and came

Page 39

1  back, for the removal of three passengers and five bags
2  due to security issue, necessary to remove and re-screen
3  the aircraft and passengers prior to re-boarding.
4    Q  Okay.  When you say 12 means security, do they
5  give you any other information about what kind of
6  security --
7    A  No.
8    Q  -- issue?
9    A  No.
10   Q  Okay.  And this would have been -- would this
11  have been entered then at 10:02 central time?
12   A  That's the way it looks.  These entries if -- if
13  I can add this --
14   Q  Yes.
15   A  -- doesn't necessarily mean that is when
16  something happened.  There could have been other things
17  going on at my desk that I didn't have time to work on
18  this particular event, so it was just as I could enter it
19  into -- the data into the event --
20   Q  I see.
21   A  -- when it was put in.
22   Q  Okay.  But that date, the time stamp that would
23  indicate when you put it in?
24   A  Correct.
25   Q  Okay.  All right.  We could turn then to Page

Page 40

1  AA0033.  Can you tell me what this is?
2    A  Okay.  This is a copy of the gate information
3  regarding that flight, and the -- the personnel who were
4  assigned on the ground to work the flight.
5    Q  Okay.
6    A  Then it tells, you know, the number of
7  passengers on board, how many frequent flyer miles are --
8    Q  Uh-huh.
9    A  -- the flight you're going to log, the phone
10  number for the gate and the jet bridge, if there are
11  wheelchair passengers or children or infants or
12  unaccompanied minors --
13   Q  Okay.
14   A  -- on the airplane.  If there's any special
15  meals, that's what the two last lines are, passenger
16  wanting a special -- ordered a special meal.
17   Q  And is this one of those piece of information
18  that is generated automatically when you have an abnormal
19  event?
20   A  It is.
21   Q  Do you know whether you used any of this
22  information in carrying out your duties on --
23   A  No, --
24   Q  -- that day?
25   A  -- I wouldn't.

Page 41

1    Q  Okay.  And then if we could look on the last
2  page, AA0034, what is this?
3    A  This is -- I had -- apparently when this was
4  entered, this is the on list of the passengers that are
5  on board.  When this was requested there were no
6  passengers on board.  I don't know.  I don't know why it
7  didn't bring that information.  It could have been
8  because the flight had already returned to the gate and
9  they have been -- they had to deplane the passengers.
10   Q  Okay.  And, again, is this passenger list the
11  kind of information generated automatically whenever
12  there's an abnormal event?
13   A  It is.
14   Q  Thank you.  Ms. Cobbs, I'm going to hand you a
15  page that's been previously marked as Exhibit 14.  This
16  is a one-page document Bates Number AA0021.  Can you tell
17  me what this is?
18   A  This is a copy of the SS -- I don't even know
19  what it stands for.  Data that can be entered into the
20  flight log, if there -- it's a free text form that I can
21  put information if there was any abnormality or
22  irregularity.
23   Q  And did you enter this information?
24   A  I did.
25   Q  Could you -- and would you have entered this at

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

---

Page 42

1  8:53 a.m. central time?
2      A  Into the event.
3      Q  Okay.  Could you, again, walk me through what
4  this means?  And I think we can -- well, some of these
5  things we have -- maybe we haven't talked about.  If you
6  can just quickly walk me through what this means in plain
7  English.
8      A  Okay.  We have the flight number, the aircraft
9  number, the city, the -- the issue as a security removal,
10 the Flight 2237, Aircraft 233 from Boston to
11 Ft. Lauderdale was delayed in removing three male
12 passengers/bags, passengers and bags, from the aircraft
13 due to security concern.
14         Passengers reportedly exhibited susp --
15 suspicious behavior in the airport toward the captain,
16 and on the aircraft observed by the Number 2 flight
17 attendant, Boston based S. Walling.  Law enforcement
18 officials removed the passengers, detained, questioned,
19 and released them.  Per system operations control manager
20 on duty, passengers denied boarding and tickets refunded.
21 Security search of the aircraft per -- performed by dogs.
22 Flight attendants were replaced due to trauma.  And then
23 it -- the PNR's are these passenger name records, that's
24 the reservation number of each passenger that was
25 removed.

---

Page 43

1  The event number is tagged on there --
2      Q  Uh-huh.
3      A  -- and then my sign.
4      Q  Where did you get this information to enter in
5  the CCRO history?
6      A  It's -- it's what I had compiled throughout
7  the -- the whole incident.
8      Q  And do you recall the sources that you used to
9  compile this information?
10     A  No.
11     Q  Do you know whether you spoke to the captain?
12     A  I don't know.
13     Q  Do you know whether you spoke to the flight
14 attendants?
15     A  I don't know.
16     Q  How about the law enforcement officers?
17     A  I don't know.
18     Q  Certain information, for example, the law
19 enforcement officers had detained, questioned, and
20 released these passengers, do you know how you learned
21 that?
22     A  It -- no, I don't.
23         MR. FITZHUGH:  So you don't know, or you
24 don't recall?
25     A  I don't recall.

---

Page 44

1      Q  So sitting here today you don't know?
2      A  Right.
3      Q  Yes.
4      A  Well --
5      Q  You're right.
6      A  Okay.
7      Q  I know.  I understand.
8      A  Okay.
9      Q  I understand your answer.
10     A  Okay.
11     Q  Do you know whether the entries here are written
12 essentially in -- in a chronological order, in other
13 words, do we know that the suspicious behavior in the
14 airport toward the captain happened before what was
15 observed by S. Walling, and that that was before -- in
16 other words, is this chronologically written?
17     A  It's -- it's just a Reader's Digest version
18 of -- of the event --
19     Q  Okay.
20     A  -- of what took place.  Obviously, in the
21 airport toward the captain would be before they got on
22 the aircraft and it was observed by the flight attendant.
23     Q  Uh-huh.  Do you recall whether the SOC manager
24 on duty told you why these passengers should be denied
25 boarding and tickets refunded?

