UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
JOHN D. CERQUEIRA,                  )
                                    )
    Plaintiff,                     )
                                    )
v.                                  )
                                    )   CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,            )
                                    )
    Defendant.                     )
_____)

### DEFENDANT AMERICAN AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S FOURTH MOTION IN LIMINE SEEKING TO PRECLUDE AMERICAN AIRLINES, INC. FROM INTRODUCING INTO EVIDENCE INFORMATION REGARDING THE SECURITY CONCERNS IN EXISTENCE AT THE TIME AMERICAN AIRLINES, INC.'S SYSTEM OPERATIONS CONTROL MANAGER DECIDED TO DENY REBOOKING TO MR. CERQUEIRA

On December 28, 2003, American Airlines, Inc. ("American") removed Mr. Cerqueira and two other passengers from Flight 2237 for questioning due to their unusual behavior. The three passengers were questioned by Massachusetts State Police and eventually were told that they were free to go. However, the manager on duty of System Operations Control (SOC) at American, Craig Marquis, decided not to allow them to rebook travel on American on that date because of security concerns. That decision is documented in the Passenger Name Record attached as Exhibit 4 to Plaintiff's motion.

Because Mr. Marquis and his subordinate, Rhonda Cobbs, have no independent recollection at this time of the security concerns leading to the decision to preclude plaintiff and two other passengers from travel on American on December 28, 2003, and because the specific nature of the security concerns in existence at the time of that decision are not reflected in documentation prepared personally by or at the direction of Mr. Marquis, plaintiff now seeks to

exclude from evidence testimony regarding the security concerns underlying the events that transpired on December 28, 2003. For the reasons set forth herein, American should be allowed to introduce testimony regarding the myriad of security issues raised in connection with Flight 2237 on December 28, 2003.

At deposition, Mr. Marquis and Ms. Cobbs both testified that they have no independent memory of the facts and circumstances surrounding the decision to preclude plaintiff and two other passengers from traveling on Flight 2237. However, Mr. Marquis and Ms. Cobbs testified extensively about the manner in which such decisions are made, and confirmed that the documentation that was prepared contemporaneously with the events in question match that which he would expect from an incident of this kind. Deposition of Craig Marquis, pp. 21, 26-29, 39-40, hereinafter "Marquis Dep.," attached hereto as Exhibit 1. The SOC manager has information from multiple sources in his or her possession when making critical rebooking decisions; in this case, that information is reflected in reports made by the captain and flight attendants.[1] Marquis Dep., pp. 28-29. The SOC manager also has extensive communications with the captain. Marquis Dep., p. 28. Moreover, the SOC manager would be in contact with law enforcement personnel on the ground. Marquis Dep., p. 29.

Captain Ehlers' report and that of Flight Attendant Sargent make it clear that the flight crew and law enforcement agents were concerned that the plaintiff or one of the other removed passengers may have had a box cutter at the security check point, and that law enforcement was sufficiently concerned to remove the passengers, rescreen them, and bring in bomb-detecting dogs. Though Mr. Marquis may have no independent memory of these events at the present

---

[1] Although Mr. Marquis testified that he did not recall seeing the reports generated by Captain Ehlers and the flight attendants prior to preparing for his deposition, he testified that standard protocol requires extensive communication between the SOC manager and the captain of a flight on which a security incident is transpiring. Marquis Dep., pp. 23-24, 28.

2

time, his actions must be evaluated in light of the circumstances in existence when he made the decision to preclude plaintiff and two other passengers from rebooking with American on the day in question.

The cases cited in Plaintiff's motion lend little or no support to his contentions. As a preliminary matter, unlike the cases cited by Plaintiff, American does not assert that the decision to deny rebooking was for unspecified security concerns. Rather, contemporaneous documentation prepared by American's employees demonstrates the precise nature of those concerns; therefore, the citations to *Loeb v. Textron, Inc.*, *Marcano-Rivera v. Pueblo Int'l, Inc.* and *IMPACT v. Firestone* have no bearing. *Marcano-Rivera*, 232 F.3d 245, 251 (1st Cir. 2000) (also irrelevant insofar it discusses evidence required to avoid Rule 50 dismissal); *IMPACT*, 893 F.2d 1189, 1194 (11th Cir.1990); *Loeb*, 600 F.2d 1003, 1012 (1st Cir.1979). Moreover, the cases cited by Plaintiff, save one, arise in the context of analyzing the prima facie case required to prove employment discrimination rather than in context of admissibility of evidence in a trial regarding provision of airline services. Finally, the *Simmons v. American Airlines* case also lends no credence to Plaintiff's contentions. In that case, the court reversed an award of summary judgment in favor of American Airlines because, when analyzing the case in the light most favorable to the plaintiff, it found insufficient evidence that lent support for the propositions advanced by American to justify its decision to deny service to a passenger. *Simmons*, 34 Fed. Appx. 573 at 4. The *Simmons* court made no finding as to whether the nature of the evidence would be sufficient to support a jury verdict in American's favor; the fact that the case was remanded for further proceedings suggests that the Simmons court believed American's proffered reasons for denying service were strong enough to merit a jury's consideration. *Id.*

Because there is no basis in law or fact to preclude a jury from hearing evidence regarding the security concerns that existed at the time Mr. Marquis made his decision to deny rebooking to the plaintiff and two other passengers, American requests that this Court DENY plaintiff's fourth motion in limine, with prejudice.

>Respectfully submitted,
>**AMERICAN AIRLINES, INC.**
>By its Attorneys,
>
>  __/s/ Amy Cashore Mariani_____
> Michael A. Fitzhugh, (BBO 169700)
> Amy Cashore Mariani, (BBO #630160)
> **FITZHUGH, PARKER & ALVARO LLP**
> 155 Federal Street, Suite 1700
> Boston, MA 02110-1727
> (617) 695-2330

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 30, 2006.

