## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN D. CERQUEIRA,<br><br>           Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>           Defendant. | Civil Action No: 05-11652-WGY |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF DEPARTMENT OF TRANSPORTATION PROCEEDINGS AND A CONSENT ORDER ENTERED INTO BETWEEN AMERICAN AIRLINES, INC. AND THE DEPARTMENT OF TRANSPORTATION IN CONNECTION THEREWITH

Plaintiff John D. Cerqueira opposes American Airlines, Inc.'s (AA) motion *in limine* to exclude evidence of Department of Transportation (DOT) proceedings and a Consent Order entered into between AA and the DOT in connection therewith. Specifically, the Consent Order and other documents related to the DOT proceedings are highly relevant because the documents demonstrate that AA repeatedly has engaged in a similar pattern of unlawful discrimination against other passengers perceived to be of Arab, Middle Eastern, or South Asian descent, by causing such passengers to be removed from flights, denied boarding, or refused services. Furthermore, the Consent Order and related documents are admissible under Fed. R. Evid. 404(b) and 406 to show: (1) a discriminatory atmosphere as evidence of motive and intent; (2) that at the time that it engaged in unlawful discrimination against Mr. Cerqueira, AA was on notice that its behavior was unlawful; (3) that AA behaved with malice and reckless indifference; and (4) that injunctive relief is necessary to prevent AA from further acts of discriminatory behavior.

On April 25, 2003, the DOT instituted enforcement proceedings against AA, citing eleven separate instances in which AA unlawfully discriminated against passengers perceived to be of Arab, Middle Eastern, or South Asian descent by either removing them from flights or denying them boarding. The Notice of Enforcement Proceedings and Proposed Assessment of Civil Penalties against AA, together with the DOT's Enforcement Complaint, are attached hereto as Exhibit A. Eight months later, on December 28, 2003, AA engaged in further unlawful discrimination against Mr. Cerqueira.

On February 27, 2004, the DOT and AA entered into a Consent Order. The Consent Order is attached hereto as Exhibit B[1]. The DOT found that "American acted inconsistently with the applicable civil rights laws in removing and denying boarding to passengers on its flights." Consent Order at 2 n. 3, 5 (emphasis added). The DOT also found that passengers were denied boarding or removed based on their ethnic background and not for purported safety/security reasons and were removed "in a manner inconsistent with the carrier's non-discrimination obligations under Federal law." *Id.* at 3. These findings were repeated and underscored: "We find that American Airlines, Inc., acted in a manner inconsistent with the requirements of 49 U.S.C. §§ 40127, 41310, 41702 and 41712[2] when it removed from or refused to board on its flights certain individuals as discussed above." Consent Order at 4. The DOT further ordered AA "to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702 and 41712, as described above." Consent Order at 4.

---

[1] The Consent Order recites that AA defended the DOT's complaint by asserting that the most of the incidents took place in the months immediately following September 11, 2001, while AA was still adjusting to a new travel environment, and that in each instance security concerns were resolved on the ground and the passenger was put on the next departing flight or his scheduled flight. Consent Order at 2. AA's discriminatory conduct against Mr. Cerqueira took place more than two years after September 11, 2001, and for reasons that AA has never been able to articulate, AA committed a second act of discrimination against Mr. Cerqueira by refusing to rebook him at all.
[2] These statutes generally prohibit airlines from engaging in discrimination based upon race, color, national origin, religion, sex or ancestry.

The Consent Order and related documents are highly probative of, and directly relevant to, AA's liability in this case. If AA meets its burden under *McDonnell Douglas*[3] of articulating a legitimate nondiscriminatory reason for its behavior, Mr. Cerqueira must prove that the reasons offered by the defendant are a pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). "[E]vidence of a discriminatory 'atmosphere' may sometimes be relevant to showing the corporate state-of-mind at the time" of the incident in question. *Cummings v. Standard Register Co.*, 265 F.3d 56, 63 (1st Cir. 2001). Moreover, consent orders are routinely admissible to show state-of-mind, intent, or motive. Fed. R. Evid. 404(b); *see, e.g., Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th Cir. 1992) (consent order bearing directly on the question of racial animus admissible as evidence of motive or intent); *see also United States v. Serian*, 895 F.2d 432, 434-35 (8th Cir. 1990); *New England Enterprises, Inc. v. United States*, 400 F.2d 58, 70 (1st Cir. 1968), *cert. denied*, 89 S.Ct. 654 (1969); *United States v. Warren*, No. 7:04 CR 00021, 2005 WL 1164195, at **3-4 (W.D. Va. May 17, 2005); *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 257 F.Supp.2d 751, 758-60 (S.D.N.Y. 2003); *Brotman v. National Life Ins. Co.*, No. 94 CV 3468(SJ), 1999 WL 33109 (E.D.N.Y. Jan. 22, 1999).

The Consent Order and related documents are also admissible and highly relevant to Mr. Cerqueira's claim for punitive damages because they show AA's reckless indifference and malice at the time of the incident. Fed. R. Evid. 404(b). The DOT proceedings regarding eleven instances of AA's discriminatory behavior, which were almost (if not entirely) identical to AA's behavior towards Mr. Cerqueira, were instituted months prior to the incident involving Mr. Cequeira on December 28, 2003. Yet, on December 28th while AA was defending itself in the DOT proceedings and was on notice that AA and its employees were engaging in discriminatory

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

behavior, AA took no steps to train AA employees or other steps to prevent further discriminatory acts from occurring.

Similarly, the Consent Order and related documents are relevant to and admissible to show that injunctive relief is necessary. While AA had notice at least as early as April 2003 that AA employees were using safety/security concerns as a pretext for removing from flights passengers perceived to be from a certain ethnic background, in December 2003 AA had still not implemented preventative measures. Therefore, the Consent Order and related documents are admissible to show AA's knowledge of repeated similar discriminatory acts and that AA's decision not to institute training and procedures to prevent future instances of discrimination was not a mistake, but instead a deliberate decision.

Finally, the Consent Order and related documents are also admissible for purposes of showing that AA was on notice of an enforcement action against it based on AA's discriminatory behavior towards passengers of Arab, Middle Eastern, or South Asian descent prior to December 28, 2003. As discussed above, these documents are highly probative of AA's intent, motive, and knowledge and that probative value outweighs any prejudice that AA may suffer.

AA characterizes the Consent Order as a "settlement agreement", and seeks to exclude it because AA did not admit liability for the violations of law alleged by the DOT, and because the Consent Order states that it "makes no findings of violations with respect to any individual incident of alleged civil rights violations and the findings herein shall have no effect in any proceeding not before the Department of Transportation." A consent order is not a settlement agreement for purposes of Fed. R. Evid. 408. *See United States v. Warren*, No. 7:04 CR 00021, 2005 WL 1164195, at *3 (W.D. Va. May 17, 2005); *Gordon Electronics v. Katone Corp.*, No. 89 Civ. 2339, 1991 WL 8485, at *2 (S.D.N.Y. Jan. 17, 1991).

Further, the provision upon which AA relies does not have the broad sweep that AA

ascribes to it. It does not state that the Consent Order makes no findings of liability. In fact as

described above, the Consent Order expressly finds that AA violated the law in numerous

instances. Instead, the provision only states that the "order makes no findings of violations with

respect to any *individual* incident of alleged civil rights violations and the findings herein shall

have no effect in any proceeding not before the Department of Transportation." This provision is

plainly a reference to the individual complaints that were part of the DOT's Enforcement

Complaint, and not to other individual complaints such as Mr. Cerqueira's.

Finally, this provision on its face applies only to the Consent Order, and not to any of the

other related documents including, without limitation, the Notice of Enforcement Proceeding and

Enforcement Complaint. Consequently, even if the Court was inclined to exclude the Consent

Order itself, the related documents should not be excluded based on this language.

## CONCLUSION

For the aforementioned reasons, Mr. Cerqueira respectfully requests that this Court deny

Defendant American Airlines, Inc.'s Motion *In Limine* To Exclude Evidence Of Department Of

Transportation Proceedings And A Consent Order Entered Into Between American Airlines, Inc.

And The Department Of Transportation In Connection Therewith, As Referenced In Paragraph

60 Of Plaintiff's Statement Of Facts In Support Of His Motion For Summary Judgment And In

His Pretrial Designations. Because the Consent Order and related documents are admissible to

show proof of motive, opportunity, intent, and/or knowledge, the documents are admissible in

evidence and should not be excluded.

Respectfully submitted,

**JOHN D. CERQUEIRA,**
By his attorneys,


/s/ Darleen F. Cantelo
David S. Godkin, BBO #196530
Darleen F. Cantelo, BBO #661733
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA  02210
617-307-6100

Michael T. Kirkpatrick, Esq.
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC  20009
(202) 588-1000

Date:   December 4, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 4, 2006.


*/s/ Darleen F. Cantelo*
Darleen F. Cantelo

**CERTIFICATE OF CONFERENCE**

I hereby certify that on November 14, 2006, at 1:00 pm, I conferred by telephone with Amy Cashore Mariani, counsel for defendant, and attempted in good faith to resolve or narrow the issue presented in this motion, but the parties were unable to resolve the issue or narrow the areas of disagreement.

/s/ Darleen F. Cantelo
Darleen F. Cantelo

**EXHIBIT A**



### UNITED STATES OF AMERICA
### DEPARTMENT OF TRANSPORTATION
### OFFICE OF THE SECRETARY
### WASHINGTON, D.C.

Issued by the Department of Transportation
on the 25th day of April, 2003

Served:  **April 25, 2003**

| |
|---|
| American Airlines, Inc.<br><br>Violations of 49 U.S.C. §§ 40127, 41310, 41702, and 41712<br>Enforcement Proceeding |

**Docket OST 2003-15046**

## NOTICE OF ENFORCEMENT PROCEEDING AND
## PROPOSED ASSESSMENT OF CIVIL PENALTIES

The attached complaint of the Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Aviation Enforcement Office) alleges that American Airlines, Inc. (American) unlawfully discriminated against certain passengers in violation of 49 U.S.C. §§ 40127, 41310, 41702 and 41712 by removing these passengers from flights or denying boarding to them because, or primarily because, the passengers were, or were perceived to be, of Arab, Middle Eastern, or South Asian descent and/or Muslim. The Aviation Enforcement Office seeks an order to cease and desist from further such violations and an assessment of $ 65,000 in civil penalties for the violations described in the complaint.

49 U.S.C. § 40127(a) provides that an "air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry."  49 U.S.C. § 41310 prohibits air carriers or foreign air carriers from engaging in unreasonable discrimination against individuals on flights between the U. S. and foreign points. 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation, which the Department interprets to prohibit invidiously

1

CRQ 0062

discriminatory practices on the part of U.S. carriers generally, both in their foreign and domestic operations. 49 U.S.C. § 41712 in pertinent part prohibits unfair and deceptive trade practices.

Shortly after the terrorist hijackings and tragic events of September 11, 2001, the Aviation Enforcement Office began hearing reports of airlines unlawfully removing passengers from flights or denying boarding to passengers. As a result, the Aviation Enforcement Office took a number of steps to remind airlines that Federal law prohibits air carriers from discriminating against passengers on the basis of race, color, national origin, religion, sex or ancestry. On September 21, 2001, the Aviation Enforcement Office sent a notice to the major U.S. carriers (including American) and aviation associations cautioning the airlines not to target or otherwise discriminate against passengers based on their race, color, national or ethnic origin, religion, or based on passengers' names or modes of dress that could be indicative of such classification. On October 17, 2001, the Aviation Enforcement Office provided to the major airlines a copy of the Department of Transportation's (DOT or Department) statement on unlawful discrimination that DOT provided to its employees and recommended that air carriers pass this guidance along to their own employees, particularly flight and cabin crews and personnel directly involved in security.

The Aviation Enforcement Office also requested preliminary information from major U.S. carriers, including American, regarding incidents occurring between September 11, 2001, and December 31, 2001, involving the removal or denied boarding of a passenger for safety/security reasons. Based on the complaints received directly from passengers since September 11, 2001, and American's own incident reports, the Aviation Enforcement Office instituted an investigation of American for violations of Federal anti-discrimination statutes. This investigation leads us to conclude that there are reasonable grounds to believe that American has unlawfully discriminated against passengers in violation of 49 U.S.C. §§ 40127, 41310, 41702 and 41712, that American's discriminatory conduct will continue and result in irreparable harm to the public, and that a formal investigation of the alleged violations is in the public interest.

Accordingly, pursuant to Rule 407 of the Department's Rules of Practice, 14 CFR 302.407, I institute a formal enforcement proceeding to investigate the allegations set forth in the attached complaint. Under 49 U.S.C. § 46301, American may be assessed civil penalties of up to $2,500 for each violation of 49 U.S.C. § 40127 or § 41712, and civil penalties of up to $1,100 for each violation of 49 U.S.C. § 41310 or § 41702. Continuing violations of the statutes would subject American to potential civil penalties of up to $2,500.00 and $1,100.00 per day for each day a violation continues. The Assistant General Counsel for Aviation Enforcement and Proceedings seeks an assessment of civil penalties in the enforcement proceeding instituted by this notice.

Under Rule 407 of the Department's Rules of Practice, 14 CFR 302.407, American is notified that it may be liable for civil penalties of $65,000 reflecting violations of 49 U.S.C. §§ 40127, 41310, 41702 and 41712. We are also notifying the carrier that it may be liable for an additional penalty of up to $2,500 for each violation of 49 U.S.C. § 40127 and/or § 41712 and an additional penalty of up to $1,100 for each violation of 49 U.S.C.

CRQ 0063

§ 41310 or § 41702 involving any discriminatory denied boarding or removal arising after September 11, 2001, and alleged in a complaint received by American but not the Department and for each such violation alleged in a complaint received directly by the Department after January 1, 2003. In addition, American may be subject to penalties for continuing violations in the amount discussed above.

This notice and the attached complaint will be served on American. Pursuant to 14 CFR 302.407 and 408 of the Department's Rules of Practice, American is required within 15 days of the date of service of this notice and complaint, to file an answer to the complaint, admitting or denying specifically and in detail each allegation of the complaint and a response to the proposed assessment of civil penalties, specifically presenting any matters the carrier intends to rely on in opposition to or in mitigation of such civil penalties. See 14 CFR 302.408 (b).


Samuel Podberesky
Assistant General Counsel for
Aviation Enforcement and Proceedings



BY:        Omar V. Guerrero and Ann Gawalt
           Trial Attorneys
           Office of Aviation Enforcement and Proceedings
           400 Seventh St., S.W.
           Washington, D.C. 20590
           (202) 366-9349



Dated: April 25, 2003


(SEAL)


3

CRQ 0064

Certificate of Service

I certify that on April 25, 2003, I served the foregoing Notice of Enforcement Proceeding and Proposed Assessment of Civil Penalties and the related Complaint on the Respondent by first class mail addressed to the Respondent's address in Fort Worth, Texas.

