UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
JOHN D. CERQUEIRA,                          )
                                            )
        Plaintiff,                          )
                                            )
        v.                                  )
                                            )    CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                     )
                                            )
        Defendant.                          )
_____)

**<u>DEFENDANT AMERICAN AIRLINES, INC.'S MOTION FOR RECONSIDERATION
AND CLARIFICATION OF THE COURT'S ORDER DATED DECEMBER 13, 2006 ON
PLAINTIFF'S SIXTH MOTION IN LIMINE SEEKING TO PRECLUDE REFERENCE
TO MATERIALS THAT AMERICAN AIRLINES, INC. HAS NOT BEEN ABLE TO
PROVIDE TO PLAINTIFF BECAUSE AMERICAN AIRLINES, INC. AWAITS
DETERMINATION BY THE DEPARTMENT OF HOMELAND SECURITY AS TO
WHETHER THEY CONSTITUTE SENSITIVE SECURITY INFORMATION</u>**

On December 13, 2006, the Court entered an order granting, without comment, plaintiff's

sixth motion in limine.  That motion sought to prevent American Airlines, Inc. ("American")

from mentioning the existence of policies, protocols, procedures and training materials used at

American on or about December 28, 2003, the date upon which Plaintiff was removed from an

American flight, because American has not produced those materials to Plaintiff.[1]  American has

been unable to produce those materials to Plaintiff because they may constitute sensitive security

information ("SSI") pursuant to 49 CFR §1520.

American files this motion to seek reconsideration and clarification of the Court's

December 13, 2006 order to a) determine the nature and extent to which it may, without

disclosing SSI, make mention of the fact that it does provide training to its employees on security

issues; b) determine whether it may describe generally and consistent with the deposition

_____

[1] American disputes that it has "refused" to produce certain materials to the plaintiff; to the contrary, it cannot do so
by operation of law.

testimony of its employees, without disclosing SSI, such training; c) determine the nature and extent to which it may, without disclosing SSI, make mention of the fact that it has policies and procedures regarding the circumstances under which a passenger may be removed from a flight or denied boarding; d) determine whether it may describe generally and consistent with the deposition testimony of its employees, without disclosing SSI, such policies and procedures; e) determine the nature and extent to which it may, without disclosing SSI, make mention of the fact that it does have policies and procedures regarding the circumstances under which a passenger may be denied rebooking; and f) determine whether it may describe generally and consistent with the deposition testimony of its employees, without disclosing SSI, policies and procedures regarding the circumstances under which a passenger may be denied rebooking.

### ABSENT PERMISSION FROM THE TRANSPORTATION SECURITY ADMINISTRATION, AMERICAN CANNOT PROVIDE DETAILED INFORMATION REGARDING ITS SECURITY TRAINING, POLICIES AND PROCEDURES WITHOUT VIOLATING FEDERAL LAW.

Congress provided authority to the Transportation Security Administration ("TSA") to determine what constitutes SSI within the transportation industry and to regulate disclosure of such information. 49 U.S.C. §114(s). The TSA defines such information to include any information that, if disclosed, would be detrimental to the security of transportation. 49 CFR §1520.5(a)(3). That information includes, among other things, security programs and contingency plans (49 CFR §1520.5(b)(1)), security guidances (49 CFR §1520.5(b)(2)), information circulars (49 CFR §1520.5(b)(3)), security measures (49 CFR §1520.5(b)(8)), and security training materials (49 CFR §1520.5(b)(11)). *See also Cassidy v. Chertoff*, --- F.3d ---, 2006 WL 3436590 at *3 (2nd Cir.2006) (Alternative Security Program required by Coast Guard constituted SSI). American's training materials and policies and procedures regarding the denial of service to passengers for security reasons fall squarely within the purview of those

regulations.  It cannot disclose the contents of those materials to anyone who does not qualify as a "covered person" or who does not meet the criteria of a person with a "need to know" under the regulations.  49 CFR §§1520.7 and 1520.11.  Plaintiff is neither.  *See, e.g., Jifry v. Federal Aviation Administration*, 370 F.3d 1174, 1182 (D.C. Cir.2004) (persons whose airmen certificates were revoked denied access to certain information on SSI grounds deemed not to be persons with "need to know" under applicable regulations).  *See also Ahmed v. American Airlines, Inc.*, (Plaintiffs deemed not to be persons with "need to know" in denial of boarding case; motion to seal information filed by Department of Justice and TSA allowed; district court had no jurisdiction to review TSA's determination that information constituted SSI under 49 U.S.C. §46110(a)).  Therefore, American must request permission to disclose information to plaintiff from the Department of Homeland Security ("DHS").  49 CFR §1520.9(a)(3).  Until such time as a decision is rendered on that request, American cannot provide plaintiff with the information sought.  *Id.*

### AMERICAN HAS ATTEMPTED TO OBTAIN PERMISSION TO DISCLOSE THE INFORMATION REQUESTED BY PLAINTIFF, AND SHOULD NOT BE PENALIZED BECAUSE IT HAS NOT RECEIVED SUCH PERMISSION AS OF THIS TIME.

American cannot disclose any of the materials described above without prior authorization from DHS to the Plaintiff, or for that matter to anyone, on the grounds of evidentiary privilege.  49 CFR §1520.  The law requires American to refer all requests from someone who is not a "covered person" under the SSI regulations to the TSA or to the appropriate agency within DHS.  49 CFR §1520.9(a)(3).

In compliance with the law, American has sought permission from DHS to disclose information regarding security training, policies and procedures requested by the plaintiff, but to date has not received a response to its request.  *See* Letter from Alec Bramlett to the TSA, dated

April 7, 2006, attached hereto as Exhibit A.  American should not be prevented from defending itself in a meaningful manner because those charged with reviewing its request have not yet made a decision thereon.[2]

### PLAINTIFF HAS FAILED TO EMPLOY THE MEANS AVAILABLE TO HIM TO OBTAIN THE INFORMATION REQUESTED.

On October 4, 2006, President George W. Bush signed into law Public Law No. 109-295, the Department of Homeland Security Appropriations Act, 2007.  Section 525(d) of that law contains provisions pursuant to which a plaintiff in a civil lawsuit may seek a court order compelling disclosure of SSI under certain circumstances.  Section 525(d) states:

"(d) That in civil proceedings in the United States District Courts, where a party seeking access to SSI demonstrates that the party has substantial need of relevant SSI in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means, the party or party's counsel shall be designated as a covered person under 49 CFR Part 1520.7 in order to have access to the SSI at issue in the case, provided that the overseeing judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a criminal history check and terrorist assessment like that done for aviation workers on the persons seeking access to SSI, or based on the sensitivity of the information, the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation: *Provided*, That notwithstanding any other provision of law, an order granting access to SSI under this section shall be immediately appealable to the United States Courts of Appeals, which shall have plenary review over both the evidentiary finding and the sufficiency of the order specifying the terms and conditions of access to the SSI in question: *Provided further*, That notwithstanding any other provision of law, the Secretary may assess a civil penalty of up to $50,000 for each violation of 49 CFR Part 1520 by persons provided access to SSI under this provision."  *See* Public Law No. 109-295, Sec. 525(d), attached hereto as Exhibit B.

In spite of knowing of the existence of this law, plaintiff has made no efforts to obtain permission from this Court to have the pertinent information released.[3]  Assuming that TSA

---

[2] Prior to legislation enacted on October 4, 2006, TSA was under no obligation to act on such requests in a timely manner.  Public Law No. 109-295, Sec. 525(a).  Legislation enacted on October 4, 2006 requires TSA to develop within thirty days guidelines for responding to such requests in a timely manner.  *Id.*  However, it is doubtful as to whether those guidelines have retroactive effect to pending requests.

receives appropriate notice of and has an opportunity to intervene in connection with any efforts made by plaintiff to obtain SSI that plaintiff requested from American, that plaintiff can meet the evidentiary standards set forth in the above law, and that plaintiff and/or his counsel are able to pass the criminal history check and terrorist assessment referenced therein, American would not oppose entry of an order permitting plaintiff's counsel to inspect the materials at issue. However, plaintiff has yet to take such initiative, and American should not be penalized in its defense of this case for withholding documents from plaintiff that it cannot produce absent permission from the TSA (which it has requested) or an order of this Court (which only plaintiff is entitled to seek under the existing law).

## AMERICAN HAS DISCLOSED, TO THE EXTENT ALLOWED BY THE LAW, THE EXISTENCE AND ASPECTS OF AMERICAN'S TRAINING, POLICIES AND PROCEDURES.

American has, to the extent it is allowed to do so by operation of law, provided information to plaintiff regarding the training, policies and procedures applicable to his claims. Specifically, American has permitted each of the employees deposed by plaintiff to testify as to a) whether American's employees receive training with regard to denial of service and rebooking decisions; b) whether American has policies and procedures in place with regard to denial of service and rebooking decisions; and c) the general parameters of such training, policies and procedures. For example, Amy Milenkovic, one of the flight attendants, testified at deposition that American's flight attendants are trained to look for unusual behavior and to report such behavior to the captain. Deposition of Amy Milenkovic ("Milenkovic Deposition"), pp. 20-21, 31-32, 28-29, attached hereto as Exhibit C. Flight attendants Lois Sargent and Sally Walling testified that the appropriate procedure for handling circumstances of suspicious passenger

---

[3] American's counsel made the existence of this provision known to plaintiff's counsel in a telephone conference at the end of October, 2006.

behavior is to report that behavior to the captain.  Deposition of Lois Sargent ("Sargent Deposition"), p. 39-41 and Deposition of Sally Walling ("Walling Deposition"), pp. 47-48 and 50, attached hereto as Exhibits D and E respectively.  Captain Ehlers in turn testified that he is trained to examine the totality of the circumstances based on the information available to him personally and through his flight attendants in making decisions regarding transporting a passenger, and that such training reflects American's policies and procedures regarding denial of boarding and removal decisions.  Deposition of John Ehlers ("Ehlers Deposition"), pp. 73-76, attached hereto as Exhibit F.  Craig Marquis and Rhonda Cobbs, American employees at Systems Operations (the department at which decisions regarding rebooking are made) testified that Systems Operations personnel are trained to examine the circumstances in question before making rebooking decisions, and that American has policies and procedures in place consistent with that training.  Deposition of Craig Marquis ("Marquis Deposition"), pp. 26-33 and Deposition of Rhonda Cobbs ("Cobbs Deposition"), pp. 56-58 and 62, attached hereto as Exhibits G and H respectively.  American's ground personnel at Logan Airport, Nicole Traer and Ynes Flores, also testified that there are policies and procedures in place for handling situations such as the one that arose on December 28, 2003.  Deposition of Nicole Traer ("Traer Deposition"), p. 37-38; Deposition of Ynes Flores ("Flores Deposition"), p. 26, attached hereto as Exhibits I and J respectively.  Moreover, all of the foregoing personnel testified that they are aware of the fact that American does not tolerate discrimination and that discriminatory factors cannot be taken into account in decisions regarding the transport of its customers.  Milenkovic Deposition, p. 30; Sargent Deposition, pp. 42 and 44; Walling Deposition, pp. 58-60; Ehlers Deposition, p. 73; Marquis Deposition, p. 29; Cobbs Deposition, pp. 53-56; Traer Deposition, pp. 38-39, 45; Flores Deposition, pp. 27-28.

Plaintiff intends to proffer expert testimony at trial that American a) failed to train its personnel adequately to handle the situation that arose on Flight 2237 on December 28, 2003 and b) that it failed to have in place and/or to follow adequate policies and procedures that would prevent discrimination from forming the basis for a decision regarding passenger transportation. See Expert Report of Douglas Laird, attached as Exhibit K, at Conclusion. As plaintiff's own expert admits, unless American is allowed to introduce the outlines of its training, policies and procedures as previously testified to by its employees at deposition, it cannot defend itself against such testimony and will not receive a fair trial. *See* Deposition of Douglas Laird ("Laird Deposition"), pp. 68-69, attached hereto as Exhibit L (TSA responsible for determining when SSI may be released and it is hard to defend oneself when one cannot utilize SSI).

Unless it receives permission to do so from the federal government, American cannot, and does not intend to, use the specifics of the policies, protocols, procedures and training materials in question as evidence at trial, even though those policies, protocols, procedures and training materials likely would advance its defenses at trial.[4]  49 CFR §1520. *See also Chowdhury v. Northwest Airlines, Inc.*, 226 FRD 608 (N.D.Cal. 2004). However, American should not be forced to make the impossible choice between violating federal law and defending itself in this action. It should be permitted to mention the fact that it does have policies, procedures and protocols by which it abides without violating its legal obligation to protect SSI. *See generally* 49 CFR §1520. *See also Chowdhury*, 226 FRD 608 (finding that plaintiff's request to prohibit defendant from using contents of materials containing SSI was premature insofar as defendant to date had not made any attempt to utilize specifics of information in defense of its case).

---

[4] Indeed, because of the stringent restrictions placed on sensitive security information, outside counsel for American has not yet seen the documents forwarded to the Department of Homeland Security for review.

For the reasons set forth herein, American requests that the Court reconsider and clarify its ruling on Plaintiff's sixth motion in limine.

Respectfully submitted,
**AMERICAN AIRLINES, INC.**
By its Attorneys,


 _/s/ Amy Cashore Mariani_
Michael A. Fitzhugh, (BBO 169700)
Amy Cashore Mariani, (BBO #630160)
**FITZHUGH, PARKER & ALVARO LLP**
155 Federal Street, Suite 1700
Boston, MA 02110-1727
(617) 695-2330


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 14, 2006.


 _/s/ Amy Cashore Mariani_
Amy Cashore Mariani


## CERTIFICATE OF CONFERENCE

I hereby certify that on December 14, 2006, I held a telephone conference with Plaintiff's counsel, Michael Kirkpatrick, during which I advised him of the defendant's intent to file the instant motion, and he informed me of Plaintiff's intent to oppose the same.


 _/s/ Amy Cashore Mariani_
Amy Cashore Mariani

# AmericanAirlines

ALEC BRAMLETT
SENIOR ATTORNEY

DIRECT DIAL (817) 931-4358
FACSIMILE NO (817) 967-2937
EMAIL  ALEC BRAMLETT@AA COM

April 7, 2006

**<u>Via Federal Express</u>**

Sarah Tauber, Esq
TSA
601 S 12th Street, East Bldg
Arlington, VA  22202

Re    *Cerqueira v  AA*

Dear Ms Tauber

Further to our conversation of last week, I am writing to let you know about SSI-related issues that have arisen in the above-referenced lawsuit

In a nutshell, Plaintiff Cerqueira has sued American claiming unlawful discrimination arising from his removal from an AA flight in late December of 2003 The factual details of the incident and allegations related to same are set out in the Amended Complaint and American's Answer to same, copies of which I have included for your convenience

During the course of discovery, Plaintiff has posed to AA certain discovery requests that American believes may implicate SSI, and accordingly I am writing to bring this to your attention and seek guidance from your office

Enclosed are copies of Plaintiff's First Request for Production and his Interrogatories directed to AA, as well as our responses to same   I direct your attention in particular to Interrogatories 11, 14, and 15, and Requests for Production 4(c), (d), 6, and 7, and American's responses to same

Although the exact scope of these discovery requests, as well as the question of whether particular documents or information may be responsive to them, may be subject to interpretation or differing opinions, American took a conservative approach in reviewing the discovery requests and making our responses   We think it arguable that, as posed, the requests, or some of them, may call for documents or information that may include SSI

Sarah Taber, Esq.
March 7, 2006
Page 2

In particular, we are concerned that the requests may implicate the following enclosed materials

1    Parts 13 and/ or 15 of our Flight Manual

2    The inflight and pre-boarding sections of our Flight Attendant Manual from 2003

3    The same sections from our Flight Service manual from 2005

4    Excerpts from our Flight Attendant Recurrent Training curriculum regarding "Perceived Security Threats"

5    A videotape entitled At First Glance that AA produced and used in its recurrent Flight and Flight Attendant Training in 2004 and 2005 (this videotape reiterates some of the concepts contained in items 1-3 above)

I would appreciate your reviewing these materials and advising AA as to whether TSA objects to our producing some or all of it on SSI grounds  Please do not hesitate to call me to discuss this

Sincerely,

Alec Bramlett

cc    Michael Fitzhugh (w/o encl )
      Amy Mariani (w/o encl )

PL 109-295, October 4, 2006, 120 Stat 1355

UNITED STATES PUBLIC LAWS
109th Congress - Second Session
Convening January 7, 2005
Copr. © 2006 Thomson/West. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 109-295 (HR 5441)

October 4, 2006

DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2007

An Act Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2007, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2007, for the Department of Homeland Security and for other purposes, namely:

TITLE I

DEPARTMENTAL MANAGEMENT AND OPERATIONS

Office of the Secretary and Executive Management

For necessary expenses of the Office of the Secretary of Homeland Security, as authorized by section 102 of the Homeland Security Act of 2002 (6 U.S.C. 112), and executive management of the Department of Homeland Security, as authorized by law, $94,470,000: *Provided*, That not to exceed $40,000 shall be for official reception and representation expenses: *Provided further*, That of the funds provided under this heading, $5,000,000 shall not be available for obligation until the Secretary of Homeland Security submits a comprehensive port, container, and cargo security strategic plan to the Committees on Appropriations of the Senate and the House of Representatives; the Committee on Homeland Security of the House of Representatives; the Committee on Homeland Security and Governmental Affairs of the Senate; and the Committee on Commerce, Science, and Transportation of the Senate that requires screening all inbound cargo, doubles the percentage of inbound cargo currently inspected, sets minimum standards for securing inbound cargo, and includes the fiscal year 2007 performance requirements for port, container, and cargo security as specified in the joint explanatory statement accompanying this Act: *Provided further*, That of the funds provided under this heading, $10,000,000 shall not be available for obligation until the Secretary submits the Secure Border Initiative multi-year strategic plan to the Committees on Appropriations of the Senate and the House of Representatives, the Committee on Homeland Security of the House of Representatives, the Committee on Homeland Security and Governmental

Affairs of the Senate, and the Committees on the Judiciary of the Senate and the House of Representatives no later than December 1, 2006, that includes: a comprehensive *1356 mission statement, an identification of long-term goals, an explanation of how long-term goals will be achieved, schedule and resource requirements for goal achievement, an identification of annual performance goals and how they link to long-term goals, an identification of annual performance measures used to gauge effectiveness towards goal achievement by goal, and an identification of major capital assets critical to program success.

Office of the Under Secretary for Management

For necessary expenses of the Office of the Under Secretary for Management, as authorized by sections 701 through 705 of the Homeland Security Act of 2002 (6 U.S.C. 341 through 345), $153,640,000: *Provided*, That not to exceed $3,000 shall be for official reception and representation expenses: *Provided further*, That of the total amount provided, $8,206,000 shall remain available until expended solely for the alteration and improvement of facilities, tenant improvements, and relocation costs to consolidate Department headquarters operations.

Office of the Chief Financial Officer

For necessary expenses of the Office of the Chief Financial Officer, as authorized by section 103 of the Homeland Security Act of 2002 (6 U.S.C. 113), $26,000,000.

Office of the Chief Information Officer

For necessary expenses of the Office of the Chief Information Officer, as authorized by section 103 of the Homeland Security Act of 2002 (6 U.S.C. 113), and Department-wide technology investments, $349,013,000; of which $79,521,000 shall be available for salaries and expenses; and of which $269,492,000 shall be available for development and acquisition of information technology equipment, software, services, and related activities for the Department of Homeland Security, and for the costs of conversion to narrowband communications, including the cost for operation of the land mobile radio legacy systems, to remain available until expended: *Provided*, That none of the funds appropriated shall be used to support or supplement the appropriations provided for the United States Visitor and Immigrant Status Indicator Technology project or the Automated Commercial Environment: *Provided further*, That the Chief Information Officer shall submit to the Committees on Appropriations of the Senate and the House of Representatives, not more than 60 days after the date of enactment of this Act, an expenditure plan for all information technology projects that: (1) are funded under this heading; or (2) are funded by multiple components of the Department of Homeland Security through reimbursable agreements: *Provided further*, That such expenditure plan shall include each specific project funded, key milestones, all funding sources for each project, details of annual and lifecycle costs, and projected cost savings or cost avoidance to be achieved by the project.

Analysis and Operations

For necessary expenses for information analysis and operations coordination activities, as authorized by title II of the Homeland *1357 Security Act of 2002 (6 U.S.C. 121 et seq.), $299,663,000, to remain available until September 30, 2008, of which not to exceed $5,000 shall be for official reception and representation expenses.

Office of the Federal Coordinator for Gulf Coast Rebuilding

For necessary expenses of the Office of the Federal Coordinator for Gulf Coast
Rebuilding, $3,000,000: *Provided*, That $1,000,000 shall not be available for obligation
until the Committees on Appropriations of the Senate and the House of Representatives
receive an expenditure plan for fiscal year 2007.

Office of Inspector General

For necessary expenses of the Office of Inspector General in carrying out the provisions
of the Inspector General Act of 1978 (5 U.S.C. App.), $85,185,000, of which not to
exceed $100,000 may be used for certain confidential operational expenses, including the
payment of informants, to be expended at the direction of the Inspector General:
*Provided*, That the Department of Homeland Security Inspector General shall investigate
whether, and to what extent, in adjusting and settling claims resulting from Hurricane
Katrina, insurers making flood insurance coverage available under the Write-Your-Own
program pursuant to section 1345 of the National Flood Insurance Act of 1968 (42 U.S.C.
4081) and subpart C of part 62 of title 44, Code of Federal Regulations, improperly
attributed damages from such hurricane to flooding covered under the insurance coverage
provided under the national flood insurance program rather than to windstorms covered
under coverage provided by such insurers or by windstorm insurance pools in which such
insurers participated: *Provided further*, That the Department of Homeland Security
Inspector General shall submit a report to Congress not later than April 1, 2007, setting
forth the conclusions of such investigation.

