UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN D. CERQUEIRA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>　　　　　　Defendant. | Civil Action No. 05-11652-WGY |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Fed. R. Civ. P. 50(b)(1)(C), defendant American Airlines (AA) has renewed its motion for judgment as a matter of law. Doc. 122. AA argues that the jury's verdict is unsupported by the evidence because, according to AA, its decisionmakers did not know that Mr. Cerqueira and the two passengers seated next to him had a similar appearance and were perceived to be Middle Eastern. AA further argues that the Court erred by instructing the jury that AA is liable for actions motivated by the discriminatory animus of its employees because AA is immune from liability for safety-related denial of service decisions that are not arbitrary or capricious. As explained below, the jury's verdict is supported by ample evidence of intentional discrimination, and the Court properly instructed the jury with regard to the controlling legal standards.

**STANDARD OF REVIEW**

In reviewing a motion for judgment as a matter of law, courts "must evaluate the evidence and inferences adduced therefrom in the light most favorable to the plaintiff." *Trull v. Volkswagen of Am., Inc.*, 320 F.3d 1, 7 (1st Cir. 2002) (citing *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1521 (1st Cir. 1991)); *Austin v. Lincoln Equip. Assocs., Inc.*, 888 F.2d 934, 937 (1st Cir. 1989). "A

motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." *Crowe v. Bolduc*, 334 F.3d 124, 134 (1st Cir. 2003) (citations omitted). "Even if contrary evidence was presented and conflicting inferences could be drawn, it is for the jury to draw the ultimate conclusion, and such determination will not be disturbed" unless the record reveals no sufficient evidentiary basis for the verdict. *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 9 (1st Cir. 1979) (citations omitted); *see also Crowe*, 334 F.3d at 134 (explaining that "review is weighted toward preservation of the jury verdict").

## ARGUMENT

**I.    The Jury's Verdict Is Supported by the Evidence.**

In its motion, AA purports to summarize the evidence "in the light most favorable to Mr. Cerqueira" by setting forth twelve bullet points unsupported by any citation to the trial transcript. Doc. 122 at 2-3. AA then concludes, without analysis or explanation, that "Mr. Cerqueira failed to prove his claims by a preponderance of the evidence." *Id.* at 3. Contrary to AA's bald assertion, Mr. Cerqueira presented ample evidence to support the jury's conclusion that AA intentionally discriminated against him because of his perceived race or ethnicity when it removed him from flight 2237 and refused to rebook him, even after he had been questioned by the Massachusetts State Police and cleared for further travel.

First, there is no question that AA *intended* that Mr. Cerqueira and the other two men seated in his row—Mr. Ashmil and Mr. Rokah—be treated differently from all the other passengers on flight 2237. These three men were the *only* passengers removed, questioned, and denied further

service (*see* Transcript of Trial Day 1 at 36:6-l4), and AA admits that its employees decided to have the three removed from flight 2237 and not rebooked on AA. *See* ¶ 32 of Docs. 3 & 4 (AA admits that "Capt. Ehlers made the decision to have Mr. Cerqueira removed from the flight"); AA's Response to Interrogatory No. 2 (read to the jury) (admitting that Mr. Craig Marquis made the decision to refuse further service to Mr. Cerqueira); Trial Exhs. 8, 9 & 10.[1]

Second, there is no dispute that AA's disparate treatment of Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah involved circumstances within the coverage of the statutes under which Mr. Cerqueira brought his claims. Specifically, 42 U.S.C. § 1981 prohibits discrimination in the making and enforcement of contracts; Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) prohibits discrimination in any program or activity that receives federal financial assistance; and M.G.L. c. 272 § 98 prohibits discrimination in any place of public accommodation. AA admitted that its actions against Mr. Cerqueira arose in such contexts. *See, e.g.*, Doc. 57 at 13-14, ¶¶ A & D; ¶ 5 of Docs. 3 & 4; Transcript of Trial Day 5 (AA's Closing Argument) at 10:22-24 ("And by the way, we don't dispute that it's a place of public accommodation and we don't dispute that he was lawfully a passenger on American.").

