# United States Court of Appeals
## For the First Circuit

No. 07-1824

JOHN D. CERQUEIRA,

Plaintiff, Appellee,

v.

AMERICAN AIRLINES, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, <u>U.S. District Judge</u>]

Before

Lynch, <u>Circuit Judge</u>,
Campbell and Stahl, <u>Senior Circuit Judges</u>.

---

<u>Michael V. Powell</u> with whom <u>Michael A. Fitzhugh</u>, <u>Fitzhugh, Parker & Alvaro LLP</u> and <u>Locke Liddell & Sapp LLP</u> were on brief for appellant.

<u>Wayne A. Schrader</u>, <u>David A. Berg</u>, <u>Katherine Andrus</u>, <u>Air Transport Association of America, Inc.</u>, <u>Jason B. Stavers</u> and <u>Gibson Dunn & Crutcher L.L.P.</u> were on brief for Air Transport Association of America, Inc., amicus curiae.

<u>Michael T. Kirkpatrick</u> with whom <u>Public Citizen Litigation Group</u>, <u>David S. Godkin</u>, <u>Darleen F. Cantelo</u> and <u>Birnbaum & Godkin, LLP</u> were on brief for appellee.

<u>Michael L. Foreman</u>, <u>Monica R. Saxena</u>, <u>Nicole Birch</u>, <u>Lawyers' Committee for Civil Rights Under Law</u>, <u>Vincent A. Eng</u>, <u>Aimee J. Baldillo</u>, <u>Asian American Justice Center</u>, <u>Cynthia Valenzuela</u>, <u>The Mexican American Legal Defense & Educational Fund</u>, <u>Angela Ciccolo</u>, <u>Anson Asaka</u>, <u>NAACP</u>, <u>Foster Maer</u> and <u>Puerto Rican Legal Defense Fund</u> were on brief for Lawyers' Committee for Civil Rights Under Law, Asian American Justice Center, Mexican American Legal Defense &

Educational Fund, National Association for the Advancement of Colored People, and Puerto Rican Legal Defense Fund, amici curiae.

January 10, 2008

**LYNCH**, **Circuit Judge**. An airline passenger, John Cerqueira, filed suit asserting that his removal from a flight violated his rights under 42 U.S.C. § 1981 to be free of race discrimination in contracting. He recovered compensatory damages of $130,000 and punitive damages of $270,000 against American Airlines ("American" or "AA"), which on December 28, 2003, refused to transport Cerqueira on a flight and to rebook him on another flight. His discrimination claim was made against the statutory permission granted to airlines, in 49 U.S.C. § 44902(b), to refuse to transport a passenger "the carrier decides is, or might be, inimical to safety." The issues raised are of first impression in this circuit.

The district court failed to instruct the jury on the statutory permission to air carriers to remove passengers under § 44902(b); it also gave instructions inconsistent with that statute and which were otherwise in error. We thus vacate the jury verdict in favor of the plaintiff.

We also conclude that no properly instructed jury could return a verdict against the air carrier and therefore the district court should have granted American Airlines's motion for judgment notwithstanding the verdict. We remand with instructions to enter judgment for American Airlines.

I.

The facts of this case center on AA Flight 2237, scheduled to fly from Boston's Logan Airport to Fort Lauderdale, Florida on December 28, 2003.

We recite the facts from particular perspectives: that of the Captain of the aircraft and of the person who within minutes that same morning decided not to rebook the plaintiff, based on the information known to them. We explain below why the law compels this perspective. The exact sequence of events is not entirely clear from the record; however, the information described was known in full detail to the Captain when he made the decision not to transport the plaintiff and in summary to the other decisionmaker. There is no material dispute of facts about the information before the decisionmakers.

A.      Removal from Flight

The Captain of AA Flight 2237 has worked for AA since 1986, starting as a flight engineer; in 1988, he became an FAA-designated instructor; around 1989, he was promoted to co-pilot; and in 1996, he was promoted to the position of Captain.  He testified that he has flown hundreds of flights, and that he had had security problems at Logan Airport before and dealt with them in the same way as he dealt with the situation at issue here.

Around 6:00am on December 28, 2003, approximately 35 minutes prior to the scheduled departure, the Captain of Flight

-4-

2237 was walking to the departure gate. A man with a ponytail approached the Captain and asked him if he was the Captain for the Fort Lauderdale flight. The Captain initially thought that the passenger was reporting a problem and so he responded that he was the Captain for the flight. The passenger said, "Good. I'm going with you. We're going to have a good day today." The passenger then immediately left the area; the Captain continued to the gate. The Captain was greatly concerned about this exchange: he testified at trial that "it [was] probably one of the most odd exchanges that I've ever had with anyone in my entire career, and it concerned me greatly."

After the passengers boarded, the Captain, in the cockpit, spoke by telephone with Flight Attendant Two in the rear of the plane.[1] He asked her to check on the location of the man with the ponytail and whether she "had any other concerns that she could see with this particular passenger." The Captain agreed at trial that he must have described the man to her but did not recall the exact description. [The flight attendants described the man with the ponytail as having a heavy accent.]

Flight Attendant Two checked and returned to the Captain with information that the man with the ponytail was sitting with

---

[1]    We refer to the three flight attendants assigned to Flight 2237 using AA's official designations for their positions: Flight Attendant One, Flight Attendant Two, and Flight Attendant Four. There was no Flight Attendant Three.

two other men in Row 20, an emergency exit row.  The plaintiff,
seated by the window, was one of those men.

The location of the man with the ponytail in an exit row
concerned the Captain.  The emergency exit row location is
important to safety because the exit rows are critical if the
aircraft needs to be evacuated.  Passengers sitting in the exit
rows need to meet specific regulatory criteria, 14 C.F.R.
§ 121.585(b), which among other things require them to follow the
instructions of crew-members and assist other passengers in
evacuating the aircraft.

Flight Attendant Two told the Captain that she perceived
the man in the ponytail was traveling with the two other men in the
row, one of whom was the plaintiff.[2]  Regardless, the Captain said
it was not important from his perspective whether or not the three
men were traveling together: "[I]f people are trying to harm the
aircraft or anyone on board, they might be traveling together, they
might not be traveling together."

