UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JOHN D. CERQUEIRA,                      )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )
                                        )    CIVIL ACTION NO.: 05-11652 WGY
AMERICAN AIRLINES, INC.,                )
                                        )
        Defendant.                      )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, AMERICAN
AIRLINES, INC.'S MOTION FOR ATTORNEYS' FEES AND COSTS
PURSUANT TO FED. R. CIV. P. 54(d) AND 42 U.S.C. § 1988**

Defendant, American Airlines, Inc. ("American"), respectfully submits this
Memorandum in Support of its Motion for Attorneys' Fees and Costs pursuant to
Fed.R.Civ.P. 54(d) and 42 U.S.C. § 1988.

## INTRODUCTION

Judgment entered in favor of American on plaintiff, John D. Cerqueira's claims
under 42 U.S.C. § 1981, 42 U.S.C. § 2000(d) and G.L. c. 272, § 98 ("USDC Judgment").
A copy of the USDC Judgment, dated January 16, 2008, is attached as Exhibit A.  The
USDC Judgment was entered pursuant to the Judgment of the United States Court of
Appeals for the First Circuit, dated January 10, 2008 ("USCA Judgment"), attached as
Exhibit B.  The USCA Judgment was revised and entered on February 29, 2008.  The
certified Mandate of the Court of Appeals entered on March 14, 2008.  A copy of the
Mandate is attached as Exhibit C.

In accordance with Fed.R.Civ.P. 54(d), American, as the prevailing party, is entitled to an award of costs as a matter of course.[1]  As part of those costs, in accordance with 42 U.S.C. § 1988, American is entitled to recover its reasonable attorneys' fees and its attorneys' reasonable and necessary out-of-pocket costs and expenses.

## I.    AMERICAN IS ENTITLED TO RECOVER ATTORNEYS' FEES AND COSTS UNDER 42 U.S.C. § 1988.

Pursuant to 42 U.S.C. § 1988(b), "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs. . . ."  As more fully set forth below, the facts and circumstances of this case and the course of the litigation support an award of attorneys' fees and costs to American.

### A.    American is the Prevailing Party.

The Supreme Court has defined the term "prevailing party" as "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 603, 121 S.Ct. 1835 (2001) *quoting Black's Law Dictionary* 1145 (7th ed.1999).  There can be no issue that American is the prevailing party as judgment has entered in its favor and against the plaintiff on all counts.  The attorneys' fees which American seeks to recover are all related to the defense of the plaintiff's claims of discrimination.  Therefore, all of the attorneys' fees and costs incurred are recoverable as American has prevailed in every instance.  *See Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933 (1983).

---

[1] Pursuant to Fed.R.Civ.P. 54(d), a Bill of Costs seeking taxable costs as set forth in 28 U.S.C. § 1920 has been filed separately.

2

**B.    The Applicable Standard for an Award of Attorneys' Fees to the Prevailing Defendant in Civil Rights Cases.**

"[A] plaintiff should not be assessed his opponent's attorneys' fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or *that the plaintiff continued to litigate after it clearly became so*." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 422, 98 S.Ct. 694 (1978) (claim of racial discrimination under Section 706(k) of Title VII of the Civil Rights Act of 1964) (emphasis in original).  A finding of frivolousness "requires a showing that the claims asserted were groundless, that is to say, a reasonable person would recognize them as having no merit.  It need not find subjective bad faith on the plaintiff's part." *Fusco v. Medeiros*, 965 F.Supp. 230, 256 (D.R.I 1996).[2]

The following cases demonstrate the wide range of scenarios in which courts have awarded prevailing defendants their reasonable attorneys' fees under 42 U.S.C § 1988.

In *Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir.1976), the plaintiff filed a complaint of race discrimination with the Commission on Human Rights in New York ("Commission") and alleged that Yeshiva University failed to promote her three times and subsequently discharged her in violation of Title VII.  The plaintiff succeeded in her action before the Commission, though that order was reversed and annulled by the New York Supreme Court upon petition by Yeshiva University.  The Appellate Division

---

[2] In *Fusco*, the Court awarded attorney's fees and costs under Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, the statutory prohibition on vexatious lawsuits.  The plaintiff was a department store employee who had sued his employer after it terminated him for improper markdowns.  The Court awarded costs against the plaintiff's attorney (Schiff), after finding that the Magistrate Judge's Report and Recommendation ". . . establish[ed] that each and every count of Fusco's complaint was frivolous in that each count was either without factual support or legal basis. Similarly, the magistrate judge's recitation of Schiff's actions after the filing of the Complaint recounts a tale of proceedings multiplied 'unreasonably and vexatiously[.]'" *Fusco*, 965 F.Supp. at 234.  The Court refused to award attorneys' fees and costs against the plaintiff under 42 U.S.C. § 1988.

upheld that order and the plaintiff was given leave to appeal to the Court of Appeals. After Ms. Carrion lost in each of these arenas, she sought review of these claims in federal court.  In awarding attorneys' fees to Yeshiva University, the Second Circuit Court of Appeals opined: ". . . in view of the failure of the previous litigation, [Mrs. Carrion] and her counsel must have been aware of the possibility of an award of counsel fees to her adversary." *Id.* at 728.  The Court relied on the conclusions of the district court judge to show plaintiff's vindictiveness and justify an attorneys' fee award.  The district court concluded that the plaintiff's testimony "constituted an unmitigated tissue of lies; that no one had discriminated against her; and that the reason she was fired was that she had engaged in deliberately disruptive conduct having nothing to do with the exercise of any constitutional or statutory right … and because she had defied reasonable attempts to control her activities." *Carrion v. Yeshiva University*, 397 F.Supp. 852 (S.D.N.Y. 1975).

In *Abbott v. Rabe,* No. 04-10777, 2005 WL 1000258 (D.Mass. March 3, 2005), the district court awarded the defendants a reasonable attorneys' fee after the plaintiff continued to seek review of the Board of Bar Overseer's decision to suspend his license to practice law.  After the hearing committee recommended that the plaintiff be suspended from the practice of law for two and a half years, he appealed to a Board of Bar Overseer's appeal panel.  Once the plaintiff exhausted all remedies in state court, he filed a complaint in federal court seeking review of the state court's ruling.[3]    Prior to filing a motion to dismiss, the defendants notified plaintiff that they were absolutely

---

[3] After oral argument, the appeal panel found no error in the hearing committee's recommendation and advised that the Board of Bar Overseers accept the recommendation.  The plaintiff appealed to a single justice of the Supreme Judicial Court and after losing, appealed that ruling to the Supreme Judicial Court.  After the petition was denied, the plaintiff filed a multi-count complaint in federal court naming the bar counsel as defendants and alleging civil rights violations during the suspension proceedings.

immune from suit and that he could not seek federal court review of claims fully adjudicated in state court.  Additionally, the defendants warned the plaintiff that if he did not withdraw his complaint, they would seek attorneys' fees.  In declaring the plaintiff's claims groundless, the district court noted that "his vast experience as an attorney should have informed him that the two doctrines raised in defendant's motion to dismiss, entirely foreclosed the possibility that the he could succeed on any of his claims." *Id.* at 9.

Finally, in *Raskiewicz v. Town of New Boston*, 754 F.2d 38 (1st Cir.1985), the plaintiff's claims, asserted because he was denied a permit in the form he requested to remove gravel from his land, were deemed "frivolous and unwarranted" where he waged a multi-year battle to secure a permit.  The plaintiff had actually been granted the permit, initially, but he refused to abide by conditions in the permit on both occasions it was granted.  He then filed civil rights claims against members of the Board of Selectmen alleging conspiracy charges against the Board members.  The court found that "the frivolous unfounded and reckless actions of both plaintiff and his counsel warranted an award of attorneys' fees and costs to defendants, to be paid by Raskiewicz and his counsel." *Id.* at 43.

> ### C.  Mr. Cerqueira's Claims Were Groundless and Unreasonable and the Complete Absence of Evidentiary Support Justifies an Award of Attorneys' Fees to American.

An award of attorneys' fees is warranted where the plaintiff's claims lack both a legal and a factual foundation.  Such is the case presently before the Court.  Mr. Cerqueira assumed and doggedly contended that Mr. Ashmil and Mr. Rokah, the two men seated next to him in row 20 were "Middle Eastern," and that he was removed from the flight because he "appeared to be of Middle Eastern" descent like them, and was thus mistakenly "perceived" to also be "Middle Eastern." Trial Tr. Vol. 2, 25 (Jan. 8, 2007).