---

Page 45

1      A  I don't recall.  I know it says for suspicious
2  behavior.
3      Q  Is there -- you referred to this as sort of a
4  Reader's Digest version of what happened.  Are there
5  other notes kept in the course of an event like this that
6  might provide more detail?
7      A  Not that I'm aware of.
8      Q  You didn't keep any --
9      A  Huh-uh.
10     Q  -- additional notes?
11     A  Huh-uh.
12     Q  I'll take that one back, and we'll look at
13 another.  I'm handing you what's previously been marked
14 as Exhibit 13; this is a page Bates numbered AA0028.
15 What is Exhibit 13?
16     A  It's an event note, and it's basically just cut
17 and pasted out of the SS history that I just read.
18     Q  Okay.  And what is the sort of different role of
19 an event note versus a SSCRO history?
20     A  The event note is -- is -- it's just in a
21 different place in the event in the report.
22     Q  Okay.  And all of the notes are tied together
23 through the common event ID number; is that correct?
24     A  Correct.
25     Q  Okay.  Let me take that back.  Thank you.

---

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

Page 46

1  Ms. Cobbs, I'm handing you what's been previously marked
2  as Exhibit Number 11; this is a document Bates numbered
3  AA0022. Can you tell me what this is?
4     A   This is an activity note in the event that is
5  generated from the flight service department when they
6  receive notification that an irregularity has taken
7  place, that this is their note querying the crew for
8  their reports.
9     Q   Okay.
10    A   Do you want me to read it to you?
11    Q   No. I think I understand the -- these
12  entries --
13    A   Okay.
14    Q   -- these codes and abbreviations. Were
15  individuals in your department asked to submit any
16  reports, sort of like this is for the -- the flight
17  service people to submit a report, is anybody within SOC
18  requested to write up a report about what happened other
19  than what we've already looked at?
20    A   Not that I'm aware of.
21    Q   You weren't asked to write anything else?
22    A   No, no. The SSCRO history is my report.
23    Q   Okay. So that's the totality of what you wrote
24  about the incident?
25    A   Correct.

Page 47

1     Q   Okay. You can hand that one back. Do you know
2  whether the flight service personnel submitted reports
3  regarding this incident?
4     A   Yes, they did.
5     Q   Okay. Did you have an opportunity to review
6  those reports?
7     A   I did.
8     Q   When was that?
9     A   Within the last few days, I suppose.
10    Q   In preparation for the deposition?
11    A   Right, right.
12    Q   Did you on December 28th, 2003 or within the
13  first couple of days after that, did you ever review the
14  reports submitted by the flight attendants or the pilot?
15    A   No, I would have no reason to. My part was
16  finished.
17    Q   I'm going to show you, just very quickly, these
18  reports, and ask whether these are reports that you have
19  had an opportunity to review. The first one is
20  Exhibit 1. Is this one of the reports that you reviewed
21  for the first time in preparation for the deposition?
22  And just for the record, I believe this is flight
23  attendant Walling's statement.
24        MR. FITZHUGH:   Yeah. You identified --
25    A   Okay.

Page 48

1        MR. FITZHUGH:   -- the crew facts.
2     A   Yes.
3     Q   And I'm going to show you Exhibit Number 5,
4  which has been identified as flight attendant, Sargent's
5  report. Did you review those for the first time in
6  preparation for the deposition?
7     A   I believe I did, yes.
8     Q   And Exhibit 9 is flight attendant, Milenkovic's
9  report to the incident. Did you review Exhibit Number 9
10  for the first time in preparation for this deposition?
11    A   Yes.
12    Q   Thank you. And I'm going to hand you what's
13  previously been marked as Exhibit 6, and this is a
14  further report from the Number 4 flight attendant on that
15  day. Have you seen Exhibit 6 before?
16    A   I don't know. This one doesn't look familiar.
17  I don't think so.
18    Q   Okay.
19    A   I don't think I've seen that one.
20    Q   I don't believe it bears the flight attendant's
21  name, just that it was Flight Attendant Number 4.
22        MR. FITZHUGH:   I'm trying to read the
23  stamp, bear with me.
24        MR. KIRKPATRICK:   I believe this was during
25  the Sargent deposition.

Page 49

1        MR. FITZHUGH:   Okay. Thank you.
2     Q   Okay. And finally, I am showing you what's been
3  marked as Exhibit 16. Have you seen Exhibit 16 before?
4     A   Yes, I saw this.
5     Q   Did you see it for the first time in preparation
6  for today's deposition?
7     A   Yes.
8        MR. FITZHUGH:   That's the Ehlers' report?
9        MR. KIRKPATRICK:   It is.
10       MR. FITZHUGH:   E-h-l-e-r-s.
11    Q   Do you know why the Ehlers' report is written in
12  a format with the event ID number and -- and detail note
13  similar to the other documents we looked at before, and
14  it's labeled as secured note as opposed to the flight
15  attendant reports?
16    A   No, I don't. It's copied into the event, and I
17  did notice that secured note and I didn't know what that
18  means. I probably don't have access to it.
19    Q   Okay. Do you know who Randy Engberg is?
20    A   He's in another department. I mean, I know him
21  but I don't know what his function is.
22    Q   Okay. And from the date and time stamp, does it
23  appear that Randy Engberg entered this information into
24  the system on June 1st, 2004?
25    A   If -- if I'm understanding the time stamp, yes.