> _/s/ Amy Cashore Mariani_____
> Amy Cashore Mariani

# 05-11652-WGY

## John D. Cerqueira

## vs.

## American Airlines

## Deposition of Craig Marquis

## June 15, 2006



Tracey D. Smith, CSR, RMR
Collins Realtime Reporting
Dallas, Texas 75201
214-220-2449
www.collinsrealtime.net

Page 1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS


    JOHN D. CERQUEIRA,        )

        Plaintiff             )

    V.                        )   CIVIL ACTION NO.
                                  05-11652-WGY
    AMERICAN AIRLINES, INC.,  )

        Defendant             )




              ***********************************

                         ORAL DEPOSITION OF
                           CRAIG MARQUIS
                           JUNE 15, 2006

              ***********************************




        ORAL DEPOSITION OF CRAIG MARQUIS, produced as a

    witness at the instance of the Plaintiff, and duly sworn,

    was taken in the above-styled and numbered cause on the

    15th of June, 2006, from 2:30 p.m. to 3:37 p.m., before

    Thu Bui, CSR in and for the State of Texas, reported by

    machine shorthand, at the offices of American Airlines,

    4333 Amon Carter Boulevard, Fort Worth, Texas, pursuant

    to the Fed.R.Civ.P.30.

Page 2

1        A P P E A R A N C E S
2  Mr. Michael T. Kirkpatrick
      PUBLIC CITIZENS LITIGATION GROUP
3     1600 200th Street, N.W.
      Washington, D.C. 20009
4  Phone: 202-588-7728   Fax: 202-588-7795
      Email: mkirkpatrick@citizen.org
5
6        APPEARING FOR THE PLAINTIFF
7
8  Mr. Michael A. Fitzhugh
      FITZHUGH, PARKER & ALVARO LLP
9     155 Federal Street, Suite 1700
      Boston, Massachusetts 02110-1727
10 Phone: 617-695-2330   Fax: 617-695-2335
      Email: mfitzhugh@fitzhughlaw.com
11
12       APPEARING FOR THE DEFENDANT
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2                       PAGE
3  Appearances..............................  2
4  Stipulations.............................  4
5  CRAIG MARQUIS
6     Examination by Mr. Kirkpatrick........  4
7     Examination by Mr. Fitzhugh...........  41
8  Signature and Changes....................  44
9  Reporter's Certificate...................  46
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              CRAIG MARQUIS,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. KIRKPATRICK:
5     Q  Good afternoon, Mr. Marquis.
6     A  Hello.
7     Q  We met earlier, but just for the record, my name
8  is Michael Kirkpatrick and I represent John Cerqueira,
9  who has brought this case against American Airlines.
10       MR. KIRKPATRICK:  Mr. Fitzhugh, same
11 stipulations as the last one?
12       MR. FITZHUGH:  Yes.
13       You'll have an opportunity to read and sign
14 your deposition transcript, but there won't be a need for
15 a notarization, but I'll get it transmitted to you.
16       THE WITNESS:  Okay.
17    Q  Mr. Marquis, would you just state your name and
18 address for the record, please?
19    A  Craig Marquis, M-a-r-q-u-i-s, address, 4403
20 Spring Creek Road, Arlington, Texas, 76017-1268.
21    Q  Mr. Marquis, have you had your deposition taken
22 before?
23    A  For this case?
24    Q  No, in any case.
25    A  Yes, I have.

Page 5

1     Q  About how many times?
2     A  I believe I've been deposed two other times.
3     Q  What were those cases about?
4     A  One was for 9-11 and one was for a job that I
5  had prior to the airline business.
6     Q  I just want to quickly go over the ground rules
7  for today.  I am here to ask you some questions, to
8  gather some information, and your job is simply to give
9  me your best and -- and most honest answer.  You are
10 under oath as though we were in a court of law even
11 though we're in this informal atmosphere.
12       It's important because the court reporter
13 is taking down my questions and your answers that we not
14 speak at the same time, so I would just ask that you wait
15 until I finish my question before you start to give your
16 answers so that we get a clean transcript.  Also if you
17 don't understand one of my questions, please let me know
18 and I'll try to repeat it or rephrase it so that you do
19 understand it.
20       And if Mr. Fitzhugh objects to some of my
21 questions, those are objections for the record that we'll
22 deal with later if we need to.  But unless he instructs
23 you not to answer, you should still try to answer my
24 question even though he's made an objection for the
25 record.

```
                                Page 6
 1        And I don't think it'll take us too long
 2   this afternoon, but if you need a break let me know and
 3   I'm happy to stop and take a break.  But I would ask that
 4   we finish the -- the question that's pending and maybe
 5   the line of questioning and find a convenient place to
 6   take a break if we need to do that.
 7        Do you understand these instructions?
 8     A  Yes, I do.
 9     Q  Do you know of any reason that would prevent you
10   today from giving me your best full and honest answers?
11     A  None.
12     Q  Did you do anything to prepare for the
13   deposition today?
14     A  Yes, I did.
15     Q  What did you do?
16     A  I read the information that Michael had sent me,
17   just the due diligence, so that I could prepare and give
18   an accurate and helpful testimony.
19     Q  What were those documents, do you recall?
20     A  They were letters back and forth from different
21   attorneys, the letter from the client, the letter back
22   from American Airlines in response.
23     Q  Is it your understanding that those are
24   documents that the parties have exchanged in the course
25   of this lawsuit?
```

```
                                Page 7
 1     A  Yes.
 2     Q  Other than your discussions with -- with the
 3   lawyers for American Airlines, did you talk to anybody
 4   else about today's deposition?
 5     A  No.
 6     Q  How long have you been employed by American
 7   Airlines?
 8     A  19 years.
 9     Q  What is your current position?
10     A  I'm the operational manager in SOC, which is
11   system operations control.
12     Q  How long have you had that job?
13     A  Approximately six years.
14     Q  Could you describe for me your duties in that
15   position?
16     A  I represent higher management on this side of
17   the highway to operate the published schedule efficiently
18   and safely.
19     Q  And on a daily basis, what are the kinds of
20   tasks that you're required to carry out in order to keep
21   the operation operating on schedule and safely?
22     A  I take into consideration equipment that may be
23   out of service, manpower issues, air traffic control
24   issues, weather issues, safety issues, security issues,
25   environmental issues.
```

```
                                Page 8
 1     Q  How many people do you have working for you on a
 2   particular shift?
 3     A  I'm the operational manager for the whole
 4   airline, so the whole airline works for me.
 5     Q  Okay.  What about within SOC, within your sort
 6   of work place, how many people do you typically have
 7   helping you carry out your duties?
 8     A  In SOC at one time?
 9     Q  Yeah.
10     A  Probably 3' or 400.  SOC encompasses a lot of
11   different departments.
12     Q  And you're in charge of all of SOC; is that
13   right?
14     A  That's correct.
15     Q  Can you explain to me the position of CCRO and
16   how that position interacts with the SOC manager?
17     A  The CCRO is a federally mandated position; it's
18   corporate complaint resolution officer.  Those people
19   were trained in the laws of disabilities, and they know
20   the rules and regulations, either the law or American
21   Airlines guidelines and rules, and they sit two seats
22   down from my position, very close relationship, a lot of
23   interaction.
24     Q  And have you been trained in the same things
25   that the CCRO's have been trained in?
```

```
                                Page 9
 1     A  I have not.
 2     Q  Do you supervise the CCRO?
 3     A  I do.
 4     Q  Prior to becoming operations manager, what other
 5   positions did you have at American Airlines?  If you
 6   could just sort of work back in time, tell me the other
 7   jobs you've had.
 8     A  I started as an assistant dispatcher, then
 9   became a dispatcher, then became an equipment coordinator
10   and became a sector manager and then a center manager.
11     Q  Is there only one CCRO on duty at a time?
12     A  There is only one CCRO position.
13     Q  Were you working on December 28, 2003?
14     A  Yes, I was.
15     Q  What time did your shift start that day?
16     A  I believe 6:00 a.m., central.
17     Q  And on that day, did you become aware that there
18   was an incident or concern with respect to Flight 2237,
19   which was a scheduled flight from Boston Logan Airport to
20   Ft. Lauderdale?
21     A  I do not recall.
22     Q  Is it your understanding, from the documents you
23   reviewed, that an incident occurred that day that
24   involved the removal of some passengers from that flight?
25     A  Yes.
```