Rosalind A. Knapp
Deputy General Counsel

By:

Nicholas Lowry
Attorney
Office of Aviation Enforcement
   and Proceedings
(202) 366-9351

4

CRQ 0065



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on 25th day of April, 2003

Served:  April 25, 2003

| | |
|---|---|
| American Airlines, Inc.<br><br>**Violations of 49 U.S.C. §§ 40127, 41310,**<br>**41702 and 41712**<br>**Enforcement Proceeding** | Docket OST 2003-15046 |

## ENFORCEMENT COMPLAINT

### I. NATURE OF THE CASE

A.    Federal law prohibits airlines from discriminating against air travelers because of their race, color, religion, ethnicity, national origin, or sex. 49 U.S.C. § 40127 provides that an "air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry." 49 U.S.C. § 41310 prohibits air carriers or foreign air carriers from engaging in unreasonable discrimination against individuals on flights between the U. S. and foreign points. 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation, which prohibits invidiously discriminatory practices on the part of U.S. carriers generally, both in their foreign and domestic operations. 49 U.S.C. § 41712 in pertinent part prohibits unfair and deceptive trade practices.

B.    Shortly after the terrorist attacks of September 11, 2001, the Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Aviation Enforcement Office) began to receive complaints against American Airlines, Inc. (American) from

CRQ 0066

individuals removed from flights or denied boarding on flights allegedly because those persons were or were perceived to be of Arab, Middle Eastern or Southeast Asian descent and/or Muslim. Because of concerns about these complaints, the Aviation Enforcement Office requested information from American regarding incidents occurring between September 11, 2001, and December 31, 2001, involving the removal or denied boarding of any passenger for safety/security reasons. Based on the complaints the Department received directly from passengers since September 11, 2001, and American's own incident reports, the Aviation Enforcement Office conducted an investigation of American for violations of Federal anti-discrimination statutes.

C.      The Aviation Enforcement Office's review of these complaints and incident reports reveal that reasonable grounds exist to believe that American has unlawfully discriminated against passengers by removing them from flights or denying boarding to them in violation of 49 U.S.C. §§ 40127, 41310, 41702 and 41712, that, absent further action, American's discriminatory conduct is likely to continue and result in irreparable harm to the public, and that a formal investigation of the alleged violations is in the public interest.

## II. VENUE AND JURISDICTION

A.      American holds certificate authority under 49 U.S.C. § 41101 to engage in air transportation of passengers and cargo. American's principal office is located at 4333 Amon Carter Blvd., Fort Worth, Texas, 76155.

B.      As a certificated air carrier, American is subject to the requirements of 49 U.S.C. § 40127, which prohibits U.S. and foreign air carriers from subjecting any air traveler to discrimination on the basis of race, color, national origin, religion, sex, or ancestry.

C.      As a certificated air carrier, American is subject to the requirements of 49 U.S.C. § 41310, which in part prohibits air carriers and foreign air carriers from unreasonably discriminating against any person in foreign air transportation.

D.      As a certificated air carrier, American is subject to the requirements of 49 U.S.C. § 41702, which requires that air carriers provide safe and adequate interstate air transportation.

E.      As a certificated air carrier, American is subject to the requirements of 49 U.S.C. § 41712, which in part prohibits unfair and deceptive practices in air transportation.

F.      As a certificated air carrier, American is subject to the requirements of 49 U.S.C. § 41739, which provides that a carrier shares responsibility, with respect to the quality of transportation provided the public, whenever it uses a single carrier designator code with another air carrier to provide air transportation.

G.      As a certificated air carrier, American is subject to this Department's adjudicatory authority pursuant to 49 U.S.C. §§ 40101 et seq. and 14 CFR Part 302 et seq.

CRQ 0067

H.    The Aviation Enforcement Office brings this action pursuant to 49 U.S.C. § 46101. Under 49 U.S.C. § 46101(a)(4), the Department may order an air carrier to cease and desist from violating Department orders, rules or certain statutory provisions, including 49 U.S.C. §§ 40127, 41310, 41702, and 41712.

I.    Under 49 U.S.C. § 46301 and 14 CFR Part 383, the Department may assess civil penalties of (1) up to $2,500 for each violation of 49 U.S.C. §§ 40127 and 41712; and, (2) up to $1,100 for each violation of 49 U.S.C. §§ 41702 and 41310. For continuing violations, each day each violation continues constitutes a separate offense.

## III. FACTS GIVING RISE TO THIS ACTION

A.    The Aviation Enforcement Office has reasonable evidence that, between September 11, 2001, and October 11, 2002, in at least eleven separate instances, American unlawfully removed passengers from flights and denied boarding to passengers because, or primarily because, the passengers were, or were perceived to be of Arab, Middle Eastern, or South Asian descent and/or Muslim. The names of the passengers that were unlawfully removed from flights or denied boarding by American personnel are:  Hamdy Abou-Husein, Maneesh Agarawal, Jehad Alshrafi, Henry Castellanos, Praneet Kataria, Lawrence Kurtz, Eduardo Mendez, Robert Menna, Wajahat Sayeed, and Vahid Tony Zohrehvandi.

B.    With regard to the denied boarding of Hamdy Abou-Husein the following facts are true:

1.    Hamdy Abou-Husesin is a U.S. citizen of Egyptian descent.

2.    On November 22, 2001, Mr. Abou-Husesin was scheduled to depart Boston Logan Airport (BOS) to Reagan National Airport (DCA) in Washington, D.C. on American Eagle flight 4595.

3.    Mr. Abou-Husesin arrived at Boston Logan Airport, was issued a boarding pass by an American ticket agent and went through the security checkpoint without incident.

4.    As Mr. Abou-Husesin was waiting in the gate area to board flight 4595, he heard an announcement over the gate area loudspeaker that he should come to the American counter.

5.    When Mr. Abou-Huessin walked over to the American counter, he was told that he was selected for additional security and to wait in line behind the other passengers who were being searched.

6.    In addition to being searched, Mr. Abou-Huessin was asked a number of questions by Massachusetts State Troopers and American employees. Mr. Abou-Huessin fully cooperated in the additional screening and questioning.

3                              CRQ 0068

7. During this additional questioning and search, a Massachusetts State Trooper repeatedly stated, "He's from Egypt" on a portable radio.

8. A short while later, this same Massachusetts State Trooper informed Mr. Abou-Husesin that the pilot decided to deny him transport on flight 4595 and the flight departed without him.

9. Despite questions from Mr. Abou-Huessin as to the reason he was being denied passage on flight 4595, American employees provided no specific reason to Mr. Abou-Huessin for his having been denied boarding.

10. American gate agents rebooked Mr. Abou-Husesin on one of its flights to Baltimore-Washington International Airport (BWI), which left later that same day. He was not subjected to additional security screening before boarding this alternate flight.

11. American did not have any legitimate safety or security reason for denying Mr. Abou-Huessin boarding on flight 4595.

12. Mr. Abou-Huessin was the only passenger denied boarding on flight 4595.

13. Mr. Abou-Huessin was the only passenger of Middle-Eastern descent scheduled to be on flight 4595.

14. The American pilot believed or knew Mr. Abou-Husesin was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

15. American denied boarding to Mr. Abou-Huessin from flight 4595 because of his race, color, national origin, religion, sex or ancestry.

16. Mr. Abou-Husesin was traumatized and made fearful and anxious as a result of the treatment he received from American.

17. Attached hereto and incorporated herein by reference, as Exhibit 1, is a true and correct copy of the Statement of Hamdy Abou-Husessin.

C. With regard to the removal of Maneesh Agarawal the following facts are true:

1. Maneesh Agarawal is a citizen of India and of the Hindu faith. He has a dark complexion.

2. On October 13, 2001, Mr. Agarawal was scheduled to fly on American flight 269 from Boston, Massachusetts to San Jose, California.

4

3.    After clearing security, during which process he was subjected to additional screening, involving a search of his person and carry-on luggage, Mr. Agarawal boarded flight 269 to San Jose.

4.    About twenty minutes after Mr. Agarawal boarded flight 269, an American agent approached Mr. Agarawal and asked that Mr. Agarawal deplane, as "security" had a few additional questions.

5.    Upon disembarking from the plane, Mr. Agarawal was met by an immigration officer, a local police officer and an air marshal. Mr. Agarawal answered the questions posed to him by these officials.

6.    When Mr. Agarawal asked the reason he was being subjected to so much additional security, the local police officer explained that the American flight crew was uncomfortable with him and some of the flight attendants were suspicious of Mr. Agarawal because he did not make eye contact with them.

7.    Flight 269 to San Jose departed without Mr. Agarawal. Mr. Agarawal was rebooked on the next American flight to the Dallas, Fort Worth Airport where he connected with another American flight, and arrived in San Jose five hours later than originally scheduled. American upgraded Mr. Agarawal to first class on both these flights and did not subject him to additional security searches for the flights.

8.    American did not have any legitimate safety or security reason for removing Mr. Agarawal from flight 269.

9.    One or more of the crewmembers of American flight 269 believed or knew Mr. Agarawal was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

10    American removed Mr. Agarawal from flight 269 because of his race, color, national origin, religion, sex or ancestry.

11.    Mr. Agarawal has suffered emotional distress as a result of the incidents of October 13, 2001.

12.    Attached hereto and incorporated herein by reference, as Exhibit, 2 is a true and correct copy of the Statement of Maneesh Agarawal.

D.    With regard to the denied boarding of Jehad Alshrafi the following facts are true:

1.    Jehad Alshrafi is a U.S. citizen of Jordanian descent.

2.    On November 3, 2001, Mr. Alshrafi was a scheduled passenger on American flight 181 from Boston Logan Airport (BOS) to Los Angeles (LAX).

5

CRQ 0070

3.   Mr. Alshrafi arrived at Boston Logan Airport, was issued a boarding pass by an American ticket agent and went through security without incident.

4.   As Mr. Alshrafi was waiting in the gate area to board flight 181, he was paged and instructed to report to an American agent at a nearby counter.  In response to the page, Mr. Alshrafi walked to a nearby counter where an American agent and a U.S. Marshall were standing.

5.   At the counter, this American agent told Mr. Alshrafi that the pilot of flight 181 had denied Mr. Alshrafi boarding on that flight.

6.   Upon repeated questioning by Mr. Alshrafi as to the reason Mr. Alshrafi was denied boarding by the pilot, the American agent stated that other passengers had complained about him.

7.   Mr. Alshrafi offered the American agent his U.S. passport and his work identification badge as evidence of his identity.  Mr. Alshrafi also informed her that he had "secret level" security clearance from the U.S. Department of Defense.

8.   The American agent and the U.S. Marshall left the gate area with Mr. Alshrafi's identification materials, presumably to talk to the pilot of Flight 181.

9.   Some time later, the American agent and the U.S. Marshall returned and the American agent informed Mr. Alshrafi that the pilot still did not want him onboard Flight 181.

10.  Mr. Alshrafi offered to be searched a second time as a reassurance that he posed no safety risk and contested the pilot's decision, but a state trooper arrived and asked him to move along. Flight 181 departed without Mr. Alshrafi.

11.  Later that day, Mr. Alshrafi was provided first class passage on another American flight to Los Angeles by way of Chicago and arrived in Los Angeles several hours later than originally scheduled.

12.  American did not have any legitimate safety or security reason for removing Mr. Alshrafi from flight 181.

13.  The American pilot for flight 181 believed or knew Mr. Alshrafi was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

14.  American denied boarding to Mr. Alshrafi on flight 181 because of his race, color, national origin, religion, sex or ancestry.

15.  Mr. Alshrafi has suffered serious emotional distress as a result of the incidents of November 3, 2001.

CRQ 0071

16.     Attached hereto and incorporated herein by reference, as Exhibit 3, is a true and correct copy of the Statement of Jehad Alshrafi.

E.     With regard to the removal of Henry Castellanos the following facts are true:

1     Henry Castellanos is a U.S. citizen of Hispanic descent with a dark complexion and is a pilot for Miami Air, a U.S. charter air carrier.

2.     American unlawfully removed Mr. Castellanos from flights from Dallas to Miami on two separate occasions – one on September 19, 2001, and one on September 28, 2001.

3.     Mr. Castellanos has suffered emotional distress as a result of the incidents of September 19, 2001, and September 28, 2001.

4.     The following facts are true with regard to Mr. Castellanos' removal that occurred on September 19, 2001:

a.     On September 19, 2001, Mr. Castellanos and two other Miami Air crewmembers were scheduled passengers on an American flight from Tucson to Miami, with a connecting flight at Dallas/Fort Worth Airport (DFW).

b.     David Caviness, one of the two other Miami Air crewmembers traveling with Mr. Castellanos, also has a dark complexion.   The other crewmember is a Caucasian.

c.     Mr. Castellanos and the other two crewmembers flew from Tucson to Dallas and boarded the flight at Dallas/Fort Worth Airport without incident.

d.     A few minutes after boarding this flight, as Mr. Castellanos was dozing in his assigned seat, an American employee approached Mr. Castellanos and requested his identification. This American employee explained to Mr. Castellanos that the captain of the flight wanted to review his identification. Mr. Castellenos provided her his driver's license and Miami Air credentials.

e.     Approximately five minutes later, an American employee stated over the public address system that Mr. Castellanos and Mr. Caviness must take their bags and deplane.

f.     Once Mr. Castellanos and Mr. Caviness deplaned, the captain explained that a flight attendant was uncomfortable having Mr. Castellanos and Mr.

7

CRQ 0072

Caviness as passengers after the events of September 11, 2001, and asked if American could book them on another flight.

g.    Mr. Castellanos provided the captain with a copy of his commercial pilot's license to reassure the flight attendant that he posed no safety risk.

h.    The American captain talked to the flight attendant three separate times about her discomfort regarding Mr. Castellanos and Mr. Caviness boarding.

i.    The flight attendant gave the pilot an ultimatum that either he remove Mr. Castellanos and Mr. Caviness or she would not fly.

j.    The American captain decided to remove Mr. Castellanos and Mr. Caviness from the flight because of the flight attendant's discomfort, and the flight departed without them.

k.    Mr. Catellanos and his fellow crewmembers were rebooked on another American flight and provided first class accommodations.

l.    American did not have any legitimate safety or security reason for removing Mr. Castellanos or Mr. Caviness from the aforementioned flight.

m.    The American flight attendant mistakenly believed Mr. Castellanos and Mr. Caviness were of Arab, Middle Eastern, or South Asian descent and/or Muslim.

n.    American removed Mr. Castellanos and Mr. Caviness from flight 223 because of their perceived race, color, national origin, religion, sex or ancestry.

o.    Attached hereto and incorporated herein by reference, as Exhibit 4, is a true and correct copy of the Statement of Henry Castellanos.

5.    The following facts are true with regard to Mr. Castellanos' removal that occurred on September 28, 2001:

a.    On September 28, 2001, Mr. Castellanos and three Miami Air crews each consisting of a number of persons were scheduled passengers on an American flight departing from Austin to Dallas, with a connecting flight in Dallas to Miami.

b.    Mr. Castellanos and the other Miami Air crewmembers flew from Austin to Dallas without incident.