TITLE II
SECURITY, ENFORCEMENT, AND INVESTIGATIONS
United States Visitor and Immigrant Status Indicator Technology

For necessary expenses for the development of the United States Visitor and Immigrant
Status Indicator Technology project, as authorized by section 110 of the Illegal
Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1365a),
$362,494,000, to remain available until expended: *provided*, that of the total amount
made available under this heading, $200,000,000 may not be obligated for the United
States Visitor and Immigrant Status Indicator Technology project until the Committees
on Appropriations of the Senate and the House of Representatives receive and approve a
plan for expenditure prepared by the Secretary of Homeland Security that--

(1) meets the capital planning and investment control review requirements established by
the Office of Management and Budget, including Circular A-11, part 7;
*1358 (2) complies with the Department of Homeland Security information systems
enterprise architecture;
(3) complies with the acquisition rules, requirements, guidelines, and systems acquisition
management practices of the Federal Government;
(4) includes a certification by the Chief Information Officer of the Department of
Homeland Security that an independent verification and validation agent is currently
under contract for the project;
(5) is reviewed and approved by the Department of Homeland Security Investment
Review Board, the Secretary of Homeland Security, and the Office of Management and
Budget;
(6) is reviewed by the Government Accountability Office;
(7) includes a comprehensive strategic plan for the United States Visitor and Immigrant

Status Indicator Technology project; and

(8) includes a complete schedule for the full implementation of a biometric exit program.

United States Customs and Border Protection

SALARIES AND EXPENSES

For necessary expenses for enforcement of laws relating to border security, immigration, customs, and agricultural inspections and regulatory activities related to plant and animal imports; purchase and lease of up to 4,500 (3,500 for replacement only) police-type vehicles; and contracting with individuals for personal services abroad; $5,562,186,000; of which $379,602,000 shall be used to hire additional border patrol agents, of which $93,000,000 shall be available until September 30, 2008; of which $3,026,000 shall be derived from the Harbor Maintenance Trust Fund for administrative expenses related to the collection of the Harbor Maintenance Fee pursuant to section 9505(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 9505(c)(3)) and notwithstanding section 1511(e)(1) of the Homeland Security Act of 2002 (6 U.S.C. 551(e)(1)); of which not to exceed $45,000 shall be for official reception and representation expenses; of which not less than $175,796,000 shall be for Air and Marine Operations; of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(f)(3)), shall be derived from that account; of which not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations; and of which not to exceed $1,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security: *Provided*, That of the amount provided under this heading, $100,000,000 of inspection and detection technology investments funding is designated as described in section 520 of this Act: *Provided further*, That for fiscal year 2007, the overtime limitation prescribed in section 5(c)(1) of the Act of February 13, 1911 (19 U.S.C. 267(c)(1)) shall be $35,000; and notwithstanding any other provision of law, none of the funds appropriated by this Act may be available to compensate any employee of United States Customs and Border Protection for overtime, from whatever source, in an amount that exceeds such limitation, except in individual cases determined by *1359 the Secretary of Homeland Security, or the designee of the Secretary, to be necessary for national security purposes, to prevent excessive costs, or in cases of immigration emergencies.

AUTOMATION MODERNIZATION

For expenses for customs and border protection automated systems, $451,440,000, to remain available until expended, of which not less than $316,800,000 shall be for the development of the Automated Commercial Environment: *Provided*, That of the total amount made available under this heading, $216,800,000 may not be obligated for the Automated Commercial Environment until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan for expenditure prepared by the Secretary of Homeland Security that--

(1) meets the capital planning and investment control review requirements established by the Office of Management and Budget, including Circular A-11, part 7;

(2) complies with the Department of Homeland Security information systems enterprise architecture;

(3) complies with the acquisition rules, requirements, guidelines, and systems acquisition management practices of the Federal Government;

(4) includes a certification by the Chief Information Officer of the Department of Homeland Security that an independent verification and validation agent is currently under contract for the project;

(5) is reviewed and approved by the Department of Homeland Security Investment Review Board, the Secretary of Homeland Security, and the Office of Management and Budget; and

(6) is reviewed by the Government Accountability Office.

BORDER SECURITY FENCING, INFRASTRUCTURE, AND TECHNOLOGY

For expenses for customs and border protection fencing, infrastructure, and technology, $1,187,565,000, to remain available until expended: *Provided*, That of the amount provided under this heading, $1,159,200,000 is designated as described in section 520 of this Act: *Provided further*, That of the amount provided under this heading, $950,000,000 shall not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan for expenditure, prepared by the Secretary of Homeland Security and submitted within 60 days after the date of enactment of this Act, to establish a security barrier along the border of the United States of fencing and vehicle barriers, where practicable, and other forms of tactical infrastructure and technology, that--

(1) defines activities, milestones, and costs for implementing the program;

(2) demonstrates how activities will further the goals and objectives of the Secure Border Initiative (SBI), as defined in the SBI multi-year strategic plan;

(3) identifies funding and the organization staffing (including full-time equivalents, contractors, and detailees) requirements by activity;

(4) reports on costs incurred, the activities completed, and the progress made by the program in terms of obtaining operational control of the entire border of the United States;

*1360 (5) includes a certification by the Chief Procurement Officer of the Department of Homeland Security that procedures to prevent conflicts of interest between the prime integrator and major subcontractors are established and a certification by the Chief Information Officer of the Department of Homeland Security that an independent verification and validation agent is currently under contract for the project;

(6) complies with all applicable acquisition rules, requirements, guidelines, and best systems acquisition management practices of the Federal Government;

(7) complies with the capital planning and investment control review requirements established by the Office of Management and Budget, including Circular A-11, part 7;

(8) is reviewed and approved by the Department of Homeland Security Investment Review Board, the Secretary of Homeland Security, and the Office of Management and Budget; and

(9) is reviewed by the Government Accountability Office.

AIR AND MARINE INTERDICTION, OPERATIONS, MAINTENANCE, AND PROCUREMENT

For necessary expenses for the operations, maintenance, and procurement of marine vessels, aircraft, unmanned aerial vehicles, and other related equipment of the air and marine program, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include the following: the interdiction of narcotics and

other goods; the provision of support to Federal, State, and local agencies in the enforcement or administration of laws enforced by the Department of Homeland Security; and at the discretion of the Secretary of Homeland Security, the provision of assistance to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts, $602,187,000, to remain available until expended: *Provided*, That of the amount provided under this heading, $232,000,000 of procurement is designated as described in section 520 of this Act: *Provided further*, That no aircraft or other related equipment, with the exception of aircraft that are one of a kind and have been identified as excess to United States Customs and Border Protection requirements and aircraft that have been damaged beyond repair, shall be transferred to any other Federal agency, department, or office outside of the Department of Homeland Security during fiscal year 2007 without the prior approval of the Committees on Appropriations of the Senate and the House of Representatives.

CONSTRUCTION

For necessary expenses to plan, construct, renovate, equip, and maintain buildings and facilities necessary for the administration and enforcement of the laws relating to customs and immigration, $232,978,000, to remain available until expended: *Provided*, That of the amount provided under this heading, $110,000,000 is designated as described in section 520 of this Act.

*1361 Immigration and Customs Enforcement
SALARIES AND EXPENSES

For necessary expenses for enforcement of immigration and customs laws, detention and removals, and investigations; and purchase and lease of up to 3,790 (2,350 for replacement only) police-type vehicles; $3,887,000,000, of which not to exceed $7,500,000 shall be available until expended for conducting special operations under section 3131 of the Customs Enforcement Act of 1986 (19 U.S.C. 2081); of which not to exceed $15,000 shall be for official reception and representation expenses; of which not to exceed $1,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security; of which not less than $102,000 shall be for promotion of public awareness of the child pornography tipline; of which not less than $203,000 shall be for Project Alert; of which not less than $5,400,000 may be used to facilitate agreements consistent with section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)); and of which not to exceed $11,216,000 shall be available to fund or reimburse other Federal agencies for the costs associated with the care, maintenance, and repatriation of smuggled illegal aliens: *Provided*, That none of the funds made available under this heading shall be available to compensate any employee for overtime in an annual amount in excess of $35,000, except that the Secretary of Homeland Security, or the designee of the Secretary, may waive that amount as necessary for national security purposes and in cases of immigration emergencies: *Provided further*, That of the total amount provided, $15,770,000 shall be for activities to enforce laws against forced child labor in fiscal year 2007, of which not to exceed $6,000,000 shall remain available until expended.

FEDERAL PROTECTIVE SERVICE

The revenues and collections of security fees credited to this account shall be available until expended for necessary expenses related to the protection of federally-owned and leased buildings and for the operations of the Federal Protective Service: *Provided*, That

the Secretary submit a report, approved by the Office of Management and Budget, to the Committees on Appropriations of the Senate and the House of Representatives no later than November 1, 2006, demonstrating how the operations of the Federal Protective Service will be fully funded in fiscal year 2007 through revenues and collection of security fees.

## AUTOMATION MODERNIZATION

For expenses of immigration and customs enforcement automated systems, $15,000,000, to remain available until expended: *Provided*, That of the funds made available under this heading, $13,000,000 may not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan for expenditure prepared by the Secretary of Homeland Security that--

(1) meets the capital planning and investment control review requirements established by the Office of Management and Budget, including Circular A-11, part 7;

*1362 (2) complies with the Department of Homeland Security information systems enterprise architecture;

(3) complies with the acquisition rules, requirements, guidelines, and systems acquisition management practices of the Federal Government;

(4) includes a certification by the Chief Information Officer of the Department of Homeland Security that an independent verification and validation agent is currently under contract for the project;

(5) is reviewed and approved by the Department of Homeland Security Investment Review Board, the Secretary of Homeland Security, and the Office of Management and Budget; and

(6) is reviewed by the Government Accountability Office.

## CONSTRUCTION

For necessary expenses to plan, construct, renovate, equip, and maintain buildings and facilities necessary for the administration and enforcement of the laws relating to customs and immigration, $56,281,000, to remain available until expended: *Provided*, That of the amount provided under this heading, $30,000,000 is designated as described in section 520 of this Act.

### Transportation Security Administration
## AVIATION SECURITY

For necessary expenses of the Transportation Security Administration related to providing civil aviation security services pursuant to the Aviation and Transportation Security Act (Public Law 107-71; 115 Stat. 597; 49 U.S.C. 40101 note), $4,731,814,000, to remain available until September 30, 2008, of which not to exceed $10,000 shall be for official reception and representation expenses: *Provided*, That of the total amount made available under this heading, not to exceed $3,768,266,000 shall be for screening operations, of which $141,400,000 shall be available only for procurement of checked baggage explosive detection systems and $138,000,000 shall be available only for installation of checked baggage explosive detection systems; and not to exceed $963,548,000 shall be for aviation security direction and enforcement: *Provided further*, That of the funds appropriated under this heading, $5,000,000 shall not be obligated until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives a detailed report in response to findings in the Department of Homeland Security Office of Inspector General report (OIG-04-44)

concerning contractor fees: *Provided further*, That security service fees authorized under section 44940 of title 49, United States Code, shall be credited to this appropriation as offsetting collections and shall be available only for aviation security: *Provided further*, That the sum herein appropriated from the General Fund shall be reduced on a dollar-for-dollar basis as such offsetting collections are received during fiscal year 2007, so as to result in a final fiscal year appropriation from the General Fund estimated at not more than $2,311,814,000: *Provided further*, That any security service fees collected in excess of the amount made available under this heading shall become available during fiscal year 2008: *Provided further*, That notwithstanding section 44923 of title 49, United States Code, the share of the cost of the Federal Government *1363 for a project under any letter of intent shall be 75 percent for any medium or large hub airport and not more than 90 percent for any other airport, and all funding provided by section 44923(h) of title 49, United States Code, or from appropriations authorized under section 44923(i)(1) of title 49, United States Code, may be distributed in any manner deemed necessary to ensure aviation security and to fulfill the Government's planned cost share under existing letters of intent: *Provided further*, That by December 1, 2006, the Transportation Security Administration shall submit a detailed air cargo security action plan addressing each of the recommendations contained in the 2005 Government Accountability Office Report (GAO-06-76) on domestic air cargo security to the Committees on Appropriations of the Senate and the House of Representatives; the Committee on Homeland Security of the House of Representatives; the Committee on Homeland Security and Governmental Affairs of the Senate; and the Committee on Commerce, Science, and Transportation of the Senate: *Provided further*, That Members of the United States House of Representatives and United States Senate, including the leadership; and the heads of Federal agencies and commissions, including the Secretary, Under Secretaries, and Assistant Secretaries of the Department of Homeland Security; the United States Attorney General and Assistant Attorneys General and the United States attorneys; and senior members of the Executive Office of the President, including the Director of the Office of Management and Budget; shall not be exempt from Federal passenger and baggage screening: *Provided further*, That beginning in fiscal year 2007 and thereafter, reimbursement for security services and related equipment and supplies provided in support of general aviation access to the Ronald Reagan Washington National Airport shall be credited to this appropriation and shall be available until expended solely for those purposes: *Provided further*, That none of the funds in this Act shall be used to recruit or hire personnel into the Transportation Security Administration which would cause the agency to exceed a staffing level of 45,000 full-time equivalent screeners.

## SURFACE TRANSPORTATION SECURITY

For necessary expenses of the Transportation Security Administration related to providing surface transportation security activities, $37,200,000, to remain available until September 30, 2008.

## TRANSPORTATION THREAT ASSESSMENT AND CREDENTIALING

For necessary expenses for the development and implementation of screening programs of the Office of Transportation Threat Assessment and Credentialing, $39,700,000, to remain available until September 30, 2008.

## TRANSPORTATION SECURITY SUPPORT

For necessary expenses of the Transportation Security Administration related to providing transportation security support and intelligence pursuant to the Aviation and Transportation Security Act (Public Law 107-71; 115 Stat. 597; 49 U.S.C. 40101 note), $525,283,000, to remain available until September 30, 2008: *Provided*, That of the funds appropriated under this heading, $5,000,000 may not be obligated until the Secretary of Homeland *1364 Security submits to the Committees on Appropriations of the Senate and the House of Representatives a detailed expenditure plan for explosive detection systems refurbishment, procurement, and installations on an airport-by-airport basis for fiscal year 2007: *Provided further*, That this plan shall be submitted no later than 60 days after the date of enactment of this Act.

### FEDERAL AIR MARSHALS

For necessary expenses of the Federal Air Marshals, $714,294,000.

### United States Coast Guard

### OPERATING EXPENSES

For necessary expenses for the operation and maintenance of the United States Coast Guard not otherwise provided for; purchase or lease of not to exceed 25 passenger motor vehicles, which shall be for replacement only; payments pursuant to section 156 of Public Law 97-377 (42 U.S.C. 402 note; 96 Stat. 1920); and recreation and welfare; $5,477,657,000, of which $340,000,000 shall be for defense-related activities; of which $24,255,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); and of which not to exceed $10,000 shall be for official reception and representation expenses: *Provided*, That none of the funds made available by this or any other Act shall be available for administrative expenses in connection with shipping commissioners in the United States: Provided further, That none of the funds made available by this Act shall be for expenses incurred for yacht documentation under section 12109 of title 46, United States Code, except to the extent fees are collected from yacht owners and credited to this appropriation: *Provided further*, That not to exceed five percent of this appropriation may be transferred to the "Acquisition, Construction, and Improvements" appropriation for personnel compensation and benefits and related costs to adjust personnel assignment to accelerate management and oversight of new or existing projects without detrimentally affecting the management and oversight of other projects: *Provided further*, That the amount made available for "Personnel, Compensation, and Benefits" in the "Acquisition, Construction, and Improvements" appropriation shall not be increased by more than 10 percent by such transfers: *Provided further*, That the Committees on Appropriations of the Senate and the House of Representatives shall be notified of each transfer within 30 days after it is executed by the Treasury.

### ENVIRONMENTAL COMPLIANCE AND RESTORATION

For necessary expenses to carry out the environmental compliance and restoration functions of the United States Coast Guard under chapter 19 of title 14, United States Code, $10,880,000, to remain available until expended.

### RESERVE TRAINING

For necessary expenses of the Coast Guard Reserve, as authorized by law; operations and maintenance of the reserve program; *1365 personnel and training costs; and equipment and services; $122,448,000.

### ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

<< 14 USCA § 663 NOTE >>

<< 14 USCA § 663 NOTE >>

For necessary expenses of acquisition, construction, renovation, and improvement of aids to navigation, shore facilities, vessels, and aircraft, including equipment related thereto; and maintenance, rehabilitation, lease and operation of facilities and equipment, as authorized by law; $1,330,245,000, of which $19,800,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(A)(5)); of which $26,550,000 shall be available until September 30, 2011, to acquire, repair, renovate, or improve vessels, small boats, and related equipment; of which $15,000,000 shall be available until September 30, 2011, to increase aviation capability; of which $119,823,000 shall be available until September 30, 2009, for other equipment; of which $22,000,000 shall be available until September 30, 2009, for shore facilities and aids to navigation facilities; of which $81,000,000 shall be available for personnel compensation and benefits and related costs; and of which $1,065,872,000 shall be available until September 30, 2011, for the integrated deepwater systems program: *Provided*, that the Commandant of the Coast Guard is authorized to dispose of surplus real property, by sale or lease, and the proceeds shall be credited to this appropriation as offsetting collections and shall be available until September 30, 2009: *Provided further*, that the Secretary of Homeland Security shall submit to the Committees on Appropriations of the Senate and the House of Representatives, in conjunction with the President's fiscal year 2008 budget, a review of the Revised Deepwater Implementation Plan that identifies any changes to the plan for the fiscal year; an annual performance comparison of Deepwater assets to pre-Deepwater legacy assets; a status report of legacy assets; a detailed explanation of how the costs of legacy assets are being accounted for within the Deepwater program; a description of how the Coast Guard is planning for the human resource needs of Deepwater assets; a description of the competitive process conducted in all contracts and subcontracts exceeding $5,000,000 within the Deepwater program; and the earned value management system gold card data for each Deepwater asset: *Provided further*, that the Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives a comprehensive review of the Revised Deepwater Implementation Plan every five years, beginning in fiscal year 2011, that includes a complete projection of the acquisition costs and schedule for the duration of the plan through fiscal year 2027: *Provided further*, that the Secretary shall annually submit to the Committees on Appropriations of the Senate and the House of Representatives, at the time that the President's budget is submitted under section 1105(a) of title 31, United States Code, a future-years capital investment plan for the Coast Guard that identifies for each capital budget line item--

(1) the proposed appropriation included in that budget;

(2) the total estimated cost of completion;

(3) projected funding levels for each fiscal year for the next five fiscal years or until project completion, whichever is earlier;

*1366 (4) an estimated completion date at the projected funding levels; and

(5) changes, if any, in the total estimated cost of completion or estimated completion date

from previous future-years capital investment plans submitted to the Committees on Appropriations of the Senate and the House of Representatives:

*Provided further*, That the Secretary shall ensure that amounts specified in the future-years capital investment plan are consistent to the maximum extent practicable with proposed appropriations necessary to support the programs, projects, and activities of the Coast Guard in the President's budget as submitted under section 1105(a) of title 31, United States Code, for that fiscal year: *Provided further*, That any inconsistencies between the capital investment plan and proposed appropriations shall be identified and justified: *Provided further*, That of the amount provided under this heading, $175,800,000 is designated as described in section 520 of this Act.

## ALTERATION OF BRIDGES

For necessary expenses for alteration or removal of obstructive bridges, as authorized by section 6 of the Truman-Hobbs Act (33 U.S.C. 516), $16,000,000, to remain available until expended.

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

For necessary expenses for applied scientific research, development, test, and evaluation; and for maintenance, rehabilitation, lease, and operation of facilities and equipment; as authorized by law; $17,000,000, to remain available until expended, of which $495,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)): *Provided*, That there may be credited to and used for the purposes of this appropriation funds received from State and local governments, other public authorities, private sources, and foreign countries for expenses incurred for research, development, testing, and evaluation.

## RETIRED PAY

For retired pay, including the payment of obligations otherwise chargeable to lapsed appropriations for this purpose, payments under the Retired Serviceman's Family Protection and Survivor Benefits Plans, payment for career status bonuses, concurrent receipts and combat-related special compensation under the National Defense Authorization Act, and payments for medical care of retired personnel and their dependents under chapter 55 of title 10, United States Code, $1,063,323,000.

## United States Secret Service

## PROTECTION, ADMINISTRATION, AND TRAINING

For necessary expenses of the United States Secret Service, including purchase of not to exceed 755 vehicles for police-type use, of which 624 shall be for replacement only, and hire of passenger motor vehicles; purchase of motorcycles made in the United States; hire of aircraft; services of expert witnesses at such rates as may be determined by the Director of the Secret Service; rental of buildings in the District of Columbia, and fencing, lighting, *1367 guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; payment of per diem or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee requires an employee to work 16 hours per day or to remain overnight at a post of duty; conduct of and participation in firearms matches; presentation of awards; travel of United States Secret Service employees on protective missions without regard to the limitations on such

expenditures in this or any other Act if approval is obtained in advance from the Committees on Appropriations of the Senate and the House of Representatives; research and development; grants to conduct behavioral research in support of protective research and operations; and payment in advance for commercial accommodations as may be necessary to perform protective functions; $961,779,000, of which not to exceed $25,000 shall be for official reception and representation expenses: *Provided*, That up to $18,000,000 provided for protective travel shall remain available until September 30, 2008: *Provided further*, That up to $18,400,000 for candidate nominee protection shall remain available until September 30, 2009: *Provided further*, That up to $1,000,000 for National Special Security Events shall remain available until expended: *Provided further*, That of the total amount provided under this heading, $2,000,000 shall not be available for obligation until the Director of the Secret Service submits a comprehensive workload re-balancing report to the Committees on Appropriations of the Senate and the House of Representatives that includes funding and position requirements for current investigative and protective operations: *Provided further*, That the United States Secret Service is authorized to obligate funds in anticipation of reimbursements from Federal agencies and entities, as defined in section 105 of title 5, United States Code, receiving training sponsored by the James J. Rowley Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available under this heading at the end of the fiscal year.