The only disputed issue regarding liability was whether AA removed Mr. Cerqueira from flight 2237 and refused to rebook him because of Mr. Cerqueira's perceived race or ethnicity. Mr. Cerqueira proved this element of his claims with both direct and circumstantial evidence. With regard to direct evidence, Mr. Cerqueira showed that Flight Attendant Lois Sargent's reports of the incidents noted that Mr. Cerqueira, Mr. Ashmil, and Mr. Rokah "seemed to be foreign nationals

---

[1] All excerpts of pleadings and discovery documents cited as factual support for this opposition were read to the jury and are in evidence. The complete trial transcript is not yet available.

(later confirmed/Middle East passports)," and that "these 3 passengers had Israeli passports but Arabic names." Tr. Exhs. 18 & 25. Flight Attendant Amy Milenkovic's report noted that at least one of the three men spoke with a "heavy accent" (Trial Exh. 19), and she testified that, since the terrorist attacks of September 11th, she pays close attention to whether a passenger has an accent.

With regard to indirect evidence, Mr. Cerqueira showed that the only passengers AA removed from flight 2237 and refused to rebook had a Middle Eastern appearance. The jury observed Mr. Cerqueira, and Mr. Cerqueira testified that, although he is Portuguese, he is often mistaken as Middle Eastern on account of his color and physical characteristics. Transcript of Trial Day 1 at 25:9-20. Mr. Cerqueira also testified that Mr. Ashmil and Mr. Rokah, who are from the Middle East and were speaking loudly to each other in a foreign language, looked like him because they had dark hair and olive complexions. *Id.* at 32:6-21. Apart from their protected characteristics, no evidence was introduced to link the three men. Mr. Cerqueira did not ask for any particular seat, was not with Mr. Ashmil or Mr. Rokah in the gate area, did not board with them, and did not talk to them or interact with them in any way before he was removed from the flight. *See id.* at 46:1-8; 34:9-18. Nevertheless, several of AA's employees perceived Mr. Cerqueira to be traveling with Mr. Ashmil and Mr. Rokah because the three men have a similar appearance. Flight Attendant Sally Walling thought the three men looked similar because they were "dark" and had "dark hair," and, in her written report of the incident, Ms. Walling referred to the three passengers collectively as "them" and "they." Trial Exh. 17. Similarly, Ms. Sargent grouped the three men together in her reports when she wrote that they "seemed to be foreign nationals" and that "these 3 passengers had Israeli passports but Arabic names." Tr. Exhs. 18 & 25. Ms. Milenkovic noticed that all three of the men removed from the flight had dark hair and that one of them spoke with a "heavy accent,"

and she testified that she thought they might have been Middle Eastern. Trial Exh. 19. In an interrogatory response read to the jury, AA asserted that Mr. Cerqueira was "refused service because his behavior and that of persons *with whom he appeared to be traveling* caused concerns among the passengers and crew of flight 2237." AA's Response to Interrogatory No. 10 (emphasis added).

In addition to showing that the only passengers removed from flight 2237 and denied further service had a similar Middle Eastern appearance, Mr. Cerqueira presented evidence that his behavior on the day of the incidents was normal passenger behavior that does not ordinarily cause a passenger to be refused service. Mr. Cerqueira requested a seat change for additional leg room, boarded when called, used the lavatory, worked on his laptop computer, and fell asleep. Thus, the jury could easily conclude that, but for the perception that Mr. Cerqueira was from the Middle East and traveling with the Middle Eastern men seated next to him, AA would not have removed Mr. Cerqueira from flight 2237 and refused to rebook him on any AA flight.

Moreover, AA's claim that Mr. Cerqueira was removed and denied further service because of "security issues" was simply not believable. As discussed in further detail below, AA's explanations for its actions were riddled with inconsistencies and embellishment. Thus, the jury concluded that AA did not remove Mr. Cerqueira from his flight and refuse to rebook him for rational reasons related to security. Rather, the jury concluded that AA's employees became concerned about Mr. Cerqueira because of stereotypes drawn irrationally from his appearance.