Flight Attendant Two also expressed her concerns to the
Captain about the plaintiff.  She described an incident she had

_____

[2]      The plaintiff is an American citizen.  The other two men
were Israeli, a fact learned by the State Police later.   The
plaintiff testified that the two other men "looked Middle Eastern"
and that they looked like the plaintiff "in the sense that they had
dark hair and . . . an olive complexion."

with the plaintiff in the terminal. She told the Captain that this passenger, the plaintiff, had been hostile to her.[3]

Specifically, she reported to the Captain that prior to boarding she had been approached by the plaintiff in the gate area. He was "very hostile and extremely insistent that his seat be switched to an exit row seat." She explained to the plaintiff that she was a flight attendant and not a gate agent and asked him to take a seat until someone could help him. She said that the plaintiff "continued to stare at her and sat down right close to the gate. . . . [T]he entire time that she worked at the gate he was just sitting there staring at her, making her extremely uncomfortable."[4]

She also told the Captain that this passenger boarded the plane into his coach class seat when only the first class passengers were called to board, and that the plaintiff immediately went to the bathroom for an extended period of time. The Captain was concerned about the plaintiff's early use of the lavatory because it is a very insecure area in which a bomb may have been

---

[3]    Plaintiff's theory of discrimination was that Flight Attendant Two was motivated by discriminatory bias based on national origin, because of the plaintiff's appearance as having "dark hair" and an "olive complexion."

[4]    As Flight Attendant Two walked down the jetbridge to the aircraft with the other flight attendants, she told them that her encounter with the plaintiff had made her uncomfortable. This is also what she told the Captain. Plaintiff denies her version of the events, but this is what she communicated to the Captain at the time.

placed.   He requested the co-pilot on the flight check the lavatory.   The co-pilot did so and found nothing.

Flight Attendant Four went to the Captain[5] with her independent concerns about the three men in Row 20.   She reported to the Captain that during (and after) the safety briefing for those seated in exit rows, two of the three passengers in Row 20 were acting very bizarrely and asking questions such as "Is this how you want me to do it?"

She reported that after the briefing, one of the three passengers in Row 20 had pressed the flight attendant call light. Although Flight Attendant Four was upset by their earlier behavior, she went to answer the call light.   The two men started in again, laughing, and one asked her, "Where do you want me to put the door?"   She testified that no one "acts like this during an exit row briefing.   This is a serious safety briefing."   She observed the plaintiff, who was leaning forward and watching the other two passengers: "[H]e wasn't laughing outright but he had this smile on his face like he found it very amusing."   She added, "I don't think the other passengers [on the plane] found it amusing when we're talking about a safety issue."   She went up front to the

---

[5]     In his deposition, the Captain had testified that he could not recall the other two flight attendants expressing concerns to him.   At trial, he testified that they also expressed concerns to him; their testimony verified that fact.

cockpit to report this to the Captain because the behavior "was so unusual and . . . somewhat frightening."

Flight Attendant Four was anxious and disturbed about what was happening. Her concerns went to all three men in the row. She thought they were together because the plaintiff had specifically requested the seat he occupied and because, she thought, he would more likely find their conduct to be amusing (as he appeared to do) and not take their conduct seriously if the three were friends.

Flight Attendant One also had observed that when the man with the ponytail boarded the plane, he had looked into the cockpit and asked the Captain, "Are you our Captain?" Both the Captain and Flight Attendant One thought this strange. The Captain thought it strange because he had already spoken with this man in the terminal and confirmed he was the Captain. Flight Attendant One thought it strange because it was obvious that he was the Captain given his location right next to the cockpit door.

In addition, Flight Attendant Two told the Captain of separate concerns that the plaintiff had an "obvious interest in flight attendant duties; someone might call it staring." This worried the Captain, as undue interest from a passenger in the flight attendants' conduct can trigger a safety concern.

As a result of all of these events, the Captain convened a meeting of the flight crew on board the aircraft to discuss

-9-

everyone's concerns and determine which course of action -- either leaving as scheduled or delaying the flight to investigate further -- was the most appropriate. The plane had been boarded by then and the jetbridge had been removed.

At this point, Flight Attendant Two reported to the Captain that other passengers had expressed their discomfort with the man with the ponytail and with comments he and others in Row 20 had made, which included wishing other passengers "Happy New Year" and acting in a "very boisterous" manner. Flight Attendant Two also reported that the passengers in Row 20 now seemed to be feigning sleep; she thought the sleep was feigned given that these passengers had shortly before been boisterous and making lively comments.

The Captain did not question the information he received from Flight Attendant Two, who was a thirty-seven-year veteran with a stellar reputation. In the meeting the Captain had convened, the flight attendants said they were not comfortable with the flight going ahead.

The Captain then decided that based on his own observations and the crew's observations, including the separate information from the three flight attendants, there was adequate reason to investigate the security concerns in more detail, even if this meant delaying the takeoff of a fully boarded plane. Thus,

-10-

the Captain made the first decision not to depart the gate, but to investigate further.

The Captain called the gate agent and had the jetbridge brought back to the plane. The Captain then called the ground security coordinator and notified him of the concerns he and all of the flight attendants had with the three passengers. The gate agent and the ground security coordinator both came aboard the aircraft, and the Captain further discussed the security concerns with them.

The second decision made was to remove the three men from the plane for further questioning by appropriate authorities. At the Captain's request, the three men were removed from the aircraft for further questioning because "of the number of concerns, not just [Flight Attendant Two's] concerns." When the three passengers were removed from the plane, they were asked to take their carry-on bags with them. The Captain did not interview the three passengers himself, as he was busy with the flight and that was not his responsibility.

The Captain then called company systems operations control in Dallas both to give them a full report on the security issues and to notify them that the flight would not be departing on time. In addition, the Captain had a ten-minute conversation with his superior, an off-site "chief pilot on duty," who offered to

-11-

come from home to the airport and help. The Captain said he would handle it on his own.