A copy of the relevant portions of the Trial Transcript are attached as Exhibit D.  When asked to describe Middle Eastern people Mr. Cerqueira testified that they have "darker hair and darker complexion." Trial Tr. Vol. 2, 39 (Jan. 8, 2007).  He further testified that "… from the moment that I was taken off the plane, I had my suspicions that the only reason I was being taken off the plane was because I looked like the guys sitting next to me, and I had no other reason to think that it could be anything else.…" Trial Tr. Vol. 2, 25-26 (Jan. 8, 2007).   Thus, his claim of unlawful discrimination was based upon his belief that American's flight crew mistakenly "perceived" him to be "Middle Eastern" (a designation that is not even a protected class, as discussed *infra*) because he resembled Mr. Ashmil and Mr. Rokah, and this mistake by the crew was the reason he was removed from the flight for questioning.

Thus, Mr. Cerqueira's belief that he was a victim of unlawful discrimination was based solely on his subjective belief that he resembled Messrs. Ashmil and Rokah, presumably because they fit his description of Middle Easterners as having "darker hair and darker complexions."[4]   Mr. Cerqueira refused to acknowledge that any number of his own actions and behavior caused at least one of the flight attendants to be ill at ease.[5]

At trial, Captain Ehlers testified that he had not seen Mr. Cerqueira prior to making the decision to have him and the other exit row passengers removed for questioning:

---

[4]  Neither Mr. Ashmil nor Mr. Rokah was called to testify or was deposed. No photographic evidence of their appearance was ever introduced at trial.  Rather, Mr. Cerqueira's description of them was the sole evidence of their "appearing" to be "Middle Eastern."

[5]  He demanded a window seat from Flight Attendant Walling and later boarded the plane with first class passengers and proceeded directly to the bathroom and remained in there five minutes.  Trial Tr. Vol. 4, 38-40 (Jan. 10, 2007) and Trial Tr. Vol. 4, 41-44 (Jan.10, 2007).  In addition, Ms. Walling and another flight attendant, Ms. Sargent, both testified to concerns raised by other passengers about the behavior of Mr. Cerqueira and those seated next to him.

I'm emphatic about it one, because I had never seen Mr. Cerqueira up to
that point; two, I had a number of concerns from three separate employees
and more than one passenger not traveling together. I didn't have one
passenger with concerns, I had more than one passenger with concerns.
So I have all of these people working for me concerned for numerous
reasons and I have some of my passengers concerned. I would have been
derelict in my duty to ignore those concerns and depart with this flight.

*Cerqueira v. American Airlines, Inc.,* --- F.3d --- , No. 07-1824, 2008 WL 541642, at
*16, (1st Cir.2008 Feb. 29, 2008) Opinion of the Justices on Plaintiff's Motion for
Rehearing *En Banc.*

No one employed by American ever asked Mr. Cerqueira about his ethnic origin.

Rather, only a state trooper questioned Mr. Cerqueira about his race, color or nationality

after he had been removed from the plane and was in the custody of the state police.

Trial Tr. Vol. 2, 57-58 (Jan. 8, 2007). Mr. Cerqueira did not call either Mr. Ashmil or

Mr. Rokah to testify at the trial and, as previously noted, he failed to offer into evidence

photographs of these men. Mr. Cerqueira's claim that he was denied air travel because

he was perceived to be Middle Eastern was based solely on conjecture. The First Circuit

reached the same conclusion:

> Here, there is absolutely no evidence that either the Captain
> himself or the SOC manager had discriminatory animus, let alone
> that their decisions to refuse to transport a passenger, which were
> made under time pressure, were based on any discriminatory
> animus. The decision not to reboard the plaintiff on the flight was
> made by the State Police and accepted by the Captain. The Captain
> did not see the plaintiff and thus was unaware of his appearance,
> whether Middle Eastern or not, until the time of the trial. The
> Captain's actions were justified in light of the safety concerns
> described earlier.
>
> The SOC manager, who was in Dallas, based his decision, made
> that same morning and within minutes, not to rebook the plaintiff
> on information provided by the Captain, specifically all of the
> security concerns that formed the basis of the Captain's decision
> relayed to him from Boston. The § 1981 claim against the SOC
> manager's decision was derivative of the § 1981 claim against the
> Captain's decision. There is no evidence that the SOC manager's
> decision was based on race discrimination. There is also no
> evidence that any of the security concerns which made the

> Captain's decision appropriate had been proven unfounded by the time the SOC manager decided within minutes that morning to deny rebooking or that the SOC manager's following the Captain's decision was motivated by race.  Further, there is no evidence that the SOC manager was aware of the plaintiff's appearance, race, or ethnicity.  As a result, the § 1981 claim against the SOC manager fails, and § 1981 imposed no further duties on him.

*Cerqueira v. American Airlines, Inc., supra,* 2008 WL 104105, at *14.

### i.    A Subjective Belief of Discrimination, Without More, Does Not Constitute Evidence of Discrimination.

Mr. Cerqueira contended that he was denied air travel because the flight crew perceived that he was "Middle Eastern" and that he resembled the two men sitting with him in the exit row.  When asked at trial to confirm that he believed that American's actions were motivated by his race, color, ancestry and national origin, Mr. Cerqueira testified:   "[w]ell, I would say that I believe that American's actions were motivated by the fact that I was perceived to be with the gentlemen in Seat 20D and 20E – who were foreigners, who were speaking a foreign language – on the plane." Trial Tr. Vol. 2, 59 (Jan. 8, 2007).  He did not offer any evidence in support of his contention and his unsupported belief about the flight crew's perception does not constitute evidence of discrimination.  A plaintiff's "[feelings and perceptions] of being discriminated against [are] not evidence" of discrimination. *Bickerstaff v. Vassar College,* 196 F.3d 435, 456 (2d Cir.1999)[6] *see also Wallmar-Rodriguez v. Felix Roma Bakery*, No. 05-CV-0111, 2007 WL 1388120, at *6 (N.D.N.Y. May 9, 2007).   "A subjective belief of

---

[6] In *Bickerstaff,* the plaintiff, an African American tenured associate professor sued Vassar under Title VII, 42 U.S.C. § 1981 and the Equal Pay Act for twice failing to promote her to the position of full professor.  In affirming the district court's grant of Vassar's summary judgment motion, it determined that "the evidence overwhelmingly supports Vassar's explanation that it denied Bickerstaff promotion for the legitimate, nondiscriminatory reason that she did not satisfy the posted criteria for promotion." *Bickerstaff,* 196 F.3d at 456.

discrimination, however genuine [may not] be the basis of judicial relief." *Lawrence v. University of Texas Medical Branch at Galveston,* 163 F.3d 309, 313 (5th Cir.1999).[7]

Since a plaintiff's subjective belief of discrimination alone does not constitute evidence of discrimination, any claim premised solely on that subjective belief must, by definition, be groundless.  In *Bickerstaff* and *Lawrence*, the plaintiffs proffered only their subjective belief that they were denied a promotion on account of their ethnicity in support of their race discrimination claims.  Both courts granted the defendants' motions for summary judgment because both Bickerstaff and Lawrence failed to proffer any facts in support of their subjective belief of discrimination that could lead a fact finder to conclude that unlawful discrimination motivated their respective employers' actions.  Similarly, Mr. Cerqueira failed to provide any factual support for his claim that he was the victim of discrimination because the flight crew perceived him to be "Middle Eastern."  Indeed, he never established that that perception, even if held by the flight crew, was the factor motivating his being denied air travel on December 28, 2003.  The following colloquy between Michael Fitzhugh, counsel for American, and Mr. Cerqueira illustrates the complete absence of evidence to support his claims that American intentionally discriminated against him:

> Q.    Did my client's staff ask you any information about your background?
>
> A.    No.
>
> Q.    They had no questions for you, did they?
>
> A.    No.

---

[7] In *Lawrence*, the plaintiff, a Caucasian female nurse who sought but was denied a promotion to nurse supervisor alleged reverse discrimination when an African American nurse was selected.  The Fifth Circuit Court of Appeals affirmed the grant of the defendant's motion for summary judgment because the plaintiff failed to show that the employer's stated reason for non selection, that she was not the most qualified candidate, was a pretext for unlawful discrimination.  *Lawrence,* 163 F.3d at 313.