13 (Pages 46 to 49)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

Page 50

1    Q   Okay.
2        MR. FITZHUGH:  It's E-n-g-b-e-r-g.
3        MR. KIRKPATRICK:  Thank you.
4    Q   Other than the exhibits I've just shown you, are
5    there any other reports written by American Airlines'
6    personnel that you've reviewed, reports relating to this
7    incident on -- on December 28th, 2003?
8    A   Reports?
9    Q   Right.
10   A   American Airlines' reports?
11   Q   Yes.
12   A   No, not that I'm aware of.
13   Q   Okay.  After December 28th, 2003, when was the
14   next time anyone from American Airlines contacted you to
15   discuss this incident?
16   A   Maybe a month ago, if that long, three weeks or
17   four weeks.
18   Q   But for the first couple of years after the
19   incident, nobody contacted you?
20   A   Correct.
21   Q   Other than preparing for this deposition today,
22   have you done any follow-up with anyone from American
23   Airlines regarding this incident?
24   A   No.
25   Q   What about -- have you had any interaction with

Page 51

1    any law enforcement or government agencies regarding this
2    incident?
3    A   No, I haven't.
4        (Interruption.)
5        MR. KIRKPATRICK:  Let's go off the record.
6        (Off the record from 1:43 to 1:43 p.m.)
7    Q   Do you know who made the decision to have the
8    dogs brought onto the plane?
9    A   No, I don't.
10   Q   Do you know who made the decision to have all of
11   the passengers deplane and re-screened?
12   A   No, I do not.
13   Q   Do you recall any specific information that you
14   provided to Craig Marquis on the date of the incident
15   regarding this incident?
16   A   I do not recall.
17   Q   Do you know how the decision not to rebook these
18   passengers was conveyed to the ticket counter personnel
19   in Boston?
20   A   Do I recall?
21   Q   Yes.
22   A   No, I don't.
23   Q   How ordinarily would that information be
24   conveyed?
25   A   A phone call, the documentation in the -- in the

Page 52

1    reservation.
2    Q   And you don't recall whether -- do you recall
3    whether you spoke to any of the ticket counter personnel
4    in Boston?
5    A   I do not recall.
6    Q   Ordinarily, if a passenger is removed or denied
7    boarding and subjected to further investigation, and that
8    investigation reveals no basis for concern, is the
9    passenger rebooked?
10   A   You say ordinarily.
11   Q   In your experience, if -- if there is indication
12   of suspicious behavior, a decision is made to investigate
13   further, the further investigation reveals nothing that
14   strikes anyone as a safety concern, is that passenger
15   ordinarily rebooked?
16   A   Every situation is -- is based on its own merit.
17   There's no -- there's no answer that I can give you that
18   is an -- an ordinarily we do this, or normally we do
19   that.  I can't -- I can't give you an answer to that
20   because there's not one.
21   Q   Okay.  When the CCRO is contacted regarding --
22   or a removal for suspicious behavior, what does the CCRO
23   do to further investigate the passenger --
24   A   Take it --
25   Q   -- if anything?

Page 53

1    A   My -- my part would be taking it to the center
2    manager.
3    Q   Which in this case would be Craig Marquis?
4    A   Correct.
5    Q   And is your role in this type of situation
6    simply to compile information provided by others, or do
7    you go out and do any kind of investigation to -- to
8    compile information yourself?
9    A   In a circumstance such as this, it would be -- I
10   would only compile the information.
11   Q   And from what sources would you generally be
12   receiving that information?
13   A   More than likely the center manager.
14   Q   And the center manager would be the person in
15   direct communication with folks in Boston in an incident
16   such as this?
17   A   Yes.
18   Q   But the CCRO would simply compile the
19   information that the SOC manager was passing along; is
20   that correct?
21   A   Correct.
22   Q   Do you know if it is permissible under your work
23   rules to consider a passenger's ethnicity in determining
24   whether they might be a security risk?
25       MR. FITZHUGH:  Objection, form.

14 (Pages 50 to 53)

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

Page 54

1        You can still answer.
2    A  Is -- is ethnicity --
3    Q  Ethnicity.
4    A  -- a factor?
5    Q  Yes.  For example, where somebody was born or
6  what their nationality is --
7    A  As to whether or not they'll be allowed to
8  travel?
9    Q  Yes.
10    A  No, absolutely not.
11    Q  Have you received civil rights training from
12  American Airlines?
13    A  No, I haven't.
14        MR. FITZHUGH:  Can you define civil rights
15  training?
16        MR. KIRKPATRICK:  Yes.  I wasn't clear.
17    Q  By civil rights training, I mean instructions in
18  the importance of not considering things such as race,
19  national origin, religion, those kinds of characteristics
20  in making determinations about whether somebody poses a
21  risk.
22    A  So you're -- you're saying are we trained as
23  American Airlines employees to --
24    Q  Right.  Does American Airlines provide you
25  training to explain that those kinds of characteristics

Page 55

1  are not to be considered in making determinations about
2  whether somebody is --
3    A  Absolutely.
4    Q  -- is a security concern?
5    A  Absolutely.
6    Q  How often do you have that sort of training?
7    A  We just -- actually, since from the day that
8  you're hired, we're trained to be nondiscr --
9  nondiscriminatory and respect the values of others, their
10  cultures, their religious beliefs; it's just something
11  that -- that's preached to us on a daily basis ever since
12  I worked for the company.
13    Q  Has that training changed at all since December
14  28th of 2003?
15    A  There was an online computer training course
16  that we all were required to take last year; that's the
17  first time that I've seen that.
18    Q  Has American Airlines ever passed along to you
19  any guidelines or instructions from the federal
20  government, for example, the Department of
21  Transportation, regarding the importance of carrying out
22  your duties in a nondiscriminatory way?
23    A  All right.  Say that again?
24    Q  My question is whether you've been provided by
25  American Airlines any materials that came from the

Page 56

1  government, from the Department of Transportation or the
2  FAA, for example, regarding the importance of airline
3  personnel carrying out their duties in a
4  nondiscriminatory way?
5    A  I'm sure we have.
6    Q  You don't recall specifically ever receiving
7  that?
8    A  (Moves head side to side.)
9        MR. FITZHUGH:  You have to say yes or no --
10    A  No.
11        MR. FITZHUGH:  -- or verbally.
12    Q  Does American Airlines have a procedure or
13  protocol to follow in how to respond if a member of a
14  flight crew thinks a passenger is suspicious, as far as
15  you know?
16        THE WITNESS:  Is -- that is not security
17  sensitive information?
18        MR. FITZHUGH:  The question is whether
19  there is a procedure.
20        THE WITNESS:  Okay.
21    A  There is a -- there is a procedure.
22    Q  And I understand some of the details may be
23  security sensitive information, but, in general, can you
24  describe for me what that protocol is?
25        MR. FITZHUGH:  No.  I'm going to instruct