Page 10

1  Q  Other than what you've learned by preparing for
2  this deposition, do you have any specific recollection of
3  what you did on December 28, 2003 with respect to that
4  flight out of Boston Logan?
5  A  No.
6  Q  Do you have any specific recollection of anybody
7  you talked to that day, any conversations you had
8  regarding the incident with Flight 2237?
9  A  No.
10 Q  Do you know how long you were involved in
11 matters relating to that Flight 2237?
12 A  I don't recall.
13 Q  Do you recall how you were first made aware, I'm
14 assuming that you were, that there was an incident with
15 that flight?
16 A  Again, I don't recall.
17 Q  Do you have any recollection of any tasks that
18 you carried out on December 28, 2003 with regard to the
19 removal of passengers or denial of re-booking related to
20 that flight?
21 A  I do not recall.
22 Q  Did you have any role in the decision to remove
23 three passengers from Flight 2237 for questioning by law
24 enforcement?
25 A  No, I do not recall.

Page 11

1  Q  Do you recall whether anyone at SOC was
2  involved, any person other than yourself, do you recall
3  anybody else was -- was working on incidents related to
4  this Flight 2237?
5       MR. FITZHUGH:  Objection, form.
6       You can still answer if you --
7  Q  If you understand my question.
8       MR. KIRKPATRICK:  It wasn't a good
9  question, but I think he understands what I'm saying.
10 Q  Was there anybody else that you can recall right
11 now, this is the guy who handled that incident, do you
12 recall anybody else who was directly involved in this
13 incident?
14 A  I do not recall.
15 Q  Do you know who made the decision to have three
16 passengers removed from Flight 2237?
17 A  Other than the information from the paperwork?
18 Q  Okay. Yeah. Setting aside anything that you've
19 learned --
20 A  No.
21 Q  -- from the paperwork you looked at in
22 preparation for today's deposition?
23 A  No, I do not recall.
24 Q  Okay. And I take it that you then do not recall
25 what the specific reasons were for that decision to

Page 12

1  remove those passengers for questioning, am I right?
2  A  That's correct.
3  Q  On December 28, 2003, did you do anything to
4  determine whether any of the passengers on that flight
5  posed a security threat?
6  A  I do not recall.
7       MR. FITZHUGH:  If it'll help, we can
8  stipulate that's the day.  You can just say on the day in
9  question.
10      MR. KIRKPATRICK:  Thank you.
11 Q  And when I say "the incident", we all know what
12 I'm referring to.
13 A  Okay.
14      MR. FITZHUGH:  We'll so stipulate.
15 Q  Did you draw any conclusions on that day about
16 whether John Cerqueira was a security risk?
17 A  I do not recall.
18 Q  Did you do any type of investigation about
19 Mr. Cerqueira or the other two passengers removed from
20 that flight?
21 A  I do not recall.
22 Q  On that date, did you learn the results of any
23 law enforcement questioning of these passengers in
24 Boston?
25 A  I do not recall.

Page 13

1  Q  Did you communicate with the pilot to that
2  flight -- it was Captain John Ehlers -- did you
3  communicate with him on that day?
4  A  I do not recall.
5  Q  Who made the decision to deplane all the
6  passengers and re-screen them?
7  A  I do not recall.
8  Q  Who made the decision to have dogs brought onto
9  the plane?
10 A  I do not recall.
11 Q  Were you involved in making the decision that
12 the three passengers removed for questioning would not be
13 rebooked on the later American Airlines flight that day?
14 A  I do not recall.
15 Q  Do you know the basis for the decision not to
16 rebook those passengers on a later flight?
17 A  I do not recall.
18 Q  Do you recall anybody that you received
19 information from on that date about this incident?
20 A  I do not recall.
21 Q  Do you recall anybody that you provided
22 information to on that date about this incident?
23 A  No.
24 Q  Do you know when the decision was made to deny
25 further service to these three passengers?

Craig Marquis                                                           June 15, 2006

Page 14

1  A  No.
2  Q  Do you know how the decision not to rebook these
3  passengers was communicated to American Airlines'
4  personnel in Boston?
5  A  I do not recall.
6  Q  Do you know whether the three individuals
7  removed from the flight are barred from further travel on
8  American Airlines?
9  A  Other than from the deposition or other from the
10 paperwork?  It was stated in the paperwork that they as
11 of January 6th, is that correct, 2004, they allowed that
12 person to travel; is that correct?
13 Q  Okay.  There are documents, yes, that --
14 A  I remember reading that in the document, --
15 Q  In preparation --
16 A  -- that's all the information I know.
17 Q  Okay.  Other than any review of documents you
18 did in preparation for this deposition, do you have any
19 knowledge about whether these individuals -- how long the
20 denial of service lasted?
21     MR. FITZHUGH:  Objection, form.  Why don't
22 you ask for each particular person?
23     MR. KIRKPATRICK:  Okay.
24 Q  With regard to Mr. Cerqueira, do you know how
25 long he was barred from travel on American Airlines?