8

CRQ 0073

c.    As Mr. Castellanos was boarding the American aircraft in Dallas for the flight to Miami, a flight attendant followed him to his seat. Shortly after Mr. Castellanos took his assigned seat, this flight attendant asked him to come and speak to the captain of that flight.

d.    The American captain asked Mr. Castellanos whether Mr. Castellanos was a pilot, whether Mr. Castellanos had a key to the cockpit, and whether there were other passengers on board that were pilots.

e.    Mr. Castellanos informed the American captain that he was a pilot, explained that there were other pilots on board, and agreed to provide the American captain his cockpit key.

f.    Mr. Castellanos returned to his assigned seat after speaking with the American captain.

g.    Soon thereafter, the American captain came out of the cockpit and walked to the back of the plane, observing the passengers as he walked. The American captain then returned to the cockpit and an announcement was made for all of the passengers to collect their belongings and exit the aircraft due to a mechanical problem.

h.    As passengers were exiting the jetway into the gate area, American security personnel pulled Mr. Castellanos and other non-Caucasian appearing Miami Air crewmembers out of line and told them that they would not be allowed to re-board the alternate American flight.

i.    When Mr. Castellanos asked the reason that they were being denied boarding, he was told that the American captain did not feel comfortable having them aboard the flight.

j.    It was only when a Miami Air crewmember told American security that there were other Miami Air crewmembers on board that the Caucasian or Caucasian-looking Miami crewmembers were told that they were also not going to be allowed to fly on the flight.

k.    None of the removed passengers were provided with a specific explanation for their removal aside from the captain not being comfortable with flying with some of the Miami Air crewmembers.

l.    American did not have any legitimate safety or security reason for removing Mr. Castellanos from the aforementioned flight.

m.    The American captain mistakenly believed Mr. Castellanos was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

CRQ 0074

n.    American removed Mr. Castellanos from the aforementioned flight because of his perceived race, color, national origin, religion, sex or ancestry.

o.    Attached hereto, as Exhibit 4 and incorporated herein by reference, is the true and correct copy of the Statement of Henry Castellanos and attached hereto, as Exhibit 5 and incorporated herein by reference, is the true and correct copy of the Statement of Patrick White, a witness to this incident.

F.    With regard to the denied boarding of Praneet Kataria the following facts are true:

1.    Praneet Kataria is a citizen of India and a permanent resident of Canada. He is a Sikh and wears a turban as a symbol of his faith.

2.    On December 25, 2001, Mr. Kataria was a scheduled passenger on American Airlines flight 1197 from Toronto to Chicago and American flight 1893 from Chicago to San Francisco.

3.    Mr. Kataria traveled on American flight 1197 from Toronto to Chicago and received his boarding pass for flight 1893 from Chicago to San Francisco without incident.

4.    When approaching the jetway to board flight 1893 at Chicago O'Hare Airport, Mr. Kataria was told to step aside and undergo an additional security search of his person and belongings.

5.    Mr. Kataria cooperated with the search and approached the jetway to board flight 1893 after the search was completed.

6.    The pilot of flight 1893 deplaned and advised the American agents not to allow Mr. Kataria to board the aircraft despite Mr. Kataria having been cleared by security.

7.    The pilot also told Mr. Kataria that he did not feel safe with Mr. Kataria on board flight 1893 because of the events of September 11, 2001.

8.    An American supervisor attempted to intervene; however, the Captain still would not permit Mr. Kataria to board the aircraft.

9.    The American supervisor stated her belief that the pilot was being racist.

10.   The captain was upset that the supervisor had pushed the issue, called the Chicago police, and re-boarded the flight. Flight 1893 departed shortly thereafter without Mr. Kataria.

CRQ 0075

11.    The Chicago police arrived, asked Mr. Kataria some questions, and cleared him. The police stated that they did not know the reason that the pilot would not allow Mr. Kataria to board the aircraft.

12.    Mr. Kataria was rebooked and traveled on the next American flight that departed to San Francisco.

13.    American did not have any legitimate safety or security reason for removing Mr. Kataria from flight 1893.

14.    The American pilot for flight 1893 believed or knew Mr. Kataria was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

15.    American denied boarding to Mr. Kataria on flight 1893 because of his race, color, national origin, religion, sex or ancestry.

16.    Mr. Kataria has suffered discrimination, emotional embarrassment and humiliation as a result of the incidents of December 25, 2001.

17.    Attached hereto, as Exhibit 6 and incorporated herein by reference, is a true and correct copy of the Statement of Praneet Kataria.

G.    With regard to the removal of Lawrence Kurtz the following facts are true:

1.    Lawrence Kurtz is a U.S. citizen of Cuban descent with a tan complexion, brown eyes, and black hair.

2.    On October 15, 2001, Mr. Kurtz was scheduled to fly on an American flight from Mexico City to Newark with a connection in Dallas, Fort Worth.

3.    Mr. Kurtz flew from Mexico City to Dallas, went through Customs in Dallas, and boarded flight 1710 from Dallas to Newark without incident.

4.    When Mr. Kurtz was sitting in his assigned seat on flight 1710 to Newark, an American employee approached him and asked him to leave the aircraft.

5.    Once Mr. Kurtz deplaned, an American agent told Mr. Kurtz that another passenger reported that he was behaving suspiciously and questioned Mr. Kurtz as to the reason he may be nervous.

6.    Mr. Kurtz explained that he did not believe that he was acting suspiciously and the American agent did not specify what, if anything, about Mr. Kurtz's behavior seemed suspicious. Upon further questioning about the purpose of his trip, Mr. Kurtz explained he was traveling home and produced his itinerary, driver license and U.S. passport.

CRQ 0076

7.  At this point, the captain of the flight approached Mr. Kurtz, informed Mr. Kurtz that the other passengers did not feel comfortable with Mr. Kurtz on board and explained that he was unwilling to depart if the passengers were uncomfortable.

8.  Although he was embarrassed and humiliated, Mr. Kurtz responded that if the captain and the passengers were unwilling to depart because of his presence, then if he were properly compensated and received an apology, he would de-board the plane.

9.  Flight 1710 to Newark departed without Mr. Kurtz and Mr. Kurtz was given a $200.00 travel voucher, $10.00 meal voucher, and rebooked on a subsequent American flight, where he was placed in first class.

10. American did not have any legitimate safety or security reason for removing Mr. Kurtz from the aforementioned flight.

11. One or more American employees and passengers on flight 1710 mistakenly believed Mr. Kurtz was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

12. American removed Mr. Kurtz from his originally scheduled flight because of his perceived race, color, national origin, religion, sex or ancestry.

13. Mr. Kurtz has suffered embarrassment and humiliation as a result of the incidents of October 15, 2001.

14. Attached hereto and incorporated herein by reference, as Exhibit 7, is a true and correct copy of the Statement of Lawrence Kurtz.

H.  With regard to the removal of Eduardo Mendez the following facts are true:

1.  Eduardo Mendez is a U.S. citizen of Hispanic descent and a pilot for Miami Air, a U.S. charter air carrier.

2.  On September 28, 2001, Mr. Mendez and eight Caucasian Miami Air crewmembers were scheduled to fly on an American flight from Austin to Miami with a connection in Dallas/Fort Worth Airport.

3.  Mr. Mendez and these eight Miami Air crewmembers flew from Austin to Dallas and boarded the flight in Dallas to Miami without incident.

4.  Soon after boarding, Mr. Mendez heard an announcement for all passengers to deplane. He thought nothing of it, grabbed his bags, and departed the aircraft.

5.  As Mr. Mendez was walking off the aircraft, the American captain standing in the front galley glanced down at Mr. Mendez's crew bag with a Puerto Rican flag on

12                              CRQ 0077

it, asked Mr. Mendez to follow him to the jetway, and demanded Mr. Mendez turn over his cockpit key.

6.    The American captain did not ask any of Mr. Mendez's eight Caucasian Miami Air crewmembers to follow him to the jetway or demand that they provide him their cockpit keys.

8.    Mr. Mendez explained to the American captain that he could not provide the captain with his cockpit key as he did not have it with him. The American captain became visibly upset at this response. Mr. Mendez offered the captain his Miami Air badge and commercial pilot's license to reassure him of his identity, but the captain appeared uninterested and told Mr. Mendez that he did not want Mr. Mendez on his flight, and the flight departed without him.

9.    Mr. Mendez and all of the other Miami Air crewmembers were rebooked on subsequent American flights.

10.    American did not have any legitimate safety or security reason for removing Mr. Mendez from the aforementioned flight.

11.    The American captain mistakenly believed Mr. Mendez was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

12.    American removed Mr. Mendez from the aforementioned flight because of his perceived race, color, national origin, religion, sex or ancestry.

13.    Mr. Mendez suffered embarrassment, humiliation and anxiousness about flying as a result of the incidents of September 28, 2001.

14.    Attached hereto and incorporated herein by reference, as Exhibit 8, is the true and correct copy of the Statement of Eduardo Mendez and attached hereto and incorporated herein by reference, as Exhibit 5, is the true and correct copy of the Statement of Patrick White, a witness to the incident.

I.    With regard to the removal of Robert Menna the following facts are true:

1    Robert Menna is a U.S. citizen of Sicilian/Norwegian descent who, at the time of the incident described below, had a dark suntan.

2.    On September 15, 2001, Mr. Menna was scheduled to fly from Islip to Boston on American flight 4624 and from Boston to Los Angeles on American flight 223.

3.    Mr. Menna flew on American flight 4624 from Islip to Boston and boarded flight 223 at Boston Logan Airport without incident.

13

CRQ 0078

4.  A few minutes after boarding flight 223, as Mr. Menna was sitting in his assigned seat, a uniformed American employee requested that Mr. Menna deplane and several Massachusetts state policemen escorted Mr. Menna off the plane.

5.  The Massachusetts state troopers asked Mr. Menna whether he was involved in an altercation at the American ticket counter and/or the security checkpoint of Boston Logan Airport.  The troopers acknowledged to Mr. Menna that the questioning was based on a report from American.

6.  Mr. Menna advised the officers that he was a connecting passenger and did not go to the American ticket counter or the security checkpoint at Boston Logan Airport.  At this point, the state troopers indicated that they had no other questions for Mr. Menna.

7.  Mr. Menna requested information as to the actual reason for his removal from flight 223 and the Massachusetts state troopers explained that he was "all right with them" and instructed him to contact American for an explanation.

8.  When Mr. Menna asked the American employee who requested that he deplane the reason for his removal from flight 223, this employee responded that some of the passengers and flight crew, including the pilot, did not feel comfortable with his presence.

9.  The American employee also acknowledged that Mr. Menna had not said or done anything to make anyone uncomfortable.

10.  Flight 223 departed without Mr. Menna.

11.  American did not have any legitimate safety or security reason for removing Mr. Menna from flight 223.

12.  One or more of the crewmembers and/or passengers on flight 223 mistakenly believed Mr. Menna was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

13.  American removed Mr. Menna from flight 223 because of his perceived race, color, national origin, religion, sex or ancestry.

14.  Attached hereto and incorporated herein by reference, as Exhibit 9, is a true and correct copy of the Statement of Robert Menna.

J.    With regard to the removal of Wajahat Sayeed the following facts are true:

1.  Wajahat Sayeed is a citizen of India and a permanent resident of the United States.  Mr. Sayeed is a Muslim with a long beard that he does not cut because of his faith.

14

2.    On October 11, 2002, Mr. Sayeed was a scheduled passenger on American flight 1048 from Dallas/ Fort Worth to Newark.

3.    Sometime after Mr. Sayeed boarded flight 1048 to Newark, as Mr. Sayeed was sleeping in his assigned seat, a security screener requested that Mr. Sayeed deplane for additional screening and escorted him off the plane.

4.    The security screener was asked by American to deplane Mr. Sayeed and subject him to additional screening.

5.    Three people searched Mr. Sayeed and his belongings.

6.    As Mr. Sayeed was being searched, the captain or one of the other crewmembers of flight 1048 asked Mr. Sayeed about his citizenship and told him that a passenger was nervous because of his presence on the flight.

7.    Mr. Sayeed was allowed to re-board flight 1048 to Newark.

8.    American did not have any legitimate safety or security reason for removing Mr. Sayeed from flight 1048.

9.    One or more of crewmembers and/or passengers on flight 1048 believed or knew Mr. Sayeed was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

10.    American removed Mr. Sayeed from flight 1048 because of his race, color, national origin, religion, sex or ancestry.

11.    Mr. Sayeed has suffered emotional distress as a result of the incidents of October 11, 2002.

12.    Attached hereto and incorporated herein by reference, as Exhibit 10, is a true and correct copy of the Statement of Wajahat Sayeed.

K.    With regard to the removal of Vahid Tony Zohrehvandhi the following facts are true:

1.    Vahid Tony Zohrehvandhi is a U.S. citizen of Iranian descent with brown skin, hair and eyes, and is a part-time fleet services employee for American in Dallas, Texas.

2.    On September 21, 2001, Mr. Zohrehvandi was scheduled to fly on American flight 1324 from Seattle to Dallas.

3.    Mr. Zohrehvandi boarded flight 1324 without incident.

CRQ 0080

4.    Shortly after boarding the plane, an American agent approached Mr. Zohrehvandi and asked Mr. Zohrehvandi to gather his belongings and to accompany him off the airplane.

5.    As Mr. Zohrehvandi was being escorted off the plane, he presented his American Airlines employee identification to the American agent.

6.    Mr. Zohrehvandi noticed that another individual who appeared to also be of Middle Eastern descent had been asked to leave flight 1324.

7.    Mr. Zohrehvandi did not see any other passengers being asked to leave the airplane.

8.    Mr. Zohrehvandi and this other man were taken by the American agent to a small room inside the airport.

9.    At some point, the American agent stated that Mr. Zohrehvandi and the other man had been removed from the flight because the pilot did not feel comfortable with their "look." The American agent acknowledged that Mr. Zohrehvandi had not done anything suspicious but asserted that pilots have the authority to request that passengers be removed.

10.   The American agent explained that American had contacted law enforcement authorities to question Mr. Zohrehvandi. Soon thereafter, three police officers came to the room. These officers asked Mr. Zohrehvandi for identification and questioned him.

11.   About an hour later, the officers informed Mr. Zohrehvandi and the American agent that the background checks on Mr. Zohrehvandi had come back negative and Mr. Zohrehvandi was free to go.

12.   Mr. Zohrehvandi was rebooked on another American flight since flight 1324 had already left.

13.   American did not have any legitimate safety or security reason for removing Mr. Zohrehvandi from flight 1324.

14.   The pilot for American believed or knew Mr. Zohrehvandi was of Arab, Middle Eastern, or South Asian descent and/or Muslim.

15.   American removed Mr. Zohrehvandi from flight 1324 because of his race, color, national origin, religion, sex or ancestry.

16.   Mr. Zohrehvandi was cautioned by his American supervisor that his job could be in jeopardy if he spoke to the media about this incident. Mr. Zohrehvandi has

CRQ 0081

suffered serious emotional distress as a result of the incidents of September 21, 2001.

17.    Attached hereto and incorporated herein by reference, as Exhibit 11, is a true and correct copy of the Statement of Vahid Tony Zohrehvandhi.

## IV. CLAIMS FOR RELIEF

A.    The actions described in paragraphs III(B) through III(K) *supra* were carried out: (a) at the direction of and with the consent, encouragement, knowledge and/or ratification of employees and/or agents of American; (b) under American employees' and/or agents' authority, control and supervision; and/or (c) within the scope of the American employees' and/or agent's employment.

B.    The actions of American's employees and/or agents were the direct and proximate cause of humiliation, embarrassment, mental pain, suffering, and inconvenience suffered by the passengers described in paragraphs III(B) through III(K) *supra.*

C.    By engaging in the conduct described in paragraphs III(B) through III(K) *supra*, American has on at least eleven separate occasions violated the requirements of 49 U.S.C. § 40127 prohibiting discrimination against air travelers on the basis of race, color, national origin, religion, sex, or ancestry.