## INVESTIGATIONS AND FIELD OPERATIONS

For necessary expenses for investigations and field operations of the United States Secret Service, not otherwise provided for, including costs related to office space and services of expert witnesses at such rate as may be determined by the Director of the Secret Service, $311,154,000; of which not to exceed $100,000 shall be to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; of which $2,366,000 shall be for forensic and related support of investigations of missing and exploited children; and of which $6,000,000 shall be a grant for activities related to the investigations of missing and exploited children and shall remain available until expended.

## ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For necessary expenses for acquisition, construction, repair, alteration, and improvement of facilities, $3,725,000, to remain *1368 available until expended: *Provided*, That of the total amount provided under this heading, $500,000 shall not be available for obligation until the Director of the Secret Service submits a revised master plan to the Committees on Appropriations of the Senate and the House of Representatives for the James J. Rowley Training Center.

## TITLE III PREPAREDNESS AND RECOVERY PREPAREDNESS

### Management and Administration

For salaries and expenses of the immediate Office of the Under Secretary for Preparedness, the Office of the Chief Medical Officer, and the Office of National Capital Region Coordination, $30,572,000, of which no less than $2,741,000 may be used for the Office of National Capital Region Coordination, and of which $6,459,000 shall be for the National Preparedness Integration Program: *Provided*, That none of the funds made available under this heading may be obligated for the National Preparedness Integration Program until the Committees on Appropriations of the Senate and the House of

Representatives receive and approve a plan for expenditure prepared by the Secretary of Homeland Security: *Provided further*, That not to exceed $7,000 shall be for official reception and representation expenses: *Provided further*, That for purposes of planning, coordination and execution of mass evacuation during a disaster, the Governors of the State of West Virginia and the Commonwealth of Pennsylvania, or their designees, shall be included in efforts to integrate the activities of Federal, State, and local governments in the National Capital Region, as defined in section 882 of Public Law 107-296, the Homeland Security Act of 2002.

Office of Grants and Training state and local programs For grants, contracts, cooperative agreements, and other activities, including grants to State and local governments for terrorism prevention activities, notwithstanding any other provision of law, $2,531,000,000, which shall be allocated as follows:

(1) $525,000,000 for formula-based grants and $375,000,000 for law enforcement terrorism prevention grants pursuant to section 1014 of the USA PATRIOT ACT (42 U.S.C. 3714): *Provided*, That the application for grants shall be made available to States within 45 days after the date of enactment of this Act; that States shall submit applications within 90 days after the grant announcement; and the Office of Grants and Training shall act within 90 days after receipt of an application: *Provided further*, That not less than 80 percent of any grant under this paragraph to a State shall be made available by the State to local governments within 60 days after the receipt of the funds; except in the case of Puerto Rico, where not less than 50 percent of any grant under this paragraph *1369 shall be made available to local governments within 60 days after the receipt of the funds.

(2) $1,229,000,000 FOR DISCRETIONARY GRANTS, AS DETERMINED BY THE SECRETARY OF HOMELAND SECURITY, OF WHICH--

(A) $770,000,000 shall be for use in high-threat, high-density urban areas: *Provided*, That not later than September 30, 2007, the Secretary shall distribute any unallocated funds made available for assistance to organizations (as described under section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code) determined by the Secretary to be at high-risk of international terrorist attack under title III of the Department of Homeland Security Appropriations Act, 2006 under the heading "Office for Domestic Preparedness--State and Local Programs" (Public Law 109-90; 119 Stat. 2075) in paragraph (2)(A): *Provided further*, That applicants shall identify for the Secretary's consideration prior threats or attacks (within or outside the United States) by a terrorist organization, network, or cell against an organization described in the previous proviso, and the Secretary shall consider prior threats or attacks (within or outside the United States) against like organizations when determining risk: *Provided further*, That the Secretary shall notify the Committees on Appropriations of the Senate and the House of Representatives the high risk or potential high risk to each designated tax exempt grantee at least five full business days in advance of the announcement of any grant award;

(B) $210,000,000 shall be for port security grants pursuant to the purposes of section 70107(a) through (h) of title 46, United States Code, which shall be awarded based on risk notwithstanding subsection (a), for eligible costs as described in subsections (b)(2) through (4);

(C) $12,000,000 shall be for trucking industry security grants;

(D) $12,000,000 shall be for intercity bus security grants;
(E) $175,000,000 shall be for intercity rail passenger transportation (as defined in section 24102 of title 49, United States Code), freight rail, and transit security grants; and
(F) $50,000,000 shall be for buffer zone protection grants:

*Provided*, That for grants under subparagraph (A), the application for grants shall be made available to States within 45 days after the date of enactment of this Act; that States shall submit applications within 90 days after the grant announcement; and that the Office of Grants and Training shall act within 90 days after receipt of an application: *Provided further*, That no less than 80 percent of any grant under this paragraph to a State shall be made available by the State to local governments within 60 days after the receipt of the funds: *Provided further*, That for grants under subparagraphs (B) through (F), the applications for such grants shall be made available to eligible applicants not later than 75 days after the date of enactment of this Act, eligible applicants shall submit applications not later than 45 days after the date of the grant *1370 announcement, and the Office of Grants and Training shall act on such applications not later than 60 days after the date on which such an application is received.
(3) $50,000,000 shall be available for the Commercial Equipment Direct Assistance Program.
(4) $352,000,000 for training, exercises, technical assistance, and other programs:

*Provided*, That none of the grants provided under this heading shall be used for the construction or renovation of facilities, except for a minor perimeter security project, not to exceed $1,000,000, as determined necessary by the Secretary of Homeland Security: *Provided further*, That the preceding proviso shall not apply to grants under subparagraphs (B), (E), and (F) of paragraph (2) of this heading: *Provided further*, That grantees shall provide additional reports on their use of funds, as determined necessary by the Secretary of Homeland Security: *Provided further*, That funds appropriated for law enforcement terrorism prevention grants under paragraph (1) of this heading and discretionary grants under paragraph (2)(A) of this heading shall be available for operational costs, to include personnel overtime and overtime associated with the Office of Grants and Training certified training, as needed: *Provided further*, That the Government Accountability Office shall report on the validity, relevance, reliability, timeliness, and availability of the risk factors (including threat, vulnerability, and consequence) used by the Secretary for the purpose of allocating discretionary grants funded under this heading, and the application of those factors in the allocation of funds to the Committees on Appropriations of the Senate and the House of Representatives on its findings not later than 45 days after the date of enactment of this Act: *Provided further*, That within seven days after the date of enactment of this Act, the Secretary shall provide the Government Accountability Office with the risk methodology and other factors that will be used to allocate discretionary grants funded under this heading.

FIREFIGHTER ASSISTANCE GRANTS

For necessary expenses for programs authorized by the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2201 et seq.), $662,000,000, of which $547,000,000 shall be available to carry out section 33 of that Act (15 U.S.C. 2229) and $115,000,000 shall be available to carry out section 34 of that Act (15 U.S.C. 2229a), to remain available

until September 30, 2008: *Provided*, That not to exceed five percent of this amount shall be available for program administration.

## EMERGENCY MANAGEMENT PERFORMANCE GRANTS

For necessary expenses for emergency management performance grants, as authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), and Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), $200,000,000: *Provided*, That total administrative costs shall not exceed three percent of the total appropriation.

## *1371 RADIOLOGICAL EMERGENCY PREPAREDNESS PROGRAM

The aggregate charges assessed during fiscal year 2007, as authorized in title III of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (42 U.S.C. 5196e), shall not be less than 100 percent of the amounts anticipated by the Department of Homeland Security necessary for its radiological emergency preparedness program for the next fiscal year: *Provided*, That the methodology for assessment and collection of fees shall be fair and equitable and shall reflect costs of providing such services, including administrative costs of collecting such fees: *Provided further*, That fees received under this heading shall be deposited in this account as offsetting collections and will become available for authorized purposes on October 1, 2007, and remain available until expended.

### United States Fire Administration and Training

For necessary expenses of the United States Fire Administration and for other purposes, as authorized by the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2201 et seq.) and the Homeland security Act of 2002 (6 U.S.C. 101 et seq.), $46,849,000.

### Infrastructure Protection and Information Security

For necessary expenses for infrastructure protection and information security programs and activities, as authorized by title II of the Homeland Security Act of 2002 (6 U.S.C. 121 et seq.), $547,633,000, of which $470,633,000 shall remain available until September 30, 2008: *Provided*, That of the amount made available under this heading, $10,000,000 may not be obligated until the Secretary submits to the Committees on Appropriations of the Senate and House of Representatives the report required in House Report 109-241 accompanying the Department of Homeland Security Appropriations Act, 2006 (Public Law 109-90) on Department of Homeland Security resources necessary to implement mandatory security requirements for the Nation's chemical sector and to create a system for auditing and ensuring compliance with the security standards.

## FEDERAL EMERGENCY MANAGEMENT AGENCY
### Administrative and Regional Operations

For necessary expenses for administrative and regional operations, $282,000,000, including activities authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), the Defense Production Act of 1950 (50 U.S.C. App. 2061 et seq.), sections 107 and 303 of the National Security Act of 1947 (50 U.S.C. 404, 405), Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), and the Homeland Security Act of 2002 (6 U.S.C. 101 et seq.): *Provided*, That not to exceed $3,000 shall be for official reception and representation expenses.

*1372 Readiness, Mitigation, Response, and Recovery

For necessary expenses for readiness, mitigation, response, and recovery activities, $244,000,000, including activities authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), the Defense Production Act of 1950 (50 U.S.C. App. 2061 et seq.), sections 107 and 303 of the National Security Act of 1947 (50 U.S.C. 404, 405), Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), and the Homeland Security Act of 2002 (6 U.S.C. 101 et seq.): *Provided*, That of the total amount made available under this heading, $25,000,000 shall be for Urban Search and Rescue Teams, of which not to exceed $1,600,000 may be made available for administrative costs.

Public Health Programs
(INCLUDING TRANSFER OF FUNDS)

<< 42 USCA § 300hh-11 NOTE >>

For necessary expenses for countering potential biological, disease, and chemical threats to civilian populations, $33,885,000: *Provided*, That the total amount appropriated and, notwithstanding any other provision of law, the functions, personnel, assets, and liabilities of the National Disaster Medical System established under section 2811(b) of the Public Health Service Act (42 U.S.C. 300hh-11(b)), including any functions of the Secretary of Homeland Security relating to such System, shall be permanently transferred to the Secretary of the Department of Health and Human Services effective January 1, 2007.

Disaster Relief
(INCLUDING TRANSFER OF FUNDS)

For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $1,500,000,000, to remain available until expended: *Provided*, That of the total amount provided, not to exceed $13,500,000 shall be transferred to the Department of Homeland Security Office of Inspector General for audits and investigations related to natural disasters subject to section 503 of this Act.

Disaster Assistance Direct Loan Program Account

For administrative expenses to carry out the direct loan program, as authorized by section 319 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5162), $569,000: *Provided*, That gross obligations for the principal amount of direct loans shall not exceed $25,000,000: *Provided further*, That the cost of modifying such loans shall be as defined in section 502 of the Congressional Budget Act of 1974 (2 U.S.C. 661a).

Flood Map Modernization Fund

For necessary expenses under section 1360 of the National Flood Insurance Act of 1968 (42 U.S.C. 4101), $198,980,000, and *1373 such additional sums as may be provided by State and local governments or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of such Act, to remain available until expended: *Provided*, That total administrative costs shall not exceed three percent of the total appropriation.

National Flood Insurance Fund

(INCLUDING TRANSFER OF FUNDS)

For activities under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), and the Flood Disaster Protection Act of 1973 (42 U.S.C. 4001 et seq.), $128,588,000, which is available as follows: (1) not to exceed $38,230,000 for salaries and expenses associated with flood mitigation and flood insurance operations; and (2) not to exceed $90,358,000 for flood hazard mitigation which shall be derived from offsetting collections assessed and collected under section 1307 of the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), to remain available until September 30, 2008, including up to $31,000,000 for flood mitigation expenses under section 1366 of that Act, which amount shall be available for transfer to the National Flood Mitigation Fund until September 30, 2008: *Provided*, That in fiscal year 2007, no funds shall be available from the National Flood Insurance Fund in excess of: (1) $70,000,000 for operating expenses; (2) $692,999,000 for commissions and taxes of agents; (3) such sums as are necessary for interest on Treasury borrowings; and (4) $50,000,000 for flood mitigation actions with respect to severe repetitive loss properties under section 1361A of that Act (42 U.S.C. 4102a) and repetitive insurance claims properties under section 1323 of that Act (42 U.S.C. 4030), which shall remain available until expended: *Provided further*, That total administrative costs shall not exceed three percent of the total appropriation.

National Flood Mitigation Fund

(INCLUDING TRANSFER OF FUNDS)

Notwithstanding subparagraphs (B) and (C) of subsection (b)(3), and subsection (f), of section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c), $31,000,000, to remain available until September 30, 2008, for activities designed to reduce the risk of flood damage to structures pursuant to such Act, of which $31,000,000 shall be derived from the National Flood Insurance Fund.

National Predisaster Mitigation Fund

For a predisaster mitigation grant program under title II of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5131 et seq.), $100,000,000, to remain available until expended: *Provided*, That grants made for predisaster mitigation shall be awarded on a competitive basis subject to the criteria in section 203(g) of such Act (42 U.S.C. 5133(g)): *Provided further*, That total administrative costs shall not exceed three percent of the total appropriation.

*1374 Emergency Food and Shelter

To carry out an emergency food and shelter program pursuant to title III of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11331 et seq.), $151,470,000, to remain available until expended: *Provided*, That total administrative costs shall not exceed 3.5 percent of the total appropriation.

TITLE IV RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES

United States Citizenship and Immigration Services

For necessary expenses for citizenship and immigration services, $181,990,000, of which $93,500,000 is available until expended: *Provided*, That $47,000,000 may not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a strategic transformation plan for United States Citizenship and Immigration Services that has been reviewed and approved by the Secretary of Homeland Security and reviewed by the Government Accountability Office.

Federal Law Enforcement Training Center

SALARIES AND EXPENSES

<< 42 USCA § 3771 NOTE >>

For necessary expenses of the Federal Law Enforcement Training Center, including materials and support costs of Federal law enforcement basic training; purchase of not to exceed 117 vehicles for police-type use and hire of passenger motor vehicles; expenses for student athletic and related activities; the conduct of and participation in firearms matches and presentation of awards; public awareness and enhancement of community support of law enforcement training; room and board for student interns; a flat monthly reimbursement to employees authorized to use personal mobile phones for official duties; and services as authorized by section 3109 of title 5, United States Code; $211,033,000, of which up to $43,910,000 for materials and support costs of Federal law enforcement basic training shall remain available until September 30, 2008; of which $300,000 shall remain available until expended for Federal law enforcement agencies participating in training accreditation, to be distributed as determined by the Federal Law Enforcement Training Center for the needs of participating agencies; and of which not to exceed $12,000 shall be for official reception and representation expenses: *Provided*, That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training sponsored by the Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available at the end of the fiscal year: *Provided further*, That section 1202(a) of Public Law 107-206 (42 U.S.C. 3771 note) is amended by striking "5 years after the date of the enactment of this Act" and inserting "December 31, 2007", and by striking "250" and inserting "350".

*1375 ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For acquisition of necessary additional real property and facilities, construction, and ongoing maintenance, facility improvements, and related expenses of the Federal Law Enforcement Training Center, $64,246,000, to remain available until expended: *Provided*, That of the amount provided under this heading, $22,000,000 is designated as described in section 520 of this Act: *Provided further*, That the Center is authorized to accept reimbursement to this appropriation from government agencies requesting the construction of special use facilities.

Science and Technology

MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Office of the Under Secretary for Science and Technology and for management and administration of programs and activities, as authorized by title III of the Homeland Security Act of 2002 (6 U.S.C. 181 et seq.), $135,000,000: *Provided*, That of the amount provided under this heading, $60,000,000 shall not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve an expenditure plan by program, project, and activity; with a detailed breakdown and justification of the management and administrative costs for each; prepared by the Secretary of Homeland Security that has been reviewed by the Government Accountability Office: *Provided further*, That the expenditure plan shall describe the method utilized to derive administration costs in fiscal

year 2006 and the fiscal year 2007 budget request: *Provided further*, That not to exceed $3,000 shall be for official reception and representation expenses.

## RESEARCH, DEVELOPMENT, ACQUISITION, AND OPERATIONS

For necessary expenses for science and technology research, including advanced research projects; development; test and evaluation; acquisition; and operations; as authorized by title III of the Homeland Security Act of 2002 (6 U.S.C. 181 et seq.); and the purchase or lease of not to exceed five vehicles, $838,109,000, to remain available until expended: *Provided*, That of the amounts made available under this heading, $50,000,000 may not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a report prepared by the Under Secretary of Science and Technology that describes the progress to address financial management deficiencies, improve its management controls, and implement performance measures and evaluations.

### Domestic Nuclear Detection Office

## MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Domestic Nuclear Detection Office and for management and administration of programs and activities, $30,468,000: *Provided*, That no funds will be made available for the reimbursement of individuals from other Federal agencies or organizations in fiscal year 2009: *Provided further*, That *1376 not to exceed $3,000 shall be for official reception and representation expenses.

## RESEARCH, DEVELOPMENT, AND OPERATIONS

For necessary expenses for radiological and nuclear research, development, testing, evaluation and operations, $272,500,000, to remain available until expended: *Provided*, That of the amount provided under this heading, $15,000,000 shall not be obligated until the Secretary of Homeland Security provides notification to the Committees on Appropriations of the Senate and the House of Representatives that the Domestic Nuclear Detection Office has entered into a Memorandum of Understanding with each Federal entity and organization: *Provided further*, That each Memorandum of Understanding shall include a description of the role, responsibilities, and resource commitment of each Federal entity or organization for the global architecture.

## SYSTEMS ACQUISITION

For expenses for the Domestic Nuclear Detection Office acquisition and deployment of radiological detection systems in accordance with the global nuclear detection architecture, $178,000,000, to remain available until September 30, 2009; and of which no less than $143,000,000 shall be for radiation portal monitors; and of which not to exceed $5,000,000 shall be for the Surge program: *Provided*, That none of the funds appropriated under this heading shall be obligated for full scale procurement of Advanced Spectroscopic Portal Monitors until the Secretary of Homeland Security has certified through a report to the Committees on Appropriations of the Senate and the House of Representatives that a significant increase in operational effectiveness will be achieved.

## TITLE V GENERAL PROVISIONS

Sec. 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

Sec. 502. Subject to the requirements of section 503 of this Act, the unexpended balances of prior appropriations provided for activities in this Act may be transferred to appropriation accounts for such activities established pursuant to this Act: *Provided*, That balances so transferred may be merged with funds in the applicable established accounts

and thereafter may be accounted for as one fund for the same time period as originally enacted.

SEC. 503. (a) None of the funds provided by this Act, provided by previous appropriations Acts to the agencies in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2007, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds that: (1) creates a new program; (2) eliminates a program, project, or activity; (3) increases funds for any program, project, or activity for which funds have been denied or restricted by the Congress; (4) proposes to use funds directed *1377 for a specific activity by either of the Committees on Appropriations of the Senate or House of Representatives for a different purpose; or (5) contracts out any function or activity for which funds have been appropriated for Federal full-time equivalent positions; unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such reprogramming of funds.

(b) None of the funds provided by this Act, provided by previous appropriations Acts to the agencies in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2007, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for programs, projects, or activities through a reprogramming of funds in excess of $5,000,000 or 10 percent, whichever is less, that: (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by the Congress; or (3) results from any general savings from a reduction in personnel that would result in a change in existing programs, projects, or activities as approved by the Congress; unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such reprogramming of funds.

(c) Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Homeland Security by this Act or provided by previous appropriations Acts may be transferred between such appropriations, but no such appropriations, except as otherwise specifically provided, shall be increased by more than 10 percent by such transfers: *Provided*, That any transfer under this section shall be treated as a reprogramming of funds under subsection (b) of this section and shall not be available for obligation unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such transfer.

(d) Notwithstanding subsections (a), (b), and (c) of this section, no funds shall be reprogrammed within or transferred between appropriations after June 30, except in extraordinary circumstances which imminently threaten the safety of human life or the protection of property.

SEC. 504. None of the funds appropriated or otherwise made available to the Department of Homeland Security may be used to make payments to the "Department of Homeland Security Working Capital Fund", except for the activities and amounts allowed in the President's fiscal year 2007 budget, excluding sedan service, shuttle service, transit subsidy, mail operations, parking, and competitive sourcing: *Provided*, That any

additional activities and amounts shall be approved by the Committees on Appropriations of the Senate and the House of Representatives 30 days in advance of obligation.

SEC. 505. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 2007 from appropriations for salaries and expenses for fiscal year 2007 in this Act shall remain available through September 30, 2008, in the account and for the purposes for which the appropriations were provided: *Provided*, That prior to the obligation of such funds, a request shall be submitted to *1378 the Committees on Appropriations of the Senate and the House of Representatives for approval in accordance with section 503 of this Act.

SEC. 506. Funds made available by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414) during fiscal year 2007 until the enactment of an Act authorizing intelligence activities for fiscal year 2007.

SEC. 507. The Federal Law Enforcement Training Center shall lead the Federal law enforcement training accreditation process, to include representatives from the Federal law enforcement community and non-Federal accreditation experts involved in law enforcement training, to continue the implementation of measuring and assessing the quality and effectiveness of Federal law enforcement training programs, facilities, and instructors.

SEC. 508. None of the funds in this Act may be used to make a grant allocation, discretionary grant award, discretionary contract award, or to issue a letter of intent totaling in excess of $1,000,000, or to announce publicly the intention to make such an award, unless the Secretary of Homeland Security notifies the Committees on Appropriations of the Senate and the House of Representatives at least three full business days in advance: *Provided*, That no notification shall involve funds that are not available for obligation: *Provided further*, That the Office of Grants and Training shall brief the Committees on Appropriations of the Senate and the House of Representatives five full business days in advance of announcing publicly the intention of making an award of formula-based grants; law enforcement terrorism prevention grants; or high-threat, high-density urban areas grants.