II.     **Mr. Cerqueira Proved That He Was One of Three Passengers With a Middle Eastern Appearance Who Were Treated Differently From All Other Passengers.**

Only three of the 129 passengers on flight 2237 were removed for police questioning and denied further service, and all three were perceived to be Middle Eastern. *See* Trial Exh. 20 ("126

other passengers" in addition to the three who were removed). Nevertheless, in its memorandum in support of its motion, AA argues that "Mr. Cerqueira never proved 'disparate treatment.'" Doc. 123 at 3. In support of this assertion, AA cites *Scott v. Macy's East, Inc.*, No. 01-10323-NG, 2002 WL 31439745 (D. Mass. Oct. 31, 2002). *Scott* is inapposite because Mr. Cerqueira presented far more evidence of discrimination than did the plaintiff in *Scott*.

In *Scott*, the court granted summary judgment for defendants in a case involving an allegation of racial profiling because the plaintiff presented no admissible direct evidence of discrimination, and the plaintiff did not present any evidence from which racial discrimination could be inferred. With regard to direct evidence, the plaintiff in *Scott* attempted to introduce a hearsay statement to show that employees of one defendant had "keyed on Scott's race." *Id.* at *6. Because the statement was inadmissible hearsay, the court did not consider it. *Id.* In this case, direct evidence of discriminatory animus was admitted at trial, including flight attendant reports showing that the three men removed from the flight were perceived to be traveling together, and making note of foreign appearances, Middle Eastern passports, Arabic names, and a heavy accent. Trial Exhs. 17, 18, 19, & 25. Had discrimination played no role in the decision to remove these three men, the flight attendants would not have mentioned these facts. *See Williams v. Lindenwood Univ.*, 288 F.3d 349, 356 (8th Cir. 2002) (holding that "injecting racial language at all into the decision-making process creates the inference that race had something to do with the decision-making process"); *Local Fin. Co. of Rockland v. Mass. Comm'n Against Discrimination*, 342 N.E.2d 536, 539-40 (Mass. 1968) (holding that distinguishing loan applicants by color was evidence of discrimination even though loan company claimed that it recorded color only for identification purposes).

With regard to indirect evidence, the court in *Scott* noted that there are many methods by which by which the plaintiff might have raised an inference of discrimination, and explained that "Scott may have made out his claim if he (or his counsel) had conducted a meaningful investigation," but he did not. *Scott*, 2002 WL 31439745, at *1. For example, the court explained that the plaintiff could have raised an inference of discrimination by showing "prior complaints of discrimination or a pattern of activity," or by comparing plaintiff's treatment by defendants "with the treatment accorded to white shoppers behaving similarly," or by presenting evidence to refute the facts underlying defendants' claim that they took action for non-discriminatory reasons. *Id.* at *5-6 (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977), and *Garrett v. Tandy, Inc.*, 295 F.3d 94, 108 (1st Cir. 2002)).

At trial, Mr. Cerqueira proved that he did nothing more than engage in common airline passenger behavior that does not ordinarily result in a denial of service. Although AA's witnesses claimed that Mr. Cerqueira's behavior raised security concerns, their testimony was either directly contradicted or simply not credible. For example, Mr. Cerqueira testified that he asked Ms. Walling for a seat change at the gate counter and, when she told him to sit down and wait for someone else who could help him, he did so. Transcript of Trial Day 1 at 29:20-30:1. Mr. Cerqueira testified that during his conversation with Ms. Walling, he was not rude, insistent, or hostile. *Id.* at 30:2-10. At trial, Ms. Walling claimed that Mr. Cerqueira was "insistent" and "hostile" about having his seat changed, yet she admitted that she did not so describe Mr. Cerqueira in the report she wrote within hours of the event. Ms. Walling further admitted that she did not consider Mr. Cerqueira's behavior to constitute a security threat, and she testified that requesting a seat change, even in an insistent manner, is not cause for a passenger to be removed from a flight. Similarly, Ms. Walling claimed

that she thought Mr. Cerqueira might have boarded out of turn, although she admitted that she was not in a position to have heard the boarding announcements. Ms. Walling's unsupported allegation was contradicted by AA's own admission, read to the jury, that "Mr. Cerqueira boarded the aircraft when his assigned group was called." ¶ 11 of Docs. 3 & 4. In any event, for purposes of deciding AA's renewed motion for judgment as a matter of law, fact disputes are viewed in the light most favorable to the verdict. *See Crowe*, 334 F.3d at 134; *Trull*, 320 F.3d at 7; *Raymond*, 938 F.2d at 1521; *Austin*, 888 F.2d at 937.