The Captain testified his decision not to takeoff and to remove the three men in Row 20 from the plane for questioning was based on his odd experience with the man with the ponytail, the information and concerns about all three passengers in the exit row expressed by all three flight attendants, as well as the fact that the flight attendants were uncomfortable with the flight departing. The Captain was particularly concerned with the report of Flight Attendant Two that both the plaintiff and the man with the ponytail "seemed extremely interested in the duties" of two of the flight attendants.

After the three men were removed for questioning by the State Police in a separate location in the terminal, a passenger on the plane reported that one of the three men in Row 20 had box cutters confiscated from him at the Transportation and Security Administration ("TSA") security checkpoint. Once he heard the report, the Captain questioned the passenger himself. The Captain then reported it personally to the head of TSA at Logan and told him that "if box cutters had been taken from one of my passengers on board my aircraft, that . . . aircraft was not going to fly the entire day no matter what was checked." The head of TSA did research and reported back to the Captain that box cutters had been taken from a passenger on a different flight that morning.

-12-

Nonetheless, the Captain testified, "That event, in and of itself, concerned me greatly."

At some point, Flight Attendant Four reported to the Captain that "we had more than one passenger, who were not traveling together, who had concerns about passengers in the exit row; passengers who were becoming very nervous." The Captain testified, "And I remember one woman, with two small children, I believe, and she was getting very nervous to the point where I thought she might not go with us."

The Captain then made a third decision, to empty the aircraft of all passengers, all carry-on belongings, and all cargo, and have the aircraft searched with dogs. He did so because of the box cutter concern, and because the Captain recognized that tension levels were rising among the other 126 passengers, and after consulting with three Massachusetts State Police officers and the TSA.

The Captain testified that it was an extremely difficult decision to empty the aircraft of passengers and baggage. He knew it meant inconvenience to over 100 people, that it would cost AA a great deal of money, and that he and his flight crew would be late getting back to their families. Indeed, he met some resistance from AA employees to unloading the bags, because it is "quite a project." The Captain told them, "[T]hat's just what we're going

to have to do. We have to make sure this aircraft is safe to depart." This process took three hours.

The three men from Row 20 had been moved to a secured location away from the gate and apart from the other passengers and were questioned by one of the State Police troopers. The Captain was told that the State Police, in questioning the three men, had become concerned about the passport of one of the men.

While the search of the plane was conducted, the passengers were kept in a secured area. During this period, the flight attendants became even more concerned. The flight attendants informed the Captain that they elected not to continue the trip.[6] Also during this period, the State Police troopers conducted lengthy interviews with passengers who had observed what the Captain called the "suspicious behavior" of the three men. The Captain had lengthy and ongoing discussions with local AA management, the State Police, TSA management, and air marshals.

From the Captain's perspective, it was the State Police who decided that the three men would not travel that day on the flight. During his conversations with the sky marshals service, systems operations control, and the chief pilot on duty, "a state police officer approached me and told me, point blank, 'These three

---

[6]     Thus, the flight attendants decided they would not continue on the trip before they knew whether the plaintiff would be a passenger should the flight continue.

gentlemen are not traveling with you today. It's out of your hands.'" The Captain accepted this decision.

After this, the Captain made the decision that the flight would continue on to Fort Lauderdale after all the passengers other than the three men had been re-screened by security, and the re-screened bags reloaded. The original flight attendants refused to continue the trip. They were replaced by another three attendants from a reserve crew. The flight departed approximately three hours late at 9:33am. The captain informed the pertinent AA personnel of this. The flight went without the plaintiff or the other two men.

Within twenty-four hours of the situation, the Captain, as is standard AA practice, prepared a report, which he filed with the company. Pertinently, the Captain's concerns about the three men had not abated. In fact, in his report, the Captain noted:

> I would like to get the status of the passengers who we did not transport. Whether they took a later flight, no flight, etc. I would like to know whether the authorities found anything that pertains to our security concerns. And, will passengers be allowed to fly AA again if no 'problems' were found?

That report, in evidence, was consistent with his testimony.

At no time, the Captain testified, did he ever see the plaintiff, nor was he aware of the plaintiff's appearance. The plaintiff was seated in 20F, a window seat which is not visible to

-15-

the Captain from the front of the plane.[7]  The Captain flatly
denied that the plaintiff's ethnic appearance had anything to do
with his decision to remove plaintiff from the flight:

> I'm emphatic about it, one, because I had
> never seen Mr. Cerqueira up to that point;
> two, I had a number of concerns from three
> separate employees, and more than one
> passenger not traveling together.  I didn't
> have one passenger with concerns, I had more
> than one passenger with concerns.  So I have
> all of the people working for me concerned for
> numerous reasons, and I have some of my
> passengers concerned.   I would have been
> derelict in my duty to ignore those concerns
> and depart with that flight.
>
> I fly hundred of flights. I fly the equivalent
> of a flight every day.  I fly thousands of
> passengers -- all races, all religions --
> every day.  I've had other security problems
> at Logan Airport and they're dealt with the
> same way. I would do everything the same way.

The first time the Captain ever saw the plaintiff was at trial.

B.      Denial of Rebooking

During the questioning of the three men by the State

Police, the Captain had communicated the situation to the systems

operations control ("SOC") manager in Dallas. The SOC manager was

the only person with the authority to make a decision on whether a

passenger who had been removed from a plane for questioning could

---

[7]      During the Captain's testimony, counsel for the plaintiff
suggested to the Captain that when the gate agent came on the
plane, the Captain emerged from the cockpit to point at the man
with the ponytail in Row 20.  The Captain said he could not recall
having done that, but that he might have been able to point out
only the passenger with the ponytail whom he recognized without
leaving the front of the plane.

be rebooked. At some point during the period, the SOC manager decided to deny rebooking to the plaintiff. He made this decision based on the information communicated to him by the Captain and those involved with the investigation in Boston.

The SOC manager communicated his decision to the AA customer service manager at Logan, advising her that the plaintiff was denied boarding and instructing her to refund his ticket. The customer service manager then made an entry into the plaintiff's passenger record at 9:01am, which stated that the passenger was "denied travel on [flight] 2237 per SOC [manager] due to security issue." A few minutes later, at 9:08am, an employee at the SOC amended the record to note that the passenger was "denied boarding . . . due [to] security issues. Refund ticket . . . Do not rebook on AA."