Q.      Nobody from American asked you about where you were born, correct?

A.      Correct.

Q.      Asked you about your ethnicity, correct?

A.      Correct.

Q.      Or whether you were traveling with the other two passengers in Row 20, correct?

A.      Correct.

Q.      And again, it's your belief that your mere appearance being similar to the other two people was what caused this at the outset, correct?

A.      Right.  If – my belief is that if I didn't look like the two guys next to me, and not happened to get seated next to them, that these incidents would not have happened.

Trial Tr. Vol. 2, 51-52 (Jan. 8, 2007).

By his own admission, American's employees never asked Mr. Cerqueira any questions about his ethnic origin, thereby calling into question the basis of his assumption that they perceived that he resembled the two gentlemen seated in the exit row.

It should be noted that in *Bickerstaff*, the plaintiff belonged to a protected class, but her claim of discrimination failed because she did not proffer any evidence to support her subjective belief that she was denied a promotion because of her race.  Conversely, Mr. Cerqueira's claim of discrimination is more tenuous than that in *Bickerstaff* because he is <u>not</u> a member of a protected class – rather he is a native of Portugal. Trial Tr. Vol. 1, 36 (Jan. 3, 2007).  As such, he could never establish a prima facie case of discrimination.

In making the determination that a claim of discrimination is groundless, "the court must assess the claim at the time the complaint was filed, and must avoid the post hoc reasoning that because the plaintiff did not ultimately prevail, the claim must have

been frivolous, unreasonable or without foundation." *Santiago-Perez v. State Insurance Fund Corporation,* 534 F.Supp.2d 242, 243 (D.Puerto Rico 2008).[8]   In categorizing plaintiff's case, the *Santiago-Perez* court observed "[p]laintiff's evidence was simply non-existent, and his case was completely without foundation.  This is not a case where plaintiff merely failed to prevail on his claim.  It is a case where plaintiff did not come forth with any evidence, only speculation."  *Id.* at 244.  In such cases attorneys' fees are appropriate for the prevailing defendant.  The district court "must not subject the plaintiff to financial ruin, but it must fulfill the deterrent purpose of [42 U.S.C.] § 1988 … in discouraging plaintiffs from bringing frivolous claims."  *See Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1192 (1st Cir.1996).  The instant case is one in which this Court should use the deterrent power of § 1988 to dissuade Mr. Cerqueira from bringing frivolous civil rights claims where he should have known that he had no chance of establishing a prima facie case of discrimination.

The only reason Mr. Cerqueira succeeded at trial is because the jury instructions were fundamentally flawed.  The First Circuit's reversal of the jury verdict supports the assessment of attorneys' fees against Mr. Cerqueira because that court's opinion establishes that his "claims were frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 422, 98 S.Ct. 694 (1978).  Consequently, the fact that Mr. Cerqueira obtained a jury verdict does not foreclose a finding that his claims were frivolous.  "The mere fact that the City was the prevailing party does not make an award of attorney's fees automatic.  On the other hand, the fact

---

[8] In *Santiago-Perez*, the plaintiff alleged that the defendants were acting in concert to deprive him of a job interview due to his affiliation with a political party.  At summary judgment, he did not proffer any evidence of a discriminatory scheme by the defendants.  The district court awarded the defendants attorneys' fees because it determined that since the plaintiff failed to make a prima facie case of political discrimination, the case was frivolous from its inception. *Id.*

that the court spent twelve pages discussing the issues that the motion for summary judgment raised does not mean that the case is not frivolous." *Wimberly v. Clovis,* 375 F.Supp.2d 1120, 1125 (D.N.M. 2004).

In light of the total inability of Mr. Cerqueira to prevail on his civil rights claims because: (1) he is not a member of a protected class; (2) perception of discrimination is not evidence of discrimination; (3) the complete absence of evidence that American's flight crew intended to discriminate against him; and (4) the discretion afforded a captain with respect to the safety of his passengers, crew and aircraft, together with the plaintiff's refusal to acknowledge how his actions contributed to the denial of air travel - this case falls within the ambit of *Carrion* for purposes of awarding American attorneys' fees. Just as in *Carrion,* Mr. Cerqueira simply perceived that he was the victim of discrimination and relentlessly pursued claims that lacked both legal and factual support.

## II.    AMERICAN'S REASONABLE ATTORNEYS' FEES

The "lodestar approach" must be applied to determine the reasonable attorneys' fees that are recoverable by the prevailing party, whether it be the plaintiff or defendant in a claim under 42 U.S.C. §1981.  *See Patton v. County of Kings*, 857 F.2d 1379, 1382 (9th Cir. 1988) (lodestar approach applicable where defendant prevailed in accordance with 42 U.S.C. §1988).   Under this method, the number of hours reasonably expended on the case is multiplied by the "prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)." *Gay Officers Action League v. Commonwealth*, 247 F.3d 288, 295 (1st Cir. 2001).   The prevailing party is also permitted to recover the reasonable attorneys' fees associated with the preparation of the fee petitions.  *See McDonald v. Secretary of Health and Human Servs.*, 884 F.2d 1468, 1480 (1st Cir.1989).  The Supreme Court has also noted that

"[t]here remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley,* 461 U.S. at 434.

### A.   Attorneys Fees

The Invoices of Fitzhugh & Mariani LLP[9] are attached as Exhibit A to the Affidavit of Michael A. Fitzhugh, Esq. ("Fitzhugh Affidavit"). These invoices accurately reflect the time incurred by each attorney and paralegal and the associated task   As set forth in the Affidavit of Michael A. Fitzhugh, Esq., the hours included on the invoices and which are being sought herein were recorded contemporaneously with the work performed. *Id*. at ¶3. The description of the work details the tasks performed justifying the charge. Furthermore, the time reflects a judicious staffing effort eliminating duplication of work and unproductive or excessive time spent on tasks. *Id*. at ¶4.

The attorneys fees sought herein include the time associated with responding to and defending the claim filed with the MCAD. Such time was reasonable and necessary and may be awarded in light of the requirement that the administrative proceeding is a prerequisite to the filing of the federal action. *See Dixon v. International Brotherhood of Police Officers*, 434 F.Supp.2d 73, 79 (D.Mass. 2006). In addition, the time includes time associated with preparing post-trial motions and the filing of the instant motion together with the preparation of American's Bill of Costs (filed concurrently).

As noted by the plaintiff in his Memorandum of Law in Support of Plaintiff, John D. Cerqueira's Motion for Attorneys' Fees and the accompanying affidavits, this case involved complex issues at the intersection of the regulations pertaining to the safety and security of the airline industry and Title VII of the Civil Rights Act of 1964. The case

---

[9] Fitzhugh & Mariani LLP was formerly known as Fitzhugh, Parker & Alvaro LLP.

was vigorously prosecuted by the plaintiffs, which included the retention of private local counsel as well as counsel affiliated with the Public Citizen Litigation Group ("PCLG")[10] based in Washington, D.C.

While the plaintiffs spent 1,714.05 hours on the case, American's counsel (including paralegals) spent 1,406.35 hours (18% less than the plaintiff's hours). Fitzhugh Affidavit at ¶5. The case involved extensive written discovery as well as numerous depositions, many of which required extensive travel to Texas and Florida. Considerable expert discovery was conducted and the plaintiff relied upon 2 medical experts at trial whose testimony was offered through video-taped depositions. In addition, cross summary judgment motions were filed which required extensive work. Lastly, in light of American's corporate offices being located in Dallas, Texas, additional time was required to defend the case in Boston as well as to coordinate legal strategy and efforts with American's in-house legal department.

Trial was conducted by lead counsel, Michael A. Fitzhugh, Esq., with assistance by a paralegal. Such assistance was reasonable and necessary in light of the magnitude of the case and volume of documents, number of witnesses, and use of 2 trial counsel by plaintiffs. Fitzhugh Affidavit at ¶6.

---

[10] The following was taken from the PCLG website: "Public Citizen Litigation Group is the litigating arm of Public Citizen. The Group specializes in cases involving health and safety regulation, consumer rights, access to the courts, open government, and the First Amendment, including Internet free speech. We litigate cases at all levels of the federal and state judiciaries and have a substantial practice before federal regulatory agencies. Our efforts are also pursued through programs such as the Alan Morrison Supreme Court Assistance Project and the Freedom of Information Clearinghouse." Public Citizen, http://www.citizen.org/litigation/ (last visited March 26, 2008).