Page 57

1  the witness not to answer, because it would violate the
2  SSI provisions of 49 CFR 1520.5.
3    Q  The procedures that we've been talking around
4  here, do you know if those procedures were followed with
5  respect to this incident on December 28th of 2003?
6    A  I'm sure they were.
7    Q  And how are you sure that they were?
8    A  How could they not have been?  I mean, that's
9  what we do every day.
10    Q  And so you're one of the individuals who's
11  involved in following those procedures when an event such
12  as this occurs, at least on the days that you're
13  operating as CCRO; is that right?
14    A  In -- okay.  Are you -- are you saying that
15  I'm -- you're going to have to say it again.  I'm sorry.
16    Q  I'm sorry.  Yeah, that's not a very good
17  question.  Let me try again.  Without revealing the
18  specifics of the procedures that you go through, when a
19  member of a flight crew thinks a passenger may be
20  suspicious, are you, in your position, one of the people
21  that follows those procedures when information comes in
22  that a member of a crew thinks a passenger is suspicious?
23    A  With the security issue, I would give it to the
24  center manager.
25    Q  Okay.  And then the center manager might

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                          June 15, 2006

Page 58

1  communicate information back to you that you would then
2  compile; is that correct?
3      A  Correct.
4      Q  But the center manager would make the decision
5  about how to proceed in terms of gathering further
6  information?
7      A  Correct.
8      Q  Do you have any input into what steps should be
9  taken and what information should be gathered?
10     A  No.  We're speaking of security issues?
11     Q  Yes, yes.  And has American Airlines trained you
12  conc -- concerning the circumstances under which a
13  passenger may be removed from a flight, denied boarding
14  or refused further service?
15     A  Denied boarding, yes.
16     Q  What about being denied the ability to rebook a
17  flight later that day, does American Airlines train you
18  on -- on -- under what circumstances it's appropriate to
19  deny re-booking?
20     A  Yes.
21     Q  And is the particular substance of that training
22  something that you would consider security sensitive
23  information?
24     A  Yes.
25     Q  I'd like to show you what's been previously

Page 59

1  marked as Exhibit 4.  And if you could just take a look
2  at the paragraph that begins, I need to caution you.
3          MR. FITZHUGH:  This is the complete
4  exhibit?
5          MR. KIRKPATRICK:  Apparently, this is a
6  complete exhibit that was used at -- in -- in
7  Ms. Walling's deposition.
8      Q  Just for the record, this is part of a message
9  to pilots that was produced by American Airlines.  It has
10  subsequently been produced with a Bates stamp, but was
11  not Bates stamped at the time of the Walling deposition.
12         Do you see in that -- that paragraph where
13  it says, I ask that if you have a problem call it in for
14  our experts to check it out?
15     A  I -- I see that.
16     Q  Okay.  Is SOC personnel the experts being
17  referred to here?
18     A  I don't -- I don't know.  I don't know if --
19  this has no label or anything on it.  I don't know where
20  this came from --
21     Q  Okay.
22     A  -- so I have no idea who they're referring to.
23     Q  When a crew member, let's say, for example, a
24  pilot has questions about a passenger that may be acting
25  suspicious, are they supposed to call it into SOC?

Page 60

1          MR. FITZHUGH:  I'm going to instruct the
2  witness not to answer that question because it's SSI.
3          Do not answer the question.
4      Q  If you would continue to the next paragraph and
5  take a look at that.  Does that paragraph accurately
6  state what crew members should do if they think a
7  passenger is suspicious?
8          MR. FITZHUGH:  Which paragraph are you on?
9          MR. KIRKPATRICK:  I'm sorry.  The one that
10  begins with, we had one case.
11         MR. FITZHUGH:  Oh.
12     Q  Let me rephrase my question.  Is it your
13  understanding that -- that that is the correct way for a
14  captain to handle such a situation, is to call it in?
15     A  Call it in where?  I don't know.
16     Q  Okay.  In your experience, when there's a
17  question about a customer, does anybody from American
18  Airlines investigate where the individual was born?
19         MR. FITZHUGH:  What kind of question --
20         If you could answer the question, go ahead.
21         THE WITNESS:  I can't answer that question.
22     Q  Okay.  Not as far as you know?
23     A  No.
24     Q  Okay.  When a -- when a passenger is perceived
25  as potentially suspicious, as far as you know, does

Page 61

1  anybody check their frequent flyer history?
2      A  I don't know.
3      Q  Okay.  That's fine.  I'll take that back.  Thank
4  you.  I'm going to hand you what's previously been marked
5  as Deposition 10.
6          MR. FITZHUGH:  I'm going to have to talk to
7  Craig Marquis if we're going to keep going very much
8  longer, 'cause he's been here for 15 minutes and I -- I
9  just want to check in with him.  How long are you going
10  to need from this point forward, can you tell me?
11         MR. KIRKPATRICK:  Probably --
12         MR. FITZHUGH:  Off the record, I'm sorry.
13         (Off the record from 2:00 to 2:03 p.m.)
14     Q  Ms. Cobbs, looking at the third entry on Exhibit
15  10, where the subject is removal of passengers, have you
16  had an opportunity to read that paragraph?
17     A  I did.
18     Q  It talks about captains refusing to accept
19  certain passengers on flights because of the passengers'
20  ethnic or religious backgrounds; are you aware of any
21  such incidents?
22     A  No, I'm not.
23     Q  What does SECOK -- do you know what that means?
24  It says, the SECOK on your close out, do you know what
25  that word means?