Page 15

1  A  Other from that documentation, I do not.
2  Q  With regard to the other passengers removed from
3  that flight, and the first one who is apparently in the
4  aisle seat, Oren Ashmil, do you know how long he was
5  barred from travel on American Airlines?
6  A  No.
7  Q  What about for Vittorio Daniel Rokah, who was in
8  the middle seat?
9  A  No.
10 Q  Before preparing for today's deposition, did
11 anybody from American Airlines contact you after
12 December 28, 2003 to discuss this incident?
13 A  Alec did.
14 Q  That would be Alec Bramlett?
15 A  That's correct.
16 Q  Do you recall when that was?
17 A  I do not.  I was on shift; he called, asked me
18 if I recalled; I did not.
19 Q  Do you have any -- do you have any --
20 A  Can I look at this?
21     MR. FITZHUGH:  No.  That's for the
22 stenographer, just for some names.
23 Q  Did you prepare any documents or reports the day
24 of the incident regarding the incident?
25 A  I do not recall.

Page 16

1  Q  In preparation for this deposition, did you see
2  any documents that you had a hand in preparing?
3  A  Other than the ones that were in the file, no.
4  Q  Okay.  Let's take a look at some documents,
5  because I'm not privy to what was in the file that you
6  looked at.  But I'd like to just take a look at a series
7  of documents and, first, if you can tell me whether it's
8  one of the documents you reviewed in preparation for the
9  deposition, that would be helpful.
10     First, I'm going to show you what was
11 previously marked as Exhibit 12, and this is a passenger
12 name record for John Cerqueira.  And it's five pages, so
13 if you want to take a moment to familiarize yourself with
14 it.
15 A  I have seen this PNR.
16 Q  When did you see it first?
17 A  I saw this PNR a couple of weeks ago when I was
18 giving information on a case for Michael.
19 Q  To prepare for the deposition?
20 A  That's correct.
21 Q  On December 28, 2003, did you add any
22 information to the detail notes for the event with this
23 ID number?
24 A  No, I don't do that.
25 Q  Did you instruct Rhonda Cobbs to add any

Page 17

1  information to this passenger name record?
2  A  I do not recall.
3  Q  Did you instruct Nicole Traer to add any
4  information to this passenger name record?
5  A  I do not recall.
6  Q  Mr. Marquis, if you would please turn to the
7  second page, which is AA0024, and the -- the first entry
8  under the -- the time stamp, correct me if I'm wrong, but
9  I believe this means passenger denied travel on Flight
10 2237 per SOC Craig, due to security issue.  CCRO will add
11 event number shortly.  Please refund tickets due to deny.
12 Boston customer service manager, N. Traer; is that
13 correct?
14 A  I see that.
15 Q  Does the notation, per SOC Craig due to security
16 issue, do you believe that that's referring to you?
17 A  Yes.
18 Q  Does this refresh your recollection at all
19 about -- about whether you made a decision to deny
20 boarding and refund the tickets to this passenger?
21 A  It does not.
22 Q  Looking down then, just a couple of lines below
23 that, there's an entry with the event ID number.  And it
24 states that above passenger denied boarding Flight 2237
25 Boston-Ft. Lauderdale per SOCMOD, due security issues

5 (Pages 14 to 17)

Thu Bui, CSR     Collins Realtime Reporting     214-220-2449

43550ef0-afba-45e7-b0a8-6a4ccc9607b6

Page 18

1  refund ticket. Do not rebook on AA. And that,
2  apparently, was input by Rhonda Cobbs. Are you the --
3  were you the SOC, I guess, manager on duty that day?
4      A   Yes, I was.
5      Q   Do you recall telling Rhonda Cobbs that this
6  passenger should not be rebooked on American Airlines?
7      A   I do not recall.
8      Q   I think I can -- we're done with that exhibit.
9  Mr. Marquis, I'm showing you what's been previously
10 marked as Deposition Exhibit 18. If you wouldn't mind
11 taking a look at these -- these pages that have been
12 collected together and labeled Exhibit 18. Let me know
13 when you got a chance to take a look at it.
14     A   Okay.
15     Q   Do the documents we've labeled as Exhibit 18,
16 are these among the documents you reviewed in preparation
17 for the deposition?
18     A   I'm not sure these all were here, but I
19 remember -- I remember seeing the aircraft -- the
20 aircraft routing, some of the crew information. I don't
21 recall that all of these were in that paperwork.
22     Q   Do any of these exhibit pages in Exhibit 18, do
23 any of them refresh your recollection about the incident?
24     A   They do not. Mr. Kirkpatrick, it doesn't seem
25 to be anything spectacular or outstanding about all the

Page 19

1  paperwork that I've looked at that would stay in my mind.
2      Q   So, in other words, none of that has refreshed
3  your recollection?
4      A   That's correct.
5      Q   Okay. Thank you, for -- for cutting to the
6  chase there. I am though, just for the record, going to
7  put you through a few more paces here.
8      A   That's fine.
9      Q   If you wouldn't mind taking a quick look at
10 Exhibit 14, and is this a document that you reviewed in
11 preparation for today's deposition?
12     A   I don't recall. I mean, there was a lot of --
13 this is just general reporting for an event. There's no
14 reason that this piece should stand out.
15     Q   Okay.
16     A   It's just reporting.
17     Q   All right. I'd like to ask you a couple of
18 questions following up on -- on this Exhibit 14. Where
19 it says, passengers reportedly exhibited suspicious
20 behavior in airport towards captain, do you know
21 specifically what behavior that was?
22     A   I do not recall.
23     Q   It -- it continues that there was some sort of
24 suspicious behavior on the aircraft observed by Number 2
25 flight attendant, Boston based S. Walling; do you know

Page 20

1  specifically what she observed?
2      A   I do not recall.
3      Q   It also indicates that law enforcement officers
4  removed passengers, detained, questioned, and released
5  them. Do you recall anything about what law enforcement
6  did with respect to these passengers?
7      A   No, I do not.
8      Q   It says, per SOCMOD passengers denied boarding
9  and tickets refunded; do you recall any specific reasons
10 why that decision was made?
11     A   I do not.
12     Q   It also says that security search of aircraft
13 was performed by dogs; do you recall specifically why
14 that was done?
15     A   I do not.
16     Q   And it says that the flight attendants were
17 replaced due to trauma; do you recall what it was that
18 caused that trauma?
19     A   I do not.
20     Q   Thank you. I'm handing you what's been marked
21 as Exhibit 13. Is this one of the documents you reviewed
22 in preparation for today's deposition?
23     A   It may have been.
24     Q   Thank you. I'm handing you what's been marked
25 as Exhibit 11. What is Exhibit 11?