D.    By engaging in the conduct described in paragraphs III(B) through III(K) *supra* American on at least eleven separate occasions committed unfair and deceptive practices that violated 49 U.S.C. § 41712.

E.    To the extent that the violations described in paragraphs III(B) through III(K) *supra* occurred in foreign air transportation, American has also violated 49 U.S.C. § 41310, which prohibits unreasonable discrimination in foreign air transportation against any person.

F.    To the extent that the violations described in paragraph III(B) through III(K) *supra* occurred in interstate air transportation, American has also violated 49 U.S.C. § 41702, which requires that air carriers provide safe and adequate interstate air transportation.

## V. PRAYER FOR RELIEF

WHEREFORE, the Aviation Enforcement Office requests the Department of Transportation to:

A.    Find that American Airlines, Inc., has violated 49 U.S.C. § 40127 by:

(i)    denying boarding to passengers because, or primarily because, the passengers were, or were perceived to be, of Arab, Middle Eastern, or South Asian descent and/or Muslim; and

17

CRQ 0082

(ii)   removing passengers from flights because, or primarily because, the passengers were, or were perceived to be, of Arab, Middle Eastern, or South Asian descent and/or Muslim.

B.   Find that to the extent the violations described in paragraphs A(i) and A(ii) supra involve flights between U.S. and foreign points,  American Airlines, Inc., has violated 49 U.S.C. § 41310.

C.   Find that to the extent the violations described in paragraphs A and B, *supra*, occurred in interstate air transportation, American Airlines violated 49 U.S.C. § 41702.

D.   Find that by engaging in the violations described in paragraphs A, B and C, *supra*, American Airlines engaged in unfair and deceptive practices in violation of 49 U.S.C. § 41712.

E.   Order American Airlines and its successors and assigns to cease and desist from violating 49 U.S.C. §§ 40127, 41310, 41702, and 41712 by engaging in the conduct described in paragraphs A, B, C, and D, *supra*.

F.   Assess civil penalties against American of $ 65,000 for the violations described in this complaint, an additional penalty of up to $2,500 for each violation and up to $2,500 per day for each continuing violation, of 49 U.S.C. § 40127 or § 41712 and an additional penalty of up to $1,100 for each violation and up to $1,100 per day for each continuing violation, of 49 U.S.C. § 41310 or § 41702 involving any other discriminatory denied boarding or removal or any continuing discriminatory policy or practice relating to denied boardings or removals, arising after September 11, 2001.

G.   Grant such other relief as may be appropriate.


Samuel Podberesky
Assistant General Counsel for
    Aviation Enforcement and Proceedings
400 Seventh St., S.W.
Washington, D.C. 20590
(202) 366-9349

BY:   Omar V. Guerrero, Trial Attorney
Ann Gawalt, Trial Attorney
Blane A. Workie, Chief, Civil Rights Enforcement Branch
Office of Aviation Enforcement and Proceedings
400 Seventh St., S.W.
Washington, D.C. 20590
(202) 366-9349
Date:   April 25, 2003
Attachment: (Appendix A)


18

CRQ 0083

# ATTACHMENTS / EXHIBITS

CRQ 0084

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1.  I, Hamdy Abou-Hussesin, being of sound mind, willfully and voluntarily make this declaration. I am over eighteen years of age and reside at Mobile, Alabama. Although my birth name is Hamdy Abou-Hussein, my friends and co-workers call me "Alex." I was born in Egypt, and I am now a naturalized U.S. citizen. I have a Master of Science degree in engineering from Boston University. At the time of the incident described below, I was employed as an independent contractor by Vine Associates in Newburyport, Massachusetts. Currently, I am employed as an engineer for Northrop Grumman Corporation in Pascagoula, Mississippi. I am awaiting a higher-level secret security clearance.

2.  On October 26, 2001, I purchased an electronic ticket for travel from Boston Logan Airport to Reagan National Airport in Washington, D.C. on American Eagle flight 4595, scheduled to depart on November 22, 2001 at 11:00 a.m.

3.  On November 22, 2001, Thanksgiving Day, I was traveling to visit my wife, Yoshiko Herrera, in Washington D.C. She is a professor at Harvard University and in November 2001, she was researching at the Library of Congress for one of her scholarly projects. My wife had been staying with her sister who is a lawyer handling cable regulation with the Federal Communications Commission. I had planned to join my wife and my sister-in-law as well as other friends for Thanksgiving dinner. For the remainder of Thanksgiving weekend, my wife and I had reservations to stay two nights at the Watergate Hotel in Washington D.C. to celebrate our fourth year wedding anniversary.

4.  On November 22, 2001, I experienced discrimination by American Airlines related to my Race, Color, National Origin, Ethnicity, Ancestry and Religion. I arrived that day at Boston Logan at around 9: 00 a.m., 2 hours prior to flight 4595's departure and I went directly to American's ticket counter in the main terminal to receive my boarding pass. I had a small carry-on suitcase on wheels with me. When it was my turn, I handed my ticket along with my Massachusetts driver's license to the American ticket agent. The ticket agent asked if I had any bags to check and I told her that I did not have any bags to check. She did not ask if I had any carry-on items and did not check over the lip of the counter to see if I had any carry-on items. My boarding pass showed that I was assigned seat 12A, and it was also marked "*CLR*" in bold letters. (See Attachment A). It is now my understanding that this designation signifies that I had not been randomly selected for additional security.

5.  I left the ticket counter, wheeling my suitcase behind me. I then proceeded through the terminal to the initial security checkpoint. I was successfully cleared through all three-security measures: my bag was x-rayed, I went through a metal

EXHIBIT 1

detector, and I was required to present photographic identification with my boarding pass.

6. I went to Gate B25, and on November 22, 2001, the boarding area at Gate 25 was enclosed by partitions and closed to regular airport walking traffic because it was a flight into Washington-National. To enter the boarding area, I was required again to present my boarding pass and photographic identification. I presented my Massachusetts driver's license and my United States passport. I entered at approximately 10 a.m. and took my seat. On my way to my seat, I passed three uniformed Massachusetts State police officers who were standing near the doorway to the Jetway.

7. I waited in the gate area for approximately 15 minutes to board the plane. During that time, I noticed a number of people were selected for more intensive security screening of their persons and belongings. These searches consisted of a scan with a hand-held metal detector and inspection of the contents of the passengers' carry-on items. As far as I could tell, the passengers selected for such searches were not asked any questions. It is my understanding that the only passengers selected for these searches were those whose boarding passes were marked "*S*."

8. I do remember there were what appeared to be young Asian girls undergoing additional security screening. Some of the passengers waiting in the gate were making small jokes and laughing that these young girls were selected for additional security screening.

9. After the girls were cleared and allowed to proceed to the airplane to take their seats, an announcement was made over the gate area loudspeaker. "Hamdy Abou-Hussein, Seat 12A, please come to the counter." There were about thirty people at the gate and I was the only one that appeared to be of Middle Eastern descent. My name was the only name called over the loud speaker. I could see people shifting in their seats and staring at me as I walked to the counter at Gate B25. An American gate agent told me that I had been selected for special screening and that I should wait in line behind the other passengers who were being searched.

10. Upon getting in line to be searched by an American employee, Officer Agcaoili, Badge No. 109, loudly ordered me to remove my hat. In the security screening area, in addition to State Police Officer Agcaoili and an American gate agent, there was also another state police officer. After several minutes, I was scanned by an American employee with a hand-held metal detector, which did not signal any evidence of metal. My baggage was also very thoroughly searched by an American gate agent with brunette hair. In my bag was my camera, which is relatively old and heavy. She seemed to be really inspecting this item. I told her that she could take my picture to see that it was a camera. She in fact did take a picture and I have the photograph in my possession. The gate agent did not express any concern with any contents of the baggage.

11. At this point after I cleared the security screening, I was asked to produce a photographic identification by the other state police officer whose identity was unknown to me. Willingly, I handed my driver's license and my U.S. passport. The police officers then interrogated me. At this point, I could see over my shoulder a six-foot something tall blond man, wearing an American pilot's uniform, standing behind me. The American Airlines pilot was there for about 5 minutes and never once asked me a question.

12. The police first asked what was I doing in Boston. I explained that I lived in the Boston area (Cambridge) and that I was going to visit my wife and sister-in-law in Washington.

13. The question regarding what I was doing in Boston was repeated. I said that I worked and had gone to school at Boston University. I was asked what department I was in at the university. I told them that I graduated in May from the engineering department, and at that time I worked for Vine Associates, as an independent contractor. For some reason, I was asked to provide my school identification. I told them I did not have it and attempted to explain that since I graduated in May, I no longer had school identification. They did not seem satisfied with this answer and asked me several more times about my school identification. I told them I could not give them my Boston University school identification because I did not have it. They were seemed so insistent that I provide them more identification. I got nervous and I offered a Harvard University library card with a photograph on it. I also attempted to give them various credit cards.

14. I then asked the police and the American agent to call my sister-in-law, a lawyer working with the federal government, who could vouch for me as a person. They made no response to my offers and to my knowledge, they made no attempt to verify my answers. The entire questioning lasted about 15 minutes.

15. I was then ordered to by Officer Agcaoili to stand in a corner away from the other passengers and not to move or go near the Jetway. Another police officer, whose identity is also unknown to me, was ordered to keep me there.

16. During the time that I was being questioned and detained, Officer Agcaoili was speaking loudly on the telephone and on a portable radio. I heard him say repeatedly "He's from Egypt." He also repeated several times that I had no school identification.

17. After all the passengers had boarded flight 4595, Officer Agcaoili told me that I was not allowed on that flight. To my knowledge, I, the only passenger of Middle East descent on flight 4595, was the only person not allowed to board the plane.

CRQ 0087

18. I asked Officer Agcaoili why I was not allowed to board and he told me that the pilot decided I could not fly on that flight. I asked to speak to the pilot, thinking I could explain the situation. The American gate agents denied my request.

19. I started to panic because I had to get to Washington to be with my wife. Not only was it Thanksgiving, but it was our wedding anniversary. I asked how was I supposed to get to Washington. One of the police officers said I could take the plane the next day, but Officer Agcaoili interrupted shouting and waving me off. He said, "Take the train".

20. While still under orders not to move from the corner, I did not know what to do so I phoned my sister-in-law, the attorney, using my cell, to ask her what legally I could do. She advised me to take the names of everybody involved. I began by asking the name of the police officer who was guarding me. Officer Agcaoili started screaming at me, "You don't ask him for anything! You deal with me! You only deal with me." His face was red, and he was leaning into me. He gave me his badge number by thrusting his badge in my face. I then felt physically threatened.

21. Two American gate agents were standing near me. I wrote the American gate agents names from their badges. Two were American employees named "Sally Anne" and "Daniel." The third American employee, a female, was too far to see her badge. I requested the identity of the pilot who denied me boarding. Sally Anne told me that she could not give me that information. I told Sally and Daniel that I had to get to Washington D.C. that day. They checked on the available seats and I was told that if I came back tomorrow I might be able to get a seat. I told that this was unacceptable and asked them to check again. I was told there was a seat on a flight into Baltimore-Washington Airport later that same day. I agreed to fly into Baltimore, and Daniel booked me on the flight.

22. I was then allowed to leave Gate 25 and went to Gate 26 for the American flight to Baltimore, which was directly next to Gate 25, but outside the partitioned area. Although I was humiliated and jittery from my last experience, I checked in and waited for my flight to board. I was not selected for additional screening and boarded without any additional scrutiny. This was a small plane with only 3 seats per row; I was assigned the very first occupied single seat in the plane, directly in full view of the eyepiece in the cockpit door. I was so worried that I was placed there so they could make allegations later about my conduct during the flight, and the one-hour flight was a horrible traumatic experience. My wife, Yoshiko Herrera, and David Nall, her sister's boyfriend, a senior partner in a D.C. law firm, picked me up at BWI. David wanted me to sue American immediately and offered assistance in organizing this, saying it won't cost me a penny. I was so scared I declined; worried this might have a bad effect on my career or even a worse outcome. I was urged to report this to the DOT, ACLU and other civil rights groups by friends and family, so other people wouldn't go through the same ordeal. I filed a complaint with the DOT in December 2001, but it took me

CRQ 0088

almost 6 months to overcome fear and a formal complaint in a state administrative process through the Massachusetts ACLU.

I state under penalty of perjury that the foregoing declaration (including any attached statement) is true and correct.

Executed on _____*Dec 17*_____, 2002.

Signature: _____



**U.S. Department of
Transportation**

General Counsel

400 Seventh St., S.W.
Washington, D.C. 20590

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1. **I, Maneesh Agarawal**, being of sound mind, willfully and voluntarily make this declaration. I am over eighteen years of age and reside at 1484 Canton Dr., Milpitas, Ca. 95035. I am presently employed at MCS Inc. as a software consultant, and I am 34 years of age. I am of Indian nationality and of the Hindu faith. I have a dark complexion and physical features.

2. On October 13, 2001, I held a reservation on American Airlines (AA) flight number 269 scheduled to depart from Boston to San Jose, via Dallas-Fort Worth, at 8:00 a.m. when I experienced discrimination by American Airlines related to my race, color, national origin, religion, sex or ancestry.

3. I arrived at the airport at 5:30a.m. I went to the ticket counter to check my luggage. I had an E-ticket purchased four to five weeks in advance of my flight. I purchased the ticket with my Diners Club card. I went through the regular security screening process before entering the restricted area for ticket holders only. I am an AA frequent flyer and a Executive Platinum member.

4. Prior to boarding at the gate, I received additional screening. My carry-on and my person were searched, which occurred without incident. I was told I was selected randomly as part of American Airline's security process. I was then cleared to enter the aircraft and proceeded down the jetway and entered the aircraft at approximately 7:30 a.m.

5. I took a seat (30A) and fell asleep. About 20 minutes latter, I was awaken by a gate agent and asked to come outside. She indicated that security had a few additional questions. I asked whether I should bring my bag and she said it was unnecessary.

EXHIBIT 2

CRQ 0090

6.    After departing the aircraft, I met with an immigration officer, a local police officer and an air marshal. The immigration officer questioned me about my immigration status. The immigration officer checked my social security number and birth date and made a phone call, I presume to the Immigration and Naturalization Service (INS). The agent was intimidating and disrespectful.

7.    Even though it appeared to me that the immigration officer was unable to find a reason to detain me, the INS agent threatened to arrest me several times and said that if he had the jail space he would arrest me.

8.    I asked why I was being subjected to so much security. I was told by the local police officer that some of the flight attendants were suspicious of me. When I told them that I was just sleeping like many other passengers in the plane as I woke up quite early in the morning to reach Logan Airport, I was told that this was because I did not make eye contact with them. The air marshal was rude to me and appeared suspicious of me and annoyed because I did not take my carry-on off the aircraft, even though I was told by the flight agent I did not need to do so.

9.    One other person of color was also asked to deplane. He also answered some questions posed by the local police, air marshal and INS personnel. They also appeared to have run a security check on him. Both his and my luggage was removed from the aircraft while we were being questioned. The flight departed without us. I witnessed no other person(s) removed from the flight or treated in such a hostile and disrespectful manner.

10.    Even though I held a proper ticket and had been thoroughly searched prior to boarding the aircraft, I was removed, questioned further, and ultimately not permitted to get on my originally scheduled morning flight. I was booked on the next flight, which left at 10:00 a.m.