SEC. 509. Notwithstanding any other provision of law, no agency shall purchase, construct, or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the Committees on Appropriations of the Senate and the House of Representatives, except that the Federal Law Enforcement Training Center is authorized to obtain the temporary use of additional facilities by lease, contract, or other agreement for training which cannot be accommodated in existing Center facilities.

Sec. 510. The Director of the Federal Law Enforcement Training Center shall schedule basic and/or advanced law enforcement training at all four training facilities under the control of the Federal Law Enforcement Training Center to ensure that these training centers are operated at the highest capacity throughout the fiscal year.

SEC. 511. None of the funds appropriated or otherwise made available by this Act may be used for expenses of any construction, repair, alteration, or acquisition project for which a prospectus, if required by the Public Buildings Act of 1959 (40 U.S.C. 3301), has not been approved, except that necessary funds may be expended for each project for required expenses for the development of a proposed prospectus.

SEC. 512. None of the funds in this Act may be used in contravention of the applicable provisions of the Buy American Act (41 U.S.C. 10a et seq.).

<< 6 USCA § 111 NOTE >>

SEC. 513. Notwithstanding any other provision of law, the authority of the Office of Personnel Management to conduct personnel security and suitability background investigations, update *1379 investigations, and periodic reinvestigations of applicants for, or appointees in, positions in the Office of the Secretary and Executive Management, the Office of the Under Secretary for Management, Analysis and Operations, Immigration and Customs Enforcement, the Directorate for Preparedness, and the Directorate of Science and Technology of the Department of Homeland Security is transferred to the Department of Homeland Security: *Provided*, That on request of the Department of Homeland Security, the Office of Personnel Management shall cooperate with and assist the Department in any investigation or reinvestigation under this section: *Provided further*, That this section shall cease to be effective at such time as the President has selected a single agency to conduct security clearance investigations pursuant to section 3001(c) of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108-458; 50 U.S.C. 435b) and the entity selected pursuant to section 3001(b) of such Act has reported to Congress that the agency selected pursuant to such section 3001(c) is capable of conducting all necessary investigations in a timely manner or has authorized the entities within the Department of Homeland Security covered by this section to conduct their own investigations pursuant to section 3001 of such Act.

SEC. 514. (a) None of the funds provided by this or previous appropriations Acts may be obligated for deployment or implementation, on other than a test basis, of the Secure Flight program or any other follow on or successor passenger prescreening program, until the Secretary of Homeland Security certifies, and the Government Accountability Office reports, to the Committees on Appropriations of the Senate and the House of Representatives, that all ten of the conditions contained in paragraphs (1) through (10) of section 522(a) of Public Law 108-334 (118 Stat. 1319) have been successfully met.

(b) The report required by subsection (a) shall be submitted within 90 days after the Secretary provides the requisite certification, and periodically thereafter, if necessary, until the Government Accountability Office confirms that all ten conditions have been successfully met.

(c) Within 90 days of enactment of this Act, the Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives a detailed plan that describes: (1) the dates for achieving key milestones, including the date or timeframes that the Secretary will certify the program under subsection (a); and (2) the methodology to be followed to support the Secretary's certification, as required under subsection (a).

(d) During the testing phase permitted by subsection (a), no information gathered from passengers, foreign or domestic air carriers, or reservation systems may be used to screen aviation passengers, or delay or deny boarding to such passengers, except in instances where passenger names are matched to a Government watch list.

(e) None of the funds provided in this or previous appropriations Acts may be utilized to develop or test algorithms assigning risk to passengers whose names are not on Government watch lists.

(f) None of the funds provided in this or previous appropriations Acts may be utilized for

data or a database that is obtained from or remains under the control of a non-Federal entity: *Provided*, That this restriction shall not apply to Passenger Name Record data obtained from air carriers.

*1380 SEC. 515. None of the funds made available in this Act may be used to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act (8 U.S.C. 1448).

SEC. 516. None of the funds appropriated by this Act may be used to process or approve a competition under Office of Management and Budget Circular A-76 for services provided as of June 1, 2004, by employees (including employees serving on a temporary or term basis) of United States Citizenship and Immigration Services of the Department of Homeland Security who are known as of that date as Immigration Information Officers, Contact Representatives, or Investigative Assistants.

SEC. 517. (a) None of the funds appropriated to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security: *Provided*, That the Director of the United States Secret Service may enter into an agreement to perform such service on a fully reimbursable basis.

<< 18 USCA § 3056 NOTE >>

(b) Beginning in fiscal year 2008, none of the funds appropriated by this or any other Act to the United States Secret Service shall be made available for the protection of a person, other than persons granted protection under section 3056(a) of title 18, United States Code, and the Secretary of Homeland Security: *Provided*, That the Director of the United States Secret Service may enter into an agreement to perform such protection on a fully reimbursable basis for protectees not designated under section 3056(a) of title 18, United States Code.

<< 49 USCA § 44901 NOTE >>

SEC. 518. The Secretary of Homeland Security, in consultation with industry stakeholders, shall develop standards and protocols for increasing the use of explosive detection equipment to screen air cargo when appropriate.

SEC. 519. (a) The Secretary of Homeland Security is directed to research, develop, and procure new technologies to inspect and screen air cargo carried on passenger aircraft at the earliest date possible.

(b) Existing checked baggage explosive detection equipment and screeners shall be utilized to screen air cargo carried on passenger aircraft to the greatest extent practicable at each airport until technologies developed under subsection (a) are available.

(c) The Transportation Security Administration shall report air cargo inspection statistics quarterly to the Committees on Appropriations of the Senate and the House of Representatives, by airport and air carrier, within 45 days after the end of the quarter including any reason for non-compliance with the second proviso of section 513 of the Department of Homeland Security Appropriations Act, 2005 (Public Law 108-334, 118 Stat. 1317).

SEC. 520. For purposes of this Act, any designation referring to this section is the designation of an amount as making appropriations for contingency operations directly

related to the global war on terrorism, and other unanticipated defense-related operations, pursuant to section 402 of H. Con. Res. 376 (109th Congress) as made applicable to the House of Representatives by H. Res. 818 (109th Congress), and as an emergency requirement pursuant to section 402 of S. Con. Res. 83 (109th Congress) as made applicable to the Senate by section 7035 of Public Law 109-234.

SEC. 521. (a) RESCISSION.--From the unexpended balances of the United States Coast Guard "Acquisition, Construction, and *1381 Improvements" account specifically identified in the Joint Explanatory Statement (House Report 109- 241) accompanying Public Law 109-90 for the Fast Response Cutter, the service life extension program of the current 110-foot Island Class patrol boat fleet, and accelerated design and production of the Fast Response Cutter, $78,693,508 are rescinded.

(b) ADDITIONAL APPROPRIATION.--For necessary expenses of the United States Coast Guard for "Acquisition, Construction, and Improvements", there is appropriated an additional $78,693,508, to remain available until September 30, 2009, for the service life extension program of the current 110-foot Island Class patrol boat fleet and the acquisition of traditional patrol boats ("parent craft").

SEC. 522. None of the funds made available in this Act may be used by any person other than the Privacy Officer appointed under section 222 of the Homeland Security Act of 2002 (6 U.S.C. 142) to alter, direct that changes be made to, delay, or prohibit the transmission to Congress of any report prepared under paragraph (6) of such section.

SEC. 523. No funding provided by this or previous appropriation Acts shall be available to pay the salary of any employee serving as a contracting officer's technical representative (COTR), or anyone acting in a similar or like capacity, who has not received COTR training.

SEC. 524. Except as provided in section 44945 of title 49, United States Code, funds appropriated or transferred to Transportation Security Administration "Aviation Security", "Administration" and "Transportation Security Support" in fiscal years 2004, 2005, and 2006 that are recovered or deobligated shall be available only for procurement and installation of explosive detection systems for air cargo, baggage, and checkpoint screening systems, subject to notification.

SEC. 525. (a) Within 30 days after enactment of this Act, the Secretary of Homeland Security shall revise Department of Homeland Security (DHS) Management Directive (MD) 11056 to provide for the following:

(1) That when a lawful request is made to publicly release a document containing information designated as sensitive security information (SSI), the document shall be reviewed in a timely manner to determine whether any information contained in the document meets the criteria for continued SSI protection under applicable law and regulation and shall further provide that all portions that no longer require SSI designation be released, subject to applicable law, including sections 552 and 552a of title 5, United States Code;

(2) That sensitive security information that is three years old and not incorporated in a current transportation security directive, security plan, contingency plan, or information circular; or does not contain current information in one of the following SSI categories: equipment or personnel performance specifications, vulnerability assessments, security inspection or investigative information, threat information, security measures, security screening information, security training materials, identifying information of designated

transportation security personnel, critical aviation or maritime infrastructure asset information, systems security information, confidential business information, or research and development information shall be subject to release upon request unless:

*1382 (A) the Secretary or his designee makes a written determination that identifies a rational reason why the information must remain SSI; or

(B) such information is otherwise exempt from disclosure under applicable law:

*Provided*, That any determination made by the Secretary under clause (a)(2)(A) shall be provided to the party making a request to release such information and to the Committees on Appropriations of the Senate and the House of Representatives as part of the annual reporting requirement pursuant to section 537 of the Department of Homeland Security Appropriations Act, 2006 (Public Law 109-90; 119 Stat. 2088); and

(3) Common and extensive examples of the individual categories of SSI information cited under 49 CFR 1520(b)(1) through (16) in order to minimize and standardize judgment by covered persons in the application of SSI marking.

(b) Not later than 120 days after the date of enactment of this Act, the Secretary of Homeland Security shall report to the Committees on Appropriations of the Senate and the House of Representatives on the progress that the Department has made in implementing the requirements of this section and of section 537 of the Department of Homeland Security Appropriations Act, 2006 (Public Law 109-90; 119 Stat. 2088).

(c) Not later than one year from the date of enactment of this Act, the Government Accountability Office shall report to the Committees on Appropriations of the Senate and the House of Representatives on DHS progress and procedures in implementing the requirements of this section.

(d) That in civil proceedings in the United States District Courts, where a party seeking access to SSI demonstrates that the party has substantial need of relevant SSI in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means, the party or party's counsel shall be designated as a covered person under 49 CFR Part 1520.7 in order to have access to the SSI at issue in the case, provided that the overseeing judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a criminal history check and terrorist assessment like that done for aviation workers on the persons seeking access to SSI, or based on the sensitivity of the information, the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation: *Provided*, That notwithstanding any other provision of law, an order granting access to SSI under this section shall be immediately appealable to the United States Courts of Appeals, which shall have plenary review over both the evidentiary finding and the sufficiency of the order specifying the terms and conditions of access to the SSI in question: *Provided further*, That notwithstanding any other provision of law, the Secretary may assess a civil penalty of up to $50,000 for each violation of 49 CFR Part 1520 by persons provided access to SSI under this provision.

<< 31 USCA § 501 NOTE >>

SEC. 526. The Department of Homeland Security Working Capital Fund, established,

pursuant to section 403 of Public Law 103-356 (31 U.S.C. 501 note), shall continue operations during fiscal year 2007.

*1383 SEC. 527. RESCISSION. Of the unobligated balances from prior year appropriations made available for the "Counterterrorism Fund", $16,000,000 are rescinded.

SEC. 528. (a) The report required by Public Law 109-62 and Public Law 109-90 detailing the allocation and obligation of funds for "Disaster Relief" shall hereafter be submitted monthly and include: (1) status of the Disaster Relief Fund (DRF) including obligations, allocations, and amounts undistributed/unallocated; (2) allocations, obligations, and expenditures for Hurricanes Katrina, Rita, and Wilma; (3) information on national flood insurance claims; (4) information on manufactured housing data; (5) information on hotel/motel data; (6) obligations, allocations and expenditures by State for unemployment, crisis counseling, inspections, housing assistance, manufactured housing, public assistance and individual assistance; (7) mission assignment obligations by agency, including: (i) the amounts reimbursed to other agencies that are in suspense because FEMA has not yet reviewed and approved the documentation supporting the expenditure; and (ii) a disclaimer if the amounts of reported obligations and expenditures do not reflect the status of such obligations and expenditures from a government-wide perspective; (8) the amount of credit card purchases by agency and mission assignment; (9) specific reasons for all waivers granted and a description of each waiver; and (10) a list of all contracts that were awarded on a sole source or limited competition basis, including the dollar amount, the purpose of the contract and the reason for the lack of competitive award.

(b) The Secretary of Homeland Security shall at least quarterly obtain and report from agencies performing mission assignments each such agency's actual obligation and expenditure data.

(c) For any request for reimbursement from a Federal agency to the Department of Homeland Security to cover expenditures under the Stafford Act (42 U.S.C. 5121 et seq.), or any mission assignment orders issued by the Department of Homeland Security for such purposes, the Secretary of Homeland Security shall take appropriate steps to ensure that each agency is periodically reminded of Department of Homeland Security policies on--

(1) the detailed information required in supporting documentation for reimbursements, and

(2) the necessity for timeliness of agency billings.

SEC. 529. RESCISSION. Of the unobligated balances from prior year appropriations made available for Science and Technology, $125,000,000 from "Research, Development, Acquisition, and Operations" are rescinded.

SEC. 530. None of the funds made available in this Act may be used to enforce section 4025(1) of Public Law 108-458 if the Assistant Secretary (Transportation Security Administration) determines that butane lighters are not a significant threat to civil aviation security: *Provided*, That the Assistant Secretary (Transportation Security Administration) shall notify the Committees on Appropriations of the Senate and the House of Representatives 15 days in advance of such determination including a report on whether the effectiveness of screening operations is enhanced by suspending enforcement of the prohibition.

SEC. 531. Within 45 days after the close of each month, the Chief Financial Officer of the Department of Homeland Security shall submit to the Committees on Appropriations of the Senate and the House of Representatives a monthly budget and staffing *1384 report that includes total obligations and on-board versus funded full-time equivalent staffing levels.

SEC. 532. (a) UNITED STATES SECRET SERVICE USE OF PROCEEDS DERIVED FROM CRIMINAL INVESTIGATIONS.--During fiscal year 2007, with respect to any undercover investigative operation of the United States Secret Service (hereafter referred to in this section as the "Secret Service") that is necessary for the detection and prosecution of crimes against the United States--

(1) sums appropriated for the Secret Service, including unobligated balances available from prior fiscal years, may be used for purchasing property, buildings, and other facilities, and for leasing space, within the United States, the District of Columbia, and the territories and possessions of the United States, without regard to sections 1341 and 3324 of title 31, United States Code, section 8141 of title 40, United States Code, sections 3732(a) and 3741 of the Revised Statutes of the United States (41 U.S.C. 11(a) and 22), and sections 304(a) and 305 of the Federal Property and Administrative Services Act of 1949 (41 U.S.C 254(a) and 255);

(2) sums appropriated for the Secret Service, including unobligated balances available from prior fiscal years, may be used to establish or to acquire proprietary corporations or business entities as part of such undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to sections 9102 and 9103 of title 31, United States Code;

(3) sums appropriated for the Secret Service, including unobligated balances available from prior fiscal years and the proceeds from such undercover operation, may be deposited in banks or other financial institutions, without regard to section 648 of title 18, and section 3302 of title 31, United States Code; and

(4) proceeds from such undercover operation may be used to offset necessary and reasonable expenses incurred in such operation, without regard to section 3302 of title 31, United States Code.

(b) WRITTEN CERTIFICATION.--The authority set forth in subsection (a) may be exercised only upon the written certification of the Director of the Secret Service or designee that any action authorized by any paragraph of such subsection is necessary for the conduct of an undercover investigative operation. Such certification shall continue in effect for the duration of such operation, without regard to fiscal years.

(c) DEPOSIT OF PROCEEDS IN TREASURY.--As soon as practicable after the proceeds from an undercover investigative operation with respect to which an action is authorized and carried out under paragraphs (3) and (4) of subsection (a) are no longer necessary for the conduct of such operation, such proceeds or the balance of such proceeds remaining at the time shall be deposited in the Treasury of the United States as miscellaneous receipts.

(d) REPORTING AND DEPOSIT OF PROCEEDS UPON DISPOSITION OF CERTAIN BUSINESS ENTITIES.--If a corporation or business entity established or acquired as part of an undercover investigative operation under paragraph (2) of subsection (a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Secret Service, as much in advance as the Director or designee *1385

determines is practicable, shall report the circumstance to the Secretary of Homeland Security. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

(e) FINANCIAL AUDITS AND REPORTS.--

(1) The Secret Service shall conduct detailed financial audits of closed undercover investigative operations for which a written certification was made pursuant to subsection (b) on a quarterly basis and shall report the results of the audits in writing to the Secretary of Homeland Security.

(2) The Secretary of Homeland Security shall annually submit to the Committees on Appropriations of the Senate and House of Representatives, at the time that the President's budget is submitted under section 1105(a) of title 31, a summary of such audits.

SEC. 533. The Director of the Domestic Nuclear Detection Office shall operate extramural and intramural research, development, demonstrations, testing and evaluation programs so as to distribute funding through grants, cooperative agreements, other transactions and contracts.

SEC. 534. Notwithstanding any other provision of law, the Secretary of Homeland Security shall consider the Hancock County Port and Harbor Commission in Mississippi eligible under the Federal Emergency Management Agency Public Assistance Program for all costs incurred for dredging from navigation channel in Little Lake, Louisiana, sediment deposited as a result of Hurricane George in 1998: *Provided*, That the appropriate Federal share shall apply to approval of this project.

SEC. 535. None of the funds made available in this Act for United States Customs and Border Protection may be used to prevent an individual not in the business of importing a prescription drug (within the meaning of section 801(g) of the Federal Food, Drug, and Cosmetic Act) from importing a prescription drug from Canada that complies with the Federal Food, Drug, and Cosmetic Act: *Provided*, that this section shall apply only to individuals transporting on their person a personal-use quantity of the prescription drug, not to exceed a 90-day supply: *Provided further*, that the prescription drug may not be--

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 536. The Department of Homeland Security shall, in approving standards for State and local emergency preparedness operational plans under section 613(b)(3) of the Robert T. Stafford Disaster and Emergency Assistance Act (42 U.S.C. 5196b(b)(3)), account for the needs of individuals with household pets and service animals before, during, and following a major disaster or emergency: *Provided*, That Federal agencies may provide assistance as described in section 403(a) of the Robert T. Stafford Disaster and Emergency Assistance Act (42 U.S.C. 5170b(a)) to carry out the plans described in the previous proviso.

SEC. 537. RESCISSION. From the unobligated balances from prior year appropriations made available for Transportation Security Administration "Aviation Security" and "Headquarters Administration", $4,776,000 are rescinded.

*1386 SEC. 538. RESCISSION. From the unobligated balances from prior year appropriations made available for Transportation Security Administration "Aviation

Security", $61,936,000 are rescinded.

SEC. 539. RESCISSION. From the unexpended balances of the United States Coast Guard "Acquisition, Construction, and Improvements" account specifically identified in the Joint Explanatory Statement (House Report 109-241) accompanying the Department of Homeland Security Act, 2006 (Public Law 109-90) for the development of the Offshore Patrol Cutter, $20,000,000 are rescinded.

SEC. 540. RESCISSION. From the unexpended balances of the United States Coast Guard "Acquisition, Construction, and Improvements" account specifically identified in the Joint Explanatory Statement (House Report 109-241) accompanying the Department of Homeland Security Act, 2006 (Public Law 109-90) for the Automatic Identification System, $4,100,000 are rescinded.

SEC. 541. Notwithstanding the requirements of section 404(b)(2)(B) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, the Army Corps of Engineers may use Lot 19, Block 1 of the Meadowview Acres Addition and Lot 8, Block 5 of the Meadowview Acres Addition in Augusta, Kansas, for building portions of the flood-control levee.

SEC. 542. Notwithstanding any time limitation established for a grant awarded under title I, chapter 6, Public Law 106-31, in the item relating to Federal Emergency Management Agency--Disaster Assistance for Unmet Needs, the City of Cuero, Texas, may use funds received under such grant program until September 30, 2007.

SEC. 543. None of the funds made available by this Act shall be used in contravention of the Federal buildings performance and reporting requirements of Executive Order No. 13123, part 3 of title V of the National Energy Conservation Policy Act (42 U.S.C. 8251 et seq.), or subtitle A of title I of the Energy Policy Act of 2005 (including the amendments made thereby).

SEC. 544. The Federal Law Enforcement Training Center instructor staff shall be classified as inherently governmental for the purpose of the Federal Activities Inventory Reform Act of 1998 (31 U.S.C. 501 note).

SEC. 545. None of the funds made available in this Act may be used in contravention of section 303 of the Energy Policy Act of 1992 (42 U.S.C. 13212).

<< 8 USCA § 1185 NOTE >>

SEC. 546. Section 7209(b)(1) of the intelligence reform and terrorism prevention act of 2004 (Public Law 108-458; 8 U.S.C. 1185 note) is amended by striking from "(1) DEVELOPMENT OF PLAN.--The Secretary" through "7208(k))." and inserting the following:

"(1) DEVELOPMENT OF PLAN AND IMPLEMENTATION.--

"(A) The Secretary of Homeland Security, in consultation with the Secretary of State, shall develop and implement a plan as expeditiously as possible to require a passport or other document, or combination of documents, deemed by the Secretary of Homeland Security to be sufficient to denote identity and citizenship, for all travel into the United States by United States citizens and by categories of individuals for whom documentation requirements have previously been waived under section 212(d)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(4)(B)). This plan shall be implemented not *1387 later than three months after the Secretary of State and the Secretary of Homeland Security make the certifications required in subsection (B), or June 1, 2009, whichever is

earlier. The plan shall seek to expedite the travel of frequent travelers, including those who reside in border communities, and in doing so, shall make readily available a registered traveler program (as described in section 7208(k)).