**III.    The Evidence Presented at Trial Was Sufficient for the Jury to Conclude That AA's Decisionmakers Were Aware of Mr. Cerqueira's Perceived Race or Ethnicity.**

AA claims that its decisionmakers "lacked any knowledge about the plaintiff's ethnicity, ancestry or even his appearance when they acted," and asserts that "[a]n intent to discriminate cannot be inferred where a decision-maker has no information relevant to the plaintiff's appearance or ancestry." Doc. 123 at 3 & 4-5. With regard to the former, AA is wrong as a matter of fact. With regard to the latter, AA is wrong as a matter of law. *See* Section IV, below.

AA asserts that "Capt. Ehlers did not even see the plaintiff prior to deciding to have him removed" from flight 2237. Doc. 123 at 3. Although Capt. Ehlers made that claim, his testimony was directly contradicted by two other AA employees, and such contradictions must be must be resolved in Mr. Cerqueira's favor. *See Crowe*, 334 F.3d at 134; *Trull*, 320 F.3d at 7; *Raymond*, 938 F.2d at 1521; *Austin*, 888 F.2d at 937. Ms. Sargent testified that Capt. Ehlers came out and looked at the passengers in the exit row, and AA Customer Service Manager Ynes Flores testified that Capt. Ehlers pointed out the three passengers from whom Mr. Flores was to collect boarding passes. Thus, there was sufficient evidence from which the jury could conclude that Capt. Ehlers saw Mr.

8

Cerqueira before deciding to have the three passengers removed from the flight. Moreover, Capt. Ehlers testified that he discussed the situation with the flight attendants, and the flight attendants' reports and testimony establish that they perceived Mr. Cerqueira to be traveling with Mr. Ashmil and Mr. Rokah because of Mr. Cerqueira's appearance. Trial Exhs. 17, 18, 19, & 25. Thus, the jury could conclude that the flight attendants discussed with Capt. Ehlers their perception that the men in the exit row were Middle Eastern, and all reasonable inferences must be drawn in favor of the verdict. *See Crowe*, 334 F.3d at 134. Finally, Capt. Ehlers lacked credibility in general, because his testimony was often at odds with that of other AA employees, his own deposition testimony, and AA's judicial admissions. For example, Capt. Ehlers claimed at trial that he did not make the decision to have Mr. Cerqueira removed from flight 2237, but AA admitted that he did. ¶ 32 of Docs. 3 & 4.

AA also asserts, with no further explanation, that "Mr. Marquis had no knowledge about the plaintiff's race, color, ethnic background or national origin when he decided to deny rebooking of the plaintiff on another AA flight that day." Doc. 123 at 4. In fact, Mr. Marquis testified that he could not recall what information he had about Mr. Cerqueira when he made his decision, but in an interrogatory response read to the jury, AA admitted that Mr. Marquis made his decision "based upon information that he obtained from law enforcement officers involved with the incident, and other American Airlines personnel." AA's Response to Interrogatory No. 2. Moreover, the evidence at trial established that Mr. Marquis made his decision after speaking with Capt. Ehlers, and Capt. Ehlers testified that he relayed all of the available information to Mr. Marquis after Capt. Ehlers had discussed the situation with the flight attendants. Thus, the information available to Capt. Ehlers included the flight attendants' perceptions that the three men were traveling together, looked similar,

9

had foreign appearances, Middle Eastern passports, Arabic names, and heavy accents. Thus, the jury could properly infer that these facts were relayed to Mr. Marquis, especially in light of AA's failure to present any rational explanation for Mr. Marquis's decision to refuse to rebook Mr. Cerqueira even after Mr. Cerqueira was, as AA admitted, "cleared for further travel by the Massachusetts State Police." *See* Doc. 57 at 14 ¶ S.