The three passengers were released at some point roughly around 9:00am. The passengers were escorted to the AA ticket counter, and one of the state troopers communicated to an AA agent that the passengers were "free to go." Another trooper noted in the police administrative log at 9:00am that the three passengers "were denied boarding [and] will be re-booked."

After being escorted to the ticket counter, the plaintiff asked a reservations agent to rebook him. The reservations agent told him that there was an afternoon flight available, but that she was not authorized to make a decision to rebook. Approximately

-17-

twenty to thirty minutes later, the customer service manager who had spoken to the SOC manager came to the ticket counter. The customer service manager asked for the plaintiff's credit card and refunded the Boston to Fort Lauderdale portion of his trip. When the plaintiff asked the customer service manager why he was not being rebooked, she told him that the decision had been made by AA's corporate offices.[5] For any further information, she informed the plaintiff, he would need to contact the corporate offices directly. Apparently, the other two passengers were also denied rebooking.

The plaintiff then called other airlines to try and make alternate arrangements to fly to his home in Florida that day. All of the flights he found were expensive, so he did not book one. His parents came to pick him up at the airport and he returned to his parents' house in Fall River, Massachusetts.

Later that day, the plaintiff wrote an e-mail to American Airlines customer service asking for any information they had about the incident, including what he was accused of saying on the plane, and the implications of the incident for his future travel with AA or any other airline.

The following day, the plaintiff completed his journey on another airline without incident.

_____

[5]   The plaintiff testified that the customer service manager told him that the decision was made because of something the plaintiff had said on the plane.

-18-

Nine days after the incident, on January 6, 2004, the plaintiff received a response from a customer relations official at AA. The response stated that the airline had "fully reviewed the decision" to deny boarding and explained that it was because "our personnel perceived certain aspects of your behavior which could have made other customers uncomfortable on board the aircraft." It informed the plaintiff that "[t]here is no indication that you will be denied boarding in the future."

II.

The plaintiff filed a complaint of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") in the fall of 2004. After the MCAD concluded that the plaintiff had established a prima facie case, the plaintiff brought suit in August 2005 in the federal district court of Massachusetts against American Airlines, the Captain, Flight Attendant Two, the reservations agent, and the customer service manager, alleging discrimination under both federal and state statutes, and seeking compensatory and punitive damages and declaratory and injunctive relief.[9]

The case was tried to a jury in January 2007.   We describe later the jury instructions requested and the instructions actually given. At the close of the plaintiff's case in chief, AA

---

[9]     He amended his complaint a month later to remove all of the individual defendants, leaving only American Airlines.

moved for judgment as a matter of law. The district court denied the motion. AA renewed its motion at the close of all the evidence, and the district court denied the motion again. After deliberating, the jury found for the plaintiff and awarded him compensatory damages of $130,000 and punitive damages of $270,000.

The defendants then filed two post-judgment motions. The first was a motion for judgment notwithstanding the verdict on the grounds that the plaintiff had not proved that AA had intentionally discriminated against him, and that he had not proved that AA's decision was arbitrary or capricious under 49 U.S.C. § 44902(b). The second sought a new trial on the same basis and also claimed that the court erred in not giving an explicit jury instruction on § 44902(b), that it had erred in instructing the jury that AA was liable if any of the information that went into the airline's decisions was tainted with discriminatory animus, that AA should have been allowed to offer testimony related to its security procedures, and that the court's admission of a consent order between the Department of Transportation and AA represented unfair prejudice. In the alternative, the second motion sought remittitur of the damages awarded to the plaintiff.

After oral argument, the district court denied AA's first motion for JNOV from the bench. In a written opinion, Cerqueira v. American Airlines, Inc., 484 F. Supp. 2d 232 (D. Mass. 2007), the district court rejected the defendant's second motion. The court

found that its jury instructions did not constitute prejudicial error and that its evidentiary rulings were proper. The court also rejected AA's request for a remittitur. In a second opinion, the court awarded the plaintiff attorneys' fees. Cerqueira v. Am. Airlines, Inc., 484 F. Supp. 2d 241 (D. Mass. 2007).

On appeal,[10] AA argues there was error in the failure to give the requested § 44902(b) instructions, errors in the instructions given, and error in the admission of the consent order. The defendant also argues that the verdict is not supported by the evidence and that the punitive damages award is unreasonable. Accordingly, the defendant asks for judgment to be entered for AA, or alternatively that a new trial be granted.

III.

This case does not involve any claim of constitutional right on the part of the plaintiff, in which the power of Congress is constrained by the Constitution. Rather, the case involves only the intersection of various statutes, which articulate competing policy concerns.

As a matter of federal policy, under the Federal Aviation Act, "assigning and maintaining safety [ranks] as the highest

---

[10]   We appreciate the assistance provided by amici curiae Air Transport Association of America, Inc., Lawyers' Committee for Civil Rights Under Law, Asian American Justice Center, Mexican American Legal Defense & Educational Fund, National Association for the Advancement of Colored People, and Puerto Rican Legal Defense Fund.

-21-

priority in air commerce." 49 U.S.C. § 40101(a)(1). Thus, the highest priority is assigned to safety, even though the federal aviation statute also has a general prohibition on race and national origin discrimination. "An air carrier . . . may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex or ancestry." 49 U.S.C. § 40127(a).[11] Plaintiff's suit is brought under 42 U.S.C. § 1981, which was expanded in the Civil Rights Act of 1991 to cover the making, performance, modification, and termination of contracts. Id. § 1981(b).

In 49 U.S.C. § 44902(a), which became effective in 1961,[12] Congress mandated air carriers to refuse to transport passengers and property where a passenger does not consent to a search of his person or property for dangerous weapons, explosives, or destructive substances. In addition to mandating that some

[11]     The provision was enacted in 2000. It appears to have been a replacement for an earlier statute which was repealed. This older section was part of a larger, comprehensive scheme of airline regulation, and as such was repealed in 1983 as part of the Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat. 1705. The repealed statute, 49 U.S.C. § 1374, barred airlines from giving any person "undue or unreasonable preference or advantage" or subjecting any person to "unjust discrimination or any undue or unreasonable prejudice or disadvantage." Plaintiff does not purport to bring suit under § 40127(a) and we do not reach the question of whether it creates an implied right of action.