**B.    Reasonable Hourly Rates**

The hourly rates charged by American for the work performed by the attorneys and paralegals was reasonable and is commensurate with those "prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)." *Gay Officers Action League*, 247 F.3d at 295. As fully detailed in the Invoices submitted, the following rates are sought for time spent through trial and the filing of post-trial motions:[11]

| Timekeeper | Hourly Rate | Hours | Total Charges |
|---|---|---|---|
| Michael A. Fitzhugh, Esq. | $325.00 | 564.75 | $183,543.75 |
| Amy Cashore Mariani, Esq. | $225.00 | 302.90 | $68,152.50 |
| Sonia L. Skinner, Esq. | $225.00 | 173.80 | $39,105.00 |
| Anne Marie Gerber, Esq. | $185.00 | 49.10 | $9,083.50 |
| Barbara L. Horan, Esq. | $185.00 | 5.40 | $999.00 |
| Jeffrey A. Novins, Esq. | $225.00 | 3.60 | $810.00 |
| Melissa M. Wangenheim, Paralegal | $95.00 | 245.20 | $23,294.00 |
| Michael P. McGarry, Paralegal | $95.00 | 38.70 | $3,676.50 |
| Philip R. Potter, Paralegal | $95.00 | 1.25 | $118.75 |
| Angelina Velasquez, Paralegal | $95.00 | 15.75 | $1,496.25 |
| Brian J. Killoy, Paralegal | $95.00 | 3.60 | $342.00 |
| Kim M. Geidd, Paralegal | $95.00 | 2.30 | $218.50 |
|  |  | 1,406.35 | $330,839.75 |

In fact, the rates sought by American are less than what the plaintiff sought to recover as reasonable fees for civil rights practitioners in Boston.  The rates are also commensurate with the rates that were deemed reasonable in the declarations of Messrs. Godkin, Kirkpatrick, Savage, Lewis, Friedman, Wolfman, Blustein, Libman, and Sellers offered by the plaintiff in support of his motion for attorneys' fees.

---

[11] In 2008, rates charged by Fitzhugh & Mariani LLP to American were revised.

In its Order and Memorandum on the plaintiff's Motion for Attorneys' Fees, the

Court (Young, J.) held:

> "[B]ased on the evidence submitted by Cerqueira and the relevant case law, that the prevailing rate for lead civil rights attorneys in the Boston area ranges between $200 and $350 per hour. *Porter v. Cabral*, 04-11935-DPW, 2007 WL 602605, at *12 (D.Mass. Feb. 21, 2007)(Woodlock, J.)(finding a range of $200 and $350 per hour for lead civil rights attorneys in the Boston area); *Dixon*, 434 F.Supp.2d at 86 (finding $250 a reasonable hourly rate for an attorney with ten years of experience in employment law); *Bogan v. City of Boston*, 432 F.Supp.2d 222,230 (D.Mass.2006) (Bowler, M.J.) (finding $300 per hour reasonable for a lead attorney and $200 per hour for junior associates); *LaPlante, 307 F.Supp.2d at 224* (accepting proposed rates of $300 per hour for a litigation partner, $275 per hour for a senior litigation associate)."

*Cerqueira v. American Airlines, Inc.,* 484 F.Supp.2d 241, 250 (D.Mass. 2007)

The District Court further held that the reasonable hourly rate for "assisting

counsel" falls between $100 and $200 per hour and a paralegal's reasonable hourly rate

was $65 per hour. *Id*. Applying these rates to the specific qualifications of the attorneys

at issue demonstrates that the rates charged are appropriate rates to be applied to the

hours deemed reasonable and necessary by the Court.

*Michael A. Fitzhugh*

Attorney Fitzhugh was lead counsel from the inception of the case at MCAD

through trial, post-trial motions and the instant fee application. Fitzhugh Affidavit at ¶8.

He has practiced as a litigator in excess of 25 years, conducting trials in state and federal

courts. Attorney Fitzhugh is a graduate of Williams College and Harvard Law School.

His practice includes the defense of employment claims involving allegations of unlawful

discrimination, harassment and wrongful termination as well as other complex civil and

commercial litigation matters. His rate of $325 per hour charged in this case is at the

lower range of rates that he charges for similar litigation.   Affidavit of Michael A. Fitzhugh, Esq., at 11.

*Amy Cashore Mariani*

Attorney Mariani was co-lead counsel after the matter was filed in federal court and until shortly before trial when she went on maternity leave.  *Id*. at ¶8.  She was senior associate at the time and has since joined the firm as a partner.  *Id*. at ¶12.  Attorney Mariani has in excess of 12 years of litigation experience and is an active member of the Massachusetts Bar Association, chairing several committees.  Her practice includes the defense of employment claims based upon allegations of discrimination, harassment and wrongful termination. *Id*.  She also has an extensive practice in commercial litigation. Her rate of $275 is appropriate and is comparable to that charged by plaintiff's co-lead counsel (Michael Kirkpatrick, Esq.) which plaintiff asserted was a reasonable fee for co-lead counsel.  *Id*.

*Sonia L. Skinner*

Attorney Skinner provided legal research and support during pre-trial preparations, including drafting proposed jury instructions, during the filing of post-trial motions, and with the instant fee application.  *See generally* Invoices (Fitzhugh Aff., at Exhibit A).  Attorney Skinner has 15 years experience in litigation where her practice includes employment law and general commercial litigation.  Fitzhugh Aff. at ¶13.  She is a former Assistant Corporation Counsel with the City of Boston Law Department.  *Id*. Her rate of $225 per hour is commensurate with her experience level and is just outside the range deemed appropriate by this Court for counsel providing assistance to lead counsel.  Nonetheless, it is a rate that is appropriate under the circumstances given the issues that were being addressed and Attorney Skinner's experience level.

*Barbara L. Horan*

Attorney Horan provided limited research assistance during the preparation and filing of post-trial motions. *See generally* Invoices (Fitzhugh Aff., at Exhibit A). Her work was not duplicative and was consistent with her experience level. Fitzhugh Aff. at ¶14. Attorney Horan has over 6 years of legal experience as a civil litigator. *Id.* Prior to attending law school, Attorney Horan attained an M.S. in Ecology and Behavioral Biology and a Ph.D. in Philosophy, both from the University of Minnesota, and she is the recipient of fellowships from the National Science Foundation, the American Association of University Women, and the National Endowment for the Humanities. Ms. Horan taught philosophy of science from 1985 through 1998 at schools that include Oberlin College, the California Institute of Technology, and Stanford University. *Id.* Her rate of $185 per hour is commensurate with her experience level and is in the range deemed appropriate by this Court for counsel providing assistance to lead counsel. *Id.*

*Anne Marie Gerber*

Attorney Gerber assisted in the presentation of American's defense at the hearing before the Massachusetts Commission Against Discrimination. *See generally* Invoices (Fitzhugh Aff., at Exhibit A). Attorney Gerber has in excess of 10 years experience in litigation where her practice includes employment law and general commercial litigation. *Id.* at ¶15. Her rate of $185 per hour is commensurate with her experience level and is in the range deemed appropriate by this Court for counsel providing assistance to lead counsel. *Id.*

*Jeffrey A. Novins*

Attorney Novins has provided assistance in drafting and preparing the instant fee application and submitting American's Bill of Costs. *Id.* at ¶16. He has in excess of 15

years experience as a litigator in state and federal courts where he focuses on commercial and civil litigation. *Id*. While his current rate is $295 per hour (as previously noted the rates have increased in 2008) it would be appropriate to charge his hours at the rate of $225 per hour as that is a rate charged by other senior attorneys working on this matter and is commensurate with his experience and the work performed on this matter.

> *Paralegals: Melissa M. Wangenheim, Michael P. McGarry, Philip R. Potter, Angelina Velasquez, Brian J. Killoy and Kim M. Geidd*

The paralegals' are experienced civil litigation paralegals, often times performing work of law clerks. *Id*. at ¶17. Their work was closely monitored and they were not assigned tasks more suited to support staff. *Id*. at ¶¶ 3, 17. Their time spent on this case was reasonable and necessary and based on their experience the hourly rate deemed appropriate by the Court for paralegals (i.e., $65 per hour) is, at a minimum, a reasonable charge for their time. *Id*. at ¶17.