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                                June 15, 2006

Page 62

1    A  I do.
2    Q  What is that?
3    A  I don't know if I should tell you.
4        MR. FITZHUGH:  Do you need a minute with
5    me?  Do you want to speak with me?
6        THE WITNESS:  Sure.
7        MR. FITZHUGH:  Give us a second.
8        MR. KIRKPATRICK:  Sure.
9        (Off the record from 2:04 to 2:04 p.m.)
10   Q  Having conferred with your counsel, are you able
11   to tell me what SECOK means?
12   A  Yes.  It means security is okay.
13   Q  Okay.  Continuing on, it says that if you have
14   any questions regarding a particular passenger's
15   acceptance, please contact the CCRO.  Is that your
16   understanding of what a pilot should do in such a
17   situation?
18   A  Yes.  And the reason being, any time there is a
19   question of passenger acceptance, the crew and the
20   passenger service representatives are told that the CCRO
21   needs to be contacted so reports can be made if needed.
22   If it's a security issue, then it's handed to the -- to
23   the center manager.  Because we do work in such close
24   proximity that's not a difficult thing to do.
25   Q  Okay.  I understand.  Thank you.  I think I can

Page 63

1    take that one back.
2        MR. KIRKPATRICK:  I'd like to have this
3    marked as Number 19.
4        (Deposition Exhibit Number 19 marked.)
5    Q  Ms. Cobbs, I'm handing you what's been marked as
6    Exhibit 19, and this is a one-page document Bates Number
7    AA0096.  And could you please take a moment to -- to
8    review it and then let me know when you're done.
9    A  Okay.
10   Q  Thank you.  Does what we've marked as Exhibit 19
11   reflect your understanding of Americans' policy regarding
12   when a passenger can legitimately be denied service?
13   A  This is more not talking about when you can deny
14   service, but stressing the fact that we can't
15   discriminate.
16   Q  Is there anything in Exhibit 19 that you
17   disagree with, in other words, that is somehow contrary
18   to what you've been instructed in your training by
19   American Airlines?
20   A  No.
21   Q  Okay.  Thank you.  I'm going to hand you what's
22   been previously marked as Exhibit 17, and I would ask
23   again that you review this and let me know when you're
24   done.
25   A  Okay.

Page 64

1    Q  Does Exhibit 17 comport with your understanding
2    of American Airlines' policy regarding the denial of
3    service to passengers?
4    A  Again, this is -- yes.
5    Q  Is -- is there anything that -- that you see in
6    Exhibit 17 that -- that you disagree with or that
7    contradicts training you've received from American
8    Airlines?
9    A  No.
10   Q  Anything that you think has been left out of
11   that statement on this topic that you would want to add?
12       MR. FITZHUGH:  Objection.  I don't think
13   the witness is qualified to answer that.
14       MR. KIRKPATRICK:  I know.  That was not a
15   very good question.
16   Q  Anything that jumps out at you that's missing?
17       MR. FITZHUGH:  Missing in what manner?
18   With respect to her training?  I'm not being difficult,
19   but I don't understand --
20       MR. KIRKPATRICK:  I know.
21       MR. FITZHUGH:  -- the scope of the
22   question.
23       MR. KIRKPATRICK:  Yeah.
24   Q  The question is, this Exhibit 17 discusses
25   removal of passengers and whether it's legitimate to

Page 65

1    remove somebody when there's sort of discomfort with a
2    particular passenger.  I'm wondering whether, from your
3    training, there is some other information that American
4    Airlines has given you on that particular topic that is
5    missing from Exhibit 17?
6        MR. FITZHUGH:  On the particular topic of
7    removing a passenger or what -- merely for discomfort?
8    Q  In other words, as to what a pilot should do if
9    a passenger or crew member says that they're
10   uncomfortable with a particular passenger.
11   A  I don't believe that this is an actual verbatim
12   instruction on steps to take.  This is -- this is a
13   hotline message which is a phone message that is just a
14   reminder.  It's not a step-by-step what you're supposed
15   to do.
16   Q  Okay.  Thank you.  Have you been involved in any
17   incidents other than the one we've talked about today
18   that resulted in a passenger complaining of
19   discrimination?
20   A  No.
21   Q  Are you aware of any American Airlines' employee
22   who has been disciplined for considering the passenger's
23   race, color, national origin or ethnicity in determining
24   whether the passenger should be removed from a flight or
25   denied service?

17 (Pages 62 to 65)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                                June 15, 2006

---

Page 66

```
 1      A  I'm not.
 2          MR. KIRKPATRICK:  Pass the witness.
 3          MR. FITZHUGH:  No questions.
 4          MR. KIRKPATRICK:  Okay.  Thank you very
 5  much.
 6          (Off the record at 2:15 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 68

```
 1      I, RHONDA COBBS, have read the foregoing deposition
 2  and hereby affix my signature that same is true and
 3  correct, except as noted above.
 4
 5
                    RHONDA COBBS
 6
 7  THE STATE OF          )
 8  COUNTY OF             )
 9     Before me,          , on this day personally
10  appeared RHONDA COBBS known to me (or proved to me under
11  oath of through          ) (description of
12  identity card or other document) to be the person whose
13  name is subscribed to the foregoing instrument and
14  acknowledged to me that they executed the same for the
15  purposes and consideration therein expresses.
16     Given under my hand and seal of office this
17  day of          ,      .
18
19
                    NOTARY PUBLIC IN AND FOR
20                  THE STATE OF TEXAS
21
22
23
24
25
```

Page 67

```
 1          CHANGES AND SIGNATURE
 2  RHONDA COBBS               JUNE 15, 2006
 3  PAGE   LINE   CHANGE     REASON
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 69

```
 1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 2
 3  JOHN D. CERQUEIRA,     )
 4     Plaintiff          )
 5  V.                    )  CIVIL ACTION NO.
                             05-11652-WGY
 6  AMERICAN AIRLINES, INC., )
 7     Defendant          )
 8          REPORTER'S CERTIFICATE
            DEPOSITION OF RHONDA COBBS
 9          JUNE 15, 2006
10     I, Thu Bui, Certified Shorthand Reporter in and for
11  the State of Texas, hereby certify to the following:
12     That the witness, RHONDA COBBS, was duly sworn by
13  the officer and that the transcript of the oral
14  deposition is a true record of the testimony given by the
15  witness;
16     That the deposition was submitted on June 22, 2006
17  to the witness or to the attorney for the witness for
18  examination, signature and return to my by July 12, 2006;
19     That the amount of time used by each party at the
20  deposition is as follows:
21      Mr. Michael T. Kirkpatrick - 01:50
22     That pursuant to information given to the deposition
23  officer at the time said testimony was taken, the
24  following includes counsel for all parties of record:
25
```