Page 21

1      A   It looks like a request to -- from a flight
2  service manager or person asking the flight attendants to
3  submit a report.
4      Q   Do you know whether reports were solicited at
5  your instruction?
6      A   I do not recall.
7      Q   What would be the purpose of asking the flight
8  service people to file a report?
9      A   Just for information gathering.
10     Q   Who do those reports go to, in other words, any
11 reports generated, you know, by flight attendants or
12 the -- the captain relating to this incident, would those
13 ordinarily be something that would go back to SOC manager
14 on duty or --
15     A   If I requested them specifically, they come to
16 me. If I didn't, then there's a reporting system called
17 the Event Call Center and they're submitted to the Event
18 Call Center, and flight service then handles them.
19     Q   If they're submitted to that Event Call Center,
20 in your position, would you ever have reason to go back
21 and review them?
22     A   Hypothetically?
23     Q   Yeah.
24     A   If I had a question, I'd go and look at them.
25     Q   Do you know whether you did, with respect to

6 (Pages 18 to 21)

Page 22

1  this incident, whether you went to look at any reports
2  that were filed?
3     A  I do not recall.  There's nothing outstanding on
4  this report, you know, it isn't a 9-11, it isn't Richard
5  Reid, it isn't, you know, a passenger being shot by FAMS.
6  There's nothing here that stands out.
7     Q  All right.  Okay.  Thank you.
8     A  You're welcome.
9        MR. FITZHUGH:  FAMS means Federal Air
10 Marshals?
11       THE WITNESS:  That's correct.
12    Q  In preparation for today's deposition, did you
13 review call center reports filed by the flight
14 attendants?
15    A  The only thing I reviewed was the paperwork that
16 I received from Michael.
17    Q  Okay.  I'm going to show you a series of
18 exhibits, there's about five of them.  And my question is
19 going to be the same for each, and it's whether you have
20 seen it before.
21    A  Seen them, okay.
22    Q  And if so, whether you saw it in preparation for
23 today's deposition or somewhere else.
24       MR. FITZHUGH:  Could we go off the record?
25 It may help.

Page 23

1        (Off the record from 3:01 to 3:01 p.m.)
2     Q  Mr. Marquis, I'm handing you Exhibit 1, which
3  has previously been identified as a call center report of
4  Flight Attendant Walling.  Have you seen this before?
5     A  Yes.
6     Q  In preparation for today's deposition?
7     A  That's correct.
8     Q  Anywhere else?
9     A  No, sir.
10    Q  I'm handing you what's been marked as Exhibit 5.
11 This has been previously identified as the call center
12 report of Flight Attendant Sargent.  Have you seen this
13 document before?
14    A  Yes.
15    Q  In preparation for today's deposition?
16    A  That's correct.
17    Q  Anywhere else?
18    A  No, sir.
19    Q  I'm handing you what's been previously marked as
20 Exhibit 9, which has been identified as a call center
21 report of Flight Attendant Milencovic.  Have you seen
22 this before?
23    A  Yes, I have.
24    Q  In preparation for today?
25    A  That's correct.

Page 24

1     Q  Anywhere else?
2     A  No, sir.
3     Q  I'm handing you what's been marked as Deposition
4  Exhibit 16.  This has been previously identified as the
5  statement of Captain Ehlers.  Have you seen this before?
6     A  Yes.
7     Q  In preparation for today?
8     A  That's correct.
9     Q  Anywhere else?
10    A  No, sir.
11    Q  Are there any other documents or reports that
12 were prepared contemporaneously to this incident by
13 American Airlines' personnel that you reviewed, and that
14 we haven't looked at today?
15    A  No, not that I know of.
16    Q  Okay.  Did you prepare any written report
17 related to this incident?
18    A  I did not.
19    Q  Do you know whether the CCRO that day prepared
20 any written report other than the detail notes that we've
21 looked at?
22    A  No.
23    Q  You don't know or she did not?  It wasn't a very
24 good question.
25    A  The information you have there with Rhonda's

Page 25

1  name on it is the correct way that we report, --
2     Q  And --
3     A  -- that is the only report that she would do.
4     Q  Okay.  And as far as you know, that represents
5  the totality of what she recorded that day?
6     A  That's correct.
7     Q  Thank you.  You mentioned earlier that
8  Mr. Bramlett contacted you to discuss this incident at
9  some time after December 20th, 2003.  Other than that
10 contact and your contacts in preparation for today's
11 deposition, has anyone else from American Airlines
12 contacted you to discuss this incident?
13    A  No.
14    Q  Has anyone from outside American Airlines, such
15 as a government agency or a law enforcement agency,
16 contacted you to discuss this incident?
17    A  No.
18    Q  When a passenger is removed from a flight or
19 denied boarding because of a perceived security concern,
20 ordinarily, how long will the denial of service last
21 before that person can fly again?
22    A  To the extent you can -- can tell me that.
23       MR. FITZHUGH:  I'm going to instruct the
24 witness not to answer the question to the extent it would
25 call for the disclosure of sensitive security information

Page 26

1  within the purview of 49 CFR 1520.5.
2       If you can answer the question without
3  disclosing such information, you may try to.
4     A  It varies.
5     Q  Where is it recorded to let, you know, for
6  example, ticket counter personnel know that somebody
7  should not be allowed to travel on American Airlines?
8        MR. FITZHUGH:  Is it for security issues
9  or --
10       MR. KIRKPATRICK:  Yes, yes.
11       MR. FITZHUGH:  Okay.  I'm going to instruct
12 the witness not to answer the question for the same
13 reasons as stated in my earlier instruction.
14    Q  If a passenger is removed or denied boarding, so
15 that further investigation can be done to determine if
16 there is security risk and nothing threatening or unusual
17 is found, are they ordinarily rebooked on a later
18 American Airlines flight?
19    A  Hypothetically?
20    Q  Yes.
21    A  Removed by who?
22    Q  For example, if the flight crew thought somebody
23 was behaving suspiciously, they have that person removed
24 and some type of law enforcement agent investigated that
25 person and found that there was an innocent explanation

Page 27

1  for whatever was perceived as -- as suspicious, and said
2  this person does not pose a risk for the security of the
3  flight, would that passenger ordinarily be rebooked on a
4  later flight?
5     A  Each event is decided on its own merit and
6  conditions and conduct.  You're being very general.
7     Q  I'm just wondering if there's a general rule.
8     A  There is no general rule or guideline.  You take
9  the combination of all the information for that specific
10 situation, you take your training, you take your
11 experience, and you make the decision.
12       Very generally, we're in the passenger
13 service business that carries passengers, we don't make
14 money if we leave everyone standing at the gate.
15    Q  Is the decision whether a passenger should be
16 rebooked made by the SOC manager on duty?
17    A  Yes.
18    Q  Is there anybody else who has the authority to
19 make the decision that somebody should not be rebooked?
20    A  No.
21    Q  When you make a decision that a passenger should
22 not be rebooked, do you record the reason anywhere?
23    A  We have a recording -- do you see the recordings
24 in that -- the CCRO enters, that's the recording data
25 that we use.