11.    American Airlines up-graded me to first-class. I do not know if they did this to keep an eye on me or to make-up for delaying and mistreating me. During the flight I felt very uncomfortable, partly because I felt like the airline crew were uncomfortable with me on board. During the flight, I was so uncomfortable, I remained in my seat the whole flight to the Dallas Fort Worth airport.

12.    After arriving in DFW I transferred to another American aircraft. I did not receive any additional searches. The airline again put me in first-class. Again I remained in my seat

CRQ 0091

the whole time and was afraid to get up because I did not know how the flight crew would react. I arrived in San Jose, California approximately five hours later than originally scheduled.

13. I e-mailed a complaint to American and to the Department of Transportation when I returned to my home in San Jose. I do not believe that American sufficiently explained to me why I was taken off the aircraft after clearing all security requirements, nor why I was not permitted to travel on my originally scheduled flight.

14. In response to the incident on October 13, 2001, when I travel, I now make an effort to communicate with the flight attendants to make them more comfortable with me. I also minimize getting out of my seat or taking things out of the overhead. As a result of the incident I have felt very self-conscious while flying.

I state under penalty of perjury that the foregoing declaration as well as any attached statement is true and correct.

Executed on _____ _October 23_____, 2002.

Signature: _____ _Maneesh_____.

_Maneesh Agarwal_
MANEESH AGARWAL
Executed on January 2, 2003.

## JEHAD A. ALSHRAFI STATEMENT OF FACTS

I, Jehad A. Alshrafi, declare under penalty of perjury that:

1.     I am a 32-year-old Arab American. I was born in Jordan and lived there until approximately the age of twenty. I immigrated to the United States in 1989, and became a citizen of the United States in 1994. At the time of the incident described below, I resided in Cambridge, Massachusetts.

2.     At the time of the incident, I was a member of the technical staff at Draper Laboratory. Draper Laboratory conducts aerospace engineering and builds and designs advanced guidance/avionics systems and components for land-and-sea-based strategic missiles for the United States Navy and Air Force. As a requirement of my employment at Draper Laboratory, I received United States Department of Defense "secret level" security clearance.

3.     On or about November 1, 2001, I called the American Airlines toll-free number and made a reservation for a round-trip airline ticket for travel between Boston and Los Angeles on American Airlines Flight 181. Flight 181 was a non-stop flight scheduled to depart from Boston Logan airport at 11:00 a.m. on Saturday, November 3, 2001.

4.     On November 3, 2001, at approximately 8:30 a.m., I arrived at Boston Logan airport and was issued a boarding pass by an American Airlines ticket agent. I walked to a security checkpoint and proceeded through a metal detector without incident. My carry-on baggage was then routinely opened and searched, also without incident. I walked to the gate assigned to Flight 181 and sat in the waiting area. About 200 people were present at that gate and in the surrounding area.

5.     After Flight 181 began to board, I was paged by my last name and instructed to report to an American Airlines agent at a nearby counter.

6.     In response to the page, I walked to a nearby counter, where American Airlines Manager Christine K. (I do not know her full last name) and a U.S. Marshal were standing. The U.S. Marshal observed the following interactions I had with Christine K at that counter.

7.     Christine K. told me that the pilot of Flight 181 (whose name I do not know) had denied me access to the airplane. Despite my questions, Christine K. refused to tell me the basis for this decision.

8.     I presented Christine K. with my U.S. passport to prove my identity as a United States citizen. I also showed Christine K. my Draper Laboratory identification badge and told her that I had United States Department of Defense "secret level" security clearance.

9.     Ellen Avery-Samra, a librarian at Draper Laboratory, observed what was happening and walked to the gate where I was talking to Christine K. and offered to vouch for me.

10.     Ellen Avery-Samra and I both asked Christine K. why I was being denied access to the airplane. In response to our questions, Christine K. said "other passengers have complained." Christine K. appeared uncomfortable to be the bearer of this news.

EXHIBIT 3

CRQ 0093

11.    Christine K. and the U.S. Marshal left the gate with my passport and my employment identification badge, presumably to speak with the pilot of Flight 181. When they returned, Christine K. told me that the pilot was sticking to his earlier decision not to allow me to board the flight. She again offered a vague explanation, this time that perhaps I had done something suspicious.

12.    I told the U.S. Marshal and Christine K. that I was willing to be searched again, but my offer was refused. Ellen Avery-Samra observed me make this offer.

13.    I was calmly contesting the pilot's decision when a state trooper arrived and asked me to move along and to deal with him. I was humiliated to be confronted by a state trooper in full view of the crowded boarding area.

14.    The state trooper and the U.S. Marshal brought me back near the seating area for Flight 181. When I explained to the state trooper that I was being denied access to American Airlines Flight 181 because of my Arab name he said "So?" and looked at my name and said, "Your name is on a list and it doesn't matter if you are an American; you have that name." When I asked the state trooper what list he was referring to, he threatened to have me detained. I was shocked and devastated to hear that I could be detained if I further contested, so I remained silent. I sat, stunned and fighting back tears, for ten or fifteen minutes. I was utterly humiliated to be confronted by a uniformed state trooper in full view of hundreds of people.

15.    I then spoke with Christine K. about alternative flight arrangements. She told me that I could take a Northwest/KLM flight, but by the time I arrived at the appropriate gate at another terminal that flight had completed boarding.

16.    I returned to the American Airlines counter and told Christine K. that it was too late to go on the Northwest/KLM flight. By this point I was not sure if I even wanted to go to California because I was feeling so frightened and demoralized.

17.    At around 1:00 p.m., I was finally allowed to board another American Airlines flight. Instead of a non-stop flight, however, this flight went from Boston to Chicago and then from Chicago to Los Angeles. As a result of this forced change in my flight plans, I did not arrive in Los Angeles until several hours later than I had originally planned. When it was time for me to board this American Airlines flight, Christine K. walked me to the gate and handed me a first class ticket.

18.    As a result of Respondents' actions, my travel plans were disrupted and I suffered emotional distress.

Jehad A. Alshrafi

9/3/02
Date

Apr 03 03 09:38a    Henry Castellanos    954-846-0188    p.6

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1. I, Henry Castellanos, being of sound mind, willfully and voluntarily make this declaration. I am over eighteen years of age and reside in Miami, Florida. I am a Hispanic U.S. citizen. I am a commercial airline pilot. At the time of the incidents described below and presently, I work for Miami Air, which is a charter air carrier that flies passengers and cargo. In September 2001, I flew primarily Boeing 727s.

2. In two separate incidents in September 2001, I experienced discrimination by American Airlines (American) related to my race, color, national origin, religion, sex, or ancestry.

### September 19, 2001

3. On September 19, 2001, I was coming off of a live flight from Tucson, Arizona. I was deadheading back to Miami, Florida by taking a flight from Tucson to Dallas/Fort Worth, and then on to Miami. I arrived in Dallas at approximately 15:20 Greenwich meantime, and about one hour later, I checked in for the flight at the American Airlines desk. I had a one-way ticket to Miami, reserved and fully paid for by my employer, Miami Air. Because I had flown American Airlines on business when I was getting to or deadheading from live flights, I was a member of the American Advantage Platinum Club.

4. I walked with my fellow crewmembers, flight engineer, David Caviness, and Captain Bill Loius, through the terminal to the American gate without incident. While we waited to board, I do not recall anything unusual that happened. When my row was called, I walked down the jet way, boarded the plane, said hello to the flight attendants, and sat in my assigned seat which was in an exit row. I was wearing my pilot's uniform.

5. In my seat, I started dozing off. The flight attendant woke me up and asked me for identification. She tried to be friendly asking where I was going and what I was doing on this flight. I explained that I was a pilot, deadheading home to Miami. When I asked her what was going on, she explained that the captain wanted to see my identification. She took my driver's license and my Miami badge into the cockpit.

6. A little while later, not more than 5 minutes, an American Airlines employee probably a flight attendant announced my name and Dave Caviness' name over the P.A. and the announcer also told us to get our bags and leave the plane. At this point, I have no idea what is going on. But, I got my luggage and walked off the plane.

7. I am Hispanic and have a dark complexion. Dave also has a dark complexion.

CRQ 0095

EXHIBIT 4

The other Miami Air crewmember Bill Louis, the captain of our crew, was not asked to leave the plane and he is Caucasian.

8. The American Airlines captain was waiting for us in the jet way. He started talking to us in what I would call a conciliatory manner. He said something to the effect that they were having a problem with one of the flight attendants and asked if they could book us on another flight. I asked what was going on. He explained that one of the flight attendants did not feel comfortable with us in the airplane after the events of September 11th.

9. I thought this had to be some kind of mix up and I explained to the American Airlines captain that I had just come off work as a commercial pilot. I gave him my commercial pilot's license thinking that seeing proof of my identity would resolve the problem. I asked him why the flight attendant did not feel comfortable with me. I asked the American captain if he could ask the flight attendant what was wrong with us being on the flight and what problems she had with us.

10. The captain went back on board the flight. From the jet way, I could see the captain talking to the flight attendant. I don't know what was said, but when she answered him, she started hysterically crying.

11. The captain came off the plane again and told us that all she would say was that she did not feel comfortable with us. Apparently, the flight attendant gave him an ultimatum that either he took us off the plane or she would not fly on the plane.

12. I was getting frustrated because I was very tired. I had been working all night and I just wanted to go home. So when I heard the ultimatum given I asked the American captain who was the captain of the flight him or her. I asked him to please go back one more time and see if he could work it out.

13. The American Airlines captain went back on to the plane to talk to the flight attendant for the third time. The flight attendant was crying and pointing at her skin on her arm. When the captain came out a third time, he said that the flight attendant might have smelled alcohol on me. I said, "If you are insinuating that I am drunk, I just came off a live flight. I want a breathalyzer right now." It is my understanding that if an airline believes a commercial pilot who just flew a plane has been drinking then it would have to give the pilot a breathalyzer test. The American Airlines captain immediately backed down and said that no I would not be given a breathalyzer test. But the captain said that he wanted the rest of my crew and me off the plane. I told him that Bill Louis, the captain of the Miami crew, was still on board. Bill was called to get his luggage and he met us on the jet way.

14. At some point, I believe the American Airlines pilot must have called security. After the American captain told us that we were off his plane, American's head

of security in Dallas grabbed me. He had Dave and I put our hands behind our back and walked us down the jet way, to the gate area where we all waited. Bill was not asked to walk with his hands behind his back. He just followed behind us, carrying his bags.

15. In the gate area, we had to wait for Dave's bags that were checked into the belly of the airplane. When the bags were brought to the gate area, the American head of security asked if he could look into our bags. It is my understanding that since our luggage had already cleared security that by law American needed permission to look in my bags. I consented to the search. American personnel took everything out of our bags. They did not question us about anything they saw in the bags.

16. American Airline's head of security and some other security members walked us through the terminal and back to the main ticket counter. At some point during our walk, the head of security apologized and said that he thought the situation was ridiculous.

17. During the entire incident with the American Airlines captain and the security personnel, we were not asked any questions about our travel itinerary, about our pilot training, about our employment, or about us. We simply were told that we were not allowed to fly because a flight attendant did not feel comfortable with us. It is my understanding that Dave Caviness was at the time a mechanic for American Airlines as well as a contract employee of Miami Air. American refused to fly him.

18. When we got to the ticket counter, the security personnel left us. The gate agent told us that American would be happy to get us tickets on another carrier. At this point, Bill Louis, our Miami Air crew captain, intervened and asked to speak to the Head Ticket Agent or manager. I was not privy to the details of the conversation between Bill and the American personnel who talked to him. But we were subsequently booked on another American flight and given first class seats.

19. When we boarded the subsequent flight, we talked to the captain of the subsequent flight and explained what happened. He seemed satisfied with our identification and allowed us to board. We flew first class to Miami.

20. I was still upset at this experience when I returned home. I was angry and humiliated so I called American Airlines Advantage Customer Service Department. The Head of Customer Service said that what happened was really bad and told me someone else would call me. Another service manager called me and told me I would be awarded more frequent flier miles. I told them I didn't want more miles that I wanted to be treated properly.

September 28, 2001

21. On September 28, 2001, I was deadheading home to Miami flying from Austin to Miami via Dallas. On this day, there were three crews from Miami Air flying on the leg from Austin to Miami. We all boarded the flight from Austin without any problem. None of the crewmembers that I am aware of were wearing their Miami Air uniforms.

22. We had a connecting flight in Dallas that required us to switch planes. We arrived just in time as the flight was boarding.

23. As I walked on to the plane I heard a male flight attendant say to another flight attendant to follow me. I thought, "Here we go again. There's going to be trouble." As I was taking my seat, a flight attendant asked me to come with her. Some of the Miami Air crewmembers started joking with me and saying things like, "We knew we shouldn't try to fly with Henry" and "They just don't like the look of Henry."

24. The flight attendant took me to speak to the American Airlines captain. He asked me if I was a pilot and if I was, did I have a cockpit key. I told him that it was no problem that he could have my cockpit key. He asked if there were any other crewmembers with cockpit keys. I told him there were about three to four crews on board.

25. When I sat down, I told my seatmate Hector Fuentes that I thought the incident was not finished. Then, I saw the American Airlines captain come out of the cockpit and walk down the aisle toward the back of the plane. He was looking at the rows of passengers as he walked.

26. Then, the American Airlines captain announced that the plane was going to be delayed. A few minutes later there was another announcement explaining that everyone needed to collect his or her belongings and exit the plane. I believe the announcer said that there were mechanical problems and that we would be taking another plane.

27. I understand that the American captain stopped Eddy Mendez, another Miami crewmember, as Eddy was walking in the jet way. Eddy Mendez is Hispanic and has a brown complexion. Apparently the American Airlines captain wanted his cockpit key and Eddy did not have a cockpit key, which was not unusual. Not every crewmember with Miami Air carries a cockpit key.

4

CRQ 0098

28. As the passengers were exiting the jet way into the gate area, some of the Miami crewmembers were taken off the line of passengers by American security. I was one of the crewmembers pulled off the line. I was told that we were not going to be allowed to board the next plane because the pilot was not comfortable having us on the plane.

29. I was shocked and angered by this treatment. I could not believe that I was being removed again from an American Airline flight less than 10 days after my first removal. I thought I had been cooperative. At this point, I believe only a small number of Miami Air personnel were told that they were not going to be allowed to fly on that flight. I do not believe any of the Caucasian or Caucasian appearing crewmembers were approached by American security personnel. I believe I was selectively asked for my cockpit key and removed because of my race and my appearance.

30. From my first experience with American earlier in September, I knew no amount of talking to American personnel was going to get us back on the plane. I stood with the other crewmembers and talked to them.

31. At some point, one of the Miami Air crewmembers told security that there were other Miami crewmembers not detained. My understanding was that the remaining crewmembers were told later that they were not going to be allowed to fly on that flight as well. I believe they were told that the captain was not comfortable with flying some of us on the aircraft. I do not believe anyone was provided with a specific explanation as to why we were removed from the aircraft.

32. It is also my understanding that John Filue, Miami Air's pilot's union vice-president, spoke to the American's head of security. I was not privy to that conversation. However, we were rebooked on a different flight to Miami.

33. We were allowed to return to Miami on another American flight. I was so upset when I returned that I contacted a lawyer to discuss filing a complaint against American. I decided against it because I did not have enough money for a retainer.