"(B) The Secretary of Homeland Security and the Secretary of State shall jointly certify to the Committees on Appropriations of the Senate and the House of Representatives that the following criteria have been met prior to implementation of section 7209(b)(1)(A)--

"(i) the National Institute of Standards and Technology certifies that the Departments of Homeland Security and State have selected a card architecture that meets or exceeds International Organization for Standardization (ISO) security standards and meets or exceeds best available practices for protection of personal identification documents: *Provided*, That the National Institute of Standards and Technology shall also assist the Departments of Homeland Security and State to incorporate into the architecture of the card the best available practices to prevent the unauthorized use of information on the card: *Provided further*, That to facilitate efficient cross-border travel, the Departments of Homeland Security and State shall, to the maximum extent possible, develop an architecture that is compatible with information technology systems and infrastructure used by United States Customs and Border Protection;

"(ii) the technology to be used by the United States for the passport card, and any subsequent change to that technology, has been shared with the governments of Canada and Mexico;

"(iii) an agreement has been reached with the United States Postal Service on the fee to be charged individuals for the passport card, and a detailed justification has been submitted to the Committees on Appropriations of the Senate and the House of Representatives;

"(iv) an alternative procedure has been developed for groups of children traveling across an international border under adult supervision with parental consent;

"(v) the necessary technological infrastructure to process the passport cards has been installed, and all employees at ports of entry have been properly trained in the use of the new technology;

"(vi) the passport card has been made available for the purpose of international travel by United States citizens through land and sea ports of entry between the United States and Canada, Mexico, the Caribbean and Bermuda; and

"(vii) a single implementation date for sea and land borders has been established.".

SEC. 547. None of the funds made available in this Act may be used to award any contract for major disaster or emergency *1388 assistance activities under the Robert T. Stafford Disaster Relief and Emergency Assistance Act except in accordance with section 307 of such Act (42 U.S.C. 5150).

SEC. 548. None of the funds made available in the Act may be used to reimburse L.B.& B. Associates, Inc. or Olgoonik Logistics, LLC (or both) for attorneys fees related to pending litigation against Local 30 of the International Union of Operating Engineers.

SEC. 549. Notwithstanding any other provision of law, the acquisition management system of the Transportation Security Administration shall be subject to the provisions of the Small Business Act (15 U.S.C. 631 et seq.).

<< 6 USCA § 121 NOTE >>

SEC. 550. (a) No later than six months after the date of enactment of this Act, the

Secretary of Homeland Security shall issue interim final regulations establishing risk-based performance standards for security of chemical facilities and requiring vulnerability assessments and the development and implementation of site security plans for chemical facilities: *Provided*, That such regulations shall apply to chemical facilities that, in the discretion of the Secretary, present high levels of security risk: *Provided further*, That such regulations shall permit each such facility, in developing and implementing site security plans, to select layered security measures that, in combination, appropriately address the vulnerability assessment and the risk-based performance standards for security for the facility: *Provided further*, That the Secretary may not disapprove a site security plan submitted under this section based on the presence or absence of a particular security measure, but the Secretary may disapprove a site security plan if the plan fails to satisfy the risk-based performance standards established by this section: *Provided further*, That the Secretary may approve alternative security programs established by private sector entities, Federal, State, or local authorities, or other applicable laws if the Secretary determines that the requirements of such programs meet the requirements of this section and the interim regulations: *Provided further*, That the Secretary shall review and approve each vulnerability assessment and site security plan required under this section: Provided further, That the Secretary shall not apply regulations issued pursuant to this section to facilities regulated pursuant to the Maritime Transportation Security Act of 2002, Public Law 107-295, as amended; Public Water Systems, as defined by section 1401 of the Safe Drinking Water Act, Public Law 93-523, as amended; Treatment Works as defined in section 212 of the Federal Water Pollution Control Act, Public Law 92-500, as amended; any facility owned or operated by the Department of Defense or the Department of Energy, or any facility subject to regulation by the Nuclear Regulatory Commission.

(b) Interim regulations issued under this section shall apply until the effective date of interim or final regulations promulgated under other laws that establish requirements and standards referred to in subsection (a) and expressly supersede this section: *Provided*, That the authority provided by this section shall terminate three years after the date of enactment of this Act.

(c) Notwithstanding any other provision of law and subsection (b), information developed under this section, including vulnerability assessments, site security plans, and other security related information, records, and documents shall be given protections from public disclosure consistent with similar information developed by chemical facilities subject to regulation under section 70103 of title *1389 46, United States Code: *Provided*, That this subsection does not prohibit the sharing of such information, as the Secretary deems appropriate, with State and local government officials possessing the necessary security clearances, including law enforcement officials and first responders, for the purpose of carrying out this section, provided that such information may not be disclosed pursuant to any State or local law: *Provided further*, That in any proceeding to enforce this section, vulnerability assessments, site security plans, and other information submitted to or obtained by the Secretary under this section, and related vulnerability or security information, shall be treated as if the information were classified material.

(d) Any person who violates an order issued under this section shall be liable for a civil penalty under section 70119(a) of title 46, United States Code: *Provided*, That nothing in this section confers upon any person except the Secretary a right of action against an

owner or operator of a chemical facility to enforce any provision of this section.

(e) The Secretary of Homeland Security shall audit and inspect chemical facilities for the purposes of determining compliance with the regulations issued pursuant to this section.

(f) Nothing in this section shall be construed to supersede, amend, alter, or affect any Federal law that regulates the manufacture, distribution in commerce, use, sale, other treatment, or disposal of chemical substances or mixtures.

(g) If the Secretary determines that a chemical facility is not in compliance with this section, the Secretary shall provide the owner or operator with written notification (including a clear explanation of deficiencies in the vulnerability assessment and site security plan) and opportunity for consultation, and issue an order to comply by such date as the Secretary determines to be appropriate under the circumstances: *Provided*, That if the owner or operator continues to be in noncompliance, the Secretary may issue an order for the facility to cease operation, until the owner or operator complies with the order.

SEC. 551. (a) CONSTRUCTION OF BORDER TUNNEL OR PASSAGE--Chapter 27 of title 18, United States Code, is amended by adding at the end the following:

<< 18 USCA § 554 >>

"§ 554. Border tunnels and passages

"(a) Any person who knowingly constructs or finances the construction of a tunnel or subterranean passage that crosses the international border between the United States and another country, other than a lawfully authorized tunnel or passage known to the Secretary of Homeland Security and subject to inspection by Immigration and Customs Enforcement, shall be fined under this title and imprisoned for not more than 20 years.

"(b) Any person who knows or recklessly disregards the construction or use of a tunnel or passage described in subsection (a) on land that the person owns or controls shall be fined under this title and imprisoned for not more than 10 years.

"(c) Any person who uses a tunnel or passage described in subsection (a) to unlawfully smuggle an alien, goods (in violation of section 545), controlled substances, weapons of mass destruction (including biological weapons), or a member of a terrorist organization (as defined in section 2339B(g)(6)) shall be subject to a maximum term of imprisonment that is twice the maximum term of *1390 imprisonment that would have otherwise been applicable had the unlawful activity not made use of such a tunnel or passage.".

<< 18 USCA prec. § 541 >>

(b) CLERICAL AMENDMENT.--The table of sections for chapter 27 of title 18, United States Code, is amended by adding at the end the following:

"Sec. 554. Border tunnels and passages.".

<< 18 USCA § 982 >>

(c) CRIMINAL FORFEITURE.--Section 982(a)(6) of title 18, United States Code, is amended by inserting "554," before "1425,".

<< 28 USCA § 994 NOTE >>

(d) DIRECTIVE TO THE UNITED STATES SENTENCING COMMISSION.--

(1) IN GENERAL.--Pursuant to its authority under section 994 of title 28, United States Code, and in accordance with this subsection, the United States Sentencing Commission shall promulgate or amend sentencing guidelines to provide for increased penalties for persons convicted of offenses described in section 554 of title 18, United States Code, as added by subsection (a).

(2) REQUIREMENTS.--In carrying out this subsection, the United States Sentencing Commission shall--

(A) ensure that the sentencing guidelines, policy statements, and official commentary reflect the serious nature of the offenses described in section 554 of title 18, United States Code, and the need for aggressive and appropriate law enforcement action to prevent such offenses;

(B) provide adequate base offense levels for offenses under such section;

(C) account for any aggravating or mitigating circumstances that might justify exceptions, including--

(i) the use of a tunnel or passage described in subsection (a) of such section to facilitate other felonies; and

(ii) the circumstances for which the sentencing guidelines currently provide applicable sentencing enhancements;

(D) ensure reasonable consistency with other relevant directives, other sentencing guidelines, and statutes;

(E) make any necessary and conforming changes to the sentencing guidelines and policy statements; and

(F) ensure that the sentencing guidelines adequately meet the purposes of sentencing set forth in section 3553(a)(2) of title 18, United States Code.

SEC. 552. The Secretary of Homeland Security may not take any action to alter or reduce operations within the Civil Engineering Program of the Coast Guard nationwide, including the civil engineering units, facilities, design and construction centers, the Coast Guard Academy, and the Coast Guard Research and Development Center until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan on changes to the Civil Engineering Program of the Coast Guard: *Provided*, That the plan shall include a description of the current functions of the Civil Engineering Program and a description of any proposed modifications of such functions and of any proposed modification of personnel and offices, including the rationale for such modification; an assessment of the costs and benefits of such modification; any proposed alternatives to such modification; and *1391 the processes utilized by the Coast Guard and the Office of Management and Budget to analyze and assess such modification.

SEC. 553. None of the funds made available by this Act may be used to take an action that would violate Executive Order No. 13149 (65 Fed. Reg. 24607; relating to greening the government through Federal fleet and transportation efficiency).

SEC. 554. (a) The Transportation Security Administration shall require each air carrier and foreign air carrier that provides air transportation or intrastate air transportation to submit plans to the Transportation Security Administration on how such air carrier will participate in the voluntary provision of emergency services program established by

section 44944(a) of title 49, United States Code.

(b)(1) Not more than 90 days after the date of the enactment of this Act, the Transportation Security Administration shall prepare a report that contains the following:

(A) Procedures that qualified individuals need to follow in order to participate in the program described in subsection (a).

(B) Relevant contacts for individuals interested in participating in the program described in subsection (a).

(2) The Transportation Security Administration shall make the report required by paragraph (1) available, by Internet web site or other appropriate method, to the following:

(A) The Congress.

(B) The emergency response agency of each State.

(C) The relevant organizations representing individuals to participate in the program.

SEC. 555. Not later than 90 days after the date of enactment of this Act, the Director of the Federal Emergency Management Agency in conjunction with the Director of the National Institute of Standards and Technology shall submit a report to the Committees on Appropriations of the Senate and the House of Representatives outlining Federal earthquake response plans for high-risk earthquake regions in the United States as determined by the United States Geological Survey.

<< 6 USCA § 485 NOTE >>

SEC. 556. Not later than six months after the date of enactment of this Act, the Secretary of Homeland Security shall establish revised procedures for expeditiously clearing individuals whose names have been mistakenly placed on a terrorist database list or who have names identical or similar to individuals on a terrorist database list. The Secretary shall advise Congress of the procedures established.

<< 42 USCA § 5207 >>

SEC. 557. Title VII of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5201) is amended by adding at the end the following:

"SEC. 706. FIREARMS POLICIES.

"(a) PROHIBITION ON CONFISCATION OF FIREARMS.--No officer or employee of the United States (including any member of the uniformed services), or person operating pursuant to or under color of Federal law, or receiving Federal funds, or under control of any Federal official, or providing services to such an officer, employee, or other person, while acting in support of relief from a major disaster or emergency, may--

"(1) temporarily or permanently seize, or authorize seizure of, any firearm the possession of which is not prohibited under *1392 Federal, State, or local law, other than for forfeiture in compliance with Federal law or as evidence in a criminal investigation;

"(2) require registration of any firearm for which registration is not required by Federal, State, or local law;

"(3) prohibit possession of any firearm, or promulgate any rule, regulation, or order prohibiting possession of any firearm, in any place or by any person where such possession is not otherwise prohibited by Federal, State, or local law; or

"(4) prohibit the carrying of firearms by any person otherwise authorized to carry firearms under Federal, State, or local law, solely because such person is operating under the direction, control, or supervision of a Federal agency in support of relief from the major disaster or emergency.

"(b) LIMITATION.--Nothing in this section shall be construed to prohibit any person in subsection (a) from requiring the temporary surrender of a firearm as a condition for entry into any mode of transportation used for rescue or evacuation during a major disaster or emergency, provided that such temporarily surrendered firearm is returned at the completion of such rescue or evacuation.

"(c) PRIVATE RIGHTS OF ACTION.--

"(1) IN GENERAL.--Any individual aggrieved by a violation of this section may seek relief in an action at law, suit in equity, or other proper proceeding for redress against any person who subjects such individual, or causes such individual to be subjected, to the deprivation of any of the rights, privileges, or immunities secured by this section.

"(2) REMEDIES.--In addition to any existing remedy in law or equity, under any law, an individual aggrieved by the seizure or confiscation of a firearm in violation of this section may bring an action for return of such firearm in the United States district court in the district in which that individual resides or in which such firearm may be found.

"(3) ATTORNEY FEES.--In any action or proceeding to enforce this section, the court shall award the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.".

<< 6 USCA § 981a >>

SEC. 558. PILOT INTEGRATED SCANNING SYSTEM. (a) DESIGNATIONS.--
(1) IN GENERAL.--Not later than 90 days after the date of the enactment of this Act, the Secretary of Homeland Security (referred to in this section as the "Secretary") shall designate three foreign seaports through which containers pass or are transshipped to the United States to pilot an integrated scanning system that couples nonintrusive imaging equipment and radiation detection equipment, which may be provided by the Megaports Initiative of the Department of Energy. In making designations under this subsection, the Secretary shall consider three distinct ports with unique features and differing levels of trade volume.
(2) COLLABORATION AND COOPERATION.--The Secretary shall collaborate with the Secretary of Energy and cooperate with the private sector and host foreign government to implement the pilot program under this subsection.
(b) IMPLEMENTATION.--Not later than one year after the date of the enactment of this Act, the Secretary shall achieve a full-*1393 scale implementation of the pilot integrated screening system, which shall--
(1) scan all containers destined for the United States that transit through the terminal;
(2) electronically transmit the images and information to the container security initiative personnel in the host country and/or Customs and Border Protection personnel in the United States for evaluation and analysis;
(3) resolve every radiation alarm according to established Department procedures;
(4) utilize the information collected to enhance the Automated Targeting System or other relevant programs; and
(5) store the information for later retrieval and analysis.

(c) EVALUATION.--The Secretary shall evaluate the pilot program in subsection (b) to determine whether such a system--

(1) has a sufficiently low false alarm rate for use in the supply chain;

(2) is capable of being deployed and operated at ports overseas, including consideration of cost, personnel, and infrastructure required to operate the system;

(3) is capable of integrating, where necessary, with existing systems;

(4) does not significantly impact trade capacity and flow of cargo at foreign or United States ports; and

(5) provides an automated notification of questionable or high-risk cargo as a trigger for further inspection by appropriately trained personnel.

(d) REPORT.--Not later than 120 days after achieving full-scale implementation under subsection (b), the Secretary, in consultation with the Secretary of Energy and the Secretary of State, shall submit a report, to the appropriate congressional committees, that includes--

(1) an evaluation of the lessons derived from the pilot program implemented under this section;

(2) an analysis of the efficacy of the Automated Targeted System or other relevant programs in utilizing the images captured to examine high-risk containers;

(3) an evaluation of software that is capable of automatically identifying potential anomalies in scanned containers; and

(4) a plan and schedule to expand the integrated scanning system developed under this section to other container security initiative ports.

(e) IMPLEMENTATION.--If the Secretary determines the available technology meets the criteria outlined in subsection (c), the Secretary, in cooperation with the Secretary of State, shall seek to secure the cooperation of foreign governments to initiate and maximize the use of such technology at foreign ports to scan all cargo bound for the United States as quickly as possible.

SEC. 559. (a) RESCISSION.--From the unexpended balances of the United States Secret Service "Salaries and Expenses" account specifically identified in the Joint Explanatory Statement (House Report 109-241) accompanying the Department of Homeland Security Act, 2006 (Public Law 109-90) for National Special Security Events, $2,500,000 are rescinded.

(b) ADDITIONAL APPROPRIATION.--For necessary expenses of the United States Secret Service "Protection, Administration, and *1394 Training", there is appropriated an additional $2,500,000, to remain available until expended for National Special Security Events.

SEC. 560. Transfer authority contained in section 505 of the Homeland Security Act, as amended by title VI of this Act, shall be used in accordance with the provisions of section 1531(a)(2) of title 31, United States Code.

<< 6 USCA prec. § 701 >>

TITLE VI--NATIONAL EMERGENCY MANAGEMENT

<< 6 USCA § 701 NOTE >>

SEC. 601. SHORT TITLE.

This title may be cited as the "Post-Katrina Emergency Management Reform Act of 2006".

<< 6 USCA § 701 >>

SEC. 602. DEFINITIONS.

In this title--
(1) the term "Administrator" means the Administrator of the Agency;
(2) the term "Agency" means the Federal Emergency Management Agency;
(3) the term "appropriate committees of Congress" means--
(A) the Committee on Homeland Security and Governmental Affairs of the Senate; and
(B) those committees of the House of Representatives that the Speaker of the House of Representatives determines appropriate;
(4) the term "catastrophic incident" means any natural disaster, act of terrorism, or other man-made disaster that results in extraordinary levels of casualties or damage or disruption severely affecting the population (including mass evacuations), infrastructure, environment, economy, national morale, or government functions in an area;
(5) the term "Department" means the Department of Homeland Security;
(6) the terms "emergency" and "major disaster" have the meanings given the terms in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122);
(7) the term "emergency management" means the governmental function that coordinates and integrates all activities necessary to build, sustain, and improve the capability to prepare for, protect against, respond to, recover from, or mitigate against threatened or actual natural disasters, acts of terrorism, or other man-made disasters;
(8) the term "emergency response provider" has the meaning given the term in section 2 of the Homeland Security Act of 2002 (6 U.S.C. 101), as amended by this Act;
(9) the term "Federal coordinating officer" means a Federal coordinating officer as described in section 302 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5143);
(10) the term "individual with a disability" has the meaning given the term in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102);

*1395
(11) the terms "local government" and "State" have the meaning given the terms in section 2 of the Homeland Security Act of 2002 (6 U.S.C. 101);
(12) the term "National Incident Management System" means a system to enable effective, efficient, and collaborative incident management;
(13) the term "National Response Plan" means the National Response Plan or any successor plan prepared under section 502(a)(6) of the Homeland Security Act of 2002 (as amended by this Act);
(14) the term "Secretary" means the Secretary of Homeland Security;
(15) the term "surge capacity" means the ability to rapidly and substantially increase the provision of search and rescue capabilities, food, water, medicine, shelter and housing, medical care, evacuation capacity, staffing (including disaster assistance employees), and

other resources necessary to save lives and protect property during a catastrophic incident; and

(16) the term "tribal government" means the government of an Indian tribe or authorized tribal organization, or in Alaska a Native village or Alaska Regional Native Corporation.

Subtitle A--Federal Emergency Management Agency

SEC. 611. STRUCTURING THE FEDERAL EMERGENCY MANAGEMENT AGENCY.

Title V of the Homeland Security Act of 2002 (6 U.S.C. 311 et seq.) is amended--

<< 6 USCA prec. § 311 >>

(1) by striking the title heading and inserting the following:
        "TITLE V--NATIONAL EMERGENCY MANAGEMENT";

<< 6 USCA § 311 >>

(2) by striking section 501;

<< 6 USCA § 313 >>

(3) by striking section 503;

<< 6 USCA § 317 >>

(4) by striking section 507;

<< 6 USCA § 321 >>

(5) by striking section 510 (relating to urban and other high risk area communications capabilities);

<< 6 USCA § 314 >>

<< 6 USCA § 321f >>

<< 6 USCA § 315 >>

<< 6 USCA § 321g >>

<< 6 USCA § 318 >>

<< 6 USCA § 321h >>

<< 6 USCA § 319 >>

<< 6 USCA § 331i >>

(6) by redesignating sections 504, 505, 508, and 509 as sections 517, 518, 519, and 520, respectively;

<< 6 USCA § 320 >>

<< 6 USCA § 321j >>

(7) by redesignating section 510 (relating to procurement of security countermeasures for the strategic national stockpile) as section 521;

<< 6 USCA § 312 >>

<< 6 USCA § 314 >>

(8) by redesignating section 502 as section 504;

<< 6 USCA § 316 >>

<< 6 USCA § 312 >>

(9) by redesignating section 506 as section 502 and transferring that section to before section 504, as redesignated by paragraph (8) of this section;

<< 6 USCA § 311 >>

(10) by inserting before section 502, as redesignated and transferred by paragraph (9) of this section, the following:

"SEC. 501. DEFINITIONS.
"In this title--
"(1) the term 'Administrator' means the Administrator of the Agency;
*1396 "(2) the term 'Agency' means the Federal Emergency Management Agency;
"(3) the term 'catastrophic incident' means any natural disaster, act of terrorism, or other man-made disaster that results in extraordinary levels of casualties or damage or disruption severely affecting the population (including mass evacuations), infrastructure, environment, economy, national morale, or government functions in an area;
"(4) the term 'Federal coordinating officer' means a Federal coordinating officer as described in section 302 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5143);
"(5) the term 'interoperable' has the meaning given the term 'interoperable communications' under section 7303(g)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 (6 U.S.C. 194(g)(1));
"(6) the term 'National Incident Management System' means a system to enable effective, efficient, and collaborative incident management;
"(7) the term 'National Response Plan' means the National Response Plan or any

successor plan prepared under section 502(a)(6);

"(8) the term 'Regional Administrator' means a Regional Administrator appointed under section 507;

"(9) the term 'Regional Office' means a Regional Office established under section 507;

"(10) the term 'surge capacity' means the ability to rapidly and substantially increase the provision of search and rescue capabilities, food, water, medicine, shelter and housing, medical care, evacuation capacity, staffing (including disaster assistance employees), and other resources necessary to save lives and protect property during a catastrophic incident; and

"(11) the term 'tribal government' means the government of any entity described in section 2(10)(B).";

<< 6 USCA § 313 >>

(11) by inserting after section 502, as redesignated and transferred by paragraph (9) of this section, the following:

"SEC. 503. FEDERAL EMERGENCY MANAGEMENT AGENCY.