**IV.    The Jury Did Not Have to Conclude That AA's Decisionmakers Knew of Mr. Cerqueira's Protected Characteristics to Find AA Liable If the Jury Concluded That the Decisionmakers Acted on Information Tainted by Discrimination.**

Even assuming that the evidence presented at trial was insufficient for the jury to conclude that AA's decisionmakers were aware of Mr. Cerqueira's perceived race or ethnicity when they decided to treat him differently from passengers who did not have a Middle Eastern appearance, it would make no difference. As the Court instructed the jury, a corporate defendant is liable for discrimination even if its decisionmakers were not biased, if the decisionmakers relied on information from subordinates motivated by discrimination. The Court's instructions were drawn from well-settled agency principles and were an accurate statement of the controlling law. *See* Transcript of Jury Charge at 16:21-17:7; 18:24-19:6; Transcript of Jury Questions, Trial Day 6, at 5:15-17; 7:23-25. Moreover, although AA objected to the subordinate bias instruction given during the initial jury charge (Transcript of Jury Charge at 30:21-31:3), AA failed to make a timely objection when, in response to a jury question, the Court further instructed the jury regarding subordinate bias liability. *See* Transcript of Jury Questions, Trial Day 6, at 5:15-10:19. Because AA did not preserve its objection to the more-detailed instruction given in response to the jury question, the objection has been waived. *See* Fed. R. Civ. P. 51; *see also Scarfo v. Cabeltron Systems, Inc.*,

54 F.3d 931, 939-40 (1st Cir. 1995); *Senra v. Cunningham*, 9 F.3d 168, 171 (1st Cir. 1993); *Lash v. Cutts*, 943 F.2d 147, 152 (1st Cir. 1991).

In any event, the Court's instructions on subordinate bias liability were correct. As explained by the First Circuit, "corporate liability can attach if neutral decisionmakers . . . rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus." *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 83 (1st Cir. 2004); *accord EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484-88 (10th Cir. 2006) (explaining that a defendant may be liable even though the decisionmaker lacked discriminatory intent, if the decisionmaker acted on information supplied by a biased subordinate) (citing numerous cases); *Zades v. Lowe's Home Ctrs., Inc.*, No. 03-30269-MAP, 2006 WL 2563456, *10 (D. Mass. Sept. 6, 2006) (holding that discriminatory motive may be shown where a neutral decisionmaker acts on biased information); *Harlow v. Potter*, 353 F. Supp. 2d 109, 116-18 (D. Me. 2005) (explaining that a defendant is liable for discrimination if the decisionmaker who took the adverse action relied on information tainted by another's discriminatory animus "even if the decisionmaker lacked discriminatory intent") (citing numerous cases). If not for this rule, a defendant could always escape responsibility for wilful discrimination simply by placing ultimate decisionmaking authority in the hands of a corporate official insulated from personal knowledge of the protected characteristics of the affected individual.

In this case, information reported to Capt. Ehlers by the flight attendants was the basis of the Captain's decision to have Mr. Cerqueira removed from flight 2237. Capt. Ehlers asserted that he conducted no investigation whatsoever, but took action because the "Flight Attendants became concerned about behavior of 2-3 of our passengers sitting in the exit row." Trial Exh. 20. Thus, Capt. Ehlers allowed the flight attendants to become the *de facto* decisionmakers when Capt. Ehlers

decided that flight attendant concern was reason enough to remove Mr. Cerqueira, even if that concern was based on stereotypes drawn irrationally from race. Because the flight attendants would not have become concerned about Mr. Cerqueira but for their perceptions that Mr. Cerqueira was from the Middle East and traveling with the men seated next to him, the jury had sufficient evidence to find AA liable on the basis that the flight attendants' discriminatory animus impermissibly tainted the decisionmaking process.

Likewise, the decision to refuse to rebook Mr. Cerqueira also flowed from the flight attendant concerns reported to Capt. Ehlers. Although Mr. Marquis testified that he does not recall the reasons for his decision to bar Mr. Cerqueira from any AA flight, the evidence presented at trial established that Capt. Ehlers communicated all available information, including the flight attendants' concerns, to Mr. Marquis.