[12]     In 1994, Congress moved the statute from 49 U.S.C. § 1511(a) to 49 U.S.C. § 44902(b). Pub. L. 103-272, § 1(e), 108 Stat. 1204 (1994).

-22-

passengers be refused transport, Congress also authorized, at subsection (b), air carriers to engage in "permissive refusal":

> Subject to regulations of the Under Secretary, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.

49 U.S.C. § 44902(b). Thus Congress supplemented the discretion airlines already had under common law to exclude certain passengers, in light of their duty of utmost care to all passengers. See Williams v. Trans World Airlines, 509 F.2d 942, 946 n.8 (2d Cir. 1975). It is obvious that § 44902(b) was enacted in furtherance of the first priority of safety in air traffic, 49 U.S.C. § 40101(a)(1). The legislative history confirms this. See generally Crimes Aboard Aircraft in Air Commerce: Hearing Before the Aviation Subcomm. of the S. Comm. on Commerce, 87th Cong. (1961).

The permissive refusal authorization in § 44902(b) has several distinct components. The statute says the air carrier "may" refuse to transport, thus vesting discretion over the decision in the air carrier. 49 U.S.C. § 44902(b). That discretion is very broad. The carrier need not decide that the passenger or property is inimical to safety; the authorization extends to situations in which the carrier decides the passenger or property "might be" inimical to safety. Id. The congressional authorization is granted to the air carrier to make the decision. The only limit contained in the statute on that discretion is that

it be subject to regulations of the Under Secretary of
Transportation for Security.

In turn, the Under Secretary has not promulgated
regulations limiting the airline's discretion directly under 49
U.S.C. § 44902(b). However, one other regulation is directly
pertinent, as it states that:

> The pilot in command of an aircraft is directly
> responsible for, and is the final authority as to the
> operation of that aircraft.

14 C.F.R. § 91.3(a). In other words, the pilot in command stands
in the role of the air carrier for a decision to remove a passenger
from a flight.[13] The authorization in § 44902(b) also applies to
decisions by others than the pilot not to rebook a passenger based
on safety concerns. In this case, that decision was made by
another person, based on information from the pilot.

Section 44902 itself does not provide for judicial review
of decisions to refuse transportation by the pilot in command.
Nonetheless, courts have entertained actions involving § 44902(b)
brought under other general statutes which prohibit discrimination,

---

[13] While it is true, as amicus for plaintiff points out,
that the statute refers to the air carrier's decision, the
appropriate focus is on the actual decisionmaker: the pilot in
command of the aircraft where the passenger is removed from the
pilot's flight. That is so as a matter of law under 14 C.F.R.
§ 91.3. In practice in this context, it is not the air carrier
that makes the decision to refuse transport to the passenger on the
flight, but the pilot in command, who acts for the air carrier.

such as § 1981 and Title VI of the Civil Rights Act.[14]  See, e.g.,
Williams, 509 F.2d 942; Dasrath v. Cont'l Airlines, Inc., 467 F.
Supp. 2d 431 (D.N.J. 2006); Al-Qudhai'een v. Am. W. Airlines, Inc.,
267 F. Supp. 2d 841 (S.D. Ohio 2003).

Accordingly, the parties have assumed that the
protections of 49 U.S.C. § 44902 and the U.S. Department of
Transportation administrative enforcement mechanisms to protect the
rights of passengers, 49 U.S.C. §§ 46101, 46301, do not preclude
the filing of actions under 42 U.S.C. § 1981, and we will assume
the same.[15]  It is clear that § 44902(b), being the more specific
statute, applies to this case.  See Vimar Seguros y Reaseguros,
S.A. v. M/V Sky Reefer, 29 F.3d 727, 732 (1st Cir. 1994).  Congress

_____

[14]    AA argues that no Title VI claim is stated here because
the only federal financial assistance AA receives is government
compensation under the Stabilization Act, which does not qualify as
federal financial assistance under 42 U.S.C. § 2000d.  We need not
reach the issue.  Any Title VI claim would fail for the same
reasons we express.

[15]    The plaintiff's claim based on the state public
accommodation discrimination law, Mass. Gen. Laws ch. 272, § 98,
may fail under the preemption clause of the Airline Deregulation
Act of 1978, 49 U.S.C. § 41713(b).  See, e.g., Am. Airlines, Inc.
v. Wolens, 513 U.S. 219, 228 (1995) (holding that the Airline
Deregulation Act preempted state-law consumer fraud claim); Morales
v. Trans World Airlines, Inc., 504 U.S. 374, 391 (1992) (holding
that the Airline Deregulation Act preempted state-law false
advertising claim).  In several cases, federal circuit courts have
held that the federal interest expressed in 49 U.S.C. § 44902(b)
and its predecessor governs airlines' boarding procedures and
preempts state law contract claims.  See, e.g., Smith v. Comair,
Inc., 134 F.3d 254, 258-59 (4th Cir. 1998); O'Carroll v. Am.
Airlines, Inc., 863 F.2d 11, 13 (5th Cir. 1989).  The resolution of
this case on other grounds means we do not reach the preemption
questions.

has, by statute, explicitly given safety the highest priority. See 49 U.S.C. § 40101(a)(1) (recognizing "safety as the highest priority in air commerce").

Some courts have described an air carrier's reliance on § 44902(b) as a defense in the nature of an immunity. See, e.g., Al-Qudhai'een, 267 F. Supp. 2d at 848 (finding defendants "immun[e] under 49 U.S.C. § 44902(b)"). In our view, § 44902(b) does not merely create a defense[16]: the statute is an affirmative grant of permission to the air carrier. Congress specifically authorized permissive refusals by air carriers; Congress did not say § 44902 was merely creating a defense. It is the plaintiff who carries the burden to show that § 44902(b) is inapplicable.