## III.    Costs Incurred as Reasonable Attorneys' Fees

The attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party pursuant to 42 U.S.C. §1988. *See Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir.1983). "Where cost-shifting is expressly authorized by statute, the traditional limitations of Rule 54(d) and 28 U.S.C. §§ 1920 and 1923(a) do not apply." *Dowdell v. City of Apopka, Florida*, 698 F.2d 1181, 1188-1189 (11th Cir.1983). Accordingly, American is entitled to recover expenses customarily billed directly to the client and shown to have been incurred reasonably and necessarily. *See System Management, Inc. v. Loiselle*, 154 F.Supp.2d 195, 204 (D.Mass. 2001). Accordingly, a fee award may include an attorney's photocopying, travel, telephone calls, couriers, depositions, court filings, mailings, and trial exhibits. *See id*.

**A.      Non-Taxable Costs Recoverable Under 42 U.S.C. §1988**

The following costs incurred as part of the reasonable attorneys' fees in the amount of $5,125.64 are recoverable:

*Travel Expenses*

1.      **Deposition of Douglas Laird – Reno, NV**

Attorney Mariani traveled to Dallas, Texas to conduct the discovery deposition of Douglas Laird, plaintiff's expert witness in the field of airline security and proper security procedures.  Fitzhugh Aff. at ¶18.  The plaintiff had identified Mr. Laird and American expected him to testify at trial.  Accordingly, conducting his deposition was reasonable and necessary to fully and fairly defend the plaintiff's claims.  Mr. Laird's business is located in Reno, Nevada.  Therefore, the deposition was conducted in Reno.

The full cost of air travel is not being sought as first class tickets were purchased. Comparable roundtrip flights from Boston to Reno, Nevada for economy class tickets purchased in advance cost $741.00.  *Id*.  This is a reasonable cost for this expense.  The associated travel and lodging expense includes one night hotel accommodations (with meal) for a total of $118.87, a rental car cost for a total of 149.29 and additional meals total $10.75.  *Id*.  Attorney Mariani conducted business on another unrelated case while in Reno, so one-half of her expenses have been apportioned to another case.  *Id*.  The total expenses for this travel are $509.95.

2.      **Depositions of Drs. Blumenthal and Faulk – Ft. Lauderdale, FL**

The plaintiff noticed and conducted the video-taped depositions of the plaintiff's treating doctors, Barry Blumenthal, M.D., and Richard Faulk, M.D. in Ft. Lauderdale, Florida.  It was reasonable and necessary for American (Attorney Mariani) to attend the depositions in person; therefore, the travel associated is also reasonable and necessary.

The cost of air travel was $538.60.  Lodging for one night cost $154.29.  Rental car plus costs (gas) totaled $50.11.  *Id.* at ¶19.  Total for this travel was $743.00.

3.     **Depositions of Craig Marquis and Rhonda Cobbs – Dallas, TX**

The depositions of Mr. Marquis and Ms. Cobbs, both American employees, were noticed by the plaintiff.  They both reside and work in Dallas, Texas.  It was reasonable and necessary for Attorney Fitzhugh to meet with them to prepare for the depositions and to attend the depositions, which necessitated a multi-day trip to Dallas.  The costs associated with this travel were reasonable and necessary.

The full cost of air travel is not being sought as first class tickets were purchased.  Comparable roundtrip flights from Boston to Dallas for economy class tickets purchased in advance cost $730.00.  *Id.* at ¶20.  This is a reasonable cost for this expense.  The associated travel expenses included cab fare of $63.00 ($23.00, $25.00 and $15.00).  Meals total $70.00.  *Id.* Total for this travel was $863.00.

4.     **Travel of T. Alec Bramlett, Esq.**

Attorney Bramlett's participation at trial was reasonable and necessary in light of his participation throughout the litigation process and his knowledge of the facts of the case and American's internal procedures.  *Id.* at ¶21.  Accordingly, although American is not seeking to recover for his attorneys' fees.   Attorney Bramlett's travel time and expenses to attend the trial were reasonable and necessary and are recoverable.  These expenses, as fully set forth below, total $2,374.86.  *Id.* at ¶22.

-       09/26/06 - 09/27/06:  $438.16 – Attendance at Hearing (Boston):

        -       $398.16 in hotel costs; and
        -       $40.00 in taxi service costs.

-        01/02/07 - 01/04/07:  $575.16 - Attendance at Trial:

-        $487.13 in hotel costs;
-        $23.00 in taxi service costs;
-        $51.00 in parking costs; and
-        $14.73 in meal costs.

-        01/07/07 - 01/11/07:  $1,088.95 Attendance at Trial:

-        $943.07 in hotel costs;
-        $40.00 in taxi service cost;
-        $85.00 in parking costs; and
-        $20.88 in meal costs.

-        06/26/07 - 06/27/07:  $272.59 Attendance at Mediation (Boston):

-        $181.05 in hotel costs;
-        $40.00 in taxi service costs;
-        $22.00 in parking costs and
-        $29.54 in meal costs.

*Fees for Special Delivery Services*

**1.    Courier Expenses**

Courier expenses, like postage costs, are recoverable as part of the necessary out-of pocket expenses incurred by attorneys that may be deemed part of an award of attorneys' fees. *See Loiselle*, 154 F.Supp.2d at 211. The total courier expense is $68.00. Fitzhugh Aff. at ¶23. The following courier expenses, all from Breakaway Courier, were incurred:

-        02/18/05:  $16.00 – Papers to MCAD (Invoice No. 13272)

-        03/04/05:  $11.00 – Papers to MCAD (Invoice No. 17024)

-        12/15/06:  $7.00 – Motions to Plaintiff's Counsel (Invoice No. 183746)

-        12/26/06:  $7.00 – Motions to Plaintiff's Counsel (Invoice No. 186116)

-        12/28/06:  $6.00 – Trial subpoena to sheriff (Invoice No. 186531)

-        12/28/06:  $7.00 – Motions to Court (Invoice No. 186462)

-    12/29/06:  $7.00 – Motions to Court (Invoice No. 186698)

-    12/29/06:  $7.00 – Motions to Court (Invoice No. 186783)

**2.    Federal Express Expenses**

Overnight delivery expenses are also permitted out-of-pocket expenses that are recoverable where reasonable and necessary. *See Cerqueira*, 484 F.Supp.2d at 254. The following overnight delivery charges totaling $566.83, all from Federal Express, were incurred as part of the out-of-pocket expenses for defending the plaintiff's claims. Fitzhugh Aff. at ¶24.

-    03/27/06:  $154.61 – To Client (Invoice No. 3-413-84985)

-    04/03/06:  $16.28 – To Client (Invoice No. 3-426-54415)

-    10/02/06:  $58.50 – To Expert (Invoice No. 8-442-19003)

-    10/09/06:  $90.24 – To Deposition (Invoice No. 8-455-06593)

-    10/16/06:  $51.81 – Return Documents to Firm (Invoice No. 8-468-10512)

-    12/25/06:  $82.71 – To Client (Invoice No. 8-596-88882)

-    01/15/07:  $112.68 – Motions to Court (Invoice No. 186698)

## CONCLUSION

WHEREFORE, American seeks $330,839.75 as reasonable attorneys' fees and $5,125.64 as its reasonable out-of-pocket expenses as the prevailing party.

**AMERICAN AIRLINES, INC.**
By Its Attorney,


 */s/ Michael A. Fitzhugh*
Michael A. Fitzhugh, Esq.
BBO #: 169700
**FITZHUGH & MARIANI LLP**
155 Federal Street, Suite 1700
Boston, MA  02110-1727
Dated:  April 15, 2008                     (617) 695-2330

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 15, 2008.

*/s/ Michael A. Fitzhugh*
Michael A. Fitzhugh

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action
No: **05-11652-WGY**

**JOHN D. CERQUEIRA**
**Plaintiff**

v.

**AMERICAN AIRLINES**
**Defendant**

JUDGMENT

Pursuant to the Judgment of the First Circuit Court of Appeals, the Judgment
entered 1/16/07 and Attorneys fees awarded 4/12/07 are hereby Vacated and Judgment
enters for the Defendant American Airlines.

Sarah Thornton
**Clerk**

/s/ Elizabeth Smith
**Deputy Clerk**

**January 16, 2008**
**To: All Counsel**

# United States Court of Appeals
## For the First Circuit

No. 07-1824

JOHN D. CERQUEIRA,

Plaintiff, Appellee,

v.