18 (Pages 66 to 69)

7f1d210b-0e83-46c1-a9dc-1b71236ac434

Rhonda Cobbs                                                June 15, 2006

Page 70

1    Mr. Michael T. Kirkpatrick, Attorney for Plaintiff
     Mr. Michael A. Fitzhugh, Attorney for Defendant
2
3    I further certify that I am neither counsel for,
4  related to, nor employed by any of the parties or
5  attorneys in the action in which this proceeding was
6  taken, and further that I am not financially or otherwise
7  interested in the outcome of the action.
8    Certified to by me this 22nd day of June, 2006.
9
10
11
              Thu Bui, CSR# 7618
12            Expiration Date:  12-31-07
              Firm Registration No. 59
13            Collins Realtime Reporting
              600 N. Pearl Street
14            Suite 640
              Dallas, Texas 75201
15            Phone:  214-220-2449
16
17
18
19
20
21
22
23
24
25

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

7f1d210b-0e83-46c1-a9dc-1b71236ac434

05/07/2004

# Detail Note

### Event ID: 03122856

## SS CCRO History

**Created:** 12/28/2003    Rhonda Cobbs        **Updated:** 12/28/2003    Rhonda Cobbs
08:53                                              08:53

```
FL 2237/28DEC BOS/SS ACFT 233
28  1453  7D950A FTW-B2L
SS*2237/28 BOS SS
**** SECURITY REMOVAL ****
-2237/28 N233 BOS-FLL DLYD RMVG 3 ML PAX/BAGS FRM
ACFT DUE SECURITY CONCERN. PAX RPRTDLY EXHIBITED
SUSPICIOUS BEHAVIOR IN ARPRT TOWARD CAPTAIN, AND ON ACFT
OBSERVED BY N2 FA BOS BASED S. WALLING. LEO RMVD PAX,
DETAINED/QUESTIONED AND RELEASED THEM. PER SOC MOD
PAX DENIED BOARDING AND TICKETS REFUNDED. SECURITY SEARCH
OF ACFT PERFORMED BY DOGS. FA-S WERE RPLCD DUE TRAUMA.
FLT INCURRED 172 MINS DEPARTURE DELAY.
PNRS DVPQQX/FEBBLI/FJZSQY. EVENT 03122856.
FTWCR/COBBS/28DEC03/0845C.

END HISTORY
```

AA 0021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO.: 05-11652 WGY<br>)<br>)<br>)<br>) |

## AMERICAN AIRLINES, INC.'S ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed.R.Civ.P 33, defendant American Airlines, Inc. ("American" or "American Airlines") responds as follows to the interrogatories propounded by the plaintiff, John D. Cerqueira.

## GENERAL OBJECTIONS

I.    American objects to any interrogatory request insofar as it seeks materials or information covered by one or more of the following:

   (a)    attorney-client privilege;
   (b)    attorney's work product and mental impressions of the attorney;
   (c)    materials prepared in anticipation of or for litigation; and
   (d)    materials prepared for, at the request of, or by an expert.

II.    American objects to any interrogatory that is burdensome, oppressive, seeks information which is already known by the party, or which is not calculated to lead to the discovery of admissible evidence.

III.    American objects to any interrogatory which seeks the home address, telephone number or wages of any employee, representative, or agent of the defendant, and the defendant will not reveal such information for fear of violating the privacy of such persons who are not parties to this litigation.

IV.    American also objects to any interrogatory to the extent that it seeks, or a response would call for, the disclosure of Sensitive Security Information that it is prohibited by federal law from disclosing, per 49 CFR § 1520. Any and all subsequent responses are given subject to this objection, and with notice that no such disclosure will be made in any of the ensuing responses.

The foregoing General Objections shall apply to all requests, whether or not any reference is made to such objections in the defendant's response.

## RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1:

Identify the person(s) who made the decision to have John D. Cerqueira removed from American Airlines flight 2237 on December 28, 2003, state the basis for the decision, and identify any other person(s) who participated in making the decision and describe their participation.

**Response:**    Under the Federal Aviation Act, 49 U.S.C. § 44902, which affords an airline and its employees the discretion to refuse transport of a passenger who is or may be inimical to airline safety, Captain John Ehlers made an assessment that certain behavior exhibited by Mr. Cerqueira and other passengers who appeared to be traveling with him might pose a security risk. Captain Ehlers notified American Airlines' Ground Security Coordinator of these concerns, and thereafter all passengers were removed for re-screening, as was all baggage. Members of federal and state law enforcement agencies, including the Massachusetts State Police, then conducted interviews of some of the passengers, including Mr. Cerqueira. The State Police officers who were involved with the situation then notified Captain Ehlers that they were making the decision to "take this out of his hands," and detain Mr. Cerqueira for further questioning. Thus, the plaintiff was initially "removed" from the flight along with all of the other passengers as a result of Captain Ehlers' decision, but was subsequently not able to re-board the flight by virtue of the actions of the Massachusetts State Police. American Airlines also incorporates herein as a part of its response to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 2:

Identify the person(s) who made the decision to refuse service to John D. Cerqueira after he was released from questioning following his removal from American Airlines flight 2237 on December 28, 2003, state the basis for the decision, and identify any other person(s) who participated in making the decision and describe their participation.

**Response:**    On information and belief, Mr. Craig Marquis made this decision based upon information that he obtained from law enforcement officers involved with the incident, and other American Airlines personnel.

2

INTERROGATORY NO. 3:

If you have ever stated that Mr. Cerqueira was removed from flight 2237 or refused service for any reason(s) other than those set forth in response to Interrogatory Nos. 1 and 2, state each such reason and identify by whom and to whom the reason was communicated.

**Response:**  Not applicable.

INTERROGATORY NO. 4:

Identify all American Airlines personnel who communicated with Mr. Cerqueira on or after December 28, 2003, and state the substance of the communications.