Page 28

1     Q  So, generally, the manager on duty in SOC would
2  verbally tell the CCRO the decision as to whether to
3  rebook or not, the CCRO would then input that information
4  into the computer system; is that right?
5     A  That's correct.
6     Q  When there is a security incident, such as the
7  one that happened in this case, do you, as the SOC
8  manager on duty, communicate directly with the crew
9  members, for example, the pilot ordinarily?  I know you
10 don't know remember the specifics of this incident, but,
11 ordinarily, would you get on the phone with the pilot?
12    A  In general, there are procedures in place where
13 the pilot contacts SOC, yes.
14    Q  And is it the manager on duty the point of
15 contact for the pilot?
16    A  Yes.
17    Q  Other than communicating with the pilot, are
18 there other individuals that the manager on duty and SOC
19 would ordinarily be in communication with?
20       MR. FITZHUGH:  Under what circumstances?
21    Q  Under these circumstances, where a passenger has
22 been identified as potentially suspicious and there's
23 been a decision to remove the passenger, and the next
24 thing that happened is somebody contacts SOC manager on
25 duty.  Under those circumstances, do you ordinarily have

Page 29

1  people that you communicate with?
2     A  Well, there is no ordinary circumstance.
3     Q  Okay.
4     A  Every circumstance is different.  It would be
5  very easy to check boxes and make every circumstance
6  ordinary.  No event is ordinary.  I can tell you that I
7  communicate with people at the station that are passenger
8  service people, ground security people, law enforcement
9  people, crew members, yes.
10    Q  Okay.  Just so we're clear, with respect to this
11 incident, you don't recall the specifics of anybody you
12 may have communicated with?
13    A  That is correct.
14    Q  Has American Airlines provided you with training
15 on carrying out your duties in a nondiscriminatory
16 manner?
17    A  Yes.  We have a very clear and strong
18 anti-discrimination policy, and I think it's a law.
19    Q  Has the -- the substance of that training
20 changed since December 28, 2003?
21    A  No.
22    Q  Does American Airlines have set procedures and
23 protocols for how to respond if a member of a flight crew
24 thinks a passenger is suspicious?  And I'm not asking you
25 for the details, but does American Airlines have such a

Craig Marquis                                                    June 15, 2006

Page 30

```
 1  procedure or protocol in place?
 2    A   No.
 3    Q   Everything is handled on case-by-case basis?
 4    A   That's correct.
 5    Q   So the procedure is to contact SOC manager on
 6  duty, and then from there decisions are made about where
 7  it goes from there; is that right?
 8    A   Not always.  I mean, there's other people that
 9  make security decisions; it depends on the severity.  I
10  mean, as an example, they can find a bullet on board an
11  aircraft on the ground.  They're going to take the bullet
12  off on their own, then they'll contact me.  I haven't
13  made that decision, but they have -- they're also
14  trained.  They, you know, everyone follows the exact same
15  protocol, I mean, our training's the same, okay?
16    Q   And so the individuals involved in making those
17  decisions could be the captain, could be ground security
18  coordinator, could be any number of people?
19    A   As far as what decision?
20    Q   A decision whether a passenger should be removed
21  and further screened because of some sort of --
22    A   No.  You were talking in general before.  A
23  Captain or a GSE cannot remove a passenger.  They cannot
24  do that --
25    Q   Okay.
```

Page 31

```
 1    A   -- not without first contacting SOC.
 2    Q   I see.  And is the decision made by SOC manager
 3  on duty?
 4    A   That's correct.
 5    Q   Have you ever been contacted after that decision
 6  has already been made and a passenger has been removed?
 7    A   Contacted by?
 8    Q   Like the first time SOC hears about it, is after
 9  the decision has already been made and the passenger's
10  been removed from the aircraft?
11    A   It may have happened once.
12    Q   Okay.  But it would be an unusual circumstance?
13    A   Very unusual.
14    Q   The ground security coordinator does not have
15  the authority to decide that a passenger should be
16  removed for further questioning?
17    A   That's correct.
18    Q   And the same with respect to the captain?
19    A   That's correct.
20    Q   Does the captain have the authority to say that
21  they don't want a particular passenger to fly on their
22  airplane without consulting SOC?
23    A   No.  The captain is the security coordinator
24  onboard that aircraft.  He is the security agent onboard
25  that aircraft.  As I'm the operational security manager,
```

Page 32

```
 1  he's the in-flight coordinat -- you know, he's the
 2  in-flight guy, and then you have the ground guy.
 3  Everyone has the same training; everyone follows the same
 4  rules, as far as contacting goes.
 5    Q   Okay.  But it would be SOC -- if procedures were
 6  followed correctly, it would be the decision of the SOC
 7  manager on duty to remove a passenger for further
 8  questioning?
 9    A   That's correct.  And then that would be
10  irregular if those procedures are not followed.
11    Q   Okay.  And once that passenger was removed,
12  let's say for further questioning by law enforcement
13  officers on the ground, it would be the SOC manager on
14  duty who would decide whether those passengers, once
15  released by law enforcement, were either denied rebooking
16  or were put on the next available flight?
17    A   In general, I wouldn't know the reason that the
18  law enforcement officer would take a passenger off an
19  aircraft.
20    Q   Okay.  Let me clarify a little bit.  If the
21  decision was made, passenger should be removed --
22    A   By?
23    Q   Let's say the SOC manager on duty --
24    A   Okay.
25    Q   -- decides, you know, crew members have reported
```