5

CRQ 0099

Apr 03 03 10:00a    Henry Castellanos    954-846-0188    p.2

34. I also understand that the president of Miami Air wrote a letter to American complaining of the treatment we received.  I do not know what happened, but I know that Miami Air's contract with American for discounted tickets was canceled after these incidents.  As a general rule, I do not travel on American when working for Miami Air.

I state under penalty of perjury that the foregoing declaration (including any attached statement) is true and correct.

Executed on _____April 2_____, 2003

Signature: _____

CRQ 0100

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1. I, Patrick White, being of sound mind, willfully and voluntarily make this declaration. I am over eighteen years of age and reside in Sunrise, Florida. I am a U.S. citizen and am Caucasian. I am a commercial airline pilot. At the time of the incident described below and currently, I work for Miami Air, which is a charter air carrier that flies passengers and cargo. In September 2001, I flew Boeing 727 aircrafts.

2. On September 28, 2001, I witnessed discrimination by American Airlines related to race, color, national origin, religion, sex, or ancestry.

3. I had a fully pre-paid one-way ticket from Austin, Texas to Miami, Florida, with a connection in Dallas-Ft. Worth. Miami Air purchased the ticket for me. I was traveling in connection with my job as a commercial airline pilot, deadheading to Miami from a cargo flight I had flown for Miami Air.

4. On September 28, 2002, I and eight other Miami Air crewmembers were deadheading from Austin, through Dallas, to Miami. In Austin, we boarded without incident. On the Austin to Dallas segment of our trip, I was not asked to surrender my cockpit key and to my knowledge none of the Miami Air crewmembers were asked to surrender their cockpit keys by any American Airlines personnel.

5. In Dallas/Ft. Worth, the flight we were on from Austin was late in arriving. We had just enough time to make our connection. I hastily boarded the airplane and took my seat. The aircraft was delayed in pushing back from the gate. As we were waiting, I saw the American Airlines captain come out of the cockpit and walk to the back of the plane. I assumed there must have been a mechanical problem.

6. Then, there was an announcement asking the passengers to take all their belongings and disembark. We were told that because of mechanical reasons, the flight would be switched to a different gate and different aircraft. I proceeded to the new gate area and waited.

7. Soon after we arrived in the new gate area, I noticed law enforcement started to show up. I heard that the American Airlines captain stopped some of the Hispanic crewmembers, including Henry Castellanos, and questioned them about their travel plans and cockpit keys. I was never asked by the American Airlines captain or any other personnel to surrender my cockpit key. To my knowledge, none of the other Caucasian or Caucasian appearing members were questioned.

EXHIBIT 5

8. Eventually the American Airlines director of security at Dallas/Ft. Worth approached me and said that the American Airlines crew was not comfortable with us on the flight and we would not be allowed to travel on that flight. I was angered and could not believe we were being denied boarding. I could not believe the American Airline pilot made this decision that affected all of us without questioning all of us, asking for and verifying our identification, or conducting additional searches. I would have had no problem with answering any additional questions or consenting to additional searches. However, the security director made it clear that the decision was made that the entire crew from Miami Air would not be allowed to board.

9. I and the other Miami Air crewmembers went to book rebook our flights at the gate counter. American gate agents told us that they could not accommodate all of us on the subsequent flight because there were not enough seats available. They divided the group into two and booked half of us for the next flight out and the second group for the flight after the next flight out. I was in the second group along with John Feliu.

10. John suggested that we should try and standby to see if we could get on the next flight out. We all went to the gate area, boarding the flight that the first group was assigned. It was a Boeing 777 that seats over 300 people. This was the second flight out in the morning from Dallas to Miami. We were surprised to learn from the gate agent handling the flight that there were plenty of seats available. When I boarded the flight, I saw that the flight had many available seats; possibly at least half of the seats were available. But there was no question that there were four more available seats for the rest of the Miami Air crew.

11. After we boarded the subsequent American flight, I saw the American Airline's director of security board the plane. He had a lengthy conversation with the captain of the subsequent flight. As the security director was talking, he kept looking back at us. The security director allowed us to stay on the flight, and we all returned to Miami on the subsequent flight.

12. It is my understanding that when we returned to Miami, the president of Miami Air, Ross Fischer, sent a letter to American Airlines complaining of this incident. I do not know what happened after the letter was sent.

I state under penalty of perjury that the foregoing declaration (including any attached statement) is true and correct.

Executed on ___DEC, 12_____, 2002.

Signature: ___Peter Wlst_____.

### UNSWORN DELCARATION UNDER PENALTY OF PERJURY

1. I, Praneet Kataria, being of sound mind, willfully and voluntarily make this declaration. I am over eighteen years of age and reside at 21 Barrington Cres, Markham, Ontario, Canada L3R3H2

2. On December 25, 2001, I flew on an American Airlines Flight 1197, from Toronto, Canada, to Chicago, Illinois, connecting at Chicago O'Hare Airport to American Airlines Flight 1893 to San Francisco, California. I experienced discrimination by American Airlines related to my perceived Race, Color, National Origin, Religion, Sex, or Ancestry. I am originally from India and have an Indian passport. I am a permanent resident of Canada and have resided in Canada for ten years. I am a Sikh, and wear a turban as a symbol of faith.

3. On December 25, 2001, I was traveling to visit my family for the holidays. I flew on Flight 1197 from Toronto, Canada to Chicago, Illinois with no security problems whatsoever. When I arrived at Chicago O'Hare Airport, I walked to the gate for my connecting flight to San Francisco, American Airlines Flight 1893. My first flight was very early in the morning, so I barely slept the night before. I was dozing while I was waiting in the boarding area for the flight. When I heard the call to board Flight 1893, I approached the agent at the jetway with my boarding pass, and she told me to step aside and undergo a security search. The security agent searched my carry-on, gave me a security pat down, and cleared me for travel.

EXHIBIT 6

CRQ 0104

4. Once again, I approached the jetway to board the Flight 1893. The pilot deplaned and told the agents not to allow me to board. As I waited for further instructions, I observed another passenger from my flight talking to the security screener. It appeared that they were questioning the screener about me and that the screener reassured the passenger that I had successfully completed the checks.

5. The gate agent told me that the issue was about seating, and that I should continue to wait. Since I already had a seat assignment, I wondered about her explanation, but I didn't want to make a scene, so I patiently cooperated.

6. The pilot returned and told me that because of recent events of Sept 11, he did not feel safe with me on the aircraft. He instructed me to wait for the airport authority to come investigate me. He did not tell me the specific reason he did not feel safe with me on the flight. He left and boarded the flight.

7. The gate agent knew that I had cleared the security checks and even called a supervisor to see if I could board the flight. The supervisor ~~arrived and~~ said that I was okay to board, and put the jetway back up to the aircraft so I could board the flight. The _gate agent_ ~~supervisor~~ told me that she felt the captain was only being racist. Before I could board, the captain deplaned. He was very angry that the supervisor had pushed the issue and was angry about a delay. Then he called the Chicago police, reboarded the flight, and the flight left without me.

CRQ 0105

8. Within five minutes, the Chicago Police arrived. They asked me three questions: where I was from, where I was going, and show them my passport. I answered these questions truthfully, and they immediately cleared me. They told me that they did not understand why the pilot would not let me board, and that they assumed American Airlines would accommodate me on another flight. They spoke to the gate agent who rebooked me on the next American Airlines flight to San Francisco.

9. When I checked in at the gate for the next American Airlines flight to San Francisco, *a different* the gate agent asked me why I would "dress that way" knowing it was an issue and knowing what had happened on September 11. I was selected for an additional security screening, and once again, was cleared by the security screener.

10. Because I felt that the incident was embarrassing, humiliating, and discriminatory, I wrote a letter of complaint to American Airlines. The response letter dated April 22, 2002, stated that the captain of Flight 1893 indicated that my "actions and demeanor prior to boarding" convinced him to pursue further security checks, and that my "unusual demeanor" was witnessed and reported to the captain by several passengers and at lease one American employee. American Airlines denied my allegation of discrimination.

I state under penalty of perjury that the foregoing is true and correct.

Executed _October 29th_, 2002.

Signature: _____

CRQ 0106

UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1.  My name is Lawrence Kurtz. I am over eighteen years of age and reside
    at 7411 Blvd. E #201 North Bergen, NJ 07047.

2.  I had tickets to fly on October 15, 2001, on American Airlines from Mexico City
    to Newark with a connection through Dallas Fort Worth and during this time I
    experienced discrimination by American Airlines related to my perceived Race,
    Color, National Origin, Religion, Sex, or Ancestry. I have a tan complexion,
    brown eyes, and black hair.

3.  On October 15, I departed from Mexico City to return to my home in New Jersey
    with a connecting flight in Dallas Fort Worth. When I checked in at Mexico City,
    there were no problems. Also, when my flight arrived to Dallas Fort Worth, I
    went through customs without incident.

4.  After going through customs, I went directly to the gate for my connection flight
    to Newark, flight #1710, sat down, read USA Today and watched CNN. During
    this time, I did not talk to anyone or call anyone.

5.  The gate agent started boarding the flight. I go to my seat and at approximately
    3:52 PM, an American Airlines agent approached me and asked me if I was Mr.
    Kurtz. I answered that I was and the agent responded that "we need to speak to
    you." I left my backpack in the overhead bin, got off the plane and was
    confronted by a security person, airline employee and an unidentified woman.

EXHIBIT 7

CRQ 0107

6. I was questioned by the agent. She asked me why was I behaving suspiciously and erratically. I responded that I did not believe that I was. The agent replied that someone who wants to remain anonymous observed me being suspicious. The agent continued to question me and asked me what my purpose was in going to Newark. I replied that I was going home and proceeded to show her my itinerary, passport and driver's license.

7. At this point, the captain of the flight approached and asked what was the problem. The captain asked me why I might be acting nervous. I explained that all I was doing was waiting for my flight. I was asked the reason of my trip and I calmly explained that I was visiting my girlfriend in Mexico City for the past four nights and that I was connecting at Dallas Fort Worth to return to New Jersey where my parents were awaiting my arrival.

8. The captain informed me that the other passengers did not feel comfortable with me on board and that he was unwilling to depart if the passengers were uncomfortable. I was embarrassed and humiliated. I further informed the captain that I am Jewish and Cuban and born in the United States.

9. Finally, I informed the agent and the captain that if the captain and passengers were unwilling to depart because of my presence, then they can depart, being I was apologized to and compensated properly. They asked to be excused for a moment and walked about fifteen feet away to discuss the situation. They returned thanking me for my calmness and understanding and promised

2

CRQ 0108

compensation. The captain retrieved my backpack from the plane and the agent had my luggage removed. I was then escorted to the counter outside the gate and given a first class ticket on flight 812, a $10.00 voucher for food, which went unused, and a $200.00 voucher on any future flight.

10.    To the best of my knowledge, I was the only person removed from the flight.

I state under penalty of perjury that the foregoing is true and correct.

Executed on ___OCT 22_____, 2002.

Signature: _____

CRQ 0109

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1. I, Eduardo Mendez, being of sound mind, willfully and voluntarily make this declaration. I am over eighteen years of age and reside in Miami, Florida. I am a U.S. citizen, born in Puerto Rico.  I am a retired commercial airline pilot.  At the time of the incident described below, I worked for Miami Air, which is a charter air carrier that flies passengers and cargo.  In September 2001, I flew Boeing 727 aircrafts.

2. On September 28, 2001, I experienced discrimination by American Airlines related to my Race, Color, National Origin, Ethnicity, Ancestry and Religion.

3. I had a fully pre-paid one-way ticket from Austin, Texas to Miami, Florida, with a connection in Dallas-Ft. Worth Airport.  Miami Air purchased the ticket for me.  I was traveling in connection with my then current job as a pilot, deadheading back from a cargo flight I had flown for Miami Air.

4. On September 28, 2002, eight other Miami Air crewmembers and I were deadheading from Austin, through Dallas, to Miami.  We experienced no problems in Austin when we boarded the flight.  The American Airlines (AA) captain of the Austin-Dallas segment did not ask any of the Miami Air crew for their cockpit keys.

5. In Dallas/Ft. Worth, we walked quickly to the gate and boarded almost immediately.  I had a window seat, but I cannot recall the exact location of the seat.  I either started dozing off or looking out the window.  I was not really paying attention to what was happening in the aircraft.  In any event, the next thing I heard was an announcement over the P.A. telling us to disembark.

6. I grabbed my bags and started to walk off the plane.  I was carrying my black pilot's suitcase which has a Puertorican flag on one of its side.  Incidentally I was holding my bag in such a manner that the flag was visible to persons as I walked.

7. The AA captain was standing in the galley at the front of the plane.  As I approached him I saw him glance down at my bag.  Immediately he asked me to step outside with him into the jet way.  As we were stepping into the jet way, the American Airlines captain asked for my cockpit key.  Once we were in the jet way I explained to him that I did not have it.  At this response, the AA captain started getting hyper and perhaps even mad at me.  He then questioned me loudly and in a demeaning manner as to how could I be a pilot without a cockpit key.  I felt embarrassed and humiliated at this point.  Additionally, people were staring as they walked by us and the situation was escalating into a discreditable scene.  I informed him that I was flying cargo and did not need a cockpit key.  He continued his badgering and asked me again and again, how do I get into the cockpit if I did not have a key.  I tried to explain to him how our crew customarily works but he was not listening and continued to address me as if he needed to reprimand me.

EXHIBIT 8

8. In order to calm the AA captain down and to reassure him, I offered him my Miami badge, my commercial pilot's license, anything I could think of to prove that I am a legitimate commercial pilot. He refused to even look at it. The AA captain never asked me questions about my employment, speak with anyone else that could vouch for me, or any other information in order to obtain proof of my identity. Nonetheless he continued to harass and badger me.

9. The AA captain proceeded to abruptly end the conversation by telling me that he did not want me on his flight and that I should leave the jet way and go to the gate area.

10. At this point I felt singled-out and I was aware that the other Miami Air crewmembers that accompanied me had deplaned and were not asked for their cockpit keys by this captain. I don't believe asking for cockpit keys is a standard operating procedure for American Airlines or any other airline for that matter. I believe such a request is understandable and fair, however, why did the AA captain targeted only me and not a few or all the other Miami Air crewmembers to surrender their cockpit key. I was embarrassed and shamed for having been mistreated.

11. When I walked to the gate area, there were American Airlines security personnel and police officers in the area. The head of the American Airlines security at Dallas told me I was not going to be allowed to board the flight. He told me that the flight attendants did not feel comfortable with us on board.

12. All of the Miami Air crewmembers were re-booked on subsequent flights. I was still upset when I boarded a subsequent flight to Miami. No American Airlines crew member or staff personnel asked for my cockpit key on the subsequent flight. It did not appear to even be a consideration as to whether I could board. To my knowledge, no one from Miami Air was asked on the subsequent flight to surrender his cockpit key.

13. On the subsequent flight I took my seat and was reluctant to move. Even though I had to use the lavatory, I did not, so as to draw no attention to myself.

14. I retired from flying as a commercial pilot. Even so, I still feel anxious to fly because of that incident with American Airlines.

I state under penalty of perjury that the foregoing declaration (including any attached statement) is true and correct.

Executed on _November, 20th_, 2002.

Signature: _Eduardo Mary_

UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1. I, Robert Menna, being of sound mind, willfully and voluntarily make this declaration.
I am over eighteen year of age and reside at 516 So. St. Andrews Place, Unit 601, Los
Angeles, California, 90020.