"(a) IN GENERAL.--There is in the Department the Federal Emergency Management Agency, headed by an Administrator.

"(b) MISSION.--

"(1) PRIMARY MISSION.--The primary mission of the Agency is to reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation.

"(2) SPECIFIC ACTIVITIES.--In support of the primary mission of the Agency, the Administrator shall--

"(A) lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters, including catastrophic incidents;

"(B) partner with State, local, and tribal governments and emergency response providers, with other Federal *1397 agencies, with the private sector, and with nongovernmental organizations to build a national system of emergency management that can effectively and efficiently utilize the full measure of the Nation's resources to respond to natural disasters, acts of terrorism, and other man-made disasters, including catastrophic incidents;

"(C) develop a Federal response capability that, when necessary and appropriate, can act effectively and rapidly to deliver assistance essential to saving lives or protecting or preserving property or public health and safety in a natural disaster, act of terrorism, or other man-made disaster;

"(D) integrate the Agency's emergency preparedness, protection, response, recovery, and mitigation responsibilities to confront effectively the challenges of a natural disaster, act of terrorism, or other man-made disaster;

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1

Volume I
Pages 1 to 34
Exhibits 8 and 9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
JOHN D. CERQUEIRA,               :
            Plaintiff,           :
                                 :
        vs.                      :   Civil Action
                                 :   No. 05-11652-WGY
AMERICAN AIRLINES, INC.,         :
            Defendant.           :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF AMY MILENKOVIC, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 4:59 p.m.

PRESENT:

    Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
        280 Summer Street, Boston, MA  02210,
        for the Plaintiff.

    Fitzhugh, Parker & Alvaro LLP
        (By Amy Cashore Mariani, Esq.)
        155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.


                *  *  *  *  *

20

1    don't remember how he looks.

2        Q.    So you recall that he was with one

3    gentleman, not two gentlemen?

4        A.    Correct.

5        Q.    Did you personally observe any other

6    unusual or suspicious behavior that we haven't

7    talked about yet?

8            MS. MARIANI:  Objection.  You may answer.

9        A.    No, I don't remember.

10       Q.    Did you personally observe any unusual or

11   suspicious behavior on the part of anyone other than

12   the man with the ponytail?

13           MS. MARIANI:  Objection.  You may answer.

14       A.    No.

15       Q.    You mentioned earlier that when you

16   witnessed the behavior that you thought was

17   suspicious and made you uncomfortable, it was based

18   on training you had had.  Can you elaborate on that,

19   what kind of training you've had to identify

20   suspicious behavior?

21           MS. MARIANI:  I'm going to object.  And I'm

22   going to instruct the witness to answer only in

23   general terms and not to provide any specifics that

24   may implicate Sensitive Security Information.  She

21

1   may answer with respect to generalities.

2        A.    We are trained that we must constantly keep

3   an eye open to anything that seems unusual behavior.

4   And one example would be going to the lavatory, but

5   going constantly, like getting up and going every

6   few minutes.   Obviously you ask if they're ill or

7   something like that.   But we just -- there are

8   certain things that we are trained to look for.   And

9   generally it's odd behavior.   I don't know what

10  other things to say.

11       Since September 11th, it's the one thing

12  that they stress to us, especially every year.   We

13  have recurrent training.   We get memos constantly

14  about, you know, keeping our eyes and ears open to a

15  lot of things.

16       Q.    Are there any other particular examples in

17  addition to, you know, someone using the lavatory

18  every few minutes that you can think of that would

19  be considered unusual or suspicious behavior?

20       MS. MARIANI:   I'm going to instruct the

21  witness not to answer on the basis that that

22  component of the training constitutes Sensitive

23  Security Information and is part of materials that

24  the TSA may consider to be Sensitive Security

28

1      Q.    And other than the testimony that you've

2   already given regarding your training, do you have

3   anything to add to your previous testimony regarding

4   how you identify suspicious behavior?

5          MS. MARIANI:  And I'm going to repeat my

6   objection from earlier.  The witness may include any

7   additional general information, but should not

8   provide any specifics that would implicate the

9   Sensitive Security Information Act.

10      A.    No, other than going into specifics.

11      Q.    Does American have protocols for what you

12   should do if you think a passenger is suspicious?

13          MS. MARIANI:  Objection.  You may answer.

14      A.    Not that I'm aware of specifics.  It's very

15   case-by-case.  Each incident is always different.

16   Actually, I can say specifically there are certain

17   rules as far as intoxicated passengers.  So, you

18   know, there are definite rules with removal towards

19   those type of things or hitting me or another flight

20   attendant, crew member or passenger, that type of

21   thing.

22      Q.    Are there protocols with respect to when

23   you think someone is engaging in suspicious

24   behavior, like we've been talking about today?

29

1          MS. MARIANI:  Objection.  You may answer.

2     A.    Like I said, it's each -- each incident is

3     very different, so there aren't any exact specifics

4     on that.

5          Q.    Has American ever instructed you on whether

6     it is okay to consider a passenger's ethnicity in

7     determining whether they may pose some sort of

8     threat?

9          MS. MARIANI:  Objection.  You may answer.

10    A.    No.

11         Q.    Have you ever been involved in any other

12    incident in which a passenger was removed from a

13    flight, denied boarding or refused service?

14    A.    For an unruly passenger, I've had -- as far

15    as he was drunk, I've had an incident here and there

16    for that type of incidents.

17         Q.    Do you recall what those incidents were?

18    A.    No.  Just in general, probably drunk.

19         Q.    Have you been involved in any other

20    incident other than when a passenger is drunk?

21    A.    No.

22         Q.    Have you ever been the subject of a

23    discrimination complaint by an American Airlines

24    customer?

30

1     A.    No.

2     Q.    And by that, I'm not limiting that to

3   formal litigation, but any kind of complaint

4   whatsoever.

5     A.    No, not that I'm aware of.

6     Q.    Is it possible that you were the subject of

7   a discrimination complaint that American would not

8   have brought to your attention?

9     A.    No.  They would have brought it to my

10  attention.

11    Q.    Has American provided you with any training

12  instruction or written materials concerning whether

13  a passenger's race, color, national origin,

14  ethnicity or ancestry may be considered in

15  determining whether a passenger should be removed

16  from a flight, denied boarding or refused service?

17          MS. MARIANI:  Objection.  You may answer.

18    A.    No.  They do the opposite.  We're not

19  supposed to look at those things at all.

20    Q.    And is that written in any training

21  materials or instructions that you've received from

22  American?

23    A.    No, not that I remember.

24    Q.    Has American ever taken any disciplinary

31

1    action against you for considering a passenger's

2    race, color, national origin, ethnicity or ancestry

3    in determining whether they should be removed from a

4    flight, denied boarding or refused service?

5            MS. MARIANI:   Objection.   You may answer.

6        A.   No.

7        Q.   Do you know any other American employee who

8    has been disciplined for that behavior?

9            MS. MARIANI:   Objection.   You may answer.

10        A.   No, I don't.

11        Q.   You testified earlier that you attend a

12    training session once a year?

13        A.   Correct.

14        Q.   What is -- strike that.

15            Do you receive training regarding

16    identifying suspicious behavior at that training

17    session?

18        A.   Yes.

19        Q.   Are any written materials given to you at

20    that training session?

21        A.   No, because it's all verbal and slides.

22    And if it is, we don't take anything with us,

23    because it is a security-sensitive subject.

24        Q.   Do you have a flight training manual?

32

1       A.    Yes.

2       Q.    Does that contain instruction on

3  identifying suspicious behavior?

4       A.    No.

5       Q.    Does that manual provide instruction on

6  when a passenger may be removed from the airplane?

7       A.    I believe it does.  It has about the

8  intoxicated passenger, also about abuse, as far as

9  hitting us and that type of thing.  But unless I

10  look at my manual, I don't know -- I can't recall.

11            MS. ABATE RECHT:  I have no further

12  questions.

13            MS. MARIANI:  I have no questions.

14                 (Whereupon, the deposition was

15                  concluded at 5:37 p.m.)

16

17

18

19

20

21

22

23

24

1

Volume I
Pages 1 to 49
Exhibits 5 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
JOHN D. CERQUEIRA,                  :
          Plaintiff,                :
                                    :
     vs.                            :   Civil Action
                                    :   No. 05-11652-WGY
AMERICAN AIRLINES, INC.,            :
          Defendant.                :
                                    :
- - - - - - - - - - - - - - - - - -x

          DEPOSITION OF LOIS SARGENT, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 1:00 p.m.

PRESENT:

     Birnbaum & Godkin, LLP
          (By Erica Abate Recht, Esq.)
          280 Summer Street, Boston, MA  02210,
          for the Plaintiff.

     Fitzhugh, Parker & Alvaro LLP
          (By Amy Cashore Mariani, Esq.)
          155 Federal Street, Suite 1700, Boston, MA
          02110-1727, for the Defendant.

                    *  *  *  *  *

1     Q.   Other than checking the lavatory, did First

2  Officer Ball do anything else with respect to this

3  incident that you know of?

4         MS. MARIANI:  Objection.  You may answer.

5     A.   I don't know.

6     Q.   Do you know who Ynes Flores is?

7     A.   No.

8     Q.   Do you know a Doug Wood?

9     A.   No.

10    Q.   Do you know a Rhonda Cobbs?

11    A.   No.

12    Q.   How about Craig Marquis?

13    A.   No.

14    Q.   Does American Airlines have a policy

15  regarding the removal of passengers from airplanes?

16         MS. MARIANI:  Objection.  You may answer.

17    A.   That would be the captain's decision.

18    Q.   Is that written anywhere?

19         MS. MARIANI:  Objection.  You may answer.

20    A.   The captain is in charge of the airplane.

21  It's written in that respect, yes.

22    Q.   Where is that written?

23    A.   In our manual.

24    Q.   Do you have a training manual that says all

40

1   of these things?

2       A.    Oh, yeah.

3       Q.    What is the manual called?

4       A.    It's our flight training manual.

5       Q.    Flight training manual?

6       A.    Uh-hum.

7             MS. MARIANI:  At this point I need to

8   instruct the witness not to disclose the contents of

9   that manual, because it is sensitive security

10  information, which we have not yet been cleared by

11  the Transportation Safety Administration to

12  disclose.

13      Q.    Were you required to sign a confidentiality

14  or nondisclosure agreement before being given the

15  flight training manual that you're referring to?

16            MS. MARIANI:  Objection.  You may answer.

17      A.    I don't believe so.

18      Q.    Have you ever discussed any of the contents

19  of the flight training manual with anyone other than

20  fellow American Airlines employees?

21      A.    No.

22      Q.    Have you been instructed not to?

23      A.    Yes.

24      Q.    Have you received any training from

41

1    American Airlines on identifying suspicious

2    behavior?

3              MS. MARIANI:  Objection.  You may answer.

4        A.    We have training in security procedures,

5    yes.

6        Q.    Does American Airlines have protocols for

7    what you should do if you think a passenger is

8    behaving in a suspicious manner?

9              MS. MARIANI:  Objection.  You may answer.

10       A.    Yes.

11       Q.    What are those protocols?

12       A.    Well, that's part of our security manual.

13       Q.    Can you tell me generally what the

14   protocols are.

15             MS. MARIANI:  You may answer in very broad

16   terms.

17       A.    Well, very broadly, we would convey our

18   observations and our concerns to the captain.  And

19   that would be left to his discretion.

20       Q.    Does the manual identify any specific

21   behaviors that it considers suspicious?

22       A.    To some extent.  It can't identify every

23   behavior.

24       Q.    Can you elaborate on what some of the

42

1  behaviors are that it identifies?

2       A.   No.

3       Q.   And are you saying "no" because that would

4  be sensitive security information?

5       A.   Yes.

6       Q.   Has American ever instructed you on whether

7  it's permissible to consider a passenger's ethnicity

8  in determining whether the passenger may pose some

9  sort of flight risk?

10          MS. MARIANI:  Objection.  You may answer.

11      A.   We are not allowed to discriminate.  Our

12  passengers are all different types, kinds.

13      Q.   Have you ever been involved in any other

14  incident in which a passenger was removed from a

15  flight, denied boarding or refused service?

16      A.   Not on American Airlines.

17      Q.   Were you involved in such an incident on

18  your previous airline?

19      A.   Yes.

20      Q.   Can you describe that incident for me.

21      A.   It was not so much a security risk.  This

22  was before 9/11.  And we were flying the DC10, which

23  has three different cabins.  And a family came

24  onboard, and they had two children.  And they were

44

1      A.    No, not that I'm aware of.  We have a
2  policy of nondiscrimination.
3      Q.    Is that a written policy?
4      A.    I believe it is.  But if I'm not mistaken,
5  I believe that that pertains to our relationship
6  with our fellow employees.
7      Q.    Does that pertain to passengers?
8      A.    I would have to -- I would assume it would
9  apply in all circumstances, but I really cannot say.
10     Q.    Has American ever provided you with any
11 training instruction or written materials concerning
12 whether a passenger's race, ethnicity, color,
13 national origin or ancestry may be considered in
14 determining whether that passenger may be removed
15 from the flight, denied boarding or refused service?
16        MS. MARIANI:  Objection.  You may answer.
17     A.    No.  On the contrary, we've had training to
18 the effect that this should not color our decisions.
19     Q.    How often do you have those trainings?
20        MS. MARIANI:  Objection.  You may answer.
21     A.    We have recurrent training once a year.
22 And during the recurrent training, we have a section
23 on security.  And we have lectures and also films of
24 different possible incidents.  And then in addition

1

Volume I
Pages 1 to 63
Exhibits 1 to 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
JOHN D. CERQUEIRA,                  :
          Plaintiff,                :
                                    :
     vs.                            :    Civil Action
                                    :    No. 05-11652-WGY
AMERICAN AIRLINES, INC.,            :
          Defendant.                :
                                    :
- - - - - - - - - - - - - - - - - -x

          DEPOSITION OF SALLY WALLING, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Tuesday, March 28,
2006, commencing at 10:15 a.m.

PRESENT:

     Birnbaum & Godkin, LLP
          (By Erica Abate Recht, Esq.)
          280 Summer Street, Boston, MA  02210,
          for the Plaintiff.

     Fitzhugh, Parker & Alvaro LLP
          (By Amy Cashore Mariani, Esq.)
          155 Federal Street, Suite 1700, Boston, MA
          02110-1727, for the Defendant.


                    *  *  *  *  *

47

1        A.    I'm sure Captain Ehlers called his chief

2    pilot.

3        Q.    And Captain Wood would have been based in

4    Boston?

5        A.    Yes.

6        Q.    What was the involvement of Rhonda Cobbs in

7    the incident?

8        A.    I don't know her.

9        Q.    Do you know Craig Marquis?

10       A.    No.

11       Q.    Do you know whether American has a

12   procedure for removing passengers from planes based

13   on suspicions of safety concerns?

14             MS. MARIANI:   Objection.   You may answer.

15       A.    No, I don't know their specific procedures.

16       Q.    Do you know whether American has a

17   procedure or a protocol to follow?

18       A.    I don't know.

19             MS. MARIANI:   Objection.   You may answer.

20       Q.    Do you know whether American has a policy

21   regarding the removal of passengers?

22             MS. MARIANI:   Objection.   You may answer.

23       A.    I don't know what their policy is.

24       Q.    Have you received any training on

48

1    identifying suspicious behavior?

2        MS. MARIANI:  Objection.  You may answer.

3    A.    Only in training.  And I wouldn't limit it

4    to suspicious behavior.

5    Q.    What training are you referring to?

6    A.    EPT training in Dallas that you have to go

7    for two days.

8    Q.    What is that?

9    A.    It's emergency training specifically for

10   American Airlines.  Each company has their own

11   training and conducts it in their own ways.  And

12   then a part of it is the FAA training.  You have to

13   have so many hours, and you have to do the drills

14   and, you know, things like that every year.

15   Q.    What other issues are discussed besides

16   emergency preparedness at this training?

17   A.    Incidences, security incidences and safety

18   instances.

19   Q.    Can you elaborate on the security

20   incidences that are discussed?

21   A.    No.

22   Q.    Why not?

23   A.    I can't remember specifically what it

24   entails.  Every year it's different.

50

1  quiz at the end of the training?

2      A.    Yes.

3      Q.    Are you graded on that test or quiz?

4      A.    You have to pass.  It's a pass/fail thing.

5      Q.    Did you pass?

6      A.    Yes.

7      Q.    When was the last time you attended that

8  training?

9      A.    Last April.

10     Q.    And I'll just ask again; you don't remember

11  anything from the safety training or security

12  incidences that they discussed?

13          MS. MARIANI:  Objection.  You may answer.

14     A.    No.

15     Q.    Does American have protocols for what you

16  should do if you think a passenger is suspicious?

17          MS. MARIANI:  Objection.  You may answer,

18  without giving specific details of the protocol,

19  based on SSI concerns.

20     A.    You report to the captain.

21     Q.    Did you have to sign a confidentiality or

22  nondisclosure agreement before being given access to

23  any of American's policies or training materials?

24          MS. MARIANI:  Objection.  You may answer.

58

1   incident?

2       A.   No.

3       Q.   None of the other flight attendants?

4       A.   No.  I never saw them again.  I think I've

5   flown maybe once with Lois at some point, but I

6   never saw them again.  I never talked to them again.

7            MS. ABATE RECHT:  Okay.  I have no further

8   questions.

9            MS. MARIANI:  I just have a couple of

10  things to clarify some of your earlier responses.

11                    CROSS EXAMINATION

12      BY MS. MARIANI:

13      Q.   You testified that you don't recall

14  receiving specific training with regard to removal

15  of passengers from flights based on their ethnicity;

16  is that correct?

17      A.   Yes.

18      Q.   Do you recall any training at American

19  Airlines about not discriminating against

20  passengers?

21      A.   Well, we're always told that.  I mean, it's

22  kind of a -- it's just kind of a known thing.

23      Q.   And when you say, "It's kind of a known

24  thing," why is it a known thing?

59

1      A.    Because that's not enough to -- you know,

2   American would not -- unless you had a combination

3   of factors going on, American would not back you up

4   in that way.

5           It is a clear policy at American that we

6   are not to generalize on someone's appearances or,

7   you know, make any type of a -- I mean, it would not

8   be -- it would not hold up.  You couldn't go to

9   American and say that.

10     Q.    You also testified that you receive emails

11  from Jane Allen.  How frequently do you receive

12  those emails?

13     A.    Well, it's not specifically Jane Allen.

14  Jane Allen is the head of flight.  So she will

15  generate messages of concern that a flight attendant

16  might be concerned with, and it comes out of her

17  office.

18     Q.    How often do you receive emails from her

19  office?

20     A.    Once or twice a year maybe.

21     Q.    You testified that you don't recall any of

22  those messages having to do with denial of boarding

23  or refusal to provide service to passengers based on

24  their ethnicity; is that correct?

60

1    A.    Yes.

2    Q.    Is it fair to say that as you sit here

3    today, you don't recall each and every one of those

4    communications you've received from her office?

5    A.    Yes.

6         MS. MARIANI:  I have nothing further.

7         MS. ABATE RECHT:  I just want to follow up

8    on something.

9              REDIRECT EXAMINATION

10   BY MS. ABATE RECHT:

11   Q.    You just testified in response to your

12   counsel's question that ethnicity wouldn't be

13   considered; that you have to have a combination of

14   factors to deny someone boarding.  Could ethnicity

15   be one of those factors?

16        MS. MARIANI:  Objection.  You may answer.

17   A.    No.

18   Q.    What are the combination of factors you

19   were referring to?

20   A.    Suspicious behavior, a security or an

21   instance -- for instance, the lavatory thing that I

22   felt was unwarranted.  It would have to be something

23   like that.  It would not be because of their looks.

24   It would have to generate other things.

1

Volume I
Pages 1 to 93
Exhibits 15 to 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
JOHN D. CERQUEIRA,                 :
          Plaintiff,               :
                                   :
     vs.                           :   Civil Action
                                   :   No. 05-11652-WGY
AMERICAN AIRLINES, INC.,           :
          Defendant.               :
                                   :
- - - - - - - - - - - - - - - - - -x

          DEPOSITION OF JOHN M. EHLERS, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
26, 2006, commencing at 10:00 a.m.

PRESENT:

     Birnbaum & Godkin, LLP
          (By Erica Abate Recht, Esq.)
          280 Summer Street, Boston, MA  02210,
          for the Plaintiff.

     Fitzhugh, Parker & Alvaro LLP
          (By Michael A. Fitzhugh, Esq.)
          155 Federal Street, Suite 1700, Boston, MA
          02110-1727, for the Defendant.

                    *  *  *  *  *

73

1     Ehlers' decision..."  Do you see that?

2         A.    Uh-hum.

3         Q.    Is that an incorrect statement?

4         A.    I would say that's incorrect.

5         Q.    Okay.  Does American have a policy

6     regarding the removal of passengers from flights?

7         A.    Most definitely.

8         Q.    What is that policy?

9         A.    Essentially it's security and behavior

10    based in terms of a threat level.  So no matter what

11    someone looks like, what their religion is, sexual

12    orientation, et cetera, et cetera, we don't remove

13    anyone unless we have a valid security threat with

14    them.

15        Q.    Do you receive training regarding

16    identifying suspicious behavior?

17        A.    Yes, we do.  And that training has

18    obviously increased post-9/11.

19        Q.    What kind of training do you receive?

20        A.    I don't think we should talk about the

21    training about identifying threats.