**V.    The Provisions of 49 U.S.C. § 44902(b) and the Arbitrary and Capricious Standard Have No Application In This Case.**

AA acknowledges the principle of corporate liability where a neutral decisionmaker acts on information tainted by a subordinate's discriminatory animus, but argues that the principle has no application in the aviation context because it is "irreconcilable with the protection afforded AA under 49 U.S.C. § 44902(b)." Doc. 123 at 5. To the contrary, because Mr. Cerqueira's claims required that he prove that AA intentionally discriminated against him because of his perceived race or ethnicity, 49 U.S.C. § 44902)(b) is irrelevant to any issue in this case.

Section 44902(b) allows an airline to refuse to transport a passenger who may be "inimical to safety," but only if the airline's decision is not arbitrary and capricious. Because decisions

12

motivated by discrimination are *per se* arbitrary and capricious, § 44902(b) cannot shield an airline from liability for discrimination.

> Although Section 44902 certainly extends broad discretion to air carriers to make safety decisions, the statute does not grant them a license to discriminate. Nor does it permit air carriers to exercise their discretion arbitrarily or capriciously. Indeed, actions motivated by racial or religious animus are necessarily arbitrary and capricious, and therefore beyond the scope of the discretion granted by Section 44902.

*Alshrafi v. American Airlines, Inc.*, 321 F. Supp. 2d 150, 162 (D. Mass. 2004).

AA acknowledges "that decisions that are based on intentional discrimination are necessarily arbitrary and capricious." Doc. 123 at 9 n.7. Nevertheless, AA invokes § 44902(b) in support of two arguments. First, AA argues that subordinate bias liability does not apply in the "aviation security arena." Second, AA argues that the Court should have instructed the jury to decide whether the decisions at issue were "arbitrary and capricious." Neither argument has merit.

### A. Section 44902(b) Cannot Protect AA From the Consequences of Its Decisionmakers' Reliance on Information Tainted by Discriminatory Animus.

AA asserts that § 44902(b) insulates an airline from liability for a pilot's decision to remove a passenger based on information reported by a crew member, even if the crew member's report is motivated by discriminatory animus. AA's theory is novel. We have found no case holding that subordinate bias liability does not apply in the aviation context, and AA has cited none.[2] In any event, this Court need not reach the question because AA's theory would apply, if at all, only to situations where 1) the biased information, if true, would provide a rational safety-related justification for the pilot's decision; and 2) time constraints or security considerations prevent the

---

[2] The denial-of-service cases cited by AA are discussed in Section V(C), below. None address the issue of subordinate bias liability.

pilot from investigating the veracity of, or motivation for, a biased subordinate's representations. Neither condition is met here.

First, Capt. Ehlers decided to have Mr. Cerqueira removed from flight 2237 based on information reported by the flight attendants that, even if true, would not have justified the removal decision. Indeed, the flight attendants did not report that Mr. Cerqueira had engaged in any uncommon or threatening behavior. Second, before flight 2237 departed, Capt. Ehlers had plenty of time to verify that Mr. Cerqueira posed no threat to safety. More than 30 minutes before flight 2237 pushed back from the gate, the police had cleared Mr. Cerqueira for travel, the airplane had been searched, and the passengers and baggage had been rescreened. *See* Trial Exh. 22.

Likewise, AA's theory is wholly inapposite when applied to Mr. Marquis's decision not to rebook Mr. Cerqueira on any AA flight. Mr. Marquis is not a pilot and was not operating under the "severe time constraints" that AA claims can immunize pilot decisions based on biased information where it is not feasible for the pilot to investigate. Further, Mr. Marquis lacked any information indicating that Mr. Cerqueira was a threat to safety. Indeed, Mr. Marquis barred Mr. Cerqueira from flying on any AA flight even after Mr. Cerqueira had been questioned and cleared for travel by the Massachusetts State Police.