The courts, by judicial construction of § 44902(b), have adopted a standard for liability for an airline's permissive refusal to transport decisions. This standard reconciles the primary priority of safety with other important policies, such as § 1981's prohibitions on racial discrimination. The standard most frequently articulated is that developed by the Second Circuit in

---

[16] Although § 44902 does not merely provide immunity, the law of qualified immunity provides some useful parallels, though qualified immunity is a judicially created defense. For example, in Saucier v. Katz, 533 U.S. 194, 205 (2001), a decision about the appropriate level of force is evaluated from the "on-scene perspective," id., and not with the benefit of "20/20 vision of hindsight," id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted). Under the qualified immunity tests, even mistaken decisions can be protected by immunity.

Williams: that the air carrier's decision to refuse air transport must be shown to be arbitrary or capricious. See Williams, 509 F.2d at 948. The arbitrary or capricious standard was later adopted by the Ninth Circuit in Cordero v. Cia Mexicana de Aviacion, S.A., 681 F.2d 669, 671-72 (9th Cir. 1982). We agree with Williams and hold that an air carrier's decisions to refuse transport under § 44902(b) are not subject to liability unless the decision is arbitrary or capricious. There is no need here to repeat the cogent reasoning in Williams. See 509 F.2d at 947-49.

We also agree with Williams that Congress did not intend the non-discrimination provisions of the FAA or of § 1981 to limit or to render inoperative the refusal rights of the air carrier. Id. at 948. Congress left decisions to refuse passage to the air carrier, and any review in the courts is limited to review for arbitrariness or capriciousness. Congress was also well aware that the air carriers' decisions to deny transport have to be made very quickly and based on limited information. See id. (noting that the permissive refusal statute specifically provides for the subjective judgment of the air carrier). Section 44902(b) must be interpreted in that light. Congress "did not contemplate that the flight would have to be held up or cancelled until certainty was achieved." Id.

Thus, in evaluating whether a decision to refuse transport is arbitrary or capricious,[17] the following principles apply:

(1)   In cases involving removal from flights under § 44902, it is the decision by the pilot in charge who refuses passage which stands as the decision of the air carrier.  The congressional intent in providing permission for air carriers to refuse transport because of safety concerns would be undercut if the focus were on the air carrier writ large, and not on the individuals given the authority for the decision.

(2)   Review of a decision to refuse transport is restricted to what information was actually known by the decisionmaker at the time of the decision. The test is not what the decisionmakers reasonably should have known.  Courts have routinely refused to permit consideration of information not

---

[17]   The term "reasonableness" is widely used in the law and we do not use it here. Of course, a reasonable decision is not arbitrary or capricious. See Williams, 509 F.2d at 948. And a decision which is arbitrary is totally devoid of reason. See Cordero, 681 F.2d at 672. The arbitrariness or capriciousness standard here is not the same as reasonableness under a negligence standard. See Adamsons v. Am. Airlines, Inc., 444 N.E.2d 21, 24-25 (N.Y. 1982), cert. denied, 463 U.S. 1209 (1983).

Similarly, in the context of Fourth Amendment rights, air carriers are not even held to normal standards for "reasonableness" for inspection of property. See United States v. Momoh, 427 F.3d 137, 141 (1st Cir. 2005) (recognizing that Fourth Amendment reasonableness analysis is inapplicable to an air carrier's inspection of property) (citing United States v. Edwards, 602 F.2d 458 (1st Cir. 1979)); see also, e.g., 49 U.S.C. § 44902(a) (requiring air carriers to refuse to transport passengers who do not submit to a search).

-28-

actually known to the decisionmakers. See, e.g., Dasrath, 467 F. Supp. 2d at 446 ("[I]f [the Captain] reasonably believed that something had taken place (even if it had not), his reasonable belief is what is critical, not what actually took place."); Al-Qudhai'een, 267 F. Supp. 2d at 847 n.4.

(3) Because the decision must be made in an expedient manner, and it is the Captain who bears the ultimate responsibility of ensuring the safety of the aircraft, there is no obligation on the part of the Captain (or other decisionmaker) to make a thorough inquiry into the information received, the sources of that information, or to engage in an investigation. See, e.g., Cordero, 681 F.2d at 672. The Captain (or other decisionmaker) is entitled to accept at face value the representations made to him by other air carrier employees. See, e.g., id.; Williams, 509 F.2d at 948. Thus, even mistaken decisions are protected as long as they are not arbitrary or capricious. We will assume that there is an exception to this where no responsible decisionmaker could credit the information provided. See Williams, 509 F.2d at 948; see also Cordero, 681 F.2d at 672 (recognizing that the decision must be made on a rational appraisal of the facts).

Such an exception has no application in this case, as our recitation of the facts makes clear.

(4)   The biases of a non-decisionmaker may not be attributed to the decisionmakers. See Al-Qudhai'een, 267 F. Supp.

2d at 848 (noting that the pilot "is entitled to rely on the information provided to him by his crew despite any exaggerations or false representations").

In light of these principles, the jury verdict cannot stand either on the law or on the evidence. The district court erred both when it refused to give several instructions requested by American and in the instructions it did give.

A.          Error in Refusal To Instruct on § 44902(b)

We review jury instructions de novo, recognizing that properly preserved objections to the omission of desired jury instructions constitute reversible error only if the omitted instructions were (1) correct as a matter of substantive law, (2) not substantially covered in the charge as a whole, and (3) integral to an important point in the case. Roger Edwards, LLC v. Fiddes & Sons, Ltd., 387 F.3d 90, 95 (1st Cir. 2004); Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 133 (1st Cir. 2004).

American Airlines requested the following jury instructions on § 44902(b), which are consistent with Williams and Cordero:

(1)  "The Federal Aviation Act permits an airline, through its Captain, to exercise his discretion to deny any passenger air transport whom the Captain believes is or may be inimical to the safety of the passengers or aircraft. If you find that American's decision to remove the plaintiff . . . was based

-30-

upon its concern for the safety and security of the passengers you must return a verdict in favor of American."

(2)   "The law endows the airline with discretion in accepting or rejecting a passenger, based on considerations of safety and problems inherent to air travel, and that such discretion, if exercised in good faith and for a rational reason, must be accepted."

(3)   "You must return a verdict for American unless you find its actions were 'arbitrary or capricious' . . . ."