AMERICAN AIRLINES, INC.,

Defendant, Appellant.

**JUDGMENT**

Entered: January 10, 2008

This cause came on to be heard on appeal from the United States District Court for the District of Massachusetts and was argued by counsel.

Upon consideration whereof, it is now here ordered, adjudged and decreed as follows: · The judgment of the district court is reversed, and the matter is remanded to the district court with instructions to vacate the judgment and fees award in favor of John D. Cerqueira and enter judgment for American Airlines, Inc.

By the Court:

Richard Cushing Donovan, Clerk

[Certified copies to Hon. William G. Young and Ms. Sarah Thornton, Clerk, United States District Court for the District of Massachusetts. Copies to Ms. Cantelo, Mr. Godkin, Mr. Kirkpatrick, Mr. Fitzhugh, Mr. Bramlett, Ms. Mariani, Ms. Skinner, Ms. Gerber, Mr. Powell, Mr. Schrader, Mr. Stavers, Mr. Foreman, Ms. Saxena, Ms. Birch, Mr. Eng, Ms. Baldillo, Ms. Valenzuela, Ms. Ciccolo, Mr. Asaka, & Mr. Maer.]





# United States Court of Appeals
## For the First Circuit

---

No. 07-1824

JOHN D. CERQUEIRA,

Plaintiff, Appellee,

v.

AMERICAN AIRLINES, INC.,

Defendant, Appellant.

---

### JUDGMENT
Entered: January 10, 2008

This cause came on to be heard on appeal from the United States District Court for the District of Massachusetts and was argued by counsel.

Upon consideration whereof, it is now here ordered, adjudged and decreed as follows: The judgment of the district court is reversed, and the matter is remanded to the district court with instructions to vacate the judgment and fees award in favor of John D. Cerqueira and enter judgment for American Airlines, Inc.

Certified and Issued as Mandate
under Fed. R. App. P. 41.

Richard Cushing Donovan, Clerk

*[signature]*
Deputy Clerk

Date: 3|14|08

By the Court:

RICHARD CUSHING DONOVAN

---
Richard Cushing Donovan, Clerk

[Certified copies to Hon. William G. Young and Ms. Sarah Thornton, Clerk, United States District Court for the District of Massachusetts. Copies to Ms. Cantelo, Mr. Godkin, Mr. Kirkpatrick, Mr. Fitzhugh, Mr. Bramlett, Ms. Mariani, Ms. Skinner, Ms. Gerber, Mr. Powell, Mr. Schrader, Mr. Stavers, Mr. Foreman, Ms. Saxena, Ms. Birch, Mr. Eng, Ms. Baldillo, Ms. Valenzuela, Ms. Ciccolo, Mr. Asaka, & Mr. Maer.]

## CERQUEIRA v. AMERICAN AIRLINES
## Jury Trial – Day 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 05-11652-WGY

JOHN D. CERQUEIRA,                )
                                  )
          Plaintiff,              )
                                  )   TRIAL TRANSCRIPT
v.                                )      (Volume 1)
                                  )
AMERICAN AIRLINES, INC.,          )
                                  )
          Defendant.              )

    BEFORE:  The Honorable William G. Young, District Judge,
                       and a Jury

APPEARANCES:

     BIRNBAUM & GODKIN, LLP
     By: David S. Godkin, Esq.
         Darleen F. Cantelo, Esq.
     280 Summer Street
     Boston, Massachusetts  02210
     - and -
     PUBLIC CITIZEN LITIGATION GROUP
     By: Michael T. Kirkpatrick, Esq.
     1600 20th Street, N.W.
     Washington, D.C.  20009
     On behalf of John D. Cerqueira

     FITZHUGH, PARKER & ALVARO LLP
     By: Michael A. Fitzhugh, Esq.
     Federal Street - Suite 1700
     Boston, Massachusetts  02110-1727
     - and -
     AMERICAN AIRLINES
     By: Alec Bramlett, Senior Attorney
     MD 5675 - P.O. Box 61916
     Dallas/Ft. Worth Airport, Texas  75261-9616
     On behalf of American Airlines

ALSO PRESENT: Melissa M. Wangenheim, Paralegal

                        One Courthouse Way
                        Boston, Massachusetts
                        January 3, 2007

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 1

Page 36

1          THE COURT:  Sum up, Mr. Fitzhugh.

2          MR. FITZHUGH:  And the evidence will show that

3    every decision made was completely consistent with

4    policies and procedures that are established and that

5    are lawful.

6          So I ask you, ladies and gentlemen, to keep an

7    open mind while you're hearing all of the evidence, and

8    to let the process play out the way it's intended to.

9    And I thank you again for your service.

10         MR. KIRKPATRICK:  The plaintiff calls John

11   Cerqueira to the stand.

12         THE COURT:  He may be called.

13                    JOHN D. CERQUEIRA, sworn

14                    DIRECT EXAMINATION

15   BY MR. KIRKPATRICK:

16   Q.   Mr. Cerqueira, please tell us your name.

17   A.   John Cerqueira.

18   Q.   Where were you born?

19   A.   I was born in Lisbon, Portugal.

20   Q.   How old were you when you came to the United States?

21   A.   I was six years old.

22   Q.   Are you a United States citizen?

23   A.   Yes.

24   Q.   After you moved to the United States, where did you

25   live?

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 05-11652-WGY

JOHN D. CERQUEIRA,            )
                             )
        Plaintiff,           )
                             )   TRIAL TRANSCRIPT
v.                           )      (Volume 2)
                             )
AMERICAN AIRLINES, INC.,     )
                             )
        Defendant.           )

        BEFORE:  The Honorable William G. Young, District Judge,
                        and a Jury

APPEARANCES:

        BIRNBAUM & GODKIN, LLP
        By: David S. Godkin, Esq.
            Darleen F. Cantelo, Esq.
        280 Summer Street
        Boston, Massachusetts  02210
        - and -
        PUBLIC CITIZEN LITIGATION GROUP
        By: Michael T. Kirkpatrick, Esq.
        1600 20th Street, N.W.
        Washington, D.C.  20009
        On behalf of John D. Cerqueira

        FITZHUGH, PARKER & ALVARO LLP
        By: Michael A. Fitzhugh, Esq.
        155 Federal Street - Suite 1700
        Boston, Massachusetts  02110-1727
        - and -
        AMERICAN AIRLINES
        By: Alec Bramlett, Senior Attorney
        MD 5675 - P.O. Box 61916
        Dallas/Ft. Worth Airport, Texas  75261-9616
        On behalf of American Airlines

ALSO PRESENT: Melissa M. Wangenheim, Paralegal

                        One Courthouse Way
                        Boston, Massachusetts
                        January 8, 2007

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 2

Page 25

1   A.    I'm sorry.  I'm not a lawyer.  I don't know.

2   Q.    You don't recall that he was a defendant in this

3   case?

4   A.    I don't know who's specifically a defendant and

5   who's not.  I'm sorry.

6   Q.    Okay.  Well, is it your contention that of the

7   people I just named -- Captain Ehlers, Ms. Walling, Ms.

8   Sargent or Ms. Milenkovic -- that they were among the

9   people who discriminated against you?

10  A.    I apologize, but I don't feel qualified based on my

11  lack of legal training to --

12        THE COURT:  And that's a fine answer, especially

13  when he says "is it your contention."  You've got

14  lawyers and those lawyers are the ones who can make your

15  contentions to the Court.

16        But suppose we ask it this way:  Do you think

17  those people -- those people, do you think they

18  discriminated against you?  You:  Do you think that?

19        THE WITNESS:  Well, my best answer to this

20  question is that I boarded the plane, and I put my

21  things away and I went to the bathroom.  And I worked on

22  my computer, and I fell asleep.  And since this

23  incident, I have -- actually, from the moment that I was

24  taken off the plane, I had my suspicions that the only

25  reason I was being taken off the plane was because I

4955d16b-55cb-4857-8e84-e66700d1cd11

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 2

Page 26

1    looked like the guys sitting next to me, and I had no
2    other reason to think that it could be anything else.
3    Not because I observed anything that the guys sitting
4    next to me did or said, it's just it was the only thing
5    that made sense.