**Response:**    Flight Attendant Sally Walling had a conversation with Mr. Cerqueira in the gate area prior the flight being boarded, when Mr. Cerqueira asked her if she would change his seat assignment to an exit row. She informed him that a gate agent would be coming along who could accommodate his request. Ms. Walling also subsequently spoke to Mr. Cerqueira after he had boarded the flight, and the substance of the conversation was to advise Mr. Cerqueira to raise his seat back and follow other general safety instructions that are given prior to all departures. Flight Attendant Lois Sargent discussed with him and the others seated alongside him in the exit row the responsibilities for being seated there, including being able to physically manage opening the door in case of an emergency. Mr. Ynes Flores, a Customer Service Manager, subsequently asked Mr. Cerqueira and those seated alongside him to accompany him off of the plane in order to resolve some issues concerning their seat assignments. In addition, Ms. Nicole Traer, at that time a Customer Service Manager, later discussed with Mr. Cerqueira the fact that he would not be allowed passage on a subsequent American Airlines flight that day. American Airlines also incorporates herein as a part of its response to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 5:

Identify each person who, on December 28, 2003, communicated information about Mr. Cerqueira to the person(s) who made the decision to have Mr. Cerqueira removed from American Airlines flight 2237, and state the substance of the communication.

**Response:**    Sally Walling, Amy Mikenkovic, Lois Sargent and Captain Ehlers communicated their observations of Mr. Cerqueira and resulting concerns to the law enforcement agencies mentioned in the response to Interrogatory Number 1, above. The identity of the Massachusetts State Police officer(s) that made the decision to detain Mr. Cerqueira has not been determined at this time, but discovery is continuing and American will supplement its responses accordingly if further information becomes known. Captain Ehlers also had other communications with additional personnel of American's Systems Operations Control and personnel stationed at Logan, the substance of which were his concerns and observations as expressed in the above response to Interrogatory 1. American Airlines also incorporates herein as a part of its response

3

to this interrogatory the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 6:

Identify each person who, on December 28, 2003, communicated information about Mr. Cerqueira to the person(s) who made the decision to refuse service to Mr. Cerqueira after he was released from questioning, and state the substance of the communication.

**Response:**    Ms. Rhonda Cobbs communicated information that is described in the above response to Interrogatory 1.

INTERROGATORY NO. 7:

If you contend that you are not liable to plaintiff because plaintiff's injuries were caused, in whole or in part, by any person(s) other than American Airlines, identify the person(s) and state the basis of your contention.

**Objection:**    American objects to responding to this interrogatory as it is without knowledge or belief that plaintiff sustained any "injuries" as a result of being refused service by American.

**Response:**    Subject to and without waiver of the foregoing objection, American answers as follows: If the plaintiff was "injured," American is unaware of any person or entity that caused or contributed to his "injuries."

INTERROGATORY NO. 8:

Identify all persons who witnessed or participated in the incidents on which the Complaint is based, and any other persons whom you believe have knowledge of relevant facts, and identify the issues on which you believe they have knowledge.

**Objection:**    American objects to this interrogatory as compound, vague and unduly burdensome.

**Response:**    Subject to and without waiver of the foregoing objection, Sally Walling, Amy Milenkovic, Captain John Ehlers, First Officer Donald M. Ball and Lois Sargent all have knowledge of the plaintiff's unusual behavior both before and after boarding. American Airlines also incorporates herein as a part of its response to this interrogatory its prior responses hereto, the facts set forth in its December 28, 2004 Position Statement to the Massachusetts Commission Against Discrimination, as well as its Automatic Disclosures and documents attached thereto.

INTERROGATORY NO. 9:

Identify all investigations conducted, reports made, or statements obtained, concerning the incidents on which the Complaint is based, and identify the person(s) involved and all related documents.

**Response:**   All such documents were attached to American's Automatic Disclosures, or will be provided in response to the plaintiff's Rule 34 request.


INTERROGATORY NO. 10:

If you contend that any person(s) communicated to Mr. Cerqueira the reason(s) why he was removed from flight 2237, or the reason(s) why he was refused service after his release from questioning, identify the person(s) and state the substance of each communication.

**Response:**  Mr. Ynes Flores communicated to Mr. Cerqueira the basis for his being initially asked to disembark from Flight 2237.  American is informed and believes that Ms. Nicole Traer later explained to Mr. Cerqueira that he was being refused service because his behavior and that of persons with whom he appeared to be traveling caused concerns among the passengers and crew of flight 2237.


INTERROGATORY NO. 11:

If the decisions to remove Mr. Cerqueira from flight 2237 and to refuse service to Mr. Cerqueira after his release from questioning were made pursuant to any policy, procedure, manual, or guideline, whether written or unwritten, identify and state the substance of the policy, procedure, manual, or guideline.

**Objection:**  American objects to this interrogatory on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security.

**Response:**  Subject to and without waiver of the foregoing objection, American states generally that perceived security concerns are dealt with on an *ad hoc* basis and that the particular action taken, and people or departments involved, depends on the circumstances of the situation. In a particular situation, a security concern may be dealt with solely by airport personnel or may also involve flight crew members, law enforcement authorities, security personnel, or AA headquarters personnel.  As a general proposition, if American determines that a passenger is a security risk and/ or should be denied boarding, the accepted procedure is to deny boarding or to otherwise effectively address the perceived risk so as to protect the safety of American's passengers and crew members.

5

INTERROGATORY NO. 12:

State whether any of the American Airlines personnel involved in the incidents on which the Complaint is based have been involved in other incidents in which a customer was removed from a flight, denied boarding, or refused service, and, if so, describe each incident and identify the persons involved.

**Objection:** American objects to this request as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to a particular time frame. Thus, a response would require that a commercial airline that serves a world wide market attempt to determine every such instance where one of its staff named above was "involved" in a situation where a passenger was denied or refused boarding. American's passenger division is the largest scheduled passenger airline in the world. American provides scheduled jet service to destinations throughout North America, the Caribbean, Latin America, Europe and the Pacific, serving 172 cities with a fleet of 840 aircraft. On an average day, American will complete 2,600 (two thousand, six hundred) flights. On any given day, 4 or 5 passengers are denied boarding for various reasons, including but not limited to behavior, illness, improper or insufficient identification and other lawful reasons. Thus, answering this interrogatory is not feasible. American also objects to this interrogatory as being unduly vague, in that it seeks to have American determine the meaning of its personnel who were "involved" in "the incidents on which the Complaint is based," as well as "involved in" other "incidents" which are not clearly defined.