Page 33

```
 1  some suspicious behavior, they've observed, something
 2  that raises some questions, let's have that passenger
 3  removed and let law enforcement investigate.  Let's do
 4  the background check, let's check the watch list, et
 5  cetera, ask them some questions about, you know, what
 6  they're doing and where they're going.  Once law
 7  enforcement is done, and let's say they become convinced
 8  that the behavior was innocent and there's no threat to
 9  safety, at that point, does the SOC manager on duty make
10  the decision about whether that passenger should be put
11  on the next available flight, or denied rebooking and
12  given a refund?
13    A   That's walking on the border of SSI, so I cannot
14  answer it.
15    Q   But certainly, the SOC manager on duty is one
16  person that has the authority to make that decision,
17  correct?
18    A   That's correct.
19    Q   And the pilot does not have that authority?
20    A   That's correct.
21    Q   What about anybody in customer service, would
22  they have the authority to decide whether somebody should
23  be booked -- rebooked or not?
24    A   No.
25    Q   Mr. Marquis, I'm going to hand you what's been
```

9 (Pages 30 to 33)

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

Page 34

1  previously marked as Exhibit 10, and I'd ask you to
2  review the third entry on that page, subject, removal of
3  passengers.  If you could just give that a quick read and
4  let me know when you're done.
5      A   Which paragraph, I'm sorry?
6      Q   The bottom one.  The one where it starts,
7  subject, removal of passengers.
8      A   How did you get this if it's confidential?
9          MR. FITZHUGH:  Off the record.
10         (Off the record from 3:20 to 3:20 p.m.)
11     Q   Mr. Marquis, looking at that third entry there
12 it -- it talks about reports of captains refusing to
13 accept certain passengers on flights because of the
14 passengers' ethnic or religious backgrounds; are you
15 aware of any such incidents?
16     A   We've received calls, yes.
17     Q   And when you say you've received calls, I
18 mean --
19     A   From captains.
20     Q   From captains who were --
21     A   Concerns.
22     Q   Okay.  And how were those handled?
23     A   The manager on duty discusses the concerns with
24 the captain.
25     Q   And then if the manager on duty thinks that

Page 35

1  there's not a problem, do they instruct the captain to
2  accept the passenger and transport them?
3      A   Yes.
4      Q   When it states that a pilot with questions
5  regarding particular passenger acceptance should contact,
6  it says the CCRO and it has a phone number there, is
7  that -- does that accurately state what a pilot should do
8  if it -- if the pilot has questions about a particular
9  passenger's acceptance?
10     A   I believe that this is old, but it has 7299,
11 which is the CCRO position, which works on the podium
12 with myself.
13     Q   Okay.
14     A   So --
15     Q   So, generally, this --
16     A   -- if you can call any of those 12 numbers, then
17 that's just one.
18     Q   Okay.  Very good.  I think I'm done with Exhibit
19 10.  I'd like you to take a look at a document we've
20 previously marked as Exhibit 19.  And you can just take a
21 moment to review that, and let me know when you're done.
22     A   Okay.
23     Q   Thank you. Mr. Marquis, does the letter marked
24 as Exhibit 19, does it accurately reflect your
25 understanding of American Airlines' policy regarding

Page 36

1  whether a passenger can be denied service because of
2  generalized discomfort that the crew has with that
3  passenger?
4      A   I agree with that letter, yes.
5      Q   Is there anything that you would disagree with
6  in the letter you just read?
7      A   No, sir.
8      Q   Mr. Marquis, I'm going to hand you what's been
9  marked as Exhibit 17, and I would ask, again, that you
10 review the document.  And let me know once you've taken a
11 look.
12         Mr. Marquis, do you agree that Exhibit 17
13 accurately reflects American Airlines' policy?
14     A   I have never seen this before, but I agree with
15 most of this, and it does reflect the American Airlines'
16 thinking.
17     Q   Is there anything you see in here that you
18 disagree with, or that you think is contradicted by your
19 understanding of American Airlines' policy, anything you
20 would take issue with?
21     A   No.
22     Q   Thank you.  How often are you involved in
23 incidents in which a passenger is removed from a flight,
24 denied boarding, or refused service because of a security
25 concern?

Page 37

1      A   I can't say.
2      Q   I mean, is that something that happens every
3  day, every week, every month?
4      A   You have 2300 flights a day.  I may go in
5  tomorrow and have none; I may go in tomorrow and have
6  ten.
7      Q   Okay.
8      A   There's no timetable for that.
9      Q   Okay.
10     A   I mean, you have times of the year where, you
11 know, there's holidays going on, red alerts, spring
12 break, you can understand.
13     Q   Certainly.  How many SOC managers on duty are
14 there?  I know there's only one at a time, but how many
15 other people have the same responsibilities you do
16 when --
17     A   There's four MOD's --
18     Q   Okay.
19     A   -- center manager MOD's.
20     Q   I see.  Have you been involved in any incidents
21 that resulted in a passenger complaining of
22 discrimination, other than this one?
23     A   Yes.
24         (Interruption.)
25     A   I'm sorry.

Page 38

```
 1   Q   No problem.
 2   A   I had turned it off once.
 3   Q   We can take a break if you need to.
 4   A   No, it's not necessary.
 5   Q   Okay.  How many incidents -- how many such
 6  incidents that resulted in some sort of discrimination
 7  complaint?
 8   A   One.
 9   Q   Can you describe for me what happened in that
10  incident?
11   A   In general?
12   Q   Let's start in general.
13   A   A secret service agent was denied boarding.
14   Q   Any other incidents that resulted in
15  discrimination complaint?
16   A   That's all.
17   Q   In that incident with the secret service agent,
18  were you the person that made the decision that that
19  passenger should be removed from the flight?
20       MR. FITZHUGH:  Objection, form, assumes
21  facts not in evidence or established by the record.
22       Can you answer the question?
23   Q   If you understand the question.  In other words,
24  were you the decision maker?
25       MR. FITZHUGH:  I think you should lay a
```

Page 39

```
 1  better foundation.  I think it's -- the first question
 2  you asked and he answered to, doesn't lead to the one you
 3  just asked.
 4       If you can answer the question, answer it.
 5  But otherwise -- I'll leave it up to you.
 6   A   Can you read the question prior, please?
 7       (Reporter read requested testimony.)
 8   A   Yes.
 9   Q   Are you aware of any American Airlines' employee
10  who has been disciplined for considering a passenger's
11  race, color, national origin, or ethnicity in determining
12  whether the passenger should be removed from a flight,
13  denied boarding or refused service?
14   A   No.
15   Q   Mr. Marquis, I'm going to show you what's been
16  previously marked as Deposition Exhibit 2.  For the
17  record, this is an American Airlines' answers to
18  plaintiff's first set of interrogatories, and I'd like
19  you to -- on Page 2, take a look at Interrogatory Number
20  2 with the question and the response.
21   A   Okay.
22   Q   Okay.  The statement that Mr. Craig Marquis made
23  this decision, we're talking about the decision to refuse
24  service to Mr. Cerqueira after he was released from
25  questioning, Mr. Marquis made that decision based on
```