2. On September 11, 2001, I was scheduled to fly on American Airlines Flight 4820,
from Islip, New York, to Boston, Massachusetts, connecting in Boston to American
Airlines Flight 223 to Los Angeles, California. Due to the terrorist attacks on the United
States, I was stranded in Islip on September 11, 2001. When United States air travel
resumed on September 15, 2001, I flew on American Airlines Flight 4624 from Islip,
New York, to Boston, Massachusetts. On September 15, 2001, at Boston Logan Airport, I
experienced discrimination by American Airlines related to my perceived Race, Color,
National Origin, Religion, Sex, or Ancestry, when I was removed from American
Airlines Flight 223 to Los Angeles International Airport. I am a United States citizen of
Sicilian/Norwegian descent. At the time of travel, I had a dark suntan.

3. On September 15, 2001, I boarded and flew on American Airlines Flight 4624 without
incident. I deplaned Flight 4624 in Boston Logan Airport, walked to the connecting
departure gate, and boarded American Airlines Flight 223 to Los Angeles International
Airport.

4. After I was seated on Flight 223, a uniformed American Airlines agent entered the
aircraft, and asked me to come with her. As I stood up, I was confronted by several

EXHIBIT 9

CRQ 0112

Massachusetts State Troopers, along with several unidentified men. I was the only passenger removed from the flight. The group of men escorted me off of the aircraft to the jetway. They asked me for my identification, which I showed them. They asked me if I had checked luggage, and I responded yes. They stated that my luggage would be removed from the aircraft, which was accomplished. Then the men escorted me up the jetway to the boarding area.

5.  In the boarding area, I asked why I was removed from the flight. The State Troopers said that I was "all right with them" and that it was American Airline's prerogative to remove me from a flight.  They stated that American Airlines had me removed because of an altercation I was involved in at the ticket counter. In addition, the State Troopers questioned me about an altercation I was allegedly involved in at the security checkpoint. I stated that I was a connecting passenger and did not go through the ticket counter at Boston Logan Airport, nor the security checkpoint.  The Troopers said that they had no other questions for me. They said that American Airlines made the decision to remove me from the flight, and instructed me to contact American Airlines for an explanation.

6.  After a while, the American Airlines agent who had asked me to leave the aircraft arrived in the gate area.  I explained to her that the State Troopers stated that American Airlines reported that I had been involved in an altercation at both the ticket counter and the security checkpoint at Boston Logan Airport.  As I had told the State Troopers, I explained to the agent that I was a connecting passenger from another American Airlines flight, Flight 4624.

7. I asked the American Airlines agent at the gate why I had been removed from Flight 223. After an awkward moment of silence, the American Airlines agent admitted that some passengers, some of the flight crew, and the pilot felt intimidated by me. I asked specifically "Did anyone say that I had said or done anything intimidating"? The American Airlines agent replied, "No, they did not feel comfortable with you on board" and that American Airlines would provide overnight hotel accommodations and rebook me for a flight the next day.

8. I was rebooked on an American Airlines flight the following day. Because of my denied boarding by American Airlines in Boston on September 15, 2001, I missed the opportunity to see a close friend who was only in California for a brief visit.

9. I wrote American Airlines a letter dated October 1, 2001, explaining the incident and that it appeared that the only possible reason for my removal was based on my perceived ethnicity. I expected an apology or some other action. I received a response from American Airlines dated October 24, 2001, denying my allegations of discrimination. American Airlines stated that I was denied boarding due to concerns of several passengers and flight attendants, indicating that I was intimidating them, and that I otherwise acted suspiciously. American Airlines stated that the Captain has the right to remove passengers if he has just cause to believe that they may be a safety or security risk, and that American Airlines acted accordingly in my case.

CRQ 0114

10. Despite several inquires I made to American Airlines, the carrier has not provided me with the description of the alleged intimidating behavior or suspicious acts.

I state under penalty of perjury that the foregoing is true and correct.

Executed on _10/25/02_ 2002.

Signature: _____

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1.     I, Wajahat Sayeed, being of sound mind, willfully and voluntarily make this
declaration. I am over eighteen years of age and reside in Plano, Texas. I am a
citizen of India. However, I am a permanent resident (Green Card) and have lived
in the U.S. for 13 years. I am a member of the Islamic faith. I have a B.S. degree
from Arizona State University and am currently employed as the Executive
Director of the Muslim Legal Fund of America. Before working in this capacity,
I worked in several capacities, but most notably as a Director in an investment
firm and as a strategy consultant for an outstanding American institution -
PricewaterhouseCoopers. I am an upstanding member of the Plano community
where I volunteer a lot of my time at the Plano Mosque, serving in various
capacities including developing strategic plans for community development. I
have also organized events to develop interfaith understanding not only at the
leadership level (mayor, congressmen, etc.), but also at the community level where
neighbors can appreciate each other and live in peace. I have a wife and two
children here, and they are all U.S. citizens. My wife also volunteers as much of
her time as she can, especially in conducting classes to educate the young.

2.     On October 11, 2002, I flew on American Airlines (American) flight number 1048
from Dallas Fort Worth, Texas to Newark, New Jersey and I experienced
discrimination by American on the bases of my race, color, national origin,
religion, or ancestry.

3.     I was flying to New York (via Newark) to attend a conference sponsored by the
National Association of Muslim Lawyers. I attended events at the New York
School of Law and Columbia University Law School. As an Executive Director of
a legal organization, the event was an important networking opportunity.

EXHIBIT 1G

CRQ 0116

4.     Upon arriving at the airport, I checked in at the American ticket counter outside of the secure areas. I was given a boarding pass and a seat assignment 5F. I had a "*CLR*" noted on my boarding pass. <u>See</u> attached. I was told once by American personnel that "*CLR*" is printed on boarding passes that have been pre-screened and cleared for security purposes, primarily because of the number of times I had traveled on American. Therefore, though I did go through the normal airport security screening before entering the gate area (i.e. I passed through the metal detector and my bags were screened) as was my usual experience, given my *CLR* status, at the time of boarding, neither the security people nor American personnel stopped me for a second screening at the gate.

5.     I boarded flight 1048 to Newark, NJ at approximately 6:40AM. Upon boarding the flight, I stowed my laptop and my carry-on bag and promptly took my First Class seat, 5F. I had with me my notebook, which I put in the pocket in front of me. I was tired, so I fell asleep while the rest of the plane was boarding. Sometime later, a security person (the people that frisk you in gray jackets) woke me. He said that I was apparently supposed to be searched, but they had somehow not done so. His approximate words were: "Mr Sayeed, sorry to disturb/wake you, but we were supposed to have searched you earlier, but we did not. I need you to please step outside the plane with your belongings so that we can search you. Thank you for your cooperation." At this point, I got out of my seat, collected my suitcase and my laptop and walked out of the plane and all the way back to the entrance of the gate. At the point when I was taking out my bags from the overhead bin, I noticed that the plane was already full. No one was boarding the plane anymore. On the way to the security gate, I asked the security person why I was being searched. I informed him that I was Executive Platinum club member (the highest level of American in its 3 classes) and that my pass shows that I am

2

cleared (*CLR* on the boarding pass).  He repeated again that they were supposed to search me, but had not.

6.    When I got to the security check station outside the gate, three people were involved in my search.  The security person who had approached me on the plane used the detection wand on me, while the other two went through the two bags I had.  While the guy was using the wand, a guy who looked like the American flight's Captain (or a member of his crew) approached me and asked me in approximately the following words: " Are you US. Citizen?" I said, "no." He said, "Do you mind if I ask... What is your citizenship?" I said, "India." I then proceeded to ask why I was being asked this and he first said, "A customer got nervous on the plane with you there." I then asked, "who" and he said rudely, " I don't want to get into this – Don't make this hard." He then left the area.  When they were done with the search, I gathered my belongings and went back to the plane.  In front of the whole plane watching me (being in first class), I again stowed my belongings and retook my seat.

7.    Either the security guy or the captain/crew member who asked me about my citizenship was not being entirely truthful.  Either I was supposed to have been checked, as the security guard suggested, (which is definitely not true since I was cleared and I have traveled enough to know that I am not on some obscure list) or someone on the plane was afraid and expressed it to the Captain/crew member.  I believe the latter was true.  The security person was obviously asked by American's crew to get me off of the airplane.  As the behavior and statement of the Captain/crew member guy indicated, it was American personnel that requested that I be subjected to this search because a passenger was concerned about my presence on the plane.

3

8.  If it is true that someone was concerned about my presence on the airplane, then removing me from the plane has to be a case for extreme misjudgment by American personnel. To remove an Executive Platinum club member or any passenger based solely on the concerns of one individual and most importantly solely on the color of my skin or the presence of my beard, which clearly indicates my religious affiliation, is discriminatory. In my opinion, an airline, if approached by someone that is uncomfortable with another person, should promptly inform the concerned individual that they have a right to catch the next flight. Airlines should be mandated to not act on mere insinuation based on ethnicity or religion without any indication of intent or probable cause to do harm.

9.  Some things about my experience were very disturbing to me. It was very humiliating to be pulled off the plane with everything as though I was some kind of criminal being asked to step off the plane. I have been searched before in the usual ways, but never by being singled-out and humiliated with my dignity attacked. The effect of the discriminatory treatment emotionally was total and devastating humiliation and mental torment in front of a plane packed with people. It is humiliating to say the least to be asked to de-board a plane as though you are some criminal. Furthermore, now, every time I am on a plane, I am looking at the entrance of the plane for the next security guard to repeat the incident. It is only when the door shuts and the plane takes off that I am a little at ease. The experience also creates an apprehension in flying. In my job, travel is a necessary part of my duties as I speak across the country. Now I hesitate to venture on a plane trip when earlier flying was second nature to me (as evident from the amount of travel). As I have stated, I am an Executive Platinum member of American Airlines. I gained this status through extreme loyalty to American (100,000 or more qualifying miles on American in one year). This means that on many instances I may have compromised a lower fare to gain my Executive Platinum status. Now from that perspective, I have spent a lot in being loyal to

4

American. But now, though I still fly American because I cannot afford to lose the benefits I have paid dearly to gain (my status expires in February 2003), thanks to their humiliating/discriminatory attitude, I have lost my desire to fly American and suffer emotionally every time I must do so.

10.    In my opinion, people of different cultures view such experiences differently. People where I come from in the Indian Subcontinent and the Middle East view this kind of discriminatory scrutiny as an attack on our dignity. It is humiliating for everyone, but culturally, being scrutinized in this way is no different than being accused of a crime when you are innocent. It becomes a face-losing issue. Therefore, most people from the Middle East and South East Asia probably won't even discuss this type of experiences because of this issue. However, being in the business of working to secure the rights of Muslims, I cannot in good conscience let my personal humiliation stop me from proceeding further by making my complaint public.

11.    On November 7, 2002, I filed a complaint against American with the Department of Transportation's Aviation Consumer Protection Division who has forwarded my complaint on to American. As of this date, I have received no dispositive response to my claims from American.

I state under penalty of perjury that the foregoing (including any attached statement) is true and correct.

Executed on _____December 15th_____, 2002.

Signature: _____

5

## DECLARATION OF VAHID TONY ZOHREHVANDHI

I, Vahid Tony Zohrehvandhi, under penalty of perjury declare as follows:

1.    I am an American citizen of Iranian descent. I reside in Grand Prairie, Texas and am the father of two teen-aged sons, both of whom are American citizens, born in Louisiana.

2.    I was educated in the United States. I possess a Bachelor's degree in Mechanical Engineering from Southern University and A&M College, and a Master's degree in Mechanical Engineering from the University of Texas. I expect to complete my Ph.d in Mechanical Engineering at the University of Texas in 2003.

3.    I am employed at Parametric Technologies, a software development company based in Dallas, Texas, and incorporated in the United States. At the time of my flight, I was employed as a business analyst. My clients included a variety of small, medium, and large corporate entities, including Lockheed Martin and Boeing. My work with Lockheed Martin and Boeing included work on high-security military projects. Due to the sensitive nature of these projects, I have received security clearances from both Lockheed Martin and Boeing.

4.    At the time of this incident, my clients were located throughout the United States. Consequently, I was a frequent business traveler. I estimate that I took more than 20 trips each year on American Airlines. Based on my frequent business travel, I am an American Airlines Advantage Gold member, having traveled more than 25,000 miles on American Airlines in a year.

5.    In addition to working for Parametric Technologies, since 1989 I have worked as a part-time fleet services employee for American Airlines in Dallas. My job responsibilities

1

EXHIBIT 11

include preparing the cabins of both domestic and international aircraft operated by American Airlines. I am among the most senior part-time American Airlines employees based in Dallas.

6.    On September 17, 2001, I flew from Dallas to Seattle on American Airlines Flight 1873 in order to provide consulting services to Boeing for Parametric Technologies. My round-trip ticket was purchased through Parametric's travel agent and cost approximately $1400. For this flight, I checked my luggage, passed through the security checkpoint, boarded the flight and flew without incident.

7.    On September 21, 2001, I was scheduled to return to Dallas on American Airlines Flight 1324 scheduled to depart at 12:23 p.m. I arrived at the airport early and checked my luggage at the American ticket counter and was given a boarding pass. My boarding pass reflected that I am an American Airlines Advantage Gold member.

8.    On my way to the gate, I passed through the security checkpoint x-ray machine. I was not carrying any coins or other metal objects and the machine did not sound. After passing through the x-ray machine, an airport security officer passed a hand wand over and around my clothing. Like the x-ray machine, the hand wand did not go off. The security officer asked for my consent to conduct a pat-down search. I consented and the officer conducted the pat-down search. After the search, I was allowed to proceed to the American Airlines gate.

9.    I arrived at the gate approximately one hour before boarding and sat and read a newspaper. I did not speak to any American Airlines employees or other passengers while waiting at the gate. The gate agent announced that boarding passengers would be required to present photo identification along with their boarding passes. I presented my Texas driver's license and boarding pass and boarded the flight along with the other passengers.

2

CRQ 0122

10.    After boarding the plane, I took my seat and began reading my newspaper. Shortly thereafter, an American Airlines agent wearing what appeared to be an Admiral's Club Attendant uniform boarded the plane and approached me. I believe that the agent's name was Cody. He appeared to be carrying a copy of the passenger manifest and asked me to gather my belongings and come with him.

11.    I asked him why I was being asked to leave the airplane and he refused to provide me with an answer. Instead, he stated that he would explain the reason to me later. I asked him if I was going to miss the flight and he said that I would miss it. During this exchange, the other passengers stared at me. In all of my years of business and leisure travel, I had never been asked to leave a flight for any reason. I was immediately embarrassed and humiliated.

12.    I accompanied the American Airlines agent off the plane. In the jetway, I explained to him that I didn't understand what was happening and informed him that, in addition to being a customer, I was an American Airlines employee. I showed him my American Airlines employee identification which contains my picture, my employee number, and the date on which I began my employment with American Airlines.

13.    The agent told me that he did not know anything about me but had been asked to take me off of the airplane. I noticed that, in addition to me, another man had been asked to leave Flight 1324. Like me, this man appeared to be of Middle Eastern descent. I did not see any other passengers being asked to leave the airplane.

14.    The American Airlines agent escorted me and the other man to a small room inside the airport. The agent asked me for my driver's license and my American Airlines identification. He made a copy of them and returned them to me.