22        Q.    Are you objecting because you think that it

23    might be sensitive security information?

24        A.    Yes.

74

1     Q.   How often do you receive the training?

2     A.   We go to recurrent training as captains

3 every nine months.

4     Q.   At that training do you receive written

5 materials?

6     A.   At the training it's mostly audio-visual

7 and Web-based training.  And then any written

8 materials are destroyed.

9     Q.   When you say "audio-visual," are you

10 referring to, for example, PowerPoint presentations?

11     A.   Yes, in-classroom type presentations.

12     Q.   Do you have anything written regarding

13 identifying suspicious behavior?

14     A.   I do.

15     Q.   What is that?

16     A.   It's something that's SSI's -- it's an area

17 in our manual that we can't talk about.

18     Q.   Can you just identify where that

19 information is located.

20     A.   Some of that information would be located

21 in what's called "Part 1" of my manual.

22     Q.   And by "my manual," what is the name of the

23 document you're referring to?

24     A.   It's just called "Part 1," and it's one of

75

1    the sections in this manual talking about security

2    threats.

3         Q.    What is the manual called?  What is the

4    full title of the manual?

5         A.    Part 1.

6         Q.    Part 1 manual, okay.

7               Does American have protocols for what you

8    should do if you think a passenger is engaging in

9    suspicious behavior?

10        A.    Absolutely.

11        Q.    What are those protocols?

12        A.    I can't talk about it.

13              MR. FITZHUGH:  That's SSI.

14        Q.    I might ask these questions, and I

15   understand that you'll be objecting on the basis of

16   SSI, but I'm going to continue to ask them anyway

17   for the record.

18        A.    Okay.

19        Q.    Has American ever instructed you on whether

20   it's permissible to consider a passenger's ethnicity

21   or national origin in determining whether that

22   passenger may pose some sort of security threat?

23        A.    Absolutely.

24        Q.    What is that training or instruction?

76

1      A.    The training and instruction is emphatic

2    that it's not to be used.

3      Q.    Have you ever been involved in any other

4    incident in which a passenger has been removed from

5    a flight?

6      A.    Yes.

7      Q.    Can you describe that incident for me.

8      A.    Another incident that comes to mind was

9    October of '02, similar in that I had a call from

10   one of the flight attendants in the back of the

11   airplane that they were concerned about a

12   passenger's behavior.  The first officer and I

13   started discussing what we might do about it.  And

14   we received another call from the flight attendant

15   saying that this passenger, male passenger, had

16   taken their belt off and had coiled it up in one of

17   their hands, and that it looked like this passenger

18   was watching the flight attendant duties very

19   carefully, abnormally so.

20        I finally made the decision to involve the

21   ground security coordinator.  We got SOC and we got

22   the State Police out there.  The passenger was taken

23   off the airplane, and questioning started in the jet

24   bridge.  We had a concern among the crew initially

Page 1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS


JOHN D. CERQUEIRA,              )

      Plaintiff                 )

V.                              )    CIVIL ACTION NO.
                                     05-11652-WGY
AMERICAN AIRLINES, INC.,        )

      Defendant                 )




          ***********************************

                    ORAL DEPOSITION OF
                      CRAIG MARQUIS
                      JUNE 15, 2006

          ***********************************




      ORAL DEPOSITION OF CRAIG MARQUIS, produced as a

witness at the instance of the Plaintiff, and duly sworn,

was taken in the above-styled and numbered cause on the

15th of June, 2006, from 2:30 p.m. to 3:37 p.m., before

Thu Bui, CSR in and for the State of Texas, reported by

machine shorthand, at the offices of American Airlines,

4333 Amon Carter Boulevard, Fort Worth, Texas, pursuant

to the Fed.R.Civ.P.30.

43550ef0-afba-45e7-b0a8-6a4ccc9607b6

Craig Marquis                                                June 15, 2006

---

Page 26

1  within the purview of 49 CFR 1520.5.
2         If you can answer the question without
3  disclosing such information, you may try to.
4     A  It varies.
5     Q  Where is it recorded to let, you know, for
6  example, ticket counter personnel know that somebody
7  should not be allowed to travel on American Airlines?
8         MR. FITZHUGH:  Is it for security issues
9  or --
10        MR. KIRKPATRICK:  Yes, yes.
11        MR. FITZHUGH:  Okay.  I'm going to instruct
12  the witness not to answer the question for the same
13  reasons as stated in my earlier instruction.
14    Q  If a passenger is removed or denied boarding, so
15  that further investigation can be done to determine if
16  there is security risk and nothing threatening or unusual
17  is found, are they ordinarily rebooked on a later
18  American Airlines flight?
19    A  Hypothetically?
20    Q  Yes.
21    A  Removed by who?
22    Q  For example, if the flight crew thought somebody
23  was behaving suspiciously, they have that person removed
24  and some type of law enforcement agent investigated that
25  person and found that there was an innocent explanation

---

Page 27

1  for whatever was perceived as -- as suspicious, and said
2  this person does not pose a risk for the security of the
3  flight, would that passenger ordinarily be rebooked on a
4  later flight?
5     A  Each event is decided on its own merit and
6  conditions and conduct.  You're being very general.
7     Q  I'm just wondering if there's a general rule.
8     A  There is no general rule or guideline.  You take
9  the combination of all the information for that specific
10  situation, you take your training, you take your
11  experience, and you make the decision.
12        Very generally, we're in the passenger
13  service business that carries passengers, we don't make
14  money if we leave everyone standing at the gate.
15    Q  Is the decision whether a passenger should be
16  rebooked made by the SOC manager on duty?
17    A  Yes.
18    Q  Is there anybody else who has the authority to
19  make the decision that somebody should not be rebooked?
20    A  No.
21    Q  When you make a decision that a passenger should
22  not be rebooked, do you record the reason anywhere?
23    A  We have a recording -- do you see the recordings
24  in that -- the CCRO enters, that's the recording data
25  that we use.

---

Page 28

1     Q  So, generally, the manager on duty in SOC would
2  verbally tell the CCRO the decision as to whether to
3  rebook or not, the CCRO would then input that information
4  into the computer system; is that right?
5     A  That's correct.
6     Q  When there is a security incident, such as the
7  one that happened in this case, do you, as the SOC
8  manager on duty, communicate directly with the crew
9  members, for example, the pilot ordinarily?  I know you
10  don't know remember the specifics of this incident, but,
11  ordinarily, would you get on the phone with the pilot?
12    A  In general, there are procedures in place where
13  the pilot contacts SOC, yes.
14    Q  And is it the manager on duty the point of
15  contact for the pilot?
16    A  Yes.
17    Q  Other than communicating with the pilot, are
18  there other individuals that the manager on duty and SOC
19  would ordinarily be in communication with?
20        MR. FITZHUGH:  Under what circumstances?
21    Q  Under these circumstances, where a passenger has
22  been identified as potentially suspicious and there's
23  been a decision to remove the passenger, and the next
24  thing that happened is somebody contacts SOC manager on
25  duty.  Under those circumstances, do you ordinarily have

---

Page 29

1  people that you communicate with?
2     A  Well, there is no ordinary circumstance.
3     Q  Okay.
4     A  Every circumstance is different.  It would be
5  very easy to check boxes and make every circumstance
6  ordinary.  No event is ordinary.  I can tell you that I
7  communicate with people at the station that are passenger
8  service people, ground security people, law enforcement
9  people, crew members, yes.
10    Q  Okay.  Just so we're clear, with respect to this
11  incident, you don't recall the specifics of anybody you
12  may have communicated with?
13    A  That is correct.
14    Q  Has American Airlines provided you with training
15  on carrying out your duties in a nondiscriminatory
16  manner?
17    A  Yes.  We have a very clear and strong
18  anti-discrimination policy, and I think it's a law.
19    Q  Has the -- the substance of that training
20  changed since December 28, 2003?
21    A  No.
22    Q  Does American Airlines have set procedures and
23  protocols for how to respond if a member of a flight crew
24  thinks a passenger is suspicious?  And I'm not asking you
25  for the details, but does American Airlines have such a

---

Thu Bui, CSR    Collins Realtime Reporting    214-220-2449

43550ef0-afba-45e7-b0a8-6a4ccc9607b6

Craig Marquis                                                June 15, 2006

Page 30

1    procedure or protocol in place?
2        A    No.
3        Q    Everything is handled on case-by-case basis?
4        A    That's correct.
5        Q    So the procedure is to contact SOC manager on
6    duty, and then from there decisions are made about where
7    it goes from there; is that right?
8        A    Not always.  I mean, there's other people that
9    make security decisions; it depends on the severity.  I
10   mean, as an example, they can find a bullet on board an
11   aircraft on the ground.  They're going to take the bullet
12   off on their own, then they'll contact me.  I haven't
13   made that decision, but they have -- they're also
14   trained.  They, you know, everyone follows the exact same
15   protocol, I mean, our training's the same, okay?
16       Q    And so the individuals involved in making those
17   decisions could be the captain, could be ground security
18   coordinator, could be any number of people?
19       A    As far as what decision?
20       Q    A decision whether a passenger should be removed
21   and further screened because of some sort of --
22       A    No.  You were talking in general before.  A
23   Captain or a GSE cannot remove a passenger.  They cannot
24   do that --
25       Q    Okay.

Page 31

1        A    -- not without first contacting SOC.
2        Q    I see.  And is the decision made by SOC manager
3    on duty?
4        A    That's correct.
5        Q    Have you ever been contacted after that decision
6    has already been made and a passenger has been removed?
7        A    Contacted by?
8        Q    Like the first time SOC hears about it, is after
9    the decision has already been made and the passenger's
10   been removed from the aircraft?
11       A    It may have happened once.
12       Q    Okay.  But it would be an unusual circumstance?
13       A    Very unusual.
14       Q    The ground security coordinator does not have
15   the authority to decide that a passenger should be
16   removed for further questioning?
17       A    That's correct.
18       Q    And the same with respect to the captain?
19       A    That's correct.
20       Q    Does the captain have the authority to say that
21   they don't want a particular passenger to fly on their
22   airplane without consulting SOC?
23       A    No.  The captain is the security coordinator
24   onboard that aircraft.  He is the security agent onboard
25   that aircraft.  As I'm the operational security manager,

Page 32

1    he's the in-flight coordinat -- you know, he's the
2    in-flight guy, and then you have the ground guy.
3    Everyone has the same training; everyone follows the same
4    rules, as far as contacting goes.
5        Q    Okay.  But it would be SOC -- if procedures were
6    followed correctly, it would be the decision of the SOC
7    manager on duty to remove a passenger for further
8    questioning?
9        A    That's correct.  And then that would be
10   irregular if those procedures are not followed.
11       Q    Okay.  And once that passenger was removed,
12   let's say for further questioning by law enforcement
13   officers on the ground, it would be the SOC manager on
14   duty who would decide whether those passengers, once
15   released by law enforcement, were either denied rebooking
16   or were put on the next available flight?
17       A    In general, I wouldn't know the reason that the
18   law enforcement officer would take a passenger off an
19   aircraft.
20       Q    Okay.  Let me clarify a little bit.  If the
21   decision was made, passenger should be removed --
22       A    By?
23       Q    Let's say the SOC manager on duty --
24       A    Okay.
25       Q    -- decides, you know, crew members have reported

Page 33

1    some suspicious behavior, they've observed, something
2    that raises some questions, let's have that passenger
3    removed and let law enforcement investigate.  Let's do
4    the background check, let's check the watch list, et
5    cetera, ask them some questions about, you know, what
6    they're doing and where they're going.  Once law
7    enforcement is done, and let's say they become convinced
8    that the behavior was innocent and there's no threat to
9    safety, at that point, does the SOC manager on duty make
10   the decision about whether that passenger should be put
11   on the next available flight, or denied rebooking and
12   given a refund?
13       A    That's walking on the border of SSI, so I cannot
14   answer it.
15       Q    But certainly, the SOC manager on duty is one
16   person that has the authority to make that decision,
17   correct?
18       A    That's correct.
19       Q    And the pilot does not have that authority?
20       A    That's correct.
21       Q    What about anybody in customer service, would
22   they have the authority to decide whether somebody should
23   be booked -- rebooked or not?
24       A    No.
25       Q    Mr. Marquis, I'm going to hand you what's been

9 (Pages 30 to 33)

43550ef0-afba-45e7-b0a8-6a4ccc9607b6

1        UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS

3  JOHN D. CERQUEIRA,              )

4        Plaintiff               )

5  V.                            )    CIVIL ACTION NO.
                                       05-11652-WGY
6  AMERICAN AIRLINES, INC.,       )

7        Defendant               )

8

9

10

11        *********************************

12            ORAL DEPOSITION OF
                 RHONDA COBBS
13              JUNE 15, 2006

14        *********************************

15              **ORIGINAL**

16

17

18        ORAL DEPOSITION OF RHONDA COBBS, produced as a

19  witness at the instance of the Plaintiff, and duly sworn,

20  was taken in the above-styled and numbered cause on the

21  15th of June, 2006, from 12:24 p.m. to 2:15 p.m., before

22  Thu Bui, CSR in and for the State of Texas, reported by

23  machine shorthand, at the offices of American Airlines,

24  4333 Amon Carter Boulevard, Fort Worth, Texas, pursuant

25  to the Fed.R.Civ.P.30.

Rhonda Cobbs - 06/15/06

```
 1        A    My -- my part would be taking it to the center

 2   manager.

 3        Q    Which in this case would be Craig Marquis?

 4        A    Correct.

13:47 5   Q    And is your role in this type of situation

 6   simply to compile information provided by others, or do

 7   you go out and do any kind of investigation to -- to

 8   compile information yourself?

 9        A    In a circumstance such as this, it would be -- I

13:48 10  would only compile the information.

11        Q    And from what sources would you generally be

12   receiving that information?

13        A    More than likely the center manager.

14        Q    And the center manager would be the person in

13:48 15  direct communication with folks in Boston in an incident

16   such as this?

17        A    Yes.

18        Q    But the CCRO would simply compile the

19   information that the SOC manager was passing along; is

13:48 20  that correct?

21        A    Correct.

22        Q    Do you know if it is permissible under your work

23   rules to consider a passenger's ethnicity in determining

24   whether they might be a security risk?

13:48 25            MR. FITZHUGH:  Objection, form.
```

1            You can still answer.

2      A    Is -- is ethnicity --

3      Q    Ethnicity.

4      A    -- a factor?

13:49  5      Q    Yes.  For example, where somebody was born or

6  what their nationality is --

7      A    As to whether or not they'll be allowed to

8  travel?

9      Q    Yes.

13:49 10      A    No, absolutely not.

11      Q    Have you received civil rights training from

12  American Airlines?

13      A    No, I haven't.

14            MR. FITZHUGH:  Can you define civil rights

13:49 15  training?

16            MR. KIRKPATRICK:  Yes.  I wasn't clear.

17      Q    By civil rights training, I mean instructions in

18  the importance of not considering things such as race,

19  national origin, religion, those kinds of characteristics

13:49 20  in making determinations about whether somebody poses a

21  risk.

22      A    So you're -- you're saying are we trained as

23  American Airlines employees to --

24      Q    Right.  Does American Airlines provide you

13:50 25  training to explain that those kinds of characteristics

1    are not to be considered in making determinations about

2    whether somebody is --

3        A    Absolutely.

4        Q    -- is a security concern?

13:50  5    A    Absolutely.

6        Q    How often do you have that sort of training?

7        A    We just -- actually, since from the day that

8    you're hired, we're trained to be nondiscr --

9    nondiscriminatory and respect the values of others, their

13:50 10   cultures, their religious beliefs; it's just something

11   that -- that's preached to us on a daily basis ever since

12   I worked for the company.

13       Q    Has that training changed at all since December

14   28th of 2003?

13:51 15   A    There was an online computer training course

16   that we all were required to take last year; that's the

17   first time that I've seen that.

18       Q    Has American Airlines ever passed along to you

19   any guidelines or instructions from the federal

13:51 20   government, for example, the Department of

21   Transportation, regarding the importance of carrying out

22   your duties in a nondiscriminatory way?

23       A    All right.  Say that again?

24       Q    My question is whether you've been provided by

13:51 25   American Airlines any materials that came from the

*Rhonda Cobbs - 06/15/06*

1  government, from the Department of Transportation or the

2  FAA, for example, regarding the importance of airline

3  personnel carrying out their duties in a

4  nondiscriminatory way?

13:51  5      A    I'm sure we have.

6      Q    You don't recall specifically ever receiving

7  that?

8      A    (Moves head side to side.)

9              MR. FITZHUGH:  You have to say yes or no --

13:52  10     A    No.

11             MR. FITZHUGH:  -- or verbally.

12     Q    Does American Airlines have a procedure or

13  protocol to follow in how to respond if a member of a

14  flight crew thinks a passenger is suspicious, as far as

13:52  15  you know?

16             THE WITNESS:  Is -- is that not security

17  sensitive information?

18             MR. FITZHUGH:  The question is whether

19  there is a procedure.

13:52  20             THE WITNESS:  Okay.

21     A    There is a -- there is a procedure.

22     Q    And I understand some of the details may be

23  security sensitive information, but, in general, can you

24  describe for me what that protocol is?

13:52  25             MR. FITZHUGH:  No.  I'm going to instruct

Rhonda Cobbs - 06/15/06

1  the witness not to answer, because it would violate the

2  SSI provisions of 49 CFR 1520.5.

3      Q    The procedures that we've been talking around

4  here, do you know if those procedures were followed with

13:53   5  respect to this incident on December 28th of 2003?

6      A    I'm sure they were.

7      Q    And how are you sure that they were?

8      A    How could they not have been?  I mean, that's

9  what we do every day.

13:53  10      Q    And so you're one of the individuals who's

11  involved in following those procedures when an event such

12  as this occurs, at least on the days that you're

13  operating as CCRO; is that right?

14      A    In -- okay.  Are you -- are you saying that

13:53  15  I'm -- you're going to have to say it again.  I'm sorry.

16      Q    I'm sorry.  Yeah, that's not a very good

17  question.  Let me try again.  Without revealing the

18  specifics of the procedures that you go through, when a

19  member of a flight crew thinks a passenger may be

13:54  20  suspicious, are you, in your position, one of the people

21  that follows those procedures when information comes in

22  that a member of a crew thinks a passenger is suspicious?

23      A    With the security issue, I would give it to the

24  center manager.

13:54  25      Q    Okay.  And then the center manager might

Rhonda Cobbs - 06/15/06

1    communicate information back to you that you would then

2    compile; is that correct?

3        A    Correct.

4        Q    But the center manager would make the decision

13:54  5    about how to proceed in terms of gathering further

6    information?

7        A    Correct.

8        Q    Do you have any input into what steps should be

9    taken and what information should be gathered?

13:55  10       A    No.  We're speaking of security issues?

11       Q    Yes, yes.  And has American Airlines trained you

12   conc -- concerning the circumstances under which a

13   passenger may be removed from a flight, denied boarding

14   or refused further service?

13:55  15       A    Denied boarding, yes.

16       Q    What about being denied the ability to rebook a

17   flight later that day, does American Airlines train you

18   on -- on -- under what circumstances it's appropriate to

19   deny re-booking?

13:55  20       A    Yes.

21       Q    And is the particular substance of that training

22   something that you would consider security sensitive

23   information?

24       A    Yes.

13:56  25       Q    I'd like to show you what's been previously

*Rhonda Cobbs - 06/15/06*

1    A    I do.

2    Q    What is that?

3    A    I don't know if I should tell you.

4         MR. FITZHUGH:  Do you need a minute with

14:03  5  me?  Do you want to speak with me?

6         THE WITNESS:  Sure.

7         MR. FITZHUGH:  Give us a second.

8         MR. KIRKPATRICK:  Sure.

9         (Off the record from 2:04 to 2:04 p.m.)

14:04  10   Q    Having conferred with your counsel, are you able

11   to tell me what SECOK means?

12    A    Yes.  It means security is okay.

13    Q    Okay.  Continuing on, it says that if you have

14   any questions regarding a particular passenger's

14:04  15   acceptance, please contact the CCRO.  Is that your

16   understanding of what a pilot should do in such a

17   situation?

18    A    Yes.  And the reason being, any time there is a

19   question of passenger acceptance, the crew and the

14:05  20   passenger service representatives are told that the CCRO

21   needs to be contacted so reports can be made if needed.

22   If it's a security issue, then it's handed to the -- to

23   the center manager.  Because we do work in such close

24   proximity that's not a difficult thing to do.

14:05  25   Q    Okay.  I understand.  Thank you.  I think I can

1

Volume I
Pages 1 to 48
Exhibits 12 to 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                          :
JOHN D. CERQUEIRA,         :
        Plaintiff,      :
                          :
     vs.               :   Civil Action
                          :   No. 05-11652-WGY
AMERICAN AIRLINES, INC.,  :
        Defendant.      :
                          :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF NICOLE TRAER, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
12, 2006, commencing at 1:37 p.m.

PRESENT:

    Birnbaum & Godkin, LLP
        (By Erica Abate Recht, Esq.)
        280 Summer Street, Boston, MA  02210,
        for the Plaintiff.

    Fitzhugh, Parker & Alvaro LLP
        (By Michael A. Fitzhugh, Esq.)
        155 Federal Street, Suite 1700, Boston, MA
        02110-1727, for the Defendant.

* * * * *

37

1     Q.    Did you have conversations with anyone else

2  concerning this incident?

3     A.    No.

4     Q.    Did you speak with Ms. Cobbs about the

5  incident?

6     A.    No.

7     Q.    Does American have a policy regarding the

8  removal of passengers?

9     A.    In respect to why or how or when?

10    Q.    With respect to whether a passenger should

11  be removed from the plane.

12    A.    I'm not sure on the policy.  Anyone denied

13  travel must go through the systems operations

14  control.

15    Q.    Are you not sure what the policy is or

16  you're not sure whether American has a policy?

17    A.    The policy I am aware of is to contact the

18  systems operation control for any denial of a

19  passenger.  I don't know what their procedures are.