> **B.    Because The Court Instructed the Jury that Mr. Cerqueira Was Required to Prove Intentional Discrimination Based On Perceived Race or Ethnicity, An Arbitrary and Capricious Instruction Was Unnecessary.**

Although "American acknowledges that decisions that are based on intentional discrimination are necessarily arbitrary and capricious" (Doc. 123 at 9 n.7), AA asserts that "[e]ven though the allegations involve unlawful discrimination, the arbitrary and capricious standard applies, and should have been applied in the instant case by way of properly focused jury instructions." *Id.*

at 9; *see also id.* at 11 (asserting that the determination of whether AA engaged in unlawful discrimination "should have been made subject to proper guidance of the 'arbitrary and capricious' standard that is the well-settled law under 49 U.S.C. § 44902(b)").

AA's claim that it was somehow prejudiced by the lack of an instruction on the arbitrary and capricious standard makes no sense because the Court instructed the jury that "Mr. Cerqueira bears the burden of proving by a fair preponderance of the evidence that he was intentionally discriminated against because of the perception of his race or ethnicity." Transcript of Jury Charge at 19:9-12. Although actions that are arbitrary and capricious are not necessarily motivated by racial animus, actions motivated by discriminatory animus are necessarily arbitrary and capricious. Thus, the Court instructed the jury to apply a standard more difficult for a plaintiff to prove than the standard AA complains was omitted.

AA claims that, "[r]ecognizing that Section 44902 was the governing legal authority, both parties submitted instructions derived from it, but this Court erroneously refused to instruct on the issue at all." Doc. 123 at 8 n.6. AA's statement is incorrect. In his trial brief, Mr. Cerqueira argued that § 44902(b) is *irrelevant* in a case alleging intentional discrimination, and he explained that there is no conflict between statutes prohibiting discrimination and a statute allowing air carriers the discretion to refuse to carry passengers for rational safety reasons. Doc. 82 at 8. Indeed, Mr. Cerqueira's only proposed jury instruction related to § 44902(b) was submitted for use in the event that AA invoked § 44902(b), and for the sole purpose of explaining that the statute is irrelevant. *See* Doc. 83 at 16.

Although the Court did not instruct the jury on the arbitrary and capricious standard, the Court made clear to the jury that if the decisions at issue were made for legitimate reasons related

15

to safety, rather than because of discrimination, the jury would have to return a verdict for AA. *See* Transcript of Jury Charge at 18:1-24; Transcript of Jury Questions, Trial Day 6, at 3:6-11; 4:17-21. Having been properly instructed, the jury concluded that AA's actions were not motivated by legitimate safety concerns, but by discriminatory animus.

      C.      **The Denial-of-Service Cases Cited By AA Do Not Support Its Theory That The Outcome Of This Case Might Have Been Different If The Jury Had Applied The Arbitrary and Capricious Standard of § 44902(b).**

AA cites numerous denial-of-service cases in which a defendant airline invoked § 44902(b) as an affirmative defense, but all are distinguishable from this case. As an initial matter, only four of the cases cited by AA involved even an *allegation* of discrimination on the basis of race or ethnicity. *See Williams v. Trans World Airlines*, 509 F.2d 942 (2nd Cir. 1975); *Dasrath v. Continental Airlines, Inc.*, No. 02-2683 (DRD), 2006 WL 3759715 (D.N.J. Dec. 22, 2006); *Al-Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841 (S.D. Ohio 2003); *Huggar v. N.W. Airlines, Inc.*, No. 98 C 594, 1999 WL 59841 (N.D. Ill. Jan. 27, 1999). In each of these cases, the courts concluded that legitimate safety concerns—not discriminatory animus—had motivated the denial of service decisions.[3] In this case, the jury found just the opposite.

In *Williams*, the court held that an airline acted out of a rational concern for safety when it refused to transport a ticketed passenger whom the FBI reported was a dangerous fugitive known to carry firearms who had been diagnosed as schizophrenic. 509 F.2d at 945. The court found "no evidence that TWA was at any time influenced by race prejudice or discrimination in the slightest."

---

[3]Significantly, in contrast to the facts here, the plaintiffs in all four of these cases were later flown to their destinations on other flights operated by the defendant airline. *Williams*, 509 F.2d at 945-46; *Dasrath,* 2006 WL 3759715 at *5; *Al-Qudhai'een*, 267 F. Supp. 2d at 844; *Huggar*, 1999 WL 59841 at *2.