(4)   "[Y]ou must review all of the facts known to [the Captain, the SOC manager,] and the Massachusetts State Police at the time they formed their decision.   You must not rely on any facts disclosed in hindsight."

(5)   "A Captain . . . is entitled to base a decision to remove a passenger from a flight on the representations made to him by other airline employees about the passenger's behavior. . . . [T]he Captain is not obligated to leave the cockpit and investigate the truthfulness of the flight attendant's statements."

Each of these instructions accurately states the law.[16]
The district court, nonetheless, declined to give any of these
instructions. The court never informed the jury that it must find
the Captain's decision to be arbitrary or capricious in order to
hold AA liable. The court also erred when it declined to instruct
the jury that the legality of the air carrier's decision was to be
judged based only on the information known to the decisionmaker at
the time of the decision and not based on information gained later
in hindsight. Further, at no point did the court instruct the jury
that the Captain was entitled to rely on the representations of
other employees, and that he had no duty or obligation to
investigate the truthfulness of representations made to him. The
defendant properly objected to the court's failure to so instruct.
Cerqueira did not object to these requested instructions;
nonetheless, the court erroneously chose not to give them.

The plaintiff argues that these omissions do not require
reversal because the court did give other instructions which, he
claims, covered these points. But those instructions do not remedy

_____

[16]    While some courts have stated that the arbitrary or
capricious standard is an objective one, see Dasrath, 467 F. Supp.
2d at 445, we stress that the point of view taken is that of the
pilot in command who is the decisionmaker, and not that of the
average juror. We have no need to decide whether a seemingly
arbitrary or capricious decision by a Captain to deny passage is
nonetheless protected by the Captain's subjective good faith, as
American argues.

-32-

the error.   Further, these instructions were themselves based on error.

The court did instruct that the jury was "entitled to consider that American Airlines is expected to operate its airlines with the primary goal of the safety and well-being of the traveling public." It instructed that "we expect of American Airlines . . . to behave themselves in a way that puts the safety of the traveling public and their employees first.   But they cannot, they're forbidden by the law from acting to discriminate. . . . " (Emphasis added.)   Through the juxtaposition of these two sentences, the district court subordinated the safety principle, which was given the highest priority by Congress.

Those instructions are, in any event, a far cry from an instruction that the air carrier was mandated by law to put safety first and that the law specifically authorized air carriers to refuse to transport passengers who, in the airline's view, "might be inimical to safety."   The instructional error is not a matter of mere wording.   The omitted instructions were required as a matter of substantive law, were not substantially covered in the charge as a whole, and were essential to the case.   Roger Edwards, LLC, 387 F.3d at 95.

B.      Instructions Actually Given Were in Error

The jury verdict was based on erroneous instructions which were in error both in the omissions to give the correct

-33-

instructions and in the instructions which were given. The court instructed the jury as follows:

(1) that liability for all employees' actions accrued to the air carrier, not just the decisionmakers' actions:

> Now, American Airlines is a company. . . . Companies are people and they're bureaucracies and they operate hierarchically; in other words, there are higher-ups in the company and lower down people. But all are employees of the company and . . . if you think they're acting within the scope of their employment and they're doing what they are doing as employees of American Airlines, then that conduct is attributed to American Airlines.

(2) that it could find for the plaintiff if it concluded that a lower-ranking American employee, such as a flight attendant, gave certain information to the decisionmaker:

> But [American] cannot, they're forbidden by law from acting to discriminate . . . against someone based upon their perception that that person is a certain race or a certain ethnic heritage. If that's why they did what they did, that's forbidden by the law. And let's say that's why a lower-level person acted as she did in respect to this.

> If that action is transformed into the action of the higher corporate people, if that's what drives the action of the higher corporate people, American's stuck with it because American should take care that they're not acting against a person based on the perceived race or ethnicity. The law forbids that.

(3) that American Airlines had the ultimate burden of showing that its reasons for removing the plaintiff were legitimate:

> [I]f you think there is a forbidden reason in
> there, then the burden shifts over to American
> Airlines. And if [American Airlines] would
> have done it anyway, if they would have
> behaved exactly the same way anyway for
> legitimate reasons, if . . . American Airlines
> proves that, well, your verdict must be for
> American Airlines.

The court, in its written opinion denying American's
motion for a new trial, set forth its reasoning for these jury
instructions. See Cerqueira, 484 F. Supp. 2d at 234. The court
reasoned that its instruction on finding intentional discrimination
was adequate to cover § 44902(b), because if there was intentional
discrimination as defined under the burden-shifting analysis of the
McDonnell Douglas test, that would itself per se be arbitrary or
capricious. Id.; see McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973). That reasoning was a mismatch with this case.

Here, there is absolutely no evidence that either the
Captain himself or the SOC manager had discriminatory animus, let
alone that their decisions to refuse to transport a passenger,
which were made under time pressure, were based on any
discriminatory animus. The decision not to reboard the plaintiff
on the flight was made by the State Police and accepted by the
Captain. The Captain did not see the plaintiff and thus was
unaware of his appearance, whether Middle Eastern or not, until the
time of the trial. The Captain's actions were justified in light
of the safety concerns described earlier.

-35-

The SOC manager, who was in Dallas, based his decision, made that same morning and within minutes, not to rebook the plaintiff on information about the situation, specifically all of the security concerns that formed the basis of the Captain's decision relayed to him from Boston. There is no evidence that any of the security concerns which made the Captain's decision appropriate had been proven unfounded by the time the SOC manager decided that morning to deny rebooking. Further, there is no indication that the SOC manager was aware of the plaintiff's appearance, race, or ethnicity.

If the Captain had made a decision to remove plaintiff from this flight based only on the Captain's bias toward persons who appeared to be of Middle Eastern descent, such a decision would be arbitrary within the meaning of § 44902(b). In such instances, there is congruence between the different statutory commands -- passenger safety and non-discrimination. The jury, though, was never asked the correct questions here.

The instructions given were based on three incorrect assumptions on the part of the district court: (1) that instructions from Title VII employment discrimination cases were appropriate in a refusal to transport case under § 44902(b); (2) that the instructions given were required by the doctrine of respondeat superior; and (3) that the instructions were required by

Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77 (1st Cir. 2004).