6          And ever since that time I've been looking for
7    an explanation, and there is no rational explanation for
8    what happened to me.  So, to me, the fact that there is
9    no rational explanation for what has happened to me
10   confirms my initial suspicion that I was in that
11   situation because I looked like the guys sitting next to
12   me.

13         I don't feel qualified, however, to say which
14   person was involved, because all I remember from the
15   incident is going to bathroom, working on my computer,
16   and falling asleep.

17   BY MR. FITZHUGH:
18   Q.   Are you finished with your answer, sir?
19   A.   Yes, sir.
20   Q.   So if we identified the decision-makers, one of them
21   would be Captain Ehlers.  He would necessarily be one of
22   the people you claim engaged in unlawful discrimination
23   that day, correct?
24         MR. KIRKPATRICK:  Objection.
25         THE COURT:  I'm going to sustain it.

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 2

Page 39

1    Q.    What is your evidence of that?

2    A.    That's my testimony.

3    Q.    Well, do you have any photographs of them?

4    A.    No.

5    Q.    Do you have any documentation as to their

6    description?

7    A.    Yes.

8    Q.    And what is that?

9    A.    I mean, my written records describe them as Middle

10   Eastern.

11   Q.    I understand.  And what does that mean?

12   A.    What does Middle Eastern mean to me?

13   Q.    Yes.  You say -- apparently you believe there's a

14   look of people that is Middle Eastern; is that right?

15   A.    I believe there is a look that's Middle Eastern more

16   so -- yeah.  That people tend to think is a Middle

17   Eastern look, yes.

18   Q.    Can you give us more specifics about the appearance

19   of people who are Middle Eastern?

20   A.    Darker hair, darker complexion.

21   Q.    Does that describe any other people in this

22   courtroom?

23   A.    Well, you know, there's different complexions.  But

24   if I just said darker hair, darker complexion, yes, that

25   would describe people in this courtroom.  But I guess

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 2

Page 51

1   BY MR. FITZHUGH:

2   Q.   Yes.  Did American Airlines have any role in how the

3   state police conducted the investigation, based on your

4   observation?

5           MR. KIRKPATRICK:  Objection.

6           THE COURT:  No.  Overruled.

7           THE WITNESS:  I don't know.

8   BY MR. FITZHUGH:

9   Q.   Well, did you see anyone from American telling the

10  state police how to question you or what questions to

11  ask you?

12  A.   Did I see anyone from American giving instructions

13  to the police?  No.

14  Q.   And did my client's staff ask you any information

15  about your background?

16  A.   No.

17  Q.   They had no questions for you, did they?

18  A.   No.

19  Q.   Nobody from American asked you about where you were

20  born, correct?

21  A.   Correct.

22  Q.   Asked you about your ethnicity, correct?

23  A.   Correct.

24  Q.   Or whether you were traveling with the other two

25  passengers in Row 20, correct?

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 2

Page 52

1   A.   Correct.

2   Q.   And, again, it's your belief that your mere

3   appearance being similar to the other two people was

4   what caused this at the outset, correct?

5   A.   Right.  If -- my belief is that if I didn't look

6   like the two guys next to me, and not happened to get

7   seated next to them, that these incidents would not have

8   happened.

9   Q.   What else did you observe about their behavior on

10  the flight beyond your general testimony that they

11  seemed a little louder than other people?

12  A.   They were young and they looked Middle Eastern.

13  Q.   And, again, can you tell me what that means?

14  A.   A complexion similar to mine, olive-like complexion,

15  and darker hair.

16  Q.   Were they dressed similar to you?

17  A.   I don't remember.

18  Q.   What was the conversation on the jet bridge about

19  whether or not you were traveling with them?

20  A.   The state troopers asked me if -- how I knew the

21  guys in 20D and 20E, and they asked the gentlemen in 20D

22  and 20E how they knew each other and whether they knew

23  me.

24  Q.   What were the responses?

25  A.   My responses were that I didn't know them and they

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 2

Page 57

1   Q.   What was his demeanor?

2   A.   And his demeanor was -- I was somewhat scared by his

3   demeanor.

4   Q.   He was hostile, wasn't he?

5   A.   I would consider it, with all due respect, somewhat

6   aggressive.

7   Q.   And overbearing?

8   A.   Yes, that's a good word.  Overbearing.

9   Q.   And he's the one that said, "If you don't answer my

10  questions, you'll have to flap your wings to get home to

11  Florida," correct?

12  A.   He did say that, yes.

13  Q.   So he's the one who asks you questions about your

14  nationality and your ethnic origin, correct?

15  A.   Correct.

16  Q.   And then he's the one who makes the comment that

17  you're not going to get back to Florida unless you start

18  flapping your wings, correct?

19  A.   He did say that.

20  Q.   That's when the issue of race gets injected into the

21  situation, isn't it?

22       MR. KIRKPATRICK:  Objection.

23       THE COURT:  The objection's sustained.

24       Isn't that the first time that the issue of your

25  race was expressly injected into the situation?

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 2

Page 58

1          THE WITNESS:  I do not believe that's when the

2     issue of race was injected into the situation.

3     Absolutely, I do not agree with that statement, sir.

4     BY MR. FITZHUGH:

5     Q.   Well, before that what had you heard from anyone

6     involved that had to do with your race or ethnic origin,

7     real or imagined?

8     A.   In answer to your question, sir, that was the first

9     time it was verbally expressed.

10    Q.   At any time during that day did anyone from American

11    Airlines make any remark having to do with your real or

12    perceived race, ethnic origin or color?

13    A.   Not to me.

14    Q.   So only one of the police officers -- to anybody

15    else, to your knowledge?

16    A.   I don't know.

17    Q.   So one police officer injected race into his

18    interrogation of you, correct?

19    A.   Yes.

20    Q.   And it was, I believe you said, for a brief period

21    of time?

22    A.   Yes.

23    Q.   Okay.  But then you told him that you went to

24    Stanford University, correct?

25    A.   The sequence was, after he asked me what my race,

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 2

Page 59

1    shortly thereafter he -- one of the questions was where

2    did I go to school, and I responded, "Stanford

3    University."

4    Q.    And then he thereafter took you to the ticket

5    counter, correct?

6    A.    Yes.

7    Q.    Now, up to that point did you believe that your race

8    had been a factor in American's actions towards you, up

9    to that point?

10   A.    I'm sorry.  Could you say which point, sir?

11   Q.    Certainly.  Up to the point just before you're going

12   to go back to the ticket counter you believed that

13   American's actions were all motivated by your race,

14   color, ancestry, national origin?

15   A.    Well, I would say that I believed that American's

16   actions were motivated by the fact that I was perceived

17   to be with the gentlemen in Seat 20D and 20E -- who were

18   foreigners, who were speaking a foreign language -- on

19   the plane.

20   Q.    And so that would mean that the captain's decision

21   to ask you to step off for further questioning was

22   motivated by those factors, correct?

23   A.    I'm sorry.  I don't feel like I have the legal

24   training to say which individual.

25   Q.    Purely as a matter of fact, Mr. Cerqueira, you are

## CERQUEIRA v. AMERICAN AIRLINES
## Jury Trial – Day 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 05-11652-WGY

JOHN D. CERQUEIRA,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)　TRIAL TRANSCRIPT
v.　　　　　　　　　　　　　　　)　　(Volume 4)
　　　　　　　　　　　　　　　　)
AMERICAN AIRLINES, INC.,　　　 )
　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　)

BEFORE:　The Honorable William G. Young, District Judge,
and a Jury

APPEARANCES:

BIRNBAUM & GODKIN, LLP
By: David S. Godkin, Esq.
　　Darleen F. Cantelo, Esq.
280 Summer Street
Boston, Massachusetts  02210
- and -
PUBLIC CITIZEN LITIGATION GROUP
By: Michael T. Kirkpatrick, Esq.
1600 20th Street, N.W.
Washington, D.C.  20009
On behalf of John D. Cerqueira

FITZHUGH, PARKER & ALVARO LLP
By: Michael A. Fitzhugh, Esq.
155 Federal Street - Suite 1700
Boston, Massachusetts  02110-1727
- and -
AMERICAN AIRLINES
By: Alec Bramlett, Senior Attorney
MD 5675 - P.O. Box 61916
Dallas/Ft. Worth Airport, Texas  75261-9616
On behalf of American Airlines

ALSO PRESENT: Melissa M. Wangenheim, Paralegal

One Courthouse Way
Boston, Massachusetts
January 10, 2007

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 4

Page 38

1   gentleman.