INTERROGATORY NO. 13:

State whether any of the American Airlines personnel involved in the incidents on which the Complaint is based have been the subject of a discrimination complaint by an American Airlines customer, and, if so, describe each complaint and identify the persons involved.

**Objection:** American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to a particular time frame. Thus, a response would require that a commercial airline serving a worldwide market attempt to determine every such instance where one of its staff named above was "the subject of a discrimination complaint" in all places where American does business. American also objects to this interrogatory as being unduly vague, in that it seeks to have American determine the meaning of its personnel who were "involved" in the "incidents on which the Complaint is based... ."

**Response:** Subject to and without waiver of the foregoing objection, American states that it believes none of its employees mentioned in the above interrogatory responses have been named as a Respondent or a Defendant in any other administrative or legal proceeding alleging unlawful discrimination by a passenger. Those employees are: Nicole Traer, Ynes Flores, John Ehlers, Donald M. Ball, Sally Walling, Lois Sargent, Amy Milenkovich, Craig Marquis, and Rhonda Cobbs.

INTERROGATORY NO. 14:

State whether you have provided any of the American Airlines personnel involved in the incidents on which the Complaint is based any training, instruction, or written materials concerning the circumstances under which a passenger may be removed from a flight, denied boarding, or refused service, and, if so, identify and state the substance of the training, instruction, or written materials.

**Objection:** American objects to this interrogatory on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security. American also objects to this interrogatory as being unduly vague, in that it seeks to have American determine the meaning of its personnel who were "involved" in "the incidents on which the Complaint is based... ."

**Response:** Subject to and without waiver of the foregoing objection, American states generally that perceived security concerns are dealt with on an *ad hoc* basis and that the particular action taken, and people or departments involved, depends on the circumstances of the situation. In a particular situation, a security concern may be dealt with solely by airport personnel or may also involve flight crew members, law enforcement authorities, security personnel, or AA headquarters personnel. As a general proposition, if American determines that a passenger is a security risk and/ or should be denied boarding, the accepted procedure is to deny boarding or to otherwise effectively address the perceived risk so as to protect the safety of American's passengers and crew members.

INTERROGATORY NO. 15:

State whether you have provided any of the American Airlines personnel involved in the incidents on which the Complaint is based any training, instruction, or written materials concerning whether a passenger's race, color, national origin, ethnicity, or ancestry may be considered in determining whether a passenger should be removed from a flight, denied boarding, or refused service, and, if so, identify and state the substance of the training, instruction, or written materials.

**Objection:** American objects to this interrogatory on the basis that the information sought therein would in part involve the disclosure of Sensitive Security Information ("SSI"), which is subject to the provisions of 49 CFR § 1520. No such disclosure can be made in the absence of special authorization from the Department of Homeland Security.

**Response:** Subject to and without waiver of the foregoing objection, American states that it has, and did have in effect during the relevant time period, a strict policy that forbids unlawful discrimination of any kind against any passenger.

INTERROGATORY NO. 16:

Identify by name, date, and forum, every lawsuit, administrative complaint, charge, or enforcement action brought against American Airlines during the last five years which involved an allegation that a passenger's race, color, national origin, ethnicity, or ancestry was a motivating factor for a decision to have the passenger removed from a flight, denied boarding, or refused service.

**Objection:**   American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought seeks this information from a commercial airline with thousands of employees serving a worldwide market. American further objects to this interrogatory because much of this information is a matter of public record, and is therefore equally available to the plaintiff.

INTERROGATORY NO. 17:

State whether, during the last five years, you have taken disciplinary action against any employee for considering a passenger's race, color, national origin, ethnicity, or ancestry in determining whether a passenger should be removed from a flight, denied boarding, or refused service, and, if so, describe each incident and identify the persons involved.

**Objection:**   American objects to this interrogatory as being unduly broad and needlessly burdensome, as well as irrelevant. The data sought is not limited to the Boston station, and thus seeks this information from a commercial airline with thousands of employees serving a worldwide market.

INTERROGATORY NO. 18:

If you contend that American Airlines does not receive federal financial assistance as a whole, identify and describe the source and purpose of any federal financial assistance received by American Airlines during the five years preceding December 28, 2003.

**Objection:**  American objects to this interrogatory as being vague and seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**Response:**   Subject to and without waiver of the foregoing objection, American states that it has not advanced any such contention.

8

INTERROGATORY NO. 19:

Identify each person whom American Airlines expects to call as an expert witness at trial.

**Response:**    American has not designated an expert witness to testify at this time. Discovery is continuing, and American will promptly supplement this answer in the event that it designates any expert.


INTERROGATORY NO. 20:

With regard to each person identified in response to the previous interrogatory, state:

(a)    The subject matter on which the expert is expected to testify;
(b)    The substance of the facts and opinions to which the expert is expected to testify; and
(c)    The summary of the grounds for each opinion.

**Response:**    Please see American's response to Interrogatory No. 19.


I hereby certify under the pains and penalties of perjury this 14th day of February, 2006, that based upon information I have obtained in response to reasonably thorough and diligent inquiries that I have made upon the agents and employees of American Airlines, Inc., the foregoing responses are true and correct to the best of my knowledge, information and belief.

_____
Alec Bramlett, Senior Attorney
American Airlines, Inc.


Dated: February 14, 2006

_____
Notary Public
My Commission Expires 5/ 9 /0 8


Objections Submitted by:

_____
Michael A. Fitzhugh, (BBO 169700)
Anne-Marie H. Gerber, (BBO #649337)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330

9

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the forgoing to be served upon opposing counsel of record set forth below, by electronic mail and first class mail postage prepaid, this _15th_ day of February 2006.

David S. Godkin, Esq.
Erica Abate Recht, Esq.
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02110

Michael T. Kirkpatrick, Esq.
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009

_____
Anne Marie Gerber, Esq.

7