Page 40

```
 1  information that he obtained from law enforcement
 2  officers involved with the incident and other American
 3  Airlines' personnel.  Is that statement accurate, as far
 4  as you know?
 5   A   Yes.
 6   Q   But you don't recall today speaking to the law
 7  enforcement officers or other American Airlines'
 8  personnel?
 9   A   I do not recall, but those are things that we do
10  before we made that decision.
11   Q   Okay.  Thank you.
12   A   Yes, sir.
13   Q   I can take that back.  Other than the CCRO on
14  duty, I think we've established was Rhonda Cobbs, is
15  there anybody else within SOC that you would turn to to
16  work on an incident, such as the one we're discussing?
17   A   Yes.
18   Q   Who are those people?
19       MR. FITZHUGH:  I'm going to instruct the
20  witness not to answer based upon it being SSI.
21       MR. KIRKPATRICK:  And I'm not, just to be
22  clear, I'm not asking for their names in particular but
23  their positions.
24       MR. FITZHUGH:  It doesn't matter.  It would
25  violate 49 CFR 1520, particularly the sections of that
```

Page 41

```
 1  protocols, guidelines and implementation of security
 2  procedures.  I'm instructing the witness not to answer
 3  the question for those, among other elements of that
 4  title of the Code of Federal Regulations.
 5   Q   Do you have any recollection about whether, with
 6  regard to this incident, you interacted with anyone at
 7  SOC other than Rhonda Cobbs?
 8   A   I do not recall.
 9   Q   Just give me a moment to look at my notes.
10       MR. FITZHUGH:  No problem.
11       MR. KIRKPATRICK:  I think we're done.
12       I pass the witness.
13                    (3:35 p.m.)
14                    EXAMINATION
15  BY MR. FITZHUGH:
16   Q   Mr. Marquis, just a few questions about the
17  incident you identified in response to Mr. Kirkpatrick's
18  question about other customers complaining of
19  discrimination.  You recall your testimony on that point
20  about the secret service agent?
21   A   Yes, sir.
22   Q   And was he removed from the flight, or was he
23  denied boarding on the flight or do you recall?
24   A   He was denied boarding.
25   Q   So even though Mr. Kirkpatrick's question was
```

Page 42

1  about whether he was re -- about passengers removed from
2  the flight, your answer, in fact, was about a situation
3  where a passenger was initially denied boarding?
4     A  That's correct.
5     Q  And with regard to the circumstances of his
6  being denied boarding, do you recall the decision you
7  made to deny him boarding?
8     A  Yes.
9     Q  And do you recall the reasons?
10    A  Yes.
11    Q  And without disclosing any SSI, describe why he
12 was denied boarding on a flight.
13    A  Without disclosing SSI, it was due to his
14 conduct.
15    Q  And was there an issue about him failing to
16 provide some documentation that would have been required?
17    A  Yes.
18    Q  And was this ultimately explained to those who
19 made inquiry of you as to the reasons for your decision?
20    A  Yes.
21    Q  And, to your knowledge, has that person ever
22 pursued an administrative or legal complaint based upon
23 your decision?
24    A  No, sir.
25    Q  And at any time in your decision-making process,

Page 43

1  were you aware of the agent's ethnicity?
2     A  No, sir.
3        MR. FITZHUGH:  That's all I have.
4        MR. KIRKPATRICK:  I have nothing further.
5     Thank you.
6        (Off the record at 3:37 p.m.)

Page 44

CHANGES AND SIGNATURE
CRAIG MARQUIS                    JUNE 15, 2006
PAGE    LINE    CHANGE      REASON

Page 45

1     I, CRAIG MARQUIS, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.

                    CRAIG MARQUIS

7  THE STATE OF         )
8  COUNTY OF            )
9     Before me,           , on this day personally
10 appeared CRAIG MARQUIS known to me (or proved to me under
11 oath of through           ) (description of
12 identity card or other document) to be the person whose
13 name is subscribed to the foregoing instrument and
14 acknowledged to me that they executed the same for the
15 purposes and consideration therein expresses.
16    Given under my hand and seal of office this
17 day of       ,     .

                    NOTARY PUBLIC IN AND FOR
                    THE STATE OF TEXAS

```
                                    Page 46
 1         UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2
 3   JOHN D. CERQUEIRA,      )
 4     Plaintiff     )
 5   V.         )  CIVIL ACTION NO.
              05-11652-WGY
 6   AMERICAN AIRLINES, INC.,  )
 7     Defendant    )
 8         REPORTER'S CERTIFICATE
           DEPOSITION OF CRAIG MARQUIS
 9              JUNE 15, 2006
10     I, Thu Bui, Certified Shorthand Reporter in and for
11   the State of Texas, hereby certify to the following:
12       That the witness, CRAIG MARQUIS, was duly sworn by
13   the officer and that the transcript of the oral
14   deposition is a true record of the testimony given by the
15   witness;
16       That the deposition was submitted on June 22, 2006
17   to the witness or to the attorney for the witness for
18   examination, signature and return to my by July 12, 2006;
19       That the amount of time used by each party at the
20   deposition is as follows:
21         Mr. Michael T. Kirkpatrick - 01:03
           Mr. Michael A. Fitzhugh - 00:02
22
23       That pursuant to information given to the deposition
24   officer at the time said testimony was taken, the
25   following includes counsel for all parties of record:
```

```
                                    Page 47
 1     Mr. Michael T. Kirkpatrick, Attorney for Plaintiff
       Mr. Michael A. Fitzhugh, attorney for Defendant
 2
 3      I further certify that I am neither counsel for,
 4   related to, nor employed by any of the parties or
 5   attorneys in the action in which this proceeding
 6    Was taken, and further that I am not financially or
 7   otherwise interested in the outcome of the action.
 8      Certified to by me this 22nd day of June, 2006.
 9
10
11
              Thu Bui, CSR# 7618
12            Expiration Date:  12-31-07
              Firm Registration No. 59
13            Collins Realtime Reporting
              600 N. Pearl Street
14            Suite 640
              Dallas, Texas 75201
15            Phone:  214-220-2449
16
17
18
19
20
21
22
23
24
25
```

13 (Pages 46 to 47)