3

CRQ 0123

15.     The American Airlines agent told me words to the effect that the pilot had requested that the other man and I be removed from the flight because the pilot did not feel comfortable with our "look."

16.     I asked the agent what about my appearance had made the pilot uncomfortable and whether I had unintentionally engaged in any suspicious conduct. I explained that because I am a frequent traveler, I did not want to have difficulty flying in the future. The agent informed me that I had not done anything suspicious or otherwise inappropriate. He stated, however, that pilots have the right to request that passengers be removed from flights.

17.     I informed him that based on my airline experience I was aware that pilots may eject passengers who are drunk, violent, threatening, or otherwise unruly. I explained that I did not understand why I had been ejected from the plane given that I did not fall into any of these categories. The agent told me that he could not give me any additional information and informed me that American Airlines had contacted law enforcement authorities so that they could question me. While I was being detained, my flight for home departed without me.

18.     Three armed and uniformed police officers arrived. Two of the officers were female and one was male. They requested my driver's license and made a copy of it. Initially, the officers addressed their questions jointly to me and the other Middle Eastern gentleman. I informed the officers that we did not know one another and were not traveling together and asked that the officers direct their questions to me as an individual. I asked the officers whether I was under arrest and the officers told me that I was not under arrest but was being detained for questioning. The officers appeared to radio information about me to some other location and then proceeded to question me.   After I explained that I was an American citizen, they asked to

4

CRQ 0124

see my passport. I explained that, like most Americans, I do not carry my passport for domestic travel. One of the officers recommended that I start carrying it because, according to the officer, people that look the way I do would no longer be able to conduct business as usual. In addition, the officers asked me my religion, my marital status, and whether I have children.

19.    I cooperated fully with the officers and asked what I had done to justify being ejected from the airplane and questioned by the authorities. Like the American Airlines agent, the officers informed me that I had not done anything wrong, but that the pilot had nevertheless requested that I be removed from the flight.

20.    After approximately one hour, the officers informed me and the American Airlines agent that background checks on me had come back negative and that I was free to go. During that hour I did not know when or if I would be allowed to fly home to Dallas. At no time after being removed from Flight 1324 did American Airlines agents or law enforcement officers search me.

21.    The American Airlines employee escorted me and the other passenger to another gate in order to obtain seats on another flight to Dallas. Approximately two hours after my scheduled departure, I was allowed to board American Airlines Flight 1954 and fly home to Dallas. After landing in Dallas, as I was walking away from the flight, I was approached by an American Airlines flight attendant. She was Caucasian, had brown hair, was approximately 5' 7", and had a sturdy build. She gave me a hug and apologized for the way I had been treated and informed me that before I had boarded Flight 1954, the pilot was asked whether he had a problem with me flying on the airplane. According to the flight attendant, the pilot stated that he did not have a problem flying with me.

5

22.    I believe that American Airlines ejected me from Flight 1324, subjected me to detention and interrogation, and authorized the pilot on Flight 1954 to refuse to fly with me because of my race and national origin. I had not done anything wrong yet American Airlines removed me from the flight because of the way I look. There is nothing I can do to change the fact that I have brown skin, hair, and eyes and appear to be Middle Eastern.

23.    On September 22, 2001, I notified an American Airlines supervisor about my experience the previous day. The supervisor contacted American Airlines' Human Relations department. Human Relations asked me to send them a statement and said that they would look into the incident, speak with the pilot, and inform me of the outcome of their review. I referred Human Relations to a newspaper article for a description of the incident.

24 .    Later, I received a call from a supervisor threatening that my part-time job with American Airlines could be in jeopardy if I spoke to the media about the discrimination I had experienced because employees are not supposed to speak with the media about company business. I informed the supervisor that American Airlines had discriminated against me in my private capacity and that I had a right to speak out about my treatment.

25.    When I reported to American Airlines for work, my co-workers informed me that it had been rumored that American Airlines had terminated me. This rumor was unfounded as I continue to work for American Airlines.

26.    The incident has turned my life upside down in countless ways. Immediately after the incident I started having trouble sleeping and noticed that my heart would race unexpectedly. My boss recommended that I see a doctor. The doctor told me that I was suffering from anxiety attacks.

6

CRQ 0126

27.     While I used to fly frequently, flying now makes me very apprehensive as I have no way of knowing when or if I will be unfairly singled out. Because of this incident, I have dramatically restructured my life in order to minimize the need to fly. I even switched positions at my company so that I no longer have to travel frequently for work even though my boss told me that I was giving up a sure promotion track leading to salary increases.

28.     To avoid flying, I cancelled the holiday trip I take every year with my sons as a reward for their academic performance. I have flown on a limited basis since the incident. Now when I fly, I avoid getting up from my seat even to use the restroom, because I worry that I will be attacked by other passengers, the flight crew, or by an air marshall. I have tried to learn what behaviors are considered suspicious in order to avoid accidentally doing something that might make someone uncomfortable.

7

CRQ 0127

I declare under penalty of perjury that the foregoing is true and correct.


Executed this _25_ day of February at Grand Prairie, Texas.

_____

Vahid Tony Zohrehvandi

8

CRQ 0128

**EXHIBIT  B**



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF HEARINGS**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 27th day of February, 2004

| | |
|---|---|
| American Airlines, Inc.<br>Violations of 49 U.S.C. §§40127, 41310, 41702 and 41712 | **Served: February 27, 2004,**<br><br>**Docket OST 2003-15046** |

## CONSENT ORDER

This order closes an enforcement proceeding involving American Airlines, Inc.'s (American)[1] compliance with Federal statutes prohibiting air carriers from subjecting any air traveler to discrimination on the basis of race, color, national origin, religion, sex or ancestry. The consent order directs American to cease and desist from future violations and to provide civil rights training to its flight and cabin crews and customer service representatives.

Shortly after the terrorist attacks of September 11, 2001, the Office of Aviation Enforcement and Proceedings (Enforcement Office) began to receive complaints against American (and other carriers) from individuals removed from flights or denied boarding on flights allegedly because those persons were, or were perceived to be, of Arab, Middle Eastern or Southeast Asian descent and/or Muslim. Because of concerns about these complaints, the Enforcement Office requested information from American regarding incidents occurring between September 11, 2001, and December 31, 2001, involving the removal or denied boarding of a passenger for safety/security reasons.

Federal law is clear. An airline cannot refuse passage to an individual because of that person's race, color, national origin, religion, sex, or ancestry. 49 U.S.C. § 40127(a). Similarly, 49 U.S.C. § 41310 prohibits air carriers and foreign air carriers from engaging in unreasonable discrimination against individuals on flights between the U.S. and foreign points, 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation, and 49 U.S.C. § 41712 prohibits unfair and deceptive practices and, therefore, prohibits invidiously discriminatory practices on the part of U.S. carriers. This proceeding was instituted on April 25, 2003, with the filing of a Notice of Enforcement Proceeding and Assessment of Civil Penalties and related Complaint based on the Enforcement Office's investigation of American's compliance with the aforementioned statutes.

---

[1] In each instance in this consent order in which the name American Airlines or American appears, it shall refer to and be binding upon American Airlines, Inc., American Eagle, Inc., and all their subsidiary or wholly-owned air carriers.

CRQ 0129

In responding to the Enforcement Office's allegations, American states that it did not and does not discriminate against passengers on the basis of race, color, national origin, religion, sex or ancestry. According to American, it has a diverse workforce which serves a diverse customer base. American contends that diversity is a major part of American's business, and all of American's policy and training reflect this fact. While American acknowledges that pilots-in-command must have reasonable grounds before removing passengers or denying them boarding from flights for safety or security reasons, American further contends that, as a matter of law, the pilot-in-command must not allow a passenger to depart on a flight if he or she believes that carriage of that passenger is or might be inimical to safety. 49 U.S.C. § 44902(b), 14 CFR 91.3 and 49 CFR 1544.215(c). In addition, American asserts that the pilot-in-command must make that decision based upon the facts and circumstances presented to him or her at that time, taking into account the time constraints under which the decision must be made and the general security climate in which the events unfold. According to American, the circumstances that play a part in the pilot-in-command's decision include the heightened actual dangers arising from the increased risk of terrorist acts, the catastrophic consequences in the case of air travel of any failure to detect such acts in advance, and the necessity that pilots-in-command must make safety decisions on short notice without the opportunity to make an extensive investigation. American opines that the pilot-in-command may rely without further inquiry upon the representations of other crewmembers or other responsible authorities with respect to safety and security.[2]

With respect to the eleven instances cited in the complaint, American states that ten of the eleven occurred in the months immediately following the September 11 tragedies when airport security was still adjusting to the new travel environment. American asserts that in eight of those instances the pilot-in-command of the aircraft made a decision that security issues raised by the passenger's conduct and/or documentation, and not the passenger's protected status, could not be resolved before departure. In many of those instances, according to American, law enforcement authorities, including some who were employees of the Department, were advising the pilot-in-command on the scene. American asserts that in the ninth instance the passenger was removed by and at the behest of local law enforcement authorities. American argues that in each instance the security questions were resolved on the ground and the passenger was put on the next departing flight. With respect to the eleventh instance, which occurred in October 2002, American states that the passenger was removed for additional screening and was reboarded on his scheduled flight. American contends that in each instance, the decision to require further screening was responsible and lawful and that discovery in the case supports this conclusion.[3]

As a legal matter, American contends that there is no jurisdictional basis for enforcement action: pursuant to 49 U.S.C. § 46301(d)(2) and given the amount initially in controversy, American asserts that exclusive jurisdiction rests with the district courts of the United States for the alleged

---

[2] The Enforcement Office strongly disagrees with this position. It is the Enforcement Office's position that a pilot-in-command's failure to inquire independently into the reasons for such action is inconsistent with carriers' legal obligations.

[3] The Enforcement Office disagrees with American's assertions. Nothing learned during discovery in this case dissuades the office that strong evidence exists indicating American acted inconsistently with the applicable civil rights laws in removing and denying boarding to passengers on its flights.

2

violations of section 40127; and sections 41310 and 41702 do not create an administrative remedy for discrimination on the basis of protected status.[4]

American further emphasizes that all of the alleged incidents occurred shortly after September 11, 2001 a period of unprecedented security concerns and tension for all participants in the nation's air transportation system, especially American one of the two carriers that lost employees, passengers and aircraft in the attacks. During the period following September 11, American states that it was scrupulous in exercising its authority and responsibility under section 44902(b), and remains so today. As one of two carriers that were direct victims of the attack, American points out that it is particularly sensitive to claims that its employees acted in disregard of the law regarding aircraft security following September 11. American, having thoroughly investigated the complaints in question, remains resolute in its conviction that none of its employees, in conducting themselves as they did under extremely difficult and historically unprecedented, circumstances, acted wrongly or with intent to violate any law.

American states that, even though it continues to deny strenuously that any violation of Federal law occurred, it made more sense to settle this matter with the Enforcement Office than to continue with costly and protracted litigation to vindicate the actions of its employees. This is especially the case as the Enforcement Office is willing to settle the matter without the assessment of civil penalties, but rather a commitment by American to incorporate civil rights training into existing training programs for pilots, flight attendants, and customer service representatives. According to American, since it is already fully committed to vigorous compliance with the country's civil rights laws, this training will serve simply to reinforce the company's commitment to these core civil rights protections, an objective to which American is fully committed in any event.

The Enforcement Office recognizes that the September 11 terrorist attacks were unprecedented and clearly created a difficult situation for the airline industry, acting pursuant to FAA-approved security programs, in trying to protect passengers and crew from further attacks. Nonetheless, based on its review of the post-September 11 incidents in which American removed or failed to board passengers purportedly for safety/security reasons, the Enforcement Office believes that some passengers were denied boarding or were removed from flights because, or principally because, of the passenger's ethnic background. Even though the Enforcement Office does not dispute that the American employees involved believed they were acting to ensure the safety and security of passengers and crew, the Enforcement Office believes some passengers were denied boarding or removed from flights in a manner inconsistent with the carrier's non-discrimination obligations under Federal law.

The Enforcement Office has carefully considered all the information provided by American, but continues to believe that enforcement action is warranted. In order to end the litigation, the Enforcement Office and American have reached a settlement of this matter. Without admitting

---

[4] American raised these arguments in a motion to dismiss in this proceeding which was denied by the Administrative Law Judge in an order issued on August 21, 2003. See American Airlines Inc., OST-2003-15046-18.

3

CRQ 0131

any violations of the law occurred, and without waiving its legal arguments as set forth above, American consents to the issuance of this order to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702, and 41712 and to provide civil rights training to its flight and cabin crewmembers, as well as its customer service representatives. The Deputy General Counsel and the Enforcement Office believe that this settlement is appropriate and serves the public interest and creates an incentive for all carriers to comply fully with the civil rights laws enforced by the Department of Transportation.[5]

**ACCORDINGLY,**

1. Based on the above discussion, we approve this settlement and the provisions of this order as being in the public interest;

2. We find that American Airlines, Inc., acted in a manner inconsistent with the requirements of 49 U.S.C. §§ 40127, 41310, 41702 and 41712 when it removed from or refused to board on its flights certain individuals as discussed above;

3. We order American Airlines, Inc., and all other entities owned and controlled by it or under common ownership and control with it, and their successors and assigns to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702 and 41712, as described above;

4. We order American Airlines, Inc., and its successors and assigns to provide civil rights training to its flight and cabin crewmembers and passenger service representatives. The total cost of the training shall be no less than $1.5 million and shall be expended by a date three years after the service date of the order.[6] Upon the completion of that training, and in no event later than the 14 months after the service date of this order and every 12 months thereafter for two subsequent years, American shall submit a sworn statement from an appropriate company official certifying that all flight and cabin crewmembers and passenger service agents have received the civil rights training required under this order.

5. Any failure by American Airlines, Inc., to conduct the training in accordance with ordering paragraph 4 or to document it adequately to the Enforcement Office shall

---

[5] Additionally, this consent order will settle any and all complaints that could be asserted against American alleging violations of 49 U.S.C. §§ 41310, 41702, 41705 or 41712 arising out of or relating to incidents where American removed from a flight or failed to board a passenger on the basis of the passenger's assumed ethnic background or national origin occurring on or after September 11, 2001, and through the service date of this order.

[6] The Department has contracted with a company to develop an easy to understand technical assistance manual that details the responsibilities of air carriers under Federal nondiscrimination statutes and to develop a model training program, which will include, at a minimum, an overview of the applicable laws and regulations, a cultural awareness component and a job-specific training segment. To support the Department in its mission of ensuring nondiscrimination in air transportation, American has agreed to share with the Department's contractors its civil rights training materials for possible inclusion in the Department's technical assistance manual and model training program.

4

CRQ 0132

constitute a continuing violation of this consent order and subject American to enforcement action; and

6. This order makes no findings of violations with respect to any individual incident of alleged civil rights violations and the findings herein shall have no effect in any proceeding not before the Department of Transportation.

This order is issued under authority assigned in 14 CFR 385.11(d) and shall become a final order of the Department 30 days after its service unless a timely petition for review is filed or the Department takes review on its motion.

By:

BURTON S. KOLKO
Administrative Law Judge

(SEAL)

*An electronic version of this document is available on the World Wide Web at*
*http://dms.dot.gov/reports/reports_aviation.asp*

5

CRQ 0133