20    Q.    Have you received any training regarding

21  identifying suspicious behavior?

22    A.    Behavior?

23    Q.    Yes.

24    A.    No.

38

1          Q.    Do you know whether American has protocols

2     for what you should do if you think a passenger is

3     acting in a suspicious manner?

4          A.    A suspicious security manner?

5          Q.    Yes.

6          A.    We contact systems operations control.

7          Q.    Is systems operations control based in

8     Dallas?

9          A.    Yes.

10         Q.    So anything that systems operation

11    control -- strike that.

12               Any decisions made by systems operation

13    control in Dallas would be based on communications

14    received from American Airlines personnel in Boston;

15    is that right?

16         A.    Based upon that and any information that

17    they have from any other source.

18         Q.    Do you know what other sources they

19    consider?

20         A.    I don't know.

21         Q.    Has American ever instructed you on whether

22    it's permissible to consider a passenger's ethnicity

23    in determining whether to deny them service?

24         A.    We're trained that everyone is equal,

39

1    nondiscriminatory.

2        Q.    Have you ever been involved in any other

3    incident in which a passenger was removed from a

4    flight, denied boarding or refused service?

5        A.    Yes.

6        Q.    How many incidents?

7        A.    I don't know.  Many.

8        Q.    "Many," like, more than five?

9        A.    More than five, yes.

10        Q.    More than ten?

11        A.    Yes.

12        Q.    More than 20?

13        A.    Yes.

14        Q.    It must come with your job description,

15    huh?

16        A.    Yes, yes.

17        Q.    Have you ever been involved in any other

18    incident in which a passenger was removed from a

19    flight, denied boarding or refused service based on

20    security concerns?

21        A.    Yes.

22        Q.    How many?

23        A.    I don't know.

24        Q.    Dozens?

45

1      A.    I don't have any written materials.

2      Q.    Has American ever given you any written

3   materials?

4      A.    I have a ground security coordinator

5   training manual.

6      Q.    How often do you undergo that training?

7      A.    Once a year.

8      Q.    Is that in Dallas?

9      A.    It could be anywhere.

10     Q.    Has American provided you with any training

11  concerning whether it's permissible to consider a

12  passenger's race, ethnicity, national origin or

13  ancestry in determining whether a passenger should

14  be denied service?

15     A.    We're trained that everyone is equal in a

16  nondiscriminatory way.

17     Q.    Has American ever taken any disciplinary

18  action against you for considering a passenger's

19  race, color, national orgin or ancestry in

20  determining whether or not a passenger should be

21  denied service?

22     A.    Can you repeat the first part of that?

23     Q.    Has American ever taken any disciplinary

24  action against you.

1

Volume I
Pages 1 to 30
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
JOHN D. CERQUEIRA,              :
          Plaintiff,            :
                                :
     vs.                        :    Civil Action
                                :    No. 05-11652-WGY
AMERICAN AIRLINES, INC.,        :
          Defendant.            :
                                :
- - - - - - - - - - - - - - - -x

          DEPOSITION OF YNES F. FLORES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Birnbaum & Godkin, 280 Summer
Street, Boston, Massachusetts, on Wednesday, April
12, 2006, commencing at 1:02 p.m.

PRESENT:

     Birnbaum & Godkin, LLP
          (By Erica Abate Recht, Esq.)
          280 Summer Street, Boston, MA  02210,
          for the Plaintiff.

     Fitzhugh, Parker & Alvaro LLP
          (By Michael A. Fitzhugh, Esq.)
          155 Federal Street, Suite 1700, Boston, MA
          02110-1727, for the Defendant.


                    *  *  *  *  *

26

1     Q.    Has your training -- do you undergo

2  training for -- strike that.

3          Do you participate in training for

4  identifying suspicious behavior?

5     A.    Yes, I do.

6     Q.    How often?

7     A.    Annually.

8     Q.    Has that training changed in any way from

9  2003 to the present?

10    A.    No, it has not.

11         MS. ABATE RECHT:  Can we go off the record.

12         MR. FITZHUGH:  Yes.  While you're doing

13  that, can I have a second with him?

14         MS. ABATE RECHT:  Sure.

15         MR. FITZHUGH:  Let's just step out.

16         (Recess taken from 1:28 to 1:31 p.m.)

17         MS. ABATE RECHT:  I have no further

18  questions.

19                 CROSS EXAMINATION

20   BY MR. FITZHUGH:

21    Q.    Mr. Flores, do you recall that earlier you

22  were asked a question, in substance, as to whether

23  or not American has ever told you whether you can

24  consider someone's ethnic background in making a

27

1    decision about denial of service?  Do you recall

2    that question in substance?

3         A.   Yes, I do.

4         Q.   And do you recall your answer?

5         A.   Yes.

6         Q.   What was your answer?

7         A.   "No."

8         Q.   Can you clarify your answer?

9         A.   My answer, actually, is, Yes, I have been

10   told by American that race is not part of a decision

11   in removing someone from an aircraft.

12        Q.   What about ethnic background, perceived

13   religious creed or anything like that?

14        A.   Yes, all those.

15        Q.   "All those" are what?

16        A.   Are part of -- you cannot use that as a

17   basis to remove someone.

18        Q.   And does American have a policy of

19   nondiscrimination, to your knowledge?

20        A.   Yes, they do.

21        Q.   And have you received training on that

22   policy?

23        A.   Yes, I have.

24        Q.   Were any of your actions on the day in

28

1   question inconsistent with American's

2   nondiscrimination policy?

3       A.    Yes, they were.

4       Q.    They were inconsistent with the policy?

5       A.    No, I'm sorry.  They were consistent.

6             MR. FITZHUGH:  Thank you.  I have no

7   further questions.

8             MS. ABATE RECHT:  I don't have anything

9   further.

10                  (Whereupon, the deposition was

11                  concluded at 1:32 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

# Laird & Associates, Inc.

LairdAssoc.com

## Introduction

At the request of Michael T. Kirkpatrick, Esq., Public Citizen Litigation Group, 1600 Twentieth Street, NW, Washington, DC 20009 I was retained to review the circumstances surrounding the denial of service to John D. Cerqueira by American Airlines, Inc. on Flight #2237 from Boston (BOS) to Fort Lauderdale (FLL) and American Airlines refusal to provide transportation on a later flight to Fort Lauderdale. Following is my report with findings and conclusion based upon documents available to me as of this date. As additional work may be done in this matter, any conclusions and opinions expressed herein will be amended or supplemented as required.

## Materials Reviewed

On June 20, 2006 I received, via UPS, copies of documents related to the case of John D. Cerqueira v. American Airlines, Inc. CA No. 05-11652-WGY which Mr. Kirkpatrick requested that I review. A copy of Mr. Kirkpatrick's letter of transmittal that itemizes the materials provided is attached to this report and titled Attachment 1.

Additional materials related to applicable security standards and government aviation regulations were also reviewed and are as follows:

1. International Standards and Recommended Practices – Security, Annex 17, Fifth Edition, Montreal, 1992
2. The White House Commission on Aviation Safety and Security, GPO, Washington, DC, May 1990
3. The 9/11 Commission Report, W. W. Norton & Company, New York, 2004
4. Aviation And Airport Security, Kathleen M. Sweet, Esq., Pearson Prentice Hall, Upper Saddle River, New Jersey, 2004
5. Combating Air Terrorism, Rodney Wallis, Brassey's US, Washington, DC, 1993
6. The Naked Crowd, Jeffrey Rosen, Random House, New York, NY, 2004
7. The Culture of Fear, Barry Glassner, Basic Books, New York, NY, 1999
8. America the Vulnerable, Stephen Flynn, HarperCollins, New York, NY, 2004
9. How Safe Are Our Skies, Rodney Wallis, Praeger, Westport, CN, 2003
10. Disinformation, Richard Miniter, Regnery Publishing, Washington, DC, 2005

## Summary of Event

Mr. John D. Cerqueira, Aventura, FL, flew on an American Airlines flight from Fort Lauderdale, FL to Boston on December 24, 2003. On December 28, 2003 he arrived at Boston's Logan Airport at approximately 5:15 A.M. to fly on American Airlines flight #2237 to Fort Lauderdale, FL. He arrived early as Transportation Security Administration (TSA) advises an early arrival to allow time for security screening. He checked luggage curbside and proceeded to the departure gate after clearing TSA screening without incident. When he saw an American Airlines staff member at the gate podium he addressed her and asked if he could be reassigned a bulk-head or exit row seat. Flight Attendant Sally Walling, the person at the podium advised Mr. Cerqueira that he'd have to wait for a gate agent to request a seat change.

Mr. Cerqueira ultimately was assigned an exit row seat, 20F, and boarded the aircraft when his "group" was called by the gate agent. Upon reaching his assigned seat Mr. Cerqueira stowed his carry-on items and proceeded to a lavatory at the rear of the aircraft. After his lavatory visit he returned to his assigned seat and worked on his laptop computer until all passengers were advised by the crew to turn off all electrical items in preparation for departure. Mr. Cerqueira, having arisen at 3:00AM to travel to the airport, then fell asleep.

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele:·1.775.770.0136 · Mobile:·1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

**Exhibit A**

# Laird & Associates, Inc.

LairdAssoc.com

FA Walling advised Captain Ehlers that she was alarmed by suspicious activity by the individual in seat 20F, Mr. Cerqueira, both before the flight was boarded and after he boarded the flight. She claimed that he had "stared" at her after he'd insisted she reassign his seat while at the podium, that he'd boarded out of sequence, that he'd gone to the aft lavatory and stayed in the lavatory a "long time" and that prior to push-back he was "feigning" sleep.

American Airlines Customer Service Manager Ynes Flores was summoned to the aircraft, it is not clear by whom, and requested the boarding passes from Mr. Cerqueira and the individuals seated in 20D and 20E. It appears that the assumption was made by the American Airlines flight crew that Mr. Cerqueira and the individuals seated in 20D and 20E were traveling together. Mr. Flores provided the documents to Captain Ehlers and departed the aircraft.

Mr. Cerqueira was subsequently removed from the aircraft by Massachusetts State Troopers and questioned by law enforcement authorities. After it was determined that he was not traveling with the passengers seated in 20D and 20E, he was cleared for travel and escorted to the American Airlines ticket counter.

Mr. Cerqueira attempted to get rebooked on a later American Airlines flight to Fort Lauderdale. At the ticket counter Ms. Nicole Traer, then an American Airlines customer service agent, advised him that she was refunding his ticket and that he could not fly on American Airlines as those were the instructions she had received from System Operations Control, Dallas, TX. The next day Mr. Cerqueira flew to Fort Lauderdale on another carrier without incident.

## Qualifications

A copy of my curriculum vitae which describes my forty-two year security career is attached to this report as Attachment 2. The C.V. provides an overview of my duties and responsibilities as security director for a U. S. Flag Carrier.

Since departing Northwest Airlines in May of 1995 I have provided security consultation to most of the international aviation community, to include: Airports – Domestic and International; Airlines – U. S. Flag and International; Governments – U. S. and Foreign; Manufacturers – U. S. and Foreign; Security Providers – U. S. and Foreign; Service Providers – U. S. and Foreign, and Universities.

I have been designated an aviation security subject matter expert by the Federal Aviation Administration and worked on a variety of projects for the FAA the most significant being:

1. Vulnerability Assessments of the airports at Miami and Jacksonville, FL to assist the FAA to identify a VA model suitable for use by all U. S. airports.

2. Develop aviation security system architecture and define the aviation security concept of operations as an integral part of and essential element of the system architecture.

3. Survey thirty (30) existing or planned domestic Category X through CAT III airport terminal designs to determine if generic terminal configuration types or groupings exist for the purpose of employing enhancements in checked baggage transport and security screening and checkpoint design configurations. Additionally, samplings of existing and planned foreign airport terminal design layouts were surveyed to assess their security screening concepts and techniques to determine applicability to U.S. security needs. In total, thirty-five airports were visited and surveyed, including Frankfurt, Germany; Schiphol Airport, Amsterdam, the Netherlands; London (Gatwick), U.K.; Hong Kong, Hong Kong and Tokyo (Narita), Japan.

# Laird & Associates, Inc.

LairdAssoc.com

During the last four years I have not testified at trial or by deposition.

## Compensation

In a letter of agreement between Laird & Associates, Inc. and the Public Citizen Litigation Group, dated June 19, 2006, Michael T. Kirkpatrick, Esq. has agreed to pay a retainer of $ 2,000 toward the work of Douglas R. Laird at the rate of $ 250 per hour for review and preparation and $ 350 per hour for deposition(s) and testimony in the case of John D. Cerqueira v. American Airlines, Inc., CA No. 05-11652-WGY.

## Publications

I have written about aviation security and been published in the following books, magazines and journals:

Books

"Airline Security Regulatory Framework", Chapter 18, p. 251-260, Protection, Security, and Safeguards, CRC Press, New York, 2000

Magazines

"Grounding Terrorists", p. 58-61, Security Management, December 1995
"Fighting Fraud on the Fly", p. 77-80, Security Management, April 1996

Professional Journals

"Regulation: Perception and Reality", p. 238-241, Journal of Testing and Evaluation, Vol. 22. Number 3, May 1994,

Professional Review

On two occasions I have been asked by the Committee on Commercial Aviation Security Panel and Passenger Screening, National Materials Advisory Board, Commission on Engineering and Technical Systems, National Research Council, to review their publication "Airline Passenger Security Screening – New Technologies and Implementation Issues", Publication NMAB-482-1, 19 and 2002 and provide comments prior to publication. In both instances I provided written comments.

## Conclusions And Opinions

Based on my review of the materials referenced, as well as my experience and training in security, specializing in aviation security, I have reached the following conclusions and opinions to date with regard to the relevant events of December 28, 2003 and the denial of service to Mr. Cerqueira at Boston Logan Airport:

1. Mr. Cerqueira was a victim of racial profiling;
2. Racial profiling does not make air travel safer;
3. Mr. Cerqueira behavior did not indicate a security threat;
4. Because the situation was mishandled an innocuous series of events was allowed to turn in to a security incident;

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele: 1.775.770.0136 · Mobile: 1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

# Laird & Associates, Inc.

LairdAssoc.com

5.  The refusal to allow Mr. Cerqueira to travel on American Airlines after he was questioned was not justified.

## Discussion

While security director at Northwest Airlines I oversaw a Federal Aviation Administration mandated profiling system that had to be carried out on our flights departing certain airports in Europe and the Pacific which was administered by a contract company.  On numerous occasions I observed the "profile" training and watched the process being carried out at foreign airports.  The profile training consisted of two weeks of classroom instruction and one month of on-the-job observation/training, and only experienced screeners were allowed to take the class.  There were many false-positives and very few positives, none of which were direct aviation security issues.  Therefore, Northwest Airlines Security Department developed what became known as CAPPS (Computer Assisted Pre-passenger Screening) and following the TWA#800 crash the CAPPS program was mandated by the FAA for use by all U. S. Flag carriers.  On 9/11 CAPPS identified ten (10) of the hijackers.  Ethnicity is not a factor in the CAPPS program.

Mr. Cerqueira was a victim of racial profiling in that none of the activities noted in the depositions as suspicious were of a security interest.

None of the following "behaviors" reported as abnormal are indicative of a security threat.  Specifically:

- Being "insistent"
- "Staring"
- Being "first to board"
- Going to the lavatory
- Sleeping while other passengers are being boarded
- Passengers in 20D and 20E being boisterous
- "Suspicious" behavior, not further defined
- "Strange questions" to Captain by passenger(s) 20D and 20E

The documents I have reviewed do not show that any of the American Airline staff involved in this event had received any meaningful training in behavioral profiling.

I have not seen the American Airlines policy or training program for In-Flight Security Coordinators (pilots) but know the philosophy of the In-Flight Security Coordinator program as mandated by the Federal Aviation Administration.  Although the Captain has ultimate command of the aircraft it is the Ground Security Coordinator that supervises the security process until the boarding of the aircraft has been completed and the GSC advises the In-Flight Security Coordinator that the "flight is secure" and the aircraft is cleared to pushback from the gate.  American Airlines Chief Pilot and the Vice President of Flight made the role of the In-Flight Security Coordinator quite clear in messages to the pilot group.

The Captain did not take control of the developing situation and thus allowed an innocuous series of events to escalate in to a security incident.  A number of things could have been done to have prevented this series of events turning into an incident.  For example:

- The TSA's "No-Fly" list could have been checked;
- The Passenger Name Records (PNR) of Cerqueira, Rokah and Ashmil could have been checked which would have shown that they were not traveling together;

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele:·1.775.770.0136 · Mobile:·1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

# Laird & Associates, Inc.

LairdAssoc.com

- Checking with knowledgeable ground staff would have shown that exit-row seats are assigned by station personnel;
- A computer check would have shown that Mr. Cerqueira was an elite member of the American Airlines Frequent Flyer Program;
- The GSC could have been summoned to the aircraft sooner and thus have had time to sort out the facts and provide input to the Captain;
- The Captain could have independently verified the available facts, discussed the situation with the GSC and attempted to calm down the flight attendants;
- If additional questioning was needed the three passengers in the exit row could have been escorted from the aircraft by ground personnel and thus avoided the State Troopers from boarding the aircraft and alarming the other passengers;
- The SOC and CCRO should have provided guidance to the Captain as how to deal with the situation;
- SOC should have advised Captain to call CCRO for guidance had he not already done so.

To the extent American Airlines did any investigation of Mr. Cerqueira following his removal from the aircraft it would show that American Airlines was not justified in refusing to rebook Mr. Cerqueira after he was released from questioning by the Massachusetts State Police. A simple review of the facts available to American Airlines combined with the findings of the State Police would show that Mr. Cerqueira was not a security threat.

## Conclusion

In summation, it is my opinion that FA Walling's concerns were a result of racial profiling that lead her to believe that there was a security threat. She reported this to Captain Ehlers who as the In-Flight Security Coordinator failed to thoroughly investigate and coordinate with the ground security coordinator and gain control of the event. The SOC made a decision to deny travel on American Airlines to Mr. Cerqueira with no basis in fact and made no record of how the decision was reached. Mr. Cerqueira was never a security threat to the flight and should have been rebooked by American Airlines and allowed to continue to Fort Lauderdale, FL.

Although American Airlines has a published policy on the prohibition of racial profiling and a denied boarding process the depositions I reviewed showed that the staff and crew had little understanding of the policy and its intent.

The breakdown in communication between the In-Flight Security Coordinator and the Ground Security Coordinator and the lack of an agreed upon definite chain-of-command lead to an incident that was not called for by the circumstances.

If any additional information has become available, please forward it to my office so that it may be reviewed and my report updated accordingly.

Douglas R. Laird, CPP

June 23, 2006

Attachments

1) Letter of Transmittal, Michael T. Kirkpatrick, June 19, 2006
2) Curriculum Vitae of Douglas R. Laird

2618 Edgerock Road · Reno, NV 89509-5765 · USA · Tele:1.775.770.0136 · Mobile:1.202.415.2324
Douglas.R.Laird@LairdAssoc.com

Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF MASSACHUSETTS
-oOo-

JOHN D. CERQUEIRA,                      :
                                        :
            Plaintiff,                   :
                                        :
    vs.                                  :  Case No.
                                        :  05-11652 WGY
AMERICAN AIRLINES, INC.,                 :
                                        :
            Defendants.                  :
=========================================================

DEPOSITION OF

DOUGLAS R. LAIRD

TUESDAY, OCTOBER 10, 2006

RENO, NEVADA

Reported by:   JANET MENGES, CCR #206, RPR, CP
               California CCR # 5785
Transcription:      ---- Computer ----
  DIGITAL COURT REPORTING & VIDEO, 1111 FOREST, RENO, NEVADA
          Telephone: (866) 954-0352

0237d948-7c45-4c20-8cf1-90254420a66f

DOUGLAS R.   LAIRD - October 10, 2006

Page 68

1   it's like to work 24 hours a day for a week and have the

2   phone ringing constantly from around the world with

3   quote unquote incidents.  I have lived through that

4   hysteria and in that particular instance luckily it

5   didn't happen in the United States, but again I have

6   been through those sorts of situations where, what do

7   you call it, people are extremely sensitive to a lot of

8   things.

9       Q    Directing your attention to the next

10  publication listed which is How Safe Are Our Skies, and

11  it has been marked as Exhibit 9 to your deposition, of

12  what significance is that publication to your opinions

13  rendered in this case?

14      A    Page 102.

15      Q    Of what significance is page 102?

16      A    They talk about security training given by the

17  airlines to their ground staff and flight crews under

18  the auspices of the Federal Aviation Authority.  It

19  talks about the need for dealing with obnoxious

20  passengers, air raged people, and that sort of thing.

21  It's the first -- that real long paragraph in the middle

22  of the page.  The use of role playing.

23          Anyway it stresses the importance of training,

24  training crews in how to deal with inflight incidents.

25      Q    Of what significance is that particular

DOUGLAS R.   LAIRD - October 10, 2006

Page 69

1   paragraph in your opinions in this case?

2        A    From the materials, the depositions and so

3   forth that have been provided it appears to me there may

4   have been -- There is some question as to -- in my mind

5   whether or not the people received adequate training.

6        Q    Are you aware, sir, that the flight crew were

7   not permitted to answer a number of questions with

8   regard to the nature of their training because that

9   information constitutes what the TSA might consider to

10  be sensitive security information?

11       A    I saw that and that creates a dilemma because

12  it's hard for me to comment when they won't let me read

13  the material.

14       Q    Is it your understanding, sir, that the TSA is

15  responsible for determining whether or not that

16  information may or may not be released rather than

17  American Airlines?

18       A    I understand that very well.

19            I'm involved in other issues surrounding 9/11

20  and on a much larger scale than this case and one of the

21  major battles with the law firms that I'm involved with,

22  which has been sought for several years and eventually

23  won was on that very issue.  How can we defend ourselves

24  when we can't get the documents?

25       Q    Are there other sections of How Safe Are Our