*Id.* at 948. In contrast, the jury in this case concluded that AA's actions were motivated by discriminatory animus. Moreover, AA did not contend that it denied service to Mr. Cerqueira based on reliable information from law enforcement authorities. Indeed, the Massachusetts State Police concluded that Mr. Cerqueira posed no threat.

In *Al-Qudhai'een*, 267 F. Supp. 2d at 847, the court found that the airline's removal decision was justified based on undisputed evidence that the plaintiff 1) disobeyed a flight attendant's instructions and changed seats without permission; 2) entered the first class cabin and touched the cockpit door; 3) appeared anxious, irritated, and uneasy when informed that the flight was not a nonstop; and 4) asked questions, uncommon for a passenger, about whether the same airplane would be used for the second leg of the trip. These facts are in stark contrast to this case, where the evidence showed that Mr. Cerqueira did nothing unusual and engaged in no misconduct, and where the information reported to Capt. Ehlers by the flight attendants was insufficient on its face to justify the denial of service decision.

Similarly, the plaintiff in *Huggar* was removed from a flight after throwing another passenger's bag down the aisle and threatening to attack the passenger. 1999 WL 59841, at *1. The court found that the plaintiff's "threatening words and actions warranted his removal from that Northwest Airlines flight, not only for the crews safety but for the safety of the other passengers." *Id.* at *6. In this case, there was no evidence that Mr. Cerqueira engaged in threatening behavior, and the jury concluded that discrimination was the driving reason for AA's actions.

*Dasrath* is the only discrimination case cited by AA where a passenger who did not engage in suspicious behavior was removed from a flight (but later rebooked) by an airline, but *Dasrath* is distinguishable from this case because the court in *Dasrath* found "ample undisputed evidence

17

linking" the plaintiff to two other men whose conduct, the court found, raised security concerns "that justified, perhaps required, that [the Captain] remove them from the flight." *Id.* at *15-*17. Although the plaintiff in *Dasrath* was linked to the other men because of misidentification, the court held that "a jury would be compelled to find that security considerations were the sole reason for [the Captain's] decision." *Id.* at *15. Thus, the court concluded that the Captain, who conducted a substantial investigation to gather the relevant facts, "acted reasonably when he removed [the plaintiff], that he removed him solely for security reasons, and that [the plaintiff's] race was not a motivating factor." *Id.* at *18.

In contrast, the jury in this case found that, but for Mr. Cerqueira's perceived race or ethnicity, he would not have been removed from flight 2237 and barred from taking any AA flight. The jury rejected AA's claims that it acted for legitimate reasons related to safety and found that discriminatory animus motivated AA's actions. Moreover, AA presented no evidence that Mr. Cerqueira was mistaken for another passenger who had behaved in a manner justifying removal. Rather, AA argued that it was reasonable to impute to Mr. Cerqueira the behavior of the two men seated next to him, but the evidence showed, and the jury found, that the flight attendants would not have linked Mr. Cerqueira to Mr. Ashmil and Mr. Rokah but for Mr. Cerqueira's protected characteristics.

## CONCLUSION

The Court should deny AA's renewed motion for judgment as a matter of law.

<table>
<tr><td></td><td>**JOHN D. CERQUEIRA**<br>By his attorneys,</td></tr>
<tr><td></td><td>*/s/ Michael T. Kirkpatrick*_____<br>Michael T. Kirkpatrick<br>Public Citizen Litigation Group<br>1600 20th Street NW<br>Washington, DC  20009<br>(202) 588-1000<br>mkirkpatrick@citizen.org</td></tr>
<tr><td>Dated: February 13, 2007</td><td>David S. Godkin (BBO #196530)<br>Darleen F. Cantelo (BBO #661733)<br>Birnbaum & Godkin, LLP<br>280 Summer Street<br>Boston, MA  02210<br>617-307-6100</td></tr>
</table>

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 13, 2007.

*/s/ Michael T. Kirkpatrick*_____
Michael T. Kirkpatrick