This claim, however, is not an employment discrimination claim arising under Title VII; it arose under § 1981[19] and challenged a decision made pursuant to the authorization given an air carrier by Congress in § 44902(b). As we have held, the burden is on the plaintiff to show the decision not to transport was arbitrary or capricious. Cordero (and Williams) hold the same. See Cordero, 681 F.2d at 672; Williams, 509 F.2d at 948. The jury must be instructed that an air carrier has the power to refuse transport because transport of a passenger "might be" inimical to safety unless that decision was arbitrary or capricious. See Cordero, 681 F.2d at 672. It is the plaintiff's burden to show the decision was arbitrary or capricious. The test we have outlined under § 44902(b) is inconsistent with the use in Title VII cases of

---

[19]    Nothing in the 1991 Amendments to § 1981 suggested Congress was changing this substantive law. Indeed, we have held that:
> The legislative history of the 1991 amendment makes it crystal clear that Congress did not intend to convert Section 1981 into a general prohibition against race discrimination.

Garrett v. Tandy Corp., 295 F.3d 94, 100 (1st Cir. 2002) (citing H.R. Rep. No. 40(II), at 37 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 731).

prima facie case methodology and the burden-shifting test. See
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[20]

There were a number of other problems with the
instructions given. The primary problem was that the instructions
permitted liability of the air carrier to turn on the purported
bias of non-decisionmakers. The jury was erroneously instructed
that its focus was not to be on the Captain's bias but on any
employee of the airline involved in providing information to the
decisionmakers. (We discuss this error further.) The instructions
also erroneously appeared to equate acting based on any perceptions
of a person's race or ethnic heritage with illegal discrimination.
Race or ethnic origin of a passenger may, depending on context, be
relevant information in the total mix of information raising
concerns that transport of a passenger "might be" inimical to
safety. The court also erroneously instructed that the mere
providing of information constitutes discrimination if the person
providing information was motivated by his or her perception of the
plaintiff's race or ethnicity. The court erroneously instructed
that if "one of the reasons that was actuating, driving, informing
people," but "not the only reason," was "that person's perception
of [plaintiff's] race or ethnicity," then this was a "forbidden
reason." (Emphasis added.)

_____

[20]    The district court in Dasrath, without explanation, did
use the McDonnell Douglas model, in our view incorrectly.   467
F. Supp. 2d at 445.

-38-

We return to the deemed attribution problem with the instructions. Not only is that type of instruction flatly inconsistent with § 44902(b), it was not justified either by reference to the Restatement (Second) of Agency ("Restatement") or under Cariglia.

Even in interpreting Title VII, the Supreme Court has not adopted Restatement § 219 principles wholesale, as the district court purported here to do. See Faragher v. City of Boca Raton, 524 U.S. 775, 797 (1998) ("The proper analysis here, then, calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement . . . ."). The district court here interpreted the respondeat superior doctrine to impose liability on an air carrier based on the purported discrimination of a lower-level employee who neither had authority to make the allegedly discriminatory decision nor in fact made the decision. Further, the Supreme Court has not addressed the scope of any respondeat superior liability in § 1981 claims generally[21] and we need not do so here.

---

[21]    Even under the Restatement, to put the question in classic agency terms, it was not within the scope of the flight attendant's employment duties to make the decision not to transport plaintiff that day. See Springer v. Seamen, 821 F.2d 871, 881 (1st Cir. 1987), abrogated on different grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989) (requiring that in order to impute liability to an employer, an employee's actions must be "within the scope of his or her duties"); Restatement § 219(1).

The district court also erroneously invoked another doctrine from employment law, which has no applicability on the facts here. In <u>Cariglia</u>, this court recognized that under the Massachusetts state employment discrimination statute, liability may be found where (a) a discriminating subordinate (b) causes the firing of a plaintiff by (i) intentionally giving false information to and (ii) withholding accurate information from the decisionmaker, (c) the decisionmaker's decision is significantly based on these very inaccuracies, and (d) the plaintiff has been given no opportunity to provide contrary information.    <u>See</u> <u>Cariglia</u>, 363 F.3d at 87-88.[22]  This theory was applied to a state employment law claim and is not available in a § 1981 federal claim where the air carrier has made a decision within the statutory authorization of § 44902(b).

Further, even on the <u>Cariglia</u> theory, the facts did not warrant such an instruction.[23]  The Captain consulted with State

_____

[22]    Other circuits have recognized a very limited and more restrictive version of this theory under Title VII.  <u>See, e.g.,</u> <u>Brewer</u> v. <u>Bd. of Trs.</u>, 479 F.3d 908, 918 (7th Cir. 2007) (imposing liability when the subordinate "has such power over the nominal decisionmaker that she is in fact the true, functional decision maker"); <u>Hill</u> v. <u>Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 291 (4th Cir. 2004) (imposing liability if the biased subordinate is "principally responsible" for the employment decision).  This circuit has not decided the issue under Title VII.

[23]    We are also very doubtful about the admission into evidence of the DOT Consent Order, which closed an enforcement proceeding against American for eleven claims of racial discrimination brought by other persons under various federal statutes.  <u>Cerqueira</u>, 484 F. Supp. 2d at 236.  The rationale for

-40-

Police and TSA personnel; it was the State Police who told the Captain that the plaintiff would not reboard the aircraft for the flight. The State Police had spoken to the plaintiff. And, even if the Captain's decision was based on his own experiences with one of the three passengers and other information, it was independently grounded and not captive of whatever information (biased or not) he received from Flight Attendant Two. Even under conventional discrimination theory, the plaintiff's evidence was insufficient to show the "tainted" information was a cause for his treatment, much less a but-for cause.

For the reasons given, we reverse and remand to the district court with instructions to vacate the judgment and fees award in favor of plaintiff and enter judgment for defendant.

admission was that the Order showed that AA was on notice of anti-discrimination policies. Id. at 238. The air carrier's knowledge of non-discrimination obligations was never at issue in this case. The carrier acknowledged it was aware of its obligations not to discriminate. To the extent the Order suggested that AA had, in other instances, engaged in discrimination, it was not relevant to the decision made by the Captain here, who is not the subject of the Order.

-41-