2           THE CLERK:  Push this back?

3           THE COURT:  Yes.  Thank you.

4           Thank you for letting us know.

5           Please continue, Mr. Fitzhugh.

6   BY MR. FITZHUGH:

7   Q.  Please continue with what happened thereafter, Ms.

8   Walling.

9   A.   Mr. Cerqueira approached me, I kind of saw him

10  coming down in this area, and asked if -- he came up to

11  the counter and he said, "I need to have my seat

12  changed."

13  Q.  And what did you say?

14  A.   And I replied, "I'm sorry, I can't do that.  You'll

15  have to wait for the agent.  The agent should be here

16  around six o'clock."  At that time it was around 5:15.

17  Q.  And how did he respond?

18  A.   He was very cold; he was very -- I wouldn't say

19  angry, but he was hostile to me.  And he stayed in front

20  of me and said again, "I need to have my seat changed."

21  And I again looked at him -- because I was really trying

22  to get my computer work done.  I again looked at him and

23  said, again, "I'm really sorry, but what would be your

24  problem?"  And he said, "I want" -- "I'd like to get

25  a" -- or "I want to get a window seat."  He didn't say

8befca73-0de0-4f1b-930f-4d1e4c317a97

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 4

1  "like," he said, "I want to get a window seat."  And I
2  said, "I just" -- "I don't know what to tell you except
3  I can't do that.  I don't know how to do that.  But when
4  the agent comes, I'm sure they'll be able to help you."
5      He was still very hostile; he still stared at me;
6  and he continued to stay in front of that podium.  I
7  went back to my computer work, or tried to, and then he
8  leaned into the counter and said, "I want my seat
9  changed."  At that time I felt uncomfortable and I said,
10 "I really can't help you.  Would you take a seat over in
11 this area."  And as I said, it was a large area.  "Would
12 you take a seat over in this area, and as soon as the
13 agent comes, they'll be able to help you with your
14 selection."
15     And he was hesitant, and he stood there staring at
16 me.  And I said, "You need to take a seat."  He moved
17 from the counter, from leaning into the counter at me,
18 to the seat directly beside me at the computer.
19 Probably I was standing here, his seat was probably
20 three feet from me, if that.  Like right from here to
21 here.
22     He was sitting at that seat, and he just glared at
23 me and stared at me.  And every time that I turned
24 around to retrieve paperwork from the printer, which was
25 in back of me, he was staring at me in a very hostile

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 4

Page 40

1    way.  And I was uncomfortable.

2    Q.    And at some point did you board the flight?

3    A.    Yes.  At about six o'clock, at the usual sign-in --

4    so I'd been there for, you know, some time -- and Lois

5    Sargent and Amy came down.  I was not familiar with

6    them, but we introduced ourselves, which is the normal

7    way to begin, and I said, "I'm going on the aircraft

8    now.  I'm going to go down on the airplane," and they

9    followed me down.  And as the jet bridge door was

10   closing I turned to them and said, "There's a

11   gentleman" -- "there's a passenger," I said -- actually,

12   I said, "There's a passenger out there that has made me

13   very uneasy.  I'm very uncomfortable."  I said, "It's

14   not a good way to start your day."

15       So I continued down the jet bridge and went directly

16   to the back of the airplane, which was --

17   Q.    Excuse me.

18       MR. FITZHUGH:  I think at this point I'd leave

19   this here, your Honor, if it's all right.  I think the

20   jurors can all see it now.

21       THE COURT:  As you wish.

22       MR. FITZHUGH:  Thank you, sir.

23   BY MR. FITZHUGH:

24   Q.    Can you see that, Ms. Walling?

25   A.    Yes.

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial – Day 4

Page 41

1    Q.    Okay.  Continue, and announce to the jury, when you

2    got on the aircraft, were you -- what happened

3    thereafter?

4    A.    I got on the aircraft and walked to the back.  The

5    other two flight attendants stayed in the forward area,

6    which is their work area, and I moved to the back and

7    started stowing my suitcase and my belongings in this

8    area.

9        I checked -- I did the usual preflight:  I checked

10   the emergency equipment; at that time I checked both

11   lavatories; I checked the hull gate; the galley area and

12   bulk door areas; and the surrounding, my general

13   position of checking.

14       So I was in back.  The air -- at that time.  It was

15   still early.  They don't -- generally speaking, the

16   passengers are not boarded on a Super 80 aircraft until,

17   like, maybe 30 to 40 minutes before the flight.  So this

18   is still early.  It was six o'clock.

19       So I was in the back.  This part of coach was dark.

20   The pilots had not come on board yet, so I was in the

21   back alone.  Where am I?  I was in the back alone, and

22   the cabin area is dark.  And I'm checking to make sure

23   the galley carts -- the galley carts are secured and

24   they have the lock seals, and everything is in working

25   order.  And then I started to set up the galley for

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 4

Page 42

1    the -- for my work.

2           MR. GODKIN:  Your Honor, forgive me.  Could we

3    just ask for more Q & A here, please, as opposed to --

4           MR. FITZHUGH:  I'm trying to move it along.

5           THE COURT:  You can, but not at the end of the

6    testimony.

7           MR. GODKIN:  I meant going forward, your Honor.

8    BY MR. FITZHUGH:

9    Q.   Ms. Walling, what happened thereafter?  Let's try to

10   go through a sequence of events and distill it to the

11   significant events that may have been unusual that day

12   that occurred after you were in the back of the aircraft

13   as you've described.

14   A.   Well, as I said, I was in the back of the aircraft.

15   I had started all my work, preparation.  And I was

16   facing the aircraft.  Facing that way.  And I heard a

17   little -- I heard a noise, a conversation.  And I peered

18   out and looked down to see that the crew had arrived.

19   They were introducing themselves and putting away their

20   bags.  And it was Captain Ehlers and First Officer Ball.

21          So I gauged at that time that I would still have

22   about ten minutes before boarding, so I went back to my

23   duties of setting up the carts and the inserts and all

24   of that.

25          Then shortly thereafter I heard an overhead bin

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 4

Page 43

1    close.  I peered out from the galley and looked down to
2    see that first class had begun boarding.  And there was
3    probably one or two passengers at that time.  So again,
4    I thought, Well, I'm right on schedule, and I turned
5    back to finish my work.  I turned to face the outside,
6    you know, to face that way, and I heard the lavatory
7    door slam.
8    Q.    Which lavatory?
9    A.    The aft right lavatory.  Right there (indicating).
10   Q.    Okay.
11   A.    I heard the lavatory door slam.  And my first
12   thought was, Well, cabin service had forgotten paper
13   towels or something; they were, you know, restocking the
14   lavatory.  So -- but it was unusual because they didn't
15   speak to me.  They usually say, "Good morning" or, "Hi,
16   Sally," or something like that.  So I thought, Well,
17   that's kind of curious.
18        So then the -- I kind of was listening for the door
19   to open and someone to come out, and no one did.  And
20   mind you, this whole airplane here in the back was dark,
21   and first class was still in the initial process of
22   boarding.
23   Q.    At some point did someone exit the lavatory?
24   A.    Yes, after about five minutes later.  I became very
25   nervous, and I went over in this area, in between the

CERQUEIRA v. AMERICAN AIRLINES
Jury Trial - Day 4

Page 44

1    rows of seats, and I stood there and I faced forward
2    because I was determined to find out who was in the
3    lavatory.  I was very uneasy.  And it was about five
4    minutes, because first class was still boarding.  And I
5    stood there and faced forward, and Mr. Cerqueira came
6    out and walked past me and got in his seat at the window
7    exit.
8    Q.   Did you know his name or identity at that time?
9    A.   No.  No.
10   Q.   What happened then?
11   A.   Well --
12   Q.   If you would move forward through the boarding
13   process, focusing on significant events.
14   A.   Okay.  Well, then the boarding -- and I stood there,
15   and I was a little upset.  A little bit.  And then I
16   continued to watch him.  And then first class finished
17   boarding, and then the passengers started coming back
18   down through this area.
19       And actually, I was standing there, greeting people.
20   And I kind of secured my galley area and was standing in
21   this back area.  A woman about 30, 35, with two small
22   children came back and said, "I feel very uncomfortable.
23   There's some people up in the window exit row that have
24   made me feel uncomfortable.  They have said certain
25   things, and I'm a little nervous because I have my two